# NONCONFIDENTIAL VERSION

No. 2023-1367

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### INGENICO INC.,
*Plaintiff / Counterclaim Defendant-Appellee*,

### INGENICO CORP., INGENICO GROUP S.A.,
*Counterclaim Defendants-Appellees*
**v.**

### IOENGINE, LLC,
*Defendant / Counter-Claimant-Appellant.*

Appeal from the United States District Court for the District of Delaware,
No. 1:18-cv-00826-WCB, Judge William C. Bryson

## APPELLANT IOENGINE, LLC'S NONCONFIDENTIAL OPENING BRIEF

Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797

Michael H. Joshi
DECHERT LLP
3000 El Camino Real
Five Palo Alto Square, Suite 650
Palo Alto, CA 94306

Derek J. Brader
Michael A. Fisher
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

*Counsel for Appellant
IOENGINE, LLC*

# LANGUAGE OF THE PATENT CLAIMS AT ISSUE

Under FCR 32(a)(3), the following is the language of a patent claim at issue in each of these appeals.

Claims 1-3 of U.S. Patent No. 9,059,969 ("the '969 Patent"), Appx169:

> 1. A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:
>
> >   (a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;
> >
> >   (b) a processor; and
> >
> >   (c) a memory having executable program code stored thereon, including:
> >
> > >   (1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and
> > >
> > >   (2) fourth program code which is configured to be executed by the portable device processor in

response to a communication received by the portable device resulting from user interaction with the interactive user interface;

wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

2. The portable device according to claim 1, wherein the fourth program code which, when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node.

3. The portable device according to claim 2, wherein the communication caused to be transmitted to the communication network node facilitates verification of the portable device.

Claim 55 of U.S. Patent No. 9,774,703 ("the '703 Patent"), Appx135:

55. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

56. The method according to claim 55, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate verification of the portable device.

# CERTIFICATE OF INTEREST

Under Federal Circuit Rule 47.4, counsel for the Appellant IOENGINE, LLC certifies the following:

| | |
|---|---|
| Under FCR 47.4(a)(1), the full name of every entity represented in this case by Appellant's counsel is: | IOENGINE, LLC |
| Under FCR 47.4(a)(2), the names of every real party in interest (if the real party named in the caption is not the real party in interest) represented by me are: | None. |
| Under FCR 47.4(a)(3), all parent corporations and any publicly held companies that own 10 percent or more of the stock of the entities represented by me in this case are: | None. |
| Under FCR 47.4(a)(4), the names of all law firms, partners, and associates that appeared for the entity now represented by me in the lower tribunal or are expected to appear in this court, other than those who have already entered an appearance in this Court, are: | Eve H. Ormerod, Smith, Katzenstein, & Jenkins LLP; Neal C. Belgam, Smith, Katzenstein, & Jenkins LLP; Judah Bellin, Dechert LLP; Luke M. Reilly, Dechert LLP. |
| Under FCR 47.4(a)(5), other than the originating case numbers, the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: | *IOENGINE, LLC v. Ingenico, Inc.*, No. 2021-1227 (Fed. Cir.) (lead case, consolidated with Nos. 2021-1331, 2021-1332, 2021-1375, 2021-1376); *Ingenico, Inc. v. IOENGINE, LLC*, No. IPR2019-00879 (PTAB); *Ingenico, Inc. v. IOENGINE, LLC*, No. IPR2019-00929 (PTAB). |
| Under FCR 47.4(a)(6), information regarding organizational victims in criminal cases and debtors and trustees in bankruptcy cases: | Not applicable. |

Date: August 14, 2023

 /s/ *Noah M. Leibowitz*
Noah M. Leibowitz
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797

*Counsel for Appellant IOENGINE, LLC*

# TABLE OF CONTENTS

LANGUAGE OF THE PATENT CLAIMS AT ISSUE ......................................... ii

CERTIFICATE OF INTEREST ..............................................................v

TABLE OF CONTENTS...................................................................... vii

TABLE OF AUTHORITIES ..................................................................x

STATEMENT OF RELATED CASES .................................................1

INTRODUCTION .............................................................................3

JURISDICTIONAL STATEMENT ......................................................5

STATEMENT OF THE ISSUES...........................................................6

I.    STATEMENT OF THE CASE ...................................................7

    A.    The Patents-at-Issue ..........................................................8

    B.    Mr. McNulty's Conception and Diligent Reduction to Practice..........8

    C.    The DiskOnKey, Firmware Upgrade Application, and SDK ............11

II.    SUMMARY OF THE ARGUMENT .........................................14

III.    STANDARDS OF REVIEW....................................................15

IV.    ARGUMENT........................................................................16

    A.    The Invalidity Verdict Was Not Supported by Substantial
        Evidence ..........................................................................16

        1.    The Firmware Upgrader Was Not "On Sale" Under
            § 102(b) ....................................................................16

            a.    The District Court Improperly Rewrote and
                Misinterpreted Evidence Not Discussed at Trial...........17

            b.    There Was No Sale or Offer for Sale of the
                Firmware Upgrader......................................................26

            c.    The SDK Does Not Support That the Firmware
                Upgrader Was "On Sale"..............................................29

        2.    The Firmware Upgrader Was Not "In Public Use" Under
            § 102(b) ....................................................................32

a.     There Is No Direct or Circumstantial Evidence of "Actual Use" of the Firmware Upgrader......................32

b.     The District Court Applied the Wrong Public Use Test...................................................................................38

c.     Evidence of "Potential Use," Whether Direct or Circumstantial, Is Not Sufficient...................................40

d.     The SDK Does Not Support That the Firmware Upgrader Was "In Public Use".......................................43

3.     The Firmware Upgrader Is Not § 102(a) Art...........................44

a.     The Firmware Upgrader Was Not "Known or Used by Others".................................................................44

b.     The Firmware Upgrader Postdates Mr. McNulty's Invention......................................................................46

4.     Substantial Evidence Does Not Support Anticipation or Obviousness ..............................................................51

B.     The District Court erred in Its Jury Instructions ...............................52

1.     The Instructions on Conception and Diligence Incorrectly Flipped the Legal Burdens.......................................52

2.     The Instructions Failed to Correctly Reflect the Requirements for § 102...........................................54

a.     The "Public Use" Instructions Were Erroneous............54

b.     The "On Sale" Instructions Were Erroneous................60

3.     The District Court Failed to Instruct on the Presumption of Validity ..............................................................62

C.     Ingenico Should Have Been Estopped From Presenting the Firmware Upgrader .........................................................62

V.     Conclusion ..................................................................66

CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 11 indicates the dollar amounts paid for the services described.

# TABLE OF AUTHORITIES

## Cases

*Allergan, Inc. v. Barr Lab'ys, Inc.*,
  501 F. App'x 965 (Fed. Cir. 2013)........................................................................19

*Allergan, Inc. v. Barr Lab'ys, Inc.*,
  808 F. Supp. 2d 715 (D. Del. 2011) ....................................................................19

*BASF Corp. v. SNF Holding Co.*,
  955 F.3d 958 (Fed. Cir. 2020) ...................................................................... passim

*Cange v. Philadelphia Parking Auth.*,
  451 F. App'x 210 (3d Cir. 2011)........................................................................15

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ..........................................................................62

*Civix-DDI, LLC v. Cellco P'ship*,
  387 F. Supp. 2d 869 (N.D. Ill. 2005)...................................................................39

*Dey, L.P. v. Sunovion Pharms., Inc.*,
  715 F.3d 1351 (Fed. Cir. 2013) ................................................................... passim

*E.I. du Pont De Nemours & Co. v. Unifrax I LLC*,
  921 F.3d 1060 (Fed. Cir. 2019) ..........................................................................49

*Egbert v. Lippmann*,
  104 U.S. 333 (1881) ...........................................................................................56

*Elec. Storage Battery Co. v. Shimadzu*,
  307 U.S. 5 (1939) ...............................................................................................57

*Ex Parte Bokhari*,
  No. 09/902,929, 2010 WL 4740064 (B.P.A.I. Nov. 19, 2010)...........................45

*Gavrieli Brands LLC v. Soto Massini (USA)*,
  No. 18-462, 2020 WL 1443215 (D. Del. Mar. 24, 2020) ...................................30

*Gillman v. Stern*,
  114 F.2d 28 (2d. Cir. 1940) ...............................................................................57

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
  254 F.3d 1041 (Fed. Cir. 2001) ..........................................................................28

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*,
  62 F.3d 1512 (Fed. Cir. 1995) ............................................................................54

*Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*,
No. 17-1086, 2018 WL 5669168 (D. Del. Nov. 1, 2018) ....................................30

*Int'l Bus. Machines Corp. v. Booking Holdings Inc.*,
775 F. App'x 674 (Fed. Cir. 2019).....................................................................32

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*,
271 F. Supp. 3d 667 (D. Del. 2017) ........................................................ 32, 36, 38

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
946 F.2d 821 (Fed. Cir. 1991) ................................................................ 28, 29, 36

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
424 F.3d 1374 (Fed. Cir. 2005) ..........................................................................38

*J.A. LaPorte, Inc. v. Norfolk Dredging Co.*,
787 F.2d 1577 (Fed.Cir.1986) ............................................................................39

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
292 F.3d 728 (Fed. Cir. 2002) ............................................................................15

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) ................................................................... 36, 50

*L-3 Commc'ns Corp. v. Sony Corp.*,
No. 10-cv-734-RGA, 2014 WL 4674815 (D. Del. Sept. 12, 2014).....................19

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) .................................................................................15

*Mahurkar v. C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996) ..................................................................... 47, 48

*Medicines Co. v. Hospira, Inc.*,
827 F.3d 1363 (Fed. Cir. 2016) ................................................................... 27, 29

*Merck & Cie v. Watson Labs., Inc.*,
822 F.3d 1347 (Fed. Cir. 2016) ..........................................................................28

*Metallizing Eng'g Co. v. Kenyon Bearing & Auto Parts Co.*,
153 F.2d 516 (2d Cir. 1946) ......................................................................... 55, 57

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) .............................................................................................62

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002) ................................................................... passim

*MLMC, Ltd. v. Airtouch Commc'ns, Inc.*,
215 F. Supp. 2d 464 (D. Del. 2002) ...................................................................15

*Netscape Commc'ns Corp. v. Konrad*,
    295 F.3d 1315 (Fed. Cir. 2002) ...........................................................................40

*Ni-Q, LLC v. Prolacta Bioscience, Inc.*,
    407 F. Supp. 3d 1153 (D. Or. 2019) ...................................................................26

*Nw. Univ. v. Universal Robots A/S*,
    No. 21-149, 2022 WL 903892 (D. Del. Mar. 28, 2022) ....................................30

*Ohio Willow Wood Co. v. Alps South*,
    735 F.3d 1333 (Fed. Cir. 2013) ...........................................................................49

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998) ...............................................................................................29

*Plumtree Software, Inc. v. Datamize, LLC*,
    473 F.3d 1152 (Fed. Cir. 2006) ...........................................................................27

*Polara Eng'g Inc v. Campbell Co.*,
    894 F.3d 1339 (Fed. Cir. 2018) ...........................................................................37

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    585 F. Supp. 2d 568 (D. Del. 2008) ....................................................................47

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
    215 F.3d 1246 (Fed. Cir. 2000) ...........................................................................28

*Smith v. Garlock Equip. Co.*,
    658 F. App'x 1017 (Fed. Cir. 2016) ............................................................ 27, 28

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ...........................................................................30

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019) ........................................................... 15, 36, 50

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004) ................................................................... 16, 52

*Taylor v. Kentucky*,
    436 U.S. 478 (1978) .............................................................................................62

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) ...........................................................................47

*Tomasko v. Ira H. Weinstock, P.C.*,
    357 F. App'x. 472 (3d Cir. 2009) ........................................................................19

*TQP Dev. LLC v. Newegg, Inc.*,
    677 F. App'x 683 (Fed. Cir. 2017) ......................................................................55

*TQP Dev., LLC v. 1-800-Flowers.com, Inc.*,
  120 F. Supp. 3d 600 (E.D. Tex. 2015) ..................................................55

*TQP Dev., LLC v. Intuit Inc.*,
  No. 2:12-CV-180-WCB, 2014 WL 2809841 (E.D. Tex. June 20, 2014) ...........55

*TransWeb, LLC v. 3M Innovative Props. Co.*,
  812 F.3d 1295 (Fed. Cir. 2016) ..........................................................49

*UCB, Inc. v. Watson Labs. Inc.*,
  927 F.3d 1272 (Fed. Cir. 2019) ..........................................................32

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983) ..........................................................57

*Wasica Fin. v. Schrader Int'l*,
  432 F. Supp. 3d 448 (D. Del. 2020) ....................................................63

*Wasica Fin. v. Schrader Int'l*,
  No. 2020-2124, 2020 WL 8374870 (Fed. Cir. Sept. 24, 2020) .........................63

*Woodland Tr. v. Flowertree Nursery, Inc.*,
  148 F.3d 1368 (Fed. Cir. 1998) .................................................... 54, 56

*Zenith Elecs. Corp. v. PDI Commc'n Sys.*,
  522 F.3d 1348 (Fed. Cir. 2008) .................................................... 39, 40

**Statutes**

28 U.S.C. § 1295(a)(1) ..........................................................................5

28 U.S.C. § 1331 ..................................................................................5

28 U.S.C. § 1338(a) ..............................................................................5

28 U.S.C. § 2201 ..................................................................................5

35 U.S.C. § 102 .......................................................................... passim

35 U.S.C. § 102(a) ...................................................................... passim

35 U.S.C. § 102(b) ...................................................................... passim

35 U.S.C. § 273 ..................................................................................58

35 U.S.C. § 315(e)(2) .................................................................... 15, 62

**Other Authorities**

157 Cong. Rec. E1219 (June 22, 2011) .................................................................58

157 Cong. Rec. S1376 (Mar. 8, 2001) ..................................................................66

H. REP. No. 112-98 (2011) ...................................................................................65

**Rules**

Fed. R. Civ. P. 50(a)...................................................................................... 7, 25, 48

Fed. R. Evid. 701 ...................................................................................................36

**Treatises**

21B Fed. Prac. & Proc. Evid. § 5122 (2d ed.) ........................................................48

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), IOENGINE states that no appeal in or from the same civil action was previously before this or any other appellate court.

Under FCR 47.5(b), other than the originating case number, the following cases are known to counsel to be pending in this or any other court or agency that may directly affect or be directly affected by this court's decision in the pending appeal because they also involve U.S. Patent No. 9,059,969 ("the '969 Patent") and U.S. Patent No. 9,774,703 ("the '703 Patent") (collectively, the "Patents-at-Issue"):

- *IOENGINE, LLC v. PayPal Holdings, Inc.*, Civ. No. 1:18-452 (D. Del.);

- *IOENGINE, LLC v. Ingenico, Inc.*, No. 2021-1227 (Fed. Cir.) (lead case, consolidated with Nos. 2021-1331, 2021-1332, 2021-1375, 2021-1376).

- *Ingenico, Inc. v. IOENGINE, LLC*, No. IPR2019-00879 (PTAB).

- *Ingenico, Inc. v. IOENGINE, LLC*, No. IPR2019-00929 (PTAB).

Under FCR 47.5(b)(2), the following parties, law firms, partners, and associates, other than those who have entered an appearance in this case, have appeared in those cases:

- PayPal Holdings, Inc.;

- Jared Bobrow, Alyssa M. Caridis, Jacob Heath, Travis Jensen, Robert Manhas, Tyler Miller, Parth Sagdeo, Robert L. Uriarte, Orrick, Herrington & Sutcliffe LLP;

- Jack B. Blumenfeld, Brian P. Egan, Morris, Nichols, Arsht & Tunnell LLP;

- Eve H. Ormerod, Neal C. Belgam, Smith, Katzenstein, & Jenkins LLP;

- Robert W. Ashbrook Jr., Judah Bellin, Jacob Ryan Porter, Luke M. Reilly, Dechert LLP;

- Christine Dealy Haynes, Richards, Layton & Finger;

- Robert M. Asher, Lawrence M. Green, Joel R. Leeman, Timothy Michael Murphy, Lisa M. Tittemore, Sunstein LLP; and

- Beth Ann Swadley, Young, Conaway, Stargatt & Taylor LLP

## **INTRODUCTION**

The invalidity case at trial was premised on a specific, downloadable firmware upgrade application for use in combination with DiskOnKey devices. Multiple witnesses testified that DiskOnKey devices were "blank" when sold, and the record uniformly reflected that the firmware upgrader was made available only by separate download—not pre-installed on DiskOnKeys. The court below erred in holding that a single webpage referring in passing to what "already comes with" DiskOnKey technology meant that the downloadable firmware upgrader relied on by Ingenico was preloaded on DiskOnKey devices as sold, and therefore could sustain the jury's invalidity verdict. No witness testified about the "already comes with" language, it facially refers not to DiskOnKey devices, but to the umbrella "DiskOnKey Technology," and there was no evidence or argument even suggesting that any pre-installed firmware upgrade application, had one existed, met the claim limitations. This error permeates every aspect of the post-trial decisions below, which wrongly held that Ingenico met its burden to prove the prior art status of the allegedly invalidating firmware upgrader by clear and convincing evidence.

Further, from the very beginning of trial, the district court permitted Ingenico to confuse the jury with respect to fundamental issues of fact and law—even with respect to which party was the plaintiff and which bore the applicable burdens. This compounded the court's confusing and faulty jury instructions regarding "sale" and

"use" under 35 U.S.C. § 102, as well as the burden of proof on conception and reduction to practice, all of which led to the jury's defective invalidity finding in the first place.

## JURISDICTIONAL STATEMENT

IOENGINE, LLC appeals from the final judgment of the United States District Court for the District of Delaware in a patent infringement action. Appx1, Appx3, Appx55. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 2201. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Did the district court err by denying IOENGINE's motion for judgment as a matter of law of no invalidity and holding that sales of "blank" DiskOnKey devices can support a jury verdict that the particular firmware upgrade application relied on by Ingenico was "in public use or on sale in this country" under § 102(b) or "known or used by others in this country…before the invention" under § 102(a)?

2.     Did the district court err by denying IOENGINE's motion for a new trial based upon its erroneous jury instructions, including regarding proving the date of invention, "use" and "sale" under § 102, and the presumption of validity?

3.     Did the district court err by refusing to find that Ingenico's invalidity case at trial was a printed publication theory in disguise and thus subject to IPR estoppel?

## I.   STATEMENT OF THE CASE

This is an appeal from the judgment of the District of Delaware in a patent infringement action.  A five-day jury trial concerning Ingenico's infringement of two IOENGINE patents began on July 11, 2022.  After the close of Ingenico's invalidity case-in-chief, IOENGINE moved for judgment as a matter of law ("JMOL") of no invalidity under Fed. R. Civ. P. 50(a).  *See* Appx9939, 943:1-21; Appx9941, 945:1-6; Appx9946-9953, 950:10-957:18.  The district court deferred ruling on the motions and submitted the case to the jury, *e.g.*, Appx9952-9953, 956:11-957:18, after holding both informal and formal jury instruction conferences.  *See* Appx10204-10282, 1169:10-1247:18; Appx10344-10355, 1265:6-1276:6.

The jury returned a verdict finding, among other things, that '969 Patent Claim 3 and '703 Patent Claims 56, 90, 101 and 105 were infringed, but invalid as anticipated and obvious.   Appx8899-8908.  The court subsequently entered judgment, Appx1, and IOENGINE timely filed a renewed motion for JMOL of no invalidity under Rule 50(b) or, alternatively, for a new trial under Rule 59.  Ingenico did not renew any Rule 50(a) motions.  The court denied IOENGINE's motions, relying on an interpretation of the evidence that was not mentioned during trial.  IOENGINE filed this appeal.

This case stemmed from a prior action in which IOENGINE sued PayPal Holdings, Inc. ("PayPal"). The accused PayPal products were supplied by Ingenico

and subject to indemnification, leading Ingenico to file a declaratory judgment action. *See* Appx206-207 ¶¶ 5-9. PayPal and Ingenico filed twelve IPR petitions challenging IOENGINE's patents, of which three of Ingenico's were instituted. Following the IPRs, IOENGINE narrowed its case to claims that had been found not unpatentable. IOENGINE was not permitted to address the indemnification relationship at trial and was to be "treated as the plaintiff." *See* Appx8831-8832; Appx8836. Nevertheless, in its opening statement, Ingenico argued it sued IOENGINE because it believed the patents to be invalid, even though it had only raised invalidity as an affirmative defense. Appx9038, 130:15-21, *see also* Appx9040-9042, 132:25-134:5.

## A.    THE PATENTS-AT-ISSUE

Mr. McNulty is the sole inventor of the Patents-at-Issue, which claim priority through an unbroken chain of continuations to a March 23, 2004 application. The Patents-at-Issue describe a secure, portable storage and data-processing device that users can interact with via an interactive user interface presented on an access terminal (*i.e.*, a computing device, such as a cellphone or laptop), thereby causing a communication to a network. *See, e.g.*, Appx147; Apx188.

## B.    MR. MCNULTY'S CONCEPTION AND DILIGENT REDUCTION TO PRACTICE

Mr. McNulty testified at trial regarding his conception and diligence and was corroborated by numerous documents and witnesses. Mr. McNulty testified that he

attended the June 2001 PC Expo in New York with Mr. Thomas Rzonca and had his "light bulb moment" while visiting a trade show booth. Appx9055-9063, 147:22-155:11; *see* Appx16786 (ad confirming PC Expo dates). He told Mr. Rzonca about his idea "right then and there." Appx9061, 153:13-23. Mr. Rzonca corroborated Mr. McNulty's conception, explaining that Mr. McNulty "presented an idea to [him] about portable devices." Appx9280, 333:2-8; *see* Appx9277-9280, 330:21-333:8.

Shortly thereafter, Mr. McNulty wrote his idea down in a document titled "Portable devices rule" ("PDR," Appx16798-16799), which he contemporaneously showed to Mr. Rzonca and his attorney. Appx9063-9065, 155:12-157:6. Mr. Rzonca testified that he was "sure [he] saw a version of [PDR]" at the time because, as a "[h]uge Stanley Kubrick fan," PDR's reference to "(hello Hal)" was memorable. Appx9280-9287, 333:2-340:25.

Mr. McNulty explained that he included every aspect of his claimed invention in PDR. Appx9098-9121, 190:25-213:3. IOENGINE's expert, Dr. Aviel Rubin, Professor of computer science at Johns Hopkins University and Director of the Johns Hopkins Information Security Institute, confirmed this from the perspective of a POSITA. Appx10087-10097, 1052:24-1062:9. With respect to the portable device verification claims ('969 Claim 3 and '703 Claims 56 and 105) and portable device identifier claims ('969 Claim 10 and '703 Claims 90, 101, and 124), both Mr. McNulty and Dr. Rubin pointed to specific statements in PDR where the device

identifies itself and seeks permission to copy content. Appx9114-9114, 206:21-210:17; Appx10093, 1058:11-17; Appx10094-10095, 1059:2-1060:23 ("And one of skill in the art…would know that you wouldn't just give the content to anyone, you would verify."); Appx10096-10097, 1061:17-1062:9.

After PC Expo, Mr. McNulty set out to reduce his invention to practice. He testified that he worked with Dr. Lawrence Bernstein, a former Bell Laboratories scientist and Professor at Stevens Institute of Technology, on proof-of-concept prototypes from August 2001 to early 2003 and was in contact with him "[j]ust about every week." Appx9065-9070, 157:7-162:25. This was corroborated by metadata reflecting an April 2002 modification date for an application from one of those prototypes. Appx9067-9069, 159:14-161:14 (discussing Appx18161). Mr. McNulty testified that, while working with Dr. Bernstein, he identified and hired others to work on additional prototypes. Appx9069-9093, 161:24-185:14. He worked diligently on those prototypes through the filing of his patent application. *E.g.*, Appx9077-98, 169:24-170:5; Appx9082, 174:8-11.

Mr. McNulty's testimony was uncontroverted and corroborated by physical evidence, including over two dozen remaining prototypes[1] shown to the jury. Appx18000; Appx9078, 170:6-10. His testimony was also corroborated by

---

[1] Mr. McNulty originally created approximately 90 prototypes. Appx9077-9078, 169:24-170:5.

documents, including a software development agreement (Appx16485-16501), development documents (Appx16560-16562, Appx16795-16797, Appx16803, Appx16804-16805, Appx18151-18160), and surviving invoices showing hundreds of hours of work (Appx11397, Appx11398-11399, Appx16800-16801, Appx16802). Two Ingenico-proffered witnesses, Dan Harkabi and Gidon Elazar, further corroborated Mr. McNulty's diligence, including that he spent **[ amount ]**

**[ amount ]** on prototype development. Appx9700-9701, 704:22-705:8; Appx9702-9703, 706:13-707:7; Appx9719-9720, 723:17-724:11; *compare* Appx9087, 179:14-24 (Mr. McNulty testifying that he spent approximately **[ amount ]** in total, with **[ amount ]** to MDRM) *with* Appx9703, 707:2-7 (Mr. Harkabi recalled MDRM being paid approximately **[ amount ]** or **[ amount ]**). Ultimately, Mr. McNulty constructively reduced his invention to practice with his March 23, 2004 patent application. *See* Appx9093, 185:15-21; Appx135; Appx169.

### C. THE DISKONKEY, FIRMWARE UPGRADE APPLICATION, AND SDK

The DiskOnKey device was a blank USB storage device from M-Systems Flash Disk Pioneers Ltd. ("M-Systems") that provided "removable, secured data storage." *See* Appx10957. Every witness to testify at trial who had personal knowledge of DiskOnKeys confirmed that they were sold as *blank* devices. Mr. McNulty testified that he recommended M-Systems USB devices to Fuji because they were pure, blank media. *See* Appx9074-9075, 166:15-167:7; Appx9132, 224:1-

8.[2]  Further, Mr. Ash, who was in the Fuji computer media division from 1987 until early 2004, explained that "[t]owards the end…, we launched a line of blank USB drives" which were the M-Systems DiskOnKey.  *See* Appx9685-9688, 689:13-692:18; *see also* Appx9695, 699:2-12 (Mr. Klein, at Fuji from 1999 to 2004, also recalled a "blank USB storage device").  Mr. Harkabi, who developed the DiskOnKey, testified that "[i]t was sold as a plain storage, personal storage …." *See* Appx9697-9698, 701:22-702:3.

Ingenico, however, made clear that it was not relying on blank DiskOnKeys to show invalidity.  *See, e.g.,* Appx10436-10437, 1357:24-1358:1 ("DiskOnKey was introduced…in November of 2000.  [R]emember, that alone is not enough."); Appx10439-10440, 1360:24-1361:2; Appx10442, 1363:7-10; *see also* Appx10377-10378, 1298:22-1299:14 (jury instructions describing prior art as the "DiskOnKey product, ***along with*** the Firmware Upgrade software and the [SDK].").[3]

Instead, the focus of Ingenico's invalidity case was a firmware upgrade application that Ingenico argued could be downloaded and used to update the firmware of DiskOnKey devices (the "Firmware Upgrader").  *See* Appx9776-9777,

---

[2] Mr. McNulty explained that, while he now knows that the M-Systems devices were called "DiskOnKeys," he was not aware of that brand name at the time.  *See* Appx9140-9141, 232:25-233:20.

[3] Emphases added unless otherwise noted.

780:25-781:14; Appx9789, 793:17-20 (calling the Firmware Upgrader "kind of the star of the show.").

Importantly, Ingenico's documentary evidence uniformly reflected that the Firmware Upgrader was available only by separately downloading it from the DiskOnKey website. *See, e.g.*, Appx11174 ("DiskOnKey Upgrade can be downloaded from our web site….The DiskOnKey Upgrade Readme file may also be viewed…through the Download menu…."); Appx11177 ("DOWNLOADING THE APPLICATION…Simply download the latest version of the DiskOnKey Upgrade from http://www.diskonkey.com/ and save it to your hard disk."); Appx11305 ("Download Now" button for "DiskOnKey Upgrade"); Appx11041 ("by visiting www.diskonkey.com"). The testimony and argument presented by Ingenico was consistent. *See, e.g.*, Appx9793-9794, 797:25-798:9 ("Q: [D]o you see where it says the DiskOnKey upgrade can be downloaded from their website? A: Yes….That indicates it's a helpful thing to let people know where they can get the software. So it's indicating that you can click on that or go to that particular website and find the software to download.").[4] There was no testimony suggesting that the Firmware

---

[4] *See also* Appx9738, 742:18-22; Appx9792-9793, 796:14-797:8; Appx9794-9796, 798:18-800:7; Appx9936, 940:6-9; Appx10439, 1360:10-13; Appx10440, 1361:6-13.

Upgrader came preinstalled on DiskOnKey devices, or that it was referenced on DiskOnKey packaging.

Ingenico also presented evidence of a software development kit ("SDK") on which the Firmware Upgrader was supposedly based. But Ingenico presented no evidence or argument that the SDK satisfied particular claim limitations. Instead, Ingenico mapped the Firmware Upgrader to the claims and pointed to the SDK to explain how the Firmware Upgrader worked. When addressing obviousness, Ingenico's expert simply testified that he considered the SDK only if it "is not considered part of [the DiskOnKey] or [firmware upgrade] application…." *See* Appx9856, 860:4-9. Ultimately, it was the Firmware Upgrader, not the SDK, that Ingenico argued was invalidating.

Additional pertinent facts are presented in applicable sections below.

## II.   SUMMARY OF THE ARGUMENT

1.     The jury's invalidity verdict is not supported by substantial evidence and IOENGINE is entitled to JMOL of no invalidity. Ingenico's invalidity case at trial relied on the Firmware Upgrader, a separately downloadable application for upgrading DiskOnKey device firmware. The Firmware Upgrader was not "on sale" or "in public use" under § 102(b), nor "known or used by others…before the invention" under § 102(a).

2. The jury was led to find invalidity by numerous errors in the instructions impacting all of Ingenico's prior art theories. As such, absent JMOL for IOENGINE, IOENGINE is alternatively entitled to a new trial with corrected instructions.

3. Ingenico's invalidity proof at trial was a printed publication theory in disguise based on grounds it reasonably could have raised in IPR. As such, it should have been barred under 35 U.S.C. § 315(e)(2).

## III.  STANDARDS OF REVIEW

This Court reviews a denial of JMOL under regional circuit law. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019). "The Third Circuit 'exercise[s] plenary review of an order granting or denying a motion for [JMOL] and appl[ies] the same standard as the district court.'" *Id.* (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). "[T]he question is not whether there is literally no evidence [to support the verdict] …but whether there is evidence upon which the jury could properly" have reached its verdict. *Cange v. Philadelphia Parking Auth.*, 451 F. App'x 210, 212 (3d Cir. 2011). "[T]he court must also take into account the required quantum of proof; for a patent invalidity verdict, the quantum of proof is clear and convincing evidence…." *MLMC, Ltd. v. Airtouch Commc'ns, Inc.,* 215 F. Supp. 2d 464, 469-70 (D. Del. 2002) (citing *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 736 (Fed. Cir. 2002)).

"The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law and is reviewed de novo." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004).  A jury verdict will be set aside if the instructions were "legally erroneous" and "the errors had prejudicial effect." *Id.*

## IV.  ARGUMENT

### A.  THE INVALIDITY VERDICT WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Ingenico's invalidity case asserted the Firmware Upgrader under §§ 102(a) and (b).  But on the key point of whether the Firmware Upgrader was used or sold before the applicable critical dates, Ingenico proffered only speculation and unreasonable inference.  Ultimately, the evidentiary record does not support finding invalidity by clear and convincing evidence.

#### 1.  The Firmware Upgrader Was Not "On Sale" Under § 102(b)

To be "on sale," the Firmware Upgrader must have been "the subject of a commercial offer for sale," *i.e.*, an offer that could be made "into a binding contract by simple acceptance (assuming consideration)." *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 969 (Fed. Cir. 2020).

The district court found the Firmware Upgrader was "on sale" only by concluding that it was pre-installed on DiskOnKey devices and thereby "sold."  But the court misinterpreted two sentences in a single webpage that it re-wrote to suit its

purpose. The evidence at trial did not support such a finding, much less by clear and convincing evidence.

> a. ***The District Court Improperly Rewrote and Misinterpreted Evidence Not Discussed at Trial***

At trial, there was no assertion that DiskOnKey devices ***required*** the Firmware Upgrader to operate; instead the Firmware Upgrader was at best tangential to the normal use of the DiskOnKey as a flash storage device. Thus, the record uniformly reflected that the Firmware Upgrader was made available *only via separate download from the DiskOnKey website*. *See supra* § I.C; Appx11174; Appx11177; Appx11305; Appx11041; Appx9793-9794, 797:25-798:9. Although the record included evidence of DiskOnKey ***device*** sales, there was no testimony that the Firmware Upgrader was included with those devices. To the contrary, all relevant witnesses testified that DiskOnKeys were "blank" when sold. *See id*; Appx9074-9075, 166:15-167:7; Appx9132, 224:1-8; Appx9685-9688, 689:13-692:18; Appx9697-9698, 701:22-702:3; *see also* Appx9695, 699:2-12.

Nevertheless, the district court concluded that "the firmware upgrade application was included on physical DiskOnKey devices that were sold to customers…." Appx7. It reached this conclusion only by seizing on two sentences from an archived DiskOnKey webpage: "[The] DiskOnKey already comes with several applications that demonstrate [the] terrific new potential [of the DiskOnKey]. Users can secure their devices and files using the KeySafe application,

or upgrade their firmware using the Upgrade program." *id.* (citing Appx10931 (bracketed alterations by district court)). Crucially, these sentences *do not appear in the trial transcript* and no witness testified about their meaning. The phrase the court found crucial ("already comes with") was also absent and Ingenico made no suggestion that the Firmware Upgrader was pre-installed on DiskOnKeys when it presented the exhibit. *See* Appx9778-9779, 782:3-783:21.[5]

Ultimately, there was no testimony that the Firmware Upgrader was pre-installed on physical DiskOnKeys when sold. Notably, immediately after the district court heard Ingenico's presentation of the evidence, it asked whether "the ability to download" was sufficient for something to be "on sale." *See* Appx9948, 952:2-4 ("But the ability to download. But my question really is, is that enough?"). Had the evidence at trial reflected that the Firmware Upgrader was pre-installed on physical DiskOnKeys, the court would not have posed the 'separate download' question. The court nevertheless skirted this question with its later contrafactual finding. That the jury heard no mention of these sentences reflects that they cannot sustain a finding

_____

[5] The first time the "already comes with" language surfaced was in Ingenico's opposition to IOENGINE's post-trial motions. But the rest of Ingenico's opposition reflected that the evidence at trial was about a downloadable application, not something included on DiskOnKey devices. *See, e.g.*, Appx10589 ("users could **download the Upgrade application**."); Appx10604 ("no basis…to demonstrate that **the version of the Firmware Upgrade that was available for download** was meaningfully different than that…analyzed by Mr. Geier.").

18

of invalidity by clear and convincing evidence. *See, e.g.*, *L-3 Commc'ns Corp. v. Sony Corp.*, No. 10-cv-734-RGA, 2014 WL 4674815, at *5 n.10 (D. Del. Sept. 12, 2014) ("[I]t cannot be the case that a jury verdict can be sustained based on arguments and evidence that were never presented to the jury.") (citing *Tomasko v. Ira H. Weinstock, P.C.*, 357 F. App'x. 472, 479 (3d Cir. 2009)); *see also Allergan, Inc. v. Barr Lab'ys, Inc.*, 808 F. Supp. 2d 715, 735 (D. Del. 2011) (refusing to consider "a different theory of obviousness post-trial than was presented at trial" and collecting cases), *aff'd*, 501 F. App'x 965 (Fed. Cir. 2013).

Further, the district court's re-interpretation of these sentences is unsupported for several reasons. **First**, the district court ***rewrote the evidence*** to support its interpretation. The below comparison shows the actual sentence in the exhibit— which no witness testified about—and the court's rewrite:

| Appx10931 | District Court's Revisions |
|---|---|
| "DiskOnKey already comes with several applications that demonstrate this terrific new potential." | "**[The]** DiskOnKey already comes with several applications that demonstrate **[the]** terrific new potential **[of the DiskOnKey]**."[6] |

This is significant because the webpage facially is about the umbrella term "DiskOnKey Technology" as a whole—not DiskOnKey devices sold at retail. *See* Appx10931:



The described "technology" is not limited to the DiskOnKey device; instead, the exhibit explains that M-Systems also "provide[s] the platform required…[for] partners…to develop custom applications." *See* Appx10931. Although the sentence in question continues in that vein and refers simply to "DiskOnKey" and "this terrific

---

[6] The court's rewrite does not appear in Ingenico's briefing or in the post-trial hearing transcript and so was not an interpretation of the evidence argued by Ingenico ***even after trial***.

new potential" (*i.e.*, the potential of the technology generally), the district court—in its only quotation of the sentence—changed the wording to support its conclusion about what was installed on DiskOnKey *devices*. No witness presented the jury with the court's re-imagined version of this webpage or anything that interpreted it in this way.

**Second**, because the evidence adduced at trial uniformly related to the operations of a *downloadable* Firmware Upgrader (per Appx11177-11182), to the extent DiskOnKey devices "already [came] with" some firmware upgrade program, no evidence described how *that* upgrade program worked. All of Ingenico's evidence and analysis was about the separate, downloadable Firmware Upgrader, leaving, at best, a failure of proof on the operation of any 'pre-installed' upgrader.

Importantly, the potential for *different* firmware upgrade programs is not speculation. The district court's holding is particularly troubling because there was evidence at trial of multiple DiskOnKey firmware upgrade programs at different times. One of the witnesses who worked on the DiskOnKey was asked whether he was aware of a firmware upgrade application and explained: "Yes. Not as an application, but yes… – *even before there was an application*, all the USB drives could remotely be updated." Appx9696-9697, 700:24-701:5. If a firmware upgrade program were pre-installed on DiskOnKeys—which the evidence at trial did not show—the above statement indicates that it would have been a different firmware

upgrade capability, not the the Firmware Upgrader. Crucially, whereas the Firmware Upgrader is "download[ed]…to your hard disk" and run on a Windows Operating System, *see* Appx11177, in discussing "DiskOnKey Technology" the webpage explains that the DiskOnKey "processor runs applications straight from the device – ***not from the host computer***." *See* Appx10931. The asserted claims, in contrast, all require program code to be executed by the terminal (*e.g.*, computer) processor and so a program executed entirely by the DiskOnKey would not be invalidating. *See* Appx202-203, Claim 1, Appx164-167, Claims 55, 78, 93, 104. Additionally, to the extent a firmware upgrade program came preloaded on DiskOnKey devices, there is no indication it made use of any interactive user interface or was configured to operate in response to the claimed user interaction as the claims require, instead of, for example, running automatically without user input. In fact, Ingenico asserted that a firmware upgrade feature could be implemented without the claimed user interaction as a basis for non-infringement. *See* Appx1561 ("[N]owhere in this [firmware upgrade] flow is there an indication that a message is sent to the [Ingenico] device as a result of user interaction with the phone/tablet."). Thus, a single clause saying that DiskOnKey Technology "already comes with" a firmware upgrade program—with no evidence about the specific capabilities or operations of ***that*** program—cannot be clear and convincing evidence that the

downloadable Firmware Upgrader on which Ingenico relied was pre-installed on DiskOnKey devices when sold.

**Third**, the District Court relied on sales records, *see* Appx7-8, but they reflected only sales of blank DiskOnKey devices—***not*** sales of the Firmware Upgrader. The limited testimony on the sales records did not address the Firmware Upgrader at all. *See* Appx9723-9724, 727:8-728:13; Appx9727-9728, 731:6-732:7; Appx10176-10177, 1141:16-1142:25. In fact, when Ingenico's expert was asked about the records (on rebuttal), his testimony was ***not*** that the Firmware Upgrader was sold with DiskOnKey devices, but rather that he "believe[d]" that "there would be somebody out there…that…would be ***downloading*** the firmware." *See* Appx10177, 1142:15-25.

Moreover, questions on the sales records remained after trial, prompting the district court to ask: "Is there anything…that would tell me that the particular DiskOnKeys that were the subjects of all those sales, or at least some of them, are the DiskOnKey that is described in [the "already comes with" webpage]?" *See* Appx10695, 38:5-10. But Ingenico's counsel conceded that "[t]here's not going to be an explicit statement that this is the same." Appx10695, 38:13-23. Ingenico proceeded to argue that there was only one DiskOnKey product. *See* Appx10695-10696, 38:24-42:4. But this was demonstrably false as the evidence reflected numerous different DiskOnKeys, with no mention of any preloaded firmware update

software.  *See generally* DX-316, DX-317; *see also* DX-322.  Ingenico later argued that the DiskOnKey for Apple was "not a difference of what's inside" but "it can be used with the Apple [sic]."  Appx10696, 41:14-42:4.  But this further illustrates the issue with this *post-hoc* rationalization because the Firmware Upgrader "System Requirements" reflected compatibility *only* with Windows, not *any* Apple operating system.  *See* Appx11177.

**Fourth**, the district court's misinterpretation of the two sentences in Appx10931 is apparent because all the other evidence reflects that the Firmware Upgrader was separately available for download.  *See supra* § I.C.  In addition, although the Firmware Upgrader was allegedly released in July 2002, highly reputable evidence of M-Systems' business in the United States (a June 30, *2003* Securities and Exchange Commission form) provides *no* disclosure of the Firmware Upgrader or it being sold with DiskOnKey devices despite discussing *other* applications for the DiskOnKey.  *See* Appx10932-11036 (the "SEC Report"); Appx10953; Appx10957.

**Fifth**, underlying the district court's misinterpretation is that the DiskOnKey and the Firmware Upgrader constitute a single prior art reference, despite all evidence to the contrary.  Attempting to insulate its conclusion, the court held that IOENGINE failed to preserve its right to challenge them as separate references.  *See*

Appx24.[7]  Remarkably, the court's basis for this was IOENGINE's failure to object to a statement in the jury instructions that simply enumerated ***Ingenico's contentions***.  *See id.* ("referring to the DiskOnKey system: 'Ingenico also contends that the following *item is* prior art….'" (emphasis original)).  In essence, the court held that, by not objecting to inclusion of Ingenico's **contention**, IOENGINE **agreed** with its **substance** (that separately available offerings constituted a single item of prior art) and therefore cannot challenge it post-trial.  But a statement about what ***Ingenico contends*** was not a concession by IOENGINE about the substance of that contention—***disputed*** contentions is why there was a trial.[8]  Regardless, IOENGINE preserved its argument on this issue in its Rule 50(a) motion.  *See, e.g.* Appx10186-10187, 1151:23-1152:5 ("The DiskOnKey [that] was sold could have been a blank device, don't know what version it is, don't know that it could even run on the software they are combining with it in terms of creating something that would invalidate the claims.").

---

[7] This finding appears in the Court's discussion of obviousness and also involves the SDK, which is addressed below.

[8] The jury instructions also stated that "IOENGINE contends that Ingenico has infringed its rights…." Appx8869.  Surely Ingenico did not concede infringement by failing to object to that statement.

Ultimately, the district court's conclusion that the Firmware Upgrader was included on physical DiskOnKey devices when sold is unsupported and cannot sustain a jury verdict of invalidity by clear and convincing evidence.

b.    ***There Was No Sale or Offer for Sale of the Firmware Upgrader***

Setting aside the district court's unsupported conclusion regarding the two sentences in Appx10931, the evidence indicated only that some version of the Firmware Upgrader may have been ***separately*** available for download—for free and without consideration—on the M-Systems website.  *See, e.g.*, Appx11305 (archived website with link to "Download Now").  Because the court erroneously assumed the Firmware Upgrader was sold preloaded on DiskOnKey devices, it ignored the implications of the Firmware Upgrader being available only by separate download.  Notably, the court agreed with IOENGINE that the press releases relied on by Ingenico "were not offers for sale."  Appx10; *see also* Appx10556-10557 and accompanying notes.  But that means that there is no evidence of a sale or an offer for sale of ***the Firmware Upgrader***.

Even if a customer downloaded the Firmware Upgrader, the lack of consideration would preclude application of the on-sale bar.  *See Ni-Q, LLC v. Prolacta Bioscience, Inc.*, 407 F. Supp. 3d 1153, 1164–65 (D. Or. 2019) ("'Acceptance' of free product, absent further communication regarding contract terms, would not create a binding contract [and] is not enough to trigger the on-sale

bar."); *see also Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152 (Fed. Cir. 2006). Even if M-Systems made the Firmware Upgrader available to sell more DiskOnKey devices or if customers would benefit from having access to the Firmware Upgrader, neither would be sufficient to put the Firmware Upgrader "on sale." *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1373 (Fed. Cir. 2016) (*en banc*) ("[C]ommercial benefit—even to both parties in a transaction—is not enough to trigger the on-sale bar….").

Ingenico attempted to show an offer for sale with an archived press release that listed pricing. *See* Appx11041-11042. But those prices were for DiskOnKey devices of differing storage capacities, not the Firmware Upgrader. *See* Appx11041 (listing MSRPs for "the 8, 16, 32, 64, 128, 256, and 512 MB DiskOnKey"). That press release, like all other evidence, reflected that the upgrade functionality could be *separately* explored "by visiting www.diskonkey.com." *Id.* This evidence is insufficient. Providing price quotations for one product, even if intended for use with another, does not constitute an offer for sale of the two products collectively. *Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1027-28 (Fed. Cir. 2016) (no offer for sale because "no reference to the Twin-Man and tether being ***offered for sale collectively***" and no evidence that anyone "issued price quotations to specific

27

customers for the sale of the Twin-Man **with a tether**.")[9]; *see also* Appx10279, 1244:2-24 ("The Court: You can't say that X is on sale because…X minus 2 was sold.").

Further, as the district court correctly found, a "press release" is nothing more than an advertisement, which does not trigger § 102(b). *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1307 (Fed. Cir. 2002) (hereinafter "*3M*") ("[P]romotional activity not rising to the level of a contractual offer for sale cannot trigger the on-sale bar."); *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) ("[M]ere advertising and promoting of a product may be nothing more than an invitation for offers…."). Notably, the "press release" simply invited interested customers to seek out DiskOnKey **devices**—not the Firmware Upgrader—for purchase, and was indiscriminate and unsolicited. *See* Appx11041; *Merck & Cie v. Watson Labs., Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016).

In its post-trial briefing, Ingenico cited *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821 (Fed. Cir. 1991) to argue that giving something away for free implicates the on-sale bar. Notably, *Intel* is pre-*Pfaff* and was decided under the totality of the circumstances test, which *Pfaff* replaced with a stricter two-part test.

---

[9] *Smith* addressed an infringing offer for sale, but applied the same 'commercial offer' standard as here. *See* 658 F. App'x at 1027-28; *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254 (Fed. Cir. 2000) ("offer to sell" under § 271(a) and § 102(b) both "invoke the traditional contractual analysis").

*See Medicines*, 827 F.3d at 1372-73 (discussing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55 (1998)). But *Intel* is still persuasive here in that its remarkably similar facts were held insufficient to prove invalidity, even under the prior, more flexible test. In *Intel*, prior art samples were distributed to customers for purposes of obtaining commercial advantage, but this Court held that "[t]he extensive inferences [respondent] would draw…are not the clear and convincing proof required" to prove an actual offer for sale. *Intel*, 946 F.2d at 830. Similarly, the district court here relied on an internal e-mail encouraging employees to pass along information about the Firmware Upgrader to customers. *See* Appx15 (citing Appx11174-11176). *Intel* helps explain why this evidence is insufficient, contrasting evidence that prior art was "***actually*** sold or offered for sale" with evidence that merely proves "that such offers or sales ***may have been 'likely.'*** " *Intel,* 946 F.2d at 830. Ingenico's evidence at best suggests that invalidating activity ***may*** have been likely, which is not clear and convincing proof. *See id.*

      c.    ***The SDK Does Not Support That the Firmware Upgrader Was "On Sale"***

Ingenico did not argue that the SDK was invalidating on its own or filled in missing claim limitations; instead, Ingenico argued that certain functionality of the Firmware Upgrader (which it mapped against the claims) was implemented *using* the SDK. *See, e.g.*, Appx9804-9805, 808:16-809:22 (arguing that the Firmware Upgrader has an "Authenticating device" step); Appx9807, 811:5-12 (arguing that

the SDK evidences how the Firmware Upgrader performed that step); Appx9842, 846:4-21 (mapping the Firmware Upgrader's authentication step to a claim limitation).  Despite this, the district court turned IOENGINE's argument into a strawman, focusing on whether the SDK was sold or offered for sale.  *See* Appx8-11.  But even if the SDK were "on sale," that would not prove whether the separate Firmware Upgrader was "on sale."[10]  The court concluded that DiskOnKey devices were sold with SDK capabilities, *see* Appx10, but, at most, that allows for the development of future applications.  *See, e.g.*, Appx11115-11117.  That does not mean any applications were actually developed based on those capabilities, much less "on sale."

---

[10] The district court found that IOENGINE forfeited its argument about the SDK because it was raised only in footnotes.  But IOENGINE's arguments about the SDK do not raise an issue separate from the Firmware Upgrader.  This is nothing like the district court's cases, where entirely independent issues were raised in footnotes.  *See, e.g.*, *Nw. Univ. v. Universal Robots A/S*, No. 21-149, 2022 WL 903892, at *6 (D. Del. Mar. 28, 2022) ("independent basis to dismiss" in footnote only); *Gavrieli Brands LLC v. Soto Massini (USA),* No. 18-462, 2020 WL 1443215 (D. Del. Mar. 24, 2020) ("invalidity under §§ 102 and 103…cursorily raised in a footnote"); *Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.,* No. 17-1086, 2018 WL 5669168, at *13 n.12 (D. Del. Nov. 1, 2018) (contributory infringement addressed "in a few short lines found exclusively in a footnote"); *SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312, 1320 (Fed. Cir. 2006) (footnote contained "the only statement that even approaches a substantive argument on novelty").  In any event, IOENGINE's arguments regarding the SDK were not presented entirely in footnotes.  *See* Appx10540-10541 ("[T]here was no proof that the SDK was ever used outside of M-Systems…"), Appx10566.

In focusing on this tangential issue, the district court ignored the fundamental problem with the SDK: The functionality that Ingenico relied upon *did not exist in the SDK* at the time the Firmware Upgrader was supposedly available. Specifically, the court found that the Firmware Upgrader relied on PKI-based authentication described in the SDK documentation, as Ingenico argued at trial. *See* Appx9-10. However, the Firmware Upgrader was purportedly available starting with DiskOnKey version 2.01, *see* Appx11174, whereas the SDK's PKI-based authentication was not enabled until *later* versions. *See* Appx11206, Appx11220 ("ICrypto interface enables PKI based authentication" but was *not* supported by version 2.01); *see also* Appx10182-10184, 1147:12-1149:6 (Ingenico's expert agreed that version 2.01 did not have ICrypto). No evidence explains how the Firmware Upgrader could have been based on SDK features *that did not yet exist*. The only fact witness testimony regarding whether the Firmware Upgrader was created using the SDK did not help Ingenico. *See* Appx9734, 738:9-12 ("We don't have this knowledge anymore."). Ultimately, the Firmware Upgrader predated the allegedly corresponding SDK features and so must have been implemented another way. Thus, the SDK cannot support a conclusion that the Firmware Upgrader was "on sale."

## 2. The Firmware Upgrader Was Not "In Public Use" Under § 102(b)

Like its "on sale" analysis, the district court's "public use" holding relied on its mistaken conclusion that the Firmware Upgrader was pre-installed on DiskOnKey devices. *See* Appx12 ("The evidence of public use of the firmware upgrade application…included…that large numbers of sales were made…of DiskOnKey devices that already contained those features."). For all the reasons discussed above, the evidence does not support a conclusion by clear and convincing evidence that the Firmware Upgrader was installed on DiskOnKey devices when sold.

### a. There Is No Direct or Circumstantial Evidence of "Actual Use" of the Firmware Upgrader

"Public use" under § 102(b) requires evidence of "***actual use*** by someone at some point." *3M,* 303 F.3d at 1307 (Fed. Cir. 2002); *see also Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 681 (D. Del. 2017) [hereinafter "*IBM*"], *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed. Cir. 2019); *UCB, Inc. v. Watson Labs. Inc.,* 927 F.3d 1272, 1291 (Fed. Cir. 2019) (acknowledging *3M's* "actual use" holding and noting "the patient ***actually used*** the patches…").

As discussed above, Ingenico's invalidity case at trial depended on the specific functionality of the Firmware Upgrader ***when used with DiskOnKey***

*devices*. *See, e.g.*, 801:14-23 (discussing Appx11178 ("This button is enabled only if your DiskOnKey is connected.")). As such, there must be evidence of "actual use" of the Firmware Upgrader and the DiskOnKey device *together*. This is just like *3M*. The District Court distinguished *3M* because Ricoseal was "a two-part composition that needed to be mixed together before being used" with a signal transmission device and there was "no evidence 'that the mixture was applied to a signal transmission device.'" Appx12-13 (citing *3M*, 303 F.3d at 1298, 1307). But similarly, the downloadable Firmware Upgrader had to be saved to the hard disk of a computer with an active Internet connection and then run *with a DiskOnKey device inserted into the same computer*. *See, e.g.*, Appx11177-11178 at 1-2 ("This button is enabled only if your DiskOnKey is connected."). In addition, there must have been a connection to a server that contained *an actual firmware* "*update*." *See* Appx9795-9796, 799:16-800:14. So, the evidence here is even weaker than in *3M*; whereas samples in *3M* were sent to individuals at specific corporations, the only evidence here is that the Firmware Upgrader *was available* for download, not that anyone in this country (or anywhere) ever actually downloaded it and used it.

Importantly, the supposed purpose of the Firmware Upgrader was to upgrade DiskOnKey devices "with the most up-to-date firmware version." *See* Appx11305; *see also* Appx11177. As such, this case presents a unique set of circumstances in that the Firmware Upgrader is entirely unnecessary to the normal operation of

DiskOnKeys as data storage devices.  *See, e.g.*, Appx9725-9726 at 729:24-730:7.
Instead, it is an optional feature that only is applicable if a firmware update is made available.  And there was no evidence at trial that a firmware "update" for use with the Firmware Upgrader was even released during the relevant time.  Use of a DiskOnKey device does not necessitate or imply use of the Firmware Upgrader.

Indeed, Ingenico's evidence confirmed the lack of use.  A presentation last modified on March 22, 2003, *just two days* before Mr. McNulty's one-year bar date, stated:

> "When is DOK Upgrade Used?
> Normally **there is no need to use** DOK Upgrade….
> **We hope there will never be a need to use it**….

Appx11286-11287.  The expression of hope indicates that, at least as of March 22, 2003, the Firmware Upgrader had not actually been used.[11]  Instead, as the document explains, the Firmware Upgrader was "for extreme and rare cases where a critical bug is found in the DiskOnKey embedded firmware" in order to "prevent[] the high costs and embarrassment of DiskOnKey products recall."  Appx11283.  No testimony or other evidence suggested that these "extreme and rare cases" ever happened.

---

[11] No evidence was presented suggesting any use between March 22, 2003 and the critical date.

The district court dismissed this argument in a footnote, again based on its incorrect conclusion that the Firmware Upgrader "was incorporated in the DiskOnKey devices," discussed above, and that only "public accessibility" is required, discussed below. *See* Appx19 n.7.

Further, as discussed above, the SEC Report makes no mention of DiskOnKey firmware or any ability to upgrade it. *See supra* § IV.A.1.a. The SEC Report even suggested that when customers want to upgrade, M-Systems encouraged them to buy a new device. *See* Appx10953 ("[O]ur customers [can] easily upgrade from one of our flash disks to another…."). Oddly, Ingenico also argued below that "M-Systems hoped that customers would buy the latest DiskOnKey devices in lieu of simply upgrading the versions they already own." *See* Appx10589 n.7. But this reflects a *lack* of any reason to use the Firmware Upgrader.

Ultimately, there was no evidence of "actual use" of the Firmware Upgrader. The district court considered five pieces of evidence, but none come close to clear and convincing evidence of actual use. *See* Appx15-16. The first was supposed sales of DiskOnKey devices with the Firmware Upgrader "already loaded onto the device." As discussed above, this is counterfactual and sales of blank DiskOnKey devices do not suggest, imply, or require use of the Firmware Upgrader. The second, third, and fourth pieces of evidence reflect only the supposed *availability* of the downloadable Firmware Upgrader. At best, this is circumstantial evidence of

*potential* use, as discussed below. *See 3M*, 303 F.3d at 1307; *IBM*, 271 F. Supp. 3d at 681; *Intel,* 946 F.2d at 830. The fifth is nothing more than speculation from Ingenico's expert Mr. Geier, over IOENGINE's objection. *See* Appx10176-10177, 1141:22-1142:25. Mr. Geier's conclusory statement was that, because a lot of DiskOnKeys were sold, "at least there would be somebody out there, a group of people or many people that would think they need to upgrade the firmware and would be downloading the firmware" and "there would be certainly somebody that downloaded that particular document." *Id.* But Mr. Geier is speculating about what he believes "*would be*" as opposed to what actually happened, which is not evidence of actual use. Further, he provided no basis for his conjecture about what customers "*would think* they need," especially in the absence of any evidence that a firmware update was released, and he was not an expert in consumer behavior. *See* Appx9754-9755, 758:25-759:6. Ultimately, his statements on this point are opinion testimony by a lay witness in violation of Federal Rule of Evidence 701, and his *ipse dixit* is not sufficient to sustain a jury verdict requiring clear and convincing evidence of actual use of the Firmware Upgrader. *See Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004); *SRI*, 930 F.3d at 1307.

Further, there was insufficient evidence of any use "in this country." Crucially, there was no evidence that M-Systems, an Israeli company, had any servers in the U.S. In other words, there was no evidence that the claimed

"communications network node" in the system of '703 Claims 105 and 124 was known, used, or on sale "in this country." The lack of evidence on this issue is unsurprising because Ingenico's expert incorrectly believed it was irrelevant to § 102 whether activity was in the U.S. *See* Appx9902, 906:6-19. The district court's analysis of U.S.-based evidence does not address the location of the system claims' "communication network node" (*i.e.*, DiskOnKey servers supporting the Firmware Upgrader), which is fatal to a finding that the system claims were known, used, or on sale "in this country" under § 102. *See Polara Eng'g Inc v. Campbell Co.*, 894 F.3d 1339, 1348 n.4 (Fed. Cir. 2018).

Finally, although Ingenico obtained extensive discovery from M-Systems' successor and took the deposition of a witness in Israel who worked for M-Systems, *see, e.g.*, Appx9723-9724, 727:8-728:5, Ingenico nonetheless failed to marshal the requisite public use evidence and notably refrained from asking any of the salient questions. Was the Firmware Upgrader ever actually used outside of M-Systems? Was the Firmware Upgrader ever downloaded by someone in the United States? Was a firmware update for use with the Firmware Upgrader ever released? Did M-Systems ever successfully update the firmware of a DiskOnKey device via the Firmware Upgrader? Instead, Ingenico was careful to ask only if the Firmware Upgrader was "*available* for download." *See* Appx9738, 742:18-22. But as discussed below, availability is insufficient to prove public use.

### b. *The District Court Applied the Wrong Public Use Test*

In a footnote, the district court paid lip service to the rule that "public use requires 'actual use by someone at some point,'" stating it "is not in dispute." *See* Appx14, n.6 (citing *3M*, 303 F.3d at 1307)).  But throughout its decision, the court improperly applied a mere "accessibility" test.  *See, e.g.*, Appx17 ("[T]he evidence is sufficient to support a finding that the [prior art was] ***accessible*** to the public."); Appx19 n.7 ("What is required is that there was public ***accessibility***…, not that any person…***actually used*** the upgrade application to update the DiskOnKey firmware.").

The district court's "accessibility" test was based on an erroneous view that "[t]he proper test for public use under section 102(b) is simply whether ***the invention*** was 'accessible to the public' or 'commercially exploited.'"  Appx14 (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005)).  But that is not what *Invitrogen* says.  *Invitrogen* says that the proper test is whether "***the purported use***: (1) was accessible to the public; or (2) was commercially exploited." 424 F.3d at 1380.  *Invitrogen* does not negate the requirement of "actual use"—it merely expounds on it.  And it does not say that ***the invention*** need only be "accessible."  Indeed, other cases expressly reject such an interpretation. *See, e.g.*, *3M*, 303 F.3d at 1306-07 (no "use" simply because samples were sent to various corporations); *IBM*, 271 F. Supp. 3d at 681 (prior art "***could have been configured***

on a network, but none of Defendants' references show actual use of that combination" (emphasis original)); *Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 896 (N.D. Ill. 2005) ("[Defendant] argues that § 102 requires only that prior art be 'publicly available' in order to be a public use. [Defendant] is wrong.").

Importantly, there was a clear disconnect between what Ingenico alleged was "actually used" and what needs to be "in public use." At trial, there was no dispute that DiskOnKeys alone did not anticipate or render obvious the "invention." *See, e.g.*, Appx10436-10437, 1357:24-1358:1 ("DiskOnKey was introduced … in November of 2000. [R]emember, that alone is not enough."). Instead, what Ingenico mapped against the claims was the Firmware Upgrader **with** a DiskOnKey. *See generally* Appx9823-9855, 827:4-859:14. Thus, what had to be "actually used" was the Firmware Upgrader **together with** a DiskOnKey device.

The district court held that "[a]ll that is required is that the public use 'related to a device that embodied the invention.'" Appx19 (citing *Zenith Elecs. Corp. v. PDI Commc'n Sys.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008)). But *Zenith* relied on *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed.Cir.1986), which was discussing a requirement for the **on-sale bar**, not public use. 787 F.2d at 1583 ("[T]he question is…whether the sale relates to a device that *embodies* the invention." (emphasis original)). Moreover, *Zenith* made clear that for public use "the device used in public [must] include[ ] every limitation of the later claimed

invention," citing *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002), and relied on specific evidence in that case that ***both parts*** of the invalidating combination were "on sale and being publicly used ***together***." *Zenith*, 522 F.3d at 1357. As discussed above, there is no evidence that any device "that embodied the invention" was ever sold or used in this case.

c.    ***Evidence of "Potential Use," Whether Direct or Circumstantial, Is Not Sufficient***

The district court held that "circumstantial evidence of public ***accessibility***" is "appropriate evidence of public ***use***." Appx14. First, as discussed above, the proper test is ***not*** "accessibility." Further, IOENGINE's position is not that circumstantial evidence can never establish invalidity. But there must be some evidence, whether direct or circumstantial, of "***actual use*** by someone at some point." *E.g.*, *3M*, 303 F.3d at 1307. For example, if a person comes in from a rainstorm dry and holding a wet umbrella, that is circumstantial evidence that the umbrella was ***actually*** used. However, if the evidence shows that a hotel made umbrellas available to guests but no one even expressed interest in one, that is merely circumstantial evidence of ***potential*** use of those umbrellas—not that any were actually used. Ultimately, given the requirement of clear and convincing evidence to show invalidity, circumstantial evidence of mere accessibility at best shows ***potential*** use and is insufficient. This was the case with *3M* where the only evidence was distribution of the alleged prior art. *See 3M*, 303 F.3d at 1307 ("Although…samples…were sent to various

corporations, there is no evidence of their use.");[12] *see also Intel*, 946 F.2d at 830 (mere evidence that invalidating activity "may have been 'likely'" requires "extensive inferences…[that] are not the clear and convincing proof required"); *IBM*, 271 F. Supp. 3d at 681 (no clear and convincing evidence where prior art system "***could have been*** configured on a network" but no evidence of "actual use" (emphasis original)).

The cases cited below do not suggest otherwise and instead involve at least circumstantial evidence of actual use. Further, none involve a situation like the one here, where the Firmware Upgrader is totally unnecessary for the normal, intended use of the DiskOnKey device such that use of DiskOnKeys does not necessitate or even imply use of the Firmware Upgrader. In *TransWeb, LLC v. 3M Innovative Props. Co.*, 16 F. Supp. 3d 385, 393 (D.N.J.), TransWeb's founder testified that he distributed samples and data sheets at an expo, including to named employees of defendant (a competitor). 16 F.Supp.3d at 392-394. His testimony was corroborated by samples found in defendant's files and that defendant's employees were sent "to make contact with TransWeb" and later "picked up samples" to be "shipped to [defendant], and included the price range." *Id.* at 394-95. There was also evidence

---

[12] One of the reasons the district court distinguished this analysis is that it appears in the § 102(a) section. But the *3M* court's § 102(b) analysis referred back to the same analysis. *See* 303 F.3d at 1307 ("[B]oth require actual use by someone at some point.'").

that defendant "targeted the TransWeb booth at the Expo" and "was highly interested in TransWeb's products." *Id.* at 398.

Other cases finding public use did not rest solely on limited pieces of circumstantial evidence of public accessibility; instead, such evidence supported evidence of actual use. *See* Appx14-15. In *Phoenix Sols., Inc. v. W. Interactive Corp.,* No. 09-8156-MRP(SS), 2010 WL 6032841 (C.D. Cal. Aug. 25, 2010), there was testimony that the prior art system was heavily publicized (including at "well attended" public seminars), used in "many demonstrations," and turned into a "DARPA test bed" for use by others. *See, e.g., id.* at *7 (citing Appx10665-10666, 30:5-31:8; Appx10684, 148:9-17.). This testimony was corroborated by published papers describing how the system worked. *Id.* at *6-8. Here, there was no evidence that the Firmware Upgrader was ever used, even in a demonstration. In *Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*, No 14-01918-JVS(JCGx), 2014 WL 12597154 (C.D. Cal. Dec. 22, 2014), the patentee did not merely advertise its product; it also allowed two other companies to advertise the product and sold the product to one of those companies before the critical date. *See id.* at *1, *6. In *Finjan, Inc. v. Symantec Corp.*, No. 10-cv-593-GMS, 2013 WL 5302560 (D. Del. Sept. 19, 2013), the evidence included a "U.S. support site" for an antivirus program that "issue[d] regular beta releases," a product review that "provided pricing information for the product and that it was sent to individuals in the United States," evidence of actual

U.S. use of certain versions, and evidence that another product—for which public use was not contested—had a "built in interface" for the antivirus program. *Id.* at *6-8.[13]

Ultimately, the district court improperly lowered the bar for clear and convincing evidence of public use by concluding that circumstantial evidence of mere accessibility is sufficient.

    d.    ***The SDK Does Not Support That the Firmware Upgrader Was "In Public Use"***

Once again, the district court misunderstood the role of the SDK. Ingenico never alleged that the SDK was invalidating; instead it alleged that the Firmware Upgrader was invalidating and was implemented using the SDK. Not only is that contrary to the evidence that the supposedly relevant SDK features post-date the Firmware Upgrader, *see supra* § IV.A.1.c, but whether the SDK was in public use has no bearing on whether the Firmware Upgrader was in public use. Even assuming DiskOnKey devices "had SDK capabilities," *see* Appx16, that does not mean that any application based on those capabilities was developed or "in public use."

---

[13] In *Finjan*, the court appears to have incorrectly considered "availability." *See* 2013 WL 5302560, at *4-*8 ("ThunderBYTE 7.0's ***Availability*** in the United States"). *Finjan* was affirmed without opinion by this Court, but whether ThunderBYTE was in public use was not an issue on appeal. *See Finjan, Inc. v. Symantec Corp.*, Case No. 2013-1682, Dkt. No. 29 at 1-2.

### 3. The Firmware Upgrader Is Not § 102(a) Art

Ingenico's presentation of evidence regarding the Firmware Upgrader focused on its availability as § 102(b) art, based on a critical date of March 23, 2003 (one year before the filing date). By contrast, Mr. McNulty's invention date preceded the alleged July 2002 release of the Firmware Upgrader. *See* Appx9791, 795:4-23. And, as discussed below, Ingenico's challenges to conception and diligence were either half-hearted or non-existent. Indeed, Ingenico argued to the jury in closing that the only relevant prior art date was March 23, 2003. *See* Appx10441, 1362:5-11 ("[I]t's prior art *simply because it's dated before March 23, 2003*. Mr. McNulty's invention date its *irrelevant* to that. Mr. McNulty's conception date is *irrelevant* to that. Mr. McNulty's reduction to practice is *irrelevant* to that."). There was no other mention of invention date, conception date, reduction to practice, or anything regarding the § 102(a) critical date during Ingenico's closing. *See* Appx10417-10444, 1338:5-1365:16. Ingenico's closing was either a reflection of the lack of substantial evidence to sustain Ingenico's § 102(a) theories, or a naked attempt to mislead the jury as to the relevant dates.

### a. The Firmware Upgrader Was Not "Known or Used by Others"

Regardless of Mr. McNulty's invention date, the Firmware Upgrader was not "known or used by others" under § 102(a). Like § 102(b), "use[] by others" requires "*actual use* by someone at some point." *See 3M*, 303 F.3d at 1307. Here, there was

no direct or circumstantial evidence of **actual use** of the Firmware Upgrader. *See supra* § IV.A.2; *see also Ex Parte Bokhari*, No. 09/902,929, 2010 WL 4740064, at *3 (B.P.A.I. Nov. 19, 2010) (allegedly invalidating software "uploaded to a Web site, apparently, in the United Kingdom" and available for download is not evidence that the software "**was** downloaded, or otherwise 'known or used by others in this country'").

To be "known…by others," the disclosure must be "accessible to the public" and "sufficient to enable [a POSITA] to reduce the invention to practice." *See BASF*, 955 F.3d at 964; *3M*, 303 F.3d at 1306. Even assuming that certain information regarding the Firmware Upgrader was publicly "accessible," Ingenico's argument was not that the Firmware Upgrader itself or the Firmware Upgrader Readme file (Appx11177-11182) was enabling; instead, Ingenico relied on numerous other documents to explain how the Firmware Upgrader worked. Ingenico's primary source of information regarding the internal operation of the Firmware Upgrader, and in particular PKI authentication, was the SDK. *See, e.g.*, Appx9804-9816, 808:16-820:2; Appx11197-11271; Appx11098-11112. But that SDK functionality **did not exist** at the time the Firmware Upgrader was supposedly available and so cannot reflect how the Firmware Upgrader works. *See supra* § IV.A.1.c. Further, the SDK press release (Appx11115-11117) indicated that it was only available to "select partners and software development companies" by request and there was no

evidence any such request was ever made. *See, e.g.*, Appx9913-9914, 917:22-918:14. Ingenico also relied on another document addressing PKI authentication (Appx11282-11287) but presented no evidence that it was "accessible to the public." Instead, Ingenico's expert was only able to say he was aware of no evidence it was **not** public. *See* Appx9904-9909, 908:15-913:16. Finally, these documents Ingenico relied upon (Appx11197, Appx11098, Appx11282) were produced as "Confidential – Attorneys' Eyes Only," further reflecting a lack of public accessibility even years later.

Further, although Ingenico presented evidence regarding how the Firmware Upgrader application worked from a user's perspective (*i.e.*, with the user-facing Readme, Appx11177), there was no evidence regarding the underlying operation of any code on which it was based. Without proof of the presence of the specifically-claimed program codes, on which memory they reside, and which processor executes them (*see, e.g.*, Appx202-203, Claim 1; Appx164-167, Claims 55, 78, 93, 104), there was no evidence that the claimed invention was "known…by others" because a POSITA would not have been enabled to make or carry out the specific structure of the claims.

    b.    ***The Firmware Upgrader Postdates Mr. McNulty's Invention***

Even if the Firmware Upgrader were "known or used by others," it was not "before the invention," as § 102(a) requires. The **only** evidence at trial that preceded

Mr. McNulty's conception date related to blank DiskOnKeys with *no* mention of the Firmware Upgrader. And there was no dispute that DiskOnKey devices alone do not anticipate or render obvious the asserted claims. *See supra* § I.C.

Thus, any verdict based on § 102(a) requires rejecting Mr. McNulty's invention date. Importantly, a patentee has no burden to persuade the jury of its invention date; instead, it only has a burden of production. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-78 (Fed. Cir. 1996). Once a patentee has come forward with some evidence of invention, the challenger "must persuade the jury that [the patentee] did not invent prior to [the prior art date]…because…he did not conceive and thereafter proceed with reasonable diligence as required to his filing date." *Id.* at 1578. At all times, the challenger retains "the burden of persuasion [by clear and convincing evidence] on the status of the" prior art. *Id.*; *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1328 (Fed. Cir. 2008) (once patentee satisfies burden of production, defendant must "convince the [jury] that [the patentee] is *not* entitled to the benefit of the earlier…date" such that "if the [jury] is not persuaded by clear and convincing evidence that [defendant] is correct, [defendant] has failed to carry its ultimate burden of persuasion, and its defense of invalidity…fails"); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 575-76 (D. Del. 2008) ("[T]he patentee *need not persuade* the fact-finder of the invention date…. Rather, the burden of proof remains on the

defendant to establish by clear and convincing evidence that the patentee's invention date does not precede the date of the ostensible prior art reference.").

Critically, "[t]he burden of production is in the hands of the judge" whereas "the jury enforces the burden of persuasion." *See* 21B Fed. Prac. & Proc. Evid. § 5122 (2d ed.). Therefore, once the district court sent the case to the jury, **IOENGINE had satisfied its burden of production**. *See id.* (burden of production is "the obligation…to produce enough evidence at trial to **justify sending the case to the jury**"); *see also* Appx10197-10204, 1162:4-1169:9 (denying Ingenico's Rule 50(a) motion on invalidity and invention date). Ingenico did not renew its Rule 50(a) motion, and so whether IOENGINE satisfied its burden of production is no longer in dispute. Instead, the correct starting point requires a **presumption** of IOENGINE's invention date. *Mahurkar* and its progeny make clear that it was Ingenico's burden of persuasion to overcome that presumption by clear and convincing evidence. *See* 79 F.3d at 1578.

IOENGINE presented extensive evidence of conception and diligence, including testimony from Mr. McNulty and corroboration from numerous other witnesses and documents. *See supra* § I.B. The only challenge Ingenico raised was whether *one* corroborating document disclosed two claim limitations (portable device identifier and portable device verification). Even assuming Ingenico was right about those points—which it was not—that still would not be sufficient as a

matter of law for Ingenico to disprove conception and diligence by clear and convincing evidence. Mr. McNulty's conception and reduction to practice are evaluated under a "rule of reason" analysis, under which "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1301-02 (Fed. Cir. 2016). "This analysis 'does not require that every detail of the testimony be independently and conclusively supported' by the corroborating evidence." *Id.* (citing *Ohio Willow Wood Co. v. Alps South*, 735 F.3d 1333, 1348 (Fed. Cir. 2013)); *see also E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1077 (Fed. Cir. 2019) (corroboration is not required "on every aspect of conception and reduction to practice"). Ingenico's narrow attack on just two claim elements in *one* of many examples of corroboration cannot be clear and convincing evidence disproving Mr. McNulty's conception story.

In any event, Ingenico's attacks were mere conjecture. The corroborating evidence was the "Portable Devices Rule" document that Mr. McNulty wrote shortly after conceiving of his invention. *See* Appx16798-16799. Ingenico did not dispute the circumstances or legitimacy of PDR or that it corroborated Mr. McNulty's conception of every other claim element, instead, disputing only whether it disclosed portable device identifier information and portable device verification. Mr. McNulty and Dr. Rubin pointed to the same portion of PDR for those claim elements: "The

user clicks yes and code on the portable device works it[s] way through the computer to the internet and contacts a web site and says Hi. I am here from a person[']s pocket and I would like to copy your content." *See supra* § I.B; Appx16798-16799. Mr. Geier argued that "the word 'I' means a name of somebody…," not the device. *See* Appx9862-9863, 866:24-867:4. But PDR distinguishes between the "somebody" the device belongs to and the device itself. *See* Appx16798-16799 ("[C]ode on ***the portable device***…***says*** Hi. ***I*** am here ***from a person[']s pocket***…."). Mr. Geier's unsupported supposition, inconsistent with PDR, is not substantial evidence. *See Koito,* 381 F.3d at 1152; *SRI*, 930 F.3d at 1307.

On device verification, Mr. Geier's testimony regarding the asserted prior art undermined him. Specifically, he admitted that "a very well[-]known method" of verification would involve "a challenge response" where a server says to a portable device, "***Hi, I'm the server***,"—nearly verbatim to the PDR language. Appx10175-10176, 1140:13-1141:15; Appx10178-10180, 1143:23-1145:13. In addition, Mr. Geier's testimony did not specifically address Mr. McNulty's and Dr. Rubin's testimony regarding "and I would like to copy your content." *See generally* Appx9861-9863, 865:6-867:14; Appx10166-10168, 1131:21-1133:6; Appx10178-10181, 1143:23-1146:5. So, the ***only*** competent evidence on the complete PDR disclosure was from Mr. McNulty and Dr. Rubin, explaining that the portable device

identifying itself *and* seeking permission ***together*** showed facilitating verification. *E.g.,* Appx9116-9118, 208:6-210:14; Appx10095, 1060:10-23.

The district court found that the jury could have concluded "that Mr. McNulty was not diligent in reducing his inventions to practice." Appx21. But the evidence the district court points to is not from Ingenico, but from Mr. McNulty. *See id.* This incorrectly flips the burden to prove invalidity on its head. The notion that the jury could have rejected Mr. McNulty's story without any argument or evidence from Ingenico incorrectly reflects that IOENGINE had to persuade the jury of Mr. McNulty's diligence.[14] Instead, with IOENGINE's burden of production satisfied, Ingenico had to ***disprove*** Mr. McNulty's diligence by clear and convincing evidence, which it simply did not do.

### 4. Substantial Evidence Does Not Support Anticipation or Obviousness

No invalidity theory presented by Ingenico was independent of the Firmware Upgrader. Thus, without substantial evidence supporting the Firmware Upgrader as prior art under any § 102 category, the jury's verdict on both anticipation and obviousness must be set aside.

---

[14] This continued mishandling of the burdens is further indication that the district court erred in its jury instructions on conception and diligence, discussed below.

**B.** **THE DISTRICT COURT ERRED IN ITS JURY INSTRUCTIONS**

There were substantial errors in the jury instructions impacting key aspects of each of Ingenico's invalidity theories. Together, these errors were legally erroneous and prejudicial to IOENGINE. *See Sulzer*, 358 F.3d at 1363.

### 1. The Instructions on Conception and Diligence Incorrectly Flipped the Legal Burdens

IOENGINE had no burden to persuade the jury of Mr. McNulty's conception or diligence. *See supra* § IV.A.3.b. This issue, particularly the difference between the burdens of production and persuasion, is certainly unfamiliar to a lay jury. Indeed, the idea that a patentee has no burden to convince the jury of ***its own*** conception and diligence is an odd concept that needs clear explanation. Nevertheless, the district court refused IOENGINE's proposed instruction:

> Once IOENGINE has put forth some evidence beyond Mr. McNulty's testimony that confirms his conception and diligence toward reducing the invention to practice, it is Ingenico's burden to prove otherwise. This means that Ingenico must prove by clear and convincing evidence that Mr. McNulty did not invent before the date of the alleged prior art.

Appx10344-10345, 1265:18-1266:18.

Although the court instructed generally on Ingenico's clear and convincing evidence burden, there was no instruction that ***Ingenico*** bore the burden of ***disproving IOENGINE's*** conception and diligence by the same standard. One sentence particularly illustrates the district court's error: "***Whatever the date of***

*invention*, Ingenico must prove by clear and convincing evidence that the prior art item pre-dated the claimed invention." Appx10376, 1297:14-16. The district court simply dismissed IOENGINE's argument that by starting off "[w]hatever the date of invention," that sentence (and the instruction as a whole) failed to address the burden for proving *the date of invention* versus proving that prior art pre-dates the invention. The instruction addressed Ingenico's burden to prove the latter, without indicating the proper (and counterintuitive) burden for the former.[15]

As discussed above, the confusion over each party's role was sown by Ingenico during opening statements on the issue of which party brought the lawsuit. *See supra* § I. The district court also misspoke multiple times while instructing the jury on these issues. *See* Appx10375-10376, 1296:6-1297:9 (incorrect reference to "Ingenico" at 1296:6 and 1297:1, with only the former corrected). This exacerbated the confusion of which party bore the burden of proof.

The error was highly prejudicial in that it failed to properly reflect Ingenico's burden. To the extent the jury rejected IOENGINE's conception and diligence, it did so under the mistaken impression that it had to be persuaded by IOENGINE of its conception and diligence.

---

[15] The district court held that it was not error to give instructions on the issue of corroboration, *see* Appx32 n.11, but this misses the point. The issue was the failure to clearly explain which party bore the burden of *persuading* the jury.

The district court concluded that the instruction did not confuse the jury because of IOENGINE's closing argument, citing *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1522 (Fed. Cir. 1995). *See* Appx30-31. But *Hilton* says that instructions must be tailored to the evidence at trial, not that an attorney's correctly stated argument may cure a court's erroneous instructions. *See* 62 F.3d at 1522-23. Indeed, the jury was told multiple times to follow the court's instructions. *See, e.g.*, Appx9001, 93:11-13; Appx10360, 1281:7-9. Counsel's argument could not have cured the prejudice. Further, if IOENGINE's closing corrected the erroneous jury instruction, Ingenico's closing argued that conception and diligence were irrelevant to a finding of invalidity, which either prejudiced the jury further or conceded that a verdict based on § 102(a) was unsupported.

2.     **The Instructions Failed to Correctly Reflect the Requirements for § 102**

a.     *The "Public Use" Instructions Were Erroneous*

In overruling IOENGINE's objections to the § 102 jury instructions, the district court failed to appreciate that different rules apply to prior use by the inventor versus an unrelated third party. *See Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("[W]hen an asserted prior use is not that of the applicant, § 102(b) is not a bar when that prior use or knowledge is not available to the public."); *BASF*, 955 F.3d at 967-68 (extending inventor-centric rules to third-party use "is inconsistent with § 102(b)"); *Dey, L.P. v. Sunovion Pharms., Inc.*, 715

F.3d 1351, 1358 (Fed. Cir. 2013) (statements about owing an obligation of secrecy to the inventor "are not meant to apply to third-party use cases").

Consistent with this distinction, when use is unrelated to the inventor, the "claimed features of the patents [must be placed] in the public's possession" such that "if members of the public are not informed of, and cannot readily discern, the claimed features of the invention in the allegedly invalidating prior art, the public has not been put in possession of those features."[16] *Dey*, 715 F.3d at 1359; *see also TQP Dev., LLC v. 1-800-Flowers.com, Inc.*, 120 F. Supp. 3d 600, 616 (E.D. Tex. 2015), *aff'd sub nom. TQP Dev. LLC v. Newegg, Inc.*, 677 F. App'x 683 (Fed. Cir. 2017); *cf. TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 2809841, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) (discussing public use in § 102(g) context). IOENGINE's proposed jury instruction drew support directly from these cases: "[P]ublic use may be found when the claimed features of the invention are discernible from a prior art product that is accessible to the public." Appx10350, 1271:7-11.

---

[16] Notably, this is the baseline rule. The reason it does not apply when the use is tied to the inventor is based on a specific forfeiture exception stemming from the policy that inventors should not be able to exploit their inventions for more than one year "regardless of how little the public may have learned about [them]." *See Metallizing Eng'g Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 519-20 (2d Cir. 1946).

The district court rejected IOENGINE's proposed instruction for two improper reasons. First, the court misunderstood the distinction between 'inventor-use' cases and 'third party-use' cases, relying on numerous cases involving inventor-use, most notably *Egbert v. Lippmann*, 104 U.S. 333 (1881). Even after IOENGINE pointed out that *Egbert* was an inventor-use case, the court continued to maintain that *Egbert* "involved a public use by a party other than the inventor." Appx35. This glosses over the pertinent distinction this Court has repeatedly explained, which is that the use in *Egbert* was **related to** the inventor, who gave the invention to the using party (his then-girlfriend). *See Dey*, 715 F.3d at 1359 ("[*Egbert*] turned on the lack of control **the inventor** maintained over his invention."); *Woodland*, 148 F.3d at 1370 (describing the holding of *Egbert* being that "**inventor's** unobservable prior use was a 'public use'"). Importantly, there was no evidence at trial that M-Systems' Firmware Upgrader or DiskOnKey were designed, disclosed, or provided by Mr. McNulty, squarely making this a third party-use case. The district court's failure to recognize that *Egbert* does not apply highlights the error in the instructions.

Second, the district court concluded that the requirement of discernibility applies only in cases involving concealment or a promise of confidentiality. *See* Appx35-46. But that is simply inconsistent with the law and policies underlying § 102. What matters from a policy perspective in a case of third party-use is whether the invention has been put in the public's possession. As this Court explained in

*Dey*, "a court still must decide whether the 'claimed features of the patents [were placed] in the public's possession.'" *Dey*, 715 F.3d at 1359; *see also BASF*, 955 F.3d at 968 ("[O]ne who invents something previously known or used in a literal sense, but which has been forgotten, abandoned, concealed, or otherwise 'lost,' is the first to 'enrich[ ] the art' by his disclosure and is therefore the original inventor."); *id.* ("[P]atent law favors the later inventor who shares his knowledge…over the prior inventor who conceals his invention." (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983)); *Metallizing*, 153 F.2d at 519 ("The only issue was whether a prior use **which did not disclose the invention to the art** was within the statute; and it is well settled that it is not.").[17] This is the crucial policy distinction between third party-use cases and inventor-use cases. *BASF*, 955 F.3d at 968.

In *Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5 (1939), cited by the district court, third-party secret commercial use was deemed invalidating. At first blush, this appears inconsistent with the distinction between inventor-use and third party-use cases. But in *Shimadzu*, *the third-party user was the accused infringer*. *See* 307 U.S. at 17 ("The petitioner…alleged that it was successfully making and

---

[17] Notably, Judge Hand's *Metallizing* decision post-dates his decision in *Gillman v. Stern*, 114 F.2d 28 (2d. Cir. 1940), which is heavily relied on by the district court.

selling the product of the invention in its plant long before it ever learned of Shimadzu's existence of his inventions…."). This implicates yet another policy, which Congress endorsed with the AIA's expansion of the prior use defense to allow a third-party to rely on its commercial, but non-discernible, use as a personal defense to infringement, even though it does not bar patentability. *See* 35 U.S.C. § 273; 157 Cong. Rec. E1219 (June 22, 2011) ("The inclusion of prior user rights is essential to ensure that those who have invented and used a technology but choose not to disclose that technology…are provided a defense against someone who later patents the technology."). This reflects that non-discernable third-party use ***does not*** bar patentability under § 102; otherwise, there would be no need for § 273.

In third party-use cases, concealment or confidentiality may be helpful proxies for assessing whether the public is in possession of an invention, but they are not required, contrary to the district court's basis for refusing IOENGINE's instruction. *See Dey*, 715 F.3d at 1357 ("We have never required a formal confidentiality agreement to show non-public use…."); *id.* at 1355-56 (where there is no confidentiality agreement, courts should consider "the skill and knowledge of those observing an invention" and whether they "understand" the invention or "could...learn anything…and disclose the invention to others"); *BASF*, 955 F.3d at 965 ("[B]oth the existence of relevant confidentiality agreements and the degree to

which they were honored are evidence of whether prior knowledge and use were accessible to the public but are not necessarily conclusive.").

Moreover, even if discernibility mattered only in cases involving "secret" use, that does not justify the district court's failure to give the requested instruction here. In the absence of a formal confidentiality agreement, the "circumstances [may] creat[e] a similar expectation of secrecy." *See Dey*, 715 F.3d at 1357. Here, the circumstances of what information was publicly available about the Firmware Upgrader certainly suggested secrecy of its inner workings. Indeed, most of the key documents Ingenico relied upon were produced "Confidential – Attorneys' Eyes Only," even *decades* later. *See, e.g.*, Appx11177 (Firmware Upgrader Readme); Appx11197 (preliminary SDK documentation); Appx11171 (Firmware Upgrader executable); Appx11282 (Firmware Upgrader presentation). And no one could confirm whether key documents had ever been made public. *See, e.g.*, Appx9730, 734:7-20 (no knowledge as to whether Appx11197-11281 was actually, or even would have been, offered to customers); Appx9911-9912, 915:23-916:8 (Mr. Geier could only testify he was aware of no evidence they were ***not*** public). Further, the jury heard testimony that using the Firmware Upgrader would not disclose how it worked. *See* Appx10108, 1073:9-18. In addition, although the claims required program code to be executed by the portable device processor, there was evidence that the Firmware Upgrader was handled by an ASIC, which both parties' experts

agreed would mean that no program code would be executed. *See* Appx11285; Appx10099-10103, 1064:4-1068:3; Appx10106, 1071:3-11; Appx10151, 1116:2-12; Appx10169-10170, 1134:3-1135:7. By presuming that the jury could not have concluded that this case involves secrecy as to the implementation of the Firmware Upgrader and, on that basis, refusing to give the proper instruction, the district court clearly erred. Had the jury been given the proper instruction, the evidence supported a different outcome.

The district court read IOENGINE's argument as akin to requiring an enabling public use. *See* Appx37. But that is incorrect. IOENGINE's instruction was consistent with this Court's jurisprudence recognizing a distinction between discernibility and enablement: "[A]lthough…we do not ask for an 'enablement-type inquiry'…, a court still must decide whether the 'claimed features of the patents [were placed] in the public's possession.'" *See Dey*, 715 F.3d at 1360. That is all IOENGINE's instruction implied.

b.   ***The "On Sale" Instructions Were Erroneous***

The district court refused to include an instruction that "only an offer that the other party could make into a binding contract simply by accepting it constitutes an offer for sale." Appx10351, 1272:3-22. Once again, the court's erroneous conclusion about the Firmware Upgrader being pre-installed on DiskOnKey devices infected its analysis. Although the court agreed that IOENGINE's instruction

correctly stated the law, it found that it was unnecessary because there was no dispute that **DiskOnKey devices** were sold. *See* Appx47-48. But in the proper context of a Firmware Upgrader available only by separate download, the question of whether the Firmware Upgrader was on sale was very much disputed. And, as discussed above, the evidence certainly supported a finding that the separately-available Firmware Upgrader was ***not*** on sale. The court also found that IOENGINE's instruction would have been "potentially confusing to the jury" because it introduced the concepts of a binding contract and acceptance. But the point of jury instructions is to explain complicated concepts; that does not justify providing no instruction.

Further, IOENGINE also alternatively proposed the simpler instruction that "an advertisement is not an offer for sale." Importantly, the district court found that the press releases at issue "were not offers for sale," *see* Appx10, Appx49, and therefore agrees that it would have been improper for the jury to find that the Firmware Upgrader was "on sale" based on these press releases. But the jury never heard an instruction to that effect. Thus, to the extent the jury's invalidity verdict was based on the "on-sale" bar, the failure to give these instructions so that the jury could correctly assess the separately downloadable Firmware Upgrader was error and severely prejudicial to IOENGINE given the context of the evidence presented at trial.

### 3. The District Court Failed to Instruct on the Presumption of Validity

The district court erred in refusing IOENGINE's request to instruct the jury on the presumption of validity, relying on *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258–59 (Fed. Cir. 2004). Appx33. But after *Chiron*, the Supreme Court recognized that the presumption may be "weakened" without impacting the clear and convincing standard, thus recognizing the presumption's significance distinct from the burden of proof. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 110 (2011). Outside the patent context, the Supreme Court has long recognized that "the ordinary citizen well may draw significant additional guidance from an instruction on the presumption of innocence" of the accused. *Taylor v. Kentucky*, 436 U.S. 478, 484-90 (1978) (finding error in district court's refusal to instruct on presumption of innocence); *id.* at 491 (Stevens, Rehnquist, J.J., dissenting) ("[I]t is reversible error to refuse a request for a proper instruction on the presumption of innocence."). Failure to instruct the jury on the presumption was prejudicial to IOENGINE and could have changed the result, particularly given the other issues discussed herein.

### C. INGENICO SHOULD HAVE BEEN ESTOPPED FROM PRESENTING THE FIRMWARE UPGRADER

A party that petitions for IPR resulting in a final written decision "may not assert…that the claim is invalid on any ground that the petitioner…reasonably could have raised during that [IPR]." 35 U.S.C. § 315(e)(2). "[T]he Patent Act

distinguishes between grounds and evidence," and "the estoppel provision, § 315(e)(2), applies to **grounds**." *Wasica Fin. v. Schrader Int'l*, 432 F. Supp. 3d 448, 454 (D. Del. 2020) (emphasis original), *appeal dismissed*, No. 2020-2124, 2020 WL 8374870 (Fed. Cir. Sept. 24, 2020). "Since the estoppel provision…applies to **grounds**, a petitioner is estopped from proceeding in litigation on those **grounds**, even if the **evidence** used to support those grounds was not available…in the IPR." *Id.* (emphasis original). Thus, IPR estoppel extends to invalidity grounds that include physical products when documents—to which the physical products are merely cumulative—were reasonably available during the IPR. *See id.* at 453-55.

At IPR, Ingenico "reasonably could have raised" documents describing the Firmware Upgrader. Accordingly, at summary judgment, the district court properly found that Ingenico was restricted from relying at trial on "documentation related to [the] DiskOnKey upgrade software and numerous other Western Digital Documents," which included the Firmware Upgrader documents. Appx115 n.21. Ingenico was permitted to rely on those documents only "to the extent . . . that they *form part of a substantively different combination of references that could not reasonably have been raised in the IPRs*," but could not raise a ground "relying on device art" that was simply "a printed publication invalidity theory in disguise." Appx115, Appx118. However, the district court refused to apply estoppel to any of the Firmware Upgrader documents.

Notwithstanding the restriction imposed by the district court at summary judgment, Ingenico's invalidity case focused on those *same* Firmware Upgrader documents. *See supra* § I.C. Ingenico's central evidence consisted of a 6-page "Readme" document (Appx11177-11182) that Ingenico argued was distributed publicly. *See, e.g.*, Appx9792-9793, 796:14-797:8 (discussing Appx11174-11176, e-mail attaching Readme); Appx9794-9795, 798:18-799:6; Appx10438, 1359:4-15 ("it's sent to people all over the world").[18] Specifically, Ingenico's element-by-element claim analysis turned on the operation of the Firmware Upgrader with a DiskOnKey, *entirely* as depicted by the Readme instructions and screenshots. *See* Appx9823-9855, 827:4-859:14.

Ingenico presented other documents, which also did not constitute any substantively different invalidity theory, instead serving only as additional evidence of the Readme's description of the Firmware Upgrader. *See, e.g.,* Appx9804-9816, 808:16-820:2 (discussing Appx11098-11112, Appx11197-11281, Appx11282-11287, and the knowledge of a POSITA as support for "Authenticating device" step in the Readme). Ultimately, Ingenico's argument at trial relied on the *very same grounds* it could have presented at IPR and not any "substantively different" invalidity theory.

---

[18] Ingenico also relied on the SDK, but similarly argued that it was publicly available. *See, e.g.,* Appx9912-9915, 916:22-919:3.

In its post-trial briefing, Ingenico argued that its reliance on a DiskOnKey "hardware product" escapes estoppel. Appx10623-10624. Ingenico's presentation may have *mentioned* a DiskOnKey device, but it was only token lip service which added *nothing* to its argument based on the documents. Even though Ingenico had a supposed copy of the Firmware Upgrader and a DiskOnKey, Ingenico chose not to plug the device in and run it. *See* Appx9822-9823, 826:6-827:2 ("the DiskOnKey, ***it's not plugged in*** or it hasn't started yet").

Ingenico's trial presentation was simply a disguised printed publication theory. This puts Ingenico in a bind: Ingenico argued at trial that the Readme was publicly available. If true, the document forming the foundation of Ingenico's invalidity theory reasonably could have been raised during IPR (along with other documents Ingenico argued were publicly available).[19] Ingenico's other Firmware Upgrader evidence did not transform its trial presentation into a "substantively different" ground from one it reasonably could have raised during IPR. Instead, Ingenico was able to get two bites at the invalidity apple, contrary to the congressional intent behind IPRs. *See* H. REP. No. 112-98, at 40 (2011) (IPR not "a means to prevent market entry through repeated…attacks on the validity of a

---

[19] All of the DiskOnKey documents, including those obtained by subpoena, were available via a reasonably diligent search at the time of the IPRs *in 2018*. *See* Appx1814-1815; Appx8371-8372. Although Ingenico delayed serving and then enforcing its subpoena, once it did so, it received all responsive documents in about six months. *Id.*

patent."); 157 Cong. Rec. S1376 (Mar. 8, 2001) (Sen. Kyl) ("Ideally…[an instituted IPR] will completely substitute for at least the patents-and-printed publications portion of the civil litigation.").

## V.    CONCLUSION

For the foregoing reasons, this Court should set aside the jury verdict, reverse and vacate the district court's denial of JMOL, or order a new trial on validity.

Date: August 14, 2023

Respectfully submitted,

*/s/ Noah M. Leibowitz*
Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797

Derek J. Brader
Michael A. Fisher
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Michael H. Joshi
DECHERT LLP
3000 El Camino Real
Five Palo Alto Square, Suite 650
Palo Alto, CA 94306

*Counsel for Appellant IOENGINE, LLC*

# **ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

| Dkt. / Ex. No. | Filed | Document Description | Page |
|---|---|---|---|
| 39 | 11/09/2018 | Agreed Protective Order Regarding the Disclosure and Use of Discovery Materials | Appxi |
| 506 | 07/25/2022 | Judgment | Appx1 |
| 531 | 12/09/2022 | Memorandum Opinion and Order denying Dkt. 512 Motion for Judgment as a Matter of Law (Oral Order unsealing document in its entirety on 12/14/2022.) | Appx3 |
| 449 | 06/15/2022 | Memorandum Opinion and Order (unsealed on 06/27/2022 per Judge Bryson) | Appx55 |
| JX-294 | 07/13/2022 | U.S. Patent No. 9,774,703 (McNulty) | Appx135 |
| JX-349 | 07/12/2022 | U.S. Patent No. 9,059,969 (McNulty) | Appx169 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INGENICO INC., | |
| *Plaintiff*, | |
| v. | C.A. No. 18-826-CFC |
| IOENGINE, LLC, | |
| *Defendant.* | |
| | |
| IOENGINE, LLC, | |
| *Counterclaim Plaintiff*, | |
| v. | JURY TRIAL DEMANDED |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP S.A., | |
| *Counterclaim Defendant*s. | |

**AGREED PROTECTIVE ORDER**
**REGARDING THE DISCLOSURE AND USE OF DISCOVERY MATERIALS**

Plaintiff counterclaim defendant Ingenico Inc. and counterclaim defendants Ingenico Corp. and Ingenico Group S.A. (collectively, "Ingenico" or "Plaintiff") and defendant and counterclaim plaintiff IOENGINE, LLC ("IOENGINE" or "Defendant") (IOENGINE and Ingenico, collectively the "Parties," and individually a "Party") anticipate that documents, testimony, or information containing or reflecting confidential, proprietary, trade secret, and/or commercially sensitive information are likely to be disclosed or produced during the course of discovery, initial disclosures, and supplemental disclosures in this case and request that the

Appxi

Court enter this Order setting forth the conditions for treating, obtaining, and using such information.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Court finds good cause for the following Agreed Protective Order Regarding the Disclosure and Use of Discovery Materials ("Order" or "Protective Order").

1.   **PURPOSES AND LIMITATIONS**

(a)   Protected Material designated under the terms of this Protective Order shall be used by a Receiving Party solely for this case, and shall not be used directly or indirectly for any other purpose whatsoever.

(b)   The Parties acknowledge that this Order does not confer blanket protections on all disclosures during discovery, or in the course of making initial or supplemental disclosures under Rule 26(a).  Designations under this Order shall be made with care and shall not be made absent a good faith belief that the designated material satisfies the criteria set forth below.  If it comes to a Producing Party's attention that designated material does not qualify for protection at all, or does not qualify for the level of protection initially asserted, the Producing Party must promptly notify all other Parties that it is withdrawing or changing the designation.

2.   **DEFINITIONS**

(a)   "Discovery Material" means all items or information, including from any non-party, regardless of the medium or manner in which they are generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things), that are produced, disclosed, or generated in connection with discovery or Rule 26(a) disclosures in this case.

**AGREED PROTECTIVE ORDER – PAGE 2**

(b)     "Outside Counsel" means (i) outside counsel who appear on the pleadings as counsel for a Party and (ii) partners, associates, and staff of such counsel to whom it is reasonably necessary to disclose the information for this litigation.

(c)     "Party" means any party to this case, including all of its officers, directors, employees, consultants, retained experts, and outside counsel and their support staffs.

(d)     "Producing Party" means any Party or non-party that discloses or produces any Discovery Material in this case.

(e)     "Protected Material" means any Discovery Material that is designated as "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE," as provided for in this Order. Protected Material shall not include:  (i) advertising materials that have been actually published or publicly disseminated; (ii) materials that show on their face they have been disseminated to the public; or (iii) other materials known to have been disseminated to the public.

(f)     "Receiving Party" means any Party who receives Discovery Material from a Producing Party.

(g)     "Source Code" means computer code, scripts, assembly, binaries, source code listings, object code listings and descriptions of object code, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip.

3.     **COMPUTATION OF TIME**

The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rule of Civil Procedure 6.

4.     **SCOPE**

(a)     The protections conferred by this Order cover not only Discovery Material governed by this Order as addressed herein, but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or their counsel in court or in other settings that might reveal Protected Material.

(b)     Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose, and nothing in this Order shall preclude any Producing Party from showing its Protected Material to an individual who prepared the Protected Material.

(c)     Nothing in this Order shall be construed to prejudice any Party's right to use any Protected Material in court or in any court filing with the consent of the Producing Party or by order of the Court.

(d)     This Order is without prejudice to the right of any Party to seek further or additional protection of any Discovery Material or to modify this Order in any way, including, without limitation, an order that certain matter not be produced at all.

5.   **DURATION**

Even after the termination of this case, the confidentiality obligations imposed by this Order shall remain in effect until a Producing Party agrees otherwise in writing or a court order otherwise directs.

6.   **ACCESS TO AND USE OF PROTECTED MATERIAL**

(a)     <u>Basic Principles</u>.  All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including, without limitation, any other litigation, patent prosecution or acquisition, or any business or competitive

purpose or function.  Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

(b)    Secure Storage.  Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

(c)    Legal Advice Based on Protected Material.  Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

(d)    Limitations.  Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protected Material.  Nothing in this Order shall restrict in any way the use or disclosure of Discovery Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of the Producing Party; (iii) previously produced, disclosed, and/or provided by the Producing Party to the Receiving Party or a non-party without an obligation of confidentiality and not by inadvertence or mistake; (iv) with the consent of the Producing Party; or (v) pursuant to an order of the Court.

(e)    Patent Prosecution Bar.  Absent the written consent of the Producing Party, any person on behalf of the Receiving Party who receives one or more items designated "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" by a Producing Party shall not be involved, directly or indirectly, in any of the following patent prosecution activities: preparing, prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims,

and/or responses to office actions, or advising or consulting on the preparation, prosecution, drafting, editing, and/or amending of patent applications, specifications, claims, and/or responses to office actions, relating to the functionality, operation, and design of secure portable devices or card readers (generally or as described in any patent in suit), before any foreign or domestic agency, including the United States Patent and Trademark Office.  These prohibitions are not intended to and shall not preclude counsel from participating directly or indirectly in reexamination, *inter partes* review, covered business method review, or reissue proceedings. These prohibitions shall begin when access to "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" materials are first received by the affected individual, and shall end one (1) years after the final resolution of this action, including all appeals.

7. **DESIGNATING PROTECTED MATERIAL**

(a)    Available Designations.  Any Producing Party may designate Discovery Material with any of the following designations, provided that it meets the requirements for such designations as provided for herein:  "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE."

(b)    Written Discovery and Documents and Tangible Things.  Written discovery, documents (which include "electronically stored information," as that phrase is used in Federal Rule of Procedure 34), and tangible things that meet the requirements for the confidentiality designations listed in Paragraph 7(a) may be so designated by placing the appropriate designation on every page of the written material prior to production.  For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate

designation, and mark the medium, container, and/or communication in which the digital files were contained.   In the event that original documents are produced for inspection, the original documents shall be presumed "CONFIDENTIAL – ATTORNEYS' EYES ONLY" during the inspection and re-designated, as appropriate during the copying process.

(c)     Native Files.  Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this Order by appending to the file names or designators information indicating whether the file contains "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE," material, or shall use any other reasonable method for so designating Protected Materials produced in electronic format. When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to paragraph 11, the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file.

(d)     <u>Depositions and Testimony</u>.  Parties or testifying persons or entities may designate depositions and other testimony with the appropriate designation by indicating on the record at the time the testimony is given or by sending written notice of how portions of the transcript of the testimony are designated within thirty (30) days of receipt of the transcript of the testimony. If no indication on the record is made, all information disclosed during a deposition shall be deemed "CONFIDENTIAL – ATTORNEYS' EYES ONLY" until the time within which it may be appropriately designated as provided for herein has passed.  If no confidentiality designation has been made, any Party that wishes to disclose the transcript, or information contained therein,

may provide written notice of its intent to treat the transcript as non-confidential, after which time, any Party that wants to maintain any portion of the transcript as confidential must designate the confidential portions within fourteen (14) days, or else the transcript may be treated as non-confidential.  Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material.  In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order. In the event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties," or their equivalent.  Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter, and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material.  Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

8. **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL"**

(a)     A     Producing     Party     may     designate     Discovery     Material     as "CONFIDENTIAL" if it contains or reflects confidential, proprietary, and/or commercially sensitive information.

(b)     Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL" may be disclosed only to the following:

(i)     The Receiving Party's Outside Counsel, such counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)     Not more than three (3) representatives of the Receiving Party who are officers or employees of the Receiving Party, who may be, but need not be, in-house counsel for the Receiving Party, as well as their immediate paralegals and staff, to whom disclosure is reasonably necessary for this case, provided that:  (a) each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; and (b) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iii)     Any outside expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; and (c) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iv)     Court reporters, stenographers and videographers retained to record testimony taken in this action;

(v)     The Court, jury, and court personnel;

(vi)     Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(vii)    Mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential;

(viii)   Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

(ix)     Any person shown on the face of the Discovery Material to have authored or received it, and any person who had lawful access to the Discovery Material outside the terms of this Protective Order;

(x)      Any other person with the prior written consent of the Producing Party.

9.     **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL – ATTORNEYS' EYES ONLY"**

(a)     A  Producing  Party  may  designate  Discovery  Material  as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" if it contains or reflects confidential, proprietary, and/or commercially sensitive information that cannot safely be disclosed to non-attorney representatives of a Receiving Party.

(b)     Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" may be disclosed only to the following:

**Appxx**

(i)     The Receiving Party's Outside Counsel, such counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)     Any outside expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; and (c) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iii)     Court reporters, stenographers and videographers retained to record testimony taken in this action;

(iv)     The Court, jury, and court personnel;

(v)     Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(vi)     Mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential;

(vii)     Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

(viii)   Any person shown on the face of the Discovery Material to have authored or received it, and any person who had lawful access to the Discovery Material outside the terms of this Protective Order;

(ix)   Any other person with the prior written consent of the Producing Party.

10.   **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE"**

(a)   To the extent production of Source Code becomes necessary to the prosecution or defense of the case, a Producing Party may designate Source Code as "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" if it comprises or includes confidential, proprietary, and/or trade secret Source Code.

(b)   Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(c)   Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" shall be subject to the provisions set forth in Paragraph 11 below, and may be disclosed, subject to Paragraph 11 below, solely to:

(i)   The Receiving Party's Outside Counsel, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)   Any outside expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such expert or consultant is not a current

officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time

of retention to become an officer, director or employee of a Party or of a competitor of a Party;

and (c) no unresolved objections to such disclosure exist after proper notice has been given to all

Parties as set forth in Paragraph 12 below;

(iii)    Court reporters, stenographers and videographers retained to record

testimony taken in this action;

(iv)    The Court, jury, and court personnel;

(v)    Any mediator who is assigned to hear this matter, and his or her

staff, subject to their agreement to maintain confidentiality to the same degree as required by this

Protective Order;

(vi)    Any person shown on the face of the Discovery Material to have

authored or received it, and any person who had lawful access to the Discovery Material outside

the terms of this Protective Order, provided that if such person is a former employee, partner, or

affiliate of  IOENGINE or Ingenico, such person agrees to be bound by the provisions of the

Protective Order by signing a copy of Exhibit A;

(vii)    Any other person with the prior written consent of the Producing

Party.

11.    **<u>DISCLOSURE AND REVIEW OF SOURCE CODE</u>**

(a)    Any Source Code that is produced shall be made available for inspection in

electronic format at the Delaware offices of the Producing Party's outside counsel, or any other

location mutually agreed by the Parties.  Source Code will be made available for inspection

between the hours of 8 a.m. and 6 p.m. on business days (*i.e.*, weekdays that are not Federal

holidays), although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times.

(b)     Prior to the first inspection of any requested Source Code, the Receiving Party shall provide seven (7) days' notice of the Source Code that it wishes to inspect. The Receiving Party shall provide two (2) business days' notice prior to any additional inspections.

(c)     Source Code that is designated "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" shall be produced for inspection and review subject to the following provisions, unless otherwise agreed by the Producing Party:

(i)     All Source Code shall be made available by the Producing Party to the Receiving Party's outside counsel and/or experts in a secure room on a secured computer without Internet access or network access to other computers and on which all access ports have been disabled (except for one printer port), as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal, or other transfer of any Source Code outside or away from the computer on which the Source Code is provided for inspection (the "Source Code Computer" in the "Source Code Review Room"). The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, and such tools shall be disclosed to the Receiving Party upon request and upon three (3) days' notice. The Receiving Party's outside counsel and/or experts may request that additional commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools, approval of which cannot be unreasonably withheld; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections

**AGREED PROTECTIVE ORDER – PAGE 14**

herein.  The Receiving Party must provide the Producing Party with electronic access to such licensed software tool(s) or with a USB drive, CD, or DVD containing such licensed software tool(s) at least five (5) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer.

(ii)     No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room.  The Producing Party shall, however, provide a functioning landline telephone in the Source Code Review Room and make available a nearby breakout room or visitor office with internet access where cellular phones and laptops may be used by the Receiving Party for permitted purposes.

(iii)    The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

(iv)    The Producing Party may, without audio monitoring, visually monitor the activities of the Receiving Party's representatives from outside the Source Code Review Room during any Source Code review, but only to ensure that no unauthorized electronic records of the Source Code and no information concerning the Source Code are being improperly created or transmitted in any way.

(v)     No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided herein.  Further, no other written or electronic record of the Source Code is permitted except as otherwise provided herein.  The Producing Party shall make available a laser printer with commercially reasonable

printing speeds for on-site printing during inspection of the Source Code.  The Receiving Party may print limited portions of the Source Code only when necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report or affidavit).  Any printed portion that consists of more than 10 pages of a continuous block of Source code shall be presumed to be excessive. The Receiving Party may print out no more than 1,000 pages of Source Code absent the written consent of the Producing Party or an Order of the Court.  The Receiving Party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, *i.e.*, as an alternative to reviewing that Source Code electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of Source Code for review and analysis elsewhere.  Upon printing any such portions of Source Code, the printed pages shall be collected by the Producing Party.   The Producing Party shall Bates number, copy, and label "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY - SOURCE CODE" any pages printed by the Receiving Party. Within five (5) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party (for delivery to Receiving Party's outside counsel within two (2) days, or by any other means agreed to by the parties) or (ii) inform the Requesting Party that it objects that the printed portions are not done for a permitted purpose.  If the Producing Party objects that the printed portions are not done for a permitted purpose, the parties shall meet and confer within two (2) business days following such objection.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek the Court's resolution of whether the printed Source Code was printed for a permitted purpose.  Upon resolution of the objection by the parties or by the Court, or if the objection is otherwise retracted by the Producing Party, the Producing Party shall provide one copy of such pages to the Receiving

Party within one two (2) business days (for delivery to Receiving Party's outside counsel within two (2) days, or by any other means agreed to by the parties), but the Producing Party shall make all reasonable efforts to provide such copies to the Receiving Party the next business day.  The printed pages shall constitute part of the Source Code produced by the Producing Party in this action.  To the extent that any printed pages of Source Code are not produced to the Receiving Party for any reason, they shall not count against any limitations on print outs.

(vi)     Members of a Receiving Party's outside law firm who will review a Producing Party's Source Code on behalf of a Receiving Party shall be identified in writing to the Producing Party at least two (2) days in advance of the first time that such person reviews such Source Code.  All other persons who will review a Producing Party's Source Code on behalf of a Receiving Party shall be identified in writing to the Producing Party at least seven (7) days in advance of the first time that such person reviews such Source Code.  Such identification shall be in addition to any other disclosure required under this Order.  All persons viewing Source Code shall, at the request of the Producing Party, sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart.

(vii)    Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room.

(viii)   Proper identification of all authorized persons shall be provided upon request prior to any access to the secure room or the computer containing Source Code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by

the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the Producing Party, to any individual who fails to provide proper identification.

(ix)     Other than as provided above, the Receiving Party will not copy, remove, or otherwise transfer any Source Code from the Source Code Computer including, without limitation, copying, removing, or transferring the Source Code onto any recordable media or recordable device.  The Receiving Party will not transmit any Source Code in any way from the Producing Party's facilities.  The Receiving Party will not electronically transmit any Source Code outside the offices of its outside counsel of record other than when necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report or affidavit) unless such electronically-transmitted Source Code or document containing Source Code is encrypted.

(x)     The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.

(xi)     If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, such filing shall be made under seal or the Parties shall meet and confer regarding alternate arrangements for making such a filing while protecting the confidentiality of the Source Code.

12.      **NOTICE OF DISCLOSURE**

(a)      Prior to disclosing any Protected Material to any person described in Paragraphs 8(b)(ii), 8(b)(iii), 9(b)(ii), or 10(c)(ii) (referenced below as "Person"), the Party seeking to disclose such information shall provide the Producing Party with written notice that includes:

(i) the name of the Person;

(ii) an up-to-date curriculum vitae of the Person;

(iii) the present employer and title of the Person;

Further, the Party seeking to disclose Protected Material shall provide such other information regarding the Person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside expert or consultant.

(b)      Within seven (7) days of receipt of the disclosure of the Person, the Producing Party may object in writing to the Person for good cause. In the absence of an objection at the end of the seven (7) day period, the Person shall be deemed approved under this Protective Order. There shall be no disclosure of Protected Material to the Person prior to expiration of this seven (7) day period. If the Producing Party objects to disclosure to the Person within such seven (7) day period, the Parties shall meet and confer via telephone or in person within five (5) days following the objection and attempt in good faith to resolve the dispute on an informal basis. If the dispute is not resolved, the Party objecting to the disclosure will have five (5) days from the date of the meet and confer to seek relief from the Court. If relief is not sought from the Court within that time, the objection shall be deemed withdrawn. If relief is sought, designated materials shall not be disclosed to the Person in question until the Court resolves the objection.

(c)     For purposes of this section, "good cause" shall include an objectively reasonable concern that the Person will, advertently or inadvertently, use or disclose Discovery Materials in a way or ways that are inconsistent with the provisions contained in this Order.

(d)     Prior to receiving any Protected Material under this Order, the Person must execute a copy of the "Agreement to Be Bound by Protective Order" (Exhibit A hereto) and serve it on all Parties.

13.     **CHALLENGING DESIGNATIONS OF PROTECTED MATERIAL**

(a)     A Party shall not be obligated to challenge the propriety of any designation of Discovery Material under this Order at the time the designation is made, and a failure to do so shall not preclude a subsequent challenge thereto.

(b)     Any challenge to a designation of Discovery Material under this Order shall be written, shall be served on outside counsel for the Producing Party, shall particularly identify the documents or information that the Receiving Party contends should be differently designated, and shall state the grounds for the objection.  Thereafter, further protection of such material shall be resolved in accordance with the following procedures:

(i)     The objecting Party shall have the burden of conferring either in person, in writing, or by telephone with the Producing Party claiming protection (as well as any other interested party) in a good faith effort to resolve the dispute.  The Producing Party shall have the burden of justifying the disputed designation;

(ii)     Failing agreement, the Receiving Party may bring a motion to the Court for a ruling that the Discovery Material in question is not entitled to the status and protection of the Producing Party's designation.  The Parties' entry into this Order shall not preclude or prejudice either Party from arguing for or against any designation, establish any presumption that

a particular designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information;

(iii)    Notwithstanding any challenge to a designation, the Discovery Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the Party who designated the Discovery Material in question withdraws such designation in writing; or (b) the Court rules that the Discovery Material in question is not entitled to the designation.

14.    **SUBPOENAS OR COURT ORDERS**

(a)    If at any time Protected Material is subpoenaed by any court, arbitral, administrative, or legislative body, the Party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every Party who has produced such Discovery Material and to its counsel and shall provide each such Party with an opportunity to move for a protective order regarding the production of Protected Materials implicated by the subpoena.

15.    **FILING PROTECTED MATERIAL**

(a)    Absent written permission from the Producing Party or a court Order secured after appropriate notice to all interested persons, a Receiving Party may not file or disclose in the public record any Protected Material.

(b)    The foregoing sub-paragraph notwithstanding, any Party is authorized under Local Rule 5.1.3 to file under seal with the Court any brief, document, or materials that are designated as Protected Material under this Protective Order.  However, nothing in this section shall in any way limit or detract from this Protective Order's requirements as to Source Code.

16.   **INADVERTENT DISCLOSURE OF PRIVILEGED MATERIAL**

(a)     The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b)     Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such or certify destruction of Protected Material or Discovery Material and all copies to the Producing Party.

(c)     At the request of the Receiving Party, the Producing Party shall promptly provide a record containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

17.   **INADVERTENT FAILURE TO DESIGNATE PROPERLY**

(a)     The inadvertent failure by a Producing Party to designate Discovery Material as Protected Material with one of the designations provided for under this Order shall not waive any such designation provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within seven (7) days of the Producing Party learning of the inadvertent failure to designate. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7)

days upon its notification to the Receiving Parties.  Upon receiving the Protected Material with the correct confidentiality designation, the Receiving Parties shall return or securely destroy, at the Producing Party's option, all Discovery Material that was not designated properly.

(b)      A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless it is clear on its face that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material at the appropriately designated level pursuant to the terms of this Order.

18.   **<u>INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER</u>**

(a)      In the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure.  The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made.

(b)      Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive the right to hold the disclosed document or information as Protected.

19.   **FINAL DISPOSITION**

      (a)    Not later than ninety (90) days after the Final Disposition of this case, each Party shall return all Discovery Material of a Producing Party to the respective outside counsel of the Producing Party or destroy such Material, at the option of the Producing Party.  For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

      (b)    All Parties that have received any such Discovery Material shall certify in writing that all such materials have been returned to the respective outside counsel of the Producing Party or destroyed.  Notwithstanding the provisions for return of Discovery Material, outside counsel may retain one set of pleadings, correspondence, and attorney and consultant work product (but not document productions) for archival purposes, but must return or destroy any pleadings, correspondence, and consultant work product that contain Source Code.

20.   **DISCOVERY FROM EXPERTS OR CONSULTANTS**

      (a)    Absent good cause, drafts of reports of testifying experts, and reports and other written materials, including drafts, of consulting experts, shall not be discoverable in accordance with Fed. R. Civ. P. 26(b)(4)(B).

      (b)    Testifying experts shall not be subject to discovery with respect to any draft of his or her report(s) in this case.  Draft reports, notes, or outlines for draft reports developed and drafted by the testifying expert and/or his or her staff are also exempt from discovery.

      (c)    Discovery of materials provided to testifying experts shall be limited to those materials, facts, consulting expert opinions, and other matters actually relied upon by the testifying expert in forming his or her final report, trial or deposition testimony, or any opinion in this case. No discovery can be taken from any non-testifying expert except to the extent that such

non-testifying expert has provided information, opinions, or other materials to a testifying expert relied upon by that testifying expert in forming his or her final report(s), trial and/or deposition testimony, or any opinion in this case.

(d)    No conversations or communications between counsel and any testifying or consulting expert will be subject to discovery unless the conversations or communications are relied upon by such experts in formulating opinions that are presented in reports or trial or deposition testimony in this case.

(e)    Materials, communications, and other information exempt from discovery under the foregoing sub-Paragraphs 20(a)-(d) shall be treated as attorney-work product for the purposes of this litigation and Order.

(f)    Nothing in Protective Order, including the foregoing sub-Paragraphs 20(a)-(d), shall alter or change in any way the requirements in Paragraph 11 regarding Source Code, and Paragraph 11 shall control in the event of any conflict.

21.    **MISCELLANEOUS**

(a)    <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.  By stipulating to this Order, the Parties do not waive the right to argue that certain material may require additional or different confidentiality protections than those set forth herein.

(b)    <u>Termination of Matter and Retention of Jurisdiction</u>.  The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Determination of the above-captioned matter.  The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

(c)     <u>Successors</u>.   This Order shall be binding upon the Parties hereto, their attorneys, and their successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, retained consultants and experts, and any persons or organizations over which they have direct control.

(d)     <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item.   Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.   This Order shall not constitute a waiver of the right of any Party to claim in this action or otherwise that any Discovery Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this action or any other proceeding.

(e)     <u>Burdens of Proof</u>.   Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Discovery Material is confidential, which level of confidentiality is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

(f)     <u>Modification by Court</u>.   This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order *sua sponte* in the interests of justice. The United States District Court for the District Of Delaware is responsible for the interpretation and enforcement of this Order.   All disputes concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the District of Delaware.

(g)    <u>Discovery Rules Remain Unchanged</u>.  Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders, except as expressly stated.  Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders.

22.    **OTHER PROCEEDINGS**.  By entering this Protective Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Protective Order who becomes subject to a motion to disclose another party's information designated as confidential pursuant to this Protective Order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

**SO ORDERED**.

_____

United States District Judge

## EXHIBIT A

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Ingenico Inc. v. IOENGINE, LLC*, United States District Court, District of Delaware, Civil Action No. 1:18-cv-826 (CFC).  Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address:_____

Dated: _____

_____

[Signature]

**AGREED PROTECTIVE ORDER – EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGENICO INC., <br>    *Plaintiff,* <br><br> v. <br><br> IOENGINE, LLC, <br>    *Defendant.* <br> ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ <br> IOENGINE, LLC, <br>    *Counterclaim Plaintiff,* <br> v. <br><br> INGENICO INC., INGENICO CORP., and <br> INGENICO GROUP SA, <br>    *Counterclaim Defendants.* | § <br> § <br> § <br> §   C.A. No. 18-826-WCB <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## <u>JUDGMENT</u>

This action came before the Court for a trial by jury beginning on July 11, 2022.  The issues have been tried and the jury has rendered its verdict (D.I. 500). Therefore,

IT IS HEREBY ORDERED AND ADJUDGED that:

1. Judgment is entered for Defendant and Counterclaim Plaintiff IOENGINE, LLC ("IOENGINE") that claim 3 of United States Patent No. 9,059,969 ("the '969 patent") is infringed as set out in the verdict form (D.I. 500);

2. Judgment is entered for Plaintiff and Counterclaim Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group SA (collectively, "Ingenico") that Ingenico does not infringe claim 10 of the '969 patent as set out in the verdict form (D.I. 500);

3. Judgment is entered for IOENGINE that claims 56, 90, 101, 105, and 124 of United States Patent No. 9,774,703 ("the '703 patent") are infringed as set out in the verdict form (D.I. 500);

**Appx1**

4.  Judgment is entered for Ingenico that Ingenico does not infringe claim 114 of the '703 patent as set out in the verdict form (D.I. 500);

5.  Judgment is entered for Ingenico that claim 3 of the '969 patent is invalid for anticipation as set out in the verdict form (D.I. 500);

6.  Judgment is entered for Ingenico that claims 56, 90, 101, 105, and 124 of the '703 patent are invalid for anticipation as set out in the verdict form (D.I. 500);

7.  Judgment is entered for Ingenico that claim 3 of the '969 patent is invalid for obviousness as set out in the verdict form (D.I. 500); and

8.  Judgment is entered for Ingenico that claims 56, 90, 101, 105, and 124 of the '703 patent are invalid for obviousness as set out in the verdict form (D.I. 500).


IT IS SO ORDERED.

SIGNED this 25th day of July, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

INGENICO INC.,

§
§
*Plaintiff,*

§
§
v.

§
§
IOENGINE, LLC,

§
§
*Defendant.*

§
§
§

Civil Action No. 18-826-WCB

**FILED UNDER SEAL**

_____

IOENGINE, LLC,

§
§
*Counterclaim Plaintiff,*

§
§
v.

§
§
INGENICO INC.,
INGENICO CORP., and
INGENICO GROUP S.A.,

§
§
§
§
*Counterclaim Defendants.*

§
_____

## MEMORANDUM OPINION AND ORDER

In this patent case IOENGINE, LLC, alleged that Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. (collectively, "Ingenico") infringed several claims of U.S. Patent Nos. 9,059,969 ("the '969 patent") and 9,774,703 ("the '703 patent"). At the conclusion of a trial held between July 11, 2022, and July 15, 2022, the jury found that Ingenico had infringed claim 3 of the '969 patent and claims 56, 90, 101, 105, and 124 of the '703 patent, and that Ingenico had not infringed claim 10 of the '969 patent or claim 114 of the '703 patent. The jury also found that claim 3 of the '969 patent

and claims 56, 90, 101, 105, and 124 of the '703 patent were invalid for both anticipation and obviousness. Because Ingenico asserted invalidity as a defense and not as a counterclaim, the jury did not enter verdicts on the validity of claim 10 of the '969 patent or claim 114 of the '703 patent.

Following the trial, I entered judgment on the verdict. Dkt. No. 506. IOENGINE subsequently filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and, in the alternative, for a new trial under Federal Rule of Civil Procedure 59(a). Dkt. No. 512. I held oral argument on IOENGINE's motion on December 6, 2022.

## I.    <u>Background</u>

The '969 and '703 patents, which share a common specification, are directed to a device that the patents refer to as a "tunneling client access point" ("TCAP"). The patents describe the TCAP as "a highly secure, portable, [and] power efficient storage and data processing device." '969 patent, Abstract. In a preferred embodiment, the TCAP is a Universal Serial Bus ("USB") device that connects to an "access terminal" (e.g., a desktop computer, server, or mobile device). *Id.* at col. 3, ll. 46–54. In some embodiments, a user can "observe data stored on the TCAP without it being resident on the [access terminal]," a feature that "can be useful to maintain higher levels of data security." *Id.*, Abstract. In other embodiments, "the TCAP may tunnel data through an [access terminal] across a communications network to access remote servers." *Id.* Put more simply, the claimed inventions allow a user to employ processing and storage resources on the TCAP device while making use of the display and network connection associated with the access terminal.

Ingenico's accused products are mobile credit card readers used by merchants who run a payment processing software application on a smartphone or tablet. In addition, Ingenico provides a payment application, known as "RoamPayX," to a small number of its customers, and IOENGINE accused that application of infringing the asserted claims when it is used with certain card readers.

2

The majority of Ingenico's customers do not use RoamPayX, but instead write their own applications using Ingenico's Application Programming Interfaces ("APIs") and/or Software Development Kits ("SDKs").

At trial, Ingenico introduced evidence regarding a device known as the "DiskOnKey," a portable USB drive that was manufactured and sold in the early 2000s by an Israeli company, M-Systems, Ltd.[1] Ingenico argued that the asserted claims of the '969 and '703 patents were anticipated by a version of the DiskOnKey device featuring a firmware upgrade application that allowed users to upgrade the firmware installed on DiskOnKey devices and an SDK designed for use with the DiskOnKey.[2] Ingenico also argued that the asserted claims would have been obvious in view of the combination of the DiskOnKey system and U.S. Patent Publication No. 2004/0039932 ("Elazar").

## II.     Motion for Judgment as a Matter of Law

In its motion for judgment as a matter of law, IOENGINE challenges various aspects of the jury's verdict in this case. For the reasons set forth below, the motion for judgment as a matter of law is denied.

Federal Rule of Civil Procedure 50(a) provides that a motion for judgment as a matter of law may be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-movant on an issue. When a party renews its motion for

---

[1] In 2006, M-Systems was acquired by SanDisk Corporation, which has since been acquired by Western Digital Technologies, Inc. *See* Dkt. No. 463 at 2.

[2] The DiskOnKey SDK is a library of functions that enables software developers to write programs that interact with physical DiskOnKey devices. Tr. 790:4–19. That is, the developers can use code from the DiskOnKey SDK to interact with the DiskOnKey firmware. Tr. 805:20–806:10. For instance, developers can call functions to retrieve the firmware version of a DiskOnKey device, or to retrieve the public key that is associated with a particular DiskOnKey. *See id.*; Tr. 814:10–24; DX333 at 36, 72. This opinion refers to the functionality of the physical DiskOnKey devices that can be leveraged by developers through the SDK as the "SDK capabilities."

3

judgment as a matter of law after the conclusion of a jury trial, that party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (citation omitted).

IOENGINE raises four specific challenges to the jury's verdict in its motion for judgment as a matter of law: (1) substantial evidence did not support a finding that the DiskOnKey device and its firmware upgrade application and SDK were prior art; (2) substantial evidence did not support a conclusion that Mr. McNulty's invention date was later than July 26, 2001; (3) substantial evidence did not support a finding of anticipation or obviousness based on the DiskOnKey device and the firmware upgrade application; and (4) substantial evidence did not support a verdict of obviousness based in part on the Elazar reference.

### A. DiskOnKey as Prior Art Under 35 U.S.C. § 102(b)

IOENGINE first argues that substantial evidence did not support a conclusion that the DiskOnKey system was prior art for purposes of section 102(b). Specifically, IOENGINE contends that there was insufficient evidence from which the jury could conclude that the DiskOnKey and its associated firmware upgrade application and SDK capabilities were either on sale or in public use (or both) prior to the critical date of March 23, 2003.[3]

---

[3] The version of section 102(b) that applies to this case is the version that pre-dated the Leahy-Smith America Invents Act of 2011 ("AIA"), because the patents in suit have effective filing dates prior to March 16, 2013, the effective date of the amendments to section 102(b) made by the 2011 Act.

4

### 1. On Sale

Under pre-AIA section 102(b), a device is prior art to a patented invention if it was "on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (2006). IOENGINE argues that there was insufficient evidence at trial to support a finding that the firmware upgrade application was "on sale" for purposes of section 102(b). Specifically, IOENGINE argues that "the evidence indicated only that some version of the firmware upgrade application may have been separately made available for download—ostensibly for free and without consideration," and that there was no evidence that the firmware upgrade application was ever sold in combination with a physical DiskOnKey device. Dkt. No. 513 at 20.

That argument mischaracterizes the evidence at trial regarding the DiskOnKey and the firmware upgrade application. Ingenico introduced evidence that the firmware upgrade application was initially made available to users in July 2002 via a download link on the M-Systems website. *See, e.g.*, DX330. In addition, Ingenico introduced evidence that M-Systems began including the firmware upgrade application on physical DiskOnKey devices that were sold to customers at least as early as November 8, 2002. *See* DX089; Tr. 782:3–783:21. Specifically, Ingenico introduced a page from the M-Systems website that stated: "[The] DiskOnKey already comes with several applications that demonstrate [the] terrific new potential [of the DiskOnKey]. Users can secure their devices and files using the KeySafe application, or upgrade their firmware using the Upgrade program." DX089. Based on that webpage, which was available at least by November 8, 2002, the jury reasonably could have found that the firmware upgrade application was included on physical DiskOnKey devices that were sold to customers from at least that date on.

Examination of the sales records introduced by Ingenico shows that M-Systems made numerous sales of the DiskOnKey in the United States in late 2002 and early 2003. Ingenico

5

introduced a spreadsheet of M-Systems' sales records, which listed 139 invoices for sales of DiskOnKey products to customers in the United States between November 8, 2002, and December 31, 2002. DX316. A second spreadsheet introduced by Ingenico showed that M-Systems listed 352 invoices for sales of DiskOnKey products to customers in the United States between January 1, 2003, and the critical date of March 23, 2003, one year before the priority date for the '969 and '703 patents. DX317. Those spreadsheets listed the number of sales, the identity and location of the purchasers, and the price paid for each purchase.[4] From those records and the M-Systems November 8, 2002, webpage, the jury reasonably could have concluded that M-Systems sold DiskOnKey devices that included the firmware upgrade application to customers in the United States prior to March 23, 2003. IOENGINE is thus incorrect in contending that "no evidence indicated that [physical DiskOnKey devices] were sold in combination with the firmware upgrade application." *See* Dkt. No. 513 at 20.

Apart from the firmware upgrade application, IOENGINE argues that the DiskOnKey SDK was neither sold nor offered for sale. Dkt. No. 513 at 23 n.25. IOENGINE raised this argument only in a footnote and therefore has forfeited it. *See Nw. Univ. v. Universal Robots A/S*, No. 21-149, 2022 WL 903892, at *6 & n.26 (D. Del. Mar. 28, 2022) ("[C]ourts traditionally do not consider arguments presented entirely in footnotes.") (citing cases); *Gavrieli Brands LLC v. Soto Massini (USA)*, No. 18-462, 2020 WL 1443215, at *5 (D. Del. Mar. 24, 2020); *Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*, No. 17-1086, 2018 WL 5669168, at *13 n.12 (D. Del. Nov. 1, 2018); *Campbell v. Sussex Cnty. Fed. Credit Union*, No. 10-710, 2015 WL 3918946, at *1 (D. Del. June 22, 2015) ("The

---

[4] The spreadsheets list all transactions; the numbers of sales listed above include only those transactions that constituted sales, i.e., transactions for payment to M-Systems. A number of those sales transactions were for multiple DiskOnKey devices.

Court will not address issues raised in footnotes . . . ."); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[A]rguments raised in footnotes are not preserved.").

Even if IOENGINE had not forfeited that argument, it would be without merit, for the following reasons: Ingenico's expert, James Geier, explained that the DiskOnKey SDK is a set of functions that allows a software developer to access certain functionality on the DiskOnKey device. *See* Tr. 805:8–806:5.[5] For example, the SDK may enable a developer to obtain the firmware version of a DiskOnKey device, Tr. 806:6–10; DX333.36, or to obtain the public key of a DiskOnKey device, Tr. 814:6–815:12; DX333.72. Mr. Geier relied on the DiskOnKey SDK documentation, which was in evidence, DX333, to illustrate that the DiskOnKey device had certain capabilities, such as authentication. *See* Tr. 811:5–12, 812:14–818:22.

With respect to authentication (or verification) capability, which was recited in claim 3 of the '969 patent and claims 56 and 105 of the '703 patent, Mr. Geier testified that the DiskOnKey firmware upgrade application would authenticate the DiskOnKey device using an authentication protocol based on Public Key Infrastructure ("PKI"). Tr. 811:5–12, 812:12–18. To support that opinion, Mr. Geier relied on multiple disclosures in the DiskOnKey SDK documentation. First, the documentation stated that "[t]he DiskOnKey enables PKI-based authentication and signing in a highly secure environment." DX333.71; *see also* Tr. 818:12–18. Second, the documentation indicated that software developers could use a function called "getPublicKey" to obtain the public key of a DiskOnKey device. DX333.72; *see also* Tr. 814:6–815:12. The documentation added that "the DiskOnKey public key is unique for each DiskOnKey." DX333.72; *see also* Tr. 815:13–816:2. Third, Mr. Geier added that "we know from the SDK" that "there is a private key sitting on the

[5] Citations to "Tr." refer to the transcript of the jury trial, which can be found at Dkt. Nos. 507–11.

7

DiskOnKey" that would be used for PKI-based authentication. Tr. 816:3–818:8. In short, Mr. Geier relied on the SDK documentation to establish that the physical DiskOnKey device would have the capability to authenticate using PKI.

The critical question is whether the DiskOnKey devices that were sold in the United States prior to March 23, 2003, had SDK capabilities. The jury heard testimony from Eyal Sobol, a Western Digital employee familiar with the M-Systems products, who testified that the SDK documentation accurately described the capabilities of the DiskOnKey device. Tr. 735:5–8, 744:18–21. The jury also saw evidence indicating that the SDK capabilities became available on the DiskOnKey in September 2002. *See* DX307; DX333.1. Based on the evidence before it, the jury could reasonably have concluded that the DiskOnKey devices that were sold in the United States after September 2002 had SDK capabilities, and thus that the DiskOnKey devices that were on sale during late 2002 and early 2003 satisfied all the limitations of the claims that the jury found invalid.

IOENGINE argues that the M-Systems press releases regarding the DiskOnKey firmware upgrade application and SDK capabilities were, at most, advertisements and did not constitute offers for sale under section 102(b). While the press releases by themselves were not offers for sale, they were highly relevant because they showed that the firmware upgrade application and SDK capabilities were available for the DiskOnKey as early as July and September of 2002. Moreover, IOENGINE's argument directed to the press releases does not undermine Ingenico's proof of invalidating sales prior to the critical date, given the clear and specific evidence that numerous sales of the DiskOnKey devices with the firmware upgrade application and SDK capabilities were made in the United States at least as early as November 8, 2002. The sales made between November 8, 2002, and March 23, 2003, triggered the on-sale bar of section 102(b) without regard to whether there were any separate offers for sale during or before that period. In particular, the evidence was

8

sufficient to show that the DiskOnKey devices that were sold during that period had processors, the firmware upgrade applications, and SDK capabilities. Accordingly, IOENGINE's motion for judgment as a matter of law with respect to the on-sale bar is denied.

### 2. Public Use

IOENGINE argues that there was insufficient evidence to conclude that the DiskOnKey and its associated firmware upgrade application and SDK capabilities were in public use prior to March 23, 2003. Under pre-AIA 35 U.S.C. § 102(b), a device is prior art to a patented invention if it was "in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." Because substantial evidence supports a conclusion that the DiskOnKey with the firmware upgrade application and SDK capabilities is prior art by virtue of being on sale, the judgment can be upheld even if the evidence is insufficient to support the jury's verdict on the public use issue. *See Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011) ("A general jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity."); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ("We will uphold . . . a [jury] verdict [of infringement] if there was sufficient evidence to support any of the plaintiff's alternative factual theories; we assume the jury considered all the evidence and relied upon a factual theory for which the burden of proof was satisfied."); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014). In any event, there is substantial evidence to support a finding that the DiskOnKey system was in public use prior to March 23, 2003.

In IOENGINE's view, the evidence Ingenico presented to the jury was insufficient to establish public use because the evidence failed to demonstrate that there was an "actual use by someone at some point" of either the firmware upgrade application or the SDK prior to March 23,

9

2003. Dkt. No. 513 at 14 (citing *Minn. Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1303 (Fed. Cir. 2002)). While IOENGINE concedes that the jury saw evidence that the DiskOnKey firmware upgrade application was made available to the public on the M-Systems website, IOENGINE argues that there is no evidence from which a jury could conclude that the software or SDK was ever downloaded from the website or used by anyone. In particular, IOENGINE argues that the jury heard no evidence "that anyone ever accessed the site, downloaded the application, or actually used [the firmware upgrade application], much less in this country." Dkt. No. 513 at 14.

To begin with, IOENGINE's argument is based on a misapprehension as to the nature of the public use evidence. The evidence of public use of the firmware upgrade application and the SDK capabilities was not limited to the use of those features by persons who downloaded material from M-Systems' website; it included the evidence that large numbers of sales were made in late 2002 and early 2003 of DiskOnKey devices that already contained those features. Moreover, the case law on which IOENGINE relies does not support its conclusion that the evidence of public use was legally insufficient.

In its briefs, IOENGINE relies heavily on the *Minnesota Mining* case to support its argument that the evidence of public use is insufficient, but a close examination of that case shows that it does not support IOENGINE's position. The defendants in *Minnesota Mining* asserted that a substance called "Ricoseal," which was manufactured by a third party, embodied the asserted claims and was in public use because "samples of Ricoseal were sent to various corporations." *Minn. Min.*, 303 F.3d at 1305, 1307. The record in that case showed, however, that the Ricoseal product was a two-part composition that needed to be mixed together before being used. *Id.* at 1307. The asserted claim also required that the Ricoseal composition be used with a "signal transmission device," and the plaintiff pointed out that the defendants presented no evidence "that the mixture was applied to a

10

signal transmission device." *Id.* at 1298, 1307. The failure of proof, therefore, was based not only on the fact that there was no evidence that the corporations receiving the samples of Ricoseal ever mixed the two components together, but also on the absence of evidence that any of the recipients of Ricoseal ever used it with a signal transmission device, even assuming any of the recipients ever mixed the components together. That point is underscored by the fact that the defendants argued to the Federal Circuit that Ricoseal was merely "*intended* to be used with a signal transmission device." *Minn. Min. & Mfg. Co. v. Chemque, Inc.*, Nos. 00-1429, 00-1517, Appellees and Cross-Appellants' Br. 17 (Fed. Cir. Feb. 7, 2001) (emphasis added). The evidence presented by the defendants in *Minnesota Mining* therefore fell short of showing that there was any public use of the product recited in the asserted claim. The evidence of public use in this case is considerably stronger, as discussed in more detail below.

IOENGINE seizes on a statement in the *Minnesota Mining* court's discussion of prior use under section 102(a). After finding that the defendants had not "directed this court to any record evidence showing that anyone ever used Ricoseal," the court noted that "there is not substantial evidence of use of the Ricoseal product; there is no direct evidence of its use." 303 F.3d at 1307. From that statement, IOENGINE infers that direct evidence is required for proof of public use under section 102(b), and that circumstantial evidence, no matter how compelling, can never suffice to prove public use under that statute. IOENGINE's argument overreads the court's opinion in *Minnesota Mining*.

The court's reference to "no direct evidence" was a characterization of the lack of evidence in that case as to prior knowledge of the invention under the "known or used" requirement of section 102(a). Even apart from the fact that the court was addressing section 102(a), not section 102(b), the context of the court's statement makes clear that the court was not setting forth a proof requirement

11

for all cases. That is, the court's language cannot fairly be read as establishing a bright-line rule that there must always be direct evidence of prior use in order to satisfy the public use requirement of section 102(b) and that circumstantial evidence will never suffice.[6]

The proper test for public use under section 102(b) is simply whether the invention was "accessible to the public" or "commercially exploited." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). In assessing whether that standard was met, "[e]ither direct or circumstantial evidence corroborating public use may be sufficient for a party to meet its burden of proof." *TransWeb, LLC v. 3M Innovative Props. Co.*, 16 F. Supp. 3d 385, 393 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016).

Courts have treated circumstantial evidence of public accessibility such as press releases, download websites, and advertisements as appropriate evidence of public use. *See, e.g.*, *Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*, No. 14-cv-1918, 2014 WL 12597154, at *6 (C.D. Cal. Dec. 22, 2014) (holding, on a motion for summary judgment, that evidence of a prior art product being advertised in a catalog and on Facebook was sufficient to create a triable issue regarding public use); *Phoenix Sols., Inc. v. W. Interactive Corp.*, No. 09-cv-8156, 2010 WL 6032841, at *7 (C.D.

---

[6] The distinction between direct and circumstantial evidence, which is often unclear, is of questionable importance in this context, since "an implication that circumstantial evidence is weaker than direct evidence is incorrect." *United States v. Godinez*, 7 F.4th 628, 639 (7th Cir. 2021). Rather, "[c]ircumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable." *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003); *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir. 1974). It therefore would not be proper to overturn a jury's invalidity verdict solely on the basis that the evidence the jury heard would be better classified as circumstantial rather than direct evidence.

IOENGINE points out that the court in *Minnesota Mining* stated that public use requires "actual use by someone at some point." 303 F.3d at 1307. That is not in dispute. What the parties disagree about is whether proof of such use must be by direct evidence or may be by circumstantial evidence. In this case, the circumstantial evidence is sufficient to show that there was actual use of the DiskOnKey device, combined with the firmware upgrade application and the SDK capabilities, in the United States "by someone at some point."

Cal. Aug. 25, 2010), *aff'd*, 438 F. App'x 897 (Fed. Cir. 2011) (holding, on a motion for summary judgment, that evidence that a prior art system was "regularly publicized . . . through conferences, workshops, and published articles," and "*could be* launched anywhere through the Web or over the telephone" was evidence of public use (emphasis added)); *Finjan, Inc. v. Symantec Corp.*, No. 10-cv-593, 2013 WL 5302560, at *6–7 (D. Del. Sept. 19, 2013), *aff'd*, 577 F. App'x 999 (Fed. Cir. 2014) (considering, among other evidence, user manuals and press releases that supported a finding of public use).

Ingenico introduced various items of evidence that could support a finding by clear and convincing evidence that the firmware upgrade application was in public use. First, as noted, the large numbers of U.S. sales of the DiskOnKey with the firmware upgrade application already loaded onto the device provided strong circumstantial evidence that devices containing that feature were in use in this country. Second, even ignoring those sales, the jury saw an earlier email that was sent by M-Systems to its employees regarding the firmware upgrade application for the DiskOnKey. DX330. That email, which was accompanied by a DiskOnKey "ReadMe" file, DX331, containing details about the functionality of the firmware upgrade application, encouraged the employees to "pass this information along to your partners, customers, reps and distributors," and indicated that the application could "be downloaded from the [DiskOnKey] website . . . starting from [July 10, 2002]." *Id.* Third, the jury saw a July 11, 2002, press release issued by M-Systems in Fremont, California, that promoted the launch of the firmware upgrade application and explained the benefits of the application. *See* DX097. Fourth, the jury saw screenshots of the M-Systems website indicating that the application was available for download. DX402. Fifth, Mr. Geier testified that "there would be . . . many people that would think they need to upgrade the firmware and would be downloading

13

the firmware [upgrade application]" and the Readme file from the M-Systems website. Tr. 1142:15–25.

There was also evidence in the record sufficient to support a finding that the SDK capabilities of the DiskOnKey were in public use. First, as noted, the devices sold at least as of November 8, 2002, had the SDK capabilities. Second, the jury saw a press release from September 2002 announcing the launch of the DiskOnKey SDK. DX307. Third, the jury saw a screenshot of an M-Systems web page that described the SDK and allowed users to download a data sheet of the SDK. DX403. Fourth, the jury saw an 84-page manual detailing the functionality of the SDK that was dated in September 2002, like the press release. DX333. Fifth, the jury heard testimony from Mr. Sobol, who testified that the information in the SDK manual "reflect[ed] how the product actually function[ed]." Tr. 735:5–8; *see also* Tr. 744:14-21.

IOENGINE argues that there was insufficient evidence that the SDK was in public use because the M-Systems press release announcing the launch of the SDK indicated that the SDK would be made available only to "select partners and software development companies" upon request. Dkt. No. 513 at 16 n.16 (citing DX307). That argument was raised only in a footnote and is therefore forfeited. *See, e.g.*, *Nw. Univ.*, 2022 WL 903892, at *6 & n.26. In any event, the argument is unpersuasive.

First, as discussed with respect to the on-sale bar in section II.A.1, the key question is not whether the SDK itself was in public use but rather is whether the DiskOnKey devices that were in public use had SDK capabilities prior to March 23, 2003. The evidence that the SDK was available as of September 2002 and that its documentation reflected how the DiskOnKey devices "actually function[ed]" is sufficient evidence for a jury to find that the DiskOnKey devices that were in public use had SDK capabilities. *See* Tr. 735:5–8; DX307; DX333; DX403.

14

Second, DX307 would not undermine a finding that the SDK itself was in public use. As discussed in section III.A.3 below, public use "includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002). Thus, although DX307 indicates that the SDK itself was available only upon request, the press release is circumstantial evidence that someone other than the inventors of the DiskOnKey used the DiskOnKey SDK. That evidence, combined with the fact that a datasheet for the SDK was made available to the public on the M-Systems website, DX403, is sufficient to support a conclusion that the SDK was used by a person other than the inventor who was not under any obligation of secrecy.

At bottom, the evidence is sufficient to support a finding that the firmware upgrade application and SDK were accessible to the public. Although there is no direct evidence that any particular person used or downloaded the firmware upgrade application or SDK capabilities, a jury is entitled to "make reasonable inferences" about whether the evidence demonstrated a public use. *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 967 (Fed. Cir. 2020). Indeed, the role of circumstantial evidence is particularly important in a case such as this one, "where so much time has elapsed between the key events and the suit." *TransWeb*, 16 F. Supp. 3d at 393. In this case that length of time is approximately 20 years.

IOENGINE argues that even if there was sufficient evidence to support a finding of public use generally, the evidence did not establish that there was any public use of the features of the invention in the United States. The evidence showed that although M-Systems leased space for sales offices in California, much of M-Systems' business activity was conducted in Israel. Accordingly, IOENGINE contends that there is no evidence that the firmware upgrade application was ever

15

downloaded or used in the United States, or that the claimed "communications network node" was ever known, used, or on sale in this country.

Based on the record evidence, the jury in this case could readily have concluded that the firmware upgrade application was used in the United States. To begin with, the M-Systems sales spreadsheets identified hundreds of sales of DiskOnKey devices with the firmware upgrade to customers in the United States as early as November 2002. In addition, the press release announcing the firmware upgrade application was in English and was released from Fremont, California. DX097. The email that encouraged M-Systems employees to notify others about the firmware upgrade application was sent to M-Systems employees in this country. DX330. And the webpage that contained the download link to the firmware upgrade application was in English and would have been accessible by American users. DX402; *see also Finjan*, 2013 WL 5302560, at *7 (Evidence that an online bulletin board regarding a prior art software product "was accessible to people in the United States who had modems" supported a finding of public use even though a manual suggested that the product was only available in the Netherlands.). In view of that evidence, a jury could permissibly have found that the public use of the firmware upgrade application occurred in the United States.

IOENGINE next argues that it was not clear that all the evidence Ingenico relied upon with respect to the firmware upgrade application represented the same version of that application. In particular, IOENGINE argues that Ingenico's evidence shows at most that "some version of the application was available for download online." Dkt. No. 513 at 21.

The jury could have concluded from the trial record that the firmware upgrade application was encompassed in a single version of software. The evidence showed that the Readme file relied upon by Mr. Geier was the same file that was sent to M-Systems employees for distribution in July

16

2002. Dkt. No. 523 at 20; DX330; DX331. And the metadata for the firmware upgrade application lists a last modified date of June 26, 2002, which is within the same timeframe. DX329.

Lastly, IOENGINE argues that the evidence did not support a finding of public use of the invention because the DiskOnKey "would not have informed the public of Mr. McNulty's invention." Dkt. No. 513 at 17. As discussed in further detail below with respect to the jury instructions, a public use need not be informing to be invalidating prior art. All that is required is that the public use "related to a device that embodied the invention." *Zenith Elecs. Corp. v. PDI Commc'n Sys.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008). IOENGINE's argument on that point therefore fails.[7]

In sum, there is substantial evidence to support a jury finding that the DiskOnKey device and its associated firmware upgrade application and SDK capabilities were in public use prior to March 23, 2003. IOENGINE's motion for judgment as a matter of law is therefore denied with respect to public use.

## B. DiskOnKey As Prior Art Under 35 U.S.C. § 102(a)

IOENGINE next argues that there was not substantial evidence to conclude that the DiskOnKey system was prior art under the pre-AIA version of 35 U.S.C. § 102(a). Section 102(a)

---

[7] IOENGINE quotes an internal M-Systems presentation from 2003 that stated: "Normally there is no need to use DOK Upgrade . . . . We hope there will never be a need to use it." Dkt. No. 513 at 16 (citing DX336, at 5–6). According to IOENGINE, that is evidence that the upgrade application was not in use. IOENGINE's argument misses the point. As indicated, the upgrade application was incorporated in the DiskOnKey devices at least as early as November 2002. The application was therefore in public use even though the owner of a DiskOnKey might seldom (or never) need to actually employ the upgrade application to upgrade his DiskOnKey device. Likewise, if even a single person downloaded the firmware upgrade application from the M-Systems website, the application would have been in public use regardless of whether that person ever ran the application to update the firmware of a DiskOnKey device. What is required is that there was public accessibility to the upgrade application, not that any person in possession of a DiskOnKey actually used the upgrade application to update the DiskOnKey firmware.

17

provides that a device is prior art to a patented invention if the device was "known or used by others in this country . . . before the invention thereof by the applicant for patent." IOENGINE contends that the DiskOnKey with the firmware update was not "known by or used by others" for purposes of section 102(a) for the same reasons that it was not "on sale or in public use" for purposes of section 102(b). In addition, IOENGINE argues that there was no substantial evidence at trial to support a conclusion that Mr. McNulty's invention date was later than July 26, 2001.[8]

At trial, Mr. McNulty testified that he conceived of the invention in June of 2001. IOENGINE sought to support Mr. McNulty's claim of conception by pointing to a July 2001 memo prepared by Mr. McNulty entitled "Portable Devices Rule" ("the PDR memo"). PX235. IOENGINE argued that the following statement in the PDR memo evidenced conception of the "portable device identifier information" and "verification" limitations of several of the asserted claims: "Hi. I am here from a person's pocket and I would like to copy your content." *Id.* However, as Mr. Geier explained on behalf of Ingenico, that language offered "no indication of whether or not that [device could] be used for any sort of authentication or verification with the server," and rather "just ma[de] the notice that I want to copy your content . . . like a request to copy content." Tr. 866:12–867:14. To the

---

[8] IOENGINE contends that Ingenico waived its prior art argument under section 102(a) when in closing argument Ingenico's counsel stated, in connection with his section 102(b) argument, that the DiskOnKey was prior art "simply because it's dated before March 23, 2003. Mr. McNulty's invention date [is] irrelevant to that. Mr. McNulty's conception date is irrelevant to that. Mr. McNulty's reduction to practice is irrelevant to that. If it's before March 23, 2003, it is prior art." Tr. 1362 at 5–11. That argument, and the point that Mr. McNulty's conception and reduction to practice were irrelevant was focused on the requirements of section 102(b). It did not constitute an abandonment of Ingenico's section 102(a) argument. Moreover, the Federal Circuit has specifically rejected the argument that a "defendant['s] failure to explicitly argue to the jury that the defendants should prevail on a diligence theory resulted in the diligence theory not being before the jury." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1363 (Fed. Cir. 2001). Applying Third Circuit law, the Federal Circuit concluded that the Third Circuit "does not require that the defendant explicitly argue a theory in order for it to be before the jury." *Id.* at 1364.

18

extent that Mr. McNulty and IOENGINE's expert, Dr. Aviel Rubin, testified otherwise, the jury was entitled to reject that testimony in favor of Mr. Geier's testimony that the PDR memo did not disclose the "portable device identifier" and "verification" limitations, one of which is recited in each of the claims the jury found invalid.

Even if the PDR memo provided adequate evidentiary support for Mr. McNulty's claim of conception, the jury heard evidence that could support a conclusion that Mr. McNulty was not diligent in reducing his inventions to practice. Mr. McNulty testified that he worked "nonstop" on his inventions, "every evening, every weekend, all weekend." Tr. 174:10–11. In addition, IOENGINE offered corroborating evidence that Mr. McNulty may have worked on reducing his invention to practice in April 2002, February 2003, May 2003, July through August September 2003, and December 2003 through January 2004. But the corroborating evidence did not account for significant gaps in Mr. McNulty's efforts, such as between July 2001 and April 2002, and between April 2002 and February 2003. As the Federal Circuit has held, "there need not necessarily be evidence of activity [by the inventor] on every single day," but the evidence "must show that the . . . inventor was diligent throughout the entire critical period." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001). Even if the jury concluded that Mr. McNulty conceived of his inventions as early as July 2001, it could properly have found Mr. McNulty's claim that he worked "nonstop" on his inventions after that to be implausible. Moreover, based on the gaps in the corroborating evidence the jury could have found that Mr. McNulty was not diligent in reducing his invention to practice before March 23, 2004, when he constructively reduced the invention to practice by filing his initial patent application. Accordingly, IOENGINE's motion for judgment as a matter of law is denied with respect to IOENGINE's section 102(a) arguments.

19

Of course, even if the evidence did not support the conclusion that the DiskOnKey system was prior art under section 102(a), the verdict of invalidity would still have to be upheld based on section 102(b), discussed above. As noted above, "[a] general jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity." *Cordance*, 658 F.3d at 1339; *see generally Griffin v. United States*, 502 U.S. 46, 56–60 (1991). Because substantial evidence supports a finding that the DiskOnKey system was prior art under section 102(b), by being in public use or on sale or both, the fact that the DiskOnKey system might not qualify as prior art under section 102(a) is irrelevant.

## C. Anticipation and Obviousness

IOENGINE argues that even if the DiskOnKey, as used with the firmware upgrade application and the SDK, is prior art under section 102, there is insufficient evidence that the DiskOnKey either anticipates or renders obvious the asserted claims of the '969 and '703 patents. First, IOENGINE contends that there was no evidence that the firmware upgrade application supported the claimed "program code" limitations. Second, IOENGINE contends that there was no evidence of a motivation to combine the firmware upgrade application with the DiskOnKey SDK.

With respect to the "program code" limitations, IOENGINE points out that the DiskOnKey devices contained an application-specific integrated circuit ("ASIC"), which IOENGINE contends may have been used to implement the firmware upgrade feature. If that were true, IOENGINE contends, a requirement of the claims would not be met: The processor on the DiskOnKey would not have executed any program codes when updating the device firmware, even though the claims require that certain program codes be executed by the processor on the portable device. *See, e.g.*, Tr. 1071:3–11.

20

IOENGINE points to no evidence that an ASIC, and not a processor, was used to implement the firmware upgrade application on the DiskOnKey device.[9] At most, the jury heard testimony that the firmware upgrade feature of the DiskOnKey initially existed "not as an application." *See* Tr. 700:24–701:8. That evidence, however, does not mean that the firmware upgrade feature would have been implemented without using the device's processor. *See id.* To the contrary, Mr. Geier testified about how certain functions of the firmware upgrade application would have been implemented using code running on the DiskOnKey processor. *See, e.g.*, Tr. 791:11–792:1, 812:22–813:16, 834:8–22, 842:18–843:4. Two former M-Systems employees, Gidi Elazar and Eyal Sobol, added testimony that would support such an inference. *See* Tr. 718:15–18 (Mr. Elazar acknowledging that "in order for the DiskOnKey to respond to a request," it would "have to run some kind of code on the DiskOnKey"); Tr. 737:16–19 (Mr. Sobol testifying that authentication functions were "integrated in the firmware of the DiskOnKey"). In any event, the product specification for the DiskOnKey indicates that the ASIC comprises the component that Mr. Geier identified as the device's processor. *See* DX322.6 (including the ARM-7 processor in a block labeled "Titan ASIC"); Tr. 785:6–787:23. Based on the evidence, a reasonable jury could have found that the DiskOnKey executed the claimed program codes on the DiskOnKey processor. IOENGINE's arguments on this point are unpersuasive.

---

[9] The only evidence that IOENGINE relies on to support its argument on this point is the following statement in a PowerPoint presentation under the heading "How does DOK Upgrade work?": "The DiskOnKey ASIC prevents the ARM 7 microprocessor from running code that is not digitally signed by M-Systems." DX336.4. That statement suggests at most that the ASIC might play some role in ensuring that unauthorized firmware is not downloaded to the DiskOnKey. It does not indicate that any functions associated with downloading and installing firmware using the firmware upgrade application would be performed by the ASIC.

21

With respect to the motivation to combine the firmware upgrade application and the SDK, IOENGINE has forfeited any argument that the DiskOnKey combined with the firmware upgrade application and the SDK is not a single prior art reference that could anticipate the asserted claims. A motivation to combine is required only when there are two separate references being used in a proposed obviousness combination. *See Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1321 (Fed. Cir. 2005) ("In determining whether a combination of old elements is non-obvious, the court must assess whether, in fact, an artisan of ordinary skill in the art at the time of invention, with no knowledge of the claimed invention, would have some motivation to combine the teachings of one reference with the teachings of another reference."). In this case, the final jury instructions clearly indicated that those three items were to be interpreted as a single prior art reference, and IOENGINE failed to object to that instruction. Dkt. No. 497 at 19 (referring to the DiskOnKey system: "Ingenico also contends that that the following *item is* prior art . . . ." (emphasis added)). Accordingly, the question whether there was a motivation to combine the SDK with the firmware upgrade application does not affect my resolution of the present motion.[10]

### D. Obviousness Based on Elazar and the DiskOnKey Device

IOENGINE argues that there was not substantial evidence to support the verdict of obviousness based in part on the Elazar reference. As an initial point, IOENGINE notes that Elazar

---

[10] In its motion for summary judgment, IOENGINE argued that the DiskOnKey could not serve as an anticipatory reference because the evidence about the DiskOnKey related to different versions of that device. I rejected that argument on the ground that "a reasonable jury could find that documentation describing various versions of the DiskOnKey device is representative of a single prior art device." Dkt. No. 449 at 75. As noted above, there is substantial evidence that the version of the firmware upgrade application and the DiskOnKey that were available prior to March 23, 2003, contained the limitations of the asserted claims. IOENGINE's post-trial argument that the SDK was a separate reference from the firmware upgrade application was not raised at summary judgment nor at the instruction conference, so that argument has been forfeited.

was published after March 23, 2003, so it would be prior art only if the jury found that Mr. McNulty was not entitled to an invention date of July 26, 2001. Dkt. No. 513 at 33. That is true, but substantial evidence would support a finding that Mr. McNulty either did not conceive of his invention until after July 26, 2001, or was not diligent between July 2001 and March 2004. Accordingly, IOENGINE's argument as to the publication date of the Elazar reference is insufficient to reject Elazar as a basis for an obviousness verdict.

IOENGINE also argues that there was no motivation to combine Elazar with the DiskOnKey firmware upgrade application. As noted, IOENGINE has forfeited the argument that the firmware upgrade application is a separate prior art reference from the DiskOnKey device itself. Moreover, the jury heard evidence at trial suggesting that a skilled artisan would have been motivated to combine the DiskOnKey with the Elazar reference. For example, Mr. Geier testified that a skilled artisan would have been motivated to use the authentication mechanism discussed in the Elazar reference with respect to the firmware on the DiskOnKey device. Tr. 861:17–862:24. That evidence would be sufficient for a jury to conclude that a skilled artisan would have been motivated to combine Elazar with the DiskOnKey.

Even absent consideration of the Elazar reference, the jury's obviousness verdicts must stand. To the extent IOENGINE argues that the jury's verdicts on obviousness must be overturned because the jury could not have found obviousness without the Elazar reference, that argument fails. The jury could have viewed the claimed inventions as obvious in view of the DiskOnKey system alone. *See, e.g.*, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1376 (Fed. Cir. 2019) (affirming a PTAB obviousness finding "in view of a single reference").

As in the case of Mr. McNulty's conception and diligence, the jury's general verdicts of invalidity can be sustained even if the evidence is insufficient to support this theory of invalidity.

23

Because I have found that substantial evidence supports a finding that the DiskOnKey system was prior art under section 102, the jury's verdict could be upheld even if Elazar were not a proper ground on which the jury could have based its verdict of invalidity. *See Cordance*, 658 F.3d at 1339.

## III. <u>Motion for New Trial</u>

In its motion for a new trial, IOENGINE argues that there were errors in the court's final jury instructions that may have misled the jury into returning a verdict of invalidity as to the asserted claims that the jury found to be infringed. IOENGINE also argues that *inter partes* review estoppel ("IPR estoppel") precluded Ingenico from offering evidence of the DiskOnKey firmware upgrade application at trial. For the reasons set forth below, the motion for a new trial is denied.

### A. Jury Instructions

The standard for ordering a new trial based on a claim of erroneous jury instructions is high. "A new trial on the ground of erroneous jury instructions is permissible only when it is clear that an error in [the] instructions as a whole was such as to have misled the jury." *New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1567 (Fed. Cir. 1990); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011); *Siemens Med. Sols. USA, Inc. v. Saint-Goban Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1278 (Fed. Cir. 2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (en banc in relevant part). In reviewing jury instructions, the court must consider the entire trial record, because "instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.* 62 F.3d 1512, 1522 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997).

### 1. Burden of Proof

IOENGINE argues that the court's instructions to the jury were erroneous in several respects. First, IOENGINE contends that the court's instructions on conception and diligence "failed to correctly inform the jury that Ingenico bore the burden of proof." Dkt. No. 513 at 34.

IOENGINE acknowledges that on the issues of conception and diligence, the patentee has the burden of producing some evidence in order to raise those issues, but that after the patentee satisfies that burden of production, the patent challenger "must persuade the jury by clear and convincing evidence that its version of the facts is true." *Id.* (quoting *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996)). IOENGINE contends that the court never made clear to the jury that the ultimate burden on these issues rests with the challenger to prove its version of the facts by clear and convincing evidence.

The portion of the court's instructions on conception and diligence began with the statement that "Ingenico has the burden of providing invalidity by clear and convincing evidence, which as I've said before, means evidence that must leave you with a clear conviction or belief that the claims in question are invalid." Tr. 1293:9–12. The court then instructed the jury that "the date of the invention is the date on which the inventor conceived of the invention, as long as the inventor was diligent in reducing the invention to practice." Tr. 1294:18–19. The court defined conception and diligence, Tr. 1294:23–1295:17, and advised the jury, in accordance with the Federal Circuit's decisions in *Mahurkar*, 79 F.3d at 1577, and *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993), that "[a]lthough an inventor can testify about when he conceived of the invention, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea," Tr. 1295:7–11, and that "[a]s in the case of conception, there must be some evidence beyond the inventor's own testimony that confirms the inventor's diligence," Tr. 1295:17–20.

The court then advised the jury that "IOENGINE's contention is that the date of the invention is no later than July 26th, 2001," and that "Ingenico's contention is that the date of the invention was March 23, 2004." Tr. 1296:20–23. The consequence of the jury's decision on that issue, the court explained, was that if the jury concluded that the invention was made as of July 26, 2001, "then any product or method that was first publicly known or used in the United States after that date wouldn't be regarded as coming before the invention." Tr. 1296:25–1297:4. On the other hand, the court explained, if the jury concluded "that the invention was made as of March 23, 2004, as Ingenico claims, then any product or method that was known to or used by others in this country before that date would be prior art to the invention." Tr. 1297:5–9. The court then instructed the jury that "[w]hatever the date of invention, Ingenico must prove by clear and convincing evidence that the prior art item predated the claimed invention." Tr. 1297:14–16.

IOENGINE contends that the court's instruction on the issue of pre-conception prior art would have led the jury to conclude that it was IOENGINE's burden to prove conception and diligence. I disagree.

The instruction given by the court was based on the *Mahurkar* case, which specifies that the patent challenger "must persuade the trier of fact by clear and convincing evidence that the [purported prior art item] was published prior to [the inventor's] invention date." 79 F.3d at 1578*; see also Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 266 F.3d 1358, 1361 (Fed. Cir. 2001) (same); *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 336–37 (D.N.J. 2015) (same); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 575–76 (D. Del. 2008) ("[T]he burden of proof remains on the defendant to establish by clear and convincing evidence that the patentee's invention date does not precede the date of the ostensible prior art reference."); *Japan Cash Mach. Co v. MEI, Inc.*, No. 2:05-cv-1433, 2009 WL 10316043, at *15 (D. Nev. Sept. 18, 2009)

26

("The burden of persuasion, which is one of clear and convincing evidence, that the patentee's invention date does not precede the date of the alleged prior art reference remains with the defendant."); *Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030, 1045 (D. Minn. 2008) ("[T]he defendant must establish, by clear and convincing evidence, that the patentee's invention date does not precede the date of the ostensible prior-art reference." (emphasis omitted)).

Consistent with those authorities, the court's instruction advised the jury that it could find invalidity only if it found that Ingenico proved by clear and convincing evidence that the prior art item pre-dated the invention. That instruction unambiguously provided that the burden of proof on invalidity by pre-conception prior art rested on Ingenico and could be met only by clear and convincing evidence. Thus, the jury was not misled into believing that IOENGINE bore the burden of proof on that issue.

Beyond that, the court instructed the jury several times that Ingenico had the burden of proof of providing invalidity by clear and convincing evidence with respect to each invalidity issue. Tr. 1283:4–19, 1286:23–1287:2, 1293:9–12, 1297:14–16, 1300:8–10, 1305:4–7. Moreover, in the court's initial instructions to the jury at the beginning of the trial, the court twice explained that it was Ingenico's burden to prove invalidity by clear and convincing evidence. Tr. 92:21–93:4, 93:25–94:2. The same point was made in the video presentation to the jurors by the Federal Judicial Center at the outset of the trial. Tr. 87:3–5. Finally, counsel for IOENGINE emphasized the clear and convincing evidence standard to the jury no fewer than 14 times during his closing argument, *see* Tr. 1319:24–1320:18 (four times), 1321:21–25, 1323:4–7, 1324:18–20, 1326:9–11, 1330:25–1331:20 (three times), 1334:4–8, 1368:8–13, 1369:24–1370:3, and the verdict form filled out by the jury twice referred to the clear and convincing standard with regard to the invalidity issues presented to the jury, *see* Tr. 1416:22–24, 1417:11–13. There was no suggestion in the court's instructions or otherwise

that the burden of proof on invalidity was different in the one case of invalidity by pre-conception prior art.

One indication that the jury was not confused on this point is that counsel for IOENGINE clearly understood that the court's instruction on this issue imposed a requirement of clear and convincing evidence with regard to the date of conception. He said the following in his closing argument:

> IOENGINE has no burden to prove that the Portable Devices Rule letter shows conception of the invention.
>
> It says, to confirm his conception, Mr. McNulty simply needs to put forth some evidence beyond his own testimony. It's Ingenico that bears the burden of proof by clear and convincing evidence that any prior art item predated Mr. McNulty's invention date. That includes proving that Mr. McNulty is not entitled to his invention date in July of 2001, and all other aspects of invalidity.
>
> In other words, Mr. McNulty and we do not need to convince you that he thought of his invention by July 26, 2001.
>
> Instead, because Mr. McNulty has provided evidence in the form of a Portable Devices Rule letter, as well as Mr. Rzonca's testimony and other evidence we will look at in a minute, Ingenico must prove by clear and convincing evidence that Mr. McNulty did not conceive of his invention by July 26th, 2001.

Tr. 1330:20–1331:13.

Similarly, with respect to diligence, counsel for IOENGINE argued as follows:

> Now, Ingenico also claims Mr. McNulty did not act with reasonable diligence in reducing his invention to practice. Once again, this is the defense Ingenico must prove by clear and convincing evidence.
>
> More importantly, we saw the evidence of Mr. McNulty's evidence [sic: diligence]. As the Judge has explained, as long as there is some evidence of reasonably continuous work by Mr. McNulty between his conception in July of 2001 and his patent application—excuse me—in March of 2004, he is entitled to his July 2001 invention date.
>
> . . .
>
> But again, just like conception, the law does not require Mr. McNulty [to] convince you he was reasonably diligent. Instead, it's Ingenico's burden to convince—by clear and convincing evidence to prove to you that he was not.

Tr. 1331:17–1332:1; 1334:4–8.

28

Contrary to IOENGINE's argument in the present motion, it is clear that counsel for IOENGINE understood the court's instructions to require Ingenico to prove, by clear and convincing evidence, lack of conception by a date antedating the prior art, or lack of diligence thereafter. Counsel for Ingenico did not object to IOENGINE's closing argument on that point or take issue with IOENGINE's argument regarding the burden of proof during his own closing argument. The jury was therefore not misled by the court's instructions on that issue. *See Hilton Davis*, 62 F.3d at 1522 ("The words of the instructions take on meaning from the context of what happened at trial, including how the parties tried their case and their arguments to the jury.").

Relatedly, IOENGINE complains about the court's instructions defining conception and setting forth the parties' competing contentions as to when conception took place, on the ground that those instructions "suggest[ed] that IOENGINE had to prove conception and diligence by discussing them in terms of facts that must be shown by the inventor." Dkt. No. 513 at 35. There was no such suggestion in the court's jury charge. The instructions defined conception without reference to the burden of proof. *See* Tr. 1294:18–1295:1 ("The date of the invention is the date on which the inventor conceived of the invention, as long as the inventor was diligent in reducing the invention to practice. . . . [A]n invention is conceived when the inventor has a definite idea of the complete and operative invention, even if the inventor did not know for sure at the time that the invention would work."). The court instructed the jury that "[a]lthough an inventor can testify about when he conceived of the invention, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea." Tr. 1295:7–11. The court then defined diligence for the jury, Tr. 1295:12–20, and explained the parties' competing theories as to the proper date of the invention, based on their positions with respect to conception and diligence, and the consequences for determining what constituted prior art. Tr. 1296:6–1297:9. And after that,

as noted, the court instructed the jury that Ingenico had to prove by clear and convincing evidence that the prior art item predated the claimed invention. Tr. 1297:14–16.

Nothing about those instructions suggested that IOENGINE bore the ultimate burden of proof on those issues. The accurate statement that there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea for the invention did not in any way suggest to the jury that the ultimate burden of proof lay with IOENGINE.[11]

In sum, the court's instructions did not fail to apprise the jury of the proper burden of proof in assessing the evidence of invalidity based on pre-conception prior art, nor did the court's instructions misdirect the jury's assessment of the evidence of conception and diligence.

### 2. Presumption of Validity

IOENGINE's second complaint about the jury instructions is that the court "failed to instruct on the presumption of validity." Dkt. No. 513 at 36. Citing no relevant authority, IOENGINE argues

---

[11] In its reply brief, IOENGINE argues in passing that the court should not have instructed the jury on the issue of corroboration, but should have decided that issue itself. Dkt. No. 526 at 15. It is clear that on the issues of conception and diligence the patentee must introduce some evidence beyond the inventor's own testimony. *Mahurkar*, 79 F.3d at 1577. District courts have frequently instructed juries on the issue of corroboration in that context. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 582–83 (D. Del. 2008); *Solas OLED Ltd. v. Samsung Display Co.*, No. 2:19-cv-00152, 2021 WL 4950308, at *22 (E.D. Tex. Oct. 25, 2021); *Glob. Traffic Techs., LLC v. Emtrac Sys., Inc.*, No. 10-4110, 2014 WL 1663420, at *6 (D. Minn. Apr. 25, 2014), *rev'd in part on other grounds*, *Glob. Traffic Techs. LLC v. Morgan*, 620 F. App'x 895 (Fed. Cir. 2015). The Federal Circuit Bar Association's Model Patent Jury Instructions recommend that the jury be instructed on the corroboration requirement with regard to conception, and in the joint proposed jury instructions in this case, IOENGINE requested that the jury be instructed on the need for corroboration of the inventor's testimony regarding conception, using the language from the Federal Circuit Bar Association's model instruction. The court's jury instruction, to which IOENGINE now objects, tracked IOENGINE's proposed instruction word for word. *Compare* Dkt. No. 445 at 36 *with* Tr. 1295:8–11. And although IOENGINE's counsel raised the question whether the corroboration issue should be submitted to the jury, Tr. 1189:21–1190:6, counsel never objected to doing so, and he ultimately proposed an instruction that would have entailed submitting that question to the jury. *See* Tr. 1266:6–12. Accordingly, it was not error for the court to instruct the jury on the issue of corroboration.

that the court should have included an instruction explicitly referring to the presumption of validity. During the instruction conference, the court explained that the presumption of validity is embodied in the requirement that invalidity be proved by clear and convincing evidence, and that to add a separate instruction on the presumption of validity would be potentially confusing to the jury. *See* Tr. 1229:7–1230:15.

IOENGINE's argument was squarely rejected by the Federal Circuit in *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258–59 (Fed. Cir. 2004). In that case, the appellant made the same argument that IOENGINE has made here, and the Federal Circuit rejected it. The court of appeals explained that "the presumption of validity and heightened burden of proving invalidity 'are static and in reality different expressions of the same thing—a single hurdle to be cleared.'" *Id.* at 1258 (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984)). Because the presumption is one of law, not fact, and does not constitute evidence to be weighed against the challenger's evidence, the Federal Circuit concluded, "the district court did not err in declining to include a jury instruction on the presumption of validity because the jury applied the correct 'clear and convincing evidence' standard." *Id.* at 1258–59; *see also BNJ Leasing, Inc. v. Portabull Fuel Serv., LLC*, No. 19-cv-156, 2022 WL 892747, at *8 (S.D. Miss. Mar. 25, 2022); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-cv-1202, 2017 WL 959592, at *6 (E.D. Tex. Mar. 13, 2017); *Calloway Golf Co. v. Acushnet Co.*, 778 F. Supp. 2d 487, 496 (D. Del. Apr. 21, 2011).

As I explained in the *Erfindergemeinschaft* case, the use of the phrase "presumption of validity" in the instructions to the jury "would add little to the jury's understanding of the burden of proof on the validity issues" and "might be confusing to the jury, to the extent that the jury is required to consider both that phrase and the Court's instructions on the burden of proof." 2017 WL 959592,

31

at *6. "At minimum, the use of the term 'presumption' would require a further definitional instruction by the Court, without leading to any greater insight on the jury's part as to the nature of the burden of proof on the validity issues." *Id.*[12]

### 3. Public Use

IOENGINE's third objection to the court's jury instructions relates to the court's instruction on "public use" under section 102(b). IOENGINE argues that the court should have instructed the jury that an invalidating public use could be found only if "the claimed features of the invention are discernible from a prior art product that is accessible to the public." Tr. 1271:7–11. That is, IOENGINE argues that the public use of the invention cannot be an invalidating "public use" within the meaning of section 102(b) of the Patent Act if members of the public could not have discerned the features of the product that corresponds to the limitations of the patent in suit.

The Supreme Court addressed this issue in the 1880s. In *Egbert v. Lippman*, 104 U.S. 333 (1881), the Court considered a case in which the inventor of a corset allowed a third party to wear the corset for several years before the inventor sought a patent on the invention. The Court held that the use of the corset, even though it was by only one person, was a public use. *Egbert*, 104 U.S. at

---

[12] IOENGINE does not seek to distinguish, nor does it even cite, the governing *Chiron* case from the Federal Circuit on this point. Instead, it cites cases having nothing to do with the issue before the court. In its opening brief, IOENGINE cites only *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 & n.7 (Fed. Cir. 2007), which stands for the proposition that an erroneous jury instruction must be prejudicial in order to warrant a new trial. In its reply brief, IOENGINE relies solely on a statement by the Supreme Court in *Microsoft Corp. v. i4i Limited Partnership*, 564 U.S. 91, 110 (2011), where the Court noted that courts of appeals prior to 1952 had observed that "the presumption of validity is 'weakened' or 'dissipated' in the circumstance that the evidence in an infringement action was never considered by the PTO." That statement has nothing to do with the question whether a court errs if it does not instruct a jury on the presumption of validity in addition to the clear and convincing evidence standard.

337.  That was so, the Court held, even though the public use did not reveal the details of the invention to the public.  *Id.* at 336–37.  The Court explained that

> some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye.  An invention may consist of a lever or spring, hidden in the running gear of a watch, or of a rachet, shaft, or cog-wheel covered from view in the recesses of a machine for spinning or weaving.

*Id.* at 336; *see also Hall v. Macneale*, 107 U.S. 90, 96 (1882) (The features of a safe were held to be in public use even though they were "hidden from view, after the safes were completed, and it required a destruction of the safe to bring them into view.  But this was no concealment of them or use of them in secret.  They had no more concealment than was inseparable from any legitimate use of them."); *In re Blaisdell*, 242 F.2d 779, 783 (C.C.P.A. 1957) ("[T]he invention may be a small element, concealed by its nature, in a larger article; its presence may not be known to the user or purchaser of said article[.]").

IOENGINE seeks to distinguish *Egbert* on the ground that the public use in that case was by the inventor himself, not by a third party.  In fact, however, *Egbert* involved a public use by a party other than the inventor.  Although that party used the corset with the inventor's consent, she was not under any obligation of secrecy regarding the corset's design.  *See* 104 U.S. at 337.  In that setting, the Federal Circuit has explained, when the inventor has "surrendered control of the invention to another, without explaining that the device was experimental, the public was entitled to believe that the device was in the public domain."  *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1330 (Fed. Cir. 2019).

In cases involving disclosure by a third party not under an obligation of confidentiality, courts have consistently rejected IOENGINE's argument that a device is not in public use if its contents would not have been apparent to an ordinary user of the device.  *See New Railhead*, 298 F.3d at 1297

33

("The statutory phrase 'public use' does not necessarily mean open and visible in the ordinary sense; it includes *any use* of the claimed invention *by a person other than the inventor* who is under no limitation, restriction, or obligation of secrecy to the inventor.") (emphases added); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (agreeing that "the public need not have access to the 'inner workings' of a device [put in use by a party other than the inventor] for it to be considered 'in public use'); *Dunlop Holdings Ltd. v. Ram Golf Corp.*, 524 F.2d 33, 36 (7th Cir. 1975) (Stevens, J.) (public use was established by "a noninforming public use of the subject matter of the invention" by a third party); *Cali v. E. Airlines*, *Inc.*, 442 F.2d 65, 68 (2d Cir. 1971) ("It is a matter of legal indifference that the 'public' use may be necessarily concealed from public awareness by the structure of the design or the manner of its use . . . . Public use by a third party, with or without the knowledge or consent of the patentee, will generally defeat the patent as readily as public use by the inventor himself."); *Gillman v. Stern*, 114 F.2d 28, 31 (2d Cir. 1940) (L. Hand, J.) (a public use, "whether or not the patentee had consented to it," is invalidating regardless of whether "the use informed the public so that they could profit by it"); *Art+Com Innovationpool GmbH v. Google Inc.*, No. 14-217, 2016 WL 9954312, at *8 (D. Del. Sept. 9, 2016) (Dyk, J., sitting by designation) (rejecting the contention, in the case of a non-secret use by a third party, "that the public must be able to ascertain the individual elements of an invention for it to constitute a public use"), *aff'd*, 712 F. App'x 976 (Fed. Cir. 2017); *Phoenix Sols., Inc.*, 2010 WL 6032841, at *7 (third-party's system was operational more than a year before the patents in suit were filed; the "operational novelty of the invention" was not required to be "exposed to the public in order for the invention to be in public use."); *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243, 1247 (Fed. Cir. 2015) ("The question in a case such as this one is thus whether the actions taken by the inventor (or, as in this case, a third party) create a reasonable belief as to the invention's public availability.").

34

The same rule has been applied to cases involving the "on sale" bar to patentability: "[O]ur precedent holds that the question is not whether the sale, even a third party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that *embodies* the invention." *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed. Cir. 1986).

IOENGINE's argument amounts to contending that the public use must be enabling in order to be invalidating. There is no such requirement recognized in the law. As the Federal Circuit has held, "the public use itself need not be enabling. . . . Rather, we must simply determine whether the public use related to a device that embodied the invention." *Zenith*, 522 F.3d at 1356; *see also Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 151, 1359 (Fed. Cir. 2013) ("[W]e do not ask for an enablement-type inquiry under section 102(b) . . . ."); *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) ("Beyond this 'in public use or on sale' finding, there is no requirement for an enablement-type inquiry."); *Extang Corp. v. Truck Accessories Grp., Inc.*, No. 19-cv-923, 2022 WL 610451, at *3 n.1 (D. Del. Feb. 18, 2022) (same).

IOENGINE cites several cases in support of its position, but those cases are directed to instances in which the allegedly prior public use has been subject to a promise of confidentiality or otherwise concealed. No such concealment or promises of confidentiality are at issue in this case, so much of the analysis in those cases is inapplicable here.

Two Federal Circuit cases cited by IOENGINE deserve close consideration on this point. In the first, *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958 (Fed. Cir. 2020), the district court granted summary judgment invalidating BASF's patent. The invalidity ruling was based on the prior use, by a party other than the inventor, of a manufacturing process similar to the patented process. The Federal Circuit reversed. The court noted that "a secret process is not in the public domain in the first place." *BASF*, 955 F.3d at 968. Upon review of the record, the court found that the evidence

35

that the third party's use of the process was concealed was sufficient to create a triable issue of fact on that issue. *Id.* at 967–68.

The *BASF* court acknowledged that the commercial exploitation of a process before the critical date of the patent on the process would normally be an invalidating use of the process, regardless of whether the use was by the inventor or by a third party.[13] *See id.* at 966 (citing *Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 19–20 (1939)). But if the process were kept secret, the court observed, the results could be different in the two situations. Given the interests in encouraging prompt disclosure of inventions and preventing the effective extension of patents, the court explained that the commercial exploitation of a novel process by the inventor would be subject to the public use bar regardless of how little the public might have learned about the details of the invention. *Id.* at 967–68. In the case of commercial exploitation of a secret process by a third party, however, the court held that concealment of the novel process would not offend any of the interests protected by the "public use" bar. *Id.* That is, if the concealed use was by a third party, invalidating the inventor's patent would not serve the interests of requiring the inventor to disclose his invention promptly or preventing the effective extension of his patent. And because the concealment of a novel process by a third party does not deprive the public of something it has come to rely on as publicly available, application of the public use bar would not serve that interest either. *See id*. at 968.

Importantly, the court in *BASF* based its ruling on the principle that if a third party's use of a process was successfully concealed or hidden, it would be considered "inaccessible to the public."

---

[13] In the course of its opinion, the court in *BASF* took note of the well-settled exception to this principle that experimental use is not considered public use. 955 F.3d at 966 (citing *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 133–37 (1877)); *see also Barry*, 914 F.3d at 1328–31. There was no issue of experimental use presented in *BASF*, however, and there is likewise no issue of experimental use presented in this case.

36

*Id.* at 966. On the other hand, the court explained, if the use identified by the defendant "was not successfully concealed or hidden from those who lack any 'limitation or restriction, or injunction of secrecy,' then it is a public use within the meaning of § 102(b)." *Id.* (quoting *Egbert*, 104 U.S. at 336).

In the course of its analysis, the *BASF* court adopted the rule of *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir. 1946) (L. Hand, J.), which distinguished between the commercial exploitation of a secret process by an inventor and the commercial exploitation of such a process by a third party. *See BASF*, 955 F.3d at 968. The *Metallizing* court held that commercial exploitation of a secret process by the inventor is potentially invalidating. At the same time, as the Federal Circuit noted, the *Metallizing* court reaffirmed its holding in *Gillman v. Stern*, *supra*, that a third party's exploitation of a secret process is not a "public use" of the process that would subject a later-filed patent to invalidation under the predecessor to section 102(b). Significantly, the court in *Gillman* was careful to distinguish between a secret use of an invention and "a public use which does not inform the art." 114 F.2d at 31 (citing *Hall,* 107 U.S. at 97). As to the latter, the court held, a non-secret public use by a third party is invalidating even if the use does not inform the public of the nature of the product or process in question. The court explained that distinction as follows:

> It is true that in each case the fund of common knowledge is not enriched, and that might indeed have been good reason originally for throwing out each as anticipations. But when the statute made any "public use" fatal to a patent, and when thereafter the court held that it was equally fatal, whether or not the patentee had consented to it, there was no escape from holding—contrary to the underlying theory of the law— that it was irrelevant whether the use informed the public so that they could profit by it. Nevertheless, it was still true that secret uses were not public uses, whether or not public uses might on occasion have no public value.

37

114 F.2d at 31; *see also Magnetics, Inc. v. Arnold Eng'g Co.*, 438 F.2d 72, 74 (5th Cir. 1971) (For purposes of "public use" under section 102(b), it is "irrelevant whether the use [by a third party] informed the public. . . . Neither [third party's] work was kept secret, for, as the district court found, these operations were carried on openly by ordinary factory help, with no attempts made to hide the operations form their employees or visitors."). Judge Hand's discussion of the issue, expressly adopted by the Federal Circuit in *BASF*, makes it quite clear that a third party's non-secret use of a product constitutes a "public use" for purposes of section 102(b) even if the inventive feature of the product, such as a corset, the inner workings of a safe, or the components of an electronic device were, by their nature, hidden from public view.

The second case relied on by IOENGINE, *Dey, L.P. v. Sunovion Pharmaceuticals, Inc.*, *supra*, is similar. In that case, as in *BASF*, the district court granted summary judgment invalidating a patent owned by the plaintiff based on a clinical trial conducted by a third party on a drug similar to the patented drug. The Federal Circuit reversed, holding that there was a triable issue of fact as to whether the clinical study on which the defendant based its invalidity defense was sufficiently confidential that it did not constitute a "public use" of the drug that was the subject of the study.

The *Dey* court explained that to decide whether a prior use constitutes an invalidating "public use," a court is required to ask whether the purported use was "accessible to the public" or "commercially exploited." 715 F.3d at 1355 (quoting *Invitrogen*, 424 F.3d at 1380). In determining what it means to be "accessible to the public," the court explained that "the policies underlying the public use bar inform its scope and that one such policy is 'discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available.'" *Id.* (quoting *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994)). Other considerations noted by the court were whether there was any confidentiality obligation imposed on persons who

observed the use of the product or process, and whether the completed invention was "used in public, without restriction." *Dey*, 715 F.3d at 1355 (quoting *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995)). Those formulations, the court explained,

> are designed to capture the commonsense notion that whether an invention is accessible to the public or reasonably believed to be freely available depends, at least in part, on the degree of confidentiality surrounding its use: An agreement of confidentiality, or circumstances creating a similar expectation of secrecy, may negate a "public use" where there is not commercial exploitation.

*Id*. (cleaned up).

That principle applies regardless of whether the prior use is by the inventor or by an unaffiliated third party, the court observed. "[T]hird-party use accessible to the public is a section 102(b) bar." *Id.* (quoting *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005)). To be "accessible to the public," the use still must be publicly available, the court noted; "secret or confidential third-party uses do not invalidate later-filed patents." *Id.* For that reason, the court stated, "we have applied section 102(b) to invalidate a patent based on third-party use when the third party made no attempt to maintain confidentiality or to deliberately evade disclosure; made no discernible effort to maintain the invention as confidential; or made no efforts to conceal the device or keep anything about it secret." *Id.* (cleaned up). In the case before it, the court concluded that summary judgment was not appropriate because it was not clear that the allegedly anticipating prior art was used without restriction during the clinical study; i.e., there was evidence that its use was "controlled and restricted, rather than unfettered and public." *Id*. at 1356.

Summarizing the applicable standard, the court in *Dey* quoted from *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315 (Fed. Cir. 2002), in which the court explained that the patentee's failure to monitor the use of his invention and his "failure to impose confidentiality agreements on those that used it was enough to place the claimed features of the invention in the

39

public's possession." 295 F.3d at 1323. Applying that standard, the court then stated that "a reasonable jury could conclude that if members of the public are not informed of, and cannot readily discern, the claimed features of the invention in the allegedly invalidating prior art, the public has not been put in possession of those features." *Dey*, 715 F.3d at 1359.

Contrary to IOENGINE's contention, that language from *Dey* does not mean that the public disclosure or commercial exploitation of a product or process, without any limitations on access or confidentiality restrictions, constitutes a public use only if the claimed features of the product or process are immediately apparent to members of the public. Instead, the *Dey* court made clear that the public use issue in that case turned on whether the measures taken to keep the details of the clinical study confidential, including the nature of the pharmaceutical product being tested, were sufficient to prevent knowledge of the product from becoming public in a manner that would trigger the public use bar. *Id.* at 1359. The same is true of *BASF*. *See* 955 F.3d at 968.

Other Federal Circuit cases are to the same effect. In *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549–50 (Fed. Cir. 1983), the public use issue turned on the fact that the third party in that case deliberately chose to keep the process at issue as a trade secret; what was disclosed was only the commercial output of the process, while the process itself was protected by various measures to ensure confidentiality. The Federal Circuit in *Woodland Trust v. Flowertree Nursery, Inc.*, similarly noted that an asserted prior use by a third party would not be a bar "when that prior use or knowledge is not available to the public." 148 F.3d 1368, 1371 (Fed. Cir. 1998). For that proposition, the court cited authorities standing for the principle that a third party's secret commercial activity more than one year before the patent applicant's filing date would not be a public use under section 102(b). *See id.* (citing, *inter alia*, *Garlock*, 721 F.2d at 1550, and *Baxter Int'l, Inc. v. COBE Lab'ys, Inc.*, 88 F.3d 1054, 1058–59 (Fed. Cir. 1996)). The cases cited above, including the cases

40

cited by IOENGINE, make clear that a third party's use of an invention will not be deemed public if it is secret, subject to a pledge of confidentiality, or experimental in nature. Otherwise, however, a third party's use of the invention will be deemed an invalidating public use even if the use does not disclose the details of the invention to the public. As Judge Hand noted in *Gillman v Stern*, 114 F.2d at 31, the key distinction in the case of a third party is between a public use "which does not inform the art" and a secret use. The former is invalidating, while the latter is not.

In its briefing, IOENGINE cites two district court cases, neither of which supports its argument. In *TQP Development, LLC v.1-800-Flowers.com, Inc.*, 120 F. Supp. 3d 600 (E.D. Tex. 2015), the defendant suggested that a third-party use of the invention was a public use. The court disagreed, noting that the third party was under a confidentiality obligation with respect to the critical features of the invention, and that those features were not made public. In the related case of *TQP Development, LLC v. Intuit Inc.*, No. 2:12-cv-180, 2014 WL 2809841 (E.D. Tex. June 20, 2014), the court denied the defendant's contention, on summary judgment, that the claim in question was invalid under 35 U.S.C. 102(g) (2006), in light of a prior invention that was not suppressed or concealed. The court found that there was a dispute of material fact with regard to whether the prior invention was suppressed or concealed from the public and therefore was not invalidating under section 102(g). The court noted that when the "inner workings" of the invention are the essence of the invention, "it is those 'inner workings' that must not be suppressed or concealed in order for the invention to be prior art under section 102(g)." *Id.* at *6. There was a dispute in that case as to whether the algorithm that was a critical component of the prior art was maintained as a trade secret and concealed from the public.

This case does not involve a confidentiality obligation, as in the *1-800-Flowers.com* case. Nor does it involve the suppression or concealment of prior art as a trade secret, which was the

disputed issue in the *Intuit* case, as there was no evidence that any component or feature of the DiskOnKey device, the firmware upgrade application, or the SDK was suppressed, concealed, or maintained as a trade secret.

At the oral argument on the JMOL and new trial motion, IOENGINE pointed the court to three other district court cases that it regarded as supportive of its position that non-secret but non-informative uses by third parties do not constitute "public uses" within the meaning of section 102(b). In fact, none of those cases support IOENGINE's position. First, in *Parallel Networks Licensing, LLC v. International Business Machines Corp.*, No. 13-2072, 2017 WL 1045912, at *9 (D. Del. Feb. 22, 2017), the court held that the defendant's allegedly anticipating server was not in public use because the actions recited in the asserted claims were carried out "confidentially" by the defendant's servers. Second, in *International Business Machines Corp. v. Priceline Group Inc.*, 271 F. Supp. 3d 667, 680–81 (D. Del. 2017), the evidence describing a prior art system did not create a genuine issue of material fact on the issue of public use because the evidence "only addressed what *could* be done in the future and never discussed any of the configurations that the [defendant's expert] relie[d] on." Third, in *TransWeb, LLC v. 3M Innovative Properties Co.*, 16 F. Supp. 3d 385, 395 (D.N.J. 2014), the question was whether a physical product sample was sufficient evidence that the processes used to manufacture that sample were in public use. In this case, none of the DiskOnKey's functions were kept confidential from the purchasers of the DiskOnKey devices; the evidence relied on by Ingenico amounts to more than forward-looking statements about the DiskOnKey's capabilities; and the asserted claims do not relate to manufacturing processes. The *Parallel Networks*, *IBM*, and

*TransWeb* cases are not inconsistent with the cases cited above and do not support IOENGINE's position that the jury was improperly instructed on the issue of public use.[14]

In sum, the public, non-experimental use of an invention, either by the inventor, by another with the consent of the inventor, or by an unrelated third party, bars the inventor from removing from the public domain an invention that the public has reasonably come to believe is freely available. *Dey*, 715 F.3d at 1355; *Baxter*, 88 F.3d at 1058 (quoting *Tone Bros.,* 28 F.3d at 1198). The Supreme Court embraced that position in *Shimadzu*, 307 U.S. at 19–20, where it held that in the absence of an obligation of confidentiality the public use bar applies in the same manner whether the public use is by the inventor or a third party. As the Court noted, the definition of public use, "formulated when the statute made only use by consent a bar, has been adopted in instances where the use was without

---

[14] Following the oral argument on this motion, counsel for IOENGINE sent an unsolicited email to the court's law clerk seeking to elaborate on the arguments IOENGINE had made on this issue in its briefs and during the oral argument. In the email, IOENGINE's counsel cited seven cases, including two new cases not cited in IOENGINE's briefs or in the oral argument. For completeness, I will address the email even though its submission was procedurally improper.

IOENGINE's email argues that the Federal Circuit's decision in *Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243 (Fed. Cir. 2015), is a case of a third-party use of an invention that did not turn on the confidentiality of the use, but in which the court found no public use because the public could not discern the nature of the invention. In fact, the *Delano* case *did* involve uses of the invention that were secret and subject to pledges of confidentiality. *See* 778 F.3d at 1246–49 (referring to the confidentiality pledges and secret nature of the uses nine times in the course of the opinion). It was in that context that the court noted that the uses of the invention were not evident to the public—a fact that is important if the use in question is secret or subject to a pledge of confidentiality, but not otherwise.

IOENGINE's email goes on to characterize the Federal Circuit's *BASF* decision as standing for the proposition that third-party public use is not invalidating if it does not reveal the "inner workings" of the invention. To the contrary, what *BASF* holds is that a secret use by a third party is not an invalidating public use; it does not suggest that a non-secret use by a third party that is merely non-informing does not constitute a public use. The court's reference to not "extending the *Metallizing* rule to third-party party public use," 955 F.3d at 968, refers to not treating secret third-party use as an invalidating public use. As noted above, courts have been careful to distinguish between secret uses and non-informing public uses.

43

consent or knowledge of the applicant for patent." *Id.* at 19–20. The Federal Circuit has consistently applied the same principle. *See Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008) ("An invention is in public use if it is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality."); *Minn. Min.*, 303 F.3d at 1301 ("Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor."); *Netscape*, 295 F.3d at 1320 (same); *Baxter*, 88 F.3d at 1058 (same); *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983) (same); *see also Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 940 (Fed. Cir. 2014) ("[O]ur case law . . . focuses on the limitations, restrictions, or secrecy obligations associated with a purported public use.").

This case is entirely different from *BASF*, *Dey, Woodland Trust*, and *Garlock*, in that the manufacturers of the DiskOnKey did not conceal that product or its contents, nor did they otherwise seek to keep the contents of the product confidential. The same is true of the DiskOnKey firmware upgrade application and the DiskOnKey's SDK capabilities. The product, the firmware upgrade application, and the SDK were all publicly available and commercially exploited by M-Systems. In fact, they were aggressively marketed. Thus, they were plainly in public use. The fact that a casual observer would not have been able to discern the inner workings of the DiskOnKey device or the firmware upgrade application is not enough to render the use of the device and the application non-public in nature.

For those reasons, the court's instruction to the jury on public use was not erroneous for failing to distinguish between a public use by the inventor and a public use by third party under no obligation of secrecy to the inventor. In particular, based on the lack of evidence of a pledge of

44

confidentiality, the instruction was not erroneous for failing to state that the public use in question had to be "accessible" to the public by revealing all the features of the device to an ordinary observer.

### 4. On Sale

IOENGINE's fourth objection to the court's jury instructions relates to the on-sale bar. IOENGINE complains that the court's instructions failed to advise the jury that an advertisement is not an offer for sale, and argues that the court's failure to instruct on that issue requires a new trial. Dkt. No. 513 at 38.

During an exchange with the court immediately before the court's instructions to the jury, IOENGINE requested that the court revise its instructions regarding the on-sale bar. First, IOENGINE suggested that the instructions be modified to indicate that an offer for sale is "an offer that the other party could make into a binding contract simply by accepting it." Tr. 1273:3–6. Alternatively, IOENGINE proposed adding a statement to the instructions that "an advertisement is not an offer for sale." Tr. 1273:10–14.

IOENGINE is correct that an offer generally must meet the requirements of a commercial offer for sale in order to satisfy the on-sale bar in section 102(b) of the Patent Act. *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1374–80 (Fed. Cir. 2016) (en banc). The problem for IOENGINE is that the evidence did not present a question whether there was merely an offer to sell the DiskOnKey devices without any actual accompanying sales. There is no basis for dispute that the DiskOnKey devices not only were offered for sale but were actually sold in the United States prior to March 23, 2003. Moreover, there was no question that any sales that were made were commercial in nature; there was no evidence at trial of any transactions that could be considered non-commercial sales.

The critical question at trial, for purposes of the prior art determination, was whether the DiskOnKey devices that were sold during the period prior to the critical date contained the firmware

45

upgrade application and the SDK capabilities. Thus, the existence of an on-sale bar in this case did

not depend on the definition of an offer for sale. Instead, it turned on what was in the products that

were sold.

IOENGINE does not dispute that DiskOnKey devices were sold in the United States prior to

the critical date of the '969 and '703 patents. *See* Dkt. No. 513 at 13. Instead, IOENGINE's

argument at trial was that Ingenico failed to prove that the products sold in the United States prior to

March 23, 2003, contained the firmware upgrade application and SDK capabilities necessary to

trigger the on-sale bar. *See* Tr. 1368:15–1370:3.[15] With respect to that issue, as discussed in section

II.A.1 above, the evidence was amply sufficient to show that the DiskOnKey devices that were sold

to customers in the United States, at least as of November 8, 2002, included those features. Because

the issue of validity turned not on whether particular conduct constituted an offer for sale, but instead

on whether the DiskOnKey devices sold in the United States contained the firmware upgrade and the

SDK capabilities, there is no force to IOENGINE's complaint that the court did not give the jury a

sufficiently detailed instruction regarding the meaning of an offer for sale and that the court's failure

to do so deprived IOENGINE of a fair trial.

Moreover, neither of IOENGINE's proposed instructions on this issue would have been

helpful to the jury. IOENGINE's first suggestion, that the court instruct the jury that an offer for

sale is "an offer that the other party could make into a binding contract simply by accepting it,"

standing by itself, would have been potentially confusing to the jury, as it would have left hanging

in the air the questions of what constitutes a binding contract and what constitutes a manifestation of

---

[15]    In his closing argument, Ingenico's counsel pointed to the M-System sales spreadsheets
(DX316 and DX317) listing numerous U.S. sales of the DiskOnKey in late 2002 and early 2003. Tr.
1358:5–1359:8. In its rebuttal argument, IOENGINE did not dispute that the evidence showed those
sales were made.

acceptance sufficient to create such a binding contract. Those questions would be likely to puzzle a lay jury, at least without substantial supplemental instructions.

IOENGINE's second suggestion, that "an advertisement is not an offer for sale" would likewise have invited confusion, for two reasons. First, the M-Systems press releases announcing the firmware upgrade in July 2002, DX097, and the availability of SDK capabilities in September 2002, DX307, were not offers for sale, but were merely announcements of the availability of those features for the DiskOnKey. Moreover, in discussing the July 2002 M-Systems press release in his closing argument, Ingenico's counsel did not contend that the press release itself was an offer for sale, but instead argued that the press release provided evidence that the DiskOnKey devices were available for sale and could be purchased "through partners like Apple and Compaq and Dell and Targus." Tr. 1360:16–22 (referring to DX097). Counsel made a similar argument with respect to a Fuji Photo Film U.S.A. press release dated July 10, 2002, which stated that the DiskOnKey was "currently available through major partners in North America, Asia and Europe." DX180. Counsel characterized that press release as "the Fuji Photo indication that they're selling DiskOnKeys." Tr. 1361:15–16. There was no reference in counsel's argument to any "advertisements" for the DiskOnKey or any suggestion in the argument or the evidence that any such advertisements would constitute potentially invalidating offers for sale.

Second, the proposed instruction would have required the jury to struggle over what constitutes a mere advertisement and what sorts of promotional activities might satisfy the legal requirements to be deemed an offer for sale. Given the strength of the evidence of actual sales and the focus of the parties on what was in the products that were sold rather than whether there were any offers for sale unconnected to actual sales, an instruction along the lines of those proposed by

47

IOENGINE would have added no value to the jury's consideration of the evidence in this case and would have risked adding complexity and confusion to an already dense set of legal instructions.

There are two other points to be made regarding IOENGINE's argument as to the on-sale bar. First, IOENGINE argues that there was no direct evidence indicating that there was an actual sale of a particular DiskOnKey device that satisfied each element of the asserted claims. But that point, which is discussed in detail in section II.A.2 above, would not have been resolved by an instruction regarding what constitutes an offer for sale for purposes of section 102(b). Second, IOENGINE raises the same point it raised with respect to the "public use" instruction: that a third party's sale of a product that did not reveal all the limitations of the product to a user cannot be invalidating under section 102(b). For the reasons discussed with respect to the "public use" instruction in section III.A.3 above, that argument is unpersuasive.

The court's instructions to the jury on the on-sale component of section 102(b) were therefore not erroneous and did not improperly lead the jury to find that M-Systems' activities with regard to the DiskOnKey devices during late 2002 and early 2003 rendered the asserted claims of the '969 and '703 patents invalid under the on-sale bar, even if those activities did not constitute sales or offers to sell those devices.

## B.    IPR Estoppel

IOENGINE next argues that because of IPR estoppel, as provided for in 35 U.S.C. § 315(e)(2), the court should have prohibited Ingenico from relying on the DiskOnKey firmware upgrade application at trial. Under section 315(e)(2), when an IPR proceeding results in a final written decision by the PTAB, the party that petitioned for IPR may not argue in a subsequent district court proceeding that the claims challenged in the IPR proceeding are "invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review."

Prior to trial, IOENGINE moved for summary judgment of no invalidity, arguing that Ingenico should not be allowed to rely on numerous documents that Ingenico either raised or reasonably could have raised in its petitions for IPR of the '969 and '703 patents. Dkt. No. 361 at 8–16. IOENGINE also argued that Ingenico should be precluded from relying on two "device art" invalidity theories, including one based on the DiskOnKey device, because in IOENGINE's view those theories were based on publications that Ingenico either raised or reasonably could have raised during the IPR proceeding. *Id.* at 17–21.

In ruling on IOENGINE's motion, I held that Ingenico would be precluded from relying on several categories of documents that it raised or reasonably could have raised in the IPR proceeding as printed publication prior art. Dkt. No. 449 at 58–61. One category of documents I prohibited Ingenico from relying on was "documentation related to [the] DiskOnKey upgrade software and numerous other Western Digital Documents." *Id.* at 61 n.21 (citing Dkt. No. 361 at 15–16 & Appendix V). Although that category included the DiskOnKey Upgrade ReadMe documents, *see* Dkt. No. 361, Appendix V, at 2, I ruled that Ingenico would not be precluded from relying on those documents "to the extent . . . that they form part of a substantively different combination of references that could not reasonably have been raised in the IPRs." Dkt. No. 449 at 61.

With respect to Ingenico's argument based on the DiskOnKey itself, I permitted Ingenico to rely on the DiskOnKey as device art because IOENGINE had not established that each of the documents on which Ingenico sought to rely was publicly available (i.e., was a printed publication) that would have been a proper ground of invalidity in an IPR proceeding. Dkt. No. 449 at 63. I further held that "Ingenico is not estopped from relying on device art if, as it appears here, that device is not simply a printed publication invalidity theory in disguise," and that the device art may be combined with other printed publications as long as the combination is "substantively different from

49

the grounds that were raised or reasonably could have been raised by Ingenico in its petitions for IPR." *Id.* at 64.

IOENGINE argues that the DiskOnKey device art, as Ingenico presented it at trial, was effectively "a printed publication invalidity theory in disguise." Dkt. No. 513 at 38. More specifically, IOENGINE argues that Ingenico relied primarily on the DiskOnKey Upgrade ReadMe document, which Ingenico admitted was originally a public document but was no longer publicly available at the time Ingenico filed its IPR petitions. IOENGINE also argues that the other documents relating to the DiskOnKey that Ingenico introduced did not create a substantively different ground of invalidity from the DiskOnKey Upgrade ReadMe document, which Ingenico could have raised as prior art in its IPR petitions.

With the benefit of the evidence presented at trial, I find that IOENGINE's argument improperly discounts the other evidence relied upon by Ingenico with respect to the DiskOnKey device. For example, Ingenico relied at trial on an M-Systems presentation, DX336, which IOENGINE has not argued is a printed publication.[16] That presentation included a reference to "public key infrastructure," along with a statement that the DiskOnKey contains an "ARM 7 microprocessor." DX336.4. Neither of those features is discussed in the ReadMe document, *see* DX331, yet the evidence of both of those features added substance to Ingenico's invalidity case. Ingenico relied on the public key infrastructure as evidence that the DiskOnKey facilitated authentication. The capacity for authentication, Ingenico argued, satisfied the "verification" limitation of claim 3 of the '969 patent and claims 56 and 105 of the '703 patent. Ingenico also relied on the ARM 7 microprocessor in the DiskOnKey device as evidence that the DiskOnKey contained

---

[16] Notably, the presentation at DX336 is marked with a "Confidential - Attorneys' Eyes Only" designation.

50

a processor, which is a required element of the "portable device" recited in each of the asserted claims.

IOENGINE argues that Ingenico's demonstration at trial of the firmware upgrade application "added nothing to the ReadMe" because the application was not actually able to run a firmware upgrade during the demonstration. Dkt. No. 514 at 39. Although the demonstration did not show a complete upgrade process, the demonstration provided additional support for the proposition that the DiskOnKey firmware upgrade application was actually available and could have been used with a DiskOnKey device.[17]

In sum, the record at trial supports Ingenico's argument that Ingenico's DiskOnKey invalidity theory was device art that did not amount to "a printed publication invalidity theory in disguise." *See* Dkt. No. 449 at 64. Accordingly, it was proper for Ingenico to rely on that prior art, including the DiskOnKey Upgrade ReadMe document, at trial. IOENGINE's motion for a new trial based on its IPR estoppel argument is therefore denied.

## IV.    Conclusion

For the reasons set forth above, IOENGINE's motion for judgment as a matter of law and for a new trial is DENIED.

In an abundance of caution, this order has been filed under seal because the parties' briefs regarding the present motions were filed under seal. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the

---

[17] At the oral argument on the present motion, IOENGINE acknowledged that Ingenico relied on "internal documents from M-Systems" as evidence of certain capabilities of the DiskOnKey, such as whether the DiskOnKey was able to execute "program code." Oral Argument Recording at 15:38–17:22. That recognition further undercuts IOENGINE's contention that Ingenico's additional evidence regarding the DiskOnKey added nothing of substance to the information contained in the Readme document.

order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order. Before making any requests to maintain particular portions of the order under seal, the parties should recognize that the transcript of the trial is in the public record, largely unredacted, and that the hearing on the motion for judgment as a matter of law and a new trial was conducted in public.  Materials that were publicly disclosed either at trial or in the hearing should not be the subject of requests for redaction.

IT IS SO ORDERED.

SIGNED THIS 9th day of December, 2022.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

IOENGINE, LLC,                          §
                                        §
    *Plaintiff,*                       §
                                        §
v.                                      §
                                        §          Civil Action No. 18-452-WCB
PAYPAL HOLDINGS, INC.,                  §
                                        §
    *Defendant.*                       §
                                        §
_____     §

INGENICO INC.,                          §
                                        §
    *Plaintiff,*                       §
                                        §
v.                                      §          Civil Action No. 18-826-WCB
                                        §
IOENGINE, LLC,                          §          **FILED UNDER SEAL**
                                        §
    *Defendant.*                       §
                                        §
_____     §

IOENGINE, LLC,                          §
                                        §
    *Counterclaim Plaintiff,*          §
                                        §
v.                                      §
                                        §
INGENICO INC.,                          §
INGENICO CORP., and                     §
INGENICO GROUP S.A.,                    §
                                        §
    *Counterclaim Defendants.*         §
_____

## MEMORANDUM OPINION AND ORDER

In these consolidated cases, the parties have each filed case dispositive motions and motions to exclude expert testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). IOENGINE, LLC ("IOENGINE"), has moved for partial summary judgment on the issue of invalidity and has moved to exclude portions of the testimony of two experts retained by Ingenico Inc. ("Ingenico"). Dkt. No. 397.[1] PayPal Holdings, Inc. ("PayPal"), and Ingenico have moved for summary judgment on several issues, and they have moved to exclude the testimony of two of IOENGINE's experts. Dkt. Nos. 398–402. On April 6, 2022, and June 7, 2022, I heard oral argument on those motions.

## I.  **Background**

IOENGINE alleges that PayPal and Ingenico infringe various claims of U.S. Patent No. 9,059,969 ("the '969 patent") and U.S. Patent No. 9,774,703 ("the '703 patent"). IOENGINE had previously alleged infringement of U.S. Patent No. 8,539,047 ("the '047 patent") as well, but IOENGINE dropped the '047 patent from these lawsuits after the Patent Trial and Appeal Board ("PTAB"), in an *inter partes* review ("IPR") proceeding, found all of the asserted claims of that patent to be unpatentable. Dkt. No. 131 at 1.

### A.  The Patents In Suit

The '969 and '703 patents, which share a common specification, are directed to a "tunneling client access point" ("TCAP") that the patents describe as "a highly secure, portable, [and] power efficient storage and data processing device." '969 patent, Abstract. In a preferred embodiment, the TCAP is a Universal Serial Bus ("USB") device that connects to an "access terminal" (e.g., a desktop

---

[1]  All citations to the docket are to Case No. 18-452, unless otherwise noted.

computer, server, or mobile device). *Id.* at col. 3, ll. 46–54. In some embodiments, a user may "observe data stored on the TCAP without it being resident on the [access terminal]," a feature that "can be useful to maintain higher levels of data security." *Id.* at Abstract. In other embodiments, "the TCAP may tunnel data through an [access terminal] across a communications network to access remote servers." *Id.* Put more simply, the inventions disclosed in the specification allow a user to use processing and storage resources on the TCAP while making use of the display and network connection associated with the access terminal.

The asserted claims that remain in the two lawsuits are claims 3 and 10 of the '969 patent and claims 56, 90, 101, 105, 114, and 124 of the '703 patent. Those claims share a common hardware architecture, which includes a "portable device" connected to a "terminal," which in turn is connected to a "communications network node." *See* '969 patent, claim 1 (on which asserted claims 3 and 10 of the '969 patent ultimately depend); '703 patent, claims 55, 78, 104 (on which the asserted claims of the '703 patent ultimately depend). The independent claims from which the asserted claims depend also each recite software architecture in the form of "program codes." *See* '969 patent, claim 1; '703 patent, claims 55, 78, 104.

Claim 3 of the '969 patent encompasses the limitations of claims 1 and 2, from which claim 3 depends, and recites as follows:

> **1.** A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:

(a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;

(b) a processor; and

(c) a memory having executable program code stored thereon, including:

(1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal communication interface; and

(2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;

wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

**2.** The portable device according to claim **1**, wherein the fourth program code which [sic], when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node.

**3.** The portable device according to claim **2**, wherein the communication caused to be transmitted to the communication network node facilitates verification of the portable device.

Claim 10 of the '969 patent, which also encompasses the limitations of claims 1 and 2, recites as follows:

**10.** The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database.

The asserted claims of the '703 patent are generally similar, although they are directed to methods and systems, rather than devices, as is the case of the asserted claims from the '969 patent.

Asserted claim 56 of the '703 patent, a method claim that depends from claim 55 and thus encompasses all the limitations of claim 55, recites as follows:

**55.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of

4

communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**56.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate verification of the portable device.

Asserted claim 90 of the '703 patent, which depends from claims 78 and 86, and thus encompasses all the limitations of those claims, recites as follows:

**78.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting [sic: effecting?] the presentation of an interactive user interface by the terminal output component;

(b) executing second program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, third program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**86.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**90.** The method according to claim **86**, wherein the data stored on the portable device memory comprises portable device identified information.

Asserted claim 101 of the '703 patent, which depends from claims 93 and 97, and thus encompasses all the limitations of those claims, recites as follows:

**93.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting [sic: effecting?] the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with

6

the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**97.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**101.** The method according to claim **97**, wherein the data stored on the portable device memory comprises portable device identifier information.

Asserted claim 105 of the '703 patent, which depends from claim 104, and thus encompasses all the

limitations of that claim, recites as follows:

**104.** A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

(a) a communications network node; and

(b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

(1) cause the terminal to execute the first program code to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component;

(2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the

7

terminal and to a communications network node through the terminal network communication interface;

(3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface to cause a communication to be transmitted to a communications network node; and

(4) facilitate communications through the terminal network communication interface to a communications network node.

**105.**   The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

Asserted claim 114 of the '703 patent, which also depends from claim 104 and therefore

encompasses all the limitations of that claim, recites as follows:

**114.**   The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

Asserted claim 124 of the '703 patent, which depends from claims 104 and 120, and thus

encompasses all the limitations of those claims, recites as follows:

**120.**   The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with data stored on the portable device to facilitate the terminal to transmit a communication to the communications network node.

**124**.   The system according to claim **120**, wherein the data stored on the portable device memory comprises portable device identifier information.

In order to facilitate analysis, it is appropriate to analyze the claims without the "technical

jargon" used in the patents. *See Ericsson v. TCL Commc'n Tech. Holdings, Ltd.*, 955 F.3d 1317, 1326

(Fed. Cir. 2020).  Viewed in that manner, claim 1 of the '969 patent can be seen to recite a portable

device that contains a processor and memory; the portable device communicates with a terminal that

contains a processor and memory, and is connected with a network; the portable device executes code

8

to perform certain specific functions in response to input on the terminal's user interface and communicates with the network through the terminal.

That set of limitations is at the core of all the asserted claims of both the '969 patent and the '703 patent. Claim 3 of the '969 patent depends from claims 1 and 2, and it adds that the communication sent to the network serves to verify the portable device. Claim 10 of the '969 patent also depends from claims 1 and 2, and it adds that the communications sent to the communication network facilitate synchronizing content on the portable device with content on the communication network node database.[2]

Claim 56 of the '703 patent is a method claim that otherwise tracks the substance of claim 3 of the '969 patent. Claim 90 of the '703 patent similarly tracks claim 1 of the '969 patent but adds that the data stored on the portable device memory contains information identifying the portable device. Claim 101 of the '703 patent is also similar, but it adds that the data stored on the portable device memory includes portable device identifier information. Claim 105 claims a similar system in which the portable device is configured to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device. Claim 114 recites a similar system in which the communication to the communications network node facilitates synchronizing content on the portable device with content on the communications network node. And claim 124 recites a similar system in which data stored on the portable device facilitates the terminal to transmit communications to the communications network node and the data stored on the portable device memory includes portable device identifier information.

---

[2] Claim 1 of the '969 patent refers to a "communications network node," while claims 2, 3, and 10 refer to a "communication network node." The difference does not appear to be one of substance, but rather simply a manifestation of careless drafting of the type found throughout the two patents in suit.

9

**Appx63**

B. The Accused Products

PayPal and Ingenico's accused products serve as components of mobile point-of-sale ("mPOS") systems. Ingenico's accused products are mobile credit card readers for use by merchants who run a payment processing software application on a smartphone or tablet. Ingenico also provides a payment application, known as "RoamPayX," to a small number of its customers. Dkt. No. 404, Exh. 4, ¶ 60; Dkt. No. 403 at 4. The majority of Ingenico's customers do not use RoamPayX, but instead write their own applications using Ingenico's Application Programming Interfaces ("APIs") and/or Software Development Kits ("SDKs"). Dkt. No. 404, Exh. 4, at ¶¶ 64–70; Dkt. No. 403 at 4.

PayPal's accused products comprise two different product lines: PayPal Here and Zettle. In connection with each of those product lines, PayPal provides a free mobile application to merchants who can then accept credit card payments using a card reader that PayPal supplies to the merchants at little or no cost. Dkt. No. 403 at 5. The PayPal Here product line supports four different card readers: one supplied by a third party, Miura Systems Limited, and three supplied by Ingenico. PayPal's Zettle product line supports only one card reader, the "Zettle 2" reader, which is supplied by a third party, Datecs Ltd. *Id.*

## II. <u>Legal Standard</u>

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the case of an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986). The burden on the nonmoving party in that situation can be satisfied by "showing," that is, by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

### III. **PayPal and Ingenico's Motions**

In their motions, PayPal and Ingenico have raised nine different issues. They argue: (1) the asserted claims of the '969 and '703 patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101; (2) IOENGINE is estopped from disputing the validity of claims that the PTAB found to be unpatentable; (3) PayPal and Ingenico do not directly infringe the asserted method claims; (4) they do not directly infringe the asserted apparatus claims; (5) they do not jointly infringe the asserted method claims together with third parties; (6) Ingenico does not indirectly infringe the asserted claims; (7) Ingenico does not infringe the asserted claims under the doctrine of equivalents; (8) the expert testimony of Dr. Jeffery A. Stec should be excluded because of his failure to apportion damages to the infringing features of the accused products and for improperly relying on settlement agreements and prior jury verdicts to support IOENGINE's request for damages; and (9) the expert testimony of Mr. Jeffrey Klenk regarding the commercial success of products covered by the asserted claims should be excluded.

### A. Patent Eligibility Under 35 U.S.C. § 101

In evaluating whether a particular invention is patent-eligible within the meaning of 35 U.S.C. § 101, the court must first determine whether the asserted claims are directed to a patent-ineligible concept, such as an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014); *Mayo*

11

*Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 71–72 (2012). That factor is conventionally referred to as *Alice* step one. If the claims are directed to an abstract idea, the court must decide whether the claims nonetheless contain an "inventive concept . . . sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18; *Mayo*, 566 U.S. at 72–73. That factor is conventionally referred to as *Alice* step two.

With respect to *Alice* step one, PayPal and Ingenico argue that the asserted claims are directed to the abstract idea of "a portable device causing messages to be sent to a network through an intermediary computer." Dkt. No. 403 at 6. IOENGINE responds that such a characterization "radically oversimplifies the invention," which is directed to a "specific arrangement of components and program code to accomplish identified functionality." Dkt. No. 416 at 6. In particular, IOENGINE argues, the asserted claims are directed to a specific improvement in computer capabilities, namely, "a tangible portable device with unconventional hardware" that "allows users to employ traditional large user interfaces they are already comfortable with, provides greater portability, provides greater memory footprints, draws less power, and provides security for data on the device." Dkt. No. 416 at 7; '969 patent, col. 2, ll. 35–39.

In cases involving computing technology, the Federal Circuit has frequently framed the inquiry at *Alice* step one as asking "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016); *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306–07 (Fed. Cir. 2020); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364–65 (Fed. Cir. 2020); *Data Engine LLC v.*

*Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018); *Core Wireless Licensing S.A.R.L.*, 880 F.3d 1356, 1361–62 (Fed. Cir. 2018); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014).

This principle has sometimes been described as requiring "a technological solution to a technological problem" specific to computers. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016); *see also cxLoyalty, Inc. v. Maritz Holdings, Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (computer functionality improvements can be patent-eligible if they are "done by a specific technique that departs from earlier approaches to solve a specific computer problem"); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (claims held patent-ineligible because they "are not directed to a solution to a 'technological problem'").

When the claims at issue do not provide "a specific technical solution to a technological problem," the claims have been held abstract. *See Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1355 (Fed. Cir. 2021). But when the claims provide for a specific improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible. *See Data Engine*, 906 F.3d at 1008–11 (methods for making electronic spreadsheets more accessible); *Core Wireless*, 880 F.3d at 1361–63 (improved display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303–06 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–62 (Fed. Cir. 2017) (improved computer memory system).

The Federal Circuit's decision in *Visual Memory* is instructive in this regard. There, the Federal Circuit held that patent claims directed to an improved computer memory system were patent-

13

eligible and not directed to an abstract idea. The memory system disclosed in the patent at issue in that case contained three separate caches, each of which was "programmable based on the type of processor connected to the memory system." 867 F.3d at 1256. The patented system "separat[ed] the functionality for the caches and defin[ed] those functions based on the type of processor" being used with the memory system. *Id.* The court held that the claims were directed to "a technological improvement" and noted that "the specification discusse[d] the advantages offered by the technological improvement." *Id.* at 1259–60.

In the cases at bar, the claimed components standing alone (e.g., a "terminal," "portable device," or "processor") can fairly be considered as generic, as were the memory and cache components that were claimed in *Visual Memory*. But here, as in *Visual Memory*, the claims recite a specific structure and division of functions that are represented to constitute a technological improvement. The asserted claims of the '969 and '703 patents recite a portable device with a processor that performs functions in response to inputs on an interface located on a separate device—the terminal—which in turn is connected to a network. And the common specification of the asserted patents sets forth the advantages offered by that particular structure of components and division of functions. *See, e.g.*, '969 patent at col. 2, ll. 25–51 (discussing various problems with existing portable devices that the claimed inventions purportedly solve).

Specifically, the claims of IOENGINE's patents are directed to allowing users to "securely access, execute, and process data . . . in an extremely compact form." '969 patent, col. 2, ll. 26–28. And the common specification describes various ways to accomplish that goal, such as by allowing certain activities to "execute on the TCAP's processor" while using the access terminal merely as a display, *id.* at col. 9, ll. 24–27, or by using the TCAP's processor to encrypt data and transmit it through the access terminal such that it is not readable by or stored on the access terminal, *id.* at col.

14

12, line 65 through col. 13, line 12.  The claims recite several tangible components, including a portable device, a terminal, communications network nodes, and memory, that are configured to perform those functions.  The generic character of those components renders the claims broad in scope, but the breadth of the claims does not necessarily dictate whether the invention is directed to patent-eligible subject matter.  Instead, courts must consider "the focus of the claim, i.e., its character as a whole, in order to determine whether the claim is directed to an abstract idea." *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, 381 F. Supp. 3d 293, 304 (D. Del. 2019), *aff'd*, 813 F. App'x 584 (Fed. Cir. 2020) (internal quotation marks and citations omitted).  Here, the character of the claims as a whole relates to a specific improvement in computing technology, and not to implementing an "independently abstract" process that merely invokes computers as a tool.  *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

More generally, the Federal Circuit has noted that the abstract idea exception to patent eligibility "prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'"  *McRO*, 837 F.3d at 1312 (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113 (1853)).  The Federal Circuit expounded upon that theme in *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018), where the court explained that claims that are drafted in a functional manner have the effect of broadening the claim scope to cover a result regardless of how that result is obtained.  And by laying claim to a function or result, the claims risk preemption of any means of achieving the claimed function or result.  *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768–69 (Fed. Cir. 2019); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 ("An improved result, without more stated in the claim, is not enough to confer eligibility to an otherwise abstract idea. . . . To be patent-eligible, the claims must recite a specific means or method that solves a problem in an existing technological process.").

15

This point was well put in the Federal Circuit's decision in *TecSec, Inc. v. Adobe Inc.*, where the court wrote that in computer-related patents, the court has inquired whether the focus of the claimed advance is on a solution not a problem specifically arising in the realm of computer networks or computers, and "whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function." 978 F.3d 1278, 1293 (Fed. Cir. 2020) (citing *Uniloc*, 957 F.3d at 1306, 1308–09).

PayPal and Ingenico characterize the abstract idea underlying the asserted claims of the '969 and '703 patents as sending messages to a network through an intermediary. If accurate, that characterization of the claims would, of course, be functional and result-oriented, and would have broadly preemptive effects. The characterization, however, is not accurate, as it summarizes the claimed subject matter at too high a level of abstraction to fairly represent what the claims actually recite. The claims are directed to particular hardware components that have particular features and are arranged in a particular manner. The recited components perform a function and achieve a result, but what is claimed is a particular arrangement of particular components, not the abstract idea of transmitting messages through an intermediary, regardless of how that result might be achieved.

PayPal and Ingenico cite as presumably analogous authority several cases in which courts have held that patent claims involving computers were directed to abstract ideas, but those cases each involved the use of computers for other purposes, not improvements in computer technology. For example, the claims in *Universal Secure Registry* were directed to a method of verifying a person's identity by combining several conventional verification techniques. 10 F.4th at 1354. The court held that the claims were directed to an abstract idea because the authentication method simply used computers as a tool for performing the claimed multi-factor authentication, and the claims "d[id] not include sufficient specificity" regarding the technical solution being claimed. *Id*.

16

Similarly, in *Yu v. Apple Inc.*, the court held certain claims to be patent-ineligible; those claims were directed to a digital camera that would take two images of the same object and use one of the images to enhance the other. 1 F.4th 1040, 1042–43 (Fed. Cir. 2021). The court held that the claimed method was "'directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery' rather than 'a specific means or method that improved the relevant technology.'" *Id.* at 1043 (quoting *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017)). In *Yu*, the purported technical solution was "the abstract idea itself—to take one image and 'enhance' it with another." *Id.* at 1044. And in *Ericsson v. TCL Communication Technology Holdings, Inc.*, the Federal Circuit invalidated claims that were directed to "controlling access to, or limiting permission to, resources." 955 F.3d at 1326. Even though the claims were written "in technical jargon," the court concluded that they were directed to "nothing more than this abstract idea" and lacked "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Id.* at 1328 (quoting *SAP Am., Inc. v. Investpic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018)).

The same is true for the district court cases cited by PayPal and Ingenico. *See, e.g.*, *Callwave Commc'ns, LLC v. AT&T Mobility*, 207 F. Supp. 3d 405, 412–13 (D. Del. 2016) (noting that "the specification fails to reveal any sort of tangible technological advance beyond a mere abstract idea implemented using various existing technological tools"); *T-Jat Sys. 2006, Ltd. v. Expedia, Inc. (DE)*, No. 16-cv-581, 2018 WL 1525496, at *4 (D. Del. Mar. 28, 2018) (holding that the "particular characteristic[s]" of the claims to a computerized translation device were "inherent to the concept of translation," such that they would apply even to a human translator); *Pragmatus Telecom, LLC v. Genesys Telecomms. Lab'ys, Inc.*, 114 F. Supp. 3d 192, 200 (D. Del. 2015) (holding that claims directed to solving problems with call centers addressed "pre-Internet problems," such as long wait

times and requiring customers to physically record and dial a telephone number). Notably, none of the claims in those cases recited a purportedly unconventional arrangement of hardware components similar to the arrangements recited in these cases or in *Visual Memory*.

At oral argument on these motions, counsel for Ingenico contended that the best case support for the defendants' section 101 argument from among the Federal Circuit's decisions can be found in *Affinity Labs of Tex. v. DirectTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016), and *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977 (Fed. Cir. 2017). In both of those cases, however, the patent in question was directed to an abstract idea implemented by technological means, rather than to a modification of the technological means themselves. In *Affinity Labs*, the court identified the abstract idea as the dissemination of broadcast content to users outside of a particular region. 838 F.3d at 1256. There was nothing in the claim that was "directed to how to implement out-of-region broadcasting on a cellular telephone. Rather, the claim [was] drawn to the idea itself." *Id.* at 1258 (emphasis omitted). And in *Smartflash* the court identified the abstract idea as conditioning and controlling access to data based on payment, and it explained that the asserted claims invoked computers "merely as tools to execute fundamental economic practices." 680 F. App'x at 982.

IOENGINE's claims are directed to what IOENGINE asserts is a novel computer architecture that is designed to provide benefits because of the claimed structures of the computing elements. Unlike the cases relied upon by PayPal and Ingenico, IOENGINE's patents do not recite the use of conventional computer components as tools to accomplish other objectives set forth in abstract terms. While PayPal and Ingenico contend that the idea of distributing computer architecture in the manner provided in the asserted claims was not new when IOENGINE's patent applications were filed, that

18

is an issue that is properly assessed under the law of anticipation and obviousness; it is not a matter of patent ineligibility under section 101.[3]

In prior litigation in this district involving the same family of patents as those asserted here, the defendant argued that the '047 patent was directed to an abstract idea. Judge Sleet rejected that argument on the ground that the claims were directed to an improvement in computing technology. *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-cv-1571, 2017 WL 67938, at *1 n.2 (D. Del. Jan. 4, 2017). Specifically, Judge Sleet noted in the *Interactive Media* case that "the claims are directed to addressing a specific technological problem in then-existing computing environments: portable devices were 'bulky, provide[d] uncomfortably small user interfaces, and require[d] too much power to maintain their data.'" *Id.* (quoting '047 patent, col. 2, ll. 29–32).[4] Although the instant cases involve different patents than the one involved in the *Interactive Media* case, the patents are from the same family, share a common specification, and are directed to the same general subject matter. Accordingly, Judge Sleet's analysis is directly applicable here, and I find his opinion to be persuasive as to this issue.[5]

---

[3] In their reply brief, PayPal and Ingenico cite three district court cases for the proposition that "[d]istributing resources and tasks among computing devices is a well-recognized abstract idea." Dkt. No. 424 at 1. In one of those cases, *British Telecommunications PLC v. IAC/InteractiveCorp*, 381 F. Supp. 3d 293, 317–18 (D. Del. 2019), the discussion of distributed computer architecture was directed to whether the patent was directed to a well-understood, routine, and conventional computer function, the issue addressed in step two of the *Alice* analysis. *See Alice*, 573 U.S. at 221-22, 225. It was not directed to the abstract idea requirement addressed in step one of *Alice*. In the other two cases, *Device Enhancement LLC v. Amazon.com, Inc.*, 189 F. Supp. 3d 392, 403–04 (D. Del. 2016), and *Appistry, Inc. v. Amazon.com, Inc.*, No. C15-311, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015), the courts found that the asserted claims were directed to the general idea of distributed computer architecture rather than to a specific structure and division of functions. The asserted claims of the '969 and '703 patents are directed to a more specific allocation of functions than was true in the "distributed architecture" cases on which PayPal and Ingenico rely.

[4] The language from the '047 patent quoted by Judge Sleet is the same as the language found in the '969 patent at col. 2, ll. 29–31.

[5] PayPal and Ingenico suggest that Judge Sleet's ruling on other "abstract idea" issue may

19

Although the claimed elements in IOENGINE's patents are broad in scope, there is sufficient structure in the claims to ensure that IOENGINE is not simply laying claim to an end result rather than to the process or machinery employed to achieve that result. As IOENGINE notes in its brief, "there are many unclaimed ways [in which the invention] could be practiced." Dkt. No. 416 at 6 (emphasis omitted). And Ingenico effectively confirms that assertion by noting, with regard to the issue of indirect infringement, that its accused card readers "support numerous mechanisms for accomplishing payment transactions and firmware updates that are not accused of infringement." *See* Dkt. No. 403 at 31. The preemption concerns that underlie the abstract idea exception are therefore not particularly strong in these cases.

For purposes of the summary judgment motion on patent ineligibility, I conclude that PayPal and Ingenico have not shown that the claims at issue in these cases are directed to an abstract idea. PayPal and Ingenico's motion for summary judgment of invalidity therefore fails at *Alice* step one. For that reason, I need not address whether, under *Alice* step two, the claims recite an "inventive concept." *See Koninklijke*, 942 F.3d at 1153; *Visual Memory*, 867 F.3d at 1262; *Enfish*, 822 F.3d at 1339.

---

have been the result of the "defendant's overbroad articulation of the abstract idea" in that case. Dkt. No. 403 at 8. That speculation is not persuasive. The defendant in the *Interactive Media* case characterized the '047 patent as being directed to "a portable device that communicates with and through general purpose computers." *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-cv-1571, Dkt. No. 137 at 2 (D. Del. Dec. 1, 2016). That characterization is quite similar to the manner in which PayPal's characterizes the abstract idea here. *See* Dkt. No. 403 at 6 (defining the abstract idea as "a portable device causing messages to be sent to a network through an intermediary computer"). Thus, the persuasive value of Judge Sleet's opinion does not appear to be undermined by the manner in which the defendant in that case characterized the alleged abstract idea.

B. Estoppel

While this litigation was pending, Ingenico filed petitions for *inter partes* review with the PTAB, challenging claims in all of the patents asserted in the litigation. In 2020, the PTAB issued final written decisions in which it held that all the challenged claims of the '047 patent and most of the challenged claims of the '969 and '703 patents were unpatentable. Only three of the originally asserted claims survived the IPR proceeding: dependent claim 3 of the '969 patent and dependent claims 56 and 105 of the '703 patent. IOENGINE then added five new claims against each defendant in the district court litigation: dependent claim 10 of the '969 patent and dependent claims 90, 101, 114, and 124 of the '703 patent.

All eight of the claims now being asserted against PayPal and Ingenico depend from claims that were invalidated in the IPR proceedings. Based on the PTAB's rulings on those claims, PayPal and Ingenico contend that IOENGINE should be estopped from arguing that any of the limitations found in those independent claims are not found in the prior art. Dkt. No. 403 at 18–22. They cite two theories in support of their estoppel argument: collateral estoppel and quasi-estoppel.

1. *Collateral Estoppel*

In deciding questions involving collateral estoppel, the Federal Circuit looks to regional circuit law—here, the law of the Third Circuit—except for any aspects of collateral estoppel that may have special or unique application to patent cases. *See Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013); *AbbVie Deutschland GmbH & Co. KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1295 (Fed. Cir. 2014). In this instance, the question is whether to give collateral estoppel effect to the decisions of the PTAB in Ingenico's IPR proceedings. It is therefore at least arguable that this is a case involving the application of collateral estoppel in the patent context, so that Federal Circuit law should apply. However, with regard to the particular principles of collateral

21

estoppel law that apply here, Federal Circuit law and Third Circuit law are the same. The choice of law question therefore does not matter to the disposition of this issue.

A party asserting collateral estoppel ordinarily must satisfy the court that (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision in the previous litigation; and (4) the party to be estopped from relitigating the issue was fully represented in the prior action. *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006); *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012). Importantly, however, when the burden of proof on an issue in the prior proceeding was less stringent than the burden of proof on the issue as to which preclusion is sought in the second proceeding, collateral estoppel typically does not apply.

That principle has been recognized by the Supreme Court on several occasions and has been applied by both the Third and the Federal Circuits. *See One Lot Emerald Cut Stones & One Ring v. United States*, 409 U.S. 232, 235 (1972); *see also B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) ("[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." (citation omitted)); *Grogan v. Garner*, 498 U.S. 279, 284–85 (1991) (when a prior decision on an issue was based on the preponderance-of-the-evidence standard of proof, that decision cannot be given collateral estoppel effect against a party in a proceeding in which the decision on that issue is governed by the clear-and-convincing-evidence standard of proof); *In re Braen*, 900 F.2d 621, 624 (3d Cir. 1990) (different burdens of proof—in that case, preponderance of the evidence in the first litigation and clear and convincing evidence in the second—"foreclose application of the issue preclusion doctrine"); *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016) ("[T]he Patent Office is not bound by [a] district court['s] claim construction due to the different claim construction

22

standards applied in the two fora."); *Fears v. Wilkie*, 843 F. App'x 256, 261 (Fed. Cir. 2021) ("[I]ssues are not identical if the second action involves application of a different legal standard" than the first.).

In addition, commentators and other courts have treated that rule as black letter law. *See* Restatement (Second) of Judgments § 28(4) (1982) (relitigation of an issue in a subsequent action is not precluded if "the adversary [of the party against whom preclusion is sought] has a significantly heavier burden than he had in the first action"); *id.*, cmt. f & illus. 11 (no preclusion where burden of proof in one action was preponderance of the evidence and in the other action was clear and convincing evidence); 18 Charles Alan Wright et al., Federal Practice & Procedure § 4422 (3d ed. 2016) ("[A] party who has carried the burden of establishing an issue by a preponderance of the evidence is not entitled to assert preclusion in a later action that requires proof of the same issue by a higher standard."); 18 James Wm. Moore et al., Moore's Federal Practice § 132.02[4][e] (2021) ("[I]ssue preclusion does not apply when the party seeking to benefit from preclusion has a significantly heavier burden in the subsequent action than in the prior action."); *Cobb v. Pozzi*, 363 F.3d 89, 113 (2d Cir. 2004) (same; citing cases).

What PayPal and Ingenico are asking the court to do is to give collateral estoppel effect in this litigation to certain aspects of the PTAB's rulings invalidating the independent claims of the '969 and '703 patents in the IPR proceedings. In particular, PayPal and Ingenico argue that because the PTAB invalidated the claims from which the asserted claims depend (which they refer to as the "underlying claims"), IOENGINE should be foreclosed from disputing that the subject matter of those claims (and thus the subject matter of each of the limitations of those claims) is contained in the prior art. The effect of that relief, if granted, would be that IOENGINE could argue that only those new limitations that were introduced in the dependent claims asserted in these cases are novel, and thus that the validity of those claims would depend entirely on the novelty of the new limitations.

23

The problem with that argument is that the standard of proof for determining validity that is applied in proceedings before the PTAB differs from the standard of proof that is applied in proceedings before a district court. A petitioner in an IPR proceeding need only prove invalidity by a preponderance of the evidence. 35 U.S.C. § 316(e). In district court litigation, however, the defendant must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). Under the general principles of collateral estoppel law, as set forth above, that difference forecloses the court from applying collateral estoppel to IOENGINE's validity arguments in this forum, as several district courts have held. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, 2022 WL 823521, at *4–5 (D. Del. Mar. 30, 2022), *report and recommendation adopted on a different ground*, 2022 WL 1503923 (D. Del. May 12, 2022); *TrustID, Inc. v. Next Caller Inc.*, No. 18-cv-172, 2021 WL 3015280, at *3 n.2 (D. Del. July 6, 2021); *Sanofi-Aventis U.S. LLC v. Mylan GmbH*, No. CV 17-9105, 2019 WL 4861428 , at *1 (D.N.J. Oct. 2, 2019); *Papst Licensing GmbH & Co. v. Samsung Elecs. Co.*, 403 F. Supp. 3d 571, 601–03 (E.D. Tex. 2019).

PayPal and Ingenico take issue with that analysis. Relying on *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282 (Fed. Cir. 2018), they argue that, notwithstanding the difference in the standards of proof between PTAB proceedings and district court litigation, collateral estoppel applies to invalidity issues decided by the PTAB when those issues arise in district court litigation. To assess that argument requires a close examination of the *XY* case and the scope of that court's holding regarding collateral estoppel.

In *XY*, the Federal Circuit had before it two appeals involving the same patent claims—an appeal from a district court judgment that, in relevant part, held the claims invalid, and an appeal from a final written decision of the PTAB that invalidated the same claims in an IPR proceeding. The Federal Circuit affirmed the PTAB's decision and then gave collateral estoppel effect to that decision

with respect to the appeal from the district court, dismissing that appeal as moot. *XY*, 890 F.3d at 1294–95. The court noted that "both parties assumed that an affirmance of the Board's decision would result in estoppel" and that there was "no indication that either party thought estoppel would not apply." 890 F.3d at 1295. Under those circumstances, the court applied collateral estoppel *sua sponte* "to avoid unnecessary judicial waste from remanding an issue that has a clear estoppel effect." *Id.* (citation omitted).

Although PayPal and Ingenico cite *XY* for the proposition that the presence of "differing invalidity standards does not negate collateral estoppel," Dkt. No. 424 at 5, *XY* does not stand for so broad a proposition. The Federal Circuit had previously held that when the PTO cancels a claim, "the patentee loses any cause of action based on that claim, and any pending litigation in which the claims are asserted becomes moot" despite the differing standards of proof in the two forums. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013) (terminating parallel district court litigation when claims are canceled in reexamination); *see also LG Elecs., Inc. v. Conversant Wireless Licensing S.A.R.L.*, 759 F. App'x 917, 926 n.5 (Fed. Cir. 2019) (applying *Fresenius* to decisions of the PTAB canceling claims following an IPR proceeding). Importantly, however, *Fresenius* was not based on collateral estoppel; instead, it was based on the fact that the PTO's cancellation of patent claims extinguishes the patentee's cause of action for infringement of those claims. The Federal Circuit in *XY* reached a result roughly equivalent to the result it reached in *Fresenius*, as the court in *XY* dismissed the appeal from the district court litigation over certain after upholding the PTAB's decision invalidating those same claims. To be sure, the court in *XY* granted that relief before the PTO had formally canceled the claims. Perhaps for that reason, the Federal Circuit in *XY* treated its decision as being based on collateral estoppel rather than on a direct application of *Fresenius*.

25

This case is different from *XY* in three respects. First, unlike in *XY*, the claims that were invalidated in the IPR proceedings are not the same as the claims that are at issue in these cases. Second, unlike in this case, the parties in *XY* advised the court that they assumed the affirmance of the Board's decision would result in an estoppel. Third, the Federal Circuit upheld the PTO's decision invalidating the claims at issue simultaneously with its decision dismissing the patentee's challenge to the district court's order holding the claims invalid. In this case, the PTAB's decision invalidating the independent claims of the '969 and '703 patents has not been resolved by the Federal Circuit, but is still pending on appeal.

Given that the parties in *XY* agreed that estoppel should apply to the PTAB's decision once the Federal Circuit affirmed that decision, the court had no reason to address whether collateral estoppel should apply despite the different legal standards applicable to PTAB proceedings and district court actions. Moreover, because the facts of the *XY* case were closely aligned to those in *Fresenius*, and because the *XY* court reached a result that was aligned with the result that would have applied under *Fresenius* as soon as the PTO canceled the claims that had been invalidated by the Board and by the court of appeals, it made practical sense for the court to hold that the PTAB's decision rendered the appeal from the district court's invalidation order moot, rather than waiting until the PTO formally canceled the claims.

At bottom, PayPal and Ingenico's argument based on *XY* ignores the special circumstances in which that case arose. Instead, they contend that the court's reference to collateral estoppel as the basis for its ruling that the PTAB's invalidation of a claim bars further assertion of the same claim means that any issue decided by the PTAB in addressing invalidity has collateral estoppel effect in subsequent district court litigation notwithstanding the differences in the standard of proof between the two forums and even if the PTAB decision in the case has not been finally resolved. To read *XY*

26

that broadly would mean that the Federal Circuit, without saying so, has created an exception to the general rule of the law of judgments that collateral estoppel does not apply in circumstances in which the standard of proof that the party asserting collateral estoppel is more exacting in the second forum than in the first.

Although, as noted above, a number of district courts—including several in this district— have declined to read the *XY* decision that broadly, others have interpreted the decision to apply beyond the circumstances at issue in *XY*, where identical claims were at issue before the PTAB and the district court. *See Trs. Of the Univ. of Pa. v. Ely Lilly & Co.*, No. 15-6133, Dkt. No. 343, at 9– 11 (E.D. Pa. Jan. 14, 2022); *M2M Solutions LLC v. Sierra Wireless Am., Inc.*, No. 14-cv-102, Dkt. No. 213, at 5–7 (D. Del. Mar. 31, 2021), *declining to adopt report and recommendation*, 2020 WL 7767639 (D. Del. Dec. 4, 2020); *Cisco Sys., Inc. v. Capella Photonics, Inc.*, No. 20-cv-1858, 2020 WL 7227153, at *3–4 (N.D. Cal. Dec. 8, 2020); *Intell. Ventures I, LLC v. Lenovo Grp. Ltd.*, 370 F. Supp. 3d 251, 255–57 (D. Mass. 2019); *Fellowes, Inc. v. Acco Brands Corp.*, No. 10 cv 7587, 2019 WL 1762910, at *6 (N.D. Ill. April 22, 2019).

Ultimately, the Federal Circuit will have to resolve the question of the intended breadth of its decision in *XY*. For the present, I interpret the *XY* decision in light of the facts that were before the court in that case. I do not understand the court's opinion to have created an exception to general and long-standing principles of collateral estoppel law, particularly in the absence of any discussion by the court of those principles or whether departing from them would be justified under circumstances such as the circumstances in the PayPal and Ingenico cases. Accordingly, I conclude that collateral estoppel has no application to the validity of the asserted claims in these cases.

27

### 2. *Quasi-Estoppel*

The doctrine of quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken." *Albertson v. Winner Auto.*, No. 01-cv-116, 2004 WL 2435290, at *4 (D. Del. Oct. 27, 2004) (citation omitted). PayPal and Ingenico argue that IOENGINE's statement to the court that it would not "re-litigate previously invalidated claims" after the PTAB issued its decision in the IPR proceeding warrants the application of quasi-estoppel here. Dkt. No. 403 at 21 (quoting Dkt. No. 131 at 1).

IOENGINE is not asserting any claims that the PTAB found to be unpatentable in the IPR proceeding. PayPal and Ingenico suggest that IOENGINE may seek to argue, for purposes of the claims now being asserted by IOENGINE, that certain limitations that the PTAB found to be disclosed in the prior art are not in fact so disclosed. As discussed above, collateral estoppel would not apply to that argument. And although the issues that IOENGINE proposes to litigate in these cases may be similar to issues decided by the PTAB in the IPR proceedings, IOENGINE did not agree not to revisit any *issue* decided by the PTAB; it agreed only not to relitigate previously invalidated *claims*. IOENGINE has not taken a position that is inconsistent with its statement that it would assert only patent claims that were not found to be unpatentable by the PTAB. As a result, quasi-estoppel does not apply to the validity of any of the claims asserted against PayPal and Ingenico.

### C. Direct Infringement of the Asserted Method Claims

PayPal and Ingenico argue that they do not directly infringe any of the asserted method claims, which are claims 56, 90, and 101 of the '703 patent. Dkt. No. 403 at 22–23. They note that each method claim requires a user to interact at various points with either the portable device (which IOENGINE maps to the accused card readers) or the terminal (which IOENGINE maps to smartphones and tablets). Dkt. No. 403 at 22. According to PayPal and Ingenico, neither one of them

28

performs all the accused method steps and thus neither directly infringes the asserted method claims.

*Id.* (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007)).

IOENGINE has two separate theories of direct infringement: payment transactions and firmware updates. With regard to the payment-transaction theory of infringement, IOENGINE points to evidence that employees of PayPal and Ingenico complete the steps of the claimed methods when they either demonstrate or test the accused card readers. Dkt. No. 416 at 19–24. For example, IOENGINE points to a video that appears to depict a PayPal employee attempting to complete a payment transaction in order to test the "blacklist" feature of PayPal Here.[6] Dkt. No. 418, Exh. 10. As for PayPal's Zettle readers, IOENGINE points to deposition testimony suggesting that in February 2021 PayPal conducted internal test transactions on the Zettle readers in the United States and that those test transactions constituted direct infringement by PayPal. PayPal responded that those tests involved about 15 cents worth of transactions.[7] *See* Dkt. No. 447 at 1–2; Dkt. No. 448-1, Exh. 41, at

---

[6] The "blacklist" feature uses the card reader's serial number, which is sent to the server during a payment-card transaction to determine whether a device is involved in fraud and needs to be blacklisted. PayPal and Ingenico argue that the video in question is not evidence of direct infringement because it "does not show an actual transaction being conducted (*e.g.*, the 'Charge' button isn't pressed)." Dkt. No. 424 at 7. It is not clear, however, that the fact that the "Charge" button was not pressed means that the employee in the video did not complete all the steps of the claimed method. Viewing the facts in the light most favorable to IOENGINE, a reasonable jury could find that the video demonstrates completion of the claimed method steps.

[7] PayPal objects to this evidence on two grounds:

First, PayPal argues that IOENGINE raised this evidence for the first time at oral argument on the summary judgment motions. That contention fails because IOENGINE pointed to that evidence in response to a question from the court seeking clarification of the evidence on which IOENGINE was relying to support its direct infringement claim. Following the hearing, PayPal filed a statement responding to that evidence. *See* Dkt. No. 447. While a party resisting summary judgment must point to evidence supporting its position during the summary judgment proceedings, nothing prohibits the party from pointing to that evidence in response to questions from the court. Because PayPal had the opportunity to respond to that evidence (and availed itself of that opportunity), it was not prejudiced by IOENGINE's reference to the evidence during the hearing.

Second, PayPal argues that, in any event, the fact that the amount of the transactions was only 15 cents means that the infringement is *de minimis*. While that may be true, IOENGINE has at least

31.  While the "volume" of the alleged test transactions is vanishingly small, that evidence is sufficient to create a triable issue of fact as to whether PayPal engaged in at least some acts of direct infringement of the method claims.  As a result, summary judgment is inappropriate with respect to the issue of direct infringement by PayPal under IOENGINE's payment-transaction theory.

As for Ingenico, IOENGINE points to two other videos that appear to depict an Ingenico employee demonstrating Ingenico's card reader systems.  Dkt. No. 418, Exhs. 13–14.  Those videos, however, do not create a genuine dispute of material fact on the issue of direct infringement under the payment-transaction theory.  One video was recorded at a conference, "Transact 15," which took place prior to the issuance of the asserted patents.  *See* Dkt. No. 418, Exh. 13; Dkt. No. 451 at 227–28.  The other video depicts the use of Ingenico's iCMP device in conjunction with the RoamPayX application.  But the combination of the iCMP device and the RoamPayX application is not accused of infringement in the Ingenico case.  *See* Dkt. No. 418, Exh. 14; Dkt. No. 451 at 228–29.  Accordingly, IOENGINE has not identified evidence sufficient to create a genuine dispute of material fact on the issue of direct infringement by Ingenico under the payment-transaction infringement theory.  Summary judgment will therefore be granted to Ingenico on that issue.

With regard to IOENGINE's firmware-update theory of infringement, the only suggestion of direct infringement is in the form of attorney argument presented at the oral argument on these motions.  *See* Dkt. No. 451 at 220.  In essence, IOENGINE suggests that because PayPal and Ingenico are large companies with many customers, they must at least test the firmware-update capability of

---

raised a dispute of fact as to whether PayPal tests the payment-transaction functionality of its Zettle readers in an infringing manner, even if the degree of the infringement is minimal.  *See Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1356 (Fed. Cir. 2013); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1343, 1352–53 (Fed. Cir. 2009) (*de minimis* infringement can still be infringement).

their products. *Id.* That supposition is insufficient to create a genuine dispute of material fact on the issue of direct infringement under the firmware-update theory. Accordingly, summary judgment will be granted to PayPal and Ingenico with respect to direct infringement under IOENGINE's firmware-update theory.

D. <u>Direct Infringement of the Asserted Apparatus and System Claims</u>

PayPal and Ingenico next challenge IOENGINE's assertion that they directly infringe the asserted apparatus and system claims. Dkt. No. 403 at 23–28. That dispute focuses on whether the preambles of those claims have the effect of limiting the claims to require a system with a terminal.

There are two asserted apparatus claims in these cases—claims 3 and 10 of the '969 patent—and three asserted system claims—claims 105, 114, and 124 of the '703 patent. Both apparatus claims of the '969 patent depend from claim 1 of that patent. The three system claims of the '703 patent depend from claim 104 of that patent.

The preamble of claim 1 of the '969 patent recites:

A portable device configured to communicate with a *terminal* comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the *terminal* processor, is configured to present an interactive user interface on the *terminal* output component, and second program code which, when executed by the *terminal* processor, is configured to provide a communications node on the *terminal* to facilitate communications to the portable device and to a communications network node through the *terminal* network communication interface.

'969 patent, claim 1 (emphases added).

The preamble of claim 104 of the '703 patent recites:

A system implementing a *terminal* having a processor, an input component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the *terminal* processor, is configured to affect the presentation of an interactive user interface by the *terminal* output component, and second program code which, when executed by the *terminal*

31

**Appx85**

processor, is configured to provide a communications node on the *terminal* to facilitate communications to and from the *terminal*.

'703 patent, claim 104. (emphases added).

A frequently quoted principle of patent law is that a preamble will be regarded as limiting if it recites essential structure or steps of a claim, or is necessary to give life, meaning, and vitality to the claim. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). By contrast, if a preamble merely "define[s] the environment in which an accused infringer must act or describe[s] capabilities that an accused device must have," the preamble is generally not considered limiting. *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374–75 (Fed. Cir. 2011); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011).

PayPal and Ingenico argue that the preambles of all the apparatus and system claims are limiting because they are "necessary for a POSITA to understand the subject matter of the claims." Dkt. No. 403 at 24. IOENGINE responds by arguing that the preambles of those claims are not limiting, because they merely "describe the environment in which the claimed portable device or system is configured to operate." Dkt. No. 416 at 25.

With respect to the apparatus claims of the '969 patent, IOENGINE's argument is persuasive. Claim 1 is explicitly directed to a "portable device," and the limitations recited in that claim are all components of the portable device. The recitation of a "terminal" in the preamble of claim 1 serves only to define the capabilities of the claimed portable device. That is, the claimed portable device is "configured to communicate with a terminal" having certain features. '969 patent, claim 1. In such situations, the reference to a second device that the claimed device is configured to engage with does

32

not require that the accused infringer make, use, or sell (or offer to sell or import) the second device. *See Advanced Software*, 641 F.3d at 1374.

As the Federal Circuit observed in *Uniloc USA, Inc. v. Microsoft Corp.*, a patentee can generally structure a claim so that it captures infringement by a single entity. 632 F.3d at 1309 (quoting *BMC*, 498 F.3d at 1381). The fact that the portable device must be able to interact with a terminal does not require that PayPal or Ingenico make, use, or sell (or offer to sell or import) both a portable device and a terminal in order to infringe those claims. *See id.* ("That other parties are necessary to complete the environment in which the claimed element functions does not necessarily divide the infringement between the necessary parties. For example, a claim that reads 'An algorithm incorporating means for receiving e-mails' may require two parties to function, but could nevertheless be infringed by the single party who uses an algorithm that receives e-mails."). Consequently, I construe the apparatus claims of the '969 patent not to require proof that the accused infringer make, use, or sell (or offer to sell, or import) a terminal in order to infringe the claims.

With respect to the system claims of the '703 patent, however, PayPal and Ingenico have the more persuasive argument. Those claims—asserted claims 105, 114, and 124—are directed to a "system *implementing* a terminal." '703 patent, claim 104 (emphasis added). Unlike the preamble of claim 1 of the '969 patent, which describes the environment in which the claimed portable device operates, the preamble of claim 104 of the '703 patent makes clear that the claimed system is required to "implement" a terminal. That language goes farther than merely defining the environment in which the system operates or defining the capabilities of the system. To "implement" a terminal, the system must necessarily comprise a terminal. Accordingly, I construe the apparatus claims of the '703 patent as requiring proof that the accused infringer make, use, or sell (or offer to sell, or import) a terminal as well as the recited portable device.

33

The summary judgment record is clear that neither PayPal nor Ingenico provides the smartphones or tablets that IOENGINE alleges correspond to the "terminal" in the asserted patents. Dkt. No. 404, Exh. 13, at 189–193; Dkt. No. 404, Exh. 15, at 28–29. IOENGINE conceded during the oral argument on this motion that PayPal and Ingenico do not provide such devices. Dkt. No. 451 at 219. Accordingly, PayPal and Ingenico are entitled to summary judgment that they do not directly infringe claims 105, 114, and 124 of the '703 patent. PayPal and Ingenico are not, however, entitled to summary judgment that they do not directly infringe claims 3 and 10 of the '969 patent.

E. Joint Infringement

Joint infringement of a method claim is established "when an alleged infringer conditions participation in an activity or receipt of a benefit upon [another party's] performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023–24 (Fed. Cir. 2015). More specifically, joint infringement occurs when "a third party hoping to obtain access to certain benefits can only do so if it performs certain steps identified by the defendant, and does so under the terms prescribed by the defendant." *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1380 (Fed. Cir. 2017). PayPal and Ingenico argue that IOENGINE has pointed to no evidence that either of them controls or directs another actor to perform the acts constituting infringement. Dkt. No. 403 at 28–30.

In the PayPal case, I allowed IOENGINE's "direction or control" theory of joint infringement to survive a motion to dismiss because "[a]ccording to IOENGINE, the ability of PayPal POS [point-of-sale] Partners to interact with the accused PayPal products depends on their use of PayPal's software development kits, which control the performance of the steps of the method claims when the PayPal software is run by the POS Partners." Dkt. No. 48 at 5.

34

PayPal's argument relies heavily on the distinction between "merchants" and "POS Partners." For example, PayPal argues that "merchants—not POS partners—run the accused apps." Dkt. No. 403 at 28. The distinction between the two is not entirely clear, although it appears that PayPal refers to the POS Partners as those entities that develop the applications used with PayPal's card readers, whereas PayPal refers to merchants as those entities that complete transactions using those applications. In any event, that distinction does not affect the resolution of this issue.

IOENGINE points to the agreement that customers enter when undertaking to use PayPal Here. The agreement requires that the customers either "download the PayPal Here App" or use an application that is "configured to make . . . requests to the PayPal Here SDK." Dkt. No. 418, Exh. 16, at § 4. Otherwise, the agreement provides, "payments will not be processed." *Id.* Viewed in the light most favorable to IOENGINE, that requirement could be understood to require either a merchant or a POS partner to use PayPal's applications and/or PayPal's SDKs in conjunction with the PayPal Here card readers.

With respect to Ingenico, IOENGINE points to evidence demonstrating that Ingenico allows its customers to use the mPOS EMV SDK in conjunction with its card readers. Dkt. No. 418, Exh. 18, at 593; Dkt. No. 418, Exh. 19, at 29–31. But that evidence does not establish that Ingenico requires its customers to use any particular application or SDK in order to use Ingenico's products. IOENGINE's attorney argument at the motions hearing that Ingenico's products must use an SDK (although not necessarily the EMV SDK) is not sufficient to create a genuine dispute of material fact on that point. *See* Dkt. No. 451 at 222–23.

The Federal Circuit has held that a defendant commits joint infringement if the defendant controls "the manner and timing of its customers' performance [when] it provide[s] them with detailed instructions regarding how to complete [the method] steps and dedicate[s] resources toward helping

the customers resolve problems encountered along the way." *Travel Sentry*, 877 F.3d at 1380 (citing *Akamai*, 797 F.3d at 1025). Here, both PayPal and Ingenico provide technical support resources to customers who use the accused card readers. Dkt. No. 418, Exhs. 44–45.

PayPal and Ingenico argue that to the extent they may control certain aspects of a merchant's transactions, they do not direct or control "the accused method steps (e.g., the Bluetooth pairing process, entering the payment amount, etc.)." Dkt. No. 403 at 29. As to PayPal, that argument is unpersuasive because a jury could find that PayPal requires its customers to use either the PayPal Here application or SDK. Steps such as pairing a card reader and entering a payment amount might plausibly be directed by the software the merchants use.[8]

Viewing the evidence in the light most favorable to IOENGINE, a jury could reasonably find that PayPal controls the manner and timing of the merchants' performance of the claimed method steps. Accordingly, PayPal is not entitled to summary judgment of no joint infringement. With respect to Ingenico, however, the evidence is different. IOENGINE has not established that Ingenico requires its customers to use any particular application or SDK in conjunction with Ingenico's accused card readers. There is therefore no genuine dispute of material fact regarding whether Ingenico controls the manner and timing of the merchants' performance of the claimed method steps. For that reason, Ingenico is entitled to summary judgment of no joint infringement.

---

[8] PayPal also argues that it "do[es] not dictate the form of payment that a merchant accepts, what time to perform a transaction, or where/whether the merchant should perform a transaction at all." Dkt. No. 424 at 10. The fact that PayPal does not require customers to process payment transactions in the first place does not preclude a finding that PayPal jointly infringes when its customers engage in those transactions. In *Travel Sentry*, the court found that the alleged infringer, by providing the Transportation Security Administration ("TSA") with resources on how to identify and disengage its accused luggage locks, could jointly infringe, despite there being no suggestion that the defendant had any control over which items of luggage the TSA chose to inspect or whether the TSA would disengage any of the locks at all. *Travel Sentry*, 877 F.3d at 1383–85 ("[I]t is irrelevant that TSA can choose to accomplish its luggage screening mandate through other means.").

36

F. Indirect Infringement

Ingenico argues that it does not indirectly infringe the asserted claims. As part of its proof of indirect infringement, a plaintiff must show that a third party directly infringed the asserted claims. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016). Ingenico argues that IOENGINE has not pointed to any specific instances of direct infringement by Ingenico's customers. Dkt. No. 403 at 30–32.

IOENGINE responds by noting that it has alleged direct infringement by PayPal based on PayPal's alleged use of Ingenico's products to infringe the asserted claims. Dkt. No. 416 at 30. I have noted above that there is a triable issue as to PayPal's direct infringement of the apparatus claims of the '969 patent and the asserted method claims of both asserted patents. Viewing the facts in the light most favorable to the non-movant, a reasonable jury could find that PayPal uses Ingenico's card readers to directly infringe the asserted claims.

In any event, in order to prevail on its indirect infringement claim, IOENGINE is not required to point to direct evidence of either inducement of particular parties by Ingenico or direct infringement by the induced parties. On multiple occasions, the Federal Circuit has held that circumstantial evidence is sufficient to support a jury verdict of indirect infringement, both with respect to the element of inducement and the element of direct infringement by the induced party. *See, e.g.*, *Power Integrations*, 843 F.3d at 1335 (collecting cases); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1340 (Fed. Cir. 2021) ("It was fair for the jury to infer that when [the defendant] distributed and marketed a product with labels encouraging an infringing use, it actually induced [third parties] to infringe."); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (circumstantial evidence sufficient to prove direct infringement element of induced infringement); *In re Bill of Lading Transmission*, 681 F.3d 1323, 1336 (Fed. Cir. 2012) ("This court has upheld claims

37

**Appx91**

of indirect infringement premised on circumstantial evidence of direct infringement by unknown parties."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317–18 (Fed. Cir. 2009) (same); *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008) (same). And IOENGINE has pointed to statements and user guides along with sample code, documentation, and applications that Ingenico makes or provides to its customers. Dkt. No. 416 at 32 (describing several exhibits). Those materials are similar to the materials the Federal Circuit held in *Power Integrations* and *GlaxoSmithKline* to be adequate circumstantial evidence of induced infringement. *See Power Integrations*, 843 F.3d at 1335 (identifying "advertisements" and "user manuals" as types of circumstantial evidence of inducement); *GlaxoSmithKline*, 7 F.4th at 1340 (same).

Ingenico makes the separate argument that IOENGINE has not shown that Ingenico's devices "necessarily infringe[] the patent[s] in suit." Dkt. No. 403 at 30 (quoting *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 493 (Fed. Cir. 2019)). However, the requirement that an indirect infringer's product must actually infringe the claim does not apply when "the claim language only requires the capacity to perform a particular claim element." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). Here, the asserted claims are directed to the capabilities of the recited elements. *See, e.g.*, '969 patent, claim 1 (reciting a "portable device configured to" perform several functions); '703 patent, claim 104 (describing the claimed system largely in terms of its capabilities). As a result, IOENGINE need not show that Ingenico's card readers necessarily infringe the asserted claims, as long as the card readers possess the capabilities recited in the claims, and as long as direct infringement is committed by third parties who are induced by Ingenico to infringe. I therefore find that there is a triable issue of fact with respect to whether Ingenico indirectly infringes the asserted claims.

G.  Doctrine of Equivalents

Ingenico moves for summary judgment that it does not infringe under the doctrine of equivalents.  Ingenico asserts that "IOENGINE has only proffered from its expert a statement of the legal standard and a single conclusory statement" that the accused products infringe under the doctrine of equivalents.  Dkt. No. 403 at 32–33.

As Judge Stark has noted, "[t]here is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the limitations rule."  *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 685 (D. Del. 2017), *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed. Cir. 2019) (citation omitted).  Nevertheless, the plaintiff must do more than offer "the same literal infringement theory repackaged as DOE, without particularized linking evidence on a limitation-by-limitation basis."  *Osseo Imaging, LLC v. Planmeca USA Inc.*, No. CV 17-1386, 2020 WL 6318724, at *5 (D. Del. Oct. 28, 2020); *see also nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1325 (Fed. Cir. 2006); *ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 552–53 (Fed. Cir. 2018).

IOENGINE points to several places in the report of IOENGINE's expert, Aviel D. Rubin, in which Dr. Rubin noted that some of the accused devices contain components or perform functions similar to the components and functions set forth in the claims.  Dkt. No. 416 at 34–35.  But those statements are directed to literal infringement, not infringement under the doctrine of equivalents.  For example, Dr. Rubin relied on the "Landi source code" in his discussion of how some of the accused readers "initiate a payment transaction."  Dkt. No. 418, Exh. 3, at ¶¶ 384–97.  He then concluded his analysis of that feature by noting that the accused readers "are capable of the same functionalities [as those provided by the Landi source code] even if they do not utilize the Landi source code" because they "embody similar source code."  *Id.* at ¶ 397.  That observation is clearly intended to say that the

additional accused card readers literally infringe, not that they infringe under the doctrine of equivalents. In any event, that observation and others to the same effect are conclusory and do not explain in what ways the functionalities or underlying source code are "similar." *See id.*

IOENGINE has thus failed "to make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex*, 477 U.S. at 322. Because IOENGINE has not "designate[d] 'specific facts showing that there is a genuine issue for trial'" as to the doctrine of equivalents, *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56), IOENGINE has failed to raise a genuine dispute of material fact on which a jury could find infringement by Ingenico under that theory of liability. Summary judgment will therefore be granted for Ingenico on the issue of infringement under the doctrine of equivalents.

   H.   Opinion of Dr. Stec

In their *Daubert* motions, PayPal and Ingenico seek to exclude the opinions of Jeffery A. Stec, IOENGINE's damages expert. Dkt. No. 403 at 33–41. IOENGINE has put forth a theory of damages based on the reasonable royalty that PayPal and Ingenico would have had to pay to license the technology in the asserted patents. As is typically done when damages claims are based on a reasonable royalty theory, IOENGINE offers expert testimony directed to the amount that willing parties would have agreed to for a license following a hypothetical negotiation. *See Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010) (a royalty rate must reflect what "would have been agreed to in a hypothetical negotiation between a willing licensee and willing licensors"); *Lucent*, 580 F.3d at 1325. IOENGINE's evidence addresses the royalty base that would have been used in such a hypothetical negotiation and the royalty rate that the parties would have settled on. PayPal and Ingenico challenge Dr. Stec's conclusions as to the amount the parties would have agreed to in such a negotiation, contending (1) that Dr. Stec failed to properly apportion the value of the licensed

technology across the royalty base, (2) that he relied on a non-comparable license agreement to support his assessment of the royalty rate to which the parties would have agreed, and (3) that he improperly based his damages opinion on jury verdicts and settlement agreements in other cases.

### 1. *Apportionment and License Comparability*

PayPal and Ingenico first argue that in performing his damages assessment Dr. Stec failed to conduct an appropriate apportionment analysis. As the Federal Circuit has explained, "damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). To do so, the patentee must either point to "evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" or demonstrate that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Uniloc*, 632 F.3d at 1318 (citation omitted).

The parties agree that in these cases the smallest salable patent-practicing units are the accused card readers. Dkt. No. 416 at 35; Dkt. No. 424 at 15. In cases in which the smallest salable unit contains features that are not attributable to the patented technology, "the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). The need for apportionment can be avoided if the patentee establishes that its "patented technology drove demand for the entire product." *Id.* at 1329. However, a patentee may "assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Id.* at 1327 (quoting *Versata Software, Inc. v. SAP Am., Inc.*, 717

41

F.3d 1255, 1268 (Fed. Cir. 2013)) (emphasis in *VirnetX*); *Sonos, Inc. v. D&M Holdings, Inc.*, 297 F. Supp. 3d 501, 515 (D. Del. 2017).

The accused card readers at issue in these cases contain numerous features that are not covered by the '969 and '703 patents. For example, the accused card readers include physical components such as "a display screen, pin pad, processor, battery, power supply, and the card reading technology itself" along with security features such as "point-to-point encryption, the capacity to meet industry anti-fraud standards, [and] the ability to handle contactless transactions." Dkt. No. 424 at 16–17.

Dr. Stec did not adjust his assessment of the royalty base for the accused products to account for those non-patented features present in the accused card readers. Nor does IOENGINE allege that the features claimed in the asserted patents "create[] the basis for customer demand" for the accused products, *see VirnetX*, 767 F.3d at 1326. Instead, IOENGINE points to the "built-in apportionment" attributable to the licenses on which Dr. Stec relies, and contends that the "built-in apportionment" satisfies the apportionment requirement. Dkt. No. 416 at 36.

A license can provide "built-in apportionment" if it is "sufficiently comparable" to the hypothetical license that parties in the position of the parties to the lawsuit would have agreed to. *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). But a fact-finder can conclude that the parties to an extraneous license "settled on a royalty rate and royalty base combination embodying the value of the asserted patent" only if the extraneous license is comparable to the license that would be the product of the hypothetical negotiation in the case before it. *Id.* at 1041; *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021). The problem with Dr. Stec's testimony is that the circumstances that gave rise to the licenses on which Dr. Stec relied in his expert report were not comparable to the circumstances in the PayPal and Ingenico cases.

42

To begin with, among the licenses on which Dr. Stec relied, only one is a license entered into other than as the product of the settlement of litigation. That license is a license from iPIN Debit Network, Inc. ("iPIN"), to Infantly Available, Inc. ("Infantly").[9] Dkt. No. 404, Exh. 10, at 32. In that license, iPIN granted Infantly an exclusive license to two patents and several products, including iPIN's devices, "Debit Network," "Debit Processing Center," capabilities for "acquiring, settl[ing], and processing transaction[s] by merchant processors," and "encryption and transmission of electronic and/or mobile financial transactions." *Id.*

PayPal and Ingenico argue that the iPIN license is not comparable to the royalty agreements that would have been reached in hypothetical negotiations with IOENGINE over the asserted claims in these cases, and that it was therefore improper for Dr. Stec to rely upon the iPIN license in his report. IOENGINE argues that license comparability is a jury question that goes to the weight of Dr. Stec's testimony, not its admissibility.

In order for the iPIN license to be admissible on the issue of damages, the license would have to be "sufficiently tied to the facts of the case." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)). More specifically, the Federal Circuit has instructed district courts "to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

It is clear that the technology that is the subject of iPIN license differs significantly from the technology at issue here. For example, in his report Dr. Stec referenced the opinion of Dr. Rubin that

---

[9] As noted below, Dr. Stec will be precluded from relying upon the settlement agreements and jury verdicts discussed in his report. Accordingly, Dr. Stec's treatment of the iPIN license must independently meet the apportionment requirement for his analysis of the iPIN license to be admissible.

"the iPIN technology is not suitable for [mPOS], where the card readers rely on the [interactive user interface] and interface capabilities of a mobile phone or tablet but rather is more like a traditional POS system." Dkt. No. 404, Exh. 10, at 38 (internal quotation marks omitted). Dr. Stec added that "the patent[s]-in-suit provide a more beneficial architecture and tunneling security benefits," and that "the Patents-in-Suit provide significantly more important features and benefits than the technology described by this license." *Id.* (internal quotation marks omitted). Ultimately, Dr. Stec noted that the technology covered by the iPIN license is "inferior or at least a distant second" to the technology covered by the asserted patents in these cases. Dkt. No. 404, Exh. 23, at 74.

Because of the iPIN license is so different from a license to the technology at issue in these cases, the iPIN license is of little or no value in analyzing the hypothetical negotiation that is designed to provide guidance as to the proper assessment of damages. First, the iPIN license covered one patent that had already expired by the time the license took effect and another patent that was to expire approximately one year after the license became effective. Dkt. No. 418, Exh. 31, at 39. Second, the iPIN license was exclusive, whereas a hypothetical negotiation in these cases would be for a non-exclusive license. *Id.* at 32. Third, the iPIN license covered several products, services, and other obligations in addition to the two patents recited in the license. *Id.* at 32–33. And fourth, the iPIN license did not involve any of the parties to these cases.[10] *See id.* Although a license need not be "perfectly analogous" in order to be comparable, the expert must nevertheless account for any

---

[10] IOENGINE's damages expert in a previous case involving the '047 patent noted, when discussing licenses not involving the parties to the hypothetical negotiation, it is "probably impossible to find anything comparable that would be acceptable in terms of supporting the royalty." *IOENGINE LLC v. GlassBridge Enterprises, Inc.*, No. 14-cv-1572, Dkt. No. 272 at 741 (D. Del. Apr. 25, 2018). That expert refused to rely upon outside licenses because "you're not going to find very comparable technology to a particular and unique patent that you are dealing with in these cases." *Id.* at 742.

differences between the license and the royalty agreement that would be expected to flow from a hypothetical negotiation involving the patents in suit. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d at 1227–28.

In his analysis, Dr. Stec used the five-percent royalty rate adopted in the iPIN license as a floor for the hypothetical negotiation in these cases. Because he viewed the technology covered by that license as inferior to the technology at issue in the cases at bar, he concluded that the royalty rate for the patents in these cases should be adjusted upward from five percent of net sales. *Id.* at 74–77. But Dr. Stec failed to explain how the iPIN license provides the built-in apportionment necessary to satisfy the apportionment requirement. The patents that were the subjects of the iPIN license were directed to a "secure keyboard" in one instance and a "system for remote purchase payment transactions and remote bill payments" in the other. Dkt. No. 418, Exhs. 38–39. Dr. Stec did not explain what portion of the five-percent royalty rate in the iPIN license was attributable to the technology covered by those patents as opposed to the other provisions of the license, aside from his general assertion that the other obligations contained in the license would result in "limited downward pressure on the royalty rate that would have been agreed to in the hypothetical negotiation." Dkt. No. 418, Exh. 31, at 41. Nor did he explain how the details of the iPIN license could be useful in separating the value of the patented features from the value of the unpatented features in the accused card readers at issue in these cases. Given the significant differences in the technologies, Dr. Stec's failure to account for those points substantially undermines his reliance on the iPIN license. *See Omega*, 13 F.4th at 1379 (noting that a patentee may not "avoid the task of apportionment" in cases in which its expert's testimony "does not sufficiently speak to 'built-in apportionment'").

The license that the Federal Circuit addressed in *Vectura Ltd. v. GlaxoSmithKline LLC*, provides a useful contrast to the iPIN license. *See* 981 F.3d at 1041. In *Vectura*, the plaintiff's expert

45

relied on a prior license between the plaintiff and the defendant as providing built-in apportionment. *Vectura*, 981 F.3d at 1040. In that case, not only were the parties to the prior license the same as in the hypothetical negotiation, but the license and the hypothetical negotiation covered "roughly very similar technologies." *Id.* at 1041. The defendant's own expert in *Vectura* admitted that the license "was a very close comparable, much closer than you ever find in a patent case." *Id.* at 1040. In the cases at bar, by contrast, the iPIN license that IOENGINE offers as a comparable license covered technology quite different from the technology that is the subject of the asserted claims. And the rights conveyed by the iPIN license differed dramatically from the rights that would be at issue in a hypothetical negotiation over a license to IOENGINE's asserted patents.

In *Pavo Solutions LLC v. Kingston Technology Co.*, ___ F.4th ___, No. 21-1834, 2022 WL 1815050 (Fed. Cir. June 3, 2022), the Federal Circuit recently found that a license relied upon by the plaintiff's damages expert provided built-in apportionment under circumstances that indicated what the Federal Circuit regards as sufficient to satisfy the apportionment requirement. The license upon which the expert in the *Pavo Solutions* case relied was a prior license to the same patent between the plaintiff and another entity. *Id.* at *8. The court observed that the license therefore "plainly reflected the value that the contracting parties settled on for the patent." *Id.* By contrast, the iPIN license differs in numerous respects from the license that would be the product of a hypothetical negotiation involving the asserted patents. For that reason, it cannot be said that the iPIN license "plainly reflect[s]" the value that the parties would place on the '969 and '703 patents. *See id.* Thus, unlike in *Vectura* and *Pavo Solutions*, the iPIN license is not "highly comparable" to the technology at issue in these cases, such that "principles of apportionment [a]re effectively baked into the [iPIN] license." *See id.* at 1041; *Pavo Solutions*, 2022 WL 1815050, at *8; *see also Omega*, 13 F.4th at 1379–80.

46

In many situations, the fact that a license is not perfectly analogous to the rights that would be at issue in a hypothetical negotiation goes to the weight of the evidence, not its admissibility. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d at 1227. And at least in broad strokes, Dr. Stec attempted to account for some of the differences between the iPIN license and the hypothetical negotiation in these cases. But those efforts are not sufficient to satisfy the requirement that IOENGINE present evidence apportioning the "patentee's damages between the patented feature and the unpatented features." *Uniloc*, 632 F.3d at 1318 (citation omitted). Dr. Stec did not apportion the royalty base or rate to account for unpatented features of the accused card readers, nor did he show that the iPIN license is sufficiently comparable that "principles of apportionment [a]re effectively baked into" the license. *See Vectura*, 981 F.3d at 1041. Accordingly, his testimony regarding the iPIN license lacks the reliability required of expert evidence and will be excluded.

2. *Jury Verdicts*

PayPal and Ingenico also argue that Dr. Stec's opinion impermissibly relies on prior jury verdicts from two cases involving the '047 patent. In 2017, a jury found that Imation Corp. infringed the '047 patent, and Dr. Stec calculated a 23.9% "implied royalty rate" based on that verdict. The same year, a jury found that Interactive Media Corp. ("IMC") infringed the '047 patent, and Dr. Stec calculated a 27.9% "implied royalty rate" based on that verdict. Dr. Stec considered both of those verdicts in his damages analysis.

District courts have frequently disapproved of the admission of prior jury verdicts into evidence in patent cases. *See, e.g.*, *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, No. 17-cv-1734, 2021 WL 982732, at *9 (D. Del. Mar. 16, 2021); *Princeton Digital Image Corp. v. Ubisoft Entm't SA*, No. 13-cv-335, 2018 U.S. Dist. LEXIS 213987, at *3–7 (D. Del. Dec. 11, 2018), *report and recommendation adopted*, No. 13-cv-335, Dkt. No. 377 (Aug. 6, 2019); *Acceleration Bay LLC v.*

*Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018); *Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 605 (D. Del. 2010); *St. Clair Intell. Prop. Consultants, Inc. v. Fuji Photo Film Co.*, 674 F. Supp. 2d 555, 558–59 (D. Del. 2010), *rev'd on other grounds*, 412 F. App'x 270 (Fed. Cir. 2011); *Maxell, Ltd. v. Apple Inc.*, No. 5:19-CV-00036-RWS, 2021 WL 3021253, at *6–7 (E.D. Tex. Feb. 26, 2021); *Atlas IP, LLC v. Medtronic, Inc.*, No. 13-CIV-23309, 2014 WL 5741870, at *6 (S.D. Fla. Oct. 6, 2014); *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, No. 99-cv-1607, 2003 U.S. Dist. LEXIS 27873, at *4–5 (D. Minn. May 16, 2003). Those courts have generally expressed concern with the prejudice that could result from introducing a prior verdict to the jury. *Sprint*, 2021 WL 982732, at *9 n.9; *St. Clair*, 674 F. Supp. 2d at 559; *Acceleration Bay*, 324 F. Supp. 3d at 489 n.19; *Honeywell*, 2003 U.S. Dist. LEXIS 27873, at *4; *Maxell*, 2021 WL 3021253, at *7.

Outside of the patent context, courts have echoed those concerns regarding the potential for prejudice. *See, e.g.*, *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975) ("The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it."); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1117–18 (8th Cir. 1999); *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 633 (D.C. Cir. 2010); *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1009–10 (9th Cir. 2007); *Blakely v. City of Clarksville*, 244 F. App'x 681, 684 (6th Cir. 2007); *Espenscheid v. DirectSat USA, LLC*, No. 09-CV-625, 2012 WL 12995333, at *4 (W.D. Wis. Feb. 27, 2012); *see generally McKibben v. Phila. & Reading Ry. Co.*, 251 F. 577, 578–79 (3d Cir. 1918) ("[T]he statement made by counsel for the plaintiff in his argument to the jury as to what had been done by other juries in former trials of this case . . . [is] in a federal court deemed so improper as to warrant opposing counsel to request, and courts of their own motion to direct, the withdrawal of a juror and the continuance of a case . . . .").

48

Apart from the issue of prejudice, Judge Andrews has questioned the reliability of using jury verdicts to inform a hypothetical negotiation, noting that "[a] jury verdict represents the considered judgment of twelve (or maybe fewer) random non-experts as to what a hypothetical negotiation would have resulted in for the patent(s) at issue." *Acceleration Bay*, 324 F. Supp. 3d at 489; *see also Sprint*, 2021 WL 982732, at *9; *Princeton*, 2018 U.S. Dist. LEXIS 213987, at *4.

The reliability of the jury verdict at issue in a particular case can also play a role in determining whether the verdict should be considered in the hypothetical negotiation. For example, in *Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349, 2017 WL 3476978 (E.D. Tex. May 8, 2017), the court declined to admit a jury verdict that had not been tested in post-trial briefing or on appeal. As a result, the court concluded that the verdict was not an "established and reliable data point" that could be used in the hypothetical negotiation. *Id*. at *2. As in the *Saint Lawrence* case, the verdicts in the IMC and Imation cases were never tested in post-trial motions or on appeal, because those cases both settled before the court had an opportunity to rule on the post-trial motions and before any appeal form the verdict was taken to the Federal Circuit. *See generally IOENGINE LLC v. Interactive Media Corp.*, No. 14-cv-1571 (D. Del.); *IOENGINE LLC v. GlassBridge Enterprises, Inc.*, No. 14-cv-1572 (D. Del.). Moreover, in the Imation case, the defendants had specifically challenged the damages methodology of IOENGINE's expert in a post-trial motion for judgment as a matter of law, but in light of the settlement, that issue was never resolved. *See GlassBridge*, Dkt. No. 208, at 8–13. The fact that the verdicts in those cases were not further analyzed by the district court or the Federal Circuit render them less reliable evidence of the parties' positions at a hypothetical negotiation than might otherwise be the case. *See Saint Lawrence*, 2017 WL 3476978, at *2. Moreover, as IOENGINE acknowledged during the oral argument on these motions, the juries in the IMC and Imation cases awarded damages that were different from (albeit close to) the amounts requested by

49

IOENGINE.  It is not clear what the precise basis was for the figures awarded by the juries in those cases, which further calls into question the reliability of the jury's awards in those cases as an indication of the outcome of a hypothetical negotiation in the cases at bar.

IOENGINE points out that on two occasions the Federal Circuit has declined to reverse judgments arising from cases in which prior jury verdicts were admitted as part of the plaintiffs' hypothetical negotiation analysis. *See Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977, 980–82 (Fed. Cir. 2019); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1365–66 (Fed. Cir. 2006).  Those decisions, however, stand only for the proposition that the district courts in those cases did not abuse their discretion in allowing the juries to consider prior jury verdicts under the specific circumstances of those cases.  *See Applied Med.*, 435 F.3d at 1366 ("We therefore conclude that the court acted within its discretion."); *Sprint*, 760 F. App'x at 982 ("[T]he district court did not commit reversible error in failing to" exclude a prior jury verdict.).  In neither case did the court of appeals give unqualified approval for the general admission of jury verdicts on the issue of damages.  In fact, in the *Sprint* case the court made clear that prior verdicts "can be prejudicial and must be treated with great care." *Sprint*, 760 F. App'x at 980–81.  As the Third Circuit has observed, district courts are given "very substantial discretion" in making evidentiary decisions, and it would be improper to read *Sprint* and *Applied Medical* as foreclosing a district court's exercise of its discretion to exclude prior jury verdicts and instead requiring that prior jury verdicts must ordinarily be treated as admissible. *See United States v. Ali*, 493 F.3d 387, 391 (3d Cir. 2007).

In sum, there are substantial issues with using jury verdicts to inform a hypothetical negotiation, both generally and in these cases.  While the jury verdicts at issue in these cases have some relevance as to the value that IOENGINE's technology would be assigned in a hypothetical negotiation, I find that the prejudicial effect of the jury verdicts substantially outweighs the probative

50

value of those verdicts. *See* Fed. R. Evid. 403. Accordingly, I will exclude Dr. Stec's testimony to the extent that it relies on the IMC and Imation jury verdicts.

### 3. *Settlement Agreements*

In addition to their arguments regarding the prior jury verdicts, PayPal and Ingenico contend that Dr. Stec improperly relied on the settlement agreements that IOENGINE entered into with IMC and Imation following the jury verdicts in those cases. After the Imation verdict, IOENGINE and Imation entered into an agreement settling the litigation in that case, from which Dr. Stec calculated a 16.8% royalty rate. And after the IMC verdict, IOENGINE and IMC entered into an agreement settling the litigation in that case, from which Dr. Stec calculated a 12.2% royalty rate. Dr. Stec considered both of those settlement agreements in his report.

The Federal Circuit has observed that "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012); *see also Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 495 (D. Del. 2019); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 675, 678 (D. Del. 2016) ("Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances."). As the court explained in *LaserDynamics*, a licensing agreement entered into to resolving an ongoing infringement claim "is tainted by the coercive environment of patent litigation" and is therefore generally "unsuitable to prove a reasonable royalty." 694 F.3d at 77.

To be sure, the Federal Circuit has recognized that a court in its discretion can admit a settlement agreement if the settlement agreement is relevant to the value of the technology in suit and the relevance of the evidence is not outweighed by the risk of prejudice accompanying its admission. *See, e.g.*, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1336–37 (Fed. Cir. 2015); *Prism Techs.*

51

*LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368–71 (Fed. Cir. 2017). As the court in *Prism* explained, "a license agreement entered into in settling an earlier patent suit sometimes is admissible in a later patent suit involving the value of the patented technology, and sometimes is not." *Prism*, 849 F.3d at 1368–69. The court in *AstraZeneca* said the same—that "there is no per se rule barring reference to settlements simply because they arise from litigation." 782 F.3d at 1336. The court in that case noted, however, that "litigation itself can skew the results of the hypothetical negotiation." *Id.* (quoting *ResQNet*, 594 F.3d at 872). Importantly, the settlements in *AstraZeneca* and *Prism*, occurred prior to an award of damages in the form of a jury verdict. For a settlement agreement to be useful in the context of a hypothetical negotiation, it must have some "relation to demonstrated economic demand for the patented technology." *LaserDynamics*, 694 F.3d at 77. Put simply, settlement agreements such as those in the IMC and Imation cases, which were reached after the juries had already obligated the defendants to pay a fixed amount of damages, do not reliably demonstrate the economic demand for the patented technology that was at issue in those lawsuits.

In cases in which the settlement occurs after a damages award, whatever number the jury arrives at inevitably forms a baseline for the settlement discussions.[11] That baseline necessarily skews the parties' negotiations when determining the amount they will agree to in order to settle the case post-verdict. Prior licenses entered into voluntarily can be instructive for a hypothetical negotiation to the extent that those licenses reflect the royalty terms the parties before the court would have settled on in a voluntary transaction. As such, parties' voluntary agreement on a royalty may "reflect the

---

[11] For example, the jury award in the Imation case was $11 million, and the parties settled for $7.75 million. Dkt. No. 404, Exh. 10, at 22–23. Assume instead that the jury in that case had returned a verdict in the amount of $15 million. It is highly unlikely that under those circumstances, even assuming all other factors were equal, IOENGINE and Imation would have agreed to the same $7.75 million settlement that was reached after the $11 million verdict that was returned in that case.

economic value of the patented technology." *LaserDynamics*, 694 F.3d at 79. But a settlement agreement entered into in the course of litigation following an award of damages is not the product of a voluntary agreement by the parties, uninfluenced by extraneous considerations. Rather, it is an agreement driven by the result of the litigation, and in particular by the amount of the jury's award. *See id.* at 77–78 ("The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee . . . ."); *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, 2021 WL 982732, at *10 ("There is minimal probative value in using litigation settlement agreements to calculate a reasonable royalty, as the settlement agreement is not comparable to a negotiation between two willing parties."); *M2M Sols.*, 167 F. Supp. 3d at 678 (the two licenses before the court "resulted from litigation settlements, providing a drastically different backdrop than the hypothetical negotiation involving two willing licensors"); *Sprint Commc'ns Co. v. Comcast IP Holdings LP,* No. 12-1013, 2015 WL 456154, at *2 (D Del. Jan. 30, 2015) (same).

In addition to following a damages award, the settlement agreements in the IMC and Imation cases differ from those in *AstraZeneca* and *Prism* due to their temporal distance from the hypothetical negotiation. The Federal Circuit has held that prior litigation can be relevant to a reasonable royalty analysis when the hypothetical negotiation occurs shortly after the prior litigation. *See Applied Medical*, 435 F.3d at 1366 (declining to overturn a district court's admission of a jury verdict when the hypothetical negotiation occurred "on the heels" of the verdict); *Sprint*, 2021 WL 982732 (applying the reasoning of *Applied Medical* to settlement agreements). For both the PayPal and Ingenico cases, Dr. Stec identified June 16, 2015, as the hypothetical negotiation date (assuming infringement of both patents), see Case No. 18-452, Dkt. No. 418-5, Exh. 31, at 51, 57; Case No. 18-

826, Dkt. No. 405-1, Exh. 1, at 43, 48, and the parties confirmed at the oral argument on the present motions that June 2015 was the hypothetical negotiation date. The IMC and Imation settlement agreements, however, both occurred in 2017. The fact that the settlement agreements were entered long after the date of the hypothetical negotiation renders the settlement agreements less reliable as an indication of the value that the hypothetical negotiation would have placed on IOENGINE's technology than might otherwise be the case.[12]

Not only do settlement agreements such as the ones at issue in these cases lack the probative value of licenses entered outside the framework of litigation, but their admission at trial would also present a significant risk of prejudice, for much the same reason that the admission of jury verdicts would be prejudicial. In order to fully consider the probative value of the agreements, the jury would need to understand the context in which the settlement agreements were executed. That is, the jury would need to be aware that a prior jury had determined liability for infringement and had awarded damages for a particular amount prior to the settlement. Providing that context for the settlement agreement would create the same risk that would be associated with allowing the introduction of the jury verdicts in the first place, namely, that "the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it." *Coleman*, 525 F.2d at 1351. For those reasons, even assuming that the settlement agreements in the Imation and IMC cases have some baseline level

---

[12] It is true that, as IOENGINE points out, some courts have held that the amount of time between a settlement agreement and the hypothetical negotiation is a concern that goes to the weight of the agreement rather than its admissibility. *See, e.g.*, *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co.*, No. 18-CV-388, 2018 WL 10126008, at *2 (E.D. Tex. Oct. 26, 2018); *Contour IP Holding, LLC v. GoPro, Inc.*, No. 17-CV-4738, 2020 WL 5106845, at *9–10 (N.D. Cal. Aug. 31, 2020). However, there is no indication that the settlement agreements in *Papst* or *Contour* came after a damages award, as is the case for the IMC and Imation settlements. The nearly two-year gap between the hypothetical negotiation and the settlement agreements in the IMC and Imation cases is further evidence of those agreements' lack of comparability to the hypothetical negotiation, and in view of the totality of the circumstances, I find that they should be excluded.

54

of comparability to the hypothetical licenses at issue in the cases at bar, I would exclude them under Rule 403 of the Federal Rules of Evidence on the ground that the probative value of that evidence would be substantially outweighed by the danger of unfair prejudice to the defendants. Dr. Stec's testimony is therefore excluded to the extent that it relies on settlement agreements reached after verdicts in the IMC and Imation cases.

I. Opinion of Mr. Klenk

Finally, PayPal and Ingenico move to exclude portions of the opinion of Mr. Jeffrey Klenk, IOENGINE's expert on commercial success. Dkt. No. 403 at 41–43. Specifically, they allege that Mr. Klenk's opinion "does not meet the legal threshold for arguing the Accused Products['] commercial success indicates nonobviousness." *Id.* at 41.

When a patentee introduces evidence of commercial success as objective evidence of nonobviousness, "the patentee bears the burden of showing that there is a nexus between the claimed features of the invention" and the commercial success. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999). Such a nexus is presumed if the specific product for which success is introduced "*is* the invention disclosed and claimed." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019). But even in the absence of such a presumption, a patentee may establish a nexus "by showing that the objective indicia are the 'direct result of the unique characteristics of the claimed invention.'" *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1276–77 (Fed. Cir. 2021) (quoting *Fox Factory*, 944 F.3d at 1373–74).

PayPal and Ingenico point to portions of Mr. Klenk's report and deposition testimony in which he acknowledged that other features of the accused card readers contribute to their commercial success. Dkt. No. 403 at 42. For example, in his report Mr. Klenk cited the importance of "encryption and other security functionality on mPOS devices" generally, Dkt. No. 404, Exh. 25, at ¶¶ 28–30, but

then in his deposition he admitted that those security features are not entirely attributable to the patented technology, Dkt. No. 404, Exh. 26, at 97–98.  And Mr. Klenk identified other features of the accused products that may have contributed to their commercial success, such as "the basic capability of reading credit card information" and "support services" offered by Ingenico.  *Id.* at 93.

What PayPal and Ingenico's argument ultimately amounts to is a contention that no nexus exists between the accused products' commercial success and the patented technology.  IOENGINE, on the other hand, points to Mr. Klenk's analysis in which he "specifically investigated the extent to which the patented technology contributed to the ability of PayPal and Ingenico to make sales of the Accused Products," and his conclusion that "the patented technology is a crucial element of PayPal and Ingenico's ability to sell the Accused Products."  Dkt. No. 418, Exh. 40, at ¶¶ 16–17.  And it is true that the patented invention "need not be solely responsible for the commercial success" of the accused products in order for a nexus to exist.  *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).  If PayPal and Ingenico had moved for summary judgment based on the absence of any nexus between commercial success and the patented technology, that motion would have been denied because, viewing the facts in the light most favorable to IOENGINE, a reasonable jury could find that such a nexus exists.

Instead, however, PayPal and Ingenico have fashioned this motion as a *Daubert* motion, which means that I must examine the "qualification, reliability, and fit" of Mr. Klenk's testimony.  *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  Other than the factual disputes previously mentioned, PayPal and Ingenico do not raise questions regarding Mr. Klenk's qualifications or the reliability of his testimony.  For example, they do not argue that he lacks the "broad range of knowledge, skills, and training [that] qualify an expert," nor do they argue that his testimony rests on "subjective belief or unsupported speculation."  *Id.* (citations omitted).  And to the

56

extent that those arguments might be implicit in the arguments PayPal and Ingenico do make, those concerns are not sufficient to prevent the evidence from reaching the jury. Rather, those concerns go to "the weight and credibility of his opinion, not its admissibility." *See Alarm.com, Inc. v. SecureNet Techs. LLC*, No. 15-807, 2019 WL 133228, at *2 (D. Del. Jan. 8, 2019). Accordingly, PayPal and Ingenico's motion to exclude the testimony of Mr. Klenk is denied.

## IV. IOENGINE's Motions

For its part, IOENGINE argues that: (1) based on "IPR estoppel," Ingenico is barred from relying on certain prior art references; (2) PayPal is estopped to the same extent as Ingenico with respect to the IPR proceedings, because PayPal was a real party in interest in those proceedings or was in privity with Ingenico for purposes of those proceedings; (3) PayPal and Ingenico have improperly asserted anticipation based on a combination of prior art references rather than a single reference; and (4) the opinion of Ingenico's experts relating to the reasonable royalty issue should be excluded.

### A. IPR Estoppel

Under 35 U.S.C. § 315(e)(2), when an IPR proceeding results in a final written decision by the PTAB, the petitioner may not argue that the claims that were challenged in the IPR proceeding are "invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review." Specifically, "[a] prior art reference not raised in the IPR proceeding is subject to the statutory bar of 35 U.S.C. § 315(e)(2) if (1) the IPR petitioner actually knew of the reference or (2) a skilled searcher conducting a diligent search reasonably could have been expected to discover the reference." *Palomar Techs., Inc. v. MRSI Sys., LLC*, No. CV 18-10236-FDS, 2020 WL 2115625, at *3 (D. Mass. May 4, 2020). The estoppel provided for by section 315(e)(2) extends not only to the IPR petitioner, but also to "the real party in interest or privy of the petitioner." 35 U.S.C. § 315(e)(2).

IOENGINE alleges that Ingenico's prior art falls into three categories: (1) patents and publications that were actually raised during IPR, (2) patents and printed publications that IOENGINE alleges could reasonably have been raised during IPR, and (3) device art for which Ingenico relies on patents and printed publications that IOENGINE alleges were raised or reasonably could have been raised in the IPR. Dkt. No. 405 at 7–21. These categories are each addressed separately below.

1. *Patents and Publications Relied Upon During the IPR*

IOENGINE alleges that Ingenico may not rely upon two references on which Ingenico actually relied in the IPR proceeding: U.S. Patent Publication No. 2003/0020813 ("Iida") and the "Fuji Guide," which is a user manual that was provided to purchasers of the Fujifilm FinePix6800Z camera. Dkt. No. 417, Exh. E, at 65.

The PTAB determined that the Fuji Guide did not qualify as a prior art printed publication because Ingenico failed to show that the Guide was publicly available before the critical date of the patents. For that reason, the Board did not allow Ingenico to rely upon the Fuji Guide during the IPR proceeding. *Id.* at 78. Ingenico argues that it should not be estopped from invoking the Fuji Guide as a prior art reference in this litigation, because the PTAB did not determine on the merits whether the Fuji Guide disclosed the limitations of the challenged claims. Dkt. No. 415 at 12–13. IOENGINE argues that because Ingenico failed to meet its burden in the IPR proceedings to show that the Fuji Guide was publicly available before the critical date, Ingenico should not be permitted to re-litigate that issue in this court. Dkt. No. 422 at 5.

IOENGINE's argument regarding the Fuji Guide is based on collateral estoppel, not IPR estoppel. In general, an agency adjudication is subject to the same collateral estoppel principles as an adjudication by a court. Restatement (Second) of Judgments § 83(1) & cmt. f (1982). With respect to the motions filed by PayPal and Ingenico, I noted above that the different standards of proof in an

58

IPR proceeding and in district court precluded a finding of collateral estoppel. In this instance, however, the burden-of-proof issue weighs against Ingenico. If Ingenico could not prove before the PTAB that the Fuji Guide was a prior art publication under the preponderance-of-the-evidence standard, that is sufficient to preclude Ingenico from attempting to establish that issue as part of its burden of proving invalidity by clear and convincing evidence. *Cf. id.* at § 28(4) (relitigation of an issue in a subsequent action is not precluded if "the adversary [of the party against whom preclusion is sought] has a significantly heavier burden than he had in the first action"). Accordingly, Ingenico will be precluded from asserting the Fuji Guide as printed publication prior art in these cases.[13]

As for the Iida reference, the Board determined that Iida did not anticipate the remaining asserted claims in these cases. Dkt. No. 417, Exh. E, at 85. Based on IPR estoppel principles, Ingenico will therefore be estopped from claiming that Iida anticipates the claims asserted in this proceeding. That estoppel does not necessarily mean, however, that Iida may play no role in Ingenico's invalidity case. A defendant "can assert invalidity based on grounds that might be 'cumulative or redundant' of grounds raised during IPR as long as the defendant does so by relying on references or combinations of references that were unavailable" at the time of the IPR proceeding. *Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-CV-04738, 2020 WL 109063, at *6 (N.D. Cal. Jan. 9, 2020) (quoting *Clearlamp, LLC v. LKQ Corp.*, No. 12 C 2533, 2016 WL 4734389, at *8 (N.D. Ill. Mar. 18, 2016)). Such reliance must constitute a new "ground" of invalidity that could not have reasonably been raised in the IPR; "merely swap[ping] evidentiary proofs supporting the same 'ground' for invalidity that" could have been raised during the IPR is not permitted. *See Wasica Fin. GmbH v. Schrader Int'l,*

---

[13] This ruling, however, does not necessarily estop Ingenico from relying on the Fuji Guide in support of its contention that the Fujifilm FinePix6800Z camera is invalidating device art, as discussed below.

59

*Inc.*, 432 F. Supp. 3d 448, 453–54 (D. Del. 2020). In other words, Ingenico may raise an invalidity theory at trial that includes Iida only if there is some substantive difference between that theory and the theories previously raised by Ingenico in the IPR proceedings that is germane to the invalidity dispute at hand.

    2. *Patents and Publications That Reasonably Could Have Been Raised During the IPR Proceedings*

    IOENGINE next alleges that Ingenico was aware of several references that it could reasonably have raised in the IPR proceedings, but did not. IOENGINE contends that Ingenico should be estopped from asserting those references in this litigation. IPR estoppel "applies not just to claims and grounds asserted in the petition and instituted for consideration by the Board, but to all grounds not stated in the petition but which could reasonably have been asserted against the claims included in the petition." *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022).

    IOENGINE argues that IPR estoppel should apply to several categories of references because Ingenico allegedly was aware of them. The references that IOENGINE argues should be excluded at trial are (1) documents raised in Ingenico's IPR challenge to the '047 patent,[14] (2) documents described in Ingenico's invalidity contentions that Ingenico did not raise in the IPR proceedings,[15] (3) documents raised in the IPR petitions filed by PayPal before Ingenico filed its IPRs,[16] (4) documents identified on the face of the '703 patent,[17] and (5) documents discussed in the report of Dr. Vijay Madisetti,[18] which was produced to Ingenico prior to the filing of Ingenico's IPR petitions. Dkt. No.

---

[14] Genske, U.S. Patent Publication No. 2002/0065872
[15] The "FujiFilm Documents," identified at Dkt. No. 405 at vi.
[16] Abbott, U.S. Patent No. 7,272,723; Shmueli, U.S. Patent Publication No. 2002/0147912; Burger, U.S. Patent Publication No. 2002/0099665; DiGiorgio, U.S. Patent No. 6,385,729.
[17] Elazar, U.S. Patent Publication No. 2004/0039932; Shmueli.
[18] The documents identified at Dkt. No. 405 at 11–12 (subsection 5).

405 at 8–12. Ingenico concedes that it could have raised those documents in the IPR proceedings. Dkt. No. 451 at 233–34. Accordingly, Ingenico will be estopped from relying on those documents to prove invalidity unless, as discussed above, they form part of a substantively different combination of references that would not have been available to raise in the IPRs.

IOENGINE also identifies several categories of documents that Ingenico "reasonably could have been expected to discover." Dkt. No. 405 at 13. Those categories are: (1) references listed by PayPal in its invalidity contentions,[19] (2) documents related to the DiskOnKey system that were identifiable via a Google search or by searching other patents from the same inventor,[20] and (3) documents obtained pursuant to a subpoena to Western Digital after the IPR petition had been filed.[21] *Id.* at 13–16. Ingenico does not suggest any reason to believe that it could not have raised those documents in the IPR proceeding as well.[22] Accordingly, Ingenico will be estopped from relying on those documents except to the extent, as noted above, that they form part of a substantively different combination of references that could not reasonably have been raised in the IPRs.

---

[19] Iijima, U.S. Patent Publication No. 2003/0053124; Nakagawa, WIPO Patent Publication No. WO 02/075549 A1; Bodnar, U.S. Patent No. 7,433,710; Seaman, U.S. Patent Publication No. 2003/0030733.

[20] Ban-078, U.S. Patent No. 7,175,078; Ban-354, U.S. Patent No. 6,148,354; Teicher-409, U.S. Patent No. 8,745,409; Teicher-219, U.S. Patent No. 7,240,219.

[21] Any "documentation related to DiskOnKey Upgrade software and numerous other Western Digital Documents," Dkt. No. 405 at 15–16, which are identified at Dkt. No. 405, Appendix V.

[22] Ingenico suggests in its brief that some of the Western Digital documents on which it relies were "designated as confidential to Western Digital." Dkt. No. 415 at 11. To the extent that Ingenico relies on documents that are not public (i.e., they are not prior art publications), Ingenico will not be estopped from raising those documents because they could not reasonably have been raised as prior art publications in the IPR proceedings.

3. *Device Art*

IOENGINE argues that Ingenico should not be permitted to rely upon device art, i.e., particular prior art devices, to the extent that the proof of the device art incorporates any documents to which IPR estoppel applies. In general, IPR estoppel does not apply to device art, because "a petitioner cannot use an IPR to challenge the validity of a patent claim . . . based on prior art products or systems." *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *3 (N.D. Ill. Sept. 14, 2020). However, some courts have estopped defendants from asserting device art when "the physical product is entirely cumulative" of the prior art raised in the IPR, i.e., when the product is "materially identical" to the prior art reference raised in the IPR. *See, e.g.*, *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 454–55 (D. Del. 2020); *see also Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015, 2017 WL 2526231, at *8 (E.D. Tex. May 11, 2017); *Cal. Inst. of Tech. v. Broadcom Ltd.*, No. CV 16-3714, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019), *aff'd*, 25 F.4th 976 (Fed. Cir. 2022) (disapproving the use of device art that "simply swap[s] labels for what is otherwise a patent or printed publication invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel").

Ingenico seeks to rely upon two devices at trial, the DiskOnKey and the Fujifilm FinePix6800Z camera (the "Fuji camera"). In response, IOENGINE first argues that because Ingenico's experts did not test those devices, but instead intend simply to rely upon documents describing the devices, those invalidity grounds may not properly be characterized as device art. Courts, however, have allowed the functions of prior art devices to be established through the use of documents and testimony. *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 604 (D. Mass. 2018) ("It is true that defendants' expert did not examine the product itself, but relied on documentation describing the product. But that documentation is evidence of how the product is

configured, how it is made, and how it works."); *Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1028–29 (N.D. Cal. 2016). I agree that Ingenico's expert need not have inspected or tested the devices in order to rely upon them for purposes of invalidity. Accordingly, the evidence relating to DiskOnKey and FinePix6800Z may properly be considered to be device art.

With respect to the DiskOnKey device, IOENGINE argues that Ingenico's expert, James T. Geier, relies on "44 documents, all of which could have been raised during IPR." Dkt. No. 405 at 19 & Appendix III. However, IOENGINE does not establish that each of those 44 documents reasonably could have been raised in the IPR. To the contrary, Ingenico submits that it is relying on documents that it obtained via a third-party subpoena and that those documents are "non-public and not reasonably available." Dkt. No. 415 at 11. In support, Ingenico points to the expert report of Mr. Geier, who Ingenico claims relied on non-public documents that Ingenico obtained via subpoena. *See* Dkt. No. 451 at 231; Dkt. No. 406, Exh. 1, at 75–85 (citing various Western Digital documents including SDK documentation and executable files). IOENGINE's briefing addresses the general categories of documents on which Ingenico seeks to rely, but it does not address Ingenico's assertion that some of those documents would not have been publicly available and could not reasonably have been relied upon in an IPR proceeding. Thus, IOENGINE has not demonstrated that there is no genuine dispute of material fact with respect to whether the documents relating to the DiskOnKey could have been raised in an IPR.

As for the Fuji camera, I noted above that I will not exclude the Fuji Guide on the basis of IPR estoppel, but that Ingenico is collaterally estopped from arguing that the Fuji Guide was publicly available before the critical date. That collateral estoppel determination does not extend, however, to the separate issue of whether the Fuji Guide evidences the features that would have been present in the Fuji camera before the critical date. Even if Ingenico was aware of the other documents it now

seeks to rely upon to establish the functions of the Fuji camera, the unavailability of the Fuji Guide for use in the IPR precludes the application of IPR estoppel to the Fuji camera device. *See SPEX Techs. Inc v. Kingston Tech. Corp.*, No. SACV 16-01790, 2020 WL 4342254 (C.D. Cal. June 16, 2020) ("The Court finds that the reliance on some printed publications in an overall collection of documents being used to describe a system invalidity theory should not lead to estoppel of the overall system invalidity theory itself, nor piecemeal exclusion of the printed publications underlying that system invalidity theory, absent a showing that the system invalidity theory is a patent or printed publication theory in disguise."). Accordingly, summary judgment will not be granted excluding the Fuji camera from evidence at trial.

### 4. *Summary*

In summary, Ingenico is estopped from relying on references that it actually raised or reasonably could have raised during the IPR proceedings. However, that estoppel extends only to references or combinations of references that could have been raised during IPR. Ingenico is not estopped from relying on device art if, as it appears here, that device is not simply a printed publication invalidity theory in disguise. Because a device may not be raised as a ground for invalidity in an IPR, Ingenico may combine the DiskOnKey device and/or the Fuji camera with other references that it raised or reasonably could have raised in the IPR proceeding, so long as that combination is substantively different from the grounds that were raised or reasonably could have been raised by Ingenico in its petitions for IPR. *See Microchip Tech. Inc. v. Aptiv Servs. US LLC*, No. 1:17-CV-01194, 2020 WL 4335519, at *4 (D. Del. July 28, 2020) (applying IPR estoppel to publications but not to device art used in combination with those publications).

B. <u>Real Party in Interest and Privity</u>

As part of its motion for partial summary judgment, IOENGINE argues that PayPal was either a real party in interest in Ingenico's IPR proceedings or was in privity with Ingenico with respect to those proceedings. As a result, according to IOENGINE, PayPal should be subject to IPR estoppel to the same extent as Ingenico with respect to prior art that Ingenico actually relied upon or could reasonably have relied upon in the IPR proceeding. Dkt. No. 405 at 21–35.

By statute, IPR estoppel extends beyond the petitioner to any "real party in interest or privy of the petitioner." 35 U.S.C. § 315(e)(2). Those terms, which are not defined in Title 35, are well-established common law terms in the law of judgments, and the Federal Circuit has held that Congress intended for those terms to have their common law meaning. *See Power Integrations, Inc. v. Semiconductor Components Indus., LLC*, 926 F.3d 1306, 1315 (Fed. Cir. 2019); *WesternGeco LLC v. Ion Geophysical Corp. Int'l S.A.R.L.*, 889 F.3d 1308, 1319 (Fed. Cir. 2018).

Consistent with its use in the law of judgments, the "real party in interest" inquiry focuses on "whether a petition has been filed at a nonparty's behest." *Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018, 1028 (Fed. Cir. 2021) (quoting *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1351 (Fed. Cir. 2018)); *Wi-Fi One, LLC v. Broadcom Corp.*, 887 F.3d 1329, 1336 (Fed. Cir. 2018). In particular, a party that "funds and directs and controls an IPR or [post-grant review] proceeding constitutes a 'real-party-in-interest.'" *Wi-Fi One*, 887 F.3d at 1336 (citing PTO, Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,760 (Aug. 14, 2012)).

The privity inquiry, also a familiar feature of the law of judgments, focuses on whether the party alleged to be in privity with the petitioner "had a full and fair opportunity to litigate the issues it now seeks to assert." *Id.* (internal quotation marks and citation omitted). In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court identified six factors as bearing on the question whether two

parties are in privity for purposes of determining whether the second party should be bound by decisions made in a proceeding involving only the first party. Those factors are whether (1) there was an agreement by the parties to be bound by a decision in the first party's case; (2) there was a pre-existing substantive legal relationship between the parties, such as assignor and assignee, preceding and succeeding owners of property, or bailee and bailor; (3) in certain circumstances, whether the second party was adequately represented by a party in the first action having the same interests as the second party; (4) the second party assumed control over the litigation in which the initial judgment was rendered; (5) the second party is seeking to relitigate an issue through a proxy, i.e., where the second party is the designated representative of a person who was a party to the prior adjudication: and (6) a special statutory scheme expressly forecloses successive litigation by persons who were not parties to the first action, assuming the statutory scheme satisfies due process requirements. *Id.* at 894–95. The Federal Circuit and the PTO have looked to the Supreme Court's opinion in *Taylor* for guidance as to whether parties were in privity for purposes of IPR estoppel. *See Uniloc 2017*, 989 F.3d at 1028–29; *Applications in Internet Time*, 897 F.3d at 1359–64 (Reyna, J., concurring); *WesternGeco*, 889 F.3d at 1319; *Wi-Fi One*, 887 F.3d at 1336; Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,759.

IOENGINE argues that the following considerations support a finding that PayPal was a real party in interest in Ingenico's IPR proceedings or that PayPal was in privity with Ingenico for purposes of those proceedings: (1) there is a supply agreement between PayPal and Ingenico, which is part of a longstanding business relationship between the parties relating to the products at issue in these cases; (2) there are cross-indemnification obligations between PayPal and Ingenico; (3) PayPal and Ingenico have conducted a coordinated defense in this action; (4) Ingenico shares and represents PayPal's interests to such a degree that PayPal should be regarded as having been a real party in interest in the

IPR proceedings or that PayPal should be regarded as having been in privity with Ingenico for purposes of those proceedings; and (5) Ingenico would in effect be relitigating by proxy the issues it lost in the IPR proceedings if PayPal were permitted to challenge the validity of the asserted claims on grounds that Ingenico is estopped from asserting. Dkt. No. 405 at 25–32. PayPal disputes that those points establish either that PayPal was a real party in interest in Ingenico's IPR proceedings or was in privity with Ingenico in the course of those proceedings.

In opposition to IOENGINE's motion for summary judgment that PayPal was the real party in interest in Ingenico's IPR proceedings, PayPal points to declarations from PayPal and Ingenico's outside counsel, as well as from PayPal's in-house counsel, stating that PayPal and Ingenico did not cooperate in petitioning for *inter partes* review of the asserted patents. Dkt. No. 417, Exhs. F–H. Additionally, Ingenico represented to the PTAB that its petitions were filed "under the complete direction and control of Ingenico without contribution from PayPal." Dkt. No. 417, Exhs. I–L. Because the real-party-in-interest inquiry typically focuses on whether a party controls, funds, or directs the "petitioner's participation in a proceeding," *see Applications in Internet Time*, 897 F.3d at 1342, PayPal and Ingenico's evidence to the contrary creates at least a genuine dispute of material fact on the real-party-in-interest issue. That is particularly true in light of the absence of any evidence that Ingenico initiated its IPR proceedings at PayPal's behest or that PayPal funded Ingenico's activities before the PTAB. Summary judgment therefore cannot be granted to IOENGINE with regard to its contentions that PayPal was a real party in interest in Ingenico's IPR proceedings.

IOENGINE has also failed to show that it is entitled to summary judgment on its contention that PayPal was in privity with Ingenico in the IPR proceedings. IOENGINE argues that the supply agreement between PayPal and Ingenico establishes that the two entities were in privity for purposes of Ingenico's IPRs. PayPal, however, responds that "[t]he agreement merely reflects a standard

67

customer-manufacturer relationship in which Ingenico manufactured and supplied products to PayPal." Dkt. No. 415 at 19. IOENGINE places great weight on the fact that Ingenico has produced a large majority of PayPal's accused card readers and that PayPal entered into a long-term "Custom Product Sales Agreement" with Ingenico's predecessor in 2012 under which Ingenico agreed to produce a custom mobile card reader exclusively for PayPal, along with various rights and services attendant to the sale and use of those machines. While that agreement confirmed that Ingenico and PayPal have had a close business relationship as manufacturer and customer, such relationships are not uncommon, and the fact of that relationship does not suffice to show that the parties are so closely related that litigation preclusion against one should extend to the other. *See Atlanta Gas Light Co v. Bennett Regul. Guards, Inc.*, No. IPR2015-00826, 2015 WL 5159438, at *8–9 (P.T.A.B. Sept. 1, 2015).

In support of its privity argument, IOENGINE places its greatest emphasis on the cross-indemnification provisions in the agreement between PayPal and Ingenico, which IOENGINE argues are strong evidence that PayPal and Ingenico are in privity. PayPal responds by pointing to evidence indicating that neither party has agreed to indemnify the other with respect to the cases at bar. Dkt. No. 409, Exh. 30, at 70–71. The indemnification clauses, which are directed at holding each party harmless from expenses attributable to violations of law by the other do not appear plainly applicable to the situation presented in these cases, in which Ingenico and PayPal have each been sued based directly on their own conduct. Nor has either party sought to control the other party's conduct of the litigation, or even suggested that either party has the right to do so under the circumstances of these cases. The indemnification clauses therefore do not have the force that IOENGINE attributes to them, and they are insufficient, at least for summary judgment purposes, to require that Ingenico and PayPal be treated as being in privity with one another.

68

Next, IOENGINE alleges that PayPal and Ingenico coordinated their strategies in the IPR proceedings, but PayPal and Ingenico dispute that assertion as well. Dkt No. 417, Exhs. F–L. PayPal and Ingenico point out that although PayPal raised issues in its IPR petitions different from those raised by Ingenico, doing so was entirely rational, since if PayPal had filed a duplicative IPR petition, the PTAB might well have declined institution on that ground alone.

The remaining consideration raised by IOENGINE is that PayPal and Ingenico have coordinated their defenses in this action. But "without more," two parties' consolidation of argument and evidence in their defense against parallel infringement proceedings does not justify a finding of privity. *See Uniloc 2017*, 989 F.3d at 1029. The Ingenico and PayPal cases were consolidated for purposes of discovery and pretrial proceedings at IOENGINE's behest, and the consolidation was clearly in all parties' interest (and well as the court's) by avoiding duplication of effort. The fact that Ingenico and PayPal have joined in making many of the same arguments during the pretrial process is hardly surprising, given that they have both been charged with infringement of the same claims of the same patent in connection with the manufacture and sale of many of the same devices. The substantial parallelism in their litigation interests is not enough to justify the conclusion, on summary judgment, that Ingenico and PayPal are so closely aligned that each should be subject to preclusion based on rulings made against the other. That is to say, IOENGINE has not shown, for purposes of summary judgment, that PayPal has had a full and fair opportunity to litigate the issues that were raised unsuccessfully by Ingenico, merely because of the close commercial relationship between the parties and their status as defendants in closely related actions brought by IOENGINE. In the end, because privity is a holistic inquiry that requires consideration of "all contacts between [the parties], direct and indirect," the existence of disputes as to many of the factors cited by IOENGINE creates at least a genuine issue of material fact with respect to privity. *See Intel Corp. v. U.S. Int'l Trade*

69

*Comm'n*, 946 F.2d 821, 838 (Fed. Cir. 1991). Accordingly, summary judgment is denied on this issue.

While considering the real-party-in-interest and privity issues, I asked the parties to brief the question whether those issues are factual or legal, and whether they are for the court to decide as a preliminary matter or for the jury to decide at trial. The parties submitted briefs in response to my request, and based on that briefing and my independent research, I am persuaded that, for the reasons set forth below, the questions whether PayPal was a real party in interest in Ingenico's IPR proceedings and whether PayPal was in privity with Ingenico for purposes of those proceedings are mixed questions of fact and law that are for the court, not the jury, to decide.

Courts are divided with regard to the question whether privity is a question of fact, a question of law, or a mixed question of fact and law. *See, e.g.*, *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, (question of fact); *Sw. Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1977) (question of law); *Matter of L & S Indus., Inc.*, 989 F.2d 929, 933 (7th Cir. 1993) (mixed question of law and fact that is "particularly amenable to a sliding-scale standard of review" depending on the nature of the inquiry).

The Third Circuit has held that the issue of privity presents a legal question that may be based on underlying issues of fact. *See Jean Alexander Cosms.*, 458 F.3d at 248 ("[W]hether the basic requirements for issue preclusion are satisfied . . . is a matter of law over which we exercise plenary review"); *Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc.*, 484 F.2d 1037, 1038 (3d Cir. 1973) ("We . . . hold that the question of control of the previous litigation was for the court as a fact-finder."); *United States v. Webber*, 396 F.2d 381, 386 (3d Cir. 1968) ("In circumstances similar to the present case, whether the individuals exercised sufficient control over or had the requisite interest in [a prior] litigation is primarily a question of fact."). As a general matter, the Federal Circuit has held

70

that questions as to the application of collateral estoppel turn on regional circuit law, not Federal Circuit law. *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1374 (Fed. Cir. 2020) ("To the extent that a case turns on general principles of claim preclusion, as opposed to a rule of law having special application to patent cases, this court applies the law of the regional circuit in which the district court sits . . . ."). Arguably, the fact that the collateral estoppel issue in this case arises in the context of an IPR proceeding would suggest that a patent-specific rule should apply, and thus Federal Circuit law should govern. *See id.*. That principle does not apply here, however, for two reasons: First, the legislative history of the AIA makes clear that the terms "privity" and "real party in interest" were intended to have their ordinary common law meanings in the IPR context, not a patent-law-specific meaning. *See Wi-Fi One*, 887 F.3d at 1335–36. Second, there is no indication that Federal Circuit law would be different from Third Circuit law in this respect. *See, e.g.*, *WesternGeco*, 889 F.3d at 1316, 1322 (reviewing the PTAB's finding of no privity for "substantial evidence," the standard of review that applies to "factual determinations" underlying the Board's legal conclusions). I will therefore apply Third Circuit law, which treats the collateral estoppel issue as a legal question that may be based on underlying disputed facts.

The next question, which was addressed by the parties in their supplemental briefing on the privity/real-party-in-interest issue, is whether the issues of privity and real-party-in-interest status are to be given to the jury or reserved for the court to decide as a preliminary matter. The parties take different positions as to that issue: IOENGINE argues that those issues are for the jury; PayPal and Ingenico argue they are for the court.

While the parties have not pointed to any governing precedent on this issue, the parties' briefing indicates, as does my research, that both the legal and factual components of these related issues have consistently been addressed by the court and not the jury. In *Ransburg*, the district court

held on summary judgment that one of the defendants to that patent infringement case "had controlled the defense of a previous [patent] infringement action" brought by the plaintiff against one of that defendant's customers (i.e., that defendant was in privity with a defendant in a prior action). *Ransburg*, 484 F.2d at 1038. Concluding that a genuine dispute of material fact existed as to whether that defendant controlled the prior litigation, the Third Circuit reversed the district court but held "that the question of control of the previous litigation was for the court as a fact-finder." *Id.* at 1038–40. Accordingly, the court's language in *Ransburg* is a strong indication that the factual portion of the privity inquiry is a question reserved for the court.

Other cases are in accord. *See, e.g.*, *Webber*, 396 F.2d at 386 ("[T]he court . . . can find that privity exists . . . ."); *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 620 (Fed. Cir. 1995) ("[A] plaintiff who chooses to bring two separate actions against two tortfeasors who are jointly responsible for the same injury runs the risk *that the court will find* the parties sufficiently related that the second action is barred by claim preclusion." (emphasis added)); *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 641 (2d Cir. 1987) ("'The question whether a party's interests in a case are virtually representative of the interest of a nonparty is one of fact for the trial court.'" (quoting *Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975))); *Evonik Degussa GmbH v. Materia Inc.*, 53 F. Supp. 3d 778, 788 n.10, 795–96 (D. Del. 2014) ("[T]he court finds [that the defendant] was in privity with [another party to a prior litigation]."); *Hinshillwood v. Cnty. of Montgomery*, No. 00-cv-4283, 2002 WL 1773059, at *5 (E.D. Pa. July 31, 2002) ("The fourth and final element of issue preclusion requires the Court to find that same parties or their privities were fully represented in the prior action. . . . [T]he Court finds that the fourth and final element of issue preclusion has been met."); *see also* 18 J. Wm. Moore, Moore's Federal Practice § 132.04 [1][b][ii] (2022) ("Privity is a legal

72

determination for the trial court with regard to whether the relationship between the parties is sufficiently close to support preclusion.").

IOENGINE cites two cases that it contends stand for the proposition that questions whether two parties are in privity should be submitted to a jury. Dkt. No. 496 at 8–9 (citing *Mazzei v. Money Store*, 829 F.3d 260 (2d Cir. 2016), and *Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1295 (D. Colo. 2013)). Those cases do not support IOENGINE's assertion that whether a third party was in privity with a participant in an IPR proceeding or was a real party in interest in that proceeding is an issue that should be given to the jury as opposed to being decided by the court. The reason is that those cases involved questions of privity of contract, not privity in the context of preclusion law. Privity of contract refers to the status of parties who are entitled to sue on a particular contract. *See* 13 Richard A. Lord, *Williston on Contracts* § 37:1 at 4 (4th ed. 2013); 9 John E. Murray, Jr., *Corbin on Contracts* § 41.2 at 4 (rev. 3d 2007); *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.*, 960 F.2d 366, 376 (3d Cir. 1992). And it is clear that the term "privity," as used in the phrase "privity of contract" has a very different meaning from the term "privity" as used in the law of judgments and in particular in the collateral estoppel context. *See, e.g., Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 702 F.2d 719, 722 (8th Cir. 1983) ("'Privity' is a term with different meanings in different contexts; for example, the concept of 'privity of parties' is not the same as the concept of 'privity of contract.'"); *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 1340 (Ct. Cl. 1973) ("The words 'privity' or 'privy,' however, are not necessarily interchangeable between the contract and res judicata contexts."); *Meisner v. Zymogenetics, Inc.*, No. 3:15-cv-3523, 2016 WL 4858741, at *4 (D.S.C. Sept. 15, 2016) ("Privity in the *res judicata* context depends on the relationship between the parties in the first and second lawsuits, and is different from privity of contract."). Thus, once IOENGINE's privity-of-contract cases are disregarded, IOENGINE has cited no authority for its position that privity and

73

real-party-in-interest status in an IPR proceeding are for the jury to decide in district court litigation following upon IPR proceedings.

While issues of privity and real party in interest frequently involve factual questions, as they do in these cases, that does not automatically require that they be committed to the jury for resolution. Issues such as claim construction can involve factual disputes, but nonetheless are reserved to the court for decision. Preliminary determinations bearing on the admissibility of evidence are also routinely decided by courts, even when they turn on factual determinations. *See Bourjaily v. United States*, 483 U.S. 171, 177–78 (1987); *see generally* Fed. R. Evid. 104(a). The task of deciding the predicate question of PayPal's status in order to determine whether to permit PayPal to introduce certain evidence at trial is closely akin to the commonplace task of deciding preliminary factual questions in determining whether to admit particular evidence. In the PayPal case, then, the court will decide whether the IPR estoppel applicable to Ingenico also applies to PayPal. That decision will be made in advance of the trial in the PayPal case.

C. <u>Anticipation for Combined References</u>

IOENGINE next argues that PayPal and Ingenico rely upon several references to describe the DiskOnKey and Fuji camera devices, but have not shown "that the functionality described across multiple references ever actually existed in a single device." Dkt. No. 405 at 35 (emphases omitted). Anticipation, of course, depends on a finding that a single reference satisfied all the limitations of the challenged claim. Nonetheless, it is permissible for a defendant to establish anticipation by using several documents that reveal how a single prior art system works. *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, No. 18-cv-366, 2020 WL 3047989, at *6 (D. Del. June 8, 2020); *see also Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-CV-02024, 2016 WL 861065, at *2 (N.D. Cal. Mar. 5, 2016); *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, No. 15 C 3702, 2018 WL 2009504, at *4 (N.D.

Ill. Apr. 29, 2018). By contrast, a "post-hoc, reconstructed interpretation of how a [prior-art] system *might* have been constructed does not constitute prior art for purposes of anticipation." *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2012 WL 2576136, at *3 (N.D. Cal. July 3, 2012).

With respect to the DiskOnKey device, IOENGINE argues that the experts for PayPal and Ingenico rely upon multiple documents to describe that device without establishing that all of the documents describe "a single device" that "was in existence . . . prior to the priority date." Dkt. No. 405 at 36. In particular, IOENGINE points to the report of PayPal's expert, Harry Bims, who noted that his analysis of the DiskOnKey referred to "the DiskOnKey 2.0, DiskOnKey Titan, DiskOnKey v.2.7.1, DiskOnKey T3, and DiskOnKey Pro *devices*." Dkt. No. 406, Exh. 2, at ¶ 776 (emphasis added). PayPal responds by offering evidence that the various versions of the DiskOnKey devices "differed only in their form factors, speed, and/or memory sizes, which [are] not material here." Dkt. No. 415 at 33; *see also* Dkt. No. 417, Exh. KK, at 23. PayPal also notes that "there is evidence in the record that the [DiskOnKey] SDK and software applications were supported across the versions." Dkt. No. 415 at 33; Dkt. No. 417, Exhs. II–JJ. Viewing the facts in the light most favorable to PayPal and Ingenico, a reasonable jury could find that documentation describing various versions of the DiskOnKey is representative of a single prior art device.

IOENGINE relies on *Apple, Inc. v. Samsung Electronics Co.*, but that decision does not support IOENGINE's argument. The court in that case found that there was "no evidence that the [documents used by the defendant's expert] were in existence at the same time or that they were combined in a single apparatus." *Apple*, 2012 WL 2576136, at *3. Here, by contrast, the evidence at least suggests that the various features described in the references on which PayPal relies may have been present in a single DiskOnKey device. Moreover, the court in *Apple* evaluated the prior art in the context of a motion to stay a preliminary injunction pending appeal, rather than one for

summary judgment. *Id.* at *1. The court in *Apple* evaluated the defendant's "likelihood of success on the merits of its appeal," whereas here the standard is whether there is a genuine dispute of material fact. *See id.* at *2. Because I find there is a triable issue of fact with respect to anticipation by a single DiskOnKey device, summary judgment on that issue will be denied.

With respect to the Fuji camera, IOENGINE asserts that Ingenico's expert, James Geier, relied upon multiple documents describing the camera and that he did not analyze or test the physical device itself. Dkt. No. 405 at 35–36. IOENGINE does not explain how or why the various documents that Mr. Geier relied upon are representative of systems other than the single asserted prior art device. Accordingly, IOENGINE has not met its burden to demonstrate that there is no genuine dispute of material fact regarding the Fuji camera. Summary judgment is therefore denied as to the Fuji camera as well.

D. Opinions of Mr. Sussman and Mr. Geier

IOENGINE's final argument is that portions of the opinions of Ingenico's experts, Barry Sussman and James Geier, should be excluded. Dkt. No. 405 at 37–41. IOENGINE objects to Mr. Geier's conclusion that the asserted claims contribute 5% of the security of Ingenico's payment transactions, and to Mr. Sussman's subsequent reliance on that opinion in his "market factors" damages theory, along with Mr. Sussman's "additional gross profits" damages theory.

1. *"Market Factors" Theory*

IOENGINE first argues that Mr. Sussman's "market factors" theory should be excluded because it relies on an unsupported opinion from Mr. Geier. As noted above with respect to Dr. Stec, damages for patent infringement should reflect the incremental value to the infringer that was attributable to the claimed invention. But that incremental value need not be determined with

absolute precision; the "approximate value of [the] technological contribution" is enough. *Ericsson*, 773 F.3d at 1233.

In his report, Mr. Sussman determined that 29.8% of the value of mPOS sales generally was attributable to security features of the mPOS system. Dkt. No. 407, Exh. 36, at ¶ 101. Mr. Sussman then accepted Mr. Geier's opinion that "the patented innovations contributed only 5% to the overall security of payment processing." *Id.* at ¶ 102. Multiplying 29.8% by 5%, Mr. Sussman concluded that 1.5% of Ingenico's mPOS sales are attributable to the claimed inventions. *Id.* at ¶ 103.

Mr. Geier arrived at his 5% figure by identifying various factors that contribute to the security of mPOS transactions and by considering whether the claimed inventions cover those factors. Dkt. No. 423, Exh. 57, at ¶¶ 296–301. Mr. Geier listed several factors that have no relationship to the claimed invention, such as "point-to-point encryption," "tokenization," "adherence to payment industry standards and specifications," and "various measures taken by consumers, merchants, and banks to avoid fraudulent payments." *Id.* at ¶¶ 297–300. He then noted that the claimed inventions "pertain[] only to specific message flow involving a card reader executing specific code in response to a message from a phone/tablet." *Id.* at ¶ 301. Mr. Geier estimated that, because the claimed inventions covered only one of several factors that contribute to security, "the asserted claims contribute 5% [of] the security of a payment transaction." *Id.*

In *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-CV-01735, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016), the court considered a similar estimate made by the plaintiff's technical expert. The defendant's expert in that case took the position that the asserted patents were "responsible for 20% of the increase in 4G LTE uplink speed" in the accused devices. *Id.* at 7. He stated that he reached that conclusion by "evaluat[ing] all the factors that contribute to the increase in 4G LTE uplink speed over previous systems." *Id.* The court rejected the argument that the expert's opinion was

inadmissible because it was "an approximation and not . . . supported by testing or simulation." *Id.*
Such arguments, according to the court, went to the weight of the testimony, not its admissibility.
*Id.*

I find that Mr. Geier's approximation and Mr. Sussman's subsequent reliance on it should
not be excluded, and that IOENGINE's concerns can be adequately addressed on cross-examination
of both experts. Unlike Dr. Stec, Mr. Sussman attempted to calculate a reasonable royalty that is
attributable only to the incremental value of the patented inventions. The fact that Mr. Geier's 5%
figure is an estimation does not preclude the evidence from being admitted, and IOENGINE is free
to explore its concerns on cross-examination. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.
579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful
instruction on the burden of proof are the traditional and appropriate means of attacking shaky but
admissible evidence"). Mr. Sussman's "market factors" theory, and Mr. Geier's opinion on which
it relies, will therefore not be excluded.

2. *"Additional Gross Profits" Theory*

IOENGINE next argues that Mr. Sussman's "additional gross profits" theory "bears no
relation to the value of the invention at issue and should be excluded." Dkt. No. 405 at 39. I need
not address whether that theory properly apportions damages according to the contribution of the
inventions, because both Mr. Sussman and Ingenico have conceded that the "additional gross profits"
theory does not factor into Mr. Sussman's ultimate calculation of a reasonable royalty. *See* Dkt. No.
406, Exh. 37, at 58 (Mr. Sussman stating that he "had no intention of relying on [the additional gross
profits analysis] exclusively," and that it was merely "a data point, something that I looked at, [that]
I thought was interesting"); Dkt. No. 415 at 38 ("Mr. Sussman does not use projected profits in his
ultimate calculation of a reasonable royalty."); Dkt. No. 407, Exh. 36, at ¶ 104 (Mr. Sussman's report,

describing the "market factors" theory as "the more appropriate apportionment technique"). Because Mr. Sussman does not ultimately rely upon the "additional gross profits" theory in his reasonable royalty calculation, there is no need for him to discuss that theory at trial. *See* Fed. R. Evid. 702 (requiring that expert testimony "help the trier of fact"). Accordingly, Mr. Sussman's testimony as to the "additional gross profits" theory will be excluded.

## V. <u>Conclusion</u>

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal. *See, e.g.*, Dkt. Nos. 403, 405, 415, 416, 423, 424. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

In view of and consistent with the above discussion, I order the following:

- IOENGINE's Motion for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier, Dkt. No. 397 (Dkt. No. 352 in Case No. 18-826), is GRANTED IN PART and DENIED IN PART.

- PayPal and Ingenico's Motion to Preclude the Testimony of Dr. Stec, Dkt. No. 398 (Dkt. No. 353 in Case No. 18-826), is GRANTED.

- PayPal and Ingenico's Motion to Preclude the Testimony of Mr. Klenk, Dkt. No. 399 (Dkt. No. 354 in Case No. 18-826), is DENIED.

- PayPal and Ingenico's Motion for Summary Judgment that IOENGINE is Estopped from Relitigating the Validity of Claims Found Unpatentable by the PTAB, Dkt. No. 400 (Dkt. No. 356 in Case No. 18-826), is DENIED.

**Appx133**

- PayPal and Ingenico's Motion for Summary Judgment of No Direct or Joint Infringement, Dkt. No. 401 (Dkt. No. 357 in Case No. 18-826), is GRANTED IN PART and DENIED IN PART.

- PayPal and Ingenico's Motion for Summary Judgment that the Asserted Claims are Invalid Under Section 101, Dkt. No. 402 (Dkt. No. 358 in Case No. 18-826), is DENIED.

- Ingenico's Motion for Summary Judgment of No Indirect Infringement, Dkt. No. 355 in Case No. 18-826, is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

SIGNED this 15th day of June, 2022.


_WILLIAM C. BRYSON_

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE



US009774703B2

(12) **United States Patent**
  McNulty

(10) **Patent No.:** US 9,774,703 B2
(45) **Date of Patent:** Sep. 26, 2017

(54) **APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT**

(71) Applicant: **IOENGINE LLC**, Norwalk, CT (US)

(72) Inventor: **Scott McNulty**, Rowayton, CT (US)

(73) Assignee: **IOENGINE, LLC**, Norwalk, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 86 days.

(21) Appl. No.: **14/721,540**

(22) Filed: **May 26, 2015**

(65) **Prior Publication Data**

US 2015/0334208 A1    Nov. 19, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/960,514, filed on Aug. 6, 2013, now Pat. No. 9,059,969, which is a continuation of application No. 12/950,321, filed on Nov. 19, 2010, now Pat. No. 8,539,047, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| G06F 15/16 | (2006.01) |
| G06F 15/177 | (2006.01) |
| H04L 29/06 | (2006.01) |
| H04L 29/08 | (2006.01) |
| H04L 9/32 | (2006.01) |
| G06F 13/00 | (2006.01) |

(52) **U.S. Cl.**

CPC ............ *H04L 67/42* (2013.01); *H04L 9/3226* (2013.01); *H04L 9/3247* (2013.01); *H04L 63/0272* (2013.01); *H04L 63/0428* (2013.01); *H04L 65/4069* (2013.01); *H04L 67/04* (2013.01); *H04L 67/141* (2013.01); *H04L 2209/56* (2013.01); *H04L 2209/76* (2013.01); *H04L 2209/80* (2013.01)

(58) **Field of Classification Search**

CPC ............. H04L 2209/76; H04L 2209/80; H04L

63/0272; H04L 63/0428; H04L 67/04; H04L 67/141; H04L 67/42; H04L 2209/56; H04L 65/4069; H04L 9/3226; H04L 9/3247

USPC ........ 709/203, 217, 219, 220, 249; 711/115; 713/150

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,928,463 B1 * | 8/2005 | Tene | H04L 12/2856 370/356 |
| 6,986,030 B2 | 1/2006 | Shmueli et al. | |
| 7,051,157 B2 | 5/2006 | James | |

(Continued)

OTHER PUBLICATIONS

Microsoft Computer Dictionary, Fifth Edition, 2002, pp. 362, 437, 458, 565, and 572.

Defendant Interactive Media Corp. d/b/a Kanguru Solutions Initial Invalidity Contentions to Plaintiff IOENGINE, dated Jul. 14, 2015, 255 pages.

Imation's Initial Invalidity Contentions, dated Jul. 14, 2015, 248 pages.

(Continued)

*Primary Examiner* — Alina N Boutah
(74) *Attorney, Agent, or Firm* — Locke Lord LLP

(57)    **ABSTRACT**

The disclosure details the implementation of an apparatus, method, and system comprising a portable device configured to communicate with a terminal and a network server, and execute stored program code in response to user interaction with an interactive user interface. The portable device contains stored program code configured to render an interactive user interface on a terminal output component to enable the user the control processing activity on the portable device and access data and programs from the portable device and a network server.

**129 Claims, 10 Drawing Sheets**





C.A. No. 18-826-WCB (D.Del.)
Joint Trial Exhibit

JX-294



Exhibit 3

## Related U.S. Application Data

continuation of application No. 10/807,731, filed on Mar. 23, 2004, now Pat. No. 7,861,006.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,546,340 B2 * | 6/2009 | Terasawa | G06F 1/1626 709/203 |
| 7,979,700 B2 | 7/2011 | Elazar et al. | |
| 8,595,488 B2 | 11/2013 | Elazar et al. | |
| 8,612,511 B2 * | 12/2013 | Friedrich | G05B 19/409 709/203 |
| 2002/0044663 A1 | 4/2002 | King et al. | |
| 2002/0046292 A1 * | 4/2002 | Tennison | H04L 12/5692 709/238 |
| 2002/0065872 A1 | 5/2002 | Genske et al. | |
| 2002/0080090 A1 * | 6/2002 | Borgstrom | G08C 17/02 345/1.1 |
| 2002/0194499 A1 * | 12/2002 | Audebert | H04L 63/0853 726/35 |
| 2003/0058274 A1 * | 3/2003 | Hill | H04L 63/0272 715/751 |
| 2004/0039932 A1 | 2/2004 | Elazar et al. | |
| 2005/0197859 A1 * | 9/2005 | Wilson | G06Q 50/22 705/2 |
| 2005/0198221 A1 * | 9/2005 | Manchester | H04L 41/0213 709/220 |
| 2006/0052085 A1 * | 3/2006 | Gregrio Rodriguez | H04L 12/2859 455/411 |
| 2007/0038870 A1 * | 2/2007 | Ciesinger | H04L 63/0428 713/193 |

OTHER PUBLICATIONS

Scott Spanbauer, "Mighty Mini Media", www.pcworld.com, May 2002, pp. 14-17.
Miranda Instant Messenger, https://web.archive.org/web/20031228092924/http:/www.miranda-im.org, Copyright 2000-2003 Miranda IM, 2 pages.
Miranda Instant Messenger (2), "About Miranda IM", https://web.archive.org/web/20031228092924/http:/www.miranda-im.org, Copyright 2000-2003 Miranda IM, 2 pages.
Miranda Instant Messenger (3), "Screenshots", https://web.archive.org/web/20031228092924/http:/www.miranda-im.org, Copyright 2000-2003 Miranda IM, 2 pages.
Jon L. Jacoby, Welcome to M-Systems DiskOnKey Site, https://web/archive.org/web/20021202082914/http:/www.diskonkey.com/prod_dok.asp, 2 pages.
Jon L. Jacoby, Welcome to M-Systems DiskOnKey Site, "Product & Solutions", https://web.archive.org/web/20021202082914/http:/www.diskonkey.com/prod_dok.asp, 1 page.
Jon L. Jacoby, M-Systems Flash Disk Pioneers, "Using MyKey", Copyright 2003 M-Systems Flash Disk Pioneers, Ltd., 23 pages.
Expert Report by Vijay Madiselli, Ph.D., *Ioengine, LLC v. Interactive Media Corp.*, C.A. No. 14-1571 (D.Del.) and *Ioengine, LLC v. Imation Corp.*, C.A. No. 14-1572 (D.Del.) Jul. 1, 2016 (141 pages).
Rebuttal Expert Report of Dr. Kevin Butler Regarding the Validity of U.S. Pat. No. 8,539,047, *Ioengine, LLC v. Interactive Media Corp.*, C.A. No. 14-1571 (D.Del.) and *Ioengine, LLC v. Imation Corp.*, C.A. No. 14-1572 (D.Del.) Jul. 22, 2016 (78 pages).

* cited by examiner

JX-294-0003



Fdrive backend server
110

Communication Network
113c

Communication Network
113b

Communication Network
113a

Storage (EMC)
105

Fdrive backend Redundancy server
115

Fdrive front end Load-balanced servers
120

130

125

User 133a

127

Fdrive users
127

Fig. 1



Fig. 2



130   AT 327

Engage TCAP with Access Terminal (e.g., via BT, WiFi, USB, etc.) 305

TCAP powers up 310

TCAP loads/accesses operating system 315

TCAP provides memory space to Access Terminal (AT) 320

125

AT accesses/mounts the TCAP memory space 325

342
desktoptool.exe

Is AT capable of accessing instructions in TCAP memory? 330

User engages TCAP memory to issue instruction signals (e.g., executes a TCAP application by double-clicking mounted TCAP) 340

Is a TCAP driver loaded? 335

Y

N

Y

AT executes instructions from TCAP memory to provide I/O for TCAP 345

Engage Tunneling Client Access Point (TCAP) 301

Fig. 3

Execution 398



Display Error Message (e.g., please go online to register or login again) **435**

Continue **498**

Display Error Message (e.g., please go online to register or login) **425**

User selection **410**

Display login/ registration welcome screen **405**

205a

Logging in? **415**

Is AT online? **420**

Is user registered? **430**

User Provides Registration Information **440**

440a

Provide Options (e.g., online (dimmed if not online)/USB storage) **453**

Unique user? All info? **445**

Display Error Message (e.g., information incomplete, please re-enter; User exists, please choose different name, etc.) **450**

453a

Is AT online? **455**

Synchronize on and off-line storage? **470**

Synchronize **475**

Provide TCAP off-line options (e.g., run program) **460**

Provide all TCAP options (e.g., run program, order prints, print documents, etc.) **480**

Allow user to access/ execute/store data/ programs on TCAP off-line (e.g., decrypt) **465**

Allow user to access/ execute/store data/ programs on TCAP and ot remote server (e.g., decrypt) **485**

Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



Fig.10

1

# APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT

This application is a continuation of U.S. application Ser. No. 13/960,514, filed Aug. 6, 2013, which is a continuation of U.S. application Ser. No. 12/950,321, filed Nov. 19, 2010, now U.S. Pat. No. 8,539,047, which is a continuation of U.S. application Ser. No. 10/807,731, filed on Mar. 23, 2003, now U.S. Pat. No. 7,861,006.

## FIELD

The present invention is directed generally to an apparatus, method, and system of accessing data, and more particularly, to an apparatus, method and system to transmit and process data comprising a portable device in communication with a terminal and a communications network comprising a plurality of communications network nodes.

## BACKGROUND

Portable Computing and Storage

Computing devices have been becoming smaller over time. Currently, some of the smallest computing devices are in the form of personal digital assistants (PDAs). Such devices usually come with a touch screen, an input stylus and/or mini keyboard, and battery source. These devices, typically, have storage capacities around 64 MB. Examples of these devices include Palm's Palm Pilot.

Information Technology Systems

Typically, users, which may be people and/or other systems, engage information technology systems (e.g., commonly computers) to facilitate information processing. In turn, computers employ processors to process information; such processors are often referred to as central processing units (CPU). A common form of processor is referred to as a microprocessor. A computer operating system, which, typically, is software executed by CPU on a computer, enables and facilitates users to access and operate computer information technology and resources. Common resources employed in information technology systems include: input and output mechanisms through which data may pass into and out of a computer; memory storage into which data may be saved; and processors by which information may be processed. Often information technology systems are used to collect data for later retrieval, analysis, and manipulation, commonly, which is facilitated through database software. Information technology systems provide interfaces that allow users to access and operate various system components.

User Interface

The function of computer interfaces in some respects is similar to automobile operation interfaces. Automobile operation interface elements such as steering wheels, gearshifts, and speedometers facilitate the access, operation, and display of automobile resources, functionality, and status. Computer interaction interface elements such as check boxes, cursors, menus, scrollers, and windows (collectively and commonly referred to as widgets) similarly facilitate the access, operation, and display of data and computer hardware and operating system resources, functionality, and status. Operation interfaces are commonly called user interfaces. Graphical user interfaces (GUIs) such as the Apple Macintosh Operating System's Aqua, Microsoft's Windows XP, or Unix's X-Windows provide a baseline and means of accessing and displaying information, graphically, to users.

Networks

2

Networks are commonly thought to comprise of the interconnection and interoperation of clients, servers, and intermediary nodes in a graph topology. It should be noted that the term "server" as used herein refers generally to a computer, other device, software, or combination thereof that processes and responds to the requests of remote users across a communications network. Servers serve their information to requesting "clients." The term "client" as used herein refers generally to a computer, other device, software, or combination thereof that is capable of processing and making requests and obtaining and processing any responses from servers across a communications network. A computer, other device, software, or combination thereof that facilitates, processes information and requests, and/or furthers the passage of information from a source user to a destination user is commonly referred to as a "node." Networks are generally thought to facilitate the transfer of information from source points to destinations. A node specifically tasked with furthering the passage of information from a source to a destination is commonly called a "router." There are many forms of networks such as Local Area Networks (LANs), Pico networks, Wide Area Networks (WANs), Wireless Networks (WLANs), etc. For example, the Internet is generally accepted as being an interconnection of a multitude of networks whereby remote clients and servers may access and interoperate with one another.

## SUMMARY

Although all of the aforementioned portable computing systems exist, no effective solution to securely access, execute, and process data is available in an extremely compact form. Currently, PDAs, which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user interfaces, and require too much power to maintain their data. Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces and operating systems. Further, current PDAs are generally limited in the amount of data they can store or access. No solution exists that allows users to employ traditional large user interfaces they are already comfortable with, provides greater portability, provides greater memory footprints, draws less power, and provides security for data on the device. As such, the disclosed tunneling client access point (TCAP) is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer, through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources. Thus, the TCAP requires no power source to maintain its data and allows for a highly portable "thumb" footprint. Also, by providing the equivalent of a plug-n-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data in an easy and secure manner that was unavailable in the prior art.

In accordance with certain aspects of the disclosure, the above-identified problems of limited computing devices are overcome and a technical advance is achieved in the art of portable computing and data access. An exemplary tunneling client access point (TCAP) includes a method to dispose a portable storage device in communication with a terminal. The method includes providing the memory for access on the terminal, executing processing instructions from the

memory on the terminal to access the terminal, communicating through a conduit, and processing the processing instructions.

In accordance with another embodiment, a portable tunneling storage processor is disclosed. The apparatus has a memory and a processor disposed in communication with the memory, and configured to issue a plurality of processing instructions stored in the memory. Also, the apparatus has a conduit for external communications disposed in communication with the processor, configured to issue a plurality of communication instructions as provided by the processor, configured to issue the communication instructions as signals to engage in communications with other devices having compatible conduits, and configured to receive signals issued from the compatible conduits.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate various non-limiting, example, inventive aspects in accordance with the present disclosure:

FIG. 1 is of a flow diagram illustrating embodiments of a tunneling client access point (TCAP);

FIG. 2 is of a flow diagram illustrating embodiments of a system of tunneling client access point and access terminal interaction;

FIG. 3 is of a flow diagram illustrating embodiments of engaging the tunneling client access point to an access terminal interaction;

FIG. 4 is of a flow diagram illustrating embodiments of accessing the tunneling client access point and server through an access terminal;

FIGS. 5-8 is of a flow diagram illustrating embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an access terminal;

FIG. 9 is of a block diagram illustrating embodiments of a tunneling client access point server controller;

FIG. 10 is of a block diagram illustrating embodiments of a tunneling client access point controller;

The leading number of each reference number within the drawings indicates the first figure in which that reference number is introduced. As such, reference number 101 is first introduced in FIG. 1. Reference number 201 is first introduced in FIG. 2, etc.

DETAILED DESCRIPTION

Topology

FIG. 1 illustrates embodiments for a topology between a tunneling client access point (TCAP) (see FIG. 10 for more details on the TCAP) and TCAP server (TCAPS) (see FIG. 9 for more details on the TCAPS). In this embodiment, a user 133a may plug-in a TCAP into any number of access terminals 127 located anywhere. Access terminals (ATs) may be any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like. The type of AT used is not important other than the device should provide a compatible mechanism of engagement to the TCAP 130 and provide an operating environment for the user to engage the TCAP through the AT. In one embodiment, the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT. In other embodiment, the TCAP may employ Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped. In one embodiment, the AT provides Java and/or Windows

runtime environments, which allows the TCAP to interact with the input/output mechanisms of the AT. See FIG. 9 for more details and embodiments on the types of connections that may be employed by the TCAP. Once the TCAP has engaged with an AT, it can provide the user with access to its storage and processing facilities.

If the AT is connected to a communication network 113, the TCAP may then communicate beyond the AT. In one embodiment, the TCAP can provide extended storage and/or processing resources by engaging servers 110, 115, 120, which have access to and can provide extended storage 105 to the TCAP through the AT. In one embodiment, a single server and storage device may provide such TCAP server support. In another embodiment, server support is provided over a communications network, e.g., the Internet, by an array of front-end load-balancing servers 120. These servers can provide access to storage facilities within the servers or to remote storage 105 across a communications network 113b, c (e.g., a local area network (LAN)). In such an embodiment, a backend server 110 may offload the front-end server with regard to data access to provide greater throughput. For purposes of load balancing and/or redundancy, a backup server 115 may be similarly situated to provide for access and backup in an efficient manner. In such an embodiment, the back-end servers may be connected to the front-end servers through a communications network 113b (e.g., wide area network (WAN)). The backend servers 110, 115 may be connected to the remote storage 105 through a communications network 113c as well (e.g., a high speed LAN, fiber-channel, and/or the like).

Thus, to the user 133a, the contents of the TCAP 130 appear on the AT as being contained on the TCAP 125 even though much of the contents may actually reside on the servers 115, 120 and/or the servers' storage facilities 105. In these ways, the TCAP "tunnels" data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT. Also, the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O.

TCAP and AT Interaction

FIG. 2 illustrates embodiments for a system of tunneling client access point (TCAP) (see FIG. 10 for more details on the TCAP) and access terminal interaction. FIG. 2 provides an overview for TCAP and AT interaction and subsequent figures will provide greater detail on elements of the interaction. In this embodiment, a user engages the TCAP 201. For example, the user may plug the TCAP into an AT via the AT's USB port. Thereafter the user is presented with a login prompt 205 on the AT's display mechanism, e.g., on a video monitor. After a user successfully logs in (for example by providing a user name and password) 204, the TCAP can then accept user inputs from the AT and its peripherals (the TCAP can then also provide output to the user via the AT's peripherals).

The user may employ the AT's input peripherals as user input devices that control actions on the TCAP. Depending on the user's actions 215, the TCAP can be used by the AT as a storage device from which it can access and store data and programs 225. For example, if the user takes the action of opening a file from the TCAP's memory, e.g., by double clicking on an icon when the TCAP is mounted as a USB drive on the AT, then the AT may treat the TCAP as a memory device and retrieve information from the TCAP 225. If the user's action 215 is one that is directed at executing on the TCAP 215, then the AT will not be involved in any execution. For example, if the user drops an icon

representing a graphics file onto a drag-and-drop location visually representing the TCAP, then the file may be copied to the TCAP where it will process and spool the file for sending the graphics file to be printed at a remote location. In such a case, all of the requirements to process and spool the file are handled by the TCAP's processor and the AT would only be used as a mechanism for user input and output and as a conduit through which the TCAP may send files.

Regardless of if there is an action 215 to execute on the TCAP 220 or to access or store data on the TCAP 225, the AT is used to display the status of any actions 230. At any time the user may select to terminate TCAP related facilities executing either on the AT, a backend server, on the TCAP itself, and/or the like 235. In one embodiment, the user may select a quit option that is displayed on the AT's screen. In another embodiment, the user may simply disengage the TCAP from the AT by severing the connection (e.g., turning power off, physically pulling the device off the AT, turning off wireless transmissions, and/or the like). It should be noted that such abrupt severing may result in the loss of data, file corruption, etc. if the TCAP has not saved data that is on the AT or on some remote server, however, if the TCAP is employing flash like memory, its contents should remain intact.

If there is no instruction signal to terminate the TCAP 235, execution will continue and the TCAP will continue to take and look for input from the user. Of course if the TCAP has been set to perform certain actions, those actions will continue to execute, and the TCAP may respond to remote servers when it is communicating with them through the AT. When the user issues a terminate signal 235, then the TCAP will shut down by saving any data to the TCAP that is in the AT's memory and then terminating any programs executing on both the AT and TCAP that were executed by and/or from the TCAP 240. If no activities are taking place on the TCAP and all the data is written back to the TCAP 240, then the TCAP may optionally unmount itself from the AT's file-system 245. At this point, if there is a TCAP I/O driver executing on the AT, that driver may be terminated as triggered by the absence of the TCAP at a mount point 250. After the TCAP is unmounted and/or the TCAP I/O driver is terminated, it is safe to disengage the TCAP from the AT.

**TCAP and AT Interaction**

FIG. 3 illustrates embodiments engaging the tunneling client access point to an access terminal interaction. Examples of engaging the TCAP 301 with an AT were discussed above in FIG. 1 127, 130, 133a and FIG. 2 201. In one embodiment, the TCAP 130 is engaged with an access terminal 327, 305. As mentioned in FIG. 1, the TCAP is capable of engaging with ATs using a number of mecha- nisms. In one embodiment, the TCAP has a USB connector for plugging into an AT, which acts as a conduit for power and data transfer. In another embodiment, the TCAP may use Bluetooth to establish a wireless connection with a number of ATs. In another embodiment, the TCAP may employ WiFi. In yet another embodiment, the TCAP may employ multiple communications mechanisms. It should be noted, with some wireless mechanisms like Bluetooth and WiFi, simply coming into proximity with an AT that is configured for such wireless communication may result in the TCAP engaging with and establish a communications link with the AT. In one embodiment, the TCAP has a "connect" button that will allow such otherwise automati- cally engaging interactions take place only if the "connect" button is engaged by a user. Such an implementation may provide greater security for users (see FIG. 10 for more details on the TCAP).

After being engaged 305, the TCAP will then power on. In an embodiment requiring a direct connection, e.g., USB, simply plugging the TCAP into the AT provides power. In a wireless embodiment, the TCAP may be on in a lower powered state or otherwise turned on by engaging the connect button as discussed above. In such an embodiment, the TCAP can employ various on-board power sources (see FIG. 10 for more details on the TCAP). The TCAP then may load its own operating system 315. The operating system can provide for interaction with the AT. In one embodiment, a Java runtime is executed on the TCAP, and Java applets communicate with the AT through Java APIs. In another embodiment, a driver is loaded onto the AT, and the on- TCAP Java operating system applets communicate to and through the AT via the driver running on the AT, wherein the driver provides an API through and to which messages may be sent.

After engaging with the AT, the TCAP can provide its memory space to the AT 320. In one embodiment, the TCAP's memory is mapped and mounted as a virtual disk drive 125 storage 325. In this manner, the TCAP may be accessed and manipulated as a standard storage device through the AT's operating system. Further, the TCAP and in some cases the AT can determine if the AT is capable of accessing program instructions stored in the TCAP's memory 330. In one embodiment, the AT's operating system looks to auto-run a specified file from any drive as it mounts. In such an embodiment, the TCAP's primary interface may be specified in such a boot sequence. For example, under windows, an autorun.inf file can specify the opening of a program from the TCAP by the AT; e.g., OPEN=TCAP.EXE.

Many operating systems are capable of at least accessing the TCAP as a USB memory drive 330 and mounting its contents as a drive, which usually becomes accessible in file browsing window 125. If the TCAP does not mount, the AT's operating system will usually generate an error inform- ing the user of a mounting problem. If the AT is not capable of executing instruction from the TCAP, a determination is made if an appropriate driver is loaded on the AT to access the TCAP 335. In one embodiment, the TCAP can check to see if an API is running on the AT. For example, the TCAP provide an executable to be launched, e.g., as specified through autorun.inf, and can establish communications through its connection to the AT, e.g., employing TCP/IP communications over the USB port. In such an embodiment, the TCAP can ping the AT for the program, and if an acknowledgement is received, the TCAP has determined that proper drivers and APIs exist. If no such API exists, the TCAP may launch a driver installation program for the AT as through an autorun.inf. In an alternative embodiment, if nothing happens, a user may double click onto an installer program that is stored on the mounted TCAP 342, 340. It should be noted, that although the TCAP's memory space may be mounted, certain areas of the TCAP may be inac- cessible until there is an authorization. For example, certain areas and content on the TCAP may be encrypted. It should be noted that any such access terminal modules that drive AT and TCAP interaction may be saved onto the TCAP by copying the module to a mounted TCAP. Nevertheless, if the AT is capable of accessing program instructions in TCAP memory 330, a TCAP driver is loaded on the AT 335, and/or the user engages a program in the TCAP memory 340, then the AT can execute program instructions from the TCAP's memory, which allows the TCAP to use the AT's I/O and allowing the user to interface with TCAP facilities 345. It should be noted that some ATs may not be able to mount the

TCAP at all. In such an instance, the user may have to install the TCAP drivers by downloading them from a server on the Internet, loading them from a diskette or CD, and/or the like. Once the TCAP is engaged to the AT **301**, execution may continue **398**.

TCAP and AT Interaction

FIG. 4 illustrates embodiments accessing the tunneling client access point and server through an access terminal. Upon engaging the TCAP to the AT as described in FIG. 3 **301**, **398**, the user may then go on to access the TCAP and its services **498**. It should be noted that users may access certain unprotected areas of the TCAP once it has been mounted, as described in FIG. 3. However, to more fully access the TCAP's facilities, the user may be prompted to either login and/or registration window **205**a to access the TCAP and its services, which may be displayed on the AT **405**. It is important to note that in one embodiment, the execution of the login and/or registration routines are handled by the TCAP's processor. In such an embodiment, the TCAP may run a small Web server providing login facilities, and connect to other Web based services through the AT's connection to the Internet. Further, the TCAP may employ a basic Web browsing core engine by which it may connect to Web services through the AT's connection to a communications network like the Internet. For purposes of security, in one embodiment, the TCAP may connect to a remote server by employing a secure connection, e.g., HTTPS, VPN, and/or the like.

Upon displaying a login window **405**, e.g., **205**a, the user may select to register to access the TCAP and its services, or they may simply log in by providing security verification. In one example, security authorization may be granted by simply providing a user and password as provided through a registration process. In another embodiment, authorization may be granted through biometric data. For example, the TCAP may integrate a fingerprint and/or heat sensor IC into its housing. Employing such a device, and simply by providing one's finger print by laying your finger to the TCAP's surface, would provide the login facility with authorization if the user's finger print matches one that was stored during the registration process.

If the user does not attempt to login **415**, i.e., if the user wishes to register to use the TCAP and its services, then the TCAP can determine if the AT is online **420**. This may be accomplished in a number of ways. In one embodiment, the TCAP itself may simply ping a given server and if acknowledgement of receipt is received, the TCAP is online. In another embodiment, the TCAP can query for online status by engaging the AT through the installed APIs. If the AT is not online, then the user may be presented with an error message **425**. Thus, if a user does not have a login, and does not have the ability to register, then restricted areas of the TCAP will remain unavailable. Thereafter, flow can continue **498** and the user may have another opportunity to login and/or register. In one embodiment as a login integrity check, the TCAP keeps track of the number of failed attempts to login and/or register and may lock-out all further access if a specified number of failed attempts occurs. In one embodiment, the lockdown may be permanent by erasing all data on the TCAP. In another embodiment, the TCAP will disallow further attempts for a specified period of time.

If the user is attempting to register **415**, and the AT is online **420**, then the user map provide registration information **440** into a screen form **440**a. Registration information fields may require a user's name, address, email address, credit card information, biometric information (e.g., requiring the user to touch a biometric fingerprint IC on the

TCAP), and/or the like. The TCAP may determine if all the information was provided as required for registration and may query backend servers to determine if the user information is unique **445**. If the user did not properly fill out the registration information or if another user is already registered, the TCAP can provided an error message to such effect. Also, both the TCAP and its back-end servers may make log entries tracking such failed attempts for purposes of defending against fraud and/or security breaches. The user may then modify the registration information **440** and again attempt to register. Similarly to the login integrity checks, the TCAP can lockout registration attempts if the user fails to register more than some specified number of times.

Upon providing proper registration information **445** or proper login authentication **415**, the TCAP can query backend servers to see if the user is registered. In one embodiment, such verification may be achieved by sending a query to the servers to check its database for the authorization information and/or for duplicate registrations. The servers would then respond providing an acknowledgment of proper registration and authorization to access data on the backend servers. If the users are not registered on the backend servers **430**, then the TCAP can provide an error message to the user for display on the AT to such effect **435**. In an alternative embodiment, the registration information may be stored on the TCAP itself. In one embodiment, the registration would be maintained in encrypted form. Thus, the user's login information may be checked relative to the information the TCAP itself, and if there is a match, access may be granted, otherwise an error message will be displayed **435**. The TCAP may then continue **498** to operate as if it were just engaged to the AT.

If the user is confirmed to be registered **430**, then the TCAP may provide options for display **453**, **453**a. Depending on the context and purpose of a particular TCAP, the options may vary. For example, a screen **453**a may provide the user with the options to access data either online or offline. The user might simply click on a button and gain secure access to such data that may be decrypted by the TCAP. In one embodiment, the TCAP will determine if the AT is online **455**. If this was already determined **420**, this check **455** may be skipped.

If the AT is online **455**, optionally, the TCAP determines if the user wishes to synchronize the contents of the TCAP with storage facilities at the backend server **470**. In one embodiment, the user may designate that such synchronization is to always take place. If synchronization is specified **470**, then the TCAP will provide and receive updated data to and from the backend servers, overwriting older data with updated versions of the data **475**. If the AT is online **455** and/or after any synchronization **475**, the TCAP may provide the user with all of its service options as authorized by the account and programs available on the TCAP and at the backend server **480**. Once again, these facilities, programs, and/or services may vary greatly depending on the context and deployment requirements of the user. The options to be presented to the user from the TCAP or the TCAP services from the backend server, as displayed through the TCAP onto the AT's display **480**, are myriad and some example embodiments are provided in FIGS. **5-8**. Upon presenting the user with the options, the user is then able to access, execute, store data and programs on the TCAP and on the remote server **485**. All areas of the TCAP and services are then open, including any encrypted data areas.

If the AT is not online **455**, the TCAP may provide options for the user not including online services **460**. In one

embodiment, the online options that may be presented on the AT display will be dimmed and/or omitted to reflect the lack of accessibility. However, the user will be able to access, execute, store data and programs on the TCAP, including any encrypted data areas **465**.

TCAP Facilities and Services

FIGS. **5-8** illustrate embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an AT. Any particular set of facilities may have a myriad of options. The options and the general nature of the facilities provided on any particular TCAP are dependant upon the requirements of a given set of users. For example, certain groups and/or agencies may require TCAPS to be targeted towards consumer photographs, and may employ TCAPs to further that end. Other groups may require high security facilities, and tailor the TCAPs accordingly. In various environments, an organization may wish to provide a secure infrastructure to all of its agents for securely accessing the organization's data from anywhere and such an organization could tailor the TCAPs contents to reflect and respond to its needs. By providing a generalized infrastructure on the TCAP backend servers and within the TCAP by using a generalized processor, the TCAPs may be deployed in numerous environments.

In one particular embodiment as in FIG. **5**, the TCAP provides facilities to access, process, and store email, files, music, photos and videos through the TCAP. Upon engaging **101** of FIG. **1** the TCAP **130** to an AT **307**, the TCAP will mount and display through the AT's file browser window **125** of FIG. **1**. As has already been described, in the case where the AT has no TCAP driver software, the user may double click on the installer software stored on the TCAP **507**. Doing so will launch the installer software from the TCAP's memory to execute on the AT, and the user may be presented with a window to confirm the desire to install the TCAP software onto the AT **507**. Upon confirming the install **507**, the software will install on the AT and the user will be asked to wait as they are apprised of the install progress **509**.

Upon installation, the TCAP front-end software may execute and present the user with various options in various and fanciful interface formats **511**, **460**, **480** of FIG. **4**. In one embodiment, these user interfaces and programs are Java applications that may execute on the AT and a present Java runtime. In an alternative embodiment, a small applet may run on the AT, but all other activities may execute on the TCAP's processor, which would use the AT display only as a display terminal. In the embodiment where the TCAP executes program instructions, the TCAP may be engaged to receive commands and execute by receiving a signal from the access terminal driver instructing it to execute certain program files or, alternatively, looking to default location and executing program instructions. In yet another embodiment, the TCAP may obtain updated interfaces and programs from a backend server for execution either on the TCAP itself and/or the AT; this may be done by synchronization with the backend server and checking for updates of specified files at the backend server. By engaging the user interface, perhaps by clicking on a button to open the TCAP facilities and services **511**, the interface may further unfurl to present options to access said facilities and services **513**. Here, the interface may reflect ownership of the TCAP by providing a welcome screen and showing some resources available to the user; for example, a button entitled "My Stuff" may serve as a mechanism to advance the user to a screen where they may access their personal data store. At this point the user may attempt to login to access their data

by engaging an appropriate button, which will take them to a screen that will accept login information **519**. Alternatively, the user may also register if it is their first time using the TCAP by selecting an appropriate button, which will advance the user to a registration screen **515** wherein the user may enter their name, address, credit card information, etc. Upon successfully providing registration information, the user may be prompted for response to further solicitations on a follow-up screen **517**. For example, depending on the services offered for a particular TCAP, the user may be provided certain perks like 5 MB of free online storage on a backend server, free photographic prints, free email access, and/or the like **517**.

After the user is prompted to login **518** and successfully provides proper login information **519**, or after successfully registering **515** and having responded to any solicitations **517**, the user may be provided with general options **521** to access data stored on the TCAP itself **522** or in their online account **520** maintained on a backend server. For example, if the user selects the option to access their online storage **520**, they may be presented with more options to interact with email, files, music, photos and videos that are available online **523**. Perhaps if the user wished to check their email, the user might select to interact with their email, and a screen allowing them to navigate through their email account(s) would be presented **525**. Such online access to data may be facilitated through http protocols whereby the TCAP applications send and receive data through http commands across a communications network interacting with the backend servers and/or other servers. Any received results may be parsed and imbedded in a GUI representation of a Java application. For example, the email facility may run as a Java applet **525** and may employ a POP mail protocol to pull data from a specified mail server to present to the user.

Similarly, many other facilities may be engaged by the user through the TCAP. In one embodiment, the user may drag **508** a file **506** onto a drag-and-drop zone **505** that is presented on the TCAP interface. Upon so doing, various drag-and-drop options may unfurl and present themselves to the user **550**. It should be noted that the file may come from anywhere, i.e., from the AT, the TCAP, and/or otherwise. For example, upon dragging and dropping a graphics file, a user may be prompted with options to order prints, upload the file to an online storage space, save the file to the TCAP's memory space, cancel the action, and/or the like **550**. If the user sends the file for storage, or otherwise wishes to see and manage their data, an interface allowing for such management may be presented **555**. The interface may organize and allow access to general data, picture, and music formats **554**, provide usage statistics (e.g., free space, capacity, used space, etc.) **553**, provide actions to manipulate and organize the data **552**, provide status on storage usage on the TCAP **551** and online **549**, and/or the like.

Should the user engage a user interface element indicating the wish to manipulate their picture data **548**, the TCAP interface will update to allow more specific interaction with the user's photos **557**. In such a screen, the user may select various stored pictures and then indicate a desire to order photo prints by engaging the appropriate user interface element **558**. Should the user indicate their desire for prints **558**, they will be presented with an updated interface allowing the specification of what graphics files they wish to have printed **559**. In one embodiment, the users may drag-and-drop files into a drop zone, or otherwise engage file browsing mechanisms **560** that allow for the selection of desired files. Upon having identified the files for prints **559**, a user may be presented with an interface allowing for the selection

of print sizes and quantities **561**. After making such specifications, the user may be required to provide shipping information **563** and information for payments **565**. After providing the billing information to a backend server for processing and approval, the user may be presented with a confirmation interface allowing for editing of the order, providing confirmation of costs, and allowing for submission of a final order for the selected prints **567**. Upon submitting the order, the TCAP will process the files for spooling to a backend server that will accept the order and files, which will be developed as prints and the user's account will be charged accordingly. In one embodiment, all of the above order and image processing operations occur and execute on the TCAP CPU. For example, the TCAP may employ various rendering technologies, e.g., ghostscript, to allow it to read and save PDFs and other media formats.

FIG. **6** goes on to illustrate embodiments and facets of the facilities of FIG. **5**. The TCAP interface allows the user to perform various actions at any given moment. As has already been discussed in FIG. **5**, the user may drag **508** a file **506** onto a drag and drop zone **505** so as to provide the file to the TCAP for further manipulation. As in **550** of FIG. **5**, the user may be presented with various options subsequent to a drag-and-drop operation. Also, the TCAP interface may provide visual feedback that files have been dropped in the drop zone by highlighting the drop zone **505**b. Should the user wish, they may close the TCAP interface by engaging a close option **633**. Also, the ability to change and/or update their personal information may be accessed through the TCAP interface **616**, which would provide a form allowing the user to update their registration information **630**. In one embodiment, should the user forget their login information, they may request login help **635** and the TCAP will send their authorization information to the last known email address and inform the user of same **640**. Also, the TCAP interface may provide help facilities that may be accessed at any time by simply engaging a help facility user interface element **617**. So doing will provide the user with help screen information as to how to interact with the TCAP's facilities **625**.

Upon providing proper login information **619** and logging-in **619**, the user may be presented with a welcome screen with various options to access their data **621** as has already been discussed in FIG. **5**, **521**. By engaging a user interface element to access online storage **620**, the user may be presented with various options to interact with online storage **623**, **523** of FIG. **5**. Should the user wish to interact with data on the TCAP itself, the user may indicate so by engaging the appropriate user interface option **622**. So doing will provide the user with further options related to data stored on the TCAP **655**. The user may engage an option to view the storage contents **658** and the TCAP interface will provide a listing of the contents **662**, which may be manipulated through selection and drag-and-drop operations with the files.

In one embodiment, the user may order prints of photos **657** from files that are on the TCAP itself. As discussed in FIG. **5**, the user may select files for which they desire prints **660**. Here, the selected files will first be processed by the TCAP in preparation for sending to backend servers and file manipulations **670**. The user may specify various attributes regarding the prints they desire, e.g., the size, number, cropping, red-eye correction, visual effects, and/or the like **661**. In one embodiment, such processing occurs on the TCAP processor, while in other embodiments such processing can take place on the AT or backend server. Once again, the user may provide a shipping address **663**, and make a

final review to place the order **667**. Upon committing to the order **667**, the processed files are uploaded to the backend servers that will use the files to generate prints **690**. A confirmation screen may then be provided to the user with an order number and other relevant information **695**.

FIG. **7** goes on to illustrate embodiments and facets of the facilities of FIGS. **5-6** as may apply in different environments. As is demonstrated, the look and feel of the TCAP interface is highly malleable and can serve in many environments. FIG. **7** illustrates that even within a single organization, various environments might benefit from TCAPs and services tailored to serve such environments **733**b-d. In this case TCAPs can serve in consumer **733**b, industry trade **733**c, corporate **733**d, and/or the like environments.

As has already been discussed, initially in any of the environments, after engaging the TCAP to an AT, the user may be prompted to install the TCAP interface **705** and informed of the installation procedure **710**. The user may then be presented with the installed TCAP interface **715**, which may be activated by engaging an interface element to unfurl the interface, e.g., in this case by opening the top to a can of soda **717**. Opening the interface will present the user with various options as **720**, as has already been discussed in FIGS. **5-6**. Similarly the user may login **725** or make a selection to register for various TCAP services and provide the requisite information in the provided form **730**. Upon registering and/or logging-in **725**, various options may be presented based upon the configuration of the TCAP. For example, if the TCAP was configured and tailored for consumers, then upon logging in **725** the consumer user might be presented **733**a-b with various consumer related options **740**. Similarly, if the TCAP were tailored for **733**a, c the trade industry or **733**a, d the corporate environment, options specific to the trade industry **770** and corporate environment **760** may be presented.

In one embodiment, an organization wishing to provide TCAPs to consumers might provide options **740** for free music downloads **743**, free Internet radio streaming **748**, free news (e.g., provided through an RSS feed from a server) **766**, free photo printing **750**, free email **740**, free coupons **742**, free online storage **741**, and/or the like. Users could further engage such services (e.g., clicking free music file links for downloading to the TCAP, by ordering prints **750**, etc. For example, the user may select files on the TCAP **750**, select the types of photos they would like to receive **752**, specify a delivery address **754**, confirm the order **756** all of which will result in the TCAP processing the files and uploading them to the backend servers for generation of prints (as has already been discussed in FIGS. **5-6**).

In another embodiment, an organization wishing to provide TCAPs to a trade industry might provide options **770** for advertising **780**, events **775**, promotions **772**, and/or the like. It is important to note that information regarding such options may be stored either on the TCAP or at a backend server. In one embodiment, such information may be constantly synchronized from the backend servers to the TCAPs. This would allow an organization to provide updates to the trade industry to all authorized TCAP "key holders." In such an embodiment, the user may be presented with various advertising related materials for the organization, e.g., print, television, outdoor, radio, web, and/or the like **780**. With regard to events, the user may be presented with various related materials for the organization, e.g., trade shows, music regional, sponsorship, Web, and/or the like **775**. With regard to promotions, the user may be presented with various related materials for the organization, e.g., rebates, coupons, premiums, and/or the like **772**.

In another embodiment, an organization wishing to provide TCAPs to those in the corporate environment and might provide options relating to various corporate entities **760**. Selecting any of the corporate entities **760** may provide the user with options to view various reports, presentations, and/or the like, e.g., annual reports, 10K reports, and/or the like **765**. Similarly, the reports may reside on the TCAP and/or the corporate TCAP can act as a security key allowing the user to see the latest corporate related materials from a remote backend server.

FIG. **8** goes on to illustrate embodiments and facets of the facilities of FIGS. **5-7** as may apply in different environments. FIG. **8** illustrates that TCAPs may serve to provide heightened security to any environment. As has been discussed in previous figures, users may engage the TCAP interface **805** to access various options **810**. The TCAP interface is highly adaptable and various services may be presented within it. For example, a stock ticker may be provided as part of the interface in a financial setting **810**. Any number of live data feeds may dynamically update on the face of the interface. Upon logging-in **815** or registering a new account **820**, the user may be informed that communications that are taking place are secured **825**. In one embodiment, various encryption formats may be used by the TCAP to send information securely to the backend servers. It is important to note that in such an embodiment, even if data moving out of the TCAP and across the AT were captured at the AT, such data would not be readable because the data was encrypted by the TCAP's processor. As such, the TCAP acts as a "key" and provides a plug-and-play VPN to users. Such functionality, heretofore, has been very difficult to set up and/or maintain. In this way, all communications, options presented and views of user data are made available only to the TCAP with the proper decryption key. In heightened security environments, display of TCAP data is provided on the screen only in bitmapped format straight to the video memory of the AT and, therefore, is not stored anywhere else on the AT. This decreases the likelihood of capturing sensitive data. As such, the user may access their data on the TCAP and/or online **830** in a secure form whereby the user may navigate and interact with his/her data and various services **835** in a secure manner.

Tunneling Client Access Point Server Controller

FIG. **9** illustrates one embodiment incorporated into a tunneling client access point server (TCAPS) controller **901**. In this embodiment, the TCAP controller **901** may serve to process, store, search, serve, identify, instruct, generate, match, and/or update data in conjunction with a TCAP (see FIG. **10** for more details on the TCAP). TCAPS act as backend servers to TCAPs, wherein TCAPS provide storage and/or processing resources to great and/or complex for the TCAP to service itself. In effect, the TCAPS transparently extend the capacity of a TCAP.

In one embodiment, the TCAPS controller **901** may be connected to and/or communicate with entities such as, but not limited to: one or more users from user input devices **911**; peripheral devices **912**; and/or a communications network **913**. The TCAPS controller may even be connected to and/or communicate with a cryptographic processor device **928**.

A TCAPS controller **901** may be based on common computer systems that may comprise, but are not limited to, components such as: a computer systemization **902** connected to memory **929**.

Computer Systemization

A computer systemization **902** may comprise a clock **930**, central processing unit (CPU) **903**, a read only memory

(ROM) **906**, a random access memory (RAM) **905**, and/or an interface bus **907**, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus **904**. Optionally, a cryptographic processor **926** may be connected to the system bus. The system clock typically has a crystal oscillator and produces a base signal. The clock is typically coupled to the system bus and various clock multipliers that will increase or decrease the base operating frequency for other components interconnected in the computer systemization. The clock and various components in a computer systemization drive signals embodying information throughout the system. Such transmission and reception of signals embodying information throughout a computer systemization may be commonly referred to as communications. These communicative signals may further be transmitted, received, and the cause of return and/or reply signal communications beyond the instant computer systemization to: communications networks, input devices, other computer systemizations, peripheral devices, and/or the like. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one high-speed data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a microprocessor such as AMD's Athlon, Duron and/or Opteron; IBM and/or Motorola's PowerPC; Intel's Celeron, Itanium, Pentium and/or Xeon; and/or the like processor(s). The CPU interacts with memory through signal passing through conductive conduits to execute stored program code according to conventional data processing techniques. Such signal passing facilitates communication within the TCAPS controller and beyond through various interfaces. Should processing requirements dictate a greater amount speed, mainframe and super computer architectures may similarly be employed.

Interface Adapters

Interface bus(ses) **907** may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) **908**, storage interfaces **909**, network interfaces **910**, and/or the like. Optionally, cryptographic processor interfaces **927** similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. Interface adapters conventionally connect to the interface bus via a slot architecture. Conventional slot architectures may be employed, such as, but not limited to: Accelerated Graphics Port (AGP), Card Bus, (Extended) Industry Standard Architecture ((E)ISA), Micro Channel Architecture (MCA), NuBus, Peripheral Component Interconnect (Extended) (PCI(X)), Personal Computer Memory Card International Association (PCMCIA), and/or the like.

Storage interfaces **909** may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices **914**, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to: (Ultra) (Serial) Advanced Technology Attachment (Packet Interface) ((Ultra) (Serial) ATA(PI)), (Enhanced) Integrated Drive Electronics ((E)IDE), Institute of Electrical and Electronics

Engineers (IEEE) 1394, fiber channel, Small Computer Systems Interface (SCSI), Universal Serial Bus (USB), and/or the like.

Network interfaces 910 may accept, communicate, and/or connect to a communications network 913. Network interfaces may employ connection protocols such as, but not limited to: direct connect, Ethernet (thick, thin, twisted pair 10/100/1000 Base T, and/or the like), Token Ring, wireless connection such as IEEE 802.11a-x, and/or the like. A communications network may be any one and/or the combination of the following: a direct interconnection; the Internet; a Local Area Network (LAN); a Metropolitan Area Network (MAN); an Operating Missions as Nodes on the Internet (OMNI); a secured custom connection; a Wide Area Network (WAN); a wireless network (e.g., employing protocols such as, but not limited to a Wireless Application Protocol (WAP), I-mode, and/or the like); and/or the like. A network interface may be regarded as a specialized form of an input output interface. Further, multiple network interfaces 910 may be used to engage with various communications network types 913. For example, multiple network interfaces may be employed to allow for the communication over broadcast, multicast, and/or unicast networks. Input Output interfaces (I/O) 908 may accept, communicate, and/or connect to user input devices 911, peripheral devices 912, cryptographic processor devices 928, and/or the like. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); audio: analog, digital, monaural, RCA, stereo, and/or the like; IEEE 1394a-b; infrared; joystick; keyboard; midi; optical; PC AT; PS/2; parallel; radio; serial; USB; video interface: BNC, composite, digital, Digital Visual Interface (DVI), RCA, S-Video, VGA, and/or the like; wireless; and/or the like. A common output device is a video display, which typically comprises a Cathode Ray Tube (CRT) or Liquid Crystal Display (LCD) based monitor with an interface (e.g., DVI circuitry and cable) that accepts signals from a video interface. The video interface composites video information generated by a computer systemization and generates video signals based on the composited information in a video memory frame. Typically, the video interface provides the composited video information through a video connection interface that accepts a video display interface (e.g., a DVI connector accepting a DVI display cable).

User input devices 911 may be card readers, dongles, finger print readers, gloves, graphics tablets, joysticks, keyboards, mouse (mice), trackballs, trackpads, retina readers, and/or the like.

Peripheral devices 912 may be connected and/or communicate to I/O and/or other facilities of the like such as network interfaces, storage interfaces, and/or the like. Peripheral devices may be audio devices, cameras, dongles (e.g., for copy protection, ensuring secure transactions with a digital signature, and/or the like), external processors (for added functionality), goggles, microphones, monitors, network interfaces, printers, scanners, storage devices, video devices, visors, and/or the like.

It should be noted that although user input devices and peripheral devices may be employed, the TCAPS controller may be embodied as an embedded, dedicated, and/or headless device, wherein access would be provided over a network interface connection.

Cryptographic units such as, but not limited to, microcontrollers, processors 926, interfaces 927, and/or devices 928 may be attached, and/or communicate with the TCAPS controller. A MC68HC16 microcontroller, commonly manufactured by Motorola Inc., may be used for and/or within

cryptographic units. Equivalent microcontrollers and/or processors may also be used. The MC68HC16 microcontroller utilizes a 16-bit multiply-and-accumulate instruction in the 16 MHz configuration and requires less than one second to perform a 512-bit RSA private key operation. Cryptographic units support the authentication of communications from interacting agents, as well as allowing for anonymous transactions. Cryptographic units may also be configured as part of CPU. Other commercially available specialized cryptographic processors include VLSI Technology's 33 MHz 6868 or Semaphore Communications' 40 MHz Roadrunner 184.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory 929. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAPS controller and/or a computer systemization may employ various forms of memory 929. For example, a computer systemization may be configured wherein the functionality of on-chip CPU memory (e.g., registers), RAM, ROM, and any other storage devices are provided by a paper punch tape or paper punch card mechanism; of course such an embodiment would result in an extremely slow rate of operation. In a typical configuration, memory 929 will include ROM 906, RAM 905, and a storage device 914. A storage device 914 may be any conventional computer system storage. Storage devices may include a drum; a (fixed and/or removable) magnetic disk drive; a magneto-optical drive; an optical drive (i.e., CD ROM/RAM/Recordable (R), ReWritable (RW), DVD R/RW, etc.); and/or other devices of the like. Thus, a computer systemization generally requires and makes use of memory.

Module Collection

The memory 929 may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) 915 (operating system); information server module(s) 916 (information server); user interface module(s) 917 (user interface); Web browser module(s) 918 (Web browser); database(s) 919; cryptographic server module(s) 920 (cryptographic server); TCAPS module(s) 935; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device 914, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through a communications network, ROM, various forms of memory, and/or the like.

Operating System

The operating system module 915 is executable program code facilitating the operation of a TCAPS controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the like. The operating system may be a highly fault tolerant, scalable, and secure system such as Apple Macintosh OS X (Server), AT&T Plan 9, Be OS, Linux, Unix, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Apple Macintosh OS, Microsoft DOS, Palm OS, Windows 2000/2003/3.1/95/98/CE/Millenium/NT/XP (Server), and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself,

    

and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAPS controller to communicate with other entities through a communications network **913**. Various communication protocols may be used by the TCAPS controller as a subcarrier transport mechanism for interaction, such as, but not limited to: multicast, TCP/IP, UDP, unicast, and/or the like.

Information Server

An information server module **916** is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, Microsoft's Internet Information Server, and/or the. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective-) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction with other program modules. After a Domain Name System (DNS) resolution portion of an HTTP request is resolved to a particular information server, the information server resolves requests for information at specified locations on a TCAPS controller based on the remainder of the HTTP request. For example, a request such as http://123.124.125.126/myInformation.html might have the IP portion of the request "123.124.125.126" resolved by a DNS server to an information server at that IP address; that information server might in turn further parse the http request for the "/myInformation.html" portion of the request and resolve it to a location in memory containing the information "myInformation.html." Additionally, other information serving protocols may be employed across various ports, e.g., FTP communications across port **21**, and/or the like. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAPS database **919**, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAPS database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through inter-application communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field

tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAPS as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module **917** is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module **918** is stored program code that is executed by the CPU. The Web browser may be a conventional hypertext viewing application such as Microsoft Internet Explorer or Netscape Navigator. Secure Web browsing may be supplied with 128 bit (or greater) encryption by way of HTTPS, SSL, and/or the like. Some Web browsers allow for the execution of program modules through facilities such as Java, JavaScript, ActiveX, and/or the like. Web browsers and like information access tools may be integrated into PDAs, cellular telephones, and/or other mobile devices. A Web browser may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the Web browser communicates with information servers, operating systems, integrated program modules (e.g., plug-ins), and/or the like; e.g., it may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAPS enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAPS Database

A TCAPS database module **919** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program

20

code portion configuring the CPU to process the stored data. The database may be a conventional, fault tolerant, relational, scalable, secure database such as Oracle or Sybase. Relational databases are an extension of a flat file. Relational databases consist of a series of related tables. The tables are interconnected via a key field. Use of the key field allows the combination of the tables by indexing against the key field; i.e., the key fields act as dimensional pivot points for combining information from various tables. Relationships generally identify links maintained between tables by matching primary keys. Primary keys represent fields that uniquely identify the rows of a table in a relational database. More precisely, they uniquely identify rows of a table on the "one" side of a one-to-many relationship.

Alternatively, the TCAPS database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. In another alternative, an object-oriented database may be used, such as Frontier, ObjectStore, Poet, Zope, and/or the like. Object databases can include a number of object collections that are grouped and/or linked together by common attributes; they may be related to other object collections by some common attributes. Object-oriented databases perform similarly to relational databases with the exception that objects are not just pieces of data but may have other types of functionality encapsulated within a given object. If the TCAPS database is implemented as a data-structure, the use of the TCAPS database may be integrated into another module such as the TCAPS module. Also, the database may be implemented as a mix of data structures, objects, and relational structures. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentralized and/or integrated. In one embodiment, the database module 919 includes three tables 919a-c. A user accounts table 919a includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then expire once a specified date has been reached. An user data table 919b includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. A user programs table 919c includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. In one embodiment, user programs may contain various user interface primitives, which may serve to update TCAPs. Also, various accounts may require custom database tables depending upon the environments and the types of TCAPs a TCAPS may need to serve. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database modules

919a-c. The TCAPS may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAPS database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS database communicates with a TCAPS module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module 920 is stored program code that is executed by the CPU 903, cryptographic processor 926, cryptographic processor interface 927, cryptographic processor device 928, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. Employing such encryption security protocols, the TCAPS may encrypt all incoming and/or outgoing communications and may serve as node within a virtual private network (VPN) with a wider communications network. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAPS module to engage in secure transactions if so desired. The cryptographic module facilitates the secure accessing of resources on TCAPS and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

TCAPS

A TCAPS module 935 is stored program code that is executed by the CPU. The TCAPS affects accessing, obtain-

ing and the provision of information, services, transactions, and/or the like across various communications networks. The TCAPS enables TCAP users to simply access data and/or services across a communications network in a secure manner. The TCAPS extends the storage and processing capacities and capabilities of TCAPs. The TCAPS coordinates with the TCAPS database to identify interassociated items in the generation of entries regarding any related information. A TCAPS module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAPS server employs a cryptographic server to encrypt and decrypt communications. A TCAPS module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS module communicates with a TCAPS database, operating systems, other program modules, and/or the like. The TCAPS may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAPS node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAPS controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module

components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D) COM), (Distributed) Object Linking and Embedding ((D) OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

Tunneling Client Access Point Controller

FIG. 10 illustrates one embodiment incorporated into a tunneling client access point (TCAP) controller 1001. Much of the description of the TCAPS of FIG. 9 applies to the TCAP, and as such, the disclosure focuses more upon the variances exhibited in the TCAP. In this embodiment, the TCAP controller 1001 may serve to process, store, search, identify, instruct, generate, match, and/or update data within itself, at a TCAPS, and/or through an AT.

The first and foremost difference between the TCAP and the TCAPS is that the TCAP is very small as was shown 130 of FIG. 1. The TCAP may be packaged in plugin sticks, often, smaller than the size of a human thumb. In one embodiment, a TCAP may be hardened for military use. In such an embodiment, the shell 1001 may be composed of metal, and/or other durable composites. Also, components within may be shielded from radiation.

In one embodiment, the TCAP controller 1001 may be connected to and/or communicate with entities such as, but not limited to: one or more users from an access terminal 1011b. The access terminal itself may be connected to peripherals such as user input devices (e.g., keyboard 1012a, mouse 1012b, etc.); and/or a communications network 1013 in manner similar to that described in FIG. 9.

A TCAP controller 1001 may be based on common computer systems components that may comprise, but are not limited to, components such as: a computer systemization 1002 connected to memory 1029. Optionally, the TCAP controller 1001 may convey information 1058, produce output through an output device 1048, and obtain input from control device 1018.

Control Device

The control device 1018 may be optionally provided to accept user input to control access to the TCAP controller. In one embodiment, the control device may provide a keypad 1028. Such a keypad would allow the user to enter passwords, personal identification numbers (PIN), and/or the like.

In an alternative embodiment, the control device may include a security device 1038. In one embodiment, the security device is a fingerprint integrated circuit (fingerprint IC) that provides biometric fingerprint information such as, but not limited to AuthenTec Inc.'s FingerLoc™ AF-S2™. Either a fingerprint IC and/or other biometric device will provide biometric validation information that may be used to confirm the identity of a TCAP user and ensure that transactions are legitimate. In alternative embodiments, a simple button, heat sensor, and/or other type of user input functionality may be provided solely and/or in concert with other

types of control device types. The control device may be connected to the I/O interface, the system bus, or the CPU directly.

The output device **1048** is used to provide status information to the user. In one alternative embodiment, the output device is an LCD panel capable of providing alpha numeric and/or graphic displays. In an alternative embodiment, the output device may be a speaker providing audible signals indicating errors and/or actually streaming information that is audible to the user, such as voice alerts. The output device may be connected to the I/O interface, the system bus, or the CPU directly.

The conveyance information **1058** component of the TCAP controller may include any number of indicia representing the TCAP's source on the cover **1001**. Source conveying indicia may include, but is not limited to: an owner name **1059** for readily verifying a TCAP user; a photo of the owner **1060** for readily verifying a TCAP controller owner; mark designating the source that issued the TCAP **1061**, **1001** such as a corporate logo, and/or the like; fanciful design information **1062** for enhancing the visual appearance of the TCAP; and/or the like. It should be noted that the conveyance information **11421** may be positioned anywhere on the cover **1189**.

Computer Systemization

A computer systemization **1002** may comprise a clock **1030**, central processing unit (CPU) **1003**, a read only memory (ROM) **1006**, a random access memory (RAM) **1005**, and/or an interface bus **1007**, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus **1004**. Optionally the computer systemization may be connected to an internal power source **1086**. Optionally, a cryptographic processor **1026** may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one low-power data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a microprocessor such as ARM's Application Cores, Embedded Cores, Secure Cores; Motorola's DragonBall; and/or the like processor(s).

Power Source

The power source **1086** may be of any standard form for powering small electronic circuit board devices such as but not limited to: alkaline, lithium hydride, lithium ion, nickel cadmium, solar cells, and/or the like. In the case of solar cells, the case provides an aperture through which the solar cell protrudes are to receive photonic energy. The power cell **1086** is connected to at least one of the interconnected subsequent components of the TCAP thereby providing an electric current to all subsequent components. In one example, the power cell **1086** is connected to the system bus component **1004**. In an alternative embodiment, an outside power source **1086** is provided through a connection across the I/O **1008** interface. For example, a USB and/or IEEE 1394 connection carries both data and power across the connection and is therefore a suitable source of power.

Interface Adapters

Interface bus(ses) **1007** may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) **1008**, storage interfaces **1009**, network interfaces **1010**, and/or the like. Optionally, cryptographic processor interfaces **1027** similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. In one embodiment, the interface bus provides I/O **1008** via a USB port. In an alternative embodiment, the interface bus provides I/O via an IEEE 1394 port. In an alternative embodiment, wireless transmitters are employed by interfacing wireless protocol integrated circuits (ICs) for I/O via the interface bus **1007**.

Storage interfaces **1009** may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices **1014**, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to a flash memory connector, and/or the like. In one embodiment, an optional network interface may be provide **1010**.

Input Output interfaces (I/O) **1008** may accept, communicate, and/or connect to an access terminal **1011**b. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); IEEE 1394a-b; infrared; PC AT; PS/2; parallel; radio; serial; USB, and/or the like; wireless component; and/or the like.

Wireless Component

In one embodiment a wireless component may comprise a Bluetooth chip disposed in communication with a transceiver **1043** and a memory **1029** through the interface bus **1007** and/or system bus **1004**. The transceiver may be either external to the Bluetooth chip, or integrated within the Bluetooth chip itself. The transceiver is a radio frequency (RF) transceiver operating in the range as required for Bluetooth transmissions. Further, the Bluetooth chip **1044** may integrate an input/output interface (I/O) **1066**. The Bluetooth chip and its I/O may be configured to interface with the TCAP controller through the interface bus, the system buss, and/or directly with the CPU. The I/O may be used to interface with other components such as an access terminal **1011**b equipped with similar wireless capabilities. In one embodiment, the TCAP may optionally interconnect wirelessly with a peripheral device **912** and/or a control device **911** of FIG. **9**. In one example embodiment, the I/O may be based on serial line technologies, a universal serial bus (USB) protocol, and/or the like. In an alternative embodiment, the I/O may be based on the ISO 7816-3 standard. It should be noted that the Bluetooth chip in an alternative embodiment may be replaced with an IEEE 802.11b wireless chip. In another embodiment, both a Bluetooth chip and an IEEE 802.11b wireless chip may be used to communicate and or bridge communications with respectively enabled devices. It should further be noted that the transceiver **1043** may be used to wirelessly communicate with other devices powered by Bluetooth chips and/or IEEE 802.11b chips and/or the like. The ROM can provide a basic instruction set enabling the Bluetooth chip to use its I/O to communicate with other components. A number of Bluetooth chips are commercially available, and may be used as a Bluetooth chip in the wireless component, such as, but not limited to, CSR's BlueCore line of chips. If IEEE 802.11b functionality is required, a number of chips are commercially available for the wireless component as well.

Cryptographic units such as, but not limited to, microcontrollers, processors **1026**, and/or interfaces **1027** may be attached, and/or communicate with the TCAP controller. A Secure Core component commonly manufactured by ARM, Inc. and may be used for and/or within cryptographic units.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory **1029**. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAP controller and/or a computer systemization may employ various forms of memory **1029**. In a typical configuration, memory **1029** will include ROM **1006**, RAM **1005**, and a storage device **1014**. A storage device **1014** may be any conventional computer system storage. Storage devices may include flash memory, micro hard drives, and/or the like.

Module Collection

The memory **1029** may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) **1015** (operating system); information server module(s) **1016** (information server); user interface module(s) **1017** (user interface); Web browser module(s) **1018** (Web browser); database(s) **1019**; cryptographic server module(s) **1020** (cryptographic server); access terminal module **1021**; TCAP module(s) **1035**; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device **1014**, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through an access terminal, communications network, ROM, various forms of memory, and/or the like. In one embodiment, all data stored in memory is encrypted by employing the cryptographic server **1020** as described in further detail below. In one embodiment, the ROM contains a unique TCAP identifier. For example, the TCAP may contain a unique digital certificate, number, and/or the like, which may be used for purposes of verification and encryption across a network and/or in conjunction with a TCAPS.

Operating System

The operating system module **1015** is executable program code facilitating the operation of a TCAP controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the like. The operating system may be a highly fault tolerant, scalable, and secure system such as Linux, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Java runtime OS, and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself, and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with an access terminal, communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAP controller to communicate with other entities through an access terminal. Various communication protocols may be used by the TCAP controller as a subcarrier transport mechanism for interaction, such as, but not limited to: TCP/IP, USB, and/or the like.

Information Server

An information server module **1016** is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, and/or the like. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective-) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction with other program modules. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAP database **1019**, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAP database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through inter-application communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAP as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module **1017** is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The TCAP may employ code natively compiled for various operating systems, or code compiled using Java. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may

JX-294-0025

communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

TCAP Database

A TCAP database module **1019** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program code portion configuring the CPU to process the stored data. In one embodiment, the TCAP database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. If the TCAP database is implemented as a data-structure, the use of the TCAP database may be integrated into another module such as the TCAP module. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentralized and/or integrated. In one embodiment, the database module **1019** includes three tables **1019***a-c*. A user accounts table **1019***a* includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then expire once a specified date has been reached. An user data table **1019***b* includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. In one embodiment, the entire TCAP memory **1029** is processes into an image and spooled to a TCAPS for backup storage. A user programs table **1019***c* includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database mod-

ules **1019***a-c*. The TCAP may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAP database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP database communicates with a TCAP module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module **1020** is stored program code that is executed by the CPU **1003**, cryptographic processor **1026**, cryptographic processor interface **1027**, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAP module to engage in secure transactions if so desired. The cryptographic module facilitates the secure accessing of resources on TCAP and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. In one embodiment, the TCAP employs the cryptographic server to encrypt all data stored in memory **1029** based on the TCAP's unique ID and user's authorization information. In another embodiment, the TCAP employs the cryptographic server to encrypt all data sent through the access terminal based in the TCAP's unique ID and user's authorization information.

TCAP

A TCAP module **1035** is stored program code that is executed by the CPU. The TCAP affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within its memory and/or across various communications networks. The TCAP enables users to simply access data and/or services from any location where an access terminal is available. It provides secure, extremely low powerful and ultra portable access to data and services that were heretofore impossible. The TCAP coordinates with the TCAP database to identify interassociated items in the generation of entries regarding any related information. A TCAP module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications. A TCAP module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP module communicates with a TCAP database, a TCAP access terminal module **1021** running on an access terminal **1011**b, operating systems, other program modules, and/or the like. The TCAP may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Access Terminal Module

An access terminal module **1021** is stored program code that is executed by a CPU. In one embodiment, the TCAP allows the access terminal **1011**b to access its memory **1029** across its I/O **1008** and the access terminal executes the module. The access terminal module affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within the TCAP's and access terminal's memory and/or across various communications networks. The access terminal module **1021** acts as a bridge through which the TCAP can communicate with communications network, and through which users may interact with the TCAP by using the I/O of the access terminal. The access terminal module coordinates with the TCAP module **1035** to send data and communications back and forth. A access terminal module enabling access of information between the TCAP and access terminal may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the access terminal module is compiled for target access terminal platform, e.g., for Windows. In an alternative embodiment, a processor independent approach is taken, e.g., Java is used, so that the access terminal module will run on multiple platforms. In another embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications as between it, the TCAP, and outside servers. A access terminal module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the access terminal module communicates with a TCAP, other program modules, and/or the like. The access terminal module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAP node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAP controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D) COM), (Distributed) Object Linking and Embedding ((D) OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

The entirety of this disclosure (including the Cover Page, Title, Headings, Field, Background, Summary, Brief Description of the Drawings, Detailed Description, Claims, Abstract, Figures, and otherwise) shows by way of illustration various embodiments in which the claimed inventions may be practiced. The advantages and features of the disclosure are of a representative sample of embodiments

only, and are not exhaustive and/or exclusive. They are presented only to assist in understanding and teach the claimed principles. It should be understood that they are not representative of all claimed inventions. As such, certain aspects of the disclosure have not been discussed herein. That alternate embodiments may not have been presented for a specific portion of the invention or that further undescribed alternate embodiments may be available for a portion is not to be considered a disclaimer of those alternate embodiments. It will be appreciated that many of those undescribed embodiments incorporate the same principles of the invention and others are equivalent. Thus, it is to be understood that other embodiments may be utilized and functional, logical, organizational, structural and/or topological modifications may be made without departing from the scope and/or spirit of the disclosure. As such, all examples and/or embodiments are deemed to be non-limiting throughout this disclosure. Also, no inference should be drawn regarding those embodiments discussed herein relative to those not discussed herein other than for purposes of space and reducing repetition. For instance, it is to be understood that the logical and/or topological structure of any combination of any program modules (a module collection), other components and/or any present feature sets as described in the figures and/or throughout are not limited to a fixed operating order and/or arrangement, but rather, any disclosed order is exemplary and all equivalents, regardless of order, are contemplated by the disclosure. Furthermore, it is to be understood that such features are not limited to serial execution, but rather, any number of threads, processes, services, servers, and/or the like that may execute asynchronously, simultaneously, synchronously, and/or the like are contemplated by the disclosure. As such, some of these features may be mutually contradictory, in that they cannot be simultaneously present in a single embodiment. Similarly, some features are applicable to one aspect of the invention, and inapplicable to others. In addition, the disclosure includes other inventions not presently claimed. Applicant reserves all rights in those presently unclaimed inventions including the right to claim such inventions, file additional applications, continuations, continuations in part, divisions, and/or the like thereof. As such, it should be understood that advantages, embodiments, examples, functional, features, logical, organizational, structural, topological, and/or other aspects of the disclosure are not to be considered limitations on the disclosure as defined by the claims or limitations on equivalents to the claims.

What is claimed is:

1. A portable device configured to communicate with a terminal comprising a processor and an output component and with a communications network comprising a plurality of communications network nodes, the portable device comprising:

(a) a communication interface configured to enable the transmission of communications to the terminal;

(b) a network interface configured to enable the transmission of communications between the portable device and a communications network node;

(c) a processor; and

(d) a memory having executable program code stored thereon, including:

(1) first program code which, when executed, is configured to present an interactive user interface on the terminal output component;

(2) second program code which, when executed by the portable device processor, is configured to facilitate communications between the portable device and the communications network node; and

(3) third program code which, when executed by the portable device processor in response to user interaction with the interactive user interface, is configured to cause a communication to be transmitted through the portable device network interface to the communications network node.

2. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

3. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the download of data to the portable device.

4. The portable device according to claim 3, wherein the portable device is configured to transmit to the terminal data downloaded from the communications network node.

5. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate access to data stored on a communications network node.

6. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the transmission of data from a communications network node to the portable device.

7. The portable device according to claim 6, wherein the portable device is configured to receive a data stream transmitted from a communications network node.

8. The portable device according to claim 7, wherein the portable device is configured to receive a data stream comprising video data content.

9. The portable device according to claim 8, wherein the terminal output component comprises a video monitor and the portable device is configured to transmit video data content to the terminal for display on the terminal video monitor.

10. The portable device according to claim 7, wherein the portable device is configured to receive a data stream comprising audio data content.

11. The portable device according to claim 10, wherein the terminal output component comprises a speaker and the portable device is configured to transmit audio data content to the terminal for presentation by the terminal speaker.

12. The portable device according to claim 7, wherein the portable device is configured to receive a data stream comprising a live data feed.

13. The portable device according to claim 12, wherein the portable device is configured to transmit to the terminal a live data stream received from a communications network node.

14. The portable device according to claim 7, wherein the portable device is configured to transmit to the terminal the data stream received from the communications network node.

15. The portable device according to claim 6, wherein the portable device is configured to transmit to the terminal data received from the communications network node.

16. The portable device according to claim 1, wherein the portable device communication interface comprises an audio/video interface.

17. The portable device according to claim 1, wherein the portable device communication interface comprises a wireless communication interface.

**18**. The portable device according to claim **1**, wherein the executable program code stored on the portable device memory comprises an operating system configured to be executed by the portable device processor.

**19**. The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the download of program code from a communications network node to the portable device.

**20**. The portable device according to claim **1**, wherein the portable device is configured to receive program code from a communications network node.

**21**. The portable device according to claim **20**, wherein the received program code comprises an updated version of the first program code and the portable device is configured to store the updated version of the first program code on the portable device memory.

**22**. The portable device according to claim **21**, wherein the updated version of the first program code comprises product advertisement information to be presented by the interactive user interface.

**23**. The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the upload of data from the portable device to a communications network node.

**24**. The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the upload of program code from the portable device to a communications network node.

**25**. The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate synchronizing data stored on the portable device memory with data stored on a communications network node.

**26**. The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate synchronizing program code stored on the portable device memory with program code stored on a communications network node.

**27**. The portable device according to claim **1**, wherein the interactive user interface comprises a graphic user interface.

**28**. The portable device according to claim **1**, wherein the portable device processor is configured to execute the first program code.

**29**. The portable device according to claim **1**, wherein the communications network node comprises a server.

**30**. The portable device according to claim **1**, wherein the portable device is configured to provide the terminal processor with access to the first program code.

**31**. The portable device according to claim **1**, wherein the first program code is configured to be executed by the terminal processor.

**32**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, a network interface configured to enable the transmission of communications between the portable device and a communications network node, and a communication interface for enabling the transmission of communications to a terminal comprising a processor and an output component, the method comprising:

(a) executing first program code stored on the portable device memory to present an interactive user interface on the terminal output component;

(b) executing second program code stored on the portable device memory to facilitate communications between the portable device and the communications network node;

(c) executing third program code stored on the portable device memory in response to user interaction with the interactive user interface; and

(d) transmitting a communication through the portable device network interface to the communications network node.

**33**. The method according to claim **32**, wherein the step of transmitting a communication through the portable device network interface to the communications network node facilitates verification of the portable device.

**34**. The method according to claim **32**, wherein the step of transmitting a communication through the portable device network interface to the communications network node facilitates the download of data to the portable device.

**35**. The method according to claim **32**, wherein the step of transmitting a communication through the portable device network interface to the communications network node facilitates the transmission of data from the communications network node to the portable device.

**36**. The method according to claim **35**, further comprising receiving data transmitted by the communications network node.

**37**. The method according to claim **36**, further comprising transmitting data from the portable device to the terminal.

**38**. The method according to claim **36**, wherein the data received by the portable device comprises a data stream.

**39**. The method according to claim **38**, wherein the data stream received by the portable device comprises video data content.

**40**. The method according to claim **39**, further comprising transmitting video data content from the portable device to the terminal for display on the terminal output component.

**41**. The method according to claim **38**, wherein the data stream received by the portable device comprises audio data content.

**42**. The method according to claim **41**, further comprising transmitting audio data content from the portable device to the terminal for presentation by the terminal output component.

**43**. The method according to claim **38**, wherein the data stream received by the portable device comprises a live data feed.

**44**. The method according to claim **43**, further comprising transmitting live data feed from the portable device to the terminal.

**45**. The method according to claim **32**, wherein the step of executing third program code stored on the portable device memory in response to user interaction with the interactive user interface causes the transmission of a communication through the portable device network interface to the communications network node.

**46**. A non-transitory computer readable medium containing executable program code to be executed by a portable device, the portable device comprising a processor, a memory, a network interface for enabling communications between the portable device a communications network node, and a communication interface for enabling the transmission of communications from the portable device to a terminal comprising a processor and an output component, the program code comprising:

(a) first program code which, when executed, is configured to present an interactive user interface on the terminal output component,

(b) second program code which, when executed by the portable device processor, is configured to facilitate communications between the portable device and the communications network node; and

(c) third program code which, when executed by the portable device processor in response to user interaction with the interactive user interface, is configured to cause a communication to be transmitted through the portable device network interface to the communications network node.

**47**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, a network interface configured to enable the transmission of communications between the portable device and a communications network node, and a communication interface for enabling the transmission of communications to a terminal comprising a processor and an output component, the method comprising:

(a) causing an interactive user interface to be presented by the terminal output component;

(b) executing first program code stored on the portable device memory to facilitate communications between the portable device and the communications network node;

(c) executing second program code stored on the portable device memory in response to user interaction with the interactive user interface; and

(d) transmitting a communication through the portable device network interface to the communications network node.

**48**. The method according to claim **47**, wherein the step of executing second program code stored on the portable device memory in response to user interaction with the interactive user interface causes the transmission of a communication through the portable device network interface to the communications network node.

**49**. The method according to claim **47**, wherein the step of causing an interactive user interface to be presented by the terminal output component comprises providing the terminal with access to third program code stored on the portable device memory which, when executed by the terminal processor, is configured to cause an interactive user interface to be presented by the terminal output component.

**50**. The method according to claim **47**, wherein the step of causing an interactive user interface to be presented by the terminal output component comprises executing third program code stored on the portable device memory cause an interactive user interface to be presented by the terminal output component.

**51**. The method according to claim **50**, wherein the portable device executes the third program code in response to user interaction with an interactive user interface on the terminal output component.

**52**. The method according to claim **47**, wherein the step of causing an interactive user interface to be presented by the terminal output component comprises affecting the presentation of an interactive user interface on the terminal output component.

**53**. The method according to claim **52**, wherein the portable device executes third program code stored on the portable device memory to affect the presentation of the interactive user interface on the terminal output component.

**54**. The method according to claim **53**, where the portable device executes the third program code in response to user interaction with the interactive user interface on the terminal output component.

**55**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**56**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate verification of the portable device.

**57**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the transmission of encrypted communications from the communications network node to the terminal.

**58**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate access to the communications network node.

**59**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the terminal.

**60**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the portable device.

**61**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable

device memory causes a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the terminal.

**62**. The method according to claim **55**, wherein the step of executing first program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the portable device.

**63**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the upload of content to the communications network node.

**64**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the upload of program code to the communications network node.

**65**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

**66**. The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the transmission of a live data feed to the terminal.

**67**. The method according to claim **55**, wherein the step of causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component comprises transmitting a communication to the terminal.

**68**. The method according to claim **55**, wherein the step of causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component comprises executing fifth program code stored on the portable device memory to transmit a communication to cause the terminal to execute the first program code.

**69**. The method according to claim **68**, wherein the portable device executes the fifth program code in response to user interaction with an interactive user interface presented by the terminal output component.

**70**. The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises transmitting a communication to the terminal to cause the communication to the communications network node.

**71**. The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**72**. The method according to claim **71**, wherein the data stored on the portable device memory comprises user authorization data.

**73**. The method according to claim **72**, wherein the user authorization information is user biometric data.

**74**. The method according to claim **71**, wherein the data stored on the portable device memory comprises a digital certificate.

**75**. The method according to claim **71**, wherein the data stored on the portable device memory comprises portable device identifier information.

**76**. The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**77**. The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises effecting the execution of fifth program code to facilitate the communication to the communications network node.

**78**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting the presentation of an interactive user interface by the terminal output component;

(b) executing second program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, third program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**79**. The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises providing the terminal processor with access to fourth program code stored on the portable device memory which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component.

**80**. The method according to claim **79**, wherein the step of providing the terminal processor with access to the fourth program code stored on the portable device memory which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component comprises storing the fourth program code onto the terminal memory.

**81**. The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises executing fourth program code stored on the portable device memory

to affect the presentation of an interactive user interface by the terminal output component.

**82**. The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises transmitting a communication to cause the terminal processor to execute fourth program code stored on the terminal memory to affect the presentation of an interactive user interface by the terminal output component.

**83**. The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises executing fifth program code stored on the portable device memory to transmit a communication to cause the terminal to execute fourth program code stored on the terminal memory to affect the presentation of an interactive user interface by the terminal output component.

**84**. The method according to claim **83**, wherein the portable device executes the fifth program code in response to user interactive with an interactive user interface presented by the terminal output component.

**85**. The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises transmitting a communication to the terminal to cause the communication to the communications network node.

**86**. The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**87**. The method according to claim **86**, wherein the data stored on the portable device memory comprises user authorization data.

**88**. The method according to claim **87**, wherein the user authorization information is user biometric data.

**89**. The method according to claim **86**, wherein the data stored on the portable device memory comprises a digital certificate.

**90**. The method according to claim **86**, wherein the data stored on the portable device memory comprises portable device identifier information.

**91**. The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**92**. The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises effecting the execution of fifth program code to facilitate the communication to the communications network node.

**93**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the

terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting the presentation of the interactive user interface presented by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**94**. The method according to claim **93**, wherein the portable device executes fifth program code stored on the portable device memory to affect the presentation of the interactive user interface by the terminal output component.

**95**. The method according to claim **94**, wherein the portable device executes the fifth program code in response to user interaction with the interactive user interface presented by the terminal output component.

**96**. The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises transmitting a communication to the terminal to cause the communication to the communications network node.

**97**. The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**98**. The method according to claim **97**, wherein the data stored on the portable device memory comprises user authorization data.

**99**. The method according to claim **98**, wherein the user authorization information is user biometric data.

**100**. The method according to claim **97**, wherein the data stored on the portable device memory comprises a digital certificate.

**101**. The method according to claim **97**, wherein the data stored on the portable device memory comprises portable device identifier information.

**102**. The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**103**. The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises effecting the execution of fifth program code to facilitate the communication to the communications network node.

**104.** A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

(a) a communications network node; and

(b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

(1) cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;

(2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface to cause a communication to be transmitted to a communications network node; and

(4) facilitate communications through the terminal network communication interface to a communications network node.

**105.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

**106.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the transmission of encrypted communications from the communications network node to the terminal.

**107.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate access to the communications network node.

**108.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the terminal.

**109.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the portable device.

**110.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the terminal.

**111.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the portable device.

**112.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the upload of content to the communications network node.

**113.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the upload of program code to the communications network node.

**114.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

**115.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the transmission of a live data feed to the terminal.

**116.** The system according to claim **104**, wherein the portable device is configured to transmit a communication to the terminal to cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component.

**117.** The system according to claim **104**, wherein the portable device is configured to execute fifth program code stored on the portable device memory to cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component.

**118.** The system according to claim **117**, wherein the portable device is configured to execute the fifth program code in response to user interaction with an interactive user interface presented by the terminal output component.

**119.** The system according to claim **104**, wherein the portable device is configured execute the fourth program code to transmit a communication to the terminal to cause the communication to the communications network node.

**120.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with data stored on the portable device to facilitate the terminal to transmit a communication to the communications network node.

**121.** The system according to claim **120**, wherein the data stored on the portable device memory comprises user authorization data.

**122.** The system according to claim **121**, wherein the user authorization information comprises user biometric data.

**123.** The system according to claim **120**, wherein the data stored on the portable device memory comprises a digital certificate.

**124**. The system according to claim **120**, wherein the data stored on the portable device memory comprises portable device identifier information.

**125**. The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**126**. The system according to claim **104**, wherein the portable device is configured to execute the fourth program to effect the execution of fifth program code to cause a communication to be transmitted to the communications network node.

**127**. The system according to claim **126**, wherein the portable device is configured to execute the fifth program code.

**128**. The system according to claim **127**, wherein the portable device is configured to execute the fifth program code in response to user interaction with the interactive user interface presented by the terminal output component.

**129**. The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to effect the execution of fifth program code to facilitate the communication to the communications network node.

\* \* \* \* \*



US009059969B2

(12) **United States Patent**
McNulty

(10) **Patent No.:** US 9,059,969 B2
(45) **Date of Patent:** *Jun. 16, 2015

(54) **APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT**

(71) Applicant: **Scott McNulty**, Rowayton, CT (US)

(72) Inventor: **Scott McNulty**, Rowayton, CT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 18 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/960,514**

(22) Filed: **Aug. 6, 2013**

(65) **Prior Publication Data**

US 2014/0172958 A1 Jun. 19, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/950,321, filed on Nov. 19, 2010, now Pat. No. 8,539,047, which is a continuation of application No. 10/807,731, filed on Mar. 23, 2004, now Pat. No. 7,861,006.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 15/177* | (2006.01) |
| *H04L 29/08* | (2006.01) |
| *H04L 9/32* | (2006.01) |
| G06F 13/00 | (2006.01) |
| H04L 29/06 | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *H04L 67/04* (2013.01); *H04L 63/0272* (2013.01); *H04L 63/0428* (2013.01); *H04L 9/3226* (2013.01); *H04L 9/3247* (2013.01); *H04L 2209/56* (2013.01); *H04L 2209/76* (2013.01); *H04L 2209/80* (2013.01)

(58) **Field of Classification Search**
CPC ............ H04L 2209/56; H04L 2209/76; H04L 2209/80; H04L 63/0272; H04L 63/0428; H04L 67/04; H04L 9/3226; H04L 9/3247
USPC .................. 709/203, 250; 713/150; 711/115
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,960,085 A | | 9/1999 | de la Huerga |
| 6,098,097 A | * | 8/2000 | Dean et al. .................. 709/220 |
| 6,134,662 A | * | 10/2000 | Levy et al. .................. 726/11 |
| 6,199,108 B1 | * | 3/2001 | Casey et al. .................. 709/220 |
| 6,547,130 B1 | | 4/2003 | Shen |
| 6,763,399 B2 | * | 7/2004 | Margalit et al. .......... 710/13 |
| 6,799,077 B1 | * | 9/2004 | Hauet .......................... 700/2 |
| 6,928,463 B1 | * | 8/2005 | Tene et al. ................... 709/203 |
| 7,051,157 B2 | * | 5/2006 | James .......................... 711/115 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          1168137          1/2002

*Primary Examiner* — Alina N Boutah
(74) *Attorney, Agent, or Firm* — Locke Lord LLP

(57) **ABSTRACT**

The disclosure details the implementation of a tunneling client access point (TCAP) that is a highly secure, portable, power efficient storage and data processing device. The TCAP "tunnels" data through an access terminal's (AT) input/output facilities. In one embodiment, the TCAP connects to an AT and a user employs the AT's user input peripherals for input, and views the TCAP's activities on the AT's display. This enables the user to observe data stored on the TCAP without it being resident on the AT, which can be useful to maintain higher levels of data security. Also, the TCAP may tunnel data through an AT across a communications network to access remote servers. The disclosure also teaches a plug-n-play virtual private network (VPN).

**29 Claims, 17 Drawing Sheets**





C.A. No. 18-826-WCB (D.Del.)
Joint Trial Exhibit

**JX-349**



**Exhibit 2**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,178,724 B2 | 2/2007 | Tamagno et al. | |
| 7,213,766 B2 * | 5/2007 | Ryan et al. | 235/492 |
| 7,308,584 B2 | 12/2007 | Himmel et al. | |
| 7,546,340 B2 * | 6/2009 | Terasawa | 709/203 |
| 7,549,161 B2 | 6/2009 | Poo et al. | |
| 7,558,953 B2 * | 7/2009 | Osthoff et al. | 713/161 |
| 7,762,470 B2 * | 7/2010 | Finn et al. | 235/492 |
| 2002/0044663 A1 * | 4/2002 | King et al. | 380/284 |
| 2002/0073340 A1 | 6/2002 | Mambakkam et al. | |
| 2002/0184349 A1 * | 12/2002 | Manukyan | 709/221 |
| 2002/0194499 A1 | 12/2002 | Audebert et al. | |
| 2003/0005337 A1 | 1/2003 | Poo et al. | |
| 2003/0028649 A1 * | 2/2003 | Uhlik et al. | 709/228 |
| 2003/0158891 A1 * | 8/2003 | Lei et al. | 709/203 |
| 2003/0182456 A1 | 9/2003 | Lin et al. | |
| 2004/0044897 A1 | 3/2004 | Lim | |
| 2004/0127254 A1 * | 7/2004 | Chang | 455/557 |
| 2005/0172075 A1 * | 8/2005 | Marcus | 711/115 |
| 2005/0197859 A1 * | 9/2005 | Wilson et al. | 705/2 |
| 2005/0198221 A1 * | 9/2005 | Manchester et al. | 709/220 |
| 2006/0052085 A1 * | 3/2006 | Rodriguez et al. | 455/411 |
| 2006/0071066 A1 * | 4/2006 | Vanzini et al. | 235/380 |
| 2006/0294249 A1 | 12/2006 | Oshima et al. | |
| 2007/0038870 A1 | 2/2007 | Ciesinger | |
| 2007/0274291 A1 * | 11/2007 | Diomelli | 370/352 |
| 2008/0233942 A9 * | 9/2008 | Kim | 455/419 |

* cited by examiner

JX-349-0003



Fdrive backend
server
110

Communication
Network
113c

Communication
Network
113b

Communication
Network
113a

Storage (EMC)
105

Fdrive backend
Redundancy server
115

Fdrive front end
Load-balanced servers
120

130

125

127

User133a

Fdrive users
127

Fig. 1



Fig. 2



130   AT <u>327</u>

Engage TCAP with Access Terminal (e.g., via BT, WiFi, USB, etc.) <u>305</u>

TCAP powers up <u>310</u>

TCAP loads/accesses operating system <u>315</u>

TCAP provides memory space to Access Terminal (AT) <u>320</u>

AT accesses/mounts the TCAP memory space <u>325</u>

125

Fig. 3a



Fig. 3b

JX-349-0007



Fig. 4a

JX-349-0008



Provide Options (e.g., online (dimmed if not online)/USB storage) <u>453</u>

453a

Unique user? All info? <u>445</u>

Y

Display Error Message (e.g., information incomplete, please re-enter; User exists, please choose different name, etc. )<u>450</u>

Is AT online? <u>455</u>

N

Synchronize on and off-line storage? <u>470</u>

Synchronize <u>475</u>

N

Provide TCAP off-line options (e.g., run program) <u>460</u>

Provide all TCAP options (e.g., run program, order prints, print documents, etc.) <u>480</u>

Allow user to access/ execute/store data/ programs on TCAP off-line (e.g., decrypt) <u>465</u>

Allow user to access/ execute/store data/ programs on TCAP and at remote server (e.g., decrypt) <u>485</u>

## Fig. 4b



Fig. 5a



Fig. 5b



Fig. 6a



Fig. 6b



Fig. 7a



Fig. 7b



Fig. 8

JX-349-0016



Fig. 9a

JX-349-0017



Fig.9b



Fig. 10a

JX-349-0018

JX-349-0019



Fig.10b

## APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT

This application is a continuation application of U.S. application Ser. No. 12/950,321, filed Nov. 19, 2010, which is a continuation application of U.S. application Ser. No. 10/807, 731, filed on Mar. 23, 2003, now U.S. Pat. No. 7,861,006.

### FIELD

The present invention is directed generally to an apparatus, method, and system of accessing data, and more particularly, to an apparatus, method and system to execute and process data by tunneling access through a terminal.

### BACKGROUND

Portable Computing and Storage

Computing devices have been becoming smaller over time. Currently, some of the smallest computing devices are in the form of personal digital assistants (PDAs). Such devices usually come with a touch screen, an input stylus and/or mini keyboard, and battery source. These devices, typically, have storage capacities around 64 MB. Examples of these devices include Palm's Palm Pilot.

Information Technology Systems

Typically, users, which may be people and/or other systems, engage information technology systems (e.g., commonly computers) to facilitate information processing. In turn, computers employ processors to process information; such processors are often referred to as central processing units (CPU). A common form of processor is referred to as a microprocessor. A computer operating system, which, typically, is software executed by CPU on a computer, enables and facilitates users to access and operate computer information technology and resources. Common resources employed in information technology systems include: input and output mechanisms through which data may pass into and out of a computer; memory storage into which data may be saved; and processors by which information may be processed. Often information technology systems are used to collect data for later retrieval, analysis, and manipulation, commonly, which is facilitated through database software. Information technology systems provide interfaces that allow users to access and operate various system components.

User Interface

The function of computer interfaces in some respects is similar to automobile operation interfaces. Automobile operation interface elements such as steering wheels, gearshifts, and speedometers facilitate the access, operation, and display of automobile resources, functionality, and status. Computer interaction interface elements such as check boxes, cursors, menus, scrollers, and windows (collectively and commonly referred to as widgets) similarly facilitate the access, operation, and display of data and computer hardware and operating system resources, functionality, and status. Operation interfaces are commonly called user interfaces. Graphical user interfaces (GUIs) such as the Apple Macintosh Operating System's Aqua, Microsoft's Windows XP, or Unix's X-Windows provide a baseline and means of accessing and displaying information, graphically, to users.

Networks

Networks are commonly thought to comprise of the interconnection and interoperation of clients, servers, and intermediary nodes in a graph topology. It should be noted that the term "server" as used herein refers generally to a computer, other device, software, or combination thereof that processes and responds to the requests of remote users across a communications network. Servers serve their information to requesting "clients." The term "client" as used herein refers generally to a computer, other device, software, or combination thereof that is capable of processing and making requests and obtaining and processing any responses from servers across a communications network. A computer, other device, software, or combination thereof that facilitates, processes information and requests, and/or furthers the passage of information from a source user to a destination user is commonly referred to as a "node." Networks are generally thought to facilitate the transfer of information from source points to destinations. A node specifically tasked with furthering the passage of information from a source to a destination is commonly called a "router." There are many forms of networks such as Local Area Networks (LANs), Pico networks, Wide Area Networks (WANs), Wireless Networks (WLANs), etc. For example, the Internet is generally accepted as being an interconnection of a multitude of networks whereby remote clients and servers may access and interoperate with one another.

### SUMMARY

Although all of the aforementioned portable computing systems exist, no effective solution to securely access, execute, and process data is available in an extremely compact form. Currently, PDAs, which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user interfaces, and require too much power to maintain their data. Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces and operating systems. Further, current PDAs are generally limited in the amount of data they can store or access. No solution exists that allows users to employ traditional large user interfaces they are already comfortable with, provides greater portability, provides greater memory footprints, draws less power, and provides security for data on the device. As such, the disclosed tunneling client access point (TCAP) is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer, through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources. Thus, the TCAP requires no power source to maintain its data and allows for a highly portable "thumb" footprint. Also, by providing the equivalent of a plug-in-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data in an easy and secure manner that was unavailable in the prior art.

In accordance with certain aspects of the disclosure, the above-identified problems of limited computing devices are overcome and a technical advance is achieved in the art of portable computing and data access. An exemplary tunneling client access point (TCAP) includes a method to dispose a portable storage device in communication with a terminal. The method includes providing the memory for access on the terminal, executing processing instructions from the memory on the terminal to access the terminal, communicating through a conduit, and processing the processing instructions.

In accordance with another embodiment, a portable tunneling storage processor is disclosed. The apparatus has a memory and a processor disposed in communication with the memory, and configured to issue a plurality of processing instructions stored in the memory. Also, the apparatus has a conduit for external communications disposed in communi-

3

cation with the processor, configured to issue a plurality of communication instructions as provided by the processor, configured to issue the communication instructions as signals to engage in communications with other devices having compatible conduits, and configured to receive signals issued from the compatible conduits.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate various non-limiting, example, inventive aspects in accordance with the present disclosure:

FIG. 1 is of a flow diagram illustrating embodiments of a tunneling client access point (TCAP);

FIG. 2 is of a flow diagram illustrating embodiments of a system of tunneling client access point and access terminal interaction;

FIG. 3 is of a flow diagram illustrating embodiments of engaging the tunneling client access point to an access terminal interaction;

FIG. 4 is of a flow diagram illustrating embodiments of accessing the tunneling client access point and server through an access terminal;

FIGS. 5-8 is of a flow diagram illustrating embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an access terminal;

FIG. 9 is of a block diagram illustrating embodiments of a tunneling client access point server controller;

FIG. 10 is of a block diagram illustrating embodiments of a tunneling client access point controller;

The leading number of each reference number within the drawings indicates the first figure in which that reference number is introduced. As such, reference number 101 is first introduced in FIG. 1. Reference number 201 is first introduced in FIG. 2, etc.

## DETAILED DESCRIPTION

### Topology

FIG. 1 illustrates embodiments for a topology between a tunneling client access point (TCAP) (see FIG. 10 for more details on the TCAP) and TCAP server (TCAPS) (see FIG. 9 for more details on the TCAPS). In this embodiment, a user 133a may plug-in a TCAP into any number of access terminals 127 located anywhere. Access terminals (ATs) may be any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like. The type of AT used is not important other than the device should provide a compatible mechanism of engagement for the user to engage the TCAP 130 and provide an operating environment for the user to engage the TCAP through the AT. In one embodiment, the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT. In other embodiment, the TCAP may employ Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped. In one embodiment, the AT provides Java and/or Windows runtime environments, which allows the TCAP to interact with the input/output mechanisms of the AT. See FIG. 9 for more details and embodiments on the types of connections that may be employed by the TCAP. Once the TCAP has engaged with an AT, it can provide the user with access to its storage and processing facilities.

If the AT is connected to a communication network 113, the TCAP may then communicate beyond the AT. In one embodiment, the TCAP can provide extended storage and/or processing resources by engaging servers 110, 115, 120, which

4

have access to and can provide extended storage 105 to the TCAP through the AT. In one embodiment, a single server and storage device may provide such TCAP server support. In another embodiment, server support is provided over a communications network, e.g., the Internet, by an array of front-end load-balancing servers 120. These servers can provide access to storage facilities within the servers or to remote storage 105 across a communications network 113b, c (e.g., a local area network (LAN)). In such an embodiment, a back-end server 110 may offload the front-end server with regard to data access to provide greater throughput. For purposes of load balancing and/or redundancy, a backup server 115 may be similarly situated to provide for access and backup in an efficient manner. In such an embodiment, the back-end servers may be connected to the front-end servers through a communications network 113b (e.g., wide area network (WAN)). The backend servers 110, 115 may be connected to the remote storage 105 through a communications network 113c as well (e.g., a high speed LAN, fiber-channel, and/or the like).

Thus, to the user 133a, the contents of the TCAP 130 appear on the AT as being contained on the TCAP 125 even though much of the contents may actually reside on the servers 115, 120 and/or the servers' storage facilities 105. In these ways, the TCAP "tunnels" data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT. Also, the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O.

### TCAP and AT Interaction

FIG. 2 illustrates embodiments for a system of tunneling client access point (TCAP) (see FIG. 10 for more details on the TCAP) and access terminal interaction. FIG. 2 provides an overview for TCAP and AT interaction and subsequent figures will provide greater detail on elements of the interaction. In this embodiment, a user engages the TCAP 201. For example, the user may plug the TCAP into an AT via the AT's USB port. Thereafter the user is presented with a login prompt 205 on the AT's display mechanism, e.g., on a video monitor. After a user successfully logs in (for example by providing a user name and password) 204, the TCAP can then accept user inputs from the AT and its peripherals (the TCAP can then also provide output to the user via the AT's peripherals).

The user may employ the AT's input peripherals as user input devices that control actions on the TCAP. Depending on the user's actions 215, the TCAP can be used by the AT as a storage device from which it can access and store data and programs 225. For example, if the user takes the action of opening a file from the TCAP's memory, e.g., by double clicking on an icon when the TCAP is mounted as a USB drive on the AT, then the AT may treat the TCAP as a memory device and retrieve information from the TCAP 225. If the user's action 215 is one that is directed at executing on the TCAP 215, then the AT will not be involved in any execution. For example, if the user drops an icon representing a graphics file onto a drag-and-drop location visually representing the TCAP, then the file may be copied to the TCAP where it will process and spool the file for sending the graphics file to be printed at a remote location. In such a case, all of the requirements to process and spool the file are handled by the TCAP's processor and the AT would only be used as a mechanism for user input and output and as a conduit through which the TCAP may send files.

Regardless of if there is an action 215 to execute on the TCAP 220 or to access or store data on the TCAP 225, the AT is used to display the status of any actions 230. At any time the

## Appx189

user may select to terminate TCAP related facilities executing either on the AT, a backend server, on the TCAP itself, and/or the like **235**. In one embodiment, the user may select a quit option that is displayed on the AT's screen. In another embodiment, the user may simply disengage the TCAP from the AT by severing the connection (e.g., turning power off, physically pulling the device off the AT, turning off wireless transmissions, and/or the like). It should be noted that such abrupt severing may result in the loss of data, file corruption, etc. if the TCAP has not saved data that is on the AT or on some remote server, however, if the TCAP is employing flash like memory, its contents should remain intact.

If there is no instruction signal to terminate the TCAP **235**, execution will continue and the TCAP will continue to take and look for input from the user. Of course if the TCAP has been set to perform certain actions, those actions will continue to execute, and the TCAP may respond to remote servers when it is communicating with them through the AT. When the user issues a terminate signal **235**, then the TCAP will shut down by saving any data to the TCAP that is in the AT's memory and then terminating any programs executing on both the AT and TCAP that were executed by and/or from the TCAP **240**. If no activities are taking place on the TCAP and all the data is written back to the TCAP **240**, then the TCAP may optionally unmount itself from the AT's filesystem **245**. At this point, if there is a TCAP I/O driver executing on the AT, that driver may be terminated as triggered by the absence of the TCAP at a mount point **250**. After the TCAP is unmounted and/or the TCAP I/O driver is terminated, it is safe to disengage the TCAP from the AT.

TCAP and AT Interaction

FIG. **3** illustrates embodiments engaging the tunneling client access point to an access terminal interaction. Examples of engaging the TCAP **301** with an AT were discussed above in FIG. **1 127, 130, 133a** and FIG. **2 201**. In one embodiment, the TCAP **130** is engaged with an access terminal **327, 305**. As mentioned in FIG. **1**, the TCAP is capable of engaging with ATs using a number of mechanisms. In one embodiment, the TCAP has a USB connector for plugging into an AT, which acts as a conduit for power and data transfer. In another embodiment, the TCAP may use Bluetooth to establish a wireless connection with a number of ATs. In another embodiment, the TCAP may employ WiFi. In yet another embodiment, the TCAP may employ multiple communications mechanisms. It should be noted, with some wireless mechanisms like Bluetooth and WiFi, simply coming into proximity with an AT that is configured for such wireless communication may result in the TCAP engaging with and establish a communications link with the AT. In one embodiment, the TCAP has a "connect" button that will allow such otherwise automatically engaging interactions take place only if the "connect" button is engaged by a user. Such an implementation may provide greater security for users (see FIG. **10** for more details on the TCAP).

After being engaged **305**, the TCAP will then power on. In an embodiment requiring a direct connection, e.g., USB, simply plugging the TCAP into the AT provides power. In a wireless embodiment, the TCAP may be on in a lower powered state or otherwise turned on by engaging the connect button as discussed above. In such an embodiment, the TCAP can employ various on-board power sources (see FIG. **10** for more details on the TCAP). The TCAP then may load its own operating system **315**. The operating system can provide for interaction with the AT. In one embodiment, a Java runtime is executed on the TCAP, and Java applets communicate with the AT through Java APIs. In another embodiment, a driver is loaded onto the AT, and the on-TCAP Java operating system

applets communicate to and through the AT via the driver running on the AT, wherein the driver provides an API through and to which messages may be sent.

After engaging with the AT, the TCAP can provide its memory space to the AT **320**. In one embodiment, the TCAP's memory is mapped and mounted as a virtual disk drive **125** storage **325**. In this manner, the TCAP may be accessed and manipulated as a standard storage device through the AT's operating system. Further, the TCAP and in some cases the AT can determine if the AT is capable of accessing program instructions stored in the TCAP's memory **330**. In one embodiment, the AT's operating system looks to auto-run a specified file from any drive as it mounts. In such an embodiment, the TCAP's primary interface may be specified in such a boot sequence. For example, under windows, an autorun.inf file can specify the opening of a program from the TCAP by the AT; e.g., OPEN=TCAP.EXE.

Many operating systems are capable of at least accessing the TCAP as a USB memory drive **330** and mounting its contents as a drive, which usually becomes accessible in file browsing window **125**. If the TCAP does not mount, the AT's operating system will usually generate an error informing the user of a mounting problem. If the AT is not capable of executing instruction from the TCAP, a determination is made if an appropriate driver is loaded on the AT to access the TCAP **335**. In one embodiment, the TCAP can check to see if an API is running on the AT. For example, the TCAP provide an executable to be launched, e.g., as specified through auto-run.inf, and can establish communications through its connection to the AT, e.g., employing TCP/IP communications over the USB port. In such an embodiment, the TCAP can ping the AT for the program, and if an acknowledgement is received, the TCAP has determined that proper drivers and APIs exist. If no such API exists, the TCAP has launched a driver installation program for the AT as through an autorun-.inf. In an alternative embodiment, if nothing happens, a user may double click onto an installer program that is stored on the mounted TCAP **342, 340**. It should be noted, that although the TCAP's memory space may be mounted, certain areas of the TCAP may be inaccessible until there is an authorization. For example, certain areas and content on the TCAP may be encrypted. It should be noted that any such access terminal modules that drive AT and TCAP interaction may be saved onto the TCAP by copying the module to a mounted TCAP. Nevertheless, if the AT is capable of accessing program instructions in TCAP memory **330**, a TCAP driver is loaded on the AT **335**, and/or the user engages a program in the TCAP memory **340**, then the AT can execute program instructions from the TCAP's memory, which allows the TCAP to use the AT's I/O and allowing the user to interface with TCAP facilities **345**. It should be noted that some ATs may not be able to mount the TCAP at all. In such an instance, the user may have to install the TCAP drivers by downloading them from a server on the Internet, loading them from a diskette or CD, and/or the like. Once the TCAP is engaged to the AT **301**, execution may continue **398**.

TCAP and AT Interaction

FIG. **4** illustrates embodiments accessing the tunneling client access point and server through an access terminal. Upon engaging the TCAP to the AT as described in FIG. **3 301, 398**, the user may then go on to access the TCAP and its services **498**. It should be noted that users may access certain unprotected areas of the TCAP once it has been mounted, as described in FIG. **3**. However, to more fully access the TCAP's facilities, the user may be prompted to either login and/or registration window **205a** to access the TCAP and its services, which may be displayed on the AT **405**. It is impor-

tant to note that in one embodiment, the execution of the login and/or registration routines are handled by the TCAP's processor. In such an embodiment, the TCAP may run a small Web server providing login facilities, and connect to other Web based services through the AT's connection to the Internet. Further, the TCAP may employ a basic Web browsing core engine by which it may connect to Web services through the AT's connection to a communications network like the Internet. For purposes of security, in one embodiment, the TCAP may connect to a remote server by employing a secure connection, e.g., HTTPS, VPN, and/or the like.

Upon displaying a login window **405**, e.g., **205***a*, the user may select to register to access the TCAP and its services, or they may simply log in by providing security verification. In one example, security authorization may be granted by simply providing a user and password as provided through a registration process. In another embodiment, authorization may be granted through biometric data. For example, the TCAP may integrate a fingerprint and/or heat sensor IC into its housing. Employing such a device, and simply by providing one's finger print by laying your finger to the TCAP's surface, would provide the login facility with authorization if the user's finger print matches one that was stored during the registration process.

If the user does not attempt to login **415**, i.e., if the user wishes to register to use the TCAP and its services, then the TCAP can determine if the AT is online **420**. This may be accomplished in a number of ways. In one embodiment, the TCAP itself may simply ping a given server and if acknowledgement of receipt is received, the TCAP is online. In another embodiment, the TCAP can query for online status by engaging the AT through the installed APIs. If the AT is not online, then the user may be presented with an error message **425**. Thus, if a user does not have a login, and does not have the ability to register, then restricted areas of the TCAP will remain unavailable. Thereafter, flow can continue **498** and the user may have another opportunity to login and/or register. In one embodiment as a login integrity check, the TCAP keeps track of the number of failed attempts to login and/or register and may lock-out all further access if a specified number of failed attempts occurs. In one embodiment, the lockdown may be permanent by erasing all data on the TCAP. In another embodiment, the TCAP will disallow further attempts for a specified period of time.

If the user is attempting to register **415**, and the AT is online **420**, then the user map provide registration information **440** into a screen form **440***a*. Registration information fields may require a user's name, address, email address, credit card information, biometric information (e.g., requiring the user to touch a biometric fingerprint IC on the TCAP), and/or the like. The TCAP may determine if all the information was provided as required for registration and may query backend servers to determine if the user information is unique **445**. If the user did not properly fill out the registration information or if another user is already registered, the TCAP can provided an error message to such effect. Also, both the TCAP and its back-end servers may make log entries tracking such failed attempts for purposes of defending against fraud and/or security breaches. The user may then modify the registration information **440** and again attempt to register. Similarly to the login integrity checks, the TCAP can lockout registration attempts if the user fails to register more than some specified number of times.

Upon providing proper registration information **445** or proper login authentication **415**, the TCAP can query backend servers to see if the user is registered. In one embodiment, such verification may be achieved by sending a query to the

servers to check its database for the authorization information and/or for duplicate registrations. The servers would then respond providing an acknowledgment of proper registration and authorization to access data on the backend servers. If the users are not registered on the backend servers **430**, then the TCAP can provide an error message to the user for display on the AT to such effect **435**. In an alternative embodiment, the registration information may be stored on the TCAP itself. In one embodiment, the registration would be maintained in encrypted form. Thus, the user's login information may be checked relative to the information the TCAP itself, and if there is a match, access may be granted, otherwise an error message will be displayed **435**. The TCAP may then continue **498** to operate as if it were just engaged to the AT.

If the user is confirmed to be registered **430**, then the TCAP may provide options for display **453**, **453***a*. Depending on the context and purpose of a particular TCAP, the options may vary. For example, the a screen **453***a* may provide the user with the options to access data either online or offline. The user might simply click on a button and gain secure access to such data that may be decrypted by the TCAP. In one embodiment, the TCAP will determine if the AT is online **455**. If this was already determined **420**, this check **455** may be skipped.

If the AT is online **455**, optionally, the TCAP determines if the user wishes to synchronize the contents of the TCAP with storage facilities at the backend server **470**. In one embodiment, the user may designate that such synchronization is to always take place. If synchronization is specified **470**, then the TCAP will provide and receive updated data to and from the backend servers, overwriting older data with updated versions of the data **475**. If the AT is online **455** and/or after any synchronization **475**, the TCAP may provide the user with all of its service options as authorized by the account and programs available on the TCAP and at the backend server **480**. Once again, these facilities, programs, and/or services may vary greatly depending on the context and deployment requirements of the user. The options to be presented to the user from the TCAP or the TCAP services from the backend server, as displayed through the TCAP onto the AT's display **480**, are myriad and some example embodiments are provided in FIGS. **5**-**8**. Upon presenting the user with the options, the user is then able to access, execute, store data and programs on the TCAP and on the remote server **485**. All areas of the TCAP and services are then open, including any encrypted data areas.

If the AT is not online **455**, the TCAP may provide options for the user not including online services **460**. In one embodiment, the online options that may be presented on the AT display will be dimmed and/or omitted to reflect the lack of accessibility. However, the user will be able to access, execute, store and programs on the TCAP, including any encrypted data areas **465**.

TCAP Facilities and Services

FIGS. **5**-**8** illustrate embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an AT. Any particular set of facilities may have a myriad of options. The options and the general nature of the facilities provided on any particular TCAP are dependant upon the requirements of a given set of users. For example, certain groups and/or agencies may require TCAPS to be targeted towards consumer photographs, and may employ TCAPs to further that end. Other groups may require high security facilities, and tailor the TCAPs accordingly. In various environments, an organization may wish to provide a secure infrastructure to all of its agents for securely accessing the organization's data from anywhere and such an organization could tailor the TCAPs

contents to reflect and respond to its needs. By providing a generalized infrastructure on the TCAP backend servers and within the TCAP by using a generalized processor, the TCAPs may be deployed in numerous environments.

In one particular embodiment as in FIG. **5**, the TCAP provides facilities to access, process, and store email, files, music, photos and videos through the TCAP. Upon engaging **101** of FIG. **1** the TCAP **130** to an AT **307**, the TCAP will mount and display through the AT's file browser window **125** of FIG. **1**. As has already described, in the case where the AT has no TCAP driver software, the user may double click on the installer software stored on the TCAP **507**. Doing so will launch the installer software from the TCAP's memory to execute on the AT, and the user may be presented with a window to confirm the desire to install the TCAP software onto the AT **507**. Upon confirming the install **507**, the software will install on the AT and the user will be asked to wait as they are apprised of the install progress **509**.

Upon installation, the TCAP front-end software may execute and present the user with various options in various and fanciful interface formats **511**, **460**, **480** of FIG. **4**. In one embodiment, these user interfaces and programs are Java applications that may execute on the AT and a present Java runtime. In an alternative embodiment, a small applet may run on the AT, but all other activities may execute on the TCAP's processor, which would use the AT display only as a display terminal. In the embodiment where the TCAP executes program instructions, the TCAP may be engaged to receive commands and execute by receiving a signal from the access terminal driver instructing it to execute certain program files or, alternatively, looking to default location and executing program instructions. In yet another embodiment, the TCAP may obtain updated interfaces and programs from a backend server for execution either on the TCAP itself and/or the AT; this may be done by synchronization with the backend server and checking for updates of specified files at the backend server. By engaging the user interface, perhaps by clicking on a button to open the TCAP facilities and services **511**, the interface may further unfurl to present options to access said facilities and services **513**. Here, the interface may reflect ownership of the TCAP by providing a welcome screen and showing some resources available to the user; for example, a button entitled "My Stuff" may serve as a mechanism to advance the user to a screen where they may access their personal data store. At this point the user may attempt to login to access their data by engaging an appropriate button, which will take them to a screen that will accept login information **519**. Alternatively, the user may also register if it is their first time using the TCAP by selecting an appropriate button, which will advance the user to a registration screen **515** wherein the user may enter their name, address, credit card information, etc. Upon successfully providing registration information, the user may be prompted for response to further solicitations on a follow-up screen **517**. For example, depending on the services offered for a particular TCAP, the user may be provided certain perks like **5** MB of free online storage on a backend server, free photographic prints, free email access, and/or the like **517**.

After the user is prompted to login **518** and successfully provides proper login information **519**, or after successfully registering **515** and having responded to any solicitations **517**, the user may be provided with general options **521** to access data stored on the TCAP itself **522** or in their online account **520** maintained on a backend server. For example, if the user selects the option to access their online storage **520**, they may be presented with more options to interact with email, files, music, photos and videos that are available online

**523**. Perhaps if the user wished to check their email, the user might select to interact with their email, and a screen allowing them to navigate through their email account(s) would be presented **525**. Such online access to data may be facilitated through http protocols whereby the TCAP applications send and receive data through http commands across a communications network interacting with the backend servers and/or other servers. Any received results may be parsed and imbedded in a GUI representation of a Java application. For example, the email facility may run as a Java applet **525** and may employ a POP mail protocol to pull data from a specified mail server to present to the user.

Similarly, many other facilities may be engaged by the user through the TCAP. In one embodiment, the user may drag **508** a file **506** onto a drag-and-drop zone **505** that is presented on the TCAP interface. Upon so doing, various drag-and-drop options may unfurl and present themselves to the user **550**. It should be noted that the file may come from anywhere, i.e., from the AT, the TCAP, and/or otherwise. For example, upon dragging and dropping a graphics file, a user may be prompted with options to order prints, upload the file to an online storage space, save the file to the TCAP's memory space, cancel the action, and/or the like **550**. If the user sends the file for storage, or otherwise wishes to see and manage their data, an interface allowing for such management may be presented **555**. The interface may organize and allow access to general data, picture, and music formats **554**, provide usage statistics (e.g., free space, capacity, used space, etc.) **553**, provide actions to manipulate and organize the data **552**, provide status on storage usage on the TCAP **551** and online **549**, and/or the like.

Should the user engage a user interface element indicating the wish to manipulate their picture data **548**, the TCAP interface will update to allow more specific interaction with the user's photos **557**. In such a screen, the user may select various stored pictures and then indicate a desire to order photo prints by engaging the appropriate user interface element **558**. Should the user indicate their desire for prints **558**, they will be presented with an updated interface allowing the specification of what graphics files they wish to have printed **559**. In one embodiment, the users may drag-and-drop files into a drop zone, or otherwise engage file browsing mechanisms **560** that allow for the selection of desired files. Upon having identified the files for prints **559**, a user may be presented with an interface allowing for the selection of print sizes and quantities **561**. After making such specifications, the user may be required to provide shipping information **563** and information for payments **565**. After providing the billing information to a backend server for processing and approval, the user may be presented with a confirmation interface allowing for editing of the order, providing confirmation of costs, and allowing for submission of a final order for the selected prints **567**. Upon submitting the order, the TCAP will process the files for spooling to a backend server that will accept the order and files, which will be developed as prints and the user's account will be charged accordingly. In one embodiment, all of the above order and image processing operations occur and execute on the TCAP CPU. For example, the TCAP may employ various rendering technologies, e.g., ghostscript, to allow it to read and save PDFs and other media formats.

FIG. **6** goes on to illustrate embodiments and facets of the facilities of FIG. **5**. The TCAP interface allows the user to perform various actions at any given moment. As has already been discussed in FIG. **5**, the user may drag **508** a file **506** onto a drag and drop zone **505** so as to provide the file to the TCAP for further manipulation. As in **550** of FIG. **5**, the user may be

presented with various options subsequent to a drag-and-drop operation. Also, the TCAP interface may provide visual feedback that files have been dropped in the drop zone by highlighting the drop zone 505b. Should the user wish, they may close the TCAP interface by engaging a close option 633. Also, the ability to change and/or update their personal information may be accessed through the TCAP interface 616, which would provide a form allowing the user to update their registration information 630. In one embodiment, should the user forget their login information, they may request login help 635 and the TCAP will send their authorization information to the last known email address and inform the user of same 640. Also, the TCAP interface may provide help facilities that may be accessed at any time by simply engaging a help facility user interface element 617. So doing will provide the user with help screen information as to how to interact with the TCAP's facilities 625.

Upon providing proper login information 619 and logging-in 619, the user may be presented with a welcome screen with various options to access their data 621 as has already been discussed in FIG. 5, 521. By engaging a user interface element to access online storage 620, the user may be presented with various options to interact with online storage 623, 523 of FIG. 5. Should the user wish to interact with data on the TCAP itself, the user may indicate so by engaging the appropriate user interface option 622. So doing will provide the user with further options related to data stored on the TCAP 655. The user may engage an option to view the storage contents 658 and the TCAP interface will provide a listing of the contents 662, which may be manipulated through selection and drag-and-drop operations with the files.

In one embodiment, the user may order prints of photos 657 from files that are on the TCAP itself. As discussed in FIG. 5, the user may select files for which they desire prints 660. Here, the selected files will first be processed by the TCAP in preparation for sending to backend servers and file manipulations 670. The user may specify various attributes regarding the prints they desire, e.g., the size, number, cropping, red-eye correction, visual effects, and/or the like 661. In one embodiment, such processing occurs on the TCAP processor, while in other embodiments such processing can take place on the AT or backend server. Once again, the user may provide a shipping address 663, and make a final review to place the order 667. Upon committing to the order 667, the processed files are uploaded to the backend servers that will use the files to generate prints 690. A confirmation screen may then be provided to the user with an order number and other relevant information 695.

FIG. 7 goes on to illustrate embodiments and facets of the facilities of FIGS. 5-6 as may apply in different environments. As is demonstrated, the look and feel of the TCAP interface is highly malleable and can serve in many environments. FIG. 7 illustrates that even within a single organization, various environments might benefit from TCAPs and services tailored to serve such environments 733b-d. In this case TCAPs can serve in consumer 733b, industry trade 733c, corporate 733d, and/or the like environments.

As has already been discussed, initially in any of the environments, after engaging the TCAP to an AT, the user may be prompted to install the TCAP interface 705 and informed of the installation procedure 710. The user may then be presented with the installed TCAP interface 715, which may be activated by engaging an interface element to unfurl the interface, e.g., in this case by opening the top to a can of soda 717. Opening the interface will present the user with various options as 720, as has already been discussed in FIGS. 5-6. Similarly the user may login 725 or make a selection to

register for various TCAP services and provide the requisite information in the provided form 730. Upon registering and/or logging-in 725, various options may be presented based upon the configuration of the TCAP. For example, if the TCAP was configured and tailored for consumers, then upon logging in 725 the consumer user might be presented 733a-b with various consumer related options 740. Similarly, if the TCAP were tailored for 733a, c the trade industry or 733a, d the corporate environment, options specific to the trade industry 770 and corporate environment 760 may be presented.

In one embodiment, an organization wishing to provide TCAPs to consumers might provide options 740 for free music downloads 743, free Internet radio streaming 748, free news (e.g., provided through an RSS feed from a server) 766, free photo printing 750, free email 740, free coupons 742, free online storage 741, and/or the like. Users could further engage such services (e.g., clicking free music file links for downloading to the TCAP, by ordering prints 750, etc. For example, the user may select files on the TCAP 750, select the types of photos they would like to receive 752, specify a delivery address 754, confirm the order 756 all of which will result in the TCAP processing the files and uploading them to the backend servers for generation of prints (as has already been discussed in FIGS. 5-6).

In another embodiment, an organization wishing to provide TCAPs to a trade industry might provide options 770 for advertising 780, events 775, promotions 772, and/or the like. It is important to note that information regarding such options may be stored either on the TCAP or at a backend server. In one embodiment, such information may be constantly synchronized from the backend servers to the TCAPs. This would allow an organization to provide updates to the trade industry to all authorized TCAP "key holders." In such an embodiment, the user may be presented with various advertising related materials for the organization, e.g., print, television, outdoor, radio, web, and/or the like 780. With regard to events, the user may be presented with various related materials for the organization, e.g., trade shows, music regional, sponsorship, Web, and/or the like 775. With regard to promotions, the user may be presented with various related materials for the organization, e.g., rebates, coupons, premiums, and/or the like 772.

In another embodiment, an organization wishing to provide TCAPs to those in the corporate environment and might provide options relating to various corporate entities 760. Selecting any of the corporate entities 760 may provide the user with options to view various reports, presentations, and/or the like, e.g., annual reports, 10K reports, and/or the like 765. Similarly, the reports may reside on the TCAP and/or the corporate TCAP can act as a security key allowing the user to see the latest corporate related materials from a remote backend server.

FIG. 8 goes on to illustrate embodiments and facets of the facilities of FIGS. 5-7 as may apply in different environments. FIG. 8 illustrates that TCAPs may serve to provide heightened security to any environment. As has been discussed in previous figures, users may engage the TCAP interface 805 to access various options 810. The TCAP interface is highly adaptable and various services may be presented within it. For example, a stock ticker may be provided as part of the interface in a financial setting 810. Any number of live data feeds may dynamically update on the face of the interface. Upon logging-in 815 or registering a new account 820, the user may be informed that communications that are taking place are secured 825. In one embodiment, various encryption formats may be used by the TCAP to send information securely to the backend servers. It is important to note that in such an

embodiment, even if data moving out of the TCAP and across the AT were captured at the AT, such data would not be readable because the data was encrypted by the TCAP's processor. As such, the TCAP acts as a "key" and provides a plug-and-play VPN to users. Such functionality, heretofore, has been very difficult to set up and/or maintain. In this way, all communications, options presented and views of user data are made available only to the TCAP with the proper decryption key. In heightened security environments, display of TCAP data is provided on the screen only in bitmapped format straight to the video memory of the AT and, therefore, is not stored anywhere else on the AT. This decreases the likelihood of capturing sensitive data. As such, the user may access their data on the TCAP and/or online 830 in a secure form whereby the user may navigate and interact with his/her data and various services 835 in a secure manner.

Tunneling Client Access Point Server Controller

FIG. 9 illustrates one embodiment incorporated into a tunneling client access point server (TCAPS) controller 901. In this embodiment, the TCAP controller 901 may serve to process, store, search, serve, identify, instruct, generate, match, and/or update data in conjunction with a TCAP (see FIG. 10 for more details on the TCAP). TCAPS act as back-end servers to TCAPs, wherein TCAPS provide storage and/or processing resources to great and/or complex for the TCAP to service itself. In effect, the TCAPS transparently extend the capacity of a TCAP.

In one embodiment, the TCAPS controller 901 may be connected to and/or communicate with entities such as, but not limited to: one or more users from user input devices 911; peripheral devices 912; and/or a communications network 913. The TCAPS controller may even be connected to and/or communicate with a cryptographic processor device 928.

A TCAPS controller 901 may be based on common computer systems that may comprise, but are not limited to, components such as: a computer systemization 902 connected to memory 929.

Computer Systemization

A computer systemization 902 may comprise a clock 930, central processing unit (CPU) 903, a read only memory (ROM) 906, a random access memory (RAM) 905, and/or an interface bus 907, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus 904. Optionally, a cryptographic processor 926 may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. The clock is typically coupled to the system bus and various clock multipliers that will increase or decrease the base operating frequency for other components interconnected in the computer systemization. The clock and various components in a computer systemization drive signals embodying information throughout the system. Such transmission and reception of signals embodying information throughout a computer systemization may be commonly referred to as communications. These communicative signals may further be transmitted, received, and the cause of return and/or reply signal communications beyond the instant computer systemization to: communications networks, input devices, other computer systemizations, peripheral devices, and/or the like. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one high-speed data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a microprocessor such as AMD's Athlon, Duron and/or Opteron; IBM and/or Motorola's PowerPC; Intel's Celeron, Itanium, Pentium and/or Xeon; and/or the like processor(s). The CPU interacts with memory through signal passing through conductive conduits to execute stored program code according to conventional data processing techniques. Such signal passing facilitates communication within the TCAPS controller and beyond through various interfaces. Should processing requirements dictate a greater amount speed, mainframe and super computer architectures may similarly be employed.

Interface Adapters

Interface bus(ses) 907 may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) 908, storage interfaces 909, network interfaces 910, and/or the like. Optionally, cryptographic processor interfaces 927 similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. Interface adapters conventionally connect to the interface bus via a slot architecture. Conventional slot architectures may be employed, such as, but not limited to: Accelerated Graphics Port (AGP), Card Bus, (Extended) Industry Standard Architecture ((E)ISA), Micro Channel Architecture (MCA), NuBus, Peripheral Component Interconnect (Extended) (PCI(X)), Personal Computer Memory Card International Association (PCMCIA), and/or the like.

Storage interfaces 909 may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices 914, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to: (Ultra) (Serial) Advanced Technology Attachment (Packet Interface) ((Ultra) (Serial) ATA(PI)), (Enhanced) Integrated Drive Electronics ((E)IDE), Institute of Electrical and Electronics Engineers (IEEE) 1394, fiber channel, Small Computer Systems Interface (SCSI), Universal Serial Bus (USB), and/or the like.

Network interfaces 910 may accept, communicate, and/or connect to a communications network 913. Network interfaces may employ connection protocols such as, but not limited to: direct connect, Ethernet (thick, thin, twisted pair 10/100/1000 Base T, and/or the like), Token Ring, wireless connection such as IEEE 802.11a-x, and/or the like. A communications network may be any one and/or the combination of the following: a direct interconnection; the Internet; a Local Area Network (LAN); a Metropolitan Area Network (MAN); an Operating Missions as Nodes on the Internet (OMNI); a secured custom connection; a Wide Area Network (WAN); a wireless network (e.g., employing protocols such as, but not limited to a Wireless Application Protocol (WAP), I-mode, and/or the like); and/or the like. A network interface may be regarded as a specialized form of an input output interface. Further, multiple network interfaces 910 may be used to engage with various communications network types 913. For example, multiple network interfaces may be employed to allow for the communication over broadcast, multicast, and/or unicast networks. Input Output interfaces (I/O) 908 may accept, communicate, and/or connect to user input devices 911, peripheral devices 912, cryptographic processor devices 928, and/or the like. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); audio: analog, digital, monaural, RCA, stereo, and/or the like; IEEE 1394a-b; infrared; joystick; keyboard; midi; optical; PC AT; PS/2; parallel; radio; serial; USB; video interface: BNC, composite, digital, Digital Visual Interface (DVI), RCA, S-Video, VGA,

and/or the like; wireless; and/or the like. A common output device is a video display, which typically comprises a Cathode Ray Tube (CRT) or Liquid Crystal Display (LCD) based monitor with an interface (e.g., DVI circuitry and cable) that accepts signals from a video interface. The video interface composites information generated by a computer systemization and generates video signals based on the composited information in a video memory frame. Typically, the video interface provides the composited video information through a video connection interface that accepts a video display interface (e.g., a DVI connector accepting a DVI display cable).

User input devices 911 may be card readers, dongles, finger print readers, gloves, graphics tablets, joysticks, keyboards, mouse (mice), trackballs, trackpads, retina readers, and/or the like.

Peripheral devices 912 may be connected and/or communicate to I/O and/or other facilities of the like such as network interfaces, storage interfaces, and/or the like. Peripheral devices may be audio devices, cameras, dongles (e.g., for copy protection, ensuring secure transactions with a digital signature, and/or the like), external processors (for added functionality), goggles, microphones, monitors, network interfaces, printers, scanners, storage devices, video devices, visors, and/or the like.

It should be noted that although user input devices and peripheral devices may be employed, the TCAPS controller may be embodied as an embedded, dedicated, and/or headless device, wherein access would be provided over a network interface connection.

Cryptographic units such as, but not limited to, microcontrollers, processors 926, interfaces 927, and/or devices 928 may be attached, and/or communicate with the TCAPS controller. A MC68HC16 microcontroller, commonly manufactured by Motorola Inc., may be used for and/or within cryptographic units. Equivalent microcontrollers and/or processors may also be used. The MC68HC16 microcontroller utilizes a 16-bit multiply-and-accumulate instruction in the 16 MHz configuration and requires less than one second to perform a 512-bit RSA private key operation. Cryptographic units support the authentication of communications from interacting agents, as well as allowing for anonymous transactions. Cryptographic units may also be configured as part of CPU. Other commercially available specialized cryptographic processors include VLSI Technology's 33 MHz 6868 or Semaphore Communications' 40 MHz Roadrunner 184.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory 929. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAPS controller and/or a computer systemization may employ various forms of memory 929. For example, a computer systemization may be configured wherein the functionality of onchip CPU memory (e.g., registers), RAM, ROM, and any other storage devices are provided by a paper punch tape or paper punch card mechanism; of course such an embodiment would result in an extremely slow rate of operation. In a typical configuration, memory 929 will include ROM 906, RAM 905, and a storage device 914. A storage device 914 may be any conventional computer system storage. Storage devices may include a drum; a (fixed and/or removable) magnetic disk drive; a magneto-optical drive; an optical drive (i.e., CD ROM/RAM/Recordable (R), ReWritable (RW), DVD

R/RW, etc.); and/or other devices of the like. Thus, a computer systemization generally requires and makes use of memory.

Module Collection

The memory 929 may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) 915 (operating system); information server module(s) 916 (information server); user interface module(s) 917 (user interface); Web browser module(s) 918 (Web browser); database(s) 919; cryptographic server module(s) 920 (cryptographic server); TCAPS module(s) 935; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device 914, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through a communications network, ROM, various forms of memory, and/or the like.

Operating System

The operating system module 915 is executable program code facilitating the operation of a TCAPS controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the like. The operating system may be a highly fault tolerant, scalable, and secure system such as Apple Macintosh OS X (Server), AT&T Plan 9, Be OS, Linux, Unix, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Apple Macintosh OS, Microsoft DOS, Palm OS, Windows 2000/2003/3.1/95/98/CE/Millenium/NT/XP (Server), and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself, and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAPS controller to communicate with other entities through a communications network 913. Various communication protocols may be used by the TCAPS controller as a subcarrier transport mechanism for interaction, such as, but not limited to: multicast, TCP/IP, UDP, unicast, and/or the like.

Information Server

An information server module 916 is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, Microsoft's Internet Information Server, and/or the. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective−) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction

with other program modules. After a Domain Name System (DNS) resolution portion of an HTTP request is resolved to a particular information server, the information server resolves requests for information at specified locations on a TCAPS controller based on the remainder of the HTTP request. For example, a request such as http://123.124.125.126/myInformation.html might have the IP portion of the request "123.124.125.126" resolved by a DNS server to an information server at that IP address; that information server might in turn further parse the http request for the "/myInformation.html" portion of the request and resolve it to a location in memory containing the information "myInformation.html." Additionally, other information serving protocols may be employed across various ports, e.g., FTP communications across port 21, and/or the like. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAPS database 919, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAPS database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through inter-application communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAPS as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module 917 is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, commu-

nicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module 918 is stored program code that is executed by the CPU. The Web browser may be a conventional hypertext viewing application such as Microsoft Internet Explorer or Netscape Navigator. Secure Web browsing may be supplied with 128 bit (or greater) encryption by way of HTTPS, SSL, and/or the like. Some Web browsers allow for the execution of program modules through facilities such as Java, JavaScript, ActiveX, and/or the like. Web browsers and like information access tools may be integrated into PDAs, cellular telephones, and/or other mobile devices. A Web browser may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the Web browser communicates with information servers, operating systems, integrated program modules (e.g., plug-ins), and/or the like; e.g., it may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAPS enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAPS Database

A TCAPS database module 919 may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program code portion configuring the CPU to process the stored data. The database may be a conventional, fault tolerant, relational, scalable, secure database such as Oracle or Sybase. Relational databases are an extension of a flat file. Relational databases consist of a series of related tables. The tables are interconnected via a key field. Use of the key field allows the combination of the tables by indexing against the key field; i.e., the key fields act as dimensional pivot points for combining information from various tables. Relationships generally identify links maintained between tables by matching primary keys. Primary keys represent fields that uniquely identify the rows of a table in a relational database. More precisely, they uniquely identify rows of a table on the "one" side of a one-to-many relationship.

Alternatively, the TCAPS database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. In another alternative, an object-oriented database may be used, such as Frontier, ObjectStore, Poet, Zope, and/or the like. Object databases can include a number of object collections that are grouped and/or linked together by common attributes; they may be related to other object collections by some common attributes. Object-oriented databases perform similarly to relational databases with the exception that objects are not just pieces of data but may have other types of functionality encapsulated within a given object. If the TCAPS database is implemented as a data-structure, the use of the TCAPS database may be integrated into another module such as the TCAPS module. Also, the database may be implemented as a mix of data structures, objects, and relational structures. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentral-

ized and/or integrated. In one embodiment, the database module **919** includes three tables **919a-c**. A user accounts table **919a** includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then expire once a specified date has been reached. An user data table **919b** includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. A user programs table **919c** includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. In one embodiment, user programs may contain various user interface primitives, which may serve to update TCAPs. Also, various accounts may require custom database tables depending upon the environments and the types of TCAPs a TCAPS may need to serve. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database modules **919a-c**. The TCAPS may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAPS database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS database communicates with a TCAPS module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module **920** is stored program code that is executed by the CPU **903**, cryptographic processor **926**, cryptographic processor interface **927**, cryptographic processor device **928**, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. Employing such encryption security protocols, the TCAPS may encrypt all incoming and/or outgoing communications and may serve as

node within a virtual private network (VPN) with a wider communications network. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAPS module to engage in secure transactions if so desired. The cryptographic module facilitates the secure accessing of resources on TCAPS and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

TCAPS

A TCAPS module **935** is stored program code that is executed by the CPU. The TCAPS affects accessing, obtaining and the provision of information, services, transactions, and/or the like across various communications networks. The TCAPS enables TCAP users to simply access data and/or services across a communications network in a secure manner. The TCAPS extends the storage and processing capacities and capabilities of TCAPs. The TCAPS coordinates with the TCAPS database to identify interassociated items in the generation of entries regarding any related information. A TCAPS module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective−) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAPS server employs a cryptographic server to encrypt and decrypt communications. A TCAPS module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS module communicates with a TCAPS database, operating systems, other program modules, and/or the like. The TCAPS may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAPS node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous

nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAPS controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D)COM), (Distributed) Object Linking and Embedding ((D)OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

Tunneling Client Access Point Controller

FIG. 10 illustrates one embodiment incorporated into a tunneling client access point (TCAP) controller 1001. Much of the description of the TCAPS of FIG. 9 applies to the TCAP, and as such, the disclosure focuses more upon the variances exhibited in the TCAP. In this embodiment, the TCAP controller 1001 may serve to process, store, search, identify, instruct, generate, match, and/or update data within itself, at a TCAPS, and/or through an AT.

The first and foremost difference between the TCAP and the TCAPS is that the TCAP is very small as was shown 130 of FIG. 1. The TCAP may be packaged in plugin sticks, often, smaller than the size of a human thumb. In one embodiment, a TCAP may be hardened for military use. In such an embodiment, the shell 1001 may be composed of metal, and/or other durable composites. Also, components within may be shielded from radiation.

In one embodiment, the TCAP controller 1001 may be connected to and/or communicate with entities such as, but not limited to: one or more users from an access terminal 1011b. The access terminal itself may be connected to peripherals such as user input devices (e.g., keyboard 1012a, mouse 1012b, etc.); and/or a communications network 1013 in manner similar to that described in FIG. 9.

A TCAP controller 1001 may be based on common computer systems components that may comprise, but are not limited to, components such as: a computer systemization 1002 connected to memory 1029. Optionally, the TCAP controller 1001 may convey information 1058, produce output through an output device 1048, and obtain input from control device 1018.

Control Device

The control device 1018 may be optionally provided to accept user input to control access to the TCAP controller. In one embodiment, the control device may provide a keypad 1028. Such a keypad would allow the user to enter passwords, personal identification numbers (PIN), and/or the like.

In an alternative embodiment, the control device may include a security device 1038. In one embodiment, the security device is a fingerprint integrated circuit (fingerprint IC) that provides biometric fingerprint information such as, but not limited to AuthenTec Inc.'s FingerLoc™ AF-S2™. Either a fingerprint IC and/or other biometric device will provide biometric validation information that may be used to confirm the identity of a TCAP user and ensure that transactions are legitimate. In alternative embodiments, a simple button, heat sensor, and/or other type of user input functionality may be provided solely and/or in concert with other types of control device types. The control device may be connected to the I/O interface, the system bus, or the CPU directly.

The output device 1048 is used to provide status information to the user. In one alternative embodiment, the output device is an LCD panel capable of providing alpha numeric and/or graphic displays. In an alternative embodiment, the output device may be a speaker providing audible signals indicating errors and/or actually streaming information that is audible to the user, such as voice alerts. The output device may be connected to the I/O interface, the system bus, or the CPU directly.

The conveyance information 1058 component of the TCAP controller may include any number of indicia representing the TCAP's source on the cover 1001. Source conveying indicia may include, but is not limited to: an owner name 1059 for readily verifying a TCAP user; a photo of the owner 1060 for readily verifying a TCAP controller owner; mark designating the source that issued the TCAP 1061, 1001 such as a corporate logo, and/or the like; fanciful design information 1062 for enhancing the visual appearance of the TCAP; and/or the like. It should be noted that the conveyance information 11421 may be positioned anywhere on the cover 1189.

Computer Systemization

A computer systemization 1002 may comprise a clock 1030, central processing unit (CPU) 1003, a read only memory (ROM) 1006, a random access memory (RAM) 1005, and/or an interface bus 1007, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus 1004. Optionally the computer systemization may be connected to an internal power source 1086. Optionally, a cryptographic processor 1026 may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one low-power data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a micropro-

cessor such as ARM's Application Cores, Embedded Cores, Secure Cores; Motorola's DragonBall; and/or the like processor(s).

Power Source

The power source **1086** may be of any standard form for powering small electronic circuit board devices such as but not limited to: alkaline, lithium hydride, lithium ion, nickel cadmium, solar cells, and/or the like. In the case of solar cells, the case provides an aperture through which the solar cell protrudes are to receive photonic energy. The power cell **1086** is connected to at least one of the interconnected subsequent components of the TCAP thereby providing an electric current to all subsequent components. In one example, the power cell **1086** is connected to the system bus component **1004**. In an alternative embodiment, an outside power source **1086** is provided through a connection across the I/O **1008** interface. For example, a USB and/or IEEE 1394 connection carries both data and power across the connection and is therefore a suitable source of power.

Interface Adapters

Interface bus(ses) **1007** may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) **1008**, storage interfaces **1009**, network interfaces **1010**, and/or the like. Optionally, cryptographic processor interfaces **1027** similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. In one embodiment, the interface bus provides I/O **1008** via a USB port. In an alternative embodiment, the interface bus provides I/O via an IEEE 1394 port. In an alternative embodiment, wireless transmitters are employed by interfacing wireless protocol integrated circuits (ICs) for I/O via the interface bus **1007**.

Storage interfaces **1009** may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices **1014**, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to a flash memory connector, and/or the like. In one embodiment, an optional network interface may be provide **1010**.

Input Output interfaces (I/O) **1008** may accept, communicate, and/or connect to an access terminal **1011**b. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); IEEE 1394a-b; infrared; PC AT; PS/2; parallel; radio; serial; USB, and/or the like; wireless component; and/or the like.

Wireless Component

In one embodiment a wireless component may comprise a Bluetooth chip disposed in communication with a transceiver **1043** and a memory **1029** through the interface bus **1007** and/or system bus **1004**. The transceiver may be either external to the Bluetooth chip, or integrated within the Bluetooth chip itself. The transceiver is a radio frequency (RF) transceiver operating in the range as required for Bluetooth transmissions. Further, the Bluetooth chip **1044** may integrate an input/output interface (I/O) **1066**. The Bluetooth chip and its I/O may be configured to interface with the TCAP controller through the interface bus, the system buss, and/or directly with the CPU. The I/O may be used to interface with other components such as an access terminal **1011**b equipped with similar wireless capabilities. In one embodiment, the TCAP may optionally interconnect wirelessly with a peripheral device **912** and/or a control device **911** of FIG. **9**. In one

example embodiment, the I/O may be based on serial line technologies, a universal serial bus (USB) protocol, and/or the like. In an alternative embodiment, the I/O may be based on the ISO 7816-3 standard. It should be noted that the Bluetooth chip in an alternative embodiment may be replaced with an IEEE 802.11b wireless chip. In another embodiment, both a Bluetooth chip and an IEEE 802.11b wireless chip may be used to communicate and/or bridge communications with respectively enabled devices. It should further be noted that the transceiver **1043** may be used to wirelessly communicate with other devices powered by Bluetooth chips and/or IEEE 802.11b chips and/or the like. The ROM can provide a basic instruction set enabling the Bluetooth chip to use its I/O to communicate with other components. A number of Bluetooth chips are commercially available, and may be used as a Bluetooth chip in the wireless component, such as, but not limited to, CSR's BlueCore line of chips. If IEEE 802.11b functionality is required, a number of chips are commercially available for the wireless component as well.

Cryptographic units such as, but not limited to, microcontrollers, processors **1026**, and/or interfaces **1027** may be attached, and/or communicate with the TCAP controller. A Secure Core component commonly manufactured by ARM, Inc. and may be used for and/or within cryptographic units.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory **1029**. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAP controller and/or a computer systemization may employ various forms of memory **1029**. In a typical configuration, memory **1029** will include ROM **1006**, RAM **1005**, and a storage device **1014**. A storage device **1014** may be any conventional computer storage. Storage devices may include flash memory, micro hard drives, and/or the like.

Module Collection

The memory **1029** may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) **1015** (operating system); information server module(s) **1016** (information server); user interface module(s) **1017** (user interface); Web browser module(s) **1018** (Web browser); database(s) **1019**; cryptographic server module(s) **1020** (cryptographic server); access terminal module **1021** (TCAP module) **1035**; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device **1014**, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through an access terminal, communications network, ROM, various forms of memory, and/or the like. In one embodiment, all data stored in memory is encrypted by employing the cryptographic server **1020** as described in further detail below. In one embodiment, the ROM contains a unique TCAP identifier. For example, the TCAP may contain a unique digital certificate, number, and/or the like, which may be used for purposes of verification and encryption across a network and/or in conjunction with a TCAPS.

Operating System

The operating system module **1015** is executable program code facilitating the operation of a TCAP controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the

JX-349-0031

like. The operating system may be a highly fault tolerant, scalable, and secure system such as Linux, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Java runtime OS, and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself, and/or the like. Most frequently, the operating system communicates with other program modules. user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with an access terminal, communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAP controller to communicate with other entities through an access terminal. Various communication protocols may be used by the TCAP controller as a subcarrier transport mechanism for interaction, such as, but not limited to: TCP/IP, USB, and/or the like.

Information Server

An information server module **1016** is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, and/or the like. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective-) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction with other program modules. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAP database **1019**, operating systems, other program modules, user interfaces, Web browsers, and/ or the like.

Access to TCAP database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through interapplication communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field tags, which act to instruct the parser to generate queries directed to appropriate tables and/ or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAP as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a

new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module **1017** is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/ XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The TCAP may employ code natively compiled for various operating systems, or code compiled using Java. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module **1018** is stored program code that is executed by the CPU. A small-scale embedded Web browser may allow the TCAP to access and communicate with an attached access terminal, and beyond across a communications network. An example browser is Blazer, Opera, FireFox, etc. A browsing module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAP enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAP Database

A TCAP database module **1019** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program code portion configuring the CPU to process the stored data. In one embodiment, the TCAP database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. If the TCAP database is implemented as a data-structure, the use of the TCAP database may be integrated into another module such as the TCAP module. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentralized and/or integrated. In one embodiment, the database module **1019** includes three tables **1019***a-c*. A user accounts table **1019***a* includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then

expire once a specified date has been reached. An user data table **1019***b* includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. In one embodiment, the entire TCAP memory **1029** is processes into an image and spooled to a TCAPS for backup storage. A user programs table **1019***c* includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database modules **1019***a*-*c*. The TCAP may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAP database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP database communicates with a TCAP module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module **1020** is stored program code that is executed by the CPU **1003**, cryptographic processor **1026**, cryptographic processor interface **1027**, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAP module to engage in secure transactions if so desired. The cryptographic module facili-

tates the secure accessing of resources on TCAP and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicate with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. In one embodiment, the TCAP employs the cryptographic server to encrypt all data stored in memory **1029** based on the TCAP's unique ID and user's authorization information. In another embodiment, the TCAP employs the cryptographic server to encrypt all data sent through the access terminal based in the TCAP's unique ID and user's authorization information.

TCAP

A TCAP module **1035** is stored program code that is executed by the CPU. The TCAP affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within its memory and/or across various communications networks. The TCAP enables users to simply access data and/or services from any location where an access terminal is available. It provides secure, extremely low powerful and ultra portable access to data and services that were heretofore impossible. The TCAP coordinates with the TCAP database to identify interassociated items in the generation of entries regarding any related information. A TCAP module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective−) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications. A TCAP module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP module communicates with a TCAP database, a TCAP access terminal module **1021** running on an access terminal **1011***b*, operating systems, other program modules, and/or the like. The TCAP may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Access Terminal Module

An access terminal module **1021** is stored program code that is executed by a CPU. In one embodiment, the TCAP allows the access terminal **1011***b* to access its memory **1029** across its I/O **1008** and the access terminal executes the module. The access terminal module affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within the TCAP's and access terminal's memory and/or across various communications networks. The access terminal module **1021** acts as a bridge through which the TCAP can communicate with communications network, and through which users may interact with the TCAP by using the I/O of the access terminal. The access terminal module coordinates with the TCAP module **1035** to send data and communications back and forth. A access terminal module enabling access of information between the TCAP and access terminal may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective−) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the access

terminal module is compiled for target access terminal platform, e.g., for Windows. In an alternative embodiment, a processor independent approach is taken, e.g., Java is used, so that the access terminal module will run on multiple platforms. In another embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications as between it, the TCAP, and outside servers. A access terminal module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the access terminal module communicates with a TCAP, other program modules, and/or the like. The access terminal module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAP node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAP controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D)COM), (Distributed) Object Linking and Embedding ((D)OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development

tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

The entirety of this disclosure (including the Cover Page, Title, Headings, Field, Background, Summary, Brief Description of the Drawings, Detailed Description, Claims, Abstract, Figures, and otherwise) shows by way of illustration various embodiments in which the claimed inventions may be practiced. The advantages and features of the disclosure are of a representative sample of embodiments only, and are not exhaustive and/or exclusive. They are presented only to assist in understanding and teach the claimed principles. It should be understood that they are not representative of all claimed inventions. As such, certain aspects of the disclosure have not been discussed herein. That alternate embodiments may not have been presented for a specific portion of the invention or that further undescribed alternate embodiments may be available for a portion is not to be considered a disclaimer of those alternate embodiments. It will be appreciated that many of those undescribed embodiments incorporate the same principles of the invention and others are equivalent. Thus, it is to be understood that other embodiments may be utilized and functional, logical, organizational, structural and/or topological modifications may be made without departing from the scope and/or spirit of the disclosure. As such, all examples and/or embodiments are deemed to be non-limiting throughout this disclosure. Also, no inference should be drawn regarding those embodiments discussed herein relative to those not discussed herein other than for purposes of space and reducing repetition. For instance, it is to be understood that the logical and/or topological structure of any combination of any program modules (a module collection), other components and/or any present feature sets as described in the figures and/or throughout are not limited to a fixed operating order and/or arrangement, but rather, any disclosed order is exemplary and all equivalents, regardless of order, are contemplated by the disclosure. Furthermore, it is to be understood that such features are not limited to serial execution, but rather, any number of threads, processes, services, servers, and/or the like that may execute asynchronously, simultaneously, synchronously, and/or the like are contemplated by the disclosure. As such, some of these features may be mutually contradictory, in that they cannot be simultaneously present in a single embodiment. Similarly, some features are applicable to one aspect of the invention, and inapplicable to others. In addition, the disclosure includes other inventions not presently claimed. Applicant reserves all rights in those presently unclaimed inventions including the right to claim such inventions, file additional applications, continuations, continuations in part, divisions, and/or the like thereof. As such, it should be understood that advantages, embodiments, examples, functional, features, logical, organizational, structural, topological, and/or other aspects of the disclosure are not to be considered limitations on the disclosure as defined by the claims or limitations on equivalents to the claims.

What is claimed is:

**1**. A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is

configured to provide a communications node on the terminal to facilitate communication to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:

(a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;

(b) a processor; and

(c) a memory having executable program code stored thereon, including:

(1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and

(2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;

wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

**2**. The portable device according to claim **1**, wherein the fourth program code which, when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node.

**3**. The portable device according to claim **2**, wherein the communication caused to be transmitted to the communication network node facilitates verification of the portable device.

**4**. The portable device according to claim **2**, wherein the communication caused to be transmitted to the communication network node facilitates the transmission of encrypted communications from the communication network node to the terminal.

**5**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates access to the communication network node database.

**6**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the download of content on the communication network node database to the terminal.

**7**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the download of program code on the communication network node to the terminal.

**8**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the upload of content on to the communication network node database.

**9**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the upload of program code on to the communication network node database.

**10**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database.

**11**. The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the download of a live data feed to the terminal.

**12**. The portable device according to claim **11**, wherein the live data feed is presented on the terminal output component.

**13**. The portable device according to claim **1**, wherein the portable device is further configured to affect the presentation of the interactive user interface on the terminal output device.

**14**. The portable device according to claim **13**, wherein the portable device memory has fifth program code stored thereon, which, when executed, is configured to affect the presentation of the interactive user interface on the terminal output device.

**15**. The portable device according to claim **13**, wherein the portable device is configured to provide the terminal with access to content stored on the portable device memory which affects the presentation of the interactive user interface on the terminal output device.

**16**. The portable device according to claim **15**, wherein the content comprises a user name and/or a portable device identifier, and the interactive user interface is affected to present the user name and/or portable device identifier.

**17**. The portable device according to claim **1**, wherein the second program code is stored on the portable device memory and the portable device is configured to provide the terminal with access to the second program code.

**18**. The portable device according to claim **17**, wherein the portable device is configured to load the second program code on to the terminal.

**19**. The portable device according to claim **1**, wherein the portable device is configured to cause the terminal to execute the second program code and present an interactive user interface on the terminal output component.

**20**. The portable device according to claim **19**, wherein the portable device memory has fifth program code stored thereon, which, when executed by the portable device processor, is configured to cause the terminal to execute the second program code and present an interactive user interface on the terminal output component.

**21**. The portable device according to claim **1**, wherein the interactive user interface comprises a graphic user interface.

**22**. The portable device according to claim **1**, wherein the first program code is stored on the portable device memory and the portable device is configured to provide the terminal with access to the first program code.

**23**. The portable device according to claim **22**, wherein the portable device is configured to load the first program code on to the terminal.

**24**. The portable device according to claim **1**, wherein the portable device memory comprises one or more of the group consisting of flash memory, read only memory, random access memory, micro hard drives and the like.

**25**. The portable device according to claim **1**, wherein the communications network node comprises a server.

**26**. The portable device according to claim **1**, wherein the external communication interface comprises a universal serial bus interface.

**27**. The portable device according to claim **1**, wherein the external communication interface comprises a wireless communication interface.

**28**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to present an interactive user interface on the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal communication interface;

(c) executing fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface; and

(d) facilitating a communication to be transmitted through the terminal network interface to a communications network node.

**29**. A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

(a) a communications network node; and

(b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

(1) cause the terminal to execute the first program code to present an interactive user interface on the terminal output component;

(2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal communication interface;

(3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface; and

(4) facilitate a communication to be transmitted through the terminal network interface to a communications network node.

\* \* \* \* \*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on August 14, 2023, I electronically filed the foregoing

with the Clerk of Court for the United States Court of Appeals for the Federal Circuit

by using the CM/ECF system. I certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.


Date: August 14, 2023

*/s/ Noah M.Leibowitz____*
Noah M. Leibowitz
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797

*Counsel for Appellant IOENGINE, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 23-1367

**Short Case Caption:** Ingenico Inc. v. IOENGINE, LLC

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ____eight____ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 08/14/2023

Signature: /s/ Noah M. Leibowitz

Name: Noah M. Leibowitz

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 13,850 words, excluding the items listed as exempted under Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), and Fed. Cir. R. 32(b)(2).


Date: August 14, 2023

*/s/ Noah M. Leibowitz*
Noah M. Leibowitz
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797

*Counsel for Appellant IOENGINE, LLC*