No. 2023-1367

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INGENICO INC.,
*Plaintiff / Counterclaim Defendant-Appellee*,

## INGENICO CORP., INGENICO GROUP S.A.,
*Counterclaim Defendants-Appellees*

**v.**

## IOENGINE, LLC,
*Defendant / Counter-Claimant-Appellant.*

Appeal from the United States District Court for the District of Delaware,
No. 1:18-cv-00826-WCB, Judge William C. Bryson.

## CORRECTED NON-CONFIDENTIAL JOINT APPENDIX

Noah M. Leibowitz
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3538
*Counsel for Appellant, IOENGINE, LLC*

Kerry L. Timbers
Sharona Sternberg
Kevin R. Mosier
SUNSTEIN LLP
100 High Street
Boston, MA 02110-2321
(617) 443-9292
*Counsel for Appellees, INGENICO INC., INGENICO CORP., INGENICO GROUP, S.A.*

Date: February 5, 2024

Gregory T. Chuebon
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3887

Derek J. Brader
Michael A. Fisher
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-3437
(215) 994-2079

Michael H. Joshi
DECHERT LLP
3000 El Camino Real
Five Palo Alto Square, Suite 650
Palo Alto, CA 94306-2112
(650) 813-4814
*Counsel for Appellant,*
*IOENGINE, LLC*

*Ingenico Inc. v. IOENGINE, LLC*

No. 2023-1367 (Fed. Cir.)

**CORRECTED JOINT APPENDIX**
**TABLE OF CONTENTS**

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|---|---|---|---|
| 11/09/2018 | 39 | Agreed Protective Order Regarding the Disclosure and Use of Discovery Materials | Appxi |
| 07/25/2022 | 506 | Judgment | Appx1 |
| 12/09/2022 | 531 | Memorandum Opinion and Order denying Dkt. 512 Motion for Judgment as a Matter of Law (Oral Order unsealing document in its entirety on 12/14/2022.) | Appx3 |
| 06/15/2022 | 449 | Memorandum Opinion and Order (unsealed on 06/27/2022 per Judge Bryson) | Appx55 |
| 07/13/2022 | JX-294 | U.S. Patent No. 9,774,703 (McNulty) | Appx135 |
| 07/12/2022 | JX-349 | U.S. Patent No. 9,059,969 (McNulty) | Appx169 |
| 06/01/2018 | 1 | Complaint for Declaratory Judgment of Noninfringement | Appx205 |
| 02/18/2022 | 360-1 | Sealed excerpted exhibits 1-33 to Egan Declaration (entire exhibit sealed; no public version filed) | Appx1140 |
| 02/18/2022 | 361 | Excerpted IOENGINE, LLC's Opening Brief in Support of Its Combined Motion for Partial Summary Judgment of No Invalidity and to Exclude Testimony of Barry Sussman and James Geier (public version filed 02/25/2022 as Dkt. 364) | Appx1793 |
| 03/18/2022 | 378 | Excerpted IOENGINE, LLC's Reply Brief in Further Support of Its Combined Motion for Partial Summary Judgment of No Invalidity and to Exclude Testimony of Barry Sussman and James Geier (public version filed 03/25/2022 as Dkt. 388) | Appx8359 |
| 06/27/2022 | 478 | Order regarding IOENGINE, LLC's Motions *in Limine* | Appx8814 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|---|---|---|---|
| 07/05/2022 | 487 | Omnibus Pretrial Order | Appx8835 |
| 07/15/2022 | 497 | Court's Final Jury Instructions | Appx8859 |
| 07/15/2022 | 500 | Redacted Final Jury Verdict | Appx8899 |
| 07/28/2022 | 507 | Excerpt of Official Transcript of Jury Trial - Volume A held on 07/11/2022 before Judge William C. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx8909 |
| 07/28/2022 | 508 | Excerpt of Official Transcript of Jury Trial - Volume B held on 07.12.2022 before Judge William Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx9242 |
| 07/28/2022 | 509 | Excerpt of Official Transcript of Jury Trial - Volume C held on 07.13.2022 before Judge W. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx9659 |
| 07/28/2022 | 510 | Excerpt of Official Transcript of Jury Trial - Volume D held on 07.14.2022 before Judge W. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx9997 |
| 07/28/2022 | 511 | Excerpt of Official Transcript of Jury Trial - Volume E held on 07.15.2022 before Judge W. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx10342 |
| 08/17/2022 | 513 | Sealed excerpted IOENGINE, LLC's Opening Brief in Support of Its Renewed Motion for Judgment as a Matter of Law or, In the Alternative, for a New Trial (public version filed 08/24/2022 as Dkt. 516) | Appx10529 |
| 09/16/2022 | 523 | Sealed excerpted Ingenico's Corrected Answering Brief in Opposition to IOENGINE's Renewed Motion as a Matter of Law, or in the Alternative, for a New Trial (public version filed 09/21/2022 as Dkt. 524) | Appx10578 |
| 10/07/2022 | 526-1 | Excerpted Exhibit 1 - Christopher Schmandt Deposition taken on June 15, 2010 (public version filed 10/14/2022 as Dkt. 528) | Appx10654 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|---|---|---|---|
| 12/06/2022 | | Excerpt of Transcript of Motion for Judgment as a Matter of Law | Appx10686 |
| 07/13/2022 | DX-089 | DiskOnKey Technology - M-Systems website via Wayback Machine | Appx10931 |
| 07/13/2022 | DX-091 | M-Systems Flash Disk Pioneers - SEC form 20 FA for fiscal year ended December 31, 2002 | Appx10932 |
| 07/11/2022 | DX-092 | Fuji Photo Film Introduces its USB Drive Version of DiskOnKey (Press release (from Internet Archive)) | Appx11037 |
| 07/11/2022 | DX-093 | DiskOnKey Technical Specifications - Diskonkey.com via Wayback Machine | Appx11039 |
| 07/13/2022 | DX-097 | Press Release - M-Systems Engineers Automatic Firmware Upgrades for Previous Generation DiskOnKey Devices - M-Systems website via Wayback Machine | Appx11041 |
| 07/13/2022 | DX-099 | Products and Solutions - DiskOnKey (diskonkey.com via Wayback Machine) | Appx11043 |
| 07/13/2022 | DX-170 | M-Systems DiskOnKey product as depicted in this document (serial no. 32410900036847) | Appx11044 |
| 7/15/2022 | DX-304 | Sealed M-Systems - remote server demonstration (with associated metadata) | Appx11098 |
| 7/13/2022 | DX-305 | Sealed DiskOnKey software development kit data sheet (with associated metadata) | Appx11113 |
| 7/13/2022 | DX-307 | Press Release M-Systems Designs Software Developer's Kit for the DiskOnKey Technology Computing Platform | Appx11115 |
| 7/13/2022 | DX-316 | Sealed Sales Dec 2001-Q4 4 2002 (native file unable to be produced in paper) | Appx11118 |
| 7/13/2022 | DX-317 | Sealed Sales, Q1 2003 (native file unable to be produced in paper) | Appx11119 |
| 7/13/2022 | DX-320 | Sealed Sales, Q2 Dec 2003 (native file unable to be produced in paper) | Appx11120 |
| 7/13/2022 | DX-322 | Sealed Product Specification - DiskOnKey T3 | Appx11121 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|------|--------------------|----------------------|----------------|
| 7/13/2022 | DX-328 | Sealed Executable file, DiskOnKey Firmware Upgrade, 6-26-2002 (native file unable to be produced in paper) | Appx11171 |
| 7/13/2022 | DX-330 | Sealed Email re Release of Firmware remote upgrade tool | Appx11174 |
| 7/13/2022 | DX-331 | Sealed Using DiskOnKey upgrade | Appx11177 |
| 7/13/2022 | DX-333 | Sealed DiskOnKey Software Development Kit | Appx11197 |
| 7/13/2022 | DX-336 | Sealed DiskOnKey upgrade presentation | Appx11282 |
| 7/13/2022 | DX-363 | US Patent Publication No. US 2004/0039932 (Elazar) | Appx11291 |
| 7/13/2022 | DX-402 | DiskOnKey - Products and Solutions (Page from Internet Archive) | Appx11305 |
| 7/13/2022 | DX-403 | DiskOnKey - Products and Solutions - SDK (Page from Internet Archive) | Appx11306 |
| 7/11/2022 | JX-003 | Sealed Invoice no. 100-286 from Brand X to the Windwood Group | Appx11397 |
| 7/11/2022 | JX-005 | Sealed Invoice no. A0093 from May Louie to the Windwood Group | Appx11398 |
| 7/11/2022 | JX-272 | Sealed Agreement between MDRM Inc. and Revolutionary Group, Inc. | Appx16485 |
| 7/11/2022 | PDX-2 | Sealed PowerPoint presentation of Scott McNulty IOENGINE U.S. Court for the District of Delaware (native file unable to be produced in paper) | Appx16553 |
| 7/11/2022 | PX-219 | Sealed Letter to Scott McNulty from Dan at MDRM recapping issues and ideas | Appx16560 |
| 7/11/2022 | PX-222 | Excerpt of PC Magazine | Appx16566 |
| 7/11/2022 | PX-231 | Sealed Specification for V2.0 targeted Dec 15, 2003 | Appx16795 |
| 7/12/2022 | PX-235 | Sealed Scott McNulty Portable devices rule | Appx16798 |
| 7/11/2022 | PX-236 | Sealed MDRM Digital Ltd. Invoice # 3006 to Revolutionary Group, Inc. | Appx16800 |
| 7/11/2022 | PX-242 | Sealed MDRM Digital Ltd. Invoice No. 4001 to Revolutionary Group, Inc. | Appx16802 |
| 7/11/2022 | PX-243 | Sealed Email from Dan Harkabi to Oliver Kromat RE: Conference call with Fuji | Appx16803 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|------|------|------|------|
| 7/11/2022 | PX-244 | Sealed Email from Bhavin Desai to Gidi Elazar, et al., RE: Next step | Appx16804 |
| 7/11/2022 | PX-434 | Sealed Physical exhibit of IOENGINE Prototype Device Nos. 2-3, 5-6, 9-30 (as identified by CRA) | Appx18000 |
| 7/11/2022 | PX-543 | Certified copies of color drawings US Pat No 7861006 | Appx18151 |
| 7/11/2022 | PX-547 | Sealed File Properties Screenshot | Appx18161 |
| 7/11/2022 | | Docket report | Appx18162 |

## CONFIDENTIAL MATERIAL

The non-confidential version of this appendix redacts information that was designated confidential under the district court protective order. Appxi-Appxxxviii. In the confidential appendix, yellow highlighting and brackets indicate confidential material. Specifically, the pages listed below omit material that was designated confidential under the district court protective order.

- Appx1140-Appx1792
- Appx8909: has redactions on Appx9075-Appx9077, Appx9087-Appx9089, Appx9091-Appx9092
- Appx9659: has redactions on Appx9703
- Appx10342: has redactions on Appx10412-Appx10413, Appx10496-Appx10497
- Appx10529: has redactions on Appx10540, Appx10566
- Appx10578: has redactions on Appx10589
- Appx11098-Appx11112
- Appx11113-Appx11114
- Appx11118
- Appx11119
- Appx11120
- Appx11121-Appx11170
- Appx11171
- Appx11174-Appx11176
- Appx11177-Appx11182
- Appx11197-Appx11281

- Appx11282-Appx11287
- Appx11397
- Appx11398-Appx11399
- Appx16485-Appx16501
- Appx16553-Appx16553
- Appx16560-Appx16562
- Appx16795-Appx16797
- Appx16798-Appx16799
- Appx16800-Appx16801
- Appx16802
- Appx16803
- Appx16804-Appx16805
- Appx18000
- Appx18161

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| INGENICO INC.,<br><br>   *Plaintiff,*<br><br> v.<br><br>IOENGINE, LLC,<br><br>   *Defendant.* | C.A. No. 18-826-CFC |
| IOENGINE, LLC,<br><br>   *Counterclaim Plaintiff,*<br><br> v.<br><br>INGENICO INC.,<br>INGENICO CORP., and<br>INGENICO GROUP S.A.,<br><br>   *Counterclaim Defendant*s. | JURY TRIAL DEMANDED |

**AGREED PROTECTIVE ORDER**
**REGARDING THE DISCLOSURE AND USE OF DISCOVERY MATERIALS**

   Plaintiff counterclaim defendant Ingenico Inc. and counterclaim defendants Ingenico Corp. and Ingenico Group S.A. (collectively, "Ingenico" or "Plaintiff") and defendant and counterclaim plaintiff IOENGINE, LLC ("IOENGINE" or "Defendant") (IOENGINE and Ingenico, collectively the "Parties," and individually a "Party") anticipate that documents, testimony, or information containing or reflecting confidential, proprietary, trade secret, and/or commercially sensitive information are likely to be disclosed or produced during the course of discovery, initial disclosures, and supplemental disclosures in this case and request that the

**Appxi**

Court enter this Order setting forth the conditions for treating, obtaining, and using such information.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Court finds good cause for the following Agreed Protective Order Regarding the Disclosure and Use of Discovery Materials ("Order" or "Protective Order").

1.   **<u>PURPOSES AND LIMITATIONS</u>**

(a)   Protected Material designated under the terms of this Protective Order shall be used by a Receiving Party solely for this case, and shall not be used directly or indirectly for any other purpose whatsoever.

(b)   The Parties acknowledge that this Order does not confer blanket protections on all disclosures during discovery, or in the course of making initial or supplemental disclosures under Rule 26(a).  Designations under this Order shall be made with care and shall not be made absent a good faith belief that the designated material satisfies the criteria set forth below.  If it comes to a Producing Party's attention that designated material does not qualify for protection at all, or does not qualify for the level of protection initially asserted, the Producing Party must promptly notify all other Parties that it is withdrawing or changing the designation.

2.   **<u>DEFINITIONS</u>**

(a)   "Discovery Material" means all items or information, including from any non-party, regardless of the medium or manner in which they are generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things), that are produced, disclosed, or generated in connection with discovery or Rule 26(a) disclosures in this case.

(b)    "Outside Counsel" means (i) outside counsel who appear on the pleadings as counsel for a Party and (ii) partners, associates, and staff of such counsel to whom it is reasonably necessary to disclose the information for this litigation.

(c)    "Party" means any party to this case, including all of its officers, directors, employees, consultants, retained experts, and outside counsel and their support staffs.

(d)    "Producing Party" means any Party or non-party that discloses or produces any Discovery Material in this case.

(e)    "Protected Material" means any Discovery Material that is designated as "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE," as provided for in this Order. Protected Material shall not include:  (i) advertising materials that have been actually published or publicly disseminated; (ii) materials that show on their face they have been disseminated to the public; or (iii) other materials known to have been disseminated to the public.

(f)    "Receiving Party" means any Party who receives Discovery Material from a Producing Party.

(g)    "Source Code" means computer code, scripts, assembly, binaries, source code listings, object code listings and descriptions of object code, and Hardware Description Language (HDL) or Register Transfer Level (RTL) files that describe the hardware design of any ASIC or other chip.

3.    **COMPUTATION OF TIME**

The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rule of Civil Procedure 6.

4.    **SCOPE**

(a)     The protections conferred by this Order cover not only Discovery Material governed by this Order as addressed herein, but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or their counsel in court or in other settings that might reveal Protected Material.

(b)     Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose, and nothing in this Order shall preclude any Producing Party from showing its Protected Material to an individual who prepared the Protected Material.

(c)     Nothing in this Order shall be construed to prejudice any Party's right to use any Protected Material in court or in any court filing with the consent of the Producing Party or by order of the Court.

(d)     This Order is without prejudice to the right of any Party to seek further or additional protection of any Discovery Material or to modify this Order in any way, including, without limitation, an order that certain matter not be produced at all.

5.     **<u>DURATION</u>**

Even after the termination of this case, the confidentiality obligations imposed by this Order shall remain in effect until a Producing Party agrees otherwise in writing or a court order otherwise directs.

6.     **<u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>**

(a)     <u>Basic Principles</u>.  All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including, without limitation, any other litigation, patent prosecution or acquisition, or any business or competitive

purpose or function.  Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

(b)     Secure Storage.  Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

(c)     Legal Advice Based on Protected Material.  Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

(d)     Limitations.   Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protected Material.  Nothing in this Order shall restrict in any way the use or disclosure of Discovery Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of the Producing Party; (iii) previously produced, disclosed, and/or provided by the Producing Party to the Receiving Party or a non-party without an obligation of confidentiality and not by inadvertence or mistake; (iv) with the consent of the Producing Party; or (v) pursuant to an order of the Court.

(e)     Patent Prosecution Bar.  Absent the written consent of the Producing Party, any person on behalf of the Receiving Party who receives one or more items designated "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" by a Producing Party shall not be involved, directly or indirectly, in any of the following patent prosecution activities: preparing, prosecuting, drafting, editing, and/or amending of patent applications, specifications, claims,

**AGREED PROTECTIVE ORDER – PAGE 5**

and/or responses to office actions, or advising or consulting on the preparation, prosecution, drafting, editing, and/or amending of patent applications, specifications, claims, and/or responses to office actions, relating to the functionality, operation, and design of secure portable devices or card readers (generally or as described in any patent in suit), before any foreign or domestic agency, including the United States Patent and Trademark Office.  These prohibitions are not intended to and shall not preclude counsel from participating directly or indirectly in reexamination, *inter partes* review, covered business method review, or reissue proceedings. These prohibitions shall begin when access to "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" materials are first received by the affected individual, and shall end one (1) years after the final resolution of this action, including all appeals.

7.   **DESIGNATING PROTECTED MATERIAL**

(a)   Available Designations.   Any Producing Party may designate Discovery Material with any of the following designations, provided that it meets the requirements for such designations as provided for herein:  "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE."

(b)   Written Discovery and Documents and Tangible Things.   Written discovery, documents (which include "electronically stored information," as that phrase is used in Federal Rule of Procedure 34), and tangible things that meet the requirements for the confidentiality designations listed in Paragraph 7(a) may be so designated by placing the appropriate designation on every page of the written material prior to production.  For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate

designation, and mark the medium, container, and/or communication in which the digital files were contained.   In the event that original documents are produced for inspection, the original documents shall be presumed "CONFIDENTIAL – ATTORNEYS' EYES ONLY" during the inspection and re-designated, as appropriate during the copying process.

(c)      Native Files.  Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this Order by appending to the file names or designators information indicating whether the file contains "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE," material, or shall use any other reasonable method for so designating Protected Materials produced in electronic format. When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an expert or consultant pre-approved pursuant to paragraph 11, the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file.

(d)      <u>Depositions and Testimony</u>.  Parties or testifying persons or entities may designate depositions and other testimony with the appropriate designation by indicating on the record at the time the testimony is given or by sending written notice of how portions of the transcript of the testimony are designated within thirty (30) days of receipt of the transcript of the testimony. If no indication on the record is made, all information disclosed during a deposition shall be deemed "CONFIDENTIAL – ATTORNEYS' EYES ONLY" until the time within which it may be appropriately designated as provided for herein has passed.  If no confidentiality designation has been made, any Party that wishes to disclose the transcript, or information contained therein,

may provide written notice of its intent to treat the transcript as non-confidential, after which time, any Party that wants to maintain any portion of the transcript as confidential must designate the confidential portions within fourteen (14) days, or else the transcript may be treated as non-confidential.  Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material.  In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order.  In the event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties," or their equivalent.  Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter, and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material.  Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

    8.    **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL"**

    (a)    A Producing Party may designate Discovery Material as "CONFIDENTIAL" if it contains or reflects confidential, proprietary, and/or commercially sensitive information.

(b)    Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL" may be disclosed only to the following:

(i)    The Receiving Party's Outside Counsel, such counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)    Not more than three (3) representatives of the Receiving Party who are officers or employees of the Receiving Party, who may be, but need not be, in-house counsel for the Receiving Party, as well as their immediate paralegals and staff, to whom disclosure is reasonably necessary for this case, provided that:  (a) each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; and (b) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iii)    Any outside expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; and (c) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iv)    Court reporters, stenographers and videographers retained to record testimony taken in this action;

(v)    The Court, jury, and court personnel;

**Appxix**

(vi)     Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(vii)    Mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential;

(viii)   Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

(ix)     Any person shown on the face of the Discovery Material to have authored or received it, and any person who had lawful access to the Discovery Material outside the terms of this Protective Order;

(x)      Any other person with the prior written consent of the Producing Party.

9.     **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL – ATTORNEYS' EYES ONLY"**

(a)     A Producing Party may designate Discovery Material as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" if it contains or reflects confidential, proprietary, and/or commercially sensitive information that cannot safely be disclosed to non-attorney representatives of a Receiving Party.

(b)     Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" may be disclosed only to the following:

(i)       The Receiving Party's Outside Counsel, such counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)      Any outside expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; and (c) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iii)     Court reporters, stenographers and videographers retained to record testimony taken in this action;

(iv)      The Court, jury, and court personnel;

(v)       Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(vi)      Mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential;

(vii)     Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order;

**AGREED PROTECTIVE ORDER – PAGE 11**

(viii)   Any person shown on the face of the Discovery Material to have authored or received it, and any person who had lawful access to the Discovery Material outside the terms of this Protective Order;

(ix)   Any other person with the prior written consent of the Producing Party.

10.   **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE"**

(a)   To the extent production of Source Code becomes necessary to the prosecution or defense of the case, a Producing Party may designate Source Code as "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" if it comprises or includes confidential, proprietary, and/or trade secret Source Code.

(b)   Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(c)   Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" shall be subject to the provisions set forth in Paragraph 11 below, and may be disclosed, subject to Paragraph 11 below, solely to:

(i)   The Receiving Party's Outside Counsel, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)   Any outside expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such expert or consultant is not a current

officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time

of retention to become an officer, director or employee of a Party or of a competitor of a Party;

and (c) no unresolved objections to such disclosure exist after proper notice has been given to all

Parties as set forth in Paragraph 12 below;

        (iii)    Court reporters, stenographers and videographers retained to record

testimony taken in this action;

        (iv)    The Court, jury, and court personnel;

        (v)    Any mediator who is assigned to hear this matter, and his or her

staff, subject to their agreement to maintain confidentiality to the same degree as required by this

Protective Order;

        (vi)    Any person shown on the face of the Discovery Material to have

authored or received it, and any person who had lawful access to the Discovery Material outside

the terms of this Protective Order, provided that if such person is a former employee, partner, or

affiliate of  IOENGINE or Ingenico, such person agrees to be bound by the provisions of the

Protective Order by signing a copy of Exhibit A;

        (vii)    Any other person with the prior written consent of the Producing

Party.

    11.    **DISCLOSURE AND REVIEW OF SOURCE CODE**

    (a)    Any Source Code that is produced shall be made available for inspection in

electronic format at the Delaware offices of the Producing Party's outside counsel, or any other

location mutually agreed by the Parties.  Source Code will be made available for inspection

between the hours of 8 a.m. and 6 p.m. on business days (*i.e.*, weekdays that are not Federal

holidays), although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times.

(b)     Prior to the first inspection of any requested Source Code, the Receiving Party shall provide seven (7) days' notice of the Source Code that it wishes to inspect. The Receiving Party shall provide two (2) business days' notice prior to any additional inspections.

(c)     Source Code that is designated "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" shall be produced for inspection and review subject to the following provisions, unless otherwise agreed by the Producing Party:

(i)     All Source Code shall be made available by the Producing Party to the Receiving Party's outside counsel and/or experts in a secure room on a secured computer without Internet access or network access to other computers and on which all access ports have been disabled (except for one printer port), as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal, or other transfer of any Source Code outside or away from the computer on which the Source Code is provided for inspection (the "Source Code Computer" in the "Source Code Review Room"). The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, and such tools shall be disclosed to the Receiving Party upon request and upon three (3) days' notice. The Receiving Party's outside counsel and/or experts may request that additional commercially available software tools for viewing and searching Source Code be installed on the secured computer, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools, approval of which cannot be unreasonably withheld; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections

**AGREED PROTECTIVE ORDER – PAGE 14**

herein.  The Receiving Party must provide the Producing Party with electronic access to such licensed software tool(s) or with a USB drive, CD, or DVD containing such licensed software tool(s) at least five (5) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer.

(ii)     No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Review Room.  The Producing Party shall, however, provide a functioning landline telephone in the Source Code Review Room and make available a nearby breakout room or visitor office with internet access where cellular phones and laptops may be used by the Receiving Party for permitted purposes.

(iii)     The Receiving Party's outside counsel and/or experts shall be entitled to take notes relating to the Source Code but may not copy the Source Code into the notes and may not take such notes electronically on the Source Code Computer itself or any other computer.

(iv)     The Producing Party may, without audio monitoring, visually monitor the activities of the Receiving Party's representatives from outside the Source Code Review Room during any Source Code review, but only to ensure that no unauthorized electronic records of the Source Code and no information concerning the Source Code are being improperly created or transmitted in any way.

(v)     No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided herein.  Further, no other written or electronic record of the Source Code is permitted except as otherwise provided herein.  The Producing Party shall make available a laser printer with commercially reasonable

printing speeds for on-site printing during inspection of the Source Code.  The Receiving Party may print limited portions of the Source Code only when necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report or affidavit).  Any printed portion that consists of more than 10 pages of a continuous block of Source code shall be presumed to be excessive. The Receiving Party may print out no more than 1,000 pages of Source Code absent the written consent of the Producing Party or an Order of the Court.  The Receiving Party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, *i.e.*, as an alternative to reviewing that Source Code electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of Source Code for review and analysis elsewhere.  Upon printing any such portions of Source Code, the printed pages shall be collected by the Producing Party.  The Producing Party shall Bates number, copy, and label "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY - SOURCE CODE" any pages printed by the Receiving Party. Within five (5) days, the Producing Party shall either (i) provide one copy set of such pages to the Receiving Party (for delivery to Receiving Party's outside counsel within two (2) days, or by any other means agreed to by the parties) or (ii) inform the Requesting Party that it objects that the printed portions are not done for a permitted purpose.  If the Producing Party objects that the printed portions are not done for a permitted purpose, the parties shall meet and confer within two (2) business days following such objection.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party shall be entitled to seek the Court's resolution of whether the printed Source Code was printed for a permitted purpose.  Upon resolution of the objection by the parties or by the Court, or if the objection is otherwise retracted by the Producing Party, the Producing Party shall provide one copy of such pages to the Receiving

**AGREED PROTECTIVE ORDER – PAGE 16**

Party within one two (2) business days (for delivery to Receiving Party's outside counsel within two (2) days, or by any other means agreed to by the parties), but the Producing Party shall make all reasonable efforts to provide such copies to the Receiving Party the next business day. The printed pages shall constitute part of the Source Code produced by the Producing Party in this action. To the extent that any printed pages of Source Code are not produced to the Receiving Party for any reason, they shall not count against any limitations on print outs.

(vi)      Members of a Receiving Party's outside law firm who will review a Producing Party's Source Code on behalf of a Receiving Party shall be identified in writing to the Producing Party at least two (2) days in advance of the first time that such person reviews such Source Code. All other persons who will review a Producing Party's Source Code on behalf of a Receiving Party shall be identified in writing to the Producing Party at least seven (7) days in advance of the first time that such person reviews such Source Code. Such identification shall be in addition to any other disclosure required under this Order. All persons viewing Source Code shall, at the request of the Producing Party, sign on each day they view Source Code a log that will include the names of persons who enter the locked room to view the Source Code and when they enter and depart.

(vii)     Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the Receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Review Room.

(viii)    Proper identification of all authorized persons shall be provided upon request prior to any access to the secure room or the computer containing Source Code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by

the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the Producing Party, to any individual who fails to provide proper identification.

(ix)     Other than as provided above, the Receiving Party will not copy, remove, or otherwise transfer any Source Code from the Source Code Computer including, without limitation, copying, removing, or transferring the Source Code onto any recordable media or recordable device.  The Receiving Party will not transmit any Source Code in any way from the Producing Party's facilities.  The Receiving Party will not electronically transmit any Source Code outside the offices of its outside counsel of record other than when necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report or affidavit) unless such electronically-transmitted Source Code or document containing Source Code is encrypted.

(x)     The Receiving Party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.

(xi)     If a Party reasonably believes that it needs to submit a portion of Source Code as part of a filing with the Court, such filing shall be made under seal or the Parties shall meet and confer regarding alternate arrangements for making such a filing while protecting the confidentiality of the Source Code.

**AGREED PROTECTIVE ORDER – PAGE 18**

**Appxxviii**

12.   **NOTICE OF DISCLOSURE**

(a)      Prior to disclosing any Protected Material to any person described in Paragraphs 8(b)(ii), 8(b)(iii), 9(b)(ii), or 10(c)(ii) (referenced below as "Person"), the Party seeking to disclose such information shall provide the Producing Party with written notice that includes:

(i) the name of the Person;

(ii) an up-to-date curriculum vitae of the Person;

(iii) the present employer and title of the Person;

Further, the Party seeking to disclose Protected Material shall provide such other information regarding the Person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside expert or consultant.

(b)      Within seven (7) days of receipt of the disclosure of the Person, the Producing Party may object in writing to the Person for good cause.  In the absence of an objection at the end of the seven (7) day period, the Person shall be deemed approved under this Protective Order.  There shall be no disclosure of Protected Material to the Person prior to expiration of this seven (7) day period.  If the Producing Party objects to disclosure to the Person within such seven (7) day period, the Parties shall meet and confer via telephone or in person within five (5) days following the objection and attempt in good faith to resolve the dispute on an informal basis.  If the dispute is not resolved, the Party objecting to the disclosure will have five (5) days from the date of the meet and confer to seek relief from the Court.  If relief is not sought from the Court within that time, the objection shall be deemed withdrawn.  If relief is sought, designated materials shall not be disclosed to the Person in question until the Court resolves the objection.

(c)     For purposes of this section, "good cause" shall include an objectively reasonable concern that the Person will, advertently or inadvertently, use or disclose Discovery Materials in a way or ways that are inconsistent with the provisions contained in this Order.

(d)     Prior to receiving any Protected Material under this Order, the Person must execute a copy of the "Agreement to Be Bound by Protective Order" (Exhibit A hereto) and serve it on all Parties.

13.     **<u>CHALLENGING DESIGNATIONS OF PROTECTED MATERIAL</u>**

(a)     A Party shall not be obligated to challenge the propriety of any designation of Discovery Material under this Order at the time the designation is made, and a failure to do so shall not preclude a subsequent challenge thereto.

(b)     Any challenge to a designation of Discovery Material under this Order shall be written, shall be served on outside counsel for the Producing Party, shall particularly identify the documents or information that the Receiving Party contends should be differently designated, and shall state the grounds for the objection.  Thereafter, further protection of such material shall be resolved in accordance with the following procedures:

(i)     The objecting Party shall have the burden of conferring either in person, in writing, or by telephone with the Producing Party claiming protection (as well as any other interested party) in a good faith effort to resolve the dispute.  The Producing Party shall have the burden of justifying the disputed designation;

(ii)    Failing agreement, the Receiving Party may bring a motion to the Court for a ruling that the Discovery Material in question is not entitled to the status and protection of the Producing Party's designation.  The Parties' entry into this Order shall not preclude or prejudice either Party from arguing for or against any designation, establish any presumption that

**Appxxx**

a particular designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information;

(iii)     Notwithstanding any challenge to a designation, the Discovery Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the Party who designated the Discovery Material in question withdraws such designation in writing; or (b) the Court rules that the Discovery Material in question is not entitled to the designation.

14.     **SUBPOENAS OR COURT ORDERS**

(a)     If at any time Protected Material is subpoenaed by any court, arbitral, administrative, or legislative body, the Party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every Party who has produced such Discovery Material and to its counsel and shall provide each such Party with an opportunity to move for a protective order regarding the production of Protected Materials implicated by the subpoena.

15.     **FILING PROTECTED MATERIAL**

(a)     Absent written permission from the Producing Party or a court Order secured after appropriate notice to all interested persons, a Receiving Party may not file or disclose in the public record any Protected Material.

(b)     The foregoing sub-paragraph notwithstanding, any Party is authorized under Local Rule 5.1.3 to file under seal with the Court any brief, document, or materials that are designated as Protected Material under this Protective Order.  However, nothing in this section shall in any way limit or detract from this Protective Order's requirements as to Source Code.

16.   **INADVERTENT DISCLOSURE OF PRIVILEGED MATERIAL**

(a)   The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b)   Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such or certify destruction of Protected Material or Discovery Material and all copies to the Producing Party.

(c)   At the request of the Receiving Party, the Producing Party shall promptly provide a record containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

17.   **INADVERTENT FAILURE TO DESIGNATE PROPERLY**

(a)   The inadvertent failure by a Producing Party to designate Discovery Material as Protected Material with one of the designations provided for under this Order shall not waive any such designation provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within seven (7) days of the Producing Party learning of the inadvertent failure to designate. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7)

days upon its notification to the Receiving Parties.  Upon receiving the Protected Material with the correct confidentiality designation, the Receiving Parties shall return or securely destroy, at the Producing Party's option, all Discovery Material that was not designated properly.

(b)     A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless it is clear on its face that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material at the appropriately designated level pursuant to the terms of this Order.

18.     **<u>INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER</u>**

(a)     In the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure.  The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made.

(b)     Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive the right to hold the disclosed document or information as Protected.

19.    **FINAL DISPOSITION**

(a)    Not later than ninety (90) days after the Final Disposition of this case, each Party shall return all Discovery Material of a Producing Party to the respective outside counsel of the Producing Party or destroy such Material, at the option of the Producing Party.  For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

(b)    All Parties that have received any such Discovery Material shall certify in writing that all such materials have been returned to the respective outside counsel of the Producing Party or destroyed.  Notwithstanding the provisions for return of Discovery Material, outside counsel may retain one set of pleadings, correspondence, and attorney and consultant work product (but not document productions) for archival purposes, but must return or destroy any pleadings, correspondence, and consultant work product that contain Source Code.

20.    **DISCOVERY FROM EXPERTS OR CONSULTANTS**

(a)    Absent good cause, drafts of reports of testifying experts, and reports and other written materials, including drafts, of consulting experts, shall not be discoverable in accordance with Fed. R. Civ. P. 26(b)(4)(B).

(b)    Testifying experts shall not be subject to discovery with respect to any draft of his or her report(s) in this case.  Draft reports, notes, or outlines for draft reports developed and drafted by the testifying expert and/or his or her staff are also exempt from discovery.

(c)    Discovery of materials provided to testifying experts shall be limited to those materials, facts, consulting expert opinions, and other matters actually relied upon by the testifying expert in forming his or her final report, trial or deposition testimony, or any opinion in this case. No discovery can be taken from any non-testifying expert except to the extent that such

**AGREED PROTECTIVE ORDER – PAGE 24**

non-testifying expert has provided information, opinions, or other materials to a testifying expert relied upon by that testifying expert in forming his or her final report(s), trial and/or deposition testimony, or any opinion in this case.

(d)     No conversations or communications between counsel and any testifying or consulting expert will be subject to discovery unless the conversations or communications are relied upon by such experts in formulating opinions that are presented in reports or trial or deposition testimony in this case.

(e)     Materials, communications, and other information exempt from discovery under the foregoing sub-Paragraphs 20(a)-(d) shall be treated as attorney-work product for the purposes of this litigation and Order.

(f)     Nothing in Protective Order, including the foregoing sub-Paragraphs 20(a)-(d), shall alter or change in any way the requirements in Paragraph 11 regarding Source Code, and Paragraph 11 shall control in the event of any conflict.

21.   **MISCELLANEOUS**

(a)     <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.  By stipulating to this Order, the Parties do not waive the right to argue that certain material may require additional or different confidentiality protections than those set forth herein.

(b)     <u>Termination of Matter and Retention of Jurisdiction</u>.  The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Determination of the above-captioned matter.  The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

(c)   <u>Successors</u>.  This Order shall be binding upon the Parties hereto, their attorneys, and their successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, retained consultants and experts, and any persons or organizations over which they have direct control.

(d)   <u>Right to Assert Other Objections</u>. By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item.  Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.  This Order shall not constitute a waiver of the right of any Party to claim in this action or otherwise that any Discovery Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this action or any other proceeding.

(e)   <u>Burdens of Proof</u>.  Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Discovery Material is confidential, which level of confidentiality is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

(f)   <u>Modification by Court</u>.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order *sua sponte* in the interests of justice. The United States District Court for the District Of Delaware is responsible for the interpretation and enforcement of this Order.  All disputes concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the District of Delaware.

**AGREED PROTECTIVE ORDER – PAGE 26**

(g)   <u>Discovery Rules Remain Unchanged</u>.  Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders, except as expressly stated.  Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders.

22.   **OTHER PROCEEDINGS**.  By entering this Protective Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Protective Order who becomes subject to a motion to disclose another party's information designated as confidential pursuant to this Protective Order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.


**SO ORDERED**.


_____

United States District Judge

## EXHIBIT A

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Ingenico Inc. v. IOENGINE, LLC*, United States District Court, District of Delaware, Civil Action No. 1:18-cv-826 (CFC).  Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address:_____

Dated: _____

_____
[Signature]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INGENICO INC., §<br> *Plaintiff,* §<br> §<br>v. §<br> §<br>IOENGINE, LLC, §<br> *Defendant.* §<br> §<br>IOENGINE, LLC, §<br> *Counterclaim Plaintiff,* §<br>v. §<br> §<br>INGENICO INC., INGENICO CORP., and §<br>INGENICO GROUP SA, §<br> *Counterclaim Defendants.* §<br> § | C.A. No. 18-826-WCB |

## JUDGMENT

This action came before the Court for a trial by jury beginning on July 11, 2022. The issues have been tried and the jury has rendered its verdict (D.I. 500). Therefore,

IT IS HEREBY ORDERED AND ADJUDGED that:

1. Judgment is entered for Defendant and Counterclaim Plaintiff IOENGINE, LLC ("IOENGINE") that claim 3 of United States Patent No. 9,059,969 ("the '969 patent") is infringed as set out in the verdict form (D.I. 500);

2. Judgment is entered for Plaintiff and Counterclaim Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group SA (collectively, "Ingenico") that Ingenico does not infringe claim 10 of the '969 patent as set out in the verdict form (D.I. 500);

3. Judgment is entered for IOENGINE that claims 56, 90, 101, 105, and 124 of United States Patent No. 9,774,703 ("the '703 patent") are infringed as set out in the verdict form (D.I. 500);

**Appx1**

4. Judgment is entered for Ingenico that Ingenico does not infringe claim 114 of the '703 patent as set out in the verdict form (D.I. 500);

5. Judgment is entered for Ingenico that claim 3 of the '969 patent is invalid for anticipation as set out in the verdict form (D.I. 500);

6. Judgment is entered for Ingenico that claims 56, 90, 101, 105, and 124 of the '703 patent are invalid for anticipation as set out in the verdict form (D.I. 500);

7. Judgment is entered for Ingenico that claim 3 of the '969 patent is invalid for obviousness as set out in the verdict form (D.I. 500); and

8. Judgment is entered for Ingenico that claims 56, 90, 101, 105, and 124 of the '703 patent are invalid for obviousness as set out in the verdict form (D.I. 500).


IT IS SO ORDERED.

SIGNED this 25th day of July, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGENICO INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 18-826-WCB |
| | § | |
| IOENGINE, LLC, | § | **FILED UNDER SEAL** |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

_____

| | | |
|---|---|---|
| IOENGINE, LLC, | § | |
| | § | |
| *Counterclaim Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| INGENICO INC., | § | |
| INGENICO CORP., and | § | |
| INGENICO GROUP S.A., | § | |
| | § | |
| *Counterclaim Defendants.* | § | |

_____

## MEMORANDUM OPINION AND ORDER

In this patent case IOENGINE, LLC, alleged that Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. (collectively, "Ingenico") infringed several claims of U.S. Patent Nos. 9,059,969 ("the '969 patent") and 9,774,703 ("the '703 patent"). At the conclusion of a trial held between July 11, 2022, and July 15, 2022, the jury found that Ingenico had infringed claim 3 of the '969 patent and claims 56, 90, 101, 105, and 124 of the '703 patent, and that Ingenico had not infringed claim 10 of the '969 patent or claim 114 of the '703 patent. The jury also found that claim 3 of the '969 patent

and claims 56, 90, 101, 105, and 124 of the '703 patent were invalid for both anticipation and obviousness. Because Ingenico asserted invalidity as a defense and not as a counterclaim, the jury did not enter verdicts on the validity of claim 10 of the '969 patent or claim 114 of the '703 patent.

Following the trial, I entered judgment on the verdict. Dkt. No. 506. IOENGINE subsequently filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and, in the alternative, for a new trial under Federal Rule of Civil Procedure 59(a). Dkt. No. 512. I held oral argument on IOENGINE's motion on December 6, 2022.

## I.    Background

The '969 and '703 patents, which share a common specification, are directed to a device that the patents refer to as a "tunneling client access point" ("TCAP"). The patents describe the TCAP as "a highly secure, portable, [and] power efficient storage and data processing device." '969 patent, Abstract. In a preferred embodiment, the TCAP is a Universal Serial Bus ("USB") device that connects to an "access terminal" (e.g., a desktop computer, server, or mobile device). *Id.* at col. 3, ll. 46–54. In some embodiments, a user can "observe data stored on the TCAP without it being resident on the [access terminal]," a feature that "can be useful to maintain higher levels of data security." *Id.*, Abstract. In other embodiments, "the TCAP may tunnel data through an [access terminal] across a communications network to access remote servers." *Id.* Put more simply, the claimed inventions allow a user to employ processing and storage resources on the TCAP device while making use of the display and network connection associated with the access terminal.

Ingenico's accused products are mobile credit card readers used by merchants who run a payment processing software application on a smartphone or tablet. In addition, Ingenico provides a payment application, known as "RoamPayX," to a small number of its customers, and IOENGINE accused that application of infringing the asserted claims when it is used with certain card readers.

The majority of Ingenico's customers do not use RoamPayX, but instead write their own applications using Ingenico's Application Programming Interfaces ("APIs") and/or Software Development Kits ("SDKs").

At trial, Ingenico introduced evidence regarding a device known as the "DiskOnKey," a portable USB drive that was manufactured and sold in the early 2000s by an Israeli company, M-Systems, Ltd.[1] Ingenico argued that the asserted claims of the '969 and '703 patents were anticipated by a version of the DiskOnKey device featuring a firmware upgrade application that allowed users to upgrade the firmware installed on DiskOnKey devices and an SDK designed for use with the DiskOnKey.[2] Ingenico also argued that the asserted claims would have been obvious in view of the combination of the DiskOnKey system and U.S. Patent Publication No. 2004/0039932 ("Elazar").

## II.     Motion for Judgment as a Matter of Law

In its motion for judgment as a matter of law, IOENGINE challenges various aspects of the jury's verdict in this case. For the reasons set forth below, the motion for judgment as a matter of law is denied.

Federal Rule of Civil Procedure 50(a) provides that a motion for judgment as a matter of law may be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-movant on an issue. When a party renews its motion for

---

[1] In 2006, M-Systems was acquired by SanDisk Corporation, which has since been acquired by Western Digital Technologies, Inc. *See* Dkt. No. 463 at 2.

[2] The DiskOnKey SDK is a library of functions that enables software developers to write programs that interact with physical DiskOnKey devices. Tr. 790:4–19. That is, the developers can use code from the DiskOnKey SDK to interact with the DiskOnKey firmware. Tr. 805:20–806:10. For instance, developers can call functions to retrieve the firmware version of a DiskOnKey device, or to retrieve the public key that is associated with a particular DiskOnKey. *See id.*; Tr. 814:10–24; DX333 at 36, 72. This opinion refers to the functionality of the physical DiskOnKey devices that can be leveraged by developers through the SDK as the "SDK capabilities."

3

judgment as a matter of law after the conclusion of a jury trial, that party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, *Ltd.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (citation omitted).

IOENGINE raises four specific challenges to the jury's verdict in its motion for judgment as a matter of law: (1) substantial evidence did not support a finding that the DiskOnKey device and its firmware upgrade application and SDK were prior art; (2) substantial evidence did not support a conclusion that Mr. McNulty's invention date was later than July 26, 2001; (3) substantial evidence did not support a finding of anticipation or obviousness based on the DiskOnKey device and the firmware upgrade application; and (4) substantial evidence did not support a verdict of obviousness based in part on the Elazar reference.

**A. DiskOnKey as Prior Art Under 35 U.S.C. § 102(b)**

IOENGINE first argues that substantial evidence did not support a conclusion that the DiskOnKey system was prior art for purposes of section 102(b). Specifically, IOENGINE contends that there was insufficient evidence from which the jury could conclude that the DiskOnKey and its associated firmware upgrade application and SDK capabilities were either on sale or in public use (or both) prior to the critical date of March 23, 2003.[3]

_____

[3] The version of section 102(b) that applies to this case is the version that pre-dated the Leahy-Smith America Invents Act of 2011 ("AIA"), because the patents in suit have effective filing dates prior to March 16, 2013, the effective date of the amendments to section 102(b) made by the 2011 Act.

4

### 1. On Sale

Under pre-AIA section 102(b), a device is prior art to a patented invention if it was "on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (2006). IOENGINE argues that there was insufficient evidence at trial to support a finding that the firmware upgrade application was "on sale" for purposes of section 102(b). Specifically, IOENGINE argues that "the evidence indicated only that some version of the firmware upgrade application may have been separately made available for download—ostensibly for free and without consideration," and that there was no evidence that the firmware upgrade application was ever sold in combination with a physical DiskOnKey device. Dkt. No. 513 at 20.

That argument mischaracterizes the evidence at trial regarding the DiskOnKey and the firmware upgrade application. Ingenico introduced evidence that the firmware upgrade application was initially made available to users in July 2002 via a download link on the M-Systems website. *See, e.g.*, DX330. In addition, Ingenico introduced evidence that M-Systems began including the firmware upgrade application on physical DiskOnKey devices that were sold to customers at least as early as November 8, 2002. *See* DX089; Tr. 782:3–783:21. Specifically, Ingenico introduced a page from the M-Systems website that stated: "[The] DiskOnKey already comes with several applications that demonstrate [the] terrific new potential [of the DiskOnKey]. Users can secure their devices and files using the KeySafe application, or upgrade their firmware using the Upgrade program." DX089. Based on that webpage, which was available at least by November 8, 2002, the jury reasonably could have found that the firmware upgrade application was included on physical DiskOnKey devices that were sold to customers from at least that date on.

Examination of the sales records introduced by Ingenico shows that M-Systems made numerous sales of the DiskOnKey in the United States in late 2002 and early 2003. Ingenico

introduced a spreadsheet of M-Systems' sales records, which listed 139 invoices for sales of DiskOnKey products to customers in the United States between November 8, 2002, and December 31, 2002. DX316. A second spreadsheet introduced by Ingenico showed that M-Systems listed 352 invoices for sales of DiskOnKey products to customers in the United States between January 1, 2003, and the critical date of March 23, 2003, one year before the priority date for the '969 and '703 patents. DX317. Those spreadsheets listed the number of sales, the identity and location of the purchasers, and the price paid for each purchase.[4] From those records and the M-Systems November 8, 2002, webpage, the jury reasonably could have concluded that M-Systems sold DiskOnKey devices that included the firmware upgrade application to customers in the United States prior to March 23, 2003. IOENGINE is thus incorrect in contending that "no evidence indicated that [physical DiskOnKey devices] were sold in combination with the firmware upgrade application." *See* Dkt. No. 513 at 20.

Apart from the firmware upgrade application, IOENGINE argues that the DiskOnKey SDK was neither sold nor offered for sale. Dkt. No. 513 at 23 n.25. IOENGINE raised this argument only in a footnote and therefore has forfeited it. *See Nw. Univ. v. Universal Robots A/S*, No. 21-149, 2022 WL 903892, at *6 & n.26 (D. Del. Mar. 28, 2022) ("[C]ourts traditionally do not consider arguments presented entirely in footnotes.") (citing cases); *Gavrieli Brands LLC v. Soto Massini (USA)*, No. 18-462, 2020 WL 1443215, at *5 (D. Del. Mar. 24, 2020); *Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*, No. 17-1086, 2018 WL 5669168, at *13 n.12 (D. Del. Nov. 1, 2018); *Campbell v. Sussex Cnty. Fed. Credit Union*, No. 10-710, 2015 WL 3918946, at *1 (D. Del. June 22, 2015) ("The

---

[4] The spreadsheets list all transactions; the numbers of sales listed above include only those transactions that constituted sales, i.e., transactions for payment to M-Systems. A number of those sales transactions were for multiple DiskOnKey devices.

Court will not address issues raised in footnotes . . . ."); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[A]rguments raised in footnotes are not preserved.").

Even if IOENGINE had not forfeited that argument, it would be without merit, for the following reasons: Ingenico's expert, James Geier, explained that the DiskOnKey SDK is a set of functions that allows a software developer to access certain functionality on the DiskOnKey device. *See* Tr. 805:8–806:5.[5] For example, the SDK may enable a developer to obtain the firmware version of a DiskOnKey device, Tr. 806:6–10; DX333.36, or to obtain the public key of a DiskOnKey device, Tr. 814:6–815:12; DX333.72. Mr. Geier relied on the DiskOnKey SDK documentation, which was in evidence, DX333, to illustrate that the DiskOnKey device had certain capabilities, such as authentication. *See* Tr. 811:5–12, 812:14–818:22.

With respect to authentication (or verification) capability, which was recited in claim 3 of the '969 patent and claims 56 and 105 of the '703 patent, Mr. Geier testified that the DiskOnKey firmware upgrade application would authenticate the DiskOnKey device using an authentication protocol based on Public Key Infrastructure ("PKI"). Tr. 811:5–12, 812:12–18. To support that opinion, Mr. Geier relied on multiple disclosures in the DiskOnKey SDK documentation. First, the documentation stated that "[t]he DiskOnKey enables PKI-based authentication and signing in a highly secure environment." DX333.71; *see also* Tr. 818:12–18. Second, the documentation indicated that software developers could use a function called "getPublicKey" to obtain the public key of a DiskOnKey device. DX333.72; *see also* Tr. 814:6–815:12. The documentation added that "the DiskOnKey public key is unique for each DiskOnKey." DX333.72; *see also* Tr. 815:13–816:2. Third, Mr. Geier added that "we know from the SDK" that "there is a private key sitting on the

_____

[5] Citations to "Tr." refer to the transcript of the jury trial, which can be found at Dkt. Nos. 507–11.

DiskOnKey" that would be used for PKI-based authentication. Tr. 816:3–818:8. In short, Mr. Geier relied on the SDK documentation to establish that the physical DiskOnKey device would have the capability to authenticate using PKI.

The critical question is whether the DiskOnKey devices that were sold in the United States prior to March 23, 2003, had SDK capabilities. The jury heard testimony from Eyal Sobol, a Western Digital employee familiar with the M-Systems products, who testified that the SDK documentation accurately described the capabilities of the DiskOnKey device. Tr. 735:5–8, 744:18–21. The jury also saw evidence indicating that the SDK capabilities became available on the DiskOnKey in September 2002. *See* DX307; DX333.1. Based on the evidence before it, the jury could reasonably have concluded that the DiskOnKey devices that were sold in the United States after September 2002 had SDK capabilities, and thus that the DiskOnKey devices that were on sale during late 2002 and early 2003 satisfied all the limitations of the claims that the jury found invalid.

IOENGINE argues that the M-Systems press releases regarding the DiskOnKey firmware upgrade application and SDK capabilities were, at most, advertisements and did not constitute offers for sale under section 102(b). While the press releases by themselves were not offers for sale, they were highly relevant because they showed that the firmware upgrade application and SDK capabilities were available for the DiskOnKey as early as July and September of 2002. Moreover, IOENGINE's argument directed to the press releases does not undermine Ingenico's proof of invalidating sales prior to the critical date, given the clear and specific evidence that numerous sales of the DiskOnKey devices with the firmware upgrade application and SDK capabilities were made in the United States at least as early as November 8, 2002. The sales made between November 8, 2002, and March 23, 2003, triggered the on-sale bar of section 102(b) without regard to whether there were any separate offers for sale during or before that period. In particular, the evidence was

sufficient to show that the DiskOnKey devices that were sold during that period had processors, the firmware upgrade applications, and SDK capabilities. Accordingly, IOENGINE's motion for judgment as a matter of law with respect to the on-sale bar is denied.

### 2. Public Use

IOENGINE argues that there was insufficient evidence to conclude that the DiskOnKey and its associated firmware upgrade application and SDK capabilities were in public use prior to March 23, 2003. Under pre-AIA 35 U.S.C. § 102(b), a device is prior art to a patented invention if it was "in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." Because substantial evidence supports a conclusion that the DiskOnKey with the firmware upgrade application and SDK capabilities is prior art by virtue of being on sale, the judgment can be upheld even if the evidence is insufficient to support the jury's verdict on the public use issue. *See Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011) ("A general jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity."); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ("We will uphold . . . a [jury] verdict [of infringement] if there was sufficient evidence to support any of the plaintiff's alternative factual theories; we assume the jury considered all the evidence and relied upon a factual theory for which the burden of proof was satisfied."); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014). In any event, there is substantial evidence to support a finding that the DiskOnKey system was in public use prior to March 23, 2003.

In IOENGINE's view, the evidence Ingenico presented to the jury was insufficient to establish public use because the evidence failed to demonstrate that there was an "actual use by someone at some point" of either the firmware upgrade application or the SDK prior to March 23,

9

2003. Dkt. No. 513 at 14 (citing *Minn. Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1303 (Fed. Cir. 2002)).  While IOENGINE concedes that the jury saw evidence that the DiskOnKey firmware upgrade application was made available to the public on the M-Systems website, IOENGINE argues that there is no evidence from which a jury could conclude that the software or SDK was ever downloaded from the website or used by anyone.  In particular, IOENGINE argues that the jury heard no evidence "that anyone ever accessed the site, downloaded the application, or actually used [the firmware upgrade application], much less in this country."  Dkt. No. 513 at 14.

To begin with, IOENGINE's argument is based on a misapprehension as to the nature of the public use evidence.  The evidence of public use of the firmware upgrade application and the SDK capabilities was not limited to the use of those features by persons who downloaded material from M-Systems' website; it included the evidence that large numbers of sales were made in late 2002 and early 2003 of DiskOnKey devices that already contained those features.  Moreover, the case law on which IOENGINE relies does not support its conclusion that the evidence of public use was legally insufficient.

In its briefs, IOENGINE relies heavily on the *Minnesota Mining* case to support its argument that the evidence of public use is insufficient, but a close examination of that case shows that it does not support IOENGINE's position.  The defendants in *Minnesota Mining* asserted that a substance called "Ricoseal," which was manufactured by a third party, embodied the asserted claims and was in public use because "samples of Ricoseal were sent to various corporations."  *Minn. Min.*, 303 F.3d at 1305, 1307.  The record in that case showed, however, that the Ricoseal product was a two-part composition that needed to be mixed together before being used.  *Id.* at 1307.  The asserted claim also required that the Ricoseal composition be used with a "signal transmission device," and the plaintiff pointed out that the defendants presented no evidence "that the mixture was applied to a

signal transmission device." *Id.* at 1298, 1307. The failure of proof, therefore, was based not only on the fact that there was no evidence that the corporations receiving the samples of Ricoseal ever mixed the two components together, but also on the absence of evidence that any of the recipients of Ricoseal ever used it with a signal transmission device, even assuming any of the recipients ever mixed the components together. That point is underscored by the fact that the defendants argued to the Federal Circuit that Ricoseal was merely "*intended* to be used with a signal transmission device." *Minn. Min. & Mfg. Co. v. Chemque, Inc.*, Nos. 00-1429, 00-1517, Appellees and Cross-Appellants' Br. 17 (Fed. Cir. Feb. 7, 2001) (emphasis added). The evidence presented by the defendants in *Minnesota Mining* therefore fell short of showing that there was any public use of the product recited in the asserted claim. The evidence of public use in this case is considerably stronger, as discussed in more detail below.

IOENGINE seizes on a statement in the *Minnesota Mining* court's discussion of prior use under section 102(a). After finding that the defendants had not "directed this court to any record evidence showing that anyone ever used Ricoseal," the court noted that "there is not substantial evidence of use of the Ricoseal product; there is no direct evidence of its use." 303 F.3d at 1307. From that statement, IOENGINE infers that direct evidence is required for proof of public use under section 102(b), and that circumstantial evidence, no matter how compelling, can never suffice to prove public use under that statute. IOENGINE's argument overreads the court's opinion in *Minnesota Mining*.

The court's reference to "no direct evidence" was a characterization of the lack of evidence in that case as to prior knowledge of the invention under the "known or used" requirement of section 102(a). Even apart from the fact that the court was addressing section 102(a), not section 102(b), the context of the court's statement makes clear that the court was not setting forth a proof requirement

11

for all cases.  That is, the court's language cannot fairly be read as establishing a bright-line rule that there must always be direct evidence of prior use in order to satisfy the public use requirement of section 102(b) and that circumstantial evidence will never suffice.[6]

The proper test for public use under section 102(b) is simply whether the invention was "accessible to the public" or "commercially exploited."  *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005).  In assessing whether that standard was met, "[e]ither direct or circumstantial evidence corroborating public use may be sufficient for a party to meet its burden of proof."  *TransWeb, LLC v. 3M Innovative Props. Co.*, 16 F. Supp. 3d 385, 393 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016).

Courts have treated circumstantial evidence of public accessibility such as press releases, download websites, and advertisements as appropriate evidence of public use.  *See, e.g.*, *Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*, No. 14-cv-1918, 2014 WL 12597154, at *6 (C.D. Cal. Dec. 22, 2014) (holding, on a motion for summary judgment, that evidence of a prior art product being advertised in a catalog and on Facebook was sufficient to create a triable issue regarding public use); *Phoenix Sols., Inc. v. W. Interactive Corp.*, No. 09-cv-8156, 2010 WL 6032841, at *7 (C.D.

---

[6]  The distinction between direct and circumstantial evidence, which is often unclear, is of questionable importance in this context, since "an implication that circumstantial evidence is weaker than direct evidence is incorrect."  *United States v. Godinez*, 7 F.4th 628, 639 (7th Cir. 2021).  Rather, "[c]ircumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable."  *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003); *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir. 1974).  It therefore would not be proper to overturn a jury's invalidity verdict solely on the basis that the evidence the jury heard would be better classified as circumstantial rather than direct evidence.

IOENGINE points out that the court in *Minnesota Mining* stated that public use requires "actual use by someone at some point."  303 F.3d at 1307.  That is not in dispute.  What the parties disagree about is whether proof of such use must be by direct evidence or may be by circumstantial evidence.  In this case, the circumstantial evidence is sufficient to show that there was actual use of the DiskOnKey device, combined with the firmware upgrade application and the SDK capabilities, in the United States "by someone at some point."

Cal. Aug. 25, 2010), *aff'd*, 438 F. App'x 897 (Fed. Cir. 2011) (holding, on a motion for summary judgment, that evidence that a prior art system was "regularly publicized . . . through conferences, workshops, and published articles," and "*could be* launched anywhere through the Web or over the telephone" was evidence of public use (emphasis added)); *Finjan, Inc. v. Symantec Corp.*, No. 10-cv-593, 2013 WL 5302560, at *6–7 (D. Del. Sept. 19, 2013), *aff'd*, 577 F. App'x 999 (Fed. Cir. 2014) (considering, among other evidence, user manuals and press releases that supported a finding of public use).

Ingenico introduced various items of evidence that could support a finding by clear and convincing evidence that the firmware upgrade application was in public use. First, as noted, the large numbers of U.S. sales of the DiskOnKey with the firmware upgrade application already loaded onto the device provided strong circumstantial evidence that devices containing that feature were in use in this country. Second, even ignoring those sales, the jury saw an earlier email that was sent by M-Systems to its employees regarding the firmware upgrade application for the DiskOnKey. DX330. That email, which was accompanied by a DiskOnKey "ReadMe" file, DX331, containing details about the functionality of the firmware upgrade application, encouraged the employees to "pass this information along to your partners, customers, reps and distributors," and indicated that the application could "be downloaded from the [DiskOnKey] website . . . starting from [July 10, 2002]." *Id.* Third, the jury saw a July 11, 2002, press release issued by M-Systems in Fremont, California, that promoted the launch of the firmware upgrade application and explained the benefits of the application. *See* DX097. Fourth, the jury saw screenshots of the M-Systems website indicating that the application was available for download. DX402. Fifth, Mr. Geier testified that "there would be . . . many people that would think they need to upgrade the firmware and would be downloading

13

**Appx15**

the firmware [upgrade application]" and the Readme file from the M-Systems website.  Tr. 1142:15–25.

There was also evidence in the record sufficient to support a finding that the SDK capabilities of the DiskOnKey were in public use.  First, as noted, the devices sold at least as of November 8, 2002, had the SDK capabilities.  Second, the jury saw a press release from September 2002 announcing the launch of the DiskOnKey SDK.  DX307.  Third, the jury saw a screenshot of an M-Systems web page that described the SDK and allowed users to download a data sheet of the SDK.  DX403.  Fourth, the jury saw an 84-page manual detailing the functionality of the SDK that was dated in September 2002, like the press release.  DX333.  Fifth, the jury heard testimony from Mr. Sobol, who testified that the information in the SDK manual "reflect[ed] how the product actually function[ed]."  Tr. 735:5–8; *see also* Tr. 744:14-21.

IOENGINE argues that there was insufficient evidence that the SDK was in public use because the M-Systems press release announcing the launch of the SDK indicated that the SDK would be made available only to "select partners and software development companies" upon request.  Dkt. No. 513 at 16 n.16 (citing DX307).  That argument was raised only in a footnote and is therefore forfeited.  *See, e.g.*, *Nw. Univ.*, 2022 WL 903892, at *6 & n.26.  In any event, the argument is unpersuasive.

First, as discussed with respect to the on-sale bar in section II.A.1, the key question is not whether the SDK itself was in public use but rather is whether the DiskOnKey devices that were in public use had SDK capabilities prior to March 23, 2003.  The evidence that the SDK was available as of September 2002 and that its documentation reflected how the DiskOnKey devices "actually function[ed]" is sufficient evidence for a jury to find that the DiskOnKey devices that were in public use had SDK capabilities.  *See* Tr. 735:5–8; DX307; DX333; DX403.

14

Second, DX307 would not undermine a finding that the SDK itself was in public use. As discussed in section III.A.3 below, public use "includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002). Thus, although DX307 indicates that the SDK itself was available only upon request, the press release is circumstantial evidence that someone other than the inventors of the DiskOnKey used the DiskOnKey SDK. That evidence, combined with the fact that a datasheet for the SDK was made available to the public on the M-Systems website, DX403, is sufficient to support a conclusion that the SDK was used by a person other than the inventor who was not under any obligation of secrecy.

At bottom, the evidence is sufficient to support a finding that the firmware upgrade application and SDK were accessible to the public. Although there is no direct evidence that any particular person used or downloaded the firmware upgrade application or SDK capabilities, a jury is entitled to "make reasonable inferences" about whether the evidence demonstrated a public use. *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 967 (Fed. Cir. 2020). Indeed, the role of circumstantial evidence is particularly important in a case such as this one, "where so much time has elapsed between the key events and the suit." *TransWeb*, 16 F. Supp. 3d at 393. In this case that length of time is approximately 20 years.

IOENGINE argues that even if there was sufficient evidence to support a finding of public use generally, the evidence did not establish that there was any public use of the features of the invention in the United States. The evidence showed that although M-Systems leased space for sales offices in California, much of M-Systems' business activity was conducted in Israel. Accordingly, IOENGINE contends that there is no evidence that the firmware upgrade application was ever

downloaded or used in the United States, or that the claimed "communications network node" was ever known, used, or on sale in this country.

Based on the record evidence, the jury in this case could readily have concluded that the firmware upgrade application was used in the United States. To begin with, the M-Systems sales spreadsheets identified hundreds of sales of DiskOnKey devices with the firmware upgrade to customers in the United States as early as November 2002. In addition, the press release announcing the firmware upgrade application was in English and was released from Fremont, California. DX097. The email that encouraged M-Systems employees to notify others about the firmware upgrade application was sent to M-Systems employees in this country. DX330. And the webpage that contained the download link to the firmware upgrade application was in English and would have been accessible by American users. DX402; *see also Finjan*, 2013 WL 5302560, at *7 (Evidence that an online bulletin board regarding a prior art software product "was accessible to people in the United States who had modems" supported a finding of public use even though a manual suggested that the product was only available in the Netherlands.). In view of that evidence, a jury could permissibly have found that the public use of the firmware upgrade application occurred in the United States.

IOENGINE next argues that it was not clear that all the evidence Ingenico relied upon with respect to the firmware upgrade application represented the same version of that application. In particular, IOENGINE argues that Ingenico's evidence shows at most that "some version of the application was available for download online." Dkt. No. 513 at 21.

The jury could have concluded from the trial record that the firmware upgrade application was encompassed in a single version of software. The evidence showed that the Readme file relied upon by Mr. Geier was the same file that was sent to M-Systems employees for distribution in July

2002. Dkt. No. 523 at 20; DX330; DX331. And the metadata for the firmware upgrade application lists a last modified date of June 26, 2002, which is within the same timeframe. DX329.

Lastly, IOENGINE argues that the evidence did not support a finding of public use of the invention because the DiskOnKey "would not have informed the public of Mr. McNulty's invention." Dkt. No. 513 at 17. As discussed in further detail below with respect to the jury instructions, a public use need not be informing to be invalidating prior art. All that is required is that the public use "related to a device that embodied the invention." *Zenith Elecs. Corp. v. PDI Commc'n Sys.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008). IOENGINE's argument on that point therefore fails.[7]

In sum, there is substantial evidence to support a jury finding that the DiskOnKey device and its associated firmware upgrade application and SDK capabilities were in public use prior to March 23, 2003. IOENGINE's motion for judgment as a matter of law is therefore denied with respect to public use.

### B. DiskOnKey As Prior Art Under 35 U.S.C. § 102(a)

IOENGINE next argues that there was not substantial evidence to conclude that the DiskOnKey system was prior art under the pre-AIA version of 35 U.S.C. § 102(a). Section 102(a)

---

[7] IOENGINE quotes an internal M-Systems presentation from 2003 that stated: "Normally there is no need to use DOK Upgrade . . . . We hope there will never be a need to use it." Dkt. No. 513 at 16 (citing DX336, at 5–6). According to IOENGINE, that is evidence that the upgrade application was not in use. IOENGINE's argument misses the point. As indicated, the upgrade application was incorporated in the DiskOnKey devices at least as early as November 2002. The application was therefore in public use even though the owner of a DiskOnKey might seldom (or never) need to actually employ the upgrade application to upgrade his DiskOnKey device. Likewise, if even a single person downloaded the firmware upgrade application from the M-Systems website, the application would have been in public use regardless of whether that person ever ran the application to update the firmware of a DiskOnKey device. What is required is that there was public accessibility to the upgrade application, not that any person in possession of a DiskOnKey actually used the upgrade application to update the DiskOnKey firmware.

17

provides that a device is prior art to a patented invention if the device was "known or used by others in this country . . . before the invention thereof by the applicant for patent." IOENGINE contends that the DiskOnKey with the firmware update was not "known by or used by others" for purposes of section 102(a) for the same reasons that it was not "on sale or in public use" for purposes of section 102(b). In addition, IOENGINE argues that there was no substantial evidence at trial to support a conclusion that Mr. McNulty's invention date was later than July 26, 2001.[8]

At trial, Mr. McNulty testified that he conceived of the invention in June of 2001. IOENGINE sought to support Mr. McNulty's claim of conception by pointing to a July 2001 memo prepared by Mr. McNulty entitled "Portable Devices Rule" ("the PDR memo"). PX235. IOENGINE argued that the following statement in the PDR memo evidenced conception of the "portable device identifier information" and "verification" limitations of several of the asserted claims: "Hi. I am here from a person's pocket and I would like to copy your content." *Id.* However, as Mr. Geier explained on behalf of Ingenico, that language offered "no indication of whether or not that [device could] be used for any sort of authentication or verification with the server," and rather "just ma[de] the notice that I want to copy your content . . . like a request to copy content." Tr. 866:12–867:14. To the

---

[8] IOENGINE contends that Ingenico waived its prior art argument under section 102(a) when in closing argument Ingenico's counsel stated, in connection with his section 102(b) argument, that the DiskOnKey was prior art "simply because it's dated before March 23, 2003. Mr. McNulty's invention date [is] irrelevant to that. Mr. McNulty's conception date is irrelevant to that. Mr. McNulty's reduction to practice is irrelevant to that. If it's before March 23, 2003, it is prior art." Tr. 1362 at 5–11. That argument, and the point that Mr. McNulty's conception and reduction to practice were irrelevant was focused on the requirements of section 102(b). It did not constitute an abandonment of Ingenico's section 102(a) argument. Moreover, the Federal Circuit has specifically rejected the argument that a "defendant['s] failure to explicitly argue to the jury that the defendants should prevail on a diligence theory resulted in the diligence theory not being before the jury." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1363 (Fed. Cir. 2001). Applying Third Circuit law, the Federal Circuit concluded that the Third Circuit "does not require that the defendant explicitly argue a theory in order for it to be before the jury." *Id.* at 1364.

18

extent that Mr. McNulty and IOENGINE's expert, Dr. Aviel Rubin, testified otherwise, the jury was entitled to reject that testimony in favor of Mr. Geier's testimony that the PDR memo did not disclose the "portable device identifier" and "verification" limitations, one of which is recited in each of the claims the jury found invalid.

Even if the PDR memo provided adequate evidentiary support for Mr. McNulty's claim of conception, the jury heard evidence that could support a conclusion that Mr. McNulty was not diligent in reducing his inventions to practice. Mr. McNulty testified that he worked "nonstop" on his inventions, "every evening, every weekend, all weekend." Tr. 174:10–11. In addition, IOENGINE offered corroborating evidence that Mr. McNulty may have worked on reducing his invention to practice in April 2002, February 2003, May 2003, July through August September 2003, and December 2003 through January 2004. But the corroborating evidence did not account for significant gaps in Mr. McNulty's efforts, such as between July 2001 and April 2002, and between April 2002 and February 2003. As the Federal Circuit has held, "there need not necessarily be evidence of activity [by the inventor] on every single day," but the evidence "must show that the . . . inventor was diligent throughout the entire critical period." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001). Even if the jury concluded that Mr. McNulty conceived of his inventions as early as July 2001, it could properly have found Mr. McNulty's claim that he worked "nonstop" on his inventions after that to be implausible. Moreover, based on the gaps in the corroborating evidence the jury could have found that Mr. McNulty was not diligent in reducing his invention to practice before March 23, 2004, when he constructively reduced the invention to practice by filing his initial patent application. Accordingly, IOENGINE's motion for judgment as a matter of law is denied with respect to IOENGINE's section 102(a) arguments.

19

Of course, even if the evidence did not support the conclusion that the DiskOnKey system was prior art under section 102(a), the verdict of invalidity would still have to be upheld based on section 102(b), discussed above. As noted above, "[a] general jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity." *Cordance*, 658 F.3d at 1339; *see generally Griffin v. United States*, 502 U.S. 46, 56–60 (1991). Because substantial evidence supports a finding that the DiskOnKey system was prior art under section 102(b), by being in public use or on sale or both, the fact that the DiskOnKey system might not qualify as prior art under section 102(a) is irrelevant.

### C. Anticipation and Obviousness

IOENGINE argues that even if the DiskOnKey, as used with the firmware upgrade application and the SDK, is prior art under section 102, there is insufficient evidence that the DiskOnKey either anticipates or renders obvious the asserted claims of the '969 and '703 patents. First, IOENGINE contends that there was no evidence that the firmware upgrade application supported the claimed "program code" limitations. Second, IOENGINE contends that there was no evidence of a motivation to combine the firmware upgrade application with the DiskOnKey SDK.

With respect to the "program code" limitations, IOENGINE points out that the DiskOnKey devices contained an application-specific integrated circuit ("ASIC"), which IOENGINE contends may have been used to implement the firmware upgrade feature. If that were true, IOENGINE contends, a requirement of the claims would not be met: The processor on the DiskOnKey would not have executed any program codes when updating the device firmware, even though the claims require that certain program codes be executed by the processor on the portable device. *See, e.g.*, Tr. 1071:3–11.

20

IOENGINE points to no evidence that an ASIC, and not a processor, was used to implement the firmware upgrade application on the DiskOnKey device.[9] At most, the jury heard testimony that the firmware upgrade feature of the DiskOnKey initially existed "not as an application." *See* Tr. 700:24–701:8. That evidence, however, does not mean that the firmware upgrade feature would have been implemented without using the device's processor. *See id.* To the contrary, Mr. Geier testified about how certain functions of the firmware upgrade application would have been implemented using code running on the DiskOnKey processor. *See, e.g.*, Tr. 791:11–792:1, 812:22–813:16, 834:8–22, 842:18–843:4. Two former M-Systems employees, Gidi Elazar and Eyal Sobol, added testimony that would support such an inference. *See* Tr. 718:15–18 (Mr. Elazar acknowledging that "in order for the DiskOnKey to respond to a request," it would "have to run some kind of code on the DiskOnKey"); Tr. 737:16–19 (Mr. Sobol testifying that authentication functions were "integrated in the firmware of the DiskOnKey"). In any event, the product specification for the DiskOnKey indicates that the ASIC comprises the component that Mr. Geier identified as the device's processor. *See* DX322.6 (including the ARM-7 processor in a block labeled "Titan ASIC"); Tr. 785:6–787:23. Based on the evidence, a reasonable jury could have found that the DiskOnKey executed the claimed program codes on the DiskOnKey processor. IOENGINE's arguments on this point are unpersuasive.

---

[9] The only evidence that IOENGINE relies on to support its argument on this point is the following statement in a PowerPoint presentation under the heading "How does DOK Upgrade work?": "The DiskOnKey ASIC prevents the ARM 7 microprocessor from running code that is not digitally signed by M-Systems." DX336.4. That statement suggests at most that the ASIC might play some role in ensuring that unauthorized firmware is not downloaded to the DiskOnKey. It does not indicate that any functions associated with downloading and installing firmware using the firmware upgrade application would be performed by the ASIC.

With respect to the motivation to combine the firmware upgrade application and the SDK, IOENGINE has forfeited any argument that the DiskOnKey combined with the firmware upgrade application and the SDK is not a single prior art reference that could anticipate the asserted claims. A motivation to combine is required only when there are two separate references being used in a proposed obviousness combination. *See Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1321 (Fed. Cir. 2005) ("In determining whether a combination of old elements is non-obvious, the court must assess whether, in fact, an artisan of ordinary skill in the art at the time of invention, with no knowledge of the claimed invention, would have some motivation to combine the teachings of one reference with the teachings of another reference."). In this case, the final jury instructions clearly indicated that those three items were to be interpreted as a single prior art reference, and IOENGINE failed to object to that instruction. Dkt. No. 497 at 19 (referring to the DiskOnKey system: "Ingenico also contends that that the following *item is* prior art . . . ." (emphasis added)). Accordingly, the question whether there was a motivation to combine the SDK with the firmware upgrade application does not affect my resolution of the present motion.[10]

### D. Obviousness Based on Elazar and the DiskOnKey Device

IOENGINE argues that there was not substantial evidence to support the verdict of obviousness based in part on the Elazar reference. As an initial point, IOENGINE notes that Elazar

---

[10]  In its motion for summary judgment, IOENGINE argued that the DiskOnKey could not serve as an anticipatory reference because the evidence about the DiskOnKey related to different versions of that device. I rejected that argument on the ground that "a reasonable jury could find that documentation describing various versions of the DiskOnKey device is representative of a single prior art device." Dkt. No. 449 at 75. As noted above, there is substantial evidence that the version of the firmware upgrade application and the DiskOnKey that were available prior to March 23, 2003, contained the limitations of the asserted claims. IOENGINE's post-trial argument that the SDK was a separate reference from the firmware upgrade application was not raised at summary judgment nor at the instruction conference, so that argument has been forfeited.

was published after March 23, 2003, so it would be prior art only if the jury found that Mr. McNulty was not entitled to an invention date of July 26, 2001. Dkt. No. 513 at 33. That is true, but substantial evidence would support a finding that Mr. McNulty either did not conceive of his invention until after July 26, 2001, or was not diligent between July 2001 and March 2004. Accordingly, IOENGINE's argument as to the publication date of the Elazar reference is insufficient to reject Elazar as a basis for an obviousness verdict.

IOENGINE also argues that there was no motivation to combine Elazar with the DiskOnKey firmware upgrade application. As noted, IOENGINE has forfeited the argument that the firmware upgrade application is a separate prior art reference from the DiskOnKey device itself. Moreover, the jury heard evidence at trial suggesting that a skilled artisan would have been motivated to combine the DiskOnKey with the Elazar reference. For example, Mr. Geier testified that a skilled artisan would have been motivated to use the authentication mechanism discussed in the Elazar reference with respect to the firmware on the DiskOnKey device. Tr. 861:17–862:24. That evidence would be sufficient for a jury to conclude that a skilled artisan would have been motivated to combine Elazar with the DiskOnKey.

Even absent consideration of the Elazar reference, the jury's obviousness verdicts must stand. To the extent IOENGINE argues that the jury's verdicts on obviousness must be overturned because the jury could not have found obviousness without the Elazar reference, that argument fails. The jury could have viewed the claimed inventions as obvious in view of the DiskOnKey system alone. *See, e.g.*, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1376 (Fed. Cir. 2019) (affirming a PTAB obviousness finding "in view of a single reference").

As in the case of Mr. McNulty's conception and diligence, the jury's general verdicts of invalidity can be sustained even if the evidence is insufficient to support this theory of invalidity.

23

Because I have found that substantial evidence supports a finding that the DiskOnKey system was prior art under section 102, the jury's verdict could be upheld even if Elazar were not a proper ground on which the jury could have based its verdict of invalidity. *See Cordance*, 658 F.3d at 1339.

## III.    Motion for New Trial

In its motion for a new trial, IOENGINE argues that there were errors in the court's final jury instructions that may have misled the jury into returning a verdict of invalidity as to the asserted claims that the jury found to be infringed. IOENGINE also argues that *inter partes* review estoppel ("IPR estoppel") precluded Ingenico from offering evidence of the DiskOnKey firmware upgrade application at trial. For the reasons set forth below, the motion for a new trial is denied.

### A.    Jury Instructions

The standard for ordering a new trial based on a claim of erroneous jury instructions is high. "A new trial on the ground of erroneous jury instructions is permissible only when it is clear that an error in [the] instructions as a whole was such as to have misled the jury." *New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1567 (Fed. Cir. 1990); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011); *Siemens Med. Sols. USA, Inc. v. Saint-Goban Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1278 (Fed. Cir. 2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (en banc in relevant part). In reviewing jury instructions, the court must consider the entire trial record, because "instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.* 62 F.3d 1512, 1522 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997).

24

### 1. Burden of Proof

IOENGINE argues that the court's instructions to the jury were erroneous in several respects. First, IOENGINE contends that the court's instructions on conception and diligence "failed to correctly inform the jury that Ingenico bore the burden of proof." Dkt. No. 513 at 34.

IOENGINE acknowledges that on the issues of conception and diligence, the patentee has the burden of producing some evidence in order to raise those issues, but that after the patentee satisfies that burden of production, the patent challenger "must persuade the jury by clear and convincing evidence that its version of the facts is true." *Id.* (quoting *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996)). IOENGINE contends that the court never made clear to the jury that the ultimate burden on these issues rests with the challenger to prove its version of the facts by clear and convincing evidence.

The portion of the court's instructions on conception and diligence began with the statement that "Ingenico has the burden of providing invalidity by clear and convincing evidence, which as I've said before, means evidence that must leave you with a clear conviction or belief that the claims in question are invalid." Tr. 1293:9–12. The court then instructed the jury that "the date of the invention is the date on which the inventor conceived of the invention, as long as the inventor was diligent in reducing the invention to practice." Tr. 1294:18–19. The court defined conception and diligence, Tr. 1294:23–1295:17, and advised the jury, in accordance with the Federal Circuit's decisions in *Mahurkar*, 79 F.3d at 1577, and *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993), that "[a]lthough an inventor can testify about when he conceived of the invention, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea," Tr. 1295:7–11, and that "[a]s in the case of conception, there must be some evidence beyond the inventor's own testimony that confirms the inventor's diligence," Tr. 1295:17–20.

The court then advised the jury that "IOENGINE's contention is that the date of the invention is no later than July 26th, 2001," and that "Ingenico's contention is that the date of the invention was March 23, 2004." Tr. 1296:20–23. The consequence of the jury's decision on that issue, the court explained, was that if the jury concluded that the invention was made as of July 26, 2001, "then any product or method that was first publicly known or used in the United States after that date wouldn't be regarded as coming before the invention." Tr. 1296:25–1297:4. On the other hand, the court explained, if the jury concluded "that the invention was made as of March 23, 2004, as Ingenico claims, then any product or method that was known to or used by others in this country before that date would be prior art to the invention." Tr. 1297:5–9. The court then instructed the jury that "[w]hatever the date of invention, Ingenico must prove by clear and convincing evidence that the prior art item predated the claimed invention." Tr. 1297:14–16.

IOENGINE contends that the court's instruction on the issue of pre-conception prior art would have led the jury to conclude that it was IOENGINE's burden to prove conception and diligence. I disagree.

The instruction given by the court was based on the *Mahurkar* case, which specifies that the patent challenger "must persuade the trier of fact by clear and convincing evidence that the [purported prior art item] was published prior to [the inventor's] invention date." 79 F.3d at 1578*; see also Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 266 F.3d 1358, 1361 (Fed. Cir. 2001) (same); *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 336–37 (D.N.J. 2015) (same); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 575–76 (D. Del. 2008) ("[T]he burden of proof remains on the defendant to establish by clear and convincing evidence that the patentee's invention date does not precede the date of the ostensible prior art reference."); *Japan Cash Mach. Co v. MEI, Inc.*, No. 2:05-cv-1433, 2009 WL 10316043, at *15 (D. Nev. Sept. 18, 2009)

("The burden of persuasion, which is one of clear and convincing evidence, that the patentee's invention date does not precede the date of the alleged prior art reference remains with the defendant."); *Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030, 1045 (D. Minn. 2008) ("[T]he defendant must establish, by clear and convincing evidence, that the patentee's invention date does not precede the date of the ostensible prior-art reference." (emphasis omitted)).

Consistent with those authorities, the court's instruction advised the jury that it could find invalidity only if it found that Ingenico proved by clear and convincing evidence that the prior art item pre-dated the invention. That instruction unambiguously provided that the burden of proof on invalidity by pre-conception prior art rested on Ingenico and could be met only by clear and convincing evidence. Thus, the jury was not misled into believing that IOENGINE bore the burden of proof on that issue.

Beyond that, the court instructed the jury several times that Ingenico had the burden of proof of providing invalidity by clear and convincing evidence with respect to each invalidity issue. Tr. 1283:4–19, 1286:23–1287:2, 1293:9–12, 1297:14–16, 1300:8–10, 1305:4–7. Moreover, in the court's initial instructions to the jury at the beginning of the trial, the court twice explained that it was Ingenico's burden to prove invalidity by clear and convincing evidence. Tr. 92:21–93:4, 93:25–94:2. The same point was made in the video presentation to the jurors by the Federal Judicial Center at the outset of the trial. Tr. 87:3–5. Finally, counsel for IOENGINE emphasized the clear and convincing evidence standard to the jury no fewer than 14 times during his closing argument, *see* Tr. 1319:24–1320:18 (four times), 1321:21–25, 1323:4–7, 1324:18–20, 1326:9–11, 1330:25–1331:20 (three times), 1334:4–8, 1368:8–13, 1369:24–1370:3, and the verdict form filled out by the jury twice referred to the clear and convincing standard with regard to the invalidity issues presented to the jury, *see* Tr. 1416:22–24, 1417:11–13. There was no suggestion in the court's instructions or otherwise

27

that the burden of proof on invalidity was different in the one case of invalidity by pre-conception prior art.

One indication that the jury was not confused on this point is that counsel for IOENGINE clearly understood that the court's instruction on this issue imposed a requirement of clear and convincing evidence with regard to the date of conception. He said the following in his closing argument:

> IOENGINE has no burden to prove that the Portable Devices Rule letter shows conception of the invention.
> It says, to confirm his conception, Mr. McNulty simply needs to put forth some evidence beyond his own testimony. It's Ingenico that bears the burden of proof by clear and convincing evidence that any prior art item predated Mr. McNulty's invention date. That includes proving that Mr. McNulty is not entitled to his invention date in July of 2001, and all other aspects of invalidity.
> In other words, Mr. McNulty and we do not need to convince you that he thought of his invention by July 26, 2001.
> Instead, because Mr. McNulty has provided evidence in the form of a Portable Devices Rule letter, as well as Mr. Rzonca's testimony and other evidence we will look at in a minute, Ingenico must prove by clear and convincing evidence that Mr. McNulty did not conceive of his invention by July 26th, 2001.

Tr. 1330:20–1331:13.

Similarly, with respect to diligence, counsel for IOENGINE argued as follows:

> Now, Ingenico also claims Mr. McNulty did not act with reasonable diligence in reducing his invention to practice. Once again, this is the defense Ingenico must prove by clear and convincing evidence.
> More importantly, we saw the evidence of Mr. McNulty's evidence [sic: diligence]. As the Judge has explained, as long as there is some evidence of reasonably continuous work by Mr. McNulty between his conception in July of 2001 and his patent application—excuse me—in March of 2004, he is entitled to his July 2001 invention date.
> . . .
> But again, just like conception, the law does not require Mr. McNulty [to] convince you he was reasonably diligent. Instead, it's Ingenico's burden to convince—by clear and convincing evidence to prove to you that he was not.

Tr. 1331:17–1332:1; 1334:4–8.

28

Contrary to IOENGINE's argument in the present motion, it is clear that counsel for IOENGINE understood the court's instructions to require Ingenico to prove, by clear and convincing evidence, lack of conception by a date antedating the prior art, or lack of diligence thereafter. Counsel for Ingenico did not object to IOENGINE's closing argument on that point or take issue with IOENGINE's argument regarding the burden of proof during his own closing argument. The jury was therefore not misled by the court's instructions on that issue. *See Hilton Davis*, 62 F.3d at 1522 ("The words of the instructions take on meaning from the context of what happened at trial, including how the parties tried their case and their arguments to the jury.").

Relatedly, IOENGINE complains about the court's instructions defining conception and setting forth the parties' competing contentions as to when conception took place, on the ground that those instructions "suggest[ed] that IOENGINE had to prove conception and diligence by discussing them in terms of facts that must be shown by the inventor." Dkt. No. 513 at 35. There was no such suggestion in the court's jury charge. The instructions defined conception without reference to the burden of proof. *See* Tr. 1294:18–1295:1 ("The date of the invention is the date on which the inventor conceived of the invention, as long as the inventor was diligent in reducing the invention to practice. . . . [A]n invention is conceived when the inventor has a definite idea of the complete and operative invention, even if the inventor did not know for sure at the time that the invention would work."). The court instructed the jury that "[a]lthough an inventor can testify about when he conceived of the invention, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea." Tr. 1295:7–11. The court then defined diligence for the jury, Tr. 1295:12–20, and explained the parties' competing theories as to the proper date of the invention, based on their positions with respect to conception and diligence, and the consequences for determining what constituted prior art. Tr. 1296:6–1297:9. And after that,

as noted, the court instructed the jury that Ingenico had to prove by clear and convincing evidence that the prior art item predated the claimed invention.  Tr. 1297:14–16.

Nothing about those instructions suggested that IOENGINE bore the ultimate burden of proof on those issues.  The accurate statement that there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea for the invention did not in any way suggest to the jury that the ultimate burden of proof lay with IOENGINE.[11]

In sum, the court's instructions did not fail to apprise the jury of the proper burden of proof in assessing the evidence of invalidity based on pre-conception prior art, nor did the court's instructions misdirect the jury's assessment of the evidence of conception and diligence.

### 2.    Presumption of Validity

IOENGINE's second complaint about the jury instructions is that the court "failed to instruct on the presumption of validity."  Dkt. No. 513 at 36.  Citing no relevant authority, IOENGINE argues

---

[11]  In its reply brief, IOENGINE argues in passing that the court should not have instructed the jury on the issue of corroboration, but should have decided that issue itself.  Dkt. No. 526 at 15. It is clear that on the issues of conception and diligence the patentee must introduce some evidence beyond the inventor's own testimony.  *Mahurkar*, 79 F.3d at 1577.  District courts have frequently instructed juries on the issue of corroboration in that context.  *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 582–83 (D. Del. 2008); *Solas OLED Ltd. v. Samsung Display Co.*, No. 2:19-cv-00152, 2021 WL 4950308, at *22 (E.D. Tex. Oct. 25, 2021); *Glob. Traffic Techs., LLC v. Emtrac Sys., Inc.*, No. 10-4110, 2014 WL 1663420, at *6 (D. Minn. Apr. 25, 2014), *rev'd in part on other grounds*, *Glob. Traffic Techs. LLC v. Morgan*, 620 F. App'x 895 (Fed. Cir. 2015).  The Federal Circuit Bar Association's Model Patent Jury Instructions recommend that the jury be instructed on the corroboration requirement with regard to conception, and in the joint proposed jury instructions in this case, IOENGINE requested that the jury be instructed on the need for corroboration of the inventor's testimony regarding conception, using the language from the Federal Circuit Bar Association's model instruction.  The court's jury instruction, to which IOENGINE now objects, tracked IOENGINE's proposed instruction word for word. *Compare* Dkt. No. 445 at 36 *with* Tr. 1295:8–11.  And although IOENGINE's counsel raised the question whether the corroboration issue should be submitted to the jury, Tr. 1189:21–1190:6, counsel never objected to doing so, and he ultimately proposed an instruction that would have entailed submitting that question to the jury.  *See* Tr. 1266:6–12.  Accordingly, it was not error for the court to instruct the jury on the issue of corroboration.

30

that the court should have included an instruction explicitly referring to the presumption of validity. During the instruction conference, the court explained that the presumption of validity is embodied in the requirement that invalidity be proved by clear and convincing evidence, and that to add a separate instruction on the presumption of validity would be potentially confusing to the jury. *See* Tr. 1229:7–1230:15.

IOENGINE's argument was squarely rejected by the Federal Circuit in *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258–59 (Fed. Cir. 2004). In that case, the appellant made the same argument that IOENGINE has made here, and the Federal Circuit rejected it. The court of appeals explained that "the presumption of validity and heightened burden of proving invalidity 'are static and in reality different expressions of the same thing—a single hurdle to be cleared.'" *Id.* at 1258 (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984)). Because the presumption is one of law, not fact, and does not constitute evidence to be weighed against the challenger's evidence, the Federal Circuit concluded, "the district court did not err in declining to include a jury instruction on the presumption of validity because the jury applied the correct 'clear and convincing evidence' standard." *Id.* at 1258–59; *see also BNJ Leasing, Inc. v. Portabull Fuel Serv., LLC*, No. 19-cv-156, 2022 WL 892747, at *8 (S.D. Miss. Mar. 25, 2022); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-cv-1202, 2017 WL 959592, at *6 (E.D. Tex. Mar. 13, 2017); *Calloway Golf Co. v. Acushnet Co.*, 778 F. Supp. 2d 487, 496 (D. Del. Apr. 21, 2011).

As I explained in the *Erfindergemeinschaft* case, the use of the phrase "presumption of validity" in the instructions to the jury "would add little to the jury's understanding of the burden of proof on the validity issues" and "might be confusing to the jury, to the extent that the jury is required to consider both that phrase and the Court's instructions on the burden of proof." 2017 WL 959592,

at *6.  "At minimum, the use of the term 'presumption' would require a further definitional instruction by the Court, without leading to any greater insight on the jury's part as to the nature of the burden of proof on the validity issues."  *Id.*[12]

### 3.  Public Use

IOENGINE's third objection to the court's jury instructions relates to the court's instruction on "public use" under section 102(b).  IOENGINE argues that the court should have instructed the jury that an invalidating public use could be found only if "the claimed features of the invention are discernible from a prior art product that is accessible to the public."  Tr. 1271:7–11.  That is, IOENGINE argues that the public use of the invention cannot be an invalidating "public use" within the meaning of section 102(b) of the Patent Act if members of the public could not have discerned the features of the product that corresponds to the limitations of the patent in suit.

The Supreme Court addressed this issue in the 1880s.  In *Egbert v. Lippman*, 104 U.S. 333 (1881), the Court considered a case in which the inventor of a corset allowed a third party to wear the corset for several years before the inventor sought a patent on the invention.  The Court held that the use of the corset, even though it was by only one person, was a public use.  *Egbert*, 104 U.S. at

---

[12]  IOENGINE does not seek to distinguish, nor does it even cite, the governing *Chiron* case from the Federal Circuit on this point.  Instead, it cites cases having nothing to do with the issue before the court.  In its opening brief, IOENGINE cites only *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 & n.7 (Fed. Cir. 2007), which stands for the proposition that an erroneous jury instruction must be prejudicial in order to warrant a new trial.  In its reply brief, IOENGINE relies solely on a statement by the Supreme Court in *Microsoft Corp. v. i4i Limited Partnership*, 564 U.S. 91, 110 (2011), where the Court noted that courts of appeals prior to 1952 had observed that "the presumption of validity is 'weakened' or 'dissipated' in the circumstance that the evidence in an infringement action was never considered by the PTO."  That statement has nothing to do with the question whether a court errs if it does not instruct a jury on the presumption of validity in addition to the clear and convincing evidence standard.

337.  That was so, the Court held, even though the public use did not reveal the details of the invention

to the public.  *Id.* at 336–37.  The Court explained that

> some inventions are by their very character only capable of being used where they
> cannot be seen or observed by the public eye.  An invention may consist of a lever or
> spring, hidden in the running gear of a watch, or of a rachet, shaft, or cog-wheel
> covered from view in the recesses of a machine for spinning or weaving.

*Id.* at 336; *see also Hall v. Macneale*, 107 U.S. 90, 96 (1882) (The features of a safe were held to be

in public use even though they were "hidden from view, after the safes were completed, and it

required a destruction of the safe to bring them into view.  But this was no concealment of them or

use of them in secret.  They had no more concealment than was inseparable from any legitimate use

of them."); *In re Blaisdell*, 242 F.2d 779, 783 (C.C.P.A. 1957) ("[T]he invention may be a small

element, concealed by its nature, in a larger article; its presence may not be known to the user or

purchaser of said article[.]").

IOENGINE seeks to distinguish *Egbert* on the ground that the public use in that case was by

the inventor himself, not by a third party.  In fact, however, *Egbert* involved a public use by a party

other than the inventor.  Although that party used the corset with the inventor's consent, she was not

under any obligation of secrecy regarding the corset's design.  *See* 104 U.S. at 337.  In that setting,

the Federal Circuit has explained, when the inventor has "surrendered control of the invention to

another, without explaining that the device was experimental, the public was entitled to believe that

the device was in the public domain."  *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1330 (Fed. Cir.

2019).

In cases involving disclosure by a third party not under an obligation of confidentiality, courts

have consistently rejected IOENGINE's argument that a device is not in public use if its contents

would not have been apparent to an ordinary user of the device.  *See New Railhead*, 298 F.3d at 1297

33

("The statutory phrase 'public use' does not necessarily mean open and visible in the ordinary sense; it includes *any use* of the claimed invention *by a person other than the inventor* who is under no limitation, restriction, or obligation of secrecy to the inventor.") (emphases added); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (agreeing that "the public need not have access to the 'inner workings' of a device [put in use by a party other than the inventor] for it to be considered 'in public use'); *Dunlop Holdings Ltd. v. Ram Golf Corp.*, 524 F.2d 33, 36 (7th Cir. 1975) (Stevens, J.) (public use was established by "a noninforming public use of the subject matter of the invention" by a third party); *Cali v. E. Airlines, Inc.*, 442 F.2d 65, 68 (2d Cir. 1971) ("It is a matter of legal indifference that the 'public' use may be necessarily concealed from public awareness by the structure of the design or the manner of its use . . . . Public use by a third party, with or without the knowledge or consent of the patentee, will generally defeat the patent as readily as public use by the inventor himself."); *Gillman v. Stern*, 114 F.2d 28, 31 (2d Cir. 1940) (L. Hand, J.) (a public use, "whether or not the patentee had consented to it," is invalidating regardless of whether "the use informed the public so that they could profit by it"); *Art+Com Innovationpool GmbH v. Google Inc*., No. 14-217, 2016 WL 9954312, at *8 (D. Del. Sept. 9, 2016) (Dyk, J., sitting by designation) (rejecting the contention, in the case of a non-secret use by a third party, "that the public must be able to ascertain the individual elements of an invention for it to constitute a public use"), *aff'd*, 712 F. App'x 976 (Fed. Cir. 2017); *Phoenix Sols., Inc.*, 2010 WL 6032841, at *7 (third-party's system was operational more than a year before the patents in suit were filed; the "operational novelty of the invention" was not required to be "exposed to the public in order for the invention to be in  public use."); *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243, 1247 (Fed. Cir. 2015) ("The question in a case such as this one is thus whether the actions taken by the inventor (or, as in this case, a third party) create a reasonable belief as to the invention's public availability.").

The same rule has been applied to cases involving the "on sale" bar to patentability: "[O]ur precedent holds that the question is not whether the sale, even a third party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that *embodies* the invention." *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed. Cir. 1986).

IOENGINE's argument amounts to contending that the public use must be enabling in order to be invalidating. There is no such requirement recognized in the law. As the Federal Circuit has held, "the public use itself need not be enabling. . . . Rather, we must simply determine whether the public use related to a device that embodied the invention." *Zenith*, 522 F.3d at 1356; *see also Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 151, 1359 (Fed. Cir. 2013) ("[W]e do not ask for an enablement-type inquiry under section 102(b) . . . ."); *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) ("Beyond this 'in public use or on sale' finding, there is no requirement for an enablement-type inquiry."); *Extang Corp. v. Truck Accessories Grp., Inc.*, No. 19-cv-923, 2022 WL 610451, at *3 n.1 (D. Del. Feb. 18, 2022) (same).

IOENGINE cites several cases in support of its position, but those cases are directed to instances in which the allegedly prior public use has been subject to a promise of confidentiality or otherwise concealed. No such concealment or promises of confidentiality are at issue in this case, so much of the analysis in those cases is inapplicable here.

Two Federal Circuit cases cited by IOENGINE deserve close consideration on this point. In the first, *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958 (Fed. Cir. 2020), the district court granted summary judgment invalidating BASF's patent. The invalidity ruling was based on the prior use, by a party other than the inventor, of a manufacturing process similar to the patented process. The Federal Circuit reversed. The court noted that "a secret process is not in the public domain in the first place." *BASF*, 955 F.3d at 968. Upon review of the record, the court found that the evidence

35

that the third party's use of the process was concealed was sufficient to create a triable issue of fact on that issue. *Id.* at 967–68.

The *BASF* court acknowledged that the commercial exploitation of a process before the critical date of the patent on the process would normally be an invalidating use of the process, regardless of whether the use was by the inventor or by a third party.[13] *See id.* at 966 (citing *Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 19–20 (1939)). But if the process were kept secret, the court observed, the results could be different in the two situations. Given the interests in encouraging prompt disclosure of inventions and preventing the effective extension of patents, the court explained that the commercial exploitation of a novel process by the inventor would be subject to the public use bar regardless of how little the public might have learned about the details of the invention. *Id.* at 967–68. In the case of commercial exploitation of a secret process by a third party, however, the court held that concealment of the novel process would not offend any of the interests protected by the "public use" bar. *Id.* That is, if the concealed use was by a third party, invalidating the inventor's patent would not serve the interests of requiring the inventor to disclose his invention promptly or preventing the effective extension of his patent. And because the concealment of a novel process by a third party does not deprive the public of something it has come to rely on as publicly available, application of the public use bar would not serve that interest either. *See id.* at 968.

Importantly, the court in *BASF* based its ruling on the principle that if a third party's use of a process was successfully concealed or hidden, it would be considered "inaccessible to the public."

---

[13] In the course of its opinion, the court in *BASF* took note of the well-settled exception to this principle that experimental use is not considered public use. 955 F.3d at 966 (citing *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 133–37 (1877)); *see also Barry*, 914 F.3d at 1328–31. There was no issue of experimental use presented in *BASF*, however, and there is likewise no issue of experimental use presented in this case.

*Id.* at 966.  On the other hand, the court explained, if the use identified by the defendant "was not successfully concealed or hidden from those who lack any 'limitation or restriction, or injunction of secrecy,' then it is a public use within the meaning of § 102(b)."  *Id.* (quoting *Egbert*, 104 U.S. at 336).

In the course of its analysis, the *BASF* court adopted the rule of *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir. 1946) (L. Hand, J.), which distinguished between the commercial exploitation of a secret process by an inventor and the commercial exploitation of such a process by a third party.  *See BASF*, 955 F.3d at 968.  The *Metallizing* court held that commercial exploitation of a secret process by the inventor is potentially invalidating.  At the same time, as the Federal Circuit noted, the *Metallizing* court reaffirmed its holding in *Gillman v. Stern*, *supra*, that a third party's exploitation of a secret process is not a "public use" of the process that would subject a later-filed patent to invalidation under the predecessor to section 102(b).  Significantly, the court in *Gillman* was careful to distinguish between a secret use of an invention and "a public use which does not inform the art."  114 F.2d at 31 (citing *Hall,* 107 U.S. at 97).  As to the latter, the court held, a non-secret public use by a third party is invalidating even if the use does not inform the public of the nature of the product or process in question.  The court explained that distinction as follows:

> It is true that in each case the fund of common knowledge is not enriched, and that might indeed have been good reason originally for throwing out each as anticipations. But when the statute made any "public use" fatal to a patent, and when thereafter the court held that it was equally fatal, whether or not the patentee had consented to it, there was no escape from holding—contrary to the underlying theory of the law— that it was irrelevant whether the use informed the public so that they could profit by it.  Nevertheless, it was still true that secret uses were not public uses, whether or not public uses might on occasion have no public value.

114 F.2d at 31; *see also Magnetics, Inc. v. Arnold Eng'g Co.*, 438 F.2d 72, 74 (5th Cir. 1971) (For purposes of "public use" under section 102(b), it is "irrelevant whether the use [by a third party] informed the public. . . . Neither [third party's] work was kept secret, for, as the district court found, these operations were carried on openly by ordinary factory help, with no attempts made to hide the operations form their employees or visitors."). Judge Hand's discussion of the issue, expressly adopted by the Federal Circuit in *BASF*, makes it quite clear that a third party's non-secret use of a product constitutes a "public use" for purposes of section 102(b) even if the inventive feature of the product, such as a corset, the inner workings of a safe, or the components of an electronic device were, by their nature, hidden from public view.

The second case relied on by IOENGINE, *Dey, L.P. v. Sunovion Pharmaceuticals, Inc.*, *supra*, is similar. In that case, as in *BASF*, the district court granted summary judgment invalidating a patent owned by the plaintiff based on a clinical trial conducted by a third party on a drug similar to the patented drug. The Federal Circuit reversed, holding that there was a triable issue of fact as to whether the clinical study on which the defendant based its invalidity defense was sufficiently confidential that it did not constitute a "public use" of the drug that was the subject of the study.

The *Dey* court explained that to decide whether a prior use constitutes an invalidating "public use," a court is required to ask whether the purported use was "accessible to the public" or "commercially exploited." 715 F.3d at 1355 (quoting *Invitrogen*, 424 F.3d at 1380). In determining what it means to be "accessible to the public," the court explained that "the policies underlying the public use bar inform its scope and that one such policy is 'discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available.'" *Id.* (quoting *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994)). Other considerations noted by the court were whether there was any confidentiality obligation imposed on persons who

38

observed the use of the product or process, and whether the completed invention was "used in public, without restriction." *Dey*, 715 F.3d at 1355 (quoting *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995)). Those formulations, the court explained,

> are designed to capture the commonsense notion that whether an invention is accessible to the public or reasonably believed to be freely available depends, at least in part, on the degree of confidentiality surrounding its use: An agreement of confidentiality, or circumstances creating a similar expectation of secrecy, may negate a "public use" where there is not commercial exploitation.

*Id*. (cleaned up).

That principle applies regardless of whether the prior use is by the inventor or by an unaffiliated third party, the court observed. "[T]hird-party use accessible to the public is a section 102(b) bar." *Id.* (quoting *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005)). To be "accessible to the public," the use still must be publicly available, the court noted; "secret or confidential third-party uses do not invalidate later-filed patents." *Id.* For that reason, the court stated, "we have applied section 102(b) to invalidate a patent based on third-party use when the third party made no attempt to maintain confidentiality or to deliberately evade disclosure; made no discernible effort to maintain the invention as confidential; or made no efforts to conceal the device or keep anything about it secret." *Id.* (cleaned up). In the case before it, the court concluded that summary judgment was not appropriate because it was not clear that the allegedly anticipating prior art was used without restriction during the clinical study; i.e., there was evidence that its use was "controlled and restricted, rather than unfettered and public." *Id*. at 1356.

Summarizing the applicable standard, the court in *Dey* quoted from *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315 (Fed. Cir. 2002), in which the court explained that the patentee's failure to monitor the use of his invention and his "failure to impose confidentiality agreements on those that used it was enough to place the claimed features of the invention in the

39

public's possession." 295 F.3d at 1323. Applying that standard, the court then stated that "a reasonable jury could conclude that if members of the public are not informed of, and cannot readily discern, the claimed features of the invention in the allegedly invalidating prior art, the public has not been put in possession of those features." *Dey*, 715 F.3d at 1359.

Contrary to IOENGINE's contention, that language from *Dey* does not mean that the public disclosure or commercial exploitation of a product or process, without any limitations on access or confidentiality restrictions, constitutes a public use only if the claimed features of the product or process are immediately apparent to members of the public. Instead, the *Dey* court made clear that the public use issue in that case turned on whether the measures taken to keep the details of the clinical study confidential, including the nature of the pharmaceutical product being tested, were sufficient to prevent knowledge of the product from becoming public in a manner that would trigger the public use bar. *Id.* at 1359. The same is true of *BASF*. *See* 955 F.3d at 968.

Other Federal Circuit cases are to the same effect. In *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549–50 (Fed. Cir. 1983), the public use issue turned on the fact that the third party in that case deliberately chose to keep the process at issue as a trade secret; what was disclosed was only the commercial output of the process, while the process itself was protected by various measures to ensure confidentiality. The Federal Circuit in *Woodland Trust v. Flowertree Nursery, Inc.*, similarly noted that an asserted prior use by a third party would not be a bar "when that prior use or knowledge is not available to the public." 148 F.3d 1368, 1371 (Fed. Cir. 1998). For that proposition, the court cited authorities standing for the principle that a third party's secret commercial activity more than one year before the patent applicant's filing date would not be a public use under section 102(b). *See id.* (citing, *inter alia*, *Garlock*, 721 F.2d at 1550, and *Baxter Int'l, Inc. v. COBE Lab'ys, Inc.*, 88 F.3d 1054, 1058–59 (Fed. Cir. 1996)). The cases cited above, including the cases

40

cited by IOENGINE, make clear that a third party's use of an invention will not be deemed public if it is secret, subject to a pledge of confidentiality, or experimental in nature. Otherwise, however, a third party's use of the invention will be deemed an invalidating public use even if the use does not disclose the details of the invention to the public. As Judge Hand noted in *Gillman v Stern*, 114 F.2d at 31, the key distinction in the case of a third party is between a public use "which does not inform the art" and a secret use. The former is invalidating, while the latter is not.

In its briefing, IOENGINE cites two district court cases, neither of which supports its argument. In *TQP Development, LLC v.1-800-Flowers.com, Inc.*, 120 F. Supp. 3d 600 (E.D. Tex. 2015), the defendant suggested that a third-party use of the invention was a public use. The court disagreed, noting that the third party was under a confidentiality obligation with respect to the critical features of the invention, and that those features were not made public. In the related case of *TQP Development, LLC v. Intuit Inc.*, No. 2:12-cv-180, 2014 WL 2809841 (E.D. Tex. June 20, 2014), the court denied the defendant's contention, on summary judgment, that the claim in question was invalid under 35 U.S.C. 102(g) (2006), in light of a prior invention that was not suppressed or concealed. The court found that there was a dispute of material fact with regard to whether the prior invention was suppressed or concealed from the public and therefore was not invalidating under section 102(g). The court noted that when the "inner workings" of the invention are the essence of the invention, "it is those 'inner workings' that must not be suppressed or concealed in order for the invention to be prior art under section 102(g)." *Id.* at *6. There was a dispute in that case as to whether the algorithm that was a critical component of the prior art was maintained as a trade secret and concealed from the public.

This case does not involve a confidentiality obligation, as in the *1-800-Flowers.com* case. Nor does it involve the suppression or concealment of prior art as a trade secret, which was the

disputed issue in the *Intuit* case, as there was no evidence that any component or feature of the DiskOnKey device, the firmware upgrade application, or the SDK was suppressed, concealed, or maintained as a trade secret.

At the oral argument on the JMOL and new trial motion, IOENGINE pointed the court to three other district court cases that it regarded as supportive of its position that non-secret but non-informative uses by third parties do not constitute "public uses" within the meaning of section 102(b). In fact, none of those cases support IOENGINE's position.  First, in *Parallel Networks Licensing, LLC v. International Business Machines Corp.*, No. 13-2072, 2017 WL 1045912, at *9 (D. Del. Feb. 22, 2017), the court held that the defendant's allegedly anticipating server was not in public use because the actions recited in the asserted claims were carried out "confidentially" by the defendant's servers.  Second, in *International Business Machines Corp. v. Priceline Group Inc.*, 271 F. Supp. 3d 667, 680–81 (D. Del. 2017), the evidence describing a prior art system did not create a genuine issue of material fact on the issue of public use because the evidence "only addressed what *could* be done in the future and never discussed any of the configurations that the [defendant's expert] relie[d] on." Third, in *TransWeb, LLC v. 3M Innovative Properties Co.*, 16 F. Supp. 3d 385, 395 (D.N.J. 2014), the question was whether a physical product sample was sufficient evidence that the processes used to manufacture that sample were in public use.  In this case, none of the DiskOnKey's functions were kept confidential from the purchasers of the DiskOnKey devices; the evidence relied on by Ingenico amounts to more than forward-looking statements about the DiskOnKey's capabilities; and the asserted claims do not relate to manufacturing processes.  The *Parallel Networks*, *IBM*, and

*TransWeb* cases are not inconsistent with the cases cited above and do not support IOENGINE's position that the jury was improperly instructed on the issue of public use.[14]

In sum, the public, non-experimental use of an invention, either by the inventor, by another with the consent of the inventor, or by an unrelated third party, bars the inventor from removing from the public domain an invention that the public has reasonably come to believe is freely available. *Dey*, 715 F.3d at 1355; *Baxter*, 88 F.3d at 1058 (quoting *Tone Bros.,* 28 F.3d at 1198). The Supreme Court embraced that position in *Shimadzu*, 307 U.S. at 19–20, where it held that in the absence of an obligation of confidentiality the public use bar applies in the same manner whether the public use is by the inventor or a third party. As the Court noted, the definition of public use, "formulated when the statute made only use by consent a bar, has been adopted in instances where the use was without

---

[14]   Following the oral argument on this motion, counsel for IOENGINE sent an unsolicited email to the court's law clerk seeking to elaborate on the arguments IOENGINE had made on this issue in its briefs and during the oral argument. In the email, IOENGINE's counsel cited seven cases, including two new cases not cited in IOENGINE's briefs or in the oral argument. For completeness, I will address the email even though its submission was procedurally improper.

IOENGINE's email argues that the Federal Circuit's decision in *Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243 (Fed. Cir. 2015), is a case of a third-party use of an invention that did not turn on the confidentiality of the use, but in which the court found no public use because the public could not discern the nature of the invention. In fact, the *Delano* case *did* involve uses of the invention that were secret and subject to pledges of confidentiality. *See* 778 F.3d at 1246–49 (referring to the confidentiality pledges and secret nature of the uses nine times in the course of the opinion). It was in that context that the court noted that the uses of the invention were not evident to the public—a fact that is important if the use in question is secret or subject to a pledge of confidentiality, but not otherwise.

IOENGINE's email goes on to characterize the Federal Circuit's *BASF* decision as standing for the proposition that third-party public use is not invalidating if it does not reveal the "inner workings" of the invention. To the contrary, what *BASF* holds is that a secret use by a third party is not an invalidating public use; it does not suggest that a non-secret use by a third party that is merely non-informing does not constitute a public use. The court's reference to not "extending the *Metallizing* rule to third-party party public use," 955 F.3d at 968, refers to not treating secret third-party use as an invalidating public use. As noted above, courts have been careful to distinguish between secret uses and non-informing public uses.

43

consent or knowledge of the applicant for patent." *Id.* at 19–20. The Federal Circuit has consistently applied the same principle. *See Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008) ("An invention is in public use if it is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality."); *Minn. Min.*, 303 F.3d at 1301 ("Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor."); *Netscape*, 295 F.3d at 1320 (same); *Baxter*, 88 F.3d at 1058 (same); *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983) (same); *see also Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 940 (Fed. Cir. 2014) ("[O]ur case law . . . focuses on the limitations, restrictions, or secrecy obligations associated with a purported public use.").

This case is entirely different from *BASF*, *Dey, Woodland Trust*, and *Garlock*, in that the manufacturers of the DiskOnKey did not conceal that product or its contents, nor did they otherwise seek to keep the contents of the product confidential. The same is true of the DiskOnKey firmware upgrade application and the DiskOnKey's SDK capabilities. The product, the firmware upgrade application, and the SDK were all publicly available and commercially exploited by M-Systems. In fact, they were aggressively marketed. Thus, they were plainly in public use. The fact that a casual observer would not have been able to discern the inner workings of the DiskOnKey device or the firmware upgrade application is not enough to render the use of the device and the application non-public in nature.

For those reasons, the court's instruction to the jury on public use was not erroneous for failing to distinguish between a public use by the inventor and a public use by third party under no obligation of secrecy to the inventor. In particular, based on the lack of evidence of a pledge of

confidentiality, the instruction was not erroneous for failing to state that the public use in question had to be "accessible" to the public by revealing all the features of the device to an ordinary observer.

### 4. On Sale

IOENGINE's fourth objection to the court's jury instructions relates to the on-sale bar. IOENGINE complains that the court's instructions failed to advise the jury that an advertisement is not an offer for sale, and argues that the court's failure to instruct on that issue requires a new trial. Dkt. No. 513 at 38.

During an exchange with the court immediately before the court's instructions to the jury, IOENGINE requested that the court revise its instructions regarding the on-sale bar. First, IOENGINE suggested that the instructions be modified to indicate that an offer for sale is "an offer that the other party could make into a binding contract simply by accepting it." Tr. 1273:3–6. Alternatively, IOENGINE proposed adding a statement to the instructions that "an advertisement is not an offer for sale." Tr. 1273:10–14.

IOENGINE is correct that an offer generally must meet the requirements of a commercial offer for sale in order to satisfy the on-sale bar in section 102(b) of the Patent Act. *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1374–80 (Fed. Cir. 2016) (en banc). The problem for IOENGINE is that the evidence did not present a question whether there was merely an offer to sell the DiskOnKey devices without any actual accompanying sales. There is no basis for dispute that the DiskOnKey devices not only were offered for sale but were actually sold in the United States prior to March 23, 2003. Moreover, there was no question that any sales that were made were commercial in nature; there was no evidence at trial of any transactions that could be considered non-commercial sales.

The critical question at trial, for purposes of the prior art determination, was whether the DiskOnKey devices that were sold during the period prior to the critical date contained the firmware

upgrade application and the SDK capabilities. Thus, the existence of an on-sale bar in this case did not depend on the definition of an offer for sale. Instead, it turned on what was in the products that were sold.

IOENGINE does not dispute that DiskOnKey devices were sold in the United States prior to the critical date of the '969 and '703 patents. *See* Dkt. No. 513 at 13. Instead, IOENGINE's argument at trial was that Ingenico failed to prove that the products sold in the United States prior to March 23, 2003, contained the firmware upgrade application and SDK capabilities necessary to trigger the on-sale bar. *See* Tr. 1368:15–1370:3.[15] With respect to that issue, as discussed in section II.A.1 above, the evidence was amply sufficient to show that the DiskOnKey devices that were sold to customers in the United States, at least as of November 8, 2002, included those features. Because the issue of validity turned not on whether particular conduct constituted an offer for sale, but instead on whether the DiskOnKey devices sold in the United States contained the firmware upgrade and the SDK capabilities, there is no force to IOENGINE's complaint that the court did not give the jury a sufficiently detailed instruction regarding the meaning of an offer for sale and that the court's failure to do so deprived IOENGINE of a fair trial.

Moreover, neither of IOENGINE's proposed instructions on this issue would have been helpful to the jury. IOENGINE's first suggestion, that the court instruct the jury that an offer for sale is "an offer that the other party could make into a binding contract simply by accepting it," standing by itself, would have been potentially confusing to the jury, as it would have left hanging in the air the questions of what constitutes a binding contract and what constitutes a manifestation of

---

[15]  In his closing argument, Ingenico's counsel pointed to the M-System sales spreadsheets (DX316 and DX317) listing numerous U.S. sales of the DiskOnKey in late 2002 and early 2003. Tr. 1358:5–1359:8. In its rebuttal argument, IOENGINE did not dispute that the evidence showed those sales were made.

acceptance sufficient to create such a binding contract.  Those questions would be likely to puzzle a lay jury, at least without substantial supplemental instructions.

IOENGINE's second suggestion, that "an advertisement is not an offer for sale" would likewise have invited confusion, for two reasons.  First, the M-Systems press releases announcing the firmware upgrade in July 2002, DX097, and the availability of SDK capabilities in September 2002, DX307, were not offers for sale, but were merely announcements of the availability of those features for the DiskOnKey.  Moreover, in discussing the July 2002 M-Systems press release in his closing argument, Ingenico's counsel did not contend that the press release itself was an offer for sale, but instead argued that the press release provided evidence that the DiskOnKey devices were available for sale and could be purchased "through partners like Apple and Compaq and Dell and Targus."  Tr. 1360:16–22 (referring to DX097).  Counsel made a similar argument with respect to a Fuji Photo Film U.S.A. press release dated July 10, 2002, which stated that the DiskOnKey was "currently available through major partners in North America, Asia and Europe."  DX180.  Counsel characterized that press release as "the Fuji Photo indication that they're selling DiskOnKeys."  Tr. 1361:15–16.  There was no reference in counsel's argument to any "advertisements" for the DiskOnKey or any suggestion in the argument or the evidence that any such advertisements would constitute potentially invalidating offers for sale.

Second, the proposed instruction would have required the jury to struggle over what constitutes a mere advertisement and what sorts of promotional activities might satisfy the legal requirements to be deemed an offer for sale.  Given the strength of the evidence of actual sales and the focus of the parties on what was in the products that were sold rather than whether there were any offers for sale unconnected to actual sales, an instruction along the lines of those proposed by

IOENGINE would have added no value to the jury's consideration of the evidence in this case and would have risked adding complexity and confusion to an already dense set of legal instructions.

There are two other points to be made regarding IOENGINE's argument as to the on-sale bar. First, IOENGINE argues that there was no direct evidence indicating that there was an actual sale of a particular DiskOnKey device that satisfied each element of the asserted claims. But that point, which is discussed in detail in section II.A.2 above, would not have been resolved by an instruction regarding what constitutes an offer for sale for purposes of section 102(b). Second, IOENGINE raises the same point it raised with respect to the "public use" instruction: that a third party's sale of a product that did not reveal all the limitations of the product to a user cannot be invalidating under section 102(b). For the reasons discussed with respect to the "public use" instruction in section III.A.3 above, that argument is unpersuasive.

The court's instructions to the jury on the on-sale component of section 102(b) were therefore not erroneous and did not improperly lead the jury to find that M-Systems' activities with regard to the DiskOnKey devices during late 2002 and early 2003 rendered the asserted claims of the '969 and '703 patents invalid under the on-sale bar, even if those activities did not constitute sales or offers to sell those devices.

### B.    IPR Estoppel

IOENGINE next argues that because of IPR estoppel, as provided for in 35 U.S.C. § 315(e)(2), the court should have prohibited Ingenico from relying on the DiskOnKey firmware upgrade application at trial. Under section 315(e)(2), when an IPR proceeding results in a final written decision by the PTAB, the party that petitioned for IPR may not argue in a subsequent district court proceeding that the claims challenged in the IPR proceeding are "invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review."

Prior to trial, IOENGINE moved for summary judgment of no invalidity, arguing that Ingenico should not be allowed to rely on numerous documents that Ingenico either raised or reasonably could have raised in its petitions for IPR of the '969 and '703 patents. Dkt. No. 361 at 8–16. IOENGINE also argued that Ingenico should be precluded from relying on two "device art" invalidity theories, including one based on the DiskOnKey device, because in IOENGINE's view those theories were based on publications that Ingenico either raised or reasonably could have raised during the IPR proceeding. *Id.* at 17–21.

In ruling on IOENGINE's motion, I held that Ingenico would be precluded from relying on several categories of documents that it raised or reasonably could have raised in the IPR proceeding as printed publication prior art. Dkt. No. 449 at 58–61. One category of documents I prohibited Ingenico from relying on was "documentation related to [the] DiskOnKey upgrade software and numerous other Western Digital Documents." *Id.* at 61 n.21 (citing Dkt. No. 361 at 15–16 & Appendix V). Although that category included the DiskOnKey Upgrade ReadMe documents, *see* Dkt. No. 361, Appendix V, at 2, I ruled that Ingenico would not be precluded from relying on those documents "to the extent . . . that they form part of a substantively different combination of references that could not reasonably have been raised in the IPRs." Dkt. No. 449 at 61.

With respect to Ingenico's argument based on the DiskOnKey itself, I permitted Ingenico to rely on the DiskOnKey as device art because IOENGINE had not established that each of the documents on which Ingenico sought to rely was publicly available (i.e., was a printed publication) that would have been a proper ground of invalidity in an IPR proceeding. Dkt. No. 449 at 63. I further held that "Ingenico is not estopped from relying on device art if, as it appears here, that device is not simply a printed publication invalidity theory in disguise," and that the device art may be combined with other printed publications as long as the combination is "substantively different from

49

the grounds that were raised or reasonably could have been raised by Ingenico in its petitions for IPR." *Id.* at 64.

IOENGINE argues that the DiskOnKey device art, as Ingenico presented it at trial, was effectively "a printed publication invalidity theory in disguise." Dkt. No. 513 at 38. More specifically, IOENGINE argues that Ingenico relied primarily on the DiskOnKey Upgrade ReadMe document, which Ingenico admitted was originally a public document but was no longer publicly available at the time Ingenico filed its IPR petitions. IOENGINE also argues that the other documents relating to the DiskOnKey that Ingenico introduced did not create a substantively different ground of invalidity from the DiskOnKey Upgrade ReadMe document, which Ingenico could have raised as prior art in its IPR petitions.

With the benefit of the evidence presented at trial, I find that IOENGINE's argument improperly discounts the other evidence relied upon by Ingenico with respect to the DiskOnKey device. For example, Ingenico relied at trial on an M-Systems presentation, DX336, which IOENGINE has not argued is a printed publication.[16] That presentation included a reference to "public key infrastructure," along with a statement that the DiskOnKey contains an "ARM 7 microprocessor." DX336.4. Neither of those features is discussed in the ReadMe document, *see* DX331, yet the evidence of both of those features added substance to Ingenico's invalidity case. Ingenico relied on the public key infrastructure as evidence that the DiskOnKey facilitated authentication. The capacity for authentication, Ingenico argued, satisfied the "verification" limitation of claim 3 of the '969 patent and claims 56 and 105 of the '703 patent. Ingenico also relied on the ARM 7 microprocessor in the DiskOnKey device as evidence that the DiskOnKey contained

---

[16] Notably, the presentation at DX336 is marked with a "Confidential - Attorneys' Eyes Only" designation.

a processor, which is a required element of the "portable device" recited in each of the asserted claims.

IOENGINE argues that Ingenico's demonstration at trial of the firmware upgrade application "added nothing to the ReadMe" because the application was not actually able to run a firmware upgrade during the demonstration. Dkt. No. 514 at 39. Although the demonstration did not show a complete upgrade process, the demonstration provided additional support for the proposition that the DiskOnKey firmware upgrade application was actually available and could have been used with a DiskOnKey device.[17]

In sum, the record at trial supports Ingenico's argument that Ingenico's DiskOnKey invalidity theory was device art that did not amount to "a printed publication invalidity theory in disguise." *See* Dkt. No. 449 at 64. Accordingly, it was proper for Ingenico to rely on that prior art, including the DiskOnKey Upgrade ReadMe document, at trial. IOENGINE's motion for a new trial based on its IPR estoppel argument is therefore denied.

## IV.    <u>Conclusion</u>

For the reasons set forth above, IOENGINE's motion for judgment as a matter of law and for a new trial is DENIED.

In an abundance of caution, this order has been filed under seal because the parties' briefs regarding the present motions were filed under seal. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the

---

[17] At the oral argument on the present motion, IOENGINE acknowledged that Ingenico relied on "internal documents from M-Systems" as evidence of certain capabilities of the DiskOnKey, such as whether the DiskOnKey was able to execute "program code." Oral Argument Recording at 15:38–17:22. That recognition further undercuts IOENGINE's contention that Ingenico's additional evidence regarding the DiskOnKey added nothing of substance to the information contained in the Readme document.

order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.  Before making any requests to maintain particular portions of the order under seal, the parties should recognize that the transcript of the trial is in the public record, largely unredacted, and that the hearing on the motion for judgment as a matter of law and a new trial was conducted in public.  Materials that were publicly disclosed either at trial or in the hearing should not be the subject of requests for redaction.

IT IS SO ORDERED.

SIGNED THIS 9th day of December, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IOENGINE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 18-452-WCB |
| PAYPAL HOLDINGS, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| _____ | § | |

| | | |
|---|---|---|
| INGENICO INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 18-826-WCB |
| | § | |
| IOENGINE, LLC, | § | **FILED UNDER SEAL** |
| | § | |
| *Defendant.* | § | |
| | § | |
| _____ | § | |

| | | |
|---|---|---|
| IOENGINE, LLC, | § | |
| | § | |
| *Counterclaim Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| INGENICO INC., | § | |
| INGENICO CORP., and | § | |
| INGENICO GROUP S.A., | § | |
| | § | |
| *Counterclaim Defendants.* | § | |
| _____ | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In these consolidated cases, the parties have each filed case dispositive motions and motions to exclude expert testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). IOENGINE, LLC ("IOENGINE"), has moved for partial summary judgment on the issue of invalidity and has moved to exclude portions of the testimony of two experts retained by Ingenico Inc. ("Ingenico"). Dkt. No. 397.[1] PayPal Holdings, Inc. ("PayPal"), and Ingenico have moved for summary judgment on several issues, and they have moved to exclude the testimony of two of IOENGINE's experts. Dkt. Nos. 398–402. On April 6, 2022, and June 7, 2022, I heard oral argument on those motions.

## I. <u>Background</u>

IOENGINE alleges that PayPal and Ingenico infringe various claims of U.S. Patent No. 9,059,969 ("the '969 patent") and U.S. Patent No. 9,774,703 ("the '703 patent"). IOENGINE had previously alleged infringement of U.S. Patent No. 8,539,047 ("the '047 patent") as well, but IOENGINE dropped the '047 patent from these lawsuits after the Patent Trial and Appeal Board ("PTAB"), in an *inter partes* review ("IPR") proceeding, found all of the asserted claims of that patent to be unpatentable. Dkt. No. 131 at 1.

### A. The Patents In Suit

The '969 and '703 patents, which share a common specification, are directed to a "tunneling client access point" ("TCAP") that the patents describe as "a highly secure, portable, [and] power efficient storage and data processing device." '969 patent, Abstract. In a preferred embodiment, the TCAP is a Universal Serial Bus ("USB") device that connects to an "access terminal" (e.g., a desktop

---

[1] All citations to the docket are to Case No. 18-452, unless otherwise noted.

**Appx56**

computer, server, or mobile device). *Id.* at col. 3, ll. 46–54. In some embodiments, a user may "observe data stored on the TCAP without it being resident on the [access terminal]," a feature that "can be useful to maintain higher levels of data security." *Id.* at Abstract. In other embodiments, "the TCAP may tunnel data through an [access terminal] across a communications network to access remote servers." *Id.* Put more simply, the inventions disclosed in the specification allow a user to use processing and storage resources on the TCAP while making use of the display and network connection associated with the access terminal.

The asserted claims that remain in the two lawsuits are claims 3 and 10 of the '969 patent and claims 56, 90, 101, 105, 114, and 124 of the '703 patent. Those claims share a common hardware architecture, which includes a "portable device" connected to a "terminal," which in turn is connected to a "communications network node." *See* '969 patent, claim 1 (on which asserted claims 3 and 10 of the '969 patent ultimately depend); '703 patent, claims 55, 78, 104 (on which the asserted claims of the '703 patent ultimately depend). The independent claims from which the asserted claims depend also each recite software architecture in the form of "program codes." *See* '969 patent, claim 1; '703 patent, claims 55, 78, 104.

Claim 3 of the '969 patent encompasses the limitations of claims 1 and 2, from which claim 3 depends, and recites as follows:

> **1.** A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:

3

(a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;

(b) a processor; and

(c) a memory having executable program code stored thereon, including:

(1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal communication interface; and

(2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;

wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

**2.** The portable device according to claim **1**, wherein the fourth program code which [sic], when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node.

**3.** The portable device according to claim **2**, wherein the communication caused to be transmitted to the communication network node facilitates verification of the portable device.

Claim 10 of the '969 patent, which also encompasses the limitations of claims 1 and 2, recites as follows:

**10.** The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database.

The asserted claims of the '703 patent are generally similar, although they are directed to methods and systems, rather than devices, as is the case of the asserted claims from the '969 patent.

Asserted claim 56 of the '703 patent, a method claim that depends from claim 55 and thus encompasses all the limitations of claim 55, recites as follows:

**55.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of

4

communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**56.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate verification of the portable device.

Asserted claim 90 of the '703 patent, which depends from claims 78 and 86, and thus encompasses all the limitations of those claims, recites as follows:

**78.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

5

(a) affecting [sic: effecting?] the presentation of an interactive user interface by the terminal output component;

(b) executing second program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, third program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**86.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**90.** The method according to claim **86**, wherein the data stored on the portable device memory comprises portable device identified information.

Asserted claim 101 of the '703 patent, which depends from claims 93 and 97, and thus encompasses all the limitations of those claims, recites as follows:

**93.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting [sic: effecting?] the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with

6

the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**97.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**101.** The method according to claim **97**, wherein the data stored on the portable device memory comprises portable device identifier information.

Asserted claim 105 of the '703 patent, which depends from claim 104, and thus encompasses all the

limitations of that claim, recites as follows:

**104.** A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

(a) a communications network node; and

(b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

(1) cause the terminal to execute the first program code to affect [sic: effect?] the presentation of an interactive user interface by the terminal output component;

(2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the

terminal and to a communications network node through the terminal network communication interface;

> (3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface to cause a communication to be transmitted to a communications network node; and

> (4) facilitate communications through the terminal network communication interface to a communications network node.

> **105.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

Asserted claim 114 of the '703 patent, which also depends from claim 104 and therefore

encompasses all the limitations of that claim, recites as follows:

> **114.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

Asserted claim 124 of the '703 patent, which depends from claims 104 and 120, and thus

encompasses all the limitations of those claims, recites as follows:

> **120.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with data stored on the portable device to facilitate the terminal to transmit a communication to the communications network node.

> **124**. The system according to claim **120**, wherein the data stored on the portable device memory comprises portable device identifier information.

In order to facilitate analysis, it is appropriate to analyze the claims without the "technical

jargon" used in the patents. *See Ericsson v. TCL Commc'n Tech. Holdings, Ltd.*, 955 F.3d 1317, 1326

(Fed. Cir. 2020). Viewed in that manner, claim 1 of the '969 patent can be seen to recite a portable

device that contains a processor and memory; the portable device communicates with a terminal that

contains a processor and memory, and is connected with a network; the portable device executes code

8

to perform certain specific functions in response to input on the terminal's user interface and communicates with the network through the terminal.

That set of limitations is at the core of all the asserted claims of both the '969 patent and the '703 patent. Claim 3 of the '969 patent depends from claims 1 and 2, and it adds that the communication sent to the network serves to verify the portable device. Claim 10 of the '969 patent also depends from claims 1 and 2, and it adds that the communications sent to the communication network facilitate synchronizing content on the portable device with content on the communication network node database.[2]

Claim 56 of the '703 patent is a method claim that otherwise tracks the substance of claim 3 of the '969 patent. Claim 90 of the '703 patent similarly tracks claim 1 of the '969 patent but adds that the data stored on the portable device memory contains information identifying the portable device. Claim 101 of the '703 patent is also similar, but it adds that the data stored on the portable device memory includes portable device identifier information. Claim 105 claims a similar system in which the portable device is configured to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device. Claim 114 recites a similar system in which the communication to the communications network node facilitates synchronizing content on the portable device with content on the communications network node. And claim 124 recites a similar system in which data stored on the portable device facilitates the terminal to transmit communications to the communications network node and the data stored on the portable device memory includes portable device identifier information.

---

[2] Claim 1 of the '969 patent refers to a "communications network node," while claims 2, 3, and 10 refer to a "communication network node." The difference does not appear to be one of substance, but rather simply a manifestation of careless drafting of the type found throughout the two patents in suit.

9

<u>B. The Accused Products</u>

PayPal and Ingenico's accused products serve as components of mobile point-of-sale ("mPOS") systems. Ingenico's accused products are mobile credit card readers for use by merchants who run a payment processing software application on a smartphone or tablet. Ingenico also provides a payment application, known as "RoamPayX," to a small number of its customers. Dkt. No. 404, Exh. 4, ¶ 60; Dkt. No. 403 at 4. The majority of Ingenico's customers do not use RoamPayX, but instead write their own applications using Ingenico's Application Programming Interfaces ("APIs") and/or Software Development Kits ("SDKs"). Dkt. No. 404, Exh. 4, at ¶¶ 64–70; Dkt. No. 403 at 4.

PayPal's accused products comprise two different product lines: PayPal Here and Zettle. In connection with each of those product lines, PayPal provides a free mobile application to merchants who can then accept credit card payments using a card reader that PayPal supplies to the merchants at little or no cost. Dkt. No. 403 at 5. The PayPal Here product line supports four different card readers: one supplied by a third party, Miura Systems Limited, and three supplied by Ingenico. PayPal's Zettle product line supports only one card reader, the "Zettle 2" reader, which is supplied by a third party, Datecs Ltd. *Id.*

## II. **<u>Legal Standard</u>**

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the case of an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986). The burden on the nonmoving party in that situation can be satisfied by "showing," that is, by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

### III. PayPal and Ingenico's Motions

In their motions, PayPal and Ingenico have raised nine different issues. They argue: (1) the asserted claims of the '969 and '703 patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101; (2) IOENGINE is estopped from disputing the validity of claims that the PTAB found to be unpatentable; (3) PayPal and Ingenico do not directly infringe the asserted method claims; (4) they do not directly infringe the asserted apparatus claims; (5) they do not jointly infringe the asserted method claims together with third parties; (6) Ingenico does not indirectly infringe the asserted claims; (7) Ingenico does not infringe the asserted claims under the doctrine of equivalents; (8) the expert testimony of Dr. Jeffery A. Stec should be excluded because of his failure to apportion damages to the infringing features of the accused products and for improperly relying on settlement agreements and prior jury verdicts to support IOENGINE's request for damages; and (9) the expert testimony of Mr. Jeffrey Klenk regarding the commercial success of products covered by the asserted claims should be excluded.

### A. Patent Eligibility Under 35 U.S.C. § 101

In evaluating whether a particular invention is patent-eligible within the meaning of 35 U.S.C. § 101, the court must first determine whether the asserted claims are directed to a patent-ineligible concept, such as an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014); *Mayo*

*Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 71–72 (2012). That factor is conventionally referred to as *Alice* step one. If the claims are directed to an abstract idea, the court must decide whether the claims nonetheless contain an "inventive concept . . . sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18; *Mayo*, 566 U.S. at 72–73. That factor is conventionally referred to as *Alice* step two.

With respect to *Alice* step one, PayPal and Ingenico argue that the asserted claims are directed to the abstract idea of "a portable device causing messages to be sent to a network through an intermediary computer." Dkt. No. 403 at 6. IOENGINE responds that such a characterization "radically oversimplifies the invention," which is directed to a "specific arrangement of components and program code to accomplish identified functionality." Dkt. No. 416 at 6. In particular, IOENGINE argues, the asserted claims are directed to a specific improvement in computer capabilities, namely, "a tangible portable device with unconventional hardware" that "allows users to employ traditional large user interfaces they are already comfortable with, provides greater portability, provides greater memory footprints, draws less power, and provides security for data on the device." Dkt. No. 416 at 7; '969 patent, col. 2, ll. 35–39.

In cases involving computing technology, the Federal Circuit has frequently framed the inquiry at *Alice* step one as asking "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016); *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306–07 (Fed. Cir. 2020); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364–65 (Fed. Cir. 2020); *Data Engine LLC v.*

12

*Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018); *Core Wireless Licensing S.A.R.L.*, 880 F.3d 1356, 1361–62 (Fed. Cir. 2018); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014).

This principle has sometimes been described as requiring "a technological solution to a technological problem" specific to computers. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016); *see also cxLoyalty, Inc. v. Maritz Holdings, Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (computer functionality improvements can be patent-eligible if they are "done by a specific technique that departs from earlier approaches to solve a specific computer problem"); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (claims held patent-ineligible because they "are not directed to a solution to a 'technological problem'").

When the claims at issue do not provide "a specific technical solution to a technological problem," the claims have been held abstract. *See Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1355 (Fed. Cir. 2021). But when the claims provide for a specific improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible. *See Data Engine*, 906 F.3d at 1008–11 (methods for making electronic spreadsheets more accessible); *Core Wireless*, 880 F.3d at 1361–63 (improved display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303–06 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–62 (Fed. Cir. 2017) (improved computer memory system).

The Federal Circuit's decision in *Visual Memory* is instructive in this regard. There, the Federal Circuit held that patent claims directed to an improved computer memory system were patent-

13

eligible and not directed to an abstract idea. The memory system disclosed in the patent at issue in that case contained three separate caches, each of which was "programmable based on the type of processor connected to the memory system." 867 F.3d at 1256. The patented system "separat[ed] the functionality for the caches and defin[ed] those functions based on the type of processor" being used with the memory system. *Id.* The court held that the claims were directed to "a technological improvement" and noted that "the specification discusse[d] the advantages offered by the technological improvement." *Id.* at 1259–60.

In the cases at bar, the claimed components standing alone (e.g., a "terminal," "portable device," or "processor") can fairly be considered as generic, as were the memory and cache components that were claimed in *Visual Memory*. But here, as in *Visual Memory*, the claims recite a specific structure and division of functions that are represented to constitute a technological improvement. The asserted claims of the '969 and '703 patents recite a portable device with a processor that performs functions in response to inputs on an interface located on a separate device— the terminal—which in turn is connected to a network. And the common specification of the asserted patents sets forth the advantages offered by that particular structure of components and division of functions. *See, e.g.*, '969 patent at col. 2, ll. 25–51 (discussing various problems with existing portable devices that the claimed inventions purportedly solve).

Specifically, the claims of IOENGINE's patents are directed to allowing users to "securely access, execute, and process data . . . in an extremely compact form." '969 patent, col. 2, ll. 26–28. And the common specification describes various ways to accomplish that goal, such as by allowing certain activities to "execute on the TCAP's processor" while using the access terminal merely as a display, *id.* at col. 9, ll. 24–27, or by using the TCAP's processor to encrypt data and transmit it through the access terminal such that it is not readable by or stored on the access terminal, *id.* at col.

14

12, line 65 through col. 13, line 12. The claims recite several tangible components, including a portable device, a terminal, communications network nodes, and memory, that are configured to perform those functions. The generic character of those components renders the claims broad in scope, but the breadth of the claims does not necessarily dictate whether the invention is directed to patent-eligible subject matter. Instead, courts must consider "the focus of the claim, i.e., its character as a whole, in order to determine whether the claim is directed to an abstract idea." *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, 381 F. Supp. 3d 293, 304 (D. Del. 2019), *aff'd*, 813 F. App'x 584 (Fed. Cir. 2020) (internal quotation marks and citations omitted). Here, the character of the claims as a whole relates to a specific improvement in computing technology, and not to implementing an "independently abstract" process that merely invokes computers as a tool. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

More generally, the Federal Circuit has noted that the abstract idea exception to patent eligibility "prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'" *McRO*, 837 F.3d at 1312 (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113 (1853)). The Federal Circuit expounded upon that theme in *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018), where the court explained that claims that are drafted in a functional manner have the effect of broadening the claim scope to cover a result regardless of how that result is obtained. And by laying claim to a function or result, the claims risk preemption of any means of achieving the claimed function or result. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768–69 (Fed. Cir. 2019); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 ("An improved result, without more stated in the claim, is not enough to confer eligibility to an otherwise abstract idea. . . . To be patent-eligible, the claims must recite a specific means or method that solves a problem in an existing technological process.").

15

This point was well put in the Federal Circuit's decision in *TecSec, Inc. v. Adobe Inc.*, where the court wrote that in computer-related patents, the court has inquired whether the focus of the claimed advance is on a solution not a problem specifically arising in the realm of computer networks or computers, and "whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function." 978 F.3d 1278, 1293 (Fed. Cir. 2020) (citing *Uniloc*, 957 F.3d at 1306, 1308–09).

PayPal and Ingenico characterize the abstract idea underlying the asserted claims of the '969 and '703 patents as sending messages to a network through an intermediary. If accurate, that characterization of the claims would, of course, be functional and result-oriented, and would have broadly preemptive effects. The characterization, however, is not accurate, as it summarizes the claimed subject matter at too high a level of abstraction to fairly represent what the claims actually recite. The claims are directed to particular hardware components that have particular features and are arranged in a particular manner. The recited components perform a function and achieve a result, but what is claimed is a particular arrangement of particular components, not the abstract idea of transmitting messages through an intermediary, regardless of how that result might be achieved.

PayPal and Ingenico cite as presumably analogous authority several cases in which courts have held that patent claims involving computers were directed to abstract ideas, but those cases each involved the use of computers for other purposes, not improvements in computer technology. For example, the claims in *Universal Secure Registry* were directed to a method of verifying a person's identity by combining several conventional verification techniques. 10 F.4th at 1354. The court held that the claims were directed to an abstract idea because the authentication method simply used computers as a tool for performing the claimed multi-factor authentication, and the claims "d[id] not include sufficient specificity" regarding the technical solution being claimed. *Id.*

16

Similarly, in *Yu v. Apple Inc.*, the court held certain claims to be patent-ineligible; those claims were directed to a digital camera that would take two images of the same object and use one of the images to enhance the other. 1 F.4th 1040, 1042–43 (Fed. Cir. 2021). The court held that the claimed method was "'directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery' rather than 'a specific means or method that improved the relevant technology.'" *Id.* at 1043 (quoting *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017)). In *Yu*, the purported technical solution was "the abstract idea itself—to take one image and 'enhance' it with another." *Id.* at 1044. And in *Ericsson v. TCL Communication Technology Holdings, Inc.*, the Federal Circuit invalidated claims that were directed to "controlling access to, or limiting permission to, resources." 955 F.3d at 1326. Even though the claims were written "in technical jargon," the court concluded that they were directed to "nothing more than this abstract idea" and lacked "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Id.* at 1328 (quoting *SAP Am., Inc. v. Investpic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018)).

The same is true for the district court cases cited by PayPal and Ingenico. *See, e.g.*, *Callwave Commc'ns, LLC v. AT&T Mobility*, 207 F. Supp. 3d 405, 412–13 (D. Del. 2016) (noting that "the specification fails to reveal any sort of tangible technological advance beyond a mere abstract idea implemented using various existing technological tools"); *T-Jat Sys. 2006, Ltd. v. Expedia, Inc. (DE)*, No. 16-cv-581, 2018 WL 1525496, at *4 (D. Del. Mar. 28, 2018) (holding that the "particular characteristic[s]" of the claims to a computerized translation device were "inherent to the concept of translation," such that they would apply even to a human translator); *Pragmatus Telecom, LLC v. Genesys Telecomms. Lab'ys, Inc.*, 114 F. Supp. 3d 192, 200 (D. Del. 2015) (holding that claims directed to solving problems with call centers addressed "pre-Internet problems," such as long wait

times and requiring customers to physically record and dial a telephone number). Notably, none of the claims in those cases recited a purportedly unconventional arrangement of hardware components similar to the arrangements recited in these cases or in *Visual Memory*.

At oral argument on these motions, counsel for Ingenico contended that the best case support for the defendants' section 101 argument from among the Federal Circuit's decisions can be found in *Affinity Labs of Tex. v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016), and *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977 (Fed. Cir. 2017). In both of those cases, however, the patent in question was directed to an abstract idea implemented by technological means, rather than to a modification of the technological means themselves. In *Affinity Labs*, the court identified the abstract idea as the dissemination of broadcast content to users outside of a particular region. 838 F.3d at 1256. There was nothing in the claim that was "directed to how to implement out-of-region broadcasting on a cellular telephone. Rather, the claim [was] drawn to the idea itself." *Id.* at 1258 (emphasis omitted). And in *Smartflash* the court identified the abstract idea as conditioning and controlling access to data based on payment, and it explained that the asserted claims invoked computers "merely as tools to execute fundamental economic practices." 680 F. App'x at 982.

IOENGINE's claims are directed to what IOENGINE asserts is a novel computer architecture that is designed to provide benefits because of the claimed structures of the computing elements. Unlike the cases relied upon by PayPal and Ingenico, IOENGINE's patents do not recite the use of conventional computer components as tools to accomplish other objectives set forth in abstract terms. While PayPal and Ingenico contend that the idea of distributing computer architecture in the manner provided in the asserted claims was not new when IOENGINE's patent applications were filed, that

18

is an issue that is properly assessed under the law of anticipation and obviousness; it is not a matter of patent ineligibility under section 101.[3]

In prior litigation in this district involving the same family of patents as those asserted here, the defendant argued that the '047 patent was directed to an abstract idea. Judge Sleet rejected that argument on the ground that the claims were directed to an improvement in computing technology. *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-cv-1571, 2017 WL 67938, at *1 n.2 (D. Del. Jan. 4, 2017). Specifically, Judge Sleet noted in the *Interactive Media* case that "the claims are directed to addressing a specific technological problem in then-existing computing environments: portable devices were 'bulky, provide[d] uncomfortably small user interfaces, and require[d] too much power to maintain their data.'" *Id.* (quoting '047 patent, col. 2, ll. 29–32).[4] Although the instant cases involve different patents than the one involved in the *Interactive Media* case, the patents are from the same family, share a common specification, and are directed to the same general subject matter. Accordingly, Judge Sleet's analysis is directly applicable here, and I find his opinion to be persuasive as to this issue.[5]

---

[3] In their reply brief, PayPal and Ingenico cite three district court cases for the proposition that "[d]istributing resources and tasks among computing devices is a well-recognized abstract idea." Dkt. No. 424 at 1. In one of those cases, *British Telecommunications PLC v. IAC/InteractiveCorp*, 381 F. Supp. 3d 293, 317–18 (D. Del. 2019), the discussion of distributed computer architecture was directed to whether the patent was directed to a well-understood, routine, and conventional computer function, the issue addressed in step two of the *Alice* analysis. *See Alice*, 573 U.S. at 221-22, 225. It was not directed to the abstract idea requirement addressed in step one of *Alice*. In the other two cases, *Device Enhancement LLC v. Amazon.com, Inc.*, 189 F. Supp. 3d 392, 403–04 (D. Del. 2016), and *Appistry, Inc. v. Amazon.com, Inc.*, No. C15-311, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015), the courts found that the asserted claims were directed to the general idea of distributed computer architecture rather than to a specific structure and division of functions. The asserted claims of the '969 and '703 patents are directed to a more specific allocation of functions than was true in the "distributed architecture" cases on which PayPal and Ingenico rely.

[4] The language from the '047 patent quoted by Judge Sleet is the same as the language found in the '969 patent at col. 2, ll. 29–31.

[5] PayPal and Ingenico suggest that Judge Sleet's ruling on other "abstract idea" issue may

19

Although the claimed elements in IOENGINE's patents are broad in scope, there is sufficient structure in the claims to ensure that IOENGINE is not simply laying claim to an end result rather than to the process or machinery employed to achieve that result. As IOENGINE notes in its brief, "there are many unclaimed ways [in which the invention] could be practiced." Dkt. No. 416 at 6 (emphasis omitted). And Ingenico effectively confirms that assertion by noting, with regard to the issue of indirect infringement, that its accused card readers "support numerous mechanisms for accomplishing payment transactions and firmware updates that are not accused of infringement." *See* Dkt. No. 403 at 31. The preemption concerns that underlie the abstract idea exception are therefore not particularly strong in these cases.

For purposes of the summary judgment motion on patent ineligibility, I conclude that PayPal and Ingenico have not shown that the claims at issue in these cases are directed to an abstract idea. PayPal and Ingenico's motion for summary judgment of invalidity therefore fails at *Alice* step one. For that reason, I need not address whether, under *Alice* step two, the claims recite an "inventive concept." *See Koninklijke*, 942 F.3d at 1153; *Visual Memory*, 867 F.3d at 1262; *Enfish*, 822 F.3d at 1339.

_____

have been the result of the "defendant's overbroad articulation of the abstract idea" in that case. Dkt. No. 403 at 8. That speculation is not persuasive. The defendant in the *Interactive Media* case characterized the '047 patent as being directed to "a portable device that communicates with and through general purpose computers." *IOENGINE, LLC v. Interactive Media Corp.*, No. 14-cv-1571, Dkt. No. 137 at 2 (D. Del. Dec. 1, 2016). That characterization is quite similar to the manner in which PayPal's characterizes the abstract idea here. *See* Dkt. No. 403 at 6 (defining the abstract idea as "a portable device causing messages to be sent to a network through an intermediary computer"). Thus, the persuasive value of Judge Sleet's opinion does not appear to be undermined by the manner in which the defendant in that case characterized the alleged abstract idea.

20

B. Underline{Estoppel}

While this litigation was pending, Ingenico filed petitions for *inter partes* review with the PTAB, challenging claims in all of the patents asserted in the litigation. In 2020, the PTAB issued final written decisions in which it held that all the challenged claims of the '047 patent and most of the challenged claims of the '969 and '703 patents were unpatentable. Only three of the originally asserted claims survived the IPR proceeding: dependent claim 3 of the '969 patent and dependent claims 56 and 105 of the '703 patent. IOENGINE then added five new claims against each defendant in the district court litigation: dependent claim 10 of the '969 patent and dependent claims 90, 101, 114, and 124 of the '703 patent.

All eight of the claims now being asserted against PayPal and Ingenico depend from claims that were invalidated in the IPR proceedings. Based on the PTAB's rulings on those claims, PayPal and Ingenico contend that IOENGINE should be estopped from arguing that any of the limitations found in those independent claims are not found in the prior art. Dkt. No. 403 at 18–22. They cite two theories in support of their estoppel argument: collateral estoppel and quasi-estoppel.

1. *Collateral Estoppel*

In deciding questions involving collateral estoppel, the Federal Circuit looks to regional circuit law—here, the law of the Third Circuit—except for any aspects of collateral estoppel that may have special or unique application to patent cases. *See Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013); *AbbVie Deutschland GmbH & Co. KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1295 (Fed. Cir. 2014). In this instance, the question is whether to give collateral estoppel effect to the decisions of the PTAB in Ingenico's IPR proceedings. It is therefore at least arguable that this is a case involving the application of collateral estoppel in the patent context, so that Federal Circuit law should apply. However, with regard to the particular principles of collateral

21

estoppel law that apply here, Federal Circuit law and Third Circuit law are the same. The choice of law question therefore does not matter to the disposition of this issue.

A party asserting collateral estoppel ordinarily must satisfy the court that (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision in the previous litigation; and (4) the party to be estopped from relitigating the issue was fully represented in the prior action. *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006); *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012). Importantly, however, when the burden of proof on an issue in the prior proceeding was less stringent than the burden of proof on the issue as to which preclusion is sought in the second proceeding, collateral estoppel typically does not apply.

That principle has been recognized by the Supreme Court on several occasions and has been applied by both the Third and the Federal Circuits. *See One Lot Emerald Cut Stones & One Ring v. United States*, 409 U.S. 232, 235 (1972); *see also B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015) ("[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." (citation omitted)); *Grogan v. Garner*, 498 U.S. 279, 284–85 (1991) (when a prior decision on an issue was based on the preponderance-of-the-evidence standard of proof, that decision cannot be given collateral estoppel effect against a party in a proceeding in which the decision on that issue is governed by the clear-and-convincing-evidence standard of proof); *In re Braen*, 900 F.2d 621, 624 (3d Cir. 1990) (different burdens of proof—in that case, preponderance of the evidence in the first litigation and clear and convincing evidence in the second—"foreclose application of the issue preclusion doctrine"); *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016) ("[T]he Patent Office is not bound by [a] district court['s] claim construction due to the different claim construction

22

standards applied in the two fora."); *Fears v. Wilkie*, 843 F. App'x 256, 261 (Fed. Cir. 2021) ("[I]ssues are not identical if the second action involves application of a different legal standard" than the first.).

In addition, commentators and other courts have treated that rule as black letter law. *See* Restatement (Second) of Judgments § 28(4) (1982) (relitigation of an issue in a subsequent action is not precluded if "the adversary [of the party against whom preclusion is sought] has a significantly heavier burden than he had in the first action"); *id.*, cmt. f & illus. 11 (no preclusion where burden of proof in one action was preponderance of the evidence and in the other action was clear and convincing evidence); 18 Charles Alan Wright et al., Federal Practice & Procedure § 4422 (3d ed. 2016) ("[A] party who has carried the burden of establishing an issue by a preponderance of the evidence is not entitled to assert preclusion in a later action that requires proof of the same issue by a higher standard."); 18 James Wm. Moore et al., Moore's Federal Practice § 132.02[4][e] (2021) ("[I]ssue preclusion does not apply when the party seeking to benefit from preclusion has a significantly heavier burden in the subsequent action than in the prior action."); *Cobb v. Pozzi*, 363 F.3d 89, 113 (2d Cir. 2004) (same; citing cases).

What PayPal and Ingenico are asking the court to do is to give collateral estoppel effect in this litigation to certain aspects of the PTAB's rulings invalidating the independent claims of the '969 and '703 patents in the IPR proceedings. In particular, PayPal and Ingenico argue that because the PTAB invalidated the claims from which the asserted claims depend (which they refer to as the "underlying claims"), IOENGINE should be foreclosed from disputing that the subject matter of those claims (and thus the subject matter of each of the limitations of those claims) is contained in the prior art. The effect of that relief, if granted, would be that IOENGINE could argue that only those new limitations that were introduced in the dependent claims asserted in these cases are novel, and thus that the validity of those claims would depend entirely on the novelty of the new limitations.

23

The problem with that argument is that the standard of proof for determining validity that is applied in proceedings before the PTAB differs from the standard of proof that is applied in proceedings before a district court. A petitioner in an IPR proceeding need only prove invalidity by a preponderance of the evidence. 35 U.S.C. § 316(e). In district court litigation, however, the defendant must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). Under the general principles of collateral estoppel law, as set forth above, that difference forecloses the court from applying collateral estoppel to IOENGINE's validity arguments in this forum, as several district courts have held. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, 2022 WL 823521, at *4–5 (D. Del. Mar. 30, 2022), *report and recommendation adopted on a different ground*, 2022 WL 1503923 (D. Del. May 12, 2022); *TrustID, Inc. v. Next Caller Inc.*, No. 18-cv-172, 2021 WL 3015280, at *3 n.2 (D. Del. July 6, 2021); *Sanofi-Aventis U.S. LLC v. Mylan GmbH*, No. CV 17-9105, 2019 WL 4861428 , at *1 (D.N.J. Oct. 2, 2019); *Papst Licensing GmbH & Co. v. Samsung Elecs. Co.*, 403 F. Supp. 3d 571, 601–03 (E.D. Tex. 2019).

PayPal and Ingenico take issue with that analysis. Relying on *XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282 (Fed. Cir. 2018), they argue that, notwithstanding the difference in the standards of proof between PTAB proceedings and district court litigation, collateral estoppel applies to invalidity issues decided by the PTAB when those issues arise in district court litigation. To assess that argument requires a close examination of the *XY* case and the scope of that court's holding regarding collateral estoppel.

In *XY*, the Federal Circuit had before it two appeals involving the same patent claims—an appeal from a district court judgment that, in relevant part, held the claims invalid, and an appeal from a final written decision of the PTAB that invalidated the same claims in an IPR proceeding. The Federal Circuit affirmed the PTAB's decision and then gave collateral estoppel effect to that decision

24

with respect to the appeal from the district court, dismissing that appeal as moot. *XY*, 890 F.3d at 1294–95. The court noted that "both parties assumed that an affirmance of the Board's decision would result in estoppel" and that there was "no indication that either party thought estoppel would not apply." 890 F.3d at 1295. Under those circumstances, the court applied collateral estoppel *sua sponte* "to avoid unnecessary judicial waste from remanding an issue that has a clear estoppel effect." *Id.* (citation omitted).

Although PayPal and Ingenico cite *XY* for the proposition that the presence of "differing invalidity standards does not negate collateral estoppel," Dkt. No. 424 at 5, *XY* does not stand for so broad a proposition. The Federal Circuit had previously held that when the PTO cancels a claim, "the patentee loses any cause of action based on that claim, and any pending litigation in which the claims are asserted becomes moot" despite the differing standards of proof in the two forums. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013) (terminating parallel district court litigation when claims are canceled in reexamination); *see also LG Elecs., Inc. v. Conversant Wireless Licensing S.A.R.L.*, 759 F. App'x 917, 926 n.5 (Fed. Cir. 2019) (applying *Fresenius* to decisions of the PTAB canceling claims following an IPR proceeding). Importantly, however, *Fresenius* was not based on collateral estoppel; instead, it was based on the fact that the PTO's cancellation of patent claims extinguishes the patentee's cause of action for infringement of those claims. The Federal Circuit in *XY* reached a result roughly equivalent to the result it reached in *Fresenius*, as the court in *XY* dismissed the appeal from the district court litigation over certain after upholding the PTAB's decision invalidating those same claims. To be sure, the court in *XY* granted that relief before the PTO had formally canceled the claims. Perhaps for that reason, the Federal Circuit in *XY* treated its decision as being based on collateral estoppel rather than on a direct application of *Fresenius*.

This case is different from *XY* in three respects. First, unlike in *XY*, the claims that were invalidated in the IPR proceedings are not the same as the claims that are at issue in these cases. Second, unlike in this case, the parties in *XY* advised the court that they assumed the affirmance of the Board's decision would result in an estoppel. Third, the Federal Circuit upheld the PTO's decision invalidating the claims at issue simultaneously with its decision dismissing the patentee's challenge to the district court's order holding the claims invalid. In this case, the PTAB's decision invalidating the independent claims of the '969 and '703 patents has not been resolved by the Federal Circuit, but is still pending on appeal.

Given that the parties in *XY* agreed that estoppel should apply to the PTAB's decision once the Federal Circuit affirmed that decision, the court had no reason to address whether collateral estoppel should apply despite the different legal standards applicable to PTAB proceedings and district court actions. Moreover, because the facts of the *XY* case were closely aligned to those in *Fresenius*, and because the *XY* court reached a result that was aligned with the result that would have applied under *Fresenius* as soon as the PTO canceled the claims that had been invalidated by the Board and by the court of appeals, it made practical sense for the court to hold that the PTAB's decision rendered the appeal from the district court's invalidation order moot, rather than waiting until the PTO formally canceled the claims.

At bottom, PayPal and Ingenico's argument based on *XY* ignores the special circumstances in which that case arose. Instead, they contend that the court's reference to collateral estoppel as the basis for its ruling that the PTAB's invalidation of a claim bars further assertion of the same claim means that any issue decided by the PTAB in addressing invalidity has collateral estoppel effect in subsequent district court litigation notwithstanding the differences in the standard of proof between the two forums and even if the PTAB decision in the case has not been finally resolved. To read *XY*

that broadly would mean that the Federal Circuit, without saying so, has created an exception to the general rule of the law of judgments that collateral estoppel does not apply in circumstances in which the standard of proof that the party asserting collateral estoppel is more exacting in the second forum than in the first.

Although, as noted above, a number of district courts—including several in this district—have declined to read the *XY* decision that broadly, others have interpreted the decision to apply beyond the circumstances at issue in *XY*, where identical claims were at issue before the PTAB and the district court. *See Trs. Of the Univ. of Pa. v. Ely Lilly & Co.*, No. 15-6133, Dkt. No. 343, at 9–11 (E.D. Pa. Jan. 14, 2022); *M2M Solutions LLC v. Sierra Wireless Am., Inc.*, No. 14-cv-102, Dkt. No. 213, at 5–7 (D. Del. Mar. 31, 2021), *declining to adopt report and recommendation*, 2020 WL 7767639 (D. Del. Dec. 4, 2020); *Cisco Sys., Inc. v. Capella Photonics, Inc.*, No. 20-cv-1858, 2020 WL 7227153, at *3–4 (N.D. Cal. Dec. 8, 2020); *Intell. Ventures I, LLC v. Lenovo Grp. Ltd.*, 370 F. Supp. 3d 251, 255–57 (D. Mass. 2019); *Fellowes, Inc. v. Acco Brands Corp.*, No. 10 cv 7587, 2019 WL 1762910, at *6 (N.D. Ill. April 22, 2019).

Ultimately, the Federal Circuit will have to resolve the question of the intended breadth of its decision in *XY*. For the present, I interpret the *XY* decision in light of the facts that were before the court in that case. I do not understand the court's opinion to have created an exception to general and long-standing principles of collateral estoppel law, particularly in the absence of any discussion by the court of those principles or whether departing from them would be justified under circumstances such as the circumstances in the PayPal and Ingenico cases. Accordingly, I conclude that collateral estoppel has no application to the validity of the asserted claims in these cases.

2. *Quasi-Estoppel*

The doctrine of quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken." *Albertson v. Winner Auto.*, No. 01-cv-116, 2004 WL 2435290, at *4 (D. Del. Oct. 27, 2004) (citation omitted). PayPal and Ingenico argue that IOENGINE's statement to the court that it would not "re-litigate previously invalidated claims" after the PTAB issued its decision in the IPR proceeding warrants the application of quasi-estoppel here. Dkt. No. 403 at 21 (quoting Dkt. No. 131 at 1).

IOENGINE is not asserting any claims that the PTAB found to be unpatentable in the IPR proceeding. PayPal and Ingenico suggest that IOENGINE may seek to argue, for purposes of the claims now being asserted by IOENGINE, that certain limitations that the PTAB found to be disclosed in the prior art are not in fact so disclosed. As discussed above, collateral estoppel would not apply to that argument. And although the issues that IOENGINE proposes to litigate in these cases may be similar to issues decided by the PTAB in the IPR proceedings, IOENGINE did not agree not to revisit any *issue* decided by the PTAB; it agreed only not to relitigate previously invalidated *claims*. IOENGINE has not taken a position that is inconsistent with its statement that it would assert only patent claims that were not found to be unpatentable by the PTAB. As a result, quasi-estoppel does not apply to the validity of any of the claims asserted against PayPal and Ingenico.

C. Direct Infringement of the Asserted Method Claims

PayPal and Ingenico argue that they do not directly infringe any of the asserted method claims, which are claims 56, 90, and 101 of the '703 patent. Dkt. No. 403 at 22–23. They note that each method claim requires a user to interact at various points with either the portable device (which IOENGINE maps to the accused card readers) or the terminal (which IOENGINE maps to smartphones and tablets). Dkt. No. 403 at 22. According to PayPal and Ingenico, neither one of them

28

performs all the accused method steps and thus neither directly infringes the asserted method claims.

*Id.* (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007)).

IOENGINE has two separate theories of direct infringement: payment transactions and firmware updates. With regard to the payment-transaction theory of infringement, IOENGINE points to evidence that employees of PayPal and Ingenico complete the steps of the claimed methods when they either demonstrate or test the accused card readers. Dkt. No. 416 at 19–24. For example, IOENGINE points to a video that appears to depict a PayPal employee attempting to complete a payment transaction in order to test the "blacklist" feature of PayPal Here.[6] Dkt. No. 418, Exh. 10. As for PayPal's Zettle readers, IOENGINE points to deposition testimony suggesting that in February 2021 PayPal conducted internal test transactions on the Zettle readers in the United States and that those test transactions constituted direct infringement by PayPal. PayPal responded that those tests involved about 15 cents worth of transactions.[7] *See* Dkt. No. 447 at 1–2; Dkt. No. 448-1, Exh. 41, at

---

[6] The "blacklist" feature uses the card reader's serial number, which is sent to the server during a payment-card transaction to determine whether a device is involved in fraud and needs to be blacklisted. PayPal and Ingenico argue that the video in question is not evidence of direct infringement because it "does not show an actual transaction being conducted (*e.g.*, the 'Charge' button isn't pressed)." Dkt. No. 424 at 7. It is not clear, however, that the fact that the "Charge" button was not pressed means that the employee in the video did not complete all the steps of the claimed method. Viewing the facts in the light most favorable to IOENGINE, a reasonable jury could find that the video demonstrates completion of the claimed method steps.

[7] PayPal objects to this evidence on two grounds:

First, PayPal argues that IOENGINE raised this evidence for the first time at oral argument on the summary judgment motions. That contention fails because IOENGINE pointed to that evidence in response to a question from the court seeking clarification of the evidence on which IOENGINE was relying to support its direct infringement claim. Following the hearing, PayPal filed a statement responding to that evidence. *See* Dkt. No. 447. While a party resisting summary judgment must point to evidence supporting its position during the summary judgment proceedings, nothing prohibits the party from pointing to that evidence in response to questions from the court. Because PayPal had the opportunity to respond to that evidence (and availed itself of that opportunity), it was not prejudiced by IOENGINE's reference to the evidence during the hearing.

Second, PayPal argues that, in any event, the fact that the amount of the transactions was only 15 cents means that the infringement is *de minimis*. While that may be true, IOENGINE has at least

29

31. While the "volume" of the alleged test transactions is vanishingly small, that evidence is sufficient to create a triable issue of fact as to whether PayPal engaged in at least some acts of direct infringement of the method claims. As a result, summary judgment is inappropriate with respect to the issue of direct infringement by PayPal under IOENGINE's payment-transaction theory.

As for Ingenico, IOENGINE points to two other videos that appear to depict an Ingenico employee demonstrating Ingenico's card reader systems. Dkt. No. 418, Exhs. 13–14. Those videos, however, do not create a genuine dispute of material fact on the issue of direct infringement under the payment-transaction theory. One video was recorded at a conference, "Transact 15," which took place prior to the issuance of the asserted patents. *See* Dkt. No. 418, Exh. 13; Dkt. No. 451 at 227–28. The other video depicts the use of Ingenico's iCMP device in conjunction with the RoamPayX application. But the combination of the iCMP device and the RoamPayX application is not accused of infringement in the Ingenico case. *See* Dkt. No. 418, Exh. 14; Dkt. No. 451 at 228–29. Accordingly, IOENGINE has not identified evidence sufficient to create a genuine dispute of material fact on the issue of direct infringement by Ingenico under the payment-transaction infringement theory. Summary judgment will therefore be granted to Ingenico on that issue.

With regard to IOENGINE's firmware-update theory of infringement, the only suggestion of direct infringement is in the form of attorney argument presented at the oral argument on these motions. *See* Dkt. No. 451 at 220. In essence, IOENGINE suggests that because PayPal and Ingenico are large companies with many customers, they must at least test the firmware-update capability of

---

raised a dispute of fact as to whether PayPal tests the payment-transaction functionality of its Zettle readers in an infringing manner, even if the degree of the infringement is minimal. *See Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1356 (Fed. Cir. 2013); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1343, 1352–53 (Fed. Cir. 2009) (*de minimis* infringement can still be infringement).

their products. *Id.* That supposition is insufficient to create a genuine dispute of material fact on the issue of direct infringement under the firmware-update theory. Accordingly, summary judgment will be granted to PayPal and Ingenico with respect to direct infringement under IOENGINE's firmware-update theory.

D. <u>Direct Infringement of the Asserted Apparatus and System Claims</u>

PayPal and Ingenico next challenge IOENGINE's assertion that they directly infringe the asserted apparatus and system claims. Dkt. No. 403 at 23–28. That dispute focuses on whether the preambles of those claims have the effect of limiting the claims to require a system with a terminal.

There are two asserted apparatus claims in these cases—claims 3 and 10 of the '969 patent— and three asserted system claims—claims 105, 114, and 124 of the '703 patent. Both apparatus claims of the '969 patent depend from claim 1 of that patent. The three system claims of the '703 patent depend from claim 104 of that patent.

The preamble of claim 1 of the '969 patent recites:

A portable device configured to communicate with a *terminal* comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the *terminal* processor, is configured to present an interactive user interface on the *terminal* output component, and second program code which, when executed by the *terminal* processor, is configured to provide a communications node on the *terminal* to facilitate communications to the portable device and to a communications network node through the *terminal* network communication interface.

'969 patent, claim 1 (emphases added).

The preamble of claim 104 of the '703 patent recites:

A system implementing a *terminal* having a processor, an input component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the *terminal* processor, is configured to affect the presentation of an interactive user interface by the *terminal* output component, and second program code which, when executed by the *terminal*

31

processor, is configured to provide a communications node on the *terminal* to facilitate communications to and from the *terminal*.

'703 patent, claim 104. (emphases added).

A frequently quoted principle of patent law is that a preamble will be regarded as limiting if it recites essential structure or steps of a claim, or is necessary to give life, meaning, and vitality to the claim. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). By contrast, if a preamble merely "define[s] the environment in which an accused infringer must act or describe[s] capabilities that an accused device must have," the preamble is generally not considered limiting. *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374–75 (Fed. Cir. 2011); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011).

PayPal and Ingenico argue that the preambles of all the apparatus and system claims are limiting because they are "necessary for a POSITA to understand the subject matter of the claims." Dkt. No. 403 at 24. IOENGINE responds by arguing that the preambles of those claims are not limiting, because they merely "describe the environment in which the claimed portable device or system is configured to operate." Dkt. No. 416 at 25.

With respect to the apparatus claims of the '969 patent, IOENGINE's argument is persuasive. Claim 1 is explicitly directed to a "portable device," and the limitations recited in that claim are all components of the portable device. The recitation of a "terminal" in the preamble of claim 1 serves only to define the capabilities of the claimed portable device. That is, the claimed portable device is "configured to communicate with a terminal" having certain features. '969 patent, claim 1. In such situations, the reference to a second device that the claimed device is configured to engage with does

not require that the accused infringer make, use, or sell (or offer to sell or import) the second device. *See Advanced Software*, 641 F.3d at 1374.

As the Federal Circuit observed in *Uniloc USA, Inc. v. Microsoft Corp.*, a patentee can generally structure a claim so that it captures infringement by a single entity. 632 F.3d at 1309 (quoting *BMC*, 498 F.3d at 1381). The fact that the portable device must be able to interact with a terminal does not require that PayPal or Ingenico make, use, or sell (or offer to sell or import) both a portable device and a terminal in order to infringe those claims. *See id.* ("That other parties are necessary to complete the environment in which the claimed element functions does not necessarily divide the infringement between the necessary parties. For example, a claim that reads 'An algorithm incorporating means for receiving e-mails' may require two parties to function, but could nevertheless be infringed by the single party who uses an algorithm that receives e-mails."). Consequently, I construe the apparatus claims of the '969 patent not to require proof that the accused infringer make, use, or sell (or offer to sell, or import) a terminal in order to infringe the claims.

With respect to the system claims of the '703 patent, however, PayPal and Ingenico have the more persuasive argument. Those claims—asserted claims 105, 114, and 124—are directed to a "system *implementing* a terminal." '703 patent, claim 104 (emphasis added). Unlike the preamble of claim 1 of the '969 patent, which describes the environment in which the claimed portable device operates, the preamble of claim 104 of the '703 patent makes clear that the claimed system is required to "implement" a terminal. That language goes farther than merely defining the environment in which the system operates or defining the capabilities of the system. To "implement" a terminal, the system must necessarily comprise a terminal. Accordingly, I construe the apparatus claims of the '703 patent as requiring proof that the accused infringer make, use, or sell (or offer to sell, or import) a terminal as well as the recited portable device.

33

The summary judgment record is clear that neither PayPal nor Ingenico provides the smartphones or tablets that IOENGINE alleges correspond to the "terminal" in the asserted patents. Dkt. No. 404, Exh. 13, at 189–193; Dkt. No. 404, Exh. 15, at 28–29. IOENGINE conceded during the oral argument on this motion that PayPal and Ingenico do not provide such devices. Dkt. No. 451 at 219. Accordingly, PayPal and Ingenico are entitled to summary judgment that they do not directly infringe claims 105, 114, and 124 of the '703 patent. PayPal and Ingenico are not, however, entitled to summary judgment that they do not directly infringe claims 3 and 10 of the '969 patent.

E. Joint Infringement

Joint infringement of a method claim is established "when an alleged infringer conditions participation in an activity or receipt of a benefit upon [another party's] performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023–24 (Fed. Cir. 2015). More specifically, joint infringement occurs when "a third party hoping to obtain access to certain benefits can only do so if it performs certain steps identified by the defendant, and does so under the terms prescribed by the defendant." *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1380 (Fed. Cir. 2017). PayPal and Ingenico argue that IOENGINE has pointed to no evidence that either of them controls or directs another actor to perform the acts constituting infringement. Dkt. No. 403 at 28–30.

In the PayPal case, I allowed IOENGINE's "direction or control" theory of joint infringement to survive a motion to dismiss because "[a]ccording to IOENGINE, the ability of PayPal POS [point-of-sale] Partners to interact with the accused PayPal products depends on their use of PayPal's software development kits, which control the performance of the steps of the method claims when the PayPal software is run by the POS Partners." Dkt. No. 48 at 5.

34

PayPal's argument relies heavily on the distinction between "merchants" and "POS Partners." For example, PayPal argues that "merchants—not POS partners—run the accused apps." Dkt. No. 403 at 28. The distinction between the two is not entirely clear, although it appears that PayPal refers to the POS Partners as those entities that develop the applications used with PayPal's card readers, whereas PayPal refers to merchants as those entities that complete transactions using those applications. In any event, that distinction does not affect the resolution of this issue.

IOENGINE points to the agreement that customers enter when undertaking to use PayPal Here. The agreement requires that the customers either "download the PayPal Here App" or use an application that is "configured to make . . . requests to the PayPal Here SDK." Dkt. No. 418, Exh. 16, at § 4. Otherwise, the agreement provides, "payments will not be processed." *Id.* Viewed in the light most favorable to IOENGINE, that requirement could be understood to require either a merchant or a POS partner to use PayPal's applications and/or PayPal's SDKs in conjunction with the PayPal Here card readers.

With respect to Ingenico, IOENGINE points to evidence demonstrating that Ingenico allows its customers to use the mPOS EMV SDK in conjunction with its card readers. Dkt. No. 418, Exh. 18, at 593; Dkt. No. 418, Exh. 19, at 29–31. But that evidence does not establish that Ingenico requires its customers to use any particular application or SDK in order to use Ingenico's products. IOENGINE's attorney argument at the motions hearing that Ingenico's products must use an SDK (although not necessarily the EMV SDK) is not sufficient to create a genuine dispute of material fact on that point. *See* Dkt. No. 451 at 222–23.

The Federal Circuit has held that a defendant commits joint infringement if the defendant controls "the manner and timing of its customers' performance [when] it provide[s] them with detailed instructions regarding how to complete [the method] steps and dedicate[s] resources toward helping

the customers resolve problems encountered along the way." *Travel Sentry*, 877 F.3d at 1380 (citing *Akamai*, 797 F.3d at 1025). Here, both PayPal and Ingenico provide technical support resources to customers who use the accused card readers. Dkt. No. 418, Exhs. 44–45.

PayPal and Ingenico argue that to the extent they may control certain aspects of a merchant's transactions, they do not direct or control "the accused method steps (e.g., the Bluetooth pairing process, entering the payment amount, etc.)." Dkt. No. 403 at 29. As to PayPal, that argument is unpersuasive because a jury could find that PayPal requires its customers to use either the PayPal Here application or SDK. Steps such as pairing a card reader and entering a payment amount might plausibly be directed by the software the merchants use.[8]

Viewing the evidence in the light most favorable to IOENGINE, a jury could reasonably find that PayPal controls the manner and timing of the merchants' performance of the claimed method steps. Accordingly, PayPal is not entitled to summary judgment of no joint infringement. With respect to Ingenico, however, the evidence is different. IOENGINE has not established that Ingenico requires its customers to use any particular application or SDK in conjunction with Ingenico's accused card readers. There is therefore no genuine dispute of material fact regarding whether Ingenico controls the manner and timing of the merchants' performance of the claimed method steps. For that reason, Ingenico is entitled to summary judgment of no joint infringement.

---

[8] PayPal also argues that it "do[es] not dictate the form of payment that a merchant accepts, what time to perform a transaction, or where/whether the merchant should perform a transaction at all." Dkt. No. 424 at 10. The fact that PayPal does not require customers to process payment transactions in the first place does not preclude a finding that PayPal jointly infringes when its customers engage in those transactions. In *Travel Sentry*, the court found that the alleged infringer, by providing the Transportation Security Administration ("TSA") with resources on how to identify and disengage its accused luggage locks, could jointly infringe, despite there being no suggestion that the defendant had any control over which items of luggage the TSA chose to inspect or whether the TSA would disengage any of the locks at all. *Travel Sentry*, 877 F.3d at 1383–85 ("[I]t is irrelevant that TSA can choose to accomplish its luggage screening mandate through other means.").

36

F.  Underlined: Indirect Infringement

Ingenico argues that it does not indirectly infringe the asserted claims.  As part of its proof of indirect infringement, a plaintiff must show that a third party directly infringed the asserted claims. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016). Ingenico argues that IOENGINE has not pointed to any specific instances of direct infringement by Ingenico's customers.  Dkt. No. 403 at 30–32.

IOENGINE responds by noting that it has alleged direct infringement by PayPal based on PayPal's alleged use of Ingenico's products to infringe the asserted claims.  Dkt. No. 416 at 30.  I have noted above that there is a triable issue as to PayPal's direct infringement of the apparatus claims of the '969 patent and the asserted method claims of both asserted patents.  Viewing the facts in the light most favorable to the non-movant, a reasonable jury could find that PayPal uses Ingenico's card readers to directly infringe the asserted claims.

In any event, in order to prevail on its indirect infringement claim, IOENGINE is not required to point to direct evidence of either inducement of particular parties by Ingenico or direct infringement by the induced parties.  On multiple occasions, the Federal Circuit has held that circumstantial evidence is sufficient to support a jury verdict of indirect infringement, both with respect to the element of inducement and the element of direct infringement by the induced party.  *See, e.g.*, *Power Integrations*, 843 F.3d at 1335 (collecting cases); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1340 (Fed. Cir. 2021) ("It was fair for the jury to infer that when [the defendant] distributed and marketed a product with labels encouraging an infringing use, it actually induced [third parties] to infringe."); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (circumstantial evidence sufficient to prove direct infringement element of induced infringement); *In re Bill of Lading Transmission*, 681 F.3d 1323, 1336 (Fed. Cir. 2012) ("This court has upheld claims

of indirect infringement premised on circumstantial evidence of direct infringement by unknown parties."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317–18 (Fed. Cir. 2009) (same); *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008) (same). And IOENGINE has pointed to various statements and user guides along with sample code, documentation, and applications that Ingenico makes or provides to its customers. Dkt. No. 416 at 32 (describing several exhibits). Those materials are similar to the materials the Federal Circuit held in *Power Integrations* and *GlaxoSmithKline* to be adequate circumstantial evidence of induced infringement. *See Power Integrations*, 843 F.3d at 1335 (identifying "advertisements" and "user manuals" as types of circumstantial evidence of inducement); *GlaxoSmithKline*, 7 F.4th at 1340 (same).

Ingenico makes the separate argument that IOENGINE has not shown that Ingenico's devices "necessarily infringe[] the patent[s] in suit." Dkt. No. 403 at 30 (quoting *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 493 (Fed. Cir. 2019)). However, the requirement that an indirect infringer's product must actually infringe the claim does not apply when "the claim language only requires the capacity to perform a particular claim element." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010). Here, the asserted claims are directed to the capabilities of the recited elements. *See, e.g.*, '969 patent, claim 1 (reciting a "portable device configured to" perform several functions); '703 patent, claim 104 (describing the claimed system largely in terms of its capabilities). As a result, IOENGINE need not show that Ingenico's card readers necessarily infringe the asserted claims, as long as the card readers possess the capabilities recited in the claims, and as long as direct infringement is committed by third parties who are induced by Ingenico to infringe. I therefore find that there is a triable issue of fact with respect to whether Ingenico indirectly infringes the asserted claims.

38

G.  Doctrine of Equivalents

Ingenico moves for summary judgment that it does not infringe under the doctrine of equivalents.  Ingenico asserts that "IOENGINE has only proffered from its expert a statement of the legal standard and a single conclusory statement" that the accused products infringe under the doctrine of equivalents.  Dkt. No. 403 at 32–33.

As Judge Stark has noted, "[t]here is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the limitations rule."  *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 685 (D. Del. 2017), *aff'd sub nom. Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674 (Fed. Cir. 2019) (citation omitted).  Nevertheless, the plaintiff must do more than offer "the same literal infringement theory repackaged as DOE, without particularized linking evidence on a limitation-by-limitation basis."  *Osseo Imaging, LLC v. Planmeca USA Inc.*, No. CV 17-1386, 2020 WL 6318724, at *5 (D. Del. Oct. 28, 2020); *see also nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1325 (Fed. Cir. 2006); *ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 552–53 (Fed. Cir. 2018).

IOENGINE points to several places in the report of IOENGINE's expert, Aviel D. Rubin, in which Dr. Rubin noted that some of the accused devices contain components or perform functions similar to the components and functions set forth in the claims.  Dkt. No. 416 at 34–35.  But those statements are directed to literal infringement, not infringement under the doctrine of equivalents.  For example, Dr. Rubin relied on the "Landi source code" in his discussion of how some of the accused readers "initiate a payment transaction."  Dkt. No. 418, Exh. 3, at ¶¶ 384–97.  He then concluded his analysis of that feature by noting that the accused readers "are capable of the same functionalities [as those provided by the Landi source code] even if they do not utilize the Landi source code" because they "embody similar source code."  *Id.* at ¶ 397.  That observation is clearly intended to say that the

39

additional accused card readers literally infringe, not that they infringe under the doctrine of equivalents. In any event, that observation and others to the same effect are conclusory and do not explain in what ways the functionalities or underlying source code are "similar." *See id.*

IOENGINE has thus failed "to make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex*, 477 U.S. at 322. Because IOENGINE has not "designate[d] 'specific facts showing that there is a genuine issue for trial'" as to the doctrine of equivalents, *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56), IOENGINE has failed to raise a genuine dispute of material fact on which a jury could find infringement by Ingenico under that theory of liability. Summary judgment will therefore be granted for Ingenico on the issue of infringement under the doctrine of equivalents.

H. Opinion of Dr. Stec

In their *Daubert* motions, PayPal and Ingenico seek to exclude the opinions of Jeffery A. Stec, IOENGINE's damages expert. Dkt. No. 403 at 33–41. IOENGINE has put forth a theory of damages based on the reasonable royalty that PayPal and Ingenico would have had to pay to license the technology in the asserted patents. As is typically done when damages claims are based on a reasonable royalty theory, IOENGINE offers expert testimony directed to the amount that willing parties would have agreed to for a license following a hypothetical negotiation. *See Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010) (a royalty rate must reflect what "would have been agreed to in a hypothetical negotiation between a willing licensee and willing licensors"); *Lucent*, 580 F.3d at 1325. IOENGINE's evidence addresses the royalty base that would have been used in such a hypothetical negotiation and the royalty rate that the parties would have settled on. PayPal and Ingenico challenge Dr. Stec's conclusions as to the amount the parties would have agreed to in such a negotiation, contending (1) that Dr. Stec failed to properly apportion the value of the licensed

40

technology across the royalty base, (2) that he relied on a non-comparable license agreement to support his assessment of the royalty rate to which the parties would have agreed, and (3) that he improperly based his damages opinion on jury verdicts and settlement agreements in other cases.

1. *Apportionment and License Comparability*

PayPal and Ingenico first argue that in performing his damages assessment Dr. Stec failed to conduct an appropriate apportionment analysis. As the Federal Circuit has explained, "damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). To do so, the patentee must either point to "evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" or demonstrate that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Uniloc*, 632 F.3d at 1318 (citation omitted).

The parties agree that in these cases the smallest salable patent-practicing units are the accused card readers. Dkt. No. 416 at 35; Dkt. No. 424 at 15. In cases in which the smallest salable unit contains features that are not attributable to the patented technology, "the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). The need for apportionment can be avoided if the patentee establishes that its "patented technology drove demand for the entire product." *Id.* at 1329. However, a patentee may "assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Id.* at 1327 (quoting *Versata Software, Inc. v. SAP Am., Inc.*, 717

41

F.3d 1255, 1268 (Fed. Cir. 2013)) (emphasis in *VirnetX*); *Sonos, Inc. v. D&M Holdings, Inc.*, 297 F. Supp. 3d 501, 515 (D. Del. 2017).

The accused card readers at issue in these cases contain numerous features that are not covered by the '969 and '703 patents. For example, the accused card readers include physical components such as "a display screen, pin pad, processor, battery, power supply, and the card reading technology itself" along with security features such as "point-to-point encryption, the capacity to meet industry anti-fraud standards, [and] the ability to handle contactless transactions." Dkt. No. 424 at 16–17.

Dr. Stec did not adjust his assessment of the royalty base for the accused products to account for those non-patented features present in the accused card readers. Nor does IOENGINE allege that the features claimed in the asserted patents "create[] the basis for customer demand" for the accused products, *see VirnetX*, 767 F.3d at 1326. Instead, IOENGINE points to the "built-in apportionment" attributable to the licenses on which Dr. Stec relies, and contends that the "built-in apportionment" satisfies the apportionment requirement. Dkt. No. 416 at 36.

A license can provide "built-in apportionment" if it is "sufficiently comparable" to the hypothetical license that parties in the position of the parties to the lawsuit would have agreed to. *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). But a fact-finder can conclude that the parties to an extraneous license "settled on a royalty rate and royalty base combination embodying the value of the asserted patent" only if the extraneous license is comparable to the license that would be the product of the hypothetical negotiation in the case before it. *Id.* at 1041; *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021). The problem with Dr. Stec's testimony is that the circumstances that gave rise to the licenses on which Dr. Stec relied in his expert report were not comparable to the circumstances in the PayPal and Ingenico cases.

42

To begin with, among the licenses on which Dr. Stec relied, only one is a license entered into other than as the product of the settlement of litigation. That license is a license from iPIN Debit Network, Inc. ("iPIN"), to Infantly Available, Inc. ("Infantly").[9] Dkt. No. 404, Exh. 10, at 32. In that license, iPIN granted Infantly an exclusive license to two patents and several products, including iPIN's devices, "Debit Network," "Debit Processing Center," capabilities for "acquiring, settl[ing], and processing transaction[s] by merchant processors," and "encryption and transmission of electronic and/or mobile financial transactions." *Id.*

PayPal and Ingenico argue that the iPIN license is not comparable to the royalty agreements that would have been reached in hypothetical negotiations with IOENGINE over the asserted claims in these cases, and that it was therefore improper for Dr. Stec to rely upon the iPIN license in his report. IOENGINE argues that license comparability is a jury question that goes to the weight of Dr. Stec's testimony, not its admissibility.

In order for the iPIN license to be admissible on the issue of damages, the license would have to be "sufficiently tied to the facts of the case." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)). More specifically, the Federal Circuit has instructed district courts "to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

It is clear that the technology that is the subject of iPIN license differs significantly from the technology at issue here. For example, in his report Dr. Stec referenced the opinion of Dr. Rubin that

---

[9] As noted below, Dr. Stec will be precluded from relying upon the settlement agreements and jury verdicts discussed in his report. Accordingly, Dr. Stec's treatment of the iPIN license must independently meet the apportionment requirement for his analysis of the iPIN license to be admissible.

"the iPIN technology is not suitable for [mPOS], where the card readers rely on the [interactive user interface] and interface capabilities of a mobile phone or tablet but rather is more like a traditional POS system." Dkt. No. 404, Exh. 10, at 38 (internal quotation marks omitted). Dr. Stec added that "the patent[s]-in-suit provide a more beneficial architecture and tunneling security benefits," and that "the Patents-in-Suit provide significantly more important features and benefits than the technology described by this license." *Id.* (internal quotation marks omitted). Ultimately, Dr. Stec noted that the technology covered by the iPIN license is "inferior or at least a distant second" to the technology covered by the asserted patents in these cases. Dkt. No. 404, Exh. 23, at 74.

Because of the iPIN license is so different from a license to the technology at issue in these cases, the iPIN license is of little or no value in analyzing the hypothetical negotiation that is designed to provide guidance as to the proper assessment of damages. First, the iPIN license covered one patent that had already expired by the time the license took effect and another patent that was to expire approximately one year after the license became effective. Dkt. No. 418, Exh. 31, at 39. Second, the iPIN license was exclusive, whereas a hypothetical negotiation in these cases would be for a non-exclusive license. *Id.* at 32. Third, the iPIN license covered several products, services, and other obligations in addition to the two patents recited in the license. *Id.* at 32–33. And fourth, the iPIN license did not involve any of the parties to these cases.[10] *See id.* Although a license need not be "perfectly analogous" in order to be comparable, the expert must nevertheless account for any

---

[10] IOENGINE's damages expert in a previous case involving the '047 patent noted, when discussing licenses not involving the parties to the hypothetical negotiation, it is "probably impossible to find anything comparable that would be acceptable in terms of supporting the royalty." *IOENGINE LLC v. GlassBridge Enterprises, Inc.*, No. 14-cv-1572, Dkt. No. 272 at 741 (D. Del. Apr. 25, 2018). That expert refused to rely upon outside licenses because "you're not going to find very comparable technology to a particular and unique patent that you are dealing with in these cases." *Id.* at 742.

differences between the license and the royalty agreement that would be expected to flow from a hypothetical negotiation involving the patents in suit. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d at 1227–28.

In his analysis, Dr. Stec used the five-percent royalty rate adopted in the iPIN license as a floor for the hypothetical negotiation in these cases. Because he viewed the technology covered by that license as inferior to the technology at issue in the cases at bar, he concluded that the royalty rate for the patents in these cases should be adjusted upward from five percent of net sales. *Id.* at 74–77. But Dr. Stec failed to explain how the iPIN license provides the built-in apportionment necessary to satisfy the apportionment requirement. The patents that were the subjects of the iPIN license were directed to a "secure keyboard" in one instance and a "system for remote purchase payment transactions and remote bill payments" in the other. Dkt. No. 418, Exhs. 38–39. Dr. Stec did not explain what portion of the five-percent royalty rate in the iPIN license was attributable to the technology covered by those patents as opposed to the other provisions of the license, aside from his general assertion that the other obligations contained in the license would result in "limited downward pressure on the royalty rate that would have been agreed to in the hypothetical negotiation." Dkt. No. 418, Exh. 31, at 41. Nor did he explain how the details of the iPIN license could be useful in separating the value of the patented features from the value of the unpatented features in the accused card readers at issue in these cases. Given the significant differences in the technologies, Dr. Stec's failure to account for those points substantially undermines his reliance on the iPIN license. *See Omega*, 13 F.4th at 1379 (noting that a patentee may not "avoid the task of apportionment" in cases in which its expert's testimony "does not sufficiently speak to 'built-in apportionment'").

The license that the Federal Circuit addressed in *Vectura Ltd. v. GlaxoSmithKline LLC*, provides a useful contrast to the iPIN license. *See* 981 F.3d at 1041. In *Vectura*, the plaintiff's expert

45

relied on a prior license between the plaintiff and the defendant as providing built-in apportionment. *Vectura*, 981 F.3d at 1040. In that case, not only were the parties to the prior license the same as in the hypothetical negotiation, but the license and the hypothetical negotiation covered "roughly very similar technologies." *Id.* at 1041. The defendant's own expert in *Vectura* admitted that the license "was a very close comparable, much closer than you ever find in a patent case." *Id.* at 1040. In the cases at bar, by contrast, the iPIN license that IOENGINE offers as a comparable license covered technology quite different from the technology that is the subject of the asserted claims. And the rights conveyed by the iPIN license differed dramatically from the rights that would be at issue in a hypothetical negotiation over a license to IOENGINE's asserted patents.

In *Pavo Solutions LLC v. Kingston Technology Co.*, ___ F.4th ___, No. 21-1834, 2022 WL 1815050 (Fed. Cir. June 3, 2022), the Federal Circuit recently found that a license relied upon by the plaintiff's damages expert provided built-in apportionment under circumstances that indicated what the Federal Circuit regards as sufficient to satisfy the apportionment requirement. The license upon which the expert in the *Pavo Solutions* case relied was a prior license to the same patent between the plaintiff and another entity. *Id.* at *8. The court observed that the license therefore "plainly reflected the value that the contracting parties settled on for the patent." *Id.* By contrast, the iPIN license differs in numerous respects from the license that would be the product of a hypothetical negotiation involving the asserted patents. For that reason, it cannot be said that the iPIN license "plainly reflect[s]" the value that the parties would place on the '969 and '703 patents. *See id.* Thus, unlike in *Vectura* and *Pavo Solutions*, the iPIN license is not "highly comparable" to the technology at issue in these cases, such that "principles of apportionment [a]re effectively baked into the [iPIN] license." *See id.* at 1041; *Pavo Solutions*, 2022 WL 1815050, at *8; *see also Omega*, 13 F.4th at 1379–80.

46

In many situations, the fact that a license is not perfectly analogous to the rights that would be at issue in a hypothetical negotiation goes to the weight of the evidence, not its admissibility. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d at 1227. And at least in broad strokes, Dr. Stec attempted to account for some of the differences between the iPIN license and the hypothetical negotiation in these cases. But those efforts are not sufficient to satisfy the requirement that IOENGINE present evidence apportioning the "patentee's damages between the patented feature and the unpatented features." *Uniloc*, 632 F.3d at 1318 (citation omitted). Dr. Stec did not apportion the royalty base or rate to account for unpatented features of the accused card readers, nor did he show that the iPIN license is sufficiently comparable that "principles of apportionment [a]re effectively baked into" the license. *See Vectura*, 981 F.3d at 1041. Accordingly, his testimony regarding the iPIN license lacks the reliability required of expert evidence and will be excluded.

2. *Jury Verdicts*

PayPal and Ingenico also argue that Dr. Stec's opinion impermissibly relies on prior jury verdicts from two cases involving the '047 patent. In 2017, a jury found that Imation Corp. infringed the '047 patent, and Dr. Stec calculated a 23.9% "implied royalty rate" based on that verdict. The same year, a jury found that Interactive Media Corp. ("IMC") infringed the '047 patent, and Dr. Stec calculated a 27.9% "implied royalty rate" based on that verdict. Dr. Stec considered both of those verdicts in his damages analysis.

District courts have frequently disapproved of the admission of prior jury verdicts into evidence in patent cases. *See, e.g.*, *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, No. 17-cv-1734, 2021 WL 982732, at *9 (D. Del. Mar. 16, 2021); *Princeton Digital Image Corp. v. Ubisoft Entm't SA*, No. 13-cv-335, 2018 U.S. Dist. LEXIS 213987, at *3–7 (D. Del. Dec. 11, 2018), *report and recommendation adopted*, No. 13-cv-335, Dkt. No. 377 (Aug. 6, 2019); *Acceleration Bay LLC v.*

*Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018); *Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 605 (D. Del. 2010); *St. Clair Intell. Prop. Consultants, Inc. v. Fuji Photo Film Co.*, 674 F. Supp. 2d 555, 558–59 (D. Del. 2010), *rev'd on other grounds*, 412 F. App'x 270 (Fed. Cir. 2011); *Maxell, Ltd. v. Apple Inc.*, No. 5:19-CV-00036-RWS, 2021 WL 3021253, at *6–7 (E.D. Tex. Feb. 26, 2021); *Atlas IP, LLC v. Medtronic, Inc.*, No. 13-CIV-23309, 2014 WL 5741870, at *6 (S.D. Fla. Oct. 6, 2014); *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, No. 99-cv-1607, 2003 U.S. Dist. LEXIS 27873, at *4–5 (D. Minn. May 16, 2003). Those courts have generally expressed concern with the prejudice that could result from introducing a prior verdict to the jury. *Sprint*, 2021 WL 982732, at *9 n.9; *St. Clair*, 674 F. Supp. 2d at 559; *Acceleration Bay*, 324 F. Supp. 3d at 489 n.19; *Honeywell*, 2003 U.S. Dist. LEXIS 27873, at *4; *Maxell*, 2021 WL 3021253, at *7.

Outside of the patent context, courts have echoed those concerns regarding the potential for prejudice. *See, e.g.*, *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975) ("The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it."); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1117–18 (8th Cir. 1999); *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 633 (D.C. Cir. 2010); *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1009–10 (9th Cir. 2007); *Blakely v. City of Clarksville*, 244 F. App'x 681, 684 (6th Cir. 2007); *Espenscheid v. DirectSat USA, LLC*, No. 09-CV-625, 2012 WL 12995333, at *4 (W.D. Wis. Feb. 27, 2012); *see generally McKibben v. Phila. & Reading Ry. Co.*, 251 F. 577, 578–79 (3d Cir. 1918) ("[T]he statement made by counsel for the plaintiff in his argument to the jury as to what had been done by other juries in former trials of this case . . . [is] in a federal court deemed so improper as to warrant opposing counsel to request, and courts of their own motion to direct, the withdrawal of a juror and the continuance of a case . . . .").

Apart from the issue of prejudice, Judge Andrews has questioned the reliability of using jury verdicts to inform a hypothetical negotiation, noting that "[a] jury verdict represents the considered judgment of twelve (or maybe fewer) random non-experts as to what a hypothetical negotiation would have resulted in for the patent(s) at issue." *Acceleration Bay*, 324 F. Supp. 3d at 489; *see also Sprint*, 2021 WL 982732, at *9; *Princeton*, 2018 U.S. Dist. LEXIS 213987, at *4.

The reliability of the jury verdict at issue in a particular case can also play a role in determining whether the verdict should be considered in the hypothetical negotiation. For example, in *Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349, 2017 WL 3476978 (E.D. Tex. May 8, 2017), the court declined to admit a jury verdict that had not been tested in post-trial briefing or on appeal. As a result, the court concluded that the verdict was not an "established and reliable data point" that could be used in the hypothetical negotiation. *Id*. at *2. As in the *Saint Lawrence* case, the verdicts in the IMC and Imation cases were never tested in post-trial motions or on appeal, because those cases both settled before the court had an opportunity to rule on the post-trial motions and before any appeal form the verdict was taken to the Federal Circuit. *See generally IOENGINE LLC v. Interactive Media Corp.*, No. 14-cv-1571 (D. Del.); *IOENGINE LLC v. GlassBridge Enterprises, Inc.*, No. 14-cv-1572 (D. Del.). Moreover, in the Imation case, the defendants had specifically challenged the damages methodology of IOENGINE's expert in a post-trial motion for judgment as a matter of law, but in light of the settlement, that issue was never resolved. *See GlassBridge*, Dkt. No. 208, at 8–13. The fact that the verdicts in those cases were not further analyzed by the district court or the Federal Circuit render them less reliable evidence of the parties' positions at a hypothetical negotiation than might otherwise be the case. *See Saint Lawrence*, 2017 WL 3476978, at *2. Moreover, as IOENGINE acknowledged during the oral argument on these motions, the juries in the IMC and Imation cases awarded damages that were different from (albeit close to) the amounts requested by

IOENGINE.  It is not clear what the precise basis was for the figures awarded by the juries in those cases, which further calls into question the reliability of the jury's awards in those cases as an indication of the outcome of a hypothetical negotiation in the cases at bar.

IOENGINE points out that on two occasions the Federal Circuit has declined to reverse judgments arising from cases in which prior jury verdicts were admitted as part of the plaintiffs' hypothetical negotiation analysis. *See Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977, 980–82 (Fed. Cir. 2019); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1365–66 (Fed. Cir. 2006).  Those decisions, however, stand only for the proposition that the district courts in those cases did not abuse their discretion in allowing the juries to consider prior jury verdicts under the specific circumstances of those cases.  *See Applied Med.*, 435 F.3d at 1366 ("We therefore conclude that the court acted within its discretion."); *Sprint*, 760 F. App'x at 982 ("[T]he district court did not commit reversible error in failing to" exclude a prior jury verdict.).  In neither case did the court of appeals give unqualified approval for the general admission of jury verdicts on the issue of damages.  In fact, in the *Sprint* case the court made clear that prior verdicts "can be prejudicial and must be treated with great care."  *Sprint*, 760 F. App'x at 980–81.  As the Third Circuit has observed, district courts are given "very substantial discretion" in making evidentiary decisions, and it would be improper to read *Sprint* and *Applied Medical* as foreclosing a district court's exercise of its discretion to exclude prior jury verdicts and instead requiring that prior jury verdicts must ordinarily be treated as admissible.  *See United States v. Ali*, 493 F.3d 387, 391 (3d Cir. 2007).

In sum, there are substantial issues with using jury verdicts to inform a hypothetical negotiation, both generally and in these cases.  While the jury verdicts at issue in these cases have some relevance as to the value that IOENGINE's technology would be assigned in a hypothetical negotiation, I find that the prejudicial effect of the jury verdicts substantially outweighs the probative

value of those verdicts. *See* Fed. R. Evid. 403. Accordingly, I will exclude Dr. Stec's testimony to the extent that it relies on the IMC and Imation jury verdicts.

### 3. *Settlement Agreements*

In addition to their arguments regarding the prior jury verdicts, PayPal and Ingenico contend that Dr. Stec improperly relied on the settlement agreements that IOENGINE entered into with IMC and Imation following the jury verdicts in those cases. After the Imation verdict, IOENGINE and Imation entered into an agreement settling the litigation in that case, from which Dr. Stec calculated a 16.8% royalty rate. And after the IMC verdict, IOENGINE and IMC entered into an agreement settling the litigation in that case, from which Dr. Stec calculated a 12.2% royalty rate. Dr. Stec considered both of those settlement agreements in his report.

The Federal Circuit has observed that "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012); *see also Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 495 (D. Del. 2019); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 675, 678 (D. Del. 2016) ("Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances."). As the court explained in *LaserDynamics*, a licensing agreement entered into to resolving an ongoing infringement claim "is tainted by the coercive environment of patent litigation" and is therefore generally "unsuitable to prove a reasonable royalty." 694 F.3d at 77.

To be sure, the Federal Circuit has recognized that a court in its discretion can admit a settlement agreement if the settlement agreement is relevant to the value of the technology in suit and the relevance of the evidence is not outweighed by the risk of prejudice accompanying its admission. *See, e.g.*, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1336–37 (Fed. Cir. 2015); *Prism Techs.*

51

*LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368–71 (Fed. Cir. 2017). As the court in *Prism* explained, "a license agreement entered into in settling an earlier patent suit sometimes is admissible in a later patent suit involving the value of the patented technology, and sometimes is not." *Prism*, 849 F.3d at 1368–69. The court in *AstraZeneca* said the same—that "there is no per se rule barring reference to settlements simply because they arise from litigation." 782 F.3d at 1336. The court in that case noted, however, that "litigation itself can skew the results of the hypothetical negotiation." *Id.* (quoting *ResQNet*, 594 F.3d at 872). Importantly, the settlements in *AstraZeneca* and *Prism*, occurred prior to an award of damages in the form of a jury verdict. For a settlement agreement to be useful in the context of a hypothetical negotiation, it must have some "relation to demonstrated economic demand for the patented technology." *LaserDynamics*, 694 F.3d at 77. Put simply, settlement agreements such as those in the IMC and Imation cases, which were reached after the juries had already obligated the defendants to pay a fixed amount of damages, do not reliably demonstrate the economic demand for the patented technology that was at issue in those lawsuits.

In cases in which the settlement occurs after a damages award, whatever number the jury arrives at inevitably forms a baseline for the settlement discussions.[11] That baseline necessarily skews the parties' negotiations when determining the amount they will agree to in order to settle the case post-verdict. Prior licenses entered into voluntarily can be instructive for a hypothetical negotiation to the extent that those licenses reflect the royalty terms the parties before the court would have settled on in a voluntary transaction. As such, parties' voluntary agreement on a royalty may "reflect the

---

[11] For example, the jury award in the Imation case was $11 million, and the parties settled for $7.75 million. Dkt. No. 404, Exh. 10, at 22–23. Assume instead that the jury in that case had returned a verdict in the amount of $15 million. It is highly unlikely that under those circumstances, even assuming all other factors were equal, IOENGINE and Imation would have agreed to the same $7.75 million settlement that was reached after the $11 million verdict that was returned in that case.

economic value of the patented technology." *LaserDynamics*, 694 F.3d at 79. But a settlement agreement entered into in the course of litigation following an award of damages is not the product of a voluntary agreement by the parties, uninfluenced by extraneous considerations. Rather, it is an agreement driven by the result of the litigation, and in particular by the amount of the jury's award. *See id.* at 77–78 ("The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee . . . ."); *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, 2021 WL 982732, at *10 ("There is minimal probative value in using litigation settlement agreements to calculate a reasonable royalty, as the settlement agreement is not comparable to a negotiation between two willing parties."); *M2M Sols.*, 167 F. Supp. 3d at 678 (the two licenses before the court "resulted from litigation settlements, providing a drastically different backdrop than the hypothetical negotiation involving two willing licensors"); *Sprint Commc'ns Co. v. Comcast IP Holdings LP,* No. 12-1013, 2015 WL 456154, at *2 (D Del. Jan. 30, 2015) (same).

In addition to following a damages award, the settlement agreements in the IMC and Imation cases differ from those in *AstraZeneca* and *Prism* due to their temporal distance from the hypothetical negotiation. The Federal Circuit has held that prior litigation can be relevant to a reasonable royalty analysis when the hypothetical negotiation occurs shortly after the prior litigation. *See Applied Medical*, 435 F.3d at 1366 (declining to overturn a district court's admission of a jury verdict when the hypothetical negotiation occurred "on the heels" of the verdict); *Sprint*, 2021 WL 982732 (applying the reasoning of *Applied Medical* to settlement agreements). For both the PayPal and Ingenico cases, Dr. Stec identified June 16, 2015, as the hypothetical negotiation date (assuming infringement of both patents), see Case No. 18-452, Dkt. No. 418-5, Exh. 31, at 51, 57; Case No. 18-

53

826, Dkt. No. 405-1, Exh. 1, at 43, 48, and the parties confirmed at the oral argument on the present motions that June 2015 was the hypothetical negotiation date. The IMC and Imation settlement agreements, however, both occurred in 2017. The fact that the settlement agreements were entered long after the date of the hypothetical negotiation renders the settlement agreements less reliable as an indication of the value that the hypothetical negotiation would have placed on IOENGINE's technology than might otherwise be the case.[12]

Not only do settlement agreements such as the ones at issue in these cases lack the probative value of licenses entered outside the framework of litigation, but their admission at trial would also present a significant risk of prejudice, for much the same reason that the admission of jury verdicts would be prejudicial. In order to fully consider the probative value of the agreements, the jury would need to understand the context in which the settlement agreements were executed. That is, the jury would need to be aware that a prior jury had determined liability for infringement and had awarded damages for a particular amount prior to the settlement. Providing that context for the settlement agreement would create the same risk that would be associated with allowing the introduction of the jury verdicts in the first place, namely, that "the jury will defer to the earlier result and thus will, effectively, decide a case on evidence not before it." *Coleman*, 525 F.2d at 1351. For those reasons, even assuming that the settlement agreements in the Imation and IMC cases have some baseline level

---

[12] It is true that, as IOENGINE points out, some courts have held that the amount of time between a settlement agreement and the hypothetical negotiation is a concern that goes to the weight of the agreement rather than its admissibility. *See, e.g.*, *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co.*, No. 18-CV-388, 2018 WL 10126008, at *2 (E.D. Tex. Oct. 26, 2018); *Contour IP Holding, LLC v. GoPro, Inc.*, No. 17-CV-4738, 2020 WL 5106845, at *9–10 (N.D. Cal. Aug. 31, 2020). However, there is no indication that the settlement agreements in *Papst* or *Contour* came after a damages award, as is the case for the IMC and Imation settlements. The nearly two-year gap between the hypothetical negotiation and the settlement agreements in the IMC and Imation cases is further evidence of those agreements' lack of comparability to the hypothetical negotiation, and in view of the totality of the circumstances, I find that they should be excluded.

54

of comparability to the hypothetical licenses at issue in the cases at bar, I would exclude them under Rule 403 of the Federal Rules of Evidence on the ground that the probative value of that evidence would be substantially outweighed by the danger of unfair prejudice to the defendants. Dr. Stec's testimony is therefore excluded to the extent that it relies on settlement agreements reached after verdicts in the IMC and Imation cases.

I. Opinion of Mr. Klenk

Finally, PayPal and Ingenico move to exclude portions of the opinion of Mr. Jeffrey Klenk, IOENGINE's expert on commercial success. Dkt. No. 403 at 41–43. Specifically, they allege that Mr. Klenk's opinion "does not meet the legal threshold for arguing the Accused Products['] commercial success indicates nonobviousness." *Id.* at 41.

When a patentee introduces evidence of commercial success as objective evidence of nonobviousness, "the patentee bears the burden of showing that there is a nexus between the claimed features of the invention" and the commercial success. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999). Such a nexus is presumed if the specific product for which success is introduced "*is* the invention disclosed and claimed." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019). But even in the absence of such a presumption, a patentee may establish a nexus "by showing that the objective indicia are the 'direct result of the unique characteristics of the claimed invention.'" *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1276–77 (Fed. Cir. 2021) (quoting *Fox Factory*, 944 F.3d at 1373–74).

PayPal and Ingenico point to portions of Mr. Klenk's report and deposition testimony in which he acknowledged that other features of the accused card readers contribute to their commercial success. Dkt. No. 403 at 42. For example, in his report Mr. Klenk cited the importance of "encryption and other security functionality on mPOS devices" generally, Dkt. No. 404, Exh. 25, at ¶¶ 28–30, but

then in his deposition he admitted that those security features are not entirely attributable to the patented technology, Dkt. No. 404, Exh. 26, at 97–98. And Mr. Klenk identified other features of the accused products that may have contributed to their commercial success, such as "the basic capability of reading credit card information" and "support services" offered by Ingenico. *Id.* at 93.

What PayPal and Ingenico's argument ultimately amounts to is a contention that no nexus exists between the accused products' commercial success and the patented technology. IOENGINE, on the other hand, points to Mr. Klenk's analysis in which he "specifically investigated the extent to which the patented technology contributed to the ability of PayPal and Ingenico to make sales of the Accused Products," and his conclusion that "the patented technology is a crucial element of PayPal and Ingenico's ability to sell the Accused Products." Dkt. No. 418, Exh. 40, at ¶¶ 16–17. And it is true that the patented invention "need not be solely responsible for the commercial success" of the accused products in order for a nexus to exist. *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991). If PayPal and Ingenico had moved for summary judgment based on the absence of any nexus between commercial success and the patented technology, that motion would have been denied because, viewing the facts in the light most favorable to IOENGINE, a reasonable jury could find that such a nexus exists.

Instead, however, PayPal and Ingenico have fashioned this motion as a *Daubert* motion, which means that I must examine the "qualification, reliability, and fit" of Mr. Klenk's testimony. *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Other than the factual disputes previously mentioned, PayPal and Ingenico do not raise questions regarding Mr. Klenk's qualifications or the reliability of his testimony. For example, they do not argue that he lacks the "broad range of knowledge, skills, and training [that] qualify an expert," nor do they argue that his testimony rests on "subjective belief or unsupported speculation." *Id.* (citations omitted). And to the

extent that those arguments might be implicit in the arguments PayPal and Ingenico do make, those concerns are not sufficient to prevent the evidence from reaching the jury. Rather, those concerns go to "the weight and credibility of his opinion, not its admissibility." *See Alarm.com, Inc. v. SecureNet Techs. LLC*, No. 15-807, 2019 WL 133228, at *2 (D. Del. Jan. 8, 2019). Accordingly, PayPal and Ingenico's motion to exclude the testimony of Mr. Klenk is denied.

## IV. <u>IOENGINE's Motions</u>

For its part, IOENGINE argues that: (1) based on "IPR estoppel," Ingenico is barred from relying on certain prior art references; (2) PayPal is estopped to the same extent as Ingenico with respect to the IPR proceedings, because PayPal was a real party in interest in those proceedings or was in privity with Ingenico for purposes of those proceedings; (3) PayPal and Ingenico have improperly asserted anticipation based on a combination of prior art references rather than a single reference; and (4) the opinion of Ingenico's experts relating to the reasonable royalty issue should be excluded.

### A. <u>IPR Estoppel</u>

Under 35 U.S.C. § 315(e)(2), when an IPR proceeding results in a final written decision by the PTAB, the petitioner may not argue that the claims that were challenged in the IPR proceeding are "invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review." Specifically, "[a] prior art reference not raised in the IPR proceeding is subject to the statutory bar of 35 U.S.C. § 315(e)(2) if (1) the IPR petitioner actually knew of the reference or (2) a skilled searcher conducting a diligent search reasonably could have been expected to discover the reference." *Palomar Techs., Inc. v. MRSI Sys., LLC*, No. CV 18-10236-FDS, 2020 WL 2115625, at *3 (D. Mass. May 4, 2020). The estoppel provided for by section 315(e)(2) extends not only to the IPR petitioner, but also to "the real party in interest or privy of the petitioner." 35 U.S.C. § 315(e)(2).

IOENGINE alleges that Ingenico's prior art falls into three categories: (1) patents and publications that were actually raised during IPR, (2) patents and printed publications that IOENGINE alleges could reasonably have been raised during IPR, and (3) device art for which Ingenico relies on patents and printed publications that IOENGINE alleges were raised or reasonably could have been raised in the IPR. Dkt. No. 405 at 7–21. These categories are each addressed separately below.

1. *Patents and Publications Relied Upon During the IPR*

IOENGINE alleges that Ingenico may not rely upon two references on which Ingenico actually relied in the IPR proceeding: U.S. Patent Publication No. 2003/0020813 ("Iida") and the "Fuji Guide," which is a user manual that was provided to purchasers of the Fujifilm FinePix6800Z camera. Dkt. No. 417, Exh. E, at 65.

The PTAB determined that the Fuji Guide did not qualify as a prior art printed publication because Ingenico failed to show that the Guide was publicly available before the critical date of the patents. For that reason, the Board did not allow Ingenico to rely upon the Fuji Guide during the IPR proceeding. *Id.* at 78. Ingenico argues that it should not be estopped from invoking the Fuji Guide as a prior art reference in this litigation, because the PTAB did not determine on the merits whether the Fuji Guide disclosed the limitations of the challenged claims. Dkt. No. 415 at 12–13. IOENGINE argues that because Ingenico failed to meet its burden in the IPR proceedings to show that the Fuji Guide was publicly available before the critical date, Ingenico should not be permitted to re-litigate that issue in this court. Dkt. No. 422 at 5.

IOENGINE's argument regarding the Fuji Guide is based on collateral estoppel, not IPR estoppel. In general, an agency adjudication is subject to the same collateral estoppel principles as an adjudication by a court. Restatement (Second) of Judgments § 83(1) & cmt. f (1982). With respect to the motions filed by PayPal and Ingenico, I noted above that the different standards of proof in an

58

IPR proceeding and in district court precluded a finding of collateral estoppel. In this instance, however, the burden-of-proof issue weighs against Ingenico. If Ingenico could not prove before the PTAB that the Fuji Guide was a prior art publication under the preponderance-of-the-evidence standard, that is sufficient to preclude Ingenico from attempting to establish that issue as part of its burden of proving invalidity by clear and convincing evidence. *Cf. id.* at § 28(4) (relitigation of an issue in a subsequent action is not precluded if "the adversary [of the party against whom preclusion is sought] has a significantly heavier burden than he had in the first action"). Accordingly, Ingenico will be precluded from asserting the Fuji Guide as printed publication prior art in these cases.[13]

As for the Iida reference, the Board determined that Iida did not anticipate the remaining asserted claims in these cases. Dkt. No. 417, Exh. E, at 85. Based on IPR estoppel principles, Ingenico will therefore be estopped from claiming that Iida anticipates the claims asserted in this proceeding. That estoppel does not necessarily mean, however, that Iida may play no role in Ingenico's invalidity case. A defendant "can assert invalidity based on grounds that might be 'cumulative or redundant' of grounds raised during IPR as long as the defendant does so by relying on references or combinations of references that were unavailable" at the time of the IPR proceeding. *Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-CV-04738, 2020 WL 109063, at *6 (N.D. Cal. Jan. 9, 2020) (quoting *Clearlamp, LLC v. LKQ Corp.*, No. 12 C 2533, 2016 WL 4734389, at *8 (N.D. Ill. Mar. 18, 2016)). Such reliance must constitute a new "ground" of invalidity that could not have reasonably been raised in the IPR; "merely swap[ping] evidentiary proofs supporting the same 'ground' for invalidity that" could have been raised during the IPR is not permitted. *See Wasica Fin. GmbH v. Schrader Int'l,*

---

[13] This ruling, however, does not necessarily estop Ingenico from relying on the Fuji Guide in support of its contention that the Fujifilm FinePix6800Z camera is invalidating device art, as discussed below.

*Inc.*, 432 F. Supp. 3d 448, 453–54 (D. Del. 2020).  In other words, Ingenico may raise an invalidity theory at trial that includes Iida only if there is some substantive difference between that theory and the theories previously raised by Ingenico in the IPR proceedings that is germane to the invalidity dispute at hand.

      2.   *Patents and Publications That Reasonably Could Have Been Raised During the IPR Proceedings*

IOENGINE next alleges that Ingenico was aware of several references that it could reasonably have raised in the IPR proceedings, but did not.  IOENGINE contends that Ingenico should be estopped from asserting those references in this litigation.  IPR estoppel "applies not just to claims and grounds asserted in the petition and instituted for consideration by the Board, but to all grounds not stated in the petition but which could reasonably have been asserted against the claims included in the petition."  *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022).

IOENGINE argues that IPR estoppel should apply to several categories of references because Ingenico allegedly was aware of them.  The references that IOENGINE argues should be excluded at trial are (1) documents raised in Ingenico's IPR challenge to the '047 patent,[14] (2) documents described in Ingenico's invalidity contentions that Ingenico did not raise in the IPR proceedings,[15] (3) documents raised in the IPR petitions filed by PayPal before Ingenico filed its IPRs,[16] (4) documents identified on the face of the '703 patent,[17] and (5) documents discussed in the report of Dr. Vijay Madisetti,[18] which was produced to Ingenico prior to the filing of Ingenico's IPR petitions.  Dkt. No.

---

[14]  Genske, U.S. Patent Publication No. 2002/0065872
[15]  The "FujiFilm Documents," identified at Dkt. No. 405 at vi.
[16]  Abbott, U.S. Patent No. 7,272,723; Shmueli, U.S. Patent Publication No. 2002/0147912; Burger, U.S. Patent Publication No. 2002/0099665; DiGiorgio, U.S. Patent No. 6,385,729.
[17]  Elazar, U.S. Patent Publication No. 2004/0039932; Shmueli.
[18]  The documents identified at Dkt. No. 405 at 11–12 (subsection 5).

405 at 8–12.  Ingenico concedes that it could have raised those documents in the IPR proceedings.

Dkt. No. 451 at 233–34.  Accordingly, Ingenico will be estopped from relying on those documents to

prove invalidity unless, as discussed above, they form part of a substantively different combination of

references that would not have been available to raise in the IPRs.

IOENGINE also identifies several categories of documents that Ingenico "reasonably could

have been expected to discover."  Dkt. No. 405 at 13.  Those categories are: (1) references listed by

PayPal in its invalidity contentions,[19] (2) documents related to the DiskOnKey system that were

identifiable via a Google search or by searching other patents from the same inventor,[20] and (3)

documents obtained pursuant to a subpoena to Western Digital after the IPR petition had been filed.[21]

*Id.* at 13–16.  Ingenico does not suggest any reason to believe that it could not have raised those

documents in the IPR proceeding as well.[22]  Accordingly, Ingenico will be estopped from relying on

those documents except to the extent, as noted above, that they form part of a substantively different

combination of references that could not reasonably have been raised in the IPRs.

---

[19]  Iijima, U.S. Patent Publication No. 2003/0053124; Nakagawa, WIPO Patent Publication No. WO 02/075549 A1; Bodnar, U.S. Patent No. 7,433,710; Seaman, U.S. Patent Publication No. 2003/0030733.

[20]  Ban-078, U.S. Patent No. 7,175,078; Ban-354, U.S. Patent No. 6,148,354; Teicher-409, U.S. Patent No. 8,745,409; Teicher-219, U.S. Patent No. 7,240,219.

[21]  Any "documentation related to DiskOnKey Upgrade software and numerous other Western Digital Documents," Dkt. No. 405 at 15–16, which are identified at Dkt. No. 405, Appendix V.

[22]  Ingenico suggests in its brief that some of the Western Digital documents on which it relies were "designated as confidential to Western Digital." Dkt. No. 415 at 11.  To the extent that Ingenico relies on documents that are not public (i.e., they are not prior art publications), Ingenico will not be estopped from raising those documents because they could not reasonably have been raised as prior art publications in the IPR proceedings.

3. *Device Art*

IOENGINE argues that Ingenico should not be permitted to rely upon device art, i.e., particular prior art devices, to the extent that the proof of the device art incorporates any documents to which IPR estoppel applies. In general, IPR estoppel does not apply to device art, because "a petitioner cannot use an IPR to challenge the validity of a patent claim . . . based on prior art products or systems." *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *3 (N.D. Ill. Sept. 14, 2020). However, some courts have estopped defendants from asserting device art when "the physical product is entirely cumulative" of the prior art raised in the IPR, i.e., when the product is "materially identical" to the prior art reference raised in the IPR. *See, e.g.*, *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 454–55 (D. Del. 2020); *see also Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015, 2017 WL 2526231, at *8 (E.D. Tex. May 11, 2017); *Cal. Inst. of Tech. v. Broadcom Ltd.*, No. CV 16-3714, 2019 WL 8192255, at *7 (C.D. Cal. Aug. 9, 2019), *aff'd*, 25 F.4th 976 (Fed. Cir. 2022) (disapproving the use of device art that "simply swap[s] labels for what is otherwise a patent or printed publication invalidity ground in order to 'cloak' its prior art ground and 'skirt' estoppel").

Ingenico seeks to rely upon two devices at trial, the DiskOnKey and the Fujifilm FinePix6800Z camera (the "Fuji camera"). In response, IOENGINE first argues that because Ingenico's experts did not test those devices, but instead intend simply to rely upon documents describing the devices, those invalidity grounds may not properly be characterized as device art. Courts, however, have allowed the functions of prior art devices to be established through the use of documents and testimony. *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 604 (D. Mass. 2018) ("It is true that defendants' expert did not examine the product itself, but relied on documentation describing the product. But that documentation is evidence of how the product is

62

configured, how it is made, and how it works."); *Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1028–29 (N.D. Cal. 2016). I agree that Ingenico's expert need not have inspected or tested the devices in order to rely upon them for purposes of invalidity. Accordingly, the evidence relating to DiskOnKey and FinePix6800Z may properly be considered to be device art.

With respect to the DiskOnKey device, IOENGINE argues that Ingenico's expert, James T. Geier, relies on "44 documents, all of which could have been raised during IPR." Dkt. No. 405 at 19 & Appendix III. However, IOENGINE does not establish that each of those 44 documents reasonably could have been raised in the IPR. To the contrary, Ingenico submits that it is relying on documents that it obtained via a third-party subpoena and that those documents are "non-public and not reasonably available." Dkt. No. 415 at 11. In support, Ingenico points to the expert report of Mr. Geier, who Ingenico claims relied on non-public documents that Ingenico obtained via subpoena. *See* Dkt. No. 451 at 231; Dkt. No. 406, Exh. 1, at 75–85 (citing various Western Digital documents including SDK documentation and executable files). IOENGINE's briefing addresses the general categories of documents on which Ingenico seeks to rely, but it does not address Ingenico's assertion that some of those documents would not have been publicly available and could not reasonably have been relied upon in an IPR proceeding. Thus, IOENGINE has not demonstrated that there is no genuine dispute of material fact with respect to whether the documents relating to the DiskOnKey could have been raised in an IPR.

As for the Fuji camera, I noted above that I will not exclude the Fuji Guide on the basis of IPR estoppel, but that Ingenico is collaterally estopped from arguing that the Fuji Guide was publicly available before the critical date. That collateral estoppel determination does not extend, however, to the separate issue of whether the Fuji Guide evidences the features that would have been present in the Fuji camera before the critical date. Even if Ingenico was aware of the other documents it now

seeks to rely upon to establish the functions of the Fuji camera, the unavailability of the Fuji Guide for use in the IPR precludes the application of IPR estoppel to the Fuji camera device.  *See SPEX Techs. Inc v. Kingston Tech. Corp.*, No. SACV 16-01790, 2020 WL 4342254 (C.D. Cal. June 16, 2020) ("The Court finds that the reliance on some printed publications in an overall collection of documents being used to describe a system invalidity theory should not lead to estoppel of the overall system invalidity theory itself, nor piecemeal exclusion of the printed publications underlying that system invalidity theory, absent a showing that the system invalidity theory is a patent or printed publication theory in disguise.").  Accordingly, summary judgment will not be granted excluding the Fuji camera from evidence at trial.

    4. *Summary*

  In summary, Ingenico is estopped from relying on references that it actually raised or reasonably could have raised during the IPR proceedings.  However, that estoppel extends only to references or combinations of references that could have been raised during IPR.  Ingenico is not estopped from relying on device art if, as it appears here, that device is not simply a printed publication invalidity theory in disguise.  Because a device may not be raised as a ground for invalidity in an IPR, Ingenico may combine the DiskOnKey device and/or the Fuji camera with other references that it raised or reasonably could have raised in the IPR proceeding, so long as that combination is substantively different from the grounds that were raised or reasonably could have been raised by Ingenico in its petitions for IPR.  *See Microchip Tech. Inc. v. Aptiv Servs. US LLC*, No. 1:17-CV-01194, 2020 WL 4335519, at *4 (D. Del. July 28, 2020) (applying IPR estoppel to publications but not to device art used in combination with those publications).

B. Real Party in Interest and Privity

As part of its motion for partial summary judgment, IOENGINE argues that PayPal was either a real party in interest in Ingenico's IPR proceedings or was in privity with Ingenico with respect to those proceedings. As a result, according to IOENGINE, PayPal should be subject to IPR estoppel to the same extent as Ingenico with respect to prior art that Ingenico actually relied upon or could reasonably have relied upon in the IPR proceeding. Dkt. No. 405 at 21–35.

By statute, IPR estoppel extends beyond the petitioner to any "real party in interest or privy of the petitioner." 35 U.S.C. § 315(e)(2). Those terms, which are not defined in Title 35, are well-established common law terms in the law of judgments, and the Federal Circuit has held that Congress intended for those terms to have their common law meaning. *See Power Integrations, Inc. v. Semiconductor Components Indus., LLC*, 926 F.3d 1306, 1315 (Fed. Cir. 2019); *WesternGeco LLC v. Ion Geophysical Corp. Int'l S.A.R.L.*, 889 F.3d 1308, 1319 (Fed. Cir. 2018).

Consistent with its use in the law of judgments, the "real party in interest" inquiry focuses on "whether a petition has been filed at a nonparty's behest." *Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018, 1028 (Fed. Cir. 2021) (quoting *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1351 (Fed. Cir. 2018)); *Wi-Fi One, LLC v. Broadcom Corp.*, 887 F.3d 1329, 1336 (Fed. Cir. 2018). In particular, a party that "funds and directs and controls an IPR or [post-grant review] proceeding constitutes a 'real-party-in-interest.'" *Wi-Fi One*, 887 F.3d at 1336 (citing PTO, Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,760 (Aug. 14, 2012)).

The privity inquiry, also a familiar feature of the law of judgments, focuses on whether the party alleged to be in privity with the petitioner "had a full and fair opportunity to litigate the issues it now seeks to assert." *Id.* (internal quotation marks and citation omitted). In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court identified six factors as bearing on the question whether two

parties are in privity for purposes of determining whether the second party should be bound by decisions made in a proceeding involving only the first party. Those factors are whether (1) there was an agreement by the parties to be bound by a decision in the first party's case; (2) there was a pre-existing substantive legal relationship between the parties, such as assignor and assignee, preceding and succeeding owners of property, or bailee and bailor; (3) in certain circumstances, whether the second party was adequately represented by a party in the first action having the same interests as the second party; (4) the second party assumed control over the litigation in which the initial judgment was rendered; (5) the second party is seeking to relitigate an issue through a proxy, i.e., where the second party is the designated representative of a person who was a party to the prior adjudication: and (6) a special statutory scheme expressly forecloses successive litigation by persons who were not parties to the first action, assuming the statutory scheme satisfies due process requirements. *Id.* at 894–95. The Federal Circuit and the PTO have looked to the Supreme Court's opinion in *Taylor* for guidance as to whether parties were in privity for purposes of IPR estoppel. *See Uniloc 2017*, 989 F.3d at 1028–29; *Applications in Internet Time*, 897 F.3d at 1359–64 (Reyna, J., concurring); *WesternGeco*, 889 F.3d at 1319; *Wi-Fi One*, 887 F.3d at 1336; Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,759.

IOENGINE argues that the following considerations support a finding that PayPal was a real party in interest in Ingenico's IPR proceedings or that PayPal was in privity with Ingenico for purposes of those proceedings: (1) there is a supply agreement between PayPal and Ingenico, which is part of a longstanding business relationship between the parties relating to the products at issue in these cases; (2) there are cross-indemnification obligations between PayPal and Ingenico; (3) PayPal and Ingenico have conducted a coordinated defense in this action; (4) Ingenico shares and represents PayPal's interests to such a degree that PayPal should be regarded as having been a real party in interest in the

66

IPR proceedings or that PayPal should be regarded as having been in privity with Ingenico for purposes of those proceedings; and (5) Ingenico would in effect be relitigating by proxy the issues it lost in the IPR proceedings if PayPal were permitted to challenge the validity of the asserted claims on grounds that Ingenico is estopped from asserting. Dkt. No. 405 at 25–32. PayPal disputes that those points establish either that PayPal was a real party in interest in Ingenico's IPR proceedings or was in privity with Ingenico in the course of those proceedings.

In opposition to IOENGINE's motion for summary judgment that PayPal was the real party in interest in Ingenico's IPR proceedings, PayPal points to declarations from PayPal and Ingenico's outside counsel, as well as from PayPal's in-house counsel, stating that PayPal and Ingenico did not cooperate in petitioning for *inter partes* review of the asserted patents. Dkt. No. 417, Exhs. F–H. Additionally, Ingenico represented to the PTAB that its petitions were filed "under the complete direction and control of Ingenico without contribution from PayPal." Dkt. No. 417, Exhs. I–L. Because the real-party-in-interest inquiry typically focuses on whether a party controls, funds, or directs the "petitioner's participation in a proceeding," *see Applications in Internet Time*, 897 F.3d at 1342, PayPal and Ingenico's evidence to the contrary creates at least a genuine dispute of material fact on the real-party-in-interest issue. That is particularly true in light of the absence of any evidence that Ingenico initiated its IPR proceedings at PayPal's behest or that PayPal funded Ingenico's activities before the PTAB. Summary judgment therefore cannot be granted to IOENGINE with regard to its contentions that PayPal was a real party in interest in Ingenico's IPR proceedings.

IOENGINE has also failed to show that it is entitled to summary judgment on its contention that PayPal was in privity with Ingenico in the IPR proceedings. IOENGINE argues that the supply agreement between PayPal and Ingenico establishes that the two entities were in privity for purposes of Ingenico's IPRs. PayPal, however, responds that "[t]he agreement merely reflects a standard

67

customer-manufacturer relationship in which Ingenico manufactured and supplied products to PayPal." Dkt. No. 415 at 19. IOENGINE places great weight on the fact that Ingenico has produced a large majority of PayPal's accused card readers and that PayPal entered into a long-term "Custom Product Sales Agreement" with Ingenico's predecessor in 2012 under which Ingenico agreed to produce a custom mobile card reader exclusively for PayPal, along with various rights and services attendant to the sale and use of those machines. While that agreement confirmed that Ingenico and PayPal have had a close business relationship as manufacturer and customer, such relationships are not uncommon, and the fact of that relationship does not suffice to show that the parties are so closely related that litigation preclusion against one should extend to the other. *See Atlanta Gas Light Co v. Bennett Regul. Guards, Inc.*, No. IPR2015-00826, 2015 WL 5159438, at *8–9 (P.T.A.B. Sept. 1, 2015).

In support of its privity argument, IOENGINE places its greatest emphasis on the cross-indemnification provisions in the agreement between PayPal and Ingenico, which IOENGINE argues are strong evidence that PayPal and Ingenico are in privity. PayPal responds by pointing to evidence indicating that neither party has agreed to indemnify the other with respect to the cases at bar. Dkt. No. 409, Exh. 30, at 70–71. The indemnification clauses, which are directed at holding each party harmless from expenses attributable to violations of law by the other do not appear plainly applicable to the situation presented in these cases, in which Ingenico and PayPal have each been sued based directly on their own conduct. Nor has either party sought to control the other party's conduct of the litigation, or even suggested that either party has the right to do so under the circumstances of these cases. The indemnification clauses therefore do not have the force that IOENGINE attributes to them, and they are insufficient, at least for summary judgment purposes, to require that Ingenico and PayPal be treated as being in privity with one another.

Next, IOENGINE alleges that PayPal and Ingenico coordinated their strategies in the IPR proceedings, but PayPal and Ingenico dispute that assertion as well. Dkt No. 417, Exhs. F–L. PayPal and Ingenico point out that although PayPal raised issues in its IPR petitions different from those raised by Ingenico, doing so was entirely rational, since if PayPal had filed a duplicative IPR petition, the PTAB might well have declined institution on that ground alone.

The remaining consideration raised by IOENGINE is that PayPal and Ingenico have coordinated their defenses in this action. But "without more," two parties' consolidation of argument and evidence in their defense against parallel infringement proceedings does not justify a finding of privity. *See Uniloc 2017*, 989 F.3d at 1029. The Ingenico and PayPal cases were consolidated for purposes of discovery and pretrial proceedings at IOENGINE's behest, and the consolidation was clearly in all parties' interest (and well as the court's) by avoiding duplication of effort. The fact that Ingenico and PayPal have joined in making many of the same arguments during the pretrial process is hardly surprising, given that they have both been charged with infringement of the same claims of the same patent in connection with the manufacture and sale of many of the same devices. The substantial parallelism in their litigation interests is not enough to justify the conclusion, on summary judgment, that Ingenico and PayPal are so closely aligned that each should be subject to preclusion based on rulings made against the other. That is to say, IOENGINE has not shown, for purposes of summary judgment, that PayPal has had a full and fair opportunity to litigate the issues that were raised unsuccessfully by Ingenico, merely because of the close commercial relationship between the parties and their status as defendants in closely related actions brought by IOENGINE. In the end, because privity is a holistic inquiry that requires consideration of "all contacts between [the parties], direct and indirect," the existence of disputes as to many of the factors cited by IOENGINE creates at least a genuine issue of material fact with respect to privity. *See Intel Corp. v. U.S. Int'l Trade*

69

*Comm'n*, 946 F.2d 821, 838 (Fed. Cir. 1991). Accordingly, summary judgment is denied on this issue.

While considering the real-party-in-interest and privity issues, I asked the parties to brief the question whether those issues are factual or legal, and whether they are for the court to decide as a preliminary matter or for the jury to decide at trial. The parties submitted briefs in response to my request, and based on that briefing and my independent research, I am persuaded that, for the reasons set forth below, the questions whether PayPal was a real party in interest in Ingenico's IPR proceedings and whether PayPal was in privity with Ingenico for purposes of those proceedings are mixed questions of fact and law that are for the court, not the jury, to decide.

Courts are divided with regard to the question whether privity is a question of fact, a question of law, or a mixed question of fact and law. *See, e.g.*, *Vulcan, Inc. v. Fordees Corp.*, 658 F.2d 1106, (question of fact); *Sw. Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1977) (question of law); *Matter of L & S Indus., Inc.*, 989 F.2d 929, 933 (7th Cir. 1993) (mixed question of law and fact that is "particularly amenable to a sliding-scale standard of review" depending on the nature of the inquiry).

The Third Circuit has held that the issue of privity presents a legal question that may be based on underlying issues of fact. *See Jean Alexander Cosms.*, 458 F.3d at 248 ("[W]hether the basic requirements for issue preclusion are satisfied . . . is a matter of law over which we exercise plenary review"); *Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc.*, 484 F.2d 1037, 1038 (3d Cir. 1973) ("We . . . hold that the question of control of the previous litigation was for the court as a fact-finder."); *United States v. Webber*, 396 F.2d 381, 386 (3d Cir. 1968) ("In circumstances similar to the present case, whether the individuals exercised sufficient control over or had the requisite interest in [a prior] litigation is primarily a question of fact."). As a general matter, the Federal Circuit has held

that questions as to the application of collateral estoppel turn on regional circuit law, not Federal Circuit law. *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1374 (Fed. Cir. 2020) ("To the extent that a case turns on general principles of claim preclusion, as opposed to a rule of law having special application to patent cases, this court applies the law of the regional circuit in which the district court sits . . . ."). Arguably, the fact that the collateral estoppel issue in this case arises in the context of an IPR proceeding would suggest that a patent-specific rule should apply, and thus Federal Circuit law should govern. *See id.*. That principle does not apply here, however, for two reasons: First, the legislative history of the AIA makes clear that the terms "privity" and "real party in interest" were intended to have their ordinary common law meanings in the IPR context, not a patent-law-specific meaning. *See Wi-Fi One*, 887 F.3d at 1335–36. Second, there is no indication that Federal Circuit law would be different from Third Circuit law in this respect. *See, e.g.*, *WesternGeco*, 889 F.3d at 1316, 1322 (reviewing the PTAB's finding of no privity for "substantial evidence," the standard of review that applies to "factual determinations" underlying the Board's legal conclusions). I will therefore apply Third Circuit law, which treats the collateral estoppel issue as a legal question that may be based on underlying disputed facts.

The next question, which was addressed by the parties in their supplemental briefing on the privity/real-party-in-interest issue, is whether the issues of privity and real-party-in-interest status are to be given to the jury or reserved for the court to decide as a preliminary matter. The parties take different positions as to that issue: IOENGINE argues that those issues are for the jury; PayPal and Ingenico argue they are for the court.

While the parties have not pointed to any governing precedent on this issue, the parties' briefing indicates, as does my research, that both the legal and factual components of these related issues have consistently been addressed by the court and not the jury. In *Ransburg*, the district court

held on summary judgment that one of the defendants to that patent infringement case "had controlled the defense of a previous [patent] infringement action" brought by the plaintiff against one of that defendant's customers (i.e., that defendant was in privity with a defendant in a prior action). *Ransburg*, 484 F.2d at 1038. Concluding that a genuine dispute of material fact existed as to whether that defendant controlled the prior litigation, the Third Circuit reversed the district court but held "that the question of control of the previous litigation was for the court as a fact-finder." *Id.* at 1038–40. Accordingly, the court's language in *Ransburg* is a strong indication that the factual portion of the privity inquiry is a question reserved for the court.

Other cases are in accord. *See, e.g.*, *Webber*, 396 F.2d at 386 ("[T]he court . . . can find that privity exists . . . ."); *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 620 (Fed. Cir. 1995) ("[A] plaintiff who chooses to bring two separate actions against two tortfeasors who are jointly responsible for the same injury runs the risk *that the court will find* the parties sufficiently related that the second action is barred by claim preclusion." (emphasis added)); *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 641 (2d Cir. 1987) ("'The question whether a party's interests in a case are virtually representative of the interest of a nonparty is one of fact for the trial court.'" (quoting *Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975))); *Evonik Degussa GmbH v. Materia Inc.*, 53 F. Supp. 3d 778, 788 n.10, 795–96 (D. Del. 2014) ("[T]he court finds [that the defendant] was in privity with [another party to a prior litigation]."); *Hinshillwood v. Cnty. of Montgomery*, No. 00-cv-4283, 2002 WL 1773059, at *5 (E.D. Pa. July 31, 2002) ("The fourth and final element of issue preclusion requires the Court to find that same parties or their privities were fully represented in the prior action. . . . [T]he Court finds that the fourth and final element of issue preclusion has been met."); *see also* 18 J. Wm. Moore, Moore's Federal Practice § 132.04 [1][b][ii] (2022) ("Privity is a legal

72

determination for the trial court with regard to whether the relationship between the parties is sufficiently close to support preclusion.").

IOENGINE cites two cases that it contends stand for the proposition that questions whether two parties are in privity should be submitted to a jury. Dkt. No. 496 at 8–9 (citing *Mazzei v. Money Store*, 829 F.3d 260 (2d Cir. 2016), and *Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1295 (D. Colo. 2013)). Those cases do not support IOENGINE's assertion that whether a third party was in privity with a participant in an IPR proceeding or was a real party in interest in that proceeding is an issue that should be given to the jury as opposed to being decided by the court. The reason is that those cases involved questions of privity of contract, not privity in the context of preclusion law. Privity of contract refers to the status of parties who are entitled to sue on a particular contract. *See* 13 Richard A. Lord, *Williston on Contracts* § 37:1 at 4 (4th ed. 2013); 9 John E. Murray, Jr., *Corbin on Contracts* § 41.2 at 4 (rev. 3d 2007); *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.*, 960 F.2d 366, 376 (3d Cir. 1992). And it is clear that the term "privity," as used in the phrase "privity of contract" has a very different meaning from the term "privity" as used in the law of judgments and in particular in the collateral estoppel context. *See, e.g., Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 702 F.2d 719, 722 (8th Cir. 1983) ("'Privity' is a term with different meanings in different contexts; for example, the concept of 'privity of parties' is not the same as the concept of 'privity of contract.'"); *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 1340 (Ct. Cl. 1973) ("The words 'privity' or 'privy,' however, are not necessarily interchangeable between the contract and res judicata contexts."); *Meisner v. Zymogenetics, Inc.*, No. 3:15-cv-3523, 2016 WL 4858741, at *4 (D.S.C. Sept. 15, 2016) ("Privity in the *res judicata* context depends on the relationship between the parties in the first and second lawsuits, and is different from privity of contract."). Thus, once IOENGINE's privity-of-contract cases are disregarded, IOENGINE has cited no authority for its position that privity and

real-party-in-interest status in an IPR proceeding are for the jury to decide in district court litigation following upon IPR proceedings.

While issues of privity and real party in interest frequently involve factual questions, as they do in these cases, that does not automatically require that they be committed to the jury for resolution. Issues such as claim construction can involve factual disputes, but nonetheless are reserved to the court for decision. Preliminary determinations bearing on the admissibility of evidence are also routinely decided by courts, even when they turn on factual determinations. *See Bourjaily v. United States*, 483 U.S. 171, 177–78 (1987); *see generally* Fed. R. Evid. 104(a). The task of deciding the predicate question of PayPal's status in order to determine whether to permit PayPal to introduce certain evidence at trial is closely akin to the commonplace task of deciding preliminary factual questions in determining whether to admit particular evidence. In the PayPal case, then, the court will decide whether the IPR estoppel applicable to Ingenico also applies to PayPal. That decision will be made in advance of the trial in the PayPal case.

C.   Anticipation for Combined References

IOENGINE next argues that PayPal and Ingenico rely upon several references to describe the DiskOnKey and Fuji camera devices, but have not shown "that the functionality described across multiple references ever actually existed in a single device." Dkt. No. 405 at 35 (emphases omitted). Anticipation, of course, depends on a finding that a single reference satisfied all the limitations of the challenged claim. Nonetheless, it is permissible for a defendant to establish anticipation by using several documents that reveal how a single prior art system works. *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, No. 18-cv-366, 2020 WL 3047989, at *6 (D. Del. June 8, 2020); *see also Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-CV-02024, 2016 WL 861065, at *2 (N.D. Cal. Mar. 5, 2016); *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, No. 15 C 3702, 2018 WL 2009504, at *4 (N.D.

74

Ill. Apr. 29, 2018).  By contrast, a "post-hoc, reconstructed interpretation of how a [prior-art] system *might* have been constructed does not constitute prior art for purposes of anticipation."  *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2012 WL 2576136, at *3 (N.D. Cal. July 3, 2012).

With respect to the DiskOnKey device, IOENGINE argues that the experts for PayPal and Ingenico rely upon multiple documents to describe that device without establishing that all of the documents describe "a single device" that "was in existence . . . prior to the priority date."  Dkt. No. 405 at 36.  In particular, IOENGINE points to the report of PayPal's expert, Harry Bims, who noted that his analysis of the DiskOnKey referred to "the DiskOnKey 2.0, DiskOnKey Titan, DiskOnKey v.2.7.1, DiskOnKey T3, and DiskOnKey Pro *devices*."  Dkt. No. 406, Exh. 2, at ¶ 776 (emphasis added).  PayPal responds by offering evidence that the various versions of the DiskOnKey devices "differed only in their form factors, speed, and/or memory sizes, which [are] not material here."  Dkt. No. 415 at 33; *see also* Dkt. No. 417, Exh. KK, at 23.  PayPal also notes that "there is evidence in the record that the [DiskOnKey] SDK and software applications were supported across the versions."  Dkt. No. 415 at 33; Dkt. No. 417, Exhs. II–JJ.  Viewing the facts in the light most favorable to PayPal and Ingenico, a reasonable jury could find that documentation describing various versions of the DiskOnKey is representative of a single prior art device.

IOENGINE relies on *Apple, Inc. v. Samsung Electronics Co.*, but that decision does not support IOENGINE's argument.  The court in that case found that there was "no evidence that the [documents used by the defendant's expert] were in existence at the same time or that they were combined in a single apparatus."  *Apple*, 2012 WL 2576136, at *3.  Here, by contrast, the evidence at least suggests that the various features described in the references on which PayPal relies may have been present in a single DiskOnKey device.  Moreover, the court in *Apple* evaluated the prior art in the context of a motion to stay a preliminary injunction pending appeal, rather than one for

75

summary judgment. *Id.* at *1. The court in *Apple* evaluated the defendant's "likelihood of success on the merits of its appeal," whereas here the standard is whether there is a genuine dispute of material fact. *See id.* at *2. Because I find there is a triable issue of fact with respect to anticipation by a single DiskOnKey device, summary judgment on that issue will be denied.

With respect to the Fuji camera, IOENGINE asserts that Ingenico's expert, James Geier, relied upon multiple documents describing the camera and that he did not analyze or test the physical device itself. Dkt. No. 405 at 35–36. IOENGINE does not explain how or why the various documents that Mr. Geier relied upon are representative of systems other than the single asserted prior art device. Accordingly, IOENGINE has not met its burden to demonstrate that there is no genuine dispute of material fact regarding the Fuji camera. Summary judgment is therefore denied as to the Fuji camera as well.

D. Opinions of Mr. Sussman and Mr. Geier

IOENGINE's final argument is that portions of the opinions of Ingenico's experts, Barry Sussman and James Geier, should be excluded. Dkt. No. 405 at 37–41. IOENGINE objects to Mr. Geier's conclusion that the asserted claims contribute 5% of the security of Ingenico's payment transactions, and to Mr. Sussman's subsequent reliance on that opinion in his "market factors" damages theory, along with Mr. Sussman's "additional gross profits" damages theory.

1. *"Market Factors" Theory*

IOENGINE first argues that Mr. Sussman's "market factors" theory should be excluded because it relies on an unsupported opinion from Mr. Geier. As noted above with respect to Dr. Stec, damages for patent infringement should reflect the incremental value to the infringer that was attributable to the claimed invention. But that incremental value need not be determined with

absolute precision; the "approximate value of [the] technological contribution" is enough. *Ericsson*, 773 F.3d at 1233.

In his report, Mr. Sussman determined that 29.8% of the value of mPOS sales generally was attributable to security features of the mPOS system. Dkt. No. 407, Exh. 36, at ¶ 101. Mr. Sussman then accepted Mr. Geier's opinion that "the patented innovations contributed only 5% to the overall security of payment processing." *Id.* at ¶ 102. Multiplying 29.8% by 5%, Mr. Sussman concluded that 1.5% of Ingenico's mPOS sales are attributable to the claimed inventions. *Id.* at ¶ 103.

Mr. Geier arrived at his 5% figure by identifying various factors that contribute to the security of mPOS transactions and by considering whether the claimed inventions cover those factors. Dkt. No. 423, Exh. 57, at ¶¶ 296–301. Mr. Geier listed several factors that have no relationship to the claimed invention, such as "point-to-point encryption," "tokenization," "adherence to payment industry standards and specifications," and "various measures taken by consumers, merchants, and banks to avoid fraudulent payments." *Id.* at ¶¶ 297–300. He then noted that the claimed inventions "pertain[] only to specific message flow involving a card reader executing specific code in response to a message from a phone/tablet." *Id.* at ¶ 301. Mr. Geier estimated that, because the claimed inventions covered only one of several factors that contribute to security, "the asserted claims contribute 5% [of] the security of a payment transaction." *Id.*

In *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-CV-01735, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016), the court considered a similar estimate made by the plaintiff's technical expert. The defendant's expert in that case took the position that the asserted patents were "responsible for 20% of the increase in 4G LTE uplink speed" in the accused devices. *Id.* at 7. He stated that he reached that conclusion by "evaluat[ing] all the factors that contribute to the increase in 4G LTE uplink speed over previous systems." *Id.* The court rejected the argument that the expert's opinion was

inadmissible because it was "an approximation and not . . . supported by testing or simulation." *Id.* Such arguments, according to the court, went to the weight of the testimony, not its admissibility. *Id.*

I find that Mr. Geier's approximation and Mr. Sussman's subsequent reliance on it should not be excluded, and that IOENGINE's concerns can be adequately addressed on cross-examination of both experts. Unlike Dr. Stec, Mr. Sussman attempted to calculate a reasonable royalty that is attributable only to the incremental value of the patented inventions. The fact that Mr. Geier's 5% figure is an estimation does not preclude the evidence from being admitted, and IOENGINE is free to explore its concerns on cross-examination. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). Mr. Sussman's "market factors" theory, and Mr. Geier's opinion on which it relies, will therefore not be excluded.

2. *"Additional Gross Profits" Theory*

IOENGINE next argues that Mr. Sussman's "additional gross profits" theory "bears no relation to the value of the invention at issue and should be excluded." Dkt. No. 405 at 39. I need not address whether that theory properly apportions damages according to the contribution of the inventions, because both Mr. Sussman and Ingenico have conceded that the "additional gross profits" theory does not factor into Mr. Sussman's ultimate calculation of a reasonable royalty. *See* Dkt. No. 406, Exh. 37, at 58 (Mr. Sussman stating that he "had no intention of relying on [the additional gross profits analysis] exclusively," and that it was merely "a data point, something that I looked at, [that] I thought was interesting"); Dkt. No. 415 at 38 ("Mr. Sussman does not use projected profits in his ultimate calculation of a reasonable royalty."); Dkt. No. 407, Exh. 36, at ¶ 104 (Mr. Sussman's report,

78

describing the "market factors" theory as "the more appropriate apportionment technique"). Because Mr. Sussman does not ultimately rely upon the "additional gross profits" theory in his reasonable royalty calculation, there is no need for him to discuss that theory at trial. *See* Fed. R. Evid. 702 (requiring that expert testimony "help the trier of fact"). Accordingly, Mr. Sussman's testimony as to the "additional gross profits" theory will be excluded.

## V. <u>Conclusion</u>

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal. *See, e.g.*, Dkt. Nos. 403, 405, 415, 416, 423, 424. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

In view of and consistent with the above discussion, I order the following:

- IOENGINE's Motion for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier, Dkt. No. 397 (Dkt. No. 352 in Case No. 18-826), is GRANTED IN PART and DENIED IN PART.

- PayPal and Ingenico's Motion to Preclude the Testimony of Dr. Stec, Dkt. No. 398 (Dkt. No. 353 in Case No. 18-826), is GRANTED.

- PayPal and Ingenico's Motion to Preclude the Testimony of Mr. Klenk, Dkt. No. 399 (Dkt. No. 354 in Case No. 18-826), is DENIED.

- PayPal and Ingenico's Motion for Summary Judgment that IOENGINE is Estopped from Relitigating the Validity of Claims Found Unpatentable by the PTAB, Dkt. No. 400 (Dkt. No. 356 in Case No. 18-826), is DENIED.

**Appx133**

- PayPal and Ingenico's Motion for Summary Judgment of No Direct or Joint Infringement, Dkt. No. 401 (Dkt. No. 357 in Case No. 18-826), is GRANTED IN PART and DENIED IN PART.

- PayPal and Ingenico's Motion for Summary Judgment that the Asserted Claims are Invalid Under Section 101, Dkt. No. 402 (Dkt. No. 358 in Case No. 18-826), is DENIED.

- Ingenico's Motion for Summary Judgment of No Indirect Infringement, Dkt. No. 355 in Case No. 18-826, is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

SIGNED this 15th day of June, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE



US009774703B2

(12) **United States Patent**
McNulty

(10) Patent No.: **US 9,774,703 B2**
(45) **Date of Patent:** **Sep. 26, 2017**

(54) **APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT**

(71) Applicant: **IOENGINE LLC**, Norwalk, CT (US)

(72) Inventor: **Scott McNulty**, Rowayton, CT (US)

(73) Assignee: **IOENGINE, LLC**, Norwalk, CT (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 86 days.

(21) Appl. No.: **14/721,540**

(22) Filed: **May 26, 2015**

(65) **Prior Publication Data**

US 2015/0334208 A1    Nov. 19, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/960,514, filed on Aug. 6, 2013, now Pat. No. 9,059,969, which is a continuation of application No. 12/950,321, filed on Nov. 19, 2010, now Pat. No. 8,539,047, which is a
(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 15/177* | (2006.01) |
| *H04L 29/06* | (2006.01) |
| *H04L 29/08* | (2006.01) |
| *H04L 9/32* | (2006.01) |
| *G06F 13/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *H04L 67/42* (2013.01); *H04L 9/3226* (2013.01); *H04L 9/3247* (2013.01); *H04L 63/0272* (2013.01); *H04L 63/0428* (2013.01); *H04L 65/4069* (2013.01); *H04L 67/04* (2013.01); *H04L 67/141* (2013.01); *H04L 2209/56* (2013.01); *H04L 2209/76* (2013.01); *H04L 2209/80* (2013.01)

(58) **Field of Classification Search**
CPC ............. H04L 2209/76; H04L 2209/80; H04L 63/0272; H04L 63/0428; H04L 67/04; H04L 67/141; H04L 67/42; H04L 2209/56; H04L 65/4069; H04L 9/3226; H04L 9/3247
USPC ........ 709/203, 217, 219, 220, 249; 711/115; 713/150
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,928,463 B1 * | 8/2005 | Tene | H04L 12/2856 370/356 |
| 6,986,030 B2 | 1/2006 | Shmueli et al. | |
| 7,051,157 B2 | 5/2006 | James | |

(Continued)

OTHER PUBLICATIONS

Microsoft Computer Dictionary, Fifth Edition. 2002, pp. 362, 437, 458, 565, and 572.
Defendant Interactive Media Corp. d/b/a Kanguru Solutions Initial Invalidity Contentions to Plaintiff IOENGINE, dated Jul. 14, 2015, 255 pages.
Imation's Initial Invalidity Contentions, dated Jul. 14, 2015, 248 pages.

(Continued)

*Primary Examiner* — Alina N Boutah
(74) *Attorney, Agent, or Firm* — Locke Lord LLP

(57) **ABSTRACT**

The disclosure details the implementation of an apparatus, method, and system comprising a portable device configured to communicate with a terminal and a network server, and execute stored program code in response to user interaction with an interactive user interface. The portable device contains stored program code configured to render an interactive user interface on a terminal output component to enable the user the control processing activity on the portable device and access data and programs from the portable device and a network server.

**129 Claims, 10 Drawing Sheets**







### Related U.S. Application Data

continuation of application No. 10/807,731, filed on Mar. 23, 2004, now Pat. No. 7,861,006.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,546,340 | B2 * | 6/2009 | Terasawa | G06F 1/1626 709/203 |
| 7,979,700 | B2 | 7/2011 | Elazar et al. | |
| 8,595,488 | B2 | 11/2013 | Elazar et al. | |
| 8,612,511 | B2 * | 12/2013 | Friedrich | G05B 19/409 709/203 |
| 2002/0044663 | A1 | 4/2002 | King et al. | |
| 2002/0046292 | A1 * | 4/2002 | Tennison | H04L 12/5692 709/238 |
| 2002/0065872 | A1 | 5/2002 | Genske et al. | |
| 2002/0080090 | A1 * | 6/2002 | Borgstrom | G08C 17/02 345/1.1 |
| 2002/0194499 | A1 * | 12/2002 | Audebert | H04L 63/0853 726/35 |
| 2003/0058274 | A1 * | 3/2003 | Hill | H04L 63/0272 715/751 |
| 2004/0039932 | A1 | 2/2004 | Elazar et al. | |
| 2005/0197859 | A1 * | 9/2005 | Wilson | G06Q 50/22 705/2 |
| 2005/0198221 | A1 * | 9/2005 | Manchester | H04L 41/0213 709/220 |
| 2006/0052085 | A1 | 3/2006 | Gregrio Rodriguez | H04L 12/2859 455/411 |
| 2007/0038870 | A1 * | 2/2007 | Ciesinger | H04L 63/0428 713/193 |

OTHER PUBLICATIONS

Scott Spanbauer, "Mighty Mini Media", www.pcworld.com, May 2002, pp. 14-17.
Miranda Instant Messenger, https://web.archive.org/web/20031228092924/http://www.miranda-im.org, Copyright 2000-2003 Miranda IM, 2 pages.
Miranda Instant Messenger (2), "About Miranda IM", https://web.archive.org/web/20031228092924/http://www.miranda-im.org, Copyright 2000-2003 Miranda IM, 2 pages.
Miranda Instant Messenger (3), "Screenshots", https://web.archive.org/web/20031228092924/http://www.miranda-im.org, Copyright 2000-2003 Miranda IM, 2 pages.
Jon L. Jacoby, Welcome to M-Systems DiskOnKey Site, https://web.archive.org/web/20021202082914/http://www.diskonkey.com/prod_dok.asp, 2 pages.
Jon L. Jacoby, Welcome to M-Systems DiskOnKey Site, "Product & Solutions", https://web.archive.org/web/20021202082914/http://www.diskonkey.com/prod_dok.asp, 1 page.
Jon L. Jacoby, M-Systems Flash Disk Pioneers, "Using MyKey", Copyright 2003 M-Systems Flash Disk Pioneers, Ltd., 23 pages.
Expert Report by Vijay Madiselli, Ph.D., Ioengine, LLC v. Interactive Media Corp., C.A. No. 14-1571 (D.Del.) and Ioengine, LLC v. Imation Corp., C.A. No. 14-1572 (D.Del.) Jul. 1, 2016 (141 pages).
Rebuttal Expert Report of Dr. Kevin Butler Regarding the Validity of U.S. Pat. No. 8,539,047, Ioengine, LLC v. Interactive Media Corp., C.A. No. 14-1571 (D.Del.) and Ioengine, LLC v. Imation Corp., C.A. No. 14-1572 (D.Del.) Jul. 22, 2016 (78 pages).

* cited by examiner



Fig. 1

Appx137



Fig. 2



130  AT 327

Engage TCAP with Access Terminal (e.g., via BT, WiFi, USB, etc.) 305

TCAP powers up 310

TCAP loads/accesses operating system 315

TCAP provides memory space to Access Terminal (AT) 320

125

AT accesses/mounts the TCAP memory space 325

Is AT capable of accessing instructions in TCAP memory? 330

342
desktoptool.exe

User engages TCAP memory to issue instruction signals (e.g., executes a TCAP application by double-clicking mounted TCAP) 340

Is a TCAP driver loaded? 335

AT executes instructions from TCAP memory to provide I/O for TCAP 345

Engage Tunneling Client Access Point (TCAP) 301

Execution 398

Fig. 3



Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



Fig.10

1

## APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT

This application is a continuation of U.S. application Ser. No. 13/960,514, filed Aug. 6, 2013, which is a continuation of U.S. application Ser. No. 12/950,321, filed Nov. 19, 2010, now U.S. Pat. No. 8,539,047, which is a continuation of U.S. application Ser. No. 10/807,731, filed on Mar. 23, 2003, now U.S. Pat. No. 7,861,006.

### FIELD

The present invention is directed generally to an apparatus, method, and system of accessing data, and more particularly, to an apparatus, method and system to transmit and process data comprising a portable device in communication with a terminal and a communications network comprising a plurality of communications network nodes.

### BACKGROUND

Portable Computing and Storage

Computing devices have been becoming smaller over time. Currently, some of the smallest computing devices are in the form of personal digital assistants (PDAs). Such devices usually come with a touch screen, an input stylus and/or mini keyboard, and battery source. These devices, typically, have storage capacities around 64 MB. Examples of these devices include Palm's Palm Pilot.

Information Technology Systems

Typically, users, which may be people and/or other systems, engage information technology systems (e.g., commonly computers) to facilitate information processing. In turn, computers employ processors to process information; such processors are often referred to as central processing units (CPU). A common form of processor is referred to as a microprocessor. A computer operating system, which, typically, is software executed by CPU on a computer, enables and facilitates users to access and operate computer information technology and resources. Common resources employed in information technology systems include: input and output mechanisms through which data may pass into and out of a computer; memory storage into which data may be saved; and processors by which information may be processed. Often information technology systems are used to collect data for later retrieval, analysis, and manipulation, commonly, which is facilitated through database software. Information technology systems provide interfaces that allow users to access and operate various system components.

User Interface

The function of computer interfaces in some respects is similar to automobile operation interfaces. Automobile operation interface elements such as steering wheels, gearshifts, and speedometers facilitate the access, operation, and display of automobile resources, functionality, and status. Computer interaction interface elements such as check boxes, cursors, menus, scrollers, and windows (collectively and commonly referred to as widgets) similarly facilitate the access, operation, and display of data and computer hardware and operating system resources, functionality, and status. Operation interfaces are commonly called user interfaces. Graphical user interfaces (GUIs) such as the Apple Macintosh Operating System's Aqua, Microsoft's Windows XP, or Unix's X-Windows provide a baseline and means of accessing and displaying information graphically to users.

Networks

2

Networks are commonly thought to comprise the interconnection and interoperation of clients, servers, and intermediary nodes in a graph topology. It should be noted that the term "server" as used herein refers generally to a computer, other device, software, or combination thereof that processes and responds to the requests of remote users across a communications network. Servers serve their information to requesting "clients." The term "client" as used herein refers generally to a computer, other device, software, or combination thereof that is capable of processing and making requests and obtaining and processing any responses from servers across a communications network. A computer, other device, software, or combination thereof that facilitates, processes information and requests, and/or furthers the passage of information from a source user to a destination user is commonly referred to as a "node." Networks are generally thought to facilitate the transfer of information from source points to destinations. A node specifically tasked with furthering the passage of information from a source to a destination is commonly called a "router." There are many forms of networks such as Local Area Networks (LANs), Pico networks, Wide Area Networks (WANs), Wireless Networks (WLANs), etc. For example, the Internet is generally accepted as being an interconnection of a multitude of networks whereby remote clients and servers may access and interoperate with one another.

### SUMMARY

Although all of the aforementioned portable computing systems exist, no effective solution to securely access, execute, and process data is available in an extremely compact form. Currently, PDAs, which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user interfaces, and require too much power to maintain their data. Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces and operating systems. Further, current PDAs are generally limited in the amount of data they can store or access. No solution exists that allows users to employ traditional large user interfaces they are already comfortable with, provides greater portability, provides greater memory footprints, draws less power, and provides security for data on the device. As such, the disclosed tunneling client access point (TCAP) is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer, through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources. Thus, the TCAP requires no power source to maintain its data and allows for a highly portable "thumb" footprint. Also, by providing the equivalent of a plug-n-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data in an easy and secure manner that was unavailable in the prior art.

In accordance with certain aspects of the disclosure, the above-identified problems of limited computing devices are overcome and a technical advance is achieved in the art of portable computing and data access. An exemplary tunneling client access point (TCAP) includes a method to dispose a portable storage device in communication with a terminal. The method includes providing the memory for access on the terminal, executing processing instructions from the

memory on the terminal to access the terminal, communicating through a conduit, and processing the processing instructions.

In accordance with another embodiment, a portable tunneling storage processor is disclosed. The apparatus has a memory and a processor disposed in communication with the memory, and configured to issue a plurality of processing instructions stored in the memory. Also, the apparatus has a conduit for external communications disposed in communication with the processor, configured to issue a plurality of communication instructions as provided by the processor, configured to issue the communication instructions as signals to engage in communications with other devices having compatible conduits, and configured to receive signals issued from the compatible conduits.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate various non-limiting, example, inventive aspects in accordance with the present disclosure:

FIG. **1** is of a flow diagram illustrating embodiments of a tunneling client access point (TCAP);

FIG. **2** is of a flow diagram illustrating embodiments of a system of tunneling client access point and access terminal interaction;

FIG. **3** is of a flow diagram illustrating embodiments of engaging the tunneling client access point to an access terminal interaction;

FIG. **4** is of a flow diagram illustrating embodiments of accessing the tunneling client access point and server through an access terminal;

FIGS. **5-8** is of a flow diagram illustrating embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an access terminal;

FIG. **9** is of a block diagram illustrating embodiments of a tunneling client access point server controller;

FIG. **10** is of a block diagram illustrating embodiments of a tunneling client access point controller;

The leading number of each reference number within the drawings indicates the first figure in which that reference number is introduced. As such, reference number **101** is first introduced in FIG. **1**. Reference number **201** is first introduced in FIG. **2**, etc.

## DETAILED DESCRIPTION

### Topology

FIG. **1** illustrates embodiments for a topology between a tunneling client access point (TCAP) (see FIG. **10** for more details on the TCAP) and TCAP server (TCAPS) (see FIG. **9** for more details on the TCAPS). In this embodiment, a user **133***a* may plug-in a TCAP into any number of access terminals **127** located anywhere. Access terminals (ATs) may be any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like. The type of AT used is not important other than that the device should provide a compatible mechanism of engagement to the TCAP **130** and provide an operating environment for the user to engage the TCAP through the AT. In one embodiment, the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT. In other embodiment, the TCAP employs Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped. In one embodiment, the AT provides Java and/or Windows

runtime environments, which allows the TCAP to interact with the input/output mechanisms of the AT. See FIG. **9** for more details and embodiments on the types of connections that may be employed by the TCAP. Once the TCAP has engaged with an AT, it can provide the user with access to its storage and processing facilities.

If the AT is connected to a communication network **113**, the TCAP may then communicate beyond the AT. In one embodiment, the TCAP can provide extended storage and/or processing resources by engaging servers **110**, **115**, **120**, which have access to and can provide extended storage **105** to the TCAP through the AT. In one embodiment, a single server and storage device may provide such TCAP server support. In another embodiment, server support is provided over a communications network, e.g., the Internet, by an array of front-end load-balancing servers **120**. These servers can provide access to storage facilities within the servers or to remote storage **105** across a communications network **113***b*, *c* (e.g., a local area network (LAN)). In such an embodiment, a backend server **110** may offload the front-end server with regard to data access to provide greater throughput. For purposes of load balancing and/or redundancy, a backup server **115** may be similarly situated to provide for access and backup in an efficient manner. In such an embodiment, the back-end servers may be connected to the front-end servers through a communications network **113***b* (e.g., wide area network (WAN)). The backend servers **110**, **115** may be connected to the remote storage **105** through a communications network **113***c* as well (e.g., a high speed LAN, fiber-channel, and/or the like).

Thus, to the user **133***a*, the contents of the TCAP **130** appear on the AT as being contained on the TCAP **125** even though much of the contents may actually reside on the servers **115**, **120** and/or the servers' storage facilities **105**. In these ways, the TCAP "tunnels" data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT. Also, the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O.

### TCAP and AT Interaction

FIG. **2** illustrates embodiments for a system of tunneling client access point (TCAP) (see FIG. **10** for more details on the TCAP) and access terminal interaction. FIG. **2** provides an overview for TCAP and AT interaction and subsequent figures will provide greater detail on elements of the interaction. In this embodiment, a user engages the TCAP **201**. For example, the user may plug the TCAP into an AT via the AT's USB port. Thereafter the user is presented with a login prompt **205** on the AT's display mechanism, e.g., on a video monitor. After a user successfully logs in (for example by providing a user name and password) **204**, the TCAP can then accept user inputs from the AT and its peripherals (the TCAP can then also provide output to the user via the AT's peripherals).

The user may employ the AT's input peripherals as user input devices that control actions on the TCAP. Depending on the user's actions **215**, the TCAP can be used by the AT as a storage device from which it can access and store data and programs **225**. For example, if the user takes the action of opening a file from the TCAP's memory, e.g., by double clicking on an icon when the TCAP is mounted as a USB drive on the AT, then the AT may treat the TCAP as a memory device and retrieve information from the TCAP **225**. If the user's action **215** is one that is directed at executing on the TCAP **215**, then the AT will not be involved in any execution. For example, if the user drops an icon

5

representing a graphics file onto a drag-and-drop location visually representing the TCAP, then the file may be copied to the TCAP where it will process and spool the file for sending the graphics file to be printed at a remote location. In such a case, all of the requirements to process and spool the file are handled by the TCAP's processor and the AT would only be used as a mechanism for user input and output and as a conduit through which the TCAP may send files.

Regardless of if there is an action **215** to execute on the TCAP **220** or to access or store data on the TCAP **225**, the AT is used to display the status of any actions **230**. At any time the user may select to terminate TCAP related facilities executing either on the AT, a backend server, on the TCAP itself, and/or the like **235**. In one embodiment, the user may select a quit option that is displayed on the AT's screen. In another embodiment, the user may simply disengage the TCAP from the AT by severing the connection (e.g., turning power off, physically pulling the device off the AT, turning off wireless transmissions, and/or the like). It should be noted that such abrupt severing may result in the loss of data, file corruption, etc. if the TCAP has not saved data that is on the AT or on some remote server, however, if the TCAP is employing flash like memory, its contents should remain intact.

If there is no instruction signal to terminate the TCAP **235**, execution will continue and the TCAP will continue to take and look for input from the user. Of course if the TCAP has been set to perform certain actions, those actions will continue to execute, and the TCAP may respond to remote servers when it is communicating with them through the AT. When the user issues a terminate signal **235**, then the TCAP will shut down by saving any data to the TCAP that is in the AT's memory and then terminating any programs executing on both the AT and TCAP that were executed by and/or from the TCAP **240**. If no activities are taking place on the TCAP and all the data is written back to the TCAP **240**, then the TCAP may optionally unmount itself from the AT's file-system **245**. At this point, if there is a TCAP I/O driver executing on the AT, that driver may be terminated as triggered by the absence of the TCAP at a mount point **250**. After the TCAP is unmounted and/or the TCAP I/O driver is terminated, it is safe to disengage the TCAP from the AT. TCAP and AT Interaction

FIG. 3 illustrates embodiments engaging the tunneling client access point to an access terminal interaction. Examples of engaging the TCAP **301** with an AT were discussed above in FIG. 1 **127**, **130**, **133a** and FIG. 2 **201**. In one embodiment, the TCAP **130** is engaged with an access terminal **327**, **305**. As mentioned in FIG. 1, the TCAP is capable of engaging with ATs using a number of mechanisms. In one embodiment, the TCAP has a USB connector for plugging into an AT, which acts as a conduit for power and data transfer. In another embodiment, the TCAP may use Bluetooth to establish a wireless connection with a number of ATs. In another embodiment, the TCAP may employ WiFi. In yet another embodiment, the TCAP may employ multiple communications mechanisms. It should be noted, with some wireless mechanisms like Bluetooth and WiFi, simply coming into proximity with an AT that is configured for such wireless communication may result in the TCAP engaging with and establish a communications link with the AT. In one embodiment, the TCAP has a "connect" button that will allow such otherwise automatically engaging interactions take place only if the "connect" button is engaged by a user. Such an implementation may provide greater security for users (see FIG. 10 for more details on the TCAP).

6

After being engaged **305**, the TCAP will then power on. In an embodiment requiring a direct connection, e.g., USB, simply plugging the TCAP into the AT provides power. In a wireless embodiment, the TCAP may be on in a lower powered state or otherwise turned on by engaging the connect button as discussed above. In such an embodiment, the TCAP can employ various on-board power sources (see FIG. 10 for more details on the TCAP). The TCAP then may load its own operating system **315**. The operating system can provide for interaction with the AT. In one embodiment, a Java runtime is executed on the TCAP, and Java applets communicate with the AT through Java APIs. In another embodiment, a driver is loaded onto the AT, and the on-TCAP Java operating system applets communicate to and through the AT via the driver running on the AT, wherein the driver provides an API through and to which messages may be sent.

After engaging with the AT, the TCAP can provide its memory space to the AT **320**. In one embodiment, the TCAP's memory is mapped and mounted as a virtual disk drive **125** storage **325**. In this manner, the TCAP may be accessed and manipulated as a standard storage device through the AT's operating system. Further, the TCAP and in some cases the AT can determine if the AT is capable of accessing program instructions stored in the TCAP's memory **330**. In one embodiment, the AT's operating system looks to auto-run a specified file from any drive as it mounts. In such an embodiment, the TCAP's primary interface may be specified in such a boot sequence. For example, under windows, an autorun.inf file can specify the opening of a program from the TCAP by the AT; e.g., OPEN=TCAP.EXE.

Many operating systems are capable of at least accessing the TCAP as a USB memory drive **330** and mounting its contents as a drive, which usually becomes accessible in file browsing window **125**. If the TCAP does not mount, the AT's operating system will usually generate an error informing the user of a mounting problem. If the AT is not capable of executing instruction from the TCAP, a determination is made if an appropriate driver is loaded on the AT to access the TCAP **335**. In one embodiment, the TCAP can check to see if an API is running on the AT. For example, the TCAP provide an executable to be launched, e.g., as specified through autorun.inf, and can establish communications through its connection to the AT, e.g., employing TCP/IP communications over the USB port. In such an embodiment, the TCAP can ping the AT for the program, and if an acknowledgement is received, the TCAP has determined that proper drivers and APIs exist. If no such API exists, the TCAP may launch a driver installation program for the AT as through an autorun.inf. In an alternative embodiment, if nothing happens, a user may double click onto an installer program that is stored on the mounted TCAP **342**, **340**. It should be noted, that although the TCAP's memory space may be mounted, certain areas of the TCAP may be inaccessible until there is an authorization. For example, certain areas and content on the TCAP may be encrypted. It should be noted that any such access terminal modules that drive AT and TCAP interaction may be saved onto the TCAP by copying the module to a mounted TCAP. Nevertheless, if the AT is capable of accessing program instructions in TCAP memory **330**, a TCAP driver is loaded on the AT **335**, and/or the user engages a program in the TCAP memory **340**, then the AT can execute program instructions from the TCAP's memory, which allows the TCAP to use the AT's I/O and allowing the user to interface with TCAP facilities **345**. It should be noted that some ATs may not be able to mount the

TCAP at all. In such an instance, the user may have to install the TCAP drivers by downloading them from a server on the Internet, loading them from a diskette or CD, and/or the like. Once the TCAP is engaged to the AT **301**, execution may continue **398**.

TCAP and AT Interaction

FIG. **4** illustrates embodiments accessing the tunneling client access point and server through an access terminal. Upon engaging the TCAP to the AT as described in FIG. **3** **301**, **398**, the user may then go on to access the TCAP and its services **498**. It should be noted that users may access certain unprotected areas of the TCAP once it has been mounted, as described in FIG. **3**. However, to more fully access the TCAP's facilities, the user may be prompted to either login and/or registration window **205**a to access the TCAP and its services, which may be displayed on the AT **405**. It is important to note that in one embodiment, the execution of the login and/or registration routines are handled by the TCAP's processor. In such an embodiment, the TCAP may run a small Web server providing login facilities, and connect to other Web based services through the AT's connection to the Internet. Further, the TCAP may employ a basic Web browsing core engine by which it may connect to Web services through the AT's connection to a communications network like the Internet. For purposes of security, in one embodiment, the TCAP may connect to a remote server by employing a secure connection, e.g., HTTPS, VPN, and/or the like.

Upon displaying a login window **405**, e.g., **205**a, the user may select to register to access the TCAP and its services, or they may simply log in by providing security verification. In one example, security authorization may be granted by simply providing a user and password as provided through a registration process. In another embodiment, authorization may be granted through biometric data. For example, the TCAP may integrate a fingerprint and/or heat sensor IC into its housing. Employing such a device, and simply by providing one's finger print by laying your finger to the TCAP's surface, would provide the login facility with authorization if the user's finger print matches one that was stored during the registration process.

If the user does not attempt to login **415**, i.e., if the user wishes to register to use the TCAP and its services, then the TCAP can determine if the AT is online **420**. This may be accomplished in a number of ways. In one embodiment, the TCAP itself may simply ping a given server and if acknowledgement of receipt is received, the TCAP is online. In another embodiment, the TCAP can query for online status by engaging the AT through the installed APIs. If the AT is not online, then the user may be presented with an error message **425**. Thus, if a user does not have a login, and does not have the ability to register, then restricted areas of the TCAP will remain unavailable. Thereafter, flow can continue **498** and the user may have another opportunity to login and/or register. In one embodiment as a login integrity check, the TCAP keeps track of the number of failed attempts to login and/or register and may lock-out all further access if a specified number of failed attempts occurs. In one embodiment, the lockdown may be permanent by erasing all data on the TCAP. In another embodiment, the TCAP will disallow further attempts for a specified period of time.

If the user is attempting to register **415**, and the AT is online **420**, then the user map provide registration information **440** into a screen form **440**a. Registration information fields may require a user's name, address, email address, credit card information, biometric information (e.g., requiring the user to touch a biometric fingerprint IC on the

TCAP), and/or the like. The TCAP may determine if all the information was provided as required for registration and may query backend servers to determine if the user information is unique **445**. If the user did not properly fill out the registration information or if another user is already registered, the TCAP can provided an error message to such effect. Also, both the TCAP and its back-end servers may make log entries tracking such failed attempts for purposes of defending against fraud and/or security breaches. The user may then modify the registration information **440** and again attempt to register. Similarly to the login integrity checks, the TCAP can lockout registration attempts if the user fails to register more than some specified number of times.

Upon providing proper registration information **445** or proper login authentication **415**, the TCAP can query backend servers to see if the user is registered. In one embodiment, such verification may be achieved by sending a query to the servers to check its database for the authorization information and/or for duplicate registrations. The servers would then respond providing an acknowledgment of proper registration and authorization to access data on the backend servers. If the users are not registered on the backend servers **430**, then the TCAP can provide an error message to the user for display on the AT to such effect **435**. In an alternative embodiment, the registration information may be stored on the TCAP itself. In one embodiment, the registration would be maintained in encrypted form. Thus, the user's login information may be checked relative to the information the TCAP itself, and if there is a match, access may be granted, otherwise an error message will be displayed **435**. The TCAP may then continue **498** to operate as if it were just engaged to the AT.

If the user is confirmed to be registered **430**, then the TCAP may provide options for display **453**, **453**a. Depending on the context and purpose of a particular TCAP, the options may vary. For example, a screen **453**a may provide the user with the options to access data either online or offline. The user might simply click on a button and gain secure access to such data that may be decrypted by the TCAP. In one embodiment, the TCAP will determine if the AT is online **455**. If this was already determined **420**, this check **455** may be skipped.

If the AT is online **455**, optionally, the TCAP determines if the user wishes to synchronize the contents of the TCAP with storage facilities at the backend server **470**. In one embodiment, the user may designate that such synchronization is to always take place. If synchronization is specified **470**, then the TCAP will provide and receive updated data to and from the backend servers, overwriting older data with updated versions of the data **475**. If the AT is online **455** and/or after any synchronization **475**, the TCAP may provide the user with all of its service options as authorized by the account and programs available on the TCAP and at the backend server **480**. Once again, these facilities, programs, and/or services may vary greatly depending on the context and deployment requirements of the user. The options to be presented to the user from the TCAP or the TCAP services from the backend server, as displayed through the TCAP onto the AT's display **480**, are myriad and some example embodiments are provided in FIGS. **5-8**. Upon presenting the user with the options, the user is then able to access, execute, store data and programs on the TCAP and on the remote server **485**. All areas of the TCAP and services are then open, including any encrypted data areas.

If the AT is not online **455**, the TCAP may provide options for the user not including online services **460**. In one

JX-294-0016

embodiment, the online options that may be presented on the AT display will be dimmed and/or omitted to reflect the lack of accessibility. However, the user will be able to access, execute, store data and programs on the TCAP, including any encrypted data areas 465.

TCAP Facilities and Services

FIGS. 5-8 illustrate embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an AT. Any particular set of facilities may have a myriad of options. The options and the general nature of the facilities provided on any particular TCAP are dependant upon the requirements of a given set of users. For example, certain groups and/or agencies may require TCAPS to be targeted towards consumer photographs, and may employ TCAPs to further that end. Other groups may require high security facilities, and tailor the TCAPs accordingly. In various environments, an organization may wish to provide a secure infrastructure to all of its agents for securely accessing the organization's data from anywhere and such an organization could tailor the TCAPs contents to reflect and respond to its needs. By providing a generalized infrastructure on the TCAP backend servers and within the TCAP by using a generalized processor, the TCAPs may be deployed in numerous environments.

In one particular embodiment as in FIG. 5, the TCAP provides facilities to access, process, and store email, files, music, photos and videos through the TCAP. Upon engaging 101 of FIG. 1 the TCAP 130 to an AT 307, the TCAP will mount and display through the AT's file browser window 125 of FIG. 1. As has already described, in the case where the AT has no TCAP driver software, the user may double click on the installer software stored on the TCAP 507. Doing so will launch the installer software from the TCAP's memory to execute on the AT, and the user may be presented with a window to confirm the desire to install the TCAP software onto the AT 507. Upon confirming the install 507, the software will install on the AT and the user will be asked to wait as they are apprised of the install progress 509.

Upon installation, the TCAP front-end software may execute and present the user with various options in various and fanciful interface formats 511, 460, 480 of FIG. 4. In one embodiment, these user interfaces and programs are Java applications that may execute on the AT and a present Java runtime. In an alternative embodiment, a small applet may run on the AT, but all other activities may execute on the TCAP's processor, which would use the AT display only as a display terminal. In the embodiment where the TCAP executes program instructions, the TCAP may be engaged to receive commands and execute by receiving a signal from the access terminal driver instructing it to execute certain program files or, alternatively, looking to default location and executing program instructions. In yet another embodiment, the TCAP may obtain updated interfaces and programs from a backend server for execution either on the TCAP itself and/or the AT; this may be done by synchronization with the backend server and checking for updates of specified files at the backend server. By engaging the user interface, perhaps by clicking on a button to open the TCAP facilities and services 511, the interface may further unfurl to present options to access said facilities and services 513. Here, the interface may reflect ownership of the TCAP by providing a welcome screen and showing some resources available to the user; for example, a button entitled "My Stuff" may serve as a mechanism to advance the user to a screen where they may access their personal data store. At this point the user may attempt to login to access their data

by engaging an appropriate button, which will take them to a screen that will accept login information 519. Alternatively, the user may also register if it is their first time using the TCAP by selecting an appropriate button, which will advance the user to a registration screen 515 wherein the user may enter their name, address, credit card information, etc. Upon successfully providing registration information, the user may be prompted for response to further solicitations on a follow-up screen 517. For example, depending on the services offered for a particular TCAP, the user may be provided certain perks like 5 MB of free online storage on a backend server, free photographic prints, free email access, and/or the like 517.

After the user is prompted to login 518 and successfully provides proper login information 519, or after successfully registering 515 and having responded to any solicitations 517, the user may be provided with general options 521 to access data stored on the TCAP itself 522 or in their online account 520 maintained on a backend server. For example, if the user selects the option to access their online storage 520, they may be presented with more options to interact with email, files, music, photos and videos that are available online 523. Perhaps if the user wished to check their email, the user might select to interact with their email, and a screen allowing them to navigate through their email account(s) would be presented 525. Such online access to data may be facilitated through http protocols whereby the TCAP applications send and receive data through http commands across a communications network interacting with the backend servers and/or other servers. Any received results may be parsed and imbedded in a GUI representation of a Java application. For example, the email facility may run as a Java applet 525 and may employ a POP mail protocol to pull data from a specified mail server to present to the user.

Similarly, many other facilities may be engaged by the user through the TCAP. In one embodiment, the user may drag 508 a file 506 onto a drag-and-drop zone 505 that is presented on the TCAP interface. Upon so doing, various drag-and-drop options may unfurl and present themselves to the user 550. It should be noted that the file may come from anywhere, i.e., from the AT, the TCAP, and/or otherwise. For example, upon dragging and dropping a graphics file, a user may be prompted with options to order prints, upload the file to an online storage space, save the file to the TCAP's memory space, cancel the action, and/or the like 550. If the user sends the file for storage, or otherwise wishes to see and manage their data, an interface allowing for such management may be presented 555. The interface may organize and allow access to general data, picture, and music formats 554, provide usage statistics (e.g., free space, capacity, used space, etc.) 553, provide actions to manipulate and organize the data 552, provide status on storage usage on the TCAP 551 and online 549, and/or the like.

Should the user engage a user interface element indicating the wish to manipulate their picture data 548, the TCAP interface will update to allow more specific interaction with the user's photos 557. In such a screen, the user may select various stored pictures and then indicate a desire to order photo prints by engaging the appropriate user interface element 558. Should the user indicate their desire for prints 558, they will be presented with an updated interface allowing the specification of what graphics files they wish to have printed 559. In one embodiment, the users may drag-and-drop files into a drop zone, or otherwise engage file browsing mechanisms 560 that allow for the selection of desired files. Upon having identified the files for prints 559, a user may be presented with an interface allowing for the selection

of print sizes and quantities **561**. After making such specifications, the user may be required to provide shipping information **563** and information for payments **565**. After providing the billing information to a backend server for processing and approval, the user may be presented with a confirmation interface allowing for editing of the order, providing confirmation of costs, and allowing for submission of a final order for the selected prints **567**. Upon submitting the order, the TCAP will process the files for spooling to a backend server that will accept the order and files, which will be developed as prints and the user's account will be charged accordingly. In one embodiment, all of the above order and image processing operations occur and execute on the TCAP CPU. For example, the TCAP may employ various rendering technologies, e.g., ghostscript, to allow it to read and save PDFs and other media formats.

FIG. **6** goes on to illustrate embodiments and facets of the facilities of FIG. **5**. The TCAP interface allows the user to perform various actions at any given moment. As has already been discussed in FIG. **5**, the user may drag **508** a file **506** onto a drag and drop zone **505** so as to provide the file to the TCAP for further manipulation. As in **550** of FIG. **5**, the user may be presented with various options subsequent to a drag-and-drop operation. Also, the TCAP interface may provide visual feedback that files have been dropped in the drop zone by highlighting the drop zone **505b**. Should the user wish, they may close the TCAP interface by engaging a close option **633**. Also, the ability to change and/or update their personal information may be accessed through the TCAP interface **616**, which would provide a form allowing the user to update their registration information **630**. In one embodiment, should the user forget their login information, they may request login help **635** and the TCAP will send their authorization information to the last known email address and inform the user of same **640**. Also, the TCAP interface may provide help facilities that may be accessed at any time by simply engaging a help facility user interface element **617**. So doing will provide the user with help screen information as to how to interact with the TCAP's facilities **625**.

Upon providing proper login information **619** and logging-in **619**, the user may be presented with a welcome screen with various options to access their data **621** as has already been discussed in FIG. **5**, **521**. By engaging a user interface element to access online storage **620**, the user may be presented with various options to interact with online storage **623**, **523** of FIG. **5**. Should the user wish to interact with data on the TCAP itself, the user may indicate so by engaging the appropriate user interface option **622**. So doing will provide the user with further options related to data stored on the TCAP **655**. The user may engage an option to view the storage contents **658** and the TCAP interface will provide a listing of the contents **662**, which may be manipulated through selection and drag-and-drop operations with the files.

In one embodiment, the user may order prints of photos **657** from files that are on the TCAP itself. As discussed in FIG. **5**, the user may select files for which they desire prints **660**. Here, the selected files will first be processed by the TCAP in preparation for sending to backend servers and file manipulations **670**. The user may specify various attributes regarding the prints they desire, e.g., the size, number, cropping, red-eye correction, visual effects, and/or the like **661**. In one embodiment, such processing occurs on the TCAP processor, while in other embodiments such processing can take place on the AT or backend server. Once again, the user may provide a shipping address **663**, and make a

final review to place the order **667**. Upon committing to the order **667**, the processed files are uploaded to the backend servers that will use the files to generate prints **690**. A confirmation screen may then be provided to the user with an order number and other relevant information **695**.

FIG. **7** goes on to illustrate embodiments and facets of the facilities of FIGS. **5-6** as may apply in different environments. As is demonstrated, the look and feel of the TCAP interface is highly malleable and can serve in many environments. FIG. **7** illustrates that even within a single organization, various environments might benefit from TCAPs and services tailored to serve such environments **733b-d**. In this case TCAPs can serve in consumer **733b**, industry trade **733c**, corporate **733d**, and/or the like environments.

As has already been discussed, initially in any of the environments, after engaging the TCAP to an AT, the user may be prompted to install the TCAP interface **705** and informed of the installation procedure **710**. The user may then be presented with the installed TCAP interface **715**, which may be activated by engaging an interface element to unfurl the interface, e.g., in this case by opening the top to a can of soda **717**. Opening the interface will present the user with various options as **720**, as has already been discussed in FIGS. **5-6**. Similarly the user may login **725** or make a selection to register for various TCAP services and provide the requisite information in the provided form **730**. Upon registering and/or logging-in **725**, various options may be presented based upon the configuration of the TCAP. For example, if the TCAP was configured and tailored for consumers, then upon logging in **725** the consumer user might be presented **733a-b** with various consumer related options **740**. Similarly, if the TCAP were tailored for **733a**, **c** the trade industry or **733a**, **d** the corporate environment, options specific to the trade industry **770** and corporate environment **760** may be presented.

In one embodiment, an organization wishing to provide TCAPs to consumers might provide options **740** for free music downloads **743**, free Internet radio streaming **748**, free news (e.g., provided through an RSS feed from a server) **766**, free photo printing **750**, free email **740**, free coupons **742**, free online storage **741**, and/or the like. Users could further engage such services (e.g., clicking free music file links for downloading to the TCAP, by ordering prints **750**, etc. For example, the user may select files on the TCAP **750**, select the types of photos they would like to receive **752**, specify a delivery address **754**, confirm the order **756** all of which will result in the TCAP processing the files and uploading them to the backend servers for generation of prints (as has already been discussed in FIGS. **5-6**).

In another embodiment, an organization wishing to provide TCAPs to a trade industry might provide options **770** for advertising **780**, events **775**, promotions **772**, and/or the like. It is important to note that information regarding such options may be stored either on the TCAP or at a backend server. In one embodiment, such information may be constantly synchronized from the backend servers to the TCAPs. This would allow an organization to provide updates to the trade industry to all authorized TCAP "key holders." In such an embodiment, the user may be presented with various advertising related materials for the organization, e.g., print, television, outdoor, radio, web, and/or the like **780**. With regard to events, the user may be presented with various related materials for the organization, e.g., trade shows, music regional, sponsorship, Web, and/or the like **775**. With regard to promotions, the user may be presented with various related materials for the organization, e.g., rebates, coupons, premiums, and/or the like **772**.

In another embodiment, an organization wishing to provide TCAPs to those in the corporate environment and might provide options relating to various corporate entities **760**. Selecting any of the corporate entities **760** may provide the user with options to view various reports, presentations, and/or the like, e.g., annual reports, 10K reports, and/or the like **765**. Similarly, the reports may reside on the TCAP and/or the corporate TCAP can act as a security key allowing the user to see the latest corporate related materials from a remote backend server.

FIG. **8** goes on to illustrate embodiments and facets of the facilities of FIGS. **5-7** as may apply in different environments. FIG. **8** illustrates that TCAPs may serve to provide heightened security to any environment. As has been discussed in previous figures, users may engage the TCAP interface **805** to access various options **810**. The TCAP interface is highly adaptable and various services may be presented within it. For example, a stock ticker may be provided as part of the interface in a financial setting **810**. Any number of live data feeds may dynamically update on the face of the interface. Upon logging-in **815** or registering a new account **820**, the user may be informed that communications that are taking place are secured **825**. In one embodiment, various encryption formats may be used by the TCAP to send information securely to the backend servers. It is important to note that in such an embodiment, even if data moving out of the TCAP and across the AT were captured at the AT, such data would not be readable because the data was encrypted by the TCAP's processor. As such, the TCAP acts as a "key" and provides a plug-and-play VPN to users. Such functionality, heretofore, has been very difficult to set up and/or maintain. In this way, all communications, options presented and views of user data are made available only to the TCAP with the proper decryption key. In heightened security environments, display of TCAP data is provided on the screen only in bitmapped format straight to the video memory of the AT and, therefore, is not stored anywhere else on the AT. This decreases the likelihood of capturing sensitive data. As such, the user may access their data on the TCAP and/or online **830** in a secure form whereby the user may navigate and interact with his/her data and various services **835** in a secure manner.

Tunneling Client Access Point Server Controller

FIG. **9** illustrates one embodiment incorporated into a tunneling client access point server (TCAPS) controller **901**. In this embodiment, the TCAP controller **901** may serve to process, store, search, serve, identify, instruct, generate, match, and/or update data in conjunction with a TCAP (see FIG. **10** for more details on the TCAP). TCAPS act as backend servers to TCAPs, wherein TCAPS provide storage and/or processing resources to great and/or complex for the TCAP to service itself. In effect, the TCAPS transparently extend the capacity of a TCAP.

In one embodiment, the TCAPS controller **901** may be connected to and/or communicate with entities such as, but not limited to: one or more users from user input devices **911**; peripheral devices **912**; and/or a communications network **913**. The TCAPS controller may even be connected to and/or communicate with a cryptographic processor device **928**.

A TCAPS controller **901** may be based on common computer systems that may comprise, but are not limited to, components such as: a computer systemization **902** connected to memory **929**.

Computer Systemization

A computer systemization **902** may comprise a clock **930**, central processing unit (CPU) **903**, a read only memory

(ROM) **906**, a random access memory (RAM) **905**, and/or an interface bus **907**, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus **904**. Optionally, a cryptographic processor **926** may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. The clock is typically coupled to the system bus and various clock multipliers that will increase or decrease the base operating frequency for other components interconnected in the computer systemization. The clock and various components in a computer systemization drive signals embodying information throughout the system. Such transmission and reception of signals embodying information throughout a computer systemization may be commonly referred to as communications. These communicative signals may further be transmitted, received, and the cause of return and/or reply signal communications beyond the instant computer systemization to: communications networks, input devices, other computer systemizations, peripheral devices, and/or the like. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one high-speed data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a microprocessor such as AMD's Athlon, Duron and/or Opteron; IBM and/or Motorola's PowerPC; Intel's Celeron, Itanium, Pentium and/or Xeon; and/or the like processor(s). The CPU interacts with memory through signal passing through conductive conduits to execute stored program code according to conventional data processing techniques. Such signal passing facilitates communication within the TCAPS controller and beyond through various interfaces. Should processing requirements dictate a greater amount speed, mainframe and super computer architectures may similarly be employed.

Interface Adapters

Interface bus(ses) **907** may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) **908**, storage interfaces **909**, network interfaces **910**, and/or the like. Optionally, cryptographic processor interfaces **927** similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. Interface adapters conventionally connect to the interface bus via a slot architecture. Conventional slot architectures may be employed, such as, but not limited to: Accelerated Graphics Port (AGP), Card Bus, (Extended) Industry Standard Architecture ((E)ISA), Micro Channel Architecture (MCA), NuBus, Peripheral Component Interconnect (Extended) (PCI(X)), Personal Computer Memory Card International Association (PCMCIA), and/or the like.

Storage interfaces **909** may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices **914**, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to: (Ultra) (Serial) Advanced Technology Attachment (Packet Interface) ((Ultra) (Serial) ATA(PI)), (Enhanced) Integrated Drive Electronics ((E)IDE), Institute of Electrical and Electronics

Engineers (IEEE) 1394, fiber channel, Small Computer Systems Interface (SCSI), Universal Serial Bus (USB), and/or the like.

Network interfaces **910** may accept, communicate, and/or connect to a communications network **913**. Network interfaces may employ connection protocols such as, but not limited to: direct connect, Ethernet (thick, thin, twisted pair 10/100/1000 Base T, and/or the like), Token Ring, wireless connection such as IEEE 802.11a-x, and/or the like. A communications network may be any one and/or the combination of the following: a direct interconnection; the Internet; a Local Area Network (LAN); a Metropolitan Area Network (MAN); an Operating Missions as Nodes on the Internet (OMNI); a secured custom connection; a Wide Area Network (WAN) a wireless network (e.g., employing protocols such as, but not limited to a Wireless Application Protocol (WAP), I-mode, and/or the like); and/or the like. A network interface may be regarded as a specialized form of an input output interface. Further, multiple network interfaces **910** may be used to engage with various communications network types **913**. For example, multiple network interfaces may be employed to allow for the communication over broadcast, multicast, and/or unicast networks. Input Output interfaces (I/O) **908** may accept, communicate, and/or connect to user input devices **911**, peripheral devices **912**, cryptographic processor devices **928**, and/or the like. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); audio: analog, digital, monaural, RCA, stereo, and/or the like; IEEE 1394a-b; infrared; joystick; keyboard; midi; optical; PC AT; PS/2; parallel; radio; serial; USB; video interface: BNC, composite, digital, Digital Visual Interface (DVI), RCA, S-Video, VGA, and/or the like; wireless; and/or the like. A common output device is a video display, which typically comprises a Cathode Ray Tube (CRT) or Liquid Crystal Display (LCD) based monitor with an interface (e.g., DVI circuitry and cable) that accepts signals from a video interface. The video interface composites information generated by a computer systemization and generates video signals based on the composited information in a video memory frame. Typically, the video interface provides the composited video information through a video connection interface that accepts a video display interface (e.g., a DVI connector accepting a DVI display cable).

User input devices **911** may be card readers, dongles, finger print readers, gloves, graphics tablets, joysticks, keyboards, mouse (mice), trackballs, trackpads, retina readers, and/or the like.

Peripheral devices **912** may be connected and/or communicate to I/O and/or other facilities of the like such as network interfaces, storage interfaces, and/or the like. Peripheral devices may be audio devices, cameras, dongles (e.g., for copy protection, ensuring secure transactions with a digital signature, and/or the like), external processors (for added functionality), goggles, microphones, monitors, network interfaces, printers, scanners, storage devices, video devices, visors, and/or the like.

It should be noted that although user input devices and peripheral devices may be employed, the TCAPS controller may be embodied as an embedded, dedicated, and/or headless device, wherein access would be provided over a network interface connection.

Cryptographic units such as, but not limited to, microcontrollers, processors **926**, interfaces **927**, and/or cryptographic processor devices **928** may be attached, and/or communicate with the TCAPS controller. A MC68HC16 microcontroller, commonly manufactured by Motorola Inc., may be used for and/or within

cryptographic units. Equivalent microcontrollers and/or processors may also be used. The MC68HC16 microcontroller utilizes a 16-bit multiply-and-accumulate instruction in the 16 MHz configuration and requires less than one second to perform a 512-bit RSA private key operation. Cryptographic units support the authentication of communications from interacting agents, as well as allowing for anonymous transactions. Cryptographic units may also be configured as part of CPU. Other commercially available specialized cryptographic processors include VLSI Technology's 33 MHz 6868 or Semaphore Communications' 40 MHz Roadrunner 184.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory **929**. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAPS controller and/or a computer systemization may employ various forms of memory **929**. For example, a computer systemization may be configured wherein the functionality of on-chip CPU memory (e.g., registers), RAM, ROM, and any other storage devices are provided by a paper punch tape or paper punch card mechanism; of course such an embodiment would result in an extremely slow rate of operation. In a typical configuration, memory **929** will include ROM **906**, RAM **905**, and a storage device **914**. A storage device **914** may be any conventional computer system storage. Storage devices may include a drum; a (fixed and/or removable) magnetic disk drive; a magneto-optical drive; an optical drive (i.e., CD ROM/RAM/Recordable (R), ReWritable (RW), DVD R/RW, etc.); and/or other devices of the like. Thus, a computer systemization generally requires and makes use of memory.

Module Collection

The memory **929** may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) **915** (operating system); information server module(s) **916** (information server); user interface module(s) **917** (user interface); Web browser module(s) **918** (Web browser); database(s) **919**; cryptographic server module(s) **920** (cryptographic server); TCAPS module(s) **935**; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device **914**, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through a communications network, ROM, various forms of memory, and/or the like.

Operating System

The operating system module **915** is executable program code facilitating the operation of a TCAPS controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the like. The operating system may be a highly fault tolerant, scalable, and secure system such as Apple Macintosh OS X (Server), AT&T Plan 9, Be OS, Linux, Unix, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Apple Macintosh OS, Microsoft DOS, Palm OS, Windows 2000/2003/3.1/95/98/CE/Millenium/NT/XP (Server), and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself,

**17**

and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAPS controller to communicate with other entities through a communications network **913**. Various communication protocols may be used by the TCAPS controller as a subcarrier transport mechanism for interaction, such as, but not limited to: multicast, TCP/IP, UDP, unicast, and/or the like.

Information Server

An information server module **916** is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, Microsoft's Internet Information Server, and/or the. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective-) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of Web pages through interaction with other program modules. After a Domain Name System (DNS) resolution portion of an HTTP request is resolved to a particular information server, the information server resolves requests for information at specified locations on a TCAPS controller based on the remainder of the HTTP request. For example, a request such as http://123.124.125.126/myInformation.html might have the IP portion of the request "123.124.125.126" resolved by a DNS server to an information server at that IP address; that information server might in turn further parse the http request for the "/myInformation.html" portion of the request and resolve it to a location in memory containing the information "myInformation.html." Additionally, other information serving protocols may be employed across various ports, e.g., FTP communications across port **21**, and/or the like. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAPS database **919**, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAPS database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through inter-application communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field

**18**

tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAPS as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module **917** is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module **918** is stored program code that is executed by the CPU. The Web browser may be a conventional hypertext viewing application such as Microsoft Internet Explorer or Netscape Navigator. Secure Web browsing may be supplied with 128 bit (or greater) encryption by way of HTTPS, SSL, and/or the like. Some Web browsers allow for the execution of program modules through facilities such as Java, JavaScript, ActiveX, and/or the like. Web browsers and like information access tools may be integrated into PDAs, cellular telephones, and/or other mobile devices. A Web browser may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the Web browser communicates with information servers, operating systems, integrated program modules (e.g., plug-ins), and/or the like; e.g., it may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAPS enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAPS Database

A TCAPS database module **919** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program

code portion configuring the CPU to process the stored data. The database may be a conventional, fault tolerant, relational, scalable, secure database such as Oracle or Sybase. Relational databases are an extension of a flat file. Relational databases consist of a series of related tables. The tables are interconnected via a key field. Use of the key field allows the combination of the tables by indexing against the key field; i.e., the key fields act as dimensional pivot points for combining information from various tables. Relationships generally identify links maintained between tables by matching primary keys. Primary keys represent fields that uniquely identify the rows of a table in a relational database. More precisely, they uniquely identify rows of a table on the "one" side of a one-to-many relationship.

Alternatively, the TCAPS database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. In another alternative, an object-oriented database may be used, such as Frontier, ObjectStore, Poet, Zope, and/or the like. Object databases can include a number of object collections that are grouped and/or linked together by common attributes; they may be related to other object collections by some common attributes. Object-oriented databases perform similarly to relational databases with the exception that objects are not just pieces of data but may have other types of functionality encapsulated within a given object. If the TCAPS database is implemented as a data-structure, the use of the TCAPS database may be integrated into another module such as the TCAPS module. Also, the database may be implemented as a mix of data structures, objects, and relational structures. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentralized and/or integrated. In one embodiment, the database module 919 includes three tables 919a-c. A user accounts table 919a includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation date, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then expire once a specified date has been reached. An user data table 919b includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. A user programs table 919c includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. In one embodiment, user programs may contain various user interface primitives, which may serve to update TCAPs. Also, various accounts may require custom database tables depending upon the environments and the types of TCAPs a TCAPS may need to serve. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database modules

919a-c. The TCAPS may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAPS database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS database communicates with a TCAPS module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module 920 is stored program code that is executed by the CPU 903, cryptographic processor 926, cryptographic processor interface 927, cryptographic processor device 928, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. Employing such encryption security protocols, the TCAPS may encrypt all incoming and/or outgoing communications and may serve as node within a virtual private network (VPN) with a wider communications network. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAPS module to engage in secure transactions if so desired. The cryptographic module facilitates the secure accessing of resources on TCAPS and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

TCAPS

A TCAPS module 935 is stored program code that is executed by the CPU. The TCAPS affects accessing, obtain-

ing and the provision of information, services, transactions, and/or the like across various communications networks. The TCAPS enables TCAP users to simply access data and/or services across a communications network in a secure manner. The TCAPS extends the storage and processing capacities and capabilities of TCAPs. The TCAPS coordinates with the TCAPS database to identify interassociated items in the generation of entries regarding any related information. A TCAPS module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAPS server employs a cryptographic server to encrypt and decrypt communications: A TCAPS module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS module communicates with a TCAPS database, operating systems, other program modules, and/or the like. The TCAPS may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAPS node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAPS controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module

components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D) COM), (Distributed) Object Linking and Embedding ((D) OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

Tunneling Client Access Point Controller

FIG. 10 illustrates one embodiment incorporated into a tunneling client access point (TCAP) controller 1001. Much of the description of the TCAPS of FIG. 9 applies to the TCAP, and as such, the disclosure focuses more upon the variances exhibited in the TCAP. In this embodiment, the TCAP controller 1001 may serve to process, store, search, identify, instruct, generate, match, and/or update data within itself, at a TCAPS, and/or through an AT.

The first and foremost difference between the TCAP and the TCAPS is that the TCAP is very small as was shown 130 of FIG. 1. The TCAP may be packaged in plugin sticks, often, smaller than the size of a human thumb. In one embodiment, a TCAP may be hardened for military use. In such an embodiment, the shell 1001 may be composed of metal, and/or other durable composites. Also, components within may be shielded from radiation.

In one embodiment, the TCAP controller 1001 may be connected to and/or communicate with entities such as, but not limited to: one or more users from an access terminal 1011b. The access terminal itself may be connected to peripherals such as user input devices (e.g., keyboard 1012a, mouse 1012b, etc.); and/or a communications network 1013 in manner similar to that described in FIG. 9.

A TCAP controller 1001 may be based on common computer systems components that may comprise, but are not limited to, components such as: a computer systemization 1002 connected to memory 1029. Optionally, the TCAP controller 1001 may convey information 1058, produce output through an output device 1048, and obtain input from control device 1018.

Control Device

The control device 1018 may be optionally provided to accept user input to control access to the TCAP controller. In one embodiment, the control device may provide a keypad 1028. Such a keypad would allow the user to enter passwords, personal identification numbers (PIN), and/or the like.

In an alternative embodiment, the control device may include a security device 1038. In one embodiment, the security device is a fingerprint integrated circuit (fingerprint IC) that provides biometric fingerprint information such as, but not limited to AuthenTec Inc.'s FingerLoc™ AF-S2™. Either a fingerprint IC and/or other biometric device will provide biometric validation information that may be used to confirm the identity of a TCAP user and ensure that transactions are legitimate. In alternative embodiments, a simple button, heat sensor, and/or other type of user input functionality may be provided solely and/or in concert with other

types of control device types. The control device may be connected to the I/O interface, the system bus, or the CPU directly.

The output device **1048** is used to provide status information to the user. In one alternative embodiment, the output device is an LCD panel capable of providing alpha numeric and/or graphic displays. In an alternative embodiment, the output device may be a speaker providing audible signals indicating errors and/or actually streaming information that is audible to the user, such as voice alerts. The output device may be connected to the I/O interface, the system bus, or the CPU directly.

The conveyance information **1058** component of the TCAP controller may include any number of indicia representing the TCAP's source on the cover **1001**. Source conveying indicia may include, but is not limited to: an owner name **1059** for readily verifying a TCAP user; a photo of the owner **1060** for readily verifying a TCAP controller owner; mark designating the source that issued the TCAP **1061, 1001** such as a corporate logo, and/or the like; fanciful design information **1062** for enhancing the visual appearance of the TCAP; and/or the like. It should be noted that the conveyance information **11421** may be positioned anywhere on the cover **1189**.

Computer Systemization

A computer systemization **1002** may comprise a clock **1030**, central processing unit (CPU) **1003**, a read only memory (ROM) **1006**, a random access memory (RAM) **1005**, and/or an interface bus **1007**, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus **1004**. Optionally the computer systemization may be connected to an internal power source **1086**. Optionally, a cryptographic processor **1026** may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one low-power data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a microprocessor such as ARM's Application Cores, Embedded Cores, Secure Cores; Motorola's DragonBall; and/or the like processor(s).

Power Source

The power source **1086** may be of any standard form for powering small electronic circuit board devices such as but not limited to: alkaline, lithium hydride, lithium ion, nickel cadmium, solar cells, and/or the like. In the case of solar cells, the case provides an aperture through which the solar cell protrudes are to receive photonic energy. The power cell **1086** is connected to at least one of the interconnected subsequent components of the TCAP thereby providing an electric current to all subsequent components. In one example, the power cell **1086** is connected to the system bus component **1004**. In an alternative embodiment, an outside power source **1086** is provided through a connection across the I/O **1008** interface. For example, a USB and/or IEEE 1394 connection carries both data and power across the connection and is therefore a suitable source of power.

Interface Adapters

Interface bus(ses) **1007** may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) **1008**, storage interfaces **1009**, network interfaces **1010**, and/or the

like. Optionally, cryptographic processor interfaces **1027** similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. In one embodiment, the interface bus provides I/O **1008** via a USB port. In an alternative embodiment, the interface bus provides I/O via an IEEE 1394 port. In an alternative embodiment, wireless transmitters are employed by interfacing wireless protocol integrated circuits (ICs) for I/O via the interface bus **1007**.

Storage interfaces **1009** may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices **1014**, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to a flash memory connector, and/or the like. In one embodiment, an optional network interface may be provide **1010**.

Input Output interfaces (I/O) **1008** may accept, communicate, and/or connect to an access terminal **1011**b. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); IEEE 1394a-b; infrared; PC AT; PS/2; parallel; radio; serial; USB; and/or the like; wireless component; and/or the like.

Wireless Component

In one embodiment a wireless component may comprise a Bluetooth chip disposed in communication with a transceiver **1043** and a memory **1029** through the interface bus **1007** and/or system bus **1004**. The transceiver may be either external to the Bluetooth chip, or integrated within the Bluetooth chip itself. The transceiver is a radio frequency (RF) transceiver operating in the range as required for Bluetooth transmissions. Further, the Bluetooth chip **1044** may integrate an input/output interface (I/O) **1066**. The Bluetooth chip and its I/O may be configured to interface with the TCAP controller through the interface bus, the system buss, and/or directly with the CPU. The I/O may be used to interface with other components such as an access terminal **1011**b equipped with similar wireless capabilities. In one embodiment, the TCAP may optionally interconnect wirelessly with a peripheral device **912** and/or a control device **911** of FIG. **9**. In one example embodiment, the I/O may be based on serial line technologies, a universal serial bus (USB) protocol, and/or the like. In an alternative embodiment, the I/O may be based on the ISO 7816-3 standard. It should be noted that the Bluetooth chip in an alternative embodiment may be replaced with an IEEE 802.11b wireless chip. In another embodiment, both a Bluetooth chip and an IEEE 802.11b wireless chip may be used to communicate and or bridge communications with respectively enabled devices. It should further be noted that the transceiver **1043** may be used to wirelessly communicate with other devices powered by Bluetooth chips and/or IEEE 802.11b chips and/or the like. The ROM can provide a basic instruction set enabling the Bluetooth chip to use its I/O to communicate with other components. A number of Bluetooth chips are commercially available, and may be used as a Bluetooth chip in the wireless component, such as, but not limited to, CSR's BlueCore line of chips. If IEEE 802.11b functionality is required, a number of chips are commercially available for the wireless component as well.

Cryptographic units such as, but not limited to, microcontrollers, processors **1026**, and/or the TCAP controller. A Secure Core component commonly manufactured by ARM, Inc. and may be used for and/or within cryptographic units.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory 1029. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAP controller and/or a computer systemization may employ various forms of memory 1029. In a typical configuration, memory 1029 will include ROM 1006, RAM 1005, and a storage device 1014. A storage device 1014 may be any conventional computer system storage. Storage devices may include flash memory, micro hard drives, and/or the like.

Module Collection

The memory 1029 may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) 1015 (operating system); information server module(s) 1016 (information server); user interface module(s) 1017 (user interface); Web browser module(s) 1018 (Web browser); database(s) 1019; cryptographic server module(s) 1020 (cryptographic server); access terminal module 1021; TCAP module(s) 1035; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device 1014, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through an access terminal, communications network, ROM, various forms of memory, and/or the like. In one embodiment, all data stored in memory is encrypted by employing the cryptographic server 1020 as described in further detail below. In one embodiment, the ROM contains a unique TCAP identifier. For example, the TCAP may contain a unique digital certificate, number, and/or the like, which may be used for purposes of verification and encryption across a network and/or in conjunction with a TCAPS.

Operating System

The operating system module 1015 is executable program code facilitating the operation of a TCAP controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the like. The operating system may be a highly fault tolerant, scalable, and secure system such as Linux, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Java runtime OS, and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself, and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with an access terminal, communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAP controller to communicate with other entities through an access terminal. Various communication protocols may be used by the TCAP controller as a subcarrier transport mechanism for interaction, such as, but not limited to: TCP/IP, USB, and/or the like.

Information Server

An information server module 1016 is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, and/or the like. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective-) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction with other program modules. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAP database 1019, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAP database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through inter-application communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAP as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module 1017 is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The TCAP may employ code natively compiled for various operating systems, or code compiled using Java. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may

communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module **1018** is stored program code that is executed by the CPU. A small-scale embedded Web browser may allow the TCAP to access and communicate with an attached access terminal, and beyond across a communications network. An example browser is Blazer, Opera, FireFox, etc. A browsing module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAP enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAP Database

A TCAP database module **1019** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program code portion configuring the CPU to process the stored data. In one embodiment, the TCAP database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. If the TCAP database is implemented as a data-structure, the use of the TCAP database may be integrated into another module such as the TCAP module. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentralized and/or integrated. In one embodiment, the database module **1019** includes three tables **1019**a-c. A user accounts table **1019**a includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then expire once a specified date has been reached. An user data table **1019**b includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. In one embodiment, the entire TCAP memory **1029** is processes into an image and spooled to a TCAPS for backup storage. A user programs table **1019**c includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database mod-

ules **1019**a-c. The TCAP may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAP database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP database communicates with a TCAP module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module **1020** is stored program code that is executed by the CPU **1003**, cryptographic processor **1026**, cryptographic processor interface **1027**, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAP module to engage in secure transactions if so desired. The cryptographic module facilitates the secure accessing of resources on TCAP and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. In one embodiment, the TCAP employs the cryptographic server to encrypt all data stored in memory **1029** based on the TCAP's unique ID and user's authorization information. In another embodiment, the TCAP employs the cryptographic server to encrypt all data sent through the access terminal based in the TCAP's unique ID and user's authorization information.

TCAP

A TCAP module **1035** is stored program code that is executed by the CPU. The TCAP affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within its memory and/or across various communications networks. The TCAP enables users to simply access data and/or services from any location where an access terminal is available. It provides secure, extremely low powerful and ultra portable access to data and services that were heretofore impossible. The TCAP coordinates with the TCAP database to identify interassociated items in the generation of entries regarding any related information. A TCAP module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications. A TCAP module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP module communicates with a TCAP database, a TCAP access terminal module **1021** running on an access terminal **1011***b*, operating systems, other program modules, and/or the like. The TCAP may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Access Terminal Module

An access terminal module **1021** is stored program code that is executed by a CPU. In one embodiment, the TCAP allows the access terminal **1011***b* to access its memory **1029** across its I/O **1008** and the access terminal executes the module. The access terminal module affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within the TCAP's and access terminal's memory and/or across various communications networks. The access terminal module **1021** acts as a bridge through which the TCAP can communicate with communications network, and through which users may interact with the TCAP by using the I/O of the access terminal. The access terminal module coordinates with the TCAP module **1035** to send data and communications back and forth. A access terminal module enabling access of information between the TCAP and access terminal may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the access terminal module is compiled for target access terminal platform, e.g., for Windows. In an alternative embodiment, a processor independent approach is taken, e.g., Java is used, so that the access terminal module will run on multiple platforms. In another embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications as between it, the TCAP, and outside servers. A access terminal module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the access terminal module communicates with a TCAP, other program modules, and/or the like. The access terminal module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAP node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAP controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D) COM), (Distributed) Object Linking and Embedding ((D) OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

The entirety of this disclosure (including the Cover Page, Title, Headings, Field, Background, Summary, Brief Description of the Drawings, Detailed Description, Claims, Abstract, Figures, and otherwise) shows by way of illustration various embodiments in which the claimed inventions may be practiced. The advantages and features of the disclosure are of a representative sample of embodiments

only, and are not exhaustive and/or exclusive. They are presented only to assist in understanding and teach the claimed principles. It should be understood that they are not representative of all claimed inventions. As such, certain aspects of the disclosure have not been discussed herein. That alternate embodiments may not have been presented for a specific portion of the invention or that further undescribed alternate embodiments may be available for a portion is not to be considered a disclaimer of those alternate embodiments. It will be appreciated that many of those undescribed embodiments incorporate the same principles of the invention and others are equivalent. Thus, it is to be understood that other embodiments may be utilized and functional, logical, organizational, structural and/or topological modifications may be made without departing from the scope and/or spirit of the disclosure. As such, all examples and/or embodiments are deemed to be non-limiting throughout this disclosure. Also, no inference should be drawn regarding those embodiments discussed herein relative to those not discussed herein other than for purposes of space and reducing repetition. For instance, it is to be understood that the logical and/or topological structure of any combination of any program modules (a module collection), other components and/or any present feature sets as described in the figures and/or throughout are not limited to a fixed operating order and/or arrangement, but rather, any disclosed order is exemplary and all equivalents, regardless of order, are contemplated by the disclosure. Furthermore, it is to be understood that such features are not limited to serial execution, but rather, any number of threads, processes, services, servers, and/or the like that may execute asynchronously, simultaneously, synchronously, and/or the like are contemplated by the disclosure. As such, some of these features may be mutually contradictory, in that they cannot be simultaneously present in a single embodiment. Similarly, some features are applicable to one aspect of the invention, and inapplicable to others. In addition, the disclosure includes other inventions not presently claimed. Applicant reserves all rights in those presently unclaimed inventions including the right to claim such inventions, file additional applications, continuations, continuations in part, divisions, and/or the like thereof. As such, it should be understood that advantages, embodiments, examples, functional, features, logical, organizational, structural, topological, and/or other aspects of the disclosure are not to be considered limitations on the disclosure as defined by the claims or limitations on equivalents to the claims.

What is claimed is:

1. A portable device configured to communicate with a terminal comprising a processor and an output component and with a communications network comprising a plurality of communications network nodes, the portable device comprising:

(a) a communication interface configured to enable the transmission of communications to the terminal;

(b) a network interface configured to enable the transmission of communications between the portable device and a communications network node;

(c) a processor; and

(d) a memory having executable program code stored thereon, including:

(1) first program code which, when executed, is configured to present an interactive user interface on the terminal output component,

(2) second program code which, when executed by the portable device processor, is configured to facilitate

communications between the portable device and the communications network node; and

(3) third program code which, when executed by the portable device processor in response to user interaction with the interactive user interface, is configured to cause a communication to be transmitted through the portable device network interface to the communications network node.

2. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

3. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the download of data to the portable device.

4. The portable device according to claim 3, wherein the portable device is configured to transmit to the terminal data downloaded from the communications network node.

5. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate access to data stored on a communications network node.

6. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the transmission of data from a communications network node to the portable device.

7. The portable device according to claim 6, wherein the portable device is configured to receive a data stream transmitted from a communications network node.

8. The portable device according to claim 7, wherein the portable device is configured to receive a data stream comprising video data content.

9. The portable device according to claim 8, wherein the terminal output component comprises a video monitor and the portable device is configured to transmit video data content to the terminal for display on the terminal video monitor.

10. The portable device according to claim 7, wherein the portable device is configured to receive a data stream comprising audio data content.

11. The portable device according to claim 10, wherein the terminal output component comprises a speaker and the portable device is configured to transmit audio data content to the terminal for presentation by the terminal speaker.

12. The portable device according to claim 7, wherein the portable device is configured to receive a data stream comprising a live data feed.

13. The portable device according to claim 12, wherein the portable device is configured to transmit to the terminal a live data stream received from a communications network node.

14. The portable device according to claim 7, wherein the portable device is configured to transmit to the terminal the data stream received from the communications network node.

15. The portable device according to claim 6, wherein the portable device is configured to transmit to the terminal data received from the communications network node.

16. The portable device according to claim 1, wherein the portable device communication interface comprises an audio/video interface.

17. The portable device according to claim 1, wherein the portable device communication interface comprises a wireless communication interface.

**18.** The portable device according to claim **1**, wherein the executable program code stored on the portable device memory comprises an operating system configured to be executed by the portable device processor.

**19.** The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the download of program code from a communications network node to the portable device.

**20.** The portable device according to claim **1**, wherein the portable device is configured to receive program code from a communications network node.

**21.** The portable device according to claim **20**, wherein the received program code comprises an updated version of the first program code and the portable device is configured to store the updated version of the first program code on the portable device memory.

**22.** The portable device according to claim **21**, wherein the updated version of the first program code comprises product advertisement information to be presented by the interactive user interface.

**23.** The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the upload of data from the portable device to a communications network node.

**24.** The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate the upload of program code from the portable device to a communications network node.

**25.** The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate synchronizing data stored on the portable device memory with data stored on a communications network node.

**26.** The portable device according to claim **1**, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate synchronizing program code stored on the portable device memory with program code stored on a communications network node.

**27.** The portable device according to claim **1**, wherein the interactive user interface comprises a graphic user interface.

**28.** The portable device according to claim **1**, wherein the portable device processor is configured to execute the first program code.

**29.** The portable device according to claim **1**, wherein the communications network node comprises a server.

**30.** The portable device according to claim **1**, wherein the portable device is configured to provide the terminal processor with access to the first program code.

**31.** The portable device according to claim **1**, wherein the first program code is configured to be executed by the terminal processor.

**32.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, a network interface configured to enable the transmission of communications between the portable device and a communications network node, and a communication interface for enabling the transmission of communications to a terminal comprising a processor and an output component, the method comprising:
    (a) executing first program code stored on the portable device memory to present an interactive user interface on the terminal output component;

    (b) executing second program code stored on the portable device memory to facilitate communications between the portable device and the communications network node;
    (c) executing third program code stored on the portable device memory in response to user interaction with the interactive user interface; and
    (d) transmitting a communication through the portable device network interface to the communications network node.

**33.** The method according to claim **32**, wherein the step of transmitting a communication through the portable device network interface to the communications network node facilitates verification of the portable device.

**34.** The method according to claim **32**, wherein the step of transmitting a communication through the portable device network interface to the communications network node facilitates the download of data to the portable device.

**35.** The method according to claim **32**, wherein the step of transmitting a communication through the portable device network interface to the communications network node facilitates the transmission of data from the communications network node to the portable device.

**36.** The method according to claim **35**, further comprising receiving data transmitted by the communications network node.

**37.** The method according to claim **36**, further comprising transmitting data from the portable device to the terminal.

**38.** The method according to claim **36**, wherein the data received by the portable device comprises a data stream.

**39.** The method according to claim **38**, wherein the data stream received by the portable device comprises video data content.

**40.** The method according to claim **39**, further comprising transmitting video data content from the portable device to the terminal for display on the terminal output component.

**41.** The method according to claim **38**, wherein the data stream received by the portable device comprises audio data content.

**42.** The method according to claim **41**, further comprising transmitting audio data content from the portable device to the terminal for presentation by the terminal output component.

**43.** The method according to claim **38**, wherein the data stream received by the portable device comprises a live data feed.

**44.** The method according to claim **43**, further comprising transmitting live data feed from the portable device to the terminal.

**45.** The method according to claim **32**, wherein the step of executing third program code stored on the portable device memory in response to user interaction with the interactive user interface causes the transmission of a communication through the portable device network interface to the communications network node.

**46.** A non-transitory computer readable medium containing executable program code to be executed by a portable device, the portable device comprising a processor, a memory, a network interface for enabling communications between the portable device and a communications network node, and a communication interface for enabling the transmission of communications from the portable device to a terminal comprising a processor and an output component, the program code comprising:
    (a) first program code which, when executed, is configured to present an interactive user interface on the terminal output component,

(b) second program code which, when executed by the portable device processor, is configured to facilitate communications between the portable device and the communications network node; and

(c) third program code which, when executed by the portable device processor in response to user interaction with the interactive user interface, is configured to cause a communication to be transmitted through the portable device network interface to the communications network node.

**47.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, a network interface configured to enable the transmission of communications between the portable device and a communications network node, and a communication interface for enabling the transmission of communications to a terminal comprising a processor and an output component, the method comprising:

(a) causing an interactive user interface to be presented by the terminal output component;

(b) executing first program code stored on the portable device memory to facilitate communications between the portable device and the communications network node;

(c) executing second program code stored on the portable device memory in response to user interaction with the interactive user interface; and

(d) transmitting a communication through the portable device network interface to the communications network node.

**48.** The method according to claim **47**, wherein the step of executing second program code stored on the portable device memory in response to user interaction with the interactive user interface causes the transmission of a communication through the portable device network interface to the communications network node.

**49.** The method according to claim **47**, wherein the step of causing an interactive user interface to be presented by the terminal output component comprises providing the terminal with access to third program code stored on the portable device memory which, when executed by the terminal processor, is configured to cause an interactive user interface to be presented by the terminal output component.

**50.** The method according to claim **47**, wherein the step of causing an interactive user interface to be presented by the terminal output component comprises executing third program code stored on the portable device memory cause an interactive user interface to be presented by the terminal output component.

**51.** The method according to claim **50**, wherein the portable device executes the third program code in response to user interaction with an interactive user interface on the terminal output component.

**52.** The method according to claim **47**, wherein the step of causing an interactive user interface to be presented by the terminal output component comprises affecting the presentation of an interactive user interface on the terminal output component.

**53.** The method according to claim **52**, wherein the portable device executes third program code stored on the portable device memory to affect the presentation of the interactive user interface on the terminal output component.

**54.** The method according to claim **53**, where the portable device executes the third program code in response to user interaction with the interactive user interface on the terminal output component.

**55.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**56.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate verification of the portable device.

**57.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the transmission of encrypted communications from the communications network node to the terminal.

**58.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate access to the communications network node.

**59.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the terminal.

**60.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the portable device.

**61.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable

device memory causes a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the terminal.

**62.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the portable device.

**63.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the upload of content to the communications network node.

**64.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the upload of program code to the communications network node.

**65.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

**66.** The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate the transmission of a live data feed to the terminal.

**67.** The method according to claim **55**, wherein the step of causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component comprises transmitting a communication to the terminal.

**68.** The method according to claim **55**, wherein the step of causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component comprises executing fifth program code stored on the portable device memory to transmit a communication to cause the terminal to execute the first program code.

**69.** The method according to claim **68**, wherein the portable device executes the fifth program code in response to user interaction with an interactive user interface presented by the terminal output component.

**70.** The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises transmitting a communication to the terminal to cause the communication to the communications network node.

**71.** The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**72.** The method according to claim **71**, wherein the data stored on the portable device memory comprises user authorization data.

**73.** The method according to claim **72**, wherein the user authorization information is user biometric data.

**74.** The method according to claim **71**, wherein the data stored on the portable device memory comprises a digital certificate.

**75.** The method according to claim **71**, wherein the data stored on the portable device memory comprises portable device identifier information.

**76.** The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**77.** The method according to claim **55**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises effecting the execution of fifth program code to facilitate the communication to the communications network node.

**78.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting the presentation of an interactive user interface by the terminal output component;

(b) executing second program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, third program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

**79.** The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises providing the terminal processor with access to fourth program code stored on the portable device memory which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component.

**80.** The method according to claim **79**, wherein the step of providing the terminal processor with access to the fourth program code stored on the portable device memory which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component comprises storing the fourth program code onto the terminal memory.

**81.** The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises executing fourth program code stored on the portable device memory

        

to affect the presentation of an interactive user interface by the terminal output component.

**82.** The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises transmitting a communication to cause the terminal processor to execute fourth program code stored on the terminal memory to affect the presentation of an interactive user interface by the terminal output component.

**83.** The method according to claim **78**, wherein the step of affecting the presentation of an interactive user interface by the terminal output component comprises executing fifth program code stored on the portable device memory to transmit a communication to cause the terminal to execute fourth program code stored on the terminal memory to affect the presentation of an interactive user interface by the terminal output component.

**84.** The method according to claim **83**, wherein the portable device executes the fifth program code in response to user interactive with an interactive user interface presented by the terminal output component.

**85.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises transmitting a communication to the terminal to cause the communication to the communications network node.

**86.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**87.** The method according to claim **86**, wherein the data stored on the portable device memory comprises user authorization data.

**88.** The method according to claim **87**, wherein the user authorization information is user biometric data.

**89.** The method according to claim **86**, wherein the data stored on the portable device memory comprises a digital certificate.

**90.** The method according to claim **86**, wherein the data stored on the portable device memory comprises portable device identifier information.

**91.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**92.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises effecting the execution of fifth program code to facilitate the communication to the communications network node.

**93.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the

terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

   (a) affecting the presentation of the interactive user interface presented by the terminal output component;

   (b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

   (c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

   (d) facilitating communications through the terminal network communication interface to a communications network node.

**94.** The method according to claim **93**, wherein the portable device executes fifth program code stored on the portable device memory to affect the presentation of the interactive user interface by the terminal output component.

**95.** The method according to claim **94**, wherein the portable device executes the fifth program code in response to user interaction with the interactive user interface presented by the terminal output component.

**96.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises transmitting a communication to the terminal to cause the communication to the communications network node.

**97.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

**98.** The method according to claim **97**, wherein the data stored on the portable device memory comprises user authorization data.

**99.** The method according to claim **98**, wherein the user authorization information is user biometric data.

**100.** The method according to claim **97**, wherein the data stored on the portable device memory comprises a digital certificate.

**101.** The method according to claim **97**, wherein the data stored on the portable device memory comprises portable device identifier information.

**102.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**103.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises effecting the execution of fifth program code to facilitate the communication to the communications network node.

**104.** A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

  (a) a communications network node; and

  (b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

    (1) cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;

    (2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

    (3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface to cause a communication to be transmitted to a communications network node; and

    (4) facilitate communications through the terminal network communication interface to a communications network node.

**105.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

**106.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the transmission of encrypted communications from the communications network node to the terminal.

**107.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate access to the communications network node.

**108.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the terminal.

**109.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of content from the communications network node to the portable device.

**110.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the terminal.

**111.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the download of program code from the communications network node to the portable device.

**112.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the upload of content to the communications network node.

**113.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the upload of program code to the communications network node.

**114.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

**115.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate the transmission of a live data feed to the terminal.

**116.** The system according to claim **104**, wherein the portable device is configured to transmit a communication to the terminal to cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component.

**117.** The system according to claim **104**, wherein the portable device is configured to execute fifth program code stored on the portable device memory to cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component.

**118.** The system according to claim **117**, wherein the portable device is configured to execute the fifth program code in response to user interaction with an interactive user interface presented by the terminal output component.

**119.** The system according to claim **104**, wherein the portable device is configured execute the fourth program code to transmit a communication to the terminal to cause the communication to the communications network node.

**120.** The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with data stored on the portable device to facilitate the terminal to transmit a communication to the communications network node.

**121.** The system according to claim **120**, wherein the data stored on the portable device memory comprises user authorization data.

**122.** The system according to claim **121**, wherein the user authorization information comprises user biometric data.

**123.** The system according to claim **120**, wherein the data stored on the portable device memory comprises a digital certificate.

**124**. The system according to claim **120**, wherein the data stored on the portable device memory comprises portable device identifier information.

**125**. The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with biometric data to facilitate the terminal to transmit a communication to the communications network node.

**126**. The system according to claim **104**, wherein the portable device is configured to execute the fourth program to effect the execution of fifth program code to cause a communication to be transmitted to the communications network node.

**127**. The system according to claim **126**, wherein the portable device is configured to execute the fifth program code.

**128**. The system according to claim **127**, wherein the portable device is configured to execute the fifth program code in response to user interaction with the interactive user interface presented by the terminal output component.

**129**. The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to effect the execution of fifth program code to facilitate the communication to the communications network node.

\* \* \* \* \*



US009059969B2

(12) **United States Patent**
McNulty

(10) **Patent No.:** US 9,059,969 B2
(45) **Date of Patent:** *Jun. 16, 2015

(54) **APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT**

(71) Applicant: **Scott McNulty**, Rowayton, CT (US)

(72) Inventor: **Scott McNulty**, Rowayton, CT (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 18 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/960,514**

(22) Filed: **Aug. 6, 2013**

(65) **Prior Publication Data**

US 2014/0172958 A1     Jun. 19, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/950,321, filed on Nov. 19, 2010, now Pat. No. 8,539,047, which is a continuation of application No. 10/807,731, filed on Mar. 23, 2004, now Pat. No. 7,861,006.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 15/177* | (2006.01) |
| *H04L 29/08* | (2006.01) |
| *H04L 9/32* | (2006.01) |
| *G06F 13/00* | (2006.01) |
| *H04L 29/06* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *H04L 67/04* (2013.01); *H04L 63/0272* (2013.01); *H04L 63/0428* (2013.01); *H04L 9/3226* (2013.01); *H04L 9/3247* (2013.01); *H04L 2209/56* (2013.01); *H04L 2209/76* (2013.01); *H04L 2209/80* (2013.01)

(58) **Field of Classification Search**
CPC ........... H04L 2209/56; H04L 2209/76; H04L 2209/80; H04L 63/0272; H04L 63/0428; H04L 67/04; H04L 9/3226; H04L 9/3247
USPC ................... 709/203, 250, 713/150; 711/115
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,960,085 | A | 9/1999 | de la Huerga |
| 6,098,097 | A * | 8/2000 | Dean et al. ..................... 709/220 |
| 6,134,662 | A * | 10/2000 | Levy et al. ..................... 726/11 |
| 6,199,108 | B1 * | 3/2001 | Casey et al. .................. 709/220 |
| 6,547,130 | B1 | 4/2003 | Shen |
| 6,763,399 | B2 * | 7/2004 | Margalit et al. ............... 710/13 |
| 6,799,077 | B1 * | 9/2004 | Hauet ........................... 700/2 |
| 6,928,463 | B1 * | 8/2005 | Tene et al. .................... 709/203 |
| 7,051,157 | B2 * | 5/2006 | James .......................... 711/115 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP     1168137     1/2002

*Primary Examiner* — Alina N Boutah

(74) *Attorney, Agent, or Firm* — Locke Lord LLP

(57) **ABSTRACT**

The disclosure details the implementation of a tunneling client access point (TCAP) that is a highly secure, portable, power efficient storage and data processing device. The TCAP "tunnels" data through an access terminal's (AT) input/output facilities. In one embodiment, the TCAP connects to an AT and a user employs the AT's user input peripherals for input, and views the TCAP's activities on the AT's display. This enables the user to observe data stored on the TCAP without it being resident on the AT, which can be useful to maintain higher levels of data security. Also, the TCAP may tunnel data through an AT across a communications network to access remote servers. The disclosure also teaches a plug-n-play virtual private network (VPN).

29 Claims, 17 Drawing Sheets





C.A. No. 18-826-WCB (D.Del.)
Joint Trial Exhibit

JX-349



Exhibit 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,178,724 B2 | 2/2007 | Tamagno et al. | |
| 7,213,766 B2* | 5/2007 | Ryan et al. | 235/492 |
| 7,308,584 B2 | 12/2007 | Himmel et al. | |
| 7,546,340 B2* | 6/2009 | Terasawa | 709/203 |
| 7,549,161 B2 | 6/2009 | Poo et al. | |
| 7,558,953 B2* | 7/2009 | Osthoff et al. | 713/161 |
| 7,762,470 B2* | 7/2010 | Finn et al. | 235/492 |
| 2002/0044663 A1* | 4/2002 | King et al. | 380/284 |
| 2002/0073340 A1 | 6/2002 | Mambakkam et al. | |
| 2002/0184349 A1* | 12/2002 | Manukyan | 709/221 |
| 2002/0194499 A1 | 12/2002 | Audebert et al. | |
| 2003/0005337 A1 | 1/2003 | Poo et al. | |
| 2003/0028649 A1* | 2/2003 | Uhlik et al. | 709/228 |
| 2003/0158891 A1* | 8/2003 | Lei et al. | 709/203 |
| 2003/0182456 A1 | 9/2003 | Lin et al. | |
| 2004/0044897 A1 | 3/2004 | Lim | |
| 2004/0127254 A1* | 7/2004 | Chang | 455/557 |
| 2005/0172075 A1* | 8/2005 | Marcus | 711/115 |
| 2005/0197859 A1* | 9/2005 | Wilson et al. | 705/2 |
| 2005/0198221 A1* | 9/2005 | Manchester et al. | 709/220 |
| 2006/0052085 A1* | 3/2006 | Rodriguez et al. | 455/411 |
| 2006/0071066 A1* | 4/2006 | Vanzini et al. | 235/380 |
| 2006/0294249 A1 | 12/2006 | Oshima et al. | |
| 2007/0038870 A1 | 2/2007 | Ciesinger | |
| 2007/0274291 A1* | 11/2007 | Diomelli | 370/352 |
| 2008/0233942 A9* | 9/2008 | Kim | 455/419 |

* cited by examiner



Fig. 1

Appx171



Fig. 2



130   AT 327

125

Engage TCAP with Access Terminal (e.g., via BT, WiFi, USB, etc.) 305

TCAP powers up 310

TCAP loads/accesses operating system 315

TCAP provides memory space to Access Terminal (AT) 320

AT accesses/mounts the TCAP memory space 325

Fig. 3a



**Fig. 3b**



Fig. 4a

Appx175



Display Error Message
(e.g., information incomplete,
please re-enter; User exists,
please choose different
name, etc.) 450

Unique user?
All info? 445

Provide Options (e.g.,
online (dimmed if not online)/USB
storage) 453

453a

Is AT online? 455

Provide TCAP off-line
options (e.g., run
program) 460

Allow user to access/
execute/store data/
programs on TCAP
off-line (e.g., decrypt) 465

Synchronize on and
off-line storage?
470

Synchronize 475

Provide all TCAP options
(e.g., run program, order
prints, print documents, etc.)
480

Allow user to access/
execute/store data/
programs on TCAP and
at remote server (e.g.,
decrypt) 485

Fig. 4b



Fig. 5a



Fig. 5b



Fig. 6a



Fig. 6b



Fig. 7a



Fig. 7b



Fig. 8



Fig. 9a

Appx184



Storage Device 914

TCAPS Module 935

TCAPS Database 919

User Accounts 919a

User Data 919b

User Programs 919c

Crytographic Server Module 920

Web Browser Module 916

User Interface Module 917

Information Server Module 916

Operating System (OS) Module 915

Memory 929

Tunneling Client Access Point Server (TCAPS) 901

Fig.9b

Appx185



Fig. 10a

Appx186



Fig.10b

Appx187

## APPARATUS, METHOD AND SYSTEM FOR A TUNNELING CLIENT ACCESS POINT

This application is a continuation application of U.S. application Ser. No. 12/950,321, filed Nov. 19, 2010, which is a continuation application of U.S. application Ser. No. 10/807, 731, filed on Mar. 23, 2003, now U.S. Pat. No. 7,861,006.

### FIELD

The present invention is directed generally to an apparatus, method, and system of accessing data, and more particularly, to an apparatus, method and system to execute and process data by tunneling access through a terminal.

### BACKGROUND

Portable Computing and Storage

Computing devices have been becoming smaller over time. Currently, some of the smallest computing devices are in the form of personal digital assistants (PDAs). Such devices usually come with a touch screen, an input stylus and/or mini keyboard, and battery source. These devices, typically, have storage capacities around 64 MB. Examples of these devices include Palm's Palm Pilot.

Information Technology Systems

Typically, users, which may be people and/or other systems, engage information technology systems (e.g., commonly computers) to facilitate information processing. In turn, computers employ processors to process information; such processors are often referred to as central processing units (CPU). A common form of processor is referred to as a microprocessor. A computer operating system, which, typically, is software executed by CPU on a computer, enables and facilitates users to access and operate computer information technology and resources. Common resources employed in information technology systems include: input and output mechanisms through which data may pass into and out of a computer; memory storage into which data may be saved; and processors by which information may be processed. Often information technology systems are used to collect data for later retrieval, analysis, and manipulation, commonly, which is facilitated through database software. Information technology systems provide interfaces that allow users to access and operate various system components.

User Interface

The function of computer interfaces in some respects is similar to automobile operation interfaces. Automobile operation interface elements such as steering wheels, gearshifts, and speedometers facilitate the access, operation, and display of automobile resources, functionality, and status. Computer interaction interface elements such as check boxes, cursors, menus, scrollers, and windows (collectively and commonly referred to as widgets) similarly facilitate the access, operation, and display of data and computer hardware and operating system resources, functionality, and status. Operation interfaces are commonly called user interfaces. Graphical user interfaces (GUIs) such as the Apple Macintosh Operating System's Aqua, Microsoft's Windows XP, or Unix's X-Windows provide a baseline and means of accessing and displaying information, graphically, to users.

Networks

Networks are commonly thought to comprise the interconnection and interoperation of clients, servers, and intermediary nodes in a graph topology. It should be noted that the term "server" as used herein refers generally to a computer, other device, software, or combination thereof that processes and responds to the requests of remote users across a communications network. Servers serve their information to requesting "clients." The term "client" as used herein refers generally to a computer, other device, software, or combination thereof that is capable of processing and making requests and obtaining and processing any responses from servers across a communications network. A computer, other device, software, or combination thereof that facilitates, processes information and requests, and/or furthers the passage of information from a source user to a destination user is commonly referred to as a "node." Networks are generally thought to facilitate the transfer of information from source points to destinations. A node specifically tasked with furthering the passage of information from a source to a destination is commonly called a "router." There are many forms of networks such as Local Area Networks (LANs), Pico networks, Wide Area Networks (WANs), Wireless Networks (WLANs), etc. For example, the Internet is generally accepted as being an interconnection of a multitude of networks whereby remote clients and servers may access and interoperate with one another.

### SUMMARY

Although all of the aforementioned portable computing systems exist, no effective solution to securely access, execute, and process data is available in an extremely compact form. Currently, PDAs, which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user interfaces, and require too much power to maintain their data. Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces and operating systems. Further, current PDAs are generally limited in the amount of data they can store or access. No solution exists that allows users to employ traditional large user interfaces they are already comfortable with, provides greater portability, provides greater memory footprints, draws less power, and provides security for data on the device. As such, the disclosed tunneling client access point (TCAP) is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer, through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources. Thus, the TCAP requires no power source to maintain its data and allows for a highly portable "thumb" footprint. Also, by providing the equivalent of a plug-n-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data in an easy and secure manner that was unavailable in the prior art.

In accordance with certain aspects of the disclosure, the above-identified problems of limited computing devices are overcome and a technical advance is achieved in the art of portable computing and data access. An exemplary tunneling client access point (TCAP) includes a method to dispose a portable storage device in communication with a terminal. The method includes providing the memory for access on the terminal, executing processing instructions from the memory on the terminal to access the terminal, communicating through a conduit, and processing the processing instructions.

In accordance with another embodiment, a portable tunneling storage processor is disclosed. The apparatus has a memory and a processor disposed in communication with the memory, and configured to issue a plurality of processing instructions stored in the memory. Also, the apparatus has a conduit for external communications disposed in communi-

3    4

cation with the processor, configured to issue a plurality of communication instructions as provided by the processor, configured to issue the communication instructions as signals to engage in communications with other devices having compatible conduits, and configured to receive signals issued from the compatible conduits.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate various non-limiting, example, inventive aspects in accordance with the present disclosure:

FIG. **1** is of a flow diagram illustrating embodiments of a tunneling client access point (TCAP);

FIG. **2** is of a flow diagram illustrating embodiments of a system of tunneling client access point and access terminal interaction;

FIG. **3** is of a flow diagram illustrating embodiments of engaging the tunneling client access point to access terminal interaction;

FIG. **4** is of a flow diagram illustrating embodiments of accessing the tunneling client access point and server through an access terminal;

FIGS. **5-8** is of a flow diagram illustrating embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an access terminal;

FIG. **9** is of a block diagram illustrating embodiments of a tunneling client access point server controller;

FIG. **10** is of a block diagram illustrating embodiments of a tunneling client access point controller;

The leading number of each reference number within the drawings indicates the first figure in which that reference number is introduced. As such, reference number **101** is first introduced in FIG. **1**. Reference number **201** is first introduced in FIG. **2**, etc.

## DETAILED DESCRIPTION

### Topology

FIG. **1** illustrates embodiments for a topology between a tunneling client access point (TCAP) (see FIG. **10** for more details on the TCAP) and TCAP server (TCAPS) (see FIG. **9** for more details on the TCAPS). In this embodiment, a user **133a** may plug-in a TCAP into any number of access terminals **127** located anywhere. Access terminals (ATs) may be any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like. The type of AT used is not important other than the device should provide a compatible mechanism of engagement to the TCAP **130** and provide an operating environment for the user to engage the TCAP through the AT. In one embodiment, the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT. In other embodiment, the TCAP may employ Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped. In one embodiment, the AT provides Java and/or Windows runtime environments, which allows the TCAP to interact with the input/output mechanisms of the AT. See FIG. **9** for more details and embodiments on the types of connections that may be employed by the TCAP. Once the TCAP has engaged with an AT, it can provide the user with access to its storage and processing facilities.

If the AT is connected to a communication network **113**, the TCAP may then communicate beyond the AT. In one embodiment, the TCAP can provide extended storage and/or processing resources by engaging servers **110, 115, 120**, which

have access to and can provide extended storage **105** to the TCAP through the AT. In one embodiment, a single server and storage device may provide such TCAP server support. In another embodiment, server support is provided over a communications network, e.g., the Internet, by an array of front-end load-balancing servers **120**. These servers can provide access to storage facilities within the servers or to remote storage **105** across a communications network **113**b, c (e.g., a local area network (LAN)). In such an embodiment, a back-end server **110** may offload the front-end server with regard to data access to provide greater throughput. For purposes of load balancing and/or redundancy, a backup server **115** may be similarly situated to provide for access and backup in an efficient manner. In such an embodiment, the back-end servers may be connected to the front-end servers through a communications network **113**b (e.g., wide area network (WAN)). The backend servers **110, 115** may be connected to the remote storage **105** through a communications network **113**c as well (e.g., a high speed LAN, fiber-channel, and/or the like).

Thus, to the user **133a**, the contents of the TCAP **130** appear on the AT as being contained on the TCAP **125** even though much of the contents may actually reside on the servers **115, 120** and/or the servers' storage facilities **105**. In these ways, the TCAP "tunnels" data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT; Also, the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O.

### TCAP and AT Interaction

FIG. **2** illustrates embodiments for a system of tunneling client access point (TCAP) (see FIG. **10** for more details on the TCAP) and access terminal interaction. FIG. **2** provides an overview for TCAP and AT interaction and subsequent figures will provide greater detail on elements of the interaction. In this embodiment, a user engages the TCAP **201**. For example, the user may plug the TCAP into an AT via the AT's USB port. Thereafter the user is presented with a login prompt **205** on the AT's display mechanism, e.g., on a video monitor. After a user successfully logs in (for example by providing a user name and password) **204**, the TCAP can then accept user inputs from the AT and its peripherals (the TCAP can then also provide output to the user via the AT's peripherals).

The user may employ the AT's input peripherals as user input devices that control actions on the TCAP. Depending on the user's actions **215**, the TCAP can be used by the AT as a storage device from which it can access and store data and programs **225**. For example, if the user takes the action of opening a file from the TCAP's memory, e.g., by double clicking on an icon when the TCAP is mounted as a USB drive on the AT, then the AT may treat the TCAP as a memory device and retrieve information from the TCAP **225**. If the user's action **215** is one that is directed at executing on the TCAP **215**, then the AT will not be involved in any execution. For example, if the user drops an icon representing a graphics file onto a drag-and-drop location visually representing the TCAP, then the file may be copied to the TCAP where it will process and spool the file for sending the graphics file to be printed at a remote location. In such a case, all of the requirements to process and spool the file are handled by the TCAP's processor and the AT would only be used as a mechanism for user input and output and as a conduit through which the TCAP may send files.

Regardless of if there is an action **215** to execute on the TCAP **220** or to access or store data on the TCAP **225**, the AT is used to display the status of any actions **230**. At any time the

Appx189

user may select to terminate TCAP related facilities executing either on the AT, a backend server, on the TCAP itself, and/or the like 235. In one embodiment, the user may select a quit option that is displayed on the AT's screen. In another embodiment, the user may simply disengage the TCAP from the AT by severing the connection (e.g., turning power off, physically pulling the device off the AT, turning off wireless transmissions, and/or the like). It should be noted that such abrupt severing may result in the loss of data, file corruption, etc. if the TCAP has not saved data that is on the AT or on some remote server, however, if the TCAP is employing flash like memory, its contents should remain intact.

If there is no instruction signal to terminate the TCAP 235, execution will continue and the TCAP will continue to take and look for input from the user. Of course if the TCAP has been set to perform certain actions, those actions will continue to execute, and the TCAP may respond to remote servers when it is communicating with them through the AT. When the user issues a terminate signal 235, then the TCAP will shut down by saving any data to the TCAP that is in the AT's memory and then terminating any programs executing on both the AT and TCAP that were executed by and/or from the TCAP 240. If no activities are taking place on the AT and all the data is written back to the TCAP 240, then the TCAP may optionally unmount itself from the AT's file-system 245. At this point, if there is a TCAP I/O driver executing on the AT, that driver may be terminated as triggered by the absence of the TCAP at a mount point 250. After the TCAP is unmounted and/or the TCAP I/O driver is terminated, it is safe to disengage the TCAP from the AT.

TCAP and AT Interaction

FIG. 3 illustrates embodiments engaging the tunneling client access point to an access terminal interaction. Examples of engaging the TCAP 301 with an AT were discussed above in FIG. 1 127, 130, 133a and FIG. 2 201. In one embodiment, the TCAP 130 is engaged with an access terminal 327, 305. As mentioned in FIG. 1, the TCAP is capable of engaging with ATs using a number of mechanisms. In one embodiment, the TCAP has a USB connector for plugging into an AT, which acts as a conduit for power and data transfer. In one embodiment, the TCAP may use Bluetooth to establish a wireless connection with a number of ATs. In another embodiment, the TCAP may employ WiFi. In yet another embodiment, the TCAP may employ multiple communications mechanisms. It should be noted, with some wireless mechanisms like Bluetooth and WiFi, simply coming into proximity with an AT that is configured for such wireless communication may result in the TCAP engaging with and establish a communications link with the AT. In one embodiment, the TCAP has a "connect" button that will allow such otherwise automatically engaging interactions take place only if the "connect" button is engaged by a user. Such an implementation may provide greater security for users (see FIG. 10 for more details on the TCAP).

After being engaged 305, the TCAP will then power on. In an embodiment requiring a direct connection, e.g., USB, simply plugging the TCAP into the AT provides power. In a wireless embodiment, the TCAP may be on in a lower powered state or otherwise turned on by engaging the connect button as discussed above. In such an embodiment, the TCAP can employ various on-board power sources (see FIG. 10 for more details on the TCAP). The TCAP then may load its own operating system 315. The operating system can provide for interaction with the AT. In one embodiment, a Java runtime is executed on the TCAP, and Java applets communicate with the AT through Java APIs. In another embodiment, a driver is loaded onto the AT, and the on-TCAP Java operating system

applets communicate to and through the AT via the driver running on the AT, wherein the driver provides an API through and to which messages may be sent.

After engaging with the AT, the TCAP can provide its memory space to the AT 320. In one embodiment, the TCAP's memory is mapped and mounted as a virtual disk drive 125 storage 325. In this manner, the TCAP may be accessed and manipulated as a standard storage device through the AT's operating system. The TCAP and in some cases the AT can determine if the AT is capable of accessing program instructions stored in the TCAP's memory 330. In one embodiment, the AT's operating system looks to auto-run a specified file from any drive as it mounts. In such an embodiment, the TCAP's primary interface may be specified in such a boot sequence. For example, under windows, an autorun.inf file can specify the opening of a program from the TCAP by the AT; e.g., OPEN=TCAP.EXE.

Many operating systems are capable of at least accessing the TCAP as a USB memory drive 330 and mounting its contents as a drive, which usually becomes accessible in file browsing window 125. If the TCAP does not mount, the AT's operating system will usually generate an error informing the user of a mounting problem. If the AT is not capable of executing instruction from the TCAP, a determination is made if an appropriate driver is loaded on the AT to access the TCAP 335. In one embodiment, the TCAP can check to see if an API is running on the AT. For example, the TCAP provide an executable to be launched, e.g., as specified through auto-run.inf, and can establish communications through its connection to the AT. e.g., employing TCP/IP communications over the USB port. In such an embodiment, the TCAP can ping the AT for the program, and if an acknowledgement is received, the TCAP has determined that proper drivers and APIs exist. If no such API exists, the TCAP may launch a driver installation program for the AT as through an autorun-.inf. In an alternative embodiment, if nothing happens, a user may double click onto an installer program that is stored on the mounted TCAP 342, 340. It should be noted, that although the TCAP's memory space may be mounted, certain areas of the TCAP may be inaccessible until there is an authorization. For example, certain areas and content on the TCAP may be encrypted. It should be noted that any such access terminal modules that drive AT and TCAP interaction may be saved onto the TCAP by copying the module to a mounted TCAP. Nevertheless, if the AT is capable of accessing program instructions in TCAP memory 330, a TCAP driver is loaded on the AT 335, and/or the user engages a program in the TCAP memory 340, then the AT can execute program instructions from the TCAP's memory, which allows the TCAP to use the AT's I/O and allowing the user to interface with TCAP facilities 345. It should be noted that some ATs may not be able to mount the TCAP at all. In such an instance, the user may have to install the TCAP drivers by downloading them from a server on the Internet, loading them from a diskette or CD, and/or the like. Once the TCAP is engaged to the AT 301, execution may continue 398.

TCAP and AT Interaction

FIG. 4 illustrates embodiments accessing the tunneling client access point and server through an access terminal. Upon engaging the TCAP to the AT as described in FIG. 3 301, 398, the user may then go on to access the TCAP and its services 498. It should be noted that users may access certain unprotected areas of the TCAP once it has been mounted, as described in FIG. 3. However, to more fully access the TCAP's facilities, the user may be prompted to either login and/or registration window 205a to access the TCAP and its services, which may be displayed on the AT 405. It is impor-

tant to note that in one embodiment, the execution of the login and/or registration routines are handled by the TCAP's processor. In such an embodiment, the TCAP may run a small Web server providing login facilities, and connect to other Web based services through the AT's connection to the Internet. Further, the TCAP may employ a basic Web browsing core engine by which it may connect to Web services through the AT's connection to a communications network like the Internet. For purposes of security, in one embodiment, the TCAP may connect to a remote server by employing a secure connection, e.g., HTTPS, VPN, and/or the like.

Upon displaying a login window 405, e.g., 205a, the user may select to register to access the TCAP and its services, or they may simply log in by providing security verification. In one example, security authorization may be granted by simply providing a user and password as provided through a registration process. In another embodiment, authorization may be granted through biometric data. For example, the TCAP may integrate a fingerprint and/or heat sensor IC into its housing. Employing such a device, and simply by providing one's finger print by laying your finger to the TCAP's surface, would provide the login facility with authorization if the user's finger print matches one that was stored during the registration process.

If the user does not attempt to login 415, i.e., if the user wishes to register to use the TCAP and its services, then the TCAP can determine if the AT is online 420. This may be accomplished in a number of ways. In one embodiment, the TCAP itself may simply ping a given server and if acknowledgement of receipt is received, the TCAP is online. In another embodiment, the TCAP can query for online status by engaging the AT through the installed APIs. If the AT is not online, then the user may be presented with an error message 425. Thus, if a user does not have a login, and does not have the ability to register, then restricted areas of the TCAP will remain unavailable. Thereafter, flow can continue 498 and the user may have another opportunity to login and/or register. In one embodiment as a login integrity check, the TCAP keeps track of the number of failed attempts to login and/or register and may lock-out all further access if a specified number of failed attempts occurs. In one embodiment, the lockdown may be permanent by erasing all data on the TCAP. In another embodiment, the TCAP will disallow further attempts for a specified period of time.

If the user is attempting to register 415, and the AT is online 420, then the user map provide registration information 440 into a screen form 440a. Registration information fields may require a user's name, address, email address, credit card information, biometric information (e.g., requiring the user to touch a biometric fingerprint IC on the TCAP), and/or the like. The TCAP may determine if all the information was provided as required for registration and may query backend servers to determine if the user information is unique 445. If the user did not properly fill out the registration information or if another user is already registered, the TCAP can provided an error message to such effect. Also, both the TCAP and its back-end servers may make log entries tracking such failed attempts for purposes of defending against fraud and/or security breaches. The user may then modify the registration information 440 and again attempt to register. Similarly to the login integrity checks, the TCAP can lockout registration attempts if the user fails to register more than some specified number of times.

Upon providing proper registration information 445 or proper login authentication 415, the TCAP can query backend servers to see if the user is registered. In one embodiment, such verification may be achieved by sending a query to the

servers to check its database for the authorization information and/or for duplicate registrations. The servers would then respond providing an acknowledgment of proper registration and authorization to access data on the backend servers. If the users are not registered on the backend servers 430, then the TCAP can provide an error message to the user for display on the AT to such effect 435. In an alternative embodiment, the registration information may be stored on the TCAP itself. In one embodiment, the registration would be maintained in encrypted form. Thus, the user's login information may be checked relative to the information the TCAP itself, and if there is a match, access may be granted, otherwise an error message will be displayed 435. The TCAP may then continue 498 to operate as if it were just engaged to the AT.

If the user is confirmed to be registered 430, then the TCAP may provide options for display 453, 453a. Depending on the context and purpose of a particular TCAP, the options may vary. For example, the a screen 453a may provide the user with the options to access data either online or offline. The user might simply click on a button and gain secure access to such data that may be decrypted by the TCAP. In one embodiment, the TCAP will determine if the AT is online 455. If this was already determined 420, this check 455 may be skipped.

If the AT is online 455, optionally, the TCAP determines if the user wishes to synchronize the contents of the TCAP with storage facilities at the backend server 470. In one embodiment, the user may designate that such synchronization is to always take place. If synchronization is specified 470, then the TCAP will provide and receive updated data to and from the backend servers, overwriting older data with updated versions of the data 475. If the AT is online 455 and/or after any synchronization 475, the TCAP may provide the user with all of its service options as authorized by the account and programs available on the TCAP and at the backend server 480. Once again, these facilities, programs, and/or services may vary greatly depending on the context and deployment requirements of the user. The options to be presented to the user from the TCAP or the TCAP services from the backend server, as displayed through the TCAP onto the AT's display 480, are myriad and some example embodiments are provided in FIGS. 5-8. Upon presenting the user with the options, the user is then able to access, execute, store data and programs on the TCAP and on the remote server 485. All areas of the TCAP and services are then open, including any encrypted data areas.

If the AT is not online 455, the TCAP may provide options for the user not including online services 460. In one embodiment, the online options that may be presented on the AT display will be dimmed and/or omitted to reflect the lack of accessibility. However, the user will be able to access, execute, store data and programs on the TCAP, including any encrypted data areas 465.

TCAP Facilities and Services

FIGS. 5-8 illustrate embodiments of facilities, programs, and/or services that the tunneling client access point and server may provide to the user as accessed through an AT. Any particular set of facilities may have a myriad of options. The options and the general nature of the facilities provided on any particular TCAP are dependant upon the requirements of a given set of users. For example, certain groups and or agencies may require TCAPS to be targeted towards consumer photographs, and may employ TCAPs to further that end. Other groups may require high security facilities, and tailor the TCAPs accordingly. In various environments, an organization may wish to provide a secure infrastructure to all of its agents for securely accessing the organization's data from anywhere and such an organization could tailor the TCAPs

contents to reflect and respond to its needs. By providing a generalized infrastructure on the TCAP backend servers and within the TCAP by using a generalized processor, the TCAPs may be deployed in numerous environments.

In one particular embodiment as in FIG. 5, the TCAP provides facilities to access, process, and store email, files, music, photos and videos through the TCAP. Upon engaging 101 of FIG. 1 the TCAP 130 to an AT 307, the TCAP will mount and display through the AT's file browser window 125 of FIG. 1. As has already described, in the case where the AT has no TCAP driver software, the user may double click on the installer software stored on the TCAP 507. Doing so will launch the installer software from the TCAP's memory to execute on the AT, and the user may be presented with a window to confirm the desire to install the TCAP software onto the AT 507. Upon confirming the install 507, the software will install on the AT and the user will be asked to wait as they are apprised of the install progress 509.

Upon installation, the TCAP front-end software may execute and present the user with various options in various and fanciful display formats 511, 460, 480 of FIG. 4. In one embodiment, these user interfaces and programs are Java applications that may execute on the AT and a present Java runtime. In an alternative embodiment, a small applet may run on the AT, but all other activities may execute on the TCAP's processor, which would use the AT display only as a display terminal. In the embodiment where the TCAP executes program instructions, the TCAP may be engaged to receive commands and execute by receiving a signal from the access terminal driver instructing it to execute certain program files or, alternatively, looking to default location and executing program instructions. In yet another embodiment, the TCAP may obtain updated interfaces and programs from a backend server for execution either on the TCAP itself and/or the AT; this may be done by synchronization with the backend server and checking for updates of specified files at the backend server. By engaging the user interface, perhaps by clicking on a button to open the TCAP facilities and services 511, the interface may further unfurl to present options to access said facilities and services 513. Here, the interface may reflect ownership of the TCAP by providing a welcome screen and showing some resources available to the user; for example, a button entitled "My Stuff" may serve as a mechanism to advance the user to a screen where they may access their personal data store. At this point the user may attempt to login to access their data by engaging an appropriate button, which will take them to a screen that will accept login information 519. Alternatively, the user may also register if it is their first time using the TCAP by selecting an appropriate button, which will advance the user to a registration screen 515 wherein the user may enter their name, address, credit card information, etc. Upon successfully providing registration information, the user may be prompted for response to further solicitations on a follow-up screen 517. For example, depending on the services offered for a particular TCAP, the user may be provided certain perks like 5 MB of free online storage on a backend server, free photographic prints, free email access, and/or the like 517.

After the user is prompted to login 518 and successfully provides proper login information 519, or after successfully registering 515 and having responded to any solicitations 517, the user may be provided with general options 521 to access data stored on the TCAP itself 522 or in their online account 520 maintained on a backend server. For example, if the user selects the option to access their online storage 520, they may be presented with more options to interact with email, files, music, photos and videos that are available online

523. Perhaps if the user wished to check their email, the user might select to interact with their email, and a screen allowing them to navigate through their email account(s) would be presented 525. Such online access to data may be facilitated through http protocols whereby the TCAP applications send and receive data through http commands across a communications network interacting with the backend servers and/or other servers. Any received results may be parsed and imbedded in a GUI representation of a Java application. For example, the email facility may run as a Java applet 525 and may employ a POP mail protocol to pull data from a specified mail server to present to the user.

Similarly, many other facilities may be engaged by the user through the TCAP. In one embodiment, the user may drag 508 a file 506 onto a drag-and-drop zone 505 that is presented on the TCAP interface. Upon so doing, various drag-and-drop options may unfurl and present themselves to the user 550. It should be noted that the file may come from anywhere, i.e., from the AT, the TCAP, and/or otherwise. For example, upon dragging and dropping a graphics file, a user may be prompted with options to order prints, upload the file to an online storage space, save the file to the TCAP's memory space, cancel the action, and/or the like 550. If the user sends the file for storage, or otherwise wishes to see and manage their data, an interface allowing for such management may be presented 555. The interface may organize and allow access to general data, picture, and music formats 554, provide usage statistics (e.g., free space, capacity, used space, etc.) 553, provide actions to manipulate and organize the data 552, provide status on storage usage on the TCAP 551 and online 549, and/or the like.

Should the user engage a user interface element indicating the wish to manipulate their picture data 548, the TCAP interface will update to allow more specific interaction with the user's photos 557. In such a screen, the user may select various stored pictures and then indicate a desire to order photo prints by engaging the appropriate user interface element 558. Should the user indicate their desire for prints 558, they will be presented with an updated interface allowing the specification of what graphics files they wish to have printed 559. In one embodiment, the users may drag-and-drop files into a drop zone, or otherwise engage file browsing mechanisms 560 that allow for the selection of desired files. Upon having identified the files for prints 559, a user may be presented with an interface allowing for the selection of print sizes and quantities 561. After making such specifications, the user may be required to provide shipping information 563 and information for payments 565. After providing the billing information to a backend server for processing and approval, the user may be presented with a confirmation interface allowing for editing of the order, providing confirmation of costs, and allowing for submission of a final order for the selected prints 567. Upon submitting the order, the TCAP will process the files for spooling to a backend server that will accept the order and files, which will be developed as prints and the user's account will be charged accordingly. In one embodiment, all of the above order and image processing operations occur and execute on the TCAP CPU. For example, the TCAP may employ various rendering technologies, e.g., ghostscript, to allow it to read and save PDFs and other media formats.

FIG. 6 goes on to illustrate embodiments and facets of the facilities of FIG. 5. The TCAP interface allows the user to perform various actions at any given moment. As has already been discussed in FIG. 5, the user may drag 508 a file 506 onto a drag and drop zone 505 so as to provide the file to the TCAP for further manipulation. As in 550 of FIG. 5, the user may be

JX-349-0024

presented with various options subsequent to a drag-and-drop operation. Also, the TCAP interface may provide visual feedback that files have been dropped in the drop zone by highlighting the drop zone 505b. Should the user wish, they may close the TCAP interface by engaging a close option 633. Also, the ability to change and/or update their personal information may be accessed through the TCAP interface 616, which would provide a form allowing the user to update their registration information 630. In one embodiment, should the user forget their login information, they may request login help 635 and the TCAP will send their authorization information to the last known email address and inform the user of same 640. Also, the TCAP interface may provide help facilities that may be accessed at any time by simply engaging a help facility user interface element 617. So doing will provide the user with help screen information as to how to interact with the TCAP's facilities 625.

Upon providing proper login information 619 and logging-in 619, the user may be presented with a welcome screen with various options to access their data 621 as has already been discussed in FIG. 5, 521. By engaging a user interface element to access online storage 620, the user may be presented with various options to interact with online storage 623, 523 of FIG. 5. Should the user wish to interact with data on the TCAP itself, the user may indicate so by engaging the appropriate user interface option 622. So doing will provide the user with further options related to data stored on the TCAP 655. The user may engage an option to view the storage contents 658 and the TCAP interface will provide a listing of the contents 662, which may be manipulated through selection and drag-and-drop operations with the files.

In one embodiment, the user may order prints of photos 657 from files that are on the TCAP itself. As discussed in FIG. 5, the user may select files for which they desire prints 660. Here, the selected files will first be processed by the TCAP in preparation for sending to backend servers and file manipulations 670. The user may specify various attributes regarding the prints they desire, e.g., the size, number, cropping, red-eye correction, visual effects, and/or the like 661. In one embodiment, such processing occurs on the TCAP processor, while in other embodiments such processing can take place on the AT or backend server. Once again, the user may provide a shipping address 663, and make a final review to place the order 667. Upon committing to the order 667, the processed files are uploaded to the backend servers that will use the files to generate prints 690. A confirmation screen may then be provided to the user with an order number and other relevant information 695.

FIG. 7 goes on to illustrate embodiments and facets of the facilities of FIGS. 5-6 as may apply in different environments. As is demonstrated, the look and feel of the TCAP interface is highly malleable and can serve in many environments. FIG. 7 illustrates that even within a single organization, various environments might benefit from TCAPs and services tailored to serve such environments 733b-d. In this case TCAPs can serve in consumer 733b, industry trade 733c, corporate 733d, and/or the like environments.

As has already been discussed, initially in any of the environments, after engaging the TCAP to an AT, the user may be prompted to install the TCAP interface 705 and informed of the installation procedure 710. The user may then be presented with the installed TCAP interface 715, which may be activated by engaging an interface element to unfurl the interface, e.g., in this case by opening the top to a can of soda 717. Opening the interface will present the user with various options as 720, as has already been discussed in FIGS. 5-6. Similarly the user may login 725 or make a selection to

register for various TCAP services and provide the requisite information in the provided form 730. Upon registering and/or logging-in 725, various options may be presented based upon the configuration of the TCAP. For example, if the TCAP was configured and tailored for consumers, then upon logging in 725 the consumer user might be presented 733a-b with various consumer related options 740. Similarly, if the TCAP were tailored for 733a, c the trade industry or 733a, d the corporate environment, options specific to the trade industry 770 and corporate environment 760 may be presented.

In one embodiment, an organization wishing to provide TCAPs to consumers might provide options 740 for free music downloads 743, free Internet radio streaming 748, free news (e.g., provided through an RSS feed from a server) 766, free photo printing 750, free email 740, free coupons 742, free online storage 741, and/or the like. Users could further engage such services (e.g., clicking free music file links for downloading to the TCAP, by ordering prints 750, etc. For example, the user may select files on the TCAP 750, select the types of photos they would like to receive 752, specify a delivery address 754, confirm the order 756 all of which will result in the TCAP processing the files and uploading them to the backend servers for generation of prints (as has already been discussed in FIGS. 5-6).

In another embodiment, an organization wishing to provide TCAPs to a trade industry might provide options 770 for advertising 780, events 775, promotions 772, and/or the like. It is important to note that information regarding such options may be stored either on the TCAP or at a backend server. In one embodiment, such information may be constantly synchronized from the backend servers to the TCAPs. This would allow an organization to provide updates to the trade industry to all authorized TCAP "key holders." In such an embodiment, the user may be presented with various advertising related materials for the organization, e.g., print, television, outdoor, radio, web, and/or the like 780. With regard to events, the user may be presented with various related materials for the organization, e.g., trade shows, music regional, sponsorship, Web, and/or the like 775. With regard to promotions, the user may be presented with various related materials for the organization, e.g., rebates, coupons, premiums, and/or the like 772.

In another embodiment, an organization wishing to provide TCAPs to those in the corporate environment and might provide options relating to various corporate entities 760. Selecting any of the corporate entities 760 may provide the user with options to view various reports, presentations, and/or the like, e.g., annual reports, 10K reports, and/or the like 765. Similarly, the reports may reside on the TCAP and/or the corporate TCAP can act as a security key allowing the user to see the latest corporate related materials from a remote backend server.

FIG. 8 goes on to illustrate embodiments and facets of the facilities of FIGS. 5-7 as may apply in different environments. FIG. 8 illustrates that TCAPs may serve to provide heightened security to any environment. As has been discussed in previous figures, users may engage the TCAP interface 805 to access various options 810. The TCAP interface is highly adaptable and various services may be presented within it. For example, a stock ticker may be provided as part of the interface in a financial setting 810. Any number of live data feeds may dynamically update on the face of the interface. Upon logging-in 815 or registering a new account 820, the user may be informed that communications that are taking place are secured 825. In one embodiment, various encryption formats may be used by the TCAP to send information securely to the backend servers. It is important to note that in such an

embodiment, even if data moving out of the TCAP and across the AT were captured at the AT, such data would not be readable because the data was encrypted by the TCAP's processor. As such, the TCAP acts as a "key" and provides a plug-and-play VPN to users. Such functionality, heretofore, has been very difficult to set up and/or maintain. In this way, all communications, options presented and views of user data are made available only to the TCAP with the proper decryption key. In heightened security environments, display of TCAP data is provided on the screen only in bitmapped format straight to the video memory of the AT and, therefore, is not stored anywhere else on the AT. This decreases the likelihood of capturing sensitive data. As such, the user may access their data on the TCAP and/or online 830 in a secure form whereby the user may navigate and interact with his/her data and various services 835 in a secure manner.

Tunneling Client Access Point Server Controller

FIG. 9 illustrates one embodiment incorporated into a tunneling client access point server (TCAPS) controller 901. In this embodiment, the TCAP controller 901 may serve to process, search, serve, identify, instruct, generate, match, and/or update data in conjunction with a TCAP (see FIG. 10 for more details on the TCAP). TCAPS act as backend servers to TCAPs, wherein TCAPS provide storage and/or processing resources to great and/or complex for the TCAP to service itself. In effect, the TCAPS transparently extend the capacity of a TCAP.

In one embodiment, the TCAPS controller 901 may be connected to and/or communicate with entities such as, but not limited to: one or more users from user input devices 911; peripheral devices 912; and/or a cryptographic processor device 928. The TCAPS controller may even be connected to and/or communicate with a cryptographic processor device 928.

A TCAPS controller 901 may be based on common computer systems that may comprise, but are not limited to, components such as: a computer systemization 902 connected to memory 929.

Computer Systemization

A computer systemization 902 may comprise a clock 930, central processing unit (CPU) 903, a read only memory (ROM) 906, a random access memory (RAM) 905, and/or an interface bus 907, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus 904. Optionally, a cryptographic processor 926 may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. The clock is typically coupled to the system bus and various clock multipliers that will increase or decrease the base operating frequency for other components interconnected in the computer systemization. The clock and various components in a computer systemization drive signals embodying information throughout the system. Such transmission and reception of signals embodying information throughout a computer systemization may be commonly referred to as communications. These communicative signals may further be transmitted, received, and the cause of return and/or reply signal communications beyond the instant computer systemization to: communications networks, input devices, other computer systemizations, peripheral devices, and/or the like. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one high-speed data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a microprocessor such as AMD's Athlon, Duron and/or Opteron; IBM

and/or Motorola's PowerPC; Intel's Celeron, Itanium, Pentium and/or Xeon; and/or the like processor(s). The CPU interacts with memory through signal passing through conductive conduits to execute stored program code according to conventional data processing techniques. Such signal passing facilitates communication within the TCAPS controller and beyond through various interfaces. Should processing requirements dictate a greater amount speed, mainframe and super computer architecture may similarly be employed.

Interface Adapters

Interface bus(ses) 907 may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) 908, storage interfaces 909, network interfaces 910, and/or the like. Optionally, cryptographic processor interfaces 927 similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. Interface adapters conventionally connect to the interface bus via a slot architecture. Conventional slot architectures may be employed, such as, but not limited to: Accelerated Graphics Port (AGP), Card Bus, (Extended) Industry Standard Architecture ((E)ISA), Micro Channel Architecture (MCA), NuBus, Peripheral Component Interconnect (Extended) (PCI(X)), Personal Computer Memory Card International Association (PCMCIA), and/or the like.

Storage interfaces 909 may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices 914, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to: (Ultra) (Serial) Advanced Technology Attachment (Packet Interface) ((Ultra) (Serial) ATA(PI)), (Enhanced) Integrated Drive Electronics ((E)IDE), Institute of Electrical and Electronics Engineers (IEEE) 1394, fiber channel, Small Computer Systems Interface (SCSI), Universal Serial Bus (USB), and/or the like.

Network interfaces 910 may accept, communicate, and/or connect to a communications network 913. Network interfaces may employ connection protocols such as, but not limited to: direct connect, Ethernet (thick, thin, twisted pair 10/100/1000 Base T, and/or the like), Token Ring, wireless connection such as IEEE 802.11a-x, and/or the like. A communications network may be any one and/or the combination of the following: a direct interconnection; the Internet; a Local Area Network (LAN); a Metropolitan Area Network (MAN); an Operating Missions as Nodes on the Internet (OMNI); a secured custom connection; a Wide Area Network (WAN); a wireless network (e.g., employing protocols such as, but not limited to a Wireless Application Protocol (WAP), I-mode, and/or the like); and/or the like. A network interface may be regarded as a specialized form of an input output interface. Further, multiple network interfaces 910 may be used to engage with various communications network types 913. For example, multiple network interfaces may be employed to allow for the communication over broadcast, multicast, and/or unicast networks. Input Output interfaces (I/O) 908 may accept, communicate, and/or connect to user input devices 911, peripheral devices 912, cryptographic processor devices 928, and/or the like. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); audio: analog, digital, monaural, RCA, stereo, and/or the like; IEEE 1394a-b; infrared; joystick; keyboard; midi; optical; PC AT; PS/2; parallel; radio; serial; USB; video interface: BNC, composite, digital, Digital Visual Interface (DVI), RCA, S-Video, VGA,

and/or the like; wireless; and/or the like. A common output device is a video display, which typically comprises a Cathode Ray Tube (CRT) or Liquid Crystal Display (LCD) based monitor with an interface (e.g., DVI circuitry and cable) that accepts signals from a video interface. The video interface composites information generated by a computer systemization and generates video signals based on the composited information in a video memory frame. Typically, the video interface provides the composited video information through a video connection interface that accepts a video display interface (e.g., a DVI connector accepting a DVI display cable).

User input devices 911 may be card readers, dongles, finger print readers, gloves, graphics tablets, joysticks, keyboards, mouse (mice), trackballs, trackpads, retina readers, and/or the like.

Peripheral devices 912 may be connected and/or communicate to I/O and/or other facilities of the like such as network interfaces, storage interfaces, and/or the like. Peripheral devices may be audio devices, cameras, dongles (e.g., for copy protection, ensuring secure transactions with a digital signature, and/or the like), external processors (for added functionality), goggles, microphones, monitors, network interfaces, printers, scanners, storage devices, video devices, visors, and/or the like.

It should be noted that although user input devices and peripheral devices may be employed, the TCAPS controller may be embodied as an embedded, dedicated, and/or headless device, wherein access would be provided over a network interface connection.

Cryptographic units such as, but not limited to, microcontrollers, processors 926, interfaces 927, and/or devices 928 may be attached, and/or communicate with the TCAPS controller. A MC68HC11 microcontroller, commonly manufactured by Motorola Inc., may be used for and/or within cryptographic units. Equivalent microcontrollers and/or processors may also be used. The MC68HC16 microcontroller utilizes a 16-bit multiply-and-accumulate instruction in the 16 MHz configuration and requires less than one second to perform a 512-bit RSA private key operation. Cryptographic units support the authentication of communications from interacting agents, as well as allowing for anonymous transactions. Cryptographic units may also be configured as part of CPU. Other commercially available specialized cryptographic processors include VLSI Technology's 33 MHz 6868 or Semaphore Communications' 40 MHz Roadrunner 184.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory 929. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAPS controller and/or a computer systemization may employ various forms of memory 929. For example, a computer systemization may be configured wherein the functionality of on-chip CPU memory (e.g., registers), RAM, ROM, and any other storage devices are provided by a paper punch tape or paper punch card mechanism; of course such an embodiment would result in an extremely slow rate of operation. In a typical configuration, memory 929 will include ROM 906, RAM 905, and a storage device 914. A storage device 914 may be any conventional computer system storage. Storage devices may include a drum; a (fixed and/or removable) magnetic disk drive; a magneto-optical drive; an optical drive (i.e., CD ROM/RAM/Recordable (R), ReWritable (RW), DVD

R/RW, etc.); and/or other devices of the like. Thus, a computer systemization generally requires and makes use of memory.

Module Collection

The memory 929 may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) 915 (operating system); information server module(s) 916 (information server); user interface module(s) 917 (user interface); Web browser module(s) 918 (Web browser); database(s) 919; cryptographic server module(s) 920 (cryptographic server); TCAPS module(s) 935; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device 914, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through a communications network, ROM, various forms of memory, and/or the like.

Operating System

The operating system module 915 is executable program code facilitating the operation of a TCAPS controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the like. The operating system may be a highly fault tolerant, scalable, and secure system such as Apple Macintosh OS X (Server), AT&T Plan 9, Be OS, Linux, Unix, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Apple Macintosh OS, Microsoft DOS, Palm OS, Windows 2000/2003/3.1/95/98/CE/Millenium/NT/XP (Server), and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself, and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAPS controller to communicate with other entities through a communications network 913. Various communication protocols may be used by the TCAPS controller as a subcarrier transport mechanism for interaction, such as, but not limited to: multicast, TCP/IP, UDP, unicast, and/or the like.

Information Server

An information server module 916 is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, Microsoft's Internet Information Server, and/or the. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective−) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction

**17**

with other program modules. After a Domain Name System (DNS) resolution portion of an HTTP request is resolved to a particular information server, the information server resolves requests for information at specified locations on a TCAPS controller based on the remainder of the HTTP request. For example, a request such as http://123.124.125.126/myInformation.html might have the IP portion of the request "123.124.125.126" resolved by a DNS server to an information server at that IP address; that information server might in turn further parse the http request for the "/myInformation.html" portion of the request and resolve it to a location in memory containing the information "myInformation.html." Additionally, other information serving protocols may be employed across various ports, e.g., FTP communications across port **21**, and/or the like. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAPS database **919**, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAPS database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through inter-application communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAPS as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module **917** is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communi-

**18**

nicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module **918** is stored program code that is executed by the CPU. The Web browser may be a conventional hypertext viewing application such as Microsoft Internet Explorer or Netscape Navigator. Secure Web browsing may be supplied with 128 bit (or greater) encryption by way of HTTPS, SSL, and/or the like. Some Web browsers allow for the execution of program modules through facilities such as Java, JavaScript, ActiveX, and/or the like. Web browsers and like information access tools may be integrated into PDAs, cellular telephones, and/or other mobile devices. A Web browser may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the Web browser communicates with information servers, operating systems, integrated program modules (e.g., plug-ins), and/or the like; e.g., it may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAPS enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAPS Database

A TCAPS database module **919** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program code portion configuring the CPU to process the stored data. The database may be a conventional, fault tolerant, relational, scalable, secure database such as Oracle or Sybase. Relational databases are an extension of a flat file. Relational databases consist of a series of related tables. The tables are interconnected via a key field. Use of the key field allows the combination of the tables by indexing against the key field; i.e., the key fields act as dimensional pivot points for combining information from various tables. Relationships generally identify links maintained between tables by matching primary keys. Primary keys represent fields that uniquely identify the rows of a table in a relational database. More precisely, they uniquely identify rows of a table on the "one" side of a one-to-many relationship.

Alternatively, the TCAPS database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. In another alternative, an object-oriented database may be used, such as Frontier, ObjectStore, Poet, Zope, and/or the like. Object databases can include a number of object collections that are grouped and/or linked together by common attributes; they may be related to other object collections by some common attributes. Object-oriented databases perform similarly to relational databases with the exception that objects are not just pieces of data but may have other types of functionality encapsulated within a given object. If the TCAPS database is implemented as a data-structure, the use of the TCAPS database may be integrated into another module such as the TCAPS module. Also, the database may be implemented as a mix of data structures, objects, and relational structures. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentral-

ized and/or integrated. In one embodiment, the database module **919** includes three tables **919***a*-*c*. A user accounts table **919***a* includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then expire once a specified date has been reached. An user data table **919***b* includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. A user programs table **919***c* includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. In one embodiment, user programs may contain various user interface primitives, which may serve to update TCAPs. Also, various accounts may require custom database tables depending upon the environments and the types of TCAPs a TCAPS may need to serve. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database modules **919***a*-*c*. The TCAPS may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAPS database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS database communicates with a TCAPS module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module **920** is stored program code that is executed by the CPU **903**, cryptographic processor **926**, cryptographic processor interface **927**, cryptographic processor device **928**, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. Employing such encryption security protocols, the TCAPS may encrypt all incoming and/or outgoing communications and may serve as

node within a virtual private network (VPN) with a wider communications network. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAPS module to engage in secure transactions if so desired. The cryptographic module facilitates the secure accessing of resources on TCAPS and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

TCAPS

A TCAPS module **935** is stored program code that is executed by the CPU. The TCAPS affects accessing, obtaining and the provision of information, services, transactions, and/or the like across various communications networks. The TCAPS enables TCAP users to simply access data and/or services across a communications network in a secure manner. The TCAPS extends the storage and processing capacities and capabilities of TCAPs. The TCAPS coordinates with the TCAPS database to identify interassociated items in the generation of entries regarding any related information. A TCAPS module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective-) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAPS server employs a cryptographic server to encrypt and decrypt communications. A TCAPS module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAPS module communicates with a TCAPS database, operating systems, other program modules, and/or the like. The TCAPS may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAPS node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous

JX-349-0029

        

nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAPS controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D)COM), (Distributed) Object Linking and Embedding ((D)OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

Tunneling Client Access Point Controller

FIG. 10 illustrates one embodiment incorporated into a tunneling client access point (TCAP) controller 1001. Much of the description of the TCAPS of FIG. 9 applies to the TCAP, and as such, the disclosure focuses more upon the variances exhibited in the TCAP. In this embodiment, the TCAP controller 1001 may serve to process, store, search, identify, instruct, generate, match, and/or update data within itself, at a TCAPS, and/or through an AT.

The first and foremost difference between the TCAP and the TCAPS is that the TCAP is very small as was shown 130 of FIG. 1. The TCAP may be packaged in plugin sticks, often, smaller than the size of a human thumb. In one embodiment, a TCAP may be hardened for military use. In such an embodiment, the shell 1001 may be composed of metal, and/or other durable composites. Also, components within may be shielded from radiation.

In one embodiment, the TCAP controller 1001 may be connected to and/or communicate with entities such as, but not limited to: one or more users from an access terminal 1011b. The access terminal itself may be connected to peripherals such as user input devices (e.g., keyboard 1012a, mouse 1012b, etc.); and/or a communications network 1013 in manner similar to that described in FIG. 9.

A TCAP controller 1001 may be based on common computer systems components that may comprise, but are not limited to, components such as: a computer systemization 1002 connected to memory 1029. Optionally, the TCAP controller 1001 may convey information 1058, produce output through an output device 1048, and obtain input from control device 1018.

Control Device

The control device 1018 may be optionally provided to accept user input to control access to the TCAP controller. In one embodiment, the control device may provide a keypad 1028. Such a keypad would allow the user to enter passwords, personal identification numbers (PIN), and/or the like.

In an alternative embodiment, the control device may include a security device 1038. In one embodiment, the security device is a fingerprint integrated circuit (fingerprint IC) that provides biometric fingerprint information such as, but not limited to AuthenTec Inc.'s FingerLoc™ AF-S2™. Either a fingerprint IC and/or other biometric device will provide biometric validation information that may be used to confirm the identity of a TCAP user and ensure that transactions are legitimate. In alternative embodiments, a simple button, heat sensor, and/or other type of user input functionality may be provided solely and/or in concert with other types of control device types. The control device may be connected to the I/O interface, the system bus, or the CPU directly.

The output device 1048 is used to provide status information to the user. In one alternative embodiment, the output device is an LCD panel capable of providing alpha numeric and/or graphic displays. In an alternative embodiment, the output device may be a speaker providing audible signals indicating errors and/or actually streaming information that is audible to the user, such as voice alerts. The output device may be connected to the I/O interface, the system bus, or the CPU directly.

The conveyance information 1058 component of the TCAP controller may include any number of indicia representing the TCAP's source on the cover 1001. Source conveying indicia may include, but is not limited to: an owner name 1059 for readily verifying a TCAP user; a photo of the owner 1060 for readily verifying a TCAP controller owner; mark designating the source that issued the TCAP 1061, 1001 such as a corporate logo, and/or the like; fanciful design information 1062 for enhancing the visual appearance of the TCAP; and/or the like. It should be noted that the conveyance information 11421 may be positioned anywhere on the cover 1189.

Computer Systemization

A computer systemization 1002 may comprise a clock 1030, central processing unit (CPU) 1003, a read only memory (ROM) 1006, a random access memory (RAM) 1005, and/or an interface bus 1007, and most frequently, although not necessarily, are all interconnected and/or communicating through a system bus 1004. Optionally, the computer systemization may be connected to an internal power source 1086. Optionally, a cryptographic processor 1026 may be connected to the system bus. The system clock typically has a crystal oscillator and provides a base signal. Of course, any of the above components may be connected directly to one another, connected to the CPU, and/or organized in numerous variations employed as exemplified by various computer systems.

The CPU comprises at least one low-power data processor adequate to execute program modules for executing user and/or system-generated requests. The CPU may be a micropro-

23                                                    24

cessor such as ARM's Application Cores, Embedded Cores, Secure Cores; Motorola's DragonBall; and/or the like processor(s).

Power Source

The power source **1086** may be of any standard form for powering small electronic circuit board devices such as but not limited to: alkaline, lithium hydride, lithium ion, nickel cadmium, solar cells, and/or the like. In the case of solar cells, the case provides an aperture through which the solar cell protrudes are to receive photonic energy. The power cell **1086** is connected to at least one of the interconnected subsequent components of the TCAP thereby providing an electric current to all subsequent components. In one example, the power cell **1086** is connected to the system bus component **1004**. In an alternative embodiment, an outside power source **1086** is provided through a connection across the I/O **1008** interface. For example, a USB and/or IEEE 1394 connection carries both data and power across the connection and is therefore a suitable source of power.

Interface Adapters

Interface bus(ses) **1007** may accept, connect, and/or communicate to a number of interface adapters, conventionally although not necessarily in the form of adapter cards, such as but not limited to: input output interfaces (I/O) **1008**, storage interfaces **1009**, network interfaces **1010**, and/or the like. Optionally, cryptographic processor interfaces **1027** similarly may be connected to the interface bus. The interface bus provides for the communications of interface adapters with one another as well as with other components of the computer systemization. Interface adapters are adapted for a compatible interface bus. In one embodiment, the interface bus provides I/O **1008** via a USB port. In an alternative embodiment, the interface bus provides I/O via an IEEE 1394 port. In an alternative embodiment, wireless transmitters are employed by interfacing wireless protocol integrated circuits (ICs) for I/O via the interface bus **1007**.

Storage interfaces **1009** may accept, communicate, and/or connect to a number of storage devices such as, but not limited to: storage devices **1014**, removable disc devices, and/or the like. Storage interfaces may employ connection protocols such as, but not limited to a flash memory connector, and/or the like. In one embodiment, an optional network interface may be provide **1010**.

Input Output interfaces (I/O) **1008** may accept, communicate, and/or connect to an access terminal **1011***b*. I/O may employ connection protocols such as, but not limited to: Apple Desktop Bus (ADB); Apple Desktop Connector (ADC); IEEE 1394a-b; infrared; PC AT; PS/2; parallel; radio; serial; USB; and/or the like; wireless component; and/or the like.

Wireless Component

In one embodiment a wireless component may comprise a Bluetooth chip disposed in communication with a transceiver **1043** and a memory **1029** through the interface bus **1007** and/or system bus **1004**. The transceiver may be either external to the Bluetooth chip, or integrated within the Bluetooth chip itself. The transceiver is a radio frequency (RF) transceiver operating in the range as required for Bluetooth transmissions. Further, the Bluetooth chip **1044** may integrate an input/output interface (I/O) **1066**. The Bluetooth chip and its I/O may be configured to interface with the TCAP controller through the interface bus, the system buss, and/or directly with the CPU. The I/O may be used to interface with other components such as an access terminal **1011***b* equipped with similar wireless capabilities. In one embodiment, the TCAP may optionally interconnect wirelessly with a peripheral device **912** and/or a control device **911** of FIG. **9**. In one

example embodiment, the I/O may be based on serial line technologies, a universal serial bus (USB) protocol, and/or the like. In an alternative embodiment, the I/O may be based on the ISO 7816-3 standard. It should be noted that the Bluetooth chip in an alternative embodiment may be replaced with an IEEE 802.11b wireless chip. In another embodiment, both a Bluetooth chip and an IEEE 802.11b wireless chip may be used to communicate and or bridge communications with respectively enabled devices. It should further be noted that the transceiver **1043** may be used to wirelessly communicate with other devices powered by Bluetooth chips and/or IEEE 802.11b chips and/or the like. The ROM can provide a basic instruction set enabling the Bluetooth chip to use its I/O to communicate with other components. A number of Bluetooth chips are commercially available, and may be used as a Bluetooth chip in the wireless component, such as, but not limited to, CSR's BlueCore line of chips. If IEEE 802.11b functionality is required, a number of chips are commercially available for the wireless component as well.

Cryptographic units such as, but not limited to, microcontrollers, processors **1026**, and/or interfaces **1027** may be attached, and/or communicate with the TCAP controller. A Secure Core component commonly manufactured by ARM, Inc. and may be used for and/or within cryptographic units.

Memory

Generally, any mechanization and/or embodiment allowing a processor to affect the storage and/or retrieval of information is regarded as memory **1029**. However, memory is a fungible technology and resource, thus, any number of memory embodiments may be employed in lieu of or in concert with one another. It is to be understood that a TCAP controller and/or a computer systemization may employ various forms of memory **1029**. In a typical configuration, memory **1029** will include ROM **1006**, RAM **1005**, and a storage device **1014**. A storage device **1014** may be any conventional computer system storage. Storage devices may include flash memory, micro hard drives, and/or the like.

Module Collection

The memory **1029** may contain a collection of program and/or database modules and/or data such as, but not limited to: operating system module(s) **1015** (operating system); information server module(s) **1016** (information server); user interface module(s) **1017** (user interface); Web browser module(s) **1018** (Web browser); database(s) **1019**; cryptographic server module(s) **1020** (cryptographic server); access terminal module **1021**; TCAP module(s) **1035**; and/or the like (i.e., collectively a module collection). These modules may be stored and accessed from the storage devices and/or from storage devices accessible through an interface bus. Although non-conventional software modules such as those in the module collection, typically, are stored in a local storage device **1014**, they may also be loaded and/or stored in memory such as: peripheral devices, RAM, remote storage facilities through an access terminal, communications network, ROM, various forms of memory, and/or the like. In one embodiment, all data stored in memory is encrypted by employing the cryptographic server **1020** as described in further detail below. In one embodiment, the ROM contains a unique TCAP identifier. For example, the TCAP may contain a unique digital certificate, number, and/or the like, which may be used for purposes of verification and encryption across a network and/or in conjunction with a TCAPS.

Operating System

The operating system module **1015** is executable program code facilitating the operation of a TCAP controller. Typically, the operating system facilitates access of I/O, network interfaces, peripheral devices, storage devices, and/or the

like. The operating system may be a highly fault tolerant, scalable, and secure system such as Linux, and/or the like operating systems. However, more limited and/or less secure operating systems also may be employed such as Java runtime OS, and/or the like. An operating system may communicate to and/or with other modules in a module collection, including itself, and/or the like. Most frequently, the operating system communicates with other program modules, user interfaces, and/or the like. For example, the operating system may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. The operating system, once executed by the CPU, may enable the interaction with an access terminal, communications networks, data, I/O, peripheral devices, program modules, memory, user input devices, and/or the like. The operating system may provide communications protocols that allow the TCAP controller to communicate with other entities through an access terminal. Various communication protocols may be used by the TCAP controller as a subcarrier transport mechanism for interaction, such as, but not limited to: TCP/IP, USB, and/or the like.

Information Server

An information server module **1016** is stored program code that is executed by the CPU. The information server may be a conventional Internet information server such as, but not limited to Apache Software Foundation's Apache, and/or the like. The information server may allow for the execution of program modules through facilities such as Active Server Page (ASP), ActiveX, (ANSI) (Objective-) C (++), Common Gateway Interface (CGI) scripts, Java, JavaScript, Practical Extraction Report Language (PERL), Python, WebObjects, and/or the like. The information server may support secure communications protocols such as, but not limited to, File Transfer Protocol (FTP); HyperText Transfer Protocol (HTTP); Secure Hypertext Transfer Protocol (HTTPS), Secure Socket Layer (SSL), and/or the like. The information server provides results in the form of Web pages to Web browsers, and allows for the manipulated generation of the Web pages through interaction with other program modules. An information server may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the information server communicates with the TCAP database module **1019**, operating systems, other program modules, user interfaces, Web browsers, and/or the like.

Access to TCAP database may be achieved through a number of database bridge mechanisms such as through scripting languages as enumerated below (e.g., CGI) and through interapplication communication channels as enumerated below (e.g., CORBA, WebObjects, etc.). Any data requests through a Web browser are parsed through the bridge mechanism into appropriate grammars as required by the TCAP. In one embodiment, the information server would provide a Web form accessible by a Web browser. Entries made into supplied fields in the Web form are tagged as having been entered into the particular fields, and parsed as such. The entered terms are then passed along with the field tags, which act to instruct the parser to generate queries directed to appropriate tables and/or fields. In one embodiment, the parser may generate queries in standard SQL by instantiating a search string with the proper join/select commands based on the tagged text entries, wherein the resulting command is provided over the bridge mechanism to the TCAP as a query. Upon generating query results from the query, the results are passed over the bridge mechanism, and may be parsed for formatting and generation of a new results Web page by the bridge mechanism. Such a

new results Web page is then provided to the information server, which may supply it to the requesting Web browser.

Also, an information server may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

User Interface

A user interface module **1017** is stored program code that is executed by the CPU. The user interface may be a conventional graphic user interface as provided by, with, and/or atop operating systems and/or operating environments such as Apple Macintosh OS, e.g., Aqua, Microsoft Windows (NT/XP), Unix X Windows (KDE, Gnome, and/or the like), and/or the like. The TCAP may employ code natively compiled for various operating systems, or code compiled using Java. The user interface may allow for the display, execution, interaction, manipulation, and/or operation of program modules and/or system facilities through textual and/or graphical facilities. The user interface provides a facility through which users may affect, interact, and/or operate a computer system. A user interface may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the user interface communicates with operating systems, other program modules, and/or the like. The user interface may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Web Browser

A Web browser module **1018** is stored program code that is executed by the CPU. A small-scale embedded Web browser may allow the TCAP to access and communicate with an attached access terminal, and beyond across a communications network. An example browser is Blazer, Opera, FireFox, etc. A browsing module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. Of course, in place of a Web browser and information server, a combined application may be developed to perform similar functions of both. The combined application would similarly affect the obtaining and the provision of information to users, user agents, and/or the like from TCAP enabled nodes. The combined application may be nugatory on systems employing standard Web browsers.

TCAP Database

A TCAP database module **1019** may be embodied in a database and its stored data. The database is stored program code, which is executed by the CPU; the stored program code portion configuring the CPU to process the stored data. In one embodiment, the TCAP database may be implemented using various standard data-structures, such as an array, hash, (linked) list, struct, structured text file (e.g., XML), table, and/or the like. Such data-structures may be stored in memory and/or in (structured) files. If the TCAP database is implemented as a data-structure, the use of the TCAP database may be integrated into another module such as the TCAP module. Databases may be consolidated and/or distributed in countless variations through standard data processing techniques. Portions of databases, e.g., tables, may be exported and/or imported and thus decentralized or integrated. In one embodiment, the database module **1019** includes three tables **1019**a-c. A user accounts table **1019**a includes fields such as, but not limited to: a user name, user address, user authorization information (e.g., user name, password, biometric data, etc.), user credit card, organization, organization account, TCAP unique identifier, account creation data, account expiration date; and/or the like. In one embodiment, user accounts may be activated only for set amounts of time and will then

expire once a specified date has been reached. An user data table **1019**b includes fields such as, but not limited to: a TCAP unique identifier, backup image, data store, organization account, and/or the like. In one embodiment, the entire TCAP memory **1029** is processes into an image and spooled to a TCAPS for backup storage. A user programs table **1019**c includes fields such as, but not limited to: system programs, organization programs, programs to be synchronized, and/or the like. It should be noted that any unique fields may be designated as a key field throughout. In an alternative embodiment, these tables have been decentralized into their own databases and their respective database controllers (i.e., individual database controllers for each of the above tables). Employing standard data processing techniques, one may further distribute the databases over several computer systemizations and/or storage devices. Similarly, configurations of the decentralized database controllers may be varied by consolidating and/or distributing the various database modules **1019**a-c. The TCAP may be configured to keep track of various settings, inputs, and parameters via database controllers.

A TCAP database may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP database communicates with a TCAP module, other program modules, and/or the like. The database may contain, retain, and provide information regarding other nodes and data.

Cryptographic Server

A cryptographic server module **1020** is stored program code that is executed by the CPU **1003**, cryptographic processor **1026**, cryptographic processor interface **1027**, and/or the like. Cryptographic processor interfaces will allow for expedition of encryption and/or decryption requests by the cryptographic module; however, the cryptographic module, alternatively, may run on a conventional CPU. The cryptographic module allows for the encryption and/or decryption of provided data. The cryptographic module allows for both symmetric and asymmetric (e.g., Pretty Good Protection (PGP)) encryption and/or decryption. The cryptographic module may employ cryptographic techniques such as, but not limited to: digital certificates (e.g., X.509 authentication framework), digital signatures, dual signatures, enveloping, password access protection, public key management, and/or the like. The cryptographic module will facilitate numerous (encryption and/or decryption) security protocols such as, but not limited to: checksum, Data Encryption Standard (DES), Elliptical Curve Encryption (ECC), International Data Encryption Algorithm (IDEA), Message Digest 5 (MD5, which is a one way hash function), passwords, Rivest Cipher (RC5), Rijndael, RSA (which is an Internet encryption and authentication system that uses an algorithm developed in 1977 by Ron Rivest, Adi Shamir, and Leonard Adleman), Secure Hash Algorithm (SHA), Secure Socket Layer (SSL), Secure Hypertext Transfer Protocol (HTTPS), and/or the like. The cryptographic module facilitates the process of "security authorization" whereby access to a resource is inhibited by a security protocol wherein the cryptographic module effects authorized access to the secured resource. In addition, the cryptographic module may provide unique identifiers of content, e.g., employing and MD5 hash to obtain a unique signature for an digital audio file. A cryptographic module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. The cryptographic module supports encryption schemes allowing for the secure transmission of information across a communications network to enable a TCAP module to engage in secure transactions if so desired. The cryptographic module facili-

tates the secure accessing of resources on TCAP and facilitates the access of secured resources on remote systems; i.e., it may act as a client and/or server of secured resources. Most frequently, the cryptographic module communicates with information servers, operating systems, other program modules, and/or the like. The cryptographic module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses. In one embodiment, the TCAP employs the cryptographic server to encrypt all data stored in memory **1029** based on the TCAP's unique ID and user's authorization information. In another embodiment, the TCAP employs the cryptographic server to encrypt all data sent through the access terminal based in the TCAP's unique ID and user's authorization information.

TCAP

A TCAP module **1035** is stored program code that is executed by the CPU. The TCAP affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within its memory and/or across various communications networks. The TCAP enables users to simply access data and/or services from any location where an access terminal is available. It provides secure, extremely low powerful and ultra portable access to data and services that were heretofore impossible. The TCAP coordinates with the TCAP database to identify interassociated items in the generation of entries regarding any related information. A TCAP module enabling access of information between nodes may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective−) C (++). Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications. A TCAP module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the TCAP module communicates with a TCAP database, a TCAP access terminal module **1021** running on an access terminal **1011**b, operating systems, other program modules, and/or the like. The TCAP may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Access Terminal Module

An access terminal module **1021** is stored program code that is executed by a CPU. In one embodiment, the TCAP allows the access terminal **1011**b to access its memory **1029** across its I/O **1008** and the access terminal executes the module. The access terminal module affects accessing, obtaining and the provision of information, services, storage, transactions, and/or the like within the TCAP's and access terminal's memory and/or across various communications networks. The access terminal module **1021** acts as a bridge through which the TCAP can communicate with communications network, and through which users may interact with the TCAP by using the I/O of the access terminal. The access terminal module coordinates with the TCAP module **1035** to send data and communications back and forth. A access terminal module enabling access of information between the TCAP and access terminal may be developed by employing standard development tools such as, but not limited to: (ANSI) (Objective−) C (++), Apache modules, binary executables, Java, Javascript, mapping tools, procedural and object oriented development tools, PERL, Python, shell scripts, SQL commands, web application server extensions, WebObjects, and/or the like. In one embodiment, the access

terminal module is compiled for target access terminal platform, e.g., for Windows. In an alternative embodiment, a processor independent approach is taken, e.g., Java is used, so that the access terminal module will run on multiple platforms. In another embodiment, the TCAP server employs a cryptographic server to encrypt and decrypt communications as between it, the TCAP, and outside servers. A access terminal module may communicate to and/or with other modules in a module collection, including itself, and/or facilities of the like. Most frequently, the access terminal module communicates with a TCAP, other program modules, and/or the like. The access terminal module may contain, communicate, generate, obtain, and/or provide program module, system, user, and/or data communications, requests, and/or responses.

Distributed TCAP

The structure and/or operation of any of the TCAP node controller components may be combined, consolidated, and/or distributed in any number of ways to facilitate development and/or deployment. Similarly, the module collection may be combined in any number of ways to facilitate deployment and/or development. To accomplish this, one may integrate the components into a common code base or in a facility that can dynamically load the components on demand in an integrated fashion.

The module collection may be consolidated and/or distributed in countless variations through standard data processing and/or development techniques. Multiple instances of any one of the program modules in the program module collection may be instantiated on a single node, and/or across numerous nodes to improve performance through load-balancing and/or data-processing techniques. Furthermore, single instances may also be distributed across multiple controllers and/or storage devices; e.g., databases. All program module instances and controllers working in concert may do so through standard data processing communication techniques.

The configuration of the TCAP controller will depend on the context of system deployment. Factors such as, but not limited to, the budget, capacity, location, and/or use of the underlying hardware resources may affect deployment requirements and configuration. Regardless of if the configuration results in more consolidated and/or integrated program modules, results in a more distributed series of program modules, and/or results in some combination between a consolidated and distributed configuration, data may be communicated, obtained, and/or provided. Instances of modules consolidated into a common code base from the program module collection may communicate, obtain, and/or provide data. This may be accomplished through intra-application data processing communication techniques such as, but not limited to: data referencing (e.g., pointers), internal messaging, object instance variable communication, shared memory space, variable passing, and/or the like.

If module collection components are discrete, separate, and/or external to one another, then communicating, obtaining, and/or providing data with and/or to other module components may be accomplished through inter-application data processing communication techniques such as, but not limited to: Application Program Interfaces (API) information passage; (distributed) Component Object Model ((D)COM), (Distributed) Object Linking and Embedding ((D)OLE), and/or the like), Common Object Request Broker Architecture (CORBA), process pipes, shared files, and/or the like. Messages sent between discrete module components for inter-application communication or within memory spaces of a singular module for intra-application communication may be facilitated through the creation and parsing of a grammar. A grammar may be developed by using standard development

tools such as lex, yacc, and/or the like, which allow for grammar generation and parsing functionality, which in turn may form the basis of communication messages within and between modules. Again, the configuration will depend upon the context of system deployment.

The entirety of this disclosure (including the Cover Page, Title, Headings, Field, Background, Summary, Brief Description of the Drawings, Detailed Description, Claims, Abstract, Figures, and otherwise) shows by way of illustration various embodiments in which the claimed inventions may be practiced. The advantages and features of the disclosure are of a representative sample of embodiments only, and are not exhaustive and/or exclusive. They are presented only to assist in understanding and teach the claimed principles. It should be understood that they are not representative of all claimed inventions. As such, certain aspects of the disclosure have not been discussed herein. That alternate embodiments may not have been presented for a specific portion of the invention or that further undescribed alternate embodiments may be available for a portion is not to be considered a disclaimer of those alternate embodiments. It will be appreciated that many of those undescribed embodiments incorporate the same principles of the invention and others are equivalent. Thus, it is to be understood that other embodiments may be utilized and functional, logical, organizational, structural and/or topological modifications may be made without departing from the scope and/or spirit of the disclosure. As such, all examples and/or embodiments are deemed to be non-limiting throughout this disclosure. Also, no inference should be drawn regarding those embodiments discussed herein relative to those not discussed herein other than for purposes of space and reducing repetition. For instance, it is to be understood that the logical and/or topological structure of any combination of any program modules (a module collection), other components and/or any present feature sets as described in the figures and/or throughout are not limited to a fixed operating order and/or arrangement, but rather, any disclosed order is exemplary and all equivalents, regardless of order, are contemplated by the disclosure. Furthermore, it is to be understood that such features are not limited to serial execution, but rather, any number of threads, processes, services, servers, and/or the like that may execute asynchronously, simultaneously, synchronously, and/or the like are contemplated by the disclosure. As such, some of these features may be mutually contradictory, in that they cannot be simultaneously present in a single embodiment. Similarly, some features are applicable to one aspect of the invention, and inapplicable to others. In addition, the disclosure includes other inventions not presently claimed. Applicant reserves all rights in those presently unclaimed inventions including the right to claim such inventions, file additional applications, continuations, continuations in part, divisions, and/or the like thereof. As such, it should be understood that advantages, embodiments, examples, functional, features, logical, organizational, structural, topological, and/or other aspects of the disclosure are not to be considered limitations on the disclosure as defined by the claims or limitations on equivalents to the claims.

What is claimed is:

1. A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is

31

configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:

(a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;

(b) a processor; and

(c) a memory having executable program code stored thereon, including:

(1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and

(2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;

wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

2. The portable device according to claim 1, wherein the fourth program code which, when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node.

3. The portable device according to claim 2, wherein the communication caused to be transmitted to the communication network node facilitates verification of the portable device.

4. The portable device according to claim 2, wherein the communication caused to be transmitted to the communication network node facilitates the transmission of encrypted communications from the communication network node to the terminal.

5. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates access to the communication network node database.

6. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the download of content on the communication network node database to the terminal.

7. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the download of program code on the communication network node to the terminal.

8. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the upload of content on to the communication network node database.

9. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the upload of program code on to the communication network node database.

32

10. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database.

11. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates the download of a live data feed to the terminal.

12. The portable device according to claim 11, wherein the live data feed is presented on the terminal output component.

13. The portable device according to claim 1, wherein the portable device is further configured to affect the presentation of the interactive user interface on the terminal output device.

14. The portable device according to claim 13, wherein the portable device memory has fifth program code stored thereon, which, when executed, is configured to affect the presentation of the interactive user interface on the terminal output device.

15. The portable device according to claim 13, wherein the portable device is configured to provide the terminal with access to content stored on the portable device memory which affects the presentation of the interactive user interface on the terminal output device.

16. The portable device according to claim 15, wherein the content comprises a user name and/or a portable device identifier, and the interactive user interface is affected to present the user name and/or portable device identifier.

17. The portable device according to claim 1, wherein the second program code is stored on the portable device memory and the portable device is configured to provide the terminal with access to the second program code.

18. The portable device according to claim 17, wherein the portable device is configured to load the second program code on to the terminal.

19. The portable device according to claim 1, wherein the portable device is configured to cause the terminal to execute the second program code and present an interactive user interface on the terminal output component.

20. The portable device according to claim 19, wherein the portable device memory has fifth program code stored thereon, which, when executed by the portable device processor, is configured to cause the terminal to execute the second program code and present an interactive user interface on the terminal output component.

21. The portable device according to claim 1, wherein the interactive user interface comprises a graphic user interface.

22. The portable device according to claim 1, wherein the first program code is stored on the portable device memory and the portable device is configured to provide the terminal with access to the first program code.

23. The portable device according to claim 22, wherein the portable device is configured to load the first program code on to the terminal.

24. The portable device according to claim 1, wherein the portable device memory comprises one or more of the group consisting of flash memory, read only memory, random access memory, micro hard drives and the like.

25. The portable device according to claim 1, wherein the communications network node comprises a server.

26. The portable device according to claim 1, wherein the external communication interface comprises a universal serial bus interface.

33

**27**. The portable device according to claim **1**, wherein the external communication interface comprises a wireless communication interface.

**28**. A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) causing the terminal to execute the first program code to present an interactive user interface on the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal communication interface;

(c) executing fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface; and

(d) facilitating a communication to be transmitted through the terminal network interface to a communications network node.

34

**29**. A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

(a) a communications network node; and

(b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

(1) cause the terminal to execute the first program code to present an interactive user interface on the terminal output component;

(2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal communication interface;

(3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface; and

(4) facilitate a communication to be transmitted through the terminal network interface to a communications network node.

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGENICO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| IOENGINE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT OF NONINFRINGEMENT

Plaintiff, Ingenico Inc. ("Ingenico"), for its suit against IOENGINE, LLC ("IOENGINE"), alleges as follows:

### INTRODUCTION

1.     On March 23, 2018, IOENGINE filed an action in this Court, alleging that PayPal Holdings, Inc. ("PayPal"), a customer of Ingenico, infringes patents in connection with certain products supplied to PayPal by Ingenico.  Ingenico brings this action because its close familiarity with the products it supplied to PayPal puts it in a better position than its customer to contest the alleged infringement of the patents- in-suit.

### PARTIES

2.     Ingenico is a Georgia corporation with its principal place of business at 3025 Windward Plaza, Suite 600, Alpharetta, Georgia. Ingenico is a leading provider of products to facilitate secure payments to merchants, whether the transactions are completed using mobile devices, or in-store payment terminals (collectively, "Card Reader Products"). Ingenico's Card Reader Products include those identified at ingenico.us/smart-terminals, and ingenico.us/mobile-solutions/mobile-smart-terminals, including *inter alia* Telium and Tetra products (including

1

AXIUM Series, Land Series, Desk Series and Move Series), Telium2 products (including iSC Series, iPP Series, iCT Series, and iWL Series), mPOS Card Readers (including Moby/8500, Moby/3000, RP457c Series, RP750x Chip & PIN Mobile Card Reader, RP350x Chip & Sign Mobile Card Reader, and G5X Mobile Card Reader), Tablet POS products (including Moby/M70), and Mobile Smart Terminals (including iSMP4 Companion, Link/2500, iSMP Companion, and iCMP), as well as G4x, G3x, and G2card readers.

3.      On information and belief, IOENGINE is a Delaware limited liability company with a stated principal place of business at 22 Ensign Road, Norwalk, Connecticut.

## SUBJECT MATTER JURISDICTION

4.      This Court has subject matter jurisdiction over this action pursuant to Title 35 of the United States Code and 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

5.      On March 23, 2018, IOENGINE filed a Complaint (the "Customer Suit Complaint") in this district docketed as Civil Action  No. 18-452-GMS ("the Customer Suit").

6.      In the Customer Suit Complaint, IOENGINE alleged that it is the assignee of United States Patent No. 8,539,047 (the "'047 patent"), No. 9,059,969 (the "'969 patent"), and No. 9,774,703 (the "'703 patent"), (collectively, "patents-in-suit"), with rights to enforce them. Copies of the '047, '969, and '703 patents are attached hereto as Exhibits A-C respectively.

7.      In the Customer Suit Complaint, IOENGINE further alleged that PayPal infringes, both directly and indirectly, "claims of each of the" patents-in-suit, including "one or more claims" of each of the patents-in-suit in connection with products that "include, but are not limited to, PayPal's card reader products for mobile payments (for, example the ... PayPal Mobile Card Reader, PayPal Chip and Swipe Reader, and PayPal Chip and Tap Reader)" (said

2

products collectively, the "Ingenico Accused Products" and each individually an "Ingenico Accused Product").

8.      The Ingenico Accused Products are Card Reader Products supplied to PayPal by Ingenico.

9.      The Customer Suit has triggered an indemnity request by PayPal to Ingenico.

10.     Ingenico denies that the patents-in-suit are infringed in connection with any of the Ingenico Accused Products by Ingenico or its customer PayPal, or any other customers to whom Ingenico supplies the Ingenico Accused Products.

11.     Under the circumstances, IOENGINE's infringement allegations in the Customer Suit Complaint threaten actual and imminent injury to Ingenico that can be redressed by judicial relief, and that injury is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Such injury includes, among other things, the implicit assertion that Ingenico is indirectly infringing by virtue of its actions in selling its Card Reader Products, including the Ingenico Accused Products; uncertainty as to whether the development, use, and sale of those products are free from infringement claims based on the patents-in-suit; a cloud over Ingenico's efforts to market and sell Card Reader Products, including the Ingenico Accused Products; and the threat that other customers will be sued, giving rise to obligations flowing from possible claims for indemnity. Absent a declaration of noninfringement, IOENGINE will wrongfully assert the patents-in-suit against Card Reader Products and the Ingenico Accused Products, thereby causing Ingenico irreparable injury and damage. Thus, an actual and justiciable controversy exists between Ingenico and IOENGINE as to the patents-in-suit.

## PERSONAL JURISDICTION

12.     IOENGINE has consented to personal jurisdiction in this district and waived any objection to suit in this district by filing the Customer Suit here. IOENGINE has purposefully availed itself of this district by taking steps to enforce the patents-in-suit here against PayPal, an Ingenico customer, and seeking to enjoin it and its agents, officers, servants, employees, and affiliated entities, and all persons in active concert or participation with them, from infringing, or inducing or contributing to the infringement of, the patents-in-suit. IOENGINE's efforts to enforce the patents-in-suit and enjoin these persons adversely impact Ingenico, as described above. The Customer Suit accuses Ingenico's customer of infringement of the same patents and by use of the same Card Reader Products for which declaratory judgment is sought in this suit, and therefore adjudicates claims which are related to the same facts that give rise to this suit.

13.     IOENGINE is subject to personal jurisdiction in this judicial district based upon its purposeful, systematic, and continuous contacts with Delaware, including those related to this case as well as its incorporation in Delaware. Upon information and belief, IOENGINE is an entity created for the purpose of enforcing the patents-in-suit.

## VENUE

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue, namely, filing of the Customer Suit, occurred in this judicial district, and because IOENGINE is subject to personal jurisdiction within this judicial district due to, *inter alia*, its incorporation in Delaware.

4

Appx1140 to Appx1792

REMOVED DUE TO CONFIDENTIAL MATERIAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IOENGINE, LLC, <br>     *Plaintiff/Counterclaim Defendant,* <br><br> v. <br><br> PAYPAL HOLDINGS, INC., <br>     *Defendant/Counterclaim Plaintiff.* | C.A. No. 18-452-WCB <br><br> JURY TRIAL DEMANDED |
| INGENICO INC., <br>     *Plaintiff,* <br><br> v. <br><br> IOENGINE, LLC, <br>     *Defendant,* | C.A. No. 18-826-WCB <br><br> JURY TRIAL DEMANDED |
| IOENGINE, LLC, <br>     *Counterclaim Plaintiff,* <br> v. <br><br> INGENICO INC., INGENICO CORP., and <br> INGENICO GROUP SA, <br>     *Counterclaim Defendants.* | |

## IOENGINE, LLC'S OPENING BRIEF IN SUPPORT OF ITS COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INVALIDITY AND TO EXCLUDE TESTIMONY OF BARRY SUSSMAN AND JAMES GEIER

OF COUNSEL:

Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
noah.leibowitz@dechert.com
greg.chuebon@dechert.com

SMITH, KATZENSTEIN & JENKINS LLP

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
1000 West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Counsel for IOENGINE, LLC*

Dated: February 18, 2022

same documents in detail. *See* Ex. 41. Ingenico knew of these documents, including the documents discussed in the Madisetti report and on the face of the '703 Patent prior to its IPRs and is barred from asserting them now.

(6)    <u>Ingenico is barred from asserting any other patents or printed publications it actually knew of</u>

Ingenico knew of and could have raised dozens of other references in its IPRs, and is therefore estopped from asserting them now, including all references:

- Raised in Ingenico's IPRs challenging the Patents-in-Suit and the parent '047 Patent. *See* Appendix I.

- Raised in PayPal's IPRs challenging the Patents-in-Suit and the parent '047 Patent. *See* Appendix I. Ingenico knew of PayPal's IPRs and, therefore, the references included therein. *See* IPR 2019-00929, Paper 2, at 2-3 (disclosing PayPal's IPRs) (April 5, 2019); Ex. 6, at 7.

- In Ingenico's April 5, 2019 Initial Invalidity Contentions or April 12, 2019 First Amended Initial Invalidity Contentions. *See* Exs. 7 and 9.

- In PayPal's April 5, 2019 Initial Invalidity Contentions. *See* Ex. 43; *see also* Ex. 4, at 7 ("reserv[ing] its right to rely on any disclosures made by PayPal in its invalidity contentions"); Ex. 6, at 7.

- Cited on or disclosed in materials cited on the face of or in the prosecution history of the Patents-in-Suit or related patents.

In each instance, to the extent not relied on, Ingenico reasonably could have relied on those references in IPR and Ingenico is estopped from raising them now. *See* 35 U.S.C. §315(e)(2); *California Inst. of Tech.*, 2022 WL 333669, *10.

Ingenico is also barred from asserting any references that it reasonably *could* have

discovered. "A prior-art reference not raised in the IPR proceeding…is subject to the statutory bar

of 35 U.S.C. § 315(e)(2) if…a skilled searcher conducting a diligent search reasonably ***could have***

***been expected to discover*** the reference." *Wasica*, 432 F. Supp. 3d, 453 (quoting *Parallel*

*Networks*, 2017 WL 1045912, \*11; *Palomar*, 2020 WL 2115625, \*3; *Tinnus Enters.*, 2018 WL

3993468, \*3. "The standard thus has a subjective prong (did the IPR petitioner actually know

about the reference?) and an objective prong (would a reasonable search have discovered the

reference?)." *Palomar*, 2020 WL 2115625, \*3.

Ingenico relies on multiple references that it could have discovered from a diligent search

by a skilled searcher. "[W]hen a reference is found in a later prior art search, there is a reasonable

inference that it could have been found earlier by a skilled searcher." *GREE, Inc. v. Supercell Oy*,

No. 219CV00071JRGRSP, 2020 WL 4999689, \*5 (E.D. Tex. July 9, 2020), *report and*

*recommendation adopted*, No. 219CV00071JRGRSP, 2020 WL 4937111 (E.D. Tex. Aug. 24,

2020); *Wi-LAN*, 421 F. Supp. 3d, 926 ("Evidence that [petitioner-defendant] discovered these

references through a prior art search is clear evidence that [petitioner-defendant] reasonably could

have discovered these references through a diligent search.").

(1) Ingenico reasonably could have discovered ***Iijima***,
***Nakagawa***, ***Bodnar***, and ***Seaman***

PayPal asserted ***Iijima*** and ***Bodnar*** in its Supplemental Invalidity Contentions, *see* Ex. 7,

at 47, 52-62, and ***Iijima***, ***Nakagawa***, ***Bodnar***, and ***Seaman*** in its Final Invalidity Contentions. *See*

Ex. 8, at 50, 55-68, 79-81. In preparing its invalidity contentions, PayPal was pursuing the same

goal as Ingenico, namely finding invalidating art for the Patents-in-Suit. That a defendant in an

identical posture found these patents leads to a reasonable inference that Ingenico could have

discovered them from a reasonable search and included them in its IPRs. *GREE*, 2020 WL 4999689, *5.

      (2)    <u>Ingenico reasonably could have discovered ***Ban-078*** and ***Ban-354***</u>

    ***Ban-078*** specifically references "DiskOnKey," *see* Ban-078, 7:7-8, 9:16-18, 9:31-33, which is a focus of Ingenico's invalidity efforts.[10] Further, ***Ban-078*** and ***Ban-354*** were assigned to M-Systems, the manufacturer of DiskOnKey. Given Ingenico's focus on DiskOnKey, and the discussion of DiskOnKey and M-Systems in the Madisetti Report, a skilled searcher would have searched for patents mentioning DiskOnKey, which would have led to Ban-078. Indeed, a Google Patents search for "DiskOnKey" results in only 78 hits, of which Ban-078 is third. *See* Ex. 9 (https://patents.google.com/?q="diskonkey"&oq="diskonkey"). Similarly, a skilled searcher would have examined related patents by the same inventor, particularly if assigned to M-Systems, and would have discovered Ban-354, as Ingenico ultimately *did*. *See Wi-LAN*, 421 F. Supp. 3d, 925.

      (3)    <u>Ingenico reasonably could have discovered ***Teicher-409*** and ***Teicher-219***</u>

    ***Teicher-409***, likewise, specifically references "DiskOnKey" (and "KeySafe"), *see* Teicher-409, 1:31-44, 2:11-15, and was assigned to SanDisk, which acquired M-Systems, including DiskOnKey, in 2006. *See* Ex. 10 (https://www.latimes.com/archives/la-xpm-2006-jul-31-fi-sandisk31-story.html.) SanDisk was itself acquired by Western Digital in 2016. *See* Ex. 11 (https://www.prnewswire.com/news-releases/western-digital-completes-acquisition-of-sandisk-creating-a-global-leader-in-storage-technology-300267606.html). ***Teicher-219*** was also assigned to SanDisk, shares inventors with ***Teicher-409***, and specifically describes the use of encryption

---

[10] Geier relies on this as motivation to combine DiskOnKey with Ban-078. Ex. 2, at 81.

related to USB devices. Like Ban-078, a Google Patents search for "DiskOnKey" turns up EP1,576,762, the European counterpart to Teicher-409, as the fourth hit. *See* Ex. 9. Again, a skilled searcher would have searched for patents referring to DiskOnKey. Moreover, a skilled searcher would have examined related patents by the same inventor and owned by SanDisk, and would have discovered both Teicher references, as Ingenico ultimately *did*. *See Wi-LAN,* 421 F.Supp.3d, 926.

(4) Ingenico reasonably could have discovered ***DiskOnKey SDK***, ***DiskOnKey Upgrade***, and ***Western Digital Documents***

As explained, Ingenico was indisputably aware of the M-Systems DiskOnKey, which is disclosed on the face of the '703 Patent and discussed in detail in the Madisetti Report, which IOENGINE produced months before Ingenico filed its IPRs. *See* '703 Patent, (56); Ex. 5; Ex. 41. The Madisetti Report also discloses a ***DiskOnKey SDK*** in its exhibits. *See* Ex. 5, internal Ex. D. Having been made aware of the M-Systems DiskOnKey, a diligent searcher would have sought further information regarding DiskOnKey, including from M-Systems' ultimate successor, Western Digital.

Ingenico eventually did so, but waited until August 19, 2019 to seek discovery from Western Digital—precisely *two days* after its one-year period to petition for IPR expired, (assuming PayPal is not found to be Ingenico's privy or real party in interest). *See* 18-cv-00826, D.I. 127. But it was Ingenico's choice to wait until it could no longer file IPRs before seeking documents from Western Digital. Indeed, Ingenico's belated Western Digital subpoena specifically references DiskOnKey, KeySafe, MyKey, BookLocker, and a ***DiskOnKey SDK***. 18-cv-00826, D.I. 127-1, Requests 1-4 and 14. That Ingenico *did* become aware of the purported ***DiskOnKey SDK*** document, documentation related to ***DiskOnKey Upgrade*** software and

15

numerous other **Western Digital Documents**[11] proves that these documents could have been located and obtained. *See Wi-LAN*, 421 F. Supp. 3d, 926. That Ingenico chose not to act diligently cannot defeat statutory IPR estoppel. Otherwise, defendants will be incentivized to purposefully delay diligent discovery until after the IPR window has closed—as Ingenico did here—with the expectation that estoppel will not apply to later-discovered documents. Surely this is not what Congress intended in designing IPRs as "quick and cost-effective alternatives to litigation." H. REP. NO. 112–98, at 40, 48 (2011)*; see also id.,* 40 ("[T]he changes made by [the amendment] are not to be used as tools for harassment or a means to prevent market entry through repeated litigation and administrative attacks on the validity of a patent.").

(5)   <u>Ingenico reasonably could have discovered additional<br>public documents and websites that it now relies on</u>

Ingenico also purports to rely on a collection of publicly available documents and websites, listed in listed in Appendix VI, (the majority of which were not disclosed in Ingenico's Final Infringement Contentions, *see* Ex. 3). These documents could have been readily discovered by searching the internet or other public sources for information on alleged prior art that Ingenico was well aware of from the face of the Patents-in-Suit, the Madisetti Report, IOENGINE's productions of documents from prior litigations, or the text of the asserted claims, and concepts disclosed throughout the specification or core to the accused products, including encryption, synchronization, DiskOnKey, MyKey, M-Systems, BookLocker, USB, network storage, DUKPT, EMV, Bluetooth. Each of these documents is publicly available, and ultimately was collected by Ingenico from public sources, including from "web.archive.org." That Ingenico *did* become aware of and obtain these documents proves that they could have been located by a diligent search. *See*

---

[11] The Western Digital Documents that Geier and Bims rely on are listed in Appendix V. All of these documents reasonably could have been discovered by Ingenico and included with its IPRs.

*Wi-LAN*, 421 F. Supp. 3d, 926. There is no reason why Ingenico could not have included them in

its IPRs.

### 3. IPR Estoppel Bars Ingenico's "Device" Art

Physical art is subject to IPR estoppel if it is simply a regurgitation of the same ***grounds***

that were raised or could have been raised during IPR:

> 35 U.S.C. § 312(a)(3) identifies as separate requirements to be included in an IPR petition 'the ***grounds*** on which the challenge to each claim is based, and the ***evidence*** that supports the grounds for the challenge to each claim' (emphasis added). In this way, the Patent Act distinguishes between grounds and evidence. Since the estoppel provision, § 315(e)(2), applies to ***grounds***, a petitioner is estopped from proceeding in litigation on those ***grounds***, even if the ***evidence*** used to support those grounds was not available to be used in the IPR.

*Wasica*, 432 F. Supp. 3d, 454 (barring reliance on a physical device that was fully described by

printed publications available for IPR).[12] As here, "[w]here there is evidence that a petitioner had

reasonable access to printed publications corresponding to or describing a product that it could

have proffered during the IPR process, it cannot avoid estoppel simply by pointing to its finished

product (rather than the printed materials) during litigation." *Oil-Dri Corp. of Am. v. Nestle Purina

Petcare Co.*, No. 15 C 1067, 2019 WL 861394, *10 (N.D. Ill. Feb. 22, 2019); *see also Biscotti Inc.

v. Microsoft Corp.*, No. 213CV01015JRGRSP, 2017 WL 2526231, *4–8 (E.D. Tex. May 11, 2017)

(where Defendant's device art "relies on or is based on patents or printed publications that

[defendant] would otherwise be estopped from pursuing at trial, … [defendant] should be estopped

from presenting those patents and printed publications at trial.").

---

[12] The *Wasica* court recognized that, to find otherwise, would allow defendants to gut the estoppel provision: "In future litigation, defendants will simply swap out publications that were available through a diligent search with the same prior art, only in a slightly different format or in a version that could not have been found in a search (such as public white papers, presentations, and data sheets that were not widely circulated)." 432 F.Supp.3d, 454 n.7.

<blockquote>
a.     Ingenico doesn't actually rely on the FinePix6800Z camera or DiskOnKey device
</blockquote>

As discussed above, Ingenico is estopped from relying on various documents describing the FinePix6800Z camera, as well as those describing DiskOnKey and its allegedly related software. In an attempt to circumvent IPR estoppel, Ingenico nominally purports to rely instead on the FinePix6800Z camera and DiskOnKey device themselves. In reality, however, Ingenico relies exclusively on documents describing the devices, each of which Ingenico raised or reasonably could have raised in its IPRs.

Although Geier states that he has a FinePix6800Z camera and DiskOnKey, he does not actually rely on either one. His report does not discuss any examination of the devices, or any testing, analysis, or device teardowns, and he admits that he did not test or even operate the devices. *See* Ex. 35, at 143:6-8 ("Q: Have you ever operated a physical Fuji FinePix 6800 Zoom camera? A: I don't believe I have."); 145:5-8 ("Q: Have you done a teardown of a Fuji FinePix 6800 Zoom camera for the purposes of this report? A: I have not, no."); 149:24-150:3 ("***I don't believe there's anything in my report where I did any testing*** because I didn't test the camera."). Indeed, Mr. Geier includes only a single picture of the outside of the FinePix6800Z, but no pictures or videos depicting its components or operation.[13] Instead, Mr. Geier relies *entirely* on patents and printed publications to describe the FinePix6800Z camera:

> Q: So in general, do you think you were able to form sufficient opinions regarding…the Fuji FinePix 6800 Zoom camera by reference to the manuals and documents and software without having tested the Fuji FinePix 6800 Zoom camera?
> A: Yes. I believe that was sufficient for me to provide my opinions.

---

[13] Geier includes a picture of the box (Ex. 42), and a picture of the outside of the camera (Ex. 43)—in a non-operative state. Ingenico previously relied on the *same* picture of the camera in IPR. *Compare* Ex. 43 (relied on by Geier) *with* Ex. 44 (IPR2019-00879, Ex. 1005, internal Exhibit A).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IOENGINE, LLC, | § | |
| *Plaintiff/Counterclaim Defendant,* | § | |
| | § | C.A. No. 18-452-WCB |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| PAYPAL HOLDINGS, INC., | § | |
| *Defendant/Counterclaim Plaintiff.* | § | |
| | § | |
| INGENICO INC., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | C.A. No. 18-826-WCB |
| IOENGINE, LLC, | § | |
| *Defendant,* | § | JURY TRIAL DEMANDED |
| | § | |
| IOENGINE, LLC, | § | |
| *Counterclaim Plaintiff,* | § | |
| v. | § | |
| | § | |
| INGENICO INC., INGENICO CORP., and | § | |
| INGENICO GROUP SA, | § | |
| *Counterclaim Defendants.* | § | |
| | § | |

**IOENGINE, LLC'S REPLY BRIEF IN FURTHER SUPPORT OF ITS COMBINED
MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INVALDITY
AND TO EXCLUDE TESTIMONY OF BARRY SUSSMAN AND JAMES GEIER**

OF COUNSEL:

Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
noah.leibowitz@dechert.com
greg.chuebon@dechert.com

SMITH, KATZENSTEIN & JENKINS LLP

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Counsel for IOENGINE, LLC*

Dated: March 18, 2022

date—*in 2003*. *See* D.I. 417, EXHIBIT-D, 77. Indeed, the Board was skeptical of the declaration submitted by Ingenico as its "main support" regarding the Fuji Guide's distribution date. *Id.*, 73-76. But this reflects Ingenico's failure of proof, not justification to collaterally estop IOENGINE. IOENGINE's position now is the same as in IPR—Ingenico still has not established that the Fuji Guide was publicly available *before the critical date*, which Ingenico had a full and fair opportunity to prove at the PTAB and failed. As for IPR estoppel, there is no question that the Fuji Guide could have been found by a diligent searcher *at the time of IPR—in 2019*—and therefore that Ingenico "reasonably could have raised" it —in fact, it did. Having failed to carry its burden on the Fuji Guide ground at IPR, Defendants should not be able to disguise that ground via illusory reliance on the FinePix6800z now.

### 3. DiskOnKey

Defendants purport to assert a DiskOnKey "system." But there is no such thing. Instead, Defendants point to a collection of five different stand-alone DiskOnKey products with different software that were available at different times. *See infra* §I.C. Regardless, Defendants do not dispute that their experts do not rely on any actual DiskOnKey product or any of the allegedly related software. *See* Mot., 4 (citing Exs. 29 & 35), 19-20 (Mr. Geier never physically examined a DiskOnKey device, nor plugged one in or executed any of the software). Instead, Defendants superficially refer to a purported DiskOnKey "system" to disguise documentary evidence that reasonably could have been raised during IPR. *See, e.g.*, *Wasica*, 432 F. Supp.3d, 455.

DiskOnKey estoppel issues fall into three categories: (i) documents Ingenico was indisputably aware of when it filed its IPRs, (ii) documents a diligent searcher would have discovered given Defendants' interest in DiskOnKey, and (iii) deposition testimony relating to DiskOnKey. Although all are subject to estoppel, Defendants' Opposition focuses solely on the latter two categories. Regarding the first category, Defendants do not dispute that a significant

number of documents they rely on were actually disclosed to them months before Ingenico's IPRs, and reasonably could have been raised. *See* Mot., 11. These documents are subject to estoppel.[6]

The second category includes documents Defendants obtained from Western Digital ("WD") by subpoena. Defendants vaguely refer to over 5,500 documents without explaining how even a single one is substantively relied on and was ineligible for IPR. Defendants contend that these documents were not available via a diligent search. Not true.[7] As IOENGINE explained in its opening brief, DiskOnKey devices are not random pieces of art not on Defendants' radar. Instead, a website and publication discussing DiskOnKey devices (made by M-Systems) are referenced on the face of the '703 Patent (along with a Madisetti Report from prior litigation discussing certain DiskOnKey products at length[8]) and in PayPal's Answer. Defendants do not deny their interest in DiskOnKey, nor dispute that a diligent searcher would have sought further information, including from M-Systems successor, WD (as Defendants in fact did). Yet, Ingenico intentionally waited to seek information from WD until August 19, 2019, two days after the latest possible expiration of its one-year IPR period. Once Ingenico tried, it took little time to obtain

---

[6] Notably, even if Defendants are permitted to raise system art, courts have limited the extent to which system art can be combined with printed publications subject to estoppel. *See Biscotti Inc. v. Microsoft Corp.*, 13-cv-01015-JRG-RSP, 2017 WL 2526231, *8 (E.D. Tex. May 11, 2017) (where system art relies on patents or printed publications otherwise subject to estoppel, defendant "should be estopped from presenting those patents and printed publications at trial"), *Biscotti Inc. v. Microsoft Corp.*, 13-cv-01015-JRG-RSP, 2017 WL 2537021, *1 (E.D. Tex. May 30, 2017) (allowing system invalidity theories but limiting use of patents or printed publications "solely for the purpose of establishing the date on which the…systems were in public use or on sale").

[7] Ironically, Defendants largely rely on user guides and readme documents. If those documents were not publicly available before the critical date (and thus printed publications that reasonably could have been raised during IPR), then Defendants cannot establish that the "system" features they rely upon are ***prior*** art.

[8] The Madisetti Report and exhibits were produced to Defendants nearly two months before Ingenico's IPRs.

**Appx8371**

documents from WD.  After the stay was lifted, Ingenico re-served its subpoena in January 2021 *id.*, D.I. 155, and WD began producing documents in March, completing its productions in July. Had Ingenico pursued this information more diligently, it could have had all the WD documents before its one-year IPR period expired.  Defendants' strategic delay should not be rewarded.  Such a result would validate Defendants' tactic as a way to get two bites at the apple—contrary to Congress's intent that IPRs should not allow for "repeated litigation and administrative attacks on the validity of a patent."  H.REP. No.112-98 (2011), at 48.

The third category is deposition testimony from a WD employee and two former M-Systems employees.  Defendants do not explain how any part of this testimony is relevant, instead vaguely referring to vast transcript ranges. *See, e.g.*, Opp., 3 (citing 100-page and 40-page ranges). Nor do Defendants explain how any of the testimony is "substantively, germanely different" from the documents, many of which were used to refresh the witnesses' decades-old recollections that added nothing of substance to the documents.  For example, the WD witness was not employed until June 2004 (after the March 23, 2004 filing date), did not work on M-Systems products before then, and could not independently corroborate the dates or substance of documents.  *See* D.I. 406, Ex. 34 at 133:3-134:14.  Similarly, the M-System witnesses had no personal knowledge of the upgrade functionality referenced in deposition documents because they had left M-Systems by that time.  *See* EX050 at 163:8-167:7; EX051 at 35:5-36:20.  Defendants claim that the M-System employees' testimony is relevant to "Booklocker," which purportedly used DiskOnKey hardware. But Booklocker was not available until fall 2003, months after the critical date, offering no basis to avoid IPR estoppel.  *See* EX050 at 195:3-198:25; EX052 at 5-6. Defendants have not shown that any of the deposition testimony adds any "*substantive* difference…that is germane to the

invalidity dispute at hand." *CalTech*, 2019 WL 8192255, *8 (emphasis original).[9] Further, for the subset of limitations where Mr. Geier cites any of the testimony, it is the documentary evidence that he actually analyzes—the deposition testimony is duplicative. *See, e.g.*, D.I. 406, Ex. 1 at 57-63 ("*see also*" string cites to testimony with no analysis).

In sum, it would be possible in nearly every case to find a witness (especially one with no personal knowledge) to regurgitate documents describing alleged prior art at deposition. But this would render IPR estoppel a dead letter. There is no meaningful reliance by Defendants on any deposition testimony to provide "substantively, germanely different" information that was unavailable to Ingenico for its IPRs. Therefore, estoppel applies.

### 4. Printed Publications Combined with Systems

Defendants contend they can assert printed publications in combination with alleged "systems." But, as discussed above, where systems are materially identical to printed publication theories, *Wasica*, 432 F. Supp.3d, 455, or add no "*substantive* difference…that is germane to the invalidity dispute at hand," *CalTech*, 2019 WL 8192255, *8 (emphasis original), there is estoppel as to both. Even if Defendants' alleged "systems" are not estopped, the permissible use of printed publications otherwise subject to estoppel should be limited. *See supra* n.6. Indeed, if IPR petitioners were able to resurrect printed publications by superficially combining them with systems, IPR estoppel would be meaningless. Here, for example, after pursuing IPRs centered on Iida—including in combination with the Fuji Guide (describing the FinePix6800z)—Ingenico should not be permitted to rescue Iida by combining it with the FinePix6800z—especially where Ingenico does not substantively rely on the physical camera.

---

[9] Further, Defendants coordinated extensively in preparing WD's witness. *See* Mot., 31 (Defendants identified documents of interest and had approximately 10 joint preparatory meetings).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IOENGINE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 18-452-WCB |
| PAYPAL HOLDINGS, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| _____ | § | |
| | | |
| INGENICO INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 18-826-WCB |
| IOENGINE, LLC, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| _____ | | |
| | | |
| IOENGINE, LLC, | § | |
| | § | |
| *Counterclaim Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| INGENICO INC., | § | |
| INGENICO CORP., and | § | |
| INGENICO GROUP S.A., | § | |
| | § | |
| *Counterclaim Defendants.* | § | |
| _____ | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In these consolidated cases, plaintiff IOENGINE, LLC, alleges that defendants PayPal Holdings, Inc. ("PayPal"), Ingenico, Inc., Ingenico Corp., and Ingenico Group S.A. (collectively, "Ingenico") infringe various claims of U.S. Patent Nos. 9,059,969 ("the '969 patent") and 9,774,703 ("the '703 patent"). The jury trial in the Ingenico action is set to begin on July 11, 2022, and the jury trial in the PayPal action is set to begin on July 25, 2022. The parties have each filed several motions in limine in advance of those trials. This order addresses most of those motions. The remaining motions, as to which the court requested additional briefing, will be addressed in a subsequent order.

**I.   <u>IOENGINE's Motions</u>**

I begin by addressing IOENGINE's motions in limine. IOENGINE has filed separate motions in limine in each case, although many of the motions are common to both cases. I will address the common motions first and then turn to those that are unique to each case.

**A.  PTAB Proceedings**

IOENGINE seeks to exclude "evidence, testimony, or argument at trial concerning IPR proceedings challenging unasserted claims" of the '969 and '703 patents, along with their parent patent, U.S. Patent No. 8,539,047 ("the '047 patent"). Dkt. No. 407 at 1.[1] After the commencement of these lawsuits, the Patent Trial and Appeal Board ("PTAB") held in a series of *inter partes* review proceedings ("IPRs") that numerous claims of the '969, '703, and '047 patents were unpatentable. IOENGINE argues that the introduction of evidence regarding those proceedings would be prejudicial to IOENGINE and confusing to the jury. PayPal and Ingenico argue that evidence regarding the IPR proceedings should be admitted because (1) the results of the IPR proceedings

---

[1]   Unless otherwise noted, all citations to the docket are to the Ingenico case, No. 18-826.

establish that the independent claims of the '969 and '703 patents are invalid and that the validity of the dependent claims asserted in these cases depends entirely on the limitations added in the dependent claims; and (2) the results of the IPR proceedings rebut IOENGINE's claim of willful infringement on the part of PayPal and Ingenico.

With regard to validity, I have held in the order addressing the parties' summary judgment motions that the results of the IPR proceedings do not preclude IOENGINE from arguing that the limitations of the independent claims of the '969 and '703 patents are not found in the prior art. Dkt. No. 449 at 27–28. Accordingly, evidence of the IPR proceedings will not be helpful to the jury in adjudicating the validity of the dependent claims. In fact, evidence of the proceedings and the PTAB's findings would be likely to confuse the jury and risk that the jury would decide the issues on evidence not before it. *See* Dkt. No. 449 at 47–55 (excluding prior jury verdicts and settlement agreements for related reasons); *Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, No. 1:12-CV-654, 2016 WL 4238769, at *2–3 (W.D. Mich. Jan. 28, 2016); *Personalized User Model, L.L.P. v. Google Inc.*, No. 09-cv-525, 2014 WL 807736 (D. Del. Feb. 27, 2014); *see also Vaporstream, Inc. v. Snap Inc.*, No. 2:17-CV-00220, 2020 WL 978731, at *8 (C.D. Cal. Feb. 28, 2020) ("Further, even assuming the IPR proceedings have some marginal relevance due to the potential overlap between the § 103 obviousness inquiry and the § 101 patent-eligibility inquiry, the Court still excludes the evidence due [to] the danger of jury confusion and wasting of time and resources. . . . Introduction of the IPR proceedings would likely require an explanation of the nature of IPR proceedings and the PTAB's role . . . and the PTAB's various findings in the multiple IPR proceedings. This would likely consume a significant amount of time and potentially lead to jury confusion over the invalidity issues in the case.").

**Appx8816**

With regard to willful infringement, I am skeptical that evidence of IPRs filed after this litigation began is particularly probative of willfulness.  To the extent that evidence of the IPRs might be relevant to that issue, I find that the introduction of evidence regarding the IPRs will result in prejudice to IOENGINE that substantially outweighs any minimal probative value that the evidence may have.  *See* Fed. R. Evid. 403; *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-cv-819, 2018 WL 2186677, at *1 (D. Del. May 11, 2018) ("Although relevant (for example, to Defendant's defense to willful infringement), the prejudice and confusion inherent in presenting [evidence regarding PTAB proceedings] to the jury—particularly given the PTAB's different standards—substantially outweighs its probative value.").  Accordingly, IOENGINE's motions in limine regarding the PTAB proceedings are GRANTED.

### B.  The MediKey Device

IOENGINE also moves to preclude Ingenico and PayPal from offering any evidence regarding the disappearance of the MediKey device, one of the prototypes created by Scott McNulty, the inventor of the asserted patents.  Dkt. No. 407 at 2–3.  Earlier in this case, after learning that the MediKey had disappeared, PayPal moved for spoliation sanctions, seeking an adverse inference instruction regarding the MediKey device.  In denying that motion, I noted that "[s]hould the disappearance of the MediKey device become relevant at trial in a way that is prejudicial to PayPal and Ingenico, I will permit PayPal and Ingenico to offer evidence of the MediKey's disappearance at that time."  Dkt. No. 400 at 18.  I agree with Ingenico that, "[w]ithout having heard what IOENGINE will present to the jury, a blanket prohibition precluding Ingenico [and PayPal] from exploring the MediKey device is premature and inappropriate."  Dkt. No. 412 at 3.  However, evidence or argument regarding the disappearance of the MediKey will be excluded unless IOENGINE opens the door to such evidence in some manner.  Should IOENGINE open the door at

trial, Ingenico or PayPal may request that I allow the introduction of evidence regarding the MediKey's disappearance at that time.  Accordingly, IOENGINE's motions in limine regarding the MediKey device are GRANTED IN PART.

### C.  Inequitable Conduct

IOENGINE next moves to preclude Ingenico and PayPal from "making any reference to inequitable conduct at trial, including any evidence, argument, or suggestion that anyone intentionally withheld material from the PTO or had (and violated) a duty of candor to the PTO." Dkt. No. 407 at 3.  Ingenico and PayPal agree that they will not present their inequitable conduct defenses to the jury, but they seek to introduce evidence that certain prior art references were not before the PTO during prosecution of the asserted patents.  Dkt. No. 412 at 4–5.  IOENGINE responds that it "does not intend [these] motion[s] to prevent Ingenico [and PayPal] from making general statements that references were or were not before the PTO, but Ingenico [and PayPal] may not argue or insinuate a breach of any duty to disclose."  Dkt. No. 418 at 2–3.  It is not clear that there is any real disagreement among the parties with respect to this motion, but to the extent that Ingenico or PayPal might wish to suggest that IOENGINE violated a duty of candor to the PTO, they will be precluded from doing so.  *Interdigital Commc'ns Inc. v. Nokia Corp.*, No. 13-cv-10, 2014 WL 12465431, at *1 (D. Del. Aug. 28, 2014) ("Inequitable conduct is not a matter for the jury to decide, and the jury should not hear any of that evidence unless it is independently admissible for some other purpose.").  Accordingly, IOENGINE's motions in limine regarding inequitable conduct are GRANTED.

### D.  Pejorative References to IOENGINE or the NPE Business Model

IOENGINE argues that Ingenico and PayPal "should not be permitted to refer to IOENGINE using pejorative descriptions that risk unfair prejudice."  Dkt. No. 407 at 4.  Specifically, IOENGINE

seeks to prevent Ingenico and PayPal from referring to IOENGINE as a "patent troll," "non-practicing entity," "patent assertion entity," or other similar term.  Ingenico and PayPal respond that they will not refer to IOENGINE as a "troll" or "patent troll," but that they should be able to use neutral terms such as "non-practicing entity" or "patent assertion entity."  Dkt. No. 412 at 5.

Courts are split regarding the use of neutral language to describe plaintiffs who do not practice the claims of the patents they are asserting.  *Compare Interdigital*, 2014 WL 12465431, at *2 ("Defendants may not refer to Plaintiff as troll, non-practicing entity (NPE), patent assertion entity, or extortionist."), *and Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-CV-00072, 2020 WL 13180008, at *3 (N.D. Cal. June 5, 2020) (excluding defendant's use of the terms "patent troll," "patent assertion entity," "PAE," "non-practicing entity," and "NPE"), *with Evolved Wireless, LLC v. Apple Inc.*, No. 15-cv-542, 2019 WL 1100471, at *7 (D. Del. Mar. 7, 2019) (allowing "neutral terms" such as "non-practicing entity"), *and Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201, 2017 WL 2773944 (E.D. Tex. May 26, 2017) ("[T]he term 'patent assertion entity' or 'non-practicing entity' may be used . . . .").

The problem with facially neutral labels such as "non-practicing entity" or "patent assertion entity" is that they are generally not helpful to the jury, which is not likely to understand what those terms mean, standing by themselves.  And in the event that jury members are familiar with the terms, they may also be familiar with the negative connotations that those terms sometimes carry.  *See Finjan*, 2020 WL 13180008, at *3 ("[S]uch projective labels are irrelevant, unhelpful to the jury, and in some instances carry negative connotations.").  PayPal and Ingenico will therefore not be permitted to use labels such as "non-practicing entity" or "patent assertion entity."  On the other hand, evidence that IOENGINE does not make or sell products embodying the claimed inventions is relevant to damages, so I will allow Ingenico or PayPal to make statements indicating that

6

**Appx8819**

IOENGINE does not practice the asserted claims, so long as those statements are made in plain language and in "neutral, strictly factual terms."  *See Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, No. C 12-1971, 2014 WL 4090550, at *12 (N.D. Cal. Aug. 19, 2014).  Accordingly, IOENGINE's motions in limine regarding pejorative references are GRANTED IN PART.

### E.   Fuji Litigation

IOENGINE moves to preclude Ingenico and PayPal from referring to or offering evidence about a prior lawsuit between Fuji Photo Film U.S.A., Inc., ("Fuji") and Mr. McNulty, in which Fuji alleged that Mr. McNulty defrauded Fuji.  That action settled prior to a determination on the merits. Ingenico and PayPal argue that if IOENGINE offers evidence that Mr. McNulty self-funded the development of his prototypes, they should be able to offer evidence "that Mr. McNulty funded [his] prototypes with fraudulently obtained funds," and that such evidence would include facts regarding Fuji's allegations against Mr. McNulty and the settlement agreement between them.  Dkt. No. 412 at 6.  As noted below, I will exclude any evidence relating to the source of funding for Mr. McNulty's prototypes.  The Fuji litigation is therefore not relevant to any issue that will arise at trial.  Moreover, the introduction of evidence relating to the Fuji action would likely provoke a dispute over a collateral matter that has little relevance to the issues in this case.  Accordingly, IOENGINE's motions regarding the Fuji litigation are GRANTED.

### F.   Undisclosed Testing of Prior Art Devices

IOENGINE seeks to preclude Ingenico and PayPal from introducing evidence of "testing or inspection of physical devices that was not disclosed in Ingenico's [or PayPal's] expert reports." Dkt. No. 407 at 6.  It is true that neither Ingenico's expert, James Geier, nor PayPal's expert, Harry Bims, reported that they performed any testing on the prior art devices asserted by PayPal and Ingenico in this case (the "DiskOnKey" and the "Fuji Camera").  Any attempt by those experts to

7

testify at trial regarding any testing that they did on those devices will be excluded as being outside the scope of those experts' reports.

PayPal and Ingenico oppose IOENGINE's motions on this issue, contending that the motions are broad enough to preclude Mr. Geier and Dr. Bims from demonstrating the DiskOnKey and the Fuji Camera to the jury at trial. IOENGINE argues, without providing any authority, that the experts should not be able to demonstrate those devices at trial because any demonstrations would be outside the scope of the experts' reports.

A high-level demonstration of the DiskOnKey and Fuji Camera devices will likely aid the jury in understanding the technology underlying those devices. I also note that, in their reports, both Mr. Geier and Dr. Bims expressly reserved the right to demonstrate the devices to the jury at trial. Dkt. No. 412-1, Exh. 5, at ¶ 92 (Geier report); Case No. 18-452, Dkt. No. 467-1, Exh. 5, at ¶ 91 (Bims report). Mr. Geier and Dr. Bims will therefore be permitted to demonstrate the basic functionality of those devices, provided that the functionality being demonstrated is in some way referenced in their reports. Should the experts attempt to demonstrate functions that are not disclosed in their reports, or attempt to refer to testing or inspection that they conducted but did not disclose in their reports, that testimony will be excluded. IOENGINE's motions regarding undisclosed testing of prior art devices are therefore GRANTED IN PART.

### G. Uncharted Background Art References

IOENGINE seeks to preclude Ingenico and PayPal "from offering into evidence or publishing to the jury any references not fully described and charted, on an element-by-element basis, in the claim charts" in Ingenico and PayPal's final invalidity contentions. Dkt. No. 407 at 8. Ingenico and PayPal intend to offer evidence that certain figures and portions of the specifications of the asserted patents are also present in several other patents because they were part of a "template" used by the

attorney who prosecuted the parent application.  Dkt. No. 412 at 9.  Those patents, in which the

alleged "template" appears, are not listed in either defendant's invalidity contentions.  Accordingly,

IOENGINE's motion essentially seeks to prevent Ingenico and PayPal from presenting evidence of

those uncharted references to the jury.

Earlier in this case, I noted during a discovery teleconference that "background art references

can be used as background, can be used by the experts in their reports, and can be alluded to by the

experts in the course of testimony; but they cannot be admitted as exhibits or otherwise published to

the jury in the form, for example, of a demonstrative."  Dkt. No. 412-1, Exh. 7, at 9.  I added,

however, that "if there is a particular reference that for some good reason needs to be featured in

more detail than would be possible in an expert's testimony, for example, report or testimony, under

Rule 703, then I would be willing to consider it."  *Id.* at 13.

Ingenico and PayPal argue that the "template" is relevant to issues such as the background of

the technology, the state of the art, and the knowledge of a person of skill in the art.[2]  I am not

persuaded, however, that the templates must be displayed to the jury in the form of a demonstrative.

To the extent it would be helpful to the jury to know that certain portions of the asserted patents are

present in other, uncharted patents, the parties may elicit testimony to that effect from their experts

(assuming such testimony is properly within the scope of their reports).  To display portions of those

uncharted patents to the jury, however, would create the risk of the "jury being misled by thinking

that the background art is a fact open for consideration as invalidating art."  *Id.* at 8; *see also*

---

[2]  PayPal and Ingenico also argue that the template is relevant to the issue of whether the technology is well understood, routine, and conventional, for purposes of determining patent eligibility under 35 U.S.C. § 101.  Because I held in the order on the parties' motions for summary judgment that PayPal and Ingenico had not established that the asserted claims are directed to an abstract idea, Dkt. No. 449 at 20, that issue is not likely to be implicated in the jury trials.

**Appx8822**

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 17-cv-577, Dkt. No. 294 at 4 (E.D. Tex. Jan. 8, 2019) (noting that anything more than a "passing reference" to background art "may result in jury confusion"). Accordingly, IOENGINE's motions regarding uncharted background art references are GRANTED IN PART.

### H. Testimony from Eyal Sobol

IOENGINE seeks to preclude the testimony of Eyal Sobol, an employee of non-party Western Digital Corporation ("WD"), who may testify regarding certain documents relating to the DiskOnKey device asserted as prior art by PayPal and Ingenico. Specifically, IOENGINE argues that "[b]ecause Mr. Sobol was not employed by WD until June 2004, he lacks personal knowledge of any documents, circumstances, or events before that date, and any such testimony should be excluded under Fed. R. Evid. 602." Dkt. No. 407 at 9. Because the earliest effective filing date of the patents is March 23, 2004, IOENGINE argues that Mr. Sobol lacks personal knowledge of issues that are relevant to validity, and any issues of which he has knowledge from June 2004 onward are irrelevant and/or potentially misleading to the jury.

Ingenico and PayPal argue that because Mr. Sobol was deposed as WD's Rule 30(b)(6) witness, he need not have personal knowledge of the facts on which he gives testimony. That is true for depositions, but at trial, a non-party 30(b)(6) witness must have personal knowledge of matters about which he testifies, as required by Federal Rule of Evidence 602. *Alpek Polyester, S.A. de C.V. v. Polymetrix AG*, No. 2021-1706, 2021 WL 5974163, at *4–5 (Fed. Cir. Dec. 16, 2021); *see also Digene Corp. v. Ventana Med. Sys.*, Inc., 316 F. Supp. 2d 174, 181 n.10 (D. Del. 2004). At the 30(b)(6) deposition of WD, Mr. Sobol indicated at various points that he could not speak to issues that occurred prior to his employment with WD. *See, e.g.*, Dkt. No. 408-3 at 27, 30, 88. Accordingly,

10

**Appx8823**

Mr. Sobol will not be permitted to testify as to any facts of which he does not have personal knowledge.

I will not, however, exclude Mr. Sobol's testimony in its entirety at this time. There may be certain issues, facts, or exhibits of which he does have personal knowledge and to which his testimony would be relevant. To exclude that testimony at this time would be premature, and IOENGINE may be heard at trial if it has objections to such testimony. In particular, PayPal and Ingenico argue that personal knowledge is not required for purposes of authenticating business records. Depending on the nature of Mr. Sobol's testimony in support of the admission of any business records that PayPal or Ingenico seek to introduce through him, the admissibility of his testimony on that issue can be resolved either based on a pretrial proffer as to the nature of his testimony, or at trial. IOENGINE's motions regarding Mr. Sobol's testimony are therefore GRANTED IN PART.

## I.   Fact Witness Comparison of Products to the Asserted Claims

IOENGINE also seeks to preclude Ingenico and PayPal from offering testimony from fact witnesses that compares the asserted claims to either an accused product or a prior art reference. IOENGINE's argument is essentially that such comparisons are not "rationally based on the witness's perception" and therefore must be offered as expert testimony. Fed. R. Evid. 701.

The problem is that IOENGINE has not identified the testimony that it seeks to exclude with this motion. As a result, this motion is premature because the court is not able to determine whether the testimony "may be relevant and admissible for [a] limited purpose[]." *Evans v. John Crane, Inc.*, No. 15-cv-681, 2019 WL 5457101, at *3 (D. Del. Oct. 24, 2019). There are circumstances in which a fact witness may properly testify regarding the structure, function, and operation of accused products, as well as beliefs regarding invalidity or non-infringement. *See, e.g., Omega Pats., LLC v.*

**Appx8824**

*CalAmp Corp.*, 920 F.3d 1337 (Fed. Cir. 2019) (holding that district court should have admitted lay witness's conclusions about infringement for purposes of determining the defendant's state of mind prior to infringement); *Helios Software, LLC v. SpectorSoft Corp.*, No. 12-cv-081, 2015 WL 3653182, at *1 (D. Del. June 11, 2015) (providing that lay witness "may testify that he reviewed the patent-in-suit and came to the conclusion that the Accused Products did not infringe," but "may not express opinions regarding the construction of claim limitations or whether particular claim elements are practiced by the accused products, opinions regarding Plaintiffs' expert's conclusions, or any technical infringement analysis").

If, during the course of trial, IOENGINE wishes to raise this objection to specific testimony offered by a witness, I will rule on the objection at that time. At this time, however, IOENGINE's motions regarding fact witnesses' comparisons of the accused products or prior art to the asserted claims are DENIED.

### J. Decryption Services Agreement

In the PayPal case, IOENGINE seeks to preclude PayPal's damages expert, Laura Stamm, from relying on a Decryption Services Agreement ("DSA") between PayPal and Roam Data, Inc. ("Roam").[3] The DSA provided that Roam would develop services that decrypt payment transaction information and that Roam would provide those services to PayPal. Case No. 18-452, Dkt. No. 458-5 at ¶ 113. The DSA further provided PayPal with a license to "Roam's intellectual property rights as utilized by PayPal for the development and provision of the decryption services." *Id.* As part of the DSA, PayPal agreed to pay Roam [REDACTED] for each transaction processed by Roam. *Id.*

---

[3] Roam was a predecessor company of Ingenico. Case No. 18-452, Dkt. No. 457 at 12.

12

**Appx8825**

at ¶ 114.  Ms. Stamm stated that she considers that per-transaction fee to be "an upper-bound on the value of the Asserted Patents."  *Id.* at ¶ 115.

IOENGINE objects to Ms. Stamm's reliance on the DSA because it is not sufficiently comparable to the patented technology.  PayPal responds by arguing that "Ms. Stamm does not rely on the [DSA] as a comparable license under *Georgia-Pacific* factors 1 or 2," but rather relies on the DSA as "any evidence probative of the value of the [infringer's] use" of the invention under *Georgia-Pacific* factor 11.  Case No. 18-452, Dkt. No. 466 at 13-14 (referencing *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).  PayPal's argument, however, is unpersuasive given that Ms. Stamm is using the DSA to set an upper bound for the royalty rate, or in other words, to "extrapolate an indicated royalty rate."  *See DataQuill Ltd. v. High Tech Computer Corp.*, No. 08-CV-543, 2012 WL 1284381, at *7 (S.D. Cal. Apr. 16, 2012).  In such cases, the agreement should be treated "as if it were a prior license under *Georgia-Pacific* factor 1 or 2 or a customary rate under factor 12."  *Id.*  The DSA must therefore be comparable to the patented technology in order for Ms. Stamm to rely upon it.  *See id.* (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)).

There are numerous differences between the DSA and a hypothetical license to the patents-in-suit.  First, the DSA covers *de*cryption services, while PayPal characterizes IOENGINE's infringement position as covering *en*cryption services.  *See* Case No. 18-452, Dkt. No. 466 at 14.  Additionally, even accepting that the value of decryption services may be relevant to the value of encryption services, the claims are not directed to encryption services; they are directed to using a user interface on one device to control the execution of certain code on a second device and to facilitate communication between the second device and a communication network node.  *See generally* '969 and '703 patents.  Neither Ms. Stamm nor any of PayPal's other experts attempt to

**Appx8826**

explain to what extent the value of encryption is driven by the patented technology as opposed to other aspects of encryption technology (e.g., the particular encryption algorithm being used).  Finally, the DSA is primarily an agreement for services, not a patent license, and Ms. Stamm was not able to identify what intellectual property rights (if any) were actually covered by the license.  Case No. 18-452, Dkt. No. 458-6 at 92.  In short, there are several substantial differences between the DSA and a hypothetical license to the patented technology, and I do not find that the DSA is sufficiently comparable to be relevant to the reasonable royalty calculation.  Accordingly, Ms. Stamm will be precluded from relying on the DSA in her calculation of a reasonable royalty.  IOENGINE's motion regarding the DSA is therefore GRANTED.

## II. <u>Ingenico's and PayPal's Motions</u>

I now turn to the motions in limine filed by PayPal and Ingenico.  As with IOENGINE's motions, PayPal and Ingenico raise several issues that are common to both cases.  I will discuss the common motions first before moving to the motions that are unique to each case.

### A. Jury Verdicts and Settlement Agreements

PayPal and Ingenico first seek to preclude IOENGINE from relying on jury verdicts in two prior cases involving the same family of patents as those asserted in these cases.  In my order addressing the parties' *Daubert* motions, I granted PayPal and Ingenico's motion to exclude the testimony of Dr. Jeffery Stec, IOENGINE's damages expert, regarding prior jury verdicts and settlements as related to the reasonable royalty determination.  Dkt. No. 449 at 40–55.  I adhere to that ruling, and to the extent that either Dr. Stec or any other witness seeks to rely on those jury verdicts or settlement agreements, they will be precluded from doing so.  Accordingly, PayPal's and Ingenico's motions regarding jury verdicts and settlement agreements are GRANTED.

### B.  License Agreements in Exhibits

Ingenico and PayPal seek to preclude IOENGINE, and specifically Dr. Stec, from relying on license agreements that are referenced only in an exhibit to Dr. Stec's report.  In the exhibit in question, Dr. Stec identified numerous "Potentially Comparable Licenses," many of which are not mentioned or discussed in the body of his report.  Dkt. No. 405-1, Exh. 1 at Exh. 15.0.  IOENGINE argues that those licenses "are relevant to show that Dr. Stec conducted a thorough search and considered a substantial number of licenses."  Dkt. No. 413 at 4.  As noted, I have excluded significant portions of Dr. Stec's testimony. Dkt. No. 449 at 40–55.  To the extent that Dr. Stec may seek to offer testimony that has not been excluded, he will not be permitted to testify beyond the scope of his report.  That is, he may reference the exhibit in question to illustrate that he has reviewed a large number of licenses, but he may not rely on any of those licenses as the basis for a reasonable royalty determination if he has not sufficiently developed that analysis in his report.  Accordingly, Ingenico's and PayPal's motions regarding license agreements in the exhibits to Dr. Stec's report are GRANTED IN PART.

### C.  Net Worth, Size, or Revenues of Defendants

PayPal and Ingenico next seek to preclude IOENGINE from offering evidence of their size, net worth, revenues, or ability to pay a judgment.  IOENGINE responds that it "does not intend to introduce at trial evidence of Ingenico's [or PayPal's] overall size, revenues, financial status, or ability to pay a judgment, provided Ingenico [or PayPal] does not open the door to such evidence." Dkt. No. 413 at 4.  Any such evidence regarding Ingenico or PayPal's overall size, net worth, or revenues is not relevant to either liability or damages and will therefore be excluded.[4]

---

[4]  If Ingenico or PayPal opens the door with respect to the issue of either party's net worth or financials, I may revisit this ruling at that time.

**Appx8828**

Ingenico's motion also seeks to exclude evidence regarding Ingenico's "revenue from accused products." Dkt. No. 405 at 4. In his report, Dr. Stec uses Ingenico's total revenue from accused products as the royalty base in his calculation of a reasonable royalty. Dkt. No. 414-1, Exh. 5, at 35. I have excluded Dr. Stec's testimony in part because he has failed to properly apportion the value of the patented features, Dkt. No. 449 at 40–47, but such a royalty base would be proper if the royalty rate were properly apportioned. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (allowing accused lawnmower to serve as the royalty base "so long as [the patentee] adequately and reliably apportions between the improved and conventional features of the accused mower" using the royalty rate). Accordingly, I will allow evidence of Ingenico's revenue from the accused products to be used for the limited purpose of establishing a royalty base, to the extent it is relevant to IOENGINE's presentation of its damages theory. Ingenico's and PayPal's motions regarding net worth, size, and financial information are therefore GRANTED IN PART.

### D. Evidence of Direct Infringement Via Testing

PayPal and Ingenico seek to preclude IOENGINE from presenting evidence that PayPal or Ingenico directly infringe the asserted claims by testing the accused products. I have granted summary judgment that Ingenico does not directly infringe the claimed methods by testing its products. Dkt. No. 449 at 30. This motion is therefore denied as moot with respect to Ingenico. As for PayPal, I declined to grant summary judgment of no direct infringement via testing, and in doing so I noted that "[w]hile the 'volume' of the alleged test transactions is vanishingly small, . . . evidence [of those transactions] is sufficient to create a triable issue of fact as to whether PayPal engaged in at least some acts of direct infringement of the method claims." *Id.*

The basic thrust of PayPal's motion is that evidence of direct infringement should be excluded because IOENGINE does not present a corresponding damages theory for that theory of infringement. It is true that Dr. Stec's damages report does not discuss infringement via testing. However, *de minimis* infringement is still infringement, and IOENGINE would be entitled to nominal damages if it establishes that PayPal infringes the asserted claims by testing the accused products, even if IOENGINE presents no other evidence of damages resulting from infringement.[5] See *Am. Infertility of New York, P.C. v. Deep Blue Health New Zealand Ltd.*, No. 17-CV-5666, 2019 WL 10786023, at \*7–8 (S.D.N.Y. Dec. 30, 2019), *report and recommendation adopted*, 2020 WL 4218261 (July 23, 2020) (collecting cases). Any potential for jury confusion that may result from the introduction of such evidence can likely be cured with an appropriate jury instruction. Accordingly, PayPal's motion regarding evidence of direct infringement via testing is DENIED.

### E. Evidence of Unasserted Patents

PayPal and Ingenico seek to preclude IOENGINE from offering evidence of other patents that are not asserted in this case, on which Mr. McNulty is the inventor, on the ground that such evidence is likely to confuse the jury. IOENGINE responds that it "does not seek to admit unrelated patents into evidence," but does intend to introduce evidence of Mr. McNulty's background, "including that he has received other patents." Dkt. No. 413 at 7. I agree with Ingenico and PayPal

---

[5] PayPal argues in reply that IOENGINE should be limited to $1.00 in nominal damages if IOENGINE is permitted to present evidence of infringement via testing. Case No. 18-452, Dkt. No. 476 at 2 & n.4 (citing *AOS Holding Co. v. Bradford White Corp.*, No. 18-cv-412, 2021 WL 5411103, at \*37–40 (D. Del. Mar. 31, 2021)). The actual amount of nominal damages that would be awarded in the event of infringement is likely to be even lower, as IOENGINE has pointed to only 15 cents of sales that are attributable to infringement via testing. *See* Dkt. No. 449 at 29–30. If an appropriate royalty rate were applied to that base, the amount of damages would likely be only a few cents, at most.

17

that the introduction of evidence regarding patents that are not asserted in these cases may confuse or mislead the jury. To the extent that IOENGINE seeks to introduce testimony regarding Mr. McNulty's background, IOENGINE may offer evidence of the fact that Mr. McNulty has received other patents, but may not introduce any specific information regarding any unasserted patents on which Mr. McNulty is listed as the inventor. Accordingly, PayPal's and Ingenico's motions regarding unasserted patents are GRANTED IN PART.

### F. Indemnification Claims

Ingenico and PayPal next move to exclude evidence of any agreements or requests for indemnification between PayPal and Ingenico on the ground that such evidence is not relevant to any issue to be decided by the jury. IOENGINE argues that the evidence is relevant for four reasons: (1) Ingenico's indemnification of PayPal is referenced in Ingenico's declaratory judgment complaint; (2) Ingenico's indemnification relationship with PayPal is relevant to Ingenico's knowledge of the asserted patents; (3) indemnity is relevant to the issue of joint infringement; and (4) indemnity is relevant to whether PayPal is in privity with Ingenico for purposes of determining whether PayPal is subject to IPR estoppel.

None of those reasons is sufficient to justify the admission of evidence regarding PayPal and Ingenico's indemnification relationship. First, the recitation of a fact in a complaint does not itself mean that the fact is relevant to any issue that will be decided by the jury. Second, it is not necessary for IOENGINE to refer to the indemnification agreement in order to establish that Ingenico had knowledge of the patents at some point after IOENGINE brought its suit against PayPal. Any communication between Ingenico and PayPal that refers to the patents would be sufficient proof of that fact, and reference to the indemnification agreement would add nothing to the force of that evidence. Third, contrary to IOENGINE's assertion, the indemnification relationship between

18

**Appx8831**

Ingenico and PayPal is not relevant to whether Ingenico directs or controls PayPal in its alleged practice of the asserted claims. That is especially true given that PayPal and Ingenico disagree regarding who is required to indemnify whom. *See* Dkt. No. 371 at 23–24. Fourth, I have held that privity for purposes of ruling on the scope of IPR estoppel is an issue for the court. Dkt. No. 449 at 70. That means that the issue of privity will not be before the jury and that evidence of the indemnification relationship therefore will not be admissible for that purpose.

At bottom, the introduction of evidence regarding the indemnification relationship between PayPal and Ingenico is not relevant to any issue that will arise at trial; moreover, such evidence would be likely to confuse the jury, and it could result in prejudice to PayPal or Ingenico if the jury were to believe that another entity would be responsible for any judgment it awards. Accordingly, PayPal's and Ingenico's motions regarding the defendants' indemnification relationship are GRANTED.

### G.  Funding of Mr. McNulty's Prototype Development

Ingenico and PayPal move to exclude evidence regarding the funding of Mr. McNulty's prototype development, including "any suggestion that Mr. McNulty spent his life savings or his retirement funds on their development." Dkt. No. 405 at 11. IOENGINE argues that such evidence is relevant to Mr. McNulty's diligence in reducing the claimed inventions to practice.

I find that the amount of funding directed toward Mr. McNulty's prototype development is relevant to the question of diligence, but the source of that funding is not. Mr. McNulty's efforts in developing the claimed inventions can be sufficiently described to the jury without reference to the source of the funds expended in reducing the invention to practice. To the extent that evidence regarding the source of the funding of Mr. McNulty's prototype development might have some marginal relevance to diligence, I find that the risk of provoking "irrelevant sympathy" from the jury

19

**Appx8832**

substantially outweighs whatever relevance that evidence has.  *See* Fed. R. Evid. 403; *United States v. Baker*, 928 F.3d 291, 299 (3d Cir. 2019).  Accordingly, PayPal's and Ingenico's motions regarding prototype funding are GRANTED IN PART.

### H.  Deposition Testimony from PayPal Action

Ingenico seeks to preclude IOENGINE from introducing deposition testimony of PayPal witnesses in the Ingenico case.  Federal Rule of Evidence 804(b)(1) provides an exception to the hearsay rule for testimony that "was given as a witness at a . . . lawful deposition, whether given during the current proceeding or a different one" and that "is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination."  Ingenico argues that testimony from depositions in the PayPal case that Ingenico did not participate in is not admissible under that Rule.

At the pretrial conference, I requested that the parties provide additional briefing on the issue of whether Ingenico had an opportunity to participate in the depositions of PayPal witnesses.  Accordingly, I will enter a separate order ruling on this motion at a later date.

### I.  Discussion of Webby Awards

PayPal seeks to preclude IOENGINE from introducing evidence that Mr. McNulty won an award known as a "Webby award" in 2005, and specifically that Mr. McNulty may have discussed his inventions with an unnamed PayPal employee who also won a Webby award the same year.  PayPal's concern is that IOENGINE may attempt to use that discussion to establish that PayPal had pre-suit knowledge of the asserted patents.  IOENGINE responds that it "will not seek to prove PayPal's pre-suit knowledge by reference to the Webby award."  Case No. 18-452, Dkt. No. 468 at 7.  IOENGINE asserts that evidence of Mr. McNulty's Webby award is relevant to his background and experience.  *Id.*

**Appx8833**

I agree with IOENGINE that Mr. McNulty's Webby award is relevant to his background, experience, and knowledge in the computing industry. It is not clear, however, how any reference to communications with an unnamed PayPal employee in the course of describing that award would be relevant to any issue in this case. I will therefore permit Mr. McNulty to testify regarding his Webby award, but I will preclude him from referencing PayPal in the course of that testimony. Accordingly, PayPal's motion is GRANTED IN PART.

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal. *See, e.g.*, Dkt. Nos. 405, 407, 412, 413, 418, 420. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 15th day of June, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

**Appx8834**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGENICO INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 18-826-WCB |
| IOENGINE, LLC, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

_____

| | |
|---|---|
| IOENGINE, LLC, | § |
| | § |
| *Counterclaim Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| INGENICO INC., | § |
| INGENICO CORP., and | § |
| INGENICO GROUP S.A., | § |
| | § |
| *Counterclaim Defendants.* | § |

_____

**OMNIBUS PRETRIAL ORDER**

On June 13, 2022, the court held a telephonic pretrial conference with the parties in this case. This order addresses several issues that were raised during the conference as well as other issues relating to the conduct of the trial on liability.

    1.     Each day of the trial will begin at 9:00 a.m. and run until 5:30 p.m. Eastern Time. Those times may be adjusted in light of the jurors' needs, if necessary.

2. The trials on liability and damages in this case will be timed. For the trial on liability, each party will be given 10 hours of trial time to present its case on liability, including willfulness. For the trial on damages, the amount of time allocated to each party will be determined after further consultation with the parties. In both trials, the time for direct and re-direct examination will be charged to the party that calls a given witness. The time for cross-examination will be charged to the opposing party. The time for any objections will be charged to the objecting party. The time in between witnesses will be charged to the party that is currently presenting its case.

3. The parties should ensure that they have enough witnesses or other evidence available for each trial day. If a party runs out of witnesses prior to the scheduled end of a trial day, that party will be charged for the remaining time until the scheduled end of the day. The parties should plan to arrive by 8:30 a.m. on the first trial day so that any outstanding legal issues may be resolved prior to voir dire.

4. Each party may present an opening statement of up to 20 minutes and a closing statement of up to 40 minutes that will not count against its trial time. I will permit each party to extend its opening statement to up to 30 minutes in total and its closing statement to up to 90 minutes in total, but any time used beyond 20 and 40 minutes, respectively, will be charged to that party's trial time.

5. For purposes of the order of presentation, IOENGINE will be treated as the plaintiff. As such, IOENGINE will be assigned the counsel table closer to the jury box. The trial on liability will proceed as follows: IOENGINE will present its affirmative case regarding infringement. Ingenico will next present its responsive case with respect to infringement and its affirmative case regarding validity. IOENGINE will then present its rebuttal case on infringement and its responsive case regarding validity. Finally, Ingenico will present its rebuttal case regarding validity.

2

**Appx8836**

6.      All witnesses who are not experts, or officers or employees of a party, will be sequestered during trial as provided by Fed. R. Evid. 615.

7.      Ordinarily, the parties should advise opposing counsel of the witnesses they intend to call on a given trial day, in the order of their appearance, by 7:00 p.m. two calendar days before those witnesses are to be called.  For example, a witness who is expected to be called on Thursday should be disclosed to the opposing party by 7:00 p.m. on Tuesday.  A party may disclose a witness on shorter notice upon a showing of good cause, but in no event should a witness be disclosed to the opposing party later than 7:00 p.m. on the day before that witness is to be called.  The parties should advise opposing counsel of the witnesses to be called on the first day of trial by Thursday, July 7, 2022, at 12:00 p.m. Eastern Time.

8.      For any witness whose testimony the parties intend to present at trial by deposition, the parties shall identify a list of deposition designations to be played to the jury, the order in which the deposition designations will be played, and the proposed exhibits used in the designations by 6:00 p.m. two calendar days before the designations are to be played to the jury.  Counter-designations are to be identified by 8:00 p.m. that same day.  The proffering party will submit its revised counter-counter designations by 10:00 p.m. that same day.  If by that time the parties are not in agreement as to the deposition designations that are to be played for the jury, they shall advise the court by email to Mr. Sowers detailing the issue or issues on which the parties are in disagreement.  When a witness's deposition testimony is played at trial, the party calling the witness shall provide the court with two printed copies of the transcript of the designations, counter-designations, and counter-counter-designations that will be played.  Any party may use testimony that is designated by another

3

**Appx8837**

party, to the same effect as if it had initially designated the testimony as its own, subject to all objections.[1]

9.      If a party intends to object to any deposition testimony designated by the opposing party, those objections must be submitted to the court by Friday, July 8, 2022, at 12:00 p.m. Eastern Time. When submitting an objection to a deposition designation, a party should identify what portion(s) of the designation is objected to, state with particularity the basis for the objection, and provide a transcript of the relevant portion of the deposition.  Any objection not submitted by that deadline will be deemed waived.  The parties are encouraged to meet and confer prior to the July 8 deadline in order to reduce the number of objections to deposition designations.

10.      The designations, counter-designations, and counter-counter-designations will be read or played by video in chronological order at the same time.  Each side shall be charged for the time needed to play only its own designations, counter-designations, and/or counter-counter designations, and will not be charged for the time necessary to play the other side's designations, counter-designations, and/or counter-counter-designations.  Colloquy between counsel, requests to have the court reporter read back a question, and objections will be eliminated when a deposition excerpt is played at trial.  Prior to reading or playing the designated testimony for a given witness, the parties should jointly determine what portion of the total time for that person's testimony is chargeable to each side and notify the courtroom deputy of those times.

11.      The party offering the testimony is responsible for preparing video deposition clips of all designated testimony for that witness.  A copy of the video deposition clips shall be provided to the

---

[1] This paragraph makes slight modifications in the proposed procedures set forth in the parties' joint status report filed on July 1, 2022, Dkt. No. 486, in order to facilitate more efficient court review of any disputes that may arise with regard to deposition designations.

**Appx8838**

opposing party by no later than 8:00 p.m. the day before the deposition testimony is expected to be played, or state in writing that the deposition will be read into the record.

12.     For those witnesses whose depositions will be played or read, the parties shall be permitted to make brief transition statements to introduce the witnesses by name, position or title, and/or the company with which he or she is associated, the time for which shall be charged to the party offering the witness's testimony, unless otherwise agreed to by the parties.  However, counsel shall not be permitted to argue or comment on the evidence during those transition statements.

13.     The above procedures regarding deposition designations do not apply to portions of deposition transcripts and/or video used for impeachment or cross-examination of a witness.  Any sworn testimony of a witness may be used at trial for the purpose of impeachment of that witness, regardless of whether a party identified that testimony on its list of deposition designations.  The parties may object to the use of deposition and other prior testimony for impeachment purposes, including but not limited to objections based on lack of completeness and/or lack of inconsistency.

14.     Exhibits not listed on a party's exhibit list or on the opposing party's exhibit list will not be admitted into evidence unless good cause is shown.  Exhibits to be used solely for impeachment need not be disclosed in advance of being used at trial.

15.     Any exhibit, once admitted at trial, may be used equally by any party, subject to the Federal Rules of Evidence.

16.     The parties shall exchange final digital copies of their exhibits, with exhibit numbers, by Friday, July 8, 2022.  The parties should also send final digital copies of their exhibits to my law clerk, Mr. Dane Sowers, at sowersd@cafc.uscourts.gov by that date.

17.     To the extent possible, I will prequalify exhibits for admission prior to the start of the trial.  Exhibits that are prequalified are not formally in evidence, but may be referenced during the

**Appx8839**

opening statements or otherwise prior to their formal introduction.  At the conclusion of a witness's testimony, the party that called the witness should move into evidence all exhibits that were introduced through that witness.

18.     The parties should ensure that three physical sets of exhibits are available during the trial. At the conclusion of the trial, the parties may take the exhibits with them unless otherwise directed by the court.

19.     On or before the first day of trial, counsel shall deliver to the courtroom deputy a completed AO Form 187 exhibit list for each party.

20.     Each party should provide any demonstratives that it wishes to use on the first day of trial to opposing counsel by Thursday, July 7, 2022, at 12:00 p.m. Eastern Time, and any objections should be raised by the end of the day on July 7.  For subsequent trial days, demonstratives should be provided to opposing counsel during the trial day prior to their intended use, and any objections to those demonstratives should be raised by the end of that trial day so that the objections may be ruled on after the jury retires for the day.

21.     I will hold an informal, off-the-record conference in the courtroom regarding jury instructions on Tuesday or Wednesday of the trial week immediately following the trial day, depending on the state of the trial proceedings at that point.  Prior to the informal conference, I will provide copies of my tentative jury instructions to the parties.  The purpose of the informal conference is to obtain input, concerns, and suggestions from the parties prior to the formulation of my final instructions.  Failure to raise an issue or make an objection at the informal conference will not result in a waiver of any issue.

22.     The formal instruction conference will occur on Thursday of the trial week after I have considered the parties' informal suggestions and objections, and after I have made any necessary

**Appx8840**

changes to my tentative jury instructions and provided the revised version of the instructions to the parties. Objections at the formal instruction conference in accordance with Federal Rule of Civil Procedure 51 will be required. Objections made at that time will be required to specify with particularity why the instruction in question is erroneous and how the party wishes it to be altered. Failure to state the reasons for objection to a particular instruction and to propose an acceptable alternative will be deemed a waiver of objection to that instruction.

23. Ingenico has made additional factual submissions regarding the patent eligibility of the asserted claims under 35 U.S.C. § 101. Those submissions constitute proffers and will not be deemed to be in evidence unless the evidence referenced in those submissions is formally offered at trial. The parties may introduce evidence directed to the section 101 issue during the trial on liability.

24. The parties have agreed that the question whether a patent claim is addressed to an abstract idea under step one of the analysis of 35 U.S.C. § 101 under *Alice Corp. Pty. v. CLS International*, 573 U.S. 208 (2014), and *Mayo Collaborative Services v. Prometheus Laboratories, Inc.,* 566 US. 66 (2012), is a question for the court, not for the jury. *See* Dkt. No. 421 at 9–10; Dkt. No. 423 at 1. In light of the parties' agreement on that issue, I will decide that issue rather than giving it to the jury for decision. If it becomes necessary to address step 2 of the section 101 analysis, I will determine whether to submit that issue to the jury at that time.

25. The parties shall provide juror notebooks for the jurors to use during the trial. Each notebook shall include pictures of the witnesses, copies of the asserted patents, and a number of blank pages for note taking. No other materials may be included in the juror notebooks.

26. During the trial, if any issues arise that need to be resolved during the next trial day, the parties are directed to notify Mr. Sowers via email of any such issues by 9:00 p.m. on the evening

**Appx8841**

preceding the trial day on which resolution is needed.[2]  At that time, the parties should provide sufficient factual background and any relevant legal authorities bearing on the issue in dispute.  I will make myself available for 30 minutes prior to the start of each trial day to address any such issues with the parties.

27.     Any motions for judgment as a matter of law should be made during breaks and outside the presence of the jury.  Such motions shall be raised with the court at the first break after the appropriate point during trial so that the court can inform the parties when such motions will be heard and whether the court wishes to receive briefing on the motions.

28.     The court will provide lunch for the jurors, the cost of which will be shared equally by the parties.  The parties should also each provide a case of bottled water for the jury room.  Each trial day will include a 30–40 minute break for lunch and two 10–15 minute breaks (one in the morning and one in the afternoon).

29.     No food or beverages other than water will be permitted in the courtroom.

30.     The jury will consist of eight jurors, subject to modification in the event of unexpected circumstances between the date of this order and the trial on liability.

31.     Ingenico has raised the question whether the America Invents Act ("AIA") applies to the asserted patent claims in this case.  Ingenico argues that the AIA applies to the asserted patents because both patents' applications contained at least one claim having an effective filing date that is after March 15, 2013.  When a patent application contains at least one claim with an effective filing date on or after March 16, 2013, the entire application is governed by the provisions of the AIA.

---

[2] To the extent possible, the parties are encouraged to notify the court of any pending disputes as soon as those disputes are ripe for the court's resolution, rather than waiting until 9:00 p.m. on the evening before resolution is needed.

8

**Appx8842**

United States Patent & Trademark Office, *Manual of Patent Examining Procedure* § 2159.02–03 (9th ed., revised June 2020).

Ingenico argues that claim 9 of the '969 patent and claim 24 of the '703 patent contain subject matter that was not disclosed in any parent application filed prior to the effective date of the AIA, and therefore those claims cannot benefit from the effective filing dates of those parent applications. Accordingly, Ingenico argues, the asserted claims are governed by the Patent Act as amended by the AIA. Claim 9 of the '969 patent recites as follows:

> 9. The portable device according to claim 2, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates *the upload of program code* on to the communication network node database.

'969 patent, claim 9 (emphasis added).

Claim 24 of the '703 patent recites as follows:

> 24. The portable device according to claim 1, wherein the third program code is configured to cause a communication to be transmitted to the communications network node to facilitate *the upload of program code* from the portable device to a communications network node.

'703 patent, claim 24 (emphasis added).

The thrust of Ingenico's argument is that the concept of uploading program code from a portable device to a network communications node lacks written description support in the parent applications to the '969 and '703 patents, which are now U.S. Patent Nos. 8,593,047 and 7,861,006 ("the '006 patent"). I find, however, that there is sufficient written description support in the specification of the '006 patent for uploading program code from a portable device. First, Figure 2 of the '006 patent describes a step in which the user can "[a]ccess/store data/programs on TCAP/server." '006 patent at Fig. 2 (item 225). Second, Figure 4 of the '006 patent describes

**Appx8843**

allowing a user to "access/execute/store data/programs on TCAP and at remote server." *Id.* at Fig. 4 (item 485). Third, the specification of the '006 patent describes a user's ability to "access, execute, [and] store data and programs on the TCAP and on the remote server." *Id.* at col. 8, ll. 41–45. Those disclosures in the specification clearly contemplate a user having the ability to upload program code (or more generally, "programs") from the portable device to the remote server.

Because the concept of uploading program code from the portable device to a network communication node has written description support in the '006 patent, there is no basis to conclude that either claim 9 of the '969 patent or claim 24 of the '703 patent has an effective filing date after March 15, 2013. The AIA provisions of the Patent Act governing the priority date of patents therefore do not apply to the asserted claims in this case.[3]

32.     In a motion in limine, Ingenico sought a ruling from the court prohibiting IOENGINE from introducing the testimony of PayPal witnesses in depositions taken by IOENGINE in the PayPal case. Dkt. No. 404; Dkt. No. 405 at 9–11. Ingenico is not a party to the PayPal case and did not participate in those depositions. In its motion, Ingenico argues that testimony from those depositions constitutes hearsay and therefore is not admissible against Ingenico. IOENGINE responded that the testimony is admissible under exceptions to the hearsay rule set forth in Federal Rule of Evidence 804(b)(1), Federal Rule of Civil Procedure 32(a), and Federal Rule of Evidence 807. Dkt. No. 413 at 11–14.

---

[3] IOENGINE also argues that it was procedurally improper for Ingenico to raise this issue at this stage in the case. Although it is true that this issue likely could have been raised earlier in the action, it is not necessary to reach the question of whether Ingenico's argument is procedurally improper given that the argument fails on the merits. For the same reason, it is unnecessary to reach IOENGINE's argument that Ingenico's assertion that the AIA applies to the patents-in-suit is foreclosed by judicial estoppel and collateral estoppel.

**Appx8844**

IOENGINE does not take issue with the general proposition that deposition testimony ordinarily cannot be used against a person or entity that was not a party to the action in which the deposition was taken.  Instead, IOENGINE argues that the special circumstances of the PayPal and Ingenico cases render the depositions taken in the PayPal case admissible against Ingenico in the Ingenico case.

Rule 804(b)(1)

First, IOENGINE contends that the PayPal deposition testimony is admissible under Rule 804(b)(1) of the Federal Rules of Evidence, which makes deposition testimony admissible against a party that had "an opportunity and similar motive to develop" the deposition testimony.  IOENGINE argues that Ingenico had an opportunity to develop the witnesses' testimony in the PayPal depositions because Ingenico had an opportunity to participate in those depositions but chose not to do so.  As for motive, IOENGINE argues that Ingenico's motive to develop the testimony was similar to PayPal's.  As a result, according to IOENGINE, the requirements of Rule 804(b)(1) were satisfied and the deposition testimony should be admissible against Ingenico.

The problem with that argument is that IOENGINE has the burden of showing that the requirements for the admission of evidence under Rule 804(b)(1) were met, and it failed to satisfy that burden by making an adequate showing either that Ingenico had an opportunity to develop the witnesses' testimony in the PayPal depositions or that PayPal and Ingenico had similar motives to develop that testimony.

It is well settled that the party seeking to admit an item into evidence bears the burden of establishing its admissibility.  *See Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 818 (8th Cir. 2010); *Los Angeles News Serv. v. CBS Broadcasting, Inc.*, 305 F.3d 924, 934 (9th Cir. 2002); *United States v. Day*, 789 F.2d 1217, 1221 (6th Cir. 1986); *Cordance Corp. v. Amazon.com, Inc.*, 639 F.

**Appx8845**

Supp. 2d 406, 430 (D. Del. 2009); *Davis v. Mountaire Farms, Inc.*, 598 F. Supp. 2d 582, 591 n.10

(D. Del. 2009), *as amended* (Mar. 6, 2009); *see also David by Berkeley v. Pueblo Supermarket of St.*

*Thomas*, 740 F.2d 230, 235 (3d Cir. 1984) ("The burden of establishing the facts which qualify a

statement as an excited utterance rests with the proponent of the evidence."); *Pittsburgh Press Club*

*v. United States*, 579 F.2d 751, 758 (3d Cir. 1978); *AAMCO Transmissions, Inc. v. Baker*, 591 F.

Supp. 2d 788, 793 (E.D. Pa. 2008) ("[T]he proponent of the evidence[] has the burden of establishing

its admissibility."); *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 165 (3d Cir. 1995) ("[I]t is the

proponent of the statement offered under Rule 804 who bears the burden of proving the unavailability

of the declarant.").

The legislative history of the Federal Rules of Evidence makes clear that Congress intended

that former testimony be admissible under Rule 804(b)(1) only if the party against whom prior

testimony evidence is offered or its predecessor in interest had an opportunity to examine the witness.

The rule as submitted to Congress by the Supreme Court and approved by the Senate Committee

would have allowed the admission of prior testimony if the party against whom it is offered, or a

person with a similar motive and interest had an opportunity to examine the witness.  The House

Committee rejected that version of the rule as too broad, stating that it is

> generally unfair to impose upon the party against whom the hearsay evidence is being
> offered responsibility for the manner in which the witness was previously handled by
> another party.  The sole exception to this, in the Committee's view, is when a party's
> predecessor in interest in a civil action or proceeding had an opportunity and similar
> motive to examine the witness.

H.R. Rep. No. 93-650, at 15, as reprinted in 1974 U.S.C.C.A.N. 7075, 7088.  The House Committee

therefore modified the rule to require that the party opponent or (in a civil action) its predecessor in

interest have had an opportunity to develop the prior testimony.  The Senate acceded to the House

**Appx8846**

version of the rule, *see* S. Rep. No. 93-1277, at 28, as reprinted in 1974 U.S.C.C.A.N. 7051, 7074, and the rule was enacted in that form.

Regarding the opportunity to develop the testimony of the PayPal employees by participating in the PayPal depositions, IOENGINE argues that Ingenico should have been aware of IOENGINE's plan to depose the PayPal employees in the PayPal case and could have requested permission from the parties in the PayPal action to participate in those depositions. IOENGINE concedes that Ingenico did not receive formal notice of the PayPal depositions. However, IOENGINE points out that in various informal exchanges among the parties, references were made to those depositions. Those references, according to IOENGINE, should have put Ingenico on inquiry notice of the depositions. IOENGINE argues that Ingenico's presumed awareness of the depositions and its failure to request permission to participate in the depositions constituted a waiver of the opportunity to the participate.

IOENGINE has not satisfied its burden of showing that Ingenico had an opportunity to examine the PayPal witnesses, and it has not shown that PayPal was Ingenico's predecessor in interest. Because Ingenico did not have an opportunity to cross-examine the PayPal witnesses, Rule 804(b)(1) by its terms does not appear to sanction the admission of the PayPal depositions against Ingenico.

Notwithstanding the language and legislative history of Rule 804(b)(1), a divided panel of the Third Circuit in a 1978 case interpreted the term "predecessor in interest" in the rule to include a party having a shared "community of interest" with the opponent of the evidence such that the party that participated in the deposition can be regarded as a representative of the party against whom the deposition testimony is later offered. *Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1185–86 (3d Cir. 1978). In that case, the court concluded that the Coast Guard, which was investigating certain

**Appx8847**

wrongful conduct, could be regarded as the predecessor in interest of the plaintiff, an individual who was seeking relief based on the same wrongful conduct. *Id.* at 1186. Under those circumstances, the court concluded, the previous party, "having like motive to develop the testimony about the same material facts is . . . a predecessor in interest to the present party," *id.* at 1187, and the "opportunity to develop" the testimony required by Rule 804(b)(1) was therefore satisfied.

The concurring judge in the *Lloyd* case pointed out that the panel's broad interpretation of the "predecessor in interest" language of Rule 804(b)(1) had the effect of conflating the "opportunity" and "similar motive" requirements of the rule, and "eliminates the predecessor in interest requirement entirely." 580 F.2d at 1191 (Stern, J., concurring). Other courts and commentators have criticized reasoning similar to that employed by the *Lloyd* court regarding the "predecessor in interest" proviso on the same ground. *See Marshall v. Northrop Grumman Corp.*, No. 16-cv-6794, 2019 WL 6358249, at * 3 (C.D. Cal. Oct. 16, 2019); *Edwards v. Techtronic Indus. N. Am., Inc.*, No. 13-cv-1362, 2015 WL 3616558, at *11 (D. Or. June 9, 2015); *In re Screws Antitrust Litig.*, 526 F. Supp. 1316, 1319 (D. Mass 1981) ("[T]he plain language of the congressionally-approved words, 'predecessor in interest,' coupled with the clearly expressed intent of the House of Representatives forestalls the complete rejection of the House's intent and the acceptance of Rule 804(b)(1) as the Supreme Court originally submitted it."); *In re IBM Peripheral EDP Device Antitrust Litig.*, 444 F. Supp. 110, 113 (N.D. Cal. 1978) (Congress rejected the concept that former testimony should be admissible as long as a party to the first action had "a similar motive and opportunity to develop the testimony." (citation omitted)); 7 Michael H. Graham, Handbook of Federal Evidence § 804:1, at 865–66 (9th ed. 2020); Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:122 (4th ed. 2013) (The *Lloyd* court's interpretation of the predecessor-in-interest proviso in Rule 804(b)(1) "essentially reads the proviso out of the Rule and leads to an

**Appx8848**

exclusive focus on motive and interest in the prior and present proceedings."); Edward R. Becker & Aviva Orenstein, *The Federal Rules of Evidence after Sixteen Years—The Effect of "Plain Meaning" Jurisprudence, the Need for an Advisory Committee on the Rules of the Evidence, and Suggestions for Selective Revision of the Rules*, 60 Geo. Wash. L. Rev. 857, 898 (1992); Mark Lawrence, *The Admissibility of Former Testimony Under Rule 804(b)(1): Defining a Predecessor in Interest*, 42 U. Miami L. Rev. 975, 996 ("The community-of-interest test employed in *Lloyd*, in effect, ignores Rule 804(b)(1)'s predecessor-in-interest requirement.").

To be sure, a number of courts in other circuits have followed the approach employed in *Lloyd* and have effectively equated the predecessor-in-interest inquiry with the inquiry into similar motive. *See, e.g., United States v. Jackson-Randolph*, 282 F.3d 369, 381–82 (6th Cir. 2002); *Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 282–83 (4th Cir. 1993); *Azalea Fleet, Inc. v. Dreyfus Supply & Mach. Corp.*, 782 F.2d 1455, 1461 (8th Cir. 1986). Those cases have been criticized, however, as ignoring the language of the rule. *See* 2 Robert P. Mosteller, ed., McCormick on Evidence § 303 at 525 (8th ed. 2020) (stating that those courts that have read the "predecessor in interest" and "opportunity and similar motive" language in Rule 804(b)(1) to set forth "no more than the general requirement that the prior party have a similar interest appear to have misconstrued the provision."). The Supreme Court has not addressed that specific issue since the enactment of the Federal Rules of Evidence, and the Third Circuit has issued no pertinent authority on the issue since *Lloyd*.

In a case decided two years after *Lloyd*, Judge Becker analyzed *Lloyd* carefully and found it to be "highly significant that the 'previous party' in *Lloyd* was a government investigator, presumably impartial, who had no role in the subsequent legal action," and that the *Lloyd* court "itself commented on the community of interest that the government, as representative of the public, and

**Appx8849**

an individual might share." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1190, 1254 (E.D. Pa. 1980), *rev'd on other grounds*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574 (1986). Judge Becker found that "[e]ntirely different considerations come into play when prior testimony is offered against one co-defendant on the basis of prior examination of the witness on behalf of a different co-defendant, when the two have potentially conflicting interests and litigation strategies." *Id.* at 1255. The court in *Zenith* noted that "[i]n applying the principles of *Lloyd* to the vastly different circumstances of this case," it was required to "bear in mind the House Judiciary Committee's admonition that it is 'generally unfair' to impose upon the present party the 'responsibility for the manner in which the witness was previously handled by another party.'" *Id.* (citation omitted).

This case resembles *Zenith* more than it does *Lloyd*. It is like *Zenith* (and unlike *Lloyd*) in that PayPal and Ingenico are both private parties in different cases, the case against each is different, and the interests of each are at least not entirely aligned. Given the separate role played by Ingenico and PayPal in the transactions at issue in these cases, and the absence of any corporate relationship between the two, it is difficult to characterize PayPal as a "predecessor in interest" of Ingenico, as that term is ordinarily understood. Because an expansive interpretation of *Lloyd* would render the "opportunity to develop" requirement of Rule 804(b)(1) a nullity, there is considerable force to Judge Becker's narrower interpretation of *Lloyd*, as limited to circumstances in which, for example, a representative of the public, such as governmental agency, has interests congruent with those of a private party in subsequent litigation. Construing Rule 804(b)(1) in that manner means that the absence of an opportunity for Ingenico to develop the testimony of the witnesses at the PayPal depositions renders the deposition testimony inadmissible under Rule 804(b)(1).

**Appx8850**

It is not necessary to rest the decision of admissibility on the scope of the "opportunity to develop" requirement of Rule 804(b)(1), however.  As the *Lloyd* court made clear, the admission of former testimony requires a showing that the party opposing the admission of deposition evidence has a similar motive to develop that evidence as the party that participated in the deposition.  It is therefore critical to consider whether IOENGINE has shown that the parties in this case had similar motives to develop the testimony of the PayPal witnesses at their depositions.

IOENGINE argues that PayPal's motive to develop evidence at the PayPal depositions was similar to Ingenico's, and that the "similar motive" requirement of Rule 804(b)(1) was therefore satisfied in this case.  As noted earlier, however, IOENGINE has the burden of showing that PayPal and Ingenico had a similar motive with respect to the examination of the PayPal witnesses. IOENGINE has failed to satisfy that burden.  Instead, IOENGINE simply asserts that the motives of PayPal and Ingenico with respect to the witnesses' testimony would be similar.  But that contention is by no means self-evident, as PayPal and Ingenico are differently situated in various respects. Ingenico argues that the two cases are not congruent, as the two cases involve somewhat different products, different evidence, and different theories of infringement.

IOENGINE has not made a sufficient showing that Ingenico's characterization is incorrect. IOENGINE points out that three of the card readers accused of infringement in the PayPal case are supplied by Ingenico and that it intends to offer evidence from the PayPal depositions that is limited to those Ingenico products.  Beyond that, IOENGINE's only argument as to the "similar motive" issue is that "PayPal and Ingenico share a common desire to avoid infringement and PayPal defended these depositions with that goal in mind."  Dkt. No. 413 at 13.  But the assertion that the parties share a similar interest in avoiding liability—an interest that would apply to any group of defendants in sequential litigation over similar subject matter—is too general a proposition to satisfy IOENGINE's

burden of showing that the parties have a sufficient congruence of interest to justify treating PayPal as Ingenico's "predecessor in interest" for purposes of Rule 804(b)(1).

The fact that PayPal and Ingenico have cooperated in various respects in these two actions during the pretrial proceedings is likewise insufficient to demonstrate that Ingenico's interests in developing the testimony of the PayPal witnesses would be the same as PayPal's. At minimum, it is safe to assume that PayPal's attorneys would have been focused on the interests of their client during the depositions, and not focused on protecting the separate interests of Ingenico, to the extent that those interests were fully aligned with PayPal's.

Rule 32(a)

IOENGINE's second argument is that Rule 32(a)(1) of the Federal Rules of Civil Procedure permits the use of deposition testimony from the PayPal case against Ingenico. Rule 32(a)(1) permits the admission of deposition testimony against a party under certain conditions, including if (1) the party "was present or represented at the taking of the deposition or had reasonable notice of it," and (2) the use of the deposition testimony "is allowed by Rules 32(a)(2) through (8)." Rule 32(a)(8), which governs depositions taken in a separate case, provides that such a deposition "may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action."

IOENGINE contends that Ingenico had notice of the PayPal depositions, and that notice is all that was necessary for the PayPal depositions to be admissible against Ingenico under Fed. R. Civ. P. 32(a)(1). IOENGINE points to the language of the rule, which requires that the party against which the deposition testimony is offered must either have been represented at the deposition *or* had reasonable notice of it, but does not require both. As noted above, Ingenico was not formally notified of the depositions of the PayPal witnesses in the PayPal case. IOENGINE points out that in various

emails and filings with the court in the two cases, references were made to the PayPal depositions. That was enough, according to IOENGINE, to constitute "reasonable notice" under Fed. R. Civ. P. 32(a)(1). Therefore, according to IOENGINE, the prior deposition testimony is admissible against Ingenico.

Besides the fact that the passing references to the PayPal depositions fell short of the notice that the Rule contemplates, IOENGINE's argument runs afoul of the text of Rule 32(a)(1). As noted, the rule conditions the use of deposition testimony by requiring that the use be "allowed by Rule 32(a)(2) through (8)." Fed. R. Civ. P. 32(a)(1)(C). Rule 32(a)(8) allows deposition testimony taken in a different action to be used in a later action when that later action involves "the same subject matter *between the same parties*, or their representatives or successors in interest" (emphasis added). By its terms, Rule 32(a)(8) does not allow the use of the PayPal deposition testimony in the Ingenico action, because the Ingenico action and the PayPal action are not "between the same parties," and because PayPal is neither a representative of Ingenico nor Ingenico's successor in interest. Therefore, under the plain language of Rule 32(a)(8), notice of a deposition in the PayPal case, a separate case, is not enough to render the deposition testimony admissible against Ingenico in the Ingenico case, even assuming that Ingenico received adequate notice of the PayPal depositions.[4]

---

[4] IOENGINE relies on *APEX Financial Options, LLC v. Gilbertson*, 19-cv-0046, 2022 WL 622130, at *3 (D. Del. Mar. 3, 2022), but misses the fundamental point that the deposition the court held admissible in that case was taken in the same case and that the deponent was a defendant in that case. That is not true here, where the deposition was taken in the PayPal case and is being offered in evidence in the Ingenico case. The same is true of *Klein v. Tabatchnick*, 459 F. Supp. 707 (S.D.N.Y. 1978), cited by IOENGINE. In that case the plaintiff sought to introduce deposition testimony from the same action against the defendant. Although the defendant objected on the ground that his lawyer did not participate in the deposition, the court pointed out that the defendant, as a party in the case, had a clear legal right and opportunity to participate in the deposition, but chose not to do so. *Id.* at 712. The same is also true of *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487 (D. Del. 2005), also cited by IOENGINE. The deposition testimony at issue was taken in the same case, and the court noted that as parties in the case, the defendants "had the

**Appx8853**

Notwithstanding the language of Rule 32, some courts have sanctioned the introduction of deposition testimony from an earlier action against one who was not a party to that action as long as there was a party to that action with the same interest in cross-examination as the party against whom the evidence is offered in the second action. Those courts have essentially followed the similar analysis applied by some courts in determining whether to admit former testimony under Federal Rule of Evidence Rule 804(b)(1). *See Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982) (citing cases); *Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*, No. 11-cv-6202, 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014); *contra*, *Hewitt v. Hutter*, 432 F. Supp. 795, 799 (W.D.W. Va. 1977).[5]

By its plain terms, Rule 32(a) would seem to require that a party against whom deposition testimony from another proceeding is offered must have had an opportunity to cross-examine the witnesses giving that testimony. But even assuming the correctness of the view that Rule 32(a) requires only that a party to the prior action had the same interest or motive to cross-examine the

---

opportunity to challenge her testimony if they so chose." *Id.* at 503. And in *In re Tropicana Ent., LLC*, 613 B.R. 587, 598–99 (Bankr. D. Del. 2020), the parties against whom the deposition evidence was offered were given an opportunity to participate in the depositions. In this case, by contrast, the depositions were taken in a case to which Ingenico was not a party, Ingenico did not participate in those depositions, and any request by Ingenico to participate in the PayPal depositions would have been at the sufferance of the parties to that action.

     [5] Although the Ninth Circuit in the *Hub* decision cited cases standing for the proposition that it is sufficient for admissibility of prior testimony if the prior cross-examination "would satisfy a reasonable party who opposes admission in the present lawsuit," the court found that line of cases "troubling." 682 F.2d at 778 n.*. The court explained: "Not only does the test disregard the 'same parties' requirement in Rule 32(a), but it also fails to take into account the possibility that the prior opponent mishandled the cross-examination." *Id.* In light of those concerns, the court qualified its reference to the cited cases by stating that its citation of cases in support of the more liberal standard for admitting prior testimony "does not mean that we adopt it." *Id.* Notably, in the *Federal Housing Finance Agency* case on which IOENGINE relies, counsel for the party that opposed the admission of the deposition testimony was present at each of the depositions for which the court found the deposition testimony admissible, and the party opposing admission of the evidence from the prior actions did not claim that its motive to develop the deposition testimony "was any different in those cases than it would have been in this case." 2014 WL 798385, at *2.

witnesses, that proposition does not help IOENGINE, for the same reason that IOENGINE failed to satisfy the requirements of Rule 804(b)(1):   IOENGINE has not met its burden of showing that Ingenico and PayPal had the same motive to develop the testimony of the PayPal deposition witnesses.

Consolidation

Third, IOENGINE argues that the fact that the PayPal and Ingenico cases were consolidated for pretrial proceedings means that Ingenico was effectively a party to the PayPal case for purposes of the PayPal depositions.  That contention is not persuasive.  The cases were consolidated as a matter of convenience for the parties and the court.  Absent an express ruling or agreement that the parties in each case would be treated as parties in the other case for purposes such as their participation in depositions and the admission of evidence at trial, the consolidation order by itself did not alter the status of the parties as separate entities for purposes of the pre-trial and trial proceedings.

The Cross-Use Stipulation

Fourth, IOENGINE argues that the Cross-Use Stipulation entered into by the parties supports the admission of the PayPal case depositions against Ingenico.  The Cross-Use Stipulation permitted the parties in each case to use discovery materials produced in the other case.  *See generally* Dkt. No. 293.  But while the agreement provided that all discovery in the PayPal action could be used in the Ingenico action, including transcripts and exhibits from depositions in the PayPal action, the agreement further provided that the parties "reserve all objections they may have to use of any such materials as evidence in their respective actions."   In addition, the agreement provided that the stipulation "does not imply an admission by Ingenico . . . that materials from the PayPal Action are relevant to or admissible in the Ingenico Action."  Dkt. No. 293 at 2–3.  Given those qualifications,

**Appx8855**

the Cross-Use Stipulation cannot be read as an agreement by Ingenico to allow the admission of evidence taken in the PayPal case that would otherwise be excludable as hearsay in the Ingenico trial.

<u>Rule 807</u>

Finally, IOENGINE relies on the residual hearsay exception set forth in Rule 807 of the Federal Rules of Evidence as an alternative basis for admitting the PayPal deposition testimony. That rule permits the admission of a statement that is not admissible under Rules 803 or 804, if the statement is "supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807.

That residual or "catch-all" provision was intended to be used "only rarely and in exceptional circumstances." *United States v. Turner*, 718 F.3d 226, 233 (3d Cir. 2013) (quoting *United States v. Wright*, 363 F.3d 237, 245 (3d Cir. 2004)); *United States v. Bailey*, 581 F.2d 341, 346–47 (3d Cir. 1978) (the legislative history of the Federal Rules of Evidence "indicates a congressional intention that the [residual hearsay] rules have a narrow focus"); *see also Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 392 (Fed. Cir. 1996); *United States v. Dalton*, 918 F.3d 1117, 1133 (10th Cir. 2019) (residual hearsay exception to be used only in "extraordinary circumstances" (citation omitted)); S. Rep. No. 93-1277, at 20, as reprinted in 1974 U.S.C.C.A.N. 7051, 7066 ("It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances."); S. Rep. No. 94-199, at 20 (1975).

In order to be admissible under that rule, the statement in question must have particularized guarantees of trustworthiness. *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995). In this case, IOENGINE has not shown that the circumstances involving the disputed testimony are extraordinary, nor has it pointed to any particularized guarantees that the statements are trustworthy.

**Appx8856**

IOENGINE has simply noted that the statements were made on cross-examination in depositions, that the deponents were represented by counsel, and that PayPal was motivated to develop their testimony through its examination.  Dkt. No. 468 at 7.  But those features are typical of many depositions; they are not sufficient to justify the admission of the deposition testimony under Rule 804(b)(1), and they are plainly insufficient to constitute the "extraordinary circumstances" necessary to justify admission under Rule 807.

The residual hearsay rule was not designed to create an evidentiary penumbra around the hearsay exceptions set forth in Rules 803 and 804, so as to allow hearsay into evidence when it resembles evidence that would satisfy the requirements of those rules but falls short in some respect. *See Creamer v. Gen. Teamsters Local Union 326*, 560 F. Supp. 495, 498 (D. Del. 1983) ("[W]here there is a specific hearsay exception applicable to a clearly defined category of evidence such as former testimony, but the evidence fails to satisfy the requirements of the specific exception, the evidence should not be admitted under the residual exception."); *Zenith*, 505 F. Supp. at 1263–64 ("[T]he residual exceptions cannot be invoked when there is a specific exception which sets forth conditions governing the admissibility of a clearly defined category of hearsay evidence.").  Rule 807 is plainly inapplicable here.

Ingenico's motion in limine barring the admission of the depositions of PayPal witnesses in the PayPal action on hearsay grounds is therefore GRANTED.

**Appx8857**

IT IS SO ORDERED.

SIGNED THIS 5th day of July, 2022.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

**Appx8858**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INGENICO INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 18-826-WCB |
| | § | |
| IOENGINE, LLC, | § | |
| | § | |
| *Defendant* | § | |
| | § | |

———————————————————

| | |
|---|---|
| | § |
| IOENGINE, LLC, | § |
| | § |
| *Counterclaim Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| INGENICO INC., | § |
| INGENICO CORP., and | § |
| INGENICO GROUP S.A., | § |
| | § |
| *Counterclaim Defendants.* | § |

———————————————————

**COURT'S FINAL JURY INSTRUCTIONS**

1

**Appx8859**

## 1. Introduction

Ladies and gentlemen of the jury, you have heard all the evidence in this case.  I will now instruct you on the law that you are to apply.  Following my instructions, the lawyers for each side will make their final arguments to you.  After that, you will retire to the jury room to begin your deliberations.

These instructions will be a little lengthy, and they may be somewhat difficult to follow at times.  To help you, I have made copies of the instructions for each of you that you can use during your deliberations.  I mention this so you won't feel that you have to take notes right now or try to memorize anything as I speak.  In fact, I would suggest that you just listen to these instructions, without trying to write anything down.  If you miss something, you will be able to check the written copy of these instructions once you return to the jury room.

Many of the things I say, you will have heard before, either from me at the beginning of the case or from the lawyers during the trial.  I will be repeating those things to remind you of them and so that you will have all the instructions you need in a single package.

When you return to the jury room, your job will be to consider the evidence you have heard and to decide the case in light of the legal principles that I will explain now.  You will indicate your decisions on the various issues in the case by answering the questions on the verdict form that will be waiting for you in the jury room.

The decision you make is yours and yours alone.  Please remember that nothing I say now or may have said, or any questions I may have asked during the trial are intended to suggest, or should be taken by you as suggesting, what I think your verdict should be.

2

### 1.1. Preponderance of the Evidence / Clear and Convincing Evidence.

I am going to start by returning to the subject of the burden of proof, which we discussed briefly at the beginning of the case.

On the issue of whether Ingenico infringes IOENGINE's patents, the burden of proof is the preponderance of the evidence. The preponderance of the evidence means that IOENGINE has the burden of persuading you that its claim of infringement is more likely to be true than untrue. If the evidence does not persuade you that IOENGINE's claim is more likely to be true than untrue, that means IOENGINE has failed to satisfy its burden. If that happens, you should find in favor of Ingenico on the issue of infringement.

As I said at the beginning of the trial, the issue of whether IOENGINE's patents are invalid, has a different burden of proof. On that issue, the burden of proof is clear and convincing evidence. Clear and convincing evidence means that Ingenico has the burden of leaving you with a clear conviction or belief that the evidence supports its defense of invalidity. That is a higher standard of proof than preponderance of the evidence. That means it is harder to prove something by clear and convincing evidence than by a preponderance of the evidence. If the evidence does not persuade you that Ingenico's claim of invalidity is supported by clear and convincing evidence, that means Ingenico has failed to satisfy its burden. If that happens, you should find in favor of IOENGINE on the issue of validity.

3

**Appx8861**

**1.2.  Evidence in the Case; Credibility of Witnesses.**

As the finders of the facts, you are responsible for weighing the evidence in this case, including the testimony of the witnesses you have heard and the exhibits that have been introduced as evidence.  As a reminder, the lawyers' statements and characterizations of the evidence are not evidence.  While the opening statements and closing arguments may have been helpful to you, your decision should ultimately depend on your evaluation of the evidence.

As part of your job as jurors, you are entitled to weigh the testimony of the witnesses.  That's a job well suited for jurors like yourselves who have heard and seen the witnesses.  For example, if two witnesses offer testimony that is in conflict, you should use your common sense in deciding whether the testimony can be reconciled and, if not, which witness you think is more believable.  You can consider, for example, each witness's motive, state of mind, knowledge, and manner while on the witness stand.  If there is a question as to the relative expertise of two witnesses, again you should use your common sense to decide which witness you find more knowledgeable and more believable.  You are entitled to give the testimony of each witness whatever weight you feel is appropriate.  You may choose to believe or disbelieve any witness's testimony, either entirely or in part.

Evidence can be direct or circumstantial.  Direct evidence is evidence that directly proves a fact.  If a witness testified that she saw it raining outside, that would be direct evidence that it was raining.  Circumstantial evidence is a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.  The law makes no distinction between the weight you should give to direct evidence as opposed to circumstantial evidence.

4

**Appx8862**

**1.3.  Expert Witnesses.**

Some of the witnesses have testified as expert witnesses because of their special knowledge in their relevant fields.  The fact that a witness has testified as an expert does not mean you must accept that witness's opinions as true.  As with all other witnesses, it is up to you to decide whether you find the witness's testimony convincing.

**1.4.  Depositions – Use as Evidence.**

During the trial, some of the testimony was presented not through a live witness, but through a deposition.  The deposition testimony that you heard at trial is entitled to the same consideration as any other evidence in the case, and you should judge its credibility and weight just the same as if the witness had been present and testified in person here in the courtroom.

6

**1.5.  Demonstrative Exhibits**

In the course of the trial, the lawyers have presented a number of slides, charts, and animations that were not formally admitted into evidence.  Those items are commonly referred to as "demonstrative exhibits."  They are not evidence and were intended only to aid in your understanding of the evidence in the case.  It is the underlying testimony of the witnesses and the admitted trial exhibits that are the evidence in this case on which you should base your decisions.

7

**1.6.  Questions to Decide.**

I will now summarize the issues that you must decide, and I will provide instructions on the issues to guide your deliberations.

IOENGINE alleges that Ingenico's products infringe certain claims of the two IOENGINE patents at issue in this case, the '969 patent and the '703 patent.  Ingenico denies that it has infringed any claims of IOENGINE's patents.

Ingenico also argues that the asserted claims of those two patents are invalid.  IOENGINE denies that any of the asserted claims are invalid.

You must decide the following two issues, each of which must be decided separately:

First, whether IOENGINE has proved, by a preponderance of the evidence, that Ingenico has infringed any of the asserted claims of the IOENGINE patents.

Second, if you find infringement of any asserted claim or claims, you must decide whether Ingenico has proved, by clear and convincing evidence, that the infringed claim or claims of the IOENGINE patents are invalid.

8

## 2. Patent Claims

To decide what is covered by a patent, we look at the patent's claims. As you have heard, the claims are the numbered paragraphs at the end of the patent. The figures and text in the rest of the patent provide a description of the invention or context for the claims, but it is the claims that define what the patent covers. You will be called upon to decide whether Ingenico infringed claims 3 and 10 of the '969 patent, and claims 56, 90, 101, 105, 114, and 124 of the '703 patent. You don't have to remember those numbers. Those claims are all set out at the back of these instructions, and they will be listed for you on the verdict form.

When an accused device, system, or method satisfies all the requirements of a claim, the claim is said to "cover" that thing, or that the thing "falls within the scope" of the claim. In other words, for example, a claim covers a device if all the claim requirements are present in that device. To find infringement, you must find that each of the requirements of a particular claim are satisfied. In patent law, the requirements of a claim are sometimes referred to as elements or limitations. Those terms all mean the same thing.

Many of the terms used in the claims will be familiar to you. One term used in the claims that you may not have been familiar with is the term "interactive user interface," which means something that enables two-way responsive communication between a user and a computer. Another such term is "program code." Each program code is a separate element of the claim and is configured to satisfy its claimed functionality. With respect to the four claimed program codes, different program code files or combinations of program code files can perform the functions of the four program codes.

One term that is used a lot in patents, and is used in both of the patents in this case, is the term "comprising" or "comprises." In the patent context, "comprising" means "including" or

9

**Appx8867**

"containing."  So if a claim states that an invention "comprises" a particular feature, that means that a product can infringe that claim if it contains that feature, even if it also contains other features beyond those claimed in the patent.

Another term that is commonly found in patents, and is found in all the asserted claims in the two IOENGINE patents, is the term "configured to," as in "configured to perform a particular function."  That term means simply that the device is designed so that it is capable of performing the function in question.

Because all the asserted claims in this case are so-called dependent claims, it is important for you to understand the meaning of independent claims and dependent claims.

As you have heard this week, an "independent claim" is a claim that sets forth all the requirements that must be met in order for something to be covered by that claim.  A "dependent claim" is a claim that refers to another claim for some of its requirements.  That is, a dependent claim incorporates all the requirements of the claims to which it refers and adds some additional requirements as well.

10

### 3.  Infringement

#### 3.1.  Patent Infringement – Generally.

I will now instruct you on how to decide whether or not Ingenico has infringed the asserted claims of IOENGINE's patents.  IOENGINE contends that Ingenico has infringed its rights under the '969 and '703 patents by directly infringing the '969 patent, by inducing others to infringe both patents, and by contributing to the infringement of both patents.

United States patent law gives the owner of a U.S. patent the right to exclude others from making, using, selling, offering to sell, or importing something that is covered by one of the patent claims during the term of the patent.  Infringement is determined on a claim-by-claim basis.  Therefore, it is possible for there to be infringement as to one claim but not as to another.

In order to prove infringement, IOENGINE must prove that the requirements of infringement are met by a preponderance of the evidence, which is to say that it is more likely than not that all the requirements of infringement have been proved.

There are three separate types of infringement at issue in this case.  The first is called direct infringement.  The other two are called indirect infringement.  IOENGINE's allegations of direct infringement apply to only the two asserted claims of the '969 patent.

11

### 3.2. Direct Infringement.

In order to prove direct infringement of a particular claim, IOENGINE must prove by a preponderance of the evidence that Ingenico made, used, sold, offered for sale, or imported into the United States a product that satisfies all the requirements of that claim and did so without IOENGINE's permission during the time the IOENGINE '969 patent has been in force.

In order to find direct infringement, you must find that every element of the claim in question was satisfied.  You are to make a separate determination of direct infringement for each of the two asserted claims of the '969 patent.

Direct infringement does not require proof that the accused infringer knew of the patent or intended to infringe the patent in question.  Someone can directly infringe a patent without knowing that what they were doing constituted infringement.

12

### 3.3.  Induced Infringement.

The first form of indirect infringement is referred to as induced infringement.  Proof of induced infringement requires a showing by a preponderance of the evidence of each of the following:

(1)     the accused infringer intentionally induced, encouraged, or caused another party to directly infringe a patent;

(2)     the accused infringer knew of the patent and knew or should have known that the other party's actions would, if taken, constitute actual infringement of the patent by another party; and

(3)     the accused infringer's conduct led the other party to directly infringe the claim.

IOENGINE has alleged that Ingenico induced others to infringe all the asserted claims of the '969 and '703 patents.  You are to make a separate determination of induced infringement for each of the asserted claims of IOENGINE's patents.

To show induced infringement, IOENGINE need not identify any specific third party that directly infringed one of IOENGINE's patent claims and may instead prove that a class of individuals (such as certain of Ingenico's customers) directly infringed IOENGINE's patents as a result of Ingenico's inducement, even if you cannot identify which specific individual actually committed direct infringement.

13

**Appx8871**

### 3.4. Contributory Infringement.

The second form of indirect infringement is referred to as contributory infringement.  Proof of contributory infringement requires a showing by a preponderance of the evidence that the accused infringer contributed to the direct infringement of a patent by another party.  IOENGINE has alleged that Ingenico contributed to the other party's infringement of the asserted claims of the '969 and '703 patents.

Contributory infringement can be established if the evidence shows each of the following:

(1)     that the accused infringer sells or offers to sell a component of an infringing product in the United States;

(2)     that the component in question has no substantial non-infringing use;

(3)     that the component constitutes a significant part of the invention;

(4)     that the accused infringer was aware of the patent and knew that the product satisfied a claim of the patent; and

(5)     that the product directly infringes the claim.

14

**Appx8872**

**4. Validity**

**4.1. Validity – Generally.**

I will now instruct you on the rules you must follow in deciding whether or not Ingenico has proved that any asserted claims of the IOENGINE patents are invalid. Ingenico has the burden of proving invalidity by clear and convincing evidence, which as I've said before means the evidence must leave you with a clear conviction or belief that the claims in question are invalid. You need to decide the validity of a particular claim only if you find that claim was infringed, either directly or indirectly, by Ingenico.

In order for someone to be entitled to a patent, the invention must be new, useful, and non-obvious. Ingenico contends that each of the Asserted Claims of IOENGINE's patents are invalid because the inventions set forth in those claims were not new, but were either anticipated by a prior invention or would have been obvious to a person of skill in the art in light of what came before.

**Appx8873**

### 4.2. Prior Art.

To determine whether a patent claim is anticipated or obvious in light of what came before, it is important to know how patent law defines what came before.  What came before, as you've heard this week, is referred to as the "prior art."  That term has a specific meaning in patent law. Prior art includes one or more of the following:

1. Any product or method that was publicly known or used by others in the United States before the date of the invention;

2. Any product or method that was in public use in the United States or on sale in the United States before March 23, 2003; and/or

3. Any publications that were publicly accessible before March 23, 2003.

The first category of prior art I just mentioned refers to the date of the invention, so it is necessary to explain how to determine the date of the invention.

The date of the invention is the date on which the inventor conceived of the invention, as long as the inventor was diligent in reducing the invention to practice.  Now there's a lot packed into that statement, so let me explain.  First, an invention is conceived when the inventor has a definite idea of the complete and operative invention, even if the inventor did not know for sure at the time that the invention would work.  Another way of saying that is that the conception of an invention is complete when the idea for the invention is so clearly defined in the inventor's mind that if the idea were communicated to a person having ordinary skill in the art, that person would be able to make the invention without undue further research or experimentation.  Although an inventor can testify about when he conceived of the invention, there must be some evidence beyond the inventor's own testimony that confirms the date on which the inventor had the complete idea.

16

**Appx8874**

Second, an inventor who wishes to have the date of invention set as of the date of conception must work diligently on the invention until he reduces it to practice. Diligence means working reasonably continuously, though not necessarily every day, from conception until the invention is reduced to practice. As in the case of conception, there must be some evidence beyond the inventor's own testimony that confirms the inventor's diligence.

Third, I mentioned the invention being "reduced to practice." An invention is said to be "reduced to practice" when the invention has been constructed, used, or tested sufficiently to show that it will work for its intended purpose and has all the elements that are subsequently included in the asserted claims. An invention is also said to be reduced to practice when the inventor files a patent application that fully describes the invention, even if the inventor has not actually made or tested a prototype of the invention prior to that time.

IOENGINE contends that the date of the invention is no later than July 26, 2001, because Mr. McNulty conceived of the invention by that date and worked diligently on it until he reduced it to practice. Ingenico contends that the date of the invention was March 23, 2004, the date on which Mr. McNulty filed the first of a series of patent applications on the invention, when the invention was constructively reduced to practice.

If you conclude that the invention was made as of July 26, 2001, as IOENGINE claims, then any product or method that was first publicly known or used in the United States after that date wouldn't be regarded as coming before the invention. On the other hand, if you conclude that the invention was made as of March 23, 2004, as Ingenico claims, then any product or method that was known to or used by others in this country before that date would be prior art to the invention. You may also conclude that the invention was made as of a date different from those two proposals offered by the parties if you are persuaded that the evidence demonstrates a different date of

17

**Appx8875**

invention. Whatever the date of invention, Ingenico must prove by clear and convincing evidence that the prior art item pre-dated the claimed invention.

You will notice that the second and third categories of prior art that I referred to before both specify the date March 23, 2003, which is one year before the filing date for the first patents related to the '969 and '703 patents. That date may sound arbitrary, but there is actually a reason for it, and let me explain: The idea is that if an inventor conceives of an invention and works diligently on the invention, he should get credit as the first to invent the invention unless someone else beat him to it. The reason for the second and third categories is that even if an inventor has come up with an invention before anyone else, the inventor is still required to apply for a patent reasonably promptly. So if a product or method that embodies the invention was in public use in the United States or on sale in the United States as of March 23, 2003, the product or method that was in public use or on sale will be treated as prior art to the invention.

Public use may be found when a prior art product is accessible to the public, commercially exploited, or otherwise used by the inventor or others with no restrictions or obligation of secrecy. Evidence of an offer to sell is sufficient to establish that a prior art product is "on sale." There is no requirement that a sale be completed in order for the product to be "on sale."

Documents and testimony may be evidence of the functions of a prior art product, as long that evidence is used to demonstrate that a single prior art item contains all of the claim limitations found together. Such documents do not have to be publicly available.

Ingenico contends that the following items are prior art to Mr. McNulty's invention because each was known or used by others in the United States or described in a printed publication in the United States or elsewhere before the date of invention:

1. The M-Systems DiskOnKey product, along with the Firmware Upgrade software and the M-Systems DiskOnKey Software Development Kit (SDK).

2. U.S. Patent Publication No. US 2004/0039932 A1 ("Elazar").

Ingenico also contends that the following item is prior art to Mr. McNulty's invention because each was publicly used, sold, or offered for sale in the United States before March 23, 2003:

1. The M-Systems DiskOnKey product, along with the Firmware Upgrade software and the M-Systems DiskOnKey Software Development Kit (SDK).

19

**Appx8877**

### 4.3. Anticipation

The explanation of what constitutes prior art gives you the background for the two types of invalidity claims that Ingenico has raised in this case: anticipation and obviousness.

Ingenico first contends that each of the Asserted Claims of IOENGINE's patents are invalid because the inventions set forth in those claims were not new, but were anticipated by a prior invention.

In order for a prior art invention to anticipate a claim, each element of the claim must be present in a single item of prior art and arranged or combined in the same way as in the claim at issue.  The claim elements may be disclosed either expressly or inherently in the prior art item so that a person of skill in the art, considering at that one item, could make and use the invention in the Asserted Claim.  You must determine anticipation on a claim-by-claim basis.

In order to establish that a claim is anticipated, Ingenico must prove anticipation by clear and convincing evidence.

20

**Appx8878**

### 4.4.  Obviousness – In General.

Ingenico's second claim of invalidity is referred to as obviousness.  A claimed invention is invalid for obviousness if it would have been obvious to a person of ordinary skill in the art at the time the invention was made.  Unlike anticipation, which allows consideration of only one item of prior art, obviousness can be shown by considering not just a single item of prior art, but a combination of multiple items of prior art.

In determining whether a claimed invention is obvious, you must consider several factors: the level of skill of a person of ordinary skill in the art at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the claimed invention, and other considerations that may suggest whether the asserted claim was obvious or not obvious.

In considering whether an invention is obvious based on a combination of items in the prior art, you must ask whether there is anything that would have prompted a person of ordinary skill in the art to combine the elements or concepts in the prior art in the same way the invention does.  A patent claim that consists of several elements is not necessarily rendered obvious merely because each of the separate elements was known in the prior art.  For example, you could say that a piano is really just a combination of wood, ivory, metal, and wires, all of which were known before the first piano was invented, but that does not mean that inventing the piano would be obvious if you just started with a pile of wood, some wire, some pieces of ivory, and a few chunks of metal.

21

**Appx8879**

**4.5. Level of Ordinary Skill.**

The term "person of ordinary skill in the art" is a term frequently used in patent law, and it has an important role in deciding whether an invention would have been obvious at the time it was invented.

A person of ordinary skill in the art is a person of average education and training in a particular field, who is also aware of all the relevant prior art in that field.  The level of ordinary skill in the art often depends on the nature of the field of the invention.  So, for example, if the invention is a way to generate additional energy in a nuclear power plant, the level of ordinary skill in the art is likely to be significantly higher than if the invention is a new way to fold cardboard boxes to make them stronger.

In deciding what the level of ordinary skill in the art of the invention is, you should consider the evidence introduced at trial, including the levels of education and experience of the inventor and other persons actively working in the field; the types of problems encountered in the field; prior art solutions to those problems; and the sophistication of the technology in the field at the time of the invention.

In this case, IOENGINE contends that a person of ordinary skill in the art would be a person with a Bachelor of Science degree in Computer Science, Computer Engineering or a related field, and two to three years of experience in developing, implementing, or deploying systems for the encryption of data on portable devices and in programming portable devices.

Ingenico contends that a person of ordinary skill in the art would be a person with a Bachelor of Science degree in Electrical Engineering, Computer Science, Computer Engineering, or a related field, and experience in programming software for computer peripheral devices and databases, who would have had an understanding of computer hardware, operating systems,

22

encryption, data storage, user interfaces, and peripheral and portable device communication protocols.

**Appx8881**

### 4.6.  Obviousness – Considerations.

In determining whether the claimed invention would have been obvious, you may consider factors such as the following:

(1)     whether the claimed invention was more than the predictable result of using prior art elements according to their known functions;

(2)     whether the claimed invention provided more than an obvious solution to a known problem in the relevant field;

(3)     whether the prior art suggested the desirability of combining elements claimed in the invention or, instead, pointed away from combining elements in the claimed invention; and

(4)     whether there was a design need or market pressure to solve the problem addressed by the claimed invention.

In deciding the issue of obviousness, you are not to use hindsight; you must consider only what was known at the time of the invention and view the issue of obviousness from the perspective of a person of ordinary skill as of the date of the invention.

Finally, in assessing whether a claimed invention would have been obvious or not, you may consider any other evidence that sheds light on the obviousness or non-obviousness of the claimed invention, such as:

(1)     whether products covered by the claims were commercially successful as a result of the merits of the claimed invention (rather than as the result of advertising, promotion, or features of the product other than those found in the claims);

(2)     whether the invention satisfied a long-felt need for a solution to a problem, which was satisfied by the claimed invention;

**Appx8882**

(3)     whether the invention achieved unexpectedly superior results over the closest prior

art;

(4)     whether others in the relevant industry praised the invention;

(5)     whether others in the relevant industry expressed doubt or skepticism that the

invention would work for its intended purpose;

(6)     whether others in the relevant industry expressed surprise regarding the invention;

and

(7)     whether others sought rights, such as licenses, to the patent from the patent holder.

In weighing this kind of evidence, you should consider whether those factors were attributable to

the claimed features of the invention as opposed to features already found in the prior art.

As with anticipation, you must determine obviousness on a claim-by-claim basis. For each

asserted claim, the claim is invalid if you find that Ingenico has proved by clear and convincing

evidence that the claim would have been obvious.

The lawyers will now present their closing arguments to you. IOENGINE will go first;

then Ingenico will present argument to you; and IOENGINE will then return briefly for the last

word. After that I will have a few final words for you, and you will then return to the jury room

to begin your deliberations.

**Appx8883**

**5.  Jury Deliberations**

 **5.1.  Election of a Foreperson.**

 The first thing you should do when you retire to the jury room is select a foreperson.  They will be responsible for communicating with the court as needed.

**Appx8884**

**5.2. Verdict – Unanimous – Duty to Deliberate.**

You should then begin your deliberations. Your verdict on each issue must be unanimous. There will be a verdict form in the jury room waiting for you when you retire for your deliberations. You will note that the verdict form has a series of questions to be answered during the course of your deliberations. The questions on the form correspond to the jury instructions that I have just given you. When you reach a unanimous verdict as to each question on the verdict form, the foreperson is to fill in the answers on the verdict form, and then sign and date the verdict form.

Please make sure to read the questions carefully, and note that some of the questions may not require answers, depending on how you answer other questions.

Do not reveal your answers to any of the questions to anyone outside of the jury until you finish your deliberations and return to the courtroom to deliver your verdict. If there is a divided vote on any of the issues at some point during your deliberations, you should not reveal how the vote is divided on any issue, even to me. It frequently happens that there is disagreement among jurors when they begin deliberating. But part of your responsibility as jurors is to continue to deliberate in order to attempt to reach a unanimous verdict on each of the questions you are being asked to answer. In the course of respectful discussion among the jurors, it almost always happens that the jurors can reach a unanimous verdict, even if they are divided at the outset.

When you return to the courtroom to announce your verdict, please bring the completed verdict form with you. You will give the completed and signed verdict form to the court security officer, who will give it to me. I will then examine the verdict form to be sure everything it filled out that needs to be filled out, and I will read the verdict aloud.

At that point, I may do what is called "polling the jury," which means asking each of you if the verdict I just read is your verdict. That is not because there is a problem or because I am

skeptical of what you have reported.  It is just a standard procedure to ensure that each juror agrees

to the verdict.  I will then ask you to return to the jury room where you can gather your things.  I

will then come to the jury room to thank you for your service and to discharge you.

**5.3.  Outside Communication.**

During your deliberations you must not communicate with or obtain any information relating to this case from any source other than your fellow jurors.  This means that you may not consult any outside sources, such as the Internet, during your deliberations.  Of course, you can have contact with the court security officer or other court staff as necessary to deal with any needs you may have, but you should not discuss the case itself with anyone outside the jury.

**Appx8887**

**5.4.  Jury's Responsibility.**

I expect that when you get to the jury room to begin your deliberations, you may feel a little overwhelmed.  That is not uncommon.  This has been a complicated case, and there will be a lot of evidence and argument to think about.  But I think you will be pleasantly surprised that as you start working methodically through the case, things will begin to seem more manageable.

I hope and expect that you will listen to one another's views respectfully, even if initially you disagree on some issues.  Discussing the issues from different perspectives can often help in formulating your own ideas about how particular issues should be decided.

**5.5.  Communications Between Court and Jury During Deliberations.**

If you wish to see any of the exhibits, you are free to see them.  All you need to do is have your foreperson sign a note asking for the exhibit and provide that note to the court security officer who is taking care of you during your deliberations.  You can ask to see all the exhibits or you can just ask for some of them, if you like.  Just let us know what you want, and we will get those exhibits for you.

If you have a question or otherwise want to communicate with me at any time, please follow the same procedure by providing a written message or question to the court security officer, who will then bring it to me.  You probably will not get a reply right away, as I will usually need to summon all the lawyers and get their input before I can respond to the question.  That just means I usually cannot get back to you right away, but we will do our best to get you an answer to your question as soon as we can.

If you do have a question that is hanging you up, you are entitled to ask.  I have to tell you, however, that once the case is submitted to you, as it will be in a moment, we will not be able to take any additional evidence, and I may just have to tell you to rely on your collective recollection of what the evidence was and tell you that you have to decide the case based on the evidence you have heard.  I think you will find in most instances, if you put your heads together, you will recall the evidence that you need to get over the problem.  That's one of the reasons there are eight of you.  Eight memories are better than one.

Finally, and most importantly, trust your common sense throughout.  One of the strongest traditions of our justice system is the confidence we place in the sound common sense of an American jury.  The parties in this case have confidence in you.  And so do I.  You may now retire for your deliberations.

31

**Appx8889**

## **APPENDIX**

### **CLAIMS AT ISSUE**

**U.S. Patent No. 9,059,969 ("the '969 patent), asserted claims 3 and 10**

Asserted claim 3 of the '969 patent encompasses the requirements of claims 1 and 2.  Claim

3 reads as follows:

> **3.**  The portable device according to claim **2**, wherein the communication caused to be transmitted to the communication network node facilitates verification of the portable device.

Claims 2 and 1 of the '969 patent read as follows:

> **2.**  The portable device according to claim **1**, wherein the fourth program code which, when executed by the portable device processor, is configured to cause a communication to be transmitted to the communication network node.

> **1.**  A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:

> (a)  an external communication interface configured to enable the transmission of communications between the portable device and the terminal;
> (b)  a processor; and
> (c)  a memory having executable program code stored thereon, including:
> (1)  third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and
> (2)  fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;
> wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

32

**Appx8890**

Asserted claim 10 of the '969 patent also encompasses the requirements of claims 1 and 2.

Claim 10 reads as follows:

> **10.**  The portable device according to claim **2**, wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database.

Claims 2 and 1 of the '969 patent are set forth above.

**U.S. Patent No. 9,774,703 ("the '703 patent), claims 56, 90, 101, 105, 114, and 124**

Asserted claim 56 of the '703 patent encompasses the requirements of claim 55.  Claim 56 reads as follows:

> **56.**  The method according to claim **55**, wherein the step of executing fourth program code stored on the portable device memory causes a communication to be transmitted to the communications network node to facilitate verification of the portable device.

Claim 55 of the '703 patent reads as follows:

> **55.**  A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:
>
> (a) causing the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;
> (b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to

**Appx8891**

the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

Asserted claim 90 of the '703 patent encompasses all the requirements of claims 78 and 86.

Claim 90 reads as follows:

**90.** The method according to claim **86**, wherein the data stored on the portable device memory comprises portable device identifier information.

Claim 86 of the '703 patent reads as follows:

**86.** The method according to claim **78**, wherein the step of executing third program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

Claim 78 of the '703 patent reads as follows:

**78.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting the presentation of an interactive user interface by the terminal output component;

(b) executing second program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, third program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

Asserted claim 101 of the '703 patent encompasses all the limitations of claims 93 and 97.

Claim 101 reads as follows:

**101.** The method according to claim **97**, wherein the data stored on the portable device memory comprises portable device identifier information.

Claim 97 of the '703 patent reads as follows:

**97.** The method according to claim **93**, wherein the step of executing fourth program code to cause a communication to be transmitted to a communications network node comprises providing the terminal with data stored on the portable device memory to facilitate the terminal to transmit a communication to the communications network node.

Claim 93 of the '703 patent reads as follows:

**93.** A method implemented on a portable device comprising a processor, a memory having executable program code stored thereon, and an external communication interface for enabling the transmission of a plurality of communications between the portable device and a terminal, the terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the method comprising:

(a) affecting the presentation of the interactive user interface presented by the terminal output component;

(b) executing third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

35

**Appx8893**

(c) executing, in response to a communication received by the portable device resulting from user interaction with the interactive user interface, fourth program code stored on the portable device memory to cause a communication to be transmitted to a communications network node; and

(d) facilitating communications through the terminal network communication interface to a communications network node.

Asserted claim 105 of the '703 patent, which encompasses all the limitations of claim 104,

reads as follows:

105.  The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate verification of the portable device.

Claim 104 of the '703 patent reads as follows:

104.  A system implementing a terminal having a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to affect the presentation of an interactive user interface by the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to and from the terminal, the system comprising:

(a) a communications network node; and

(b) a portable device comprising an external communication interface for enabling the transmission of a plurality of communications between the portable device and the terminal, a processor, and a memory, wherein the memory has executable program code stored thereon, the portable device configured to:

(1) cause the terminal to execute the first program code to affect the presentation of an interactive user interface by the terminal output component;

(2) execute third program code stored on the portable device memory to provide a communications node on the portable device configured to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and to facilitate communications to the terminal and to a communications network node through the terminal network communication interface;

(3) execute fourth program code stored on the portable device memory in response to a communication received by the portable device resulting from user interaction with the interactive user interface to cause a communication to be transmitted to a communications network node; and

(4) facilitate communications through the terminal network communication interface to a communications network node.

**Appx8894**

Asserted claim 114 of the '703 patent encompasses all the requirements of claim 10.  Claim

114 reads as follows:

> **114.**   The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to cause a communication to be transmitted to the communications network node to facilitate synchronizing content on the portable device with content on the communications network node.

Claim 104 is set forth above.

Asserted claim 124 of the '703 patent encompasses all the requirements of claims 104 and

120.  Claim 124 reads as follows:

> **124**.   The system according to claim **120**, wherein the data stored on the portable device memory comprises portable device identifier information.

Claim 120 of the '703 patent reads as follows:

> **120.**   The system according to claim **104**, wherein the portable device is configured to execute the fourth program code to provide the terminal with data stored on the portable device to facilitate the terminal to transmit a communication to the communications network node.

Claim 104 of the '703 patent is set forth above.

**Appx8895**

## GLOSSARY OF PATENT-RELATED TERMS

Some of the terms in this glossary are defined in more detail in the legal instructions you are given.

**Abstract**: A brief summary of the technical disclosure in a patent to enable the U.S. Patent and Trademark Office and the public to determine quickly the nature and gist of the technical disclosure in the patent.

**Amendment**: A patent applicant's change to one or more claims or to the specification either in response to an office action taken by an Examiner or independently by the patent applicant during the patent application examination process.

**Claim**: Each claim of a patent is a concise, formal definition of an invention and appears at the end of the specification in a separately numbered paragraph.  In concept, a patent claim marks the boundaries of the patent in the same way that a legal description in a deed specifies the boundaries of land, i.e., similar to a landowner who can prevent others from trespassing on the bounded property, the inventor can prevent others from using what is claimed. Claims may be independent or dependent.  An independent claim stands alone.  A dependent claim does not stand alone and refers to one or more other claims.  A dependent claim incorporates whatever the other referenced claim or claims say.

**Drawings**: The drawings are visual representations of the claimed invention contained in a patent application and issued patent, and usually include several figures illustrating various aspects of the claimed invention.

**Elements**: The required parts of a patent claim, sometimes referred to as "limitations" or "requirements."  A device infringes a patent if it contains each and every requirement of a patent claim.

**Embodiment**: A product that contains the claimed invention.

**Examination**: Procedure before the U.S. Patent and Trademark Office whereby an Examiner reviews the filed patent application to determine if the claimed invention is patentable.

**Filing Date**: Date that a patent application, with all the required sections, has been submitted to the U.S. Patent and Trademark Office.

**Infringement**: Violation of a patent occurring when someone makes, uses, or sells a patented invention, without permission of the patent holder, within the United States during the term of the patent. Infringement may be direct, by inducement, or contributory, as described to you in the final instructions.

**License**:  Permission to make, use, or sell a patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other compensation.

**Appx8896**

**Limitation**: A required part of an invention set forth in a patent claim. A limitation is a requirement of the invention. The word "limitation" is often used interchangeably with the words "requirement" or "element." The phrase "claim limitation" is often used interchangeably with the phrase "claim element."

**Non-obviousness**: One of the requirements for securing a patent. To be valid, the subject matter of the invention must not have been obvious to a person of ordinary skill in the art at the time of the earlier of the filing date of the patent application or the date of invention.

**Office Action**: A written communication from the Examiner to the patent applicant in the course of the application examination process.

**Patent**: A patent is an exclusive right granted by the U.S. Patent and Trademark Office to an inventor to prevent others from making, using, or selling an invention for a term of 20 years from the date the patent application was filed. The patent has three parts, which are a specification, drawings and claims. The patent is granted after examination by the U.S. Patent and Trademark Office of a patent application filed by the inventor which has these parts, and this examination is called the prosecution history.

**Patent Application**: The initial papers filed in the United States Patent and Trademark Office (Patent Office or PTO) by an applicant. These typically include a specification, drawings and the oath (Declaration) of applicant.

**Patent Examiners**: Persons employed by the Patent Office having expertise in various technical areas who review (examine) patent applications to determine whether the claims of a patent application are patentable and the disclosure adequately describes the Invention.

**United States Patent and Trademark Office (USPTO, or PTO, or Patent Office)**: An administrative branch of the U.S. Department of Commerce that is charged with overseeing and implementing the federal laws of patents and trademarks. It is responsible for examining all patent applications and issuing all patents in the United States.

**Prior Art**: Previously known subject matter in the field of a claimed invention for which a patent is being sought. It includes issued patents, publications, and knowledge deemed to be publicly available, such as trade skills, trade practices, and the like.

**Prosecution History**: The prosecution history is the complete written record of the proceedings in the PTO from the initial application to the issued patent. The prosecution history includes the office actions taken by the PTO and the amendments to the patent application filed by the applicant during the examination process.

**Reference (Prior Art Reference)**: Any item of prior art (publication or patent) used to determine patentability.

**Requirement**: A required part or step of an invention set forth in a patent claim. The word "requirement" is often used interchangeably with the word "limitation" or "element."

**Appx8897**

**Royalty**: A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention.

**Specification**: The specification is a required part of a patent application and an issued patent.  It includes a written description of the invention and the process of making and using it, together with the claims of the patent.

**Written Description**:  That part of the specification that comes before the claims and describes the invention and the process of making and using it.

40

**Appx8898**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INGENICO INC.,

        Plaintiff,

    v.

IOENGINE, LLC,

        Defendant.

IOENGINE, LLC,

        Counterclaim Plaintiff,

    v.

INGENICO, INC., INGENICO CORP., and
INGENICO GROUP S.A.,

        Counterclaim Defendants.

C.A. No. 18-826-WCB

## VERDICT FORM

**Instructions**: When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Please refer to the Jury Instructions for guidance on the law applicable to the subject matter covered by each question.

1

**Appx8899**

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this Court as our verdict in this case:

**Appx8900**

## I.    INFRINGEMENT

1.    For each of the following products, did IOENGINE prove by a preponderance of the evidence that Ingenico has directly infringed the Asserted Claims of the '969 Patent?

*Writing "Yes" below indicates a finding for IOENGINE.*

*Writing "No" below indicates a finding for Ingenico.*

| Products | '969 Claim 3 | '969 Claim 10 |
|---|---|---|
| ROAM Products: G3X, G4X, G5X, Moby/3000, Moby/8500, RP350x, RP450c, RP45BT, RP45xBT, RP457c, RP750x | Yes | No |
| Telium Products: iSMP, iSMP Companion, iSMP4 Companion, iCMP | Yes | No |
| Telium iSMP4 | Yes | No |
| Tetra Link/2500 | Yes | No |

*Continue to Question 2.*

3

**Appx8901**

2.    For each of the following products, did IOENGINE prove by a preponderance of the evidence that Ingenico has actively induced its customers who use the ROAM Pay X App to directly infringe the Asserted Claims of the '969 and '703 Patents?

*Writing "Yes" below indicates a finding for IOENGINE.*

*Writing "No" below indicates a finding for Ingenico.*

| Products | '969 Claim 3 | '969 Claim 10 | '703 Claim 56 | '703 Claim 90 | '703 Claim 101 | '703 Claim 105 | '703 Claim 114 | '703 Claim 124 |
|---|---|---|---|---|---|---|---|---|
| ROAM Products: G3X, G4X, G5X, Moby/3000, Moby/8500, RP350x, RP450c, RP45BT, RP45xBT, RP457c, RP750x | Yes | NO | Yes | Yes | Yes | Yes | NO | Yes |

*Continue to Question 3.*

4

**Appx8902**

3.      For each of the following products, did IOENGINE prove by a preponderance of the evidence that Ingenico has actively induced its customers who do not use the ROAM Pay X App to directly infringe the Asserted Claims of the '969 and '703 Patents?

*Writing "Yes" below indicates a finding for IOENGINE.*

*Writing "No" below indicates a finding for Ingenico.*

| Products | '969 Claim 3 | '969 Claim 10 | '703 Claim 56 | '703 Claim 90 | '703 Claim 101 | '703 Claim 105 | '703 Claim 114 | '703 Claim 124 |
|---|---|---|---|---|---|---|---|---|
| ROAM Products: G3X, G4X, G5X, Moby/3000, Moby/8500, RP350x, RP450c, RP45BT, RP45xBT, RP457c, RP750x | Yes | No | Yes | Yes | Yes | Yes | No | Yes |
| Telium Products: iSMP, iSMP Companion, iSMP4 Companion, iCMP | Yes | No | Yes | Yes | Yes | Yes | No | Yes |
| Telium iSMP4 | Yes | No | Yes | Yes | Yes | Yes | No | Yes |
| Tetra Link/2500 | Yes | No | Yes | Yes | Yes | Yes | No | Yes |

*Continue to Question 4.*

5

**Appx8903**

4.      For each of the following products, did IOENGINE prove by a preponderance of the evidence that Ingenico has contributed to direct infringement of the Asserted Claims of the '969 and '703 Patents by its customers who use the ROAM Pay X App?

*Writing "Yes" below indicates a finding for IOENGINE.*

*Writing "No" below indicates a finding for Ingenico.*

| Products | '969 Claim 3 | '969 Claim 10 | '703 Claim 56 | '703 Claim 90 | '703 Claim 101 | '703 Claim 105 | '703 Claim 114 | '703 Claim 124 |
|---|---|---|---|---|---|---|---|---|
| ROAM Products: G3X, G4X, G5X, Moby/3000, Moby/8500, RP350x, RP450c, RP45BT, RP45xBT, RP457c, RP750x) | Yes | No | Yes | Yes | Yes | Yes | No | Yes |

*Continue to Question 5.*

6

**Appx8904**

5.    For each of the following products, did IOENGINE prove by a preponderance of the evidence that Ingenico has contributed to direct infringement of the Asserted Claims of the '969 and '703 Patents by its customers who do not use the ROAM Pay X App?

*Writing "Yes" below indicates a finding for IOENGINE.*

*Writing "No" below indicates a finding for Ingenico.*

| Products | '969 Claim 3 | '969 Claim 10 | '703 Claim 56 | '703 Claim 90 | '703 Claim 101 | '703 Claim 105 | '703 Claim 114 | '703 Claim 124 |
|---|---|---|---|---|---|---|---|---|
| ROAM Products: G3X, G4X, G5X, Moby/3000, Moby/8500, RP350x, RP450c, RP45BT, RP45xBT, RP457c, RP750x | Yes | NO | Yes | Yes | Yes | Yes | NO | Yes |
| Telium Products: iSMP, iSMP Companion, iSMP4 Companion, iCMP | Yes | NO | Yes | Yes | Yes | Yes | NO | Yes |
| Telium iSMP4 | Yes | NO | Yes | Yes | Yes | Yes | NO | Yes |
| Tetra Link/2500 | Yes | NO | Yes | Yes | Yes | Yes | NO | Yes |

*Continue to Question 6 only for claims you have found were infringed in Questions 1, 2, 3, 4, or 5.*

7

**Appx8905**

## II.    VALIDITY

*Answer Question 6 only for claims you have found were infringed in Questions 1, 2, 3, 4, or 5.*

6.      Did Ingenico prove, by clear and convincing evidence, that the Asserted Claims of the '969 or '703 Patent are invalid for anticipation by the prior art?  Answer this question only with respect to claims that you have found were infringed by Ingenico in Questions 1, 2, 3, 4, or 5.

*Checking "Invalid" below indicates a finding for Ingenico.*

*Checking "Not Invalid" below indicates a finding for IOENGINE.*

| Claim | | Invalid (for Ingenico) | Not Invalid (for IOENGINE) |
|---|---|---|---|
| '969 Patent | Claim 3 | ✓ | |
| | Claim 10 | N/A | N/A |
| '703 Patent | Claim 56 | ✓ | |
| | Claim 90 | ✓ | |
| | Claim 101 | ✓ | |
| | Claim 105 | ✓ | |
| | Claim 114 | N/A | N/A |
| | Claim 124 | ✓ | |

*Continue to Question 7.*

8

**Appx8906**

*Answer Question 7 only for claims you have found were infringed in Questions 1, 2, 3, 4, or 5.*

7.     Did Ingenico prove, by clear and convincing evidence, that the Asserted Claims of the '969 or '703 Patent are invalid for obviousness in light of the prior art?  Answer this question only with respect to claims that you have found were infringed by Ingenico in Questions 1, 2, 3, 4, or 5.

*Checking "Invalid" below indicates a finding for Ingenico.*

*Checking "Not Invalid" below indicates a finding for IOENGINE.*

| Claim | | Invalid (for Ingenico) | Not Invalid (for IOENGINE) |
|---|---|---|---|
| '969 Patent | Claim 3 | ✓ | |
| | Claim 10 | N/A | N/A |
| '703 Patent | Claim 56 | ✓ | |
| | Claim 90 | ✓ | |
| | Claim 101 | ✓ | |
| | Claim 105 | ✓ | |
| | Claim 114 | N/A | N/A |
| | Claim 124 | ✓ | |

*Continue to the next page.*

**Appx8907**

For the Jury:

_7/15/22_

Date

Jury Foreperson

10

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -
      INGENICO INC.,
 4                                    :    CIVIL ACTION
              Plaintiff,             :
 5    v                              :
                                     :
 6    IOENGINE, LLC,                 :
                                     :
 7            Defendant.
      -----------------------------------
 8    IOENGINE, LLC,
                                     :
 9            Counterclaim Plaintiff, :
      v                              :
10                                   :
      INGENICO INC., INGENICO CORP. and  :
11    INGENICO GROUP SA,             :
                                     :    NO. 18-826-WCB
12            Counterclaim Defendants.

13                          - - -

14                     Wilmington, Delaware
                      Monday, July 11, 2022
15                   Jury Trial - Volume A

16                          - - -

17    BEFORE:      HONORABLE WILLIAM C. BRYSON, and a jury
                 United States Circuit Court Judge
18                          - - -

19

20
      (Appearances in their entirety placed beginning on page 2)
21

22

23    Reported by:

24    Brian P. Gaffigan
      Registered Merit Reporter
25    Federal Certified Realtime Reporter
```

**Appx8909**

1    lawsuit is that the patent in question is invalid.

2            You may wonder why it is that you would be asked

3    to consider such things when the patent has already been

4    reviewed by a Government Examiner.   There are several

5    reasons for this.

6            First, there may be facts or arguments that

7    the Examiner did not consider, such as prior art that was

8    not located by the PTO or provided by the Applicant.   In

9    addition, there is, of course, the possibility that mistakes

10   were made or important information overlooked.   Examiners

11   have a lot of work to do and no process is perfect.

12           Also, unlike a court proceeding, prosecution of

13   a patent application takes place without input from people

14   who might later be accused of infringement, so it is

15   important that we provide a chance for someone who is

16   accused of infringement to challenge the patent in court.

17           In deciding issues of infringement and validity,

18   it is your job to decide the facts of the case.   The

19   Judge will instruct you about the law, which may include

20   the meaning of certain words or phrases contained in the

21   patent.

22           So it is your primary duty as jurors to resolve

23   any factual disputes and in some cases, such as infringement

24   and validity, to apply the law to those facts.   To prove

25   infringement, the patentholder must persuade you by what is

1    called a preponderance of the evidence relating to the facts

2    of the case that the patent has been infringed.

3           To prove invalidity, the alleged infringer must

4    persuade you by what is called clear and convincing evidence

5    that the patent is invalid.

6           The Judge in your case will explain these and

7    other terms and provide additional specific instructions at

8    the appropriate time.

9           Good luck with your task, and thank you for your

10   service.

11          (End of video.)

12          THE COURT:  Very well.  I think that gives you

13   at least an introduction and you will hear some of these

14   terms again.  You may get a little tired of hearing them,

15   but I think as you get more comfortable with the terminology

16   it will make everything much easier to understand.  Bear

17   with us if there is some repetition of what you heard.  You

18   will hear repetition of these terms from me, you will hear

19   repetition of these terms from the lawyers but that is all

20   important in making you comfortable with essentially a

21   language that is significantly peculiar to patent law but

22   will you get used to.

23          So let me give you some initial instructions

24   before the lawyers begin the case with their opening

25   statements.

1          As you heard on the video, infringement is the

2     legal term for the violation of a patent owner's rights

3     under a patent.  A person that is -- a company that is sued

4     for infringing a patent can deny infringement.  They can

5     also defend against a charge of infringement as you heard on

6     the video, by proving that the patent is invalid.

7          The two patents that are at issue in this case

8     are owned by IOENGINE.

9          The first is U.S. Patent No. 9,059,969.

10         And the second is the Patent No. 9,774,703.

11         Fortunately, you won't have to keep any of those

12    numbers in mind.  They will be referred to in shorthand as

13    the '969 patent, the last three digits of the patent, and

14    the '703 patent and will you hear a lot about '969 and the

15    '703 patents.

16         IOENGINE contends that Ingenico has infringed

17    certain claims of each of those patents.  Now the patents,

18    each of those patents have a lot of claims but there are

19    only certain claims that are at issue in this case.  Those

20    claims will be referred to as the "asserted claims."

21         As was explained in the video, the "claims" of

22    the patent are the parts that set forth what the inventor

23    says he or she has invented and is protected by the patent.

24    Ingenico contends -- I'm sorry, IOENGINE contends that

25    Ingenico has infringed those claims by making, selling,

**Appx8996**

1    everyday life.  You are not required to believe any witness

2    if you do not find their testimony to be credible.

3              Much of the evidence you will hear will be, as I

4    said, in the form of testimony from live witnesses here in

5    court by examination by one side and cross-examination by

6    the other.  But you will also hear some evidence that will

7    be presented through what we call deposition testimony.

8    Now, a deposition is the sworn, recorded testimony of a

9    witness that is taken in advance of the trial, typically

10   when a witness is not available to testify in person.  You

11   should judge deposition testimony in the same way that you

12   judge testimony that is given live in court.

13             You will also hear testimony from witnesses who

14   are referred to as expert witnesses.  When knowledge of

15   technical subject matter may be helpful to a jury, a person

16   who has special training or experience in that technical

17   field is permitted to state his or her opinion on those

18   technical matters.  That person is regarded as an expert

19   witness.  But you are not required to accept that opinion

20   simply because it comes from an expert for either side.

21   There will be experts who will be testifying for one side,

22   experts who will be testifying for the other.  As in the

23   case of every other witness, it is up to you to decide

24   whether to rely on any of that testimony.

25             Now, let me talk a bit about burdens of proof.

1    This was alluded to in the video.  Let me expand on this a

2    little bit.

3              We use the word "burden" because the person that

4    has the burden of proof on a particular issue is the party

5    that must persuade you with respect to that issue.  If at

6    the end of the trial you're not persuaded by the party that

7    has the burden on a particular issue, that party loses on

8    that issue.

9              As the patent owner, IOENGINE has the burden

10   of proving infringement, and it is required to prove

11   infringement by what is called the preponderance of the

12   evidence.  That means IOENGINE has to produce evidence

13   which, considered in the light of all the facts, leads you

14   to believe that what IOENGINE alleges is more likely true

15   than not.  If IOENGINE does not satisfy that burden, you

16   must rule in favor of Ingenico on that issue.

17             Now, IOENGINE also contends that Ingenico

18   willfully infringed IOENGINE's patents.  IOENGINE has the

19   burden of proving willful infringement by a preponderance of

20   the evidence.

21             For its part, Ingenico asserts that IOENGINE's

22   patents are invalid.  A party challenging a patent has the

23   burden of proving by clear and convincing evidence that the

24   patent is invalid.  Clear and convincing evidence is

25   evidence that produces in your mind a firm belief that a

1    particular fact is true.  Proof by clear and convincing

2    evidence is a higher burden than proof by a preponderance of

3    the evidence.  If Ingenico fails to meet that burden, the

4    verdict on validity must be for IOENGINE.

5         Those of you who may be familiar with the burden

6    of proof in criminal cases will have heard of the burden of

7    proof beyond a reasonable doubt, which is a very high

8    burden.  That burden does not apply in a civil case like

9    this one, so you should put that burden of proof out of your

10   minds for this purpose.

11        In this case, you will be asked to decide

12   several things according to the legal instructions I will

13   give you at the end of the trial.  Those instructions will

14   cover some of the same ground that I have discussed today,

15   only in more detail.  You will be required to decide three

16   things:  First, you must decide whether IOENGINE has proved

17   by a preponderance of the evidence that the accused Ingenico

18   products infringe one or more of the asserted claims of the

19   '969 and '703 patents.

20        Second, if you find that one or more of the

21   asserted claims of the '969 and '703 patents are infringed,

22   you must decide whether IOENGINE has proved by a

23   preponderance of the evidence that Ingenico's infringement

24   was willful.

25        And, third, you must decide whether Ingenico has

1    proved by clear and convincing evidence that any of the

2    asserted claims of the '969 and '703 patents are invalid.

3              Now, let me say a few words about your conduct

4    as jurors:

5              First, during the trial you may find that people

6    want to talk to you about the case.  This is very natural

7    and not at all uncommon.  You go home, someone says, well

8    what is the case about?  As much as you might want to talk

9    about the case, you need to tell that person that you cannot

10   discuss it until it's over.  You can tell them that you were

11   selected for a jury in a civil case -- that it's not a

12   criminal case but that is much as you should say.  The

13   reason for that is if you start down the road of talking

14   about the case, you never know what will happen.

15             You might talk to someone who says, "oh, yes, I

16   sat on a case like that and here's what happened," and

17   suddenly you can have a conversation that could have an

18   affect on your view in the evidence in this case.  So that

19   is something that you really can't allow to happen.  So if

20   someone starts to talks to you about the case, just tell

21   them politely that you can't discuss it, and then after it's

22   over, you will be free to talk about it any way they want or

23   not if you so choose."

24             Now if a lawyer or any other member of the trial

25   teams should encounter you in the hall or in the elevator,

1  they will not speak with you.  That's not because they're

2  being unfriendly; they just know the rules are that they

3  can't speak with you.  So if they pass, they will allow you

4  pass.  They might nod or say "good morning," but that is it.

5  Because they are not supposed to talk with you during the

6  trial.

7          If anyone does try to talk to you about the

8  case, then please inform either Ms. Grimes or myself.

9  That's, that's a no-no and it's something that we should

10  know about if it happens.  It's not likely to happen but if

11  it does, let us know.

12          Now, I know that many of you probably use

13  cellphones, tablets, email, the internet and other

14  technology to communicate on a regular basis.  You must not

15  use those tools to communicate with anyone about the case.

16  That doesn't mean you have to throw away your cellphone for

17  a week.  It just means nothing about this case.  That

18  includes family and friends.

19          Second, don't read or listen to anything related

20  to this case in any way.  By that, I mean that if there is a

21  newspaper article or an Internet post or radio or television

22  report about the case, turn the next page, turn to the next

23  page, walk away, whatever you need to do.  Don't read it or

24  listen to it.

25          Third, don't do any research or investigation

1   DiskOnKey from Mr. McNulty himself.

2           You will hear from Mr. McNulty that he based his

3   prototypes on the DiskOnKey, meaning that his prototypes

4   were made with actual DiskOnKey devices that he then says he

5   added his own software to.

6           You will hear that he hired former M-Systems

7   employees who had worked on the DiskOnKey to work for him.

8   He hired them to work on his prototypes.

9           You will see a press release from Fuji quoting

10  Mr. McNulty, talking about the DiskOnKey in 2002 and showing

11  that the DiskOnKey had a processor that ran software, and in

12  the same press release, it will establish that the DiskOnKey

13  was sold to the public by Mr. McNulty's division at Fuji

14  bench more than one year before he filed his patent

15  application, which, in and of itself, makes it prior art in

16  this case.

17          And then Mr. Geier will show you why the claims

18  are not invalid.  He will walk through them.  And why the

19  PTO, the Patent and Trademark Office, did not have all of

20  this information about the DiskOnKey available to him to

21  consider when it granted Mr. McNulty's claims.

22          But you should also focus on what you might not

23  hear.

24          Mr. Liebowitz indicated that none of his

25  products became "a commercial success."

1         You also will not hear that they ever became

2    anything that does what the patent claims require.  In other

3    words, you will not hear that they are a "reduction to

4    practice."  You will not hear that they functioned in a way

5    that does everything the claims require.

6         You will also not hear that Mr. McNulty's

7    company has ever made or sold even one device that does what

8    these claims require.

9         Of course, aside there hearing a lot about

10   Mr. McNulty and DiskOnKey, you will hear a lot about

11   Ingenico.  You will hear about how they have actually been

12   developing card readers for years and years and years, and

13   how they have never heard of Mr. McNulty before this lawsuit

14   or IOENGINE or the patent.

15        Actually before IOENGINE sued one of Ingenico's

16   customers and what did Ingenico do in response when its

17   customer was sued by Mr. McNulty?  It brought this lawsuit.

18   That's why this lawsuit says, Ingenico versus IOENGINE,

19   because Ingenico does not infringe and Ingenico believes the

20   patents are invalid so it brought this lawsuit so that a

21   jury could determine that.

22        Finally, you might hear a surprise or two in

23   this case, but I'm not going to be a spoiler.  But I will

24   say that I do very much look forward to helping you do the

25   difficult job you have been asked to do, which is to

1    understand all the evidence that we put before you and

2    determine whether each of the parties has proven what they

3    set out to prove.

4            And I want to thank you for being on the jury in

5    this case.  We do all know this is a big disruption in your

6    lives and I want you to know that your help in resolving

7    this dispute between the parties is greatly appreciated.

8            Thank you very much.

9            THE COURT:  Thank you very much, Mr. Timbers.

10           Very well.  We will break for lunch at this

11   point.  I think what we'll do is we'll take until -- your

12   lunches will be ready, they will be in the jury room ready

13   for you, so there will be no delay in getting your chance to

14   start eating.

15           We'll break until -- let's say 1:20.  Now what I

16   want to do is I'm going to see how much time you all are

17   comfortable with for lunch.  I don't want to have you

18   rushing your lunch.  I'll give you a chance to get a real

19   break, but I also don't want to have you sitting around

20   waiting to start.

21           So what I want you to do when you get in the

22   jury room after you had a chance, talk among yourselves and

23   decide whether that wasn't enough time, whether it's was too

24   much time or whether it was just about the right amount of

25   time and then we will try to make, excuse me, future lunch

1    times accommodate your comfort level.

2              So Ms. Grimes, you can take the jury out.

3              (Jury left courtroom.)

4              THE COURT:  Okay.  We are adjourned until

5    1:20 p.m.  And at that point, you will present your evidence

6    unless -- what I will tell Ms. Grimes is if the jurors are

7    still eating, we may just have to cool our heels here in the

8    courtroom.  We'll time trade the period that the jury need

9    for lunch and presumably we can adjust.

10              Let me state one other thing which is that I am

11   very comfortable with you all coming and going as you need

12   or prefer at any point, you don't have to ask the Court to

13   leave the courtroom.  Just wander out, come back as your

14   needs or preferences dictated.  And I will say with respect

15   to local counsel, you are obviously very welcome to stay the

16   entire time here, but if you need or prefer to depart, I

17   don't insist on your presence of local counsel in order to

18   continue the operation.

19              Thank you.  We're adjourned.

20              (Lunch recess taken.)

21              *       *       *

22              1:20 p.m. - Afternoon Session

23              THE COURT:  Please be seated.

24              Ms. Grimes is going to bring in the jury.

25              MR. LEIBOWITZ:  Your Honor, before the jury

1    comes back, we have one issue with the very end of

2    Mr. Timbers' presentation where he referred to Ingenico as

3    having filed this lawsuit.

4              I think Your Honor referred to IOENGINE as the

5    plaintiff earlier, and that was the convention that we've

6    been using and he also said that he filed this because they

7    thought the patent was invalid.  There was a declaratory

8    judgment that didn't even allege validity.

9              It was very confusing, I think, for the jury to

10   hear that after the hearing the presentations given the way

11   they were in terms of plaintiff versus defendant in this

12   case, Your Honor.

13             THE COURT:  You know what?  I think the easiest

14   thing to do is I will just explain.

15             MR. LEIBOWITZ:  The parties have sued each

16   other.

17             THE COURT:  The parties have sued each other.  I

18   think I will say that and I think that is really all that

19   needs to be said on that score.

20             I can tell you I don't think that made nearly as

21   much of an impression as it made on the lawyers.  And it is

22   true, what he said is true.  They did bring this lawsuit.

23             MR. LEIBOWITZ:  Other than the validity part,

24   Your Honor.

25             THE COURT:  Yes, right.  And we couldn't go --

1            MR. LEIBOWITZ:  We're not going into the

2    history; right?  Of the indemnification and all that?

3            THE COURT:  No, I understand.  But I just don't

4    think that is an issue that the jurors, that there is any

5    concern to the jury it's a nonissue as far as I'm concerned.

6            Mr. Timbers.

7            MR. TIMBERS:  That's all.

8            MR. LEIBOWITZ:  Thank you, Your Honor.

9            THE COURT:  All right.  Thank you.

10           By the way, I think Ms. Grimes asked the jurors

11   how they felt about lunch and they were comfortable with the

12   40-45 minute range.  Is that acceptable to the lawyers?

13           MR. TIMBERS:  Yes, Your Honor.

14           MR. LEIBOWITZ:  (Nodding yes.)

15           THE COURT:  Besides court staff, including my

16   Jimmy Johns, but that is their worst case.

17           Let them know we're ready.

18           (Jury returned.)

19           THE COURT:  Please be seated.

20           Members of the jury, there is something that

21   might be a little confusing to you but is actually a pretty

22   simple explanation.  There has been a reference to Ingenico

23   sued IOENGINE or IOENGINE sued Ingenico.  In fact, the

24   parties sued one another, so technically there were two

25   different lawsuits brought.  That is a fact.

1           The way we have treated this is that it is

2     IOENGINE is seeking to prove infringement and Ingenico is

3     seeking to prove noninfringement and invalidity, and for

4     your purposes that is all you really need to focus on.

5           MR. TIMBERS:  Your Honor, it's just that we just

6     mentioned we're trying to prove noninfringement, which we're

7     not.

8           THE COURT:  I shouldn't have said prove

9     noninfringement.  They're defending on the grounds that

10    there is noninfringement and thank you, Mr. Timbers.  It's

11    an easy mistake.  Well, it shouldn't be that easy.  It's a

12    mistake I shouldn't have made.  I apologize for that.  Thank

13    you for the clarification.

14          All right.  Your first witness, Mr. Leibowitz.

15    Are you going to have a first witness?

16          MR. LEIBOWITZ:  Yes.  Thank you, Your Honor.

17          IOENGINE calls Mr. Scott McNulty.

18          THE COURT:  Oh, yes.  I'm sorry.  Before you

19    begin, let's hand out the juror notebooks so that the

20    jurors --

21          Go ahead and take the stand, Mr. McNulty.

22          MR. BRADER:  Your Honor, may I approach?

23          THE COURT:  Yes.

24          Let's let Ms. Grimes get her notebooks done and

25    then we can handle things.

McNulty - direct

1              (Notebooks passed out to the jurors.)

2              THE COURT:  Thank you.

3              Ms. Grimes, please swear the witness.

4              ... SCOTT MCNULTY, having been first duly sworn,

5    was examined and testified as follows ...

6              THE COURT:  Okay.  Mr. Leibowitz.

7              MR. LEIBOWITZ:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9    BY MR. LEIBOWITZ:

10        Q.    Good afternoon, Mr. McNulty.

11        A.    Good afternoon.

12        Q.    Can you please introduce yourself to the jury?

13        A.    My name is Scott Francis McNulty.

14        Q.    And where do you currently live?

15        A.    I live at 22 Ensign Road in Rowayton,

16   Connecticut.

17        Q.    And are you currently employed?

18        A.    Yes, I'm employed by IOENGINE LLC.  And I have

19   another company called BIOPTid, which is a biometrics

20   company separate from this case.

21        Q.    And what is your position at IOENGINE?

22        A.    I'm the founder, president, and CEO and the

23   inventor.

24        Q.    And why did you form IOENGINE?

25        A.    I have a slide to break that down.

**Appx9044**

McNulty - direct

1              I wanted to create a brand and the brand would

2     emphasize IO.  I and O, in the case of computers is input

3     and output, and then "engine" really means my, my technology

4     is the engine for input and output.

5          Q.   I noticed on your slide it mentions the digital

6     spectrum.  What is that?

7          A.   So I have a slide for that.

8              So at the point of my invention I had already

9     been in technology for 20 some years and I really saw the

10    whole of technology really in three parts, portable devices,

11    terminals, and networks and I call that -- the whole thing,

12    I call that the "digital spectrum."

13         Q.   Now, Mr. McNulty, can you tell us a little bit

14    about your background?

15         A.   Yes.  So I have a slide to, you know, break this

16    down.

17              There is really four areas:  Education, my time

18    in advertising on Madison Avenue, my time in manufacturing

19    and product management, and my time as an entrepreneur which

20    is that yellow section.

21         Q.   Let's start with your educational background.

22    Do you have any formal education?

23         A.   I did my undergraduate degree at Bloomsbury

24    University.

25         Q.   And did you have any other formal education

 1    after you got your undergraduate degree?

 2         A.    Yeah.  After Bloomsbury, I got a postgraduate

 3    certificate from Columbia University in New York City in

 4    finance and marketing.

 5              I also got a postgraduate certificate from the

 6    School of Visual Arts in New York City and then I got an MBA

 7    from the University of Connecticut.

 8         Q.    Outside of formal education, do you have any

 9    other training?

10         A.    Yes.  I like to consider myself as self-taught

11    meaning that, you know, I read a lot of textbooks that are

12    in, you know, advanced degree programs.  And then, of

13    course, a lot of trade magazines.

14         Q.    Let's move over to your career, starting with

15    your advertising career.  Where did you work?

16         A.    So my career started at an ad agency in New York

17    City and it was -- Coca-Cola had an ad agency and that was

18    my first job out of college.  And that was really -- at the

19    time, to be on the Coca-Cola account was sort of a premier

20    job you could get out of college.  It was mainly me and a

21    bunch of Ivy League marketing graduates who worked on

22    Coca-Cola.  But shortly after that, things changed.

23         Q.    How did they change?

24         A.    So at the same time I was working on Coke, we

25    had Sony also as a client and if you remember the Sony

McNulty - direct

1    Betamax, at the time when I was there, the Betamax was

2    making its sort of last effort to try to overcome VHS.  If

3    you remember VHS, the old cartridges that you probably

4    watched movies on and your kids watched movies on.

5            So that was really quite a transitional

6    experience for me.

7        Q.   In what way was it "transitional"?

8        A.   So, you know, Coke, you know, this incredibly

9    well established, you know, sort of marketing process,

10   everybody had their job and their silo and that is pretty

11   much how Madison Avenue worked but Sony was different and

12   the team on Betamax was different.

13           So the way it worked is, you know, just a small

14   group of us at the agency would go over to Sony in North

15   Jersey and work very closely with the engineers and the

16   engineers would actually tear down the Betamax, you know,

17   tear down meaning take it apart, show us pieces and for an

18   advertising person, that was really quite a unique

19   experience to actually work that closely.

20           And the reason is because the engineers at Sony

21   wanted the advertising people to really intimately

22   understand the technology because they thought if we did, we

23   could overcome the VHS.

24       Q.   And what are some of the other technology

25   projects you worked on from an advertising perspective?

**Appx9047**

McNulty - direct

1              After that, this was just a personal project

2       called spacesounds.com, and I won a Webby award.  The New

3       York Times called the Webby award the Oscar of the Internet.

4              And after that I started to, you know, get

5       patents and then finally I was awarded a grant by the

6       Department of Energy and the National Nuclear Security

7       Agency for my biometrics technology.

8              MR. LEIBOWITZ:  Can we have PX-221 on the

9       screen.

10      BY MR. LEIBOWITZ:

11          Q.   Do you recognize this document, Mr. McNulty,

12      PX-221?

13          A.   Yes.  This is a press release by the NNSA

14      Division of the Department of Energy, and if you go to the

15      bottom, it lists three companies that won this grant and it

16      lists my company, BIOPTid, which I'm the sole owner of and

17      that was the biometric technology.  I was extremely proud of

18      this because its was a very competitive situation, a lot of

19      scientists go through this and I was one of three people who

20      got it.

21          Q.   Now, Mr. McNulty, what did you do after Fuji?

22          A.   So after Fuji, I -- you know, I really had my

23      own strong feeling and opinions about where technology was

24      going, and I decided to pursue those interests rather than

25      staying at Fuji.

McNulty - direct

1          Q.    Now, earlier you mentioned you had -- have a

2     number of patents.  How many patents do you have?

3          A.    I have about 12 IOENGINE patents and then

4     several patents in the biometric space and I have a couple

5     patents in what I call acoustic identity.

6          Q.    And on the screen, there is JX-349 and JX-350.

7     Can you identify those for the jury?

8          A.    These patents?

9          Q.    Yes.

10         A.    Yeah, well these are my IOENGINE patents.

11         Q.    And are you the inventor on all the IOENGINE

12    patents?

13         A.    Yes, I'm the sole inventor on all these patents.

14         Q.    Now, which patents are we talking about today?

15         A.    We're talking about two patents, the '969 patent

16    and the '703 patent.

17         Q.    And for the record, we have JX-349.  Is that the

18    '969 patent?

19         A.    Yes.

20         Q.    And JX-350, is that the '703 patent?

21         A.    Yes.

22         Q.    Now, let's focus on the invention of the two

23    patents that this trial is about.  Do you remember where you

24    were when you first thought of your invention?

25         A.    Yes.

McNulty - direct

1          Q.    And where was that?

2          A.    So in late June, in late June of 2001, PC Expo

3    was a trade show -- it no long exists today -- but it was a

4    popular trade show in New York City and so I thought of the

5    patent at the PC trade show.

6               MR. LEIBOWITZ:  Can we have PX-222.

7    BY MR. LEIBOWITZ:

8          Q.    Do you recognize this document, Mr. McNulty?

9          A.    Yes.  This is an ad for the 2001 PC Expo.  You

10   see the exposition dates were June 26 to June 28th.  A few

11   days prior to that there was a conference date.

12         Q.    And is this the PC Expo you were just talking

13   about?

14         A.    Yes.

15         Q.    Now, what were you doing at PC Expo?

16         A.    I was going to trade shows was, you know, sort

17   of one of my hobbies.  Loved technology, involved for

18   20 years.  I, you know, went to every tech trade show that I

19   could in the U.S.  And I even took days off of work to go to

20   trade shows.

21         Q.    And then why did you go?

22         A.    I went to see what was new.  I went to walk the

23   show and see what is new.

24         Q.    Now, Mr. McNulty, did you attend the PC Expo

25   with anyone?

McNulty - direct

1          A.    Yes.   I met up with my colleague, Tom Rzonca.

2    We often would meet at trade shows and at least walk a

3    portion of the trade show together.   Tom shares the same

4    sort of passion for tech that I have.

5          Q.    And so what happened at this 2001 PC Expo?

6          A.    So Tom and I are walking through the show and,

7    of course, you have these giant booths and these big

8    corporations but all the way sort of in the back corner

9    is -- are these table toppers, typically companies from

10   overseas.   And this one small company, I believe they were

11   from Taiwan, had a, you know, USB 2.0 exhibit there.   And I

12   walked up and I looked at it and that is when I had the

13   light bulb moment.

14         Q.    And what, what was that light bulb moment?

15         A.    So the trigger was I looked at, you know, this

16   technology and then suddenly the trigger for me was USB 2.0

17   compared to USB 1.0 was significantly faster.   The USB

18   device had a processor and had a memory and that was the

19   trigger.   So those three things.

20               And maybe a fourth thing that, that the USB

21   technology had what I perceived as somewhat of a flexible

22   channel and as you know in data storage, you know, I was

23   very, not as you know, but I'll tell you that in data

24   storage, when you are marketing products, one of the most

25   important things are the connection technologies.   How do

McNulty - direct

1   these drives connect to everything?  So I'm very aware of

2   the technology, the pin technology in the older connection

3   technologies.

4          And what I saw in USB was there was somewhat of

5   a flexible channel that information could flow somewhat

6   freely back and forth through this channel and it's really

7   that aspect of it that, that I, you know, realized

8   everything about my invention.

9          Q.   And then what did you, what did you realize at

10  that point?

11         A.   So at that point I realized if you put custom

12  firmware on that device because the USB device's firmware

13  manages flash media.  But if you put more robust custom

14  firmware and application on the memory of that device and

15  the two communicate to each other, you, you can create that,

16  that device can now tunnel out of that, out of the device

17  through that unrestricted pipe when you plug it into a

18  computer and when you plug it into a computer -- this is

19  where the Coke side of my background comes into play -- I

20  saw an interactive user interface that will allow the

21  consumer to control that activity because my feeling was

22  that activity was a way, you know, protocols in computers

23  were never given to the consumer to control.

24         So the interactive user interface that appears

25  on the computer to me was a really key part of it and then

McNulty - direct

1    the consumer could use the interactive interface to control

2    flow of information.

3              THE COURT:  Mr. Leibowitz, I wonder if it would

4    help the jury perhaps if -- some of the terms that have been

5    floating around may not be as familiar with the jurors as

6    they are to the witness in the tech area like USB, make sure

7    they understand, and flash drive and interactive user

8    interface.

9              MR. LEIBOWITZ:  Thank you, Your Honor.  Yes.

10   BY MR. LEIBOWITZ:

11             Q.   So, Mr. McNulty, can you explain some of these

12   terms to the jury?  Let's start with -- you mentioned

13   firmware a moment ago.  What did you mean by "firmware"?

14             A.   So firmware is -- and we actually have slides

15   later that do show all this but I'll clear some of that up

16   right now.

17             So you have a picture of a USB device which I

18   think a lot of people are familiar with.  If you take it

19   apart, inside that USB device you have a processor, and in

20   that processor is firmware.  And typically firmware at the

21   lowest level -- not the lowest but a lower level of software

22   that is used to operate the device.  You know, just to kind

23   of turn it on, manage the media.  That is typically how

24   firmware back then was used.

25             My idea was to change all that.

1            And then the next thing was flash media.  That,

2    that is the storage media.  So I talked to you about

3    magnetic media, floppy disks, we all know about magnetic

4    media, magnetic tape.  Flash media is an electronic way to

5    storing media.  That is the other thing that goes on the

6    portable device.

7            And my idea was, well, this firmware can talk to

8    the flash media and the processor can talk to the flash

9    media and as I said it I was triggered by the USB.  And I

10   think most people are familiar with USB, you know, the USB

11   port technology.  Because of that somewhat open pipe, I saw

12   a -- really an unrestricted way when you plug that into a

13   computer of my interactive user interface to appear on the

14   computer.

15        Q.   And what with the network side the -- of this?

16        A.   So the other part of the invention was then I

17   could give that USB device a new way to connect to the

18   Internet.  So with the interactive user interface, I

19   could -- I can get that processor going, the firmware going

20   to talk to the application and tunnel out through the

21   computer and then right through the computer up to the Net.

22        Q.   Now when you say "interactive user interface,"

23   what do you mean by that?

24        A.   So interactive user interface.  Is a, you know,

25   GUI, if you will, in this case.  But it must be -- it's

McNulty - direct

1    interactive, the consumer interacts with it.  There is

2    buttons and there is interactive elements and it gives you

3    feedback.  So it's giving you feedback from the portable

4    device itself.  It's giving you feedback from when you make

5    the connection to the Internet.  So that's the interactive

6    user interface.

7            And of course, as an ad guy, I saw that as more

8    than just, you know, being subservient to that product.  I

9    thought it, you know, could deliver a real strong, you know,

10   consumer branded and functional message to the user.

11           Q.   And do you have some examples we'll show later?

12           A.   Yeah, yeah, we have all that coming.

13           Q.   Now, did you tell anybody about this light bulb

14   moment that you had?

15           A.   Yes.  So I told my colleagues Tom Rzonca right

16   then and there.  I said, wow.  First I told him about the

17   trigger ideas.  Do you realize there is this open pipe and

18   the processor and memory?  Do you are realize what could

19   happen?  And Tom is like, no.

20           And then I told him the idea.  If you modify the

21   firmware, put an application to the flash media, create an

22   interactive user interface, you could then tunnel all the

23   way up to the Net and it changes everything.

24           Q.   Now, did you see this invention, Mr. McNulty, as

25   solving any problems that existed at the time?

McNulty - direct

1          A.    Yes.  So as you know, I have a slide for that

2     and I -- you know, I've been at this point again, I've been

3     involved with technology for 20 years.  I've worked on a lot

4     of portable devices, and this is really the direction on the

5     left-hand side that it was going.  You know, this is a Sharp

6     Wizard.  Well, it's kind of like an electronic organizer

7     here.

8               And look at all the tiny buttons.  I think some

9     of us may be familiar with that and it's very difficult to

10    read screen.  And that was the direction that the industry

11    was going in.  And so that would be the first problem that

12    my invention would solve.  On the right-hand side, you see a

13    very comfortable interactive user interface that is on the

14    terminal that is connected to the portable device.

15         Q.    And did you see any other problems that your

16    invention resolved, Mr. McNulty?

17         A.    Yes, a couple other problems.

18              So the other problem was, you know, in these

19    portable devices, if you remember these little tiny device

20    is were all buttons, they wanted -- the manufacturers wanted

21    to do the pop-out flash cards and then take that flash card

22    and put it into your computer and that was their idea of

23    transferring data.  And this would eliminate that and this

24    would give you a whole new way to connect to networks.

25         Q.    And were there any other problems that you

**Appx9062**

McNulty - direct

1    realized your invention could solve?

2         A.   Yes.  Well, when you think about the security

3    of, you know, doing that, popping that out and then putting

4    it into a computer, there is very little security.  This

5    would allow you to encrypt the data all the way from the

6    point of origin at the portable device.  And it would allow

7    you to encrypt it as it goes through the terminal up to the

8    network and it would allow the network to encrypt data all

9    the way back to the portable device and allow the portable

10   device to decrypt.  So it's a very secure transactional

11   system.

12        Q.   Now, after PC Expo, Mr. McNulty, did you write

13   this idea of your invention down?

14        A.   Yes, so right after PC Expo, I wrote a memo that

15   sum -- that embodies what I think is the idea.

16             MR. LEIBOWITZ:  Can we have PX-235, please?

17   BY MR. LEIBOWITZ:

18        Q.   And, Mr. McNulty, can you identify this

19   document, PX-235?

20        A.   Yes.  So this is a document that I wrote right

21   after PC Expo, shortly after it.  PC Expo was June 26th and

22   I wrote this document like around July, some time early in

23   July.

24        Q.   Now, Mr. McNulty, this has a date on it,

25   July 26th, 2001.  You say you wrote it early in July; is

McNulty - direct

1   that right?

2          A.   Yes.  I first wrote it early in July and then

3   I -- later, I had to present this document to an attorney

4   and I dated it July 26th.

5          Q.   Now, what is the title of this document,

6   Mr. McNulty?

7          A.   This is called "Portable Devices Rule."

8          Q.   And why did you choose that title?

9          A.   So working in data storage and then especially

10   on Madison Avenue on portable devices, the one thing that I

11   noticed was that portable devices were treated like sort of

12   second-class citizens in the technology world, you know.

13   Like nobody took portable devices seriously back then, they

14   were like gadgets.  And companies like Microsoft and Apple,

15   they didn't -- and the network companies, they didn't take

16   portable devices seriously.  That was very frustrating

17   working in the industry to see.

18          So I saw my invention as something, you know,

19   that would change all that, that would give portable devices

20   finally their place in the digital spectrum.

21          Q.   Now, did you show you this document to anyone

22   after you wrote it, Mr. McNulty?

23          A.   Yes.

24          Q.   And who did you show it to?

25          A.   I showed it to Tom Rzonca, the colleague that I

**Appx9064**

McNulty - direct

1  mentioned who was at the PC Expo and then I showed it to my

2  attorney.

3      Q.   And when did you show this to Mr. Rzonca?

4      A.   Some time right after I wrote it.  So before the

5  26th, some time shortly after the first week in July or

6  sometime in that time frame.

7      Q.   Now, after you came up with your invention and

8  wrote this memo, Mr. McNulty, what did you do next with

9  respect to your invention?

10      A.   So now, I wanted to build it.

11      Q.   And how did you go about trying to do that?

12      A.   I went out and I found somebody who I thought

13  could do everything that I described, you know, write

14  new firmware, application for the flash media and the

15  interactive user interface and I found Dr. Larry Bernstein

16  at Stevens Institute of Technology.  He was a senior

17  professor there and he is also a former Bell Labs executive.

18  So I went, I found Larry Bernstein and found him and asked

19  him if he could do this.

20      Q.   What did you tell Dr. Bernstein about your

21  invention?

22      A.   So I told Dr. Bernstein, you know, what

23  triggered my idea, and then I told him what I need him

24  to do.  I told him, I specifically need him to write

25  firmware or something that I had in mind, an application

**Appx9065**

McNulty - direct

1    for something that I had in mind.  I need that thing to

2    tunnel through the computer, an interactive user interface

3    will appear and then give that, that idea that I had in

4    mind a way to access to the Internet.

5            Q.    And did Dr. Bernstein agree to work on a proof

6    of concept of your invention?

7            A.    Yes.

8            Q.    And did you have any formal kind of employment

9    agreement or consulting agreement with Dr. Bernstein?

10           A.    On the business side, we just had a handshake

11   and -- but we did have an NDA, which was a nondisclosure

12   agreement, in place.

13           Q.    Now, was Dr. Bernstein able to create a proof of

14   concept of your invention?

15           A.    Right.  Yes, within a very short time frame, I

16   had taken some samples from PC Expo from that Taiwanese

17   company.  I believe the name was Gem-tech.  So I took some

18   samples, gave them to Dr. Bernstein, and he, in very short

19   time frame, he was able to do a very basic version, like

20   proof of concept of the idea.

21           Q.    And now you mentioned Gem-tech.  Was that the

22   hardware that the proof of concept was based on?

23           A.    Yes, hardware just like USB.  The firmware on

24   that device only managed the, you know, the USB protocol and

25   the flash media itself.

McNulty - direct

1           We were to put much more robust firmware and a

2    very specific application on the flash media.

3           Q.    Now, did you keep working with Dr. Bernstein

4    after he developed this proof of concept?

5           A.    Yeah.  You know, really from, you know, the end

6    of 2 -- you know, from the August of 2001 all the way

7    through, you know, the first part of 2003, I worked with

8    Dr. Bernstein.

9           Q.    And did you work on additional prototypes with

10   him?

11          A.    Yes we have worked on a new, more advanced

12   prototype than that, you know, that first basic one that was

13   on Gem-tech.

14          Q.    Now, let me show you what has been marked as

15   PX-547.

16          Is this related to one of the prototypes that

17   Dr. Bernstein was working on at the time?

18          A.    Yes.  This is the metadata from one of those

19   prototypes.

20          Q.    And what does this tell you about the time

21   frame, just the time frame that it was worked on?

22          A.    It shows that it was April 22nd, 2002 that we

23   really completed the device and then April 23rd was the

24   device that -- you know, he saved the device to a file on

25   April 23rd but it's really April 22nd that he completed the

McNulty - direct

1    device.

2            Q.   Now, for the record, I think it was -- I said it

3    was PX-547.  It looks like the created date here is after

4    the modified date.  What does -- did that tell you something

5    Mr. McNulty?

6            A.   Yes, you create --

7                 MR. TIMBERS:  Objection.

8                 THE COURT:  Excuse me, Mr. McNulty.  We have an

9    objection.

10                Yes, Mr. Timbers.

11                MR. TIMBERS:  Foundation.

12                THE COURT:  Yes.  Let's -- what is the basis for

13   his knowledge?

14   BY MR. LEIBOWITZ:

15           Q.   Do you know what the difference is between these

16   two dates?

17                THE COURT:  Sustained, the objection.

18                Go ahead.

19   BY MR. LEIBOWITZ:

20           Q.   So, Mr. McNulty, do you know that there is --

21   what the difference is between these dates?

22           A.   Yes, I do.

23           Q.   Can you explain that to the jury?

24           A.   Yes.  So you look at created and then modified.

25   It looks a little funny, but if you -- if you create a file

McNulty - direct

1    today -- right? -- and tomorrow I take that file and I drag

2    it to a file folder, that -- even though I didn't change

3    anything on it, when I drag it to that file folder, that

4    becomes the new creation date.

5              I didn't invent that system.  I think Microsoft

6    did and I think it's still alive today because we just -- I

7    just did a demonstration of that.

8              So, but I know it sounds funny, but it just

9    shows you Microsoft's centric attention is on file

10   management, and I think that is why they did that.

11        Q.   Now, Mr. McNulty, just to be clear, does this

12   reflect the type of work that was being done in April,

13   either of these days, in 2002 with Dr. Bernstein?

14        A.   Yes.

15        Q.   Now, when working on your prototype with

16   Dr. Bernstein, how frequently were you in contact with him?

17        A.   Just about every week.

18        Q.   And how was that contact carried on?  Did you

19   send emails, did you talk on the phone?

20        A.   In 2001 and 2002, I didn't use emails very much.

21   Neither did Dr. Bernstein.  It wasn't very secure.

22              I went down there and actually physically met

23   with him at nights and then sometimes on the weekends.

24        Q.   Okay.  Now, while you were working with

25   Dr. Bernstein, did you take further steps to work on other

**Appx9069**

McNulty - direct

1    prototypes of your invention?

2         A.    Yes.  So you know, during this process,

3    Dr. Bernstein is really a man, but I really wanted to

4    advance this idea to, you know, I wanted to go back to my

5    Coke days, how would Coke view this technology; right?  So I

6    really wanted to advance it, and I knew I had to find

7    different kinds of developments.  So what this slide

8    represents is the next phase in my development.

9         Q.    And when did you start looking for additional

10   assistance?

11        A.    So I started looking for additional vendors to

12   work on this in, you know, mid-2002.

13        Q.    While you were still working with Dr. Bernstein?

14        A.    While I'm still working with Dr. Bernstein, yes.

15        Q.    And by the way, you work with Dr. Bernstein.

16   Did it always use that Gem-tech hardware or did it change to

17   something else?

18        A.    It changed.  Like I'd said the first proof of

19   concept was Gem-tech, but I found another vendor, M-Systems,

20   and we -- I decided to switch over to the M-Systems blank

21   USB device.

22        Q.    And why is that?

23        A.    I just thought it was a little bit better

24   product and, you know, I just -- I think it was a

25   relationship thing.  I liked the owner; I liked the company.

McNulty - direct

 1          Q.    Now, turning back to your work with other

 2     vendors.  Can you explain who else you engaged to work with

 3     you on your invention?

 4          A.    So I found two guys at a company called MDRM,

 5     which is a small company based in Israel and one of the guys

 6     is actually a programmer like Dr. Bernstein.  The other guy

 7     is a business guy, so I found MDRM to work on the portable

 8     device side.  They would work on the firmware and the

 9     application on the portable device.  But my idea was to sort

10     of divide and conquer here and bring in other vendors to do

11     other aspects of the project.

12          Q.    And who were those?

13          A.    So on the interactive user interface I brought

14     in a woman by the name of May Louie.  She is a great

15     computer graphic artist, in my opinion; and a company called

16     Brand X in Brooklyn, and they would work on the interactive

17     user interface.

18          Q.    Then what about the network side?

19          A.    Then the network side, you -- typically when you

20     do network, there is two type of vendors you need too hire:

21     software and hardware.  And so Agile Solv, which is based in

22     Mumbai, India, and then Heavy Water, which is right north of

23     New York City.

24          Q.    So did any single vendor work on all three

25     aspects of your invention?

McNulty - direct

1        A.    No.

2        Q.    Why did you do that?

3        A.    Over the years working with all these innovative

4    devices, the one thing you learn is don't tell your ideas to

5    people if you don't have to.  You know, people will steal

6    your ideas and I was very paranoid about that.

7        Q.    Now, did that lead to any difficulties with any

8    of these vendors?

9        A.    Yeah, they -- you know, they got frustrated

10   because they know that if -- they know that they don't know

11   the whole picture and they wanted to know.  So yeah.

12       Q.    Now, you mentioned MDRM hiring two individuals.

13   What are the names of those two individual?

14       A.    One is Gidi Elazar and the other is Dan Harkabi.

15       Q.    And what did you tell Mr. Elazar and Mr. Harkabi

16   when you engaged them?

17       A.    So I told them, so first thing I did is I showed

18   them the other prototype that I developed so they had a real

19   sort of head start to see exactly what I wanted.  So I wanted

20   that but different themes and I told them that.  And then I

21   instructed them, you know, I want them -- I want Gidi to

22   modify the firmware.  I want him to create an application that

23   goes on the flash media of that device and then he needed to

24   put hooks into that to communicate to the interactive user

25   interface that the other vendors are working on.

McNulty - direct

1              And then that would eventually talk to the work

2      that is happening in India on the network side.

3              Q.   Now, did it matter to you what hardware

4      Mr. Elazar and Harkabi was using?

5              A.   Yes, I wanted them to work on the M-Systems

6      hardware because Dr. Bernstein and I had already switched

7      over to that and I was not familiar with theirs.

8              Q.   Was Mr. Elazar and Harkabi familiar with the

9      M-Systems hardware?

10             A.   Yes.  In fact, that is where I met them.  I

11     worked with M-Systems and, you know, eventually I -- first I

12     worked with the owner and then met some other people and

13     then eventually, Dan Harkabi was like the Vice President of

14     Sales of something so I met him.  And I thought Dan and I

15     had, you know, kind of a great relationship and then like a

16     month later, they, he calls me up and says, hey, we quit and

17     we're starting this company, MDRM.

18             Q.   Now, at this time, when you are working with

19     Dr. Bernstein and working on prototypes, were you still

20     employed by Fuji?

21             A.   Yes.

22             Q.   And Fuji let you work on this project?

23             A.   Yes.  It sounds strange but my whole career at

24     Fuji I always had some major project going and I had the

25     Fuji project.  So as long as I didn't screw up what was

McNulty - direct

1    going on with the Fuji side, they allowed us to do that.

2    That was the culture of the company.  Times were different

3    back them.  That was a way to get good people at your

4    company.

5         Q.   And for them did you work with them on

6    spacesounds.com that you won the Webby for?

7         A.   Yes, I developed spacesounds.com.  They knew

8    what I was doing.  I paid for it myself.  I even looked to

9    them to partner with me because the space sounds actually

10   came from NASA and were being backed up on data tapes so I

11   saw a pie there.

12             I worked on other of our products, online

13   storage companies.  Again, they were not interested but they

14   allowed me to work on it.

15        Q.   Now, were you working on any USB devices for

16   Fuji?

17        A.   Yes.  Fuji, as I mentioned earlier, you know,

18   Fuji data storage, like film, that magnetic coating, just

19   like film, was pure and blank, untouched, that's the brand

20   of the company, it's a chemical company.  But a USB device

21   is kind of the same thing.  It's a piece of flash media.  As

22   long as you don't put an application on it like I did, the

23   flash media is also pure and untouched and I saw it as a

24   good fit for Fuji.  So I went to M-Systems and said let's

25   sell the blank M-Systems' product to Fuji and make it part

McNulty - direct

1    of the Fuji product line.

2           Q.    And did M-Systems also ultimately supply Fuji

3    with blank USB drives?

4           A.    Yes, they did.

5           Q.    To your knowledge, did M-Systems ever sell

6    anything other than an blank USB drive to Fuji?

7           A.    No, just a blank USB drive.

8           Q.    Okay.  Now going back to your invention, did you

9    form a company at around this time to help develop your

10   invention?

11          A.    Yes.  So I really saw this as becoming a big

12   thing so I started a C corporation and named the company

13   called Revolutionary Group.

14          Q.    And did Revolutionary Group have a formal

15   agreement with MDRM?

16          A.    Yes, we had a formal agreement and I have a

17   slide that can show you that.

18                MR. LEIBOWITZ:  Can we have JX-272.

19   BY MR. LEIBOWITZ:

20          Q.    Can you identify this agreement, Mr. McNulty?

21          A.    Yes.  This is the agreement dated February 1st,

22   2003.  ████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ██████████████████████████████████████████

25   ██████████

McNulty - direct

1      Q.   Did MDRM agree to do that?

2      A.   Yes, they did.

3      Q.   Yes, they did.

4      MR. LEIBOWITZ:  And if we have the next callout

5 from this document, JX-272.

6 BY MR. LEIBOWITZ:

7      Q.   What did it say?

9      A.

12      Q.

14      A.

17      Q.

19      A.

20      Q.   Does the contract explain that?

21      A.

25      Q.

McNulty - direct

1 ████████████████████████████████

2　　　　A.　　So MDRM had a digital rights management

3 technology, and that is what DR -- the DRM of MDRM is

4 Digital Rights Management.  And what that means is, you

5 know, big companies who are distributing copies of the

6 content will use digital rights management software to

7 protect copy written material so that is really what they

8 were doing.  That was their specialty.

9　　　　Q.　　████████████████████████████████

10 ████████████████████████████████

11　　　　A.　　████

12　　　　Q.　　████████████████████████████

13 ████████

14　　　　A.　　████████████████████████████████

15 ████████████████████████████████

16 ████████████████████████████████

17 ████████

18　　　　Q.　　████████████████████████████████

19 ████████████████████████████

20　　　　A.　　████████████████

21　　　　Q.　　████████████████████████████████

22 ████████████████████████████

23　　　　A.　　████████████████

24　　　　Q.　　Now, how many prototypes did you ultimately

25 create?

McNulty - direct

1          A.     Around, I'd say, you know, upwards to 90, 9-0,

2     90 prototypes.

3          Q.     What time period were those -- that work done?

4          A.     All the way from late 2002 actually, all the way

5     through mid-2004.

6          Q.     Do you still have any of those prototypes?

7          A.     I have about 30 today.

8          Q.     And are some of those displayed over here on

9     counsel table?

10         A.     Yes.

11         Q.     And if we, if we turn to PX-434.

12                Can you tell the jury what this is?

13         A.     So this is the first prototype that we set out

14    to develop, which is -- which I call the Pepsi prototype.

15         Q.     And what was -- why did Revolutionary Group

16    choose to create it a Pepsi prototype?

17         A.     I knew the President of Pepsi and I knew if I

18    developed this, I could get an audience at Pepsi at a high

19    level.

20         Q.     And I'm holding up a prototype here.  This is

21    the Pepsi prototype?

22         A.     Yes.

23         Q.     Now, Mr. McNulty, when you developed this work

24    done, this Pepsi prototype, did it have a custom interactive

25    user interface?

McNulty - direct

1          A.   Yes.  I have some slides to show you that.

2          Q.   And this is, for the record, PX-543?

3          A.   (Nodding yes.)

4          Q.   Can you explain what this is for the jury?

5          A.   So when you plug that Pepsi prototype into a

6     laptop, a Pepsi can would appear on the screen of the

7     laptop.  So, boop, Pepsi can, and then with your mouse, you

8     would actually click the tab, like you open a can of Pepsi.

9     It would play the Pepsi jingle and then the interactive user

10    interface would unfurl.

11         Q.   Now, would the Pepsi prototype based on

12    commercially available hardware and software?

13         A.   Well, it was developed on a blank M-Systems USB

14    device.

15         Q.   And then how did that change?  Or did it change?

16    I'm sorry.  Was there additional work done other than the

17    like --

18         A.   Yes.  So what we had to do, it's a blank.  It's

19    a blank drive.  It had a processor.  It has memory.  It has

20    a USB port but we had to modify the firmware.  We had to put

21    our own custom application on the device which had this

22    interactive user interface as part of the application.  We

23    had to develop the network side so the feature is listed

24    here would actually operate.

25              So, for example, you can't see it here, but you

McNulty - direct

1    would have Pepsi radio and we actually set up a streaming

2    radio service that would play from the Internet when you

3    clicked that device.

4            Q.    Now, did you show any of your Pepsi prototypes

5    to anyone at Pepsi?

6            A.    Yes, I mentioned I know -- I knew the President

7    of Pepsi.  He loved it, especially that bottle, and then he

8    sort of opened up the organization to me and sent me various

9    places to see if any of the groups at Pepsi would be

10   interested in pursuing this idea.

11           Q.    And ultimately was anybody at Pepsi interested

12   in pursuing it?

13           A.    But in the end, we spent a lot of time, a lot of

14   money, a lot of people, a lot of interest but in the end,

15   no.

16           Q.    Mr. McNulty, did -- in addition to the Pepsi

17   prototype, did you -- did Revolutionary Group develop other

18   prototypes?

19           A.    Yes.  So the next prototype series I developed

20   was for J.P. Morgan.  Same story.  I knew the Vice Chairman

21   of J.P. Morgan at the time, and I knew I could get an

22   audience at J.P. Morgan.

23           Q.    And did this J.P. Morgan prototype, you also

24   worked on a custom user interface for this?

25           A.    Yes, I have some examples of that.  So the theme

**Appx9080**

McNulty - direct

1    at J.P. Morgan.  You know, Pepsi had a can.  J.P. Morgan was

2    all about security, a vault, you know, your money is secure.

3    So we did this interactive user interface that was a vault.

4    The way it worked is when you clicked to open the vault, the

5    J.P. Morgan logo would appear and then secure log-in would

6    appear.  And if you didn't have a username and password, it

7    would take you over to another screen, sort of a signup for

8    J.P. Morgan services.

9         Q.   Now, in addition to those prototypes, was there

10   also a prototype that the Revolutionary Group did for Fuji?

11        A.   Yes, I -- so I have some screens that show you

12   that.

13        Q.   What is this?

14        A.   This is an attempt to do -- to make it look like

15   the blimp.  So, you know, Pepsi we hit it out of the park.

16   J.P. Morgan was okay.  This is, you know, not my best work

17   but, you know, Fuji got it and it's supposed to be the Fuji

18   blimp.

19        Q.   And did it have the custom user interface

20   developed as well?

21        A.   Yes, I have a screen for that.

22        Q.   And what is this?

23        A.   So this is the FujiFilm -- at the time, the Fuji

24   blimp was this huge icon.  You know, it was the blimp.  Fuji

25   blimp versus the Goodyear blimp at the football -- the NFL

McNulty - direct

 1    football games if you remember.

 2                So we took this blimp and gave it sort of this

 3    whimsical fun look.  You know, if we wanted tech to look fun

 4    and easy we wanted it to look different than Windows and

 5    Microsoft, so we took this approach.

 6                Same thing.  You click the button and it

 7    unfurled and we have -- this thing was loaded with apps.

 8         Q.    Now, how often did you interact with the vendors

 9    that were working with you on these prototypes?

10         A.    You know, every evening, every weekend, all

11    weekend.  It was nonstop for me.

12         Q.    And did you receive any feedback on your

13    invention from any of these developers?

14         A.    Well, verbal feedback all the time.  But I have

15    a letter to show you some written feedback that I was quite,

16    you know, felt pretty good about.

17                MR. LEIBOWITZ:  And if we can have PX-219.

18    BY MR. LEIBOWITZ:

19         Q.    Can you explain what this is, Mr. McNulty?

20         A.    So this is a letter that Dan Harkabi wrote me.

21    He is the person -- the business guy at MDRM and he wrote me

22    this letter and there is a slide coming up here.

23         Q.    What did Mr. Harkabi write to you about -- first

24    about how MDRM had approached work with yours?

25         A.    So he -- the first thing he says is he sort of,

McNulty - direct

1    you know, in writing says exactly what I have been saying

2    here, is "MDRM's approach of managing copyrighted content

3    complements my initiative of online storage and, keyword,

4    centralized personal data station."  And that is just

5    another word for portable device.

6         Q.   How does Mr. Harkabi comment on your directions?

7         A.   He says, "I admire your directions."

8         Q.   In another section of this agreement discusses

9    your vision; is that right?

10        A.   Yes, he goes on to say "your direction and

11   vision are phenomenal and revolutionary in themselves."

12             So, you know.

13        Q.   Now, was this the only time Mr. Harkabi referred

14   to you as a visionary, a revolutionary?

15        A.   He also wrote something very similar to a

16   supplier in Europe at Infineon.

17             MR. LEIBOWITZ:  And if we can have PX-243.

18   BY MR. LEIBOWITZ:

19        Q.   What is this document, Mr. McNulty?

20        A.   The letter that Dan wrote to executives at

21   Infineon in Europe saying about me, Scott McNulty, "I think

22   he is one of the best visionaries of the key chain storage

23   category."

24        Q.   And what was the context of this email to

25   Infineon?

McNulty - direct

1          A.    Well, this is September, 2003.  We were in high

2     hopes of getting Pepsi onboard here.  And if you think about

3     it, I was -- you know, had these prototypes hand programmed,

4     right?  The processor, the memory, the interactive user

5     interface, it's all done.  But if you get a big order from

6     Pepsi for millions of devices, you need to develop something

7     that is called an ASIC, and it's, perhaps you have seen it.

8     It's the big gold disk that has millions of microchips on

9     it -- not millions but many microchips on it and it

10    basically is, you know, a high-speed way of producing a lot

11    of what the idea is and that's what -- that's one of the

12    business units at Infineon they make that.

13          Q.    Now, it looks like this email is setting up a

14    conference.  Did you ultimately have a conference with -- a

15    conference call with Infineon?

16          A.    Yes, I did.

17          Q.    Did you participate in that call?

18          A.    Yes.

19          Q.    Now, are you aware Mr. Harkabi was deposed in

20    this case?

21          A.    Yes, I am.

22          Q.    Are you aware that he said that some of your

23    ideas were just fluff?

24          A.    Yeah, I heard that.

25          Q.    And are you aware he called you an enigma?

McNulty - direct

1          A.   Yes, I heard that.

2          Q.   Di that testimony surprise you?

3          A.   Well, yes and no.  When I first heard that, my

4    feelings were really hurt because I thought Dan and I had a

5    connection.  I thought he would be the first person to say

6    the things that you have seen in writing multiple times.

7    That I was really quite sure proud.

8               But on the other hand, given it thought, I know

9    he was frustrated during the process because I didn't really

10   key him in on everything so I do know he was frustrated

11   during that time period.  So maybe that is why, you know, he

12   said the things that he said.

13         Q.   Now, when working on these kind of prototypes

14   that we were just looking at, the Pepsi the J.P. Morgan, the

15   Fuji, were these prototypes, were they developed on behalf

16   of those companies?

17         A.   No.  These are -- they're developed, you know,

18   by me, for me.

19         Q.   And so why, why did you have these other

20   companies' brands on these products?

21         A.   Because I had --

22         Q.   Prototypes, I should say.

23         A.   I'm sorry.  I have access at a very high level,

24   almost boardroom level at the president or like I said vice

25   chairman and same thing at Fuji and I knew that is what it

McNulty - direct

1    would take to get it approved.  So I picked the three

2    companies that I knew I had very high level, you know,

3    personal relationships where I could present this and

4    have the best chance to get my technology into these

5    companies.

6          Q.   And so what were you hoping to do here?  What

7    were you trying to do by producing these and then showing

8    them to people at the company?

9          A.   Well, I was trying to get them to partner with

10   me on these inventions.

11         Q.   Now, did Fuji ultimately partner with

12   Revolutionary Group on any of this?

13         A.   No.  Fuji ultimately said no, we're about pure

14   blank untouched media.  We don't like the idea of this

15   application modified firmware.  That is not for us.

16         Q.   Now, was there anyone who worked on both your

17   invention and also worked on projects that were actually for

18   Fuji?

19         A.   Yeah.  There was an internal employee that, you

20   know, by the name of Gene Klein that, you know, I thought

21   he would be one of the best people to help me create this

22   partnership with few guy.  Gene had a great reputation

23   and -- in design and packaging with big iconic brands, so I

24   thought he would be a good person to help me make this

25   partnership.

**Appx9086**

McNulty - direct

1    Q.    What about any of the vendors you had hired, did

2    any them ever do any unrelated work for Fuji?

3    A.    Yeah.  So sometimes it was difficult.  So for

4    example, I mentioned they would be the -- the great computer

5    artist, Brand X.  They were Gene's vendors and they were

6    doing work for Fuji.  That's how I met them.  And I wanted

7    them to work on my product, but I paid them for my stuff.

8    Fuji paid them for their stuff.

9    Q.    Did this ever cause any kind of confusion?

10   A.    Yeah.  You know, once in a while.  I did set

11   up a system to try to avoid that confusion.  But, you know,

12   every once in awhile, something might fall through the

13   cracks, but I, I would quickly fix it.

14   Q.    Now, you mentioned paying for the development

15   work on these prototypes.  Overall, ultimately, how much did

16   you spend developing your prototypes?

17   A.    In total, ███████████████████████.

18   Q.    And how did that break down among the various

19   vendors you had hired to work for Revolutionary Group?

20   A.    ███████████████████   for MDRM, who is the Israeli

21   company who did work on the port and device, ████████████

22   ████   for the graphic designers, interactive user interface

23   designers.  And the most expensive part was the network side

24   for the hardware and the software.

25   Q.    Did you receive invoices from developers for

McNulty - direct

1   their work on your prototypes?

2          A.   Yes.

3               MR. LEIBOWITZ:  If we can have PX-236.

4   BY MR. LEIBOWITZ:

5          Q.   What are we -- what is PX-236, Mr. McNulty?

6          A.   This is an invoice from MDRM.

7          Q.   And who is it sent to?

8          A.   It's sent to Frank Franze, who was the President

9   of my company, Revolutionary Group, because, you know, I

10  needed somebody to help me with this because I have a

11  full-time job, you know, running a big division at Fuji.

12         Q.   And what was Mr. Franze, what was it that he

13  doing?  Was he a technical person?

14         A.   He was more like a project manager.  He did have

15  some -- a great history of tech experience, but he is not a

16  programmer or anything like that.

17         Q.   So what is his role?

18         A.   So he basically was project manager and he

19  would, you know, just take care of things like this, getting

20  these invoice is paid.

21         Q.   Now, what is the total invoice amount here?

22         A.   ████████

23         Q.   And over what time period did this cover?

24         A.   This is just one month.

25         Q.   And we see another part of the invoice here.

McNulty - direct

1   What is, what is -- can you tell us, and be specific about

2   the time frame we're talking about?

3        A.   So these are the July invoices for work done in

4   July.  A couple days in August, but for the most part the

5   work for July.

6        Q.   And that's 2003?

7        A.   Yes.

8        Q.   And how many hours did MDRM invoice

9   Revolutionary Group for?  How many hours of work were done

10   over that month, period?

11        A.   541 hours just for that one month.

12             MR. LEIBOWITZ:  Now, if we get PX-242.

13   BY MR. LEIBOWITZ:

14        Q.   Can you tell the jury what this is?

15        A.   Yep.  Another MDRM invoice that has the hours

16   and costs.

17        Q.   What time period was this for?

18        A.   These are for -- this is January software

19   development, January 2004 software development.

20        Q.   And what was the total amount of time and money

21   that was invoiced here?

22        A.   So ████████████████████, and it looks like,

23   just doing some quick math, maybe 300-plus hours.

24             MR. LEIBOWITZ:  Let's take a look at another

25   invoice, JX-5.

McNulty - direct

 1    BY MR. LEIBOWITZ:

 2            Q.   And what is this document, Mr. McNulty?

 3            A.   I cannot see that.

 4            Q.   You have it in your book.

 5            A.   Oh, I see it here on my screen.

 6                 So this is May Louie, the graphic designer.

 7    This is an invoice dated 8/29/03.

 8            Q.   I note it is billed to The Windwood Group, Frank

 9    Franze.  What is The Windwood Group?

10            A.   So Frank is the president of my company but this

11    is Frank's company.  So as I mentioned earlier, May Louie

12    was also doing some Fuji work.  And I mentioned that once in

13    awhile, we saw potential for a problem, and we solved that

14    by having any vendor that was dealing with my stuff, not any

15    vendor, but certain vendors that were dealing with my stuff

16    and Fuji stuff would be sent to Frank and Frank would check

17    the invoices, make sure there is no mixing because sometimes

18    the vendors get lazy and they just want to put everything on

19    one invoice.

20                 So Frank would make sure that didn't happen and

21    if did happen, he would fix it and then he would bill me for

22    my stuff and bill Fuji for their stuff.

23                 MR. LEIBOWITZ:  Now, let's have JX-3.

24    BY MR. LEIBOWITZ:

25            Q.   Can you explain this invoice for the jury as

McNulty - direct

1   well?

2          A.    This is the other graphic designer, Brand X in

3   Brooklyn.

4          Q.    And what is the time period associated with this

5   invoice?

6          A.    July 16th, 2003.

7          Q.    And what is the amount of the invoice here?

8          A.    It's about ███████████████.

9          Q.    And the invoices that we have just been looking

10  at, are those all for work done on your prototypes?

11         A.    Yes.

12         Q.    Now, other than invoices, did you have other

13  documents that showed your work with your vendors and

14  developers at this time?

15         A.    Well, you know, there is emails that talk about

16  project management, yes.  And there is emails that reference

17  phone calls, yep.

18              MR. LEIBOWITZ:  I'll call PX-231, which is here.

19  BY MR. LEIBOWITZ:

20         Q.    What is this document?

21         A.    This is, this is a document that is sort of

22  outlines the direction that I went in for what we call

23  Version 2 of all those prototypes and dated December 15th,

24  2003.

25         Q.    And do you see at the bottom, it says

McNulty - direct

1    MDRM/Revolutionary Confidential?

2         A.   Yes.

3         Q.   So what does that tell you?

4         A.   Well, it just tells me that MDRM is clear who

5    they're doing their work for.  You know, between this and

6    the contract and all the other communications, it's pretty

7    clear they're doing work for me.

8         Q.   And then it says "Specification For V2.0."  Does

9    that imply there was a Version 1.0 that preceded this?

10        A.   Yes.

11        Q.   And this says, "targeted December 15th, 2003."

12   How does that date relate to dates we saw earlier, looking

13   at the MDRM agreement on the deliverables?

14        A.   If you recall, on the actual contract,  ██████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████

17        Q.   So MDRM kept doing work; is that accurate?

18        A.   Yes, they kept doing work into 2004.

19             MR. LEIBOWITZ:  Let's take a look at PX-244.

20   BY MR. LEIBOWITZ:

21        Q.   What is this document, Mr. McNulty?

22        A.   This is an email from Bhavin Desai, from Agile

23   Solv, which is an Indian software company in Mumbai.

24        Q.   And why is Mr. Desai from Agile Solv sending

25   this email, that you know of?

**Appx9092**

McNulty - direct

1    A.    This is, this is actually an email reaching out

2    to the team basically to -- and more importantly to Gidi.

3    And Bhavin and his team had been programming my online

4    storage sites, Xstorage.com, world.com.  We were going to

5    take one of those properties and create a USB device that

6    would operate the same way, you know, as my invention would

7    describe.  So they had been working, you know, quite hard on

8    the whole back end and now they're ready to marry it to a

9    USB device.

10    Q.    And what was Bhavin write in the e-mail here?

11    A.    He says, "Hello Gidi.

12          "We had a meeting with Frank and Scott.  They

13    indicated they would like Agile Solv to start working with

14    you at a technical level."

15    Q.    Okay.  Now other than working on prototypes, did

16    you do anything else to move forward with your invention?

17    A.    Yes.

18    Q.    And what was that?

19    A.    I applied for a patent.

20    Q.    And when did you apply for your patent?

21    A.    I applied in March.  March 23rd, 2004.

22          MR. LEIBOWITZ:  And could we have JX-34 -- oh,

23    we do have JX-349.

24    BY MR. LEIBOWITZ:

25    Q.    Does that show the March 23rd, 2004 application

McNulty - direct

1   date for the '969 patent?

2           A.   Yes.

3           Q.   And looking at figures from your patent -- this

4   is Figure 10 of JX-350.  Can you explain to the jury a

5   little bit of how this figure shows your invention?

6           A.   So this is Figure 10, and Figure 10 is --

7   describes the portable device.

8           Q.   And what do we see here in Figure 10?

9           A.   So I have some slides.  I can walk you through

10  this.

11          This is kind of what I was describing a little

12  bit earlier when Judge Bryson asked me to describe it, and

13  here is that exhibit where I can actually point to things

14  and teach you about, you know, where these things are.

15          So everything you see here in blue is a

16  portable device.

17          And the yellow section is a CPU and a

18  crypto-processor and a system bus.

19          And in purple you see the RAM, which it stands

20  for random access memory and read only memory.

21          And then in red, that's where the flash media is

22  that I described to you.

23          And then in that red section, you see the

24  actual -- I mentioned to you that there are applications.

25  There is an application on that flash memory.

**Appx9094**

McNulty - direct

1           And over here and to the right, I don't have a

2    laser pointer, but I wish I could, yeah.  I want to point

3    out the modules.

4           So you will see here, at least I in this one

5    example, this is just one example, one, two, three, four,

6    five, six modules that make up the application that is on

7    flash memory.

8       Q.   And does this Figure 10 also have a, have a

9    terminal or computer associated with it?

10      A.   Yes.  I have a separate slide for that.

11          So now you see in green, that's the terminal,

12   the disk device, that communicates with it.

13      Q.   And what are some examples of what the terminals

14   could be?

15      A.   It could be like you see here like a traditional

16   desktop computer, it could be a laptop, could be a tablet.

17   It could be -- it could even be an iPhone.  It could be any

18   of those things.

19      Q.   And what about a network?  Is that shown on this

20   figure as well?

21      A.   Yes, I have a new slide for that.

22          So here is the network.  Really, you know,

23   illustrated with a cloud and something that looks like a

24   server.

25      Q.   Now, do your patents contain any examples of

McNulty - direct

1  the interactive user interfaces that are part of your

2  invention?

3        A.   Yes, so a lot of what you saw but then some.  So

4  you will see in the patent, Figure 5, Figure 7, Figure 8, I

5  have all of Fuji interactive user interfaces with all the

6  apps and same thing with Pepsi and then the same thing with

7  J.P. Morgan.

8              MR. LEIBOWITZ:  For the record, this is PX-543.

9  BY MR. LEIBOWITZ:

10       Q.   Are these color versions of the figures that

11 appear in your patents?

12       A.   Yes.

13       Q.   Now, is your invention described anywhere else

14 in your patents other than the figures?

15       A.   So there is the figures and then there is the

16 whole written section that describes the idea, too.

17       Q.   Can you break down that section for the jury?

18       A.   Yes.  So the section, in the written section,

19 there is sort of an introduction and a background to set you

20 up for the idea and then Sections 1 through 8 in the patent

21 really tell a story and tells you about the idea and sort of

22 creates a family tree of ideas.  And it starts with some

23 basic applications and then by the time you get to

24 Section 8, you know, we're talking encryption and credit

25 card processing and many other things --

**Appx9096**

McNulty - direct

1        Q.    **What about --**

2        A.    **-- and it builds like that.**

3        Q.    **Sorry, didn't mean to interrupt you.**

4              **What about other sections in the specification?**

5        A.    **So the final two sections, Sections 9 and 10 are**

6   **about -- Section 9 is about the server up in the cloud and**

7   **Section 10 is about the portable device.  And the way those**

8   **are organized is each first talks about the hardware that**

9   **you need and then talks about the hardware that you need and**

10  **then it talks about the software that you need.  Then it**

11  **goes into multiple pieces of hardware, and multiple pieces**

12  **of software.**

13       Q.    **Now, are some of the components discussed in the**

14  **specification, were those things that were already known in**

15  **the computer industry?**

16       A.    **Yes, the basic raw components are known in the**

17  **industry.**

18       Q.    **Now, does your patent talk about security in**

19  **some way?**

20       A.    **Yeah.  I mean, in many ways.  The word security**

21  **is mentioned I think over 30 times in the specification, but**

22  **I have some examples.**

23             **MR. LEIBOWITZ:  If we go to JX-349.**

24  **BY MR. LEIBOWITZ:**

25       Q.    **Is this one of the examples of the patent**

McNulty - direct

1     discussing security?

2          A.    Yes.  If you don't mind, I'll read it aloud:

3               "Upon logging in or registering a new account,

4     the user may be informed that communications that are taking

5     place are secured.  In one embodiment, various encryption

6     formats may be used by the TCAP" --

7               And the TCAP is the portable device.

8               -- "to send information securely to the back end

9     servers.  It is important to note that in such an

10    embodiment, even if data moving out of the TCAP and across

11    the access terminal" --

12              That's the patent word for terminal, or

13    computer.

14              -- "were captured, such data would not be

15    readable because it's encrypted."

16         Q.    Do you have another example to share with the

17    jury as well on this?

18         A.    Yes.

19         Q.    And what do we see here?

20         A.    This says that "the cryptographic module

21    supports encryption schemes allowing for the secure

22    transmission of information across a communications network

23    to enable a TCAPs server" -- which is the cloud module --

24    "to engage in secure transactions if so desired."

25         Q.    Now, I'd like to take a look at some of the

McNulty - direct

1    claims in the case and discuss them in context of that

2    portable device.

3        A.    Okay.

4        Q.    So starting with some of the asserted claims

5    in the case, Claim 3 of the '969 patent, can you, can you

6    explain to the jury how the claims work here in the '969

7    patent?

8        A.    Okay.  So Claim 3 is dependent on Claim 2.  And

9    Claim 2, which is underneath it, is dependent on Claim 1 and

10   this is Claim 1.  This is where I apologize because I am

11   going to walk you through these claims piece by piece so you

12   understand it.

13       Q.    Yes, there is a lot here.

14           What is the first part of Claim 1?

15       A.    Okay.  So the first part of Claim 1 is a

16   portable device.

17       Q.    Can you explain to the jury what we're talking

18   about when you say a portable device?

19       A.    Well, you know, if everything that we talk about

20   in my, in my prototypes, J.P. Morgan, Pepsi, Fuji, all the

21   others, and, you know, here we've just illustrated it as a

22   normal USB drive.

23       Q.    Now, does it have to be a USB drive?

24       A.    It doesn't have to be a USB drive.  It can be

25   any portable device with a processor memory and it can have

1    any kind of connection technology.  It's not just USB, it

2    could be Bluetooth, WiFi, anything.  It could be any kind of

3    wired technology.  It doesn't matter.

4          Q.   Let's take a look back at your portable devices

5    rule memo.  Does that memo discuss a portable device?

6          A.   Yes.  So the title --

7          Q.   I am giving away there with the title.  I

8    apologize.

9          A.   So the title is "Portable Devices Rule."  So

10   clearly this one is about portable devices.

11              MR. LEIBOWITZ:  And again for the record, the

12   Portable Devices Rule memo is PX-235.

13   BY MR. LEIBOWITZ:

14         Q.   Let's take a look at the next part of the claim.

15   What is the next part of the claim?

16         A.   Okay.  You know, my computer just shut off.

17              MR. LEIBOWITZ:  May I approach, Your Honor?

18              THE COURT:  Perhaps we can deal with it.

19              THE WITNESS:  Okay.  It's back on.  I got it.

20   BY THE WITNESS:

21         A.   Okay.  The next part is the portable device is

22   configured to communicate with a terminal with a processor,

23   with an input component, with an output component, and a

24   network communication interface, and a memory configured to

25   store executable program code.

McNulty - direct

1          Q.    What is an example of that kind of a terminal?

2     Do you have a slide on that?

3          A.    Yes, I have a slide on that.

4          Q.    Can you explain to the jury what we're talking

5     about here?

6          A.    So this is -- it's configured -- this portable

7     device is actually configured to communicate with this

8     terminal.

9          Q.    And does the terminal have the various

10    components?

11         A.    Yeah.  And the terminal has -- so we just

12    outlined in red a processor and a memory that is configured

13    to store code.  That is outlined in red.  The input

14    component is green, which is the keyboard and mouse.  So

15    that's an input component.  You type it and it inputs into

16    the terminal.

17         Q.    What is the output component?

18         A.    And the output is the screen on the monitor.

19    You know, it's outputting the information from the computer.

20         Q.    And would this kind of a computer have a network

21    communication interface?

22         A.    Yes.  And you can't, you can't see that but it's

23    inside the laptop there, that communicates to the cloud.

24         Q.    Now when you say the portable device is

25    configured to communicate with the terminal, does that mean

McNulty - direct

1    it has to plug into it literally like the USB example does?

2           A.   It doesn't have to.  It can be -- I mean in this

3    example, you know, we're showing a USB, but it can be

4    Bluetooth or any other type of medium.

5           Q.   And does the terminal have to be a laptop the

6    way it is shown here?

7           A.   It doesn't have to be a laptop.  It can be

8    anything, a tablet, a phone, it can be a desktop computer.

9           Q.   Now, does your July 2001 Portable Devices Rule

10   memo describe a terminal with a processor and memory having

11   executable code?

12          A.   Yes.

13          Q.   And can you explain that to the jury?

14          A.   So these are callouts from that memo, and I

15   will just quickly walk you through these.  So the first

16   one -- and this is what I wrote:  "Portable devices can take

17   control of computers and networks with a user interface."

18               Then I go on to say, "to control the processing

19   power of these larger environments.

20               And then finally, I show the Apple and Microsoft

21   operating systems.  That's the executable programming.

22          Q.   Now, going back to this part of the claim, does

23   the Portable Devices Rule memo show a terminal with an input

24   and output component?

25          A.   Yes.

McNulty - direct

1      Q.    And can you explain that?  Where it shows that

2  in the Portable Devices Rule memo?

3      A.    So here, this is the memo that I wrote again and

4  it says "the user clicks yes."  So the user is clicking --

5  they're using an input component which is the mouse.

6      Q.    What about an output component?

7      A.    Then it goes on to say, a dashboard appears,

8  and that is the dashboard or the interactive user interface

9  appearing on the computer monitor, so.

10      Q.    Now, what about a network communication

11  interface?  Does the Portable Devices Rule memo discuss that

12  on the terminal?

13      A.    Yes.

14      Q.    And can you explain that to the jury?

15      A.    So, I say, the portable device will need to link

16  to a computer's network communications in order to reach the

17  Internet.

18      Q.    Going back to the claim, what is the next part

19  of Claim 1, Mr. McNulty?

20      A.    So the next part is what is called the first

21  program code and "it's the first program code, executed by

22  the terminal processor, is configured to present the

23  interactive user interface on the terminal output

24  component."

25      Q.    And do you have an example of that to show the

1   jury?

2        A.    Yes.

3        Q.    And what is happening here?

4        A.    So this is the code and you see No. 1, it's a

5   wheel, it's a gear, and it's generating that interactive

6   user interface.  That's the first program code.

7        Q.    And is that code on the terminal?

8        A.    Yes, and that's running on the terminal.

9        Q.    Now, is that, is that interactive user interface

10  described in your Portable Device Rule memo?

11       A.    Yes.

12       Q.    Can you explain that to the jury?

13       A.    So here it's characterized as Apple and

14  Microsoft operating system and that's the executable code on

15  the terminal is the Apple and Microsoft operating systems.

16  And then later I say "one example of a specific sequence

17  is where a user plugs a USB 2.0 into the USB port and a

18  dashboard appears and it's personalized for the user:

19  Hello, Hal."

20       Q.    And what is the Hal reference there?

21       A.    That is -- I'm kind of a huge fan of Space

22  Odyssey 2001, Stanley Kubrick, so ...

23       Q.    Now, Mr. McNulty, do the claims of the '703

24  patent require anything a little different with respect to

25  the interactive user interface?

McNulty - direct

1          THE COURT:  Can you explain a little bit more

2     about that Hal?

3          MR. LEIBOWITZ:  You can go right ahead.

4          THE WITNESS:  So Space Odyssey 2001, which was a

5     breakthrough film by a director, Stanley Kubrick, was about

6     a computer that took over a space station and, you know, at

7     first, Hal is serving everyone on the space station doing

8     what everybody needs, getting information, whatever they

9     needed.

10          And eventually Hal starts getting a little upset

11    with the people on the space station and starts not doing

12    things that he is supposed to do and, you know, the people

13    on the space station are getting more and more concerned and

14    as the movie goes on, Hal basically shuts everything down

15    and they're trying to figure out a way to, you know, to --

16          MR. LEIBOWITZ:  Spoiler alert.

17          THE WITNESS:  -- to deal with this.

18          Yeah, I won't, I won't give it away but I highly

19    recommend to watch it.  It's, it's so relevant to today and

20    artificial intelligence.  It's unbelievable, really.

21          THE COURT:  Thank you.

22    BY MR. LEIBOWITZ:

23       Q.   Mr. McNulty, the '703 claim there, it requires a

24    little bit different with respect to the interactive user

25    interface?

**Appx9105**

McNulty - direct

1          A.    Yes.  So if you recall on the previous one, the

2     '969, we said present, the word "present."  Here we say

3     "configured to affect the presentation."

4          Q.    Is that shown on your Portable Device Rule memo

5     as well?

6          A.    Yes.

7          Q.    Where is that?

8          A.    So I say, "the dashboard asked a second

9     question."

10          So read into that.  So obviously the dashboard

11     asks the first question, and when it asks a second question,

12     it's affecting the display.  It has to change up to show the

13     second question.  So that's affecting the display.

14          Q.    Okay.  Let's go back to the claim language of

15     Claim 1 of the '969.  What are the next elements here?

16          A.    Okay.  So we just reviewed the first program

17     code, this is second program code, which when executed by

18     the terminal processor, configured to provide a

19     communications node on the terminal.

20          And then the second and third program codes kind

21     of work in tandem, so I'll read them both to you.  Is that

22     okay?

23          Q.    Sure.  If you think they work in tandem, explain

24     to the jury.

25          A.    Yes.  So it's easier to understand each of these

McNulty - direct

1   when you think of them working together.

2          So the second program code executed by the

3   terminal provides a communication node on the terminal with

4   communications.

5          And the third program code is executed by the

6   portable device processor and that provides a communication

7   node on the portable device to coordinate with the

8   communications node on the terminal and establish

9   communications.

10          And I have an animated slide that will really

11   depict that better.

12          Q.   And so I'll play the animation; you can explain

13   it.

14          (Animated slide played.)

15   BY THE WITNESS:

16          A.   So the two and the three are the second program

17   code and the third program code.  So each of those has their

18   own program code and those two program codes are basically

19   letting these two things communicate and then the portable

20   device now has a task to go up to the cloud.

21          Q.   And we have been talking about -- we've been

22   using the words "program code" a number of times.  Can you

23   explain to the jury what that is, what is the "program code"

24   they're talking about?

25          A.   Program code is, you know, the instructions that

McNulty - direct

1    the processor is using to make these things happen.   So

2    these are the 0s and 1s are written in a special way where

3    the processor actually takes action.

4         Q.   Now, with respect to this, the second program

5    code and the third program code kind of working together,

6    can you give us kind of a real-world example of a

7    communication technology that works this way?

8         A.   Like Bluetooth technology.

9         Q.   You mean, like when they pair, when the device

10   pairs?

11        A.   Like when you pair your iPhone with your iWatch

12   or a number of other things.

13        Q.   Okay.   Let's go back to the -- oh, I'm sorry.

14   Is this second and third program code, is this described in

15   your Portable Devices Rule memo?

16        A.   Yes.

17        Q.   Can you explain that to the jury?

18        A.   So here I say, The dashboard interactive user

19   interface makes a request:  "Would you like to connect to

20   this computer?"

21             And the user responds yes, and their device

22   containing the proper code connects to the computers

23   systems, as well as its outbound network, thus providing the

24   portable device a way to take the next step and connect to

25   the Internet."

**Appx9108**

McNulty - direct

1        Q.   Now, going back to the claim language,

2   Mr. McNulty, what is the next part of Claim 1?

3        A.   Okay.  So the next three things are called

4   elements and this is the first element, A, and it is a

5   portable device.

6             It describes what a portable device must have.

7   And if you remember, I said this earlier, it has to have an

8   external communication interface configured to enable the

9   transmission of communications between the portable device

10  and terminal.

11            So that is a patent way of saying something like

12  the USB for it or the Bluetooth connection or something

13  else.

14       Q.   And do you have an example of that?

15       A.   Yes, so I just circled it, or it's a square in,

16  over the USB port.  So that is what that is.

17       Q.   And is that in your Portable Devices Rule memo?

18       A.   Yes.

19       Q.   And can you explain that?

20       A.   I say, "Newer connection technologies such as

21  USB and Bluetooth will need portable devices to give the

22  instructions rather than take the instructions."

23       Q.   Now, let's go back to the claim language.  Can

24  you explain what the next elements here are of the claim?

25       A.   Yes.  So the last two elements are a processor,

McNulty - direct

1    so this is something else that the portable device must

2    comprise, and a memory having executable program code stored

3    there on.

4         Q.   And do you have an example -- an exemplary way

5    to show that to the jury?

6         A.   Yes, I have a slide for that.

7         Q.   What do we see here?

8         A.   I'm sorry?

9         Q.   What do we see here?

10         A.   You see on the left-hand side, the USB device,

11    and in green you see the processor, and then in yellow or

12    orange, whatever that color is, it's the memory.

13         Q.   Now, are these elements found in your Portable

14    Devices Rule memo?

15         A.   Yes.

16         Q.   And can you tell the jury where they are?

17         A.   And so it says:  "Any portable device with a

18    processor and memory."

19              And then later it goes:  "Moving the processor

20    power, the code, or the storage, and/or control mechanism

21    from the computer and/or network to the portable device."

22              So that's what I said earlier when I was

23    describing my invention.

24         Q.   Now, when we -- let's go back to the claim

25    language again.  Oh, I think we talked about the third

McNulty - direct

1    program code with the second.  What's the next element?

2          A.   Okay.  So the next element is the fourth

3    program code, and this is, again, the portable device

4    comprising of this fourth program code and that is

5    configured to be executed by the portable device processor

6    in response to a communication received by the portable

7    device resulting from interactive -- a user interacting

8    with the interactive user interface.

9          Q.   And do you have an animation to display this,

10   explain it, Mr. McNulty?

11         A.   Yes.

12              MR. LEIBOWITZ:  Play the animation.

13              (Animation played.)

14   BY THE WITNESS:

15         A.   So what you saw here, you saw the arrows

16   interact with the user interface, and it's communicated with

17   the portable device and it calls the portable device.

18         Q.   And the fourth program code executed a response

19   to that?

20         A.   And the fourth program code is executed on the

21   portable device.

22         Q.   Is this described in your Portable Devices Rule

23   memo?

24         A.   Yes.

25         Q.   Can you explain where that is to the jury?

**Appx9111**

McNulty - direct

1          A.    "A portable device that operates in steps where

2     the user initiates the steps by interaction with their

3     personal dashboard."

4          Q.    Let's go back to the claim language, the last

5     part of Claim 1 of the '969 patent.  What is that?

6          A.    It's a wherein clause and it says:  "Wherein the

7     portable device is configured to facilitate communications

8     through the communication node on the terminal and the

9     terminal network interface to a communications network node.

10         Q.    And do you have an animation to explain that to

11    the jury as well?

12         A.    Yes.  Yes, I do.

13               MR. LEIBOWITZ:  Okay.  Play that.

14               (Animation played.)

15    BY MR. LEIBOWITZ:

16         Q.    What do we see here, Mr. McNulty?

17         A.    So here you see the portable device is

18    configured to facilitate communications through the

19    communication node on the terminal and the terminal network

20    interfaces up to the cloud, up to the communications network

21    node.

22         Q.    And it says communication network node.  Is that

23    the way the claim talks about the servers of the network?

24         A.    Yes, the servers of the network or the cloud.

25         Q.    Now, is that clause, this "wherein" clause,

McNulty - direct

1    discussed in your Portable Devices Rule memo?

2         A.   Yes.

3         Q.   Can you explain that to the jury?

4         A.   So here I wrote:  "The user clicks yes, and the

5    code on the portable device, works its way through the

6    computer to the Internet and contacts a website."

7         Q.   Now, is that the end of Claim 1 of the '969

8    patent?

9         A.   Yes.

10        Q.   Okay.  And so if we move to Claim 2, which I

11   think you said earlier, builds on Claim 1; is that right?

12        A.   Yes.  So Claim 2 depends on Claim 1.  If you

13   remember where we're headed is to Claim 3.  Claim 3 depends

14   on Claim 2.

15        Q.   So what does Claim 2 add to Claim 1?

16        A.   So Claim 2 says, "portable device, according

17   Claim 1, wherein the fourth program code which, when

18   executed by the portable device processor, is configured to

19   cause a communication to be transmitted to the communication

20   network node."

21        Q.   Can you explain that?  Do you have an animation

22   to explain that?

23        A.   Yes.

24             MR. LEIBOWITZ:  I'll play it.

25             (Animation played.)

**Appx9113**

McNulty - direct

1   BY THE WITNESS:

2       A.   So here is the fourth program node which is

3   executed by the portable device processor, is configured to

4   cause a communication to be transmitted to the communication

5   network node through the terminal.

6   BY MR. LEIBOWITZ:

7       Q.   Is that all happening in response to user

8   interaction with the user interactive interface?

9       A.   Yes.

10      Q.   And is there -- is that described in your

11  Portable Device Rule memo as well?

12      A.   Yes, it is.

13      Q.   And can you explain why that is?

14      A.   So I wrote the dashboard asks a second question:

15  "Would you like to connect to the Internet?"

16           The user clicks yes and the code on the portable

17  device works its way through the computer to the Internet

18  and contacts a website.

19      Q.   Is that all for Claim 2?

20      A.   Yes.

21      Q.   And if we can talk about Claim 3.  What does

22  Claim 3 add to Claim 2?

23      A.   Okay.  So this is Claim 3.  This is the asserted

24  claim in this case and it says:  "The portable device,

25  according to Claim 2, wherein the communication caused to be

McNulty - direct

1    transmitted to the communication network node facilitates

2    verification of the portable device."

3         Q.    And do you have an animation to explain that?

4         A.    Yes.

5               (Animation played.)

6    BY THE WITNESS:

7         A.    So what happens here is the user clicks the

8    interface, causes the portable device to execute code and

9    then send a verification up to the cloud.

10        Q.    And is this described in your Portable Devices

11   Rule memo?

12        A.    Yes.

13        Q.    And take a look at that.

14              Can you explain what we see here?

15        A.    The user clicks yes, and the code on the

16   portable device works its way through the computer to the

17   Internet and contacts a website and says:  Hi, I am here

18   from a person's pocket and I would like to copy your

19   content.

20        Q.    How is that showing verification, facilitating

21   verification of the portable device?

22              THE COURT:  We have an objection.

23              Yes?

24              MR. TIMBERS:  Asking for expert testimony.

25              THE COURT:  I'm sorry, I couldn't hear you.

McNulty - direct

1           MR. TIMBERS:  Asking for expert testimony.

2           MR. LEIBOWITZ:  They had an expert on this.

3           THE COURT:  They may have an expert.  Overruled.

4    I think he can answer the question.

5    BY MR. LEIBOWITZ:

6       Q.    Please go ahead, Mr. McNulty.  Can you explain

7    how this shows the facilitating verification of a portable

8    device?

9       A.    This is a very friendly way of saying the code

10   works its way through the computer and contacts the website

11   and says, hi, right?  And then it say I would like to copy

12   your content.  So it's basically code going up to the cloud

13   looking for verification, I'd like to copy you.

14      Q.    And what is the focus of the "I" in this

15   sentence?

16      A.    The code.

17      Q.    And is that coming from the portable device; is

18   that right?

19      A.    Yes.

20      Q.    Now, were there claims in the '703 patent that

21   relate to portable device verification as well?

22      A.    Yes.

23      Q.    And can you explain what we see here?

24      A.    So this is the '703 patent.  It's a method claim

25   and it says at the bottom, "it facilitates verification."

McNulty - direct

1          Q.    What about 105?

2          A.    This is a system claim, and it also facilitates

3    verification.

4          Q.    And are these claims and their independent

5    claims that they depend on showing in the portable devices

6    memo for the same reason we just looked through for Claim 3

7    of the '969 patent?

8          A.    Yes.

9          Q.    Now, are there some other claims in the '703

10   patent that use a different formulation than facilitate

11   verification?

12         A.    Yes.

13         Q.    And what do we see on the next slide?

14         A.    So this is characterized a little bit

15   differently.  It's a method claim and it says "portable

16   device identifier information."

17         Q.    Let's look at one of these claims.  These are

18   Claims 98, 101, and 124 of the '703 patent; is that right?

19         A.    Two methods and then one system claim.

20         Q.    Let's take a look at one of these in more

21   detail, 101.  And can you explain what the claim language

22   here in Claim 101 is saying and the claim it depends from,

23   Claim 97?

24         A.    Yes, so 101 says, "wherein the data stored on

25   the portable device memory comprises portable device

**Appx9117**

McNulty - direct

1    identifier information.

2          Q.    And is that -- is that also shown on the

3    Portable Devices Rule memo?

4          A.    Yes.

5          Q.    And can you explain that for the jury?

6          A.    Yes.  So I wrote, "any portable device with a

7    processor and memory," and then a little bit further down,

8    the user clicks yes and the code on the portable device

9    works its way through the computer to the Internet and

10   contacts a website and says hi.  I am here from a person's

11   pocket.

12         Q.    And is that information that is on a portable

13   device identifier information?

14         A.    Yes.

15         Q.    Now, I think we have gone through all of Claim 3

16   for the '969 patent; is that right?

17         A.    Yes.

18         Q.    Let's take a look at Claim 10 of the '969

19   patent.  Can you explain Claim 10 for us and how it depends

20   on the prior claims?

21         A.    So Claim 10 involved here, it says, "the

22   portable device, wherein the communication network node

23   comprises a database and the communication -- and the

24   communication must by transmitted to the communication

25   network node facilitates synchronizing content on the

McNulty - direct

1  portable device which, with content on the communication

2  network node database."

3      Q.    And does Claim 10 depend again from Claim 2,

4  which depends from Claim 1?

5      A.    Yes, same thing.

6      Q.    So now we saw Claims 1 and 2 already.  So let's

7  just focus on Claim 10.  You have an animation that explains

8  Claim 10, what Claim 10 added to the jury?

9      A.    Yes.

10      Q.    We'll play it and you can explain it,

11  Mr. McNulty.

12          (Animation played.)

13  BY THE WITNESS:

14      A.    Okay.  So what you just saw was interacting with

15  the user, the portable device executes code, takes and goes

16  up to the cloud and then it syncs these two database files.

17  You will see these two files have first name Scott, last

18  name McNulty, and that's my picture.  And now they're in

19  sync.  So the same database files on the portable device and

20  it's up in the cloud and they're in sync.

21      Q.    Now, is this claim described in your Portable

22  Devices Rule memo as well?

23      A.    Yes.

24      Q.    And can we see -- can you explain to the jury

25  where that is?

McNulty - direct

1          A.    So I wrote:  "A user controlled tunnel will

2    have been created from the portable device to the computer

3    to the Internet.   The possibilities are endless as to the

4    combination of features and applications that can be

5    executed by combining these three environments into one

6    management system.   Simultaneous synchronizing will be

7    across three digital environments will be possible once

8    this system is in place, creating new types of applications

9    as well as an artificial intelligence channel."

10         Q.    And does this discuss synchronization?

11         A.    Yes.   So it says right in the middle of

12   paragraph, "simultaneous synchronizing will be across three

13   digital environments."

14         Q.    And what is that on the database aspect of it?

15   Where do you see that here?

16         A.    This is in one management system for that

17   database, as well as artificial intelligence channel.

18         Q.    Now, Mr. McNulty, does the '703 patent have a

19   similar claim with respect to synchronization?

20         A.    Yes.

21         Q.    What does the '703 patent say?

22         A.    It's a system claim highlighted in yellow and

23   it "facilitates synchronizing content on the portable device

24   with content on the communications network node."

25         Q.    Does that show -- is that found in the portable

McNulty - direct

1    devices memo for the same reason you were just talking about

2    with respect to Claim 10 of the '969 patent?

3        A.   Yes, it is.

4        Q.   Now, Mr. McNulty, does IOENGINE manufacture and

5    sell any of its own products?

6        A.   No, it does not.

7        Q.   Are there any other current commercial products

8    sold under the IOENGINE brand?

9        A.   Yes.

10       Q.   And what are those?

11       A.   There is a line of encrypted USB called --

12            THE COURT:  I have an objection.  I'm sorry,

13   Mr. McNulty, but we have an objection.

14            MR. TIMBERS:  Irrelevant.  It's not been

15   connected to anything in this case.

16            THE COURT:  Mr. Leibowitz, your answer.

17            MR. LEIBOWITZ:  Your Honor, Counsel mentioned

18   earlier that IOENGINE doesn't make or sell anything.  This

19   is a discussion of what they, what they do license.

20            THE COURT:  So where are we going with this?

21            MR. LEIBOWITZ:  It's maybe two questions, Your

22   Honor.

23            THE COURT:  But what is the nature of the

24   inquiry that it is going to?

25            MR. LEIBOWITZ:  That IOENGINE does have products

McNulty - direct

1    that is sold under its brand name.

2                    THE COURT:  Under its brand name?

3                    Mr. Timbers.

4                    MR. TIMBERS:  Yes.  In my opening, I said there

5    is no product sold that do what the claims require in this

6    case.

7                    THE COURT:  All right.  Yes, it sound like this

8    is not -- doesn't specifically rebut the point Mr. Timbers

9    made.

10                   So setting aside Mr. Timbers' opening, what

11   relevance does this have?

12                   MR. LEIBOWITZ:  Simply to show IOENGINE's

13   commercial presence, Your Honor.

14                   THE COURT:  All right.  I'm going to allow it.

15   Overruled.

16                   MR. LEIBOWITZ:  Thank you, Your Honor.

17   BY MR. LEIBOWITZ:

18       Q.    Does IOENGINE have products that are in the

19   market sold under its brand name?

20       A.    Yes.

21       Q.    What are those products?

22       A.    It's a line of encrypted security USB devices

23   that do what my technology does and they put powered --

24                   THE COURT:  We have another objection.

25                   Yes, Mr. Timbers.

**Appx9122**

McNulty - cross

1                    **CROSS-EXAMINATION**

2     BY MR. TIMBERS:

3            Q.    Good afternoon, Mr. McNulty.

4            A.    Good afternoon.

5            Q.    It's good to see you again.  Do you recall we

6     spent some time together over Zoom doing a deposition?

7            A.    Yes.

8            Q.    Yes.

9            A.    You look much better in person.

10           Q.    And, in fact, you have given testimony several

11    times under oath before, so you are familiar with the

12    process?

13           A.    Yes.

14           Q.    I'd like to go all the way back to the beginning

15    and ask some questions about the Fuji USB project.

16                 When you went to the PC Expo in 2001, you said

17    you had your aha moment about your invention.

18                 You had a second aha moment as well, didn't you,

19    about Fuji itself selling USB drives?

20           A.    I wouldn't characterize that as an aha moment

21    but, you know, it definitely was an idea, yes.

22           Q.    It was your idea, correct?

23           A.    Yeah, yeah.  Yes.

24           Q.    And you brought it to Fuji?

25           A.    Yes.

McNulty - cross

1          Q.    And the USB drives used by Fuji for that were

2    provided by M-Systems, correct?

3          A.    So just to clarify, M-Systems was the OEM

4    supplier of blank USB storage devices to Fuji, but Fuji put

5    their name on the device.  It was Fuji's brand that went on

6    the device.

7          Q.    The devices were provided by M-Systems; correct?

8          A.    Yes.

9          Q.    And that was your division, the computer

10   products division?

11         A.    I was group product manager and director, yes.

12         Q.    If we can show -- so you have a witness binder

13   in front of you?

14         A.    Yes.

15         Q.    If you could turn to DX-348.

16               MR. TIMBERS:  And if we could show that on the

17   screen.

18   BY MR. TIMBERS:

19         Q.    Am I right, this is a confidentiality agreement

20   between Fuji and M-Systems that you signed on behalf of

21   Fuji?

22         A.    Yes.

23         Q.    Okay.

24               MR. TIMBERS:  And could we also next look at

25   DX-92?

**Appx9132**

McNulty - cross

1    BY MR. TIMBERS:

2          Q.    And do you see this is a press release from Fuji

3    Photo and M-Systems about that project?

4          A.    Okay.

5          Q.    Is that right?

6          A.    I believe I already testified that I did not

7    believe this was, this is -- you know, I'm the person that

8    put out the press releases at Fuji and this is definitely

9    not their format.  And, you know, as an OEM supplier, you

10   know, it's almost like the golden rule as an OEM supplier,

11   you never reveal your source, so I can't imagine, you know,

12   somebody putting this into a press release.

13              You know, Fuji would never stand for that and

14   this is definitely not their format.  So, you know, I'm not

15   sure where it came from or what the circumstances are here.

16         Q.    So are you telling the jury this is not an

17   authentic document?

18         A.    Well, you know, I don't know about that.  You

19   know, I don't want to go that far because I just don't know

20   any of the details but I can tell you that Fuji would never

21   allow the world to know who was making any of their products

22   or any of their components.  You know, it's a very serious

23   issue, and I think pretty much the whole tech industry

24   operates that.  From my standpoint, you know, when you put

25   your brand on something, you don't want the world to know

McNulty - cross

1         Q.   All right.  So let's talk about those

2 prototypes that were made.  I think you indicated that the

3 prototypes were all based on M-Systems' drives; correct?

4         A.   Well, they were, you know, I used a blank

5 M-Systems USB drive.  They're not based on anything

6 M-Systems did except putting the hardware together and it

7 being blank and pure and clean, the way you bought it.

8         Q.   I'm sorry.  Just the way Fuji bought it?

9         A.   Well, I mentioned that when I recommended the

10 M-Systems, you know, USB device to Fuji, the reason is

11 because really because of exactly what this spec here is

12 showing me, it's pure and clean.  There is nothing on it.

13 There is no applications, there is no -- you know, there is

14 nothing, you know, that gets in the way of the Fuji brand,

15 which was just pure and clean blank media.  And that that's

16 the only reason why I used the M-Systems device for the same

17 reason, because it was a quality, you know, blank, pure and

18 clean USB device.

19         Q.   So just to be clear, you used the disk on -- I'm

20 sorry.  You used the M-Systems' device for all the MediKey

21 prototypes; correct?

22         A.   Well, I initially used Gem-tech which was a

23 competitive company from Taiwan, so that was my first

24 sort of proof of concept.  And then I switched over to

25 M-Systems.

McNulty - cross

1      Q.    And every prototype that you made from then on

2   was based on an M-Systems' USB drive; correct?

3      A.    Yes.  Well, it was on a USB drive.  I don't want

4   to get hung up on semantics based on it was just -- we used

5   it.  Like I said, the modified the firmware, we put our own

6   firmware, we put our own application on there, so on and so

7   forth.  Everything that I was presented.

8      Q.    So just to be clear, you took a physical

9   M-Systems USB drive.  I have a pen in my hand, but let's

10  pretend it's a USB.

11     A.    Yes, I see it.

12     Q.    You took a physical drive and then you did

13  something to it to work on your invention?

14     A.    Yes.

15     Q.    Is that right?

16     A.    Yeah, yeah.  Yep.

17     Q.    And that's true for all the prototypes after

18  that first proof of concept?

19     A.    Yeah.  After the Gem-tech proof of concept, then

20  I switched over.

21     Q.    So that included the MediKey devices that were

22  after that?

23     A.    The MediKey, the Pepsi, the J.P. Morgan, the

24  Fuji, the George W. Bush, so on and so forth.

25     Q.    Now, Mr. McNulty, isn't it true that those

McNulty - cross

1    M-Systems devices that you used were called DiskOnKey?

2           A.   Well, I -- you know, I can see from this

3    litigation that that was sort of a sub-brand that they

4    used, you know, that was M-Systems and I can see from this,

5    this litigation that they called it M-Systems DiskOnKey.  I

6    didn't really pay attention to it at the time, I think.  I

7    don't want to say that I didn't know that, but it just

8    didn't -- it wasn't anything that registered to me.

9                You know, keep in mind, I'm a Coke branding guy

10   and these small companies do a terrible job branding so, you

11   know, in my mind, it was just M-Systems.  Did it have

12   DiskOnKey written on it?  Maybe.  Maybe.  I just don't

13   remember it.

14          Q.   Are you saying you don't recall if you ever used

15   a DiskOnKey for any of your prototypes?

16          A.   I see in the litigation now that, that it was

17   there, you know, because it's been pointed out to me like

18   this, you know, in depositions and things.  But at the time,

19   I, I just wasn't paying attention to DiskOnKey.  It doesn't

20   stand out to me.

21          Q.   I'm not really asking about, yet, what you were

22   thinking then.  I'm just asking right now for the jury to

23   understand.

24          A.   Yeah.

25          Q.   All your prototypes were based on a DiskOnKey;

McNulty - cross

1   is that right?

2          A.   Well, I can't say that for sure, to be honest

3   with you because some of the earlier prototypes from

4   M-Systems had some, had some whacky processors in there.

5   You know, they didn't settle down -- their agreement was

6   with their processor, OEM customer was for a little while

7   so I remember a couple of the original M-Systems products,

8   you know, having like an ARM 6 processor in it and then

9   something else, some other crazy processor.  So I think

10  there was an experimental time for them as to what processor

11  they would use.

12             How DiskOnKey relates to that, I have no idea.

13         Q.   Well, do you recall testifying in 2017 that

14  what you got from M-Systems for you to work with on your

15  invention was called DiskOnKey?

16         A.   Well, again, I testified from the standpoint

17  of -- I know that now, through this litigation and my

18  lawyers, but at the time, I don't think I was paying

19  attention to it.

20         Q.   Again, Mr. McNulty, I'm not asking at all

21  about what you knew at the time.  I'm just trying to

22  establish a simple fact, that in fact, whether you knew it

23  or not, DiskOnKey is what you used from M-Systems for your

24  prototype?

25         A.   Again, I'm trying to tell you that today,

McNulty - cross

1   used to describe that -- as a name for your invention;

2   correct?

3         A.   Yes, through Frank Franze, as I explained

4   earlier.

5              MR. TIMBERS:   If we could look at JX-001.

6   BY MR. TIMBERS:

7         Q.   Again, Pepsi and Medi/o.  Medi/o being used as

8   the name of your invention?

9         A.   Right.  Yes, again, Frank Franze, at my

10  direction.

11        Q.   Am I correct that you actually testified that

12  Tom Rzonca came up with this name for your invention?

13        A.   Yes.

14        Q.   So let's go back to when you were a Fuji

15  employee, Mr. McNulty.  I believe we established you were in

16  the Computer Products Division at Fuji?

17        A.   Yes.

18        Q.   And that was often called CPD; is that right?

19        A.   That rings a bell, perhaps.  Computer Products

20  Division.  I mean Fuji Products Division.  Yes.

21        Q.   And we already established and agreed that Fuji

22  had a USB promotional campaign that was run through your

23  division that was selling USB drives from -- that were

24  sourced from M-Systems; correct?

25        A.   Well, what time period are you talking about?

McNulty - cross

1       Q.   Well, we saw that you had signed a

2   confidentiality agreement in late 2001; right?

3       A.   Yes.

4       Q.   And we saw that there was a press release in

5   October 2002?

6       A.   That, I don't think -- you know, that's

7   questionable in my mind but go ahead.

8       Q.   Well, let's just say this is the time period in

9   2001, 2002.

10      A.   Oh, that answers my question.

11      Q.   Yes.

12      A.   Well, it's tricky because remember I testified

13   that I was promoted out of product management, I think

14   mid-2002, so we have to get really specific here.  At some

15   point in mid-2002, now I'm focused on the worldwide

16   corporation from a branding standpoint and really using most

17   of this product management day-to-day responsibility.  So do

18   you --

19      Q.   I'm focusing on the time that you were in the

20   Computer Products Division.

21      A.   Well, I left that group.  I think it's better to

22   think of the mid-2002 time frame.

23      Q.   Now, do you recall testifying under oath that

24   what Fuji was doing and you, as part of the Computer

25   Products Division was doing, was to customize the USB and

McNulty - cross

1    the USB could have a customer's custom logo on it just like

2    "I described what we did for President Bush.  So that's one

3    thing we would do."

4            Do you recall that testimony?

5        A.    It sounds vaguely familiar.  I can't pinpoint

6    it, but I can, I can explain it in more detail if you would

7    like.

8        Q.    You're saying you don't recall?

9        A.    For what you just said, I could explain to you

10   in detail how that operation worked.

11       Q.    I'm just asking if you recall the testimony,

12   sir.

13       A.    I, I can't pinpoint it.  Was it in our

14   deposition or -- I just can't pinpoint it.

15       Q.    Okay.  That's fine.  So this is your testimony

16   under oath in 2010, page 258.

17           "Question:  Why don't you just generally

18   describe what happened on USB, the aspects of it that you

19   were responsible for?

20           "Answer:  Well, we would customize the USB and

21   the USB could have a customer's custom logo on it.  Just

22   like I described what we did for President Bush, so that's

23   one thing we would do."

24           Do you see that?

25       A.    Yes.

McNulty - cross

1          Q.    The reference to President Bush, you talked

2     about President Bush before you had a President Bush

3     prototype; correct?

4          A.    Yes.

5          Q.    Of your invention?

6          A.    Yes.

7          Q.    And do you recall testifying under oath that for

8     President Bush you came up with ways, "I had developed a USB

9     drive for President Bush for his campaign reelection.  When

10    you plugged it in, it became a direct link to the reelection

11    efforts of the Bush campaign but don't show that yet"?

12         A.    But your earlier slide is only talking about the

13    printing on the outer casing and that was a business that

14    Fuji was in.

15         Q.    Yes.  And I'm asking about different testimony,

16    sir.  I'm asking whether you recall testifying you developed

17    a USB drive for President Bush that would become a direct

18    link to the reelection efforts of the Bush campaign?

19         A.    Yeah, I do.  But just to clarify what was in the

20    President Bush device is my invention, but Fuji had a, had a

21    printing operation to print things on it.  So that's what I

22    was talking about in this statement, and I think very

23    clearly it says that.  It's two different things.

24         Q.    And you testified that the one you did for Bush,

25    you hired two programmers in Israel to work on it; is that

McNulty - cross

```
 1   right?

 2          A.   Yes.

 3          Q.   And that would be Gidi Elazar and Dan Harkabi?

 4          A.   Yeah.  I mean, yes.

 5          Q.   All right.  Now, are you familiar with a company

 6   called Revolutionary Graphics?

 7          A.   Yes.

 8          Q.   What is that?  Was that?

 9          A.   That is my wife's company.

10          Q.   Did she ever work on your invention?

11          A.   No.

12          Q.   Did she work for Fuji?

13          A.   She didn't work for Fuji so she may have done

14   like presentations, but not the actual invention itself.

15   She may have done presentations about the invention but not,

16   you know, not the actual invention itself.

17          Q.   Didn't you tell me before she never did any work

18   on your invention?

19          A.   She did not.  She -- I'm saying she may have.  I

20   just don't recall but she may have.  She has an ad agency.

21   You know, I met her at one of the big ad agencies and she

22   was one of the key Fuji vendors and she may have done, you

23   know, presentations where ads about -- you know, I'm not

24   even sure but she may have done presentations but not -- she

25   would know nothing about, you know, customizing firmware and
```

1    all that stuff.  That is not her agency.

2           Q.   Okay.  Do you recall testifying that in

3    connection with the Fuji USB project, Revolutionary Graphics

4    came up with an idea called Medi/o?

5           A.   If I did, you know, maybe I misspoke.  I just

6    don't know.  I'm not sure.  Did that come from our

7    deposition?

8                MR. TIMBERS:  Page 259.  Show it.

9    BY MR. TIMBERS:

10          Q.   Do you see here that you were asked:

11               "Question:  What did Revolutionary Graphics do

12   with respect to the customization of the USB?"

13               And your answer was:

14               "Answer:  They came up with an idea called

15   Medi/o and this was an idea where if you -- if a consumer

16   put a photograph on the USB drive, there would be -- the

17   drive would recognize that there was a photo there and

18   launch the Fuji Photo printing center and allow you to order

19   prints."

20               Do you see that?

21          A.   Yes.  Yeah, I just don't know if Tom Rzonca was

22   working with my wife on that or not, but it's two different

23   things.

24          Q.   Okay.

25          A.   They came up with the idea, meaning the name

McNulty - cross

1    Medi/o, because I was looking for a name.  And, you know,

2    maybe, maybe they worked together, maybe they didn't.  I

3    just don't -- I just don't know.

4          Q.    You don't recall that?

5          A.    Yes.

6                MR. TIMBERS:  Let's put up the next, slide 262

7    to 263.

8    BY THE WITNESS:

9          A.    I know Tom Rzonca was involved with the name.

10   Whether he did it with my wife or not, I don't know.

11         Q.    Does this refresh your recollection?

12               "Question:  Are you aware of anybody that

13   Revolutionary Graphics hired, meaning that they paid to do

14   work for the USB customization?

15               "Answer:  Yes.

16               "Question:  Who?

17               "Answer:  Tom Rzonca."

18   BY THE WITNESS:

19         A.    Yeah, that's possible they worked together.

20   Now, USB customization, that is just printing on the outer

21   shell, so they could be, they could have been working with

22   any number of presentations or pitches, pitch decks to sell

23   the idea to print somebody else's brand on the outside of a

24   USB device.

25         Q.    For Fuji; correct?

McNulty - cross

1          A.    Well, that's a Fuji business, printing on the

2     outer casing but not my invention.

3          Q.    Just, yes -- so just to crystallize that.  The

4     testimony is not about your invention, it's about what was

5     being done for Fuji; correct?

6          A.    I guess so.  Yes.

7          Q.    So do you recall testifying that Revolutionary

8     Graphics developed the idea, developed the user interface,

9     developed all the graphics files, developed the copy,

10    developed product design, the animation, developed the

11    method in which it would work and developed the sales

12    presentations for the idea?

13         A.    Well, that, that really sounds like a

14    presentation.  The giveaway word is animation.  So all my

15    presentations were animated and so yes, it's possible she

16    worked on something.  It's possible Tom and she worked on

17    something.  I just don't recall.

18         Q.    But is that testimony that I read to you

19    correct?

20         A.    Oh, didn't see it here.

21         Q.    I didn't put it up.  I was first asking whether

22    you recalled having testified.

23         A.    I'd have to see it up.

24         Q.    All right.

25               MR. TIMBERS:  Let's put it up, 264 to 265.

McNulty - cross

1    BY MR. TIMBERS:

2          Q.   Do you see, that's the testimony that I was

3    referring to?

4          A.   Yeah.   Yeah.

5          Q.   That's your testimony under oath, correct?

6          A.   Yes, top copy animation.   They pitched that

7    which they often would create.

8          Q.   And here it says, Revolutionary Graphics, your

9    wife's company, developed the idea and the user interface;

10   right?

11         A.   Well, of the pitch deck.

12         Q.   Okay.   Do you recall then that you testified

13   your wife created the user interface for Medi/o?

14         A.   The user interface for the pitch deck.   You

15   know, the pitch deck were an interactive -- they were a

16   flash presentation and they required, you know, a designer,

17   so that's all she could do.   There is no possible way she

18   could have designed, you know, my invention or programmed it

19   or anything like it.

20         Q.   Okay.   You have testified Medi/o was your

21   invention; right?

22         A.   Well, Medi/o was a name that I came up with and

23   then tried to sell it five different ways after I decided

24   not to use it.   You know, I think I tried to sell it to

25   Fuji.   I think I tried to sell it Pepsi.   It's such a great

McNulty - cross

1    name, you know.  Naming, I'm sure as you know when you come

2    up with a good name, that's a valuable asset and it's

3    terrible to just throw it away.

4           So I -- you know, I do remember trying to find a

5    home for Medi/o going around, showing everybody, hey, maybe

6    you could use this for that, maybe you could use it for

7    that.  And so, yeah, you know, Medi/o was a fantastic name.

8           To this day I regret -- kind of regret not

9    keeping it.

10          Q.   It was a simple question.  You used Medi/o as a

11   name of your invention, correct?  We saw lots of documents

12   about that.  Is that wrong?

13          A.   Well, Medi/o would be the name of the company.

14   That was the idea, Medi/o would be the name of a company

15   that would sell my invention.

16          MR. TIMBERS:  Let's show 269.

17   BY MR. TIMBERS:

18          Q.   Do you recall testifying:

19          "Question:  Do you have any reason to believe

20   that your wife created the user interface with respect to

21   the USB customization?

22          "Answer:  Do I have any?

23          "Question:  Reason to believe that your wife is

24   the person who created the user interface?

25          "Answer:  For Medi/o?

**Appx9173**

McNulty - cross

1             "Question:  Yes.

2             "Answer:  Yes, of course.

3             "Question:  What do you base that on?

4             "Answer:  Because I saw it, I witnessed it.

5      BY THE WITNESS:

6          A.   Yeah, we're talking about a pitch deck, a

7      presentation.

8          Q.   We are talking about Medi/o in this discussion,

9      aren't we?  Medi/o for Fuji, your invention for Fuji; isn't

10     that right?

11         A.   No, we're talking about a -- you know, like you

12     saw the Pepsi presentation.  We -- she would do the same

13     thing, you know, for the Fuji customization, so that was

14     another way of trying to pitch it to Fuji.  So, for example,

15     you know, Fuji was in the business of customizing blank

16     storage media for really big companies, and so the concept

17     is, hey, Fuji, you know, because I turned down Medi/o, I

18     don't want it, hey, Fuji, you know, let's, let's call this

19     customization business for USB, let's call it Medi/o.  It

20     will be such a great name, it will have legs, and we'll get

21     greater market share.

22             And, you know, so she is doing these, you know,

23     flash automated presentations, and Tom and many people were

24     actually doing them, so -- May Louie was, Brand X was, my

25     wife was.  And we're really -- we worked for a big

McNulty - cross

1    multibillion dollar company.  You have a flurry of activity

2    to try to get a new product going, and that is all this was,

3    you know.

4         Q.    I hesitate to interrupt your answer.  I did ask

5    a very simple question.  Let me ask another very simple

6    question.

7              Pepsi, that didn't have anything to do with

8    Fuji, did it?

9         A.    Well, at the end, you know, at certain points it

10   did have something to do with Fuji in that, you know, we

11   were trying to convince Fuji to partner with me; right?

12   And I kept developing the Fuji prototype, adding features,

13   adding things to it, and then I had this idea, you know, how

14   I know how to get Fuji to commit to this.  I'll get Pepsi

15   to commit to like photo printing, and other aspects of Fuji

16   business.

17             So we actually did a prototype for Pepsi with

18   Fuji printing.  Then I would take that over to Fuji and say

19   look at this.  This is why you should partner with me.

20   Imagine Pepsi distributing these things to millions of

21   customers with Fuji Photo printing, which Fuji did get

22   excited about.

23             So all you are seeing here is a matrix of,

24   this is the marketing process.  You know, you are doing

25   everything you can to make something stick, especially when

McNulty - cross

1   you launch it, you know.  This is actually the secret sauce

2   behind a lot of the awards that I win.  You just don't do

3   things in methodical ways, you know, according to the

4   textbook.  You work with as many people as you can, come up

5   with as many creative ideas you can with Medi/o and other

6   ideas and you try to make something stick, and eventually it

7   will when you try hard enough.

8              MR. TIMBERS:  Can I have 272, please?

9   BY MR. TIMBERS:

10             Q.   Do you see the question:

11                  "Question:  What other customizations were

12   done?"

13                  And let's stop here.

14                  You testified that this is all about Fuji.  All

15   about Fuji.

16                  "Answer:  We did a customization for Fuji, we

17   did a customization for Pepsi, we did a customization -- I

18   don't remember who I, I can't remember who else."

19             A.   Yeah.  So I didn't --

20             Q.   I'm sorry.  Let me finish my question, sir.  I

21   need to read this and then ask you a question.

22                  "Question:  With respect to the customization

23   for Pepsi, who was involved in doing that?

24                  "Answer:  Pepsi was -- I don't recall.  Pepsi

25   utilized the Medi/o concept, but I am not sure who else was

McNulty - cross

1   involved in the actual Pepsi customization.  I don't

2   recall."

3               This is all testimony about what the Computer

4   Products Division was doing at Fuji; is that right?  Yes or

5   no question.

6       A.   Well, no.  What happened is, as it looked like

7   Pepsi didn't want to use my invention, then we said to

8   Pepsi, because we didn't want to lose it, we had the

9   attention of the company.  We said to Pepsi, how about just

10  a very low cost customized USB device?  And, you know, then

11  I went to Fuji and said, you know, I tried to marry it that

12  way, that Fuji can print that.  They had the facility to

13  print that.  So that is really where all that is going.

14      Q.   Mr. McNulty --

15              MR. TIMBERS:  You can take that down.

16  BY MR. TIMBERS:

17      Q.   -- you talked about paying a lot of money and

18  showed some invoices for work on your invention; right?

19      A.   Yes.

20      Q.   We don't have any evidence that any of those

21  invoices were paid other than your say-so; is that correct?

22      A.   Yeah, I guess that's correct.  Yeah.

23      Q.   And you don't have any bank statements that show

24  it?

25      A.   I don't have any longer, no.

McNulty - cross

1        Q.    No canceled checks?

2        A.    I'm not sure what I have and what I don't have.

3   Everything would be in my email but I think for the most

4   part you are correct.  I can't say that, you know, there is

5   nothing there, but, you know, basically yeah, I don't -- you

6   know, I think I explained that at a different hearing why

7   that was.

8        Q.    And you have some prototypes here today, but we

9   don't know what is on them, do we?

10       A.    Well, you know, I had --

11             MR. LEIBOWITZ:  Objection, Your Honor.

12             THE COURT:  There is an objection.  Hold on,

13   Mr. McNulty.

14             Yes.

15             MR. LEIBOWITZ:  I'm not sure if counsel is

16   asking if he knows what is on the particular device today

17   because there is discovery what is on those.

18             THE COURT:  Well, let's inquire systematically.

19   Proceed.

20             MR. TIMBERS:  I can move on.  I can move on.

21             THE COURT:  Sustained.  The question is

22   withdrawn.

23   BY MR. TIMBERS:

24       Q.    You did say that you thought it was possible

25   that Fuji may have paid some of those invoices; correct?

**Appx9178**

McNulty - cross

1        A.    Well, I, I don't know.  All I know is that I did

2   everything I can to avoid that.  And I don't want to sit

3   here today and say that it absolutely never happened but I

4   don't remember it happening.

5        Q.    All right.  You testified about JX-272, which is

6   the MDRM agreement.  Do you recall that?

7             MR. TIMBERS:  Can we put that up?

8   BY THE WITNESS:

9        A.    I'm sorry.  JX?

10       Q.    JX-272.  You testified about that earlier, the

11  agreement between MDRM and Revolutionary Group?

12       A.    Yes.

13       Q.    And you see, sir, that this document did not

14  come from IOENGINE?

15       A.    Well, the time I called the company,

16  Revolutionary Group.

17       Q.    No.  What I mean is this document is not from

18  IOENGINE's files, is it?

19       A.    I have no idea where this document came from, my

20  files or somebody else's files.  I don't know.  How can you

21  tell?

22       Q.    It has WDC and some numbers at the bottom of it.

23  Do you recall that?

24       A.    I have no idea what those numbers mean.  I'm

25  sorry.

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
       INGENICO INC.,
 4                                         :    CIVIL ACTION
                 Plaintiff,                :
 5     v                                   :
                                           :
 6     IOENGINE, LLC,                      :
                                           :
 7              Defendant.
       ------------------------------------
 8     IOENGINE, LLC,
                                           :
 9              Counterclaim Plaintiff,    :
       v                                   :
10                                         :
       INGENICO INC., INGENICO CORP. and   :
11     INGENICO GROUP SA,                  :
                                           :    NO. 18-826-WCB
12              Counterclaim Defendants.

13                              - - -

14                          Wilmington, Delaware
                            Tuesday, July 12, 2022
15                          Jury Trial - Volume B

16                              - - -

17     BEFORE:       HONORABLE WILLIAM C. BRYSON, and a jury
                     United States Circuit Court Judge
18
                                - - -
19

20
       (Appearances in their entirety placed beginning on page 2)
21

22

23     Reported by:

24     Brian P. Gaffigan
       Registered Merit Reporter
25     Federal Certified Realtime Reporter
```

Rzonca - direct

1    types, printed advertising, some films, some video, some

2    animation.   And then very early on in my career I was, I was

3    contracted to produce graphics for a, a relatively -- I

4    think it was a brand new technology at that time, in the

5    early '80s -- interactive video.

6              And the client was IBM for the launch of the

7    IBM PC.

8         Q.    Did you work on any other interactive design

9    projects like that early in your career?

10        A.    Yes, I did.

11        Q.    Can you give us an example?

12        A.    Okay.  Shortly after the, the IBM project, that

13   was a very short-term project.  I produced a lot of graphics

14   for it but shortly after that, I was hired to -- as a

15   consultant to work on the, on the interactive directory for,

16   for the World Financial Center in New York, which had been

17   under construction at that time.

18             The World Financial Center in New York, that was

19   located -- and it's still there under a different name, but

20   it's located in lower Manhattan just across the west side

21   highway from the former twin towers of the World Trade

22   Center so I spent a lot of time there.

23             What this project was all about, this was a --

24   it was a groundbreaking project.  It was a design for --

25   primarily for touch screens, for the user to find his or her

1    way around this complex, kind of a large complex consisting

2    of the four towers over 14 acres.   Okay?

3                An interactive directory really became necessary

4    because the user would need directions or might want to find

5    out about the corporate clients there, they might want to

6    find out about the shops and services or the restaurants or

7    the upcoming concerts.   It was quite a project.   It was not

8    an overnight project.   It took years to complete.

9        Q.   Did you receive any awards for your work on the

10   interactive directory for the World Financial Center?

11       A.   Yes, there were numerous awards.   Among those

12   awards -- there was one major award back at that time, the

13   AT&T True Vision award.   AT&T was a big player back then

14   because they were making -- they were making graphics boards

15   for the, the computers back then, for the IBM PC.

16               Graphics boards that would allow video and

17   graphics simultaneously were -- we were able to overlay

18   graphics on top of video.   And instead of ample colors like

19   the very early PCs, I had a color palette of 16.7 million

20   colors known as 24-bit color.

21       Q.   When did your project with the World Financial

22   Center end?

23       A.   That project ended in 1989.

24       Q.   And what did you do after that?

25       A.   After that, I received a -- I received a phone

 1    call from an advertising agency in New York, Hal Riney &

 2    Partners.  And they wanted me to come in to discuss the

 3    possibility of working on interactive presentations,

 4    interactive multimedia presentations, for -- for some of the

 5    first digital cameras to be introduced into this market.

 6         Q.    And who hired you at Hal Riney?

 7         A.    That is Scott McNulty.

 8         Q.    Is that Mr. Scott McNulty sitting here in the

 9    courtroom?

10         A.    That is Scott McNulty, yes.

11         Q.    Did you work with Mr. McNulty at Hal Riney?

12         A.    Yes, I did.

13         Q.    How long did you work with Mr. McNulty at Hal

14    Riney?

15         A.    Only about a week.

16         Q.    Why only a week?

17         A.    Because he had moved to a different agency at

18    that point.

19         Q.    Did you stay in touch with Mr. McNulty in the

20    1990s after he left Hal Riney?

21         A.    Yes, I did stay in touch with him.

22         Q.    How?

23         A.    He would -- he would get in touch with me to

24    help him out with projects.  He went to a different agency

25    working on different products.  He was already aware of my

Rzonca - direct

```
 1    background.  He needed help for whatever kind of visuals he

 2    was looking for, whatever kind of concepts.  And then I

 3    would also run into him at trade shows during the '90s.

 4         Q.   What do you mean by trade shows?

 5         A.   Okay.  Trade shows are industry events where --

 6    you have a trade show -- let's say one big one was COMDEX

 7    where that was the -- that was the PC industry trade show.

 8    And it was all PC companies, peripherals, software

 9    companies, but that was the -- it was the showcase of

10    brand-new products usually.

11         Q.   At roughly how many trade shows did you run into

12    Mr. McNulty in the 1990s?

13         A.   During the '90s, I would have to say about a

14    dozen.

15         Q.   Did you go to any PC Expo trade shows with

16    Mr. McNulty?

17         A.   Yes, I did.

18         Q.   Did you go to the 2001 PC Expo with Mr. McNulty?

19         A.   Yes, I did.

20         Q.   Now, why do you remember it was the 2001 PC

21    Expo?

22         A.   Okay.  Well, a couple of reasons behind the 2001

23    PC Expo.  First of all, the time frame, the proximity to

24    9/11.

25         Q.   Where was the show?
```

Rzonca - direct

1        A.   It was held in New York.

2        Q.   Do you remember anything specific about what

3    happened at the 2001 PC Expo?

4        A.   Well, Scott and I would walk the show, we would

5    walk the floor, and there were many exhibits, some which he

6    would gravitate toward; some which I would gravitate toward,

7    and we would have conversations.  He presented an idea to me

8    about portable devices back then.

9        Q.   Now, in the course of the '90s, did Mr. McNulty

10   share ideas with you frequently?

11       A.   Yes, he did.

12       Q.   Can you guess over the '90s how many ideas you

13   think he shared with you?

14       A.   Scott always had ideas.  Dozens.

15       Q.   So why do you remember this particular instance

16   of being -- of him sharing an idea at the 2001 PC Expo?

17       A.   Okay, I remember because shortly afterward, and

18   it was a matter of days, might have been a week, a couple

19   days, but it was shortly afterward, we had gotten together

20   again, and Scott McNulty produced a document for me --

21       Q.   Do you --

22       A.   -- that went over his idea.

23       Q.   Do you remember the title of that document?

24       A.   Yes.  The title of the document is Portable

25   Devices Rule.

1      Q.   So if we could have PX-235.  It's in your binder

2    if you want to look at it there, or we'll bring it up on the

3    screen as well.

4           Is this the document you were just referring to?

5      A.   This is a version of the document.  Yes, I would

6    say.

7      Q.   How do you know you saw a version of this

8    document in 2001?

9      A.   How do I know about the document?  Well, a

10   couple things stood out to me.  First of all, the title,

11   Portable Devices Rule.  But what really did it here in the

12   first paragraph -- let me find that on here.

13          Okay.  About two-thirds of the way down in the

14   first paragraph, there is a -- there is a reference to

15   (Hello, Hal).

16     Q.   And why did that stick out in your mind?

17     A.   Okay.  That -- that zoomed out immediately to me

18   because that (Hello, Hal), this is a reference to the 2001

19   Space Odyssey film by Stanley Kubrick.  And HAL was the main

20   character of that film; not a person, but a computer.

21          And a couple other things about this.  And first

22   of all, this is incorrect the way it was written.  Hal

23   should not be written in title case.  It should be all caps,

24   the H-A-L, because it is an acronym.  Okay?  And the acronym

25   comes from H standing for heuristically.  Okay?  And the AL

Rzonca - direct

1    is for algorithmic.

2              And namely the -- the type of computer, it was a

3    heuristically programmed algorithmic computer; HAL for

4    short.

5         Q.   Are you a Stanley Kubrick fan?

6         A.   Huge Stanley Kubrick fan.

7         Q.   How many times have you seen 2001 Space Odyssey?

8         A.   I would have to say 30 or 40, at least.

9         Q.   Do you have a personal connection to the Kubrick

10   family?

11        A.   Yes, I do.

12        Q.   Can you tell us a little bit about that?

13        A.   Okay.  Well, this was after -- this was after

14   Stanley Kubrick's death.  Stanley Kubrick died, I believe it

15   was 1999.  But a former girlfriend of mine had grown up in

16   London, and the family right across the hall from where her

17   family was living was the Kubrick family.  It was Stanley,

18   his wife, and three daughters.  And so my former girlfriend

19   became best friends with one of -- one of Stanley Kubrick's

20   daughters, Katharina.  And the personal connection here --

21   well, back then when they were kids, their playground -- and

22   this is for any Stanley Kubrick fans here -- the playground

23   back then was the war Roam for Dr. Strangelove, one of the

24   most iconic film sets ever designed.

25              So moving on with this to more present day, the

Rzonca - direct

1    personal connection came in 2007 when Stanley Kubrick's

2    daughter was getting remarried and my former girlfriend, at

3    that time, we were both invited to the wedding in the

4    southwest of France, and we were asked would we like to go?

5    And, you know, I said, sure, yeah.  I would love to go.

6        Q.   So of all the things we just talked about

7    regarding you learning of Mr. McNulty's idea in 2001, which

8    of all those things stands out the most?

9        A.   If I understand the question correctly, I would

10    say HAL, the (Hello, Hal).  The tie-in to 2001.

11        Q.   Now, Mr. Rzonca, are you being compensated in

12    any way for your testimony today?

13        A.   No, I am not.

14        Q.   Do you have any financial interest in the

15    outcome of this case?

16        A.   No, I do not.

17        Q.   Do you have any ownership interest or financial

18    interest in IOENGINE?

19        A.   No, I do not.

20        Q.   Do you invest in any of Mr. McNulty's businesses

21    or projects?

22        A.   No, I do not.

23        MR. JOSHI:  Thank you, Mr. Rzonca.

24        THE WITNESS:  Thank you.

25        THE COURT:  Cross-examination.

Rzonca - cross

1               (Documents passed forward.)

2                     DIRECT EXAMINATION

3     BY MS. STERNBERG:

4          Q.    Good morning, Mr. Rzonca.

5          A.    Good morning.

6          Q.    You may recall we spoke in the fall at your

7     deposition on Zoom.  So it's nice to see you in person today

8     as well.

9               So do you recall testifying that you have been

10    friends with Mr. McNulty for over 30 years?

11         A.    That is correct.

12         Q.    And you recall testifying that you were in touch

13    with him quite frequently; is that correct?

14         A.    That's correct.

15         Q.    And you previously testified that you were in

16    touch with him multiple times a week; is that correct?

17         A.    Yes, that's correct.

18         Q.    And so today you testified about a conversation

19    you had with him back in 2001; is that right?

20         A.    That's correct.

21         Q.    And that was over 20 years ago; is that right?

22         A.    That's correct.

23         Q.    And you testified that Mr. McNulty often comes

24    up with ideas and sends you information about those ideas

25    and you talked to him at many trade shows over the years; is

Rzonca - cross

1    that right?

2          A.    He -- he wouldn't always send me information.

3    We would have conversations like, "What do you think of this

4    idea?"  "What do you think of that idea?"  So we've had

5    conversations about that.

6                But, yes, there were many ideas.

7          Q.    And do you recall that at your deposition I

8    asked you if you could remember any other conversations from

9    that time frame in 2000 or 2002 and you couldn't recall any

10   specific other conversations; is that right?

11         A.    No, I couldn't.

12         Q.    And you testified today about a document called

13   Portable Devices Rule; is that right?

14         A.    That's correct.

15         Q.    And you were shown a version of that document,

16   PX-235, which we can put back up.

17               Is that right?

18         A.    That's correct.

19         Q.    But IOENGINE's counsel did not show you other

20   versions that exist of this document; is that right?

21         A.    Well, I understand there were other documents --

22   there were other versions.

23         Q.    Okay.  So let's put those back up.  So let's put

24   PX-245 and PX-215 up next to this, if we can, all three

25   together.

Rzonca - redirect

1                    So PX-235, PX-215, and PX-245.

2                    We're just waiting for PX-215 as well.  Okay.

3        That's fine.

4                    So if you can scroll down to the second page of

5        each document.

6                    Do you see that these versions are different?

7        Is that right?

8            A.    That's correct.  The one on the right is longer.

9            Q.    Okay.  And you testified previously that you

10       weren't sure which version you saw; is that right?

11           A.    That's correct.

12           Q.    And you also testified previously that you

13       recall seeing a document that referenced HAL, but you didn't

14       remember anything else specific about the document; is that

15       right?

16           A.    That's correct.

17           Q.    And so aside from remembering (Hello, Hal), you

18       don't recall anything else specific about that document or

19       that conversation; is that right?

20           A.    No, I don't.

21           Q.    Okay.  No further questions.

22                 THE COURT:  Redirect?

23                 MR. JOSHI:  Yes, Your Honor.

24                       REDIRECT EXAMINATION

25       BY MR. JOSHI:

Rzonca - redirect

```
 1            Q.    So, Mr. Rzonca -- actually, we can have PX-215

 2    up?  One of the documents that you just looked at.

 3                  And do you see the title of this document?

 4            A.    Yes.

 5            Q.    And what is it?

 6            A.    It's Portable Devices Rule.

 7            Q.    And then if we zoom back out, about two-thirds

 8    down the page, does this version of the document reference

 9    HAL?

10            A.    Yes, it does.

11            Q.    Can we switch to PX-235?

12                  And what is the title of this document?

13            A.    It's also Portable Device Rule.

14            Q.    And about two-thirds down the page --

15            A.    (Hello, Hal).

16            Q.    -- (Hello, Hal)?

17                  And let's go to the last one that -- what you

18    were just shown, PX-245.

19                  What is the title of this document?

20            A.    Portable Device Rule.

21            Q.    And does it mention Hal?

22            A.    It does mention (Hello, Hal).

23            Q.    Now, are you sure you saw a version of this

24    document in 2001?

25            A.    Yes, I am.
```

```
 1                    MR. JOSHI:  No other questions.

 2                    THE COURT:  Very well.

 3                    Mr. Rzonca, you are excused.  And thank you for

 4        your testimony.

 5                    THE WITNESS:  Okay.  Thank you.

 6                    (Witness excused.)

 7                    THE COURT:  Next witness.

 8                    MR. CHUEBON:  Your Honor, I believe our next

 9        witnesses are by deposition, so we'll be playing some

10        depositions videos.

11                    THE COURT:  Members of the jury, I think I

12        explained that there will be some witnesses who will be here

13        live as you have seen.  There will also be some witness who

14        are not going to be here live and will be presenting --

15        their testimony will be presented by deposition.  That means

16        they will be shown on the screen.  They will have been

17        questioned, they will have been other lawyers and they will

18        have been sworn in.  Treat their testimony just as if they

19        were testifying live here in court.

20                    MR. JOSHI:  So, Your Honor, IOENGINE calls by

21        video Mr. Scott Tubbs.

22                    THE COURT:  Okay.

23                    MR. JOSHI:  Mr. Tubbs is the former chief

24        revenue you officer of Ingenico Group.  The video is about

25        14 minutes and 28 seconds and will reference trial exhibits
```

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

     INGENICO INC.,
 4                                       :    CIVIL ACTION
                Plaintiff,               :
 5   v                                   :
                                         :
 6   IOENGINE, LLC,                      :
                                         :
 7                Defendant.
     ------------------------------------
 8   IOENGINE, LLC,
                                         :
 9              Counterclaim Plaintiff,  :
     v                                   :
10                                       :
     INGENICO INC., INGENICO CORP. and   :
11   INGENICO GROUP SA,                  :
                                         :    NO. 18-826-WCB
12              Counterclaim Defendants.

13                              - - -

14                        Wilmington, Delaware
                          Wednesday, July 13, 2022
15                        Jury Trial - Volume C

16                              - - -

17   BEFORE:       HONORABLE WILLIAM C. BRYSON, and a jury
                   United States Circuit Court Judge
18                              - - -

19

20
     (Appearances in their entirety placed beginning on page 2)
21

22

23   Reported by:

24   Brian P. Gaffigan
     Registered Merit Reporter
25   Federal Certified Realtime Reporter
```

**Appx9659**

Tang - cross

1      Q.   So again for a log-in purpose, there is a

2  mandate, there is a need for Ingenico to record the specific

3  device ID for a card reader that is using the transaction;

4  correct?

5      A.   So for log-in purpose, there is a -- it's a,

6  it's a, it's a big -- I think it's called KSN; right?  So

7  it's all the way with the model, the device information and

8  then the transaction account; right?  So that is the initial

9  pin where -- I mean from the gateway we don't really care.

10  We just save it for auditing purpose.  That's it.

11      Q.   So again I'm asking you a question.  I think you

12  yourself said there is a mandate --

13      A.   Yes.

14      Q.   -- for you to have a specific ID used by a card

15  reader in a transaction; is that right?

16      A.   Yes, we save it for auditing purposes.

17         MR. YOSHI:  No further questions.

18         THE COURT:  Redirect?

19         MS. STERNBERG:  No.

20         THE COURT:  Very well.

21         Mr. Tang, you are excused.  Thank you for your

22  testimony.

23         THE WITNESS:  Thank you.

24         (Witness excused.)

25         THE COURT:  Next witness.

1            MS. STERNBERG:  So at this point we're going to

2    be playing a series of deposition videos.  So I do have the

3    time.

4            THE COURT:  You can share that with Mr. Sowers

5    and opposing counsel.

6            MS. STERNBERG:  So we're going to begin with a

7    deposition of Mr. Jeffrey Ash who was Mr. McNulty's former

8    supervisor in the computer project -- products provision at

9    Fuji.

10           THE COURT:  All right.

11           You may proceed.

12           (Video of Jeffrey Ash is played.)

13           "Question:  When did you begin working at Fuji?

14           "Answer:  It was August of 1987.

15           "Question:  When did you stop working at Fuji?

16           "Answer:  I retired and left Fuji in July of

17    2018.

18           "Question:  What roles did you have while you

19    worked at Fuji?

20           "Answer:  Actually when I joined Fuji, I joined

21    the computer media division as a product marketing manager,

22    and I left the division in 20 -- 2004, early 2004 to begin

23    working on some various company projects.

24           "Question:  What products were included in that

25    computer products division at Fuji?

1            "Answer:  It was primarily storage products that

2    were sold to our partner OEMs and also through retail.  So

3    it was floppy disks and data tape.  Products like that, that

4    people would store data on.

5            "Question:  Were USB devices also included in

6    your division?

7            "Answer:  Towards the end, yes.  We launched a

8    line of blank USB drives.

9            "Question:  Did you work with Scott McNulty

10   while you were at Fuji?

11           "Answer:  Yes, Scott reported to me.

12           "Question:  And so you were his supervisor; is

13   that right?

14           "Answer:  That's correct.

15           "Question:  Do you recall supervising

16   Mr. McNulty on projects related to the USB devices?

17           "Answer:  No, just the introduction of our blank

18   USB drive, which I don't know how much he was involved in

19   that.  But we did market a blank USB drive for retail.

20           "Question:  And do you recall whether Fuji sent

21   Mr. McNulty to the PC Expo?

22           "Answer:  I do not recall that.  I don't know

23   that we had a presence there, but -- our major efforts were

24   COMDEX and to a lesser extent CES.

25           "Question:  And do you recall a company known as

 1    M-Systems?

 2              "Answer:  The name sounds familiar.  I believe

 3    they may have been our supplier for the USB, the blank USB

 4    drives that we sold under the Fuji name.

 5              "Question:  Okay.  So we talked a little bit

 6    about a Fuji USB device, which you referred to as a blank

 7    USB device; is that right?

 8              "Answer:  That's right.

 9              "Question:  And did you work on that device at

10    all?

11              "Answer:  I think I had a role in -- in that

12    early on, sure, yes.

13              "Question:  Do you remember what your role was?

14              "Answer:  Well, again, it was a blank USB drive,

15    so it followed suit in our line of blank storage products.

16    So along with floppy disks and tapes and products like that,

17    we felt that -- I believe we felt that it would be a

18    complement and it was a growing -- a growing technology to

19    allow people to store data on a removable device.  So once

20    the decision was made to move forward, it was, you know, a

21    matter of selecting a vendor and developing the product, the

22    packaging, and launching the product.

23              "Question:  I'm going to introduce the next

24    exhibit, which has been premarked Klein Exhibit 4.  And that

25    just means it was used at a prior deposition as well.

Ash - designations

1                     Do you see that this document appears to be a

2        press release dated July 10th, 2002?

3                     "Answer:  I see that -- I see that.

4                     "Question:  And then do you see in the next

5        sentence it quotes Scott McNulty, Director of Marketing,

6        Computer Products Division?

7                     "Answer:  I see that.

8                     "Question:  So does this refresh your

9        recollection as to the term DiskOnKey and what that might

10       refer to?

11                    "Mr. Liebowitz:  Object to the form.

12                    "Answer:  Well, it would appear as though that

13       we called our USB -- our blank USB drive the DiskOnKey.

14                    "Well, it would appear as though we called our

15       USB -- our blank USB drive the DiskOnKey.

16                    "Question:  And for clarity, I believe it says

17       the M-Systems DiskOnKey?

18                    "Answer:  Yes.  I see that.

19                    "Question:  Does this indicate that Scott

20       McNulty was involved in the effort to launch this product?

21                    "Answer:  I would say yes.

22                    "Question:  Is that consistent with your memory?

23                    "Answer:  Yes.

24                    "Question:  Oh, sure.  Do you know what Fuji

25       knew about the functionalities of the M-Systems' USB device.

1              "Mr. Leibowitz:  Object to form.

2              "Answer:  Well, my understanding would have been

3      that it was basically a blank USB drive that would -- that

4      would allow a user to store data files.  So whatever

5      software allowed that to happen would have been the extent

6      of it.  The USB drive was basically a blank storage device.

7              "Question:  And have you ever heard of an

8      application called MyKey?

9              "Answer:  No, I have not.

10             "Question:  What about an application called

11     KeySafe?

12             "Answer:  KeySafe?  No.  Not that I'm aware of.

13             "Question:  And did Fuji ever create any

14     software applications to be used with its USB device?

15             "Answer:  Not to my knowledge, no.  We just --

16     it was a blank USB drive that was bought and resold from our

17     supplier.

18             "Question:  Did Fuji ever advertise the ability

19     for customers to create software applications that could run

20     from its USB device?

21             "Answer:  Not that I recall, no.

22             "Question:  Were you aware that Mr. McNulty

23     hired programmers to work on software development related to

24     USB customization?

25             "Answer:  No, I was not aware.

Ash - designations

1                  "Question:  Are you familiar with a company

2        known as MDRM?

3                       "Answer:  I am not.

4                       "Question:  Are you familiar with a person named

5        as Dr. -- sorry, named Dr. Bernstein?

6                       "Answer:  Not that I recall, no.

7                       "Question:  Were you aware that Mr. McNulty had

8        servers located at 24 Broadway in --

9                  Do you recall providing permission to

10       Mr. McNulty to use Fuji logo in images and presentations

11       related to a Fuji USB device?

12                      "Answer:  No, I do not.

13                      "Question:  Okay.  So I'm just confirming that

14       you never had any discussions with Mr. McNulty about the use

15       of graphics in his patent application?

16                      "Answer:  No.  That's my -- that's correct.  I

17       don't remember anything -- any discussion like that."

18                 (Video ends.)

19                 THE COURT:  Okay.

20                 Is that exhibit that was --

21                 MS. STERNBERG:  Yes, that is DX-092.

22                 THE COURT:  Okay.  It will be admitted.

23                 MS. STERNBERG:  Yes.  Oh.

24                 THE COURT:  The exhibit will be admitted.

25                 (DX-092 was entered into the record.)

Klein - designations

1                MS. STERNBERG:  Thank you.

2                Next, Ingenico is going to introduce the

3       deposition testimony of Mr. Gene Klein, who was a former

4       colleague of Mr. Scott McNulty at Fuji.

5                (Video of Gene Klein played.)

6                "Question:  So you mentioned that you worked for

7       the computer products division of Fuji; is that right?

8                "Answer:  That's correct.

9                "Question:  Who did you report to?

10               "Answer:  Scott McNulty.

11               "Question:  Were you involved with engineering

12      of any product?

13               "Answer:  No.

14               "Question:  Okay.  Product design?

15               "Answer:  Not really, no.

16               "Question:  So was your involvement limited to

17      graphic design related to marketing material?

18               "Answer:  Pretty much.

19               "Question:  Okay.

20               "Answer:  Packaging and marketing material.

21               "Question:  Do you recall a company named

22      "M-Systems"?

23               "Answer:  I know M-Systems, yes.

24               "Question:  Okay.  Did you work with M-Systems?

25               "Answer:  To some degree, yes.

Klein - designations

1              "Question:  In what capacity did you work with

2      them?

3              "Answer:  Basically just to understand their

4      product.  Exchange of information mostly.

5              "Question:  Do you recall the name of their

6      product?

7              "Answer:  No.  It was just a -- if I recall, it

8      was a USB drive.

9              "Question:  And do you know if Fuji had any kind

10     of policy about whether projects you worked on while at Fuji

11     belonged to Fuji?

12             "Answer:  No.

13             "Question:  So while you were working at Fuji,

14     all of your work related to Fuji; is that right?

15             "Answer:  Yes.

16             "Question:  I'm going to share a next exhibit,

17     which is a screenshot from the Fujimediasource.com website,

18     and it's Bates-stamped INGEN-0541886.  And do you see that

19     the next paragraph says, 'Since the Fujifilm USB drive has

20     its own central processing unit, CPU, it can directly

21     support and run multiple applications, crossing the

22     boundaries between a PC and a Macintosh'?

23             "Answer:  Okay.  I see it.

24             "Question:  Do you recall whether that was true

25     about the device?

 1                "Answer:  As far as I know, yes.

 2                "Question:  Okay.

 3                "Answer:  It was interchange -- it was

 4   interchangeable between both platforms.

 5                "Question:  Do you recall whether it had a

 6   processor?

 7                "Answer:  I do not.

 8                "Question:  And you mentioned that you worked

 9   with M-Systems?

10                "Answer:  Yes.

11                "Question:  Who managed that relationship?

12                "Answer:  Mostly Scott.

13                "Question:  So M-Systems sent you samples at

14   Fuji and you looked at it; is that right?

15                "Answer:  That's correct.

16                "Question:  Were you aware of whether M-Systems

17   offered any other features or software related to its

18   DiskOnKey device that Fuji did not use?

19                "Answer:  No, I was -- I was not aware at all.

20                "Question:  And were you aware of an encryption

21   feature of -- known as KeySafe?

22                "Answer:  No.

23                "Question:  Okay.  Do you know if -- oh, I

24   guess:  Were you aware of a feature for the DiskOnKey known

25   as MyKey?

Klein - designations

1              "Answer:  No.

2              "Question:  Were you aware of the ability of the

3      FujiFilm USB drive to perform firmware updates?

4              "Answer:  No.

5              "Question:  Did Fuji ever create any software

6      applications to work with its USB drive?

7              "Answer:  Not that I know of.

8              "Question:  Were you aware of a device known as

9      the Blimp device, or the Fuji Blimp device?

10             "Answer:  Yes.

11             "Question:  What was that?

12             "Answer:  We fooled around with changing the

13     shape, the outer container of the USB drive, to make it look

14     like a blimp.

15             "Question:  Who's "we"?

16             "Answer:  The marketing group that I worked

17     with.

18             "Question:  Including Scott McNulty?

19             "Answer:  Yes.

20             "Question:  Do you remember whose idea that was?

21             "Answer:  It was sort of everybody's first idea

22     of what would you do with this device if you were to brand

23     it, and there was FujiFilm right in front of us.  So the

24     blimp was an obvious icon.

25             "Question:  So that was a Fuji project?

Harkabi - designations

1                    "Answer:  Yes.

2                    "Question:  Did you have any other form of

3       employment between 1999 and your departure from Fuji in

4       2004?

5                    "Answer:  No.

6                    "Question:  Did you work own any USB projects

7       with Mr. McNulty between 1999 and 2004?

8                    "Answer:  Only the FujiFilm one.

9                    "Question:  So, Mr. Klein, the USB drives that

10      you worked on for Fuji, were those all blank USB storage

11      devices?

12                   "Answer:  Yes.

13                   A Voice:  Objection.

14                   (Video ends.)

15                   MS. STERNBERG:  So I'd like to introduce DX-379.

16                   That may have already been introduced, actually.

17                   THE COURT:  That's already been admitted.

18                   Okay.  It's admitted.

19                   THE DEPUTY CLERK:  (Nodding head yes.)

20                   MS. STERNBERG:  Next, we're going to be playing

21      the testimony of Mr. Dan Harkabi, who is a former M-Systems

22      and MDRM employee.

23                   (Video of Dan Harkabi played.)

24                   "Question:  When did you work for M-Systems?

25                   "Answer:  I worked there from in March 2000

Harkabi - designations

1    until, I think, summer 2002 or early May 2002.

2           "Question:  And when you first joined M-Systems,

3    what was your role?

4           "Answer:  I started a new business unit called

5    DiskOnKey, which was developing the first USB Drive.

6           "Question:  And the DiskOnKey had its own

7    processor; is that right?

8           "Answer:  That's correct, and that's a -- again,

9    I would say a contribution that I've made because we've

10   incorporated a microprocessor within the device, which at

11   that time was used mainly by smartphones, and that

12   microprocessor allowed us to be independent of any operating

13   system.

14          "Question:  What other functionalities could the

15   ARM7 processor on the DiskOnKey do?

16          "Answer:  ARM7 can run different applications as

17   you had on many smartphones.  So in a way, you could create

18   an environment to run applications of different nature that

19   could run inside.  Depends on what you wanted to do with

20   that drive.  It could have been -- for example, it could be

21   storing and encrypting files on the device.  It could do all

22   kinds of stuff.  You could write firmware and run it inside

23   the device.

24          "Question:  Were you aware of a firmware upgrade

25   application developed by M-Systems?

Harkabi - designations

1           "Answer:  Yes.  Not as an application, but yes.

2                 The capability to upgrade the devices was from

3      day one.  The capability that was -- even before there was

4      an application, all the USB drives could remotely be

5      updated.

6                 "Question:  Were you aware of the steps involved

7      in updating the firmware of the DiskOnKey?

8                 "Answer:  No.

9                 "Question:  Do you know when the DiskOnKey was

10     first offered for sale in the United States?

11                "Answer:  As far as I remember, to the best of

12     my recollection, our promise was September 15 to be in GA at

13     IBM.

14                "Question:  September 15 of which year?

15                "Answer:  Of 2000.  GA means general

16     availability.

17                "Question:  When you say the promise was to be

18     general availability, was that promise fulfilled?

19                "Answer:  I believe so, if not a month late, but

20     something within that range.  Q -- let's say last quarter of

21     2000.

22                "Question:  And at the time the DiskOnKey was

23     made available in the last quarter of 2000, did it have the

24     capability to run applications from the device?

25                "Answer:  Some of the basic phenomenons existed,

**Appx9697**

Harkabi - designations

1    but that was not.  It was sold as a plain storage, personal

2    storage at very low capacity.  It was 8 megabytes.  So it

3    was not even relevant at that point in time.

4              "Question:  Do you recall any other trade shows

5    that that M-Systems attended in the year 2000 or 2001?

6              "Answer:  No.

7              "Question:  Okay.  Were you -- before you left

8    M-Systems, were you aware of the ability for the DiskOnKey

9    to synchronize content with content on the computer?

10             "Answer:  No.

11             "Question:  Okay.  Could a disk -- could a

12   DiskOnKey be shared over an LAN or local area network?

13             "Answer:  I'm not aware of it.

14             "Question:  Okay.  And when you were at

15   DiskOnKey, were you -- did you work on any of the source

16   code development of the DiskOnKey?

17             "Answer:  No.  N-O.

18             "Question:  And were you aware of the ability of

19   the DiskOnKey to perform device authentication?

20             "Answer:  I'm not sure.  I'm not sure at the

21   time when I was there that it allowed already this kind of

22   functionality.

23             "Question:  So do you recall when you first met

24   Mr. McNulty while you were at M-Systems?

25             "Answer:  I met him, I think, through, again,

Harkabi - designations

1   our OEM activity with FujiFilm in the United States.

2              "Question:  And do you recall when that was?

3              "Answer:  Probably early 2002 or late 2001.

4   Somewhere within 2001.  They were not the first comers to

5   USB drive.  I would say they were pretty much one of the

6   last ones that acknowledged it.

7              "Question:  Did you introduce M-Systems to

8   FujiFilm?

9              "Answer:  Yes.

10             "Question:  And why you introduce M-Systems to

11  FujiFilm?

12             "Answer:  As I mentioned, my strategy was to

13  work with the major OEMs, such as IBM, Dell, HP, Compaq,

14  Sony, I-O Data, and as a media company, of course, it made

15  sense to work also and let FujiFilm promote USB drives.

16             "Question:  Did you manage the relationship with

17  FujiFilm from the M-Systems side?

18             "Answer:  Yes.

19             "Question:  And so you mentioned that you left

20  M-Systems in the summer of 2002; is that right?

21             "Answer:  That's correct.  Maybe May or early --

22  early that year.

23             "Question:  Did you start a company known as

24  MDRM when you left M-Systems?

25             "Answer:  Not directly.  Several months after,

Harkabi - designations

1    yes.

2                    "Question:  What was your goal with starting

3    MDRM?

4                    "Answer:  To look for ways to allow distribution

5    of copyright content on flash devices, not just USB drives.

6    But a secured mechanism to simplify distribution of such

7    consent.

8                    "Question:  Did MDRM have a relationship with

9    Fuji?

10                   "Answer:  Yes.

11                   "Question:  And what was that relationship?

12                   "Answer:  I remember them asking us we've

13   created the blimp or something, some ID that they wanted

14   for a particular exhibition or something like that.  To the

15   best of my recollection, it's something around images,

16   distribution of images on some USB devices.  So we

17   subcontracted, we made those ID for a promotional, and then

18   that's what I remember.

19                   "Question:  Do you recall working with Scott

20   McNulty?

21                   "Answer:  Yes.

22                   "Question:  So when you were at MDRM, what work

23   do you remember doing with Scott McNulty?

24                   "Answer:  What I remember is -- I don't remember

25   what kind of subcontracting services he hired us, but I'm

1    happy to look into it to refresh my memory.  But it was

2    something with regard to MDRM doing some service --

3    development services for him.

4             "Question:  And when you say "for him," was that

5    for him personally or for him as a Fuji employee?

6             "Answer:  No.  That's after we leave -- it's a

7    year after we leave M-Systems, not related to Fuji.  I don't

8    know if he was at that time even an employee at Fuji.

9             "Question:  Okay.  You testified that MDRM did

10   some work for Fuji; is that right?

11            "Answer:  Yes, in the sense of a device, but I'm

12   not sure that that's not later on after that period of time.

13            "Question:  Okay.  Do you recall what device

14   you're referring to?

15            "Answer:  Yeah.  It was a device that they

16   wanted for an exhibition or promotion of salespeople.  What

17   I recall is making them a blimp.  It was a USB like a

18   commercial product that looked like a FujiFilm blimp.  They

19   had like a blimp flying in the air with the big sign of the

20   FujiFilm.  So we did this hardware kind of promotional USB

21   drives for them.

22            "Question:  I said do you recall if that work

23   was done for Fuji?

24            "Answer:  Yes.  As I mentioned, it had even the

25   logo of FujiFilm on the product.  So I guess it was for

Harkabi - designations

1   Fuji.

2           "Question:  Do you recall how you were paid for

3   your work in connection with this agreement?

4           "Answer:  I remember writing the invoice and

5   sending and getting paid there.

6           "Question:  Do you recall who paid your

7   invoices?

8           "Answer:  I don't remember, but probably if it's

9   done for Fuji, it was probably paid by Fuji.

10          "Question:  And do you -- would you consider

11  this project to be a big part of MDRM's business?

12          "Answer:  No.

13          "Question:  Do you recall how much time was

14  spent working on projects with Scott McNulty?

15          "Answer:  This was a side project for MDRM

16  because we were mainly busy developing our product.  So not

17  a significant time nor a significant project.

18          "Question:  Do you recall whether MDRM made any

19  prototype devices for Mr. McNulty?

20          "Answer:  I remember, as I mentioned, making

21  some prototypes for him, but I don't remember exactly.  What

22  I remember is the image, but more than that I don't

23  remember.

24          "Question:  Am I correct that you recall a

25  prototype device shaped like a Fuji blimp; is that right?

Harkabi - designations

1         "Answer:  Yeah.  That's what I said, yeah.

2         "Question:  Do you recall how much MDRM got paid

3    for its work with Mr. McNulty?

4         "Answer:  I don't remember the exact amounts.

5         "Question:  Do you recall a ballpark amount?

6         "Answer:  Ballpark?  ███████████  over the

7    whole of time, something of that nature.

8         "Question:  So this will be Exhibit 7, and for

9    the record it's Bates-stamped IOENGINE-014186.  Let me know

10   when you're ready.

11        "Answer:  Okay.

12        "Yes.  Interesting.

13        "Question:  Okay.  Do you -- I guess what is

14   this document?

15        "Answer:  It's, I guess, a document that I'm

16   writing to Scott about all kinds of ideas that he has, and

17   with some I agree and with some of them I think they are, in

18   an understatement, a little farfetched.

19        "Question:  Do you recall writing this letter?

20        "Answer:  No.

21        "Question:  Do you see in the section titled

22   "operating systems", you state "I advise not to enter this

23   area"?

24        "Answer:  This is a very polite way to say that

25   I think it's not realistic, an understatement.

1              "Question:  Do you recall any conversations with

2       Mr. McNulty along these lines?

3              "Answer:  No.  I didn't even remember this

4       letter.

5              "Question:  Did -- are you aware of whether

6       Mr. McNulty, in fact, developed an independent operating

7       system?

8              "Answer:  I'm not aware of him developing an

9       operating system.

10             "Question:  Okay.  And do you see in the next

11      sentence it refers to something called "data storage

12      warehouse"?

13             "Answer:  Yes.

14             "Question:  Do you recall what that is?

15             "Answer:  In a way, what we call today a cloud

16      in a concept, creating a cloud for people maintaining their

17      data.  As we know today, this is a much more realistic

18      approach.  The only thing I remember is -- was going and

19      setting a server, we looked for a place to set our server

20      and he gave us a place to set our server somewhere downtown

21      Manhattan.

22             "That's something vaguely I remember around this

23      -- what I remember that it's not fair away from that bull,

24      you know, from Broadway on Wall Street.  That's the only

25      thing that is stuck in my memory right now.

Harkabi - designations

```
 1              "Question:  So you remember meeting with

 2   Mr. McNulty to set your server at his space in Manhattan; is

 3   that right?

 4              "Answer:  Something of that nature.  I don't

 5   know where it is related, but that's something that I can

 6   recall.  And I don't know exactly to what it is related, but

 7   I remember going with him to a building and then it allowed

 8   us to physically put our servers there in a protected area.

 9              "Question:  And do you see there's the next

10   section called "Pepsi"?

11              "Answer:  Yeah.

12              "Question:  And you write "your direction and

13   vision are phenomenal and revolutionary in themselves"?

14              "Answer:  Um-hmm.

15              "Question:  What was Mr. McNulty's direction and

16   vision?

17              "Answer:  These are concept of how to leverage

18   on Pepsi's consumer footprint and to allow them to utilize

19   such a platform where they're creating promotional content

20   that they can increase their public awareness.  So that's --

21   I was, you know, giving him some directions at Pepsi Pocket

22   University, all kinds of -- kind of an implementation of his

23   grand vision.

24              "Question:  And did you think that vision was

25   phenomenal and revolutionary?
```

**Appx9705**

Harkabi - designations

1          "Answer:  You know, it didn't look very

2    realistic, by understatement, but who am I to -- you know,

3    to break his ideas.  You know, I didn't want to put him

4    down, but it seems a bit exaggerated or not realistic, and I

5    think life showed it didn't happen.

6          "To the best of my knowledge, I don't think

7    Pepsi did any of this stuff.

8          "Question:  Do you recall any conversations with

9    Mr. McNulty about his ideas?

10         "Answer:  I don't remember any specific

11    discussions.

12         "Question:  What was your general impression of

13    Mr. McNulty?

14         "Answer:  I didn't understand the -- you know, I

15    thought that his -- you know, he has those brilliant ideas

16    that -- I didn't manage to connect them to something that is

17    realistic for me.

18         I didn't -- it wasn't -- I mean, I don't know if

19    the word 'enigma,' but I didn't really understand what --

20    what's going on in his head.

21         "Question:  You referred to his ideas as

22    brilliant.  What did you mean?

23         "Answer:  They're even more than brilliant.

24    They're so brilliant that I couldn't understand really how

25    they connect to anything which made sense to me, but if it

**Appx9706**

Harkabi - designations

1    made sense to him, why should I put him down?  Such as

2    creating an operating system and having all those big names,

3    I didn't know what's behind this extravagant discussion.

4    But, you know, I'm from Israel, I don't know those names.

5    I thought he was trying to impress us and it's mainly

6    fluff.

7            "Question:  So do you see that this appears to

8    be the same -- or a version of the same letter that we just

9    looked at?

10           "Answer:  Um-hmm.

11           "Question:  But this version has track changes?

12           "Answer:  Um-hmm.

13           "Question:  Are you aware of why Mr. McNulty

14   would have a version of this letter with track changes?

15           "Answer:  No.

16           "Question:  Are you aware of whether Mr. McNulty

17   made edits to your letter to him?

18           "Answer:  No.

19           "Question:  Do these appear to be edits that you

20   made to your letter?

21           "Answer:  No.

22           "Question:  You don't recall having an

23   understanding about any relationship between Revolutionary

24   Group and Fuji; is that correct?

25           "Answer:  That's correct.

**Appx9707**

Harkabi - designations

1                "Question:  Okay.  Let me -- let's look at a

2     different document.  This was what was previously marked

3     this morning as Harkabi Exhibit 7.

4                "Do you recall being shown this document earlier

5     today, Mr. Harkabi?

6                "Answer:  Yes.

7                "Question:  And I believe you testified that you

8     were -- you were -- you were skeptical about what

9     Mr. McNulty was trying to accomplish; is that fair to say?

10                "Answer:  It's fair to say.

11                "Question:  And that you tried to dissuade him

12     from going down the path that he was describing to you; is

13     that -- is that fair to say?

14                "Answer:  I would say to what I see here that

15     I'm trying to ground him -- okay? -- to a more realistic --

16     not without -- you know, I also appreciate people being very

17     innovative and doing things that I think that are --

18     sometimes I find myself wrong, but it looked to me to be

19     totally weird.

20                "Question:  So you were -- again, you were --

21     you were skeptical about whether Mr. McNulty could actually

22     accomplish what he was setting out to do; is that right?

23                "Answer:  Yes.

24                "Question:  But if he actually was able to

25     accomplish it, you would be surprised by that; is that -- is

Elazar - designations

1    that fair?

2              "Answer:  I would appreciate, you know, that he

3    managed to do it.  And I have no idea if he did it, he

4    didn't do it.  It was left somewhere at that time.

5              "Question:  And I believe you testified that you

6    were encouraging Mr. McNulty to use his relationship with

7    Fuji in order to have Fuji be the first customer of a

8    revol- -- a Revolutionary Group product; is that right?

9              "Answer:  Correct.  Yes.

10             (Video ends.)

11             MS. STERNBERG:  So I'd like to admit DX-261.  I

12   believe PX-219 was already introduced yesterday.

13             THE COURT:  Admitted.

14             MS. STERNBERG:  Admitted, I mean.

15             I also forgot to admit, from Joey Tang's

16   deposition, JX-058.

17             THE COURT:  Admitted.

18             (Exhibit DX-261 and JX-058 were entered into the

19   record.)

20             MS. STERNBERG:  So next we're going to be

21   playing a video deposition of Mr. Gidi Elazar, who was also

22   a former M-Systems and MDRM employee.

23             (Video of Gidi Elazar played.)

24             "Question:  So can you tell me when you first

25   started to work at M-Systems?

Elazar – designations

1    "Answer:  I worked at M-Systems in two periods.

2    So I was there, like, a year or so, maybe two, and then

3    left.  And afterwards, then I was called back to M-Systems.

4    And I guess between those two, there was maybe a couple of

5    years.  The second started about 2000.

6    "Question:  And what role did you have the

7    second time when you joined in 2000?

8    "Answer:  I joined to -- in -- to start a new

9    product for M-Systems, which was the USB drive.  And I was

10   their product manager and the technical lead.

11   "Question:  And what was the name of that

12   product?

13   "Answer:  DiskOnKey.

14   "Question:  And do you recall when you left

15   M-Systems to start MDRM?

16   "Answer:  In 2002, but I don't remember exactly.

17   "Question:  And was there a relationship between

18   M-Systems and MDRM?

19   "Answer:  Yes.

20   "Question:  What was the nature of that

21   relationship?

22   "Answer:  We have a license with M-Systems that

23   gave the ability to work with the software of DiskOnKey.

24   "Question:  And when you say "software," what do

25   you mean?

1          "Answer:  DiskOnKey is the USB drive as a small

2    chip inside a CPU.  It runs software.  That's how it

3    communicates with the computer when it's attached to the

4    USB.  And we could develop software for that chip.

5          "Question:  Do you recall when the DiskOnKey was

6    first sold in the United States?

7          "Answer:  I would say year 2000 or beginning of

8    2001.  Bringing up the DiskOnKey was really very, very fast

9    track work.  We were a very small team, very focused.  And

10   in a few months we have managed to develop that, and it was

11   sold through IBM.  And I think it was maybe the end of 2000,

12   beginning of 2001.

13         "Question:  Do you recall whether anyone at

14   M-Systems showed the DiskOnKey at any trade shows in 2001?

15         "Answer:  I don't remember that.  I think as of

16   that point in time, we tried to work through OEMs, through

17   IBM and other big names.  I don't remember that we've shown

18   it ourselves, no.  Maybe.

19         "Question:  So in order to function, the program

20   running on the host computer and the program running on the

21   DiskOnKey must interact; is that right?

22         "Answer:  Yes.

23         They have to interact and they have to find each

24   other and communicate and maybe even authenticate each

25   other.  So, we look at area ten, and retrieve the disk --

Elazar - designations

1    the data from the local area and will retrieve the sign.

2              "Question:  You mentioned that M-Systems offered

3    an encryption application known as KeySafe; is that right?

4              "Answer:  Yes.

5              "Question:  Did you work on KeySafe?

6              "Answer:  I did work on that.  I just don't

7    remember exactly the technical datas that we implemented.

8              "Question:  Do you recall whether KeySafe

9    involved sending any messages to a network?

10             "Answer:  If KeySafe was sending messages to a

11   network?  I don't think so.

12             "Question:  So could third-party developers

13   create custom firmware for the DiskOnKey?

14             "Answer:  I don't think that it was able to.

15             "Question:  And do you know why not?

16             "Answer:  Anyone except MDRM.  When MDRM was

17   later on developing into the firmware is -- you need to know

18   more of how the components of the product work.  It's more

19   difficult than developing a Windows application or adding

20   some Windows application, which many programmers know how to

21   do that.  I would say that would be the reason.

22             "Question:  Were you aware of whether it was

23   possible to write an application that involved sending the

24   DiskOnKey's public key to a remote server?

25             "Answer:  Thinking about adding PKI and hardware

Elazar – designations

1    into a device, you usually do that in order to communicate

2    with some server, because then both ends are outside of the

3    reach of the person in the middle, the user, and one can

4    communicate to the other and they can verify each other and

5    then provide privilege to the user.

6             I just don't remember that on M-Systems we had

7    it.

8             "Question:  Does user interaction with MyKey

9    trigger the DiskOnKey processor to execute code that allowed

10   the DiskOnKey to communicate with the computer?

11            "Answer:  I would say the answer to all that is

12   no.  There is interaction between this software and

13   DiskOnKey, but it's not to allow it to communicate.

14            "Question:  I guess what I mean is does clicking

15   on a button here, such as browse, cause code to run on the

16   DiskOnKey that would communicate back to the computer?

17            "Answer:  You mean if it responds?

18            "Question:  If that's how you understand it.

19            "Answer:  Yeah, I would assume that, for

20   anything that the software running on the computer sends a

21   message to the DiskOnKey, the DiskOnKey will somehow

22   respond.

23            "Question:  Were you aware of the ability to

24   synchronize content between the DiskOnKey and the computer?

25            "Answer:  I do not remember that, no.  I

Elazar - designations

1  probably should, but I don't remember that.  But it says

2  it's doing exactly that, synchronizing between --

3  synchronizing storage in your computer and storage on the

4  DiskOnKey.

5        "Question:  Okay.  Do you know what code was

6  implemented on the DiskOnKey in order to facilitate that

7  synchronization?

8        "Answer:  The DiskOnKey would have to be a

9  storage device to be able to do this, and -- but I would

10  imagine that the synchronization itself is a function of

11  both the software running on the computer, and not something

12  specific for the DiskOnKey.

13        Synchronization -- what it says here is it's

14  synchronization between folders.  So that's the SDS.

15        "Question:  But in order for the DiskOnKey to

16  respond to a request, would it have to run some kind of code

17  on the DiskOnKey?

18        "Answer:  Yes.

19        "Question:  And could a DiskOnKey be shared over

20  an LAN, or a local area network?

21        "Answer:  So the answer to that is yes.  Any

22  storage, including DiskOnKey, can be shared over a network

23  if the operating system, like -- even Windows can share

24  folders, so in the same manner.

25        "Question:  And was that standard back in 2001?

**Appx9714**

1              "Answer:  At any point.

2              "Question:  Do you recall that M-Systems had a

3     relationship with Fuji?

4              "Answer:  I remember that DiskOnKey was speaking

5     to Fuji.  That, I remember.

6              "Question:  Okay.  And do you recall who at Fuji

7     you spoke to?

8              "Answer:  That was to -- I think -- yeah, it was

9     to Scott McNulty.  At the time, he was at Fuji.

10             "Question:  And are you aware of a Fuji-branded

11    DiskOnKey device?

12             "Answer:  I think there was -- I think there was

13    some prototypes.  I'm not sure there was actually a branded.

14    It looked like -- like a blimp.  Am I saying it correctly?

15    Fuji had this kind of -- not logo, but they market and they

16    say for this kind of blimp, saying Fuji, because they had

17    it.  And we had the DiskOnKey in that form, but I think it

18    was like a more demonstration of capability, not actual

19    product.  I don't remember if there was a branded DiskOnKey

20    for Fuji.

21             "Question:  Did you meet with Scott McNulty

22    while you were at M-Systems?

23             "Answer:  I did.  We met once at the Fuji, I

24    think, headquarters.  I met with him and some other people.

25             "Question:  You mentioned that you started the

Elazar - designations

1    business called MDRM after you have left M-Systems?

2              "Answer:  Right.

3              "Question:  What did you do at MDRM?

4              "Answer:  MDRM, we developed a system which

5    mainly was a -- at least initially was targeting education,

6    and enabled students to get books for school -- we have a

7    name, Books For School, I recall them -- and we use that USB

8    drive to read the books and use them without -- in a secure

9    way.  So it secures the publisher it cannot be copied.

10             "Question:  And was that program known as

11   Booklocker?

12             "Answer:  Right.

13             "Question:  So the DiskOnKey had the ability to

14   authenticate with the server; is that right?

15             "Answer:  So I'm hesitating because of time.  We

16   started with DiskOnKey, and I don't remember if we already

17   got to have the server at that point and already had all

18   these communications or we were, at that point, at the

19   initial starting point, working on the capabilities of the

20   device and see how to implement it.

21             So I don't know exactly if it actually had that.

22             "Question:  And just to be clear, there were

23   many devices back in the 2001 to 2004 time frame that used

24   authentication to remote server?

25             "Answer:  I guess there were.  I mean, it's one

Elazar - designations

1    of the reasons for doing authentication.

2              "Thank you.  So the answer is, I think there

3    were, because at that time the chips that did PKI started to

4    be more common and there were cards and smart cards doing

5    exactly this, authentication from a device to something

6    remotely.

7              "Question:  And as part of that authentication,

8    would a device identifying information be sent to the

9    server?

10             "Answer:  As part of that authentication, some

11   kind of identification has to be sent to the server.  So for

12   example, the public key.  It's very common to send what is

13   called a public key and -- to the server, and the public key

14   is unique for each device.

15             "Question:  Okay.  I'm going to introduce what

16   I've designated as Exhibit 10, which will now be Exhibit 6.

17             It's one of your patent applications.

18             And for the record, this is patent application

19   publication No. U.S. 2004/0039932A1.

20             "Do you see this document?

21             "Answer:  Yes, I do.

22             "Question:  And under inventors, it lists

23   yourself; is that right?

24             "Answer:  Yes.

25             "Question:  And Dan Harkabi as well?

Elazar - designations

1           "Answer:  Right.

2           "Question:  And I just want to clarify some

3     phrases in this patent, that DRM device refers to the

4     peripheral device, like a USB; is that right?

5           "Answer:  An example of the DRM device would be

6     the USB device.

7           "Question:  Okay.

8           "Answer:  With the software from MDRM.

9           "Question:  Okay.  And 'digital appliance,' do

10    you know what that refers to?

11          "Answer:  Where is it?

12          "Question:  In paragraph 25, it says:  The DRM

13    device hardware includes a CPU, an optional system memory,

14    nonvolatile storage and an interface to connect the device

15    to a digital appliance.

16          "Answer:  I would say this would be a

17    computational device, maybe a PC.

18          "Question:  Do you see in the last sentence of

19    that same paragraph, it says 'the nonvolatile storage may

20    also store a plurality of methods for authentication'?

21          "Answer:  Yes.

22          "Question:  Do you know what other methods of

23    authentication you were talking about?

24          "Answer:  Yes.  So a little bit above, it says

25    -- it talks about a pair of public and private cryptographic

**Appx9718**

Elazar – designations

1    keys.  This method requires a lot of computation and not all

2    devices have this kind of computation capability.

3              "Another option is to have a key, a secret key,

4    an encryption key, which is shared between the server and --

5    and the DRM device.  Both of them have the same key.  And,

6    even better, that each device has a different key, but the

7    server knows those devices.  So this is another form of

8    authentication.

9              "Question:  And so is the first form that you

10   mentioned an example of symmetric key authentication?

11             "Answer:  Right.  The symmetric key is when both

12   have the same, the same key.

13             "Question:  And so was that method of

14   authentication known at the time you filed this patent

15   application?

16             "Answer:  It was known.

17             "Question:  Okay.  So we talked before about how

18   you met Mr. McNulty while you were at M-Systems; is that

19   right?

20             "Answer:  Yeah.

21             "Question:  Did you continue to work with

22   Mr. McNulty when you went to MDRM?

23             "Answer:  At some point -- at some point we

24   started again working with Scott McNulty.  I don't remember

25   exactly the timelines there.

Elazar - designations

1          "Question:  Do you recall whether you used the

2     DiskOnKey as the hardware for the prototypes for

3     Mr. McNulty?

4          "Answer:  So we used DiskOnKey -- this is very

5     early M-Systems or MDRM.  We only had DiskOnKey, so whatever

6     we used at that point must have been DiskOnKey.

7          "Question:  Do you recall changing or modifying

8     the firmware of the DiskOnKey in connection with your work

9     with Mr. McNulty?

10          "Answer:  I don't remember that.  It could have

11     happened, but I just don't have a recollection.

12          "Question:  Do you recall ever changing the

13     processor to create any of the prototypes for Mr. McNulty?

14          "Answer:  The processor?

15          "Question:  Yes, the processor.

16          "Answer:  Changing the processor?

17          "Question:  Yes.

18          "Answer:  No.

19          "Question:  Did Mr. McNulty teach you to

20     exploit a vulnerability in order to modify the firmware of a

21     DiskOnKey?

22          "Answer:  No.

23          "Question:  Are you aware of either a computer

24     or a portable device initiating a communication to send

25     content or messages from the portable device through the

Elazar – designations

1  computer to a network?

2           "Answer:  I mean, every email is -- applies to

3  that.  From your computer, you send an email.  It goes from

4  the server, that server now has this email, it's in the

5  database, and it has to initiate some transfer to someone to

6  read.  It is really basic of networking.

7           "Question:  Correct.  I'm asking you,

8  Mr. Elazar, leaving aside the documents that you saw today,

9  do you have any specific knowledge or recollection, on your

10  own, of how that application worked as of December 7th,

11  2002?

12           "Answer:  Of course, after I left M-Systems, I

13  don't have knowledge of how they proceeded except for things

14  I've later seen.  So I don't know if it's changed.

15           "Question:  You don't know if the application

16  changed after you left M-Systems; correct?

17           "Answer:  I don't know.

18           "Question:  And with respect to the DiskOnKey

19  upgrade that's mentioned in the exhibit, Sobol 58, you don't

20  have any specific knowledge as to how that upgrade actually

21  worked as of December 7th, 2002; correct?

22           "Answer:  I don't."

23           (Video ends.)

24           MS. STERNBERG:  So can I proffer to admit

25  DX-363?

**Appx9721**

```
 1                    (Exhibit DX-363 was entered into the record.)

 2                    MS. STERNBERG:  I'm mindful of the time.  We

 3     have another video.

 4                    THE COURT:  How long is the next video?

 5                    MS. STERNBERG:  I think it -- I don't have the

 6     times.  Can I have the times?

 7                    It's like 26 minutes.

 8                    THE COURT:  All right.  Let me, let me ask the

 9     jury.  Would you like to hear this video before we take a

10     break or are you ready for a break?

11                    A break?  Let's take a break now.

12                    Let's break for -- let's go ahead and take

13     15 minutes, and we'll come back at quarter of 11:00.

14                    (Jury left courtroom.)

15                    THE COURT:  We'll resume at quarter of 11:00.

16                    (Brief recess taken.)

17                    *     *     *

18                    (Proceedings reconvened after recess.)

19                    THE COURT:  All right.

20                    Please be seated.

21                    Who is the deposition of?

22                    MS. STERNBERG:  It is 26 minutes.

23                    THE COURT:  And who is it?

24                    MS. STERNBERG:  It is Mr. Eyal Sobol.

25                    THE COURT:  We ought to have a binder
```

Sobol - designations

1    manufacturer in Delaware.

2                    (Jury returned.)

3                    THE COURT:  All right.  Proceed.

4                    MS. STERNBERG:  Ingenico is next going to call

5    Mr. Eyal Sobol by deposition and he was a former M-Systems

6    employee.

7                    (Video of Eyal Sobol played.)

8                    "Question:  Did Western Digital search for any

9    documents in response to these subpoenas?

10                   "Answer:  Yes.

11                   "Question:  Do you know where they searched?

12                   "Answer:  So, yes.  We searched on a few areas.

13   The majority of the data came from M-Systems' legacy

14   archive.  Back on M-Systems' days, we used to have a shared

15   network folder.  We were able to locate the network folder

16   to find all the relevant data sheet, release notes and

17   whatever was supplied from the DiskOnKey division.  This was

18   the first product that we used for the search.

19                   In addition for that, I also managed to find my

20   first desktop that I have been using since the M-Systems

21   days in 2004.  I was able to operate it and also to extract

22   some source code for MyKey application from this computer,

23   and we shared the source code as well.  Another thing that

24   was done by the attorney, they did a wide search over the

25   emails with their tools and whatever they found relevant for

1       this subpoena they shared.

2              And the last thing that we did, we managed to

3       contact also some M-Systems' final, the salesperson, and we

4       also supplied some data sheets with respect to all the sales

5       transactions that was done during 2002 and 2003.

6              "Question:  Okay.  So for the documents that you

7       found in the M-Systems' legacy archive and on your own

8       laptop and those other sources you referenced, who created

9       those documents?

10              "Answer:  The documents were created by

11       M-Systems' employees back on the relevant date.  I don't

12       have familiarity with all of them.  They were taken from the

13       legacy archive of M-Systems, most of them.

14              "Question:  When did you begin at M-Systems back

15       in 2004?

16              "Answer:  It was June 2004.

17              "Question:  And what was your responsibilities

18       at M-Systems at that time?

19              "Answer:  So I joined the DiskOnKey division.

20       My first position was automation engineer at the DiskOnKey

21       division.  And on late 2005, I transitioned into a new team.

22       And this is when I become the main developer of KeySafe and

23       MyKey application.

24              "Question:  Before you moved to that new role in

25       2005, were you aware of the MyKey and KeySafe applications?

Sobol - designations

1                    "Answer:  Yes.

2                    "Question:  So were you part of the team that

3       worked on the firmware and the software or just the loading

4       process?

5                    "Answer:  Back on the -- just on the loading

6       process.

7                    "Question:  Were you aware of what firmware and

8       software was loaded onto the DiskOnKey?

9                    "Answer:  The answer is yes.

10                   "Question:  I am going to be asking a lot of

11      questions today about a product that is known as the

12      DiskOnKey, which we have been discussing.  For purposes of

13      this case, I'm focused on what happened prior to March 23rd,

14      2004 in the United States.  So you should assume when I ask

15      questions that I am talking about that time period and that

16      I am not asking about what happened after that unless I

17      specifically state so.

18                   Do you understand?

19                   "Answer:  Yes.

20                   "Question:  Are you aware of the DiskOnKey?

21                   "Answer:  Yes.

22                   "Question:  And did you work on that product?

23                   "Answer:  Yes.

24                   "Question:  Can you give a general explanation

25      of what the DiskOnKey was?

Sobol - designations

1            "Answer:  The DiskOnKey is a USB stick drive.  I

2    have here an example of the DiskOnKey.  It's a thumb drive.

3    This one is 64 megabytes.  And you can plug it to every USB

4    socket.  It's primarily being used in order to transfer

5    files from computer to other computer by just copying the

6    file to DiskOnKey, and then you can open them on every

7    computer and see the contents.

8            "Question:  I will introduce Exhibit 4.

9            "This is a photo of a DiskOnKey product and a

10   series of photos of a DiskOnKey product that was produced in

11   our case.  That has Bates numbers beginning INGEN-0360875

12   and it has a serial number on it, 3241D90036B47.

13           "Do you recognize the device with that serial

14   number?

15           "Answer:  I have it here, yes.

16           "Question:  Can you describe, you know, what it

17   is that you have been provided and that you are holding?

18           "Answer:  I was provided a DiskOnKey, and I was

19   told that I may use it during the deposition.  So this is

20   the DiskOnKey.  I am familiar with the icon of the

21   M-Systems, which is the donkey -- sorry, the kangaroo.  My

22   mistake.  And this is the DiskOnKey.  I am not sure from

23   which year, but I am familiar with this design and with the

24   look and feel of the DiskOnKey.

25           "Question:  How was MyKey provided?

**Appx9726**

Sobol - designations

 1              "Answer:  So I can only answer how it was

 2     provided back, you know, starting when I joined the company.

 3     But I am not sure back on 2000 whether it was provided on

 4     the DiskOnKey or if there was a link in order to download it

 5     from the website.

 6              "Question:  Do you recognize this document?

 7              "Answer:  Yes.

 8              "Question:  What is it?

 9              "Answer:  So this is the document that was

10     supplied by the finance personnel, Gil David.  It should

11     describe the transactions of 2002, if I'd remember

12     correctly, that was done by M-Systems.

13              "Question:  Does each line here represent a

14     sale?

15              "Answer:  So depends how do you define a sale.

16     Each line represents a transaction.  Transaction can be

17     either a sale to a customer or sales to employee which

18     purchase something under employee plan or even samples.

19     Every line represents a transaction.  A transaction can be,

20     you know, a sale, sample, whatever.

21              "Question:  I am going to points you to another

22     example on tab Q4, row -- I am just going to freeze the

23     panes again.  Row 2919.

24              What's the customer name here?

25              "Answer:  Fuji Photo Film --

**Appx9727**

1              "Question:  Okay.  And --

2              "Answer:  Fuji, sorry.

3              "Question:  And the 'shipped to' name?

4              "Answer:  Dan Harkabi.

5              "Question:  Do you know who that is?

6              "Answer:  I heard the name before, but I don't

7    have any familiarity with him except for the name.

8              "Question:  Okay.  I will introduce the next

9    exhibit.  This is Exhibit 17.

10             "Do you recognize this document?

11             "Answer:  Yes.

12             "Question:  What is it?

13             "Answer:  It's a press release about DiskOnKey

14   -- developer key.

15             "Question:  Are you aware of the M-Systems

16   software development kit?

17             "Answer:  Yes.

18             "Question:  What is it?

19             "Answer:  So the M-Systems software developer

20   kit, the SDK, has been developed and used for -- in order

21   for any future application developer to be able to develop

22   application that interacts with the DiskOnKey.  So instead

23   of every vendor or even for internal you at this times to

24   invent the wheel from scratch for every new application,

25   when using the SDK, you are getting some basic

1   infrastructure API which related to the DiskOnKey.  And it

2   can save you a lot of time of development and also, you

3   don't need to be -- you don't need to have intrinsic

4   understanding how the DiskOnKey's working and how do a

5   specific thing.  You have a very simple high level API that

6   you can use in order to interact with the DiskOnKey.

7               "Question:  Can you confirm whether the SDK

8   was made available to consumers as of September 25, 2002?

9               "Answer:  I can only confirm the date of the

10  press release.  I don't have the understanding whether it

11  was actually offered to a customer on this day or maybe

12  later.  We don't have this knowledge anymore.

13              "Question:  Would it be fair to say that this

14  press releases announces that it is 'inviting developers to

15  design applications for leading key chain storage device'?

16              "Answer:  So based on the press release, I would

17  assume that it would be available on this time frame.

18              "Question:  Do you recognize this document?

19              "Answer:  Yes.

20              "Question:  What is it?

21              "Answer:  This is the software development kit

22  document.  I guess it describes all the APIs that exists

23  inside of the SDK.

24              "Question:  Which team would have been

25  responsible for creating this?

**Appx9729**

1          "Answer:  So the technical API came from the SDK

2     team and most probably there was some kind of a reviewer

3     that's making something externally.

4          "Question:  So would it be fair to say that this

5     was made by someone with knowledge of what's reported in it?

6          "Answer:  Yes.

7          "Question:  This document says 'preliminary.'

8     Do you know what that means?

9          "Answer:  Preliminary means that most probably

10    this is for early availability, maybe for only specific --

11    you know, in order to get some kind of feedback from

12    internal or external stakeholder, but most probably it's not

13    the final version.

14         "Question:  Okay.  Do you know if this was

15    actually offered to customers?

16         "Answer:  We don't have this knowledge anymore

17    of the company.

18         "Question:  Okay.  And do you know if this kind

19    of document would have been offered to customers?

20         "Answer:  I don't know.

21         "Question:  I'm going to point you to this

22    overview on page 5 or what purports to be an overview and

23    ask you to read this paragraph.

24         "Answer:  'This document describes the system

25    architecture of which M-Systems' DiskOnKey SDK is based.

Sobol - designations

1    The library of functions that is available to the software

2    developers to activate the DiskOnKey and how to work with

3    those functions.  It also provides sample code and some

4    troubleshooting tips.'

5            "Question:  Okay.  Are you aware that the

6    information in here reflects how the product actually

7    functions?

8            "Answer:  Yes.

9            "Question:  Does this describe how to create

10   applications that would reside on the host or on the

11   DiskOnKey?

12           "Answer:  It can work for both cases, but the

13   idea of the SDK is to have interaction with the DiskOnKey.

14   So you can either create application that reside on the

15   DiskOnKey or on the host, but as long as it will have the

16   interaction with the DiskOnKey, you can use the SDK.

17           "Question:  I'm going to point you to page 35.

18   Do you recognize this page?

19           "Answer:  Yes.

20           "Question:  What is this?

21           "Answer:  So this is the API that returns the

22   serial number to the application.  The serial number is

23   being extracted from the DiskOnKey and being returned to the

24   application.

25           "Question:  I am pointing you to the next page.

1    Do you recognize this page?

2              "Answer:  Yes.

3              "Question:  What is this?

4              "Answer:  So this is the API that returns the

5    firmware version of the DiskOnKey.  So since we had a

6    firmware inside the DiskOnKey, there are several different

7    firmware versions; so in order for an application to be able

8    to extract the firmware version, there is a dedicated API

9    for that.

10             "Question:  I'm going to point you to section

11   beginning on page 71.

12             "Do you recognize this page?

13             "Answer:  Yes.

14             "Question:  What is this?

15             "Answer:  So this is the crypto interface

16   between the application and the DiskOnKey.  As I explained

17   before, we used to have a crypto engine inside the firmware

18   of the DiskOnKey.  We exposed through the SDK some of the

19   crypto capabilities to the application developers.

20             "Question:  Okay.  To your knowledge, does this

21   section actually -- sorry, accurately reflect how it

22   functions?

23             "Answer:  Yes.

24             "Question:  Can you read this first sentence?

25             "Answer:  'The DiskOnKey enables PKI-based

Sobol - designations

1    authentication and signing in a highly secure environments.'

2              "Question:  What does it mean by 'PKI-based

3    authentication'?

4              "Answer:  So PKI is the standard for, I think,

5    encryption and authentication.  It's a well-known standard.

6    The meaning of this sentence that the DiskOnKey enables you

7    to do authentication and signing, to be PKI-compliant on a

8    secure environment.

9              "Question:  I'm going to highlight this

10   sentence.  Can you read that out loud?

11             "Answer:  'All the cryptographic actions are

12   executed on the DiskOnKey.'

13             "Question:  So to your knowledge, is that

14   statement accurate?

15             "Answer:  Yes.

16             "Question:  So does this mean that

17   authentication is run from code stored on the DiskOnKey?

18             "Answer:  The API that's described below was run

19   on -- was integrated in the firmware of the DiskOnKey.

20             "Question:  How is the authentication process

21   initiated?

22             "Answer:  So it's up to the application

23   developer to send some kind of buffer to the DiskOnKey, and

24   the DiskOnKey will do the authentication.

25             "Question:  Okay.  And did you ever see code

Sobol - designations

1  that runs on the DiskOnKey?

2              "Answer:  Are you referring to the firmware

3  code?

4              "Question:  Yes.

5              "Answer:  That is no.

6              "Question:  Were you aware of this?

7              "Answer:  Of course there is a firmware code, so

8  yes.

9              "Question:  Do you know if this -- the firmware

10  upgrade described in this document was created using the SDK

11  or API?

12              "Answer:  We don't have this knowledge anymore.

13              "Question:  Do you know what information will be

14  communicated to a server?

15              "Answer:  I think I already answer it, but I can

16  repeat it again.  So most probably the product name, the

17  firmware version, and also the serial number.

18              "Question:  Okay.  And does the DiskOnKey itself

19  communicate with the server, or does it go through the host?

20              "Answer:  It does not go through the host.

21              "Question:  And why is that?

22              "Answer:  Because there is no GPS antenna on the

23  DiskOnKey; so the DiskOnKey doesn't have a way to

24  communicate with someone externally.  The only way to

25  interact with the DiskOnKey is by plugging it into a

Sobol - designations

1    relevant host, and then a dedicated application will do the

2    moderator -- will be the moderator between the DiskOnKey and

3    the server.

4                "Question:  Do you know who ran the server?

5                "Answer:  Based on this document, it was run by

6    M-Systems.

7                "Question:  Okay.  Did you ever see server side

8    code?

9                "Answer:  No.

10               "Question:  Just to go back to synchronization

11   for a minute.  Do you know what happened on the DiskOnKey

12   during the synchronization process?

13               "Answer:  So it's just regular copy comparing

14   and deleting operations.

15               "Question:  Does the DiskOnKey run code in order

16   to facilitate that synchronization?

17               "Answer:  No, no.  So there was nothing special

18   on the DiskOnKey in order to support the synchronization.

19   The logic was part of the MyKey application just querying

20   the list of files.  And this is a regular read command from

21   the DiskOnKey, not something special.

22               "Question:  Okay.  But in order to facilitate

23   that, the DiskOnKey had to respond to that query in some

24   way?

25               "Voice:  Objection to form.

1              "Answer:  There is no special API in order to

2     support it.  The DiskOnKey, by nature, supports regular read

3     and write command, and this is built on top of the regular

4     read and write command.

5              "Question:  Based on what I just showed, do you

6     recognize that file?

7              "Answer:  Yes.

8              "Question:  Are you aware of any significant

9     changes to MyKey in between September 2002 and October 2003?

10             "Answer:  Without having knowledge.

11             "Question:  Okay.  Do you know if the syncing

12    functionality changed in different versions of MyKey?

13             "Answer:  We don't have this knowledge.

14             "Question:  Prior to June 26th, 2004, had you

15    done any work with M-Systems?

16             "Answer:  No.

17             "Question:  But you of never did any work on any

18    M-Systems products prior to June 26th, 2004; correct?

19             "Answer:  Correct.

20             "Question:  During the earlier parts of today's

21    deposition, you were asked a number of questions about

22    documents from the 2002 and 2003 time range.

23             "Do you recall that?

24             "Answer:  Yes.

25             "Question:  You were not at M-Systems at the

1    time that those documents were purportedly created; correct?

2              "Answer:  Correct.

3              "Question:  And you don't know who authored

4    those documents that were purportedly created in 2002 or

5    2003; correct?

6              "Answer:  Based on the metadata, I can say that

7    they are from 2002 and 2003.  I don't have more info than

8    that.

9              "Question:  So a number of times when you were

10   looking at documents from purportedly 2002 and 2003, you

11   said, 'based own what I see in this document.'

12             "Do you recall that now?

13             "Answer:  Yes.

14             "Question:  So was that testimony based on what

15   you were seeing in the document today during the deposition

16   when you were providing answers about those documents?

17             "Answer:  Depends specifically on the document,

18   but naturally, I don't have familiarity with all the

19   documents that was shared here.  Eventually the lawyers took

20   a bunch of the folders and shared it with the relevant

21   stakeholders.

22             I'm just, you know, covering -- I came from the

23   development, so I don't have any access -- used to have

24   access or familiarity with press release from 2002 and also

25   from agreement and stuff like that.

Sobol - designations

1              "So some of the documents, I saw for the first

2      time as part of the preparation with my attorney.  And some

3      documents, I saw only today for the first time.

4              "Question:  Okay.  I'm going to share my screen.

5      I am introducing what's been marked as Exhibit No. 58.

6              "What is this document?

7              "Answer:  This looks like a download page for

8      MyKey, KeySafe, and also the FFU utility.

9              "Question:  Okay.  And do you see the URL at the

10     bottom of the page?

11             "Answer:  Yes.

12             "Question:  Does that indicate that this was

13     taken from the web archive from the DiskOnKey website?

14             "Answer:  Yes.

15             "Question:  And what is the date listed from the

16     web archive?

17             "Answer:  December 7th, 2002.

18             "Question:  So would it be fair to say that

19     according to this page -- according to this exhibit, the

20     MyKey and the DiskOnKey upgrade were available for download

21     from the DiskOnKey website?

22             "Answer:  Yes.

23             "Question:  And I'm just going to point out this

24     language down here.  When it's describing the DiskOnKey

25     upgrade, it says:  "DiskOnKey upgrade let's you upgrade your

Sobol - designations

1    DiskOnKey device remotely with the most up-to-date firmware

2    version."  Is that correct?

3                 "Answer:  Correct.

4                 "Question:  I'm going to move on to another

5    page.  This is marked as Exhibit 60.

6                 "So this marked document that has been marked as

7    Exhibit 60, what is this document?

8                 "Answer:  It looks like the SDK data sheet

9    document.  Link to download the SDK.

10                "Question:  And does this appear to be from the

11   DiskOnKey website?

12                "Answer:  Yes.

13                "Question:  And what's the date listed on this

14   web archive?

15                "Answer:  November 14th, 2002.

16                "Question:  So you have testified that you

17   joined M-Systems back in June of 2004; is that right?

18                "Answer:  Yes.

19                "Question:  As part of your job responsibilities

20   when you got to M-Systems, did you learn about the DiskOnKey

21   products as they existed before you joined?

22                "Answer:  No.

23                "Question:  Did you learn about the software

24   that was created by M-Systems before you joined?

25                "Answer:  No.

 1            "Question:  As part of your job, you have

 2      testified that you worked on MyKey and KeySafe applications

 3      as well as the firmware upgrade application; is that right?

 4                "Answer:  Correct.

 5            "Question:  So as part of your job doing that,

 6      did you review the legacy or what existed beforehand?

 7                "Answer:  Yes.

 8            "Question:  So you had some familiarity with

 9      what existed before you got involved?

10                "Answer:  Pretty much.

11            "Question:  Okay.  And did you see anything in

12      any of the documents today relating to the DiskOnKey product

13      or any software applications that was incorrect?

14            "Answer:  Not that -- as far as I can tell, no.

15      I'm not sure whether everything was final product or not.

16      Some of it was draft, some of it was internally, but look

17      like, you know, I cannot say that anything was incorrect.

18            "Question:  But based on your review of the

19      materials we discussed, do you have any reason to believe

20      that the contents do not accurately describe the products?

21                "Answer:  No.

22            (Video ends.)

23            THE COURT:  Very well.  Exhibits?

24            MS. STERNBERG:  So we move to admit DX-170,

25      DX-307, DX-316, DX-317, DX-320, DX-333, DX-402, and DX-403.

1              THE COURT:  Admitted.

2   *    *    *  (Above-referenced exhibits were received into

3   evidence.)

4              MS. STERNBERG:  And we have one final shorter

5   deposition to show, and this is Mr. Walter Hanchuk, who was

6   the attorney that filed the initial patent application that

7   ultimately led to the asserted patent.

8              THE COURT:  Okay.

9              (Video of Walter Hanchuk played.)

10             "Question:  Good morning, Mr. Hanchuk.

11             "Answer:  Good morning.

12             "Question:  Am I correct that you're a patent

13  attorney?

14             "Answer:  That's correct.

15             "Question:  So I'll just indicate for the record

16  that this is the application that became the '006 patent

17  filed on behalf of Scott McNulty on March 23rd, 2004.

18             So as you sit here today, does it look familiar

19  to you at all?

20             "Answer:  Well, now that I've looked at it, I

21  mean, yes.  But do I recall anything about this case from

22  2004?  I do not.

23             "Question:  So if you turn to page 4.  Do you

24  see your signature here?

25             "Answer:  Oh, you mean page 4, the PDF or

1      get into your opinion.

2                      MS. STERNBERG:   If we could put up DX-476, which

3      I believe is a copy of your CV.

4      BY MS. STERNBERG:

5              Q.   So what is this document?

6              A.   This is my CV.

7              Q.   Okay.  And what is your educational background?

8      Let's starts with that.

9              A.   Yeah, I have a bachelor's degree in electrical

10     engineering.  I also have a master's degree in electrical

11     engineering.  I also have a master's in business

12     administration.

13             Q.   So what got you interested in this field, in

14     technology in general?

15             A.   Yes, I can give a little bit of an idea if it

16     helps you understand my background as a technical person.

17                      This might sound a little silly to start with

18     but when I was 12 years old, my parents gave me what was

19     called a 101 Electronic Project Kit.  So there is 101

20     projects in that kit.  And I was only 12.

21                      I got that and I wasn't sure if it was something

22     I was going to enjoy or not, but once I started making these

23     projects -- this kit had an integrated circuit that it was

24     bigger than we have today, it was quite large, that had

25     trans -- it had resistors and capacitors and components you

Geier - direct

1    may have heard of, maybe you don't know what they are but I

2    didn't at the time either.

3                But I started using that.  I thoroughly enjoyed

4    that part of it, the hands-on working with electronics and

5    that kit gave me sort of a lifelong passion for the hands-on

6    side of technology, actually implementing, building, you

7    know, making products.

8        Q.    So what kind of work experience do you have in

9    terms of communications systems, generally?

10       A.    My work experience, I have 35-40 years of

11   experience working with analyzing, designing and

12   implementing communications systems.

13       Q.    So what do you mean by a "communications

14   system"?

15       A.    A communication system is a system that is able

16   to transport data or information from one point to another

17   electronically.

18       Q.    So what experience have you had with portable

19   devices?

20       A.    Probably -- I have had a lot of experience with

21   portable devices with I'd say 100 different types of

22   portable devices.  Probably one that I really like to talk

23   about is -- it's in my CV.  I used to work for a company

24   called Monarch Marking Systems.  And Monarch Marking Systems

25   is actually, kind of interesting, was the maker of the very

Geier - direct

 1    first price marking equipment.  It was the late 1800s.

 2             It was simply taking a piece of paper and

 3    sticking a needle through it, through clothing but it was

 4    done automatically so people wouldn't have to stick their

 5    fingers in it, that sort of thing.

 6             But, of course, I didn't work with the company

 7    then.  I worked with the company starting around mid-1990s

 8    but anyway, the portable devices I worked on at Monarch were

 9    used for all sorts of applications.  One especially that I

10    did work on was called the Pathfinder.

11             The Pathfinder was a handheld device, a portable

12    device that had a processor that would run applications.  T

13    had a scanner built in so you could use that scanner.  You

14    might see in grocery scores and other places where they take

15    a scanner and they scan an item, the barcode on a product.

16    So it had a scanner.  There was a little keypad and display

17    on that product, very small.  It also communicated to --

18    through a network to servers.

19             So that was a type of portable device that's

20    sort of representative of the time of devices I worked on

21    through my career over the last, I'd say 30 years since

22    then.

23        Q.   What was that time frame that you worked at

24    Monarch?

25        A.   At Monarch, I started -- let me think just a

Geier - direct

1     minute.  I started there I believe in 1996 and I left there

2     in 2000.

3            Q.    And what experience have you had with databases?

4            A.    I'm sorry.  What was the question?

5            Q.    I'm sorry.  What experience have you had with

6     databases?

7            A.    Okay.  With databases, lots of experience.

8     Again, I've talked about the idea I had to do a lot of

9     hands-on work.  I have implemented many databases.  For

10    example, with Monarch, any of our applications that we sold

11    to various consumers like Wal-Mart and Best Buy, they needed

12    databases to store their price marking information.  Prices

13    that relate to different products.

14           We also sold inventory applications.  So I was

15    responsible then for not only designing but implementing, by

16    myself actually, developing the databases for those type of

17    applications.

18           Through my career -- I joined the military too

19    when I was younger and in my military career I also worked

20    with databases and overseeing the development of databases.

21           Q.    So what do you mean by "databases," just so

22    everybody understands what that means?

23           A.    Yes.  Probably important for the jury to

24    understand that because it certainly is part of one of the

25    claims here.

Geier - direct

1          A database is an organized collection of records

2     and a database would typically be on a server which might be

3     a PC or maybe kind of a high-end PC, some sort of computer

4     that can serve up the data at whatever speed is needed based

5     on the size of the database.

6          Q.   And what experience have you had regarding

7     authentication of devices or verification of devices?

8          A.   Yeah.   Authentication which is -- it's basically

9     verification.   We might think of those as the same thing, at

10    least for our purposes here.   I worked a lot with that.   For

11    one I wrote a book on that.   I have a dozen books I have

12    written on communication systems but one of those books

13    deals with securing networks with what is called 802.1X type

14    of protocol.

15          Now, you don't have to remember that name.   It

16    maybe have been even -- had a lot of different acronyms to

17    learn but that -- 802.1X is a standard that's for --

18    provides a framework for doing authentication.   So I have

19    that book I have written, but I have worked on a lot of

20    projects where the idea was to authenticate portable devices

21    on the system to make sure that device is actually verified

22    to one particular server.

23          For example, at Monarch Marking Systems we would

24    authenticate/verify the Pathfinder when they connected to a

25    server to get important inventory data that might be on the

**Appx9752**

Geier – direct

1    server, inside the database.

2         Q.   In your view are the terms "authenticate" and

3    "verify" different or the same?

4         A.   Well, verification is something done when you

5    authenticate.  So the idea of verification would be to

6    confirm that something is what it is.  When you walked in

7    this morning, you probably had to show your driver's

8    license, you are confirming who you are based on your name

9    and if there is a picture, there is some way of confirming

10   who you are.

11             Systems do that -- computer systems do that and

12   in kind of a similar way.  You are confirming that a

13   particular device is the device that is represented by some

14   sort of name or identification.

15        Q.   And what experience have you had with writing

16   software or using or writing software development kits?

17        A.   Okay.  That's a good question.  I spent a lot of

18   time writing software during my career so I need to focus on

19   certain ones that maybe -- hopefully would be interesting.

20   But I have been writing software, first of all, for about

21   40, 45 years.  I started a long time ago back when we had

22   Commodore 64s and those types of computers.  I remember

23   writing lots and lots of software.

24             At Monarch Marking Systems I wrote the firmware

25   for that Pathfinder device.  I designed the firmware myself

Geier - direct

1    and there is a team that did the coding and writings of the

2    instructions, the software, but I wrote that software.

3             Also with the Pathfinder -- this is again

4    Monarch, mid-1990s, I was the one who architected the --

5    which APIs we would use.  You've heard that term,

6    application program interface, that APIs are generally

7    parts of an SDK, the software development kit.  I was the

8    one who designed those and then wrote the code to make

9    those interface with the Pathfinder and put the software

10   development kit together as something we could give to

11   customers.  So I have done that.

12            I have also done that with -- this firmware

13   development for probably 50 different products, different

14   companies I have worked with as a consultant.

15       Q.   And you mentioned that you wrote a book.  So how

16   many books have you written?

17       A.   I think I mentioned that earlier but I have

18   written, I believe -- it's around a dozen, I believe.  One

19   of my books has been translated, I believe, into 10 or 12

20   different languages.

21       Q.   And in this case, how much of your analysis was

22   done by you or by a team of people working for you?

23       A.   I do not have a team of people.  I work

24   independently, and I have for the past 22 years.

25            MS. STERNBERG:  Your Honor, at this time, I

Geier - direct

1   would like to offer Mr. Geier as an expert in the field of

2   computer programming, communications systems, databases and

3   mobile devices.

4          THE COURT:  Any objection?

5          MR. LEIBOWITZ:  No objection, Your Honor.

6          THE COURT:  Admitted.

7          MS. STERNBERG:  Okay.  So if we put up JX-294,

8   which is the '703 patent.

9   BY MS. STERNBERG:

10         Q.   This might look familiar, hopefully by now to

11  everybody, but can you just describe what this is?

12         A.   This is what we have been referring to as the

13  '703 patent.  You have seen various claims from this and

14  some, in other presentations, for example, from Dr. Rubin.

15         Q.   And how does the '703 patent relate to -- or

16  compare to the '969 patent, the other asserted patent?

17         A.   Yes it's very similar.  It has the same

18  specifications and some of the claims are a little bit

19  different as we'll point out.

20         Q.   Can you describe what you mean by

21  "specification"?

22         A.   Yeah.  So the specification is the part that is

23  written that describes the patent that gets in there.  It's

24  before the claims, so it's the body of that patent.

25         Q.   Okay.  And so rather than looking at the text

Geier - direct

1    from the '703 itself, we're going to put up a demonstrative

2    with the claim language, kind of along the lines of what we

3    saw yesterday.

4              MS. STERNBERG:  So if we could put up DDX-2, the

5    first page of it.

6    BY MS. STERNBERG:

7         Q.   So which claim is this?

8         A.   This is the '703 patent.

9         Q.   Okay.  I see the word "system" is big, so what

10   does that mean?

11        A.   Okay.  The word "system" is highlighted --

12   again, you probably heard this again and this is for a

13   second time, this is what is considered to be a patent that

14   is based on systems, so it's going to have various

15   components, that are going to be parts of that system.

16             MS. STERNBERG:  And if we can move to the next

17   slide.

18   BY MS. STERNBERG:

19        Q.   Okay.  So now I see three terms are highlighted.

20   So what are the terms that are being displayed here?

21        A.   Yes.  What is being displayed here as part of

22   this are the, the components of the system.  So in this

23   particular claim, of the '703 patent there is a terminal, we

24   have been talking about terminals, the communications

25   network node and portable device.

Geier - direct

1        Q.    Okay.  So let's, let's kind of dig into the

2    different -- the three different components and the three

3    different devices involved in these claims.

4              MS. STERNBERG:  And so if we could go to the

5    next slide.

6    BY MS. STERNBERG:

7        Q.    Let's start with the terminal as described in

8    the patent.  What is a "terminal" as far as the patent

9    claims?

10       A.    Yeah.  Terminal, as you can see in the images

11   there, could be a PC, just a general purpose computer.  It

12   could be a smartphone.  It could be a laptop.  It's some

13   type of device that is something that you can use that you

14   might even have at home that you could use for this

15   particular -- to be a terminal.

16       Q.    So back in the 2001, 2002, 2003 time frame, what

17   was known about kind of computers or terminals at that time?

18       A.    Well, they were very well known.  I remember

19   having a PC at home at that point.  They're used in offices.

20   They were very available.

21       Q.    Okay.  So let's talk next about the

22   "communications network node."  What is that as far as the

23   patent?

24       A.    Yeah.  What that is, is actually -- we have been

25   calling that a server.  Now there are some claims that have

Geier - direct

 1    a database element, that is where the database would be.

 2    The communications network node is going to be -- it will

 3    be, particularly here, a server that would be connected to

 4    the network.

 5              Q.    Okay.   And what is known about servers in the

 6    early 2000s?

 7              A.    They were very well known.   There are many

 8    different types of servers at that point or before.   I was

 9    working on applications that would interface the servers at

10    that point.

11              Q.    Okay.   And then let's talk about portable device

12    on the left.   So as far as the claims go, what it -- what

13    does it mean by "portable device"?

14              A.    Yes, portable device is something that you can

15    pick up and move around.   That's kind of what -- based on

16    portable.   You can see pictures of items here that would be

17    portable.   For example, a PDA device at the top left up

18    there.   It could be a phone that you see at the top right.

19    There is a DiskOnKey that is imaged there.   That is a type

20    of portable device.   A camera that is shown, a digital

21    camera could be a portable device.   Again these are items

22    that you can pick up and move around.

23              Q.    Okay.   So back in the early 2000s, what was

24    known about portable devices and particularly portable

25    devices with processors?

**Appx9758**

Geier - direct

1          A.    Yeah.   Portable devices at that point had

2     processors.   All the ones that are shown in this picture

3     would have some sort of processor.   The portable devices I

4     worked on at -- 2001, I would have been a consultant then.

5     I worked on many projects that year and even before Monarch

6     Marking Systems in the mid '90s there were portable devices

7     that had processors.

8          Q.    So what does its mean to have a processor, I

9     guess?   Take a step back.

10         A.    That is probably a good idea.   "There were

11    processors" may not be quite as understandable maybe to --

12    although them you have learned a little bit about processors

13    since we started the trial here.

14              But a processor is sort of like the brains of

15    the device.   It's what going to be actually executing the

16    instructions that you write.   That's the software.   The

17    software would be instructions that are written.   The

18    processor is what is going to process those instructions.

19    So it's going to take the instructions one at a time and

20    perform whatever that instruction is supposed to be, what it

21    was intended to do.

22         Q.    And so back in the early 2000s, what was known

23    about the ways in which these three systems could

24    communicate with each other?

25              A.    A lot was known at that point.   At that point we

Geier - direct

1    had ethernet, which was a type of networking technology.

2    There was -- even USB was available.  There was various ways

3    to interconnect these devices so they could communicate with

4    each other.  There was Internet connectivity.  We had ways

5    of communicating amongst -- with each other.  You might use

6    email, like AOL or something, AOL email to communicate with

7    each other.  There is ways of connecting various devices

8    together in a what would be called a network.

9         Q.   Okay.  So let's look at the claim language.

10             MS. STERNBERG:  Let's go to the next slide.

11   BY MS. STERNBERG:

12        Q.   Now we have in addition to the terminal

13   communications network node, and portable device we have

14   some highlights of program code.  So what, again, do the

15   three -- do the claims require that these devices actually

16   do?

17        A.   Okay.  That's actually contained or at least

18   named by the type of program code.  And this is really

19   important to understand.  What we're dealing with, program

20   code is actually software, those are instructions that are

21   telling the computer what to do.  So program code would be

22   the software/instructions, going to tell the computer what

23   to do.

24             But throughout the claims here, it's indicating

25   certain, I would say nuggets of software or nuggets of

Geier – direct

1    functionality that is represented by that program code.  So

2    first program code would correspond to what is described

3    there in the claim for that particular code.  So first

4    program code would correspond to part of that, second

5    program code would correspond to another part, that is

6    another functionality, and so forth.

7              So the program code specifies what functionality

8    corresponds to that particular program code.  That is why it

9    has different numbers, different names, so you can identify

10   those functions and consider what they are in the patent

11   claim.

12        Q.   So how does the word "program code" relate to a

13   program or an application?

14        A.   Well, the program code is going to be, again,

15   functionality.  So there is various functionality that is

16   defined here by each, I'd say, nugget of code.  So first

17   program code would be one nugget of functionality.

18              The software would be something that would -- if

19   it implemented that, it would need to implement the

20   functionality.

21        Q.   Okay.  We've heard some terms thrown out about

22   firmware and software.  So can you just maybe explain some

23   of those things so that we're all on the same page?

24        A.   Okay.  I talked a little bit -- in fact, I

25   mentioned earlier, about firmware.  I probably should have

Geier - direct

1    talked about it a little more then.

2              Let's start maybe with software.  You heard this

3    before and I even said it already but it's worth repeating

4    because it's really important.

5              Software's really instructions.  Think about a

6    computer -- you have to go back a little bit in time.  You

7    might have heard that computers are actually dumb.  They

8    don't know anything.  They're just hardware that sits there

9    and the computers need to be told what to do.  They don't

10   know what to do unless you give them instructions and

11   software, those are the instructions.

12             So software is actually a list of instructions

13   in a certain order that the computer needs to have in order

14   to operate.  When to get information from a key that is

15   pressed, when to put something on a display, when to perform

16   certain functions that are here, certain types of program

17   code, those are all done by instructions.  That is software.

18   That is sort of a general category of what we're talking

19   about.

20             Now firmware, firmware is a type of software

21   that is actually run on the device.  So let's say you have a

22   portable device, for example, this Pathfinder I worked on.

23   I mentioned firmware.  Firmware is what is actually run on

24   that device and it handles the CPU or the processer, the

25   processor we talked about earlier, runs that software on the

                           Geier - direct

 1    portable device and that firmware then manages all the

 2    components within that portable device.  So it's going to

 3    be -- it takes care of the basic functionality that is

 4    needed.

 5              So that would be firmware.  Firmware runs on

 6    that hardware device, the portable device, at least in the

 7    examples that we're talking about.

 8         Q.   Okay.  So we looked at the program code

 9    language.  You talked about -- you mentioned that each

10    program code can have a specific function.  So just very

11    quickly, overview, what are the different functions of the

12    first -- or what is the function of the first program code?

13              MS. STERNBERG:  If we could highlight that.

14    BY THE WITNESS:

15         A.   Yes, you can see up there where it was already

16    boldfaced on program code, I think we're going to highlight

17    the part right after that.

18              But first program code is going to be when this

19    code is executed --

20         Q.   I'm sorry.  That's the second one but?

21         A.   Yeah.

22              MS. STERNBERG:  One line up.

23    BY MS. STERNBERG:

24         Q.   Configured to effect the presentation of an

25    interactive user interface.

Geier - direct

1          A.    Right.  So first program code which when

2    executed -- remember this is software so it can be executed

3    by the processor -- when executed is configured to effect

4    the presentation of an interactive user interface by the

5    terminal output components.

6               So kind of like sort of boring ways with words,

7    basically the interactive user interface would be the thing

8    you see on the display that comes up.  I can see in

9    applications that you can press buttons and do stuff to the

10   display and the terminal output application is like a

11   display on the computer.

12              So it's going to effect that presentation of

13   that interactive user interface.

14         Q.    Okay.  And is that something that was well known

15   back in the early 2000s?

16         A.    It was very well known and I developed many what

17   I would call interfaces on a computer that users would

18   interact with.

19         Q.    Then yesterday we heard from Dr. Rubin that the

20   second frame code and the third program code were kind of

21   flip sides of each other.  Do you recall that testimony?

22         A.    Yes, I do.  Yes.

23         Q.    So can you explain what each of those in broad

24   terms are meant to do?

25         A.    Yeah.  Pretty much like Dr. Rubin said.  What

Geier - direct

1    that is doing is -- as you can see, it's setting up the

2    communications between the terminal and the portable device.

3    So it's setting up those communication nodes that need to be

4    able to talk to each other, so that the terminal and the

5    portable device can communicate with each other.

6           Q.    Okay.   The third program code adds an additional

7    piece about the network -- communications network node; is

8    that right?

9           A.    Yes.

10          Q.    So what was known back in the early 2000s about

11    communications between a portable device, a computer and a

12    network?

13          A.    Yeah.   The technologies were there.   You could

14    easily -- everything was known.   You could connect those

15    devices.   Again, there was USB, so you could connect the

16    portable device to a computer with USB.   There were various

17    forms of other networking to connect a terminal to what

18    we're calling a communications network node here, which

19    would be a server, whether it's in the same building or

20    located someplace else.   All those technologies were in

21    place.   I used those technologies to build applications.

22          Q.    Okay.   So let's focus on the fourth program code

23    which is probably going to be the focus of most of our

24    presentation today, and it seems to be the most complicated.

25                MS. STERNBERG:   So if we can go to the next

Geier - direct

1    slide.

2    BY MS. STERNBERG:

3         Q.    This calls it out so we can see it in big.

4               So if you could read that out loud.

5         A.    Certainly.  So this is fourth program code.

6    Where fourth program code -- okay, we're going to "execute

7    the fourth program code stored on the portable device memory

8    in response to a communications received by the portable

9    device resulting from user interaction with the interactive

10   user interface to cause a communication to be transmitted to

11   a communications network node."

12        Q.    Okay.  So in plain English, maybe could you

13   explain what is being required by that?

14        A.    Yeah.  What is going to happen here is somebody,

15   possibly a computer like this, is going to have an

16   interactive user interface.  They're going to interact with

17   that -- we will call it IUI like Dr. Rubin did.

18              They're going to interface with the IUI and

19   maybe press a button and that is going to cause a

20   communications to be sent to the portable device.  So the

21   portable device would then receive the communication that

22   resulted from that interaction of the user pressing a button

23   there or doing something with that interface, and then that

24   is going to cause them -- as a result of that cause a

25   communications all the way out there to the communications

Geier - direct

1    network now.

2         Q.   Okay.

3              MS. STERNBERG:   So let's go to the next slide.

4    I'm going to show the diagram of what is happening here.

5    BY MS. STERNBERG:

6         Q.   So we start with the three devices.   And what is

7    the first step?

8              MS. STERNBERG:   If you can go to the next slide.

9    BY THE WITNESS:

10        A.   Okay.   First, now at this point, a user has

11   interacted with the interactive user interface, the IUI, and

12   we can see there is some sort of message that is sent to the

13   portable device, so there is a communication sent to the

14   port and device.

15        Q.   And then the next slide?

16        A.   At this point, that reception of that message or

17   that information has caused communications to be sent from

18   the portable device back to the terminal or through the

19   terminal.

20        Q.   Okay.   And then the next slide.

21        A.   And on to the communications network node.

22        Q.   So the claims, the actual asserted claims in

23   this case kind of go farther than that; right?   So they're

24   dependent claims that kind of talk about that fourth

25   program code, where the message actually has to be; is that

Geier - direct

1    correct?

2         A.   That's correct.

3              MS. STERNBERG:  So if we can go to the next

4    slide.

5    BY MS. STERNBERG:

6         Q.   So can you explain what those two boxes are.

7         A.   Yes, at this point, these are again based on

8    the dependent claims.  You saw some of this yesterday.

9    There is going to be a claim dealing with identifier

10   information.

11             So identifier information would identify that

12   portable device of someone.  There is also -- you can see on

13   the far right of the server there is going to be some sort

14   of facilitating -- or there is going to be some sort of --

15   I'm sorry -- facilitate synchronizing the content.  So that

16   has to take place.

17             And also there would need to be some sort of

18   facilitation and verification of the device as well.

19        Q.   Okay.  So let's, let's break those apart.  So

20   for identifying information, what was known back in the

21   early 2000s about portable device identifying information?

22        A.   There was information that I used -- first of

23   all, it was well known.  I actually used different types of

24   identifier information to be used in this particular type of

25   environment, such as serial numbers of the device itself.

Geier - direct

1    There were -- there is a thing called PKI, which is going to

2    be maybe a new buzz.  You heard that earlier.  PKI is a type

3    of authentication that uses what is called a public key and

4    I think we're going to get more into that later but a public

5    key would be a type of identifier information.

6           Q.    Okay.  Then we talked a little bit about

7    verification of devices which I think you said was part of

8    authentication process, is that right?

9           A.    That's correct.

10          Q.    What was known about that back in the early

11   2000s?

12          A.    That was done regularly with devices.  We did

13   that with our products at Monarch.

14          Q.    What about -- what does it mean to facilitate

15   synchronizing content?

16          A.    At this point it's -- first of all, about

17   synchronization.  Synchronization would be something where

18   at two different points, you are making that data the same.

19   Okay?  So you want -- and the idea is to make them the same.

20   For example, if you are having some sort of -- you have

21   pictures out and we'll call it the cloud today.  But on the

22   cloud there you have some photos on your known you have got

23   totes toes you synchronize them so they're the same.  You

24   have the same photos on your phone as you do in some storage

25   device or maybe the cloud we'll call it.  That would be

Geier - direct

1    synchronizing content.

2            Q.    What does "content" mean?

3            A.    Content could be information.  It could be

4    files, it could be pictures, it could be videos, it could be

5    different types of data.

6            Q.    So in order for that data to be synchronized,

7    what has to happen?

8            A.    As I mentioned earlier, it needs to be made the

9    same on both sides or both ends of that system that you are

10   synchronizing.

11           Q.    Okay.

12                 MS. STERNBERG:  So if we could put up

13   demonstrative DDX-9 into the highlighted copy of the '969

14   patent.

15   BY MS. STERNBERG:

16           Q.    Can you explain what this document is?

17           A.    Okay.  I'm having trouble seeing on my monitor,

18   it's a little small.  There we go.  Thank you.  We need to

19   scroll down so we can see it.

20           Q.    I think we want to show the full pages of the

21   document but you can scroll down here.

22                 So were you here for Mr. Hanchuk's testimony?

23   That was the last deposition that we played.

24           A.    Yes, I was.

25           Q.    So what was he talking about?

Geier - direct

1      A.    He was talking about the use of a template when

2  they were creating this patent.

3      Q.    Okay.

4      A.    Prosecuting this patent.

5      Q.    And so what did he say about use of a template

6  in prosecuting the patent?

7      A.    He said that they use the template to populate

8  the specification portion of this patent.

9      Q.    Okay.  So let's go page by page.  And so what,

10 what does the highlighting in this document represent?

11     A.    The highlighted part of this is representing

12 what is present in other patents that they prosecuted.

13     Q.    Okay.  And just to be clear, are you relying on

14 that as prior art?

15     A.    Oh, no.  Not at all.  No.

16     Q.    So here is where the highlighting starts.

17     MS. STERNBERG:  You can go to the next page.

18 The next page.  Keep going.

19 BY THE WITNESS:

20     A.    Again, when you see a highlights, that is part

21 of the template that he said earlier, as you saw in David's

22 deposition.

23     Q.    Okay.

24     MS. STERNBERG:  Let's just keep going page by

25 page throughout this.

**Appx9771**

Geier - direct

1                       Okay.  I think that is where it ends.

2    BY MS. STERNBERG:

3          Q.    So what does that highlighting tell you?

4          A.    Well, the highlighting is something that is

5    certainly not part of Mr. McNulty's patent.  It was the

6    template.

7          Q.    Okay.  And does the amount of highlighting

8    surprise you after having read the patent?

9          A.    Not necessarily.  You know, I -- in reading this

10   patent, I didn't see anything new so it didn't surprise me

11   that there is highlighting based on the template.

12         Q.    Okay.  So now that we have kind of the

13   terminology and what the requirements of the patent down,

14   let's get into your actual invalidity analysis.

15               MS. STERNBERG:  So if we could go back to DDX

16   page 11.  Sorry, yes.  There we go.

17   BY MS. STERNBERG:

18         Q.    So what did you do in order to determine whether

19   the patents are valid, patent claims I should say are valid?

20         A.    Yeah, I followed a couple of -- I'll call them

21   doctrines.  But this is what you do when you do an

22   invalidity analysis is you consider prior art and one way to

23   do that is what is called "anticipation."

24               And anticipation, I think that was mentioned

25   earlier, but I can't remember.  I was sitting here, but

Geier - direct

1    anticipation is where a single prior art reference would

2    include, would teach a person of ordinary skill in the art

3    enough to actually satisfy those claims.  They would

4    understand how to actually implement them.

5            Q.   Okay.  What is "obviousness"?

6            A.   Obviousness is where you would use two or more

7    prior art references to do the same thing where you could --

8    you know, a person of ordinary skill in the art would have

9    enough understanding there to understand the claims, the

10   ability to implement that solution.

11           MS. STERNBERG:  So let's go to the next slide.

12   BY MS. STERNBERG:

13           Q.   You mentioned the term "person of ordinary skill

14   in the art."  So what does that mean in this context?

15           A.   Well, a person of ordinary skill in the art

16   would be someone with this -- I'm going to talk about that

17   the details first -- but would have these types of

18   qualifications you might say, or this type of experience, at

19   a point that would be at or before the priority date of the

20   patent.

21           We're going to talk about priority dates in a

22   little bit too, but it's not necessarily right now.  It's

23   back when this invention was being considered, you know,

24   that sort of thing.  So this goes back in time.  So this

25   would go back in time to a certain point.

Geier - direct

1              So for this particular -- my understanding a

2    person of ordinary skill in the art is what I have shown

3    here.

4              THE COURT:  Excuse me.  Ms. Sternberg this is a

5    demonstrative; is that correct?

6              MS. STERNBERG:  Correct.

7              THE COURT:  So you may want to elicit the

8    content --

9              MS. STERNBERG:  Thank you.  That was going to be

10   my next question.

11   BY MS. STERNBERG:

12       Q.   Can you explain what it is that you think is a

13   person of ordinary skill in the art?  And you can read it.

14   I know it's long.

15       A.   Right.  I have volatilized what those are and a

16   person of ordinary skill in the art, what I might call a

17   POSITA, if that makes it easier.  That's another acronym for

18   you, POSITA.

19              It would be a person that has a bachelor of

20   science degree in electrical engineering, computer science,

21   computer engineering or some related discipline.  That would

22   be the education level.

23              Experience in programming software for computer

24   peripheral devices and databases, servers.

25              "Peripheral" is another word you haven't seen

**Appx9774**

Geier - direct

1   but that is something that is possibly attached to the

2   computer would be a peripheral.

3            They would also have a working understanding of

4   computer hardware which is the hardware part of the device,

5   operating systems, encryption, data storage, user

6   interfaces, and peripheral and portable device communication

7   protocols.

8       Q.   And were you familiar back in the 2001 time

9   frame of what would it mean to be a person of ordinary skill

10  in the art?

11      A.   Absolutely I was that.  I was that person.

12      Q.   Okay.

13           MS. STERNBERG:  So we can go to the next slide.

14  BY MS. STERNBERG:

15      Q.   We talked a little bit about priority dates, so

16  I think it's important to kind of talk about what dates

17  matter.

18           And so can you walk us through this slide?

19      A.   Right.  So a person is entitled to a patent, and

20  I'll just read this so it's really clear.

21           "So a person shall be entitled to a patent

22  unless the invention was known or used by others in this

23  country, or patented or described in a printed publication

24  in this or a foreign country, before the invention.

25           Okay.  So obviously it can't be before the

Geier - direct

1    invention -- therefore by the applicant or the patent or.

2                    And the invention date is equal to the

3    conception date of that particular patent.

4                    Part B, there is another way of looking at this.

5    The invention was patented or described in a printed

6    publication in this or a foreign country or in public use or

7    on sale in this country, more than one year prior to the

8    date of the application for the patent in the United States.

9                    So for our purposes, that one year prior would

10   be March 23rd, 2003.  So that's an important date to

11   remember.  That is the date that we're looking at prior art,

12   that a person of ordinary skill needs to be that date or

13   earlier, or earlier in that day, the prior art that we used

14   needs to be earlier than that date.

15           Q.   And that's for items that were in public use or

16   on sale in this country are or patented or described in

17   the --

18           A.   Yes, that is exactly right, that part of it.

19           Q.   Yeah.  Okay.  So in this case, what did you do

20   to determine whether or not the patents are valid?

21           A.   Well, that was a big job.  I spent a lot of time

22   doing this.  I looked at prior art and then compared that

23   prior art to the asserted claims and to see if that prior

24   art would save those satisfy those claims.

25           Q.   So what prior art will we be focused on today?

**Appx9776**

Geier - direct

1          A.    I will be focusing on the DiskOnKey, which is a

2     product.

3          Q.    And just so we can know as a roadmap what to

4     expect, what did you find about the DiskOnKey that relates

5     to your invalidity analysis?

6          A.    I found that the DiskOnKey performs all the

7     claims that are asserted.

8          Q.    And is it the DiskOnKey alone?

9          A.    Yes.

10         Q.    Okay.  And the -- as used with software

11    associated with a DiskOnKey?

12         A.    Yes, with -- the DiskOnKey is used with the

13    software, the firmware update application, that particular

14    part of it would be, I'd say, operating on its own.

15         Q.    And so we have heard a lot about the DiskOnKey

16    over the last few days.  So I'm going to slow you actually'

17    DiskOnKey device which I believe is the same device

18    discussed in Mr. Sobol's testimony.  And this is DX-170.

19              MS. STERNBERG:  It's a little bit small so if we

20    could put up the photos of it.  And you can put up the next

21    pages, too.

22    BY MS. STERNBERG:

23         Q.    So does this look familiar to you?

24         A.    Yes, it does.

25         Q.    So is this, in fact, what you know to be a

Geier - direct

1     DiskOnKey?

2          A.   Yes, it is.

3               MS. STERNBERG:   Okay.   So we can now put up

4     DX-89.

5               And if we could make that a little bigger.

6     BY MS. STERNBERG:

7          Q.   So what is this document?

8          A.   This appears to be a document from M-Systems'

9     website and it's talking about the DiskOnKey.

10         Q.   And I believe this comes from the web archive

11    which was discussed in one of those depositions.   So what

12    date was this screen captured?

13         A.   I'm looking for the date.   It looks like

14    November 8th of 2002.

15              MS. STERNBERG:   Okay.   So if we could highlight

16    the paragraph next to the kangaroo or make that bigger.

17    BY MS. STERNBERG:

18         Q.   Okay.   So if you could read the first few lines

19    of that?

20         A.   Certainly.

21              This reads:   "The DiskOnKey technology is the

22    only portable key chain storage device that can run

23    applications.   That's what sets us apart from our

24    competition.   We offer raw computing power."

25         Q.   And then if you can skip ahead to the sentence

Geier - direct

1    after where it says "the processor runs"?

2          A.    I'm not following where you want me.

3          Q.    He is highlighting it so that will help.

4          A.    Okay.

5                Okay.  Yes.  This particular sentence says:

6    "The processor runs applications straight from the device,

7    not from the host computer."

8          Q.    Okay.  So what do they mean that this "sets them

9    apart from the competition" from other key chain storage

10   devices?

11         A.    Generally, what that means in a statement like

12   this on a website would be it's a different changing factor.

13   It's something that would be -- something they offer that

14   possibly others don't.

15         Q.    So is it your understanding that not all USB

16   devices had a processor that could run applications at this

17   time?

18         A.    That's my understanding.

19         Q.    So this is something different that DiskOnKey

20   was offering; is that right?

21         A.    It appears to be, right.

22               MS. STERNBERG:  So if we could go to the Exhibit

23   DX-99.

24               And if we could make -- I guess let's just first

25   look at the date on this page and the URL.

**Appx9779**

Geier - direct

1    BY THE WITNESS:

2         A.    Yes, this looks like this particular page comes

3    from the DiskOnKey website and it's dated December 2nd of

4    2002.

5              MS. STERNBERG:  Okay.  And now, if we could look

6    at the text under those nice photos that I think might look

7    familiar at this point.

8              And if we could highlight the last sentence of

9    that, of that first paragraph.

10   BY MS. STERNBERG:

11        Q.    So what is that saying?

12        A.    Well, this is talking -- do you want me to read

13   it or explain it.

14        Q.    You can explain it.

15        A.    Okay.  Well it's talking about the idea the

16   DiskOnKey has a CPU, central processing unit.  The CPU is

17   the brain that runs those instructions.  It's going to run

18   the instructions from the application.

19             And it can, it is also saying it can correctly

20   support and run multiple applications.  And that's the idea.

21   It has a processor that can run applications.  Process

22   throws instructions.

23             MS. STERNBERG:  So let's look at one of the spec

24   sheets that was produced in this case, DX-322.

25   BY MS. STERNBERG:

Geier - direct

1          Q.   Okay.  So what is this document?

2          A.   Yes, this is a product specification for

3    DiskOnKey for a particular model and just to talk a little

4    bit about what these are.  A product specification is

5    something that explains what the product is, but some of it

6    is internal how it works.  Monarch Marking Systems, we

7    developed process specifications like this for our products.

8    Maybe it's not something you hand to a user that is going

9    to be using the product eventually, but it is something

10   internally that can be used.  It's also shared with other

11   people that do the development.  It explains what the -- how

12   the product works internally leap and what type of

13   specifications it might have.

14          Q.   And what is the date on this document?

15          A.   This is dated November 2002.

16          MS. STERNBERG:  Okay.  And so if we could move

17   to page 6 of this document.

18          Oh sorry.  That's two.  We're looking for six.

19   Yeah.  There we go.

20          And if we can blow that up.

21   BY MS. STERNBERG:

22          Q.   Okay.  So can you explain what is going on here?

23          A.   Sure.  Absolutely.

24          This may look a little bit daunting to you

25   because it's actually a diagram of the internal operation of

Geier - direct

1    this DiskOnKey, the actual system on the DiskOnKey.  I'm

2    trying to keep this as simple as I can, but the -- you can

3    see in the top right there, it says ARM7TDMI 32-bit RISC

4    CPU.

5            CPU, central processing unit.  That is the

6    processor.  It says depicted in the diagram that the

7    DiskOnKey has a processor.

8            Below that you see the SRAM, static RAM, random

9    access memory.  And SRAM is -- you don't have to worry about

10   whether it is static or dynamic.  But the idea that it is

11   RAM, it can store the instructions that the processor is

12   going to use.

13           So think of this again.  The software, a bunch

14   of instructions, you are telling the computer what to do,

15   you have to tell it what to do, it has to be stored some

16   place, those instructions have to be stored.  The CPU is

17   going to be fetching those instructions generally one at a

18   time.  They might do multiple ones but it's going to be

19   fetching the instructions in order.  So the RAM is where,

20   the instructions are stored.

21           You can also see on the left side there it says

22   "USB controller."  What that is, is a -- kind of a mixture

23   of hardware and software that allows it to interface with

24   the USB connector that might be -- that is used on the

25   DiskOnKey to plug into a terminal of some type, like a PC or

Geier - direct

1  laptop, so to a USB port.

2         One more thing just to mention, on the far

3  right, sort of in the center, there is a flash.  So that

4  would be where you would typically store data on that thing.

5  At least some types of -- not all data, but like you would

6  think of a flash drive or a USB drive or a USB stick.  You

7  can call that many different names.  Thumb drive, that is

8  where you are going to be storing maybe some files, that

9  would be stored there.

10        And there is a flash controller that is the top

11  rating in the system as well to make that work.

12        Q.   So back in 2000s or the early 2000s, a typical

13  thumb drive, which parts of this would it have?

14        A.   They certainly have a flash, as some type of

15  control.  There would be primarily flash would be the

16  primary component of that.

17        Q.   So what we're seeing here is the processor that

18  was discussed in those websites, is that right, as kind of a

19  distinguishing feature?

20        A.   Yes, I would say the distinguishing feature is

21  certainly the type of processor up there in the upper right.

22  And the RAM to be able to run applications as custom

23  applications, specific applications.

24        Q.   Okay.  So now that we understand kind of the

25  hardware, let's talk about when the DiskOnKey was introduced

Geier - direct

1    and the various aspects were introduced.

2                MS. STERNBERG:  So I'm going to ask to pull up

3    DX-91 which is --

4    BY MS. STERNBERG:

5         Q.    Well, I'll let you explain what this is.

6         A.    Okay.  This is, this is a particular

7    governmental type of process that is done that documents

8    certain things about their product.  So this is something

9    that they would have filed at the SEC and this is the form

10   that represents that.  This is what -- the M-Systems'

11   DiskOnKey.

12               MS. STERNBERG:  And let's go to page 26.

13   BY MS. STERNBERG:

14        Q.    Oh sorry.  Let's talk about the date first.

15               So do you see where it says for the fiscal year

16   ending December 31st, 2002?

17        A.    Yes, so that would be the date that this is

18   representing.

19               MS. STERNBERG:  Let's go to page 26.

20               Okay.  Then if we can blow up the bottom where

21   it talks -- the first paragraph, in November 2000, the

22   DiskOnKey section.

23               Perfect.

24   BY MS. STERNBERG:

25        Q.    So if you could read the first sentence?

**Appx9784**

Geier - direct

1          A.    Okay.  In -- I'm sorry.  "In the winter of 2000,

2     we announced the introduction of our DiskOnKey product."

3          Q.    Okay.  And then do you see kind of in the middle

4     there is a sentence that says "in addition to providing data

5     storage"?

6          A.    Just looking for that.  It would help if you

7     could highlight it.

8          Q.    Right.  There is a line that says the DiskOnKey

9     is currently available in the capacities of 8, 16, 32, 64?

10         A.    Yes.

11         Q.    And then after that?

12         A.    Okay.

13         Q.    That full sentence?

14         A.    Yes.  So in addition to providing data storage,

15    right.

16         Q.    Yes.

17         A.    The DiskOnKey has its own CPU.

18         Q.    Keep going.

19         A.    "It can also support and run multiple software

20    applications directly from the product itself."

21         Q.    Okay.  And then this document references a

22    couple of those applications which we heard a little bit

23    about in the video, KeySafe and MyKey.  Are you going to be

24    discussing those today?

25         A.    Not necessarily, no.

**Appx9785**

Geier - direct

1           Q.   So they don't form a base of your invalidity

2      opinion?

3           A.   No.

4           Q.   And so we've talked about how the DiskOnKey can

5      run applications.  So are you aware of any tools that

6      M-Systems offered that allowed developers to write

7      applications or that M-Systems used to write applications?

8           A.   Sure, like other companies they offer an SDK.

9      They offer an SDK.

10          Q.   And can you remind the jurors what an SDK is?  I

11     know they heard that a lot?

12          A.   We'll do it again.  So SDK is a software

13     development kit and that would include the -- in general the

14     tools that a developer would need to write their own

15     applications.  It's going to include the instructions that

16     you need to write to make these APIs work, that the API

17     would need the interface with an employee, customer or on

18     that product and other, other utilities that might be

19     helpful.

20              MS. STERNBERG:  Okay.  So let's pull up DX-307.

21     BY MS. STERNBERG:

22          Q.   Okay.  And this appears to be a press release;

23     is that right?

24          A.   Yes.

25          Q.   What is the date on this?

**Appx9786**

Geier - direct

1          A.    Yes.  It's September 25th of 2002.

2          Q.    Okay.  And what is the title if we could blow

3    that up.

4          A.    Yes, this -- the title is "M-Systems designs

5    software developer's kit for the DiskOnKey technology

6    computer platform."

7               MS. STERNBERG:  And if we could go to the second

8    page of this document.

9               And if we could blow up the first paragraph.

10   BY MS. STERNBERG:

11         Q.    Okay.  Do you see the sentence that says "the

12   DiskOnKey firmware already contains powerful functions such

13   as encryption and authentication that only need to be

14   activated by software developers"?

15         A.    Yes, I see that.

16         Q.    So what does that mean?

17         A.    What that means is the DiskOnKey firmware, which

18   again runs on the DiskOnKey.  So the DiskOnKey has that

19   processor, we showed you the memory.  There is firmware that

20   is going to be run, you know, right on the DiskOnKey.  So

21   the software running on the DiskOnKey that is going to

22   contain the functions such as encryption and authentication,

23   that it says can be activated by software developers means

24   it's probably going to be -- it's available through the API.

25   The API will be able to make those actually -- enable them

 1    and make them work.

 2            Q.   And so according to this document, around what

 3    time was the SDK actually released publicly?

 4            A.   I believe the end of 2002.  I think we saw.

 5            Q.   Okay.

 6                 MS. STERNBERG:  And so if we can move to DX-305.

 7    BY MS. STERNBERG:

 8            Q.   And so what is this document?

 9            A.   This is actually a data sheet for the software

10    development kit.  So it gives you an idea what you expect to

11    see in the software development kit.

12            Q.   Can you give us a listing of basic

13    functionality?

14                 And then the bottommost of that it says

15    "authentication and encryption."

16            A.   Yes.

17            Q.   So what does it mean that authentication and

18    encryption were basic functionalities?

19            A.   That -- usually when someone like this and we

20    did this at Monarch -- when you say it has basic

21    functionality, it means it's part of the firmware.  You

22    don't have to do anything, you might need to do something to

23    use it but it's going to be there ready to go.

24            Q.   Okay.  And do you see at the bottom there is a

25    box that says "firmware support"?

Geier - direct

1      A.   Yes.

2      Q.   So I guess backup question:  Are you aware of

3  whether there were different versions of DiskOnKey devices?

4      A.   Well, there are different model numbers and

5  there are different firmware versions.

6      Q.   Okay.  Are you aware of the difference between

7  the different model numbers?

8      A.   I recall some of those, yes.

9      Q.   Okay.  And do you know what was different about

10 the different DiskOnKey devices that were put out there?

11     A.   Well, if one ran -- if different models ran the

12 same firmware, they would operate the same.

13     Q.   Okay.  So as long as the different device is

14 were running the same firmware, all of this would apply; is

15 that right?

16     A.   Yes, the functionality would.  Yes.

17     Q.   Okay.  And if we could -- so we'll get into the

18 SDK later.  I don't want to get into the weeds on it now.

19 So let's move on to kind of the star of the show, which is

20 going to be the firmware upgrade application?

21          THE COURT:  Is this -- would this be a good

22 place --

23          MS. STERNBERG:  To take a break, yes.

24          THE COURT:  -- to take a break for lunch?

25          MS. STERNBERG:  Sure.

**Appx9789**

Geier – direct

```
 1                    THE COURT:  We'll resume where we are after

 2       lunch.  Let's see.  Let's take until -- why don't we take

 3       until 1:00 o'clock, if that is enough time, and we'll

 4       reconvene at that point.

 5                    (Jury left courtroom.)

 6                    THE COURT:  Very well.

 7                    Mr. Geier, during the break, you are not to

 8       speak with any of the lawyers about the subject matter of

 9       your testimony.  You can speak to them about other subjects

10       but not on about the subject matter or for that matter

11       anyone else.  Most everyone here is either a lawyer or

12       connected with this.  So speak about any other subject to

13       the extent you choose to, but not about the subject matter.

14                    THE WITNESS:  Yes, Your Honor.

15                    THE COURT:  Thank you.  We're adjourned.  1:00

16       o'clock.

17                    (Lunch recess taken.)

18                    *     *     *

19                    1:00 p.m., Afternoon Session

20                    THE COURT:  Thank you.  Please be seated.

21                    Mr. Grimes will be bringing in the jury

22       momentarily.

23                    (Jury returned.)

24                    THE COURT:  Thank you, Ms. Grimes.

25                    Please be seated.
```

**Appx9790**

1           Ms. Sternberg.

2    BY MS. STERNBERG:

3           Q.    Good afternoon, Mr. Geier.

4                 MS. STERNBERG:   So if we could bring up DX-97.

5           And zoom in on the title.   And the date.

6    BY MS. STERNBERG:

7           Q.    So what is this document?

8           A.    This appears to be a news press release about

9    M-Systems' automatic firmware upgrades for DiskOnKey.

10          Q.    Okay.   And what is the date of this document?

11          A.    July 11th, 2002.

12          Q.    Okay.   And so what is this document indicating?

13          A.    This is indicating a release of a product which

14   is typically what companies do.   We do this all the time at

15   Monarch when we release a product, we issue a press release

16   that corresponded to that product being released.

17          Q.    So what product is this?

18          A.    This is the DiskOnKey.

19          Q.    Right.   But what product is being released I

20   guess is what I mean?   The title.

21          A.    This is, yeah -- this is providing for the

22   DiskOnKey, the firmware upgrade for the DiskOnKey.   It's an

23   application.

24          Q.    Okay.   And what is a firmware upgrade?   What

25   does that mean?

                           Geier - direct

 1           A.    Firmware upgrade, remember we talked about

 2    firmware.   That's the software that runs on the device that

 3    a company such as M-Systems or another manufacturer like we

 4    did at Monarch, occasionally you want to update that

 5    firmware so that we can make the device do other things, you

 6    know, then it was more basic functionality, maybe change

 7    some of that basic functionality.

 8              So this is a, a utility for an application to

 9    allow you to upgrade the firmware on that device.  You may

10    have upgraded firmware on other products you have purchased

11    maybe an iPhone you may have operating the operating system.

12    Similarly you may have other products you upgraded the

13    firmware on.

14              MS. STERNBERG:  So let's open up DX-330.  And if

15    we could blow up the date.  Perfect.

16    BY MS. STERNBERG:

17           Q.    Okay.  So what is this document?

18           A.    Okay.  This is part of the description here.  So

19    that's what this is.  Oh, this is actually an email, I'm

20    sorry.  Yeah, this is an email from Shany Nir -- I believe

21    is how you pronounce that -- to it looks like a group of

22    people.  So it's an email.

23           Q.    So if we could, I guess summarize what this

24    email is about.

25           A.    This is an email.  It looks like someone sent

Geier - direct

1      out, which again, at Monarch, we send out an email to let

2      everyone know we're releasing this product and it's

3      indicating, "please pass this indication on to other

4      partners, distributors, partners, customers, reps, and

5      distributor to let them know the product was released."

6              It also talks about how to download the

7      software, what the capabilities are.  It's giving you a

8      little bit of information about the product and what it is.

9              MS. STERNBERG:  Okay.  If we could highlight the

10     second paragraph.

11     BY MS. STERNBERG:

12         Q.    I'll just read it.

13              "The DiskOnKey upgrade supports the DiskOnKey

14     product line, starting from DiskOnKey firmware version 2.01

15     for all the capacities from 8 megabytes to 513 megabytes."

16              What does that mean?

17         A.    What that means is give an indication or

18     explaining what this firmware upgraded, which products it

19     works with.  So it will work with any product that has

20     capacities of 8 megabytes to 512 megabytes.

21              So as long as the product had that capacity, it

22     if it fell within that capacity it could be upgraded.  Also

23     a DiskOnKey that had an exerting firmware version of 2.01 or

24     higher.  You know, it could be upgraded to this.

25         Q.    Okay.  And then do you see where it says the

**Appx9793**

Geier - direct

1    DiskOnKey upgrade can be downloaded from their website?

2         A.   Yes.

3         Q.   Starting from July the 10th?

4         A.   Yes.

5         Q.   What does that indicating?

6         A.   That indicates it's a helpful thing to let

7    people know where they can get the software.  So it's

8    indicating you can click on that or go to that particular

9    website and find the software to download.

10             MS. STERNBERG:  And if we could just look at the

11   document it itself without the callout.

12             And go to the second page.

13   BY MS. STERNBERG:

14        Q.   Do you see that it explains who Shany Nir was?

15   And I guess who was she?

16        A.   Okay.  It looks like she is a product line

17   manager for DiskOnKey.

18        Q.   Okay.  And if we could go back to -- oh, I guess

19   do you see it has an attachment to the document called a

20   DiskOnKey upgrade?

21        A.   Yes, it says DiskOnKeyUpgradeReadMe.PDF.

22             MS. STERNBERG:  So now we're going to open up

23   what was the attachment which is DDX-331 or DX-331.

24   BY MS. STERNBERG:

25        Q.   Okay.  So what is this document?

Geier - direct

1          A.    This is an explanation for how to download the

2     application, how to run it and basically what it does.

3     Typically what the product developer would be sending out to

4     people if we're going to tell them where to download the

5     application, we want to explain what it does and how to use

6     it.

7          Q.    Let's start with how to download it.  So what

8     does it say in Section 2.

9          A.    Okay.  So downloading the application -- the

10    print is really small on my screen.  I'm sorry.  Blow it up.

11          For paragraph No. 2, downloading the

12    application.  No installation is required.  Simply download

13    the latest version of the DiskOnKey upgrade and it gives you

14    the website, which is the DiskOnKey website and company, and

15    save it to your hard disk.

16          Q.    Okay.  And so that's Step 1.  Then let's go to

17    No. 3.  Which is -- what happens next?

18          A.    Okay.  Now this section here is explained on how

19    you run it.

20          You download it to the desktop.  It's sitting

21    there.  You are ready to start using it.

22          So running the application.

23          It's fairly self-explanatory but before you

24    begin running the DiskOnKey make sure you have an active

25    connection to the Internet.  So it's make sure you have a

Geier - direct

1   connection from your computer to the Internet.  That's

2   straightforward.

3           Then you follow some systems -- so the first

4   thing you do is double-click on the icon.  You probably

5   downloaded software to the computer.  The icon sits there.

6   You open it up by double-clicking on it.  That's what it's

7   telling you to do.

8       Q.  Why would you need an active connection to the

9   Internet when using this application?

10      A.  What is going to happen it's going to use the

11  Internet as a part of the network that -- we talked about

12  networking earlier, the way it connected these computers to

13  get to a server where the firmware updates are going to be

14  located.

15      Q.  Okay.  So let's see what happens next.

16          MS. STERNBERG:  So if we can go to the next page

17  of this document.

18          Oh, sorry.  The bottom of the last page.  I

19  should have led into this.  That's a little hard.

20          No, sorry, the bottom of the first page.

21  BY MS. STERNBERG:

22      Q.  Okay.  Do you see No. 3, it says "click continue

23  to advance to the next screen or cancel"?

24      A.  Yes, I do.

25          MS. STERNBERG:  Now, go to the next page.

**Appx9796**

Geier – direct

1    BY MS. STERNBERG:

2          Q.    Now what is that image at the top?

3          A.    The image at the top would be what appears after

4    you double-click on the icon.  This will be a menu that

5    comes up.

6                And it's informing you to click to continue.

7          Q.    Okay.  And so what happens next?  Let's look at

8    the next step of the document.

9          A.    After you click continue, then as it says right

10   here, paragraph 4, "click upgrade to begin the upgrade

11   procedure."

12               So this is going to be a button you can push now

13   to upgrade the firmware.

14         Q.    So what does the next sentence means where it

15   says this button is enabled only if your DiskOnKey is

16   connected?

17         A.    That means that the button that says upgrade is

18   only going to be usable if you have the DiskOnKey inserted

19   into the USB port.  If it's not inserted, that button is not

20   going to do it.  Okay?  You probably have experienced of

21   other software like that where you have to do something to

22   make that button active.  So that's, that's a similar

23   situation here.

24         Q.    So kind of like grayed out then, it's not

25   enabled but if it populates or something then it would be

**Appx9797**

1    enabled?  Is that what you mean?

2            A.    That's correct.

3                  MS. STERNBERG:  Okay.  So then if we could

4    highlight the next sentence.

5    BY MS. STERNBERG:

6            Q.    And if you can read that out loud?

7            A.    Yes, as it reads there:  "The application

8    connects to a remote server and checks if a newer version

9    exists for the current DiskOnKey."

10           Q.    Okay.  Then it says "the steps of this process

11   are displayed on the screen."

12                 So just to be clear is that, when it says remote

13   server, I guess, what does that mean?

14           A.    The remote server is that server out there that

15   is going to be holding the firmware to use in an upgrade

16   version of the software on that DiskOnKey.

17                 MS. STERNBERG:  Sean, can we get that back up?

18                 THE COMPUTER TECH SPECIALIST:  Yes?

19                 MS. STERNBERG:  Can we get that back up.

20                 THE COMPUTER TECH SPECIALIST:  Sure.  I'm sorry.

21   BY MS. STERNBERG:

22           Q.    It says the steps of the process are displayed

23   onscreen, Figure 2, upgrade screen.  So what does that mean

24   that there is an upgrade screen?  Where is that being

25   displayed?

Geier - direct

1        A.      We see a picture of it right there.  That is the

2    same screen you would have clicked upgrade, that is going to

3    come back and that is going to start showing these steps

4    like you might see in other software where it shows the

5    progress.  This is more than just a little progress bar.

6    You have to wait for the hourglass turning.  This is

7    actually going through and checking off certain steps that

8    it's actually completed.

9        Q.      Okay.  So let's walk through those steps as

10   they're displayed on the screen.  Just to be clear, where is

11   the screen displayed?  Is it on the computer?

12       A.      Yes, this will be on the computer that the

13   person installed the application on.

14       Q.      Okay.  So let's go through the first one,

15   getting current version, 2.5.  What happens there?

16       A.      What is happening in that step is the

17   application running on the computer, which is where this

18   application is installed, is going out to the DiskOnKey and

19   it's going to go through an API, you know, to get to that

20   and retrieve the current firmware first from the DiskOnKey.

21       Q.      And so where do you get that current version

22   from?

23       A.      As I was mentioning, it comes from the

24   DiskOnKey.  It's stored on the DiskOnKey and this, this

25   particular step, the application on the PC is going to the

Geier – direct

 1   DiskOnKey, retrieving it from the DiskOnKey where it is

 2   stored.  And then bring it back into the, the application

 3   that you're on, on the computer.

 4        Q.   Okay.  You mentioned an API.  So how do you know

 5   about an API being involved in this callout?

 6        A.   I do know there is a software development kit

 7   that's used with the DiskOnKey and there is various APIs

 8   that are in that software development kit and one of those

 9   is for getting the current firmware version.

10             MS. STERNBERG:  Okay.  So if we can keep this up

11   on the screen but then add DX-33.  Sorry, PX-333.

12   BY MS. STERNBERG:

13        Q.   Okay.  So is this the software development kit

14   that you were referring to?

15        A.   Yes.  That appears to be it, yes.

16        Q.   So it says "preliminary" on the cover.  What is

17   your take by reading that?

18        A.   Well, preliminary typically means I think we

19   heard on video earlier that -- and it's similar to that.  It

20   means that it's -- there may be -- there is going to be

21   other updates coming later, but at least for this point when

22   this was released, these functions that are in there, the

23   API calls, the functionality that is provided by that

24   software development kit, is there.  It just might be

25   changed in the future.  This is alerting companies that

Geier - direct

1      there they may be more to come later.

2                  MS. STERNBERG:  Okay.  If we can go to page 5 of

3      the software development kit document.

4                  And then if we could blow up the second

5      paragraph.

6      BY MS. STERNBERG:

7            Q.    So what does that mean?

8            A.    Okay.  This is explaining that there is a

9      library of functions and that is really what an SDK

10     provides.  There is a library.  I think the other day we

11     heard dictionary, you know, a dictionary function.  It's a

12     big stack of documents for Ingenico that that was their SDK.

13     It's a lot much functions that is in their particular SDK.

14     But it's actually a library of functionality that can be

15     used by a software developer if they want to use it and how

16     they want to use it.

17                 MS. STERNBERG:  So let's go to page 36.

18     BY MS. STERNBERG:

19           Q.    So what is this particular page discussing?

20           A.    Okay.  Maybe to give a little bit of background

21     on the SDK, so you understand what this is.  As I mentioned,

22     there are APIs.  And APIs and the SDK are represented by

23     function calls.  It's going to be something that when a

24     developer writes the software for an application, that

25     they're going to be writing the application, they can use

1    the SDK to call these functions, to do certain things.  And

2    when you have an instruction that calls for that function,

3    that's going to be going back to the firmware that is going

4    to key and do something with that.  It's going to perform

5    some type of functionality.

6              So this is one of those functions.  There is a

7    lot of functioning, a lot much different ones, but this is

8    one of those functions.  This particular one is to get

9    device version.  That's to get the firmware version of the

10   DiskOnKey.

11         Q.   Okay.  And were you here for Mr. Sobol's

12   testimony?

13         A.   Yes, I was, this morning.

14         Q.   Do you remember that he testified that during

15   the API that returned the firmware version of the DiskOnKey?

16         A.   Yes, he said pretty much what I just explained

17   to you.

18         Q.   So that is consistent with what you are showing

19   us; is that right?

20         A.   Yes.

21         Q.   Okay.  And so how do we know that it's getting

22   the current version during this process?

23         A.   Well, there are several reasons.  One is you

24   have to have a DiskOnKey plugged in for this to work, so

25   that is giving you a sign that you are going to need a

Geier - direct

1    DiskOnKey so something is going to happen on the DiskOnKey.

2                Also I know from my experience, that we have

3    also heard in other testimony, that an API that's within a

4    software development kit that you are going to use while

5    writing the instructions, you write the application

6    software, that those APIs go into the firmware and do

7    something.  It provides an interface to the firmware on that

8    portable device.  So this is going to have to work within

9    what the SDK so it's related to firmware and relate to the

10   DiskOnKey and getting that device version number from the

11   DiskOnKey.

12        Q.   Okay.  So we focus --

13             MS. STERNBERG:  We can put the SDK documents

14   aside for now.

15             And if we look back at the firmware upgrade

16   document.

17   BY MS. STERNBERG:

18        Q.   The next step, we can move the circle down, is

19   to connect to server.

20             So what do we know about what that means?

21        A.   Well, it's pretty self-explanatory by what it

22   says.  It says it's connecting to the server.  So that means

23   that the PC, the application is now going out to connect to

24   the server and you have probably seen that in applications

25   where it will be connecting to something.  This is actually

Geier - direct

1   saying connecting to the server and we do know that this --

2   that the memo we're talking about here does talk about going

3   out to the server to work with it.  So it's, it's very clear

4   that it's connecting to a server from the PC we're talking

5   about the application that runs on that server.

6           Q.   Okay.  You see on the paragraph that says the

7   "application connects to a remote server and checks to see

8   if a newer version exists"?

9           A.   Yes.  That's what I was referring to when I said

10   that.

11           Q.   Yes.

12           A.   That's exactly right.  It says that there.  So

13   the application connects to a remote server and that's where

14   it's checking for a newer version of the remote server to

15   see for that current DiskOnKey.

16           Q.   Okay.  And then the next step is authenticating

17   the device.

18                MS. STERNBERG:  We can move the circle down to

19   that one.

20   BY MS. STERNBERG:

21           Q.   So what does that mean?

22           A.   Okay.  This is what I going to need to do a

23   little more explanation on it because I want to make sure

24   the jury understands what authentication means.  I know we

25   said it a few times, but it's probably important to

**Appx9804**

Geier - direct

1    reiterate one more time.  I hate to be saying the same thing

2    all the time, but I think this one is important.

3              Authentication is again we're using it sort of

4    simultaneously with the verification so we're verifying

5    that device.  We're verifying the actual device so

6    authentication means you are confirming that something is

7    what it's supposed to be.  It's sort of the idea.  Making

8    sure that that product or that particular device is that

9    device -- that particular device.

10        Q.   Okay.  And why would the device need to be

11   authenticated or why would they want it to be authenticated

12   during a firmware upgrade process?

13        A.   Typically you want to make sure that you

14   download firmware only to devices that you -- that they're

15   going to operate on, for one.  They could be certain it

16   will be a device that will use that firmware.  There is

17   other security aspects to that, that you just don't want to

18   download the firmware to anything, that, that you worry

19   about maybe someone getting a firmware and doing something

20   with it and maybe trying to reverse engineer it, whatever.

21   But you want to authenticate that device to make sure it's

22   authorized to download that software.

23        Q.   So back in July of 2002, the date of this

24   document, what are ways that one of ordinary skill in the

25   art would know how to do authentication?

Geier - direct

1          A.    Well, there was several ways.  Certainly one way

2     would be to use what is called PKI.  PKI is called a key

3     infrastructure.  That is one way.  I can explain that to the

4     jury whenever you think it is appropriate.  We talked a

5     little bit about it.

6          Q.    Well, we'll talk more about that but what are

7     other ways that one of ordinary skill can --

8          A.    Well, you can use the serial number of the

9     device, the actual product, the device itself, and use that

10    in a way to authenticate it.  We used to do that at Monarch

11    Marking Systems to authenticate certain types of devices,

12    depending on how secret that serial number is kept.

13         Q.    And were you here for Mr. Elazar's testimony

14    today?

15         A.    Yes, I was.

16         Q.    Do you remember him talking about various

17    authentication methods?

18         A.    Yes.

19         Q.    And is that consistent with what you have been

20    discussing?

21         A.    Yeah, it is.  He operates some other ideas on

22    how to do authentication but that is it in general, yes.

23         Q.    So is it fair to say back in 2002, somebody of

24    ordinary skill in the art looking at this would know what to

25    do in order to complete that step?

Geier - direct

1              A.    Right.   I would sit at my desk at Monarch

2      Marking System and I had this screen, or at least this

3      particular product screen associated with it, I would right

4      away know how to do authenticate it.

5              Q.    Okay.   So based on your review of other

6      DiskOnKey documents including the SDK, what is your

7      understanding about how the actual M-Systems' people did

8      authentication in this step?

9              A.    Well, there is some documents I mentioned that

10     the DiskOnKey uses PKI and the SDK talks about the fact that

11     it implements PKI.   And there is some function calls in the

12     SDK that I'd know pertain to PKI.

13             Q.    So let's look at some of those documents.

14             MS. STERNBERG:   If we could keep this screen up

15     but look at DX-336 at page 4.

16     BY MS. STERNBERG:

17             Q.    Okay.   Do you see this is a slide entitled "How

18     does the DiskOnKey upgrade work"?

19             A.    Um-hmm.   Yes.

20             Q.    Sorry.   And if you could read the first few

21     bullets and explain what that means?

22             A.    Okay.   So again, this is how the DiskOnKey

23     upgrade works.

24             The DiskOnKey identifies the designated upgrade

25     server using public key infrastructure, which is the PKI we

Geier - direct

1   have been talking about.

2              The upgrade server identifies for DiskOnKey

3   using PKI.

4              And only after both are mutually identified,

5   the DiskOnKey allows new firmware to replace the previous

6   one.

7         Q.   So in that second bullet, what does it mean

8   that the "upgrade server identifies the DiskOnKey using

9   PKI"?

10        A.   This is another way of saying this is where the

11  upgrade server is authenticating the DiskOnKey.

12        Q.   And I guess, now let's look at the SDK document.

13  It talks about the function calls you mentioned.

14             MS. STERNBERG:  So let's look at DX-333 at

15  page 71.

16             Okay.  If we could highlight the first sentence

17  where it says the DiskOnKey enables PKI-based

18  authentication.

19  BY MS. STERNBERG:

20        Q.   So is this what you were referencing?

21        A.   Yes.

22        Q.   Okay.  And if you could highlight the sentence

23  that says, where the cursor is where it says all the

24  cryptographic actions are executed on the DiskOnKey?

25             First of all, what is a cryptographic action and

Geier - direct

1   what does it mean it's executed on the DiskOnKey?

2           A.    Okay.   These particular cryptographic actions

3   are things pertaining to like encryption, authentication,

4   things that deal with security.   You know, as a way of kind

5   of -- maybe the best way you can think about that.

6               So that is what these types of functions

7   provide.   These are all functions that are API calls that

8   you can write your software and use these in your

9   instructions.

10              And the idea that it's implemented on the

11  DiskOnKey means that when you call these functions, that

12  particular function is going to be pertaining to the

13  DiskOnKey.   You know, it's going to be -- the firmware is

14  going to be providing that, operating that, running that.

15  Whatever the function is doing is going to be pertaining to

16  the DiskOnKey.

17          Q.    And I guess now, have you explained what is

18  PKI-based authentication?

19          A.    Okay.   PKI is one of those umbrella terms.   It's

20  used in the industry and it primarily deals with the idea of

21  authentication.   You know, I wrote this book and talked

22  about securing computer networks.   It's the framework of

23  this protocol.   802.1X is a framework you can utilize PKI

24  with.

25              PKI, public key infrastructure, the idea is we

**Appx9809**

Geier - direct

1    can authenticate devices, so if you have a computer and you

2    want to be sure the computer connecting code is authentic,

3    you can use PKI protocols which involves some exchanges of

4    different types of keys and so forth and certificates to

5    make that happen.

6              MS. STERNBERG:  And so if we could go to the

7    next page, page 72 of this document.

8    BY MS. STERNBERG:

9         Q.    What is this discussing?

10        A.    Okay.  Now again, this is another one of those

11   functions.  This is, you know, a list of functions and this

12   is one of the cryptographic functions that is going to be

13   called and this is pertaining to API and this is called "get

14   public key" so it's pretty self-explanatory.

15             So a lot of these APIs are written in kind of

16   human understandable term.  There is going to be a code

17   behind it that is going to run software that is going to do

18   stuff.  So get public key means that when you implement that

19   at the computer in your application, and the certain syntax

20   would follow, that you send that -- you go and exercise that

21   particular command.  It's going to go through the API and

22   it's going to return the public key that is stored on the

23   DiskOnKey device.  That's where you turn it back to the

24   application that you're running on the PC.

25        Q.    So in other words, just to make sure I

**Appx9810**

Geier - direct

1    understand because I'm not a software engineer, if somebody

2    writes an application and puts in this command, get public

3    key, it will then send a message to the portable device,

4    the portable -- the DiskOnKey, the DiskOnKey will go into

5    the firmware and get the public key and then send it back?

6         A.   It will -- yeah.  Exactly right.  It will

7    return the public key from the DiskOnKey.  So a message

8    goes across the DiskOnKey from the computer.  The DiskOnKey,

9    the processor then will exercise that function, that

10   functionality within the firmware and then it will get the

11   public key and then send that back to the application on the

12   computer.

13        Q.   Okay.  And do you see under remarks, it says

14   "the DiskOnKey public key is unique for each DiskOnKey"?

15        A.   Yes.

16        Q.   So what does that mean?

17        A.   That means that the public key used on each

18   DiskOnKey device will be different.

19        Q.   So why is that important for PKI-based

20   authentication?

21        A.   Because that becomes an identifier of that

22   device.  To do authentication -- to authenticate a device,

23   the identifier needs to pertain to that particular device

24   and be unique.  It's got to pertain just only to that

25   device.  It's like every one would have a different name.

**Appx9811**

Geier - direct

1    We have common names between people but it would be required

2    that everyone have a different name.

3         Q.    Okay.  So if you were a developer looking at

4    this SDK and you wanted to authenticate the device, what --

5    how would you do it?

6         A.    Okay.  I think it's a little more involved which

7    I can explain using public keys and what are called private

8    keys.  There is two different types of keys and PKI and a

9    public key you can give to anybody and you could -- it's not

10   secret.  It's not a secret thing.

11             It identifies -- it's a particular

12   identification number.  It's just a number but it's a --

13   cryptographically paired with the private key, meaning you

14   can encrypt data with a public key and decrypt it with a

15   private key.  You can encrypt data with a private key and

16   decrypt it with a public key.  Either way.

17             It's different than what is call symmetric

18   encryption.  Symmetric encryption you use common keys on

19   both sides.  The same key would decrypt, the same key would

20   encrypt.  So with public key infrastructure, with PKI, there

21   is public keys and private keys.

22             Here we're getting the public key.  And the

23   public key can be then -- this would then be given to -- the

24   they are running the software.  I would do authentication

25   by taking this public key and sending it to the server.  So

Geier – direct

1    the server has the public key.  Remember, that's the one

2    that you can send to anybody.  It's not private, it's not

3    secret.

4          But there is a private key sitting on the

5    DiskOnKey that we know from the SDK exists.  That private

6    key is going to be there.  And now you have a public key on

7    the left hand with the server; you have a private key with

8    the DiskOnKey end of it.

9          To do authentication, the server -- this is

10   just one way.  The server can send a message of some type,

11   something that, hi, I'm the server.  Just whatever it wants

12   to.  Sends that to the DiskOnKey and that will be done

13   through your application.  You are writing that was as a the

14   developer will be writing that application to handle this.

15         I would say "hi" on the server to the DiskOnKey.

16   DiskOnKey would then encrypt that with its private key.

17   It's kept it there secret.  It's not going to let that key

18   go.  It's going to stay on the DiskOnKey.  It's secret.  It

19   will encrypt with that private key and then your application

20   will now send that back to the server.  The server now can

21   take that encrypted value it got, use the public key,

22   decrypt it and see if it got back the same thing it sent.

23   If it did, it's authenticated.  If you get something back

24   different, that doesn't authenticate, it's not verified.

25   Because if it comes back encrypted differently, that

 1    DiskOnKey must not have the right private key so there's not

 2    a pairing there, lost its pairing with the private key and

 3    public key.

 4            I know that's a little complicated but that is

 5    one way a developer sitting there at Monarch Marking Systems

 6    could have authenticated the DiskOnKey and the server by

 7    using this application, you know, the way this is by using

 8    public keys and private -- by just using the SDK.

 9        Q.   And how do we know that the authentication is

10    happening at the server and not, let's say, on the

11    application on the computer?

12        A.   Well, they actually -- authentication needs to

13    be done there.  So we talk about the server authenticating

14    the DiskOnKey.  That was in one of the other slides that

15    we highlighted.  So if the server authenticates the

16    DiskOnKey, it's the server doing authentication.  That's

17    the end.

18            It's like you walk in here in the security,

19    they're authenticating you.  So security guards are

20    authenticating, that is the entity that did that.  The

21    same thing here, the server is authenticating the DiskOnKey

22    so the server would be doing the authentication.

23        Q.   And would a person of ordinary skill in the art

24    back in 2001 know how to do PKI-based authentication the way

25    you were describing?

Geier - direct

1          A.   Yes.  As I explained -- I'm sitting at my desk

2      at Monarch Marking Systems, I would be able to do this based

3      on having this information.

4          Q.   Not just you but any person of ordinary skill

5      in the art at that time?

6          A.   Right.  I guess I was talking about myself as

7      being ordinary skill in the art.  Others I knew at Monarch

8      who had a similar skill the art would have qualified as a

9      person of ordinary skill in the art could have done the

10     same thing.

11         MS. STERNBERG:  Let's look quickly at DX-304 at

12     page 1.

13     BY MS. STERNBERG:

14         Q.   So this is a presentation called a remote server

15     demonstration from the M-Systems file.  Do you see that?

16         A.   Yes.

17         MS. STERNBERG:  And so if we could go to page 3

18     of this document.

19     BY MS. STERNBERG:

20         Q.   And what does that say?

21         A.   Okay.  This is explaining that the SDK, the

22     software development kit that we're -- have been looking at,

23     allows you to write applications that authenticates with

24     remote server using PKI.

25         Q.   So that is consistent with your testimony right

Geier - direct

1      now; is that correct?

2              A.   Right.  It's saying the same thing.

3              Q.   Okay.  So let's go back to just the firmware

4      upgrade document and talk about what happens after

5      authentication.

6                   So the next step is checking for newer version.

7      What happens there?

8              A.   Okay.  This is where the application is doing

9      what its called to do.  That's why they wrote the

10     application.  It's getting now into that.  You need to

11     authenticate first, but now it's getting to the point,

12     they've got to check for a newer version.  That's what the

13     idea -- you want to check for a newer version before you

14     download a version, make sure there isn't a newer version

15     available.

16                  MS. STERNBERG:  So if we could keep the screen

17     up but then look at the actual document itself.  Yeah.

18                  You want to go to the next page of the document

19     which is page 3.  DX-331.  Perfect.

20     BY MS. STERNBERG:

21             Q.   Okay.  So I think, is this describing what

22     happens at that step?  Where paragraph 5 says, "If your

23     DiskOnKey is already using the newest version, click okay."

24     And then number 6 says, "If not, click okay to upgrade to

25     the new version or cancel."

Geier - direct

1          A.     Right.   This is going to take place in that

2    period of time -- I'm looking at the screen here -- where

3    we're checking to see if a newer version but that -- when it

4    comes back with the result it's going to -- the application

5    is running on the PC isn't going to display these particular

6    menus.

7                So you can see the first one at the top there,

8    you have the, your -- you have the latest DiskOnKey version.

9    There is no need to upgrade.   So if the version is okay, you

10   have the latest one, this is telling you that you can click

11   out and you are done.

12               If there is a newer version, you'll see "a new

13   version DiskOnKey was found."   And would you like to

14   update to that version?   So it's letting you have a chance

15   to decide if you want to do that and if you do, you click

16   okay.

17         Q.    If we look at the callout on the left, it said,

18   "The application connects to remote server and checks if a

19   newer version exists."

20               So does that indicate that this checking of the

21   new version is happening at the remote server?

22         A.    Yes.   Because it says a new DiskOnKey version

23   was found and that would be looking at the server.   Yeah,

24   that's -- you connect it to a server, is you authenticated

25   with a server, so this is getting that from a server.   That

Geier - direct

1   is why you authenticate it was to get access to the server.

2   So it's going to be from the server is where it's coming

3   from.

4              MS. STERNBERG:  Okay.  Then if we could go to

5   the next page of the document, page 4.

6   BY MS. STERNBERG:

7        Q.   And let's see what happens at the next step

8   where it's the upgrading to new version step.  So what

9   happens in step 7?

10       A.   Well, as we can see there, it says, "To complete

11  the upgrade procedure, remove and reinsert your DiskOnKey

12  with a similar action to restart the computer."  So you take

13  the key out and put it back in again.

14       Q.   And do you see where it says "the verifying

15  procedure may take a few minutes"?

16       A.   Yes.

17       Q.   So if we look on the left screen of all the

18  things that are happening, do you see where it says

19  "verifying new version" at the bottom --

20       A.   Yes.

21       Q.   -- step?

22            So what is happening at that step?

23       A.   I believe what is happening there is it's

24  checking to make sure everything is okay.  That if you

25  update firmware you may have do that to other devices and

Geier - direct

1    software.  It doesn't work anymore.  There was a problem,

2    maybe there was a glitch in the download that just messed it

3    up.  So this is confirming to make sure everything is okay

4    on that upgrade.

5         Q.   Okay.  Then step 8 is, "If success, we can move

6    on"; right?

7         A.   Yes.  It's prompting you again to say, okay, I

8    understand it's done.  Okay.  We'll click the screen.  We're

9    finished with it.

10        Q.   Okay.  So now we can close out of this document

11   but we have an executable file of the firmware upgrade that

12   was produced by Western Digital.  So first, before you run

13   the executable, let's look at DX-329, which was the metadata

14   for that file.

15             And do you see the date and time last modified?

16        A.   Yes, I do.

17        Q.   And what is that?

18        A.   It indicates June 26th of 2002.

19        Q.   Okay.  And so now if we could give a little

20   demonstration about --

21             MR. LEIBOWITZ:  Objection, Your Honor.

22             THE COURT:  Sorry, we have an objection.

23             Go ahead.

24             MR. LEIBOWITZ:  Your Honor, this demonstrative

25   and demonstration was not provided to us per the rule we

Geier - direct

1   have been under.

2              MS. STERNBERG:  It's not a demonstrative.  It's

3   literally clicking the executable and opening it up.  And

4   that was produced to them long ago and it was on our exhibit

5   list.

6              THE COURT:  With what exhibit number is it?

7              MS. STERNBERG:  It's DX-328.

8              THE COURT:  328.

9              MR. LEIBOWITZ:  Can we approach, Your Honor.

10             THE COURT:  You may.

11             (Sidebar conference held.)

12             THE COURT:  Okay.  Exhibit DX-328.

13             MS. STERNBERG:  Yes.

14             THE COURT:  That's was produced and that is one

15  of your exhibit list.

16             MS. STERNBERG:  (Nodding yes.)

17             THE COURT:  Do you not have DX-328?

18             MR. LEIBOWITZ:  No, Your Honor we have the

19  exhibit.  The issue is that it was not disclosed as a

20  demonstrative or demonstrate to occur.

21             THE COURT:  It's not using it as demonstrative.

22             MS. STERNBERG:  I'm not using -- we're okay with

23  showing it.

24             MR. LEIBOWITZ:  I'm sorry.  Go ahead.

25             MS. STERNBERG:  In your motion in limine

1    decision, you said our expert could demonstrate the product

2    as used with -- demonstrate the executable files.  That did

3    exactly what we're doing now is just having somebody open it

4    up and seeing what the screen looks like that's it.

5                    MR. LEIBOWITZ:  Your Honor, she just said the

6    expert is demonstrating.  To the extent we have had

7    demonstrative slides, demonstrative, this is a

8    demonstration.  It's not a matter on the exhibit list two

9    days ago.  They should have told us what they were planning

10   to do, just as if I was going to put up a slide with my

11   expert that showed something on the screen.

12                   MS. STERNBERG:  I had to tell the other side two

13   days ago.

14                   THE COURT:  That was for demonstratives.

15                   MR. LEIBOWITZ:  And Ms. Sternberg just said the

16   how is the expert not a demonstrative.

17                   THE COURT:  You can demonstrate something with

18   an exhibit.  But if it's -- if a lot of what evidence is, is

19   demonstrating things with exhibits, and if the exhibits are

20   not required to be turned over two days in advance as

21   demonstratives are, then I don't see a problem.

22                   MS. STERNBERG:  We did provide this on the list

23   of exhibits that will be presented with Rubin -- I mean with

24   Mr. Geier.  We did provide a list and it was on the list.

25                   THE COURT:  And it was on the list?

Geier - direct

1                    MS. STERNBERG:  Yes.

2                    THE COURT:  I don't see a problem.

3                    MR. LEIBOWITZ:  Thank you, Your Honor.

4                    (Sidebar conference ends.)

5                    THE COURT:  Overruled.  You may proceed.

6                    MS. STERNBERG:  You can double-click that.

7      BY MS. STERNBERG:

8           Q.   Does this look familiar?

9           A.   Yes.

10          Q.   And if you could press continue?

11          A.   Yes.

12          Q.   Okay.  And does this look familiar?

13          A.   Yes, it does.  This is what we were showing in

14     the other slides.

15          Q.   So what is this executable file an example of?

16          A.   It's an example of the DiskOnKey firmware

17     upgrade application.

18          Q.   And it's consistent with the document we just

19     looked at; is that right?

20          A.   Yes.

21          Q.   And this time, the little checkmarks are not

22     there; correct?

23          A.   That's correct.

24          Q.   And so why are not -- why are the checkmarks not

25     there?

Geier - direct

1          A.    I believe it could be the DiskOnKey, it's not

2     plugged in or it hasn't started yet.

3          Q.    Okay.   Thank you.

4                Okay.   So now here comes a little bit of a

5     boring part where we have actually walk through the claims

6     again.

7                And so now that we discussed kind of the

8     functionality and how the DiskOnKey firmware upgrade works,

9     let's discuss the actual -- actual invalidity analysis with

10    respect to the claim.

11               MS. STERNBERG:   So if we can put up our slide at

12    page 14.   PDX-2, I think it was.

13    BY MS. STERNBERG:

14         Q.    Okay.   So we're going to -- I know Dr. Rubin

15    used an apparatus claim as the basis, but can you explain

16    why you are choosing to use system claim as kind of the

17    representative claim we're going to focus on today?

18         A.    Well, it includes the items that we need to

19    discuss.

20         Q.    And which of the devices, just as a reminder,

21    that are involved in the claim?

22         A.    That would be a terminal communications network

23    node and a portable device.

24         Q.    What does it mean to be a system?

25         A.    A system would include those devices or those

Geier - direct

1    particular items.

2         Q.   Do you recall that there were also method claims

3    and apparatus claims at issue?

4         A.   That's true.

5         Q.   And so what is the difference between each of

6    those things?

7         A.   An apparatus would correspond to a particular

8    device.  The method claims would be corresponding to a

9    certain methodology.

10         Q.   What do you mean by "methodology"?

11         A.   The functionality that would have to be

12    implemented.

13         Q.   Okay.  So let's start at the beginning.

14              MS. STERNBERG:  So if you can go to the next

15    slide.

16    BY MS. STERNBERG:

17         Q.   This is -- what is this slide telling us?

18         A.   Well, this is a slide representing the '703

19    patent, Claim 105.  And it shows that 105 is a dependent

20    claim of 104.

21         Q.   Okay.

22              MS. STERNBERG:  And so let's go to the next

23    slide.

24    BY MS. STERNBERG:

25         Q.   Breaking down the claim language.  I know we

Geier - direct

1    kind of have been describing it as a wall of words, so we're

2    going to have to take it piece by piece.

3              So what is required by this step?

4        A.   Okay.  This particular step pertains to the

5    terminal which has certain things.  Okay?  So remember it --

6    maybe from yesterday possibly -- but this is a terminal

7    having certain things, a processor, we talked about --

8              MS. STERNBERG:  You can go to the next slide as

9    he is talking.

10   BY THE WITNESS:

11       A.   The processor we talked about that, that is what

12   is going to implement the instructions, so it's going to run

13   the instruction.  Input component --

14             MS. STERNBERG:  Next slide.

15   BY THE WITNESS:

16       A.   -- a keyboard of some type or a way of entering

17   data, maybe a mouse.

18             Output component would be like a monitor.

19             Network communications interface would be some

20   sort of USB or Ethernet or some type of networking interface

21   that is part of that.

22             And then there is also a memory to store the

23   executable program code.

24             And --

25       Q.   Okay.  So in the DiskOnKey system is there a

Geier – direct

1   terminal that meets this requirement?

2           A.   Yes, there is.

3           Q.   And so what is that terminal?

4           A.   That would be the PC that you installed the

5   firmware upgrade application on.

6           Q.   Okay.  So is this claim satisfied by the use of

7   the DiskOnKey?

8           A.   Absolutely.

9           Q.   Okay.  So check that off.

10          All right.  Next step.

11          So this -- we're still in the first paragraph

12  but now we're talking about the program code.

13          So what is required by this step?

14          A.   Okay.  This deals with the first program code so

15  it's going to be a certain functionality that corresponds to

16  that when it's executed by the terminal processor, is

17  configured to effect the presentation of an interactive user

18  interface by the terminal output component.

19          So all that gobbledygook means, you are going to

20  put the menu up on the screen that we saw before.

21          Q.   Is this satisfied by the DiskOnKey device as we

22  saw?

23          A.   Yes, that is exactly what we saw.

24          MS. STERNBERG:  Okay.  Let's go to the next one.

25  BY MS. STERNBERG:

Geier - direct

1          Q.    So this is the second program code.  What is

2     required here?

3          A.    Okay.   The second program code is to provide

4     the communications node on the terminal to facilitate

5     communications to and from the terminal.

6          Q.    And so how do we see that, the program running

7     the application -- sorry, the computer running the

8     application?

9          A.    Yes.   With a computer like that, the general

10    purpose computer, it's going to have USB ports, and it's

11    going to be able to configure those USB ports for

12    communications.

13         Q.    And that is communications to portable devices.

14    Does it also provide communications to networks as well?

15    Just in general if computers do that?

16         A.    It could, yes.

17         Q.    And did we see that at all with the firmware

18    upgrade application?

19         A.    Yes.   We're connecting to a server over the

20    Internet so there is going to be some type of network

21    connection that is going to go over or travel through.

22         Q.    So is this satisfied by the DiskOnKey?

23         A.    Absolutely.

24               MS. STERNBERG:  Go to the next step.

25    BY MS. STERNBERG:

Geier – direct

1          Q.    All right.  So now we have the system is

2     comprising first, a communications network node.

3               So can you remind us what this is?

4          A.    Again, remember that is a server out there, that

5     is a server, at least in our example here, that is what

6     we're talking about for invalidity.  That is a server that

7     contains and stores the, the firmware upgrades.

8          Q.    Okay.  So is this satisfied, then, by the

9     DiskOnKey and the firmware upgrade application?

10         A.    Yes, it is.

11         Q.    All right.

12               MS. STERNBERG:  Next step.

13    BY MS. STERNBERG:

14         Q.    All right.  So this is about the hardware and

15    what is going to be physically on the portable device.  So

16    can you walk us through this?

17         A.    Yes.  So again, this is a portable device.  This

18    would be the DiskOnKey.  It's what we've seen examples of.

19    Okay?  It's going to comprise an external communication

20    interface.  That would be the USB side of it.  We saw that

21    on the block diagram when we talked about the USB interface.

22               We're enabling transmission of plurality of

23    communications between the portable device and the terminal.

24    It's also going to include a processor on the portable

25    device and memory.

**Appx9828**

Geier - direct

1          Q.   And did we see a processor in memory on the

2     DiskOnKey?

3          A.   Yes, we do.  I looked at that earlier in the

4     diagram when we talked about what was in the product

5     specification.

6          Q.   Okay.  So is this satisfied, then, by the

7     DiskOnKey?

8          A.   Yes.

9          Q.   And just to be clear, we looked at one product

10    specification but have you also looked at other product

11    specifications for other versions of the DiskOnKey?

12         A.   Yeah, I believe I did.  Yes.

13         Q.   Did you see anything different with those other

14    versions?

15         A.   They looked consistent to me.

16              MS. STERNBERG:  Okay.  So let's go to the next

17    step.

18    BY MS. STERNBERG:

19         Q.   So now the portable device has to be configured

20    to cause the terminal to execute the first program code to

21    affect the presentation of the interactive user interface by

22    the terminal output component.

23              So what does that mean?

24         A.   That means that the -- it's going -- the -- is

25    the portable device needs to do this first of all.  So the

Geier – direct

1    portable device will cause the terminal to execute the first

2    program code to -- and it's going to be effecting the

3    presentation.  It needed to change it somewhat.  So we --

4    that is what is happening here.  That is what needed to be

5    done is the portable device on DiskOnKey somehow needs to

6    make that presentation on the IUI change so it's going to

7    effect the presentation.

8         Q.   Where do we see that in the firmware upgrade

9    application?

10        A.   Well, certainly, the -- we're seeing that as

11   the -- as the firmware update proceeds, there are certain

12   things that are being executed on the portable device that

13   is sent to the computer and that would cause the status,

14   those steps that are taking place, to change.

15        Q.   And we saw when we plugged it in, when we ran

16   the executable and the DiskOnKey was not plugged in those

17   were not populated; is that right?

18        A.   That's right.  And that reminds me of another

19   reason that I believe -- let's see.  When you plug in the

20   DiskOnKey, there was a thing we talked about where it would

21   enable that one button, remember?  There was a button if the

22   DiskOnKey is not plugged in, it's not enabling that button.

23        Q.   That would be another example of effecting the

24   presentation?

25        A.   Yeah, that would before considered effecting the

Geier – direct

1    presentation.

2           Q.    Okay.  So is this limitation satisfied by use of

3    the DiskOnKey?

4           A.    Yes, it is.

5                 MS. STERNBERG:  And let's go to the next at

6    third program code.

7    BY MS. STERNBERG:

8           Q.    All right.  Another wall of words.

9                 So what is required here?

10                MS. STERNBERG:  If we can go to the next slide,

11   that breaks it down a little bit.

12   BY THE WITNESS:

13          A.    Okay.  So third program code is going to provide

14   a communications node on the portable device.  It's going to

15   the flip side of the second program code.  It's going to be

16   on the portable device now, not the terminal.

17                And it's also going to provide -- establish a

18   communications link between the portable device and the

19   terminal.

20          Q.    So what do we see in the DiskOnKey that

21   satisfies that?

22          A.    Well, the DiskOnKey has -- is a USB drive.  So

23   you have -- it has a USB port on it.  We saw it on the block

24   diagram.  If you look at the actual DiskOnKey, it has a USB

25   plug on it and the computer that we're running this firmware

**Appx9831**

1    update application also has a USB port.  So by having -- by

2    establishing that node on the, the portable device to the

3    USB, you plug into the computer, we have communications.

4    It's going to be configured to communicate between the two

5    devices.

6              MS. STERNBERG:  Let's go to the next part of

7    third program code.

8              THE WITNESS:  Yes, this is --

9    BY MS. STERNBERG:

10        Q.   What is required here?

11        A.   Yeah, this is where, it's also going to need

12   to facilitate communications to the terminal and to a

13   communications network node.  So it's going to be going from

14   the portable device to the communications network node

15   through the terminal.

16        Q.   And so how do we see that when using the

17   DiskOnKey with the firmware upgrade application?

18        A.   Well, at least as a minimum, when we're going

19   through that we saw there is a step for authentication and

20   that is where they do authentication.  You can use that API

21   call where -- to get public key and to perform

22   authentication, you would -- the public key would be gotten

23   from -- probably not great words -- from the portable

24   device, taken to the terminal because that is where the

25   application is and then the software developer on the

Geier - direct

1    terminal would be sending that to the server to do

2    authentication.

3            Q.    So is this satisfied by the DiskOnKey in the

4    firmware upgrade application?

5            A.    Yes, it is.

6            MS. STERNBERG:   Let's go to the fourth program

7    code.

8    BY MS. STERNBERG:

9            Q.    Okay.  So there is another slide that kind of

10   breaks it down into bullet.  Same language but just in

11   pieces.

12            So can you walk us through this?

13           A.    Okay.  This one is really important to

14   understand.  And it's also not really as confusing.  It's a

15   fairly simple thing if you look at it, but it's written in a

16   way that is a little confusing.  You have to read it a few

17   times to get it, but it's really important to understand it

18   so I'm going to try to explain it the best I can.

19            Again, this is your fourth program code.  So

20   it's going to be code only pertaining to this, this

21   particular set of functionalities and stored on a portable

22   device.

23            And let me just explain it more.  I don't know

24   if we did before with the other picture.  This is somewhat

25   on the computer where the application is, is interacting

Geier - direct

1    with that interactive user interface -- in other words, that

2    menu we had where they push a button -- and now a message is

3    sent to the portable device.

4            And in response to that, message that the

5    portable device receives, it's causing communications

6    between to be transmitted to the communications network node

7    which is the server.  Okay?  So it's sort of an automatic

8    process that goes, makes that loop around.  We saw that

9    picture earlier when we showed that.  So that is really what

10   this claim is doing.

11       Q.   Let's put up that picture so we have it side by

12   side.

13            MS. STERNBERG:  So if we can put up DX-331 but

14   kind of screen that shows the steps of the DiskOnKey

15   firmware upgrade next to it.

16            Great.

17   BY MS. STERNBERG:

18       Q.   So if you can walk us through how using the

19   firmware upgrade meets the requirements of the fourth

20   program code?

21       A.   Sure.  So at the very top, when this thing

22   starts, I need to get the firmware version from the

23   DiskOnKey.  I say "it" does, but we're talking about the

24   computer when the application is running.  So imagine there

25   is a computer where the DiskOnKey upgrade is running.  I'm

**Appx9834**

Geier - direct

1    going to call that the computer.  So from the computer, we

2    hit the button that -- let's say continue on there -- I'm

3    sorry, upgrade.  So we push upgrade on that menu.

4            That is going to be the user interaction where

5    the user -- interactive user interface so the second bullet

6    down there.

7            The second bullet, resulting from user

8    interaction with the interactive user interface, pressing

9    that that button satisfies that, that part of it.

10           Okay.  What is going to happen next is that is

11   sort of a two-step thing here.  One is the computer, the

12   application on the computer is going to go get the firmware

13   version from the DiskOnKey that needs that to send it to the

14   server.  It does that, sends that to the server and next

15   it's going to connect to the server -- I'm sorry, it's going

16   to get the firmware version first, connect to the server,

17   send that firmware -- sorry.  Let me back up again.  I'm

18   getting jumbled up.

19           After getting the current version, it's going to

20   connect to the server, it's going to authenticate -- and

21   let's go down to authenticate.  So highlight authenticate.

22   So authenticate server.

23           So I will start from the beginning since I kind

24   of jumbled it up a little bit.

25           After you click on the upgrade button that's

Geier – direct

1    the -- resulting from the user action with the interactive

2    user interface.  We talked about that a second ago.

3            Then it's going to then get the firmware

4    version from the portable device.  That's going to come

5    back to the, the computer itself.  It's going to have to

6    then get a public key from the portable device.  And part of

7    the authentication step and that's the part that is going to

8    send to the server.  So it's a -- you push the button and

9    all that happens automatically.  You are going to get the

10   firmware update first from the for portable device, then you

11   get the public key, and the public key would be sent to the

12   server to authenticate.

13        Q.   Okay.  So let's look back.

14             MS. STERNBERG:  We can close that up.  Actually

15   let's keep the right screen up but let's go to the next page

16   of the slide deck on the left.

17   BY MS. STERNBERG:

18        Q.   So if you remember, we talked about this flow,

19   what is happening in the fourth program code.  So we can

20   walk through it.

21             MS. STERNBERG:  So if you can go to the next

22   slide.

23   BY MS. STERNBERG:

24        Q.   So there is -- what happens there?

25        A.   This is what is happening after you push that

 1    button to upgrade when it's getting the public key.

 2          Q.    Okay.   So the -- right now the slides on the

 3    left are just the fourth program code, so we can walk

 4    through that quickly.

 5          A.    That's correct.

 6          Q.    So let's just talk about what the claim requires

 7    first.   So there is user interaction?

 8          A.    Yes.   There is going to be a message sent to the

 9    portable device.

10          Q.    Right.

11                MS. STERNBERG:   Next slide.

12    BY THE WITNESS:

13          A.    And in response to that message being received

14    by the portable device, there is going -- it's going to

15    cause a communications to be sent back toward the terminal.

16                MS. STERNBERG:   Yes, the next -- um-hmm.

17    BY THE WITNESS:

18          A.    And then on to the communications network.

19                MS. STERNBERG:   Yes, the next slide.   There we

20    go.

21    BY MS. STERNBERG:

22          A.    It's that simple, that is what is happening.

23          Q.    Okay.

24                MS. STERNBERG:   Then if we go to the next slide.

25    BY MS. STERNBERG:

Geier - direct

1      Q.   And that message has to do what?

2      A.   That message, in some of the claims, it would be

3   an identifier info, some type of identifier.  And it's going

4   to facilitate verification of the device and facilitate

5   synchronizing content.

6           MS. STERNBERG:  So if we go to the next slide.

7   BY MS. STERNBERG:

8      Q.   Now we're going to do it with a firmware

9   upgrade.  So what happens at the first step?

10     A.   So what is happening now is when it is

11  performing that authentication step, it's getting the public

12  key -- well, let me back up.  On the terminal, on the

13  computer, someone after they pushed that update button, it's

14  going to be sending via public key a command because that is

15  one of the API calls that we talked about and that is going

16  to be sent to the portable device.

17     Q.   Then what happens next?

18     A.   So that portable device gets that command to --

19  the message to send it, it's going to return the public key

20  back to the terminal.

21     Q.   And in order to return the public key back to

22  the terminal, how do you know that it executes code?

23     A.   Because we have seen documents that indicate

24  that.

25     Q.   And I guess what about those documents is

Geier - direct

1      indicating that?

2            A.    Well, it's indicating that all PKI functions are

3      done on the DiskOnKey, and it's a public key, with a public

4      key type of functionality.

5                 MS. STERNBERG:  Go to the next slide.

6      BY MS. STERNBERG:

7            Q.    So what happens next?

8            A.    Okay.  Now, the -- we know that we have to send

9      that public key to do some type of authentication to the

10     server, so the application then would send that public key

11     to the server.

12           Q.    Okay.

13                MS. STERNBERG:  And go to the next slide.

14     BY MS. STERNBERG:

15           Q.    Let's talk about how each of these are met.

16     We'll get there in the claims but we'll do a little preview.

17           A.    Yeah.  Let's start on the far left there where

18     it says "device version sent to computer."  When that is

19     taking place, that is identifier information because that

20     device version sent to computer would be a form of

21     identifier.

22           Q.    I think that is actually a typo.  I think that

23     was supposed to be PKI.

24           A.    That is supposed to be a public key.  That is

25     public key.

Geier - direct

1          Q.   Yes, sorry.

2          A.   So that should say public key there.   So when

3     the public key is sent to the computer, that public key

4     would represent identifier information.   Remember it's

5     unique for every device.   It's something only that device

6     is going to have.

7          Q.   Okay.   And then what about facilitating

8     verification?

9          A.   Yeah, facilitating verification is where we

10    know that public keys could be used for -- commonly used for

11    verification and that is something somebody would need to do

12    to verify.   We know from documents that say that the server

13    authenticates the portable device, we saw that in the

14    documents.   So we know the server is going to be doing this.

15    So by sending that public key to the server, it can

16    facilitate verification.

17         Q.   And if you look at the screen on the right, it

18    says "authenticating device"; is that right?

19         A.   That's right.

20         Q.   Okay.   And then how does this facilitate

21    synchronization of content?

22         A.   Yes.   Synchronization, since we know that

23    firmware update is to some particular level, let's say it's

24    version 4 on the server, we're only on version 2 on the

25    portable device, the way this works and we have seen on the

Geier - direct

1     screen, so there is a newer version available, it's going to

2     update the portable device to the new version.

3              So after this update is done, the portable

4     device will now have version 4.  So they would both by at

5     version 4.  We made the data the same or made the content

6     the same on both devices.

7              MS. STERNBERG:  Okay.  So if we could go back to

8     the next page of the slide deck.

9     BY MS. STERNBERG:

10         Q.   So is that claim satisfied now by the DiskOnKey

11    upgrade application?

12         A.   Yes.  What we talked about satisfies all of

13    those, yes.

14         Q.   So let's -- for the last part of Claim 104.  And

15    what is required here?

16         A.   Yeah, this is where facilitating communications

17    through the terminal network, terminal network

18    communications interface to a communications network node.

19    That is just the idea facilitating communications, so it

20    just need to be able to facilitate those communications to

21    the server.

22         Q.   And did we see that with the DiskOnKey?

23         A.   Yes, we did.

24         Q.   So is the claim satisfied?

25         A.   Absolutely.

Geier - direct

 1              MS. STERNBERG:  Okay.  And so let's go to the

 2    next slide.

 3    BY MS. STERNBERG:

 4        Q.   And -- so now we get into the actual asserted

 5    independent claim.  And what is this one requiring?

 6              So it's a dependent claim.

 7        A.   This is where you, when you execute fourth

 8    program code, cause communication to be transmitted to the

 9    network node, which is the server, to facilitate

10    verification.

11        Q.   And is that what you discussed earlier?

12        A.   Yeah, the idea of authenticating that device and

13    facilitating -- well, the idea of sending the public key to

14    the server facilitates verification.  It's going to be used

15    for authentication.

16        Q.   You see on the right it says "authenticating

17    device"; is that right?

18        A.   That's correct.

19        Q.   So is this claim satisfied by the firmware

20    upgrade application?

21        A.   Yes.

22        Q.   On the DiskOnKey?

23              MS. STERNBERG:  Okay.  Next claim.

24    BY MS. STERNBERG:

25        Q.   Okay.  So what does this claim require?

Geier - direct

1        A.    Okay.   This claim is going to facilitate

2    synchronizing content, between the portable device and node.

3        Q.    And where do we see that with the DiskOnKey

4    firmware application?

5        A.    As I explained before the idea that we're

6    upgrading the firmware, we're making the content the same on

7    both the portable device and the communications network

8    node, being the DiskOnKey and the server.

9        Q.    Okay.   So is this claim satisfied by the

10   DiskOnKey firmware upgrade application?

11       A.    Yes.

12             MS. STERNBERG:   Next.

13   BY MS. STERNBERG:

14       Q.    Okay.   So the asserted claim is Claim 124 but

15   that depends on 120 so we're showing you both of them here.

16             So what is required here?

17       A.    You want me to talk about both claims then.

18       Q.    Yes, it kind of flows from each other.

19       A.    Well, Claim 120 is where the portable device

20   configured to execute the fourth program code is focusing on

21   fourth program code.

22             With data stored on the portable device to

23   facilitate the -- to facilitate the terminal to transmit

24   communication to the communications network node.   That is

25   satisfied.

**Appx9843**

Geier - direct

1              But we're getting into Claim 124.  It's where

2       the data stored on the portable device memory comprises

3       portable device identifier information.  So it's something

4       stored on the portable device but -- that is stored on the

5       portable device needs to be portable device identifier

6       information.

7              Q.    And so what is portable device identifier

8       information that is being sent in the firmware upgrade

9       stuff?

10             A.    In this situation, this is the public key that

11      we have been talking about.  It's unique.  We know it's

12      stored there at the, at the DiskOnKey and it actually

13      identifies that particular device.

14             Q.    So in the event that the firmware upgrade

15      application uses something else beside PKI, would it also

16      have involved sending portable device identifier

17      information?

18             A.    Well, there would be other ways to do that that

19      may be not involve PKI, but it would have to be some sort of

20      identifier that actually identifies the device from other

21      devices differentiate those devices from other device.

22             Q.    And I think Dr. Rubin testified authenticating a

23      device necessarily means portable device information has to

24      be sent.  Is that -- am I getting that right?

25             A.    (No audible response.)

**Appx9844**

Geier - direct

1          Q.    Is that your understanding?

2          A.    I'm not following your question.

3          Q.    That if it's authenticating a device it has to

4    have some type of device identifier in order to perform that

5    authentication.

6                MR. LEIBOWITZ:  I object, leading, Your Honor.

7                THE COURT:  We have an objection.

8                I'm sorry.  What was the objection?  Leading?

9                MR. LEIBOWITZ:  Leading.  Correct, Your Honor.

10               THE COURT:  Yeah.  I think -- I think that is

11   leading.  Why don't you rephrase and this may have been the

12   product of some confusion about the previous question.  You

13   might want to go back to the previous question and start

14   with that.

15               MS. STERNBERG:  I'll ask it a different way.

16   BY MS. STERNBERG:

17         Q.    So if someone of ordinary skill in the art

18   wanted to authenticate a device in the firmware upgrade

19   version, you testified earlier that there are multiple ways

20   they could do that; is that correct?

21         A.    Yes.

22         Q.    And am I right that you said it could involve

23   sending digital certificates or serial numbers?

24               MR. LEIBOWITZ:  Objection, Your Honor.  I think

25   it's the same objection, Your Honor.  I think this is

Geier - direct

1    leading as to another question.  I haven't been objecting on

2    a lot of leading.

3            THE COURT:  Well, there has been quite a lot of

4    leading on both sides to be honest.

5            MR. LEIBOWITZ:  Understood.

6            THE COURT:  But since you are objecting, I think

7    that is technically a leading question.

8            Let's see if we can come at it in a more generic

9    way.

10           MS. STERNBERG:  Okay.

11   BY MS. STERNBERG:

12       Q.    So take us a step back about what somebody of

13   ordinary skill in the art would understand about the steps

14   of authenticating a device?

15       A.    Yeah.  To authenticate a particular device

16   that -- we're talking about the device being the portable

17   device.  So if there is a portable device, it's actually a

18   device like the DiskOnKey or Pathfinder I talked about

19   earlier, some device, there needs to be some sort of

20   identifier of that device, that corresponds to the device to

21   be able to authenticate it.

22       Q.    So is this claim satisfied by the DiskOnKey

23   firmware upgrade application?

24       A.    Absolutely.

25           MS. STERNBERG:  Go to the next slide.  Oop,

Geier – direct

1    sorry.  One back.

2    BY MS. STERNBERG:

3        Q.    So now we have covered all of the dependent

4    claims that come off of Claim 104.  So now we have to go,

5    unfortunately, through the other claims but hopefully within

6    can do that in a more efficient manner.

7            MS. STERNBERG:  So let's go to the next one.

8    BY MS. STERNBERG:

9        Q.    So this is claim 56.  What is different or the

10   same about this claim from Claim 104 that we looked at?

11       A.    What is very similar is -- well, the difference

12   is it's a method claim for one, but it also has the

13   different devices, portable devices and so forth, and

14   terminal.  It's got the first program code, second program

15   code, third program code, fourth program code.  The biggest

16   difference is the numbered code.

17       Q.    So in order to satisfy the method claim, what

18   needs to happen?

19       A.    You have to satisfy all the steps of that

20   method.

21       Q.    And are all the steps of this method satisfied

22   by performing a firmware upgrade using the DiskOnKey

23   firmware update application?

24       A.    Yes, it is.

25       Q.    So this is satisfied.

Geier - direct

1                And did you -- what is, I guess what is the

2       basis of your analysis?  Is it similar to your analysis of

3       the previous claim?

4            A.   Yeah, it would be the same analysis for, I

5       guess, the saving time by saying that is satisfied.  If we

6       went through ever step of this, it would be the same as we

7       covered before.

8                MS. STERNBERG:  Okay.  And let's go to the next

9       claim.

10      BY MS. STERNBERG:

11           Q.   So this is the actual dependent claim.  So this

12      one requires facilitating verification of the portable

13      device.

14                So is this satisfied for the same reasons that

15      the previous verification claim was satisfied under your

16      view.

17           A.   Yes.  This would be very similar.  So

18      facilitating verification.  We talked about that.  The

19      verification was facilitated with the other claims.  So for

20      the same reason this would we satisfied also.

21                MS. STERNBERG:  Let's move to Claim 90.

22      BY MS. STERNBERG:

23           Q.   So what is this claim?

24           A.   Okay.  This is a method claim as well.  And it's

25      got a little bit different breakdown with the program code,

Geier - direct

1   so I hope this isn't too confusing.

2           We have been talking about four program codes,

3   one, two, three, and four.  This has first program code,

4   second program code, and the third program code.  So it's

5   different that way.

6           The second program code, I believe, here is

7   combining what used to be program code two and three from

8   the other one, setting up those -- the communications

9   between the two devices.

10          Q.   I think, actually, the first program code still

11  sets up the communications on the terminal, but I think the

12  difference is this one doesn't have first program code --

13          THE COURT:  Could you --

14          MS. STERNBERG:  Sure.

15          THE COURT:  There is an objection.  If we could

16  finish the form of question.

17          MS. STERNBERG:  Oh, I'm sorry.

18  BY MS. STERNBERG:

19          Q.   So let's take a closer look at these program

20  codes, just to make sure we got it right.

21          So if you could look at what each program code

22  requires.

23          A.   I'm sorry.  The print is also a little bit

24  smaller --

25          MS. STERNBERG:  Yes.  If you could blow up first

Geier - direct

1    program code.  And we can take away the side screen.

2         There we go, much better.

3    BY MS. STERNBERG:

4         Q.    So could you tell us what is different about the

5    program codes here?

6         A.    Yeah.  Like I said, there's only three instead

7    four.  So that is a difference.

8         So here, first program code is executed by the

9    terminal processor, configured to provide a node on that

10   terminal, and, and to a communications network node.

11        So here, first program code would be running

12   that node, you know, communications node.

13        Q.    Okay.  And what does second program code

14   require?

15        A.    Okay.  Now this is code that is stored on a

16   portable device, and that is going to be providing a

17   communications node on the portable device and to coordinate

18   communications with the node on the terminal.  And it is

19   establishing a link, a communications link between the

20   portable device and the terminal and that is going to be

21   facilitating communications with the terminal and on to the

22   communications network node which is the server we were

23   talking about.

24        Q.    Okay.  And let's look at third program code.

25        A.    Okay.  So third program code, it's stored on a

Geier - direct

1    portable device, and it causes communications to be

2    transmitted to a communications network node.

3         Q.   And I think you have to read what comes ahead of

4    it as well.

5         A.   Yeah.

6              Okay.  There's still a response portion of that,

7    so the third program is going to be responding to a

8    communications received by the portable device.  And that's,

9    that's similar we talked about before where we're pushing a

10   button on a menu and this particular code is going to be

11   responding to a code after you push that button.

12        Q.   So is Claim 78 satisfied by the DiskOnKey

13   firmware upgrade, application?

14        A.   Yes, for the same reason we talked about before.

15   And we can go through each one of these, but it's the same

16   reasons apply, because it's the same type of functionality.

17             MS. STERNBERG:  Okay.  And let's look at the

18   actual independent claim, which is Claim 90.

19   BY MS. STERNBERG:

20        Q.   So what does this claim require?

21        A.   Okay.  This is an apparatus claim.  So it's --

22        Q.   No, I'm sorry.  This is -- Claim 90 was still --

23        A.   Oh, you went to Claim 90.  Okay.  I see.

24             Okay.  So Claim 90 is -- this is a dependent

25   claim where it's requiring a portable device identifier

Geier - direct

1    information.

2         Q.   And so is this satisfied by the DiskOnKey

3    firmware upgrade application?

4         A.   Yes, for the same reason we talked about with

5    our initial discussion.

6              MS. STERNBERG:  Now, we can move on.

7    BY MS. STERNBERG:

8         Q.   So this is independent Claim 93.  So what kind

9    of claim is this?

10        A.   This is a method claim.

11        Q.   Okay.  And is this meaningfully different in any

12   way from the other claims you have been discussing?

13        A.   I don't believe it is, no.

14        Q.   And so is this satisfied by use of the DiskOnKey

15   firmware upgrade application?

16        A.   Yes.  Again, we can go through each one, but

17   it's the same reasons we talked about before for the initial

18   claim we talked about.

19             MS. STERNBERG:  Okay.  Then we'll look at the

20   dependent claim.

21   BY MS. STERNBERG:

22        Q.   So what does this require?

23        A.   Okay.  This is Claim 101 where it's, again,

24   requiring a portable device identifier information.  Again,

25   we talked about that earlier.  This one would be satisfied

Geier - direct

1    as well.

2          Q.    So for the same reasons that you talked about

3    earlier?

4          A.    Exactly, yes.

5                MS. STERNBERG:  Okay.  So now we're going to

6    move on to the '969 patent.

7    BY MS. STERNBERG:

8          Q.    So what's different about these claims?

9          A.    Okay.  So this is a portable device so this

10   would be an apparatus claim.  Oh, I'm sorry.  A type of, a

11   type of -- so apparatus claims.  I don't see where there

12   is really no difference here than what we discussed before

13   with the functionality with the different types of code.

14         Q.    So is this claim satisfied by the DiskOnKey

15   firmware upgrade application?

16         A.    Yeah, for the same reasons -- we can go through

17   each one of these pieces here, but it's going to be the

18   same.

19               MS. STERNBERG:  And let's look at Claim 3.

20   BY MS. STERNBERG:

21         Q.    So is this claim satisfied?

22         A.    Yeah.  For Claim 3, again, it's required to

23   facilitate verification of the portable device, and we

24   talked about that.

25               So for the same reasons, it also facilitates

**Appx9853**

Geier - direct

1       verification of the portable device.

2                   MS. STERNBERG:  Okay.  And the next claim.

3                   THE WITNESS:  Yeah, this one is Claim 10.  And

4       in this situation here, this is something where we're

5       comprising a database.

6                   So the portable device where the communications

7       network node is going to be the server, you know, we talked

8       about, comprises a database.  And the communications

9       caused -- it also facilitates synchronizing content.

10      BY MS. STERNBERG:

11          Q.   So how is this claim satisfied by the DiskOnKey

12      firmware application?

13          A.   Yeah.  This is something new, so we haven't

14      discussed yet.  So we're stopping here -- we're not

15      stopping, but just pausing here with our continuation with

16      what we're doing.

17                  And remember, database is a organized collection

18      of data.  So it's going to be organized in some way.  And

19      when you put firmware on a server -- and I have done this

20      where I wrote firmware upgrade application for Monarch for

21      pathfinder, we updated on that -- we put data -- firmware

22      updates on a server.  They're going to be organized because

23      for, one, they have a version of it.  So there is a way of

24      tagging it to be a certain version that is organized that

25      way.

**Appx9854**

Geier - direct

1          We also might have multiple versions of

2     firmware, or firmware that goes to other products, depending

3     on what, you know, type of product it is.  But it's going to

4     be in, stored in that database.

5          So that's, this is satisfied with the DiskOnKey

6     application because we're dealing with firmware and firmware

7     stores in an organized manner.

8          Q.   So in your view, is this satisfied by use of the

9     firmware upgrade application?

10         A.   Yes, it is.

11         Q.   For reasons you just discussed?

12         A.   Well, the reasons we discussed were facilitating

13    synchronizing, but comprising the additional aspects of it,

14    yes.

15         Q.   Okay.  And then there is one more '703 claim, I

16    believe.

17              MS. STERNBERG:  No, sorry.  This was I think we

18    can pull out of this.  That would be a mistake.

19              Okay.  So let's close out of the demonstrative

20    all together right now.

21    BY MS. STERNBERG:

22         Q.   Okay.  So we just have been discussing the

23    firmware upgrade application.  So as part of your invalidity

24    analysis, can you describe what else you looked at?

25         A.   Yeah, I looked at -- well, certainly we did --

**Appx9855**

Geier - direct

1    talked about the idea of the DiskOnKey.  There is some other

2    references that I looked at for an obvious, obvious type of

3    deal.  Or that type of analysis.

4         Q.   Okay.  So what -- so if you think everything is

5    in the DiskOnKey, why do an obviousness analysis?

6         A.   Well, one part of that could be if the

7    DiskOnKey, if the software development kit is not considered

8    part of that device or application, one of ordinary skill in

9    the art would know it would be obvious to use it.

10        Q.   So that is step one of your obviousness

11   argument?

12        A.   Yes.

13        Q.   Okay.  And then what else did you consider for

14   an obviousness argument?

15        A.   I also looked at publications of Elazar, who we

16   saw speak today, earlier, a patent.

17             MS. STERNBERG:  Okay.  And if we could put up

18   DX-363.

19   BY MS. STERNBERG:

20        Q.   So do you recall that Mr. Elazar talked about

21   this patent application in his testimony?

22        A.   Yes, I believe he did.

23        Q.   What do you recall about his testimony?

24        A.   Yeah, that was just this morning.  He talked

25   about different ways to authenticate the device, you know,

Geier - direct

1    related to his patent.

2         Q.   So when you are talking about combining the

3    DiskOnKey, like this patent, what part of this patent are

4    you combining it with?

5         A.   There were portions of this that dealt with

6    different ways to authenticate, talking about the DiskOnKey.

7              MS. STERNBERG:  So if we could move to page 3,

8    paragraph 34 of this.

9              Oh, sorry.  I think it's the PDF page 3.

10             Keep going.  After the figures.

11             So at the bottom of page 3 and then it's going

12   to go on to the next page as well.

13             THE WITNESS:  I'll probably need that enlarged.

14   I can't see that on my screen.

15             There we go.

16   BY MS. STERNBERG:

17        Q.   Okay.  And so what, what is this paragraph

18   discussing?

19        A.   Well, here he is talking about an authenticator

20   implemented in a DRM device.  That is his words, his phrase

21   for a portable device, so that would be the portable

22   device participates in a process of authenticating the DRM

23   device to a remote server over a network.  So then we have a

24   portable device authenticating the DRM device.

25             So whenever you see, it says authenticating a

Geier - direct

1    particular device to a device, it means that here, the

2    services authenticating the device is making sure who it is,

3    who they say they are.

4              And then he is also talking about here an

5    authenticator being one of several methods of

6    authentication, including sending a device ID number.

7    Another thing here, he gives a description using an

8    encryption secret key, and it goes on and he talks about

9    other ways.

10        Q.   So in your view, what would one of ordinary

11   skill in the art understand from reading this?

12        A.   That there are ways to verify the device; in

13   other words, perform the authentication.

14        Q.   And why would someone of ordinary skill in the

15   art be motivated to combine this discussion with the

16   DiskOnKey?

17        A.   Because I believe that he's certainly one of

18   interest on the DiskOnKey, and I believe it's mentioned in

19   his patent there.

20        Q.   And so why would somebody be motivated, I guess,

21   to use authentication on a DiskOnKey?

22        A.   Well, it's the idea of security.  Security is

23   always something you need to be concerned about, especially

24   when moving data like that around, in a firmware case.

25              MS. STERNBERG:  Okay.  So if we can move on and

Geier - direct

1    look back at the patent, JX-350.

2              We can close out of Elazar altogether.

3              And if we could go to page 2.  So this is the

4    '703 patent.

5              And just -- there we go.

6    BY MS. STERNBERG:

7         Q.   So what are we looking at here?

8         A.   Okay.  These are references cited.  Well, first

9    of all, it's the '703 patent, which is one of the asserted

10   patents we have been talking about.  And what we're

11   currently looking at here references "cited by a particular

12   patent."

13        Q.   Okay.  And what does that mean, that its

14   reference is cited by the particular patent?

15        A.   Yes, it has been cited and considered for the

16   purposes of prosecuting patent.

17        Q.   Okay.  And so do you see on the right, it

18   actually mentions the DiskOnKey?

19        A.   Yes, I do.

20        Q.   Do you see that it has a website listed,

21   DiskOnKey.com?

22        A.   Yes.

23        Q.   Products and solutions?  There's actually two of

24   them but they seem to be the same page.

25        A.   Yes.

Geier - direct

```
 1                MS. STERNBERG:  And so we're going to open up

 2      that page, okay, which we actually looked at before.  So

 3      it's DX-99.

 4                We can put that side by side with this.

 5                It was the '703 patents, which is -- page 2.

 6      BY MS. STERNBERG:

 7          Q.    And I guess my first question is, it's a little

 8      small, but is there anything on the left reference the

 9      firmware upgrade application?

10          A.    I can't read that; it's too small on the screen.

11      I can't see it up here either.

12                THE WITNESS:  So can you make that bigger?

13                MS. STERNBERG:  Yes, there we go.

14                THE WITNESS:  Make it just slightly bigger.

15      It's so tiny on the screen.  Maybe you can scroll up so I

16      can see the bottom text.

17                There we go.

18                Did you ask whether or not this indicates it's

19      doing...

20      BY MS. STERNBERG:

21          Q.    If it mentions anything about the firmware

22      upgrade.

23          A.    I don't see that there.  I'm not seeing it.

24          Q.    Okay.  So -- and if we look back at the patent,

25      what it cites about the DiskOnKey, do you see anything there
```

Geier - direct

1    either about the firmware upgrade application?

2         A.   I don't see anything there mentioning firmware

3    update.

4         Q.   Okay.  We can move on to different topics.  So I

5    think that takes us through your invalidity analysis.

6              What is your -- I guess this is still related to

7    invalidity, but what is your understanding of IOENGINE's

8    contention about when Mr. McNulty conceived of his

9    invention?

10        A.   I remember looking at a document that he talked

11   about that portable devices rule and there were some issues

12   based on that.

13             MS. STERNBERG:  So if we could put up PX-235.

14   BY MS. STERNBERG:

15        Q.   And so do you recall Mr. McNulty testifying

16   about how this met the requirements of conception?

17        A.   Yeah, I remember seeing this document, yeah, in

18   his presentation.  Yes.

19        Q.   Okay.  And so have you reviewed this document

20   before?

21        A.   Yes, I have.

22             MS. STERNBERG:  And so I'm going to put up

23   Mr. McNulty's opening slide on a particular issue related to

24   this document, which was Slide 52.

25             PDX -- yes, PDX-1.

Geier - direct

1              That's the right page.

2              Well, I guess we might not even need this slide.

3              If we can just highlight the bottom where it

4    says, "Hi, I am here from a person's pockets and I would

5    like to copy your contents."

6    BY MS. STERNBERG:

7         Q.   Do you recall him testifying about that phrase?

8         A.   Yes, I remember that.  Yes.

9              MS. STERNBERG:  No, sorry.  Up, yes.

10             THE WITNESS:  There we go.

11   BY MS. STERNBERG:

12        Q.   And so do you recall -- what does it say about

13   that particular language?

14        A.   I think he is saying there that a lot -- that

15   single sentence, I think he was saying that that would

16   constitute verifying the device.

17        Q.   So what is your opinion about whether that

18   constitutes verifying a device?

19        A.   That absolutely does not verify the device.  I

20   mean, reading that, a person of ordinary skill in the art

21   would not understand that as identifying the device.  Or

22   verifying the device.

23        Q.   And why not?

24        A.   Well, for one, it's the word -- the use of the

25   word "I" means a name of somebody, and it's not indicating,

Geier - direct

1    first of all, that that word, that name I, could be

2    different for any other device.  So there is no identifying

3    a device as a specific device.  So there is a commonality

4    there that wouldn't work.

5            There is also no indication of whether or not

6    that could even be used for any sort of authentication or

7    verification on the -- with the server.  Or that that could

8    ever facilitate authentication.

9        Q.   So in your opinion, if someone of -- a person of

10   ordinary skill in the art, back in 2001, saw this, what

11   would they understand this to mean?

12       A.   It's just making the notice that I want to copy

13   your content is all.  It's like a request to copy content.

14   Just from a person.

15           MS. STERNBERG:  Okay.  So now we can close out

16   of this document.

17   BY MS. STERNBERG:

18       Q.   We're going to shift gears to infringement.  I

19   know it's a long day, and I apologize, but we're going to

20   talk now about infringement.  The good news is we don't have

21   to go claim by claim and we can focus on a particular issue.

22           So were you here for Dr. Rubin's testimony?

23       A.   Yes, I was.

24           THE COURT:  I think since you are changing to an

25   entirely different subject it might be a good time to take a

**Appx9863**

Geier - direct

1    break.  It has been a long day and this is an afternoon

2    break.  I don't think anybody will mind.

3                    Let's come back at quarter of 3:00.  Okay.

4                    (Jury left courtroom.)

5                    THE COURT:  Mr. Geier, during the break, you

6    are not to talk to anyone about the subject matter of your

7    testimony.

8                    THE WITNESS:  Yes, Your Honor.

9                    THE COURT:  Very good.  You can talk about

10   anything else, just not that.

11                   THE WITNESS:  Thank you.

12                   THE COURT:  Thank you.

13                   All right.  We will be in recess.

14                   (Brief recess taken.)

15                   *      *      *

16                   (Proceedings reconvened after recess.)

17                   THE COURT:  Be seated, please.

18                   How much longer, roughly, do you think you have

19   on direct?

20                   MS. STERNBERG:  Maybe another 30 or so minutes.

21                   THE COURT:  Another 30 or so?  Okay.  Then we'll

22   have our cross-examination started today.

23                   MS. STERNBERG:  Yes.

24                   THE COURT:  I didn't want to break in the middle

25   of your presentation.

**Appx9864**

Geier - direct

1              MS. STERNBERG:  Sure.

2              (Jury returned.)

3              THE COURT:  Very well.  Be seated.

4              You may continue.

5    BY MS. STERNBERG:

6         Q.   Good afternoon, Mr. Geier.

7         A.   Good afternoon.

8         Q.   Welcome back.  So before we jump back to

9    infringement, I just have one quick follow-up about your

10   invalidity testimony.

11              So we discussed the firmware -- sorry.  We

12   discussed the DiskOnKey SDKs.  Do you recall that?

13        A.   Yes.

14        Q.   And so was that SDK made specifically to work

15   with a particular product?

16        A.   Yes, it was made specifically to work with the

17   DiskOnKey.

18        Q.   And so does that -- how does that impact your

19   analysis for obviousness or the motivation to combine the

20   DiskOnKey with the SDK?

21        A.   It would have been, it would have been obvious

22   to do that, to combine those, to use the software

23   development kit with the DiskOnKey.

24        Q.   Thank you.

25              Okay.  So we're shifting gears now to

Geier - direct

 1    infringement.

 2               And you were here for Dr. Rubin's testimony; is

 3    that correct?

 4         A.    Yes, I was.

 5         Q.    So what were your takeaways from his testimony?

 6         A.    I saw there were some issues with the testimony,

 7    with his analysis of infringement.

 8         Q.    And so what particular issues are you going to

 9    focus on there?

10         A.    Well, in particular, I'm talking about the

11    fourth program code is where I say the issues were.

12         Q.    And so you rendered an opinion in this case

13    related to whether or not the accused Ingenico products

14    infringe the claims; is that right?

15         A.    That's correct.

16         Q.    And what -- sorry.

17               What did you conclude?

18         A.    I concluded there was no infringement of the

19    claims by Ingenico products.

20         Q.    And so what's, I guess, the main highlights of

21    your noninfringement analysis that you are going to be

22    discussing today?

23         A.    Again, we're going to be talking about the

24    fourth program code.

25         Q.    And I guess what I mean is, what is the

Geier - cross

1    invention equals conception date for one part of your

2    analysis and one year prior to the patent filing date for

3    the other part; is that right?

4              A.    That's correct.

5              Q.    And the bottom date you have there is

6    March 23rd, 2003; right?

7              A.    Right.

8              Q.    So it matters what was available to the public,

9    not only generally but in public use or on sale in this

10   country by March 23rd, 2003; right?

11             A.    Maybe I don't understand your question.   I

12   didn't understand your question.

13             Q.    Sure.   So is it -- does it matter to your

14   analysis what was available by March 23rd, 2003 in public

15   use or on sale in this country, in the United States, as

16   compared to elsewhere?

17             A.    As least from what I understand, I don't believe

18   so because the March 23rd, 2003 date would be earlier than

19   the other one.   So it would be -- I think that would apply

20   to both.

21             Q.    I'm sorry.   What would apply to both?

22             A.    I think it would apply to both.   I mean, I think

23   that was -- I don't think it would matter based on what you

24   said.

25             Q.    So in your opinion, it wouldn't matter whether

Geier - cross

1    something was available outside the country as opposed to

2    inside the United States?  Is that your testimony?

3         A.    Well, I think what I'm considering here is

4    something on sale inside the country.  It's in this country

5    was my understanding of this priority date.

6         Q.    Okay.  So you would agree that it has to be

7    something that is on public sale in the United States?

8         A.    Oh, I think I understand your question now.  I'm

9    sorry I didn't understand it before.

10             Let me think about that a minute.

11             Well, my understanding is it either in this

12   country or a foreign country.  That is what I understand

13   this to be, you know, that --

14        Q.    So your analysis, if something were on sale in

15   a foreign country before March 23rd, 2003, that would

16   satisfy the standard of invalidity that you applied in this

17   case?

18        A.    That's the way I understand this to be.  Based

19   on a reading here.

20        Q.    Okay.  Let me, let me show you -- this is a

21   document you put up earlier.

22             MR. LEIBOWITZ:  I think it was DX-91.

23   BY MR. LEIBOWITZ:

24        Q.    Do you remember talking about this document with

25   Ms. Sternberg?

Geier - cross

1          A.   Right.  Right.

2          Q.   And I think you looked at this document and you

3     said, this is a document that as of December 31, 2002.

4     That's the dates you used for it; right?

5          A.   I believe it is.  Yes.

6          Q.   And December 31, 2002, that's earlier than

7     March 23rd, 2003.  We can agree on that; right?

8          A.   It certainly is.

9          Q.   Okay.  Now, this says, "For the fiscal year

10    ended December 31, 2002," doesn't it?

11         A.   Yes, it does.

12         Q.   And if we go over on to the next page, there is

13    an explanatory note and it says, "This was filed on June

14    30th, 2003."

15              Do you see that?

16         A.   Yes.

17         Q.   Okay.  So this document wouldn't, although it

18    was reporting about a fiscal year that ended in 2002, this

19    document wasn't available until June 30th, 2003, which would

20    be after March 23rd, 2003; right?

21         A.   If you don't mind, I'll take a look at this

22    highlighting.

23              Yes.  I believe this was filed June 30th of

24    2003.  Of course what is in there is pertaining to

25    information from that preceding year.

Geier - cross

1          Q.   Okay.  And you understand that the M-Systems

2    was, was an Israeli company; correct?

3          A.   I believe that's true.

4          Q.   And did you have an understanding where the work

5    that M-Systems was doing, whether that was occurring in the

6    United States or in Israel?

7          A.   I don't remember either way where it was, where

8    that was done.

9          Q.   And that didn't, that didn't make a difference

10   in your analysis?  That didn't inform your opinion?  Am I

11   right about that?

12         A.   I don't believe it did.

13              MR. LEIBOWITZ:  Let's look at some of these

14   other documents.

15              If we can have DX-336.

16   BY MR. LEIBOWITZ:

17         Q.   This is a document you looked at with

18   Ms. Sternberg as well.  Do you recall this one?

19         A.   Yes.

20         Q.   And this was a document that you pointed to --

21              MR. LEIBOWITZ:  If we can turn to page 4.

22   BY MR. LEIBOWITZ:

23         Q.   -- you pointed to this document for the, for

24   the, to support your view that the DiskOnKey used PKI,

25   public key infrastructure; right?

**Appx9904**

Geier - cross

1          A.    That's one of them, yes.

2          Q.    And that the servers would identify DiskOnKey

3    and PKI.  That is why you point to this document; right?

4          A.    That is certainly part of it.  Yes.

5          Q.    Do you know what version of the DiskOnKey this

6    document addresses?

7          A.    I don't know specifically what version they were

8    at when this document was produced, but I do know that PKI

9    commands -- or PKI is addressed in the software development

10   kit which applies to certain versions.  So it would be at

11   least, PKI would have to be at least available on the

12   version that -- the earliest version that the software

13   development kit applied to.

14         Q.    Okay.  So -- but you understand there were

15   different versions of the DiskOnKey; correct?

16         A.    There were different firmware versions of the

17   DiskOnKey, yes.

18         Q.    And you understand that those different versions

19   of the DiskOnKey had different functionality at different

20   times; correct?

21         A.    Certainly products that have different firmware,

22   the idea of updating firmware is to provide different

23   functionality or tweak things, fix errors, that type of

24   thing.

25         Q.    Okay.  And you don't know which particular

Geier - cross

1    version of the DiskOnKey this document refers to; is that

2    correct?

3          A.    I don't recall knowing that.  I don't know if

4    there is a way of figuring that out, but I don't recall

5    seeing that.  I'm just saying that this is mentioning PKI

6    and then the SDK, it does mention that PKI is available for

7    versions of -- a certain version or higher.  It's listed in

8    the SDK what that lowest version is.

9              So I would say the PKI would be available in any

10   version, of that version and later.  That is listed in the

11   SDK.

12         Q.    Were you here for Mr. Sobol's testimony this

13   morning by video?  He was the person from Western Digital?

14   Did you recall that?

15         A.    Yes, I remember seeing him present in the video.

16   Yes.

17         Q.    And would it make a difference to your analysis

18   if Mr. Sobol, even he didn't know which version of the

19   DiskOnKey this document related to?  Does that make any

20   difference to you?

21         A.    I don't think it would, no.  Not that I can

22   think of.

23         Q.    Okay.  How about that if Mr. Sobol said that

24   it's possible that this document was addressing a version of

25   the DiskOnKey -- sorry.  I'm sorry.  Yes.  Oh, I'm sorry.

**Appx9906**

Geier - cross

1    I'm just in the wrong spot here.

2              That this document -- let me start that again.

3              How about if Mr. Sobol said that it's possible

4    this document is addressing a version of the DiskOnKey

5    upgrade that is not yet final, not yet released?  Would that

6    make any difference in your analysis?

7         A.    I don't think so, no.  It's just going to apply

8    to a version that they're not quite there yet.  You know,

9    not the version that this would be supported by this.

10        Q.    And how about if Mr. Sobol said that he didn't

11   even know whether this presentation was ever presented?

12   Would that make any difference in your analysis?

13        A.    My understanding, this presentation was

14   presented so I don't know.  I didn't hear him say that it

15   was never presented.

16              MR. LEIBOWITZ:  Can we have Sobol, the Sobol

17   deposition at 161?

18   BY MR. LEIBOWITZ:

19        Q.    And here's some questions.

20              "Question:  Do you know what version of the

21   DiskOnKey upgrade this document addresses?

22              "Answer:  No.

23              "Question:  Is it possible that is not

24   addressing a version of DiskOnKey upgrade that is not yet

25   final, not yet released?

Geier - cross

1          "Answer:  I have no idea.  I don't know what

2    type of presentation it is, whether it was presented or not.

3    All I know it was found in the archive by W.D., and that's

4    it.

5          "Question:  So you don't know if this document

6    was ever a public document or if it was only an internal

7    document either; correct?

8          "Answer:  I don't know."

9          That is what Mr. Sobol said about this document.

10   Were you aware of that?

11   A.    I don't recall exactly those words, but it looks

12   like a presentation to me that would have been presented.

13   Q.    And if this weren't a public document, if it

14   were only an internal document in Israel, would that make

15   any difference in your analysis?

16   A.    It depends on how that document might have been

17   released to other companies.  It could have been released

18   to -- or briefed and provided to other companies maybe

19   developing products around this or companies that might want

20   to partner with.  So it would, yes.

21   Q.    But you don't know any of that.  You are just

22   speculating; correct?

23   A.    I think you are asking if it would change my

24   opinion, and I don't have the information to show this was

25   not provided publicly.

**Appx9908**

Geier - cross

1    Q.   Well, we don't know if it was or if it weren't;

2    right?  We don't know.  That's your testimony; correct?

3    A.   Well, presentation, I've made many presentations

4    when I worked at these other companies, and I presented

5    those.  I made presentation to present to conferences and

6    other companies I work with, that I partnered about.

7    Q.   Does that -- sorry.  I didn't mean to cut you

8    off.  Please.

9    A.   That's fine.  Go ahead.

10   Q.   I wasn't asking you about that.

11        Do you know for a fact that this presentation

12   was ever presented outside of being something internal to a

13   company in Israel?

14   A.   I don't recall seeing that specifically.  I

15   might have, but my assumption was this was presented

16   publically.

17   Q.   And as Mr. Sobol doesn't know, he says it could

18   be internal or not; right?  If it were internal, that would

19   make any difference to your analysis.  That's your

20   testimony.

21   A.   Again, it would depend on what was meant by

22   "internal."  If it was still shown to others that could have

23   taken the information out and known it, or at least

24   distributed it.

25        MR. LEIBOWITZ:  Okay.  Let's go to Document 333.

Geier - cross

```
 1       This is the SDK document, I believe, that you relied on.

 2       BY MR. LEIBOWITZ:

 3            Q.    And you, you were asked -- do you recall seeing

 4       this document earlier?

 5            A.    Yes.

 6            Q.    And you were asked a question by Ms. Sternberg

 7       about what it means, it says "preliminary" on the front.

 8                  Do you remember that?

 9            A.    Yes.

10            Q.    Okay.  And do you know, would it make a

11       difference to your analysis in any way that Mr. Sobol said

12       that he doesn't know whether this document, this SDK

13       document, was ever offered to customers?  Would that make

14       any difference in your analysis?

15            A.    I don't remember him saying it was never

16       offered.  The dates line up with when the product was

17       actually released, and that is typical for a company to

18       release a software development kit for a product, especially

19       when it could be developed -- or making custom applications.

20       They are tying together.

21            Q.    So you are saying it could have been released;

22       right?  That's what you're saying?

23            A.    I would say a company would have to; otherwise,

24       there would be no application for it.

25            Q.    But it would make no difference to your analysis
```

Geier - cross

1    what Mr. Sobol said about this document.  That is your

2    testimony?

3           A.   All I know, looking at the software development

4    kit, that it was released about the same time as the

5    product, and that's how companies release products.

6    Especially one like this.  It provides a new feature of

7    being able to wright custom applications for a particular

8    device, they would have to have this software development

9    kit to make that work.

10          Q.   So is it your testimony that the DiskOnKey was

11   released around the time of this document?

12          A.   I think I remember seeing dates that coincided

13   with this, yes, when the release was put; that the DiskOnKey

14   was being released.

15          Q.   And do you recall when it was the DiskOnKey was

16   released?

17          A.   I believe it was toward the end of 2002.

18          Q.   And so prior -- in your understanding, prior to

19   the end of 2002, DiskOnKey had not been released?

20          A.   At least the version that I was seeing in the

21   press release that talked about the idea that there was a

22   processor that could run applications.

23               MR. LEIBOWITZ:  Let's take a look at 331.

24   This is another document that I believe you were shown.

25   BY MR. LEIBOWITZ:

Geier - cross

1          Q.   Again, would it make any difference to your

2     analysis as to whether this document was ever made available

3     to the public, or whether it was just internal?

4          A.   Well, this document is describing how software

5     works, and that software, if it was released -- it describes

6     how software worked, what actually worked.

7               I don't have, I don't remember any evidence

8     showing it was never released.

9          Q.   Did you know whether Mr. Sobol knew whether this

10    document was ever released or ever made available to the

11    public?

12         A.   I don't remember or recall anything he said

13    about this.

14         Q.   You were just talking about a few minutes ago

15    about seeing a press release related to the SDK.  Do you

16    recall that?

17         A.   I think it was about the product.  And there

18    was an email about sending out -- I'll look back and see

19    what specifically that was it.  I'm not remembering right

20    now.

21         Q.   That's fine.  That's fine.  I'll direct you.

22              MR. LEIBOWITZ:  Let's have DX-307, please.

23    BY MR. LEIBOWITZ:

24         Q.   Do you recall Ms. Sternberg showed you this

25    press release?

Geier - cross

1          A.    If you can blow that up just a little bit.  I

2    can't see that very well.  I need reader glasses.

3                Right.  This is what I was referring to.

4          Q.    Do you recall testifying about this earlier

5    today?

6          A.    Yes.

7          Q.    And you said -- I believe I wrote it down.  You

8    said, "this is one that this DiskOnKey SDK was released

9    publicly."

10               Do you recall saying that?

11         A.    Right.

12         Q.    Okay.  Let's turn it over to the second page.

13   And toward the bottom it says "availability of M-Systems'

14   SDK."

15               Do you see that?

16         A.    Um-hmm.

17         Q.    It says, "Currently the SDK will be available to

18   select partners and software development companies.  To

19   request the SDK, please contact M-Systems."

20               Do you see that?

21         A.    Um-hmm.  Yes.

22         Q.    Do you know whether this was actually publicly

23   released or only given to select partners?

24         A.    Well, certainly here it's being released to

25   select partners, so it's becoming -- I remember applying to

Geier - cross

1    get software development kits from other companies.  It was

2    always easy to get.  They wants you to understand how to

3    develop applications of that product.

4           So it would become -- it would be available to

5    pretty much anyone who wants to use it.

6           Q.   Did you know, do you know of anyone that

7    actually got it?

8           A.   Fine.  I don't have a -- I can't name a person

9    that downloaded this during that time, but it was made

10   available.  And people were informed to go out and tell

11   people about it.  So it would have been --

12          Q.   But this has been -- sorry.

13          A.   It would have been something that people would

14   have had ready access to.

15          Q.   And this says you have to request from M-Systems

16   to get it; right?

17          A.   That's typical of a software development kit.

18   The reason they do that, they want to make you a customer.

19   And so they like you to request it to gather that

20   information.  We did that at Monarch Marking Systems all the

21   time.  Rather than just post it someplace you could download

22   it freely, they make them sign up for it.  So we get their

23   email and their contact information and that is why that --

24   that is why that request is usually stated.

25          But anybody could get it.  You know, software

Geier - cross

1    development kits, they want people to have those so people

2    can start learning how to write applications for it.  That

3    is going to sell their product.

4         Q.   Now, Mr. Geier, you were shown the cover of the

5    '703 patent, the first couple pages of the '703 patent.  I

6    think it's JX-350.

7              MR. LEIBOWITZ:  If we can have that on the

8    screen.

9              And over to the next page, please.

10             And if you can blow up on the right side, the

11   other -- actually this whole, this whole thing that is here,

12   you can blow it up.

13   BY MR. LEIBOWITZ:

14        Q.   Ms. Sternberg asked you about some, some

15   DiskOnKey web pages that are disclosed here to the Patent

16   Office; right?

17        A.   Right.

18        Q.   And were you here for Mr. Timbers' opening

19   statement?  Were you in court for that?

20        A.   I believe that is back on Monday.  I believe --

21   it's been a long week so far, but yeah, I think I was here.

22        Q.   And did you hear him say that sometimes the

23   Patent Office doesn't have all the information in front of

24   it?  He didn't say something to that effect?

25        A.   I don't remember that specifically from him.  I

Geier - cross

1    don't remember that statement.

2         Q.   Okay.  In this case, the Patent Office did have

3    the DiskOnKey product in front of it, didn't it?

4         A.   They would have had a way of downloading what is

5    indicated here.  They would have known about that.

6         Q.   And if you'll go over on the left side, about

7    two-thirds way down, there is a reference to "Elazar, et

8    al., 2004."  There you go.  It is highlighted now?

9         A.   Right.

10        Q.   That's the Elazar patent application that you --

11   patent publication, I should say, that you went over with

12   Ms. Sternberg?

13        A.   I believe it is, yes.

14        Q.   So the Patent Office had that in front of them

15   as well; correct?

16        A.   I believe that's what this indicates.  Yes.

17        Q.   Okay.  Now, you showed, you showed -- you opened

18   up the firmware upgrade application with Ms. Sternberg, and

19   then you closed it; right?

20        A.   (Nodding yes.)

21        Q.   When you were forming your opinions in this

22   case, you never executed the firmware upgrade application,

23   did you?

24        A.   I did not, no.

25        Q.   And in fact, you never executed any firmware

Geier - cross

1          Q.    But there is, there is some code on the portable

2    device, on the card reader that you agree is executed in

3    response to user interaction; isn't that right?

4          A.    Yeah, I think I talked about earlier.  I'll

5    restate it again, and then if you are asking the question

6    again, that's fine.

7                When the reader receives that start transaction

8    request, there is code on the reader that is going to

9    process and run.  It's not program code, not program code

10   we're talking about with the claims.  It's code that runs to

11   get it to the point where it's going to wait for a card.

12   That is clearly, clearly shown in the code and clearly shown

13   in Dr. Rubin's code he showed for his analysis it's going to

14   wait for that card.  That is as far as it gets.

15         Q.    And is it your testimony that that code, the

16   code you were just addressing, does not -- is not

17   configured to cause a communication to be transmitted to

18   the server?

19         A.    It absolutely is not, no.  Because the only way

20   that any communications is going to go out of that portable

21   device or that reader will be if a card is swiped and that

22   is unless something else messes up the, the transmission.

23                I mean it's going to have to get the credit card

24   in there to make that happen.

25                MR. LEIBOWITZ:  Okay.  I have no further

Geier - redirect

```
 1    questions at this time.

 2              THE COURT:  Very well.  Redirect.

 3                     REDIRECT EXAMINATION

 4    BY MS. STERNBERG:

 5         Q.   Mr. Geier, do you remember being asked about

 6    DX-91?

 7         A.   I'm sorry.  I didn't hear you.

 8         Q.   Sorry.  I'm going to ask to put DX-91 back up

 9    and I'll ask you.

10         A.   Okay.

11         Q.   I don't expect you to remember the numbers --

12         A.   I don't remember the numbers, no.  Not this late

13    in the day.

14         Q.   Okay.  Do you recall being asked questions by

15    Mr. Liebowitz about when this document came out?

16         A.   Okay.  So this is the securities exchange

17    commission.  Yes, I remember those questions.

18         Q.   Are you relying on this document it itself as a

19    prior art reference?

20         A.   I don't believe so.

21              MS. STERNBERG:  And if we could turn to page 90

22    -- oh, sorry.  If we could turn to page 30 of this document.

23    Sorry, 33.

24              If we could blow that up.

25    BY MS. STERNBERG:
```

**Appx9933**

Geier - redirect

1          Q.    What do you see here?

2          A.    Okay.   This -- are you referring to C or D?

3          Q.    C.

4          A.    C.   So in Section C, called "Structure," it says

5    "the following table lists our subsidiary, their country of

6    origins and our owner percentage of each.

7               It's listing by name companies, various

8    companies listed.   And the ownership is 100 percent for all

9    of them.   And their country of organization.   So like for

10   M-Systems Inc., it's U.S., M-Systems Asia LTD is Taiwan and

11   so forth.

12         Q.    Where is M-Systems Inc. organized?

13         A.    It's in the United States.

14              MS. STERNBERG:   And if you could turn to page 37

15   of this document.

16              You can blow up after it says year ended

17   December 31st, 2002.

18              And the revenues.

19              THE WITNESS:   Okay.

20   BY MS. STERNBERG:

21         Q.    Do you see that it talks about revenues in 2002?

22         A.    Yes.

23              MS. STERNBERG:   And can we highlight the second

24   sentence?

25   BY MS. STERNBERG:

Geier - redirect

1          Q.   And so what does this sentence say?

2          A.   Are you referring to when the last you

3     highlighted.

4          Q.   Yes.

5          A.   It says "our DiskOnKey sales increased by

6     $20.2 million or 306 percent."

7          Q.   So does that indicate that in 2002, DiskOnKey

8     sold at least $20.2 million if not more, increased by

9     20.2 million?

10         A.   Yes, it would be more than that, obviously,

11    because it was increased with that much.

12              MS. STERNBERG:  And if we could look at DX-330.

13    BY MS. STERNBERG:

14         Q.   Do you recall seeing this document earlier

15    today?

16         A.   Yes.

17         Q.   And what was this document?

18         A.   I believe this is an email that we looked at.

19         Q.   So if we could look at the "to: List."  It's

20    got a lot of random digits in there but keep going up.

21              Do you see references to Tel Aviv?

22         A.   Yes.  At the very top.

23         Q.   And do you see references to Santa Clara?

24         A.   Yes, in the second one.

25         Q.   And do you have an understanding of where Santa

Geier - redirect

```
 1   Clara is?

 2            A.   It's my home state of California.

 3                 MS. STERNBERG:  And we can go down and look at

 4   this document.

 5   BY MS. STERNBERG:

 6            Q.   And do you see -- I think we talked about this

 7   earlier.  That it says the DiskOnKey upgraded can be

 8   downloaded from our website at DiskOnKey.com?

 9            A.   I see that, yes.

10            Q.   Are you aware of whether websites are limited by

11   a certain country?  Meaning if I was in Asia, could I still

12   get to the DiskOnKey website?

13            A.   I'm sorry.  I didn't -- I coughed when you asked

14   the question.

15            Q.   If I was in Asia, could I still get to the

16   DiskOnKey website?

17            A.   I think generally, yes.

18            Q.   And of I was in the United States, could I get

19   to the DiskOnKey website?

20            A.   Yes.

21                 MS. STERNBERG:  And could we go to the next page

22   of this document?

23                 Okay.  That takes care of that.

24                 If we could go to DX-336.

25   BY MS. STERNBERG:
```

1          Q.   Do you recall being asked whether you knew when

2     this document came out?

3          A.   Yes.

4               MS. STERNBERG:  And if we could go to the last

5     page.

6     BY MS. STERNBERG:

7          Q.   Can you read the date and time last modified,

8     and date and time created date?

9          A.   Yes, the date and time last modified would be

10    March 22nd of 2003 and the date and time created was

11    March 21st, 2003.

12              MS. STERNBERG:  Okay.  I have no further

13    questions.

14              THE COURT:  Very well.  Next witness.

15              MR. CHUEBON:  Your Honor, IOENGINE calls

16    Dr. Aviel Rubin.

17              THE COURT:  Now how long do you expect?

18              MS. STERNBERG:  We have exhibits.

19              THE COURT:  Oh, yes.  Well, I tell you what.

20    Let's wait on the exhibits until we release the jury.  I

21    think it probably makes sense to -- well, no.

22              Let's do the exhibits now.  Because we need

23    to -- I think we can move them into the case.  It's better

24    if it's now.

25              MS. STERNBERG:  All right.  It's a lot.

**Appx9937**

```
 1              DX-476.

 2              JX-294.

 3              DX-089.

 4              DX-099.

 5              DX-332.

 6              DX-091.

 7              DX-305.

 8              DX-097.

 9              DX-330.

10              DX-331.

11              DX-336.

12              DX-328.

13              JX-143.

14              JX-145.

15              JX-061.

16              THE COURT:  That's it?

17              MS. STERNBERG:  Yes.

18              THE COURT:  Do we have any other exhibits that

19      aren't already admitted from earlier?

20              MR. LEIBOWITZ:  I don't believe we had any on

21      cross.

22              THE COURT:  Mr. Geier, you are released.  I

23      don't know whether there is anything I recall, but in any

24      event, thank you for your testimony.

25              THE WITNESS:  Thank you, Your Honor.
```

```
 1                    THE COURT:  Now, is the defense resting?

 2                    MR. TIMBERS:  Yes.

 3                    (Witness excused.)

 4                    THE COURT:  It wasn't clear to me.  Mr. Chuebon

 5       came up --

 6                    MR. TIMBERS:  He's not putting on our witness.

 7                    Yes, we are resting.

 8                    THE COURT:  Very good.  So now we're moving on

 9       to -- I think I told you at the beginning of the case there

10       will be before several back and forths.

11                    We have, you have heard from the plaintiffs and

12       you have heard from the defendants on both infringement and

13       invalidity and now you will hear from the plaintiffs again,

14       this time addressing validity.  So...

15                    MR. LEIBOWITZ:  Thank you, Your Honor.  We

16       don't have to do it in the presence of the jury but I wanted

17       to note the ability to make motions in the rest of their

18       case.

19                    THE COURT:  And that's -- you preserved your

20       right to make a motion as of now, but we'll do it as soon as

21       the jury is released.

22                    MR. LEIBOWITZ:  Thank you, Your Honor.

23                    THE COURT:  How long do you anticipate the

24       direct examination, Mr. Chuebon?  I mean, I don't expect --

25       we may well not be able to finish today but I wanted to get
```

 1    a sense of what -- how much you have in mind.

 2              MR. LEIBOWITZ:  May I take a moment, Your Honor?

 3              (Counsel confer.)

 4              MR. CHUEBON:  Your Honor, I expect Dr. Rubin to

 5    take longer than the end of the day.

 6              THE COURT:  Yeah, well.  We won't do that for

 7    sure.

 8              Is there a discrete chunk of his testimony that

 9    you can present now or if not, we can -- I think we can

10    release the jury at this point.

11              MR. CHUEBON:  I think for the benefit of the

12    jury, maybe we do that.

13              THE COURT:  Why don't we do that?

14              Ladies and gentlemen of the jury, we'll take a

15    little bit of an early departure here and tomorrow, I expect

16    we'll probably finish with the testimony and maybe even be

17    able to give you, possibly, depending on how things go, even

18    a shorter day.  So I expect that we're running pretty well

19    on time.  So I don't think it's going to be -- I'm hoping we

20    won't be done, it's difficult to predict, but so far so

21    good.  So again thank you for your patience.

22              (Jury left courtroom.)

23              THE COURT:  Okay.  Please be seated.

24              All right.  Now we'll have motions.  Okay.  Talk

25    a little bit about our scheduling.

1              Why don't we start with motions?

2              MR. LEIBOWITZ:  Thank you, Your Honor.  So I

3      don't know.  I think we had sort of abbreviated motions but

4      upon oral motion we would move to, you know, for judgment on

5      JMOL of no invalidity.  We also move for judgment of

6      infringement, Your Honor.

7              THE COURT:  Okay.  Well, why don't you give me a

8      little bit, put some flesh on the bones.

9              MR. LEIBOWITZ:  Sure.  So on both counts, Your

10     Honor, we think the only -- Mr. Geier's interpretation of

11     how he's interpreting fourth program code, for example, is

12     not the way fourth program code is -- sort of conflicts with

13     Your Honor's *Markman* ruling in terms of code being able to

14     have different files, different parts but put together to

15     be a program code as the claims require as long as the

16     functionality is there.

17              And there is code on the reader that executes in

18     response to user interaction.  There is code that executes

19     to cause a, a transmission to the network and what

20     Mr. Geier's position is and what Ingenico's position seems

21     to be is you can't put those two pieces of code together to

22     be fourth program code.  But in fact that is -- there is

23     absolutely no reason why that can't happen.  And without

24     there, there really isn't any -- a specific noninfringement

25     position that we think, you know, is shown through the

1    evidence.

2         THE COURT:  What is your position with respect

3    to the argument that first chunk of what I think we're all

4    referring to or at least you are referring to as fourth

5    program code is, does not have the effect of triggering the

6    second chunk of the fourth program code because of the

7    intercession of the card, the required card swipe.  I think

8    that is probably a fair word of Mr. Geier's position.

9         MR. LEIBOWITZ:  Sure.  I think Dr. Rubin will be

10   addressing this as well.  But I think the point is, Your

11   Honor, it's really, it's -- the whole thing is the fourth

12   program code.  And in effect, especially with respect to

13   the '969 claims, you are talking about fourth program code

14   configured to execute to cause a, a transmission and so that

15   code, that whole body of code is configured to do just that.

16   It's all written and executes on the reader.  It's all

17   written to work together.

18         So just because the code is a step in the

19   process which is if all programs together to work just that

20   way, that says we're now going to pause to receive credit

21   card data doesn't, doesn't change the fact that that is all

22   fourth program code.

23         THE COURT:  Let's hear from Ingenico on that.

24         MR. TIMBERS:  Your Honor, I think I tried to

25   establish with Dr. Rubin and he agreed that, and what he

**Appx9942**

1    first place, and then what is executed is wait for the card,

2    and then when the card is inserted you have to execute code

3    to read the card, depending on what kind of card it is, and

4    then as our fact witnesses talked about, you also may have

5    additional steps where you ask for additional interaction

6    with the reader by cardholder, separate code.  Code, code,

7    code.

8            Eventually it gets sent to the, to the phone.

9    That doesn't mean all of that is fourth code.

10           THE COURT:  All right.

11           MR. LEIBOWITZ:  Your Honor, if I can say on

12   thing.  There is no reason it can't be.  In fact, that is

13   what Your Honor ruled from the *Markman*.  I'm reading from

14   the *Markman* decision.

15           "That is different program files or combinations

16   of program files can perform the functions of the four

17   recited program codes.  The claims duly require that there

18   be code that performs each of those functions.  It does not

19   appear the other parties disagree with that proposition in

20   substance.  However, if that issue becomes a matter of

21   dispute at trial, I can instruct the jury appropriately at

22   that time."

23           I think the whole -- that is their defense is

24   well, there is different parts to this code but the *Markman*

25   order says that doesn't matter.  You can have different code

1    that --

2              THE COURT:   Now I know how witnesses feel when

3    somebody reads their deposition.

4              MR. LEIBOWITZ:   Oh, I'm sorry.

5              MR. TIMBERS:   Your Honor, we're not saying

6    different parts of code are different.   It's different

7    functions.   Different functions.   The functions are what

8    define the code.   As I said to Dr. Rubin, first, second,

9    third, fourth cannot be just any old code.

10              THE COURT:   Okay.   Let me hear on validity and

11    then I'll see where we are.

12              MR. LEIBOWITZ:   Sure, Your Honor.   So on

13    validity, there is -- certainly Dr. Rubin will speak to

14    this, too, if he needs to, but we think they really have

15    failed in their proof on validity, Your Honor.   They've

16    established that DiskOnKey, the drives themselves were

17    sold.

18              They have not established that the functionality

19    that they are attributing to those DiskOnKey, specific

20    versions of which may have been in the United States or not,

21    may have that actually -- that that functionality was

22    available at any time prior to being on sale.   On sale more

23    than a year before or prior to Mr. McNulty's invention which

24    would go back many more years.

25              THE COURT:   For purposes of "on sale," what do

**Appx9946**

1    you think is required -- if hypothetically a party is saying

2    this is now available to you, the consumer or some subset

3    of all consumers.  And, you know, it's not, there isn't a

4    price tag for it, there isn't a marketing enterprise that

5    is behind it but it's simply a communication that says this

6    is available for you to -- we'll transfer it to you to use,

7    presumably with the expectation that this will lead to

8    remuneration in a way other than through the actual sale of

9    the readers themselves that's in this case, the DiskOnKey

10    itself.

11              MR. LEIBOWITZ:  Right.  So on that, Your Honor,

12    I think that with respect to -- I don't think that is on

13    sale.  I think the DiskOnKey, the drive, might be on sale

14    and in terms of leading to further remuneration, note the

15    person who might use that already has bought -- presumably

16    already has bought the USB drive.  And indeed, in fact what

17    Mr. Geier kept saying was, you know, he saw no evidence that

18    this, that this functionality was not available.

19              THE COURT:  All right.

20              MR. LEIBOWITZ:  But it's their burden on clear

21    and convincing evidence to show that, in fact, it was

22    available.

23              THE COURT:  Now let's hear from Mr. Timbers.

24              MR. TIMBERS:  We have -- we have -- so in press

25    release after press release and website evidence that shows

**Appx9947**

```
 1    the ability to download --

 2                 THE COURT:  Okay.  But the ability to download.

 3    But my question really is, is that enough?  Is it enough if

 4    you're giving it away?

 5                 MR. TIMBERS:  Yes, Your Honor.

 6                 THE COURT:  Okay.

 7                 MR. TIMBERS:  PayPal is giving away -- PayPal --

 8                 THE COURT:  Well, I understand.  I understand

 9    but I think what --

10                 MR. TIMBERS:  As I understand.

11                 THE COURT:  Mr. Liebowitz's response to my

12    question is that that is a different situation because

13    PayPal has a way of recovering and then some.  It's whatever

14    investment it makes by giving away the reader.

15           But DiskOnKey is not seemingly getting

16    remuneration from its distribution of the DiskOnKey.  You

17    know where we are on that evidence, but what is your

18    position legally as to whether having distributing is

19    enough?

20                 MR. TIMBERS:  Well, two things.

21                 THE COURT:  It may be that the statute covers

22    this in a way that doesn't require us to cross this

23    particular bridge but help me out.

24                 MR. TIMBERS:  Sure.  It doesn't.  So two

25    arguments.
```

**Appx9948**

```
 1                    THE COURT:  All right.

 2                    MR. TIMBERS:  First, it doesn't say "just on

 3        sale."

 4                    THE COURT:  It doesn't.  That's correct.

 5                    MR. TIMBERS:  It says in public use or on sale

 6        in this country.

 7                    And --

 8                    THE COURT:  Right.  And you would consider the,

 9        the evidence that we have seen, even if it doesn't establish

10        on sale and establishes public use --

11                    MR. TIMBERS:  Yes.

12                    THE COURT:  -- because it's made available to

13        people in this country?

14                    MR. TIMBERS:  It is available to anyone in this

15        country.

16                    THE COURT:  But how that is that public use in

17        the country?

18                    MR. TIMBERS:  Well.

19                    THE COURT:  I mean, if Bugatti decides that they

20        will make an offer to anyone in this country to, to purchase

21        their $2.5 million car and they don't make any sales, they

22        simply have a website, you can go to the website?  It's a

23        little hard to get the analogy.

24                    MR. TIMBERS:  I understand.

25                    THE COURT:  The whole idea is that I'm not
```

1    seeing where there is evidence that it actually was in

2    currency I'd say.

3            MR. TIMBERS:  I'd like a chance to brief that

4    aspect of it.  And as for on sale, I don't think you have to

5    get any money for that exact thing.  You saw all the sales

6    of the DiskOnKey key.  Let me give you an example, Your

7    Honor.

8            L.L.Bean.  Lifetime guarantee.  And so if

9    buttons or something rips, you can send it to them and they

10   fix it and send it back or they will send you a replacement.

11   They don't charge you for that but you are getting it, you

12   are getting the thing and it's part of your initial -- it's

13   part of you did pay because you paid at the beginning.  So I

14   would ask for a chance to brief that as well.

15           THE COURT:  What if L.L.Bean decides they really

16   want to get their product out there in the public eye if eye

17   and therefore they will give 100,000 pairs of jeans -- set

18   aside public use for moment and just on sale -- they will

19   give 100,000 pairs of jeans to a random assortment of people

20   around the U.S. and once they get people familiar with it,

21   they will develop the market.  Are those jeans on sale?

22           MR. TIMBERS:  I believe they are, but again I'd

23   like a chance to show you.

24           (Counsel confer.)

25           MR. TIMBERS:  Yes.  Okay.  We do know the

 1    DiskOnKey was on sale.  So all we're talking about is the

 2    SDK.

 3              MS. STERNBERG:  Yes, yes, the spreadsheet that

 4    we showed today were U.S. sales.

 5              THE COURT:  But those are U.S. transactions as I

 6    recall which included giveaways.

 7              MS. STERNBERG:  Right.  And it shows the Fuji

 8    sales.

 9              THE COURT:  Fuji was sales?

10              MS. STERNBERG:  Yes.

11              THE COURT:  All right.

12              MR. TIMBERS:  So to be clear, Mr. McNulty, our

13    very first witness indicated that the DiskOnKey was being

14    sold by Fuji.

15              THE COURT:  As before when?

16              MR. TIMBERS:  By October 2002, he is quoted in

17    October 2002, saying we are selling these --

18              THE COURT:  Okay.

19              MR. TIMBERS:  -- and we have, we have from

20    Sobol --

21              THE COURT:  And that leaves us with the question

22    of which version and so forth and all those issues.

23              MR. TIMBERS:  I want the jury --

24              MR. LEIBOWITZ:  I don't think that is right

25    because the only evidence --

1          THE COURT:  You don't think that is right but

2     that is what we're left with.

3          MR. LEIBOWITZ:  I think it's -- the only

4     evidence is that what was ever sold were blank drives, blank

5     DiskOnKeys.  There is no evidence that -- and we, we don't

6     know what version, we don't know if they can even run this

7     code.  So how can they get clear and convincing evidence

8     out of that if you sell a blank drive that might do many

9     different things but the particular functionality they're

10    talking about wasn't sold and wasn't for public use.

11         THE COURT:  Yes.  Okay.  Well, I think what I'm

12    going to do on both of these issues is once again, I think

13    I will defer on the Rule 50.  This case is bristling with

14    issues and these are two -- I think, both difficult issues

15    and I don't know the extent to which we will need to brief

16    either or both of them.

17         But I think it is something that I would not

18    feel comfortable ruling without briefing and that's not

19    anything that I think either you or I are particularly eager

20    to have happen before we have this case go to the jury.

21         MR. TIMBERS:  I would prefer this to be in the

22    post-trial case.

23         THE COURT:  Well, I understand, but I think,

24    I wouldn't -- I think this is a difficult enough set of

25    questions that I would feel that I could not give

**Appx9952**

1   responsible consideration to the questions prior to tomorrow

2   probably, given we have other things to occupy us and it

3   would put you under enormous pressure at a time in the case

4   in which you have a lot of other things to think about.

5            That may not be according to the Book of Hoyle

6   as to Rule 50 and the way Rule 50 is supposed to work, but I

7   think as a practical matter, that is the best resolution.

8   We will see what the jury does and we will pick up from

9   there and decide what needs to be done going forward.

10           But I will put you -- you know this already.  I

11  don't have to tell you but these are tricky questions in

12  which there are a lot of facts to be taken into account and

13  the, the prospect I would be able to remember all the facts

14  just as I had actually forgotten Mr. McNulty's testimony of

15  all things about the Fuji.  And now that we have discussed

16  it, I see there is something to be said for both sides on

17  that issue.  So I think we need to hold off on that issue at

18  this point.

19           That brings us to the question of timing.

20           Now, Mr. Sowers, where are we on the respective

21  time?  Do you have a calculation?

22           All right.  Here is where we are.

23           IOENGINE has two hours, 14 minutes and

24  57 seconds.

25           And I would, I would trust Mr. Sowers to be plus

1    or minus five seconds.

2                Defendant, two hours -- Ingenico, two hours, six

3    minutes and 21 seconds.

4                So for future planning, remember the arrangement

5    with respect to the closing arguments.  You can, in effect,

6    buy some extra time if you want it after your 40 minutes up

7    to -- did I say 90?

8                THE LAW CLERK:  (Nodding yes.)

9                THE COURT:  But you have to have that time

10   remaining so you get to choose how you want to use it.

11               Now if you get embroiled in very intense

12   examination and you start running very close to the margin,

13   I'll stop -- I'll stop you and give you a warning that you

14   are eating into your, you know, your reservoir of time.  I

15   have given up 40 minutes, which is free of charge, to avoid

16   putting you in a position that you suddenly find you only

17   have three minutes to give a closing argument.

18               But I think even so, we get real close, I'm

19   going to try to give some signal that if you have the idea

20   of giving an hour and-a-half closing argument that you are

21   already in danger of forfeiting that right.

22               Okay.

23               MR. LEIBOWITZ:  Your Honor, just on the point of

24   timing.  Do you expect closings tomorrow or do you expect

25   even if we finish tomorrow --

**Appx9954**