No. 2023-1367

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**INGENICO INC.,**
*Plaintiff / Counterclaim Defendant-Appellee,*

**INGENICO CORP., INGENICO GROUP S.A.,**
*Counterclaim Defendants-Appellees*

**v.**

**IOENGINE, LLC,**
*Defendant / Counter-Claimant-Appellant.*

Appeal from the United States District Court for the District of Delaware,
No. 1:18-cv-00826-WCB, Judge William C. Bryson.

**CORRECTED NON-CONFIDENTIAL JOINT APPENDIX**

Noah M. Leibowitz
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3538
*Counsel for Appellant, IOENGINE, LLC*

Kerry L. Timbers
Sharona Sternberg
Kevin R. Mosier
SUNSTEIN LLP
100 High Street
Boston, MA 02110-2321
(617) 443-9292
*Counsel for Appellees, INGENICO
INC., INGENICO CORP.,
INGENICO GROUP, S.A.*

Date: February 5, 2024

Gregory T. Chuebon
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3887

Derek J. Brader
Michael A. Fisher
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-3437
(215) 994-2079

Michael H. Joshi
DECHERT LLP
3000 El Camino Real
Five Palo Alto Square, Suite 650
Palo Alto, CA 94306-2112
(650) 813-4814
*Counsel for Appellant,*
*IOENGINE, LLC*

*Ingenico Inc. v. IOENGINE, LLC*

No. 2023-1367 (Fed. Cir.)

**CORRECTED JOINT APPENDIX**
**TABLE OF CONTENTS**

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|------|------------------|----------------------|----------------|
| 11/09/2018 | 39 | Agreed Protective Order Regarding the Disclosure and Use of Discovery Materials | Appxi |
| 07/25/2022 | 506 | Judgment | Appx1 |
| 12/09/2022 | 531 | Memorandum Opinion and Order denying Dkt. 512 Motion for Judgment as a Matter of Law (Oral Order unsealing document in its entirety on 12/14/2022.) | Appx3 |
| 06/15/2022 | 449 | Memorandum Opinion and Order (unsealed on 06/27/2022 per Judge Bryson) | Appx55 |
| 07/13/2022 | JX-294 | U.S. Patent No. 9,774,703 (McNulty) | Appx135 |
| 07/12/2022 | JX-349 | U.S. Patent No. 9,059,969 (McNulty) | Appx169 |
| 06/01/2018 | 1 | Complaint for Declaratory Judgment of Noninfringement | Appx205 |
| 02/18/2022 | 360-1 | Sealed excerpted exhibits 1-33 to Egan Declaration (entire exhibit sealed; no public version filed) | Appx1140 |
| 02/18/2022 | 361 | Excerpted IOENGINE, LLC's Opening Brief in Support of Its Combined Motion for Partial Summary Judgment of No Invalidity and to Exclude Testimony of Barry Sussman and James Geier (public version filed 02/25/2022 as Dkt. 364) | Appx1793 |
| 03/18/2022 | 378 | Excerpted IOENGINE, LLC's Reply Brief in Further Support of Its Combined Motion for Partial Summary Judgment of No Invalidity and to Exclude Testimony of Barry Sussman and James Geier (public version filed 03/25/2022 as Dkt. 388) | Appx8359 |
| 06/27/2022 | 478 | Order regarding IOENGINE, LLC's Motions *in Limine* | Appx8814 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|------|------|------|------|
| 07/05/2022 | 487 | Omnibus Pretrial Order | Appx8835 |
| 07/15/2022 | 497 | Court's Final Jury Instructions | Appx8859 |
| 07/15/2022 | 500 | Redacted Final Jury Verdict | Appx8899 |
| 07/28/2022 | 507 | Excerpt of Official Transcript of Jury Trial - Volume A held on 07/11/2022 before Judge William C. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx8909 |
| 07/28/2022 | 508 | Excerpt of Official Transcript of Jury Trial - Volume B held on 07.12.2022 before Judge William Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx9242 |
| 07/28/2022 | 509 | Excerpt of Official Transcript of Jury Trial - Volume C held on 07.13.2022 before Judge W. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx9659 |
| 07/28/2022 | 510 | Excerpt of Official Transcript of Jury Trial - Volume D held on 07.14.2022 before Judge W. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx9997 |
| 07/28/2022 | 511 | Excerpt of Official Transcript of Jury Trial - Volume E held on 07.15.2022 before Judge W. Bryson (public version filed 09/01/2022 as Dkt. 519-2) | Appx10342 |
| 08/17/2022 | 513 | Sealed excerpted IOENGINE, LLC's Opening Brief in Support of Its Renewed Motion for Judgment as a Matter of Law or, In the Alternative, for a New Trial (public version filed 08/24/2022 as Dkt. 516) | Appx10529 |
| 09/16/2022 | 523 | Sealed excerpted Ingenico's Corrected Answering Brief in Opposition to IOENGINE's Renewed Motion as a Matter of Law, or in the Alternative, for a New Trial (public version filed 09/21/2022 as Dkt. 524) | Appx10578 |
| 10/07/2022 | 526-1 | Excerpted Exhibit 1 - Christopher Schmandt Deposition taken on June 15, 2010 (public version filed 10/14/2022 as Dkt. 528) | Appx10654 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|---|---|---|---|
| 12/06/2022 | | Excerpt of Transcript of Motion for Judgment as a Matter of Law | Appx10686 |
| 07/13/2022 | DX-089 | DiskOnKey Technology - M-Systems website via Wayback Machine | Appx10931 |
| 07/13/2022 | DX-091 | M-Systems Flash Disk Pioneers - SEC form 20 FA for fiscal year ended December 31, 2002 | Appx10932 |
| 07/11/2022 | DX-092 | Fuji Photo Film Introduces its USB Drive Version of DiskOnKey (Press release (from Internet Archive)) | Appx11037 |
| 07/11/2022 | DX-093 | DiskOnKey Technical Specifications - Diskonkey.com via Wayback Machine | Appx11039 |
| 07/13/2022 | DX-097 | Press Release - M-Systems Engineers Automatic Firmware Upgrades for Previous Generation DiskOnKey Devices - M-Systems website via Wayback Machine | Appx11041 |
| 07/13/2022 | DX-099 | Products and Solutions - DiskOnKey (diskonkey.com via Wayback Machine) | Appx11043 |
| 07/13/2022 | DX-170 | M-Systems DiskOnKey product as depicted in this document (serial no. 32410900036847) | Appx11044 |
| 7/15/2022 | DX-304 | Sealed M-Systems - remote server demonstration (with associated metadata) | Appx11098 |
| 7/13/2022 | DX-305 | Sealed DiskOnKey software development kit data sheet (with associated metadata) | Appx11113 |
| 7/13/2022 | DX-307 | Press Release M-Systems Designs Software Developer's Kit for the DiskOnKey Technology Computing Platform | Appx11115 |
| 7/13/2022 | DX-316 | Sealed Sales Dec 2001-Q4 4 2002 (native file unable to be produced in paper) | Appx11118 |
| 7/13/2022 | DX-317 | Sealed Sales, Q1 2003 (native file unable to be produced in paper) | Appx11119 |
| 7/13/2022 | DX-320 | Sealed Sales, Q2 Dec 2003 (native file unable to be produced in paper) | Appx11120 |
| 7/13/2022 | DX-322 | Sealed Product Specification - DiskOnKey T3 | Appx11121 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|---|---|---|---|
| 7/13/2022 | DX-328 | Sealed Executable file, DiskOnKey Firmware Upgrade, 6-26-2002 (native file unable to be produced in paper) | Appx11171 |
| 7/13/2022 | DX-330 | Sealed Email re Release of Firmware remote upgrade tool | Appx11174 |
| 7/13/2022 | DX-331 | Sealed Using DiskOnKey upgrade | Appx11177 |
| 7/13/2022 | DX-333 | Sealed DiskOnKey Software Development Kit | Appx11197 |
| 7/13/2022 | DX-336 | Sealed DiskOnKey upgrade presentation | Appx11282 |
| 7/13/2022 | DX-363 | US Patent Publication No. US 2004/0039932 (Elazar) | Appx11291 |
| 7/13/2022 | DX-402 | DiskOnKey - Products and Solutions (Page from Internet Archive) | Appx11305 |
| 7/13/2022 | DX-403 | DiskOnKey - Products and Solutions - SDK (Page from Internet Archive) | Appx11306 |
| 7/11/2022 | JX-003 | Sealed Invoice no. 100-286 from Brand X to the Windwood Group | Appx11397 |
| 7/11/2022 | JX-005 | Sealed Invoice no. A0093 from May Louie to the Windwood Group | Appx11398 |
| 7/11/2022 | JX-272 | Sealed Agreement between MDRM Inc. and Revolutionary Group, Inc. | Appx16485 |
| 7/11/2022 | PDX-2 | Sealed PowerPoint presentation of Scott McNulty IOENGINE U.S. Court for the District of Delaware (native file unable to be produced in paper) | Appx16553 |
| 7/11/2022 | PX-219 | Sealed Letter to Scott McNulty from Dan at MDRM recapping issues and ideas | Appx16560 |
| 7/11/2022 | PX-222 | Excerpt of PC Magazine | Appx16566 |
| 7/11/2022 | PX-231 | Sealed Specification for V2.0 targeted Dec 15, 2003 | Appx16795 |
| 7/12/2022 | PX-235 | Sealed Scott McNulty Portable devices rule | Appx16798 |
| 7/11/2022 | PX-236 | Sealed MDRM Digital Ltd. Invoice # 3006 to Revolutionary Group, Inc. | Appx16800 |
| 7/11/2022 | PX-242 | Sealed MDRM Digital Ltd. Invoice No. 4001 to Revolutionary Group, Inc. | Appx16802 |
| 7/11/2022 | PX-243 | Sealed Email from Dan Harkabi to Oliver Kromat RE: Conference call with Fuji | Appx16803 |

| Date | Exhibit / Dkt. No. | Document Description | Appendix Pages |
|------|--------------------|-----------------------|----------------|
| 7/11/2022 | PX-244 | Sealed Email from Bhavin Desai to Gidi Elazar, et al., RE: Next step | Appx16804 |
| 7/11/2022 | PX-434 | Sealed Physical exhibit of IOENGINE Prototype Device Nos. 2-3, 5-6, 9-30 (as identified by CRA) | Appx18000 |
| 7/11/2022 | PX-543 | Certified copies of color drawings US Pat No 7861006 | Appx18151 |
| 7/11/2022 | PX-547 | Sealed File Properties Screenshot | Appx18161 |
| 7/11/2022 | | Docket report | Appx18162 |

## CONFIDENTIAL MATERIAL

The non-confidential version of this appendix redacts information that was designated confidential under the district court protective order. Appxi-Appxxxviii. In the confidential appendix, yellow highlighting and brackets indicate confidential material. Specifically, the pages listed below omit material that was designated confidential under the district court protective order.

- Appx1140-Appx1792
- Appx8909: has redactions on Appx9075-Appx9077, Appx9087-Appx9089, Appx9091-Appx9092
- Appx9659: has redactions on Appx9703
- Appx10342: has redactions on Appx10412-Appx10413, Appx10496-Appx10497
- Appx10529: has redactions on Appx10540, Appx10566
- Appx10578: has redactions on Appx10589
- Appx11098-Appx11112
- Appx11113-Appx11114
- Appx11118
- Appx11119
- Appx11120
- Appx11121-Appx11170
- Appx11171
- Appx11174-Appx11176
- Appx11177-Appx11182
- Appx11197-Appx11281

- Appx11282-Appx11287
- Appx11397
- Appx11398-Appx11399
- Appx16485-Appx16501
- Appx16553-Appx16553
- Appx16560-Appx16562
- Appx16795-Appx16797
- Appx16798-Appx16799
- Appx16800-Appx16801
- Appx16802
- Appx16803
- Appx16804-Appx16805
- Appx18000
- Appx18161

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     INGENICO INC.,
 4                                      :    CIVIL ACTION
                  Plaintiff,            :
 5   v                                  :
                                        :
 6   IOENGINE, LLC,                     :
                                        :
 7            Defendant.
     ------------------------------------
 8   IOENGINE, LLC,
                                        :
 9            Counterclaim Plaintiff,   :
     v                                  :
10                                      :
     INGENICO INC., INGENICO CORP. and  :
11   INGENICO GROUP SA,                 :
                                        :    NO. 18-826-WCB
12            Counterclaim Defendants.

13                              - - -

14                         Wilmington, Delaware
                           Thursday, July 14, 2022
15                         Jury Trial - Volume D

16                              - - -

17   BEFORE:      HONORABLE WILLIAM C. BRYSON, and a jury
                  United States Circuit Court Judge
18                              - - -

19

20
     (Appearances in their entirety placed beginning on page 2)
21

22

23   Reported by:

24   Brian P. Gaffigan
     Registered Merit Reporter
25   Federal Certified Realtime Reporter
```

**Appx9997**

Rubin - direct

1    document, please.

2              Dr. Rubin, what do we see here at Section 5.3 of

3    JX-174?

4         A.   I'm going to wait until it's -- thank you.

5              So I actually showed this in my previous direct

6    exam, and it shows that basically the standard requires --

7    it's got that "shall" word in the middle -- that every --

8    every card have a unique ID that is used and, in fact,

9    every transaction have a unique key that indicates that

10   transaction and that indicates which device it's coming

11   from.

12             And so in the '969 patent, the requirement is

13   that the communication facilitate verification of the

14   device.  By including something unique like this in every

15   transaction, that facilitates the verification of the

16   device.

17             The '969 doesn't go further and say -- you know,

18   there is not an element at the end that says, and then the

19   verification occurs on the server.  That is not part of the

20   claim.  And so if there is something in there that

21   facilitates the verification, then the claim is met.

22             MR. CHUEBON:  Your Honor, I'd like to switch to

23   a new topic.  I don't know if you had thoughts on when to

24   give the jury a break.

25             THE COURT:  Well, let's see if the jury would

**Appx10086**

                              Rubin - direct

 1    like a break.  Is this --

 2                    I'm getting a sense this would be a good place

 3    to --

 4                    MR. CHUEBON:  I won't take it personally.

 5                    THE COURT:  That's fine.  We'll take a 15-minute

 6    break and return at 10:35.

 7                    (Jury and the Court left courtroom.)

 8                    *    *    *

 9                    (Jury returned.)

10                    THE COURT:  Please be seated.

11                    You may resume.

12                    MR. CHUEBON:  Thank you, Your Honor.

13    BY MR. CHUEBON:

14          Q.    So, Dr. Rubin, I'd like to move on to another

15    topic now.  The validity of the patents in suit.

16                    Have you independently reviewed the documents

17    that Mr. Geier discussed in his testimony yesterday?

18          A.    Yes.

19          Q.    And did you hear Mr. Geier offer opinions

20    regarding the validity of the '969 and '703 patents?

21          A.    I did.

22          Q.    And do you agree with those opinions?

23          A.    I don't agree.

24          Q.    If we could have Dr. Rubin's slides, please.

25                    And if you could briefly tell us, why is it that

Rubin - direct

1    you don't agree with doctor -- excuse me, Mr. Geier's

2    opinions?

3         A.    So he offered opinions about how the DiskOnKey

4    works, and he offered opinions about the conception

5    document.  And I disagree with those opinions.

6         Q.    So let's start with the conception of the --

7    his conception date of the invention.

8              What did you consider when you were forming your

9    opinions regarding the conception date of the asserted

10   patents?

11        A.    So I considered the portable devices rule memo

12   that we have seen in the court, and I considered the patents

13   as well.

14        Q.    And what was your opinion regarding the

15   conception date of the patents-in-suit?

16        A.    That the conception date is no later than July

17   26th, 2001.

18        Q.    And regarding the portable devices rule letter,

19   what date associated with that letter were you relying on?

20        A.    The date that was on the letter itself that said

21   July 26th, 2001.

22              MR. CHUEBON:  We have some technical

23   difficulties here.

24              Okay.  Can we go back a slide?

25   BY MR. CHUEBON:

Rubin - direct

1   Q.   Okay.  Dr. Rubin, so what claims did you compare

2   to the portable devices rule letter?

3   A.   So I looked at all of the asserted claims with

4   respect to that.

5   Q.   Okay.  Let's start with the preamble of the

6   claims.  We'll go one slide forward, please.

7        Dr. Rubin, in your opinion, is the portable --

8   actually, let's ground ourselves here.  What do we see on

9   the left-hand side of the screen?

10   A.   So on the left-hand side, and this is going to

11   follow through the next several slides, I talk about an

12   element found in claim -- Claim 1 of the '969 and then below

13   it, recall that between the two patents there is a lot of

14   similarity, so rather than do this over and over, I just

15   list the parts of the '703 patents that are the matching

16   ones.

17   Q.   Okay.  So, Dr. Rubin, in your opinion, does the

18   portable devices rule letter discuss a portable device?

19   A.   Yes.  You can see in the name as well as the

20   first two words of the document.

21   Q.   And what about the next element, "configure to

22   communicate with a terminal."  Is that discussed in the

23   conception memo?

24   A.   Yes.  Recall the terminal is communicating with

25   the portable device, the USB, Bluetooth, something like that

**Appx10089**

Rubin - direct

1  and here it says when a user plugs in a USB into the USB

2  port and then it also talks later about technologies like

3  USB and Bluetooth.

4           MR. CHUEBON:  Move on to the next element.

5  BY MR. CHUEBON:

6     Q.  What about this description of a terminal

7  comprising?  Was that discussed in the conception memo?

8     A.  Yes.  So this element talks about a processor,

9  input and output components, a network communications

10 interface and the memory that holds the code.  And we can

11 see on the right these are excerpts from the memo that talks

12 about the processing power, it talks about the user clicking

13 yes, and a dashboard.

14          So those would be -- the input and output

15 components would be required for that.  It talks about that

16 the portable device needs to link to a computer network, so

17 that is showing the networking and then that the -- there is

18 code in the last excerpt there, code on the computer.  So

19 all of those are present in the memo.

20    Q.  And what about the next element, the first

21 program code?  Is that discussed in the conception memo?

22    A.  So the next program code -- I'm sorry, the next

23 element is about the first program code, which is about the

24 IUI and you can see that that is mentioned, an interactive

25 user interface.  The user plugs in to the USB and then can

**Appx10090**

Rubin - direct

1     be asked a question like would you like to connect to the

2     Internet, showing that the user interface is interactive.

3          Q.    Okay.   And what about the next element,

4     Dr. Rubin, second program code.   Is that discussed in the

5     conception memo?

6          A.    Right.   So the second program code has to do

7     with being able to communicate from the terminal to the

8     portable device and we can see in the memo, the dashboard

9     makes a request, would you like to connect to this computer,

10     would you like to connect to the Internet?   So these show

11     that the inventor had in mind these, these elements.

12          Q.    And what about the next element, the portable

13     device comprising -- discussing external communications

14     interface.   Is that discussed in the conception memo?

15          A.    Right.   So once again the USB and the inclusion

16     of USB and Bluetooth satisfies this and shows that it's part

17     of the memo.

18          Q.    Okay.   And the next element, a processor.   Is

19     that discussed in the conception memo?

20          A.    Yes, you can see it mentions a processor.

21          Q.    What with the memory element, is that disclosed

22     or mentioned in the conception memo?

23          A.    Yes, it is.   It talks about the processor and

24     the memory and in the next excerpt, I'm showing controlling

25     the bios or firmware or software of their personal device.

Rubin - direct

1   Q.   And what about the next element, the third

2   program code.  Do you understand that to be included in the

3   conception memo?

4   A.   So the third program code has to do with

5   providing communications nodes, to coordinate the

6   communication node on the terminal and establish the

7   communication link when -- between the portable device and

8   the terminal, and facilitate communication to the network

9   node.

10          And here it talks about in the memo, their

11  device containing the proper code connects to the computers

12  as well as its outbound network system thus providing a

13  portable device a way to take the next step and connect to

14  the Internet so this is showing that element in Claim 1.

15  Q.   What about the next element, the fourth program

16  code?  Is that discussed in the conception memo?

17  A.   Right.  So the fourth program code, what I'm

18  showing on the screen, talks about the portable device being

19  configured to execute code in response to a communication

20  that is received resulting from an IUI.  And in the memo,

21  he said the dashboard makes a request, the user responds

22  with yes, and the device contains the proper code connects.

23  The user clicks yes, and the code on the device works this

24  way.

25          And so this is showing that the portable device

Rubin - direct

1    receives a command from the terminal and then executes code.

2           Q.    Okay.  And what about the next element,

3    configured to facilitate communications?  Is that discussed

4    in the conception memo?

5           A.    Yes.  We see it says code on the portable device

6    works its way through the computer to the Internet an

7    contacts a website.

8           Q.    Okay.  And by the way, Dr. Rubin, it actually

9    continues on and it says -- it says, "hi, I am here from a

10   person's pocket and I would like to copy your content."

11          What is your understanding of what the "I" there

12   refers to?

13          A.    So that is referring to the portable device.

14   It's kind of -- you see some informality in this document

15   as -- there's a reference to Hal and all that, and here, he

16   is just saying the portable device is talking and saying,

17   hi, I am here from a person's pocket.

18          Q.    And what about the next element there,

19   Dr. Rubin, is that discussed in the conception memo?

20          A.    Yes.  So this one has to do with causing a

21   communications to be transmitted to a communication network

22   node.  That is a node on the Internet.  And the memo says,

23   "and their device containing the proper code connects to the

24   computer system as well as its outbound network system, thus

25   providing a portable device a way to take the next step and

Rubin - direct

1    connect to the Internet should the user desire."

2         Q.   And what about the next element?  The

3    communication caused to be transmitted to the communication

4    network node facilitates verification of the portable

5    device.  Is that discussed in the conception memo?

6         A.   So what I would like to do now is ask if you

7    could please pull up my definition of one of ordinary skill

8    in the art?

9              MR. CHUEBON:  See if we can do that for you.

10   BY THE WITNESS:

11        A.   Okay.  The reason I pulled this up is that the,

12   the analysis to look at a conception memo with respect to

13   the claims is supposed to take place as to whether someone

14   of ordinary skill in the art, however I defined it, would --

15   the way they would understand what the memo included or what

16   was in the invention.

17             And so to review, I defined a person of ordinary

18   skill in the art for my analysis to be someone with a

19   bachelor's degree in computer science, computer engineering

20   or related discipline.  So someone who has studied for four

21   years this topic and then has two to three years' experience

22   developing, implementing or deploying systems for the

23   encryption of data on portable devices, as well as two to

24   three years' experience in programming software and firmware

25   for portable devices.

**Appx10094**

Rubin - direct

1    So the idea is not to look at the memo and say

2    would someone off the street be able to look at this memo

3    and understand X, Y and Z.  It's to say someone like this

4    looking at the memo.  So with that in mind, let me address

5    that.

6         MR. CHUEBON:  Can we go back a slide please?

7         THE WITNESS:  There we go.

8         MR. CHUEBON:  There we go.

9    BY THE WITNESS:

10        A.    So what I want to point out to in the memo, it

11   says, code on the portable device works its way through the

12   computer to the Internet and contacts a website and says,

13   hi, I am here from a person's pocket and I would like to

14   copy your content.

15        And so what Mr. McNulty is saying in this memo

16   is there is a portable device and it's talking to a server.

17   It's being a little silly, it says I'm in someone's pocket

18   but I would like to copy your content.  And one of skill in

19   the art, looking at the request to copy content, would know

20   that you wouldn't just give the content to anyone, you would

21   verify.  As part of the type of system you would build, you

22   would verify that that person was really who they said they

23   were.

24        Q.    And what about the next element, Dr. Rubin?  Is

25   that discussed in the conception memo?

Rubin - direct

1      A.    Right.  And also this one, I'm looking at it --

2   I'm looking at all of these, but in particular I'm looking

3   at this from the point of view of one of ordinary skill in

4   the art at the time of the invention.  And so in the memo,

5   the portable device wants to copy data and the system is

6   discussed such that there is simultaneous synchronizing

7   across all three digital environments.

8           What the memo talks about is combining portable

9   devices, terminals, and the Internet and talks about doing

10  that with one management system.  And having worked on many

11  complex systems before, I can tell you that all of those,

12  one of skill in the art would utilize a database when they

13  were doing that.  And the memo actually talks about

14  synchronizing across digital environments and so one of

15  ordinary skill in the art would understand that that

16  involves a database.

17     Q.    And what about the next element that we see

18  here, "wherein the data stored on the portable device memory

19  comprises portable device identifier information."  Is that

20  discussed in the conception memo?

21     A.    Right.  So again, I'm going back, a person of

22  ordinary skill in the art with a bachelor's degree, a couple

23  years of experience and says I am here from a person's

24  pocket and I would like to copy your content.  That is going

25  to require verification and in order to do that, some

**Appx10096**

Rubin - direct

1    identifier would have to be sent in order to perform the

2    verification.

3         Q.    Again, the "I" there, that is referring to the

4    portable device or the person whose pocket it is in?

5         A.    It's the portable device.

6         Q.    So, Dr. Rubin, in your opinion, are all of the

7    elements of the asserted claims disclosed and discussed in

8    the conception memo?

9         A.    Yes.

10        Q.    Let's move on to the validity of the

11   patents-in-suit.

12             Let's jump right into the DiskOnKey.

13             Have you analyzed whether or not the DiskOnKey

14   discloses all the elements of the asserted claims of the

15   patents-in-suit.

16        A.    I have.

17        Q.    Okay.  Let's take a look at what you have on

18   your next slide.  What are we looking at here?

19        A.    So for validity, I only need to show that a

20   piece of prior art does not meet one element of the claim

21   and that prior art does not render the patent, the patent

22   claim invalid.

23             And what I have done is pulled out four claim

24   elements that Mr. Geier has failed to show are disclosed by

25   the DiskOnKey.

Rubin - direct

1    Q.    And, Dr. Rubin, are these claim elements common

2    across the asserted claims?

3    A.    Yes, they are.

4    Q.    So I see Claim 3 down here, but can you remind

5    us what the dependency structure of Claim 10 is?

6    A.    So Claim 10 depends on Claim 2 which depends on

7    Claim 1.

8    Q.    So would the first three elements be included in

9    Claim 10 as well?

10   A.    I want to be clear because the last one says

11   three, but the first three are, yes.

12   Q.    Okay.  Right.  Can you summarize your opinions

13   on, your reactions to Dr. Rubin -- sorry, Mr. Geier's

14   opinions on validity in light on DiskOnKey?

15   A.    Yes.  So Mr. Geier did not perform any

16   examination of the program code on the DiskOnKey in order to

17   attempt to show that the elements were there.  He also did

18   not show that there was any program code executed in

19   response to a communication resulting from interaction with

20   an IUI.

21   Q.    Well, is source code important to this kind of

22   analysis, Dr. Rubin?

23   A.    Yes, it is.  So my team spent hundreds of hours

24   and several trips up to Delaware to analyze source code.  We

25   spent many more hours looking at the source code that we

Rubin - direct

1  printed out and in order to show that an element exists, you

2  need the definitive reference for how it works which is the

3  code.

4       Q.   Well, let's take a look at what Mr. Geier

5  pointed to.  What about this alleged upgrade software that

6  Mr. Geier relies on?  What is your opinion regarding that?

7       A.   Well, several things.  One is he did not show us

8  the code of how this works.  He relied on presentations such

9  as this.  And this actually I believe is, is -- describes

10  the product in a way that is different from how Mr. Geier

11  described it.

12       Q.   What do you mean by that?

13       A.   He -- Mr. Geier focused on the top half of this

14  slide.  He said that, you know, the DiskOnKey uses PKI, so

15  that involves authentication.  But if you look at the second

16  part of this slide, it says, "if an attacker manages to

17  overcome the security mechanism, the DiskOnKey ASIC prevents

18  the ARM7 microprocessor from running code that is not

19  digitally signed by M-Systems."

20       Q.   What does, what does that mean?

21       A.   Yeah.  Let me decipher that.

22            So first I'll explain what an ASIC is.  And ASIC

23  is an application specific integrated circuit.  Okay?  And

24  that basically means it's hardware, it's not software.

25            Most people have heard of software and not a lot

**Appx10099**

Rubin - direct

1   of people have necessarily heard of ASICs but they make up a

2   tremendous part of the technology industry.  And the idea

3   behind an ASIC is that if you build an application specific

4   integrated circuit for something, it will run very, very

5   fast, compared to how things run in software.

6           And it will also be a lot more secure because

7   one of the ways that people attack systems is by injecting

8   code into other code.  So you have code running in -- on

9   your phone and I want to hack your phone.  What I try to do

10  is get the code that I write to be injected into your phone

11  and now I can control your phone, I have hacked it.

12          Can't hack an ASIC.  It's just hardware and it

13  can perform the same type of functionality that software can

14  perform but it performs it in hardware.

15          The reason that I found this so telling is that

16  when it's talking about -- what it is talking about here is

17  saying that if you try to upgrade and you have upgraded the

18  wrong firmware file into the device, that will be prevented

19  by the ASIC which is the cryptographic code that performs

20  the digitally signed, the verification on the digitally

21  signed code.

22          So this tells me that the DiskOnKey had some

23  things that might have run in software and also some things

24  including cryptographic code that wasn't code.

25  Cryptographic functions were in an ASIC in hardware.

**Appx10100**

Rubin - direct

1    Q.   So how does that impact your analysis of the

2    validity or invalidity of the '969 and '703 patents?

3    A.   Well, recall that the patents-in-suit involve

4    program codes.  Every single patent claim talks about having

5    program codes.  For Mr. Geier to show that the DiskOnKey

6    invalidates the patent claims, he would need to point to

7    those program codes like I did this morning.  But here we

8    see that there may not even be program code for some of

9    those elements, so I think it's even more important for him

10   to show that code because otherwise how do we know there is

11   even any code and it doesn't run on an ASIC.

12   Q.   Well, do you disagree with Mr. Geier's opinions

13   about how the DiskOnKey code runs?

14   A.   Yes.

15   Q.   Can you explain those opinions?

16   A.   Yes.  This is Mr. Geier's -- this is from

17   Mr. Geier's slide where he showed the DiskOnKey firmware

18   upgrade process.  And he said that because there is an API

19   call that allows getting the current version from the

20   DiskOnKey that that represents a -- an interaction on an IUI

21   that causes a fourth program code to run and then that

22   program code contacts an Internet server.

23           However, there are other ways that this could be

24   built.  You have to look at the code to see exactly how this

25   is implemented.

**Appx10101**

Rubin - direct

1          Q.     Well, what about the getting current version

2    lineup there?  What is your opinion on Dr. -- of Mr. Geier's

3    analysis of what is happening there?

4          A.     Yes.   So Mr. Geier said that getting current

5    version happens as an interaction with an IUI when the user

6    clicks the upgrade button.

7                 However, I have seen many systems like this and

8    I've built systems like this and programmers will often try

9    to optimize their code.  They try to make a program faster,

10   better and more user friendly.

11                And the way that I've seen many systems work

12   what they'll do is when you of first insert the DiskOnKey,

13   at that point, the computer might read off the version

14   number.  Why?  Because now it knows the version number that

15   is running on there.  In addition, the computer system might

16   store that in what is called a system registry or in a file.

17   Many, many applications keep information about the

18   application on the computer for quick and ready access.

19                And so if that is the way it happened and I

20   admit I don't know how it happens and I haven't seen any

21   code for how it happens, but it could happen that way.  And

22   if that is the way it happens, then it is possible that when

23   a user clicks the upgrade button, clicks the upgrade button,

24   what happens is that the computer just reads the current

25   version out of memory and it doesn't actually interact with

Rubin - direct

1    the DiskOnKey at that point.  And his invalidity analysis

2    requires that the user interact with the DiskOnKey at that

3    point.

4         Q.   Were you here yesterday when Mr. Geier said that

5    the authenticating step of the DiskOnKey file that we're

6    looking at here would be met by sending a public key to a

7    server as part of PKI?

8         A.   I was.

9         Q.   Do you agree with Mr. Geier's analysis?

10        A.   I do not.

11        Q.   Do you have a background in PKI?

12        A.   I do.

13        Q.   What sort of background is that?

14        A.   I have been teaching PKI for over 20 years.  I

15   have worked on PKI standards myself and many of the systems

16   that I have developed use PKI, so, you know, I even -- one

17   of my books has several chapters devoted to PKI so I

18   consider that core to the work that I do.

19        Q.   Well, what about Mr. Geier's description of the

20   use of PKI with respect to the DiskOnKey do you disagree

21   with?

22        A.   I disagree with several things that Mr. Geier

23   said.

24             MR. CHUEBON:  Can we get it a copy of

25   Mr. Geier's testimony from yesterday?

                        Rubin - direct

1                   There we go.

2    BY MR. CHUEBON:

3         Q.    Dr. Rubin, is this the testimony you were

4    referring to?

5         A.    Yes, it is.

6         Q.    What about this testimony do you disagree with?

7         A.    So what Mr. Geier said, and I don't know if that

8    needs to be enlarged or not.  I can read it.

9              So -- okay.  He said that authentication can

10   happen by taking a public key and sending it to a server.

11        Q.    And do you agree with that analysis or disagree?

12        A.    No, that is not how you do authentication.  And

13   let me actually give a small analogy to explain why that

14   doesn't work.

15             So let's say that I talk to you on the phone and

16   I say, you know, I -- you want to know who I am.  I say, you

17   know, I am Bob.  How do I know that you are Bob?  And I say,

18   no, I promise that I'm Bob.  You say, no, no, I need you to

19   prove it to me.  Sending a public key would be the

20   equivalent of me putting my driver's license into an

21   envelope and mailing it to the person.  So they open it up

22   and they say okay, that says Bob, it must be Bob; right?

23             That is not an actual authentication protocol

24   that works.  In PKI, we design all kinds of authentication

25   protocols.  I assign my students projects to, you know,

Rubin - direct

1  build authentication systems.  And one of the issues here is

2  that if you just send a public key, that might be a small

3  step in a larger protocol but that in itself will not

4  provide authentication.

5       Q.  Why wouldn't this fictional Bob sending somebody

6  his driver's license in an envelope authenticate it?

7       A.  Because the person receiving the envelope has

8  never seen Bob, so they get something that is a plastic card

9  that says Bob, maybe it's the person who was on the phone's

10  friend whose name is Bob.  They don't know.  There is no way

11  to authenticate it.

12            MR. CHUEBON:  Well, let's take a look back at

13  the slides please.

14            And if we could go to the next slide.

15  BY MR. CHUEBON:

16       Q.  What about Mr. Geier's citation to this "get

17  public key"?  Did you agree with his analysis of this?

18       A.  No.

19       Q.  Why not?

20       A.  So Mr. Geier showed that there is a function

21  called get public key.  And he didn't show any code on the

22  DiskOnKey that runs as a result of this function.  He didn't

23  really explain how this function could result in invalidity

24  because just getting a public key is not enough for

25  authentication.  So yes, there is a function to get public

Rubin - direct

1    key and maybe somebody could do something with that but he

2    didn't show that anybody wrote code that uses this.

3            Q.    Is there any connection between the ASIC and

4    this function?

5            A.    Yes.   In particular, public key cryptography,

6    which is what PKI uses, is used for digital signature and

7    verification.   And the slide I showed you earlier that

8    talked about an ASIC said that the firmware was verified

9    using an ASIC.   And so it's possible that this get public

10   key describes an interface to the ASIC on the portable

11   device and not to any code.

12           Q.    And what about the next item that Mr. Geier

13   pointed to, getting a version.   Do you agree with his

14   analysis of that step?

15           A.    I do not.

16           Q.    Why not?

17           A.    So there are different ways this could be

18   programmed.   One of the ways that many upgrade programs work

19   is that whenever there is a new version, it gets sent down

20   and then when the user tries to upgrade, they can instantly

21   copy the new version and upgrade to it, rather than seeing

22   if the server is available, waiting for it to download at

23   the moment they want to upgrade.   Again, I'm not saying that

24   that is how DiskOnKey works.   I'm saying that that would be

25   a preferred way it could have been implemented, and I didn't

Rubin - direct

1   see any code from Mr. Geier showing that it didn't work that

2   way.

3           Q.    So, Dr. Rubin, in your opinion, the element that

4   we just looked at a minute ago, are they disclosed by the

5   DiskOnKey?

6           A.    They're not.

7           Q.    And to be clear, Dr. Rubin, these elements, are

8   they also included in the asserted claims of the '703

9   patent?

10          A.    Yes.

11          Q.    So in your opinion, can the DiskOnKey disclose

12  all elements of any of the asserted claims?

13          A.    No.

14          Q.    Dr. Rubin, out of curiosity -- so let's imagine

15  that you have a DiskOnKey and that you have the upgrade

16  software -- well, I guess it didn't run but let's imagine

17  that it did work.  And you have those two things.

18              MR. TIMBERS:  Objection.

19  BY MR. CHUEBON:

20          Q.    You don't have documents --

21              THE COURT:  We have an objection.  Yes.

22              MR. TIMBERS:  Yes.  I'm not sure where counsel

23  is basing his run.

24              THE COURT:  Go ahead.  Your response.

25              MR. CHUEBON:  Because it didn't run.  We saw it

Rubin - direct

1    the other day in court.  Mr. Geier clicked on it and it

2    didn't run.

3                    MR. TIMBERS:  Well --

4                    MR. CHUEBON:  I'll rephrase the question.

5                    THE COURT:  I think probably let's rephrase it

6    to -- to avoid --

7                    MR. CHUEBON:  Sure.

8    BY MR. CHUEBON:

9         Q.   Dr. Rubin, let's imagine you have the DiskOnKey

10   and you have a DiskOnKey upgrade file, but you don't have

11   documents.  You don't have any of these documents that

12   Mr. Geier looked at.

13                    In that circumstance, you plug in the DiskOnKey

14   and you upgrade it -- upgrade the firmware.  Would that

15   inform you as to how the DiskOnKey is operating?

16        A.   It wouldn't tell me anything about how it

17   worked.  It would tell me how to use it, but not how things

18   were implemented on it.

19                    MR. CHUEBON:  Can we skip forward to Slide 45,

20   please?

21   BY MR. CHUEBON:

22        Q.   So, Dr. Rubin, what about Mr. Geier's proposed

23   combination of the DiskOnKey and Elazar?  Have you performed

24   an analysis of that?

25        A.   I have.

**Appx10108**

Rubin - direct

1    Q.    And can you remind us, what is Elazar?

2    A.    So Elazar, as we refer sometimes to like a

3    patent application or a paper by the name of the author, it

4    was a patent application by somebody whose last name is

5    Elazar.  And this patent application had to do with the

6    field of digital rights management.

7    Q.    Okay.  And is it your opinion, is Elazar prior

8    art?

9    A.    Elazar is not prior art because it was published

10   after the conception date.

11   Q.    Well, in your opinion, would a person of

12   ordinary skill in the art have been motivated to combine the

13   DiskOnKey with the Elazar reference?

14   A.    No.

15   Q.    Why not?

16   A.    The reason is -- let me give a little

17   explanation of what this Elazar reference is.

18        So Elazar, in this patent application, was

19   attempting to solve a problem where people were copying

20   music illegally and other digital content, you know, books

21   online, et cetera.  There was a problem as things moved

22   into the digital format that they were very easy to copy

23   and people wanted to get paid if somebody bought another,

24   you know, record or another book or something like that.

25        And so what Elazar was doing was taking a

**Appx10109**

Rubin - cross

1    Q.    Yes.

2    A.    Well, I think this was the document that he, he

3    felt most strongly demonstrated the anticipation that he was

4    claiming.

5    Q.    And this is a screen depicting what would happen

6    on the computer when it's running a DiskOnKey firmware

7    upgrade; correct?

8    A.    That's right.

9    Q.    And it's your understanding that this begins

10   with the user at the computer clicking the upgrade button on

11   the screen that is shown on the computer; is that right?

12   A.    Yes.  My understanding is that this is -- this

13   is a document and it is saying that when you use the

14   DiskOnKey, this is what you are going to see and if you

15   click on the upgrade, you will upgrade your software.

16   Q.    Right.  And you see the little checkmarks, there

17   are two of them on the left?

18   A.    Yes.

19   Q.    And a little kangaroo which the arrow kind of

20   obscures a little bit but there is a little kangaroo there?

21   A.    There is.

22   Q.    Yes.  So am I right the checkmark is indicating

23   well that step is done, right?

24   A.    That is how these interfaces usually work.

25   Q.    And the kangaroo is indicating we're in the

Rubin - cross

 1    middle of doing this; right?

 2          A.   That is what I would assume.

 3          Q.   Okay.  And in the absence of actual code that

 4    exists for Mr. Geier to show us, we can look at this screen

 5    that shows a series of steps that are taken at the computer

 6    about how to do the upgrade of this DiskOnKey firmware;

 7    correct?

 8          A.   Right.  I want to mention in response to that

 9    that there has been some question about this document and

10    its accuracy.  But a lot of times products that you are

11    building evolve kind of on a separate tangent from the

12    documentation.  You don't always keep up with it.  But this

13    document shows what the intended user experience is.

14          Q.   All right.  So that very first item, getting the

15    current version - 2.50, that as you've mentioned happens

16    after the upgrade button is pushed; correct?

17          A.   That is the idea that is being portrayed here.

18          Q.   So that action takes place in response to user

19    interaction with the interactive user interface; correct?

20          A.   I think that is fair to say.

21          Q.   And this first item, the computer is getting the

22    current version of the DiskOnKey; correct?

23          A.   Well, the computer may already have it but the

24    computer is -- the interface is telling the user okay, the

25    step of getting the current version has now occurred.

Rubin - cross

1         Q.   So that step involves obviously getting it,

2  getting the information from the DiskOnKey; correct?

3         A.   Well, it would involve it if it didn't already

4  get it when the DiskOnKey was plugged in or from a registry

5  in the system.

6         Q.   And the fact that this says that it's doing it,

7  that it gets it indicates it needs to actually get it and

8  that it does get it.  It doesn't already have it?

9         A.   I don't know that I agree with that.  Here we

10  have a listing of the steps that are going to be

11  communicated to a user who is upgrading their software.  So

12  the user would want to know that they're getting the current

13  version, connecting to the server, but programmers often

14  will take optimizations when they're building a system and

15  if I were building this system or if one of ordinary skill

16  in the art at that time were building it, they very well

17  could say let's have an optimization, let's keep that in a

18  registry because then when the user clicks upgrade things

19  will happen more quickly.

20         Q.   But you didn't build this system, did you?

21         A.   No.

22         Q.   And this explicitly said it's getting the

23  current version; correct?

24         A.   Yes.

25         Q.   From a DiskOnKey?

Rubin - cross

1    that right?

2         A.   Yes, at some point the DiskOnKey has to provide

3    that information.  It doesn't necessarily have to be at the

4    time the user clicked upgrade because the programmer may

5    have decided to speed up the upgrade process and be storing

6    that already on the computer.

7         Q.   And, in fact, the SDK that we saw actually shows

8    a command that requires the DiskOnKey to return to it

9    information about its DiskOnKey, its current version;

10   correct?

11        A.   There is no doubt that at some point the

12   computer is going to get the current version of the

13   DiskOnKey.  And it will have to get that from the DiskOnKey

14   and there is -- they're API calls to do that.  But what I'm

15   disagree with is when that happens, and I only need to show

16   that it wouldn't necessarily happen when the user clicked

17   the upgrade button.  If it's possible that it happens some

18   other time.  Then the burden is on Mr. Geier to say this

19   happened at the moment after, in response to the user

20   clicking the upgrade button and I don't feel that he has

21   shown that.

22        Q.   Well, that is actually maybe not the burden.

23   Isn't it really the burden that a person of ordinary skill

24   reading this would know how to make and use this system in

25   the way that it is disclosed without undue experimentation?

Rubin - cross

1       A.    I don't think so.   I think this is -- the

2  grounds that Mr. Geier has applied for anticipation our

3  system and not a single reference and so he has -- he has

4  not disclosed that that particular system operates that way.

5       Q.    This does, in fact, teach to one of ordinary

6  skill in the art the step of communicating with the

7  DiskOnKey to get its current version in response to the

8  clicking of the upgrade button, doesn't it?

9       A.    I think it would.

10      Q.    And then the next step is connecting to server.

11            Do you see that?

12      A.    Yes.

13      Q.    That happens after the computer already has the

14  current version, correct?

15      A.    Yes.

16      Q.    And so that requires communicating between the

17  computer and the server; is that right?

18      A.    Yes.

19      Q.    And that happens after, directly after the step

20  right above it; correct?

21      A.    Yes.

22      Q.    And then there is authenticating the device;

23  right?

24      A.    Right.

25      Q.    And this teaches one of ordinary skill in the

Rubin - cross

1     art that the device needs to be authenticated; correct?

2          A.   If one of ordinary skill in the art reading this

3     document, that person would understand that there would be

4     some communication at some point with the portable device,

5     but again it wouldn't have to be at that moment for the same

6     reason that I described the optimization step.  There could

7     have been some pre-communication when the device was

8     inserted that would allow a very fast authentication to

9     happen at this point.

10         Q.   Well, this is very clearly indicating that you

11    have to connect to the server in order to authenticate the

12    device; correct?

13         A.   Right.  My point is that the computer -- when

14    the device is plugged in, one of the ways that one of

15    ordinary skill in the art would build a system like this is

16    there would be a handshake with the device when it got

17    plugged into the computer.  And then that handshake could

18    involve giving the current version number and then some

19    credentials that could be used to authenticate.

20              Then later when we get to the step that the

21    computer connects to the server, then it could perform the

22    authentication with the information that it received on

23    startup from the DiskOnKey.

24         Q.   That's not what this is teaching one of ordinary

25    skill in the art, is it?

Rubin - cross

1    A.   I think it is.

2    Q.   It is teaching first, go get the current version

3    from the portable device; correct?  That's what it says?

4    A.   No, it doesn't.  You are adding the words "from

5    the portable device" to it.

6    Q.   Getting current version.  All right.  Connecting

7    to server.  Are you saying there is no connecting to the

8    server at that point?

9    A.   Never said that.

10   Q.   Okay.  So we should believe it when it says

11   connect to server?

12   A.   Yes.

13   Q.   And can we believe it when it says

14   authenticating device?

15   A.   Yes.

16   Q.   That is what it is teaching one of ordinary

17   skill in the art to do?

18   A.   Right.

19   Q.   And then after authentication -- now just take

20   authentication.  That has to be information shared between

21   the portable device and the server; correct?

22   A.   There has to be information that the server uses

23   that originated from the portable device perform that

24   authentication, which I will point out Mr. Geier said was a

25   public key and a public key will not do that.

Rubin - cross

1        Q.    But this absolutely teaches authenticating the

2  device; correct?

3        A.    It does.

4        Q.    And one of ordinary skill in the art, at this

5  time, would absolutely know how to authenticate a device;

6  correct?

7        A.    They would know many ways to do it.

8        Q.    So then the next step after that, device is

9  authenticated.  We're going to do checking for newer

10  version.  So that pretty clearly involves asking the server,

11  do you have a newer version; is that right?

12        A.    As I said earlier in my direct, not necessarily.

13  The way many upgrade systems work is that the newer versions

14  are constantly being updated or pushed out so that, because

15  that is the stuff that really could cause the most delay.

16  Say that the user is doing something really important and

17  they need to upgrade their device and the Internet

18  connection goes down.  So, you know, they try to upgrade,

19  they can't.  If the -- if the firmware, the new firmware is

20  only on the server.

21             So what a lot of systems do, the firmware will

22  be pushed down to the terminal, say to the computer every

23  time it is available, and then when the user clicks upgrade

24  it's a quick, quick change and now counter has got it.

25        Q.    I understand there are other ways to do it other

Rubin - cross

1    than what is, what is taught here.  But I'm only asking

2    about what is taught here.  This says checking for newer

3    version, and that is done by communicating with the server;

4    correct?

5            A.    Not necessarily.

6            Q.    Than what it is say something?

7            A.    It doesn't.  You keep adding things and saying

8    it is there.

9            Q.    Let's ask.

10           A.    Okay.

11           Q.    There are three devices in this system; correct?

12           A.    Okay.

13           Q.    So we're looking at the screen for the one in

14   the middle, the computer, right?

15           A.    We are looking at the computer, yes.

16           Q.    And you will agree the computer already knows

17   what version the DiskOnKey has?

18           A.    I -- at this point of the process, it does.

19           Q.    So who is it checking with for the newer version

20   if it's not the DiskOnKey and it's not itself, where is it

21   getting the information?

22           A.    So to kind of reiterate but maybe a little

23   differently what I said before, in case I wasn't clear, the

24   program developer builds a user interface for the

25   interaction that will most satisfy the user, the user

Rubin - cross

1    expects to see.  I've built a lot of programs.  I've build a

2    user interface and I say, okay, now we're doing this, now

3    we're doing this now, we're doing that.

4             Under the covers, I'm writing the code to

5    perform the best that it can and I don't think the user

6    would want me to say, okay, I'm getting the latest version

7    number from the portable device.  It doesn't care.  The user

8    doesn't care if it's coming from there, you know.

9             So when it says getting newer version, the

10   programmer is going to build that the best way they can.

11   They're not going to put in their user interface getting

12   newer version by going to the server, downloading it or

13   anything like that.

14        Q.   But this talks -- well, okay.  That is what --

15   okay.

16             MR. TIMBERS:  Let's take it a look at DX-331

17   where this screen comes from.

18             If we could go down to the page and if we could

19   show four.

20             This is right above what we have been looking

21   at.

22             Can you make that bigger?  Everything with four.

23   BY MR. TIMBERS:

24        Q.   Sir, do you see that this right here says the

25   application, that's what is running on the computer;

Rubin - cross

1    correct?

2         A.    Yes.

3         Q.    Connects, that's communication; correct?

4         A.    Yes.

5         Q.    To a remote server.  Yeah?

6         A.    Yes.

7         Q.    Yeah.  That's the server we have been talking

8    about all this time?

9         A.    Yes.

10        Q.    And checks for a newer version.  That's just

11   what this says; right?

12        A.    Yes.

13        Q.    So can you agree with me that this is teaching

14   one of ordinary skill in the art to do that step which

15   involves communicating with the server at this point?

16        A.    That, that is what it says it does there.

17        Q.    Okay.  So after that, it says getting new

18   version.  Do you see that?

19        A.    Yes.

20        Q.    Will you agree that that means that the

21   computer -- that the new version is being sent by the server

22   to the computer?

23        A.    Again, I, I don't mean to be difficult, but I

24   think that when a programmer builds a system, they have one

25   way that they build it under the covers.  You can see how

Rubin - cross

1   that happens if you look at the code and then they have the

2   one way that they explain it to the users, either in manuals

3   or on the screen.

4           I just want to add that my opinions do not

5   depend on whether or not the -- at this point the new

6   version is downloaded from the server.  That wasn't part of

7   my analysis.  And so I don't mean to be difficult and

8   disagree, but I the don't actually think that that

9   necessarily teaches one way of doing it or another.

10          Q.   So, and again all I'm really focusing on is this

11  teaches a specific set of steps to follow to one of ordinary

12  skill in the art; correct?

13          A.   Yes.

14          Q.   And they would all know how to follow all these

15  steps; right?

16          A.   Yes.

17          Q.   Okay.  So you could do it a lot of other ways;

18  right?

19          A.   Yes.

20          Q.   That are not disclosed here?

21          A.   Even -- if you look at what is disclosed, you

22  could do it a lot of different ways.

23          Q.   But everybody knows how to follow all these

24  steps; right?

25          A.   Right.  If the user wants to upgrade, they would

Rubin - cross

1    know how to follow these steps especially if they were

2    looking at this.

3         Q.    So now we're doing the upgrade.  That requires

4    providing the new, new firmware to the DiskOnKey; correct?

5         A.    Yes.

6         Q.    And that is done by communicating it from the

7    computer, which now has it, to the DiskOnKey; correct?

8         A.    Yes.

9         Q.    All right.  And then the DiskOnKey verifies the

10   new version?

11        A.    Yes.

12        Q.    Yes.  So that is all taught in this document;

13   correct?

14        A.    Yes.

15        Q.    You made a comment in direct about removing

16   DUKPT from Ingenico's slides.  And I think you actually used

17   the term, "you'd have to replace it with other algorithms";

18   right?

19        A.    I, I was -- this is in reference to the

20   noninfringing alternatives that Mr. Geier proposed and what

21   I said is that if you removed DUKPT, and you still wanted to

22   be compliant with the standards, you have to replace it with

23   other algorithms.

24        Q.    Meaning other encryption schemes?

25        A.    Yes.

                        Rubin - cross

1          Q.    But those are already there, aren't they?

2          A.    There are some other encryption schemes that

3    there are.

4          Q.    So those don't have to be replaced, do they?

5    They are already there?

6          A.    The ones -- if they wanted to use one of the

7    ones they had there, they wouldn't have to replace anything.

8          Q.    All right.  Now, I also just want to make sure

9    we understand the difference.  You mentioned it before, the

10   difference between a standard which says that it provides

11   enough information for one of ordinary skill in the art to

12   make and use it without undue experimentation.  That's the

13   standard we have been talking about; right?

14         A.    I would want to look at the words because I'm

15   not a lawyer, but if that is what I said, then yes.

16         Q.    First is infringement.  Infringement is

17   everything has to be there; right?

18         A.    Yes, for direct infringement, everything has to,

19   has to be there.

20         Q.    And then, I just want to confirm, you actually

21   did give some opinions about how devices work without any

22   code, didn't you, in this case?

23         A.    I gave some opinions of -- about how some

24   devices work for which I did not have code, but I had a lot

25   of supporting information as well, like SDKs and other code

                        **Appx10137**

Rubin - redirect

1              MR. TIMBERS:  Thank you, Your Honor.

2              THE COURT:  See what the question is but we have

3    direct, cross, redirect.  I'll allow brief recross and we'll

4    see where we are.

5              MR. TIMBERS:  Thank you, Your Honor.

6    BY MR. CHUEBON:

7         Q.   Dr. Rubin, do you recall testifying about the

8    ASIC?

9         A.   I do.

10        Q.   If an ASIC provides information, is it running

11   program code to do that?

12             MR. TIMBERS:  Your Honor.

13             THE COURT:  Yes.

14             MR. TIMBERS:  I didn't ask any questions about

15   an ASIC.

16             THE COURT:  I think that is right.

17             MR. CHUEBON:  I believe Dr. Rubin's testimony on

18   cross-examination was regarding an ASIC and Counsel was

19   asking Dr. Rubin about information provided by the

20   DiskOnKey, so I'm just inquiring as to the source of the

21   information allegedly provided by the DiskOnKey.

22             THE COURT:  You can ask about the source of the

23   information provided by the DiskOnKey.  I think the way you

24   led into it was the ASIC.  Overruled.

25             MR. CHUEBON:  Thank you, Your Honor.

**Appx10150**

Rubin - redirect

1   BY MR. CHUEBON:

2          Q.   Dr. Rubin, is there more than one source of

3   information from the DiskOnKey?

4          A.   There is more than one way that the

5   functionalities on the DiskOnKey can operate.

6          Q.   What are some of those potential sources of

7   information from a DiskOnKey?

8          A.   So it could be software running on there or

9   there could be an ASIC, which we saw from that document that

10  said it was.

11         Q.   Does an ASIC run program code?

12         A.   No.

13              MR. CHUEBON:   Can we take a look at DX-331,

14  please.

15              THE COURT:   Do you know -- how much more do you

16  think you have?

17              MR. CHUEBON:   Perhaps 45 seconds.

18              THE COURT:   Oh.   Okay.

19              MR. CHUEBON:   I'm not as accurate as Mr. Sowers

20  on seconds but hopefully close.

21              Can we please turn to page 2?

22  BY MR. CHUEBON:

23         Q.   And, Dr. Rubin, do you recall being shown this

24  on cross-examination?

25         A.   Yes.

Rubin - redirect

1      Q.    Do you see the note right above the bottom

2  figure?

3            MR. CHUEBON:  Can we zoom in on that?

4  BY MR. CHUEBON:

5      Q.    What does that say?

6      A.    "Note:  If this is the first time that you

7  inserting your DiskOnKey in the computer, wait until the

8  registration procedure finishes before beginning to use it."

9      Q.    Can you explain to us what that registration

10 procedure might be?

11     A.    Yes.  So this is what I was alluding to that the

12 way a lot of applications that use a device are built is

13 they'll say -- when it first connects, there is a handshake

14 and that can be called a registration, and all of the

15 information that would be needed by the computer about the

16 device could be sent and stored somewhere.  So this is

17 showing that they are claiming that DiskOnKey has a

18 registration process like that.

19     Q.    Thank you, Dr. Rubin.

20           MR. CHUEBON:  No further questions.

21           THE COURT:  All right.

22           I will allow some recross.  Go ahead.

23           We will break for lunch immediately after this

24 process.  Let me ask the jurors:  Is there something like

25 45 minutes good enough for you for lunch?  Are you happy

Geier - direct

1  all the things that happen on the back end, what security

2  measures are relevant on that type of things?

3       A.   Certainly one good example is wire fraud.  We're

4  all concerned having our credit card information stolen,

5  replicated used by somebody else.  You probably heard about

6  that in the news various companies have that issue.

7            So there is various antifraud mechanisms.  That

8  is partly some of those are entering a pin or entering a zip

9  code, so antifraud is probably one big one you heard of.

10      Q.   Are there any other factors that contribute to

11 the security of transaction?

12      A.   Yeah.  There is, there is standards that are

13 available that can -- that list a plethora of security

14 measures that could be used to protect the transactions.

15      Q.   So in your opinion, what do the claims do

16 themselves that relate to the security of the payment

17 transaction?

18      A.   The only thing I see in the claims that would

19 relate to security would be the idea that, remember, there

20 is a, a portable device identifier and that's sent to a

21 server to facilitate verification.  That is the only aspect

22 of security that I see.

23            And, remember, we talked about yesterday

24 verification is what we mean by authentication.  So the only

25 thing I see in there is providing the device identifier that

Geier - direct

1      is going to be used in authentication.

2           Q.    When you say authentication, authentication of

3      what?

4           A.    The authentication would be, the claim refers to

5      of the portable device, so the authentication, verification

6      in the claims is referring to the actual device itself.  The

7      reader -- the reader would be an example of a portable

8      device.

9           Q.    Is that correct that is different than

10     authentication of a card transaction.

11          A.    Right.  Authenticating a card transaction would

12     something different.  They are authenticating possibly the

13     credit card or the user using the credit card.  It's not

14     that particular type of authentication or verification is

15     not tied to that specific device portable device, for

16     example, a reader.  The hardware, the software that makes up

17     that reader, it's not tied specifically to that device.

18               MS. STERNBERG:  Okay.  If we could put up PDX-3

19     at page 19.

20     BY MS. STERNBERG:

21          Q.    Did you hear Dr. Rubin's testimony today about

22     Mr. McNulty's conception memo?

23          A.    Yes, I remember that.  Yes.

24          Q.    Okay.  And did you hear his testimony about this

25     particular sentence:  "Hi, I am here from a person's pocket

Geier - direct

1    and I would like to copy your content"?

2          A.    Yes.

3          Q.    And can you provide your reaction to that

4    testimony?

5          A.    If you don't mind, I would like to look at it

6    just briefly.

7                Okay.  Yeah, here he is, he is using the

8    statement:  "Hi.  I am here from a person's pocket and I

9    would like to copy your content."

10               I understand he is trying to show that that

11   meets this limitation for verification?

12         Q.    And do you think he succeeded in that analysis?

13         A.    Absolutely not.  No.

14         Q.    Why not?

15         A.    A person skilled in the art looking at this

16   would not read this and see there is any form of

17   verification that is being done here or even teaching that

18   verification needs to be done.  Devices can use

19   verification, a verification for certain things, maybe not.

20   Not all devices use verification between devices to, before

21   they start sending data.  There is nothing in here that

22   would be related to verification.

23               For example, the word "I" just means, that's a

24   single instance of something to be able to verify different

25   types of devices.  You need to distinguish from one device

Geier - direct

1    to the other, and this doesn't do that.

2           And also there is nothing in that sentence or

3    that statement here that would have a person believe, a

4    person of ordinary skill in the art, it would teach them

5    that you would use that word "I" or some word in there, some

6    piece of this information to do any type of verification.

7           Q.   Okay.  Let's talk now about the DiskOnKey.  Did

8    you hear Dr. Rubin criticize you for not looking at the

9    program code?

10          A.   Yes, I remember that.  Yes.

11          Q.   So why didn't you talk about the program code or

12   I guess the code running on this DiskOnKey?

13          A.   Okay.  Could you rephrase that?  I didn't quite

14   understand your question.

15          Q.   Okay.  Why didn't you, in your analysis, discuss

16   what program code was running on the DiskOnKey?

17          A.   Okay.  First of all, I didn't need to, but also

18   the code was not available.  You don't need to use program

19   code to do an invalidity analysis in a lot of situations I

20   have been involved in.  I worked on many, many cases and the

21   idea is it -- what you read in the references needs to teach

22   you a person of ordinary skill in the art how that would

23   work, but you don't necessarily need that code, plus in this

24   situation I had no access to the code at all.

25          MS. STERNBERG:  And if we could put up PDX-3, at

**Appx10168**

Geier - direct

1    page 29.

2    BY MS. STERNBERG:

3         Q.    Did you hear Dr. Rubin's testimony about an

4    ASIC?

5         A.    Yes, I remember that.

6         Q.    So could you explain what it was he was trying

7    to say about the ASIC?

8         A.    I think what he is making a big stretch here,

9    and it is actually a big fault with it as well.  He is

10   pointing out the fact the device uses an ASIC.

11         And, remember, he explained an ASIC correctly.

12   It's hardware.  It's going to be a chip that is made that

13   has a specific function.  And with in this particular

14   statement, he is talking about DiskOnKey ASIC prevents the

15   ARM7 microprocessor from running code that is not digitally

16   signed.

17         Even if this ASIC performs the functions doesn't

18   necessarily mean that the public key we're talking about is

19   going to be stored in that.  In fact, me sitting at my desk

20   at Monarch Marking Systems, we did authentication.  We had

21   ASICs.  We were involved with at least a form of that.  We

22   would never store a public key in an ASIC.  The reason is

23   once you do that, you have to make a different ASIC for

24   every single device you make.

25         Ingenico makes many devices.  It would just be

Geier - direct

1    too costly to make a different ASIC for each device and

2    program each one with the unique public key.

3          Q.   And just to be clear, we're talking about the

4    DiskOnKey here, not Ingenico's product?

5          A.   That's true.  I guess Ingenico would be an

6    example that in this case, DiskOnKey would be the company

7    we're talking about with the ASIC.  That's right.

8          Q.   And did you hear, I guess related to that, that

9    Dr. Rubin was saying that there wasn't evidence of where the

10   public key was coming from?

11         A.   Yes.

12         Q.   Is that right?

13              MS. STERNBERG:  So could we put up Mr. Sobol's

14   testimony that was played yesterday at page 736 to 737.

15   BY MS. STERNBERG:

16         Q.   Okay.  So on the left, on the bottom it says,

17   there is a discussion about the crypto interface on the

18   DiskOnKey.  Do you see that?

19         A.   I'm sorry.  Can you make it a little bit bigger?

20   It's hard to see on the screen with my eyes.

21              MS. STERNBERG:  Page -- line 15 of 736 all the

22   way to the bottom, if you could blow that up.

23              THE WITNESS:  I can barely make it out.

24              MS. STERNBERG:  736, all the way to the top.

25   Blow it up.  Thank you.  No, sorry, the other.  736.  The

Geier - direct

1  whole, the whole page.  So from 15 all the way to the

2  bottom.

3  BY MS. STERNBERG:

4       Q.   Okay.  So do you see his testimony about a

5  crypto interface?

6       A.   Yes, I do.

7       Q.   And so can you remind us what the crypto

8  interface was?

9       A.   I believe that was the interface that provide

10  the cryptographic functions.

11       Q.   And the cryptographic functions include PKI and

12  public key?

13       A.   Right.  That would be parts of the code that

14  would be returning the public key like we have been talking

15  about.

16            MS. STERNBERG:  Okay.  If we can go to the next

17  page.

18  BY MS. STERNBERG:

19       Q.   Do you see where it says -- I'm going to --

20  oops.  Okay.  Yeah, we can read that.  So the question:

21            "Question:  What does it mean by PKI-based

22  authentication?"

23            And the answer was:

24            "Answer:  So PKI is the standard for, I think

25  encryption and authentication.  It's a well-known standard.

Geier - direct

1    The meaning of this sentence that the DiskOnKey enables you

2    to do authentication and signing, to be PKI compliant on the

3    secure environment."

4        A.   Yes.

5            MS. STERNBERG:  So on the next page, sorry,

6    further down, if we could do line 16.

7    BY MS. STERNBERG:

8        Q.   Yeah.  So I asked:

9            "Question:  So does this mean that the

10   authentication is run from code stored on the DiskOnKey?"

11           And the answer was:

12           "Answer:  The API that's described below was run

13   on -- was integrated into the firmware of the DiskOnKey."

14           Do you see that?

15       A.   Yes, and that's consistent with my thinking as

16   well as a person of ordinary skill in the art at the time.

17           MS. STERNBERG:  Okay.  So we can take that down.

18   Thank you.

19   BY MS. STERNBERG:

20       Q.   And so we can go to PDX-3 at page 30.

21   BY MS. STERNBERG:

22       Q.   Can you remind us what Dr. Rubin testified with

23   respect to this slide?

24       A.   I think here he is talking about a simpler to

25   implement on the terminal, without code executing on the

**Appx10172**

Geier - direct

1   DiskOnKey.  I think he is referring to keeping a public key

2   on the terminal instead of getting it from the portable

3   device.  I believe that is what he was talking about here.

4        Q.   So can you describe your thoughts on that?

5        A.   Yeah.  I don't think that would be done at all.

6   Again, I'm going to go back in time.  When I worked at

7   Monarch Marking Systems back in the mid '90s, we did -- I

8   wrote software that did downloads and firmware updates and

9   especially with a device like this is portable.

10            The idea is to be portable so you keep that

11   information on the portable device so you can move it around

12   from device to device.  That's one of the advantages of

13   being portable you can take it with you and use it that way,

14   so it's highly likely season that someone would have leave

15   the keys there on the portable device but you might move it

16   to a different device.

17            It also doesn't make sense to put that on the

18   computer.  Certainly, I agree with Dr. Rubin that there is

19   some information you can move from a device to a computer

20   and store there.  This wouldn't be one of those.  It doesn't

21   make sense.  You are not going to use this, this upgrade

22   mechanism very often really save you that much time to have

23   it local on the terminal versus on the -- have to get it

24   from the key itself, because it doesn't take much time to

25   get it from the key.  It really doesn't.

**Appx10173**

Geier - direct

1    The API calls, it goes to the key to get it, so

2    it's highly unlikely someone would have put this on the

3    terminal and had it stored there instead of just having it

4    on the key.

5         Q.    And do you recall Dr. Rubin testifying about

6    whether or not a public key can be used for verification?

7         A.    Right.

8         Q.    So can you briefly hopefully explain how sending

9    a public key can facilitate verification of a DiskOnKey

10   which is the actual claim language?

11        A.    Absolutely.  And this is the basis of the book I

12   wrote, because I have the document in my book on how to do

13   this.  I have also implemented software that does what I'm

14   going to tell you and how it happens.

15        The public key, remember, is -- and we talked

16   about this late yesterday:  the public key and a private

17   key.  And they work together.  So that you can have

18   asymmetric keys.  So the key that you would use to encrypt

19   something is different than the key that you would decrypt

20   something.

21        So there is a private key.  That's the key that

22   you would want to keep private, not show anybody.  You want

23   to keep that secret.

24        There is a public key, you can give it to

25   anybody.  It doesn't matter who gets that key.

**Appx10174**

Geier - direct

1       So when you -- you can perform authentication

2   with a public and private key, and we know there is a

3   private that is used in the DiskOnKey because there is also

4   other elements on the SDK that indicate that.

5       The public key is sent from the portable device

6   to the server for this reason.  And it can be used for

7   authentication.

8       So imagine I talked about we're sending the

9   public key to the server.  Think about the server having

10  that public, key so it's there at the server.  The server

11  is going to perform authentication, so a very well known

12  method to do this is a challenge response.

13      And where the server now, I think I mentioned

14  this a little bit yesterday, the server will take some piece

15  of information, there is some challenged text, says:  Hi,

16  I'm the server.  It can be just any text.  The server is

17  going to remember.

18      The server sends that text to say Hi, I'm the

19  server.  It sends it to the portable device.

20      The portable device encrypts it with a private

21  key.  Okay?  So now it's going to be an encrypted form that

22  is done with an key that is secret.  Only the portable

23  device has that key.

24      The portable device now will send that encrypted

25  information back to the server.  Now the server has the

**Appx10175**

Geier - direct

1    public key, and it has this encrypted value of:  Hi, I'm the

2    server that has been encrypted with the private key.

3              The public key can now decrypt that and get back

4    what it had, and as long as it says:  Hi, I'm the server, it

5    proves that the portable device had that private key.

6              If it didn't have the private key, it's going

7    to decrypt to something different.  It will be gobbledygook.

8    It won't say:  Hi, I'm the server.  It will be something

9    else.

10             So using that challenge response type of

11   technique with public and private keys is a way of

12   performing authentication at the server.  It will facilitate

13   authentication by sending that public key to the server.  It

14   facilitated that authentication because it allowed the

15   certain verdict to now have the key.

16        Q.   Okay.  And do you recall yesterday looking at

17   some documents that talked about the sale of the DiskOnKey

18   including spreadsheet, and you looked at that government SEC

19   document that talked about $20 million or something like

20   that?

21        A.   Yes, I remember those two documents.  Yes.

22        Q.   So given the sense of the sales of the DiskOnKey

23   in 2002 and 2003, how likely do you think it is that a

24   person actually downloaded the firmware upgrade and used it

25   with the DiskOnKey?

**Appx10176**

Geier - direct

1           MR. LEIBOWITZ:  Objection, Your Honor.

2           THE COURT:  We have an objection.

3           MR. LEIBOWITZ:  It's outside the scope of his

4    report.  Nothing in Mr. Geier's expert report.

5           THE COURT:  Ms. Sternberg.

6           MS. STERNBERG:  It talks how it was publicly

7    available, and he is rebutting Dr. Rubin's testimony.

8           THE COURT:  His report about being publicly

9    available is what you said?

10          MS. STERNBERG:  Yes.

11          THE COURT:  Why don't you approach it with

12   respect that way.

13          MS. STERNBERG:  Sure.

14   BY MS. STERNBERG:

15       Q.   So what is your knowledge of whether or not the

16   DiskOnKey firmware upgrade was publicly available?

17       A.   I believe since DiskOnKey sold so many of those

18   DiskOnKeys, there is a lot of them out there.  People who

19   get DiskOnKeys would be, at least there would be somebody

20   out there, a group of people or many people that would think

21   they need to upgrade the firmware and would be downloading

22   the firmware.  So if there is that many of those DiskOnKeys

23   sold, there would be certainly somebody that downloaded that

24   particular document.  It would have been available to

25   download easily and they would use it.

**Appx10177**

Geier - cross

| | |
|---|---|
| 1 | MS. STERNBERG:  No further questions. |
| 2 | THE COURT:  Cross-examination. |
| 3 | CROSS-EXAMINATION |
| 4 | BY MR. LEIBOWITZ: |
| 5 | Q.   Good afternoon, Mr. Geier. |
| 6 | A.   Good afternoon. |
| 7 | Q.   I think we'll be brief. |
| 8 | On that last point you just talking to |
| 9 | Ms. Sternberg about, you understand that not all versions of |
| 10 | the DiskOnKey were even compatible with the upgrade program, |
| 11 | to the extent it even worked; right? |
| 12 | A.   I remember from the documentation that there is |
| 13 | a certain level of firmware that this particular firmware |
| 14 | upgrade needed to work with. |
| 15 | Q.   And so out of the many, many DiskOnKeys on the |
| 16 | market, do you know how many, what percentage of those had |
| 17 | the firmware that would even work with this upgrader that |
| 18 | were available? |
| 19 | A.   I don't know the exact number that that would |
| 20 | be, but I'm certain there would be some.  There would be |
| 21 | certainly.  They sold a lot of DiskOnKeys.  It would be some |
| 22 | of the higher firmware levels. |
| 23 | Q.   Now, you were just talking to Ms. Sternberg |
| 24 | about public key and private key authentication; right? |
| 25 | A.   Yes. |

Geier - cross

1    Q.    And you gave an example of a challenge response;

2    correct?

3    A.    Yes.

4    Q.    And the challenge example that you used was

5    what?  What was the challenge example you used?

6    A.    You asked me would I?  You want me to go through

7    it again?  I'm not sure what's your question.

8    Q.    No, you gave an example to Ms. Sternberg of the

9    challenge request.  Do you recall the challenge request was

10   you used in your example?

11   A.    I think what I used for the example would be

12   something that the server sends to the portable device would

13   be something that the server knows.  It would be something

14   that they'll know what that is when they get it back on the

15   other end that has been encrypted.

16   Q.    You would agree with me in 2001, you testified

17   public key, private key authentication, that was known in

18   2001; right?

19   A.    I believe it was.

20   Q.    A person of ordinary skill in the art would

21   understand how to conduct public key, private key

22   authentication in 2001; right?

23   A.    Asymmetric keys was well known.

24   Q.    And they would understand the challenge response

25   request that you, that you were talking about before that

**Appx10179**

Geier - redirect

1    algorithm?

2         A.    Absolutely.  We did that at Monarch Marking

3    Systems.

4         Q.    Do you recall that precise challenge that you

5    used with Ms. Sternberg?  Do you remember what it was?

6         A.    I think I said something like:  Hi, I'm the

7    server.

8         Q.    Right.

9               MR. LEIBOWITZ:  Can we have PDX-3 at 19?

10   BY MR. LEIBOWITZ:

11        Q.    "Hi.  I am here from a person's pocket."  You

12   see that right?

13        A.    Yes.

14              MR. LEIBOWITZ:  Okay.  No further questions.

15              THE COURT:  Redirect.

16              MS. STERNBERG:  So if we could put that back up,

17   PDX-3 at 19?

18                       REDIRECT EXAMINATION

19   BY MS. STERNBERG:

20        Q.    Can you explain how that is different than what

21   you were just talking about?

22        A.    Yes, it is very different.  In my example, I

23   started with the idea of using a public key that we know is

24   used.  And that there is nothing here about a public key.

25   Nothing at all.

**Appx10180**

Geier - redirect

1           In my example, I start with a public key, and it

2   gives the idea what you can, a person of ordinary skill in

3   the art would understand what they could do with a public

4   key, and private key is part of that.  There is no public

5   key mentioned in this particular statement at all.

6           MS. STERNBERG:  And we can put up DX-330.

7           MR. LEIBOWITZ:  Your Honor, I think we're

8   outside the scope of cross.

9           MS. STERNBERG:  It's not.  It's related.

10          THE COURT:  Let's just see whether -- where

11  are you going?  Same subject matter.

12          MS. STERNBERG:  This is about the DiskOnKey and

13  which versions.  It was, sorry, the DiskOnKey firmware

14  upgrade and which versions it worked with.

15          THE COURT:  There was cross-examination

16  questions about multiple versions, so I will allow it.

17  BY MS. STERNBERG:

18      Q.   So do you recall being asked whether you knew

19  about whether this firmware upgrade could work with

20  different versions of the DiskOnKey?

21      A.   Yes, I remember that.

22          MS. STERNBERG:  Okay.  So if we could blow up

23  the second paragraph on the bottom where it says DiskOnKey

24  upgrade support?

25  BY MS. STERNBERG:

Geier - redirect

1      Q.   And if you could read that out loud?

2      A.   Yes.   "The DiskOnKey upgrade supports the

3  DiskOnKey product line, starting from DiskOnKey firmware

4  Version 2.01 for all the capacities from 8 megabytes to 512

5  megabytes.

6           MS. STERNBERG:  No further questions.

7           THE COURT:  Very well.

8           MR. LEIBOWITZ:  Your Honor, can I have a very

9  brief recross on that last point?

10          THE COURT:  Yes, I will allow you recross.

11          MR. LEIBOWITZ:  Thank you, Your Honor.

12          Can we put that back up?

13          The DiskOnKey firmware version 2.01.

14                   RECROSS-EXAMINATION

15 BY MR. LEIBOWITZ:

16     Q.   So it's your testimony, Mr. Geier, that any

17 DiskOnKey version with a Version 2.01 would be able to be

18 upgraded this way?  Is that your testimony?

19     A.   My understanding is that is correct.  Yes.

20     Q.   And if, if the DiskOnKey worked the way you say

21 they did and the upgrade works the way you said it did, you

22 would expect that any DiskOnKey with a firmware version of

23 2.01 or higher would be able to conduct that PKI process

24 that you went through; right?

25     A.   It would at least be able to do the firmware

Geier - redirect

1    update mechanism.  I would know that for certain.

2                 MR. LEIBOWITZ:  Can we have DX-333.  This is the

3    SDK preliminary document.  If we can have it at page 333.10.

4    BY MR. LEIBOWITZ:

5         Q.   Do you see at the bottom there it says "the

6    iCrypto interface enables PKI-based authentication."  Do you

7    see that?

8         A.   Let me look at that a second, please.

9         Q.   Sure.

10        A.   Yes, I see that.

11                MR. LEIBOWITZ:  Can we have page 24?  333.24,

12   this document.

13   BY MR. LEIBOWITZ:

14        Q.   Look at the middle.  DiskOnKey Version 2.01.  Do

15   you see that on the right-hand side?

16        A.   Can you please enlarge that?

17        Q.   Sure.

18        A.   My eyes don't work that well.

19             Yes, I see that.

20        Q.   So DiskOnKey Version 2.01 did not have the

21   iCrypto engine, did it?

22        A.   I'm sorry.  What was the question?

23        Q.   DiskOnKey Firmware Version 2.01 didn't have the

24   iCrypto engine which is what you say -- what the document

25   says enables the PKI --

```
 1              A.    I think what this --

 2              Q.    -- authentication?

 3              A.    I'm sorry.

 4              Q.    That's it.

 5              A.    What I think the table identifies is the

 6    DiskOnKey Version 2.01 does not have the iCrypto.

 7                    MR. LEIBOWITZ:  That's it, Your Honor.  No

 8    further questions.

 9                    THE COURT:  Okay.  Anything further from this

10    witness?

11                    MS. STERNBERG:  (Shaking head no.)

12                    THE COURT:  No.  Okay.  Very well.  Is that your

13    last witness on rebuttal?

14                    MS. STERNBERG:  It is, Your Honor.  Ingenico

15    rests.

16                    THE COURT:  Very good.

17                    Okay.  Mr. Geier, thank you for your testimony.

18    You are released.

19                    THE WITNESS:  Thank you very much, sir.

20                    (Witness excused.)

21                    THE COURT:  And so is the jury for the day.

22                    Tomorrow we'll start at 9:00 as usual, but what

23    we'll start with is the charge to the jury.  That will be my

24    instructions to the jury.

25                    I'm sorry.  By the way, my voice start sort of
```

**Appx10184**

1  tails off so if for some reason you can't hear me, just

2  signal and I will, I will up the volume one way or another,

3  so please don't be shy about doing that because it is

4  important particularly with the instructions when we get to

5  it that I not mumble.

6          So we'll have the instructions then we'll have

7  the arguments of the lawyers and then the case will be yours

8  to deliberate.  So have a good afternoon and evening and

9  we'll see you in the morning.

10          (Jury left courtroom.)

11          THE COURT:  Okay.  I don't know if we had any

12  more exhibits that had not been previously introduced.  I

13  recognize most of the numbers but perhaps there was some.

14          MR. LEIBOWITZ:  I have exhibits, Your Honor, but

15  if I can just put on the record in terms of moving for JMOL

16  on the validity points.  We don't have to do it now or we

17  can, if Your Honor prefers.

18          THE COURT:  It seems to me we might as well have

19  our JMOL presentations.  We can do it fairly briefly.  Why

20  don't we hear from each side.

21          Are you going to have a JMOL as well?

22          MR. TIMBERS:  Yes, JMOL on noninfringement and

23  validity.

24          THE COURT:  Okay.  Why don't you summarize your

25  points first, Mr. Liebowitz.

**Appx10185**

1       MR. LEIBOWITZ:  So, Your Honor, we would move

2   for JMOL on no invalidity on the basis they're not having

3   been established certainly by clear and convincing evidence

4   but we would say not at all that there was a prior use or

5   sale of a DiskOnKey that has the applicable functionality

6   that would anticipate the claims or render them obvious.

7       And I'll stop at there for now, Your Honor.

8       THE COURT:  Well, let me hear just --

9       MR. LEIBOWITZ:  Sure.

10      THE COURT:  -- what the jist of your invalidity

11  argument is as well.

12      MR. LEIBOWITZ:  Sure.  So the argument is in

13  order to be for sale, they have to say.

14      THE COURT:  I said invalidity argument, I meant

15  your infringement argument.

16      MR. LEIBOWITZ:  Oh, infringement argument.  I'm

17  sorry.

18      THE COURT:  Yeah, I take it -- okay.  Did you

19  have other points on invalidity?  Let's go do that.

20      MR. LEIBOWITZ:  Sure.  I have two points on

21  invalidity.

22      THE COURT:  Okay.

23      MR. LEIBOWITZ:  In terms of public sale, prior

24  sale; right?  Sale or for sale.  There may have been

25  DiskOnKeys sold but there is no competent testimony as to

**Appx10186**

1    what.  The DiskOnKey was sold could have been a blank

2    device, don't know what version it is, don't know that it

3    could even run on the software they are combining with it

4    in terms of creating something that would invalidate the

5    claims.

6              And so just the sale of a device, that could do

7    many different things doesn't get them there.

8              The program they're pointing to, there is no

9    evidence of sale of that at all.  And I think the law

10   requires that either an actual sale or something that is

11   commercially close to a sale and offer that would have

12   prices, quantities, things like that, and simply putting up

13   a, you know, a download panel, which we haven't even seen

14   evidence of that.  We have seen evidence of an email sending

15   something out with an attached, you know what it says,

16   people can download something.  No real evidence that it

17   was, that it ever was downloaded or really available.  And

18   it wouldn't be the sale even if it, even if it had been.

19             In addition, what was -- anything that was

20   disclosed about it would not have informed the public of the

21   invention in any meaningful way.  All of these, the things

22   that Mr. Geier pointed to in terms of how this firmware

23   updater would have worked in terms of the SDK document,

24   these various presentations that he looked at which may or

25   may not have been filed -- final, may or may have been

**Appx10187**

1       drafts, may or may not have reflected the way the program

2       worked, none of that would have been known to members of the

3       public simply.

4               THE COURT:  Let me stop you and see if I

5       understand the argument you are making.

6               Are you suggesting that on sale, in order to be

7       a bar, would require that the public at large would be able

8       to understand exactly how the invention works, invention

9       that is on sale?

10               Let me just give you a hypothetical.  I have an

11       intention which in fact I don't want to patent.  I want to

12       keep it as a trade secret, and so I have a hermetically

13       sealed box that has the key guts of the invention, and if

14       you break into the box, the machine will self-destruct just

15       to make sure that the public doesn't have access.  But

16       nonetheless, I can prove that that machine actually does

17       anticipate let's say an invention that is patentable.

18               Why isn't that a case of on sale invalidity?

19               MR. LEIBOWITZ:  So I think there are two points

20       to that.  I think, one, it may stray into the public use

21       part of the inquiry.  I think for the public use, in fact it

22       does need to be an informing public use, and especially when

23       I think the law does -- I mean the cases are a little bit --

24               THE COURT:  So you would agree with me, I take

25       it that in my hypothetical, that my hermetically sealed box

**Appx10188**

1    or whether it's under some kind of agreement.

2              My view is that if you have the black box, the

3    thing that has super-software in it, you know, it's all

4    compiled, you can't really figure out how it works.  That

5    is how most software products work.  You can't actually

6    figure out how they work unless you sort of look at what

7    they do.

8              But in terms of the actual code in them, it can

9    be pretty hard if you don't have some documentation that

10   explains it.  If that is, if that is offered for sale, that

11   is good enough.  You don't have to see all the guts and

12   everything inside.  And so if you have some secret

13   documentation that explains how it works --

14             THE COURT:  Well, I think Mr. Liebowitz

15   acknowledged for purposes of on sale, it wouldn't necessary

16   to have public awareness of, potential public awareness of

17   the contents, but he was taking a stand on public use.

18             MR. TIMBERS:  Yes.  So that I do have a case for

19   you.  It's from the VPIA from, it's *Ex Parte Kuklo*, 25 USPQ

20   2d 1387.  And it says, with respect to --

21             THE COURT:  What was the cite again?  I'm sorry.

22             MR. TIMBERS:  Sure.  25 USPQ 2d 1387.

23             THE COURT:  That sounds like a pretty old case.

24             MR. TIMBERS:  Yes, it is.  It's the one I happen

25   to have right here.  But it does say, we are not aware of

1    any requirement that the person to which an invention sis

2    publicly disclosed has to in the significance of a technical

3    complexities of the invention.

4              THE COURT:  Okay.  Validity.

5              MR. TIMBERS:  Well, so on validity, we put forth

6    lots of evidence of how this product works.  And of course

7    the way this works was you have a product that is publicly

8    available.  We have the SDK, the publicly available.  We

9    have evidence it is publicly available.  It's offered in

10   the, it's basically offered in connection with the actual

11   DiskOnKey.

12             We have a press release that talks about both

13   the firmware of grade and the DiskOnKey at the same time,

14   with pricing, MSRP, $99.99, $149.99, et cetera; okay?

15             So it's all in one.  It's all in one saying it's

16   offered for sale.

17             And --

18             THE COURT:  What was the source of that, the

19   document you are reading from.

20             MR. TIMBERS:  PX-97, Your Honor.

21             THE COURT:  All right.  Remind me what, when did

22   that, how did that come in?  I'm not remembering the

23   document itself.

24             MR. TIMBERS:  Mr. Sobol, Mr. Sobol's testimony.

25             THE COURT:  Oh, okay.  One of the Sobol

1    documents.

2             MR. TIMBERS:  Yes, yes why.  And it's a Wayback

3    Machine.

4             THE COURT:  Yeah, okay.

5             MR. TIMBERS:  Right?

6             THE COURT:  I understand.

7             MR. TIMBERS:  So we have, we have.

8             MS. STERNBERG:  Designer.

9             MR. TIMBERS:  I'm sorry.

10            MS. STERNBERG:  With Mr. Geier.

11            MR. TIMBERS:  I'm told it --

12   I'm told it wasn't Mr. Sobol.  It was Mr. Geier.  It was a

13   document as to which it was allowed, it's admissible.  That

14   has been admitted

15            THE COURT:  All right.

16            MR. TIMBERS:  So you have the offering of all of

17   it together, the upgrade, and the device that is to be

18   upgraded all together with pricing and everything:  And

19   that's available in the United States.

20            And so --

21            THE COURT:  And your inference it is available

22   in the United States was based on what?

23            MR. TIMBERS:  The press release.

24            THE COURT:  Is this the document that had the

25   long list of?

**Appx10198**

1     MR. TIMBERS:  No, Your Honor.  This is the

2  document that starts with it's a press release from Fremont,

3  California.

4     THE COURT:  Yes, I remember.

5     MR. TIMBERS:  July 11, 2002.

6     THE COURT:  Oh, yes.  The press release.  Okay.

7  I have been thinking about it when you were talking about a

8  price list but it's the press release.

9     MR. TIMBERS:  Yes.

10     THE COURT:  Okay.  I remember that.  And I can

11  look at that.  All right.

12     MR. TIMBERS:  And then we have lots of documents

13  that talk about how it works.  And we have Mr. Sobol saying

14  yes, that's how it worked.  So --

15     THE COURT:  Okay.

16     MR. TIMBERS:  And then I went through, you know,

17  we went through Mr. Geier's testimony as well.  There is

18  Dr. Rubin's testimony that it teaches one of ordinary skill

19  in the art to take all of those steps.

20     And we believe all of those steps anticipate all

21  the claims in the patent.

22     THE COURT:  Now, turning to question that goes

23  to conception, diligence, reduction to practice.  Toward the

24  end of the cases, it was in reference to the conception

25  memo.

1    MR. TIMBERS:  Yes.

2    THE COURT:  What was focused on of course was

3    the authentication question of whether:  Hi, I'm a device in

4    your pocket or whatever.  I would like to hear from both of

5    you on how that demonstrates authentication.

6    Mr. Liebowitz first.

7    MR. LEIBOWITZ:  So Your Honor, I think in terms

8    of the claim language, I don't think we need to demonstrate

9    authentication I think what the claim says is something,

10   it's two part, two piece of the claim language that will be

11   relevant there.  One would be a portable device identifier,

12   and so, you know, I think it says it right there:  Hi, I am

13   here from a person pocket.  And we had testimony both about

14   the inventor and by Dr. Rubin that the "I" there identifies

15   right as it does a particular device that is calling from a

16   person's pocket.

17       And it's code that actually implements this

18   because if you read earlier in the sentence that is what it

19   talks about, that it's the code that works its way through

20   the computer to the Internet.

21       And, and with respect to the facilitate

22   verification, I mean you heard from Mr. Geier -- right? --

23   at the end of his testimony the example he used for

24   authentication was the server sending a challenge that says:

25   Hi, I'm a server.  And that is exactly, the language was

1   parallel.  I understand he tried to distinguish it, but the

2   language and the example was very parallel to what is in the

3   letter.

4           And according to Dr. Rubin, somebody, a computer

5   scientist who is reading this, a sentence that says:  Hi, I

6   am here and I would like to copy your content, that those

7   parts of the sentence together would lead it, you know,

8   would a person of ordinary skill in the art would understand

9   you would have something that would facilitate verification

10  of who I am.

11          If I come to you, in fact, I think we heard

12  other examples from Mr. Geier and Dr. Rubin about you show

13  up to this building in the morning and you need to present

14  your credentials in order to enter; right?  There is

15  something that is you as a person or in this case the

16  device.

17          THE COURT:  Right.  What I missed hearing was

18  the credential part.

19          MR. LEIBOWITZ:  Oh.  So I think the

20  credential --

21          THE COURT:  The argument was if you just show up

22  in the building in the morning and say:  Hi, I'm Bob.  That

23  isn't --

24          MR. LEIBOWITZ:  Well, so I think, so I think

25  the testimony is, Your Honor, in terms of, you know, human

**Appx10201**

 1    beings, that doesn't work because, you know, you don't, I am

 2    Bob; right?  But in terms of computers, that implies you

 3    actually have something that identifies that, that -- I mean

 4    portable device identifier, that is part of, that is one of

 5    the claim elements; right?  So identifying the device with a

 6    particular, you know, name, that in fact identifies, and in

 7    terms of, and that again it doesn't need to actually

 8    identify, it would be facilitate.  That's the claim

 9    language.

10                THE COURT:  Okay.  Let me hear from Mr. Timbers

11    on this.

12                MR. TIMBERS:  Gee, none of that makes any sense,

13    Your Honor.

14                THE COURT:  Well, I think that seems to me to be

15    it a bit harsh and perhaps an overstatement.

16                MR. TIMBERS:  I actually think the example you

17    gave which is similar to the example I gave was talking

18    about Dr. Rubin is exactly right.  And Dr. Rubin said,

19    Dr. Rubin said you have to compare something to something

20    to verify.

21                Just saying I'm here doesn't verify you at all.

22    Not even a bit.  So from our perspective, that is not

23    verification, authentication, that is not facilitating the

24    it.  That's not even having the idea of it.

25                THE COURT:  All right.

```
 1              MR. LEIBOWITZ:  Your Honor, could I add?

 2              Again, we're talking about facilitating

 3    verification, not that you have to -- that that is not, in

 4    of itself, needed to suffice to verify.  And it's what one

 5    of ordinary skill in the art looking at this as a computer

 6    scientist would understand something identifying itself and

 7    saying I would like to copy your content, and that in

 8    this -- it would imply that in fact you need to figure out

 9    whether you are authorized to do so or not.

10              And that, that is the testimony both from the

11    inventor and Dr. Rubin that having, saying I am here --

12    right? -- is not what this is saying.  This is saying I am

13    here.  I would like to copy content.  So it is an identifier

14    and it would lead someone to say, so a computer scientist

15    to understand that there would be an authentication process,

16    it doesn't need to be spelled out here.

17              And the example Mr. Geier gave was exactly that.

18    The challenge response request:

19              Hi, I'm here.  I'm the server.

20              Hi, I'm here from the person's pocket.

21              THE COURT:  It is true, and I heard the

22    testimony a couple times from Dr. Rubin, that he regarded

23    that as being sufficient to satisfy the, for lack of a

24    better term, the authentication element.

25              I can certainly see the jury not finding that to
```

**Appx10203**

1    be compelling but that's not the standard for a JMOL.

2              All right.  I think I have a sense of where you

3    think your strongest points are on each point.  And again I

4    think I'm going to have the jury have first crack at this.

5    I will look at it presumably at a point at which there is

6    going to be some resolution on which we can work from the

7    jury.

8              So I will, I will deny each of the motions at

9    this point for JMOL.

10             Now, let's talk about when we should get

11   together for our instruction conference.

12             I take it you probably haven't had a chance to

13   go completely through the version of the instructions I

14   served you with.

15             MR. TIMBERS:  We're making our best progress on

16   it.

17             MR. LEIBOWITZ:  I am about halfway, Your Honor.

18             THE COURT:  Well, you tell me when is a good

19   time.

20             And Mr. Gaffigan, are you okay taking a break

21   for a period of time.

22             THE COURT REPORTER:  Yes, sir.

23             THE COURT:  And we can be back in -- I'm not

24   talking about coming back at 8:00 o'clock or 1:15 in the

25   morning.  We have some communication for us.

**Appx10204**

```
 1              So let's see if we can do it reasonably
 2    promptly.
 3              MR. TIMBERS:  Maybe 3:15?
 4              THE COURT:  Does that sound reasonable,
 5    Mr. Liebowitz?
 6              MR. LEIBOWITZ:  It does.
 7              THE COURT:  All right.  Why don't we break until
 8    3:15.  I think I put in language from each of the points
 9    that I think except on sale and public use.  Did we leave
10    anything else out?
11              THE LAW CLERK:  (Shaking head no.)
12              THE COURT:  I don't think so.  It doesn't mean
13    I'm locked in stone on any of the others, but I am giving
14    you proposed language which you can consider.
15              Okay.  Very good.  Did we say 3:15?
16              MR. TIMBERS:  3:15.
17              THE COURT:  We're adjourned.
18              You all can sit because I'm going to look for my
19    rule book which I have now lost amidst all the binders.
20              MS. STERNBERG:  Would it be okay to get an
21    accounting of the time?
22              THE LAW CLERK:  Yes.
23              IOENGINE has 14 minutes 58 seconds.  Ingenico
24    has 44 minutes, 1 second.
25              THE COURT:  Please be seated.
```

**Appx10205**

1        I'm just going to putter around the desk until I

2   find my rule book.

3        (Brief recess taken.)

4        *      *      *

5        (Proceedings reconvened after recess.)

6        THE COURT:  Good afternoon.  Please be seated.

7        So why don't we jump right in.  We have the

8   draft final instructions and I will start -- I guess

9   probably the most logical way to do this is to start with

10  constructive plaintiff, and let's go through the

11  instructions, and hear from Ingenico about any objections

12  they may have.

13       So, Mr. Liebowitz, are you ready to go?

14       MR. LEIBOWITZ:  Yes.  Thank you, Your Honor.

15       So the first, I think our largest point would be

16  on 1.1 is the standard for burden.  So maybe we can back

17  into it because we actually decided -- we printed out, we're

18  trying to print out a couple of changes here that -- it just

19  simplifies it, I think, rather than talking about, you know,

20  a party that is asserting a particular claim, you know, we

21  put in IOENGINE or Ingenico in the applicable spot and we,

22  and -- you know, again -- so I don't, I don't know if it

23  will be -- I don't think it will be objectionable.  We tried

24  to make it, you know, again, like I said, to fit the

25  particular parties rather than being more general, which

1    requires a little bit of redlining, but I don't think we

2    changed much of the substance.

3                    THE COURT:  All right.  If you have text, you

4    can --

5                    MR. LEIBOWITZ:  Yes, I think it is being

6    printed -- we're trying to print it out and we'll hand it

7    up.

8                    Next, Your Honor, in --

9                    THE COURT:  All right.  Let me just keep track

10   of this.

11                   MR. LEIBOWITZ:  Yep.

12                   THE COURT:  Anything that you need to -- oh,

13   good.  Thanks.

14                   MR. LEIBOWITZ:  So we substituted the parties'

15   names and we put a parallel sentence at the end of the

16   second paragraph, and that's the one at the end of the first

17   paragraph.

18                   THE COURT:  All right.

19                   Now, has Ingenico seen this?

20                   MR. LEIBOWITZ:  We just got it printed, Your

21   Honor, so I think we handed it over to them.

22                   THE COURT:  Yes.  Okay.  Let's give them a

23   chance to read it.

24                   MR. TIMBERS:  Do you have another copy?

25                   MR. JOSHI:  Yes, I have one.

**Appx10207**

```
 1                    MR. LEIBOWITZ:  Of course.  Sorry.

 2                    MR. JOSHI:  This is.

 3                    MR. LEIBOWITZ:  I had delayed printing.

 4                    (Pause.)

 5                    MR. TIMBERS:  I have a question.

 6                    MR. LEIBOWITZ:  Sure.

 7                    MR. TIMBERS:  Is there a reason you used

 8      "should" for your version than "shall" for ours?

 9                    MR. LEIBOWITZ:  Absolutely not.  You can change

10      it to "should."

11                    MR. TIMBERS:  All right.

12                    THE COURT:  Where is that?

13                    MR. TIMBERS:  The last line:  If that happens,

14      you shall find in favor.  It should be "should."

15                    MR. LEIBOWITZ:  It was not -- it was not

16      intentional.

17                    THE COURT:  Okay.

18                    MR. LEIBOWITZ:  Okay.  So those would be our

19      proposal on 1.1, just to simplify it.

20                    THE COURT:  All right.  You want some time to

21      look at that, Mr. Timbers, or have you had a chance to look

22      at it sufficiently?  We can come back to you if you would

23      like.

24                    Why don't we come back to it.

25                    MR. TIMBERS:  I think it's okay.
```

**Appx10208**

```
 1                    THE COURT:  It's okay.

 2                    MR. TIMBERS:  I think so.  My colleague may yell

 3       at me.

 4                    THE COURT:  Let's look at it.  Again, if we have

 5       a problem, we'll let you know.

 6                    So next.

 7                    MR. LEIBOWITZ:  Next on 1.6, Your Honor.

 8       Questions To Decide.

 9                    So there is the way --

10                    THE COURT:  You may have noticed on

11       circumstantial evidence, over my better judgment, but since

12       both parties wanted it, I went ahead and did that.

13                    MR. LEIBOWITZ:  Yep.  Thank you, Your Honor.

14                    So here on 1.6, so the second paragraph there

15       starts talking about "IOENGINE alleges."

16                    THE COURT:  Yep.

17                    MR. LEIBOWITZ:  And then there is a sentence in

18       the next paragraph that says, "Ingenico denies."  Then there

19       is a sentence, "Ingenico also argues," but there is no

20       parallel sentence talking about "IOENGINE denies."

21                    THE COURT:  Yes.

22                    MR. LEIBOWITZ:  And so the way we split it up

23       was we moved that "Ingenico denies" sentence to the previous

24       paragraph and started a new paragraph with Ingenico's claims

25       and then a sentence -- that parallel sentence, "IOENGINE
```

1   denies."

2               THE COURT:  And that sentence, why don't you

3   give me your text of that sentence.

4               IOENGINE --

5               MR. LEIBOWITZ:  IOENGINE denies that any of the

6   asserted claims are invalid.

7               THE COURT:  All right.

8               MR. TIMBERS:  Where is that?  I'm sorry.

9               MR. LEIBOWITZ:  In 1.6.

10              MR. TIMBERS:  No, sorry.

11              THE COURT:  Third paragraph.

12              MR. TIMBERS:  Where is your language?

13              MR. LEIBOWITZ:  Sure.  Oh no.  This is -- oh,

14   this is your redline?

15              MR. TIMBERS:  Yes.

16              MR. LEIBOWITZ:  I can read it to you.

17              MR. TIMBERS:  This is the Court's final.

18              MR. LEIBOWITZ:  Yes.  So the language --

19              MR. TIMBERS:  Just note there is no --

20              MR. LEIBOWITZ:  -- would go right after

21   "Ingenico also argues that the asserted claims of those two

22   patents are invalid."  And then we are proposing to add

23   "IOENGINE denies any asserted claims are invalid," parallel

24   to the --

25              THE COURT:  Okay.

1       All right.  I have that one.

2       Okay.  Next.

3       MR. LEIBOWITZ:  Next, make sure I'm not missing

4  something, but I think it's further on in 4.1 on validity.

5  I think we were --

6       THE COURT:  Okay.

7       MR. LEIBOWITZ:  I don't think we had anything

8  before that.  Oh, actually I had one thing.  Sorry.

9       3.3 in the induced infringement.

10      THE COURT:  Yep.

11      MR. LEIBOWITZ:  So in the last paragraph, it

12  says, "if IOENGINE has proved that a class of individuals"

13  and then it says, "such as Ingenico's customers INGEN-."

14  And I think it would be more accurate to say certain of

15  Ingenico's customers.  Right now, the implication is that it

16  must be all of their customers and I'm not sure that's

17  correct.

18      THE COURT:  I think -- I'm certain it is

19  probably okay.  I'm not sure that I would draw the same

20  inference you did, but in case someone might, such as

21  certain of Ingenico's customers.

22      MR. TIMBERS:  You want my comments on this

23  language now or later?

24      THE COURT:  Comment on the suggestion or to the

25  extent that you don't like the language INGEN- --

**Appx10211**

```
 1              MR. TIMBERS:  Okay.

 2              THE COURT:  -- you can comment on that.  We

 3    might be able to reach consensus.

 4              MR. TIMBERS:  Yes.  I think the certain

 5    customers is actually important, and I'm going to raise a

 6    question with the verdict form with respect to that.

 7              The way I would have it read is "directly

 8    infringed" -- in the second line of this paragraph --

 9    "directly infringed one of IOENGINE's patent claims and may"

10    -- I can't read my own writing -- and may -- oh -- "and may

11    prove that a class of individuals such as Ingenico's

12    customers are certain of" --

13              I'm okay with the "certain" idea.

14              THE COURT:  Yes.

15              MR. TIMBERS:  But it's basically "need not

16    identify a specific third party and may instead" -- that's

17    my word, may instead -- "prove that a class of individuals,"

18    et cetera, et cetera.

19              Then I think in the fourth line we should stop

20    at the word "Ingenico's inducement."

21              And there is a very specific reason for that

22    because merely proving direct infringement is not enough to

23    support a finding of induced infringement because there is a

24    lot more to it.  But this is only about the issue of direct

25    infringement and that's why taking out that is enough to
```

**Appx10212**

1    support a finding of the rest of that.

2              THE COURT:  I see -- I see what you are saying.

3              MR. LEIBOWITZ:  I'm not sure I'm following.  I

4    apologize.  So what you are saying --

5              THE COURT:  I think I can summarize it.

6              MR. LEIBOWITZ:  Okay.

7              THE COURT:  What Ingenico wants is the first

8    sentence of that last paragraph, "to show induced

9    infringement, IOENGINE need not identify any specific third

10   party that directly infringed one of Ingenico's patent

11   claims."

12             And then was it -- the connection was "and

13   instead".

14             MR. TIMBERS:  "And may."

15             THE COURT:  "And may instead."

16             MR. TIMBERS:  "Prove."

17             THE COURT:  Yes, "may prove."  Hmm.

18             Well, the suggestion is "and may prove that a

19   class of individuals such as certain of Ingenico's customers

20   directly infringed IOENGINE's patents as a result of

21   Ingenico's inducement, period, strike the rest of those two

22   lines.

23             MR. LEIBOWITZ:  Then what -- then I guess the

24   sentence doesn't -- if IOENGINE has proved or may instead

25   prove that a class of individuals directly infringed, then

1    what?

2              THE COURT:  Well, the beginning of the paragraph

3    is to show induced infringement, that you said, and you

4    have taken care of the second sentence by adding it to the

5    end of the first, or the sentence that begins the first

6    sentence.

7              MR. LEIBOWITZ:  How about -- can we, I

8    understand the point.  And I understand that getting rid

9    of the "that is enough to support a finding of induced

10   infringement" but I think it would be the balance of that,

11   "even if you cannot identify which specific individual

12   actually committed direct infringement" should remain.  So

13   it would read --

14             THE COURT:  Yeah, I see.

15             MR. LEIBOWITZ:  They said prove, right, "that a

16   class of individuals, such as certain of Ingenico's

17   customers INGEN-directly infringed IOENGINE's patents that

18   result in inducement even if you cannot identify which

19   specific" --

20             THE COURT:  That's the point, I think, of *Power*

21   *Integrations* and *GSK*.

22             MR. LEIBOWITZ:  Correct.  And I'm fine with

23   getting rid of "and that's enough to support a finding of

24   inducement."

25             MR. TIMBERS:  Yes.

**Appx10214**

```
1              THE COURT:  That sounds like we --

2              Did you get rid of the language, Dane?

3              THE LAW CLERK:  (Nodding yes.)

4              THE COURT:  I think we got it.

5              Okay.  Next.

6              MR. LEIBOWITZ:  So this is the point that we

7    submitted some briefing on -- or a short informal briefing

8    to Your Honor in terms of the inducement and contributory

9    infringement parallel on page 18.  If Your Honor has reached

10   a decision on this, obviously you considered it, but we

11   think there, you know, based on the -- this statutory

12   text --

13             THE COURT:  We're at page 18 now?

14             MR. LEIBOWITZ:  Correct, Your Honor.  Under the

15   staple article point.

16             And that, you know, if, the way inducement and

17   contributory infringement work together in terms of, you

18   know, how contributory -- how they're codified in 35 U.S.C.,

19   we think we would like that.

20             THE COURT:  Hold on just a second.

21             (The Court and Law Clerk confer.)

22             THE COURT:  Oh, okay.  I see what is going on.

23   You all have a redline version; right?

24             MR. LEIBOWITZ:  Yes.  Oh.

25             THE COURT:  And I have a final version.  So why
```

**Appx10215**

1    don't we go by numbers like 3.4 rather than page because

2    otherwise we are going to be scrambling all over the place.

3              MR. LEIBOWITZ:  Sorry.  Apologize, Your Honor.

4    Yes.  So --

5              THE COURT:  So, yes.

6              MR. LEIBOWITZ:  -- in 3.4 --

7              THE COURT:  Well, I read your submission and I

8    think that not just the two Supreme Court cases, but I think

9    there is -- as interesting as I think Ingenico pointed out,

10   when Dr. Rubin was reciting the law, he cited -- he recited

11   it this way, not that that is binding, but it's -- it

12   does -- that formulation shows up a lot, and I'm inclined

13   to take what the Supreme Court's characterization as

14   sufficient.

15             I don't know -- I think as I mentioned the

16   other day, once we get into saying something about staple

17   articles, we then have to define what is a staple article

18   and we're into, into the weeds.  So I think we'll go with

19   this.

20             You are entitled to object.

21             MR. LEIBOWITZ:  Yep.  Could we perhaps insert

22   the notion of "commercially," no "commercially substantial

23   noninfringing use"?  I think that at least gets us closer to

24   the point that we're talking about.

25             THE COURT:  I don't know what that means.

1          MR. LEIBOWITZ:  Because I think the point is,

2     Your Honor, you can find another use for any -- I can use --

3          THE COURT:  You can use it as a paper weight.

4          MR. LEIBOWITZ:  That was --

5          THE COURT:  I think the jury is -- understands

6     it in this context.  That's not what we're talking about.

7     I don't think we have to do any more embellishment.  The

8     problem with starting to throw in adjectives is that every

9     time you throw in an adjective, you add in possibility of

10    confusion.  I'm inclined to go with what we've got.

11         MR. LEIBOWITZ:  Okay.  Next I moved to

12    Section 4.1.

13         THE COURT:  Yeah.

14         MR. LEIBOWITZ:  And so this is in the validity

15    section.  So I think we, reading it through and I know Your

16    Honor did put something in earlier on in terms of validity

17    being assessed only with respect to the claims that are

18    found infringed.

19         THE COURT:  Yeah.

20         MR. LEIBOWITZ:  But we thought there should be

21    something in this section that says that as well.  So it's

22    when we start the validity section.

23         THE COURT:  Yeah.  I hear you.  And I think

24    that -- since that's the way the case has completed, I think

25    we can add --

**Appx10217**

```
1              MR. LEIBOWITZ:  Yes.  Especially since the way
2    it starts, instruct you on deciding whether or not and it
3    has proved any asserted claims; right?  It should say has
4    proved -- well, you know, any infringed claims.  Or if there
5    is a sentence, preceding sentence, that explains that it's,
6    we're talking about any claims that have been found
7    infringed, then maybe the first sentence here.
8              THE COURT:  Yes, I think that's -- I assume than
9    Ingenico doesn't have a problem with language -- adding
10   language to that ilk.
11             MR. TIMBERS:  Yeah, as long as we're not adding
12   it repeatedly, yes.
13             THE COURT:  Well, yeah.
14             MR. TIMBERS:  The verdict form will guide the
15   jury very well.
16             THE COURT:  I think we can say that.  Okay.
17             MR. LEIBOWITZ:  Okay.  Then in the section, the
18   prior art section, 4.2.
19             THE COURT:  Yeah.
20             MR. LEIBOWITZ:  My copy is the second page of
21   that section.  It's the paragraph that was the insertion on
22   diligence, Your Honor.
23             THE COURT:  Yeah.
24             MR. LEIBOWITZ:  So one change we would make
25   is diligence mean -- it says "diligence means working
```

**Appx10218**

1  continuously."  We think it should say "reasonably

2  continuously."

3           THE COURT:  Yes, we have reasonably above the

4  first time.  I think I left that in.  Didn't I?

5           THE LAW CLERK:  (Shaking head no.)

6           MR. LEIBOWITZ:  I think they're defining

7  diligence here or instructing on diligence.

8           THE COURT:  I took it out.

9           This language I think I took from Ingenico's

10 suggestion, that continuously not necessarily.  I have a

11 different expression in there.  I thought that was simple.

12           So your suggestion is --

13           MR. LEIBOWITZ:  "Reasonably continuously though

14 not necessarily every day."

15           MR. TIMBERS:  I don't have a problem with that,

16 Your Honor, although then we have reasonably up on page 21.

17 I don't know why.

18           THE COURT:  Well, when you say 21, tell me --

19           MR. TIMBERS:  You actually added reasonably as

20 you mentioned just now.  The date, the last paragraph, the

21 date of invention, et cetera, et cetera, as long as the

22 inventor was reasonably diligent.

23           THE COURT:  Yeah.

24           MR. TIMBERS:  You describe reasonableness later

25 and that is the reasonableness that they're talking about.

**Appx10219**

1    MR. LEIBOWITZ:  But I think the cases actually

2    talk about this and I don't remember the case off the top of

3    my head but I know in terms of -- specifically with this

4    idea of continuously; right?  And, you know, continuously,

5    saying not necessarily every day, cases go on from there.

6    I think our proposal sort of further

7    embellishment on this concept, right, of it being, you know,

8    not needing to be, you know, in terms of what continuously

9    means in this context and so I think adding reasonably here

10    doesn't change the tenor of anything.  It's necessary on

11    diligence.

12    MR. TIMBERS:  Yes.  I'm actually okay with

13    having reasonable where Mr. Liebowitz wants it, but then I

14    would remove it from page 21.

15    THE COURT:  When you say page 21, remember --

16    MR. TIMBERS:  Oh I'm sorry, Your Honor.

17    THE COURT:  This is in the paragraph.  Yeah I

18    knew I had reasonably.  It's a paragraph that starts -- it's

19    one after the number -- the second one after the number.

20    MR. TIMBERS:  Yeah.

21    THE COURT:  And it says the date of invention...

22    MR. TIMBERS:  Yes.

23    THE COURT:  "... as long as the inventor was

24    reasonably diligent in reducing the invention to practice."

25    Now, I could -- what I could do is I could say,

1   in the paragraph we were looking at which is on the next

2   page, in this case, comma, Ingenico contends, I could say

3   reasonable -- you know, second sentence.  I could say

4   "reasonable diligence means working continuously" and then

5   we tie reasonable diligence to the reasonable that we

6   talked about in the first paragraph on the preceding page.

7           Does that work for you?

8           MR. TIMBERS:  (Nodding yes.)

9           MR. LEIBOWITZ:  Well, so I think, I'm not sure,

10  Your Honor, because -- I think the modifier that I'm looking

11  for is to continuously; right?  Because otherwise the jury

12  gets the impression than continuous really means continuous

13  as opposed to reasonably continuous; right?  You can have

14  some interruptions.  So we say reasonable diligence means

15  continuously that means -- that then the impressions is you

16  can't have any interruption as opposed to diligence means

17  reasonably continuously, right, shows you can have some

18  interruptions and that but still be diligent; right?  Not to

19  belabor anything.

20          THE COURT:  The mischief is in technical reading

21  of the word continuous means without a break and what we're

22  saying is continuous means breaks are okay.

23          MR. LEIBOWITZ:  Right.

24          THE COURT:  What was the expression, do you

25  remember from Chief Justice Taft, he listed this language

**Appx10221**

1   but it was -- I don't remember what we had but we had it in

2   the prior version, which I substituted in the not

3   necessarily every day because it got simpler language, but

4   he had language that -- I don't like reasonably continuously

5   much.  I mean, that is sort of clunky.

6           Mr. Timbers, any suggestion on how to solve the

7   problem of continuously?  Because I think Mr. Liebowitz's

8   issue with that is that continuous actually does as opposed

9   to continual, means without a stop.

10          MR. TIMBERS:  Yes, and that's why I think

11  everybody uses the language though not necessarily every

12  day.

13          THE COURT:  Right.

14          MR. TIMBERS:  That makes it really clear.  Not

15  every day means it's not continuous or continual.

16          THE COURT:  Right, right.  But maybe steadily

17  working.

18          MR. TIMBERS:  Yeah.  I mean, I have one other

19  comment and that is IOENGINE when it made its original

20  proposal did not propose reasonably continuously.  They said

21  working continuously, though not necessarily every day.

22          MR. LEIBOWITZ:  But I think we had additional

23  language there.  We also had additional language.

24          MR. TIMBERS:  You have a whole page, yes.

25          MR. LEIBOWITZ:  Right.

**Appx10222**

1      MR. TIMBERS:  It's true you have an entire page

2   after that.

3      MR. LEIBOWITZ:  Yes.  I'm not sure that's --

4      THE COURT:  All right.  I might take another

5   look at -- this is Chief Justice Taft when he was on the

6   Sixth Circuit.  He wrote some terrific opinions.

7      I'll take a look and see if I can --

8      MR. LEIBOWITZ:  Then the other issue we have

9   with this formulation, this, you know, so "that the process

10   from conception to reduction to practice is substantially

11   one continuous period" and for the same reason -- what we

12   have revised it to say was "diligence means working

13   reasonably continuously though not necessarily every day

14   from conception to reduction to practice.

15      THE COURT:  That's fine.

16      Now that part, Mr. Timbers, you don't object to

17   it?

18      MR. TIMBERS:  No.

19      THE COURT:  Okay.

20      MR. LEIBOWITZ:  Then the next sentence, Your

21   Honor, it starts if "IOENGINE introduces such evidence,

22   Ingenico still must prove."  We took out the part that

23   IOENGINE is introducing evidence because we think it is

24   really their burden either way to prove invalidity.  And

25   so we just started it "Ingenico still must prove that a

1    particular item is prior art by clear and convincing

2    evidence."

3                    But...

4                    THE COURT:  Well, I guess the question is what

5    is the consequence of IOENGINE's not putting forth some

6    corroborating evidence, and that is that you lose on this

7    issue.

8                    What is your proposal again?

9                    MR. LEIBOWITZ:  To strike "if IOENGINE produces

10   such evidence, Your Honor, especially since it's them -- the

11   introduction of the evidence.  The evidence is calling in --

12                   THE COURT:  That's not really -- that is not

13   really true.  Because if IOENGINE does not introduce

14   evidence, i.e., evidence of diligence and corroborated by

15   something other than the inventor's testimony, then Ingenico

16   has a general burden of proving prior art, not with respect

17   to the issue of whether there has been shown to be diligence

18   from conception to reduction to practice.  Because you lost

19   on that issue by failure to meet your burden of production

20   on diligence; right?

21                   MR. LEIBOWITZ:  Yes.  Although what I'm thinking

22   about, Your Honor, is whether that is really -- you know,

23   is whether IOENGINE has introduced evidence in the Ingenico

24   production.  Is that the jury's decision?  In other words,

25   the evidence -- there was evidence introduced into the

```
 1    record.  Are we asking the jury to decide whether that
 2    evidence was, was introduced or not?  Because that is what
 3    it sounds, like as opposed to -- you know, I guess is that
 4    the question for the jury in terms of whether evidence has
 5    been introduced?  That doesn't sound to me like a question
 6    we normally put to the jury.
 7                   THE COURT:  Hmm.
 8                   What do you think, Mr. Timbers?
 9                   MR. TIMBERS:  Well, it's a fact question, but
10    if you have failed to put in evidence, then that would be
11    appropriate for the Court in the context of a JMOL, or
12    otherwise to hold that question from the jury to say that
13    you haven't produced any corroborating evidence that shows
14    what is needed under this.
15                   THE COURT:  Do you want me to decide that
16    question or do you want that question to go to the jury?
17                   MR. LEIBOWITZ:  I'm just --
18                   THE COURT:  I don't know the answer.  I don't
19    know the answer to whether there is law on this.  I wouldn't
20    be surprised if there isn't.  It's the kind of thing that is
21    recited but without focusing on it.
22                   MR. LEIBOWITZ:  I mean, right.  Look, I think to
23    the point of whether there has been evidence introduced, I
24    mean clearly there has been.  Whether the evidence is
25    sufficient or not in terms of weighing the evidence, that I
```

**Appx10225**

1    feel is what we give to the jury but there certainly is

2    corroborating evidence.  We had testimony from other

3    witnesses, we had documentary evidence, we had right

4    there -- there was evidence introduced but, you know -- but

5    I, I guess I'm -- I think this, this language, we can think

6    about it some more.

7                    THE COURT:  I think something like -- I'm

8    playing around with my language like once IOENGINE has put

9    forth some evidence beyond Mr. McNulty's own testimony that

10   confirms the diligence and then fill in the rest after that,

11   but...

12                   MR. LEIBOWITZ:  That would about fine, Your

13   Honor.  You said from the prior sentence you say.

14                   THE COURT:  Yes.

15                   MR. LEIBOWITZ:  Once IOENGINE has put forth some

16   evidence beyond...

17                   THE COURT:  I'm not sure about the -- I'm not

18   entirely satisfied.

19                   MR. LEIBOWITZ:  I didn't mean to open a can of

20   worms, Your Honor, on the -- I didn't open a can of worms on

21   that question but it did strike me as --

22                   THE COURT:  No, I don't think -- I don't think

23   the opening of the can of worms increases the number of

24   worms.  It just make them more visible.

25                   Now let's think about that one.  All right?

**Appx10226**

```
1              MR. LEIBOWITZ:  All right.

2              THE COURT:  Next.

3              MR. LEIBOWITZ:  Next, Your Honor, moving forward

4    in the same, in the same section.  For me, it is it a couple

5    pages forward.  It's right above No. 1.

6              THE COURT:  Yes.

7              MR. LEIBOWITZ:  So two things here.  No. 1, I

8    don't think necessarily, but you -- are you keeping KeySafe?

9    I don't think we had anything on KeySafe.

10             MR. TIMBERS:  No.

11             THE COURT:  KeySafe is out, isn't it?

12             MR. LEIBOWITZ:  It thought it was.

13             THE COURT:  KeySafe it's still in there; right.

14             MR. TIMBERS:  Yes.

15             MR. LEIBOWITZ:  And then right above then 1, it

16   says "or disclosed in a patent or printed publication before

17   March 23rd, 2003."

18             Is that -- I mean there aren't any -- there is

19   no patents that have been asserted as referencing --

20             MR. TIMBERS:  I think I have a fix for this if

21   you want to hear it.

22             MR. LEIBOWITZ:  Yes, sure.  Go ahead.

23             MR. TIMBERS:  All right.  So above this, means,

24   I'll read it quickly but then I'll have to read it more

25   slowly.  This is the 102(a) part, so I'm not going to say
```

1    102(a).

2                "But Ingenico contends that the following items

3    are prior art to Mr. McNulty's invention because each was

4    known or used by others in this country or described in a

5    printed publication in this or foreign country before the

6    date of invention."

7                And that would be Elazar and DiskOnKey with the

8    associated items, not including MyKey or KeySafe.  All

9    right?

10               So in other words, if we read a lot like what

11   is in No. 1, but it is -- the DiskOnKey does fall into the

12   102(a) category, so it's basically the 102(a) language and

13   then listing Elazar and DiskOnKey.

14               Then it would be this -- what you already have

15   here which would say, "in this case Ingenico also contends

16   that the following items are prior art to Mr. McNulty's

17   invention and then it would list the M-Systems' DiskOnKey

18   product along with its associated firmware upgrade,

19   software, and the M-Systems' DiskOnKey development kit.

20               THE COURT:  Period.

21               MR. TIMBERS:  Does that make sense?

22               THE COURT:  Yes, it takes care of 102(a) and

23   102(b).

24               MR. TIMBERS:  Right.  And whether you mention

25   102(a) or (b) is irrelevant to us because the jury won't

1    understand.

2              THE COURT:  No, they won't.

3              MR. LEIBOWITZ:  We certainly -- we don't think

4    that is necessary.  So where is your first --

5              MR. TIMBERS:  The first paragraph would be

6    above --

7              MR. LEIBOWITZ:  What is here now.

8              MR. TIMBERS:  -- what is here now.  And I will

9    read it slowly:

10             "And Ingenico contends that the following items

11   are prior art to Mr. McNulty's invention to cause each was

12   known or used by others in this country or described in a

13   printed publication in this or a foreign country before the

14   date of invention" and then the list would be the Elazar

15   patent and then the DiskOnKey, defined exactly the same as

16   how we would define it in what is coming.

17             THE COURT:  That is the M-Systems' DiskOnKey

18   product along with its associated firmware, upgrade.

19             MR. TIMBERS:  Software.

20             THE COURT:  Upgrade and the M-Systems' DiskOnKey

21   software development kit?

22             MR. TIMBERS:  Yes.  There is it a word software

23   after upgrade, but yeah.

24             THE COURT:  Associates the firmware, software --

25   firmware, upgrade, software?

**Appx10229**

1                MR. TIMBERS:  Yes.

2                THE COURT:  All right.

3                MR. TIMBERS:  And then what I'm calling the

4    102(b), which is slightly changed to same "in this case,

5    Ingenico also contends" --

6                THE COURT:  Yep.

7                MR. TIMBERS:  -- "that the following items of

8    prior art," sorry, "the following items are prior art and

9    then we continue, as you have it, and then we, we just

10   continue as you have it.  And then with that formulation of

11   DiskOnKey as we said.

12               THE COURT:  Hmm.

13               MR. TIMBERS:  So it's just trying to -- they are

14   two different sources.

15               THE COURT:  They are two different sources.

16   It's got to be -- the jury is -- I'm afraid the jury might

17   be confused by the similarity of the two as is often the

18   case.

19               Well, let's try doing that, and if it just looks

20   hopeless and terribly confusing because of the similarity,

21   the parallelism is unfortunate.  But we will try our hand to

22   see if we can do that and make it make sense.

23               MR. LEIBOWITZ:  Your Honor, one point on that.

24               What is the -- with respect to the 102(a) point,

25   described in a printed publication in this or a foreign

1  country, Elazar -- I understand their position on that

2  although I'm not sure it falls into that category.

3            With respect to the DiskOnKey, "printed

4  publication to a foreign country," we have no evidence of

5  printed publication with respect to DiskOnKey.

6            THE COURT:  Well, are you talking about the

7  associated firmware upgrade, software and the --

8            MR. LEIBOWITZ:  I mean, it's a product.  It was

9  sold as a product.  But in terms of printed publication,

10  related to that, I don't -- I don't think there is evidence.

11            THE COURT:  Mr. Timbers, what evidence on

12  printed publication on 102(a)?

13            MR. TIMBERS:  He asked the question would be

14  whether the press releases are considered printed

15  publication or not.

16            THE COURT:  I see.

17            MR. TIMBERS:  It's not a foreign country.  I

18  mean they clearly printed -- press releases are in the

19  United States.

20            THE COURT:  Yeah.

21            MR. TIMBERS:  And I don't have a quick answer to

22  that one at the moment.

23            MR. LEIBOWITZ:  And I think that kind of

24  requires dividing up the various art that was kind of put

25  together with respect to the DiskOnKey and say, you know, is

**Appx10231**

1   there a printed publication?

2           MR. TIMBERS:  Well, Elazar is a print

3   publication.

4           THE COURT:  Yes, I think Mr. Liebowitz is

5   conceding that -- well not conceding that.

6           MR. LEIBOWITZ:  No, no.

7           THE COURT:  He is conceding that it falls within

8   the general category of printed publication but is asking

9   what else besides Elazar qualifies as a printed publication.

10          MR. TIMBERS:  And the thing that comes to mind

11  is the possibility that a press release is a printed

12  publication.  It certainly -- yeah.  So -- but they're both

13  in the U.S., so I think you have to leave in printed

14  publication because of Elazar.

15          THE COURT:  Yeah.  The question isn't so much

16  whether to put in or leave out printed publication.  The

17  question is whether to include the M-Systems in the 102(a),

18  i.e., is that, is that something that M-Systems' DiskOnKey

19  product, is that -- well, maybe.

20          MR. TIMBERS:  It was known or used by others in

21  this country.

22          THE COURT:  Yeah.

23          MR. LEIBOWITZ:  But not as a printed

24  publication.

25          MR. TIMBERS:  It says "or."

1    THE COURT:  Yes, it says "or."  That's right.

2    And I think we're not suggesting each of them qualifies

3    for all of the various options.  We're suggesting that

4    viewing the options collectively, these are the two that

5    fall under one or another of the options.  I think that

6    probably works.

7    MR. LEIBOWITZ:  Okay.

8    THE COURT:  Let's try -- we will try to, to put

9    that in a form that works.

10   Did you get -- Dane, did you get all of that?

11   THE LAW CLERK:  (Nodding yes.)

12   THE COURT:  Okay.

13   MR. LEIBOWITZ:  Then, Your Honor, one more minor

14   point on this -- that is not minor.  In the description of

15   No. 1, we talk about the products, the "DiskOnKey product

16   along with its associated firmware upgrade."  I think it

17   should say maybe allegedly associated or something, but I

18   don't think we could be telling the jury that it is in fact

19   associated which is a, a point of contention.

20   THE COURT:  If we just say along with the

21   firmware upgrade, software, and the MyKey.  It just -- take

22   out "the", instead it's associated.  I think in the context

23   is going to make it clear the assertion is that it is

24   associated.  You don't have to have the Court saying that

25   it's associated.

**Appx10233**

```
 1              MR. LEIBOWITZ:  Right.  Thank you.

 2              THE COURT:  All right.

 3              MR. LEIBOWITZ:  Looking at my note here.

 4         Oh.  Okay.  I think this might be my last

 5    comment on the anticipation section.  4.3.

 6              THE COURT:  Yeah.  Okay.

 7              MR. LEIBOWITZ:  So this is, this says -- I

 8    think I brought this up last time.  The very last sentence

 9    of this section doesn't have any parallel in the prior

10    section.  It says, "if you find with respect to any asserted

11    claim that Ingenico has proved by clear and convincing

12    evidence that the claim was anticipated you must find that

13    claim invalid."

14              We don't have that same kind of sentence in the

15    infringement --

16              THE COURT:  I thought we put -- didn't we put

17    that in?

18              MR. LEIBOWITZ:  I apologize if I missed it.

19              (The Court and Law Clerk confer.)

20              THE COURT:  Well, we put in something to that

21    effect, maybe not in the exact parallel place.  But we will

22    look at it again and see if the parallel -- we made an

23    effort to try to preserve -- implement the parallelism

24    concept and we'll see if we can find maybe where we put it

25    or make sure that it goes in in an equivalent place.
```

1           I get -- I understand the problem.

2               MR. LEIBOWITZ:  Okay.

3               THE COURT:  So that is 4.2, last sentence.

4               MR. LEIBOWITZ:  Correct.

5               THE COURT:  Okay.

6               MR. LEIBOWITZ:  On 4.6, Your Honor, in the

7       obviousness, the secondary or objective indicia.

8               THE COURT:  Right.

9               MR. LEIBOWITZ:  No. 1.

10              THE COURT:  Yeah.

11              MR. LEIBOWITZ:  Whether the products were

12      covered -- were commercially successful, it says "as a

13      result of the merits."  We think it should say "at least in

14      part as a result of the merits."

15              THE COURT:  Well, what do you think, Mr.

16      Timbers?

17              MR. TIMBERS:  Well, *Campbell Soup* says by

18      showing the commercial success is the direct result of

19      unique characteristics of the claimed invention.  And so I

20      actually was going to suggest something in the other

21      direction by using the word, basically this exact language,

22      the direct result of the characteristics.

23              THE COURT:  Well, if I can make each of you

24      equivalently unhappy, we will probably stick with what we

25      got.  I mean, I recognize -- I don't -- I think actually

1    IOENGINE's version is too weak and I think the *Campbell* case

2    sounds like it's a little too muscular.  Let's go with the

3    Goldilocks solution here.

4              MR. LEIBOWITZ:  My last -- this is my last one,

5    I believe now.  It's really just a stray, stray comment

6    perhaps.  On Section 5.5, Your Honor has, in the second

7    paragraph, it talks about Ms. Grimes or the Court Security

8    Office with brackets around it.  I just wanted to point that

9    out.

10             THE COURT:  I have to fix that because it wasn't

11   clear to me -- I think they modified the process a little

12   bit maybe since my last jury trial here and it won't be

13   Ms. Grimes.  It will be a Court Security Officer who will be

14   taking care of the jury.

15             My recollection, at least, was that the

16   courtroom deputy did it.  So I will change it, those

17   references to Court Security Officer who will be taking care

18   of you and there are two references --

19             MR. LEIBOWITZ:  Yes.

20             THE COURT:  -- one I think I took out.  Yeah, in

21   the second line of 5.5, I put Ms. Grimes and that will be

22   just the Court Security Officer is taking care of you during

23   your deliberations.

24             And then in the second paragraph, second line,

25   scratch out Ms. Grimes and the open bracket and the word,

1    or, and then put -- take out the closed bracket.  That fixes

2    that problem.  All right.

3              MR. LEIBOWITZ:  Those are all the comments I

4    have.

5              THE COURT:  Mr. Timbers.

6              MR. TIMBERS:  Yes, Your Honor.  So on 1.2, we're

7    back to circumstantial evidence.  And so Ingenico would

8    either prefer not to have a reference to circumstantial

9    evidence or to have the one that the parties agreed upon.

10             THE COURT:  You want the rain back, with the

11   raincoat?

12             MR. TIMBERS:  So what I would say is, yes, if

13   you want I can -- I realize we're preserving our -- this is

14   the time to preserve our objections.  But I would say that

15   this doesn't do it.  It talks about a logical inference.  No

16   nobody knows what that is.  Took me a long time to figure it

17   out.

18             So I think either no reference to circumstantial

19   evidence or the full one that the parties agreed upon and is

20   in Document 445 at 1.5.

21             THE COURT:  Let's hear from IOENGINE on

22   circumstantial evidence.

23             This version, a different version.

24             MR. LEIBOWITZ:  Sure.

25             THE COURT:  I'm almost ready to wave the white

1   flag on this one because I, I just can't persuade lawyers

2   that this doesn't make any sense to put this in.

3          It's funny because of all the various

4   boilerplate instructions, this is the one I have the

5   hardest sell in trying to get people to get rid of.  I'm not

6   sure why but that's where we are.  I thought we might be

7   able to get away with just using the terms "direct" and

8   "circumstantial," letting them know that they have no

9   concept whatsoever of the duty the jury is undertaking, that

10  doesn't seem to be sufficient.

11         You don't feel that way, I take it.

12         MR. LEIBOWITZ:  Your Honor, I think we do want

13  the instruction.  The way Your Honor has formulated it was

14  fine with us, or we can go with the agreed formulation that

15  includes the rain and umbrellas.

16         THE COURT:  Okay.  I'm going to hate myself for

17  acceding on this.

18         MR. TIMBERS:  I am almost apologetic, but we do

19  feel ...

20         THE COURT:  Well, you know my feelings about

21  formal instructions.  I think they are -- it's, it's been

22  done before so let's do it again.  And I think it has very

23  little bearing on this case, but...

24         I'll consult with my counsel and I think we will

25  probably end up relenting and putting in the rain but I

 1    might take another try at something with a logical

 2    inference.

 3              All right.

 4              MR. TIMBERS:  All right.  Your Honor, I -- my

 5    next comment is section -- I wasn't sure.  I guess it's

 6    Section 2.

 7              THE COURT:  All right.

 8              MR. TIMBERS:  All right.  So this comes down to

 9    this description of program code.  This is, this is an issue

10    in this case.  We have two experts who say two totally

11    different things about program code and what we -- what we

12    did was we went back to look at, we went back to look at

13    Your Honor's comments as well as IOENGINE's.

14              THE COURT:  What is the page or not page, but

15    what is the section?

16              MR. TIMBERS:  2.  Section 2.  It's a long

17    section so it's pretty far in.

18              THE COURT:  Right.

19              MR. TIMBERS:  The second page.

20              THE COURT:  All right.

21              MR. TIMBERS:  On my copy, it looks like it's the

22    paragraph that starts "many of the terms used in the claims

23    will be familiar to you."

24              THE COURT:  Yep, I got it.

25              MR. TIMBERS:  And then at the end of that

1    paragraph, you have a discussion of program code.

2                    THE COURT:  Right.

3                    MR. TIMBERS:  And so as I said, we went back to

4    look at what Your Honor has said about program code, but

5    also what IOENGINE has told Your Honor about program code in

6    connection with the summary judgment motion.  And so we have

7    a very specific statement.  And so I'll read it.

8                    "Each program code is a separate element of the

9    claim and is configured to satisfy the particular

10   functionality identified in the claim."

11                   And that is basically language taken from

12   IOENGINE's brief.

13                   THE COURT:  Right.  But --

14                   MR. LEIBOWITZ:  I don't see how that conflicts

15   with what is here, Your Honor.

16                   THE COURT:  Well, I was just going to say, that

17   seems --

18                   MR. TIMBERS:  I think it's different, Your

19   Honor.

20                   Yes, so "can perform the function."  So this is

21   an important issue.  They're separate -- they're separate

22   program codes.  We had testimony that the fourth code could

23   include showing the IUI.  That's the first code.  So

24   Dr. Rubin basically testified the fourth code could include

25   the first code.  He didn't say it that way but he said the

**Appx10240**

1   fourth code could include the functionality of displaying

2   the IUI.  So that's a problem because these are four

3   different codes.  These are four different elements of the

4   claim.

5          And so looking at the language that, that

6   IOENGINE itself has said -- IOENGINE said "these are

7   separately claimed elements of the invention," okay?  They

8   are.  And IOENGINE apparently agrees with us on that.

9          And IOENGINE also says that they're configured

10  to satisfy particular functionality, the particular

11  functionality identified in the claim.  That is the language

12  I have added, "identified in the claim."

13         This is important because we have a witness who

14  said, oh, anything can be in the fourth program code.  And

15  we're saying, no.

16         The fourth program code, like IOENGINE has told

17  you, each program code is a separate element of the claim

18  and each is configured to satisfy the particular

19  functionality identified in the claim.  That's, that's what

20  they have said and that is, that is what, that is what it

21  should be.

22         THE COURT:  But that, the language that you have

23  read from IOENGINE does not, from what I can understand, say

24  that the code can do the functionality and nothing else.

25         MR. TIMBERS:  And that's not what this says

1    either.

2              THE COURT:  No, but I thought what you were

3    saying is it's problematic if there is a suggestion that

4    the fourth program code can do functions other than the

5    particular function called out in the claims.

6              MR. TIMBERS:  That's -- but that's why we have

7    each as a separate element.  Each --

8              THE COURT:  Well, you know, but that's a little

9    different from saying -- a lot different from saying that no

10   individual program code can perform any function other than

11   the function assigned it.  That's where you are going.

12             MR. TIMBERS:  I'm not arguing that, Your Honor.

13             THE COURT:  All right.  Maybe the best way to do

14   this is to tell me what your proposal is and then we can

15   have a taste of it.

16             MR. TIMBERS:  So I will read it exactly.

17             THE COURT:  All right.

18             MR. TIMBERS:  "Each program code is a separate

19   element of the claim, and" --

20             THE COURT:  Okay.  So far no disagreement, not

21   from me.  I assume not from Mr. Liebowitz?

22             MR. LEIBOWITZ:  I'd like -- yeah I'd like to

23   hear it all, but so far, yes, Your Honor.

24             THE COURT:  We'll take it in gross first.

25             MR. TIMBERS:  -- "and is configured to satisfy

**Appx10242**

1    the particular functionality identified in the claim."

2             THE COURT:  All right.

3             MR. LEIBOWITZ:  So I think, Your Honor, to me

4    that implies exactly the issue that Your Honor was raising.

5    That it can only have that functionality.  I mean, there is

6    no reason why the fourth program code can't perform its

7    function and also perform other functions and that is what

8    we have here is the language, you know, that came right out

9    of the *Markman* order.

10            THE COURT:  Well, to be, to be fair,

11   Mr. Timbers' version does not have the word "only" in it.

12   To satisfy only the particular functionality.  My concern is

13   that, I'm afraid the jury hearing that and reading it might

14   infer the word only is implied.

15            MR. TIMBERS:  I think you have already talked

16   about what "configured to" means, in this section, I

17   believe.

18            Actually right -- right after this you talk

19   about comprises.  I thought somewhere you talked about

20   configured to.  Maybe I'm wrong.

21            THE COURT:  I think we may have taken that off.

22            MR. LEIBOWITZ:  It's the last paragraph.

23            THE COURT:  Oh no, we still got it in.  We left

24   it in.

25            MR. TIMBERS:  Configured to simply means the

1    device is designed so it's capable of performing the

2    function in question.  That is actually why we use the

3    term -- well, we use the term "configured to" for two

4    reasons:

5              One is that you, you use it and it should be

6    unobjectionable and they used the exact same statement.

7    That says exactly what they said.

8              THE COURT:  This is language is quoted from

9    IOENGINE, is that --

10             MR. TIMBERS:  Well, I'll read exactly what they

11   said.  We didn't use all of it because all of it isn't

12   necessary, but I will read the entire two paragraphs.

13             It says:  "Each of these program codes is stored

14   on a particular memory executed by particular processor" --

15             I didn't put that in.

16             -- "and configured to satisfy a particular

17   functionality, period.  They are separately claimed elements

18   of the invention" --

19             And then I didn't put in the next part.

20             -- "and cannot be treated as one

21   undifferentiated morass."

22             That I thought was going too far.  But I thought

23   that I captured exactly what IOENGINE is saying in as

24   neutral a statement as I could think of.

25             THE COURT:  And your saying each program code is

**Appx10244**

1    a separate -- what is the next word for separate?

2              (The Court and Law Clerk confer.)

3              THE COURT:  See if we can combine that sentence

4    with what we got in there already, which is not

5    inconsistent, not inconsistent, and that may, make clear

6    that that we're not implying the word "only."

7              If we had your material, it may take some

8    adjusting of words but the general idea is adding your

9    material to the material that is in there now with respect

10   to program code.  Does that work?

11             MR. TIMBERS:  Here is the question:  How -- does

12   your second new sentence, the one that starts with respect

13   to --

14             THE COURT:  Yes.

15             MR. TIMBERS:  -- where it says different files

16   in combinations can perform the functions of the four codes.

17   Do you mean the functions of each of the four codes because

18   they're separately claimed elements or do you mean the

19   functions of the four codes?  That's what I'm just trying to

20   get at.

21             The idea is they're separate elements, they're

22   numbered, they have different functions that are identified

23   in the claim.  And so I'm a little worried maybe we can --

24   I'm not sure --

25             THE COURT:  I can say the word "each" should go

**Appx10245**

1   there.  I don't know that that is -- is a problem.

2               MR. LEIBOWITZ:  No, I think, Your Honor, if that

3   solves this issue, if we add, you know, each of, you say

4   with respect to the four claimed programs codes, different

5   program code files or combinations of program code files can

6   perform the functions of each of the four program codes,

7   full stop.  I think we would be fine with that.

8               THE COURT:  Okay.  And then the question is -- I

9   mean it seems to me there is some there to the point that,

10   to say each program code is a separate element of the claim,

11   that claim, and is configured to satisfy the particular

12   functionality identified in the claims.  And that -- those

13   two points I don't think are wrong.  And I, it may be that

14   they add some clarification to what is there.

15               And that would lead into the sentence with

16   respect to the four claim program codes, with the

17   combinations.

18               MR. TIMBERS:  I actually would make the point

19   that the sentence I proposed should go before the "with

20   respect to the code."

21               THE COURT:  That's where I'm putting it.

22               MR. TIMBERS:  Yes, yes.  And then with respect

23   is the last sentence --

24               THE COURT:  Yeah.

25               MR. TIMBERS:  -- in the paragraph.  I agree with

**Appx10246**

1    that, Your Honor.

2              MR. LEIBOWITZ:  So, Your Honor I would make one

3    proposed amendment there.

4              So the sentence that Mr. Timbers has proposed,

5    each program code is, is a separate element --

6              Well, reserve on separate for a moment.

7              -- "element of the claim and is configured to

8    satisfy its particular functionality as opposed to the

9    particular functionality identified in the claims."

10             Because that then, then you are back to the,

11   well, what functionality in the claim are you talking about?

12             THE COURT:  Well, that looks okay to me, that

13   particular functionality.  That is what the claims recite

14   for each of the codes.

15             MR. TIMBERS:  I think there is some confusion

16   about that in the jury based on some of the testimony.  I

17   think we need to -- that is a job of the Court to indicate

18   where is the functionality found?  It's found in the claim.

19   It is identified in the claim.

20             MR. LEIBOWITZ:  No, I don't --

21             MR. TIMBERS:  It doesn't just come from thin

22   air.

23             MR. LEIBOWITZ:  Yeah, but it's the functionality

24   with respect to -- it has, as the construction we have been

25   working under, right, the program computer performing the

**Appx10247**

1   functionality of the four program codes.

2              THE COURT:  It's functionality.

3              MR. LEIBOWITZ:  Right.

4              THE COURT:  Something like that.  The

5   functionality is set forth in the claims.

6              MR. LEIBOWITZ:  Sure.  We can say it's claimed

7   functionality.

8              MR. TIMBERS:  But I think not only should the

9   jury be told that, but that is exactly what IOENGINE has

10  said in the next paragraph below the one I quoted, which

11  says, "each having a different claimed functionality."

12             It is "claimed" functionality.

13             THE COURT:  Well, but --

14             MR. TIMBERS:  And I would say if we went with

15  particular claims --

16             THE COURT:  It's claimed functionality.

17             MR. TIMBERS:  Yes.  That would, that would also

18  work and in fewer words.  "Satisfy its particular claimed

19  functionality."

20             MR. LEIBOWITZ:  I think it's "claimed

21  functionality" as to opposed to "particular claimed

22  functionality."

23             MR. TIMBERS:  Well --

24             MR. LEIBOWITZ:  We're going with that.  It's

25  claimed functionality.

1           THE COURT:  The fact those words were used at

2   some point in the document does not mean they have to go

3   into construction.

4           To satisfy its claimed functionality.  That

5   seems to me to be a reasonable compromise.

6           MR. TIMBERS:  I would just say this, Your Honor.

7   So these statements that are made are very much about

8   indicating that each code is different.  That is the whole

9   idea.  Different claimed functionality, particular

10  functionality separately claimed.

11          These arguments were made to you in the -- with

12  respect to the issue of PayPal's attacks on the claims as

13  being indefinite or in connection -- sort of in connection

14  with, the issue of definiteness and the issue you need to

15  define "code terms" in more detail.  And Your Honor decided

16  I don't need to define the terms in more detail.

17          But they made this point and this point is very

18  important to this trial.

19          THE COURT:  Well, I understand what you are

20  saying.  I'm just not seeing much difference between, to

21  satisfy its "claimed functionality" and to satisfy its

22  "particular functionality."  In other words, its particular

23  claimed functionality.  The words -- to me, there isn't much

24  space between the two.

25          MR. TIMBERS:  Between particular claimed

**Appx10249**

1   functionality and --

2                   THE COURT:  And claimed functionality, yes.

3                   MR. TIMBERS:  We say "it's."  All right?

4                   THE COURT:  It's, yes.

5                   MR. TIMBERS:  All right.

6                   THE COURT:  All right.  Do you have that, Dane?

7                   THE Law Clerk:  (Nodding yes.)

8                   THE COURT:  Okay.

9                   MR. TIMBERS:  All right.  So on induced

10  infringement, which is 3 -- oh, I think we, that was just my

11  notes from what's we did before.  My apologize, Your Honor.

12  I'm flipping through because I like a lot of what you have

13  done.

14                  And we have addressed already the issue of the

15  prior art listings.

16                  So anticipation.  4.3.

17                  THE COURT:  Yep.

18                  MR. TIMBERS:  So this, I have a very specific

19  proposal.  It's in the third paragraph, it would be new

20  language after the first sentence.  So after "claim at

21  issue" and before "the claim elements may be proposed."  And

22  I will read it and then I will explain why I feel it should

23  be there.

24                  "The functions of a prior art product may be

25  established through the use of documents and testimony.  The

1   documents do not have to be publicly available."

2          And let me just make sure everybody's got that

3   before I say anything.  Should I read it again?

4          THE COURT:  Yes, why don't you.

5          MR. TIMBERS:  "The functions of a prior art

6   product may be established through the use of documents and

7   testimony.  The documents do not have to be publicly

8   available."

9          And I'll just make a comment that this comes up

10  because there's been a question by expert witness --

11         THE COURT:  Because of Dr. Rubin's testimony.

12         MR. TIMBERS:  Yes.

13         THE COURT:  I understand.

14         MR. TIMBERS:  So the first sentence, I do

15  apologize for quoting Your Honor because that is a quote --

16         THE COURT:  Here I am.

17         MR. TIMBERS:  -- of your memorandum opinion and

18  order, yeah, on partial summary judgment on the issue of

19  invalidity.  And that's on page 62 where you cite on

20  Ingenico's and this has to do with relying on advice and

21  documents, et cetera.

22         That is a very succinct statement and an unusual

23  statement.  We thought that was appropriate.

24         Also there was the suggestion that somehow it is

25  important whether it is publicly or not available and is

 1    it's not, it's not.  So we should tell the jury that because

 2    the jury may have the wrong impression that it matters that,

 3    that the documents that describe the publicly available

 4    thing were, in fact, private.

 5            And that is it a key issue in this case because

 6    DiskOnKey -- it is mentioned in one of the patents.  It's

 7    mentioned the publicly available information about it does

 8    not have everything in it.  And it's private information

 9    that has a lot more information about it.

10            THE COURT:  Mr. Liebowitz.

11            MR. LEIBOWITZ:  Yes, Your Honor.  We're looking

12    at the language.

13            Mr. Timbers, was all of that language you just

14    read here?  Because I only see parts of it.

15            MR. TIMBERS:  No, no.  Just the first sentence

16    and I added the publicly available.

17            MR. LEIBOWITZ:  Sure.  Exactly and I think that

18    does make a difference.  And I don't think we -- I'm not

19    sure why we need to put a finer point on this, Your Honor.

20    I think the description of what it is that comes in as prior

21    art, which has a very long section of instructions as to

22    what is prior art and what is not prior art should make

23    clear to the jury what counts and what doesn't count.

24            And I don't think that this is accurate to say

25    although they -- the documents do not need to be publicly

1   available nor do I think that -- trying to take down the

2   substance of what Mr. Timbers said, but I don't believe it

3   belongs in the instructions.

4            THE COURT:  Why do you think it is inaccurate?

5            MR. LEIBOWITZ:  Well, that's partly what -- it's

6   appearing for the first time so I'm trying to get it down.

7            THE COURT:  The reason I asked because we do

8   have the testimony which came as a bit of a surprise to me

9   this morning -- I think it was this morning -- from

10  Dr. Rubin saying -- distinguishing between the DiskOnKey and

11  the documents, saying you can't consider the documents --

12  something to the effect.  You can't consider the documents

13  in looking at what the DiskOnKey system does.

14           MR. LEIBOWITZ:  I don't think that is what

15  Dr. Rubin was saying, Your Honor.  I think that got caught

16  up in the way Counsel phrased the question of authenticity

17  of the documents.  And I think Mr. Chuebon tried to clear

18  that up on redirect.  Dr. Rubin's point wasn't that the

19  documents were somehow inauthentic; his point was whether

20  they establish or reflect what the DiskOnKey actually did.

21           THE COURT:  My recollection is Dr. Rubin said

22  something a little different and it may have been in a

23  different point in the testimony to the effect --

24           Do you recall I'm talking about?

25           THE LAW CLERK:   (Nodding yes.)

1  THE COURT:  -- to the effect that you have to

2  look at the documents.  He said, you can't look at the

3  documents to support what it is that the product itself is

4  and does.

5  MR. LEIBOWITZ:  I don't think --

6  THE COURT:  Let me see if my counsel recalls the

7  testimony the same way I do.

8  (The Court and Law Clerk confer.)

9  THE COURT:  Distinguishing between them, yes.

10  Yes, I think he seemed to be saying it either

11  has to be a prior art publication or a product and you

12  cannot use publication to tell you what is in the prior art

13  product.  Something to that effect.

14  MR. LEIBOWITZ:  So I think -- Your Honor, right.

15  Dr. Rubin was being questioned about the standards; right?

16  The definition from 102.  In fact, I think we objected to

17  him being asked those questions.  I mean, he is not a lawyer

18  and Counsel insinuated this difference between reference

19  and -- or in terms of enablement.  I think you actually had

20  a sidebar on it, although I wasn't at the sidebar and I

21  don't think that -- I think the instructions are the

22  instructions regardless of what Dr. Rubin said about that.

23  THE COURT:  No, I understand.  But what I'm

24  trying to sort out, and maybe Ingenico can give me some help

25  on this, but I thought that what this proposal that

1    Mr. Timbers is making was directed at was the proposition

2    that might have been left in the jury's mind that you can't

3    look at documents or testimony or anything else in order to

4    determine what is in and what the product and what the

5    product does.

6              Now is that -- am I wrong in remembering that?

7              MR. TIMBERS:  You are exactly right.  He is

8    suggesting -- and this was not, this was not in the

9    standards, okay?

10             THE COURT:  No, this was a separate --

11             MR. TIMBERS:  I think are you correct.  He was

12   suggesting that you don't look at the documents to determine

13   what the product does.  And that's just not true.  If the

14   jury believes that, then how do I -- how is it ever possible

15   for me to dissuade them from that.

16             MR. LEIBOWITZ:  Your Honor, it wasn't, it wasn't

17   that he is testifying you can't look at the documents.  He

18   testified that he doesn't believe the documents actually

19   show it.  It wasn't a matter -- he didn't say you can't, you

20   can't look at it, at least to my memory of the documents.

21             (The Court and Law Clerk confer.)

22             THE COURT:  Yeah.

23             MR. CHUEBON:  Your Honor, I think when we spoke

24   about this at sidebar, this was exactly the potential issue

25   that I was speaking about.  I was a afraid that Mr. Timbers,

**Appx10255**

1   by asking Dr. Rubin about these legal standards, was going

2   to try to draw some distinction or some issue or try to

3   tease out some misunderstanding of one versus the other, or

4   as Your Honor said, is hiding an ace up his sleeve that I

5   was concerned about.

6          Because Mr. Timbers was putting two standards

7   on the screen in front of Dr. Rubin and is now seeking to

8   turn what an objectionable line of testimony to his

9   advantage to, to get a misspoke instruction specifically on

10  testimony which frankly Dr. Rubin probably isn't -- wasn't

11  in the place to give.  He was being asked to compare those

12  two legal standards.

13         Around I would just echo Mr. --

14         THE COURT:  Mr. Sowers' recollection is the

15  same as mine.  The testimony I remember was not testimony

16  that was -- that came up during the course of and prior to

17  our sidebar, but it was -- I think it was during his direct

18  testimony and -- but be that as it may, the ultimate

19  question is, was this language legally erroneous.  I don't

20  think it is.  And I think I hear Mr. Liebowitz saying it's

21  just not necessary.

22         MR. LEIBOWITZ:  I think it's not necessary and I

23  think -- I mean the way it is phrased certainly, the prior

24  art, the functions may be established through the use of

25  documents and testimony.  You know, I don't -- I don't know,

1    Your Honor.  I think, I think this is -- the instruction

2    given this way would leave the jury to include -- to

3    conclude that, in fact, because they put forward a document,

4    that does establish the function of the product, and that is

5    a matter of serious dispute in this case.  It maybe can be

6    evidence of how a product functions --

7              THE COURT:  And the evidence of --

8              MR. LEIBOWITZ:  -- or something like that.

9              MR. TIMBERS:  I think it's "may."  May, may be

10   established.

11             MR. LEIBOWITZ:  May be evidence of.

12             MR. CHUEBON:  Well, I still think this goes a

13   little too far, Your Honor, because if I recall Dr. Rubin's

14   testimony, it was -- the gist of it was that, yes, I can see

15   this document but that doesn't tell me the internals.  It

16   doesn't tell me how it's working under the hood.  It gives

17   you the surface.

18             So I'm afraid this will lead the jury to believe

19   that the face of the document is talking about the externals

20   must be applied and trusted as a definitive reference as to

21   what is happening on the internals and that is just not

22   accurate and that is a points of dispute.

23             THE COURT:  Well, we could tone it down by

24   taking out "may" or "can be established" and put in

25   something that would make it clear that documents and

**Appx10257**

```
 1    testimony -- evidence in the form of documents and testimony
 2    may be relevant to the functionality.
 3              MR. TIMBERS:  I think it should say, we're going
 4    in that direction, maybe use -- that this really is.  It's
 5    not just relevant to; it does prove it.  It can be used to
 6    prove it.
 7              MR. LEIBOWITZ:  Right.
 8              MR. TIMBERS:  It's a suggestion it could be used
 9    to prove it and that's my concern.
10              THE COURT:  Well, I don't know that --
11    obviously, certainly after this discussion I hope that we
12    won't hear any suggestion in closing argument that you have
13    to disregard all the documents.  So I don't think that the
14    jury is going to be invited to draw that inference.
15              To the extent that they may harbor some
16    continuing -- if they heard the evidence the way I did, the
17    way Mr. Sowers did and the way Mr. Timbers did, my concern
18    is that they may still have this lingering sense that you
19    can't think about the documents as having anything to do
20    with the functionality of the item.  And I think we can
21    solve that problem with an instruction that is maybe
22    relevant to the functionality of the item.  I don't think we
23    need to have a stronger form.
24              Let's -- here is what I'm going to do.
25              We'll work on this claim.  We'll come -- or
```

1    this language.  We'll come up with something and if in the

2    morning, we're going to get together again after we send you

3    a final version, and we will run the final version by you.

4    We'll get one more look at it and if you have objections,

5    you can make your objections at that time.

6                    MR. TIMBERS:  All right.

7                    MR. LEIBOWITZ:  Thank you, Your Honor.

8                    MR. TIMBERS:  Are all of our statements -- I

9    think we -- I have been very clear to indicate what I have

10   sought so --

11                   THE COURT:  I think.  Let me be check.  Let me

12   check again with Mr. Sowers.

13                   Have you gotten --

14                   THE LAW CLERK:  (Nodding yes.)

15                   THE COURT:  -- Mr. Timbers' full version?

16                   THE LAW CLERK:  (Nodding yes.)

17                   THE COURT:  All right.  I think we have it and

18   in any event -- well, yep, we've got it.

19                   MR. TIMBERS:  Thank you, Your Honor.

20                   THE COURT:  All right.

21                   MR. LEIBOWITZ:  Your Honor, two things.  So one,

22   so we don't need to preserve objections at this point; is

23   that right?

24                   THE COURT:  No, not at this point.  But I am

25   going to want you -- I say no.  If you don't raise a point

**Appx10259**

1    at this point, if we pass by a whole section, I don't want

2    you coming in tomorrow and saying, oh, yeah, you know, we

3    have some --

4             MR. LEIBOWITZ:  Got it.

5             THE COURT:  But on these issues we're having

6    discussions where I'm saying I'll come back to you with a

7    proposed version and there have been a couple that fall into

8    that category, then you can defer your objections until you

9    see what I deem to be, as far as I'm concerned, the final

10   version.

11            MR. LEIBOWITZ:  Got it, Your Honor.  So one more

12   point, I think especially if we're going to head down the

13   road of having a sentence like this.  I think we need a

14   concept in here about, you know, about this idea of

15   anticipation by having multiple references being -- because

16   what they are essentially saying is we're combining

17   different -- you know, I mean, I have a case here -- where

18   there this no evidence that the software programs or code

19   were in existence at the same time, or that they were

20   combined in a single apparatus or reconstructed

21   interpretation how the device was constructed does not

22   constitute prior art for purposes of anticipation.

23            So I think the idea -- it's *Apple v Samsung*

24   case, Your Honor.  So I think the idea that if we're going

25   to be talking about anticipation based on -- anticipation

**Appx10260**

1    based on evidence in the form of documents and testimony,

2    then we should have some addition here to discuss, you know,

3    how you can -- that there needs to be some evidence that

4    these, that these were actually combined in a single

5    reference for purposes of anticipation.

6              THE COURT:  Yes, we're saying that already in

7    this section and it's not a long section.

8              MR. LEIBOWITZ:  Well, we say to find

9    anticipation it must be in a single item of prior art, but

10   the suggestion is to follow that up with a sentence that

11   says, well, you can -- you know, you can rely on documents,

12   plural and testimony; right?

13             And so I think that is where --

14             THE COURT:  Right.  But the point is you can

15   rely on a variety of forms of evidence to decide what is in

16   the single reference which has to have all the elements of

17   the invention.

18             MR. LEIBOWITZ:  Yes.  But I think -- but I think

19   the way, the way this is now is potentially confusing.

20             THE COURT:  You can add something to the effect

21   of as long as the evidence that is -- is used to demonstrate

22   that a single reference, a single item or prior art

23   reference contains all the limitations, something like that.

24             MR. LEIBOWITZ:  That would be fine, Your Honor.

25             THE COURT:  All right.

**Appx10261**

1           MR. LEIBOWITZ:  And then --

2           MR. TIMBERS:  I mean, we are talking about a

3    system claim here; right?  So that is important.  We have

4    software that runs on a computer and a server and code and

5    that runs on a portable device.  We have a single document

6    that talks about firmware upgrade software in connection

7    with the portable device and offers portable device for sale

8    for a specific prices in the United States.  So we have

9    that.

10          But, you know, go too far down the single

11   reference thing --

12          THE COURT:  Well, the single reference is the

13   soul of anticipation --

14          MR. TIMBERS:  Yes.

15          THE COURT:  -- so I don't have an intention to

16   go down there.

17          MR. TIMBERS:  Right.  So we have described one

18   system which has a DiskOnKey and the software that upgrades

19   the DiskOnKey that runs on the computer and that describes

20   all the steps.  That is the reference.  This is the only way

21   that anyone could do products for a system claim.

22          THE COURT:  Well, but yes, I hear all that --

23          MR. TIMBERS:  That's what --

24          THE COURT:  I hear what you are saying.

25          MR. TIMBERS:  They're associated.

**Appx10262**

```
 1              THE COURT:  Why doesn't that -- why does the

 2    language I was proposing place it at war with what you are

 3    saying.

 4              MR. TIMBERS:  Maybe I should hear it again.

 5              THE COURT:  Would you read back what --

 6              THE LAW CLERK:  Yes.

 7              As long as the evidence is used to demonstrate

 8    that a single prior art reference contains all of the

 9    limitations.

10              MR. TIMBERS:  I think if you say a single prior

11    art system, that would take care of it.  A reference, that's

12    the issue.

13              THE COURT:  Well reference is a bad word for the

14    jury.  I mean we all know, we use it a lot.  They're not

15    going to understand.  So it's my word and I'm taking it off.

16              Item?

17              MR. LEIBOWITZ:  I think item is what we have in

18    the prior sentence and that would work.

19              I think the other issue here, Your Honor, is the

20    timing of that.  It has to be, you know -- exist in a single

21    item as of a particular the time; right?  It can't be that

22    there is, you know -- yes, there are these system parts.

23    They eventually exist together, but they're not at the right

24    time.

25              THE COURT:  We could add the word "together,"
```

**Appx10263**

1    are found together.

2              MR. LEIBOWITZ:  The timing issue is the one I

3    was getting at.

4              THE COURT:  Well, together certainly is implicit

5    and together is simultaneously.

6              All right.

7              MR. LEIBOWITZ:  Then, Your Honor, the only other

8    issue, maybe I don't need to raise this now.  We know Your

9    Honor's feelings on it but the presumption of validity, Your

10   Honor.  I think --

11             THE COURT:  Okay.  I have written on this and

12   I've -- and I, I don't know if you picked up -- we seem to

13   have a library of Bryson opinions, but we'll catch you on

14   this one.

15             When I -- my feeling on this, and I expressed

16   it I think in greater length in the opinion I wrote a few

17   years ago.  I said I don't think juries are really very

18   comfortable with language like presumptions and so forth.

19   We use it a lot and I think probably too much in

20   instructions.

21             To me, clear and convincing evidence is the

22   legal expression of the presumption of validity.  That's

23   the way the law tells us and tells the jury that they are to

24   look at validity through the lens that embodies the

25   presumption of validity.

1    So I, I know that District Courts are split on

2    this and I read a lot of opinions both ways and they go both

3    ways.  But that's where I am.

4    MR. LEIBOWITZ:  Understood, Your Honor.  That is

5    why I was premising to understand your view, but that is

6    something we will probably preserve.

7    THE COURT:  Yeah.  I, I am uncomfortable giving

8    that language to a jury just because I'm afraid that the

9    word "presumption," without an awful lot of -- and

10   presumptions can be overturned, and there are strong

11   presumptions and weak presumptions.  Just you end up having

12   again, a term that a third of all of the students never

13   figure out and just telling the jury that along with

14   everything else we've got in this case I think would be

15   burdensome, anyway.

16   Okay.  Next.

17   MR. LEIBOWITZ:  Just a housekeeping issue, Your

18   Honor.  Does the Court want us to submit a single set of

19   printed admitted exhibits so that -- for the jury, or have

20   it electronically in some way?

21   MR. CHUEBON:  You don't have to put that one on

22   the transcript.

23   THE COURT:  I'm assuming that it would look sort

24   of those two carts.

25   MR. CHUEBON:  Yes.

**Appx10265**

```
 1              MR. LEIBOWITZ:  Probably, Your Honor.

 2              THE COURT:  Could we do it electronically?

 3              Let's do this.  Let's -- we have the exhibits

 4    available electronically.

 5              If they want particular exhibits we can print

 6    them all for them, so they don't have to mess with the

 7    computers.  They may ask for exhibits, they may ask for

 8    categories of exhibits or something.  And if they do, why

 9    don't we print them off.  I think Mr. Sower's suggestion, I

10    think, is a good one.  Satisfactory?

11              MR. TIMBERS:  They'll have them electronically

12    and may have them printed if they wish?  Or we have none?

13              THE COURT:  If they have anybody that's -- we

14    could offer them a laptop, if you have a laptop that you can

15    provide that is otherwise clean and just has the exhibits on

16    it we can, we could offer them.  I think that would be fine

17    and if they don't like that and they want to see an exhibit

18    in physical form, we can print the form.

19              Is there a way we could give them a laptop to

20    use?

21              MR. TIMBERS:  I'm a little concerned about the

22    jury not having the patent.  It's impossible to read

23    patents --

24              THE COURT:  Well, they will have the patents,

25    actually, and the claims.
```

**Appx10266**

1            MR. TIMBERS:  I guess, I don't know.

2            THE COURT:  I thought -- didn't we give them the

3    patents at some point.

4            The jury notebooks?  Okay.  They're in the jury

5    notebooks.

6            MR. TIMBERS:  I'm thinking like -- I would

7    think, I would think IOENGINE would want their key evidence

8    to be in front of the jury and we, we would want our -- I

9    don't know.  There is a lot of stuff.

10           THE COURT:  Once you start picking and choosing,

11   well, we're going to give them Exhibits 9 and 34, 72.  I

12   just think that is going to be chaotic.

13           My first inclination is to say we just tell them

14   the exhibits are available if you want them and provide them

15   printed copies of the exhibits if they want them.  They have

16   the -- they have the patents.  If they want any other

17   exhibits, they can have them.

18           (The Court and Law Clerk confer.)

19           THE COURT:  Is that acceptable?

20           MR. LEIBOWITZ:  Yes, Your Honor.

21           THE COURT:  All right.  Let's proceed on that

22   assumption.  Let's see what happens.

23           If the jury is unhappy, they'll let us know.

24           MR. TIMBERS:  Are you --

25           THE COURT:  I think you're up, Mr. Timbers.

1    MR. TIMBERS:  Ah.

2    I think I've gone through my comments on the --

3    I'm up on, I think I finished my comments on the jury

4    instructions.

5    THE COURT:  All right.  Okay.

6    Now we left two jury instructions hanging.

7    MR. TIMBERS:  Oh.  Your Honor, there was one

8    other issue.

9    THE COURT:  All right.

10   MR. TIMBERS:  And that was Your Honor had asked

11   some questions during the trial.

12   THE COURT:  Yes.

13   MR. TIMBERS:  And we just think a very simple,

14   simple instruction that your questions are no more or less

15   important than the questions asked by the lawyers.

16   THE COURT:  Well, I have said something which I

17   think probably covers that, although I'm not -- I said both

18   in my original instructions and in -- I think we kept it

19   in this instruction that anything I may have said or done

20   during the course of the trial should not be taken as any

21   indication.

22   I mean, I asked a question which was designed to

23   try to clarify a point that was I thought left hanging, but

24   I don't think -- there was no follow-up to that.  I didn't

25   think that it really affected the course of the discussion

**Appx10268**

1    at that point.  I'd rather not call attention to it because

2    I don't think -- I'm afraid if we say oh, you know, if you

3    recall I asked a question.  I think I made a few comments

4    along the way.

5                    MR. TIMBERS:  Yeah.  Just a couple comments on

6    that.

7                    One is I think if you fold it into anything I

8    say or do, et cetera and just mention "or questions I

9    asked," then it won't call attention to anything.

10                   THE COURT:  Let me see if there is a place.

11                   MR. TIMBERS:  I was thinking if we do all -- not

12   to sound funny, but the jury, when they see a judge wearing

13   a robe, Your Honor, it's a, it's a big role.  It carries a

14   lot of weight.

15                   THE COURT:  Yeah, but I don't think -- certainly

16   if the judge says "you can't be serious in asserting that."

17   Yeah, can you see it?

18                   On the other hand, I was trying to be as -- to

19   express the question in a noncontentious way.  Well, let me

20   look, let me see if there is a place where I thought that --

21   right at the end of the introduction:

22                   "Please remember that nothing I say now or may

23   have said during the trial is intended to suggest or should

24   be taken by you as suggesting what I think your verdict

25   should be."

**Appx10269**

```
 1              Now, do you want -- I guess I could add --

 2              MR. TIMBERS:  Or questions.

 3              THE COURT:  -- nothing I say now, or I may have

 4   said during the trial or any comments I may have made or

 5   something like that or questions I may have asked.

 6              MR. TIMBERS:  Yes.  Just something like that.

 7              THE COURT:  All right.

 8              MR. LEIBOWITZ:  We have no objection with that,

 9   Your Honor.  I don't think it's necessary but that's fine.

10              THE COURT:  Okay.  I'll put something like that

11   in.

12              MR. TIMBERS:  Thank you, Your Honor.

13              THE COURT:  Now there are two remaining issues,

14   I think, on instructions which were the public use and on

15   sale.

16              Again, I don't want to get into the level of

17   complexity that I thought that the proposed instructions

18   entailed.  I propose the following two instructions, which I

19   am willing to consider modifying but this is where I'm going

20   to start.

21              Public use.  Public use may be found when a

22   prior product is accessible to the public, commercially

23   exploited or otherwise used by the inventor or others with

24   no restrictions or obligations of secrecy.

25              And then on sale.
```

**Appx10270**

1            Evidence of an offer to sell is sufficient to

2    establish a prior art product is on sale.  There is no

3    requirement that a sale be completed in order for the

4    product to be on sale.

5            Let me say about the on sale.

6            You know, getting into whether there is

7    sufficient, a sufficiently clear offer that it could be

8    accepted and assuming consideration, we don't want to try to

9    instruct the jury on the first two-thirds of the course of

10   contract law and I just don't see how we can say any of that

11   is going to be meaningful to the jury beyond simply saying

12   that it's an offer to sell, and it need not be completed in

13   order for the product to be on sale.

14           So I will listen to comments on both of those.

15           MR. LEIBOWITZ:  Your Honor, so I tried to take

16   down what Your Honor said --

17           THE COURT:  I'm sorry, I went too fast.

18           MR. LEIBOWITZ:  Yes.

19           THE COURT:  Let me give it again.

20           I'll go much slower.

21           "Public use may be found when a prior product is

22   accessible to the public, commercially exploited or

23   otherwise used by the inventor or others with no

24   restrictions or obligation of secrecy."

25           MR. LEIBOWITZ:  Your Honor, I think my proposal

1   there would be to tie in terms of what -- in terms of the

2   public use.  You said a prior product is accessible to the

3   public.  The question there is what, what has to be

4   accessible and I think we talked about this a little bit

5   earlier today.

6                    THE COURT:  Yeah.

7                    MR. LEIBOWITZ:  I think tying the accessibility

8   solely to the product as opposed to informing the public of

9   the function of the product isn't, you know -- is the issue,

10  Your Honor.

11                   THE COURT:  Yeah.  Well, I went back, as you

12  probably guessed I would, and read the *Dey* case and *Dey*, I

13  remember the case, if I'm reading it.  And that was a

14  clinical trial, that case, clinical trial type case is also

15  falls as being sui generous.

16                   That is the case of which the full purpose was

17  to use the drug in question in a way that is partially

18  public, and then you have to give it to individuals.  You

19  typically inform their positions about what is going on and

20  so forth.  But you have all sorts of confidentiality

21  requirements that are surrounding the use of the drug.

22                   And that is typically as long as the

23  confidentiality requirements are -- that's enough to keep it

24  from being deemed a public use.  It's strong public policy

25  and not encouraging those kinds of public trials for a drug

**Appx10272**

1    that someone wants to maintain the capacity to that.

2           So I think the -- and, in fact, all it was was

3    turning over a summary judgment of public use in the case.

4    So I think they -- the language that, or the cases that were

5    cited, they're such as the *Egbert* case, the corset case in

6    which there was public use was found even though the nature

7    of the corsets was they were hidden from members of the

8    public, other than the wearer of the corset.

9           So I think it is not inconsistent with, I think

10   is the general rule as to what constitutes public use.

11          But --

12          MR. LEIBOWITZ:  Well, Your Honor, I think, I

13   mentioned that case, Your Honor's case to you earlier, but I

14   think that is not the only case that stands for that

15   proposition.  There is the *Gore v Garlock* case, there are

16   other cases that make the same point and that is that public

17   use needs to inform the public of the invention in some way.

18          THE COURT:  Well, inform the public of the

19   invention, it seems to me is, can be viewed in several

20   different ways.  Does it have to inform -- how does *Egbert*

21   inform the public of the invention of the corset?  It

22   informs the public there is this new type of corset out

23   there.

24          MR. LEIBOWITZ:  Right, but I think that is the

25   difference between an inventor doing it or someone unrelated

1  to the inventor.  So there is public policies that are at

2  interplay here.  You have one, I think Your Honor maybe made

3  this point in that *Dey* case, that there is a difference

4  between inventor and not.  And so the public policies with

5  respect to an inventor, him or herself, can be keeping their

6  invention of nonpublic, but yet into the delaying the filing

7  of the patent is different than an unrelated third party who

8  may have -- who may be using something.

9           But because you haven't informed the public of

10  it, the whole point of the patent system is to inform the

11  public and so if you have an inventor who comes forward and

12  files an application that ultimately becomes a patent,

13  there is different public policy issue there.  And for that

14  reason you, in the non-inventor situation, you look to

15  whether the public has been informed in some way; right?

16  Public use.

17           And so the use has to be informing to the public

18  in some way of the invention, otherwise it wouldn't qualify

19  as a public use.

20           MR. JOSHI:  Just to put a tiny point on that,

21  that third party, if they tried to file a patent but had

22  been using it secretly, the bar might apply differently to

23  them than it does to, for example, now relative to them a

24  different third-party.

25           THE COURT:  I think that starting to talk about

**Appx10274**

1    what constitutes informing the public is -- I think it leads

2    to some very difficult line-drawing if you accept that as a

3    standard and you have in mind that the public has to be

4    fully cognizant of exactly how this things works.  If that

5    is required, then, you know, I doubt there is -- there

6    certainly are going to be a lot of inventions that are, you

7    know, products that are out there in the public but that

8    very few people understand how they work.

9              MR. LEIBOWITZ:  Well, so maybe the -- well, two

10   things, Your Honor.

11             So I think the issue that we have with the

12   formulation that Your Honor has proposed is that it doesn't

13   include this even as concept, meaning that the fact that the

14   public can be completely uninformed doesn't, you know -- it

15   would satisfy, I think, the formulation Your Honor has put

16   forward.

17             But I think also when we say the public is

18   informed, I'm not sure it means that every layperson who

19   looks at it would need to know.  We're talking I think in

20   context of what a person of ordinary skill in the art would

21   glean from knowing the information that is available.

22             And I think that's, you know -- I think in terms

23   of public, informing the public, that's the community that

24   we're directing this to.

25             THE COURT:  Let me hear from Mr. Timbers on

**Appx10275**

1  this.

2          MR. TIMBERS:  I think your corset -- I think you

3  are exactly right, Your Honor.  Your language is fine with

4  us.  I think the corset case is the -- corset is just one

5  example of if you go out in the public and you use it,

6  that's public use.  And if it's hidden beneath a dress and

7  no one sees it, that doesn't change the fact that it's still

8  public use.  I think all of your comments are correct.

9          THE COURT:  Well, I wish I had the same degree

10  of confidence.

11          What do you say as to the first part, the

12  inventor versus third party?  That distinction is drawn in

13  the law, that's true.

14          MR. TIMBERS:  Well, so it's very clear, for

15  example, in the --

16          (Lawyers confer.)

17          MR. TIMBERS:  Oh, yes.  The AIPLA model patent

18  jury instruction talk about the secret use is not public

19  unless members of the public have access to the invention.

20  But in this case, there is access to the invention.

21          THE COURT:  Yeah.

22          MR. TIMBERS:  I mean this is not, this is not an

23  issue of hiding it.  This actually is not a corset.  This is

24  out there.  So everything is out there.  The only question

25  is -- are they suggesting that it's, that in this case

**Appx10276**

1    something is not known because people haven't torn it apart

2    or reverse engineered it?  Is that what is necessary?  I

3    don't think so.

4              THE COURT:  Well, let's see --

5              MR. LEIBOWITZ:  I think we're suggesting that

6    what was available would not adequately inform a person of

7    ordinary skill in the art as to how -- how to operate it and

8    that's the problem.

9              That is part of what you heard from Dr. Rubin, I

10   think, today that you have -- he is not saying you can't

11   look at the documents.  What he was saying is if you looked

12   at that one screen that was put up and it says, you know,

13   check here, you know, version downloaded or whatever it

14   says, check here, server contacted, that that doesn't inform

15   a person of ordinary skill in the art as to how this product

16   operated.  It could have operated many different ways.

17             THE COURT:  That's because, that's because it

18   does not -- it may not anticipate for that reason.  That is

19   to say it may be that it just -- the document doesn't

20   disclose all the elements of the invention.

21             And that's just, you know, a substantive

22   anticipation problem, but I don't think that goes to whether

23   the object was in public use even if it would be difficult

24   or virtually impossible for someone to reverse engineer it.

25             Suppose it's some kind of pharmaceutical that

```
 1    is -- evades easy chemical analysis, but it's out there.

 2    That is not in public use?  I've sold a quarter of a

 3    million tablets of my drug that fights lethargy among

 4    ageing judges.

 5               What is -- why isn't that public use even if the

 6    chemists have been befuddled by trying to figure out what is

 7    in the drug?

 8               MR. LEIBOWITZ:  So, Your Honor, I think Your

 9    Honor's example is more looking at sale, right, in terms

10    of you sold the drugs, then you can look at a different

11    analysis.

12               THE COURT:  All right.  Because somebody is

13    trying to get in good favor with judges, they give them away

14    to judges.

15               MR. LEIBOWITZ:  Okay.  So I think, Your Honor,

16    the -- our issue is the instruction as phrased implies the

17    opposite, meaning that, in fact, you can have something that

18    doesn't disclose anything about the way the product works

19    can, can be considered a public use simply because something

20    is, is accessible, even if it doesn't inform the public in

21    any way as to how it actually operates or works.

22               THE COURT:  All right.

23               MR. LEIBOWITZ:  That's the issue.

24               THE COURT:  Okay.  I think I have your position.

25    We're going to do some more work on this, and try to see if
```

1    something else is needed.

2              MR. LEIBOWITZ:  And then on the sale, Your

3    Honors, I think I don't have any problem with not dealing

4    with contract issues in terms of consideration or something

5    like that.  I think the point, though, that we would like

6    to be made clear is what it is that needs to be on sale.

7    Meaning if you sell, you know, (a) you're selling tires, and

8    you say well, you can take my tires, that's what is being

9    sold, tires.  And now, I have a brand new, you know, car

10   that works in some different way.  Well, you know, the,

11   there were tires on sell and then I can combine that with

12   the, you know, something else to make a car.  It's not the

13   car that was on sale as of that date.

14             So if you are talking to put it in this case,

15   specific, you know, we don't deny that there were blank

16   DiskOnKeys that were sold.  No, we don't have any denial

17   there, that there was something on sale.  The problem is

18   that what was on sale doesn't include the functionality that

19   they're, they're talking about.  I think we need

20   something --

21             THE COURT:  No, I understand your point and that

22   seems to be frankly correct.  You can't say that X is on

23   sale because X sub 2 or X minus 2 was sold.

24             MR. LEIBOWITZ:  Exactly.

25             THE COURT:  I understand that.  But this

**Appx10279**

1  instruction --

2              MR. LEIBOWITZ:  Maybe I missed it, so evidence

3  of an offer to sell, then I fell off, Your Honor, in terms

4  of what you have.

5              THE COURT:  Well, evidence of an offer -- sorry.

6  Evidence of an offer to sell --

7              And you can put in a product or maybe that's

8  the place to put in something that would take care of the

9  problem you just identified.  And I'm open to that, of

10  course.

11             -- is sufficient to establish that a prior art

12  product is on sale.

13             And then there is no requirement that a sale be

14  completed in order for the product to be on sale.

15             MR. LEIBOWITZ:  Okay.  Certainly no issue with

16  the last part of it in terms of no requirement to have an

17  actual sale.  I'm trying to think of what is being sold in

18  terms of a product and what is encompassed within that

19  definition of product.  But I, I'd like -- I'll think about

20  it, Your Honor.

21             THE COURT:  Okay.

22             All right.  So we have some work ahead of us.

23             MR. LEIBOWITZ:  Your Honor, one more just

24  housekeeping issue.

25             THE COURT:  Yes.

**Appx10280**

```
 1              MR. LEIBOWITZ:  I think we found a couple of

 2    typos in the claims that were attached.

 3              THE COURT:  Yes.  Please do help us on that

 4    because I --

 5              MR. LEIBOWITZ:  We can --

 6              THE COURT:  I'm was not look -- I was not

 7    looking forward to doing a -- another side-by-side read of

 8    the claims.

 9              MR. LEIBOWITZ:  Yes.  So we have, now, Your

10    Honor, in Claim 1, Element C1, the very end of that element,

11    it says "to a communications network node."  It's just

12    through the terminal network communication interface.  The

13    word "network" is not there.

14              THE COURT:  You're representing you checked on

15    this because I --

16              MR. LEIBOWITZ:  I --

17              THE COURT:  I didn't want to go back and

18    double-check.

19              MR. LEIBOWITZ:  I'm being told this is correct.

20    We will check it again.

21              THE COURT:  One of the problems is, no doubt

22    you're more aware of it than I am, but I'm pretty aware,

23    that this patent -- these patents are loaded with typos as

24    it is and I have taken out all of six, but there is -- there

25    are places where things don't make a lot of sense, but it's
```

1    actually the form that is in the patent.

2              MR. LEIBOWITZ:  Yep.  So this one I'm sure of in

3    Claim 90.  It says portable device "identified" information,

4    where it should be "identifier."

5              THE COURT:  Yes, okay.

6              MR. LEIBOWITZ:  And then I have one more in 93.

7              THE COURT:  Yeah.

8              MR. LEIBOWITZ:  (A), affecting the presentation

9    of.  It says an interactive user interface "by the" terminal

10   it should say be affecting the presentation "of the"

11   interactive user interface presented by the terminal output

12   component.

13             THE COURT:  Okay.

14             MR. LEIBOWITZ:  I think that is it, Your Honor.

15             THE COURT:  Okay.  Here is what I -- is what I

16   propose to do.  We will work on what we've got and we have

17   your suggestions and I expect we should be able to get

18   something to them this evening.

19             THE LAW CLERK:  (Nodding yes.)

20             MR. TIMBERS:  Your Honor, the verdict form.

21             THE COURT:  Yes.  Oh, yeah.  Why don't we go

22   over the verdict form.

23             MR. TIMBERS:  I don't know.  Who you would like

24   to hear from first?

25             THE COURT:  Well, since we started with

1    Mr. Liebowitz last time, why don't we start with you,

2    Mr. Timbers?

3                    MR. TIMBERS:  All right.  We really only have

4    one change.

5                    THE COURT:  Okay.

6                    MR. TIMBERS:  So in the case on the '703,

7    actually all of it, with respect to inducement and

8    contributory infringement, there is really wildly different

9    evidence about the system where 5 percent or so our

10   customers viewed our app that we make and everyone else,

11   95 percent of our customers do not use our server, they

12   don't use our app, et cetera.

13                   And what I am concerned about is that now that

14   we are having separate trial on damages, where we have

15   really wildly different evidence on different readers,

16   then if the jury comes in and says, okay, yes, there is

17   infringement but doesn't distinguish between where there is

18   evidence, where we're providing an app and a server for a

19   few of our customers as opposed to not just a majority, but

20   95 percent where we don't provide those things, it's very

21   relevant to the method claims and the system claims.  It's

22   not so relevant to Claims 3 and 10 given the way they are

23   construed but extremely relevant to that.

24                   And what I am worried about is if I don't raise

25   this and suggest we have two separate questions, one for

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -
      INGENICO INC.,
 4                                    :    CIVIL ACTION
                 Plaintiff,           :
 5    v                               :
                                      :
 6    IOENGINE, LLC,                  :
                                      :
 7             Defendant.
      ------------------------------------
 8    IOENGINE, LLC,
                                      :
 9             Counterclaim Plaintiff, :
      v                               :
10                                    :
      INGENICO INC., INGENICO CORP. and :
11    INGENICO GROUP SA,              :
                                      :    NO. 18-826-WCB
12             Counterclaim Defendants.

13                           - - -

14                      Wilmington, Delaware
                        Friday, July 15, 2022
15                      Jury Trial - Volume E

16                           - - -

17    BEFORE:      HONORABLE WILLIAM C. BRYSON, and a jury
                 United States Circuit Court Judge
18                           - - -

19

20
      (Appearances in their entirety placed beginning on page 2)
21

22

23    Reported by:

24    Brian P. Gaffigan
      Registered Merit Reporter
25    Federal Certified Realtime Reporter
```

**Appx10342**

```
 1     APPEARANCES:

 2
                  SMITH, KATZENSTEIN & JENKINS LLP
 3                BY:  NEAL C. BELGAM, ESQ., and
                       EVE H. ORMEROD, ESQ.
 4
                          and
 5
                  DECHERT LLP
 6                BY:  NOAH M. LEIBOWITZ, ESQ.
                  And, GREGORY T. CHUEBON, ESQ.
 7                     (New York, New York)

 8                        and

 9                DECHERT LLP
                  BY:  DEREK J. BRADER, ESQ.,
10                And, LUKE M. REILLY, ESQ.
                       (Philadelphia, Pennsylvania)
11
                          and
12
                  DECHERT LLP
13                BY:  MICHAEL H. JOSHI, ESQ.
                       (Mountain View, California)
14
                          Counsel on behalf of IOENGINE, LLC
15

16                RICHARDS, LAYTON & FINGER, P.A.
                  BY:  FREDERICK L. COTTRELL, III, ESQ.
17                And, CHRISTINE DEALY HAYNES, ESQ.

18                        and

19                SUNSTEIN LLP
                  BY:  KERRY L. TIMBERS, ESQ.
20                     JOEL L. LEEMAN, ESQ.
                       SHARONA H. STERNBERG, ESQ.
21                And, KEVIN R. MOSIER, ESQ.
                       (Boston, Massachusetts)
22
                          Counsel for Plaintiff Ingenico Inc.,
23                        Counterclaim Defendants Ingenico Corp.
                          and Ingenico Group S.A.
24

25
```

**Appx10343**

```
 1                          - oOo -

 2                    P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following jury trial was

 4     held in open court, beginning at 8:24 a.m.)

 5              THE COURT:  All right.  Please be seated.

 6              We have the -- gotten your proposed verdict

 7     form, and you have gotten the final jury instructions.  Now,

 8     the first thing I want to do is get on the record any

 9     further objections not raised yesterday on items that you

10     did not discuss yesterday.  You had preserved your

11     objections on items that we discussed yesterday.

12              So let me hear first from IOENGINE if there are

13     any issues.

14              MR. LEIBOWITZ:  Yes, Your Honor.

15              This is -- I think they're all combined into one

16     section.

17              I'll find it.  I apologize.

18              So in Section 4.3, Prior Art, Your Honor.

19              THE COURT:  Yes.

20              MR. LEIBOWITZ:  So a couple of, a couple of

21     objections.

22              First, with respect to how, how we have set out

23     the standards with respect to conception and diligence.

24              THE COURT:  Yes.

25              MR. LEIBOWITZ:  We think, phrased as it is, it
```

**Appx10344**

1    makes it seems as if it's IOENGINE's burden to prove

2    conception as opposed to have a burden of production on

3    conception and diligence.  And so we -- we did -- we went

4    back and looked at the *Mahurkar* case I know Your Honor has

5    looked at as well.  And, you know, what that case said, and

6    I think what we would propose, is a sentence that says once

7    IOENGINE has put forth some evidence beyond Mr. McNulty's

8    own testimony that confirms his conception and diligence

9    toward reducing the invention to practice, it is Ingenico's

10   burden to prove otherwise.  This means that Ingenico must

11   prove by clear and convincing evidence that Mr. McNulty did

12   not invent before the date of the alleged prior art.

13          THE COURT:  Yes, I was conscious of the *Mahurkar*

14   case and what I attempted to do, and was to incorporate the

15   concept of burden of production without getting into any of

16   the mechanisms unnecessarily, and then to emphasize the

17   ultimate burden as being clear and convincing evidence.  So

18   that objection will be overruled.

19          Next.  Anything further?

20          MR. LEIBOWITZ:  Yes, Your Honor.  On the next --

21   the next page -- well, actually, right above that, Your

22   Honor, it talks about work diligently on it until he reduced

23   to practice.  We would propose to insert "constructively" in

24   reduced it to practice, since that is conforming to the

25   evidence in this case, Your Honor.

**Appx10345**

1      THE COURT:  We defined reduction to practice

2   to include, but patent lawyers should call construction

3   reduction to practice, and I don't want to get the word

4   "constructive" before the jury because I think that would

5   be -- would not be constructive.  Any -- if Ingenico wants

6   to pitch in in any of this, they may do so perhaps some

7   further thoughts.  I think I will overrule that objection

8   again.  But you've preserved your objection.

9      MR. LEIBOWITZ:  Thank you, Your Honor.  On the

10  next page there are two references, and this is in the

11  paragraph that starts "You will notice that the second and

12  third categories of prior art."

13      THE COURT:  Yes.

14      MR. LEIBOWITZ:  And so those are, you know,

15  conforming to 102(b), categories of prior art.  There is two

16  clauses toward -- toward the bottom of that paragraph where

17  it says, "Or if it was disclosed in a patent or printed

18  publication as of March 23rd, 2003."  And then there is

19  one, "or disclosed in the patent or publication."  I don't

20  believe there are any patents or publications as of

21  March 23rd, 2003 that would fit into the evidence here.

22  And so that's -- we think that clause should come out.

23      THE COURT:  All right.  Mr. Timbers on that.

24      MR. TIMBERS:  No objection.

25      THE COURT:  Hmm?

```
 1                    MR. TIMBERS:  No objection.

 2                    THE COURT:  To taking that out, you say?

 3                    MR. TIMBERS:  Yes.

 4                    MR. LEIBOWITZ:  Can I point Your Honor to where

 5      it is?

 6                    THE COURT:  Yes.

 7                    MR. LEIBOWITZ:  So there is a sentence "If a

 8      product or method that embodies the invention was in public

 9      use in the United States or on sale in the United States as

10      of March 23rd, 2003" and then it says, "or if was disclosed

11      in a patent or publication as of March 23rd, 2003."  Should

12      we strike that?

13                    THE COURT:  So we go from 2003 to a product or

14      method that was in public use on sale -- or on sale will be

15      treated.

16                    MR. LEIBOWITZ:  Correct, Your Honor.  Exactly.

17                    THE COURT:  Okay.  Let me confer with my counsel

18      on that.

19                    (The Court and Law Clerk confer.)

20                    THE COURT:  All right.  That will be done.

21      We'll have that changed.

22                    MR. LEIBOWITZ:  And conforming with that same

23      change, I think in the following page or maybe two pages

24      ahead where we have the, the art listed out --

25                    THE COURT:  When you say following page or two
```

**Appx10347**

```
 1        pages ahead, do you mean ahead or behind?

 2                   MR. LEIBOWITZ:  I mean forward, so --

 3                   THE COURT:  Forward.

 4                   MR. LEIBOWITZ:  -- page 20 of my draft, but I'm

 5        looking at the redline, Your Honor, so it might be --

 6        actually, probably it's the next page in your draft.

 7                   THE COURT:  All right.

 8                   MR. LEIBOWITZ:  Where we have the list of prior

 9        art, 1 and 2.

10                   THE COURT:  Yes.

11                   MR. LEIBOWITZ:  In the second category, which is

12        the 102(b) category, Elazar is not 102(b) art, and so we

13        think that should come off, Your Honor.

14                   THE COURT:  Mr. Timbers.

15                   MR. TIMBERS:  That is correct.

16                   THE COURT:  Okay.  Elazar -- now, just to be

17        perfectly clear, so we have a paragraph that says, "Ingenico

18        also contends that each of the following items of prior art

19        conceive of the invention..." and that paragraph is the one

20        that followed -- or it's one of the two paragraphs -- it's

21        the second of the two paragraphs that is followed by two

22        items.  That's the paragraph as to which you want to take

23        number two out?

24                   MR. LEIBOWITZ:  Correct, Your Honor.

25                   THE COURT:  Okay.  I don't see a problem with
```

**Appx10348**

1   that, so that will be taken out.  So we need to have those

2   two changes.

3                    (The Court and Law Clerk confer.)

4                    THE COURT:  Okay.  Mr. Sowers points out that

5   that paragraph needs to be changed slightly to say that the

6   following item" instead of each of the following items."

7   And then let's see.  We probably get rid of the "are

8   disclosed in a printed publication."  So that would also

9   come out, right?

10                    MR. LEIBOWITZ:  (Nodding yes.)  Yes.

11                    THE COURT:  On my line 3 of that paragraph.

12   Lines 2 and 3 of that paragraph.

13                    MR. LEIBOWITZ:  Yes.

14                    THE COURT:  No objection?

15                    MR. TIMBERS:  No objection.

16                    THE COURT:  Done.  That will be done.  Anything

17   else?

18                    MR. LEIBOWITZ:  Yes, Your Honor.  In the

19   paragraph that discusses public use of -- we would suggest

20   after the -- after the when, public use --

21                    THE COURT:  Where are we?  What number is that?

22   Oh, I see.  It's in --

23                    MR. LEIBOWITZ:  The same section, Your Honor.

24                    THE COURT:  -- the same section.  Okay.  Yes.

25   Go ahead.

1      MR. LEIBOWITZ:  So this is the point we have

2    discussed a little bit about what the public needs to be

3    informed.

4              THE COURT:  Yes, actually quite a lot.

5              MR. LEIBOWITZ:  Yes, about the public use.

6              THE COURT:  Yes.

7              MR. LEIBOWITZ:  And we suggest, having looked at

8    additional cases in addition to the *Dey v Sunovion* case,

9    "perhaps public use may be found when the claimed features

10   of the invention are discernible from a prior art product

11   that is accessible to the public."

12             THE COURT:  Okay.  That is -- once again, the

13   *Egbert* case is an old one.  That is a third-party case, that

14   is not a first party -- that's not an inventor case.  And

15   anybody but a voyeur is not going to be observing the

16   corset.  So I'm going to go with the language we've got.

17             Mr. Timbers, any objection to?

18             MR. TIMBERS:  No objection.

19             THE COURT:  Okay.  Next.

20             MR. LEIBOWITZ:  Your Honor, one more.  With

21   respect to the sales, a line was added with respect to an

22   offer to sell.  I do think we have -- you know, I think we

23   need some qualification with respect to -- what it says now

24   is "Evidence of an offer to sell is sufficient to establish

25   that a prior art product is on sale.  There is no

**Appx10350**

 1    requirement that a sale be completed in order for the

 2    product to be on sale."

 3            The issue, Your Honor, is that there is -- we

 4    know the evidence in this case with respect to what

 5    Defendant is saying is an offer for sale, but it's an

 6    advertisement.  It's not an offer for sale.  And we do think

 7    we need some additional language so that the jury doesn't

 8    come to the mistaken conclusion that, especially based on

 9    the cases including, you know, the -- a number of cases from

10    the Federal Circuit, including the *Medicines v Hospira* case

11    which is en banc, that we look to the Uniform Commercial

12    Code to define what is a commercial offer for sale.  And we

13    think the language, as it is set up right now, would

14    potentially have the jury conclude that something that is an

15    offer for sale when it is not.  So we would propose a

16    sentence that says something to the effect of either only

17    an offer that the other party could make into a binding

18    contract simply by accepting it constitutes an offer for

19    sale, or at the very least, an advertisement is not an offer

20    for sale, which, you know, we looked at some cases that say

21    things like it's hornbook law that an advertisement is not

22    an offer for sale.

23            THE COURT:  Yes, the problem is exactly that,

24    the hornbook.  To say offer that the party can -- what was

25    your language?  It sounded like it came from the kingdom

**Appx10351**

1  court rather than being something that this jury is going to

2  be able to understand.

3            MR. LEIBOWITZ:  Well, the first one I had, it

4  came it a Federal Circuit case but it would say only an

5  offer that the other party could make into a binding

6  contract simply by accepting it.

7            THE COURT:  Yes, but --

8            MR. LEIBOWITZ:  Or -- sorry, Your Honor.

9            THE COURT:  Go ahead.

10           MR. LEIBOWITZ:  Or language that simply says, at

11  the end of that prior sentence, "an advertisement is not an

12  offer for sale."  Which I think, you know, jurors should

13  understand, you know, simply an advertisement that is not an

14  offer for sale.

15           THE COURT:  Okay.  Mr. Timbers?

16           MR. TIMBERS:  That's a pretty broad statement,

17  "an advertisement is not an offer for sale," without any

18  looking at the content of it.  We have a press release --

19           THE COURT:  Let me, let me ask Mr. Leibowitz on

20  this.

21           Suppose that the back page of the Post says

22  brand-new Ford Mustang electric vehicles, $14,999 for the

23  first five purchasers.  Advertisement or offer?

24           MR. LEIBOWITZ:  I think it's an advertisement,

25  Your Honor.  I think the ad --

**Appx10352**

1    THE COURT:  You don't think that would be --

2    that Mustang would be on sale under those circumstances?

3    MR. LEIBOWITZ:  I think, Your Honor, the law

4    that we've seen says that's -- something just like that is

5    a solicitation for an offer to purchase.  And that's --

6    THE COURT:  Yeah, I don't think I'm with you on

7    that.  What is your best case on this?  Is this *Medicines*

8    case?

9    MR. LEIBOWITZ:  Well, the *Medicines* case is the

10   case that -- en banc from the Federal Circuit saying we look

11   to the UCC to define whether communication or a series of

12   communications rises to the level of a commercial offer for

13   sale.  And there is many cases discussing, both the UCC and

14   in other context, that advertisements don't rise to that

15   level.  Even if you have a price, even if you are

16   offering to --

17   THE COURT:  So if I go over to Walgreens and I'm

18   looking for some -- a toothbrush, and it says toothbrush,

19   $5.99, that is not an offer for sale?

20   MR. LEIBOWITZ:  Well, Your Honor, I'm not sure

21   in that context of being in a store where you can go --

22   where you are there and you can purchase as opposed to, Your

23   Honor --

24   THE COURT:  Isn't it?

25   MR. LEIBOWITZ:  Well, again, I think, Your

**Appx10353**

1    Honor, the case we have seen says this is a hornbook

2    principle of contract law.  It's the same reason -- they're

3    talking about something on a website.  It's the same reason

4    you don't have personal jurisdiction.  Just because you have

5    something on a website, it's not considered an offer.

6            And I think this concept is potentially going to

7    lead the jury in a direction that is contrary to the law,

8    Your Honor.

9            THE COURT:  Okay.  Mr. Timbers.

10           MR. TIMBERS:  Your Honor, I think your analogies

11   are exactly right.  If I go to Amazon.com, everything is for

12   sale, right, just like with the toothbrush.  Sometimes it

13   actually says advertisement, right, sponsored content.  But

14   everything is there.  You have got -- and we have it too.

15   You get the price, you have got the terms that -- of how to

16   acquire it.  It's all there.  Just saying it's an

17   advertisement that doesn't make sense.

18           THE COURT:  Give me the cite to the medicine

19   case just so that I have it.

20           MR. LEIBOWITZ:  Yes.  It's *Medicines* V Hospira

21   827 F.3d 1363 and that's Fed Circuit 2016 en banc.

22           THE COURT:  What's the jump cite?

23           MR. LEIBOWITZ:  1373 is the one I have, Your

24   Honor.

25           THE COURT:  Okay.  That's fine.  I will overrule

1    that objection.

2              And anything more?

3              MR. LEIBOWITZ:  I don't believe so, Your Honor.

4              THE COURT:  Okay.

5              Mr. Timbers, anything from Ingenico?

6              MR. TIMBERS:  On the instructions, nothing.

7              THE COURT:  Okay.  Now, verdict form.  I am

8    going to go with the Ingenico version, which I think since

9    it's all parallel, I think that version runs through both

10   portions of the inducement, both questions under inducement

11   and both questions on the contributory infringement.

12             MR. LEIBOWITZ:  Your Honor, I believe ours was

13   parallel as well, and the issue we had with the Ingenico

14   version was that it implies that customers could use no app

15   at all.  And that's -- you know, where it says customers who

16   do not use the ROAMpay X app, the jury can believe that

17   that means they don't have an app of any kind and therefore

18   that's why we changed the language so it would be, you know,

19   an app other than the ROAMpay app, which is also parallel.

20             THE COURT:  I don't really see that as a problem

21   but there is a further problem with the IOENGINE suggestion,

22   which is that the language -- let me get the verdict form.

23             Dane, do you have that there, the particular

24   page?

25             (The Court and Law Clerk confer.)

**Appx10355**

 1              THE COURT:  Yeah, the language for each of the

 2     following products used with the ROAMpay X app.

 3              Well, that is ambiguous because it depends on

 4     whether you read in the word "that" or the word "which."  A

 5     classic dependent/independent -- dependent relative clause

 6     versus an independent relative clause and it makes a huge

 7     difference to me.

 8              So I found that to be at least potentially

 9     highly confusing to the jury.  I think we'll go with the

10     Ingenico version.

11              Dane, you can have this back.

12              Okay.  Anything further?

13              MR. TIMBERS:  Just a tiny thing on page 7.  It

14     mentions Questions 2, 3, 4, and 5 and I think it needs to be

15     1, 2, 3.  This is the first question or maybe I'm

16     misunderstanding.  This is where you say you got to go and

17     deal with invalidity.

18              THE COURT:  I'm working from the copy that

19     you-all submitted to us.

20              MR. TIMBERS:  We -- this may be a mistake that

21     we made.

22              THE COURT:  Okay.  Let's check.

23              MR. TIMBERS:  There are five questions.  And so

24     this might be a typo on our part, Your Honor.  The

25     question -- I believe Question 1 is, you know, an

```
 1    thing we're ready to bring in the jury.

 2              MR. BELGAM:  Can I have one moment?

 3              THE COURT:  Yes.

 4              MR. BELGAM:  I have to get my co-counsel.  I

 5    prefer not to have the jury come in --

 6              THE COURT:  Oh, I'm sorry.  They are not here.

 7              MR. BELGAM:  They're not here.  I'm sorry.

 8              THE COURT:  I didn't realize what the problem

 9    was.

10              MR. BELGAM:  I was not very cleared about

11    explaining that.

12              THE COURT:  That's quite all right.  You just

13    asked for a moment.  That's fair.

14              All right.  I think we're ready for the jury.

15              THE COURT:  Make sure that each of you provides

16    Mr. Sowers with a phone number to contact if the jury comes

17    in with questions or we hear from them.

18              MR. LEIBOWITZ:  Yes, Your Honor.

19              (Jury returned.)

20              MR. BELGAM:  Your Honor, you asked if one of us

21    from each side stay in the facility.

22              THE COURT:  If possible.  If you are not in the

23    courthouse, don't be 20 minutes away.

24              (Jury returned.)

25              THE COURT:  Good morning.
```

**Appx10359**

1    (The jurors respond:  "Good morning.")

2    THE COURT:  Please be seated.

3    Ladies and gentlemen of the jury, you have heard

4    all the evidence in this case -- by the way, again, if you

5    have trouble hearing me, and sometimes juries do, raise your

6    hand and I will speak up as best as I can.

7    I will now instruct you on the law that you are

8    to apply.  Following my instructions, the lawyers for each

9    side will make their final arguments to you.  After that

10   you, you will retire to the jury room to begin your

11   deliberations.

12   These instructions will be a little lengthy and

13   they may be somewhat difficult to follow at times.  To help

14   you, I have made copies of the instructions for each of you

15   so that you can use those copies of the instructions in

16   your deliberations that will be waiting for the in the jury

17   room.

18   I mention this to you so you won't feel that you

19   have to take notes right now or try to memorize anything as

20   I speak.  In fact, I would suggest that you just listen to

21   the instructions, without trying to write anything down.  If

22   you miss something, you will be able to check the written

23   copy of the instructions once you return to the jury room.

24   Many of the things I say, you will have already

25   heard before during the trial, either from me or at the

**Appx10360**

1    beginning of the case or from the lawyers during the trial

2    and perhaps even from the video that you saw.  I will be

3    repeating those things to remind you of them and so that you

4    will have all the instructions you need in a single package.

5            When you return to the jury room, your job will

6    be to consider the evidence you have heard and decide the

7    case in light of the legal principles that I will explain

8    now.  You will indicate your decisions on the various issues

9    of the case by answering the questions on the verdict form

10   that will be waiting for you in the jury room.

11           The decision to make is yours and yours alone.

12   Please remember that nothing I now say or may have said, or

13   any questions I may I have asked during the trial are

14   intended to suggest, or should be taken as suggesting, what

15   I think your verdict should be.

16           Now, I'm going to start by returning to the

17   subject of the burden of proof, which we discussed briefly

18   at the beginning of the case.

19           On the issue of whether Ingenico infringes

20   IOENGINE's patents, the burden of proof is the preponderance

21   of the evidence.

22           The preponderance of the evidence means that

23   IOENGINE has the burden of persuading you that its claim of

24   infringement is more likely to be true than untrue.  If the

25   evidence does not persuade you that IOENGINE's claim is more

1    likely to be true than untrue, that means IOENGINE has

2    failed to satisfy its burden.  If that happens, you should

3    find in favor of Ingenico on the issue of infringement.

4              As I said at the beginning of the trial, the

5    issue of whether IOENGINE's patents are invalid, has a

6    different burden of proof.  On that issue, the burden of

7    proof is clear and convincing evidence.

8              Now, clear and convincing evidence means that

9    Ingenico has the burden of leaving you with a clear

10   conviction or belief that the evidence supports its defense

11   of invalidity.  That is a higher standard of proof than

12   preponderance of the evidence.  That means it is harder to

13   prove something by clear and convincing evidence than by a

14   preponderance of the evidence.

15             If the evidence does not persuade you that

16   Ingenico's claim of invalidity is supported by clear and

17   convincing evidence, that means Ingenico has failed to

18   satisfy its burden.  If that happens, you should find in

19   favor of IOENGINE on the issue of validity.

20             As the finders of facts, you are responsible

21   for weighing the evidence in this case, including the

22   testimony of witnesses you have heard and the exhibits that

23   have been introduced as evidence.  As a reminder, the

24   lawyers' statements and characterizations of the evidence

25   are not evidence.  While the opening statements and the

1    closing arguments that you will be hearing may be helpful

2    to you, your decision should ultimately depend on your

3    evaluation of the evidence.

4            As part of your job as jurors, you are

5    entitled to weigh the testimony of the witnesses.  That's

6    a job very well suited for jurors like yourself who have

7    heard and seen the witnesses.  For example, if two witnesses

8    offer testimony that is in conflict, you should use your

9    common sense in deciding whether the testimony can be

10   reconciled and, if not, which witness you think is more

11   believable.  You can consider, for example, each witness's

12   motive, state of mind, knowledge, and manner while on the

13   witness stand.

14           If there is a question as to the relative

15   expertise of two witnesses, again you should use your common

16   sense to decide which witness you find more knowledgeable

17   and more believable.  You are entitled to give the

18   testimony of each witness however much weight you believe

19   is appropriate.  You may choose to believe or disbelieve

20   any witness's testimony, either entirely or in part.

21           Now, evidence can be direct or circumstantial.

22   Direct evidence is evidence that directly proves a fact.

23   For example, if a witness testified that she saw it raining

24   outside, that would be direct evidence that it was raining.

25           Circumstantial evidence is a chain of

1    circumstances that indirectly proves a fact.  So if someone

2    walked into the courtroom wearing a raincoat covered with

3    drops of water and carrying a wet umbrella, that would be

4    circumstantial evidence from which you could conclude that

5    it was raining.

6              Now, the law makes no distinction between the

7    weight you should give to direct evidence as opposed to

8    circumstantial evidence.

9              Some of the witnesses have testified as expert

10   witnesses because of their special knowledge in their

11   relevant fields.  The fact that a witness has testified as

12   an expert does not mean that you must accept that witness's

13   opinions as true.  As with all other witnesses, it is up

14   to you to decide whether you find the witness's testimony

15   convincing.

16             During the trial, some of the testimony was

17   presented, not through live witnesses, but through

18   depositions.  The deposition testimony that you heard at

19   trial is entitled to the same consideration as any other

20   evidence in the case, and you should judge its credibility

21   and weight just the same as you would if the witness had

22   been present and testified in person here in the courtroom.

23             Demonstrative exhibits.

24             In the course of the trial, the lawyers have

25   presented a number of slides, charts, and animations that

**Appx10364**

1    were not formally admitted into evidence.  Those items are

2    commonly referred to as "demonstrative exhibits."  They

3    are not evidence and were intended only to aid in your

4    understanding of the evidence in the case.  It is the

5    underlying testimony of the witnesses and the trial exhibits

6    that are the evidence on which you should base your

7    decisions.

8            I will now summarize the issues that you must

9    decide, and I will provide instructions on the issues to

10   guide your deliberations.

11           IOENGINE alleges that Ingenico's products

12   infringe certain claims of the two patents at issue in this

13   case, the '969 patent and the '703 patent.  Ingenico denies

14   that it has infringed any claims of IOENGINE's patents.

15           Ingenico also argues that the asserted claims of

16   those two patents are invalid.  IOENGINE denies that any of

17   the asserted claims are invalid.

18           Accordingly, you must decide the following two

19   issues, each of which must be decided separately:

20           First, whether IOENGINE has proved, by a

21   preponderance of the evidence, that Ingenico has infringed

22   any of the asserted claims of the IOENGINE patents;

23           Second, if you have find infringement of any

24   asserted claim or claims, you must decide whether Ingenico

25   has proved, by clear and convincing evidence, that the

**Appx10365**

1    infringed claim or claims of the IOENGINE patents are

2    invalid.

3            To decide what is covered by a patent, we look

4    at the patent's claims.  As you have heard this week, the

5    claims are the numbered paragraphs at the end of the patent.

6    The figures and text in the rest of the patent provide a

7    description of the invention or context for the claims, but

8    it is the claim that defines what the patent covers.

9            You will be called on to decide whether Ingenico

10   infringed Claims 3 and 10 of the '969 patent, and Claims 56,

11   90, 101, 105, 114, and 124 of the '703 patent.  You don't

12   have to remember those numbers.  Those claims are all set

13   out at the back of the instructions that you will have in

14   the jury room.  So the full claims will be there for you to

15   see.

16           When an accused device, system, or method

17   satisfies all the requirements of a claim, the claim is

18   said to "cover" that thing, or that the thing falls within

19   the "scope" of the claim.  In other words, for a claim --

20   for example, a claim covers a device if all the claim

21   requirements are present in that device.  To find

22   infringement, you must find that each of the requirements

23   of a particular claim are satisfied.

24           Now, in patent law, the requirements of a claim

25   are sometimes referred to as elements or limitations.  You

1    IOENGINE's patents.

2         To show induced infringement, IOENGINE need not

3    identify any specific third party that directly infringed

4    one of IOENGINE's patent claims and may instead prove that

5    a class of individuals (such as certain of Ingenico's

6    customers) directly infringed IOENGINE's patents as a result

7    of Ingenico's inducement, even if you cannot identify which

8    specific individual actually committed direct infringement.

9         The second form of indirect infringement is

10   referred to as "contributory infringement."  Proof of

11   contributory infringement requires a showing by a

12   preponderance of the evidence that the accused infringer

13   contributed to the direct infringement of a patent by

14   another party.  IOENGINE has alleged that Ingenico

15   contributed to the other party's infringement of the

16   asserted claims of the '969 and '703 patents.

17        Contributory infringement can be established if

18   the evidence shows each of the following:

19        (1)  that the accused infringer sells or offers

20   to sell a component of an infringing product in the United

21   States;

22        (2)  that the component in question has no

23   substantial noninfringing use;

24        (3)  that the component constitutes a

25   significant part of the invention;

**Appx10371**

1          (4)  that the accused infringer was aware of the

2  patent and knew that the product satisfied a claim of the

3  patent; and

4          (5)  that the product directly infringes the

5  claim.

6          I will now instruct you on the rules you must

7  follow in deciding whether or not Ingenico has proved that

8  any asserted claims of the IOENGINE patents are invalid.

9  Ingenico has the burden of proving invalidity by clear and

10  convincing evidence, which as I've said before, means

11  evidence that must leave you with a clear conviction or

12  belief that the claims in question are invalid.  You need to

13  decide the validity of a particular claim only if you find

14  that claim was infringed, either directly or indirectly, by

15  Ingenico.

16          In order for someone to be entitled to a patent,

17  the invention must be new, useful, and nonobvious.  Ingenico

18  contends that each of the asserted claims of IOENGINE's

19  patents are invalid because the inventions set forth in

20  those claims were not new, but were either anticipated by a

21  prior invention or would have been obvious to a person of

22  skill in the art in light of what came before.

23          Now, to determine whether a patent claim is

24  anticipated or obvious in light of what came before, it is

25  important to know how patent law defines what came before.

**Appx10372**

1   What came before, as you have heard this week, is referred

2   to as the "prior art."  Now, that term has a specific

3   meaning in patent law.  Prior art includes one or more of

4   the following:

5           Any product or method that was publicly known or

6   used by others in the United States before the date of the

7   invention;

8           Any product or method that was in public use in

9   the United States or on sale in the United States before

10  March 23rd, 2003; that's the date you have heard during the

11  course of the trial;

12          And/or any publications that were publicly

13  accessible before March 23rd, 2003.

14          The first category of prior art that I just

15  mentioned refers to the date of the invention, so it is

16  necessary to explain how to determine the date of the

17  invention.

18          The date of the invention is the date on which

19  the inventor conceived of the invention, as long as the

20  inventor was diligent in reducing the invention to practice.

21  Now, there's a lot packed into that sentence, so let me go

22  and take it part by part.

23          First, an invention is conceived when the

24  inventor has a definite idea of the complete and operative

25  invention, even if the inventor did not know for sure at the

1    time that the invention would work.  Another way of saying

2    that is that the conception of an invention is complete

3    when the idea for the invention is so clearly defined in the

4    inventor's mind that if the idea were communicated to a

5    person of ordinary skill in the art, that person would be

6    able to make the invention without undue further research

7    or experimentation.  Although an inventor can testify

8    about when he conceived of the invention, there must be

9    some evidence beyond the inventor's own testimony that

10   confirms the date on which the inventor had the complete

11   idea.

12          Second, an inventor who wishes to have the date

13   of invention set as of the date of conception must work

14   diligently on the invention until he reduces it to practice.

15          Diligence means working reasonably

16   continuously, though not necessarily every day, from

17   conception until the invention is reduced to practice.  As

18   in the case of conception, there must be some evidence

19   beyond the inventor's own testimony that confirms the

20   inventor's diligence.

21          Third, I mentioned the term the invention being

22   "reduced to practice."  An invention is said to be "reduced

23   to practice" when the invention has been constructed, used,

24   or tested sufficiently to show that it will work for its

25   intended purpose and has all the elements that are

**Appx10374**

1    subsequently included in the asserted claims.  An invention

2    is also said to be reduced to practice when the inventor

3    files a patent application that fully describes the

4    invention, even if the inventor has not actually made or

5    tested a prototype of the invention at that point.

6              Ingenico (sic) contends that the date of the

7    invention is no longer than July 26th, 2001, because

8    Mr. McNulty conceived of the invention by that date and

9    worked diligently on it until he reduced it to practice.

10             Ingenico, on the other hand, contends that the

11   date of the invention was March 23, 2004, the date on

12   which Mr. McNulty filed the first of a series of patent

13   applications on the invention, when the invention was

14   reduced to practice by the filing of the patent application.

15             I'm not sure that I said at the beginning of

16   that last statement -- if I said that IOENGINE -- that

17   IOENGINE contends.  So I'm going to read IOENGINE's

18   contention again to make sure that I didn't say Ingenico by

19   mistake.

20             IOENGINE's contention is that the date of the

21   invention is no later than July 26th, 2001.  Ingenico's

22   contention is that the date of the invention was March 23,

23   2004.  So if I misspoke at the beginning of that paragraph,

24   it is what I just said.

25             If you conclude that the invention was made as

**Appx10375**

1    of July 26th, 2001, as Ingenico claims, then any product or

2    method that was first publicly known or used in the United

3    States after that date wouldn't be regarded as coming before

4    the invention.

5              On the other hand, if you conclude that the

6    invention was made as of March 23, 2004, as Ingenico claims,

7    then any product or method that was known to or used by

8    others in this country before that date would be prior art

9    to the invention.

10             You may also conclude that the invention was

11   made as of a date different from those two proposed by the

12   parties if you are persuaded that the evidence demonstrates

13   a different date of invention.

14             Whatever the date of invention, Ingenico must

15   prove by clear and convincing evidence that the prior art

16   item predated the claimed invention.

17             You will notice that the second and third

18   categories of -- excuse me -- of prior art that I referred

19   to before both specify the date March 23, 2003, which is one

20   year before the filing date for the first patents related to

21   the '969 and '703 patents.  That date may sound arbitrary,

22   but there is actually a reason for it, and let me explain:

23   The idea is that if an inventor conceives of an invention

24   and works diligently on the invention, the inventor should

25   get credit as the first to invent the invention unless

**Appx10376**

1    someone else beat him to it.  The reason for the second and

2    third categories is that even if an inventor has come up

3    with an invention before anyone else, the inventor is still

4    required to apply for a patent reasonably promptly.  So if a

5    product or method that embodies the invention was in public

6    use in the United States or on sale in the United States as

7    of March 23, 2003, the product or method that was in public

8    use or on sale will be treated as prior art to the

9    invention.

10           Now, public use may be found when a prior art

11   product is accessible to the public, commercially exploited,

12   or otherwise used by the inventor or others with no

13   restrictions or obligations of secrecy.  Evidence of an

14   offer to sell is sufficient to establish that a prior art

15   product is "on sale."  There is no requirement that a sale

16   be completed in order for the product to be "on sale."

17           Documents and testimony may be evidence of the

18   functions of a prior art product, as long as that evidence

19   is used to demonstrate that a single prior art item contains

20   all of the claim limitations found together.  Such documents

21   do not have to be publicly available.

22           Ingenico contends that the following items are

23   prior art to Mr. McNulty's invention because each was known

24   or used by others in the United States or described in a

25   printed publication in the United States or elsewhere before

1    the date of the invention:

2                1.   The M-Systems DiskOnKey product, along with

3    the Firmware Upgrade software and the M-Systems DiskOnKey

4    Software Development Kit.

5                2.   U.S. Patent Publication No. U.S.

6    2004/0039932 A1, which is known and which you have heard

7    reference to as Elazar.

8                Ingenico also contends that the following item

9    is prior art to Mr. McNulty's invention because it was

10   publicly used, sold, or offered for sale in the United

11   States before March 23, 2003:

12               And that is the M-Systems DiskOnKey product,

13   along with the Firmware Upgrade Software, and the M-Systems

14   DiskOnKey Software Development Kit.

15               Now, as to anticipation, the explanation of what

16   constitutes prior art gives you the background for the two

17   types of invalidity that Ingenico has raised in this case:

18   Anticipation and obviousness.

19               Let's talk about anticipation first.

20               Ingenico contends that each of the asserted

21   claims of IOENGINE's patents are invalid because the

22   inventions set forth in those claims were not new, but were

23   anticipated by a prior invention.

24               In order for a prior art invention to anticipate

25   a claim, each element of the claim must be present in a

**Appx10378**

1    single item of prior art and arranged or combined in the

2    same way as in the claim at issue.  The claim elements may

3    be disclosed either expressly or inherently in the prior art

4    item so that a person of skill in the art, considering that

5    one item, could make and use the invention in the asserted

6    claims -- in the asserted claim.  You must determine

7    anticipation on a claim-by-claim basis.

8         In order to establish that a claim is

9    anticipated, Ingenico must prove anticipation by clear and

10   convincing evidence.

11        Now obviousness.

12        Ingenico's second claim of invalidity is

13   referred to as "obviousness."  A claimed invention is

14   invalid for obviousness if it would have been obvious to

15   a person of ordinary skill in the art at the time the

16   invention was made.  Unlike anticipation, which allows

17   consideration of only one item of prior art, obviousness can

18   be shown by considering not just a single item of prior art,

19   but a combination of multiple items of prior art.

20        In determining whether a claimed invention is

21   obvious, you must consider several factors:  The level of

22   skill of a person of ordinary skill in the art at the time

23   the invention was made, the scope and content of the prior

24   art, any differences between the prior art and the claimed

25   invention, and other considerations that may suggest whether

1    the asserted claim was obvious or not obvious.

2            In considering whether an invention is obvious

3    based on a combination of items in the prior art, you must

4    ask whether there is anything that would have prompted a

5    person of ordinary skill in the art to combine the elements

6    or concepts in the prior art in the same way that the

7    invention does.  A patent claim that consists of several

8    elements is not necessarily rendered obvious merely because

9    each of the separate elements was known in the prior art.

10           For example, you could say that a piano is

11   really just a combination of wood, ivory, metal, and wires,

12   all of which were known before the first piano was invented,

13   but that does not mean that inventing the piano would be

14   obvious if you just started with a pile of wood, some wire,

15   some pieces of ivory and a few chunks of metal.

16           The term "person of ordinary skill in the art"

17   is a term frequently used in patent law, and you've heard it

18   a lot this week.  And it has an important role in dividing

19   whether an invention would have been obvious at the time it

20   was invented.

21           A person of ordinary skill in the art is a

22   person with average education and training in a particular

23   field, who is also aware of all the relevant prior art in

24   that field.  The level of ordinary skill in the art often

25   depends on the nature of the field of the invention.

**Appx10380**

1         Finally, in assessing whether a claimed

2   invention would have been obvious or not, you may consider

3   any other evidence that sheds light on the obviousness or

4   nonobviousness of the claimed invention, such as:

5         (1)  whether products covered by the claims were

6   commercially successful as a result of the merits of the

7   claimed invention (rather than as the result of advertising,

8   promotion, or features of the product other than those found

9   in the claims);

10        (2)  whether the invention satisfied a long-felt

11  need for a solution to a problem, which was satisfied by the

12  claimed invention;

13        (3)  whether the invention achieved unexpectedly

14  superior results over the closest prior art;

15        (4)  whether others in the relevant industry

16  praised the invention;

17        (5)  whether -- yes, whether others in the

18  relevant industry expressed doubt or skepticism that the

19  invention would work for its intended purpose;

20        (6)  whether others in the relevant industry

21  expressed surprise regarding the invention; and

22        (7)  whether others sought rights, such as

23  licenses, to the patent from the patentholder.

24        In weighing this kind of evidence, you should

25  consider whether those factors were attributable to the

**Appx10383**

1    claimed features of the invention as opposed to features

2    already found in the prior art.

3              Now, as with anticipation, you must determine

4    obviousness on a claim-by-claim basis.  For each asserted

5    claim, the claim is invalid if you find that Ingenico has

6    proved by clear and convincing evidence that the claim would

7    have been obvious.

8              Now the lawyers will now present their closing

9    arguments to you.  IOENGINE will go first; then Ingenico

10   will present argument to you; and IOENGINE will then return

11   briefly for the last word.  After that, I will have a few

12   final words for you, and you will then return to the jury

13   room and begin your deliberations.

14             We'll now hear from the lawyers.

15             Mr. Leibowitz.

16             MR. LEIBOWITZ:  Thank you, Your Honor.

17             Good morning, ladies and gentlemen of the jury.

18             (The jurors respond:  "Good morning.")

19             MR. LEIBOWITZ:  And thank you for your time and

20   attention to this matter.  Like serving in the military or

21   paying your taxes, jury service is something that your

22   country asks of you.

23             It can be a burden, no doubt, and as I mentioned

24   in my opening statement, though, the system does not work

25   without you.

**Appx10384**

1   So again I'm sure I speak for everyone here on

2   both sides when I say we appreciate your time and attention.

3   So the evidence is in, no more testimony and

4   this is my opportunity to talk with you before you get to

5   do the most important job in this case, deliberate.

6   And unlike in the openings, when all we could

7   do was suggest what you might hear, now you have the

8   evidence and we are permitted to argue to you what the

9   evidence means, and to ask you to weigh it and to make

10   findings on the verdict form, finding that IOENGINE's

11   '969 and '703 patents are infringed by Ingenico and that

12   they are valid.

13   Now, you have heard a lot of the evidence this

14   week and many different issues and subissues were raised by

15   the parties.  And some of it may not have seemed important

16   at the time but then seemed to grow in importance as more

17   evidence and more testimony was submitted.

18   What I intend to do is walk you through an

19   outline of the evidence and try to help you see where it

20   fits and what it means in terms of the legal issues that

21   the Judge has just instructed you on and why it should lead

22   to your verdict of infringement and no invalidity.

23   There is a lot of material and I don't intend

24   to take you through every piece of evidence.  I saw you

25   listening intently and taking notes over the course of the

1    Dr. Rubin did?  Did he explain the work and methodology and

2    the detailed reasoning for why he disagreed with Dr. Rubin

3    on infringement?  I submit he did not.

4            Instead, without pointing to the underlying

5    source code files, he insisted that the need to present a

6    credit card during a payment transaction somehow creates

7    this break in the fourth program code.

8            He drew a line between the code that executed in

9    response to a communication from the terminal and the code

10   that causes the communication to be sent to the server.

11           But Dr. Rubin did exactly what Mr. Geier

12   avoided.  He presented the actual code that controls the

13   process.  And Dr. Rubin showed you that that is not -- that

14   is not actually true.

15           In fact, waiting for the card insertion doesn't

16   interrupt the code.  All of the fourth program code is

17   contained in a function on the card reader that conducts the

18   transaction.  Dr. Rubin walked us through the entire code

19   sequence.

20           Mr. Geier's break is simply a normal software

21   operation.

22           So Dr. Rubin showed you how the accused Ingenico

23   products infringed each element of the asserted claims.  He

24   walked you through each of the elements in detail, providing

25   support from Ingenico's own documents and source code.  He

1  also showed how Ingenico indirectly infringes by encouraging

2  and instructing its customers to use the accused products.

3          Ingenico also contributes to its customers'

4  infringement.  And as you have been instructed, there is no

5  need to point to a specific individual user or customer by

6  name in order to find indirect infringement.  Although we

7  have seen evidence of certain customers, certainly, such as

8  PayPal and Apple.

9          Now I would like to address invalidity.

10          This is the part of the case in which you

11  determine whether Mr. McNulty's patents are valid.  Before

12  we get to that evidence, a few things to remember.

13          First, the experts at the Patent and Trademark

14  Office went through the process that you are being asked to

15  do now.  They considered the patent application, they

16  weighed many of the same issues that are being raised by

17  Ingenico now, and they granted the patents.

18          In fact --

19          If we have Slide 5.

20          -- we saw that the DiskOnKey and the Elazar

21  reference are listed right on the face of the '703 patent

22  and items that the Patent and Trademark Office considered

23  before deciding to grant the patent.

24          Second, because of the standard on which you

25  must decide invalidity, which is clear and convincing

1    evidence, you need to be convinced that the Patent Office

2    got it wrong, and not just that they made a mistake.  As the

3    Court has instructed you, you'd need to believe that there

4    is clear and convincing evidence to that effect.

5            IOENGINE does not need to prove that its patents

6    are valid.  They are valid unless Ingenico proves that they

7    are invalid using the highest burden of proof in this case.

8            And because -- and they need to do that by clear

9    and convincing evidence, meaning you need to have a firm

10   conviction or belief that Ingenico is right.

11           So let's look at the evidence on this point.

12           Let's start with anticipation.

13           Ingenico asked you to find the '969 and '703

14   patents are anticipated over the DiskOnKey.  And as you were

15   instructed to prove any claim in the patent anticipated by

16   the prior art, Ingenico needs to prove by clear and

17   convincing evidence that each and every element of the claim

18   is found in the prior art device.  And Ingenico undoubtedly

19   searched long and hard to find the best prior art that they

20   could to put in front of you, and what they brought you was

21   the DiskOnKey firmware upgrader.

22           Now, what do we know about the DiskOnKey?  And

23   equally important, what do we know about it at the crucial

24   points in time here?

25           Now, there is no dispute that like DiskOnKey

**Appx10399**

1    devices were available 20 years ago.

2              We can have Slide 24.

3              This is Mr. McNulty:  "I used a blank M-Systems

4    USB drive."

5              If we could have Slide 25.

6              This was Mr. Ash, from Fuji:  "Our blank USB

7    drive, the DiskOnKey."

8              Slide 26.

9              This was Mr. Harkabi about the DiskOnKey:  "It

10   was sold as a plain storage, personal storage at a very low

11   capacity."

12             Slide 27.  This is Mr. Klein.

13             "Question:  Were all those blank USB storage

14   devices?

15             "Answer:  Yes."

16             But blank DiskOnKey cannot disclose any of the

17   program code of the patents-in-suit.  There is no relevant

18   program code on a blank DiskOnKey and Ingenico knows this so

19   they -- they've brought together what they claim is a prior

20   art DiskOnKey with firmware upgrade software.

21             But they don't have any evidence, much less

22   clear and convincing evidence, that the firmware update was

23   even ever run on any DiskOnKey or that the firmware updater

24   functioned the way Ingenico proposes, let alone that it did

25   so at the time they allege it did.

1    On that note, we didn't hear from a single

2    witness in this case with knowledge of when a DiskOnKey with

3    firmware update software, according to what Ingenico is

4    proposing, was available, let alone it was ever sold or

5    offered for sale.  That is a failure of proof.

6    More importantly there is no proof that a

7    theoretical DiskOnKey with firmware upgrade combination

8    functions as Mr. Geier speculated it may have.

9    Mr. Geier did not review a single line of

10   DiskOnKey code.  He couldn't even recall plugging in a

11   DiskOnKey.

12   And now we're not suggesting he did this by

13   choice, that he just decided not to look at it.  The issue

14   is, just as he said, the source code no longer exists.  But

15   Mr. Geier didn't test the DiskOnKey either, even though he

16   could have.  We saw Ingenico counsel had a DiskOnKey and he

17   held it up during Mr. Geier's testimony.

18   We also saw that Mr. Geier had what he said was

19   an executable file for a firmware upgrade program.  He had

20   access to what he needed to test it but he didn't.  If it

21   works, as Mr. Geier claims it does, he could have shown it

22   to us but he did not.

23   And you can draw your own inferences as to why

24   he did not.

25   Instead of testing the actual operation of the

**Appx10401**

1    device, Mr. Geier relied on pictures from a document.  Now

2    that document may or may not reflect how the firmware

3    updater actually worked.

4            The documents that Mr. Geier relied on certainly

5    don't provide clear and convincing evidence that the

6    firmware updater operates in the very specific way that

7    Mr. Geier needs it to.

8            In fact, Dr. Rubin explained that a person

9    ordinary skill in the art would understand that the

10   presentation discussing firmware upgrades describes it in a

11   way that could have multiple implementations and does not

12   disclose all of the limitations of the claim.

13           Dr. Rubin explained that the most likely

14   operation of DiskOnKey was that when it was first plugged

15   in, it would conduct a "handshake" with the terminal and the

16   firmware version would be loaded into a file, into the

17   memory of the terminal and stored locally on the PC.

18           This is, this is confirmed by that same using

19   DiskOnKey upgrade document that Mr. Geier relies on --

20           And if we can have Slide 29.

21           -- which makes it clear that before DiskOnKey

22   can be used for the first time on a computer, it must first

23   go through a registration procedure.  That is the

24   "handshake" that Dr. Rubin was talking about.

25           And as Dr. Rubin also explained, there is

**Appx10402**

1   absolutely no reason to simply assume, as Mr. Geier does,

2   that there is program code executing on the DiskOnKey to

3   accomplish firmware upgrade, especially when the very

4   documentation that Mr. Geier relies on explicitly said

5   that the DiskOnKey has an ASIC on the very same slide.

6                   If we have Slide 6.

7                   On the very same slide discussing PKI, that

8   Mr. Geier talks about, says -- talks about the DiskOnKey

9   ASIC.

10                  And as we heard from Dr. Rubin and ASIC in an

11  alternative way, Dr. Rubin actually said "a faster, more

12  efficient, more secure way to do it."

13                  And ASIC is hardware and would not involve any

14  program code running on the DiskOnKey.

15                  So if the DiskOnKey used an ASIC to conduct the

16  firmware upgrade, there is no way it can possibly invalidate

17  the claims.

18                  Did it do that?  We don't know, but neither

19  does Mr. Geier.  And therefore, you -- it does not reach the

20  level of clear and convincing evidence.

21                  Similarly Ingenico has promoted -- provided,

22  excuse me, no testimony establishing the accuracy or

23  availability of the preliminary SDK documents and the

24  firmware upgrade presentation that it relies on.

25                  In fact, Mr. Sobol, whose testimony Ingenico

**Appx10403**

1    relies on, didn't even begin working at M-Systems until

2    June of 2004, years after the dates of the documents that

3    Ingenico relies on and even after Mr. McNulty's patent

4    filing date.  And he made clear that there is no

5    knowledge -- the company has no knowledge that any of the

6    documents were ever made publicly available.

7               And in that regard -- now regarding that SDK

8    document, Mr. Sobol testified that it was preliminary and no

9    one at the company knew whether it was actually ever offered

10   to customers.

11              In fact, if we can have Slide 30, it says

12   "preliminary" right on the cover.

13              And Mr. Sobol had no knowledge at all of the

14   firmware upgrade document that mentions PKI.

15              So what does all this mean?

16              It means that Ingenico has been unable to

17   connect any actual version of a DiskOnKey with a version of

18   the firmware update software that was, that was publicly

19   available or showed that its contents were accurate as of

20   any particular point in time.

21              And the timing, of course, matters.  It matters

22   a great deal, because if the time is after the dates of

23   invention, then it -- or after the dates of March 23rd,

24   2003, as you heard the instruction from the Court, then it

25   cannot be considered prior art to Mr. McNulty's invention.

**Appx10404**

1    Now, Ingenico also discusses the Elazar patent

2    in combination with DiskOnKey and alleges that the asserted

3    claims would be obvious in light of that combination.

4    Now, was you heard from Dr. Rubin, a person of

5    ordinary skill in the art would not have been motivated to

6    combine the Elazar reference and the DiskOnKey because they

7    deal with very different subject matter.  Elazar discusses a

8    digital rights management system, and the DiskOnKey was a

9    blank USB drive and there is no evidence, let alone clear

10   and convincing evidence that a person of ordinary skill in

11   the art would try to combine the two in some way.

12   Let's talk about conception next.

13   As the Court just instructed you, one of the

14   issues that you need to decide in this case is the date of

15   Mr. McNulty's invention.  Again, the dates matter.

16   Even though there was extensive evidence that

17   Mr. McNulty conceived of his invention in July of 2001 and

18   wrote it down in his Portable Devices Rule letter, Ingenico

19   contends that Mr. McNulty should not get credit for his

20   ideas until he filed his patent application in March 2004.

21   We submit that Ingenico is wrong.

22   You heard testimony from Mr. McNulty about the

23   2001 PC Expo in June 2001.  While walking around with

24   Mr. Rzonca and exploring the trade show, Mr. McNulty had his

25   light bulb moment.  The trigger was USB 2.0 which was

1   significantly faster than USB 1.0 and had a flexible channel

2   through which he could send information back and forth

3   freely.

4          He realized if he could put custom firmware on

5   a USB device and combine it with an application and an

6   interactive user interface on the terminal, he can give the

7   user control over that flow of information between all three

8   legs of what he referred to as the digital spectrum:

9   portable devices, terminals and networks.

10         Now as you just have been instructed, the law

11  requires that Mr. McNulty's testimony regarding his light

12  bulb moment be confirmed by other evidence.

13         Now, here your heard corroborating testimony

14  from Mr. Rzonca and you have seen documents confirming

15  Mr. McNulty's conception.  Mr. Rzonca, who is not being

16  compensated for his time and has nothing to gain or lose for

17  this case, told you that he remembers being with Mr. McNulty

18  and that Mr. McNulty shared his invention idea with him at

19  the 2001 PC Expo.  He remembers it was 2001 because of the

20  proximity to 9/11 and the fact that he actually worked at

21  the World Financial Center.

22         You also saw an advertisement --

23         Slide 7.

24         -- for the 2001 PC Expo confirming the June 26

25  to 28 trade show dates.

**Appx10406**

1   verification.

2          And Mr. McNulty told you that is exactly what

3   he was thinking when he wrote the code on the portable

4   device, works its way through the computer to the Internet

5   and connects to a website and says:  "Hi, I am here from a

6   person's pocket and I would like to copy your content."

7          And as Dr. Rubin explained, a computer

8   scientist of ordinary skill in the art reading the letter,

9   understanding the context, would understand -- excuse me,

10  would understand that portable device verification would be

11  facilitated because the "I" in "I am here from a person's

12  pocket" refers to the portable device using code to identify

13  itself to the server for purpose of copying content and

14  seeking authorization to do so.  The device then asks for

15  permission to copy the content, which is a request for

16  verification.

17         And Dr. Rubin explained the person of ordinary

18  skill in the art would understand a server wouldn't just

19  give its content to anyone and would instead verify the

20  identity of the device.

21         Now, interestingly, Mr. Geier tried to disagree

22  with this but his words betrayed him.

23         When discussing a different topic, his

24  opinions about public key authentication with respect to

25  the DiskOnKey, he explained how a server could perform

**Appx10408**

1    authentication by sending a challenge request to the

2    portable device.

3              This was in his direct testimony.  And what was

4    his, his paradigm classic example of such a request?

5              If we have Slide 9.

6              "Hi.  I am the server."

7              This is no coincidence.

8              The exact same concept is in the Portable

9    Devices Rule letter:  "Hi, I am here from a person's

10   pocket."  To a person of ordinary skill in the art in this

11   field, that would imply authentication and verification.

12             Now yesterday during questioning, Mr. Timbers

13   tried to suggest Dr. Rubin's analysis regarding the Portable

14   Devices Rule letter was inconsistent with how Dr. Rubin

15   analyzed the DiskOnKey, but it is important to pay close

16   attention to the burden of proofs on these issues.

17             There is a very important reason you should view

18   the Portable Devices Rule letter differently from the

19   DiskOnKey.

20             IOENGINE has no burden to prove that the

21   Portable Devices Rule letter shows conception of the

22   invention.

23             It says, to confirm his conception, Mr. McNulty

24   simply needs to put forth some evidence beyond his own

25   testimony.  It's Ingenico that bears the burden of proof by

1    clear and convincing evidence that any prior art item

2    predated Mr. McNulty's invention date.  That includes

3    proving that Mr. McNulty is not entitled to his invention

4    date in July of 2001, and all other aspects of invalidity.

5              In other words, Mr. McNulty and we do not need

6    to convince you that he thought of his invention by

7    July 26th, 2001.

8              Instead, because Mr. McNulty has provided

9    evidence in the form of a Portable Devices Rule letter, as

10   well as Mr. Rzonca's testimony and other evidence we will

11   look at in a minute, Ingenico must prove by clear and

12   convincing evidence that Mr. McNulty did not conceive of

13   his invention by July 26th, 2001.

14             Ingenico cannot possibly satisfy this burden in

15   light of the extensive evidence supporting Mr. McNulty's

16   invention.

17             Now, Ingenico also claims Mr. McNulty did not

18   act with reasonable diligence in reducing his invention to

19   practice.  Once again, this is the defense Ingenico must

20   prove by clear and convincing evidence.

21             More importantly, we saw the evidence of

22   Mr. McNulty's evidence.  As the Judge has explained, as long

23   as there is some evidence of reasonably continuous work by

24   Mr. McNulty between his conception in July of 2001 and his

25   patent application -- excuse me -- in March of 2004, he is

1      entitled to his July 2001 invention date.

2              So let's take a quick look at that evidence.

3              First, you heard from Mr. McNulty.  He explained

4      that in August 2001, right after this July 2001 Portable

5      Devices Rule letter, he is started working on developing a

6      proof of concept device with Dr. Bernstein of the Stevens

7      Institute of Technology in New Jersey.  He continued to work

8      with Dr. Bernstein on additional prototypes until early 2003

9      and was in contact with Dr. Bernstein continuously.  And

10     Mr. McNulty showed you a file from his work with

11     Dr. Bernstein.

12             If we can have Slide 10.

13             And the file had Windows properties from April

14     of 2002.

15             In mid-2002 while he was still working with

16     Dr. Bernstein, Mr. McNulty began looking for other

17     developers to help him work on additional prototypes.  He

18     hired a number of vendors, including MDRM, May Louie, Brand

19     X, Agile Solv, and Heavy Water to work on different aspects

20     of his invention.

21             The work continued through mid-2004 after he

22     filed the patent application, and over this time period he

23     created over 90 prototype devices.  He even brought a number

24     of that support.  We had them displayed here on counsel

25     table, I think it was Monday, if you recall that.

**Appx10411**

1           Mr. McNulty also showed you a number of

2    documents confirming his diligence.

3           He had an agreement, the contract between his

4    company, Revolutionary Group, and MDRM, to work on his

5    invention.

6           Slide 11, please.

7           We looked at the contract, including the scope

8    of work and schedule of deliverables that went throughout

9    the year.  He also showed you several -- several examples of

10    invoices.

11           If we have Slide 12.

12           One invoice from July 2003 showed over 500 hours

13    of work in a single month, amounting to nearly ██████.

14           Another invoice from January 2004 had over

15    300 hours of work in a different month.

16           He also explained that he paid ████████████

17    █████  to these different vendors developed -- toward

18    development work on his prototypes.

19           Now, Ingenico tried to imply that perhaps these

20    invoices were never paid.  There were no canceled checks,

21    things like that.

22           But you also heard from Dan Harkabi of MDRM, a

23    former M-Systems employee familiar with the DiskOnKey.  He

24    confirmed that MDRM was hired to do work on Mr. McNulty's

25    invention and that MDRM was paid somewhere in the ballpark

1   of ▮▮▮▮▮▮, consistent with Mr. McNulty's testimony.

2   All of this evidence is more than enough to prove that

3   Mr. McNulty was reasonably diligent.

4           But again, just like conception, the law does

5   not require Mr. McNulty convince you he was reasonably

6   diligent.  Instead, it's Ingenico's burden to convince -- by

7   clear and convincing evidence to prove to you that he was

8   not.

9           So having heard all the evidence on

10  Mr. McNulty's conception and reasonable diligence, IOENGINE

11  and Mr. McNulty ask you to find that he should get credit

12  for his invention as of July 26th, 2001.

13          And this will be important to one aspect of

14  Ingenico's invalidity case.

15          Now, let me talk about obviousness very quickly.

16          You may recall that in opening, I tried to

17  reorient you to the time of the invention in the early

18  2000s.  And that is because what may seem obvious today in

19  the age of smartphones may not have been obvious in the

20  early 2000s before the release of the first iPhone, before

21  Netflix in the way we know it today.

22          The law understands that -- the temptation to

23  view inventions as obvious when we look back at them later,

24  and that is why, as the Court has just instructed you, you

25  need to be very careful not to use hindsight.  You must

1   consider only what was known at the time of the invention

2   and view the issue of obviousness from the perspective of

3   a person of ordinary skill in the art at the date of the

4   invention.

5            Now, Mr. McNulty has never claimed to have

6   invented a standard USB thumb drive or a computer or a

7   processor or anything like that.

8            If we can have DX-207, please.

9            You may remember this -- this document, which

10  was shown to you by Ingenico.  And they showed it to you for

11  purposes of -- of trying to convince you there was many

12  parts of Mr. McNulty's patent that were -- are we having

13  trouble?

14           (IT Operator shakes head no.)

15           MR. LEIBOWITZ:  No?  Okay.

16           Maybe you remember, it was a patent that was --

17  had highlighting on it, and they showed it to you for the

18  purpose of showing you how many different parts of

19  Mr. McNulty's patent existed in -- in other patents, and a

20  template that was used by his patent prosecution counsel.

21           But if you flip through that document, you would

22  see that many, many parts of that patent -- and, in fact, we

23  did see it as they flipped through it the other day -- had

24  no highlighting at all.

25           Many of the flow diagrams, the flow charts,

**Appx10414**

1    but the brand suffered considerably when it didn't have that

2    feature.

3              And you heard how this and other factors led

4    Mr. Klenk to conclude that the commercial success of

5    Ingenico's card readers is attributable to the patented

6    technology.

7              In fact, Ingenico's first witness, Mr. Ahern,

8    confirmed that security is a core component of what Ingenico

9    does.

10             And you also heard about how Mr. McNulty was

11   going against traditional wisdom in making his invention.

12   You heard how Gidi Elazar and Dan Harkabi, the two

13   developers of the Disk-On-Key, and the same Elazar from the

14   Elazar reference, and Harkabi who is also listed on that

15   Elazar patent application that is asserted as prior art,

16   praised Mr. McNulty, called him a visionary and -- and

17   worked with him, spending hundreds of hours working to

18   develop his -- his invention.

19             Third, Mr. Harkabi and Elazar, who worked for

20   M-Systems with the DiskOnKey, both said that -- they both

21   confirmed that the conventional wisdom taught away from

22   Mr. McNulty's invention, and they were trying to persuade

23   him to go in a different direction, but he took a different

24   path.

25             With that, I will reserve the remainder of my

**Appx10416**

1    time for a brief rebuttal.

2            THE COURT:  Very good.  Thank you,

3    Mr. Leibowitz.

4            We'll now hear from Ingenico's counsel.

5            MR. TIMBERS:  Good morning.

6            (The jurors respond:  "Good morning.")

7            MR. TIMBERS:  We're almost done.

8         So I actually want to start today exactly where

9    I left you at the end of my opening, which is to thank you

10   for all the hard work you're -- when I said it, all the hard

11   work you are going to do.  And I think you have done a fair

12   bit of it already.  But also to say that I'm privileged

13   because it's my job to try to help you do your job and

14   explain as best I can in a more understandable way a lot of

15   the confusing things that have happened this week.

16          There is a lot in this case that looks a lot

17   more complicated than it is.  A good example is the claims

18   themselves.  It's this wall of words and just way too many

19   words to describe, like, oh, that -- that second

20   communication thing.

21          But -- so I think surely there is a way that we

22   can cut through the gobbledygook and the extra words and get

23   down to the bottom of what you need to decide.

24          So what I want to start with, actually, and you

25   heard a little bit of it from Mr. Leibowitz, is there is a

Appx10417

1   lot of things we actually agree on.  And so that might make

2   your job a little easier.

3             So first of all, you know, all that hardware

4   we're talking about, the portable device, the terminal,

5   meaning a computer, the network device, there is really no

6   dispute about any of that.  And that is true for both the

7   readers and the DiskOnKey.

8             And of course there is code for communications

9   between the devices.  That is pretty much in agreement.

10            And of course we all know that the Ingenico

11  readers all use encryption, and they're all capable of doing

12  DUKPT.  They're capable of doing other types of encryption

13  too.

14            And Ingenico sold a lot of readers.  It's a very

15  popular product.  They've sold mobile readers and nonmobile

16  readers.  And there are a lot of reasons for that success.

17            And I think we're all in agreement that when the

18  devices, the readers were being designed, Ingenico didn't

19  know about the patents or Mr. McNulty or IOENGINE.  That

20  happened as a result of litigation.

21            So what I really want to do is now walk you

22  through some of the key evidence.  I grew up in Missouri,

23  and Missouri is the "show me" state.  And I learned early

24  on that a little healthy skepticism is a good thing.  And

25  I think in the case of jurors in a trial, some healthy

1    skepticism is appropriate as well, on both sides.

2          So what I'm going to do, hopefully, is not tell

3    you, but show you what the evidence is.

4          So let's start with the legal standard for what

5    IOENGINE needs to prove for infringement.  And the key, as

6    you all know, is each and every limitation of the claim.

7          And the first one, and of course wall the words,

8    right?  But if you look way down at the bottom, the very,

9    very bottom, we have the requirement that the communication

10   that is transmitted facilitates verification.

11         So I want to look at what was the evidence that

12   Dr. Rubin presented for facilitating verification?

13         So here is the code.  This is his slide.

14         This, as you can see, relates to DUKPT, and

15   relates to encryption.  This is code from the portable

16   device.

17         And here is also his slide showing the code,

18   some code from the server, the Ingenico server.

19         And you can actually see all the references to

20   encryption, decryption, et cetera.

21         And I asked Dr. Rubin about this code yesterday.

22   And he explained what it shows.

23         It shows decryption.  It shows just decryption,

24   nothing else.

25         And he confirmed that encryption and

1    verification are not the same thing.  This is -- what you

2    are seeing is what Dr. Rubin said to me in

3    cross-examination.

4              They are not the same.

5              And to verify, you have to check one thing

6    against another.  And although encryption is one way to

7    verify, not all encryption verifies.

8              So here is the thing that wasn't shown.  And

9    remember, Dr. Rubin had the code.  In fact, he showed you

10   part of the code.  That's what I just showed.

11             In fact, he had thousands and -- I think he said

12   tens of thousands of lines of code.  How did he have all

13   that code?  We gave it to him.  Go find the smoking gun.

14             But he didn't show you any code that shows

15   comparison of anything to anything which he says is

16   verification.  That is what verification is.

17             And his answer to me was, no, I didn't have to.

18             And I'd like you to think about that answer

19   because Dr. Rubin had the code for whatever the devices do

20   and whatever the servers do, and you can't facilitate

21   verification if the server has no capability of verifying.

22             And yes, he told you later, yeah, it does it.

23   It does it.  Decryption does it.  But he didn't show you

24   the code and he had all the code.  So if it was there,

25   wouldn't he have shown it to you?  And it's their burden of

**Appx10420**

1    proof.

2                And this again is just what I'm saying.  You

3    have the code for the server, you didn't show the step, and

4    we talked about -- remember, he had the big slide with Apple

5    and all the others?

6                Yeah.

7                You don't have any code for the Apple server?

8                No.

9                Or any of the other names that you listed up

10   there?

11               That's correct.

12               So we have two problems:

13               For the server he does have the code for, he

14   decides not to show you verification step.

15               For the code for other servers, which is part of

16   this inducement case, saying I am inducing -- we are

17   inducing other people to do this, our customers.  They don't

18   have any evidence.

19               So we also heard from Joey Tang.  You may recall

20   we had three witnesses come in during our case.  And we

21   asked Joey, does the Ingenico gateway, which is the very

22   same gateway that the code was shown for, does not perform

23   verification.

24               And he said, no, we don't, which confirms the

25   lack of evidence.  It confirms Dr. Rubin's choice not to

1    show you any verification code from that exact server.

2              Now, that's not the only time that Dr. Rubin has

3    had code but chose not to show it to you.

4              For example, you know that a few of the

5    customers of Ingenico used something called ROAMpay app.  It

6    runs on the phone.  Most customers make their own apps but

7    we do have a ROAMpay app and we gave Dr. Rubin the code for

8    it.

9              And I asked him, he didn't put up any code from

10   the ROAMpay app?

11             And he said, no, I don't believe I did.

12             Why not?

13             And we confirmed, you had access to it?

14             Yes.

15             And I said, and you chose not to present it to

16   the jury?

17             His answer was so there is a very good reason

18   for that, and then you got a big long answer after that that

19   probably didn't make a lot of sense.

20             It seems to me that if you are going to show

21   something, to prove something, you show it.  You don't just

22   say, oh, oh, it's in there.  Take my word for it.

23             Now, I also want to talk about Claim 10, way

24   down at the bottom is synchronizing content.

25             So Dr. Rubin says there is synchronization.

1    What he says is that you take the transaction information

2    from the reader and you send it to the server and now, for a

3    brief blip, they're in both places.

4              Actually that brief blip isn't quite right

5    because -- let me say here is the language for

6    facilitating -- for facilitating synchronizing content.

7              We talked to Mr. Rotsaert.  You may recall him.

8    He was the gentlemen, he works in Boston and he is from

9    France.  He has a very difficult accent.

10             So, what he did say was -- here is a few

11   snippets.

12             During a card transaction, when the card data

13   is sent to the network, does the card hold on to the card

14   information?

15             He says, no.  They are designed to be no data,

16   so the principle is it cannot be in the device.  The reader

17   does not keep it.

18             But he went on to clarify.

19             So am I right that it's cleared as soon it's

20   sent?

21             Yes.

22             It's cleared.  As soon as you send the data,

23   it's gone.

24             And specifically was asked:

25             Is there ever a time when the data is in both

1   places?

2            And he says, no.  Once it is gone from the

3   reader, it may go where our customer decides to send it, but

4   it won't be on both devices.

5            So it's not -- nothing in this system is

6   designed for there to be synchronization.  And therefore,

7   there is nothing in the system design to facilitate

8   synchronization.

9            So let's talk about a completely separate reason

10   why there is no infringement.  Mr. Leibowitz alluded to it.

11            You may recall this:  This is all about the

12   credit card, an intervening step.  And not an intervening

13   computer step.  An intervening person step.  An intervening

14   second person step.

15            And remember this fourth code has two

16   requirements.  Dr. Rubin was very clear about that.

17            The claimed functions were to send the message

18   to the terminal but also to be executed in response to a

19   message from the phone.

20            And he, he really pushed that idea.  He is

21   right.  He is absolutely right.  We all agree on that.

22            Code that is both triggered by the message

23   coming from the phone and that sends something to the

24   terminal.

25            But the code that sends the message to the

1    terminal is not triggered by a message for the phone.  That

2    happens much earlier.  What you have is you have to have the

3    interaction of a person with the reader with a card.

4            And you have heard a lot about how important the

5    interaction with the user interface is but so is the

6    interaction with the reader itself.

7            And you may recall a little bit of theatrics

8    here where we put up -- they put up a big board with this

9    exact document on it and they started covering things up.

10           It seems to me that covering things up is not

11   showing you what actually happens.

12           So I would also like to talk about induced

13   infringement.  There is -- remember there is two kinds of

14   what they call indirect infringement.  This is for all the

15   claims in the case, but I want to especially focus on the

16   '703 patent.  That's the system claims and the method

17   claims.

18           And induced infringement is one of those

19   indirect infringements and I want to focus on the fact

20   that induced infringement requires that somebody actually

21   infringe; right?  We have to actually prove somebody

22   infringes.

23           And IOENGINE says, well, it's Ingenico's

24   customers which are the people we send -- send our readers

25   to.  For example, that big slide that showed Apple and

1    PayPal, and all those companies.

2              Do they infringe the '703 system and method

3    claims?

4              Oh, there is my slide; right?  We have Bank of

5    America, 7-11, et cetera.

6              Do they infringe?  And I want to remind you,

7    Ingenico does not infringe these claims because Ingenico

8    does not provide a terminal, meaning a phone.  Ingenico does

9    not provide a phone.

10             And who said this?  Dr. Rubin.  In fact, you are

11   going to notice that I have a lot of Dr. Rubin today.

12             So Dr. Rubin agrees, there can be no direct

13   infringement by anybody without providing a terminal.

14             But there is no evidence in this case that Apple

15   provides a phone.  There is no -- a phone for this purpose.

16   No evidence that PayPal provides a phone.  No evidence 7-11

17   provides a phone.  No evidence that any customer of Ingenico

18   provides a phone.

19             So if we can agree that -- and we all do -- that

20   providing a phone is necessary for infringing these system

21   and method claims, then none of the customers of Ingenico

22   can infringe because they don't provide the phones.

23             So that's one reason that we don't -- we can't

24   possibly induce infringement of these customers.

25             A second would be intent and I want to talk

1    about intent.  It is really important.

2                   This is Dr. Rubin's slide.  You also have heard

3    slightly different wording of this from the judge and you

4    will have the jury instructions to review.

5                   But the key part of this that I want to

6    indicate is that just knowing what your customers are doing

7    is not enough.  You have to know that what they're doing

8    is infringement.  You have to know that they're actually

9    infringing the patent, which is why knowing about the patent

10   is part of the story because you can't know about infringing

11   if you don't know about the patent.  But just knowing about

12   the patent alone isn't enough.

13                  And every time you have heard from IOENGINE,

14   whether through its attorneys or Dr. Rubin, what we don't

15   hear is about Ingenico's knowledge of infringement.

16                  Now, I also want to talk about contributory

17   infringement.  And I apologize for the length of these

18   words.  Again, this is Dr. Rubin's slide and you will have

19   a very long statement about contributory infringement in

20   the jury instructions.  But let me just point out two things

21   which happen to be exactly the same as for inducement.

22                  At the very bottom of this, it says, "in a

23   manner that infringes the patent."

24                  You have to have infringement.

25                  Somebody has to infringe for Ingenico to induce

1    infringement.  And just like what I showed before, if our

2    customers don't provide the phone, nobody is infringing.

3              So this part doesn't work.

4              Also, it says, in the middle, knew that the part

5    or component was especially made in a manner that infringes

6    the claim.

7              Again, knowledge of infringement.  Not just

8    knowledge of facts.

9              But there is a third reason here, because there

10   is the issue of substantial noninfringing uses.

11             What was the evidence that you heard about

12   substantial noninfringing uses?

13             Well, that's where that DUKPT comes in.

14             Yeah, DUKPT is supported, but it's not the only

15   one that is supported.

16             And so Dr. Rubin tried to make you believe that

17   every single time anybody uses one of these readers, there

18   is a DUKPT, but that is not true.  Sometimes they're not

19   using it.

20             And one way we know this is -- well, we don't

21   have to use DUKPT.  And he has no evidence that, for

22   example, Apple used DUKPT.

23             And this again is Rubin.

24             And he says, well, they would have to use this

25   code.

 1              And I said, no, I thought we established that

 2      is not true.  You could use a different encryption system?

 3              And he says, if someone chose not to use DUKPT,

 4      then they could use something else, meaning one of the other

 5      encryption methods.

 6              And he even said I don't want to make a blanket

 7      statement where I relied on DUKPT.  If DUKPT was not used,

 8      then I would not have shown infringement.

 9              And here he is talking about the method claims.

10      And then I say, is that also true for the system claims?

11              If DUKPT is not used, I would not have shown

12      infringement.

13              Now the question is, are there substantial

14      noninfringing uses?  And here, Rubin is saying, yes, there

15      are.

16              A final point.  You have heard that the

17      Link/2500 and the iSMP4 can be used by themselves without a

18      phone.  If they're used without a phone, they can't

19      infringe.  So that is a substantial noninfringing use of

20      those products.

21              Now, let me talk now since we have to move from

22      topic to topic about anticipation.  It's such a strange

23      word, it seems to me.

24              But the key is right here in the middle and

25      again you have jury instructions on this.

1             Does what we're talking about -- in this case

2   we're talking about the DiskOnKey.  And not just any

3   DiskOnKey, right?  We agree that IOENGINE, the original

4   DiskOnKey when it came out, does not do what the patent

5   requires.

6             What we're talking about is when DiskOnKey came

7   out with a firmware upgrade program, and that -- and I'm

8   going to show that in a little bit -- and that came out a

9   little bit later.  It came out in 2002, which is well before

10  that magic date of March 23, 2003.

11            So it's prior art.  I'm going to show you that

12  it's prior art.  And remember, show.  It's my job to show

13  you.

14            I have to show you two things, that it does --

15  here, I will just read it:

16            "Must enable an ordinary skilled artisan to

17  make and use the claimed invention without undue

18  experimentation."

19            Does what we have teach a person of ordinary

20  skill in the art how to make and use it?  How to do it?

21            I don't have to show you exactly, exactly what

22  it did.  I have to show you that it teaches somebody to make

23  and use the claimed invention.

24            And that is an important distinction.

25            I also have to show you that it really was out

 1   there.

 2           So I also want to remind you of something, this

 3   is language that you just heard from the Court in the

 4   instructions.

 5           Dr. Rubin kind of suggested -- that's a soft way

 6   of saying it -- that you can't look at documents to find out

 7   what something does.  That the opposite is true.

 8           So when we're talking about the DiskOnKey and

 9   how the software worked to do the upgrade, we are in fact

10   allowed to rely upon evidence.  And that is a single prior

11   art item that -- that DiskOnKey, with its software, that --

12   that is what we're talking about.

13           And those documents that tell you how it worked

14   do not have to be publicly available.  And that's a pretty

15   important issue in this case, actually, because this

16   happened a long, long time ago and some of the documents

17   that we needed to find, some were publicly available but

18   some were not.

19           So you hopefully remember this document, two

20   pages of it, using DiskOnKey upgrade.  We spent a lot of

21   time talking with Dr. Rubin about it.

22           And the key part of this is what is shown, what

23   is taught by this screen.  This is the screen that the user

24   sees on the computer when they run the DiskOnKey upgrade

25   software.

**Appx10431**

1    I just want to be clear that what the fourth

2    code requires is that the user interact with the screen on a

3    computer, and that's to click the upgrade button.  And then

4    that a message would go from the computer to the portable

5    device, the DiskOnKey, and then a message would go back in

6    response to that to the computer, and that would cause a

7    message to go to the network.  And what needs to be in that

8    is portable device, identifier information, like some

9    encryption key, and it needs to facilitate verification of

10   which authentication is a type, and it needs to synchronize,

11   which having firmware and firmware of the same version in

12   both places is synchronizing data in a database.

13           So let's look at what Dr. Rubin told us.

14           And again, I'm going focus very much on what

15   Dr. Rubin has told us.

16           So first, he says:  This is about a firmware

17   update, and it's done by communicating from the computer to

18   the DiskOnKey, from the computer to the portable device, and

19   it verifies.

20           Yes.

21           So that's all taught in this document?

22           Yes.

23           And the little checkmarks that we see, there is

24   two of them on the left, and then the kangaroo.  The

25   checkmarks are indicating a step is done.  What does -- what

1    does -- how does that happen?

2              You only know it's done because there has been

3    communication with the portable device.  So you can change

4    the user interface.

5              And, in fact, he even says that is how these

6    interfaces usually work; right?

7              And with the kangaroo, stuff is working; right?

8              That is because the -- the computer knows what

9    is going on because it is being told what is going on by the

10   communications from the portable device and from the server.

11             So we looked at that very first item.  Getting

12   the current version.

13             And it took a little bit of work, but he has

14   indicated here, this happens, this step happens after

15   the upgrade button is pushed, and so that takes place in

16   response to user interaction with the interactive user

17   interface language right from the claim.

18             And he says this teaches one of ordinary skill

19   in the art the step of communicating with the DiskOnKey to

20   get its current version in response to clicking the upgrade

21   button.

22             And the next step is connecting to the server.

23   One, two, three.

24             And that happens after the computer has the

25   current version from the DiskOnKey.  And that requires

1   communicating between the computer and the server.

2              Yes.

3              Directly after.

4              And then there is authenticating the device;

5   right?

6              And it took a while to get him to say this, but

7   here he admits, yes, it is teaching authenticating the

8   devices, which is exactly the words you see in front of you.

9              Then I asked him:  Should we believe it?

10             And he says:  Yes.

11             And should we believe it about authenticating?

12             Yes.

13             That is exactly what it is teaching.

14             So I said:  This absolutely teaches

15  authenticating?

16             It does.

17             He doesn't qualify these answers.  He doesn't

18  give you any other explanations.  It is very

19  straightforward.

20             And I also wanted to know, would somebody know

21  how to do it; right?  Remember, it says can -- it teaches

22  them how to do it without undue experimentation.

23             He says:  Yes, they absolutely would know how to

24  do it.  In fact, they would know many ways to do it.

25             And remember the claim doesn't talk about any

1    specific way, just doing it is good enough.

2                    And so again, we have connection to the server,

3    to the remote server that is checking for the new version.

4    We have teaching communicating with the server.  We have

5    getting the new version.  And we have teaching this specific

6    set of steps.

7                    And would they know how to do it?

8                    Yes.  Every single step they would know how to

9    do.

10                   Now, I know Dr. Rubin spent a lot of time saying

11   there are 10,000 other ways to do it.  Irrelevant.  All that

12   matters is what is taught here.

13                   Everybody knows how to do it if they -- and he

14   even said, this is his own language:  If a user wants to

15   upgrade, they would know how to follow these steps,

16   especially if they were looking at this.

17                   It verifies the new version.  All that is taught

18   here.

19                   Now, we also showed an SDK.  You heard a lot

20   about SDKs.

21                   We can never know if an SDK is running on a --

22   running in code for sure, but we do know an SDK tells you

23   what is done, what can be done by the portable device.

24                   And here, what we have is the ability to get

25   the device version from the portable device and the ability

**Appx10435**

1    to get a public key from the portable device.

2              So all the steps you showed, show -- one of them

3    showed getting the version.

4              And this shows the capability of doing that, of

5    asking, what version are you?

6              And the capability of asking, can you tell --

7    can you give me your public key?

8              Now, you may also recall that Mr. Elazar talked

9    about encryption and authentication.  And here he is just

10   saying, well, everybody knows how to do this.  Which, of

11   course, Dr. Rubin also said.

12             And here we talk about authentication, would

13   there be device identifying information?

14             And he said:  Yes.

15             And remember who Mr. Elazar is.  He is one of

16   the people who worked on the DiskOnKey.

17             Now, I can't just stop there.  I have to show

18   you that it really was there.  There has been a lot of

19   questions about was it really there.

20             So let's start with this SEC document.  This is

21   a document that M-Systems filed with the United States

22   Government.  And when you file a document like this, you are

23   talking about what happened in the past.

24             And this document indicates the DiskOnKey was

25   introduced, actually, quite early in November of 2000.

**Appx10436**

1       Now, remember, that alone is not enough.

2       And then it talks about KeySafe security

3    application in 2001, and we haven't talked about that.

4       And then it talks about some awards.

5       Well, all this really shows is very early on,

6    DiskOnKey was actually on sale.

7       And you may recall that Mr. Sobol showed this

8    huge spreadsheet that is showing -- I'll just show you three

9    lines out of it -- is showing that in late 2002, DiskOnKeys

10   were being sold in the United States.

11      Here is Nevada, California, and California.

12      In fact, some of them apparently are being sold

13   in an Apple Computer Store.

14      So Mr. Sobol was asked about the documents that

15   he found in the M-Systems archive.

16      Now, you remember that M-Systems no longer

17   exists.  These are documents from almost 20 years ago.  And

18   Mr. Sobol has worked at M-Systems since 2004, 2005, so --

19   and then, and then worked for later companies.  But he was

20   familiar with the documents that were in the archive.

21      And he said, yeah, these are the things that

22   were created by the people who came before me, that were

23   taken out of the regular files.

24      So I'm going to also show you the Western

25   Digital certification and how it proves that these documents

1    are the real documents, and how these show the exact

2    versions of the DiskOnKey that worked with the firmware

3    upgrade.

4           So you may recall these two documents.  They go

5    together because you have an email saying, hey, send this

6    information along because we are putting out the firmware

7    update software, and attached to this email is the document

8    on the right.

9           And the document on the right is the one we just

10   went through with the big screen on it.

11          So these go together.  And -- and if we look at

12   the dates, we have, way at the top, July 8, 2002, and it's

13   sent to people all over the world, including Santa Clara.

14   And then we have an attachment, so this attachment is

15   obviously as of the same date.

16          And this is the certification.  Remember, the

17   Western Digital Custodian of Records certification.

18          And, remember, on page 2 it had all these

19   documents.  This document is listed in the certification.

20   This is Western Digital, which acquired SanDisk, which

21   acquired M-Systems and the MDRM, saying, you know what, we

22   acquired these companies, we still have these documents from

23   20 years ago, and they're real.

24          And then the document that was attached to the

25   email, here it's showing up somewhere else.  In this big

**Appx10438**

1    list.  And remember the SDK document.  That's also real.

2              That's what Western Digital is telling us.

3    They're in the files.

4              Now, there is testimony about, oh, Mr. Sobol

5    didn't know who wrote the documents.

6              That doesn't matter.  What matters is somebody

7    wrote the documents, not Mr. Sobol.  We don't need that.  We

8    just need to know is the document real?  And it came from

9    the records.

10             And if we look at this, we see July 8, 2002,

11   pass this information on.  And the DiskOnKey upgrade can be

12   downloaded starting from July 10, two days later.  It's

13   going to be able to be downloaded.

14             And then, we actually have the press release

15   from July 11.

16             And this press release was issued from Fremont,

17   California, and it talks about DiskOnKey devices and the

18   firmware upgrade for the DiskOnKey devices.  It indicates

19   that the DiskOnKey devices that can be -- have this

20   functionality of the upgrade, can -- are for sale.  It even

21   gives prices.  It indicates they're available through

22   partners like Apple and Compaq and Dell and Targus.

23             All right?  And it ties all of this together.

24             This version of the DiskOnKeys that we have are

25   for sale and we now have firmware upgrades for them and

**Appx10439**

1    it's, it's all together.  DiskOnKey offers increased

2    functionality beyond storage, beyond the blank drive.

3              And here we have from the -- remember we talked

4    about the Wayback Machine, which is the colloquial name for

5    the Internet Archive; right?

6              So this is an Internet Archive copy of the

7    download page for the DiskOnKey software that I went

8    through with Dr. Rubin.  And the date, look at the date:

9    December 2, 2002.

10             Now, I asked Mr. Sobol -- Mr. Sobol was asked,

11   not by me -- would it be fair to say that this page shows

12   that it was available for download?

13             And he said, yes.

14             We also have, at around the same time, July 10,

15   which is actually one day earlier, the Fuji Photo indication

16   that they're selling DiskOnKeys.  So this is within days of

17   each other:  FujiFilm USB product to incorporate DiskOnKey

18   technology.

19             And we have another Wayback Machine from

20   August 16, 2002 that indicates that the FujiFilm drive will

21   have a CPU and can run applications.

22             So we also have this issue of the preliminary

23   SDK document.  Remember there was, oh, it's preliminary,

24   it's not real.

25             But you may recall that Mr. Harkabi testified

**Appx10440**

1    that, yeah, that was issued very shortly after the date on

2    the document, and then we have DiskOnKey's news release

3    indicating that it, in fact, was issued just a few -- just

4    at the very end of September.

5              Now, I want to emphasize that four DiskOnKey,

6    its prior art simply because it's dated before March 23,

7    2003.

8              Mr. McNulty's invention date its irrelevant to

9    that.  Mr. McNulty's conception date is irrelevant to that.

10   Mr. McNulty's reduction to practice is irrelevant to that.

11             If it's before March 23, 2003, it is prior art.

12             And here we have Mr. Sobol indicating this

13   document describes the architecture of the SDK:

14             And are you aware that this reflects how it

15   really worked?

16             Yes.  It really worked this way.

17             So we have evidence that it was available all

18   together in one package in the summer of 2002 and we have

19   evidence that it worked this way.  And we have Dr. Rubin's

20   testimony about it.

21             Here is the download dated -- you can download

22   the data sheet for the SDK.

23             So I also want to address one other thing.  And

24   this was shown by Mr. Leibowitz.

25             The Patent Office.  This is the patent, the '703

**Appx10441**

1    patent, and over on the right you see this list of other

2    publications?

3            And these are actually -- this is listed twice

4    for some reason but it's actually the same thing.  If you

5    look at the numbers and everything, it's all the same thing.

6    It's web -- it's the web archive.  It's the Wayback Machine.

7            The Patent Office did know something about

8    DiskOnKey.  What they knew was this document, this web page.

9    And this with web page is the web page that talks about just

10   the DiskOnKey, not the firmware upgrade.

11           Now let's talk about obviousness.  Now, I

12   want to be clear, obviousness is totally separate from

13   anticipation.  And you heard Mr. Leibowitz say that there's

14   a bunch of things relate to obviousness including commercial

15   success and statements that, oh, he is a visionary, et

16   cetera.

17           Those are relevant to obviousness, but they're

18   not relevant to anticipation.  Anticipation is simply

19   does -- the product that we're showing you, does it teach

20   one of ordinary skill in the art to make and use the

21   invention without undue experimentation?

22           We're really only relying upon Elazar as an

23   obviousness combination.  Elazar is about digital rights

24   management.  Digital rights management is about

25   authentication.  It's about "do you have the right to have a

1   copy of this on your, on your product -- on your device."

2   And to the extent that there was any doubt that there was

3   authentication of, with the DiskOnKey, this fills in the

4   gap.

5          However, I think we have established Dr. Rubin

6   has told you and admitted that authentication -- he agrees

7   that authentication actually happens.

8          So with that, I just want to clear up a couple

9   of things.

10          One is remember all that discussion about

11   Mr. McNulty on the DiskOnKey?

12          What of that matters and what doesn't?

13          Well, I don't need to show you that Mr. McNulty

14   knew about the DiskOnKey or even that he used it.  If the

15   DiskOnKey does everything it need to do with its, with its

16   firmware upgrade, that is enough, that is anticipation.  We

17   do not require proof that the inventor knew of the prior

18   art, or used it.

19          And whether he knew about it or not is really

20   irrelevant.  And I didn't ask any questions about whether he

21   knew it.  I asked questions about whether he did it, whether

22   today we know that he used it.

23          And that's admitted.  That is all agreed upon.

24   He did, he did use it.  He spent a lot of time talking about

25   why he didn't know at the time.  I'm not sure why but it's

**Appx10443**

1    not really relevant to any decision you have to make.

2              So I hope that I have been able to go through

3    and show you the evidence with very heavy reliance upon

4    Dr. Rubin, because if Dr. Rubin says it, and Mr. Geier also

5    says it, that's pretty convincing evidence.

6              So again, I want to thank you.  I know that this

7    is very technical, very complicated and the way it was all

8    put in, I think would confuse just about anybody.  And that

9    is sort of the nature, sometimes, of these cases.

10             And so boiling it down to what you really need

11   to decide is what I hope that I have done a good job of

12   doing.  So I want to thank you again and thank you for what

13   you have already done and thank you for what you are going

14   to be doing in your deliberations.

15             And I hope you will bring back a verdict for my

16   client, Ingenico.  Thank you.

17             THE COURT:  Thank you, Mr. Timbers.

18             Let me ask the jury, we have only the rebuttal

19   argument by IOENGINE to go, but if you feel like -- we have

20   gone two hours.  I think we have roughly --

21             Who is going to give the rebuttal argument,

22   Mr. Leibowitz?

23             MR. LEIBOWITZ:  I will, Your Honor.

24             THE COURT:  Roughly how long do you expect to

25   go?

```
 1              MR. LEIBOWITZ:  I'd say 15 -- 10 to 15 minutes,
 2     Your Honor.
 3              MR. TIMBERS:  Your Honor, I think there is a
 4     time issue, isn't there?
 5              THE LAW CLERK:  No.
 6              THE COURT:  We have the time under control.
 7              Let me ask the jury.  Would you like to take a
 8     short break now before we -- I'll tell you what is left is
 9     10 or 15 minutes for Mr. Leibowitz, and then about five
10     minutes from me just telling you guidance as to how to
11     conduct your deliberations.  We can go on or we can take a
12     break.  Just give me a sense of whether you would like to --
13              A JUROR:  Keep going.
14              THE COURT:  -- keep going?  Very well then.
15              Mr. Leibowitz.
16              MS. STERNBERG:  Thank you, Your Honor.
17              Mr. Timbers started his --
18              THE COURT:  Mr. Leibowitz, let me just, on the
19     issue of time.  If you like, I can give you a two-minutes
20     warning if you are running into the red zone.
21              MR. LEIBOWITZ:  Thank you, Your Honor.  I will
22     try to be even shorter than I estimated.
23              When Mr. Timbers started his presentation he
24     mentioned being from -- I say Missouri.  I guess it's
25     Missourah (phonetic), the show-me state, either way.
```

**Appx10445**

1     And I think he was there when he was talking

2  about infringement, but he left pretty quickly when he got

3  to invalidity.

4     And let me explain a couple things by that.

5     IOENGINE's position here is not that there are

6  certain documents that need to be publicly available.  There

7  is not certain documents that we think weren't found in

8  files or that somebody faked or something like that.

9     What our position is, and what they have failed

10 to show, is that there are documents that accurately

11 reflected the functionality of the device with the firmware

12 upgrade software at the particular time they're trying to

13 show it.

14    These documents -- we don't disagree these

15 documents were found in Western Digital's files.  The

16 problem is no one, not Mr. Sobol, not Mr. Harkabi, nobody

17 can say that the documents that were found accurately

18 reflect the way the product worked, and in particular the

19 way the firmware upgrader worked.

20    And so you have, you have a situation where,

21 yes, it was many years ago and there are certain documents

22 but they -- by their very nature, they say right on the

23 face, it's preliminary.  They're are drafts.

24    There are things when Mr. Sobol, for example, is

25 questioned about this document.  He says he doesn't know --

1    not that he personally doesn't know who wrote it.  That is

2    not the issue.  The issue is that there is no one who can

3    speak to whether that document accurately reflected what

4    was happening at the time or was a document that was written

5    to create something for later, a presentation that was --

6    somebody was working on in their files but wasn't actually

7    accurate.

8              And when you can't connect the dots for purposes

9    of invalidity, where he has a higher burden, a clear and

10   convincing evidence burden to prove not only that this art

11   existed at the time or that it was sold at the time but what

12   was being sold actually functioned the way the documents

13   supposedly say it did.

14             And that's what is missing.

15             Mr. Timbers pointed to a press release; right?

16   He pointed to that July press release.  What was being

17   discussed there?  Sales of DiskOnKey.  They weren't selling

18   the firmware upgrader.  They a said, oh, you can download

19   this.  But what was mentioned there for sale were the same

20   blank DiskOnKeys that we have seen -- that have seen sold

21   for many, many years.

22             We don't dispute there were was blank DiskOnKeys

23   sold, but no one can speak to what that firmware upgrader

24   was that was being downloaded, or was available for download

25   if it actually was or how it worked, how it functioned.

1           Mr. Timbers criticized Dr. Rubin for not showing

2    certain parts of the code for purposes of infringement and I

3    will talk about that in a moment.

4           But we have no code whatsoever with respect to

5    Mr. Timbers supposedly invalidating prior art when the

6    claim talks about program code over and over again, and

7    very specific program code that needs to be run and executed

8    in specific places.  There is code that is executed on the

9    terminal and code, according to the claims, that is

10   executed -- needs to be executed on the portable device.

11          And according to Dr. Rubin, a -- very common, in

12   fact, more efficient better way to have done that firmware

13   upgrader.  What he would do, if he were trying to do that,

14   would be to not have program code that would be executing on

15   the portable device at all.

16          That there was a function to get a version

17   number of the DiskOnKey?  That is great.  It can return its

18   version number.  But that would likely happen if you just

19   plug the USB drive into the computer as Dr. Rubin said,

20   there is a handshake.  When you have that handshake, the

21   computer retrieves the firmware version from the DiskOnKey

22   without the user interacting with an interactive user

23   interface at all.

24          So there is -- what they haven't been able to

25   show is prove, prove by clear and convincing evidence that

**Appx10448**

1    the firmware upgrader worked the way they say it did at the

2    relevant time or was on sale at all, much less sale with

3    working the way they say it did at the relevant time.

4              Now, with respect to infringement --

5              If we can have the Claim 3 of the '969 patent.

6              Mr. Timbers focused you --

7              Here, I think it's JX-349.

8              -- focused you on Claim 3.

9              And I'll come back to it as I mentioned it in my

10   early remarks.

11             What does this part of the claim require?

12             Facilitating -- facilitates, excuse me,

13   verification of the portable device.

14             That is what Dr. Rubin was working with and

15   what he was trying to show, something that facilitates

16   verification.

17             The claim the does not require that the

18   verification be completed.  So yes, Dr. Rubin said he didn't

19   show you the code, where the -- where after this, where

20   there would be a facilitation that would actually happen

21   because, as he said, the quote was up there on the screen,

22   he didn't need to.

23             What he needed to show was that there was a

24   communication that is caused to be transmitted to the

25   network that would facilitate verification.

**Appx10449**

1    And that is exactly what he did show.  He showed

2    it through DUKPT.  He showed it by explaining that if you

3    look at the DUKPT standards there is the key serial number

4    and that key serial number has, has a unique -- part of that

5    key serial number is unique to the device and that that is

6    going to -- when it's sent, that it will facilitate

7    verification of the device.

8    Mr. Timbers also insinuated that there was code

9    that Dr. Rubin didn't show you, which is true.  That doesn't

10   mean he didn't actually review the code, which he certainly

11   did.  He and his team has spent hundreds of hours reviewing

12   the code and that formed the basis of his testimony, not

13   only the parts that he actually was able to show to you

14   or -- in fact, Mr. Timbers implied that he had all the code.

15   He didn't.

16   He needed to go to their offices, review the

17   code and was only allowed to print and keep with him very

18   small excerpts.  So what we were able to present to you

19   was excerpts of the code and that is what Dr. Rubin did.

20   Now I'd like to spend a couple of minutes, if I

21   could, on the issues of the indirect infringement.

22   Because on this whole point -- well, actually

23   before I do that, on DUKPT.  And I think you heard it from

24   Mr. Timbers, you heard it throughout the case, there are

25   other ways to do encryption other than DUKPT.  There are

1    each juror agrees with the verdict.  I will then ask you to

2    return to the jury room where you can gather your things.

3            And I would like to have an opportunity, if

4    you don't mind, to come out, to come back and greet you

5    personally and speak with you after you go back to the jury

6    room.  So if you don't mind, it will take a couple of

7    minutes but I will be back there and I would like to have

8    the opportunity to thank you for your service in an informal

9    way.

10           At that point, I will discharge you.

11           Now, during your deliberations, you must not

12   communicate with or obtain any information relating to the

13   case from any source other than your fellow jurors.  That

14   means you cannot consult any outside sources, such as the

15   Internet, during your deliberations.

16           Of course, you can have contact with the court

17   security officer or other of court staff as is necessary to

18   deal with any needs you may have.  Your lunches and likewise

19   will be delivered to you by somebody from the court staff.

20   You don't have to keep them out in the jury box because that

21   doesn't count as a contact.

22           But you should not discuss the case itself with

23   anyone outside the jury.

24           Now, I expect when you get to the jury room to

25   begin your deliberations, you may feel a little overwhelmed.

**Appx10458**

1    This is not uncommon.  This has been a complicated case, and

2    there will be a lot of evidence and argument to think about.

3    But I think you will be pleasantly surprised that as you

4    start working methodically through the case, things will

5    begin to seem more manageable.

6            I hope and expect that you will listen to one

7    another's views respectfully, even if you initially disagree

8    on some issues.  Discussing the issue from different

9    perspectives can often help in formulating your own ideas

10   about how particular issues should be decided.

11           Now, if you want to see any of the exhibits,

12   you are free to see them.  All you need to do is have your

13   foreperson sign a note asking for a particular exhibit and

14   provide that note to the court security officer who is

15   taking care of you.  You can ask to see all the exhibits or

16   you can ask for just some of them, if you like.  Just let us

17   know what you want, and we will do our best to get whatever

18   you want to you that is part of the evidence.

19           If you have a question or otherwise want to

20   communicate with me at any time, please follow the same

21   procedure by providing a written message or question to

22   the court security officer, who will then bring it to me.

23   You probably will not get a reply right away, because I

24   will need to summon all the lawyers and get their input

25   before I can formulate a response to your question.  That

**Appx10459**

1    just means I usually can't get back to you right away, but

2    we'll do our best to get an answer to your question as soon

3    as we can.

4         If you do have a question that is hanging you

5    up, you are entitled to ask.  I have to tell you, however

6    that once the case is submitted to you, as it will be in a

7    moment, we will not be able to take any additional evidence,

8    and I may just have to tell you to rely on your collective

9    recollection of what the evidence was and tell you that

10   you have to decide the case based on the evidence you have

11   heard.

12        I think you will find in most instances, if

13   you put your heads together, you will recall the evidence

14   that you need to get over the problem.  That's one of the

15   reasons there are eight of you.  Eight memories are better

16   than one.

17        Finally, and most importantly, trust your common

18   sense throughout.  One of the strongest traditions of our

19   justice system is the confidence we place in the sound

20   common sense of an American jury.  The parties in this case

21   have confidence in you, and so do I.  You may now retire to

22   begin your deliberations.

23        THE COURT:  You can follow the court security

24   officer.

25        (Jury left courtroom.)

**Appx10460**

```
 1              It's a very small courthouse, tiny in fact, and

 2    there is one exit other than the judges' exit.  And that one

 3    exit is just one door and everybody comes and goes through

 4    the door.  And after the trial, the jurors come out of that

 5    door and there is this swarm of lawyers that are standing

 6    there waiting to assail the jurors and once I saw that, I

 7    said, that's no good.

 8              Some of them are pretty aggressive about

 9    questioning the jurors and the jurors don't know for sure

10    that they don't have to talk to lawyers.  That is what I'm

11    trying to avoid.

12              MR. TIMBERS:  I'll just say, Your Honor, I had

13    cases where just like what you are doing, if jurors want to

14    talk and the judge is here, they will stay, I find that

15    jurors actually really like that opportunity.

16              THE COURT:  Well, that may be --

17              MR. TIMBERS:  And sometimes they have questions

18    actually.  And I think a controlled aspect of it is really

19    nice and fair to everyone involved.

20              THE COURT:  Yes.  And I will, I will tell them

21    that if they want to come through that door, they're

22    perfectly free to do so.  If they want to go through another

23    door, they're perfectly welcome to do so.

24              Now, since I started doing that, do you want to

25    know how much jurors went through this door?
```

**Appx10465**

1    MR. TIMBERS:  Yes.

2    THE COURT:  All of them.

3    MR. TIMBERS:  Really?

4    THE COURT:  Not a single one.  I will see.  This

5  may break the chain.

6    Okay.

7    (Brief recess taken.)

8    *    *    *

9    (Proceedings reconvened after recess.)

10    THE COURT:  All right.  We have a question.

11    Okay.  The jury has asked the following

12  question:

13    "Asking for exhibits of all products, ROAM,

14  Telium, Telium iSMP, Tetra Link/2500, pictures and breakdown

15  differences," signed by the foreperson.

16    Any suggestions?

17    MR. CHUEBON:  Your Honor, I believe we have the

18  physical exhibits.  I think we may have a question, perhaps

19  as to what breakdown means.

20    THE COURT:  I think, this is just my take, I

21  read the exact words but I would infer from this question

22  that they would like not just pictures but any exhibits that

23  would be informative as to the differences between the

24  various products.

25    And if there is a set of exhibits that we can

**Appx10466**

1   direct them to, I think that would responsive to their

2   question.

3            I think we should try very hard to come up

4   with something to show them.  I had a feeling this might

5   happen given we were giving them a lot of names of products

6   which -- there wasn't a whole lot of attention during the

7   trial to specifics of individual products.  But let's see

8   if we can do the best we can with getting the exhibits that

9   would fairly present that kind of information.

10           MR. CHUEBON:  Sure, we're happy to.

11           THE COURT:  Any suggestions from your side,

12   Mr. Timbers?

13           MR. TIMBERS:  I think probably if we confer, we

14   might be able to.

15           THE COURT:  All right.  Let's do that.

16           MR. TIMBERS:  That is probably the best way.

17           THE COURT:  Let's see if we can.

18           MR. CHUEBON:  It would be nice to get this

19   done quickly, but I have a feeling this may be something

20   that will take a little while and much better we give them

21   everything that is pertinent than we get some piece of it

22   and we end up having to say we actually have more and more.

23           Let's see if we can get a universe of

24   informative information.  And I'll just see what you can

25   come up and we'll wait.

**Appx10467**

```
 1              '703, Claim 101:  Yes.

 2              '703, Claim 105:  Yes.

 3              '703, Claim 114:  No.

 4              '703, Claim 124:  Yes.

 5          For each of the products, following products did

 6    IOENGINE prove by a preponderance of the evidence that

 7    Ingenico has contributed to the direct infringement of the

 8    asserted claims of the '969 and '703 patents by its

 9    customers who do not use the ROAMpay X app?

10              ROAM products.

11              '969, Claim 3:  Yes.

12              '969, Claim 10:  No.

13              '703, Claim 56:  Yes.

14              '703, Claim 90:  Yes.

15              '703, Claim 101:  Yes.

16              '703, Claim 105:  Yes.

17              '703, Claim 114:  No.

18              '703, Claim 124:  Yes.

19              Telium products.

20              '969, Claim 3:  Yes.

21              '969, Claim 10:  No.

22              '703, Claim 56:  Yes.

23              '703, Claim 90:  Yes.

24              '703, Claim 101:  Yes.

25              '703, Claim 105:  Yes.
```

```
1                    '703, Claim 114:  No.

2                    '703, Claim 124:  Yes.

3                    Telium iSMP4.

4                    '969, Claim 3:  Yes.

5                    '969, Claim 10:  No.

6                    '703, Claim 56:  Yes.

7                    '703, Claim 90:  Yes.

8                    '703, Claim 101:  Yes.

9                    '703, Claim 105:  Yes.

10                   '703, Claim 114:  No.

11                   '703, Claim 124:  Yes.

12                   Tetra Link/2500.

13                   '969, Claim 3:  Yes.

14                   '969, Claim 10:  No.

15                   '703, Claim 56:  Yes.

16                   '703, Claim 90:  Yes.

17                   '703, Claim 101:  Yes.

18                   '703, Claim 105:  Yes.

19                   '703, Claim 114:  No.

20                   '703, Claim 124:  Yes.

21                   Validity.

22                   Did Ingenico prove by clear and convincing

23    evidence that the asserted claims of the '969 or 703 patents

24    are invalid for anticipation by the prior art?

25                   Answer this question only with respect to claims
```

1   that you have found were infringed by Ingenico in questions

2   1, 2, 3, 4, or 5.

3                '969, patent, Claim 3:  Invalid.

4                '969, Claim 10:  Not applicable.

5                '703, Claim 56:  Invalid.

6                '703, Claim 90:  Invalid.

7                '703, Claim 101:  Invalid.

8                '703, Claim 105:  Invalid.

9            Claim 114 -- '703, Claim 114:  Not applicable.

10           And '703, Claim 124:  Invalid.

11           Did Ingenico proven by clear and convincing

12  evidence that the asserted claims of the '969 or '703 patent

13  are invalid for obviousness in light of the prior art?

14           Answer this question only with respect to claims

15  that you found are infringed by Ingenico in Claims 1, 2, 3,

16  4, and 5.

17               '969, Claim 3:  Invalid.

18               '969, Claim 2 -- I'm sorry, 10:  Not applicable.

19               '703, Claim 56:  Invalid.

20               '703, Claim 90:  Invalid.

21               '703, Claim 101:  Invalid.

22               '703, Claim 105:  Invalid.

23               '703, Claim 114:  Not applicable.

24               '703, Claim 124:  Invalid.

25           Signed and dated 7/15/22,  ████████████

```
 1      ████████████

 2                  Would anyone like me to poll the jury?

 3                  MR. LEIBOWITZ:  Yes, Your Honor.

 4                  THE COURT:  Very well.

 5                  All right.

 6                  Juror No. 1, is that your verdict?

 7                  JUROR NO. 1:  Yes.

 8                  THE COURT:  Juror No. 2, is that your verdict?

 9                  JUROR NO. 2:  Yes.

10                  THE COURT:  Juror No. 3, is that your verdict?

11                  JUROR NO. 3:  Yes.

12                  THE COURT:  Juror No. 4, is that your verdict?

13                  JUROR NO. 4:  Yes.

14                  THE COURT:  Juror No. 5, is that your verdict?

15                  JUROR NO. 5:  Yes.

16                  THE COURT:  Juror No. 6, is that your verdict?

17                  JUROR NO. 6:  Yes.

18                  THE COURT:  Juror No. 7, is that your verdict?

19                  JUROR NO. 7:  Yes.

20                  THE COURT:  Juror No. 8, is that your verdict?

21                  JUROR NO. 8:  Yes.

22                  THE COURT:  Very well.  The jury may return to

23      the jury room and I will come in momentarily to discharge

24      you and to thank you personally for your service.

25                  (Jury left courtroom.)
```

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGENICO INC., | § | |
|        *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | C.A. No. 18-826-WCB |
| IOENGINE, LLC, | § | |
|        *Defendant.* | § | JURY TRIAL DEMANDED |
| | § | |
| IOENGINE, LLC, | § | |
|        *Counterclaim Plaintiff,* | § | |
| v. | § | |
| | § | |
| INGENICO INC., INGENICO CORP., | § | |
| and INGENICO GROUP SA, | § | |
|        *Counterclaim Defendants.* | § | |

## IOENGINE, LLC'S OPENING BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

OF COUNSEL:

Noah M. Leibowitz
Gregory T. Chuebon
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
noah.leibowitz@dechert.com
greg.chuebon@dechert.com

SMITH, KATZENSTEIN & JENKINS LLP

Neal C. Belgam (No. 2721)
Eve H. Ormerod (No. 5369)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com

*Counsel for IOENGINE, LLC*

Dated: August 17, 2022

B.      The DiskOnKey Hardware, Firmware Upgrade Application, and Software Development Kit

The DiskOnKey was a blank USB storage device from M-Systems Flash Disk Pioneers Ltd. ("M-Systems") that provided "removable, secured data storage."  *See* DX-091.26 (the "2002 SEC Annual Report").  The 2002 SEC Annual Report also reported that M-Systems introduced versions of "KeySafe" and "MyKey" applications for use with the DiskOnKey.  *Id.*  However, at trial, Ingenico disclaimed reliance on blank DiskOnKeys, KeySafe, and MyKey to show invalidity.  *See, e.g.*, Trial Tr. 789:21-790:3 ("KeySafe and MyKey…[didn't] form a base of [Mr. Geier's] invalidity opinion…."), 1357:24-1358:1 ("DiskOnKey was introduced…in November of 2000. [But], remember, that alone is not enough."), 1360:24-1361:2, 1363:7-10; *see also* 1298:22-1299:14 (instructions described the prior art as "The M-Systems DiskOnKey product, ***along with*** the Firmware Upgrade software and the M-Systems DiskOnKey Software Development Kit.").

Instead, the focus of Ingenico's invalidity case was a firmware upgrade application supposedly able to be downloaded and used with DiskOnKey hardware, with Ingenico calling that application "kind of the star of the show."  *See* Trial Tr. 780:25-781:14 (Geier), 793:17-20.

However, critically, Ingenico adduced no evidence at trial proving that the firmware upgrade application was ever "on sale" anywhere, much less in this country.  Nothing resembling an offer for sale was presented and the "press release" Ingenico relied upon heavily was merely an advertisement that, at best, invited potential customers to offer to purchase blank DiskOnKeys—not the firmware upgrade application.  *See* DX-097 (listing MSRPs of various storage capacities of blank DiskOnKeys and directing interest to third-party retailers and to the DiskOnKey website only "for additional information"). The evidence similarly failed to establish that the firmware upgrade application was ever actually used—even a single time—or known by others in this country. The 2002 SEC Annual Report (filed June 30, 2003, less than one year before Mr.

5

**Appx10539**

McNulty's March 23, 2004 application date), contains 105 pages of disclosures, including of *other* applications that M-Systems had introduced for the DiskOnKey, but makes no mention of DiskOnKey firmware or any application to upgrade it. *See generally* DX-091.[6] There was also no evidence that M-Systems ever actually made a firmware update available through the application. In fact, one of the documents Ingenico relied on, an M-Systems presentation from ***just*** ████ before Mr. McNulty's one-year critical date, indicated the opposite. *See* DX-336 at 5-6:

████████████████████████████████

████████████████████████████████████

████████████████████████████████

Ingenico also relied on an M-Systems software development kit ("SDK") that supposedly described functionality on which the firmware upgrade application was based. But the only document describing details of the SDK was "preliminary" and there was no proof that the SDK was ever used outside of M-Systems[7] or that the functionality Ingenico relied on was supported by all DiskOnKey versions that supposedly could use the firmware upgrade application. *Compare* DX-330 (claiming that firmware upgrade ████████████) *with* DX-333 at 10, 24 (████ ████████████████████████████).[8] Further, the custodial witness for the decades-old documents—who did not join M-Systems until years later, after Mr. McNulty's application was filed—explained that knowledge of whether the firmware upgrade application used the SDK no longer existed. *See* Trial Tr. 728:14-16, 738:9-12 (Sobol). The only other witnesses with knowledge of the DiskOnKey's development were two

---

[6] This is despite Ingenico's claim that the upgrade application was released in mid-2002.

[7] Like the firmware upgrade, the SDK is not mentioned in the 2002 SEC Annual Report.

[8] There was no evidence that different SDKs or different firmware upgrade applications existed for different DiskOnKey versions. So, if the firmware upgrade application worked with ████ ███, it must have used something other than the SDK because the only documentary evidence presented at trial proves that supposedly relevant SDK features required ████████.

former M-Systems employees, Messrs. Dan Harkabi and Gidon Elazar, who left the company in 2002. Neither knew how the firmware upgrade application worked and both doubted whether any associated DiskOnKey authentication ability existed at the time. *See, e.g.*, *id.* at 701:6-8, 702:18-22 (Harkabi); *id.* at 716:22-717:7, 720:13-21, 725:18-22 (Elazar).

### C.       The Elazar Publication

U.S. Patent Application Publication No. 2004/0039932 ("Elazar") was published on February 26, 2004.   DX-363.   Ingenico presented Elazar only as a potential obviousness combination with the DiskOnKey art, and only on the issue of authentication. *See* Trial Tr. 721:15-723:16 (Elazar), 860:13-862:24 (Geier), 1363:22-1364:4 ("We're really only relying upon Elazar as an obviousness combination….[T]o the extent that there was any doubt that there was authentication of, with the DiskOnKey, this fills in the gap.").

Additional pertinent facts are presented in applicable sections throughout this brief.

## IV.    LEGAL STANDARDS

### A.       Judgment as a Matter of Law

Judgment as a matter of law ("JMOL") may be entered if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1); *see also* Fed. R. Civ. P. 50(b) ("If the court does not grant a [Rule 50(a)] motion…, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."). "To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998). "[T]he question is not whether there is literally no evidence supporting the party against whom the [Rule 50(b)] motion is directed but whether there is evidence upon which

the jury could properly find a verdict for that party." *Cange v. Philadelphia Parking Auth.*, 451 F.

App'x 210, 212 (3d Cir. 2011); *Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, C.A. No. 18-

462-MN, 2020 WL 1443215, at *2 (D. Del. Mar. 24, 2020) ("Substantial evidence is such relevant

evidence that a reasonable mind might accept as adequate to support the finding under review.").

On a JMOL, "the court must also take into account the required quantum of proof; for a patent

invalidity verdict, the quantum of proof is clear and convincing evidence, because a patent

is presumed valid." *MLMC, Ltd. v. Airtouch Commc'ns, Inc.*, 215 F. Supp. 2d 464, 469-70 (D.

Del. 2002) (citing *Juicy Whip, Inc. v. Orange Bang, Inc.,* 292 F.3d 728, 736 (Fed. Cir. 2002)).

### B.    New Trial

Under Fed. R. Civ. P. 59, the Court should grant a new trial on the basis that the verdict

was against the weight of the evidence and a miscarriage of justice would result if the verdict were

to stand. *See Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991). The standard

for a new trial is less rigorous than the standard for JMOL, in that "the Court need not view the

evidence in the light most favorable to the verdict winner…." *Gavrieli*, 2020 WL 1443215, at *3.

There is more freedom to scrutinize the jury's verdict in a case that deals with complex factual

determinations, as opposed to when the subject matter of the litigation is simple and within a

layman's understanding. *See Williamson*, 926 F.2d at 1352.

A new trial may also be granted if "substantial errors were made in the…giving or refusal

of instructions." *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992),

*aff'd*, 4 F.3d 1153 (3d Cir. 1993). Where a party challenges patent law instructions, Federal Circuit

law governs the sufficiency of the instructions. *See Eko Brands, LLC v. Adrian Rivera Maynez*

*Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020). In general, the challenging party "must 'prove

the jury instructions read in their entirety were incorrect or incomplete as given.'" *Id.* (citing

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1307 n.7 (Fed. Cir. 2007)).

8

**Appx10542**

the other evidence, reflected that the upgrade functionality could be *separately* explored "by visiting www.diskonkey.com." *Id.*; *see, e.g.*, DX-330; DX-402. This evidence is insufficient because, as the Federal Circuit has recognized, providing price quotations for one product, even if intended to be used with another product, does not as a matter of law constitute an offer for sale of the two products collectively. *Smith*, 658 F. App'x at 1027-28. In *Smith*, the question concerned whether a claim limitation requiring a tether was met. *Id.* at 1027.[21] Evidence was presented showing an advertisement for a "Twin-Man" product that "state[d] a price" and "provide[d]…contact information for the purchase of the product." *Id.* at 1028. The advertisement showed the Twin-Man product being used with a tether and there was even testimony that the "Twin-Man could not be used without the tether." *Id.* Nevertheless, the Court found that the advertisement made "no reference to the Twin-Man and tether being *offered for sale collectively*" and that there was no evidence that anyone "issued price quotations to specific customers for the sale of the Twin-Man *with a tether*." *Id.* at 1029. Similarly, neither the "press release" nor any other evidence here shows that DiskOnKey devices *with the firmware upgrade application* were ever on sale.

Moreover, although Ingenico did a partial demonstration of a version of the firmware upgrade application, it presented no evidence that that particular version was ever on sale, much less at any particular time. Instead, Ingenico argued that *some* version of the application was available for download online and relied on several separate documents to establish its supposed

---

[21] *Smith* addressed an infringing offer for sale, but applied the same "commercial offer" standard as here. *See* 658 F. App'x at 1027-28 ("A party offers to sell an infringing product when it communicates a 'willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." (quoting *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon, Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005))); *see also Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254 (Fed. Cir. 2000) (analysis of "offer to sell" under § 271(a) and § 102(b) both "invoke the traditional contractual analysis").

features.  But there was no evidence establishing the extent to which the documents reflected the features of the version that supposedly was available for download at any relevant time.  "It was [Ingenico's] burden—not [IOENGINE]'s—to show that there aren't any relevant differences between the [application] described by the [documents] and the [application supposedly available for download]…."  *Navico Inc. v. Garmin Int'l, Inc.*, No. 216CV00190JRGRSP, 2017 WL 3750252, at *4–5 (E.D. Tex. July 28, 2017), *report and recommendation adopted*, No. 216CV00190JRGRSP, 2017 WL 3764213 (E.D. Tex. Aug. 29, 2017).

Further, the "press release" is nothing more than an advertisement, which, as a matter of law, does not trigger § 102(b). *See Minn. Mining*, 303 F.3d at 1307 ("[P]romotional activity not rising to the level of a contractual offer for sale cannot trigger the on-sale bar."); *Grp. One*, 254 F.3d at 1048 ("[M]ere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer."); *see also Speedtrack, Inc. v. Wal-Mart Stores, Inc.*, No. C 06-7336 PJH, 2012 WL 581338, at *3–4 (N.D. Cal. Feb. 22, 2012), *aff'd sub nom. Speedtrack, Inc. v. Endeca Techs., Inc.*, 524 F. App'x 651 (Fed. Cir. 2013).  Notably, the "press release" simply invited interested customers to seek out DiskOnKey *devices*—not the firmware upgrade application—for sale and purchase.[22]  To the extent anyone who read the "press release" wanted to buy a DiskOnKey, the press release simply directs potential customers to third party retailers, and invites them to visit the DiskOnKey website

---

[22] *See Silver State Intell. Techs., Inc. v. Garmin Int'l, Inc.*, 32 F. Supp. 3d 1155, 1171 (D. Nev. 2014) ("[The press release] refers consumers to retail stores and [the company's] phone number or website to make a purchase.  It thus appears to be an advertisement directed at the general public, and as such constitutes an invitation for offers, not a firm offer for sale.").  The DiskOnKey press release was also indiscriminate and unsolicited.  *See Merck*, 822 F.3d at 1351 (a fax sent in direct response to a purchase request constituted an offer for sale because it was "not an unsolicited price quote sent to numerous potential customers" and "'a relevant factor' in determining whether an offer has been made is 'the number of persons to whom a communication is addressed'" (quoting Restatement (Second) of Contracts § 26, cmt. c)).

only "for additional information"—not to consummate a purchase.  DX-097.[23]  The press release

provides no way to enter into "a binding contract by simple acceptance."  *BASF*, 955 F.3d at 969.[24]

Finally, as discussed above, the 2002 SEC Annual Report makes no mention of the

firmware upgrade application being sold or on sale, despite describing *other* software applications

for the DiskOnKey in the same time period.  *See* DX-091.22, 26-27.

Ultimately, with no evidence that anything other than blank DiskOnKey devices (without

the firmware upgrade application) were sold, and nothing resembling an offer for sale of the

firmware upgrade application, substantial evidence cannot support a verdict based on the firmware

upgrade application being "on sale" under § 102(b).[25]

### c.   Ingenico Abandoned Its § 102(a) Firmware Upgrade Theory

Throughout trial, Ingenico's presentation of evidence regarding the firmware upgrade

application focused on its availability as § 102(b) art, based on a critical date of March 23, 2003

---

[23] When discussing advertisements versus offers for sale during Rule 50(a) argument, counsel for Ingenico argued that a toothbrush at Walgreens is on sale just like how, on Amazon.com, "everything is for sale…."  Trial Tr. 1275:10-17.  But the ubiquity of buying products online today does not mean something available for download on the Internet in the early 2000s was on sale. In any event, there's nothing like Walgreens or Amazon.com here.  Instead, we have a manufacturer announcing a new **toothpaste** in a press release and then providing prices for **toothbrushes** that are separately available at Walgreens or on Amazon.com.

[24] By analogy, the mere posting of information or advertisements on a website without further commercial interactivity (such as the ability to place orders, make payments, or engage in business transactions) is insufficient to confer personal jurisdiction.  *See, e.g.*, *Ackourey v. Sonellas Custom Tailors*, 573 F. App'x 208, 212 (3d Cir. 2014); *inno360, Inc. v. Zakta, LLC*, 50 F. Supp. 3d 587, 595 (D. Del. 2014); *see also M2M Sols. LLC v. Simcom Wireless Sols. Co.*, 935 F. Supp. 2d 740, 745 (D. Del. 2013) ("At best, the web-site information can be understood as an invitation to deal, but it is a basic precept of contract law that an invitation to deal is not an 'offer for sale.'").

[25] Like the firmware upgrade application, there was no evidence that the SDK was ever "on sale." There was no evidence of any pricing for the SDK nor any indication it was ever provided in combination with DiskOnKey devices.  Instead, the only evidence indicated it may have been separately obtainable by "**select** partners and software development companies," only by request, and there is no evidence it was ever actually provided to anyone.  *See* DX-307.

**Appx10557**

(one year before the filing date).  By contrast, Mr. McNulty's invention date (no later than July 26, 2001) preceded nearly all of Ingenico's DiskOnKey evidence and *all* of its firmware upgrade evidence.  And Ingenico's challenges to conception and diligence were either half-hearted or non-existent. The reason for this became clear in closing, when Ingenico affirmatively abandoned any attempt to qualify the firmware upgrade application as § 102(a) art:

> Now, I want to emphasize that [for] DiskOnKey, its prior art *simply because it's dated before March 23, 2003*.
> Mr. McNulty's invention date its *irrelevant* to that. Mr. McNulty's conception date is *irrelevant* to that.  Mr. McNulty's reduction to practice is *irrelevant* to that.
> If it's before March 23, 2003, it is prior art.

Trial Tr. 1362:5-11.[26]  Ingenico's statement in closing affirmatively waived any § 102(a) theory with respect to the DiskOnKey firmware upgrade application.  If Ingenico were relying on a § 102(a) theory, counsel's statements to the jury that conception and reduction to practice are "irrelevant" and that DiskOnKey is prior art "simply because it's before March 23, 2003," would be irreparably improper and misleading. They are also indicative of the lack of substantial evidence supporting a verdict based on the firmware upgrade application being § 102(a) art.

### d.  Substantial Evidence Does Not Support a Verdict That the Firmware Upgrade Application was § 102(a) Prior Art

Whether or not Ingenico abandoned its § 102(a) firmware upgrade theory, substantial evidence does not support the theory under any circumstances (regardless of the date of invention). Similar to the failure of proof that the firmware upgrade application was "in public use or on sale in this country" under § 102(b), the evidence presented at trial cannot support a verdict that the firmware upgrade application was "known or used by others in this country" under § 102(a).

---

[26] There was no other mention of invention date, conception date, or reduction to practice during Ingenico's closing.  *Id.* at 1338:5-1365:16.

Again, none of this testimony was challenged by Ingenico.[33]   Rather, as discussed above, in closing, Ingenico argued to the jury that conception and reduction to practice were "irrelevant" with respect to the DiskOnKey art. Trial Tr. 1362:5-11. The attempt to cast conception and diligence as irrelevant, rather than challenge them, reflects that substantial evidence does not support any verdict premised on Ingenico proving by clear and convincing evidence that Mr. McNulty is not entitled to his July 2001 invention date.

**f.    Substantial Evidence Does Not Support Anticipation or Obviousness Based on the Firmware Upgrade Application**

No invalidity theory presented by Ingenico during trial (whether for anticipation and obviousness) was independent of the firmware upgrade application. Thus, without substantial evidence supporting the firmware upgrade application as prior art under any § 102 category, the jury's verdict on both anticipation and obviousness must be set aside.

Even assuming that the firmware upgrade application qualified as prior art under §§ 102(a) or 102(b), substantial evidence did not support a verdict by clear and convincing evidence that the firmware upgrade application anticipated or rendered obvious the Asserted Claims.  First, as discussed above, because the evidence at trial reflected that the firmware upgrade application was supported by an ASIC and because no evidence of program code associated with the firmware upgrade application was presented, there was no substantial evidence that the firmware upgrade application met the claimed program code limitations, including on which memory each code resides and by which processor each code is executed.  *See supra* V.A.1.a, V.A.1.d.

---

[33] Ingenico presented some testimony about Mr. McNulty's separate work for Fuji involving blank M-Systems USB devices and about use of the brand name Medi/o, the relevance of which was not apparent to any issues the jury was asked to decide.  There was no challenge to Mr. McNulty's *ownership* of the claimed invention and none of the Fuji testimony negated any of the evidence reflecting the actions Mr. McNulty took to reduce his invention to practice.

31

**Appx10565**

Further, Ingenico relied on PKI based authentication described in the SDK documentation as reflecting how the firmware upgrade application worked. But that supposition, supported by no affirmative testimony or evidence from anyone at the time, conflicted with the evidence regarding version compatibility of the firmware upgrade application and PKI functions. While the firmware upgrade application was purportedly available for DiskOnKey ████████, *see* DX-330, ████████ ████████████████████████████████████████. *See* DX-333 at 10 ("████████████████████████████████████"), 24 (████████████████████████ ████████████████████████). Because the firmware upgrade application purportedly was available for ████████████████████████████████████, substantial evidence does not support Ingenico's contention that the firmware upgrade application used the SDK functions, or that the firmware upgrade application and SDK constituted a single reference. Indeed, the evidence reflected that they were two separate offerings. Perhaps anticipating this, Ingenico proffered Mr. Geier's testimony on motivation to combine. However, Mr. Geier testified only that a POSITA would be motivated to combine the SDK with ***DiskOnKey devices***—not to combine the SDK with the ***firmware upgrade application***. *See* Trial Tr. 869:8-23. No evidence reflected a motivation to combine the SDK and firmware upgrade application, and evidence on version compatibility suggests the two were independent. Thus, substantial evidence does not support a verdict of invalidity based on the firmware upgrade application and the SDK, either as a single anticipatory reference or as an obviousness combination.

### 2.   A Verdict of Obviousness Based on Elazar Is Not Supported by Substantial Evidence

As discussed above, the overwhelming focus of Ingenico's invalidity case at trial was the firmware upgrade application.  Minimal attention was given to Elazar, which was presented only as a potential obviousness combination with the firmware upgrade application on the issue of

32

**Appx10566**

authentication. *See* Trial Tr. 860:13-862:24 (Geier) ("Q: So when you are talking about combining the DiskOnKey, like this patent, what part of this patent are you combining it with?  A. There were portions of this that dealt with different ways to authenticate, talking about the DiskOnKey."), 1363:22-1364:4 ("We're really only relying upon Elazar as an obviousness combination….[T]o the extent that there was any doubt that there was authentication of, with the DiskOnKey, this fills in the gap."). Accordingly, to the extent substantial evidence does not support the verdict based on the firmware upgrade application, the verdict must be set aside notwithstanding Elazar.

Further, because Elazar published after Mr. McNulty's conception date, *see* DX-363, qualifying Elazar as § 102(a) (or (e)) art required finding that Ingenico had proved by clear and convincing evidence that Mr. McNulty is not entitled to his July 2001 invention date.  As discussed above, the trial record cannot support a verdict based on that premise.  *See supra* V.A.1.e.

In addition, substantial evidence does not support a finding that a POSITA would be motivated to combine the ***firmware upgrade application*** with Elazar.  Mr. Geier's testimony addressed only motivation to combine Elazar with DiskOnKey devices generally, ***not*** with the firmware upgrade application Ingenico asserted as necessary prior art. *See* Trial Tr. 862:14-24. There was ***no*** testimony that addressed combining Elazar with any aspect of the firmware upgrade application. Thus, substantial evidence did not support obviousness based on that combination.

**B.    Alternatively, IOENGINE Should Be Granted a New Trial on Other Grounds**

In the event that IOENGINE is not granted judgment as a matter of law of no invalidity or a new trial on the above grounds, IOENGINE should be granted a new trial for two other reasons: (1) there were substantial errors in the jury instructions; and (2) Ingenico's presentation of the firmware upgrade application was precluded by IPR estoppel.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INGENICO INC., | |
| Plaintiff, | |
| v. | C.A. No. 18-826-WCB |
| IOENGINE, LLC, | JURY TRIAL DEMANDED |
| Defendant. | |
| | **REDACTED PUBLIC VERSION** |
| IOENGINE, LLC, | |
| Counterclaim Plaintiff, | |
| v. | |
| INGENICO, INC., INGENICO CORP., and INGENICO GROUP S.A., | |
| Counterclaim Defendants. | |

## INGENICO'S CORRECTED ANSWERING BRIEF IN OPPOSITION TO IOENGINE'S RENEWED MOTION AS A MATTER OF LAW, OR IN THE ALTERNATIVE, FOR A NEW TRIAL

OF COUNSEL:

Kerry L. Timbers
Sharona H. Sternberg
Sunstein LLP
100 High Street
Boston, MA 02110
(617) 443-9292
ktimbers@sunsteinlaw.com
ssternberg@sunsteinlaw.com

Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

*Attorneys for Plaintiffs and Counterclaim Defendants Ingenico, Inc., Ingenico Corp. and Ingenico Group S.A.*

Dated: September 16, 2022

*Confidential – Attorneys' Eyes Only*

productivity…DiskOnKey already comes with several applications that demonstrate this terrific new potential. Users can secure their devices and files using the KeySafe application, or upgrade their firmware using the Upgrade program." DX-089.

With respect to the Firmware Upgrade application, the jury saw a July 2002 email to numerous M-Systems employees—including employees located in Santa Clara, California—announcing the release of the Firmware Upgrade application, stating in bolded letters: "**Please pass this information to your partners, customers, reps and distributors."** DX-330. This email promoted the Upgrade application as a "unique capability offered by DiskOnKey **only,**" which supports the "DiskOnKey product line, starting from DiskOnKey firmware version 2.01 for all the capacities from 8MB to 512 MB." *Id.* This email attached a DiskOnKey "ReadMe" file, which contained the instructions and details regarding the Upgrade application's functionality, and encouraged its employees to "become familiarized with the application to better serve our customers." *Id.*; DX-331. The email announced that the "DiskOnKey Upgrade can be downloaded from the [DiskOnKey] website through the Download menu starting from July the 10th," and "the ReadMe file may also be viewed from our site." DX-330.

The jury was also presented with a concurrent July 11, 2002 M-Systems press release issued from California similarly publicly announcing the launch of the Upgrade application, which, according to the press release, "solidifies that the DiskOnKey is the only product in the keychain storage category offering storage capabilities combined with the functionality to run applications from the device." DX-097. In the press release, the worldwide M-Systems marketing manager explained that "[b]y developing the DiskOnKey upgrade, we are providing existing and new applications to our past, present, and future DiskOnKey users." *Id*. The Upgrade press release goes on to provide specific pricing and availability of the DiskOnKey, including for various

4

*Confidential – Attorneys' Eyes Only*

memory capacities, and lists it as available through major partners including Apple, Compaq, Dell and Targus. *Id*. The jury also saw screen captures of the DiskOnKey website from December 2002, in which users could download the Upgrade application. DX-402. *See also* Trial Tr. 742:4-743:3. Indeed, many DiskOnKey devices were sold in the U.S. after July 11, 2002 (when the Firmware Update was released) and before March 23, 2003 (the critical date for the on-sale and public use bars).   DX-316; DX-317; DX-320. *See also* DX-089 (Nov. 8, 2002 webpage stating that "DiskOnKey already comes with several applications [including the] Upgrade program.").

The jury heard significant testimony from Ingenico's expert, Mr. Geier, analyzing the Upgrade ReadMe file that was available on the DiskOnKey website and emailed to employees to distribute, as well as testimony regarding the Firmware Upgrade executable itself and other internal M-Systems presentations discussing the DiskOnKey functionalities and the Upgrade Application. Trial Tr. 795:4-827:2; DX-331; DX-328; DX-336; DX-304; DX-97, DX-330.[7] With respect to the public availability of the Upgrade Application, based on his expertise and experience as a POSITA at the time of the invention, Mr. Geier testified that based on the vast DiskOnKey sales, "there would be…many people that would think they need to upgrade the firmware and would be downloading the firmware" and the ReadMe file. *Id.* 1142:15-25. *See also id.* 914:15-915:9, 916:22-919:3 (discussing public availability of Upgrade application and SDK).

With respect to the DiskOnKey SDK, the jury likewise saw a California-issued September 25, 2002 press release announcing the launch of the SDK, in which M-Systems "Invite[d]

---

[7] Although one internal presentation states that "████████████████████████████████████████ ████████████████," this is likely because M-Systems hoped that customers would buy the latest DiskOnKey devices in lieu of simply upgrading the versions they already own. DX-336. This certainly does not prove the Upgrade application was *never* used, and all inferences must be in Ingenico's favor. In any event, this document similarly touts the functionality of the Upgrade application, and it corroborates that M-Systems widely publicized the Upgrade application, made it publicly available, and commercially exploited it as a differentiating factor to customers.

5

*Confidential – Attorneys' Eyes Only*

Developers to Design Applications for [its] Leading Keychain Storage Device," promoting its present availability to select partners and software development companies, and inviting customers to request the SDK by contacting M-Systems at the email address provided. DX-307. The M-Systems website from November 2002 similarly promoted the DiskOnKey as being "the only product in the keychain storage market to offer a Software Developers Kit," and show that users could download the SDK data sheet and click links for more information. DX-403. *See also* Trial Tr. 743:4-18. The jury also saw evidence and heard testimony related to the SDK itself, including an SDK guide from September 2002, the same month the official SDK was publicly announced. DX-333. Mr. Sobol testified about the functionalities described in the SDK and confirmed that it describes the functionalities that existed inside the DiskOnKey, and that the information in the SDK reflected how the product actually functioned. Trial Tr. 733:18-737:24, 744:11-21.

### 2. The DiskOnKey System as Invalidating Art under Anticipation and Obviousness Theories

At trial, Mr. Geier testified at length about the DiskOnKey functionality, the Upgrade Application, and the SDK, including how these disclose every element of the asserted claims to a POSITA and that a POSITA could look at the relevant device, documentation, and executable files and make and use the claimed invention without undue experimentation. Trial Tr. 780:19-864:3, 1133:7-1142:25. Mr. Geier also testified at length about the general knowledge of a POSITA at the time of the invention, and how these devices invalidate the asserted claims as both anticipated and obvious. Trial Tr. 753:8-779:12; 869:8-23.

Dr. Rubin confirmed much of Mr. Geier's testimony on cross-examination, including that a POSITA, looking at the Firmware Upgrade documentation, could understand how to make and use this system in the way it is disclosed without undue experimentation. *See* Trial Tr. 1093:5-24 (admitting that ReadMe teaches a POSITA steps of communication between a DiskOnKey and a

6

*Confidential – Attorneys' Eyes Only*

"claimed features of the patents [were placed] in the public's possession." *Dey*, 715 F.3d at 1359

(citation omitted); *Zenith*, 522 F.3d at 1356 ("the public use itself need not be enabling"). The

Federal Circuit has recently explained that § 102(b) "does not require a strict identity between the

claimed invention and the device involved in the public use or on sale activities; it only requires

that the differences between the claimed invention and the device used or sold would have been

obvious to one skilled in the art." *BASF*, 955 F.3d at 966-67 (internal quotations and citations

omitted)*. See also In re Blaisdell*, 242 F.2d 779, 783 (CCPA 1957) (finding public use even where

some elements of the invention are by their nature concealed from view). The public has been "put

in possession of [the] features" when the public is informed of, or can readily discern, the claimed

features of the invention in the allegedly invalidating prior art. *Dey*, 715 F.3d at 1359.

Here, Ingenico presented substantial evidence that all claimed aspects of the invention were

made public. Mr. Geier testified at length regarding the functionality of the Upgrade application,

as disclosed in the ReadMe and executable files, explaining how the product and software met

each asserted claim on a limitation-by-limitation basis. Trial Tr. 780:19-864:3, , 1133:7-1142:25;

DX-331; DX-328. *See Acoustic Tech., Inc. v. Itron Networked Sols., Inc*., 949 F.3d 1366, 1375-76

(Fed. Cir. 2020) ("[E]xpert testimony can constitute substantial evidence of anticipation when the

expert explains in detail how each claim element is disclosed in the prior art reference."). Indeed,

IOENGINE's own expert made numerous admissions admitting that, using the Firmware Upgrade

User Guide, a POSITA would understand how to make or use the product in a way that would

meet the claim limitations. Trial Tr. 1093:5-24; 1095:10-1096:7; 1100:10-1101:14; 1089:12-13.

Further, to the extent Dr. Rubin contended the product could also have been configured another

way, the jury was free to disregard this testimony and to credit Mr. Geier's testimony that the

product did in fact meet the claim limitations and inform the public of the claimed features of the

*Confidential – Attorneys' Eyes Only*

invention. *See Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*, No. 06-601-LPS, 2011 WL 4005444, at *4-5 (D. Del. Sept. 8, 2011), *aff'd*, 478 F. App'x 672 (Fed. Cir. 2012) (jury was free to discredit testimony that the sold prior art product may have been contaminated and thus would not have met the claim limitations); *Leader Techs.*, 678 F.3d at 1307 (Fed. Cir. 2012) ("[N]ormally, a witness's discredited testimony is not considered a sufficient basis for drawing a contrary conclusion," especially where there was substantial evidence that the product fell within the scope of the asserted claims).

IOENGINE provides no basis, let alone record evidence, to demonstrate that the version of the Firmware Upgrade that was available for download was meaningfully different than that which was analyzed by Mr. Geier. *See Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1029 (N.D. Cal. 2016) (rejecting argument that certain versions of the prior art product may not have contained the relevant functionality since Fujifilm cites no evidence that this was the case or of material variation among the models). The Firmware Upgrade application that Mr. Geier analyzed is the version that was sent to numerous M-Systems employees to distribute widely, and is the same version identified as being available for download from the DiskOnKey website. DX-330; DX-331; DX-097; DX-402. This version was released in July 2002, which matches the same time frame as the metadata associated with the executable file for the Upgrade application presented at trial. Trial Tr. 823:10-18; DX-329.

Further, source code was not required to evidence the application's operation. Patents can be invalidated by evaluating the operation or documentary evidence of a prior art product and not its source code.[9] *See Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (the

---

[9] IOENGINE's argument is belied by its own infringement analysis at trial for card readers  that lacked any reliance on source code, as well as its allegations regarding the scope of disclosures in the PDR Memo, which lacked corresponding code.

20

*Confidential – Attorneys' Eyes Only*

"public use of the high-level aspects of the SABRE system was enough to place the claimed features of the '359 patent in the public's possession"); *eBay Inc. v. Kelora Sys.*, LLC, No. C 10-4947 CW, 2012 WL 1835722, at *13 (N.D. Cal. May 21, 2012) (code unnecessary when defendants may prove invalidity by showing the operation of a prior art product); *Touchcom, Inc. v. Bereskin & Parr*, 790 F. Supp. 2d 435, 453-54 (E.D. Va. 2011) (rejecting argument that a product is not prior art because public would not have been able to see its source code). The jury was free to credit Mr. Geier's expert testimony that he did not need the source code for his analysis. Trial Tr. 1133:15-24. Further, "that the offered product is in fact the claimed invention may be established by any relevant evidence, such as memoranda, drawings, correspondence, and testimony of witnesses." *Lab'y Skin Care*, 2011 WL 4005444, at *5 (citing *Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1263 (Fed. Cir. 1991)).

Indeed, courts routinely find the public can discern the patented features of a prior art product based upon accompanying documentation, as was accomplished by the Upgrade and SDK documentation provided with the DiskOnKey. *See Pronova*, 549 F. App'x at 941-43 (sending of samples of the invention along with a certificate of analyses revealing all the claimed elements constituted invalidating public use); *Pixion, Inc. v. Citrix Sys., Inc.*, 887 F. Supp. 2d 881, 891-94 (N.D. Cal. 2012), *aff'd*, 500 F. App'x 954 (Fed. Cir. 2013) (ReadMe files accompanying the software properly used to corroborate the software functionality and disclosure under § 102(b) public use); *Versata Software*, 902 F. Supp. 2d at 847 (prior art manual sufficient to support jury's finding that the prior art software met claim limitations).

Moreover, the jury had substantial evidence to reach its finding, and as the verdict winner, Ingenico is entitled to all inferences in its favor with respect to the software functionality and scope of disclosure. Ultimately, "[t]he dispositive question regarding anticipation is whether one skilled

*Confidential – Attorneys' Eyes Only*

966-67; *Zenith*, 522 F.3d at 1356. In any event, the instructions, read in their entirety and in the context of the entire transcript, properly instructed the jury. *See Therasense*, 593 F.3d at 1331. The Court clearly and explicitly instructed the jury that the prior art must disclose the claim elements to be found anticipating, which reasonably conveys the same concept to the jury. Trial Tr. 1299:24-1300:6 ("to anticipate a claim, each element of the claim must be present in a single item of prior art…so that a person of skill in the art, considering that one item, could make and use the invention in the asserted claims…"). This same concept was highlighted to the jury throughout the trial, including during witness testimony and in closing arguments. *E.g.*, Trial Tr. 476:6-9, 1083:14-1084:3, 1299:24-1300:7. Given that as a whole, the jury instructions make clear that a POSITA must have been able to make or use the invention based on the prior art, there is no error in the instructions. *See Lab'y Skin Care,* 2011 WL4005444, at *6 (denying  motion for a new trial because "[a]s a whole, the instruction made clear that an embodiment of the claimed invention must have been offered for sale to find the claims invalid.").

This Court already rejected these same arguments from IOENGINE at trial based on sound analysis and careful consideration. Trial Tr. 1270:18-1276:1. With respect to the on-sale bar, the Court also correctly noted that a jury would not be able to understand the meaning of nuanced concepts borrowed from the Uniform Commercial Code such as: "only an offer that the other party could make into a binding contract simply by accepting it constitutes an offer for sale." *Id.* at 1273:23-1274:2. Additionally, there is no bright-line rule that an advertisement cannot rise to the level of an offer for sale under 102(b). *Id.* at 1273:10-1276. *See, e.g., Helifix Ltd. v. Block-Lok, Ltd*., 26 F. Supp. 2d 294 (D. Mass. 1998) (distribution of brochure detailing the product at international trade show constituted offer for sale under the on-sale bar). Adding IOENGINE's purportedly curative instructions would only confuse the jury and would not change the outcome.

**Appx10622**

*Confidential – Attorneys' Eyes Only*

Any alleged error, to the extent any exist, would be harmless because the jury was at least equally as likely to find for Ingenico under IOENGINE's proposed instructions given the ample evidence presented that the DiskOnKey was publicly available and the abundant evidence that the Upgrade software and SDK, along with the corresponding user guides, would enable a POSITA to make or use the claimed invention. *See Lab'y Skin Care*, 2011 WL4005444, at *7. M-Systems reported significant sales of DiskOnKey devices to U.S. customers after the launch of the Firmware Upgrade tool and the SDK, and documents in the form of press releases, website screenshots, and emails corroborate public availability. There is no reason to award IOENGINE a new trial where the jury instructions did not contain any clear error, especially where additional detail would serve only to confuse the jury rather than impact its findings.

### 4. IPR Estoppel Does Not Bar Reliance on the Firmware Upgrade Application

At summary judgment, this Court unequivocally ruled that "Ingenico is not estopped from relying on device art if, as it appears here, that device is not simply a printed publication invalidity theory in disguise…Ingenico may combine the DiskOnKey device…with other references that it raised or reasonably could have raised in the IPR proceeding, so long as that combination is substantively different from the grounds that were raised or reasonably could have been raised." D.I. 449 at 63. Ingenico's DiskOnKey prior art references presented at trial formed a substantially different combination of references that could not reasonably have been raised in the IPRs.

Ingenico did not rely on any DiskOnKey art in its IPRs, and IPR estoppel does not extend to prior-art devices. *See Microchip Tech. Inc. v. Aptiv Servs. US LLC*, No. 1:17-cv-01194-JDW, 2020 WL 4335519, at *4 (D. Del. July 28, 2020) ("Section 311 [] does not estop references based on physical prior art, whether standing alone or in combination with a printed reference."). Ingenico did not rest its invalidity theory on a single document; rather, Mr. Geier testified at length

39

*Confidential – Attorneys' Eyes Only*

about an actual hardware product and associated software. With respect to the functionality of the Firmware Upgrade application, Mr. Geier relied upon the executable file (DX-328) as well as the ReadMe file (DX-331), neither of which were public or reasonably available when Ingenico filed its IPR. Despite many searches, Ingenico only obtained these documents via a third-party subpoena that took many months. *See* D.I. 371 at 2-3, 10-12. Although the Firmware Upgrade ReadMe file was *once* publicly distributed and available on the M-Systems website, this document is over twenty years old and is no longer reasonably publicly available. Indeed, the only version of the ReadMe file that is now available is a version attached to an M-Systems email, which Western Digital designated as Confidential. DX-328. *See* D.I. 449 at 63, 61 n.22 ("To the extent that Ingenico relies on documents that are not public (i.e., they are not prior art publications), Ingenico will not be estopped from raising those documents because they could not reasonably have been raised as prior art publications."). *See also Clearlamp, LLC v. LKQ Corp.*, No. 12C25533, 2016 WL 4734389, at *8 (N.D. Ill. Mar. 18, 2016) (burden on the moving party to show that petitioner actually knew of the reference or that it could have been found by a diligent search).

Moreover, IOENGINE did not raise any objections to the admission of DX-331 on this basis before or during trial, nor did IOENGINE object to any testimony about this document or the inclusion of the Firmware Upgrade application in the jury instructions on invalidity. IOENGINE thus waived any objection on this basis. Fed. R. Evid. 103(a); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("[a]ny implicit objection on appeal is deemed waived by failing to object at trial).

## VI.   CONCLUSION

For the above reasons, Ingenico respectfully requests that the Court deny IOENGINE's motion for JMOL, or in the alternative, a new trial.

*Confidential – Attorneys' Eyes Only*

|                                    | */s/ Frederick L. Cottrell, III*            |
|------------------------------------|---------------------------------------------|

OF COUNSEL:

Kerry L. Timbers
Sharona H. Sternberg
Sunstein LLP
100 High Street
Boston, MA 02110
(617) 443-9292
ktimbers@sunsteinlaw.com
ssternberg@sunsteinlaw.com

Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

*Attorneys for Plaintiffs and Counterclaim Defendants Ingenico, Inc., Ingenico Corp. and Ingenico Group S.A.*

Dated: September 16, 2022

41

# EXHIBIT 1

# EXHIBIT A

Exhibit A
000001

```
 1            UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA

 3                 WESTERN DIVISION

 4

 5   PHOENIX SOLUTIONS, INC., a      )
     Maryland Corporation,           )
 6                                   )
                  Plaintiff and      )
 7                Counterclaim-      )   Case No.
                  Defendant,         )   2:09-cv-08156 MRP
 8                                   )   (SSx)
             vs.                     )
 9                                   )
     WEST INTERACTIVE CORP., a       )
10   Delaware Corporation,           )
                                     )
11                Defendant and      )
                  Counterclaim-      )
12                Plaintiff.         )
     _____)
13

14

15

16      VIDEOTAPED DEPOSITION OF CHRISTOPHER SCHMANDT

17                Boston, Massachusetts

18                Tuesday, June 15, 2010

19

20

21

22

23

24   Reported by:
     CAROL H. KUSINITZ, RPR
25   JOB No. 100615DWA

                                                      1
```

Exhibit A
000002

1       Q    And so since it was roughly 18 years ago, how

2    do you -- what, in your mind, places the date in 1990,

3    '91?

4       A    Oh, because it was fairly early when they got

5    the system working, and they were pleased and I was

6    pleased that they had done such a cool job extending the

7    software that we had given them and making it into a

8    working system.

9       Q    And was the Galaxy/Voyager system available to

10   the public in 1990?

11          MR. ROBERTS:  Objection.  Vague.  Calls for a

12   legal conclusion.

13      Q    Do you understand the question?

14      A    I'm not sure about the particular dates.  The

15   system, when I saw it, was very new.  I may have been

16   one of the first people to see it.  So I'm not sure.

17      Q    Do you know approximately -- well, first, do

18   you know if the Galaxy/Voyager system was ever made

19   available to the general public to use?

20          MR. ROBERTS:  Objection.  Vague.

21      A    I'm not --

22          MR. ROBERTS:  Calls for a legal conclusion.

23      A    I'm not quite sure what you mean by available

24   for use.  The system in certain periods, not in 1990,

25   but later, was available over the World Wide Web, so it

29

Exhibit A
000010

Appx10664

1    could be accessed over the World Wide Web.  The system

2    was available at various times over a telephone.  So as

3    long as you could dial a U.S. telephone number, you

4    could talk to the system.

5           The system was highly publicized.  You know,

6    this project was done with government funding.  It was

7    funded as part of the DARPA, Defense Advanced Research

8    Projects Agency, speech recognition work.  They funded

9    quite a few labs around the country in the 1990s to do

10   speech recognition work.

11          They had regular conferences and workshops with

12   published proceedings which they -- in particular, one

13   of the focuses of DARPA was to get all of these

14   researchers sharing information more readily, basically

15   so they could get better results for their research

16   dollars.

17          Instead of having these different labs

18   duplicate each other's efforts, they wanted to be able

19   to take the work from one lab and use it readily in

20   another, which is why, in fact, Galaxy at one point was

21   turned into the DARPA test bed and the code was given

22   over -- I think the subcontractor was MIT Lincoln

23   Labs -- to make a version, maintain a version of the

24   Galaxy software, which would be the official DARPA test

25   bed.

30

Exhibit A
000011

Appx10665

```
 1              Additionally, Victor Zue in particular is very

 2    good -- he's a very good man at publicizing his work.

 3    He speaks a lot.  He encourages his students to do so.

 4    It was important for him and his group, in terms of

 5    their career in the Computer Science Department at MIT,

 6    to have a lot of recognition.  That was very, very

 7    important for him politically.  So it was essential to

 8    publicize the work as much as possible.

 9         Q    So do you know when the Galaxy/Voyager system

10    was first publicized?

11         A    I don't know the dates of the first

12    publication.  Generally 1991, plus or minus a year or

13    two.

14         Q    So -- okay.  And why do you place it in

15    approximately 1991?

16         A    Because that's approximately the time that

17    they did it, and they were always very prompt about

18    publishing their results and presenting them.

19         Q    Did what?

20         A    I'm sorry?

21         Q    You said, "That's approximately the time that

22    they did it."

23         A    That they built the system.

24         Q    Approximately 1991?

25         A    1990, 1991.  I'm not certain.
```

31

Exhibit A
**000012**

**Appx10666**

```
1          Q     And do you know --

2          A     They say explicitly -- they say explicitly

3    that Galaxy can be used anywhere in the world using a

4    web browser and a telephone.

5          Q     Where does it say that?

6          A     The end of the first paragraph on -- the page

7    that ends with Bates Nos. 095.  It's Exhibit B, Page 14.

8          Q     And what sentence are you looking at?

9          A     "Finally, Galaxy is mobile.  It can be

10   launched anywhere in the world using an ordinary Web

11   browser for display and a telephone for speech

12   input/output."

13         Q     And do you know whether that in fact had

14   occurred as of the writing of this article?

15         A     I'm not certain when the article was written.

16   Certainly by the time that it was -- by the time that it

17   was published, I had seen it in use.  So, yes.

18         Q     You had seen it in use in what way?

19         A     I had -- sorry?

20         Q     No, go ahead.

21         A     I had used it in the SLS lab.

22         Q     Okay.  So within the lab at MIT you had used

23   the Galaxy system; is that correct?

24         A     You know, again, "Galaxy" is a term that they

25   would use, okay?  So --
```

63

Exhibit A
**000013**

**Appx10667**

1       Q    Well, what time in its history?  Galaxy

2    existed for a long time, correct?

3       A    Galaxy was always a multidomain system.  That

4    was the whole point.

5       Q    And with respect to Galaxy, do you know

6    whether the speech recognition and the natural language

7    occurred on different processors?

8       A    I don't know whether it did or did not.

9       Q    And do you know whether, for Galaxy, whether

10   the speech recognition and natural language occurred on

11   different servers?

12      A    I don't know that either.  No.  Let me stop

13   there, because there's a difference between processors

14   and servers, and in the way the term is being used in

15   the description of the Galaxy system, I believe they

16   would say they were different servers.

17      Q    And on what basis do you say that?  Where is

18   the documents to support that?

19      A    I would have to take a look here.  (Reviewing

20   documents)  Well, back to Exhibit B, Bates number ends

21   in 095.  At the very top they say, "Galaxy uses a

22   client-server architecture to allow sharing of

23   computationally intensive processes, as well as

24   knowledge intensive processes."

25           Now, I don't know whether they consider each of

137

Exhibit A
000029

Appx10683

Christopher Schmandt
6/15/2010

```
 1        not part of the laboratory that was creating Galaxy?

 2             A    I was not part of the group or part of the

 3        laboratory or part of the department.

 4             Q    So -- but was Galaxy available to you,

 5        notwithstanding the fact that you were not a part of the

 6        group, laboratory or department?

 7             A    Yes.  All I had to do was ask, and I could use

 8        it.

 9             Q    Were the people who were developing Galaxy

10        attempting to keep it a secret?

11             A    No.  Quite the contrary.

12             Q    How do you know that?

13             A    Because they gave lots of talks about it,

14        because all their seminars were open to the public and

15        were actually well attended by people in the Cambridge

16        area.  And they gave many demonstrations of the system,

17        and they have a very impressive publication record.

18             Q    Were the people who were using Galaxy or who

19        were creating Galaxy attempting to prevent people from

20        using Galaxy, or were they trying to get people to use

21        it?

22             A    No, they wanted people to use it, because the

23        more people who use it, the more data you get, and if

24        you get data, you can do evaluations and publish more

25        papers.
```

148

**GRADILLAS COURT REPORTERS**
(310) 859-6677

Exhibit A
**000030**

## CERTIFICATE OF SERVICE

I, Neal C. Belgam, hereby certify that on October 7, 2022, a true and correct copy of the

foregoing was served on the following counsel via email:

Frederick L. Cottrell, III
Christine D. Haynes
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
cottrell@rlf.com
haynes@rlf.com

*/s/ Neal C. Belgam*
Neal C. Belgam (No. 2721)

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
    INGENICO, INC.,                   )
 4  --------------------Plaintiff,    )
 5                                    )Case No.
          vs.                        )18-826-WCB
 6                                    )
    IOENGINE LLC,                     )
 7  --------------------Defendant.    )
 8
 9     TRANSCRIPT OF MOTION FOR JUDGMENT AS A MATTER
10                         OF LAW
11
12         MOTION FOR JUDGMENT AS A MATTER OF LAW
13     had before the Honorable William C. Bryson,
14     United States Circuit Court Judge, via
15     teleconference on the 6th December, 2022.
16
17
18                     APPEARANCES
19         SMITH KATZENSTEIN & JENKINS LLP
20            BY:  EVE ORMEROD, ESQ.
                    -and-
21
           DECHERT LLP
22            BY:  NOAH LEIBOWITZ, ESQ.
23                           Counsel for Plaintiff
24
25
```

```
 1   (Appearances continued.)
 2
 3     RICHARDS, LAYTON & FINGER, P.A.
          BY:  KELLY E. FARNAN, ESQ.
 4
                    -and-
 5
       SUNSTEIN LLP
 6        BY:  KERRY TIMBERS, ESQ.
             SHARONA STERNBERG, ESQ.
 7
               Counsel for Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        THE COURT:  This is an argument on
2   the motion for judgment as a matter of law and
3   in the alternative for a new trial in *Ingenico*
4   *against Ioengine*, Number 18-826.  Who is going
09:30AM 5   to be speaking for the plaintiff?
6        MR. LEIBOWITZ:  Good morning, Your
7   Honor.  Noah Leibowitz for Ioengine.
8        THE COURT:  Okay.  And for the
9   defendant?
09:30AM 10        MR. TIMBERS:  Good morning.  Kerry
11   Timbers.
12        THE COURT:  So, Mr. Leibowitz and
13   Mr. Timbers, you're going to be handling the
14   entire proceeding?
09:30AM 15        MR. TIMBERS:   Actually, my colleague
16   Sharona Sternberg will be handling the new
17   trial aspect.
18        THE COURT:  One piece of information
19   about the proceeding.  We had a request from a
09:30AM 20   third party to listen in on the argument, and I
21   told them that they could, given that this is a
22   public proceeding, so people should be aware
23   that if there is any confidential information,
24   you should be careful to skirt around it.  But
09:31AM 25   I, frankly, doubt that there will be anything

1   that falls in that category, but just in case,
2   you should be aware that this is not a private
3   session.
4        All right.  I think the way we'll proceed
09:31AM 5   is I will give 20 minutes per side,
6   essentially, uninterrupted.  I may have a
7   question to throw in from time to time if I'm
8   just not following.  Contrary to my usual
9   system, I will give you an opportunity to speak
09:31AM 10   and make your points without my jumping in
11   every two seconds.  After that, if I have any
12   questions, I will then ask my questions at that
13   point.
14        So let's just go ahead and jump right in.
09:32AM 15   We'll begin with Mr. Leibowitz.
16        20 minutes, Mr. Leibowitz, and then we'll
17   go to Mr. Timbers and Ms. Sternberg as they
18   decide to divide their time.
19        MR. LEIBOWITZ:  Thank you, Your
09:32AM 20   Honor.  This is Noah Leibowitz.
21        Before we get started, who is the third
22   party?  Obviously, if we were all together,
23   we'd probably be able to see who they are.
24        THE COURT:  Well, as I understand
09:32AM 25   it -- hold on just a second.

Appx10686

1  required by the law.
2       For those reasons, in addition to the
3  other reasons we mentioned in our brief, we do
4  not think that a new trial is warranted.
10:12AM 5       THE COURT:  All right.  Very well.
6  Let me ask a few questions, then, since we're
7  done with our uninterrupted period.
8       First, Mr. Timbers, why don't you review
9  with me or for me the evidence that you think
10:12AM 10  supports the view that all of the components
11  necessary to establish anticipation were
12  present in the version of the DiskOnKey that
13  was made available and/or sold as of
14  November 2002, during the period between
10:13AM 15  November 2002 and March 23, 2003.
16       MR. TIMBERS:  All right.  So the
17  key --
18       (Cross-talk.)
19       THE COURT:  Let me back up just a
10:13AM 20  little and give you some context for the
21  question.
22       Mr. Leibowitz argued that the DiskOnKey
23  that was sold -- he concedes that many
24  DiskOnKeys were sold, but he said, well, they
10:13AM 25  were blank.  And your argument is not maybe as

1  of 2000, but not as of some period prior to the
2  critical date.  So I'm really looking to you to
3  tell me what evidence there was that the
4  version of the DiskOnKey that was both used in
10:14AM 5  this country, if it was, and sold in this
6  country had all the components of all the
7  limitations of the claims.
8       MR. TIMBERS:  Yes, Your Honor.  Just
9  one moment.
10:14AM 10       So DDX 330 is the e-mail.
11       THE COURT:  That was DX 330?
12       MR. TIMBERS:  DX 330.  And DX 330 has
13  in it the -- right -- it's the e-mail attaching
14  the Read Me file, and it says, "This is for
10:14AM 15  release."  And then the next day was the actual
16  press release which then made all this
17  information available to the public.  And in
18  the Read Me file is the explanation of how the
19  firmware update works and the firmware update,
10:15AM 20  and one of the keys to this is that screen that
21  actually shows what a user sees, so for
22  example --
23       (Cross-talk.)
24       THE COURT:  Let me interrupt,
10:15AM 25  Mr. Timbers.  I'm sorry.  I understand that

1  argument about the availability of the update.
2       MR. TIMBERS:  Yes.
3       THE COURT:  What I'm really looking
4  to you for now is a slightly different
10:15AM 5  question, which is what was actually on the
6  DiskOnKey that was sold or made available for
7  use starting, let's say, as early as November
8  of 2002?  Was that not what was available for
9  uploading to preexisting DiskOnKeys that didn't
10:16AM 10  already have that feature?
11       MR. TIMBERS:  Okay.  So the DiskOnKey
12  had a processor, the ARM7, and that processor
13  ran firmware, which is software, that allowed
14  it to run applications and allowed it to
10:16AM 15  respond to requests from another device, for
16  example, from the computer that it was plugged
17  into.  And so that's what the SDK was all about
18  because the SDK allowed programmers to make
19  applications and to give commands to the
10:17AM 20  DiskOnKey and have it run those commands on its
21  firmware.  So unlike most "blank" USB storage
22  devices -- and this is what Mr. Harkabi and
23  Mr. Elazar emphasized -- unlike most "blank"
24  devices, this had a processor that had software
10:17AM 25  running on it with memory associated with it

1  that allowed it to communicate with the
2  computer in a way that regular USB blank
3  devices cannot.  So that's what was on the
4  DiskOnKey in its native form.  Software --
10:17AM 5  effectively, it's a computer because it has
6  everything that a computer needs.  It also, of
7  course, had an interface that allowed it to
8  communicate with the computer.
9       THE COURT:  All right.  I still am
10:18AM 10  looking for a specific piece of information,
11  which is, was there a version of the DiskOnKey
12  that had the upgrade firmware, the upgrade
13  application, already loaded at the time it was
14  used or sold?  And what I'm looking at, I'm
10:18AM 15  looking at DX 89, which you're familiar with.
16  You cited it.  And it refers to the
17  DiskOnKey -- this is in the last paragraph of
18  this item.  It says, "The DiskOnKey already
19  comes with several applications that
10:18AM 20  demonstrate this terrific new potential.  Users
21  can secure their devices and files using the
22  Key Safe application or upgrade their firmware
23  using the upgrade program."
24       So, presumably, that sounds like it's
10:19AM 25  saying that the upgrade program was on the

**Appx10694**

1  DiskOnKey that was available for purchase as of
2  November 8, 2002, at the latest.  Is that a
3  fair characterization of what that exhibit
4  says?
10:19AM 5        MR. TIMBERS:  Just a moment, Your
6  Honor.  So this does say exactly that.  It
7  says, ". . .can upgrade their firmware using
8  the upgrade program."  So absolutely, it does
9  say that, Your Honor.
10:19AM 10       THE COURT:  All right.  And now the
11  next question is, how do we know that these
12  DiskOnKeys, the ones referred to in the website
13  page, the web page that was -- well, I guess at
14  the latest November 8, 2002 -- how do we know
10:20AM 15  that those were the ones that were the subjects
16  of the numerous sales that are shown in the two
17  spreadsheets, DX 316 and DX 317, which show
18  several hundred sales in the U.S. between
19  November 8th and March 23rd?
10:20AM 20       MR. TIMBERS:  Well, the way we know
21  that is that this DiskOnKey available at this
22  time, which is this November 8, 2002, date,
23  were the subject of -- basically, there's
24  always one DiskOnKey available in different
10:20AM 25  capacities, but all the hardware on each

1  DiskOnKey is the same.  There's no evidence
2  that there were more than one of these at any
3  given time, and we have sales during this
4  period in the spreadsheet.
10:21AM 5        THE COURT:  Okay.  Yes.  Is there
6  anything on the spreadsheet or otherwise that
7  would tell me that the particular DiskOnKeys
8  that were the subjects of all of those sales,
9  or at least some of them, are the DiskOnKey
10:21AM 10  that is described in DX 89?
11       Do you understand the question?  It may
12  be a little --
13       MR. TIMBERS:  I do, Your Honor.
14  There's not going to be -- yes, Your Honor.
10:21AM 15  There's not going to be an explicit statement
16  that this is the same.  What we know is that at
17  any given time, there was one DiskOnKey
18  product.  In different capacities, understand,
19  but the firmware and the processor is all the
10:21AM 20  same.  And in fact, that's what the witnesses
21  talked about.  The witnesses said it always,
22  always used the ARM7 all of the products used
23  the ARM7.
24       THE COURT:  I understand that.  If I
10:22AM 25  can go back with you, you said that there was

1  evidence that there was only one DiskOnKey
2  available at any given time.  What evidence do
3  you have of that?
4        MR. TIMBERS:  Well, when you look at
10:22AM 5  the spreadsheet, Your Honor, of all the sales,
6  all you see in terms of differences in the
7  DiskOnKey would be the capacities.  There's
8  no -- every time the DiskOnKey is talked about,
9  it's just talked about as the DiskOnKey.  What
10:22AM 10  we don't have is DiskOnKey red and DiskOnKey
11  blue.  I'm saying "red" and "blue" as in
12  they're different products.  It was one
13  product, always just one product, and that's
14  clear from the context of everything that's
10:22AM 15  ever been said about DiskOnKeys, and that's
16  true in the testimony as well as in all the
17  documents.  It just talks about DiskOnKey.
18  It's the DiskOnKey product, and there were
19  changes over time to it, but at any given time,
10:23AM 20  there's no evidence -- I mean, all the evidence
21  is actually quite clear in the context of all
22  of this, that there's a DiskOnKey on sale at
23  any given time.  And that the features are all
24  the same.  Again, with one change, and that is
10:23AM 25  how much memory it had in it, because it does

1  come in different capacities.
2        THE COURT:  So if I had contacted
3  mSystems or one of their retailers in December
4  of 2002 and said I want a DiskOnKey but I don't
10:23AM 5  want the copy -- the version of the DiskOnKey
6  that has all these additional features on it, I
7  just want the blank DiskOnKey, I would not have
8  been able to get one?
9        MR. TIMBERS:  I don't see how you
10:24AM 10  could because it would require removing
11  something, like a person to actually remove the
12  stuff from the product, which would be --
13       THE COURT:  If they had some
14  inventory left over, let's say from earlier
10:24AM 15  times -- what I'm really trying to get at is,
16  is it clear that there was only one type of
17  DiskOnKey that was being offered for sale at
18  that time?
19       MR. TIMBERS:  I think the context
10:24AM 20  makes it absolutely clear that there was one
21  DiskOnKey, and this is actually saying this is
22  what it comes with.  At this time, it's saying
23  our DiskOnKeys come with this.  For example --
24       THE COURT:  Let me ask this question,
10:24AM 25  Mr. Timbers.  As I read the spreadsheets, there

1 are references to the DiskOnKey, the DiskOnKey
2 Titan, and the DiskOnKey for Apple. What were
3 the differences among those? Because that
4 sounds to me as if it's three different
10:25AM 5 DiskOnKeys.
6 MR. TIMBERS: That's the form factor.
7 So the only difference is that to plug it into
8 an Apple, you need a different connecter.
9 And I'm sorry. I'm being corrected.
10:25AM 10 It's how it looked. It's the outer skin, not
11 what was inside. And in fact, on the issue
12 of --
13 (Cross-talk.)
14 MR. TIMBERS: Well, Mr. -- I believe
10:25AM 15 it was Mr. Elazar or Mr. Harkabi who talked
16 about what was special about the DiskOnKey was
17 that it could work with Windows and it could
18 work with Apple because it had the processor
19 and it had the firmware and that allowed it to
10:26AM 20 be independent of the operating system,
21 completely independent. So the idea was that
22 the DiskOnKey could work with any computer, and
23 I'm told that the Apple version is not a
24 difference of what's inside, but the skin is
10:26AM 25 different so that people -- it's more clear to

1 people that it can be used with the Apple. But
2 there was testimony at trial that the DiskOnKey
3 could be used with either of those types of
4 operating systems.
10:26AM 5 THE COURT: All right. Let me ask
6 you a different question. I do not recall in
7 your closing argument that you made an argument
8 that the press releases constituted an
9 invalidating offer for sale. My recollection
10:26AM 10 is that your argument -- your references to the
11 press releases were simply by way of saying
12 that these are the dates on which the various
13 features were added to the DiskOnKey, and I'm
14 directing this to the issue that was raised
10:27AM 15 with respect to the instructions on the absence
16 of any elucidation, as Mr. Leibowitz described
17 it, to the jury of what constitutes an offer
18 for sale.
19 Do you disagree? Did you make the
10:27AM 20 argument that the press releases were an offer
21 for sale? That is not my understanding of what
22 your argument was. I understood that you were
23 relying on the spreadsheets as the indications
24 of the sales.
10:27AM 25 MR. TIMBERS: My recollection is not

1 different from yours, Your Honor, and I would
2 have to look carefully at the transcript to see
3 if my recollection is wrong, which it's
4 possible.
10:28AM 5 THE COURT: Well, I've read the
6 transcript, and I believe that's the case. I
7 just wanted to confirm that that was what you
8 understood that you were arguing.
9 All right. Let me give Mr. Leibowitz --
10:28AM 10 I believe I'm going back and forth.
11 Mr. Timbers, let me give Mr. Leibowitz a chance
12 to respond if he has anything to add on any of
13 the questions that I've asked.
14 MR. LEIBOWITZ: Thank you, Your
10:28AM 15 Honor, and I do.
16 So I think Your Honor pointed Mr. Timbers
17 to the one snippet of a sentence talking about
18 DiskOnKey already comes with several
19 applications, and that's really the only thing
10:29AM 20 in the record, and I would say there was no
21 testimony about what that means. There was no
22 discussion about that aspect of this document
23 at all during the trial, and that's what
24 they -- that is what they hang their hat on in
10:29AM 25 their brief, though.

1 And I think Your Honor asked the question
2 is it fair to assume or presume that that is --
3 that that means that there were DiskOnKeys that
4 were sold with the firmware updater on it. And
10:29AM 5 I think for a number of reasons, some of which
6 as Your Honor's questioning shows, it is not
7 fair to do that, absolutely not fair, and
8 certainly not fair to take that inference as
9 clear and convincing evidence that that, in
10:29AM 10 fact, happened. There's absolutely no evidence
11 in the record of a DiskOnKey with any
12 application on it whatsoever in terms of being
13 sold. The spreadsheet that Your Honor pointed
14 to --
10:29AM 15 First of all, Mr. Timbers said there's
16 only one DiskOnKey. That is absolutely
17 incorrect based on the record. There's a
18 DiskOnKey Titan, there's a DiskOnKey T3,
19 there's the DiskOnKey for Apple that Your Honor
10:30AM 20 pointed to, there's a DiskOnKey 2.0. There are
21 multiple versions, aside from just the capacity
22 of the storage, of DiskOnKey. And so there's
23 no way to tell whether any of those had this
24 firmware updater loaded on it before it was
10:30AM 25 sold. And there's no evidence that any of

Appx10696

1  them did.  The only evidence in the record is
2  that the firmware updater was available for
3  download.  If you read the sentence --
4          THE COURT:  Mr. Leibowitz, let me ask
10:30AM  5  you.  You say the only evidence was for
6  download, but the document DX 89 is suggesting
7  what's on the DiskOnKey is the upgrade program.
8  So that's not simply saying that an owner of
9  the DiskOnKey can download that because it
10:31AM  10  would appear it was true back in September.
11  But at least as of November, the suggestion in
12  DX 89 is that the upgrader was already
13  incorporated into the DiskOnKeys that were
14  available then.  That would be my
10:31AM  15  interpretation of that language.  Is that not a
16  reasonable interpretation?
17          MR. LEIBOWITZ:  So, Your Honor, I
18  don't think that's what the sentence means.  I
19  think if you read the sentence in context, what
10:31AM  20  the sentence is talking about is the prior
21  paragraph talks about having other developers
22  develop applications for the DiskOnKey.  And
23  then this is contrasting that with applications
24  that are already available from mSystems with
10:31AM  25  respect to the DiskOnKey.  By saying the

1  DiskOnKey already comes with several
2  applications, I don't think this is implying
3  that it's preloaded on the device.  Other than
4  the sentence --
10:31AM  5          THE COURT:  Mr. Leibowitz, "comes
6  with" strikes me as pretty strong indication
7  that it's on the DiskOnKey.  That would
8  certainly be my reading of that language.  Am I
9  way off base here?
10:32AM  10          MR. LEIBOWITZ:  Well, look, I
11  disagree with that, Your Honor, but I think
12  there is a bigger problem with that reading,
13  and it's as follows:  We don't know -- we're
14  assuming.  Let's assume that Your Honor is
10:32AM  15  correct that there is a version of a firmware
16  upgrader that was loaded on the DiskOnKey.  One
17  problem is we don't know if any of those
18  DiskOnKeys were actually sold.  As Your Honor
19  pointed out, there's no indication, no way to
10:32AM  20  parse and tell from the spreadsheets that there
21  are DiskOnKeys with the firmware updater on it
22  that were sold versus DiskOnKeys that did not
23  have the firmware updater on it.
24          I think your question to Mr. Timbers was
10:32AM  25  if I called up and said I want one without the

1  firmware updater, could I get one?  Absolutely,
2  and we don't think there's any inference
3  anywhere on the record that, in fact, this was
4  on all or some or any of the DiskOnKeys.
10:33AM  5          But even assuming -- putting that aside,
6  the other issue is there's no evidence of what
7  that firmware updater, the one that came on the
8  DiskOnKey, how -- what that firmware updater
9  did or how it works.  The only evidence in the
10:33AM  10  case was with respect to a firmware updater
11  that was available for download, and that's the
12  Read Me file that's attached to the e-mail that
13  says this is something we're making available
14  for download.
10:33AM  15          And that's important here, especially if
16  Your Honor reads this the way you do, sounds
17  like you do, in terms of "comes with" means it
18  comes with.  The prior paragraph, right, talks
19  about these applications, right, the processors
10:33AM  20  in the family of the DiskOnKey technology, and
21  it says the processor runs applications
22  straight from the device, not from the host
23  computer.  Okay.  If that's true, if the
24  upgrader that's coming with the DiskOnKey comes
10:34AM  25  with it and preloaded on it, is running from

1  the DiskOnKey and not at all from the computer,
2  that's a problem for them because the first
3  program code -- in all of the claims that are
4  at issue here, it's first program code executed
10:34AM  5  on the terminal on the computer.
6          Now, that issue didn't come up with the
7  case because what they were pointing to was a
8  version of the upgrader that was downloaded to
9  a computer.  And yes, you clicked on it on your
10:34AM  10  computer, and the first program code was
11  executing on the terminal on the computer.  If
12  there were a version -- assuming there were a
13  version of the firmware upgrader that was
14  preloaded on the DiskOnKey, there was no
10:34AM  15  evidence in this case as to how that worked.
16  We don't know whether that was the same
17  upgrader or not, and we don't know whether it
18  would have satisfied the other limitations of
19  the claim, and that's important in particular
10:35AM  20  because there's evidence in the record that
21  there were other ways, other updaters.  You
22  have testimony from Mr. Harkabi, and this is at
23  page 700 of the transcript, 700 line 24, that
24  there was an updater that was a available "not
10:35AM  25  as an application."

**Appx10697**



http://www.m-sys.com/technology/DOKTechnology.asp          Go   OCT **NOV** DEC

11 captures
8 Nov 2002 - 9 Jun 2003                                         2001 **2002** 2003

日本語 简体 繁體

**PRODUCTS**
**TECHNOLOGY**
**TrueFFS Technology**
**Security Technology**
**x2 Technology**
**DiskOnChip Technology**
**DiskOnKey Technology**
**APPLICATIONS**
**PARTNERS**

**MOBILE DEVICES**

# DiskOnKey Technology

**M-Systems** has already proven itself as the creator and leader of the **keychain storage market**, bringing end-users a solid-state, ultra-portable storage alternative, and is continuing to lead the revolution in portable flash storage technologies.

**DISKonKEY**  **DiskOnKey technology** is the only portable keychain storage device that can run applications. That's what sets us apart from our competition - we offer raw computing power. Proving our pioneering spirit once again, we offer a powerful on-board ARM7 32 bit processor that will change the way consumers are using their portable storage devices. The processor runs applications straight from the device - not from the host computer. This means applications are now just as mobile as data, and there's no need to carry around CDs or install any software.

Along with the computing power, we provide the platform required to develop applications and translate this power into user productivity. Our partners will be able to develop custom applications and extend their offerings to target niche markets. This value-added application solution will drive customer demand and offer them more than ever before.

**DiskOnKey** already comes with several applications that demonstrate this terrific new potential. Users can secure their devices and files using the KeySafe application, or upgrade their firmware using the Upgrade program.

**Click here to go to the DiskOnKey web site.**

Home | About M-Systems | News & Events | Technical Support | Contact
DiskOnKey | DiskOnChip | IDE/SCSI Flash Disks

Legal Terms of Use | info@m-sys.com | webmaster@m-sys.com



Ingenico Inc. v. IOENGINE LLC

**DX-089**

C.A. No. 18-cv-00826-WCB

INGEN-0100698

DX-089.1
**Appx10931**

# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

---

# FORM 20-F/A

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### For the fiscal year ended December 31, 2002

---

# M-SYSTEMS FLASH DISK PIONEERS LTD.

(Exact name of Registrant as specified in its charter and translation of Registrant's name into English)

---

**Israel**

(Jurisdiction of incorporation or organization)

## 7 Atir Yeda St., Kfar Saba, Israel 44425

(Address of principal executive offices)

---

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| N/A | N/A |

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**Ordinary Shares, nominal value 0.001 New Israeli Shekel per share**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

27,485,361

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:

Yes [X]     No [ ]

Indicate by check mark which financial statements the registrant has elected to follow:

Item 17 [ ]     Item 18 [X]

---

Ingenico Inc. v. IOENGINE LLC

**DX-091**

C.A. No. 18-cv-00826-WCB

**Exhibit 0005**

Sobol

## EXPLANATORY NOTE

This Amendment No. 1 on Form 20-F/A (the "Amended 20-F") speaks as of the filing date of our Form 20-F for the fiscal year ended December 31, 2002, filed on June 30, 2003 (the "Original 20-F"), except for the certifications which speak as of their respective dates and the filing date of the Amended 20-F. Except as specifically indicated, the Amended 20-F has not been updated to reflect events occurring subsequent to the filing of the Original 20-F.

## PRELIMINARY NOTE

THIS ANNUAL REPORT CONTAINS HISTORICAL INFORMATION AND FORWARD-LOOKING STATEMENTS. STATEMENTS LOOKING FORWARD IN TIME ARE INCLUDED IN THIS ANNUAL REPORT PURSUANT TO THE "SAFE HARBOR" PROVISION OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THEY INVOLVE KNOWN AND UNKNOWN RISKS AND UNCERTAINTIES THAT MAY CAUSE OUR ACTUAL RESULTS IN FUTURE PERIODS TO BE MATERIALLY DIFFERENT FROM ANY FUTURE PERFORMANCE SUGGESTED HEREIN, INCLUDING ALL OF THE RISKS AND UNCERTAINTIES DISCUSSED BELOW IN ITEM 3.D "RISK FACTORS" AND ELSEWHERE IN THIS REPORT. FURTHERMORE, WE OPERATE IN AN INDUSTRY SECTOR WHERE SECURITIES VALUES MAY BE VOLATILE AND MAY BE INFLUENCED BY ECONOMIC AND OTHER FACTORS BEYOND THE COMPANY'S CONTROL. FUTURE EVENTS AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE SET FORTH IN, CONTEMPLATED BY OR UNDERLYING THE FORWARD-LOOKING STATEMENTS AND THUS RELIANCE SHOULD NOT BE PLACED ON THESE FORWARD-LOOKING STATEMENTS, WHICH ARE APPLICABLE ONLY AS OF THE DATE HEREOF. IN THE CONTEXT OF THE FORWARD-LOOKING INFORMATION PROVIDED IN THIS ANNUAL REPORT AND IN OTHER REPORTS, PLEASE REFER TO THE DISCUSSIONS OF RISK FACTORS DETAILED IN, AS WELL AS THE OTHER INFORMATION CONTAINED IN, THIS ANNUAL REPORT AND OUR OTHER FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION.

WE URGE YOU TO CONSIDER THAT STATEMENTS THAT USE THE TERMS "BELIEVE," "DO NOT BELIEVE," "EXPECT," "PLAN," "INTEND," "ESTIMATE," "ANTICIPATE," "PROJECT" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THESE STATEMENTS REFLECT OUR CURRENT VIEWS WITH RESPECT TO FUTURE EVENTS AND ARE BASED ON ASSUMPTIONS AND ARE SUBJECT TO RISKS AND UNCERTAINTIES.

EXCEPT AS REQUIRED BY APPLICABLE LAW, INCLUDING THE SECURITIES LAWS OF THE UNITED STATES, WE DO NOT INTEND TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE AND WE DISCLAIM ANY OBLIGATION TO PUBLICLY REVISE ANY SUCH STATEMENTS TO REFLECT ANY CHANGE IN EXPECTATIONS OR IN EVENTS, CONDITIONS, OR CIRCUMSTANCES ON WHICH ANY SUCH STATEMENTS MAY BE BASED.

INGEN-0100716

# INDEX

## PART ONE

Item 1.      Identity of directors, senior management and advisors – not applicable
Item 2.      Offer statistics and expected timetable – not applicable
Item 3.      Key information
Item 4.      Information on the company
Item 5.      Operating and financial review and prospects
Item 6.      Directors, senior management and employees
Item 7.      Major shareholders and interested party transactions
Item 8.      Financial information
Item 9.      The offer and listing
Item 10.     Additional information
Item 11.     Quantitative and qualitative disclosures about market risk
Item 12.     Description of securities other than equity securities – not applicable

## PART TWO

Item 13.     Defaults, dividend arrearages and delinquencies – not applicable
Item 14.     Material modifications to the rights of security holders and use of proceeds – not applicable
Item 15.     Controls and procedures
Item 16A.    [Reserved]
Item 16B.    [Reserved]
Item 16C.    [Reserved]

## PART THREE

Item 17.     Financial statements – not applicable
Item 18.     Financial statements
Item 19.     Exhibits

## EXHIBIT INDEX

## FINANCIAL STATEMENTS

## SIGNATURES

## CERTIFICATIONS

Unless the context otherwise requires, all references in this annual report to "M-Systems", "we", "our", "us" and the "Company" refer to M-Systems Flash Disk Pioneers Ltd. and its consolidated subsidiaries. References to "dollars" or $ are to United States dollars.

All references herein to "ordinary shares" shall refer to our ordinary shares, nominal value 0.001 New Israeli Shekel per share.

## ITEM 1.  IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISORS

– Not applicable

## ITEM 2.  OFFER STATISTICS AND EXPECTED TIMETABLE

– Not applicable

1

INGEN-0100718

## item 3. KEY INFORMATION

### A. SELECTED FINANCIAL DATA

The following selected summary of financial information was derived from our Consolidated Financial Statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The selected summary data should be read in conjunction with, and are qualified in their entirety by, our Consolidated Financial Statements and notes thereto, which are presented elsewhere herein and by reference to "Item 5: Operations and Financial Review and Prospects."

**Summary Consolidated Financial Information**

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 |
| | (in thousands, except per share data) | | | | |
| Statement of Operations Data: | | | | | |
| Revenues | $ 16,351 | $ 30,430 | $ 92,589 | $ 44,678 | $ 64,817 |
| Cost of revenues | 9,834 | 20,735 | 64,281 | 60,573 | 44,415 |
| Gross profit (loss) | 6,517 | 9,695 | 28,308 | (15,895) | 20,402 |
| Operating expenses: | | | | | |
| Research and development, net | 2,237 | 3,137 | 7,364 | 13,290 | 11,974 |
| Selling and marketing, net | 4,310 | 6,779 | 11,535 | 12,122 | 12,547 |
| General and administrative | 1,264 | 1,772 | 2,809 | 3,913 | 4,000 |
| In-process research and development write-off | --- | --- | 6,215 | --- | --- |
| Total operating expenses | 7,811 | 11,688 | 27,923 | 29,325 | 28,521 |
| Operating income (loss) | (1,294) | (1,993) | 385 | (45,220) | (8,119) |
| Other income (expenses), net | 785 | --- | --- | (1,193) | --- |
| Financial income, net | 202 | 217 | 5,875 | 4,628 | 2,619 |
| Income (loss) before minority interest in losses of a Subsidiary | $ (307) | $ (1,776) | $ 6,260 | $ (41,785) | $ (5,500) |
| Minority interest in losses of a Subsidiary | 37 | 122 | 19 | --- | --- |
| Net income (loss) | $ (270) | $ (1,654) | $ 6,279 | $ (41,785) | $ (5,500) |
| Basic net earnings (loss) per share | $ (0.01) | $ (0.08) | $ 0.25 | $ (1.56) | $ (0.20) |
| Diluted net earnings (loss) per share | $ (0.01) | $ (0.08) | $ 0.22 | $ (1.56) | $ (0.20) |
| Number of shares used in computing basic net earnings (loss) per share (in thousands) | 19,245 | 19,881 | 25,368 | 26,716 | 26,953 |
| Number of shares used in computing diluted net earnings (loss) per share (in thousands) | 19,245 | 19,881 | 28,040 | 26,716 | 26,953 |

2

INGEN-0100719

DX-091.5
Appx10936

Summary Consolidated Financial Information (cont.)

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 |
| | | | (in thousands) | | |
| Balance Sheet Data: | | | | | |
| Cash, cash equivalents, short-term | | | | | |
| Bank deposits, short term and long | | | | | |
| term marketable securities.................... | $ 7,990 | $ 6,230 | $ 120,476 | $97,236 | $94,094 |
| Working capital ...................................... | 12,242 | 15,710 | 155,694 | 87,264 | 70,297 |
| Total assets ............................................ | 17,882 | 26,791 | 185,251 | 145,451 | 148,202 |
| Shareholders' equity.............................. | 13,832 | 17,474 | 172,799 | 133,051 | 128,290 |

## B. CAPITALIZATION AND INDEBTEDNESS

– Not applicable

## C. REASONS FOR THE OFFER AND USE OF PROCEEDS

– Not applicable

## D. RISK FACTORS

*Our business, operating results and financial condition could be seriously harmed due to any of the following risks. In addition, the trading price of our ordinary shares could decline due to any of these risks, and you could lose all or part of your investment.*

**We have incurred losses in the past, are currently incurring losses, and may incur losses in the future.**

We have a history of losses. Other than the year 2000, in which we were profitable, we have incurred losses in our past ten years of operation. In recent years, we incurred net losses of $1.7 million in 1999, $41.8 million in 2001 ($30.2 million of them were due to an inventory write-down, and $1.0 million of them were due to an investment write-off) and $5.5 million in 2002. We will need to generate increased revenues to return to and maintain profitability. We cannot be sure that we will be successful in increasing our revenues or that we will be able to achieve profitability or maintain profitability, if achieved, on a consistent basis.

INGEN-0100720

DX-091.6

Appx10937

**Our quarterly operating results have fluctuated significantly in the past and may fluctuate significantly in the future, which may harm the price of our shares.**

Our quarterly operating results have fluctuated significantly in the past and we expect that they will continue to fluctuate in the future. This fluctuation could cause the market price of our ordinary shares to decline. This fluctuation may result from a variety of factors, including, without limitation, the following:

- Changes in global economic conditions in general, and conditions in our industry and target markets in particular;
- Changes in business and economic conditions or growth rates in any of the geographic regions in which we do business, particularly in the United States, the European Union and the Far East;
- Availability of components, including flash components, in sufficient quantities, at competitive prices and delivered in a timely manner to allow us to meet customer demand;
- Accessibility of third party manufacturing and assembly services for certain of our products;
- Changes in the price of components, including flash components, used in our products;
- Decline in the average selling prices of our products due to competitive pricing pressures;
- Expenses related to obsolescence or devaluation of unsold inventory, or reserves necessary to protect us against future write-downs of unsold inventory;
- Lengthening in manufacturing cycle times or increases in manufacturing costs due to disruptions in the manufacturing process or reductions in yield;
- Manufacturing flaws affecting the reliability, functionality or performance of our products which could increase our product costs, reduce demand for our products or require product recalls;
- Quality problems or any other significant technical difficulties or interruptions in the manufacture or supply of our products, which could cause shipment delays and require product recalls;
- Difficulty of forecasting sales and managing inventory levels;
- Competition in general and the timing of new product introductions by us and our competitors;
- Lower than anticipated market acceptance of our new or enhanced products;
- Slower than anticipated market acceptance of the products that incorporate our solutions, resulting in delays or cancellation of such product introductions;
- Changes in our distribution channels;
- Competitive pricing pressures, which affect both the selling prices of our products and the value of our inventory;
- Increases in our research and development and marketing expenses;
- Decreases in our financial income based on interest rate reductions;
- The business impact of unrest or political instability in locales in which we conduct our business, such as the current unrest in Israel;
- Difficulties in conducting business with subcontractors, customers, partners and others in Asia and other areas of the world that have been or may be affected by contagious diseases such as the SARS virus;
- Exchange rate fluctuations; and
- Adverse economic conditions and currency fluctuations, and especially the new conditions associated with the September 11, 2001 terrorist attacks in the U.S.

4

INGEN-0100721

Sales and profitability, if any, in any particular quarter may be lower (or losses may be greater) than those of preceding quarters, including comparable quarters. Moreover, our product and customer mix varies quarterly, which affects our overall average selling prices and gross margins. Our DiskOnChip and DiskOnKey products, which currently represent the majority of our product revenues, have lower average selling prices and gross margins than our Fast Flash Disk ("FFD") products. Depending on the relative mix between sales of these products (and any other products we may offer), our gross margins could fluctuate significantly. In addition, a significant portion of our research and development, marketing, and general and administrative expenses are relatively fixed. Accordingly, our operating results have been and may in the future be, adversely affected when our revenues do not meet our expectations in any given quarter. Our operating results in future periods may be below the expectations of securities analysts and investors. If that occurs, the market price of our ordinary shares could be materially and adversely affected.

**Our revenues and gross margins may be, and have been, adversely affected by volatility in, and various factors affecting, the market price of flash memory components.**

For most of its products, the Company relies to a significant extent on the purchase of flash memory components or custom made products incorporating flash components from third party manufacturers and distributors. As a result, the Company is exposed to the risks associated with any increase or decrease in the price of flash components and to the volatility of such price range.

In the event of a sharp decline in the price of flash components, the value of our inventory will fall and the Company may be compelled to write-down its inventory's value, which may result in a significant decrease in our gross margins. In addition, we may need to significantly reduce our selling prices, which may result in a decline in our revenues and gross profits. An example of this vulnerability occurred during the first half of 2001, when the flash prices decreased significantly both due to the worldwide economic slowdown and the excess of supply of flash components. This caused our revenues to decline significantly and caused us to write-down $30.2 million against the valuation of our inventory in the first half of 2001.

Alternatively, in the event that the market price for flash components goes up (e.g. as a result of inflationary pressures on flash component suppliers or increased demand for any reason), we may be unable to pass these price increases on to our customers and, consequently, our gross margins could suffer, or, in the extreme, we may not be able to sell the Company' products at a profit at all, resulting in loss of revenues and market share and/or in net losses.

To the extent that the market price for flash components either increases or declines dramatically and this situation continues or worsens, our revenues may decline or may fail to grow. If we cannot reduce our product manufacturing costs to offset either a reduction or an increase in prices, as the case may be, our gross margins and net results will be adversely affected.

**Our revenues and gross margins may be adversely affected by reduced activity in our customers' markets.**

As a result of the continued worldwide economic slowdown, many of our customers may continue refraining from increased spending at previously estimated rates or decide to decrease spending and may hold back or cease the development of new products. In addition, public demand for new products incorporating our technology – such as high end cell phones and Personal Digital Assistants ("High-End Mobile Devices") for our DiskOnChip product line or for new lap-top computers and PCs and their accessories for our DiskOnKey product line (see in Item 4.D below the paragraph titled "Our Target Markets") – might languish resulting in reduced demand for our products. As a result, our revenues may decline, and our inventory levels may increase. To the extent our inventory levels increase in an environment of decreasing flash product prices or as a result of continuing lowered demand for our products, our gross margins may be negatively impacted.

INGEN-0100722

DX-091.8
**Appx10939**

**Our stock price has been, and may continue to be, volatile for various reasons, including the volatility and downturn in share prices for technology companies generally as well as for companies in our industry.**

The market price of our stock has fluctuated significantly in the past and is likely to continue to fluctuate in the future. For example, between January 1, 2002 and May 1, 2003, our closing stock price has fluctuated from a low of $4.95 to a high of $12.59. We believe that fluctuations will continue as a result of, among other things, the factors discussed above (see in this Item 3.D above the paragraph titled "Our quarterly operating results may have fluctuated significantly in the past and may fluctuate significantly in the future, which may harm the price of our shares") and as a result of announcements by us, our competitors or third parties (such as industry and research analysts) regarding our business, the business of our competitors, our markets, technological innovations, or changes in earnings estimates. In addition, in recent years the stock market has experienced significant price and volume fluctuations and the market prices of the securities of high technology companies have been especially volatile, often for reasons outside the control of these companies. These fluctuations, as well as general economic, political and market conditions, including certain conditions related to the State of Israel (also see in this Item 3.D below the paragraph titled "Conditions in Israel affect our operations and may limit our ability to produce and sell our products"), may have an adverse effect on our stock price. In the past, securities class action litigation has often been brought against companies following periods of volatility in the market price of their securities. We may be the target of similar litigation in the future. Securities litigation could result in substantial costs and divert our management's attention and resources, which could cause serious harm to our business.

**The success of our business depends on emerging markets and new products and on our ability to maintain a competitive edge as these markets grow.**

Sales of our DiskOnChip products are directly related to the demand for High-End Mobile Devices and for such products as set-top boxes and thin clients ("Embedded Devices"). High-End Mobile Devices and Embedded Devices are still relatively new types of products, and we cannot be sure that they will achieve market acceptance, that demand for these products will grow or that our products will be included in the High-End Mobile Devices and Embedded Devices that achieve market acceptance. If sales of High-End Mobile Devices and Embedded Devices do not grow, or if successful High-End Mobile Devices or Embedded Devices do not incorporate our products, then sales of our DiskOnChip products will decrease or will not grow as anticipated. Most High-End Mobile Devices currently do not use or need flash for data storage and we cannot be sure that the requirement for data storage in that market will grow or that High-End Mobile Device designers and Original Equipment Manufacturers ("OEMs") will choose to use the DiskOnChip. If the demand for Flash data storage does not grow in the High-End Mobile Devices market, or the DiskOnChip is not chosen by the relevant manufacturers as their preferred solution, then sales of our products to this market will not develop or grow as anticipated. This would reduce our revenues and our profitability, if any, or increase our losses.

The market for our DiskOnKey products is relatively new market that comes to answer a new need – secured and easy transfer of data between different computers and other applications. We cannot be sure that the need for such new products will develop, that demand for these products will grow or that our products will be accepted as the preferred solution by manufacturers, OEMs and consumer end-users. If the demand for Universal Serial Bus ("USB") compatible personal flash data storage devices does not grow, or the DiskOnKey is not chosen by the relevant OEMs, consumer electronic companies and consumer end-users as their preferred solution, then sales of our DiskOnKey products to this market will not develop or grow as anticipated. This would reduce our revenues and our profitability, if any, or increase our losses.

As certain of our markets are in their initial stages of development, our competition in these markets may be comparatively limited. However, should the potential of these markets increase, we expect major corporations to enter into competition for these markets, which may result in our losing current design wins and/or customers. This would reduce our revenues and our profitability, if any, or increase our losses.

**We may be unable to achieve broad market acceptance for our products.**

Our business strategy depends on our achieving broad market acceptance for our products. We may, however, be unsuccessful in developing products that meet the needs of our target markets, in effectively marketing our products and in convincing potential customers to adopt our products and solutions. In addition, in order to attain a high market share, we may have to increase our production volumes at a rapid rate. If our products are not accepted in the market or if we are unable to increase our production volumes in a timely manner, we may lose market share to our competitors.

INGEN-0100723

DX-091.9
**Appx10940**

**We depend on operating system vendors to support our software and include our software with their operating systems.**

Our marketing strategy for DiskOnChip relies on our software being included in major operating systems. These operating systems are constantly being updated. As a result, we should continue to promote our software to ensure that it remains supported by these operating systems. If we are unable to maintain the support of major operating systems for our products, if the developers and distributors of major operating systems choose to support a competing product instead of our own or support other competing solutions together with our solution, or if other operating systems that do not include our software achieve market acceptance, this could adversely impact sales and accordingly have a material adverse effect on our business, financial condition and results of operations.

**We depend on Toshiba as a single source for our Mobile DiskOnChip and our DiskOnChip Millennium Plus products, and we expect to be dependant on them as a single source for future DiskOnChip products.**

We developed our Mobile DiskOnChip, DiskOnChip Millennium and DiskOnChip Millennium Plus products as part of a strategic relationship with Toshiba Corporation ("Toshiba"). At present, Toshiba is our sole manufacturer of the Mobile DiskOnChip and DiskOnChip Millennium Plus products. In addition, we are working with Toshiba on the joint development of future DiskOnChip products, for which they will be the sole source of supply as well. Toshiba not only provides the flash components but also manufactures and assembles the finished product. We are seeking to develop, with other manufacturers, products that will be comparable to the DiskOnChip although possessing different features and capacity. This will require additional hardware and software development, and we cannot assure you that we will be successful in developing such comparable products or that such other manufacturers will succeed in delivering products which are of similar cost, quality and functionality. If Toshiba were to close down or downsize its flash business, experience manufacturing problems or delays for any reason, including difficulty in obtaining sufficient raw materials, work stoppages, excessive demand for its manufacturing capacity or other causes, we may be unable to fill our customers' orders for this product or unable to fulfill it in a timely fashion, which would result in lost sales and significantly lower revenues.

Pursuant to our agreement with them, Toshiba has begun to market and expects to begin selling the Mobile DiskOnChip, the DiskOnChip Millennium Plus and presumably future jointly-developed products as well, to customers under Toshiba's trademark without obtaining our prior consent, subject to Toshiba paying us specified royalties. If Toshiba markets and sells the Mobile DiskOnChip, DiskOnChip Millennium Plus or future jointly-developed products to customers, they may compete in the same markets as we do, which could result in lost sales and lower revenues.

**We depend on third party subcontractors and certain strategic partners to manufacture, assemble and supply almost all of our products, and to jointly develop certain of our products.**

We rely on third party subcontractors and certain strategic partners to manufacture, assemble and supply most of our products, and to jointly develop certain of our products. For some products, we rely on a single source of supply (e.g., see in this Item 3.D above the paragraph titled "We depend on Toshiba as a single source for our Mobile DiskOnChip, DiskOnChip Millennium and DiskOnChip Millennium Plus products etc."). The prices charged for the products we need manufactured, and the availability of qualified subcontractors for a particular product or products, may vary from time to time. Our product suppliers are often operating at peak capacity. At times, we have been unable to obtain adequate supplies of certain products within the time frame we need, which has resulted in delayed or lost sales of our products. In other cases, we have been required to keep unusually large product inventories in order to avoid shortages. We cannot assure you that shortages will not occur in the future. Moreover, an increase in prices by any of our suppliers could reduce our gross margins. In addition, should any of our suppliers or strategic partners become unable or unwilling to continue supplying us with their components or services, this would have a material adverse effect on the Company. As a majority of our third party subcontractors and strategic partners are located in the Far East, in the event that the SARS virus causes any of their manufacturing facilities to experience a shut-down or slow-down of manufacturing capacity and/or shipping ability, this may have a material adverse effect on the Company.

INGEN-0100724

Some of our manufacturers and suppliers require that we give them lead times of three months or more when we place orders. If we underestimate our needs when we place orders, we may be unable to meet our customers' demands, and we could lose revenues and market share to our competitors. Alternatively, if we overestimate our need for products, we could increase our inventory levels, which could, in turn, increase our working capital needs and increase our exposure to a later devaluation of the inventory in stock if prices in the market go down. Either of these situations could have a material adverse effect on our business, financial condition and results of operations.

Should any of our strategic partners refrain from developing future products with us, our future results may be adversely affected.

If we experience quality problems or any significant technical or other difficulties or interruptions in the manufacture of our products, or supply delays from any of our product manufacturers or suppliers, it could take us a significant amount of time to correct the problem or to find a replacement source of supply.

**Any disruptions or other difficulties experienced at our manufacturing facility in Israel could adversely affect our business.**

We operate one manufacturing facility at our headquarters in Kfar-Saba, Israel. We currently manufacture our FFD and DiskOnChip 2000 products at that facility. If we experience quality problems or any significant technical or other difficulties or interruptions in the manufacture of our products at our facility, this could have an adverse effect on our business, financial condition and results of operations (also see in this Item 3.D below the paragraph titled "Conditions in Israel affect our operations and may limit our ability to produce and sell our products.").

**We depend on third parties for the supply and quality of components required for the manufacture of our products, including flash components.**

We rely on third parties to manufacture and supply components for our products, including the basic flash components used in all our products and the application specific integrated circuit ("ASIC") components used in our DiskOnKey and in some of our DiskOnChip products. For some components, we rely on a single source of supply. The availability and prices in the market of the components we need may vary from time to time. Our component suppliers are often operating at peak capacity. At times, the demand for components used in our products has exceeded available supply, and suppliers have raised prices and/or been forced to allocate limited resources among competing purchasers. On certain occasions we have been unable to obtain adequate supplies of certain components, which has resulted in delayed or lost sales of our products. In other cases, we have been required to keep unusually large component inventories in order to avoid shortages. We cannot assure you that shortages will not occur in the future. Moreover, an increase in prices by our suppliers could reduce our gross margins. In addition, should any of our suppliers become unable or unwilling to continue supplying us with their components, this would have a material adverse effect on the Company.

Some of our suppliers require that we give them lead times of three months or more when we place orders. If we underestimate our needs when we place orders, we may be unable to meet our customers' demands, and we could lose revenues and market share to our competitors. Alternatively, if we overestimate our need for products, we could increase our inventory levels, which could, in turn, increase our working capital needs. Either of these situations could have a material adverse effect on our business, financial condition and results of operations.

If we experience supply delays from any of our component suppliers, it could take us a significant amount of time to find a replacement source of supply. Any such delay in supply could cause us to lose sales.

Furthermore, if we experience quality problems from any of our component suppliers, it could take us a significant amount of time to identify the problem as associated with a particular component, ascertain whether this is as a result of a design or a manufacturing flaw and either correct the problem, if possible, replace the components or find an alternate source of supply. Any such quality problem or delay could, in addition to causing us lost sales, detrimentally affect our reputation in the market and cause us to incur additional costs as a result of the recall and replacement of affected products.

INGEN-0100725

DX-091.11
Appx10942

**We depend on third party foundries for silicon wafers and any shortage or disruption in our supply from these sources will reduce our revenues, earnings and gross margins.**

Our flash memory based products require silicon wafers, which are currently supplied by Toshiba and Samsung Electronics Co., Ltd. ("Samsung"). If Toshiba or Samsung are uncompetitive, or are unable or unwilling to satisfy our requirements, our business, financial condition and operating results may suffer. In addition, in the event that we are supplied with silicon wafers with low yield, our operating results and our ability to supply products to our costumers may suffer. Any disruption in supply from these sources due to natural disaster, power failure, labor unrest or other causes, could significantly harm our business, financial condition and results of operations. Our obligation to provide a rolling forecast of anticipated purchase orders, limits our ability to react to fluctuations in demand for our products which may lead to excess wafer inventories and could result in higher operating expenses and reduced gross margins. In addition, if our flash suppliers do not continue to invest in the required advancements to their flash technology and flash products, our business, financial condition and operating results may suffer.

**High levels of inventory could adversely affect our gross margins.**

Due to various reasons (e.g. an anticipation of a shortage in components, a high sales forecasts which is not realized, cancellation of orders from customers, anticipation of an increase in prices), the Company may find itself with a higher level of inventory than its then current needs. As a result of this high level of inventory, the Company may be exposed to the risk of a decrease in the value of the inventory should the price of such components drop, and our gross margins will be adversely affected. Furthermore, in the event that the Company maintains large amounts of inventory, certain components or products, if warehoused for too long, might be rendered obsolete due to the modification and improvement of the Company's products which might cause the Company to incur an inventory write-off. In addition, the Company may lose out on any financial income which it might have earned from cash assets converted into inventory.

**Undetected hardware and software errors or defects may increase our costs and impair the market acceptance of our products.**

Our products may contain undetected errors or defects. These could result either from errors or defects in components or products designed or manufactured by us that we fail to detect, or errors or defects in components supplied by third parties. In the past we have at times found these errors or defects in new or enhanced products after the commencement of commercial shipments. Our customers integrate our products into their applications together with products they acquire from other vendors. As a result, when problems occur in an application, it may be difficult to identify the product that has caused the problem. Regardless of the source of these errors or defects, we will need to divert the attention of engineering personnel from our product development efforts to address the detection of the errors or defects. These errors or defects could cause us to incur warranty or repair costs, liability claims or lags or delays. We could be forced to recall products that were already sold into the market and installed by our customers. Our insurance policies may not provide sufficient protection should a claim be asserted. Moreover, the occurrence of errors or defects, whether caused by our products or the products of another vendor, may significantly harm our relations with, or result in the loss of, customers, injure our reputation and impair market acceptance of our products.

**We sell our products in a highly competitive industry. As a result, we may lose market share and be unable to achieve or maintain profitability.**

The markets in which we compete are characterized by intense competition. Our DiskOnChip, DiskOnKey and FFD products compete with other flash disks, standard flash components, hard drives and alternative data storage technologies. Our competitors include many large U.S. and international companies that have substantially greater financial, technical, marketing, logistical infrastructure and support and other resources, greater access to component fabrication capacity, broader product lines and longer-standing relationships with customers than us, which may limit our ability to effectively compete with them. We believe that our ability to compete successfully depends on a number of factors, including the price, quality, features, performance, ease of integration and availability of our products.

9

INGEN-0100726

**DX-091.12**
**Appx10943**

Our DiskOnKey product competes with other USB-compatible flash disks, removable magnetic media, removable optical media, flash cards, floppy drives and other removable storage media. Our competitors in this market currently consist of numerous third tier computer peripheral manufacturers or hardware manufacturers, the majority of whom are located in Asia where manufacturing costs tend to be lower. Many of these competitors are vying for and attaining market share on the basis of aggressive pricing. In addition, we also currently experience (and expect this trend to continue) competition from large U.S. and/or international companies (including flash manufacturers) that have substantially greater financial, sales, technical, marketing, logistical infrastructure and support and other resources, greater access to component fabrication capacity, sometimes at substantially lower costs, broader product lines and longer-standing relationships with customers than we do.

The competition for our DiskOnChip products comes mainly from flash manufacturers offering competing solutions to our own. These flash manufacturers may have an advantage over us in that they have substantially greater financial, sales, technical, marketing, logistical infrastructure and support and other resources, greater access to component fabrication capacity, sometimes at substantially lower costs, broader product lines and longer-standing relationships with customers than we do. In addition, customers who desire to purchase our DiskOnChip products, may need to make engineering changes in the architecture of their current NOR based solution (for which most cell phones today are designed) to our NAND based solution, changes which are not required of certain of our competitors.

We expect competition to increase in the future from existing competitors and from other companies, including flash manufacturers, that may enter our existing or future markets with similar or alternative data storage solutions that may be less costly or provide additional and better features. In addition, given the developing nature of our markets and the related intellectual property, we cannot assure you that some of our competitors will not infringe our intellectual property rights, and thereby might force us to incur substantial or even prohibitive costs if we choose to defend our rights. In fact, we believe that some of our competitors to the DiskOnKey infringe our patent covering USB flash drives and we have initiated legal action in two separate instances (see Item 4.B below the paragraph titled "Intellectual Property Rights and Current Litigation"). Furthermore, increased competition may force us to reduce the prices for our products, thereby reducing our revenues and margins, and could otherwise have a material adverse effect on our business, financial condition and results of operations. There can be no assurance that we will be able to compete successfully against current and future competitors or that competitive pressures faced by us will not materially adversely affect our business, financial condition or results of operations.

**We have limited product offerings. As a result, our business may suffer if demand for any of these products declines or if we cannot develop new products to meet the needs of our customers.**

We offer three major product lines, with our DiskOnChip products accounting for approximately 45% of our sales in 2002, and our DiskOnKey products accounting for approximately 41% of our sales in 2002. If other companies were to develop products with similar or more features, similar or better performance or wider acceptance than our products, sales of our products could decline. Any significant decrease in the sales of our products could have a material adverse effect on our business, financial condition and results of operations

Adversely, focusing on three different major product lines requires that the Company allocate sufficient resources to each, and the Company might not have the infrastructure to be able to fully support the needs of each product line and of additional product lines. As a result of not being able to adequately focus our efforts and resources on all of the Company's product lines, we may loose our positioning in already existing markets.

INGEN-0100727

DX-091.13
**Appx10944**

**Our success depends on our ability to anticipate new technological changes and to introduce new products in a timely manner.**

The market for our products is characterized by rapidly changing technology and evolving industry standards. The introduction of products embodying new technology and the emergence of new industry standards could render our existing products obsolete and unmarketable. Although we design our products to fit and match certain market standard interfaces, some of these interfaces may change over a relatively short period which may cause our then existing products to become obsolete while possibly enabling competing products. Our ability to anticipate changes in technology and industry standards and interfaces and to successfully develop and introduce new and enhanced products on a timely basis will be a critical factor in our ability to grow and to remain competitive. In addition, the anticipated development schedules for high technology companies are inherently difficult to predict and are subject to change as a result of shifting priorities in response to customers' requirements and product introductions from competitors. Our inability, for technological or other reasons, to develop products and product enhancements that are technologically competitive, responsive to customer needs or competitively priced would have a material adverse effect on our business, financial condition and results of operations.

**Our non-retail products generally have a long sales cycle, which increases our costs in obtaining orders and reduces the predictability of our earnings.**

Our DiskOnChip and FFD products are technologically complex and are typically intended for use in applications that may be critical to the business of our customers. Non-retail prospective customers generally must make a significant commitment of resources to test and evaluate our products and to integrate them into their applications. As a result, our non-retail sales process is often subject to delays associated with lengthy approval processes that typically accompany the design and testing of new computer and telecommunications equipment. The sales cycles of our non-retail products to new customers currently average approximately 18 months from the time we make a proposal to a customer until the time the customer begins to commercially manufacture its product. This requires us to invest significant resources to make sales, and reduces the predictability of our sales.

Long sales cycles also subject us to risks not usually encountered by companies whose products have short sales cycles. These risks include the potential cancellation of orders based on customers' changing budgetary constraints, and the unpredictability of internal acceptance reviews. In addition, orders expected in one quarter could shift to another because of the timing of customers' procurement decisions. This complicates our planning processes and reduces the predictability of our earnings.

**Sales to a small number of customers represent a significant portion of our revenues.**

More than half of our revenues come from a small number of customers. Specifically, sales to our top 3 customers accounted for approximately 34.5% of our revenues in 2000, 18.8% in 2001 and 33.8% in 2002 and sales to our top 10 customers accounted for approximately 55% of our revenues in 2000, 47% in 2001 and 56% in 2002. If we were to lose any of our significant customers or experience any material reduction in orders from these customers, our revenues and operating results would suffer. In particular, due to the business nature of the market for our DiskOnKey products (the fact that a customer can, with little effort and investment, move from our solution to a solution of a competitor), and the relative ease with which our customers may terminate their business relationship with us, we may encounter a severe reduction in sales of our DiskOnKey products over a very short period of time. Furthermore, due to the high level of fluctuation in the amount of units ordered by significant customers, our overall revenues may fluctuate from quarter to quarter. In addition, the composition of our major customer base changes from year to year as the market demand for our customers' products change, and as we introduce new or improved products targeted at different or additional markets.

INGEN-0100728

**We expect our expenses to increase, which could adversely affect our financial condition and results of operation.**

We expect our quarterly operating expenses to increase in 2003 beyond the figures for the fourth quarter of 2002 due primarily to planned sales & marketing and research & development activities. In addition, subject to market conditions at the time, our operating expenses might increase as a result of a need to hire additional personnel to support possible future growth in sales unit volumes, and sales and marketing efforts. Furthermore, we have significant fixed costs, and we cannot readily reduce these expenses over the short term. If revenues do not increase as our operating expenses increase, or if revenues decrease or do not meet expectations for a particular period, we will experience growing losses.

**Our business could suffer if third parties infringe upon our proprietary technology, and our patents and proprietary technology may not afford us sufficient protection from infringement.**

Our success is dependent upon our proprietary technology. We currently rely on a combination of patent, trade secret, copyright and trademark law, together with non-disclosure agreements, to establish and protect the proprietary rights and technology used in our products.

As of May 1st, 2003, we hold twenty two (22) U.S. patents and several foreign patents relating to our technology and products. We also have forty three (43) applications for patents pending in the U.S. with respect to new products and technologies. However, we cannot assure you that the pending patent applications will be granted or that our existing patents or any other patents that may be granted will be enforceable or provide us with meaningful protection from competitors. Patents that may be granted to us in some foreign countries may not afford the same protection to us as is provided under the patent laws of the U.S. If a competitor were to infringe our patents, the costs of enforcing patent rights might be substantial or even prohibitive. In seeking to protect our trademarks, copyrights and other proprietary rights, or defending ourselves against claims of infringement brought by others, with or without merit, we could face costly litigation and the diversion of our management's attention and resources. This could have a material adverse effect on our business, financial condition and results of operations (see Item 4.B below the paragraph titled "Intellectual Property Rights and Current Litigation").

We also may desire or be required to obtain licenses from others in order to further develop, produce and market commercially viable products. We cannot assure you that we will be able to obtain any required licenses on commercially reasonable terms, if at all, that the patents underlying those licenses will be valid and enforceable or that the technology underlying those licenses will remain proprietary in nature.

We also rely on unpatented proprietary know-how, copyrights and trade secrets, and employ various methods, including confidentiality agreements with employees, consultants and marketing partners, to protect our trade secrets and know-how. However, these methods may not afford complete protection and we cannot assure you that others will not independently develop our trade secrets and know-how or obtain access thereto.

**Our products may infringe on the intellectual property rights of others and this could cause us to have to stop manufacturing or selling certain of our products.**

Third parties may assert against us infringement claims or claims that we have violated a patent or infringed a copyright, trademark or other proprietary right belonging to them. An infringement claim, even if not meritorious, could result in the expenditure of significant financial and managerial resources by us. An adverse determination of any infringement claim could subject us to significant liabilities to third parties, could require us to seek licenses from third parties and could prevent us from manufacturing, selling or using certain of our products, any of which could have a material adverse effect on our business, financial condition or results of operations.

**Our success depends on key personnel, including our executive officers, the loss of whom could disrupt our business.**

Our success greatly depends on the continued contributions of our senior management and other key research and development, sales, finance, marketing and operations personnel, including, without limitation, Mr. Dov Moran, our Chairman, President and Chief Executive Officer. We cannot assure you that we will be successful in retaining our key personnel.

INGEN-0100729

**Our success depends on attracting and retaining additional qualified personnel.**

The success of our business depends on our ability to attract and retain highly qualified management, technical, sales, finance and marketing personnel. In particular, we require highly qualified technical personnel who are capable of developing technologies and products and providing the technical support required by our customers. Individuals who possess these qualifications are in high demand, and we may not be successful in attracting, integrating and retaining them when and as needed.

**Investments in or acquisitions of companies or technologies may distract our management and disrupt or otherwise harm our business.**

One of our strategies is to acquire or make investments in complementary businesses, technologies, services or products if appropriate opportunities arise. We have made several investments in or acquisitions of companies or assets of companies in the past. We may in the future engage in discussions and negotiations with companies about our acquiring or investing in those companies' businesses, products, services or technologies. We cannot make assurances that we will be able to identify future suitable acquisition or investment candidates, or if we do identify suitable candidates that we will be able to make the acquisitions or investments on commercially acceptable terms or at all. If we acquire or invest in another company, we could have difficulty assimilating that company's personnel, operations, technology or products and service offerings into our own. The key personnel of the acquired company may decide not to work for us. These difficulties could disrupt our ongoing business, distract our management and employees, increase our expenses and adversely affect our results of operations. We may incur indebtedness or issue equity securities to pay for any future acquisitions. The issuance of equity securities could be dilutive to our existing shareholders. In addition, any investment in another company will be subject to the risks faced by that company. To the extent that any company in which we invested in the past or any company in which we invest in the future, thereafter loses value or does not succeed, we may lose part or all of our investment. We do not now have any agreement to enter into any material investment or acquisition transaction.

**Our United States investors could suffer significant adverse tax consequences if we are characterized as a passive foreign investment company.**

Although we do not believe that we were a passive foreign investment company for U.S. federal income tax purposes during 2002, we cannot assure you that we will not be treated as a passive foreign investment company in any of 2002, 2003 or in future years. We would be deemed to be a passive foreign investment company if (i) 75% or more of our gross income in a taxable year including the pro rata share of the gross income of any company, U.S. or foreign, in which we are considered to own 25% of the shares by value, is passive income, or (ii) at least 50% of our assets in a taxable year, averaged over the year and ordinarily determined based on fair market value and including our pro rata share of the assets of any company, U.S. or foreign, in which we are considered to own 25% or more of the shares by value, produce, or are held for the production of passive income. Passive income includes interest, dividends, royalties, rents and annuities. If we are or become a passive foreign investment company, or if the U.S. Internal Revenue Service subsequently successfully asserts that we are, were or became a passive foreign investment company at some point, many of our shareholders will be subject to potentially substantial adverse tax consequences, including:

- Taxation at the highest ordinary income tax rates in effect during the holding period on some distributions on our ordinary shares, and gain from the sale or other disposition of our ordinary shares;
- Paying interest on taxes allocable to prior periods; and
- No increase in the tax basis of our ordinary shares to fair market value at the date of the holder's death.

**Our costs may be impacted by fluctuations in currency exchange rates.**

Certain of our expenses are in, or are linked to, currencies other than the U.S. Dollar, principally the New Israeli Shekel (NIS), the New Taiwanese Dollar and the Japanese Yen. This exposes us to potentially increased operational costs as well as increased costs for certain of our products as a result of currency fluctuations. In the event that any of our customers demand that certain of the Company's products be quoted and sold in currencies other than the U.S. Dollar, we may receive income in the future in such other currencies. As a result, our revenues may be adversely affected.

INGEN-0100730

**Conditions in Israel affect our operations and may limit our ability to produce and sell our products.**

We are incorporated under Israeli law and our principal offices and research and development facilities are located in Israel. Political, economic and military conditions in Israel directly affect our operations. Since the establishment of the State of Israel in 1948, a number of armed conflicts have taken place between Israel and its Arab neighbors and a state of hostility, varying in degree and intensity, has led to security and economic problems for Israel. We could be adversely affected by any major hostilities involving Israel, the interruption or curtailment of trade between Israel and its trading partners, a significant increase in inflation, or a significant downturn in the economic or financial condition of Israel. Since October 2000, there has been a significant and escalating increase in violence between Israel and the Palestinians, primarily but not exclusively in the West Bank and Gaza Strip. Further deterioration of hostilities into a full scale conflict might require more widespread military reserve service by some of our employees, which could have a material adverse effect on our business. In addition, several Arab countries still restrict business with Israeli companies. We could be adversely affected by restrictive laws or policies directed towards Israel or Israeli businesses. In addition, the current conflict in Iraq may have adverse implications on business in Israel.

Generally, all male adult citizens and permanent residents of Israel under the age of 54 are, unless exempt, obligated to perform up to 43 days of military reserve duty annually. Additionally, all Israeli residents of this age are subject to being called to active duty at any time under emergency circumstances. Many of our officers and employees are currently obligated to perform annual reserve duty. Although we have operated effectively under these requirements since we began operations, we cannot assess the full impact of these requirements on our workforce or business if political and military conditions should change, and we cannot predict the effect on us of any expansion or reduction of these obligations.

**The government programs and tax benefits that we currently receive require us to meet several conditions and may be terminated or reduced in the future, which would increase our costs and taxes.**

We benefit from certain government programs and tax benefits, particularly as a result of tax exemptions and reductions resulting from the 'approved enterprise' status of our manufacturing facilities in Israel (see Item 10.E below the paragraph titled "Law for the Encouragement of Capital Investments, 1959"). To be eligible for these programs and tax benefits, we must continue to meet conditions, including making specified investments in property and equipment and financing a percentage of investments with share capital. If we fail to meet such conditions in the future, the tax benefits would be canceled and we could be required to refund the tax benefits already received. These programs and tax benefits may not be continued in the future at their current levels or at any level. The Israeli government has reduced the benefits available under some of these programs in recent years, and Israeli governmental authorities have indicated that the government may further reduce or eliminate some of these benefits in the future. The termination or reduction of these programs and tax benefits could increase our expenses, thereby reducing our profits and increasing our losses.

**The rate of inflation in Israel may negatively impact our costs if it exceeds the rate of devaluation of the New Israeli Shekel against the U.S. Dollar.**

The majority of our revenues is denominated in U.S. dollars or is dollar-linked, but we incur a portion of our expenses, principally salaries and related personnel expenses in Israel and the costs of maintaining our facilities in Israel, in NIS. As a result, we are exposed to the risk that the rate of inflation in Israel will exceed the rate of devaluation of the NIS in relation to the dollar or that the timing of this devaluation lags behind inflation in Israel. In that event, the dollar cost of our operations in Israel will increase and our dollar-measured results of operations will be adversely affected. In 1997, 1998, 2001 and 2002, the rate of devaluation of the NIS against the dollar exceeded the rate of inflation in Israel, a reversal from prior years, which benefited us. In 1999 and 2000 however, the rate of inflation in Israel exceeded the rate of devaluation of the NIS against the dollar. We cannot predict whether in the future the rate of devaluation of the NIS against the dollar will exceed the rate of inflation in Israel or vice versa. We cannot assure you that we will not be materially adversely affected if the rate of inflation in Israel exceeds the devaluation of the NIS against the dollar, or if the timing of this devaluation lags behind increases in inflation in Israel.

14

INGEN-0100731

**DX-091.17**
**Appx10948**

**It may be difficult to enforce a U.S. judgment against us, our officers and directors and some of the experts named in this report or to assert U.S. securities law claims in Israel.**

We are incorporated in Israel. Substantially all of our executive officers and directors and certain experts named in this report are nonresidents of the U.S., and a substantial portion of our assets and the assets of these persons are located outside the U.S. Therefore, it may be difficult to enforce a judgment obtained in the U.S. against us or any such persons. Additionally, it may be difficult for you to enforce civil liabilities under U.S. federal securities laws in original actions instituted in Israel.

**Under current Israeli law, we may not be able to enforce covenants not to compete and therefore may be unable to prevent our competitors from benefiting from the expertise of some of our former employees.**

We currently have non-competition clauses in the employment agreements of nearly all of our employees. The provisions of such clauses prohibit our employees, if they cease working for us, from directly competing with the Company or working for our competitors. Recently, Israeli courts have required employers, seeking to enforce non-compete undertakings against former employees, to demonstrate that the competitive activities of the former employee will cause harm to one of a limited number of material interests of the employer recognized by the courts (e.g. the confidentiality of certain commercial information or a company's intellectual property). In the event that any of the Company's employees chooses to go and work for one of our competitors, we may be unable to prevent our competitors from benefiting from the expertise of our former employees obtained from us, if we cannot demonstrate to the court that harm would be caused to the Company.

**Certain provisions of our Articles of Association and of Israeli law could delay, hinder or prevent a change in our control.**

Our Articles of Association contain provisions that could make it more difficult for a third party to acquire control of us, even if that change would be beneficial to our shareholders. Specifically, our Articles of Association provide that any merger or significant acquisition involving us requires the approval of 75% of the voting power of our shareholders present at a meeting, in person or by proxy, and voting on the transaction. This provision of our Articles of Association can only be amended by the same supermajority shareholder vote required for approval of a merger or acquisition transaction. In addition, certain provisions of the Israeli Companies Law 1999 (the "Companies Law"), which came into effect in February 2000, could also delay or otherwise make more difficult a change in our control. The provision of the Companies Law relating to mergers and acquisitions are discussed in greater detail in "Item 10: Additional Information."

15

INGEN-0100732

DX-091.18

**Appx10949**

## ITEM 4. INFORMATION ON THE COMPANY

### A. HISTORY AND DEVELOPMENT OF THE COMPANY

Our commercial and legal name is M-Systems Flash Disk Pioneers Ltd. We are a company organized under the laws of the State of Israel and are subject to the Companies Law. Our principal offices are located at 7 Atir Yeda St., Kfar Saba 44425, Israel and our telephone number is +972-9-764-5000. Our U.S. agent is our subsidiary, M-Systems, Inc., located at 8371 Central Avenue, Suite A, Newark, CA 94560, and its telephone number is (510) 494-2090.

In March 2000, we completed a secondary offering of our ordinary shares, which provided net proceeds for the company of approximately $149.6 million. In September 2000, we effected a 2-for-1 stock split in the form of a 100 percent stock dividend.

In September 2000, we acquired the assets of Fortress U&T Ltd. ("Fortress") for approximately $8 million. These assets included significant technology, patents and know-how relating to implementation of secured encryption, data protection, secure smart card technology and secure payment schemes. These technologies can provide security and access control to prevent accidental or intentional modification of a customer's application code residing on a flash disk, copy protection to prevent piracy and unauthorized cloning, and reliable authentication of authorized users. As part of this transaction, most of Fortress' employees formed our new research and development center in Omer, Israel to develop new flash disk security features and to integrate advanced security features into our existing and future flash disk products.

In October 2000, we purchased 586,080 preferred shares of Saifun Semiconductors Ltd. ("Saifun") for approximately $10 million. Saifun is a private, venture-backed Israeli company engaged in research, development, production and marketing of flash memory products and technology. Boaz Eitan, who was, up until the last Annual General Meeting of the shareholders of the Company, a member of our Board of Directors, is the founder, chief executive officer and a director of Saifun (see Item 7.B below the paragraph titled "Related Party Transactions").

In April 2001, we signed an agreement for the purchase of the building in which our headquarters' executive offices, research, development and manufacturing facilities are located. As part of the agreement, we also purchased a vacant lot adjacent to our offices. The aggregate consideration for these purchases was approximately $10.5 million, which we financed ourselves. Some of the consideration has been placed in an escrow fund pending the receipt by the sellers of these properties of various permits and third party approvals. In addition to the consideration paid for the building and the adjacent lot, we invested an additional $3.29 million in developing and renovating the facility.

In April, 2003 we established a subsidiary in Israel named Smart Caps Ltd. ("Smart Caps") for the purpose of developing and marketing smart applications for our line of DiskOnKey products. The State of Israel, through the Office of the Chief Scientist ("OCS"), has committed to investing up to approximately $550,000 in Smart Caps. This investment by the OCS is to at least match our investment in Smart Caps. In consideration for such investments, M-Systems and the OCS are to be issued shares in Smart Caps pro rata to each of their relative investments.

On May 1st, 2003, we entered into a Share Purchase Agreement with Dr. Hans Wagner, a member of our Board of Directors, for the purchase of 500,000 ordinary shares, which transaction was subsequently consummated (see Item 7.B below the paragraph titled "Related Party Transactions").

INGEN-0100733

DX-091.19

Appx10950

## B. BUSINESS OVERVIEW

### Our Company

We are a leading developer, manufacturer and marketer of innovative data storage products based on flash memory, known as flash disks. Our flash disks provide the functionality of a mechanical hard drive on a solid-state silicon chip. We achieve this through the combination of our patented flash management technology, known as TrueFFS (True Flash File System), with standard flash memory components and miniaturization technologies that we have developed. Flash components are silicon chips on which data can be recorded and from which data can be retrieved and which require no power to retain data. Our TrueFFS software enables us to transform standard flash components into highly reliable, easy to integrate and efficient flash disks which meet the unique data storage needs of our target markets.

Our products are based on our TrueFFS technology and include both removable and non-removable data storage media in a wide range of capacities, interfaces, and form factors. We have three primary product lines: the DiskOnChip, DiskOnKey and FFD product families.

Our DiskOnChip and FFD product lines provide non-removable (sometimes referred to as 'local') data storage. In this way, they are analogous to a hard disk, which is embedded within a computer system, in contrast to removable storage such as a floppy disk.

Our DiskOnKey product line provides removable and pocketable thumb-sized data storage which plugs directly into the USB port of PC's, laptops, and other computer-based consumer products, allowing the user to store and carry his data with him and to quickly, easily and reliably transfer data between any computer or any computerized system which has a USB port.

Typically, our flash disks are used to store operating systems, applications software, and data such as voice, video, documents, e-mail and pictures, in the many applications where the use of traditional data storage devices, such as mechanical hard drives or floppy drives, is unsuitable or is less suitable. As we discuss in further detail below (see in this Item 4.B below the paragraphs titled "Industry Background" and "The M-Systems Solution"), the benefits of flash disks over traditional data storage devices include lower power consumption; much higher reliability, durability and ruggedness; greater cost-effectiveness in many applications, much greater capacity when comparing the DiskOnKey to a floppy drive, and (except for the FFD products, which are designed to serve as drop-in replacements for hard drives) much smaller and more lightweight.

In very broad terms, the difference between the DiskOnChip and FFD product lines can be summarized as follows: Our DiskOnChip family is comprised of various compact and light-weight flash disk products (at a form factor of either a chip or module) which are optimized for applications which are relatively small and/or need relatively small data storage capacities. Our FFD product line is available in much higher data storage capacities, comes in standard hard-drive sizes and interfaces, and is designed to provide extremely high reliability, ruggedness and durability under the harshest environmental and other conditions.

Our DiskOnChip product family is well-suited for and primarily targeted at the High-End Mobile Devices and Embedded Devices markets.

Our DiskOnKey product family is targeted at the PC and laptop markets. It currently provides 8, 16, 32, 64, 128, 256, 512 megabytes and 1 gigabyte of portable, reliable data storage in a thumb-sized and pocketable device that plugs directly into the USB port of PCs, laptops and various consumer appliances. This product is designed to replace other portable data storage devices, such as conventional floppy disks, which lack the convenience, reliability and/or the storage capacity of the DiskOnKey.

Our FFD product line is well-suited for and primarily targeted at military systems and network infrastructure equipment.

See in this Item 4.B below the paragraph titled "Products" for more details on our product lines and our specific products.

17

INGEN-0100734

DX-091.20

Appx10951

**Industry Background**

The memory and data storage markets have traditionally included data storage devices such as hard drives and floppy drives, and traditional memory components such as ROM (Read Only Memory), RAM (Random Access Memory) devices, or standard flash memory components.

These traditional solutions are not suitable, or are not efficient, in meeting the data storage needs of many existing and emerging products. Our target markets for our DiskOnChip, DiskOnKey and FFD product lines are comprised of such products (see in this Item 4.B below the paragraph titled "Our Target Markets.")

Following is a brief review of the aforementioned traditional solutions:

- A hard drive is a high capacity, low cost-per-megabyte data storage device that consists of one or more flat, mechanically spinning circular disks coated with magnetizable material, over which an arm with a read/write head is positioned to magnetically record and retrieve data to and from the disk. Traditional hard drives are not a suitable solution for the data storage requirements of High-End Mobile Devices and Embedded Devices (products which are based on a computer platform but are not generally thought of as computers). Hard drives are unsuitable for these products because, among other things, they are too big and heavy, too noisy, consume too much power, and are not cost-effective in relatively low capacities. In addition, hard drives are susceptible to mechanical failures, and wear, strong shocks, vibrations or extremes in temperature and humidity adversely affect their performance. As a result, they are not sufficiently reliable either for High-End Mobile Devices or the many portable Embedded Devices that are subject to shocks, falls and other stresses. Furthermore, they are certainly a problematic solution for the data storage requirements of military systems and network infrastructure equipment applications and other applications where data reliability and extended life expectancy is critical.

- A floppy drive is a very low capacity (1.44 megabyte) mechanical data storage device that, similar to a hard drive, includes a flat, mechanically spinning circular disk coated with magnetizable material, over which an arm with one or two read/write heads are positioned to magnetically record and retrieve data to and from the disk. Unlike a hard drive, it has no accurate feedback mechanism from the disk, which makes the floppy disk a much less reliable solution than a hard disk. Furthermore, writing to and reading from a floppy disk are much slower than on a hard drive. In addition to reliability and speed concerns, a floppy disk lacks the storage capacity required by many of today's files and applications, is less convenient to carry around than a DiskOnKey that can clip in one's pocket, and requires one to carry an external floppy drive around for use with the many laptops which do not integrate a floppy drive. The current 3.5 inch format of the floppy disk and drive was introduced in 1980, using the same basic technology used in the 8 inch floppy drives introduced in 1973. In light of all of the above, the floppy drive and floppy disk are clearly much less suitable for storing, transporting and transferring data than the much more reliable, convenient, high-speed and high capacity DiskOnKey.

- Traditional memory components, such as ROM or RAM devices and standard flash memory components, are not suitable solutions for the data storage requirements of High-End Mobile Devices, Embedded Devices, military systems and network infrastructure equipment applications, and key-chain storage devices. ROM devices are unable to record new data or update previously recorded data. RAM devices are able to record new data but are volatile, meaning that they are unable to retain stored data when the power supply is cut off. Standard flash memory components are able to record new data and are non-volatile. However, standard flash memory components alone are not an optimal data storage solution because they are unable to rewrite to locations that have already been written to without first erasing large blocks of data and they have a limited number of write cycles. Among other things, they are less reliable than our flash disks because they lack our error detection and correction feature. Moreover, they do not organize stored data in a way that is efficiently recognized by the operating systems commonly used in computers and computer-based systems.

18

INGEN-0100735

**The M-Systems Solution**

We have capitalized on our patented TrueFFS flash management technology to provide a broad range of both non-removable and removable flash disks that resolve many of the drawbacks and limitations of the traditional data storage solutions discussed above.

Our DiskOnChip products provide the combination of ease of integration, compact size, cost-effectiveness, reliability, durability, speed and low power consumption required by High-End Mobile Devices and Embedded Devices. The Mobile DiskOnChip family was designed for and optimized to the specific needs of advanced High-End Mobile Devices.

Our DiskOnKey products, introduced at the end of 2000, are removable, reliable, lightweight, high-speed and high capacity thumb-sized and pocketable data storage devices that are based both on our TrueFFS technology and on our new and patented DiskOnKey technology. The DiskOnKey plugs directly into the USB port of PC's, laptops, and other computer-based consumer products, allowing the user to conveniently store and carry his data with him and to quickly and reliably transfer data between any computer-based system which has a USB port. Since the DiskOnKey has its own central processing unit ("CPU"), it can also support and run multiple software applications directly from the product itself. For example, in November 2001, we introduced our KeySafe™ security application that ensures the confidentiality of private data by means of a user-defined password and internally secured access verification and is supported by the latest Windows operating systems.

Our FFD products offer much higher maximum data storage capacities than our DiskOnChip and DiskOnKey products families, and provide the combination of speed and extremely high reliability, durability, and ruggedness under the harshest environmental conditions that are required by military systems and network infrastructure equipment.

In general, although not all of the following advantages are relevant to all of our products or to some of our products when competing in specific markets, the benefits that our products provide include the following:

*Ease of Integration.* Our TrueFFS software supports nearly all major operating systems used in High-End Mobile Devices and Embedded Devices. As a result, our customers can easily integrate our DiskOnChip products into their products with minimal integration efforts. This enables our DiskOnChip products to provide a convenient solution for the data storage requirements of our customers' products and reduces the time and cost required for our customers to bring a product to market. In addition, several hundred different types of commercially available embedded motherboards currently include a socket specifically designed for our DiskOnChip 2000 products. As a result, our customers can easily integrate the DiskOnChip into their designs. Our FFD products have a standard hard drive interface and can therefore easily replace a hard drive. Our products are available in modular form, which enables our customers to easily upgrade from one of our flash disks to another with greater capacity, if and when required.

*Compact Size.* Our technology enables our DiskOnChip products to emulate a hard drive without the need for a microprocessor, unlike competing products. As a result, our DiskOnChip products are small. We believe that our Mobile DiskOnChip is the smallest flash disk in the world, with the DiskOnChip Millennium and DiskOnChip Millennium Plus being smaller than any flash disk other than the Mobile DiskOnChip. Compact size is particularly important to manufacturers of High-End Mobile Devices and Embedded Devices that increasingly are seeking to provide more product functionality with components occupying less space.

*Low Power Consumption; Non-Volatility.* All of our products require relatively little power to operate. This feature is particularly important to manufacturers of battery-powered and other portable or small appliances. All our products are also non-volatile, meaning they retain stored data even while the power supply is cut off, and our TrueFFS software ensures data integrity if for any reason the power supply is cut off while data is being read or written.

*Cost-Effectiveness.* The DiskOnChip Millennium and the Mobile DiskOnChip families provide particularly cost-effective solutions for the data storage needs of our customers' products because all of the logic circuitry and related hardware of the flash disk have been integrated with the flash memory component onto a single chip. In addition, our FFD products are highly reliable and durable. As a result, they represent a cost-effective solution for products such as military systems and network infrastructure equipment, where the cost of repairing or replacing the data storage device is high or where the potential costs of losing data or the failure of the related system are great.

19

INGEN-0100736

*High Reliability, Durability and Ruggedness.* Unlike many traditional data storage devices that use rotating media such as hard drives, or floppy disks, our products are solid-state, meaning that they have no moving parts and therefore are not susceptible to mechanical failure. In addition, because our products are solid-state, they can withstand shocks, vibrations and temperature and humidity extremes better than data storage devices that use rotating media. Our products also contain effective error detection and correction algorithms that further enhance reliability. Moreover, our TrueFFS software performs wear leveling, which spreads the writing of data over the entire flash storage device, thereby increasing the durability of the product.

*High Performance.* Our products have a higher write speed than standard flash components alone. In addition, our FFD products provide faster access times than hard drives and read and write speeds comparable to high-performance hard drives.

*Compatibility; Capacity.* Our DiskOnKey is a lightweight, thumb-sized and pocketable device that plugs directly into the USB port of PCs, laptops and other consumer appliances. The DiskOnKey does not require drivers with the latest operating systems and is operating-system-independent, thus allowing users with both a Mac and Windows machine to easily transfer data between the two systems. In addition, in contrast to floppy disks whose maximum capacity is 1.44 megabytes, the DiskOnKey is currently available in capacities of 8, 16, 32, 64, 128, 256 and 512 megabytes and 1 gigabyte.

## Our Target Markets

As discussed above, our primary target markets for our three principal product lines, the DiskOnChip, the DiskOnKey, and the FFD families, are as follows:

### — Target Markets for the DiskOnChip Product Line

The primary target markets for our DiskOnChip products are: (i) the High-End Mobile Devices market; and (ii) the Embedded Devices market.

#### The High-End Mobile Devices Market:

High-End Mobile Devices are portable handsets of all kinds. The High-End Mobile Devices market is comprised primarily of cellular phones and PDAs.

Cellular phones were originally just that; telephones that you could carry around with you to make and receive phone calls, with no additional features (i.e. voice-centric cellular hand-sets). The first handheld computers were dubbed Personal Digital Assistants, or PDAs, because they were primarily used to store phone numbers, addresses and appointments. Many were basically just expensive electronic organizers.

The market for 2.5G-3G feature-rich handsets is growing rapidly. More and more handsets with features such as digital cameras, color screens, MMS (Multimedia Messaging Services) & Email capabilities, PIM (Personal Information Management) and gaming, as well as graphical applications & operating systems (i.e. data-centric cellular devices) are introduced and sold world wide. These data-centric devices require (among others), much more memory than their predecessors. For example, a simple voice-centric 2G cellular phone usually featured 2 megabytes of flash memory, while 2.5G and 3G data-centric devices feature 16-64 megabytes. This increase in memory must also take into account the unique characteristics of data-centric mobile handsets that must be physically small yet feature improved performance and lower power consumption for a longer battery life.

Most of today's data-centric mobile handsets suffer from slow write performance, low reliability, limited capacity and high power consumption. This limits the ability of designers of mobile applications to provide advanced applications and to allow the customer to store more than a minimal amount of data. The Mobile DiskOnChip offers both the storage capacity and the features needed to overcome these limitations.

We believe that our Mobile DiskOnChip delivers an ideal combination of high capacity & small size, with the high performance and reliability needed for multimedia enabled handsets and PDAs. Based on the latest NAND technology, integrated with a feature rich ultra thin controller, Mobile DiskOnChip also features an ideal cost structure.

INGEN-0100737

DX-091.23
**Appx10954**

**The Embedded Devices Market:**

Our DiskOnChip product line was designed and developed over the years with the needs of embedded systems in mind. Embedded systems are products that are based on a computer platform but that are nevertheless not generally thought of as computers. Among the numerous examples of these products are point-of-sale terminals, bar-code readers, video conferencing equipment and manufacturing robots and control systems.

With the advent and increasing popularity of the Internet, the ever-growing demand for access to the Internet anytime and anywhere fueled dramatic growth in the year 2000 in the Connected Devices market and we shifted our focus to this then-emerging market for internet connected devices ("Connected Devices"). Connected Devices (many of which are Embedded Devices themselves) are digital devices of all kinds that are used to access the Internet and process, store and respond to information. These appliances enable low-cost and convenient access to Internet content, services and applications and are revolutionizing the way people access and use information. Examples of Connected Devices are digital set-top boxes and thin clients which are relatively inexpensive devices (also known as "network computers") designed primarily for business use which are configured with only essential equipment (usually without hard disk drives) and connected to a local area network or other server via the Internet or other communications lines. Our DiskOnChip products provide the combination of ease of integration, compact size, cost-effectiveness, reliability, durability, speed and low power consumption required by Connected Devices and other embedded systems. However, in light of the sharp decrease in the worldwide demand for Connected Devices which negatively affected our revenues in 2001, together with the growing and anticipated demand for the next-generation of data-centric mobile handsets, we decided to widen our target markets and focus on more than just the Connected Devices Market. Embedded systems which we are targeting include, for example, residential gateways (i.e. devices which allow to easily and securely share a high-speed broadband Internet connection with all of the computers throughout the home or small office), point of sales devices and wireless terminals (i.e. small hand held computers, ruggedized to withstand the rigors of everyday use and abuse).

*— Target Markets for the DiskOnKey Product Line*
The DiskOnKey product family is targeted at the PC and laptop markets. It is designed to replace other portable data storage devices, such as conventional megabyte floppy disks, which lack the convenience, reliability and/or the storage capacity of the DiskOnKey. The DiskOnKey, currently available in capacities of 8, 16, 32, 64, 128, 256 or 512 megabyte and 1 gigabyte, provides the user with the ability to save and transfer data such as Word documents, songs (MP3s), pictures (JPEGs), PowerPoint presentations, digital video and anything else that can be saved within the boundaries of the storage capacity of the model purchased. It provides portable, secure and reliable data storage in a thumb-sized and pocketable device that plugs directly into the USB port of PCs and laptops, and so enables the easy storage, back-up and transfer of data between any PC, laptop or other computer appliance with a USB port.

We sell our DiskOnKey products through PC and laptop vendors, distributors, Consumer Electronic Companies, and our other marketing channels. DiskOnKey is re-sold by our customers mainly under their own private name and label.

*— Target Markets for the FFD Product Line*
Our FFD product line is primarily targeted to provide solutions for the military and aerospace, telecommunication network infrastructure, public safety and automation markets. These mission-critical systems, where the risk and/or cost of data loss based on technical failure or down-time is unacceptably high, require products which may be subject to rough handling, extreme shocks, vibrations and/or to a variety of temperature, humidity or altitude extremes; or which otherwise need to store data reliably under harsh environmental conditions.

INGEN-0100738

DX-091.24
**Appx10955**

Our FFD product line was designed specifically to meet the needs of the markets for mission critical systems. The FFD products provide extremely high reliability, measured by impressive MTBF (Mean Time Between Failures), durability, ruggedness, enabling compliance with various US military and telecom standards, and extended life expectancy under the harshest environmental conditions. The FFD line offer high performance and high capacity in standard hard-drive sizes and interfaces, serving as drop-in replacements for standard rotating hard drives. In contrast to rotating/mechanical hard drives, which are susceptible to mechanical failure and whose performance is adversely affected by shocks, vibrations or extremes in temperature, high altitude and humidity, the FFD product line is a solid-state flash disk with no moving parts. As with all of our products, this feature, combined with the error detection and correction capabilities of our TrueFFS technology, makes our FFD products significantly more rugged, reliable and long-lived than hard drives. The markets for our FFD products include the military and aerospace markets (e.g. data recorders, moving maps, sonar, radar, fire control systems, black boxes, airborne reconnaissance systems, rugged laptops, tactical computers and servers), the telecommunication network infrastructure market (e.g. data storage in optical switches, ATM (Asynchronous Transfer Mode) switches, IP gateways and wireless base stations), the public safety-computing systems market (in police vehicles, public buses and in trains) and the market for mission critical automated applications (e.g. production line manufacturing machines, point of sales systems and automatic teller machines).

## Products
### DiskOnChip

Our DiskOnChip product line includes, in historical order of their introduction to the market, the DiskOnChip 2000, the DiskOnChip Millennium, the DiskOnChip Millennium Plus, Mobile DiskOnChip, DiskOnChip based MCP (Multi-Chip Packaging) and the Mobile DiskOnChip G3. DiskOnChip is based on cost effective, high capacity NAND flash technology, optimized to meet the unique requirements of Mobile devices and embedded systems

DiskOnChip provides an easy and reliable high capacity non volatile memory ("NVM") solution. It utilizes standard NAND flash components, while overcoming the technological limitations of NAND flash. DiskOnChip supports virtually all major operating systems in its target markets (such as Symbian OS, all Microsoft OSs, Linux, Palm, VxWorks, QNX, Nucleus). As a result, our customers can integrate the DiskOnChip into their products with relatively minimal integration efforts, reducing their integration risk and time to market. Thanks to built-in error detection and correction features, enabled by our TrueFFS technology, DiskOnChip provides extremely reliable data storage to the market.

* ### DiskOnChip 2000.

DiskOnChip 2000 is a module that contains NAND flash components and a thin controller, forming a flash disk. Its capacities range from 16 megabytes to 1 gigabyte, all using the exact same pinout, making it ideal as an easy drop-in storage solution for embedded application. It features a standard memory interface (similar to that of NOR flash or EEPROM), and built in error detection / correction capabilities, based on TrueFFS technology. DiskOnChip 2000 is available in a standard DIP (Dual In-line Package) form factor, which enables it to be easily incorporated into our customers' products.

* ### DiskOnChip Millennium.

DiskOnChip Millennium is the industry's first monolithic flash disk (both the flash and the controller are placed on the same silicon die). It is also the first NAND device with XIP (eXecution In Place) boot capabilities. DiskOnChip Millennium was jointly developed by M-Systems and Toshiba as part of a strategic relationship. We believe that, when introduced, the DiskOnChip Millennium was the smallest flash disk in the world;

The main advantages of DiskOnChip Millennium's monolithic structure are its reduced cost and size and its boot capabilities. DiskOnChip Millennium is available with 8 megabytes of storage capacity, in form factors of TSOP (Thin Small Outline Package) and DIP (compatible with DiskOnChip 2000).

INGEN-0100739

DX-091.25
Appx10956

- **DiskOnChip Millennium Plus.**

DiskOnChip Millennium Plus is the world's first 32 megabyte monolithic (single die) flash disk. This product is the second joint development with Toshiba. In addition to the larger storage capacity that it provides, the DiskOnChip Millennium Plus offers data protection features to prevent customers' software, proprietary data and products from being duplicated or modified. It also features an improved XIP boot capability designed to efficiently replace boot ROM in any hardware environment.

- **Mobile DiskOnChip.**

The Mobile DiskOnChip product line is the most recent addition to the DiskOnChip family of products. It is the first NAND-based device optimized for the unique requirements of mobile handsets, including a low 1.8V I/O interface, a deep power-down mode, and a small BGA (Ball Grid Array) form factor (as small as 7x10mm, the smallest in the world). Mobile DiskOnChip offers capacities of 16 megabytes to 64 megabytes. The 16 megabytes and 32 megabytes are monolithic (single die) products, and the 64 megabytes is a single chip product comprised of two dies of Mobile DiskOnChip 32 megabytes (using MCP technology). Mobile DiskOnChip also provides mobile applications with increased write performance.

We have recently announced (along with Toshiba) the new Mobile DiskOnChip G3 which is the first device to implement Multi Level Cell (MLC) NAND technology. We believe that the Mobile DiskOnChip G3 is the smallest flash disk in the world. It features a complete NVM solution in approximately 60 percent of the die size of a standard NAND flash of the same capacity. Mobile DiskOnChip G3 is based on M-Systems' x2 technology, designed to overcome the limitations of MLC NAND technology and enables it as a reliable, high-performance, low-cost local storage device – mainly intended for 2.5G and 3G mobile handsets.

- **DiskOnChip-based MCP.**

DiskOnChip-based MCP packs Mobile DiskOnChip along with a selected combination from NOR flash, PSRAM (Pseudo Static Random Access Memory), SDRAM (Synchronous Dynamic Random Access Memory) or SRAM (Static Random Access Memory), delivering all system memory needs in a single, compact FBGA package. This is extremely useful for Mobile applications, facing shrinking printed circuit boards ("PCBs") and increasing memory requirement. M-Systems offers DiskOnChip-based MCP combinations as well as combinations tailored to specific customer needs. To provide the service, M-Systems partnered with both Toshiba and Advanced Micro Devices Inc. ("AMD"), thus has access to best of breed flash technologies (NAND and MLC NAND from Toshiba and MirrorBit from AMD) to provide ideal MCP solutions.

**DiskOnKey**

In November 2000, we announced the introduction of our DiskOnKey product. The DiskOnKey is a lightweight, thumb-sized and pocketable device that plugs directly into the USB port of PCs, laptops and other consumer appliances. The DiskOnKey provides removable, secured data storage based on flash memory and our patented technology. It can be used as an alternative to bulky storage devices and floppy disks for reliable and personal data storage, and enables users to quickly, easily and reliably transfer data between their computers at home or work, in their pocket, or briefcase or on their keychain. The DiskOnKey does not require drivers with the latest operating systems and allows users with both a Mac and Windows machine to easily transfer data between the two systems. The DiskOnKey is currently available in capacities of 8, 16, 32, 64, 128, 256 and 512 megabytes, and 1 gigabyte. In addition to providing data storage, since the DiskOnKey has its own CPU, it can also support and run multiple software applications directly from the product itself. For example, in November 2001, we introduced our KeySafe security application (available in six languages), which ensures the confidentiality of private data by means of a user-defined password and internally-secured access verification and is supported by the latest Windows operating systems. In June of 2002, we introduced our MyKey™ application, which allows users easy access, synchronization, and personalization of their DiskOnKey, and is supported on all the latest Windows operating systems.

Throughout 2002, the DiskOnKey product family grew to meet the various market demands. The DiskOnKey Pro was introduced in August of 2002 to meet the market's demand for a smaller form factor. DiskOnKey USB 2.0, allowing faster performance (speeds) was introduced in October of 2002. In addition, during the second half of 2002, certain partners of M-Systems began developing their own unique form factors (different shape of exterior plastic casing) to differentiate themselves in the marketplace, while continuing to incorporate our technology and components inside.

23

INGEN-0100740

The DiskOnKey has been tested under extreme conditions for reliability and durability, securing both USB-compliance and certification by Microsoft's Windows Hardware Quality Testing Lab (WHQL). The DiskOnKey has been granted industry awards and write-ups, such as CNET's Top 100 Products of 2002, numerous gift and tech buying guides mentions, such as Business Week, CNN Headline News, Newsweek, and mentioned as the industry leader in Wall Street Journal, just to name a few.

### FFD

Our FFD, or Fast Flash Disk, product line is designed to meet the data storage requirements of the military and aerospace, telecommunication network infrastructure, public safety and automation markets. Our FFD products consist of a printed circuit board that contains a number of flash components, a microprocessor that runs our TrueFFS software and other proprietary algorithms, and the logic circuitry and related hardware of a flash disk, all encased in a rugged metal package. Our FFD products provide an attractive alternative to traditional hard drive technologies for applications that require extremely reliable, rugged, high-performance and high capacity flash data storage. Unlike rotating hard drives, our flash disk products are solid-state devices that have no moving parts and can withstand rough handling, extreme shocks, vibrations, or a variety of temperature, humidity and altitude extremes. This characteristic, together with the error detection and correction capabilities of our TrueFFS technology, makes our flash disks significantly more rugged and reliable than hard drives. The FFD product line is available in capacities ranging from 32 megabytes to 35 gigabytes. Our newest FFD product provides a data rate of 30 megabytes per second for sustained read, 20 megabytes per second for sustained write. Our FFD products are available with standard hard drive form factors and interfaces, including IDE/ATA (Integrated Drive Electronics/AT Attachment), Narrow SCSI (Small Computer Systems Interface) and Ultra Wide SCSI interfaces in standard 2.5" and 3.5" casing can, and can therefore be used as a "drop in replacement" for hard drives.

### Technology

Our proprietary TrueFFS (True Flash File System) software, which consists of patented data organization algorithms, procedures and methodologies, is the core of our flash disk technology. We designed TrueFFS to enable our flash disks to emulate a hard drive and overcome the inherent limitations of flash memory technology. We work with major operating system vendors to make TrueFFS universally available, free of charge, in the form of software modules incorporated in their operating systems, or supporting their operating systems.

TrueFFS enables our flash disks to overcome critical flash memory limitations, including:

- Standard flash memory components are unable to rewrite to locations that have already been written to without erasing large blocks of data. TrueFFS overcomes this limitation by virtual mapping and allocation of "sector size" flash areas. Sector size is the standard size of an information block written to a data storage device such as a hard drive.
- Standard flash memory components have a limited number of write cycles. TrueFFS overcomes this limitation by wear leveling, a process which spreads the writing of data over the available media even if the application is continuously rewriting the same file or to the same sector.
- Standard flash memory components often include imperfections in the silicon, which make certain areas unusable for read/write functions. TrueFFS addresses this limitation by incorporating sophisticated error detection and correction algorithms, which are supported by the internal logic of our DiskOnChip products, to ensure reliable operation while maintaining high performance. In addition, TrueFFS performs on-line block mapping out mechanism to isolate imperfect areas of the flash media.
- Standard flash memory components may lose large portions of data if power is lost while "writing" data. TrueFFS addresses this limitation by incorporating algorithms that ensure data integrity in the event that power is cut off in the middle of a write operation.

We achieve hard disk emulation for our DiskOnChip products through our TrueFFS software, rather than through a hardware-based solution, such as the addition of a microprocessor. By doing so, we are able to produce our DiskOnChip products with the addition of only minimal logic circuitry. In our DiskOnChip Millennium and DiskOnChip Millennium Plus and Mobile DiskOnChip this architecture enables us to integrate all the required logic circuitry onto the flash component itself. As a result, our products are able to provide compact and cost-effective solutions for our customers' data storage requirements.

24

INGEN-0100741

**DX-091.27**
# Appx10958

## Marketing and Sales

We market our products through a variety of methods, including participation in industry trade shows, conferences, publications, media promotion, through our website and increasingly, through strategic partners.

We target our DiskOnChip sales efforts primarily to large original equipment manufacturers that include our products in their applications. Our DiskOnKey is a retail product. Accordingly, we market and sell the DiskOnKey to the retail consumer market through major computer vendors and international retail chains, as well as through various distributors.

We market our products through a combination of our own sales managers; independent local sales representatives that sell our products on our behalf; and independent distributors that purchase our products for resale to their customers. Our sales managers are compensated based on a salary and a bonus dependent in part on sales levels. The independent local sales representatives receive commissions for their product sales. We continually seek to strengthen each of our sales channels, including by engaging new representatives and distributors and providing them with extensive training and support with respect to our products and technologies. Our technical engineers are an integral part of the sales process and provide customers with technical information and support regarding our products and their integration with the customers' applications.

In addition, we have entered into a strategic partnership with Toshiba in order to position the DiskOnChip as the market standard. As part of this arrangement, Toshiba provides us with raw flash components and fabrication services for some of our DiskOnChip products. In addition, we have, from time to time, entered into agreements with Toshiba for the joint development of some of our DiskOnChip products using Toshiba's flash component technology and our flash data storage technology. These development agreements also grant Toshiba an 8-year license to manufacture and distribute specific DiskOnChip products as a second source for which we receive royalty payments.

We maintain local sales offices in Silicon Valley, California; Boston, Massachusetts; Taipei, Taiwan; Tokyo, Japan; Shenzhen, China and Kfar Saba, Israel. As of May 1st, 2003, we had 112 employees dedicated to marketing, sales and technical support functions.

See Note 14 to our Consolidated Financial Statements included elsewhere in this report for a breakdown by geographical market of our revenues for 2000, 2001 and 2002.

## Manufacturing and Sources of Supply

### *Manufacturing*

We manufacture most of our products through qualified subcontractors. Toshiba manufactures our DiskOnChip Millennium, DiskOnChip Millennium Plus and Mobile DiskOnChip products. We have entered into a manufacturing agreement with Toshiba, pursuant to which Toshiba has agreed to provide us with specified manufacturing capacity through 2005, and we negotiate and place purchase orders with Toshiba from time to time for the manufacture of products. Subcontractors located in China and Taiwan manufacture our DiskOnKey products for us. We manufacture our DiskOnChip 2000 and FFD products at our facility in Kfar Saba.

Our products are European Union CE (Communaute Europenne) approved and our manufacturing process meets the ISO-9001 quality standards. The Company's Quality System is ISO-9001, certified for the design and development, manufacturing and service processes. The Company's contract manufacturers are all ISO-9002 certified as well as ISO-14001 certified.

The Company's DiskOnKey products comply with worldwide regulatory standards such as UL, TUV, CB and FCC.

INGEN-0100742

DX-091.28

**Appx10959**

### Sources of Supply

We purchase our supplies from various sources, including flash components that we purchase principally from Toshiba and Samsung. Samsung currently supplies the majority of our flash components. Although our agreement with Samsung expired in March 2003, we continue to purchase flash components from them. Our policy is to have more than one supplier for all of our parts wherever feasible. However, Toshiba is currently the sole manufacturer of our DiskOnChip Millennium, DiskOnChip Millennium Plus and Mobile DiskOnChip products, and might be the sole manufacturer of future DiskOnChip products. Samsung is currently the sole supplier of the flash components for a portion of our DiskOnKey products. In addition, we currently rely on Atmel Sarl as a single source for supply of ASIC components for our DiskOnKey products. In April 2001 we entered into a development and supply agreement with Atmel Sarl. Under this agreement, Atmel is to layout, develop, manufacture, test and supply the ASIC components for our DiskOnKey products. The agreement is terminable by Atmel at will, subject to six-months' prior notice, or by either party for breach, subject to thirty days' prior notice. If Toshiba, Samsung, Atmel or any of our other suppliers fails to provide parts or services in a timely manner and we are unable to secure an alternate supply of comparable price and quality in a timely manner, our results of operations could be adversely affected.

At times, we have experienced difficulties in securing adequate supplies of certain components for our products, which has resulted in delayed or lost sales. In an effort to mitigate supply shortages, we at times have maintained a larger inventory of certain components than we would otherwise maintain if the availability of adequate supplies were more certain.

### Seasonality

We do not believe that seasonality has a material affect on our business at this time. However, we anticipate that we may experience seasonality in sales of our DiskOnKey product in the future. This is due to DiskOnKey being a retail product that may experience higher sales during holiday shopping seasons.

### Research and Development

We have devoted significant resources to research and development activities with respect to our core flash data storage technology. We have emphasized the development of our technology, the enhancement of existing products and the development of new products, generally in response to the rapidly evolving markets for PCs and laptops, High-End Mobile Devices and Embedded Devices and the demanding markets for military systems and network infrastructure equipment applications. In addition, we emphasize the development and addition of new features to our products, such as data protection, security and access control, and the development of new applications for our DiskOnKey products. Our expertise and in depth know how in the usage of advanced flash technologies is utilized to good effect in our research and development activities. We believe that our success will continue to depend upon our ability to enhance our existing products and to introduce new products in response to changes in market demands in a timely manner. Accordingly, we intend to continue to make substantial investments in product and technology development. As of March 15, 2003, we had 91 employees dedicated to research and development activities.

Our gross research and development expenses during 2000, 2001 and 2002 were $7.4 million, $13.3 million and 12.2 million, respectively. A small portion of our operating expenses during 2001 was funded by the Singapore – Israel industrial research and development ("SIIRD"). In 2002 a small portion of our operating expenses was funded by the SIIRD and the Information Society Technology ("IST") funds, in the amounts of $63,000 and $212,000, respectively. Net research and development expenses represented, 8%, 29.7% and 18.5%, of our revenues during, 2000, 2001 and 2002 respectively. In connection with the grants received from the OCS and SIIRD, we are required to pay the OCS and SIIRD royalties at the rate of 1.5%-5.0% on all revenues derived from the sale of products developed as a result of the research projects funded by these grants, up to a maximum of 150% of the dollar-linked amount of the grant. The IST fund does not require any royalties. The manufacture of products developed using OCS funding must remain in Israel, and any technology developed using OCS funding may not be transferred to any other entity without the prior consent of the OCS. These restrictions do not affect sales of our products outside Israel.

INGEN-0100743

**Intellectual Property Rights and Current Litigation**

Our success is dependent upon our proprietary technology. We currently rely on a combination of patent, trade secret, copyright and trademark law, together with non-disclosure agreements, to establish and protect the proprietary rights and technology used in our products.

As of May 1st, 2003, we hold twenty two (22) U.S. patents and several foreign patents relating to our technology and products. We also have forty three (43) applications for patents pending in the U.S. with respect to new products and technologies. However, we cannot be sure that the pending patent applications will be granted or that our existing patents or any other patents that may be granted will be enforceable or provide us with meaningful protection from competitors. Patents that may be granted to us in some foreign countries may not afford the same protection to us as is provided under the patent laws of the U.S. If a competitor were to infringe our patents, the costs of enforcing patent rights might be substantial and, in some cases, even prohibitive.

We also may desire or be required to obtain licenses from others in order to further develop, produce and market commercially viable products effectively. We cannot be sure that these licenses will be obtainable on commercially reasonable terms, if at all, that the patents underlying these licenses will be valid and enforceable or that the technology underlying these licenses will remain proprietary in nature.

We also rely on unpatented proprietary know-how, copyrights and trade secrets, and employ various methods, including confidentiality agreements with employees, consultants and marketing partners, to protect our trade secrets and know-how. However, these methods may not afford complete protection and we cannot be sure that others will not independently develop our trade secrets and know-how or obtain access thereto.

We have registered U.S. trademarks with respect to "M-Systems," "TrueFFS," "DiskOnChip," "DiskOnChip Millennium," "DiskOnKey" and our stylized kangaroo symbol for our DiskOnKey products and have filed U.S. trademark applications in connection with certain of our other products, including "DiskOnKey MyKey," "Mobile DiskOnChip" and "FFD".

The Company is currently involved in two separate lawsuits relating to its intellectual property. Following is a short summary of the status of these lawsuits:

(1)  JMTek LLC ("JMTek") - On October 1st, 2002, we filed suit in U.S. Federal Court against JMTek, a corporation based in Washington State, for infringement of one of our patents. As of May 1st, 2003, the suit is still in pre-trial stages. Although we are confident in our assertions, it is not possible, at this stage, to predict the outcome or estimate the financial consequences of this action.

(2)  Trek Technology (Singapore) PTE Ltd. ("Trek") – During 2002, Trek, a Singaporean company, issued what we believed to be threatening letters to some of the our distributors in Singapore, alleging that our DiskOnKey products infringe their Singaporean patent. Our request from Trek to retract its allegations went unanswered and in May, 2002, we filed suit against Trek in the High Court of Singapore for making groundless threats alleging that our products infringe Trek's patent. Concurrently, Trek sued certain of our distributors in Singapore, for infringement of Trek's patent. Trek subsequently added us and another distributor as co-defendants. In accordance with indemnification agreements entered into between M-Systems and its co-defendants, we have been managing the litigation for all of the co-defendants. A trial date was set for June 28th, 2003. Under our indemnification obligations, we have undertaken to indemnify its co-defendants in the event that Trek prevails in its action and our co-defendants suffer losses as a result. Although we are confident in our assertions, it is not possible, at this stage, to predict the outcome or estimate the financial consequences of this action.

INGEN-0100744

DX-091.30
Appx10961

## Competition

Our products compete with flash data storage products, including flash components and other flash disks, and alternative data storage technologies, including hard drives. The markets in which we compete are characterized by intense competition, rapid technological change, evolving industry standards, unstable average selling prices and rapid product obsolescence. Our competitors include many large U.S. and international companies that have substantially greater financial, technical, marketing, logistical infrastructure and support and other resources, greater access to component fabrication capacity, broader product lines and longer-standing relationships with customers than we have, which may limit our ability to effectively compete with them. In addition, we have also experienced competition from a number of relatively small companies (mainly from the far east) who have taken advantage of low assembly costs and have accepted lower than average gross margins resulting in such competitors setting very low prices for their products.

We believe that our various products possess many, if not all, of the following competitive strengths: reliability, ease of integration, ease of use, high-performance, cost-effectiveness, features and capabilities.

We believe that our non-retail products, such as the DiskOnChip and FFD product lines also benefit from the extensive and pre-sale technical support we provide to our customers. In addition, we believe that our DiskOnChip product line benefits from long-term strategic relationships that we have with Toshiba, and we expect it to benefit from our strategic relationship with AMD.

The advantages of our DiskOnKey product over older technologies, such as floppy disks that require floppy drives, include much higher capacity, reliability, and greater convenience and portability. In competing against rival USB-compatible 'keychain storage' products, we believe that our DiskOnKey products benefit from the fact that we are considered by many to be the leader and innovator of the USB-compatible 'keychain storage' market, having first introduced the concept and product. We believe that we also benefit, among other things, from the combination of the following factors: our long-standing reputation and expertise in the flash disk storage field relative to newer and smaller third-tier competitors; the fact that DiskOnKey products do not need drivers with the latest operating systems and their ability to transfer data between Windows and Mac machines; our advanced technology and the incorporated CPU which enables the DiskOnKey to directly support and run multiple, advanced software applications directly from the product itself; and the DiskOnKey's reliability and performance and its existing and planned features.

Specifically, our DiskOnChip products compete primarily against standard flash components, with or without added software, and other flash disks. The DiskOnChip competes against these products based on a number of factors, including functionality, cost-effectiveness, ease of integration, size, reliability, performance, capacity, modularity and the effectiveness of the related disk emulation software. Flash components are manufactured by various companies, including Intel Corporation, Samsung, Toshiba and AMD. However, customers relying on standard flash components currently have to develop or purchase, test and integrate additional hardware and/or software into their products in order for the flash components to be able to emulate a hard drive in the way a flash disk does. Our DiskOnChip products also face competition from other flash disk products, principally those manufactured by SanDisk. The DiskOnChip product in the DIP package faces competition in the embedded systems market from a product called DiskOnModule manufactured by a Taiwanese company, Power Quotient International Co., Ltd. (PQI) and from others.

Our DiskOnChip products are specifically designed for applications where removability of the flash disk is not required. For these applications, the DiskOnChip is generally more cost-effective, faster and consumes less power than removable flash disks and it requires a simpler interface.

Our DiskOnKey product competes with other flash USB drives, removable magnetic media, removable optical media, flash cards, floppy drives and other removable storage media. Our primary competitors in this market currently consist of numerous third tier computer peripheral manufacturers or new hardware manufacturers, the majority of whom are located in Asia where manufacturing costs tend to be lower. These companies include, among others, Trek 2000, J.M. Tech, Netac and LGN. Many of these competitors are vying for and attaining market share on the basis of aggressive pricing. We have also begun to experience competition from large U.S. and international companies (e.g. SanDisk and Lexar) that have more experience in the retail market, substantially greater financial, sales, technical, marketing and other resources, greater access to component fabrication capacity, broader product lines and longer-standing relationships with customers than we do.

INGEN-0100745

We believe the DiskOnKey will compete in this market on the basis of its patented and advanced technology and features (including the ability to directly run security and other software applications that we have developed and are developing), its user-friendly size, reliability and performance.

Our FFD products face competition primarily from traditional hard drives, which are available from many sources, including Seagate Technology, Inc., Maxtor Corporation and International Business Machines Corp. ("IBM"), and drives based on flash or other solid-state memory offered by a number of competitors, including SanDisk, Silicon Storage Technology, Inc., Memtech, and BiTMICRO Networks. The FFD competes against these products based on a number of factors, including performance, reliability, durability, ruggedness, available capacities, price (in some instances) and other features, including the ability to customize the product to a customer's needs.

In general, we expect competition to increase in the future from existing competitors and from other companies that may have a more efficient cost structure and/or direct access to distribution channels and/or stronger relations with the OEMs we currently sell to or intend to sell to. Such companies may enter our existing or future markets with similar or alternative data storage solutions that may be less costly and/or provide additional features and/or sell directly to computer manufacturers that will provide such device with their computers. In addition, computer manufacturers themselves may choose to manufacture competing devices. Increased competition may force us to reduce the prices for our products, thereby reducing our revenues and margins, and could otherwise have a material adverse effect on our business, financial condition and results of operations. We cannot be sure that we will be able to compete successfully against current and future competitors or that competitive pressures faced by us will not materially adversely affect our business, financial condition or results of operations.

INGEN-0100746

DX-091.32
Appx10963

## C. STRUCTURE

The following table lists our subsidiaries, their country of organization and our ownership percentage in each.

| Name | Country of Organization | Ownership |
|------|------------------------|-----------|
| M-Systems, Inc. | U.S. | 100% |
| M-Systems Asia Ltd. | Taiwan | 100% |
| M-Systems Flash Disk Pioneers (Japan), Inc. | Japan | 100% |
| M-Systems UK Ltd. | United Kingdom | 100% |
| M-Systems B.V. | The Netherlands | 100% |
| Smart Caps Ltd. | Israel | 100%* |

* As of May 1st, 2003, Smart Caps Ltd. is a wholly owned subsidiary of M-Systems. As and when the OCS invests in Smart Caps, our ownership percentage will decrease (see Item 4.A above the paragraph titled "HISTORY AND DEVELOPMENT OF THE COMPANY").

## D. PROPERTY, PLANTS AND EQUIPMENT

Our headquarters' executive offices, research, development and manufacturing facilities are currently located in a building of approximately 75,000 square feet at 7 Atir Yeda St., Kfar Saba 44425, Israel, which we own. We also own an adjacent vacant plot of 117,000 square feet. We own the building and the property free and clear of all encumbrances except for a mortgage taken out by the sellers from Bank Leumi. The outstanding balance of that mortgage on our building and property is covered in full by escrowed funds to be delivered to the sellers only upon the receipt of various necessary permits and third party approvals, at which point the escrowed funds are to be released for the purpose of paying off the mortgage and removing the lien. In addition, we lease office space of approximately 5,000 square feet for a research and development facility in Omer, Israel.

We also lease office space for our sales offices in Silicon Valley, California; Massachusetts; Taipei, Taiwan; Tokyo, Japan; Shenzhen, China; and Vienna, Austria. These leases for sales offices are not material to our operations.

INGEN-0100747

DX-091.33
Appx10964

## ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS

*This "Operating and Financial Review and Prospects" section contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors including, but not limited to, those set forth elsewhere in this report.*

## A. OPERATING RESULTS

### Overview

We are a leading developer, manufacturer and marketer of innovative data storage products, known as flash disks. Our products are based on our patented TrueFFS technology and include the DiskOnChip, DiskOnKey and Fast Flash Disk (FFD) product families. DiskOnChip is primarily targeted at the Mobile Devices and Embedded Devices markets, while the FFD product line is used in military systems and network infrastructure equipment. The DiskOnKey product family targets the PC and laptop markets.

During 2000, our efforts were primarily targeted at the Connected Devices market and as a result, our revenues increased significantly in 2000 as compared to 1999. During 2000, we began investing both time and resources in the development of a new product line, the DiskOnKey. In early 2001, due primarily to the worldwide economic slowdown, we experienced a significant decrease in our revenues, mainly from the Connected Devices market. As a result of this slowdown, we decided to shift our focus to the Mobile Devices market and the PC and Laptop market. Due to this shift in focus, we succeeded in showing a significant growth in our revenues in 2002, in comparison to 2001. On a quarterly basis, our revenues decreased significantly in the first and second quarters of 2001. Since then, from the third quarter of 2001, throughout the end of 2002 and continuing on through the first quarter of 2003, our revenues have steadily increased on a quarter by quarter basis.

The worldwide economic slowdown was the primary cause of both the decrease in our revenues during the first half of 2001 and the concurrent industry-wide decrease in the price of flash components. This decrease in our revenues and the significant decrease in the price of flash components necessitated a re-evaluation of our inventory, which resulted in our accepting a significant inventory write-down and, in turn, resulted in negative gross profits for 2001.

During 2000 and the first quarter of 2001, our operating expenses increased on a quarterly basis, as the Company invested additional resources in the development and marketing of both its DiskOnChip and DiskOnKey product lines. Following the sharp decrease in the Company's revenues and as the existence of a continuing global economic slowdown became evident, we decreased our quarterly expenses, from the second quarter of 2001 until the first quarter of 2002 (inclusive), by sharpening our focus only on those products and activities deemed to be crucial to our future growth and cutting or eliminating expenses in other areas. As we identified the great potential of both the Mobile Devices market and the market for Laptops and PCs for the sale of our products, we began investing in the development of new products and new sales & marketing channels, which resulted in an increase of our quarterly expenses from the second quarter of 2002, throughout the end of 2002 and continuing on through the first quarter of 2003. On a yearly basis, our operating expenses increased from 2000 to 2001, and slightly decreased from 2001 to 2002.

The preparation of financial statements requires management to make estimates, assumptions, and judgments that affect both (1) the reported amounts of assets and liabilities and the disclosure of contingent liabilities as of the date of the financial statements, and (2) the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, management evaluates its estimates, assumptions, and judgments. Management bases its estimates, assumptions, and judgments on historical experience and on various other factors that it believes to be reasonable under the circumstances, some of which may not be readily apparent from other sources. Under different estimates, assumptions, judgments, factors or circumstances, actual results might differ from the results that were reported.

31

INGEN-0100748

Management believes the following critical accounting policies, among others, affect its significant judgments and estimates used in the preparation of the Company's Consolidated Financial Statements:

*Revenue Recognition* - The Company and its subsidiaries generate most of their revenues from selling their data storage products to end customers, resellers and to OEMs. Revenues from product sales are recognized in accordance with Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements" ("SAB 101") when delivery has occurred, persuasive evidence of an arrangement exists, the vendor's fee is fixed or determinable, no further obligation exists and collectibility is reasonably assured. Because of frequent sales price reductions and rapid technology obsolescences in the industry, sales made to distributors or retailers under agreements allowing price protection and/or right of return are deferred until the retailers or distributors sell the merchandise to the end customer, or the right of return expires.

*Inventory Valuation* - Our policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires us to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, valuation of existing inventory, as well as product life-cycle and product development plans. The estimates of future demand that we use in the valuation of inventory are the basis for the revenue forecast, which is also consistent with our short-term manufacturing plan. Inventory reserves are also provided to cover risks arising from slow moving items. We write-down our inventory for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value based upon assumptions about future demand, market conditions, and specifically – prices of flash components.

*Warranties* - We provide for the estimated cost of product warranties at the time revenue is recognized. Our products sold are covered by a warranty for periods ranging from one (1) year to five (5) years. We accrue a warranty reserve for estimated costs to provide warranty services. Our estimate of costs to service the warranty obligations is based on historical experience and expectation of future conditions. To the extent we experience increased warranty claim activity or increased costs associated with servicing those claims, our warranty accrual will increase, resulting in decreased gross profits.

*Investment in private companies* - Investment in a privately-held company is recorded at the lower of cost or estimated fair value. Any decrease in the value of investments, other than a temporary decrease, is recorded when it becomes known to us.

*The following is a brief description of certain of the line items included in our financial statements as well as trend information regarding those line items:*

*Revenues.* Substantially all of our revenues are generated from the sale of our products. A significant portion of our product sales consists of sales of our DiskOnChip, DiskOnKey and FFD product lines. In 2002, we derived approximately 45% of our revenues from sales of our DiskOnChip product line and 41% from sales of our DiskOnKey product line.

Due to the global economic slowdown which began during the first half of 2001, our 2001 revenues went down as compared to our revenues for 2000. Our resulting shift in focus to the PC and Laptop market and to the Mobile Devices market has since brought us consistent growth and our quarterly results have shown consecutive growth, quarter by quarter, from the third quarter of 2001 through the first quarter of 2003. On an annual basis, in 2002 we have shown a growth in revenues of 45% in comparison to 2001.

*Cost of Revenues.* Our cost of revenues consists primarily of the cost of components and manufacturing costs (including costs of subcontractors that manufacture our products), salaries and related personnel expenses for those engaged in the manufacture of our products, maintenance costs and other overhead costs.

The market price for flash memory components decreased significantly during 2001, mainly in the first half of 2001, due to the excess supply of flash memory components caused by the significant increases in 2000 in worldwide flash memory supply and the significant decrease in customer demand sparked by the worldwide economic slowdown in 2001. In response to this decline in the market price for flash memory components, we reduced the value of our inventory during the first half of 2001 by approximately $30.2 million. Our inventory decreased from $37.5 millions at December 31, 2000 to $13.4 millions at June 30, 2001, mainly due to the inventory write-down. Any further decline in the market price of such components could have a further negative effect on the value of inventory of flash memory components and, therefore, increase our costs of revenues.

32

INGEN-0100749

*Gross Profit.* Our gross profit increased significantly in 2002 compared to 2001, moving from a gross loss to a gross profit. Our gross loss in 2001 is attributable mainly to the inventory write-down and the sharp decrease of our revenues. Furthermore, compared to 2001, gross margins shifted significantly from negative gross margins (due to the inventory write-down done in 2001) to positive gross margins.

*Research and Development Expenses, Net.* Research and development expenses consist primarily of salaries and related personnel expenses and subcontractor costs related to the design, development and testing of new products and technologies and product enhancements. Research and development expenses are presented net of participations received or accrued from the OCS, the Binational Industrial Research and Development ("BIRD") Foundation, SIIRD and IST. All research and development costs are expensed as incurred. We believe that continued investment in research and development is critical to attaining our strategic objectives. As a result of the decrease in the revenues in 2001 compared to 2000, and the company's decision to sharpen its focus only on those products and activities deemed to be crucial to our future growth and cutting or eliminating expenses in other areas, the research and development expenses went down from the first quarter of 2001 till the first quarter of 2002. During 2002, as a result of the continued growth in our revenues compared to those of 2001 and the high potential for revenues growth both in the DiskOnKey and the Mobile DiskOnChip products, we decided to expand our investments in the development of new products. In addition, during 2002 we decided to change the company's focus to be more markets oriented, and as a result some of our employees and their related activities moved from R&D to sales and marketing. We consequently shifted $2.2 million from R&D expenses to sales and marketing expenses during 2002. We expect the R&D expenses to increase in the future as we continue to develop new products and product lines and enhance existing products

*Selling and Marketing Expenses, Net.* Selling and marketing expenses consist primarily of salaries, commissions and related personnel expenses for those engaged in the sale, marketing and support of our products (including commissions payable to our independent sales representatives), as well as related trade shows, promotional and public relations expenses. As a result of the decrease in the Company's revenues in 2001 compared to 2000, and the Company's decision to sharpen our focus only on those activities deemed to be crucial to our future growth and cutting or eliminating expenses in other areas, the selling and marketing expenses went down from the first to the fourth quarter of 2001. During 2002, as a result of the continued growth in our revenues compared to those of 2001 and the high potential for the growth of our revenues from both in the DiskOnKey and the Mobile DiskOnChip products, we have decided to expand our sales and marketing activities. In addition, during 2002 we have decided to change the company's focus to be more markets oriented, and as a result some of our employees and their related activities moved from R&D to sales and marketing. As a result, during 2002 we shifted $2.2 million from R&D expenses to selling and marketing expenses. We intend to pursue sales and marketing campaigns aggressively and expect selling and marketing expenses to increase in the future

*General and Administrative Expenses.* General and administrative expenses consist primarily of salaries and related personnel expenses for executive, accounting, finance, legal and litigation, human resources, administrative and network and information systems personnel, facilities maintenance, professional fees and other general corporate expenses. As we add personnel and incur additional costs related to the growth of our business, we expect that general and administrative expenses will also increase.

*Financial Income, Net.* Financial income, net consists primarily of interest earned on bank deposits, bonds and gains or losses from selling marketable securities and from the translation of monetary balance sheet items denominated in non-dollar currencies. Our financial income, net, decreased during both 2001 and 2002 as a result of the both of the decrease of interest rates in the market and of our reduced cash balance.

*Taxes.* Israeli companies are generally subject to income tax at the corporate rate of 36%. However, as an 'approved enterprise' we are eligible for certain tax benefits. These benefits should result in our income being tax exempt or taxed at a lower rate after we begin to report taxable income for a number of years (see in Item 5.B below the paragraph titled "Taxation").

*Net Income (Loss).* In 2001 our net loss was $41.8 million, $30.2 million of which was due to the inventory write-down, and $1 million was an investment write-off. In 2002 our net loss was $5.5 million dollars.

INGEN-0100750

## Results of Operations

The following table sets forth, for the periods indicated, the percentage of revenues represented by certain items reflected in our consolidated statements of operations.

| | Year ended December 31, | | |
|---|---|---|---|
| | **2000** | **2001** | **2002** |
| Revenues | 100.0% | 100.0% | 100.0% |
| Cost of revenues | 69.4 | 68.0 | 68.5 |
| Inventory write-down | --- | 67.6 | --- |
| Gross profit (loss) | 30.6 | (35.6) | 31.5 |
| Operating expenses: | | | |
|    Research and development, net | (8.0) | (29.7) | (18.5) |
|    Selling and marketing, net | (12.5) | (27.1) | (19.4) |
|    General and administrative | (3.0) | (8.8) | (6.2) |
| In-process research and development write-off | 6.7 | --- | --- |
| Total operating expenses | 30.2 | 65.6 | 44.0 |
| Operating income (loss) | 0.4 | (101.2) | (12.5) |
| Capital loss | --- | (2.7) | --- |
| Financial income, net | 6.3 | 10.4 | 4.0 |
| Income (loss) before minority interest in losses of a subsidiary | 6.8 | (93.5) | (8.5) |
| Minority interest in losses of a subsidiary | 0.0 | --- | --- |
| Net income (loss) | 6.8% | (93.5)% | (8.5)% |

## Year Ended December 31st, 2002 Compared to Year Ended December 31st, 2001

*Revenues.* Revenues in 2002 increased by $20.1 million or 45% to $64.8 million from $44.7 million in 2001. Our DiskOnKey sales increased by $20.2 million or 306%. Our DiskOnChip sales increased by $1.9 million, or 7%, and our FFD sales increased by $0.5 million, or 10%. The increase in revenues was attributable primarily to the continued penetration of our DiskOnKey product line to the PC and Laptop market, which resulted in a significant increase in unit sales in 2002 as compared to 2001. Average selling prices for our DiskOnKey products remained relatively constant during 2001 and 2002.

*Gross Profit.* Our gross profit in 2002 was $20.4 million compared to a gross loss of $15.9 million in 2001, which resulted from the inventory write-down of $30.2 million. Furthermore, compared to 2001, gross margins changed from negative 35.6%, reflecting the 2001 inventory write-down, to positive 31.5%.

*Research and Development Expenses, Net.* Our gross research and development expenses in 2002 decreased by $ 1.1 million to $ 12.2 million, a decrease of 8.2% from the Company's gross research and development expenses of $13.3 million in 2001. Our net research and development expenses decreased by $1.3 million to $12.0 million, a decrease of 9.9% from the net research and development expenses of the Company's of $13.3 million in 2001. The decrease in our gross research and development expenses is attributable to the Company's decision to shift focus to a more market oriented approach. This, in turn, caused us during 2002 to reallocate employees and the related expenses in the amount of $0.7 million from research and development to selling and marketing. As a percentage of revenues, our net research and development expenses decreased to 18.5% in 2002 from 29.7% in 2001. In 2002, we received $63,000 and $212,000 research and development grants from SIIRD and IST, respectively, in comparison to the $60,000 research and development grant we received from SIIRD in 2001.

*Selling and Marketing Expenses, Net.* Gross selling and marketing expenses in 2002 slightly increased by $0.4 million, or 3.5%, to $12.5 million from $12.1 million in 2001. As a result of the Company's decision to shift focus to a more market oriented approach, during 2002 we reallocated employees and the related expenses in the amount of $0.7 million from research and development to selling and marketing. As a percentage of revenues, our net selling and marketing expenses decreased to 19.4% in 2002 from 27.1% in 2001.

INGEN-0100751

*General and Administrative Expenses.* General and administrative expenses in 2002 slightly increased by $0.1 million, or 2%, to $4.0 million from $3.9 million in 2001, as we increased our administrative staff to support our expanding operations. As a percentage of revenues, our general and administrative expenses decreased to 6.2% in 2002 from 8.8% in 2001.

*Capital loss.* In 2001, we realized a one-time charge of $1.0 million due to an investment write-off, as well as a one-time write-off of $181,000 relating to assets used in our previous facilities that could not be utilized in our new facilities in Kfar-Saba. In 2002 we had no capital loss.

*Financial Income, Net.* Financial income, net, in 2002 decreased by $2 million or 43.4% to $2.6 million from $4.6 million in 2001, due mainly to the lower interest rates prevailing in the market.

*Net Income (Loss).* For the reasons discussed above, in 2002 our net loss was $5.5 million compared to a net loss of $41.8 million in 2001.

## Year Ended December 31st, 2001 Compared to Year Ended December 31st, 2000

*Revenues.* Revenues in 2001 decreased by $47.9 million or 52% to $44.7 million from $92.6 million in 2000. Our DiskOnChip sales decreased by $45.5 million, or 62%, and our FFD sales decreased by $2.6 million, or 33%. The decrease in revenues was attributable primarily to the economic slowdown that negatively affected the Connected Devices and the telecom infrastructure markets, and by extension sales of our DiskOnChip products which are incorporated into these devices. In 2001, we commenced sales of our DiskOnKey products, and derived revenues of $6.6 million from such sales by the end of that year.

*Gross Loss.* Our gross loss in 2001 was $15.9 million and was attributable mainly to the inventory write-down accepted by the Company in 2001 and to the sharp decrease in our revenues compared to 2000. Our gross loss in 2001 was $15.9 million compared to a gross profit of $28.3 million in 2000. Furthermore, compared to 2000, gross margins went down significantly due to the inventory write-down.

*Research and Development Expenses, Net.* Gross research and development expenses in 2001 increased by $6.0 million, or 81.3%, to $13.3 million from $7.4 million in 2000. The increase in our research and development expenses was attributable primarily to a high level of activity in connection with the development of new products in the DiskOnChip family, mainly the Mobile DiskOnChip, the development of the DiskOnKey and the addition of the activity of the new development center based on the personnel and technology of Fortress, acquired by us in September 2000, the expenses of which were only consolidated to our results in 2000 in the fourth quarter. As a percentage of revenues, our net research and development expenses increased to 29.7% in 2001 from 8.0% in 2000. In 2001, we received $60,000 in research and development grants from SIIRD while we did not receive research and development grants in 2000 from any of SIIRD, OCS or BIRD.

*Selling and Marketing Expenses, Net.* Gross selling and marketing expenses in 2001 increased by $0.6 million, or 5.1%, to $12.1 million from $11.5 million in 2000. We increased the selling and marketing expenses in connection with our introduction and promotion of the Mobile DiskOnChip and the DiskOnKey. At the same time, we minimized other sales and marketing activities to the level we believed was crucial for the company to allow for future growth. As a percentage of revenues, our net selling and marketing expenses increased to 27.1% in 2001 from 12.5% in 2000.

*General and Administrative Expenses.* General and administrative expenses in 2001 increased by $1.1 million, or 39.3%, to $3.9 million from $2.8 million in 2000. In 2000 and the beginning of 2001, we built an administrative and finance infrastructure which would be able to cope with the sales growth that we had experienced in 2000, and that we then expected would continue. As a percentage of revenues, our general and administrative expenses increased to 8.8% in 2001 from 3.0% in 2000.

*In Process R&D Write-Off.* In 2000, we realized a one-time charge of $6.2 million due to a write-off of in-process research and development in connection with our acquisition of the business and assets of Fortress.

*Capital loss.* In 2000 we had no capital loss. In 2001, we realized a one-time charge of $1.0 million due to an investment write-off, as well as a one-time write-off of $181,000 relating to assets used in our previous facilities that could not be utilized in our new facilities in Kfar-Saba.

35

INGEN-0100752

*Financial Income, Net.* Financial income, net, in 2001 decreased by $1.2 million or 21.2% to $4.6 million from $5.9 million in 2000, due both to the lower interest rates prevailing in the market and to a decrease in our cash balance.

*Minority Interest in Losses of Subsidiary.* In June 1998, we established a subsidiary in Japan, M-Systems Flash Disk Pioneers (Japan), Inc., to further the sales and marketing of our products in Japan. The subsidiary was established together with a Japanese partner, Dempa Shinbun Inc. ("Dempa"), which owned 33% of the company through June 2001, at which time we purchased Dempa's share in the subsidiary. In 2001, no minority interest in losses of this subsidiary was recorded, compared to $19,000 in 2000.

*Net Income (Loss).* For the reasons discussed above, in 2001 our net loss was $41.8 million as opposed to our income of $6.3 million in 2000.

### In-Process Research and Development

In September 2000, we acquired the business and assets of Fortress U&T Ltd. ("Fortress"), in exchange for $8,456,000 in cash, out of which $6,215,000 was allocated to in-process research and development and written–off. The value of the in-process research and development was determined based on an independent expert's assessment of the relative market potential of the research and development project.

The project under development at the time of the acquisition was for the development of a Smart Card. As of the date of the acquisition, the Smart Card technology had not demonstrated its technological or commercial feasibility. Significant risks of technical completion, costs and timing were associated with the development of this project, as there were significant new features being developed at the time of the acquisition. In addition, there were also high levels of market risks as there was very strong competition in the market for Smart Card technology. In the event that the project failed to become viable, it was unlikely that Fortress would be able to realize any value from the sale of the technology to another party.

As the in-process research and development had no alternative use in the event that the proposed project did not prove to be feasible, these development efforts are within the definition of In-Process Research and Development (IPR&D) contained in Statement of Financial Accounting Standards (SFAS) No. 2 "Accounting for Research and Development Costs".

Sales of Smart Card based on this project were expected to continue through 2005. We have assessed a percentage of completion for the Smart Card in order to allocate only the value of research and development performed as of the acquisition date. The percentage of completion was primarily based on our estimates as to the costs incurred on the project prior to the date of the acquisition out of the total estimated budget. As of the date of the acquisition, approximately $2,900,000 had been spent while an additional approximately $1,000,000 was thereafter estimated to be incurred to complete the project. Thus, the technical development was estimated to be approximately 74% complete. Actual total expenses incurred under this project were in compliance with the original estimates.

We used an income approach in valuing the acquired IPR&D. Under this approach, the fair value reflects the present value of the projected free cash flows that will be generated by the IPR&D projects and that would be attributable to the acquired technology, if successfully completed. The projected revenues used in the income approach were based upon our estimate of the revenues to be generated upon completion of the projects and the beginning of commercial sales. The projections assumed that the products will be successful and that the product's development and commercialization would meet our management's time schedule.

In determining applicable discount rates to be used in the valuation of the in-process technology, the independent expert analyzed the risks of an investment in Fortress. In arriving at appropriate discount rates, the independent expert considered the weighted average cost of capital. The weighted average cost of capital was calculated to be 15%. The discount rate applicable to in-process project reflects the risks inherent in such project, as described above. An overall after-tax discount rate of 45% was applied to the in-process projects' cash flows.

36

INGEN-0100753

## B. LIQUIDITY AND CAPITAL RESOURCES

To date, we have funded our operations primarily through cash from operations and the sale of securities and, to a much lesser extent, through government grants to support our marketing and research and development efforts. We completed our initial public offering in March, 1993, which provided net proceeds of $4.6 million. In July, 1993, we called for redemption of certain of the warrants we had issued in connection with the IPO, which resulted in the exercise of most of these warrants and provided net proceeds of $4.7 million. In January, 1995, we completed a private placement of ordinary shares and warrants, which provided net proceeds of $3.7 million (and thereafter, an additional $480,000 upon exercise by certain investors of some of the warrants issued). In August, 1996, we completed a secondary offering of our ordinary shares, which provided net proceeds of $12.6 million. In March, 1998, we received net proceeds of $72,000 from the exercise of warrants that had been granted to the underwriters' representative in connection with our IPO. In March, 2000, we completed a secondary offering of our ordinary shares, which provided net proceeds to us of approximately $149.6 million.

In July, 1999, we raised approximately $5.0 million in a private placement of 1,818,182 ordinary shares, reflecting a price per share of $2.75, and 1,038,962 warrants. Each warrant entitled the holder to purchase one ordinary share at a price of $2.875 until December 31st, 2002, subject to certain anti-dilution and other adjustment protections. The holders of the ordinary shares issued in the private placement and upon the exercise of the warrants have registration rights, including the right to demand registration of their shares in an underwritten public offering at any time after January, 2002. As of December 31st, 2002 all of said warrants have been exercised and none remain outstanding.

On May 1st, 2003, we entered into a Share Purchase Agreement with Dr. Hans Wagner, a member of our Board of Directors, for the purchase of 500,000 ordinary shares (see Item 7.B below the paragraph titled "Related Party Transactions").

We had no indebtedness as of May 1st, 2003, December 31, 2001 and as of December 31, 2000.

Our cash, cash equivalents, short-term deposits and short term marketable securities were $64.0 million at December 31st, 2002, compared to $80.1 million at December 31st, 2001. Our long term marketable securities were $30.1 million at December 31st, 2002, compared to $17.2 million at December 31st, 2001.

Net cash used in operating activities in 2002, 2001 and 2000 was $2.75 million, $9.8 million and $15.4 million, respectively. This was attributable primarily to changes in our working capital. We expect that our principal uses of cash in the near future will be to fund increases in sales and marketing expenditures and research and development expenditures. We cannot assure you that the uses will not be different. In addition, we may also use cash to finance strategic acquisitions of, or investments in, related businesses, product lines and technologies.

During the years ended December 31st, 2002, 2001 and 2000, the aggregate amount of our capital expenditures was $19.2 million. These expenditures were principally for the purchase of our building and the adjacent vacant lot, improvement of our building, investment in our manufacturing facilities, purchases of computer equipment and leasehold improvement. As of December 31, 2002, we had no commitment for material capital expenditures.

INGEN-0100754

DX-091.40
Appx10971

**Lease commitments:**

The Company's facilities in Omer, its subsidiaries' facilities and its vehicles are leased under several operating lease agreements, which expire on various dates, the latest of which is in 2005.

Future minimum lease commitments under non-cancelable operating leases, are as follows:

| | Year ended December 31, | | | |
| | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|
| Facilities | $ 363,000 | 369,000 | 305,000 | $ 1,037,000 |
| Vehicles | $ 666,000 | 375,000 | 122,000 | $ 1,163,000 |
| Total | $ 1,029,000 | 744,000 | 427,000 | $ 2,200,000 |

Facilities lease expenses for the years ended December 31, 2000, 2001 and 2002, were approximately $798,000, $384,000 and $456,000, respectively. Vehicles lease expenses for the years ended December 31, 2000, 2001 and 2002 were approximately $234,000, $606,000 and $763,000, respectively.

As of December 31, 2002, the Company has authorized and available credit lines of $4.0 million from banks. None of the credit lines were drawn as of December 31, 2002. In connection with the credit lines, the Company agreed not to place any liens on its assets without the respective bank's consent.

**Royalty Commitments**

Under the Company's research and development agreements with the OCS, BIRD and SIIRD, the Company is required to pay royalties at the rate of 1.5%-5% of sales of products developed with funds provided by the OCS, BIRD and SIIRD, up to an amount equal to 150% of the OCS and BIRD and 100% of the SIIRD research and development grants (dollar-linked) related to such projects. In addition, the Israeli Government, through the Fund for Encouragement of Marketing Activities ("FEMA"), and BIRD awarded the Company and its U.S. subsidiary grants for participation in expenses for overseas marketing. The Company is committed to pay royalties to FEMA at the rate of 3% on the increase in export sales, up to the amount of the grants received by the Company. As of December 31, 2002, the Company had outstanding obligations to pay royalties of $447,000 in respect of these various grants.

**Taxation**

Israeli companies are subject to corporate tax at the rate of 36%. However, the effective rate of tax of a company that derives income from an 'approved enterprise' (as referred to below) may be considerably lower (see Item 10.E below the paragraph titled "Law for the Encouragement of Capital Investments, 1959").

Most of our production facilities have been granted 'approved enterprise' status under six separate programs pursuant to Israel's Law for the Encouragement of Capital Investments, 1959 (the "Investment Law"). The primary tax benefits resulting from such status are described below.

During 2001, we purchased the assets of Fortress, which had a facility that had been granted 'approved enterprise' status. In 2001, we initiated a research and development facility in Omer, Israel, at the site of Fortress' facilities. Income derived from our Omer facility is tax-exempt for a 10-year period, commencing in the year in which we first recognize Israeli taxable income from that facility, and will end no later than the earlier of 12 years from the commencement of production, or 14 years from receipt of the approval for the Omer 'approved enterprise'. The Company came to an agreement with the Israeli tax authorities on the percentage of revenues which are deemed attributable to the facility in Omer.

38

INGEN-0100755

DX-091.41
Appx10972

In addition, income which is not attributable to our Omer facility and which is derived from our 'approved enterprises' that commenced operations prior to or during 1996 is tax exempt for the first four years of the 10-year tax benefit period, and is subject to a reduced tax rate during the rest of the period. Income which is not attributable to the Omer facility and which is derived from our 'approved enterprises' that commenced operations after 1996 is tax exempt for the first two years of the 10-year tax benefit period, and is subject to a reduced tax rate during the rest of the period. The reduced tax rate is imposed at a rate of between 10% and 25%, depending on the percentage of M-Systems' shares held by non-Israelis in that remaining period (the more shares held by non-Israelis, the lower the tax rate). The tax benefit periods for each respective 'approved enterprise' will commence in the year in which we first recognize Israeli taxable income from such 'approved enterprise', and will end no later than the earlier of 12 years from the commencement of production, or 14 years from receipt of the approval for such 'approved enterprise'. Accordingly, the period relating to these 'approved enterprises' will expire between 2005 and 2012. The tax benefit periods for these 'approved enterprises' have not yet commenced except for the first plan.

We cannot be sure that 'approved enterprise' programs will continue to be available, or that we will continue to qualify for benefits under such programs. In addition, the benefits available to an 'approved enterprise' are conditional upon the fulfillment of certain conditions stipulated in the relevant laws and regulations and the criteria set forth in the certificate of approval issued to us. In the event that we do not comply with these conditions, in whole or in part, we may be required to refund the amount of the benefits, indexed to the Israeli CPI, with interest.

In the years ended December 31st, 2002, 2001 and 2000, we incurred losses for tax purposes. Accordingly, we did not provide for taxes on income in any of the reported periods.

INGEN-0100756

DX-091.42

Appx10973

## C. RESEARCH AND DEVELOPMENT, PATENTS AND LICENSES, ETC.

**Government of Israel Support Programs**

### *Research and Development Overview and Internal Program*

We have devoted significant resources to research and development activities with respect to our core flash data storage technology. We have emphasized the development of our technology, the enhancement of existing products and the development of new products, generally in response to the rapidly evolving markets for Mobile Devices, Embedded Devices, military systems and network infrastructure equipment and other embedded systems. In addition, we emphasize the development and addition of new features to our products, such as security and access control.

Our gross research and development expenses during 2002, 2001 and 2000 were $12.2 million, $13.3 million and $7.4 million, respectively. A small portion of our revenues during those years was funded through grants from - SIIRD and IST, as discussed below.

### *Research and Development Grants*

We participate in programs offered by the OCS, SIIRD and IST that support research and development activities. We received or accrued participation from OCS, SIIRD and IST of $0, $63,000 and $212,000 respectively in 2002, $0, $60,000, $0 in 2001, and $0, $0 and $0, respectively, in 2000. Our OCS grants related to the development of a compact IDE interface flash disk, our SIIRD grants related to the development of LPC flash disk and our IST grants related to the development of secure mobile payment on chip (SM-PAYSOC). For a discussion of such programs, including royalty obligations and limitations on manufacturing and the transfer of technology relating to such participations, see "Item 4B: Business Overview — Research and Development."

### Inflation

Most of our sales traditionally have been made in dollars, and most of our expenses have been incurred in dollars or denominated in NIS. We have not been materially affected by changes in the rate of inflation in Israel. Inflation in the U.S. and our other markets has not had a material effect on our results of operations.

### Functional Currency

The U.S. dollar is the primary currency in the economic environment in which we operate. Most of our sales are made outside of Israel and are denominated in dollars. Most of our purchases of materials and components are made outside of Israel and are denominated in dollars. In addition, most marketing and service costs are incurred in dollars. As a result, our functional and reporting currency is the U.S. dollar.

## D. TREND INFORMATION

Please see the discussion of significant recent trends in our business, including trends in our revenues, costs of revenues, research and development expenses, sales and marketing expenses and net income (loss), in "Item 5A: Operating Results – Overview."

INGEN-0100757

DX-091.43

Appx10974

## ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

### A. DIRECTORS AND SENIOR MANAGEMENT

The following table sets forth certain information regarding our directors and executive officers as of May 1st, 2003:

| Name | Age | Position |
|------|-----|----------|
| Dov Moran | 47 | President, CEO and Chairman of the Board of Directors |
| Aryeh Mergi | 41 | Executive Vice President of Business Development; Director |
| Ronit Maor | 32 | CFO and Vice President of Finance and Administration |
| Dana Gross | 36 | Chief Marketing Officer; Director |
| Amir Friedman | 41 | Director |
| Yair Shoham | 49 | Director |
| Dr. Hans Wagner | 73 | Director |
| Yossi Ben Shalom | 47 | Director |

The background of each of our directors, executive officers and key employees is as follows:

*Dov Moran.* Mr. Moran is a founder of M-Systems and has been a director and President, Chief Executive Officer and Chairman of the Board of Directors of M-Systems since 1989. Mr. Moran has also been a director and chairman of the board of directors of our U.S. subsidiary, M-Systems Inc. ("MSU"), since 1992. From 1984 to 1989, Mr. Moran was an independent consultant in the computer industry. Prior thereto, Mr. Moran served in the Israeli Navy for seven years and was director of its microprocessors department. Mr. Moran received a B.Sc. in Computers and Electronic Engineering (with honors) from the Technion, Israel Institute of Technology, in Haifa, Israel in 1977.

*Aryeh Mergi.* Mr. Mergi is a founder of M-Systems and has been a director of M-Systems since 1989 and a director of MSU since 1992. Mr. Mergi has been our Executive Vice President of Business Development of the Company since 2000. From 1995 to 2000, he served as Executive Vice President of Sales and Marketing. From 1989 to 1995, he served as Vice President of Research and Development. Mr. Mergi received a B.Sc. in Electronic Engineering (with honors) from the Technion, Israel Institute of Technology, in Haifa, Israel in 1988.

*Ronit Maor.* Ms. Maor has been Chief Financial Officer and Vice President of Finance and Administration since May 1997. Ms. Maor joined us as Planning and Control Manager in March 1996 and was promoted to Vice President of Planning and Control in February 1997. Prior thereto, Ms. Maor was a project manager at Tefen, an industrial engineering consulting company. She received her B.Sc. in Industrial Management Engineering (with honors) from Tel-Aviv University in 1995.

*Dana Gross.* Ms. Gross has served as the Company's Chief Marketing Officer since July, 2002, and as a director of the Company since September 2000. Ms. Gross joined the Company in July 1992 as Vice President of Operations. She was promoted to Chief Financial Officer in 1994, to President of MSU in 1995, to Executive Vice President of Business Development in 1997, to Vice President of Worldwide Sales in 1998 and to Executive Vice President of the DiskOnChip business unit in 2000. Ms. Gross received a B.Sc. in Industrial Management Engineering (with honors) from Tel-Aviv University in 1992 and an M.B.A. degree from San Jose State University in 1997.

*Amir Friedman.* Mr. Friedman is a founder of M-Systems and has served us as a director since 1991. Mr. Friedman served as our Vice President for U.S. operations from 1991 to 1994 and as the President of MSU from 1989 to 1994. Mr. Friedman is also a founder and director of Connect-ONE Ltd., and has served as its President since 1995. Mr. Friedman received a B.Sc. in Electronic Engineering from the University of Wisconsin in 1981 and an M.B.A. from Tel-Aviv University in 1989. Mr. Friedman qualifies as an independent director under applicable Nasdaq rules and was elected to the Board of Directors as an External Director under the applicable provisions of the Companies Law.

-41-

INGEN-0100758

*Yair Shoham.* Mr. Shoham has served as a director of M-Systems since 1996. Since June 1999, Mr. Shoham has been general partner with Genesis Partners II L.L.C., an Israel-based venture capital fund that is affiliated with CIBC World Markets Corp. From 1997 to 1999, Mr. Shoham was the Vice President for Business Development of Butterfly VLSI Ltd., and from January 1996 to December 1996 he was the Vice President for Business Development of VDOnet Corporation Ltd. From January 1994 to December 1995, Mr. Shoham was a partner at the law firm of Goldfarb, Levy, Eran & Co., Tel-Aviv, Israel. Mr. Shoham received his B.A. degree from Haifa University in Israel in 1982 and a J.D. degree from Loyola University of Chicago School of Law in 1985. Mr. Shoham qualifies as an independent director under applicable Nasdaq rules and was elected to the Board of Directors as an External Director under the applicable provisions of the Companies Law.

*Dr. Hans Wagner.* Dr. Wagner has served as a director of M-Systems since November, 2002. Dr. Wagner is currently a Senior Partner of Omega Partners Ltd., a telecommunications consultancy firm, of which he was a founder in 1977. Dr. Wagner also founded and serves as a director of Ozone Ltd., a manufacturer of recycling devices founded in 1996, and of Pelikon Ltd., a developer and manufacturer of electro-luminescent displays founded in 2000. From 1995 to 2000, Dr. Wagner served as a strategic advisor to the management of Ericsson Mobile LM. From 1984 to 1992, Dr. Wagner was a founder and served as chairman of Technophone, a mobile telephone manufacturer which was then the worldwide number three in sales prior to its acquisition by Nokia. From 1973 to 1977, Dr. Wagner served as the Assistant Secretary General of the UNDP. From 1969 to 1973, Dr. Wagner served as the CEO of SONAB AB, Sweden's second largest communication equipment manufacturer. From 1963 to 1969, Dr. Wagner served as the COO of Incentive AB, Sweden's largest technical conglomerate. Dr. Wagner holds a Masters degree in Chemical Engineering, an MBA degree from the Stockholm School of Economics and a Ph.D. from the Massachusetts Institute of Technology. Dr. Wagner qualifies as an independent director under applicable Nasdaq rules.

*Yossi Ben Shalom* Mr. Ben Shalom has served as a director of the Company since January, 2003. Mr. Ben Shalom is a co-founder of DBSI Investments Ltd. Before establishing DBSI Investments, Mr. Ben-Shalom had been Executive Vice President and Chief Financial Officer of Koor Industries Ltd. (KOR - Nasdaq) from 1998 through 2000. Before that, Mr. Ben-Shalom served as Chief Financial Officer of Tadiran Ltd. Mr. Ben-Shalom serves as an active director on numerous boards, including, among others, on the boards of NICE Systems (NICE - Nasdaq) - computer telephony; Machteshim Agan – chemicals; and Bank Klali. Mr. Ben-Shalom served as an active chairman in successful turnaround programs, such as at Eurocar Israel, American Express Israel and Scopus Technologies. Mr. Ben Shalom holds a BA in Economics and an MA in Business Management from Tel Aviv University. Mr. Ben Shalom qualifies as an independent director under applicable Nasdaq rules.

## B. COMPENSATION

The aggregate compensation paid by us and our subsidiaries to all persons who served in the capacity of director and executive officer for the year ended December 31, 2002 (11 persons of which 4 no longer serve in such capacity) was approximately $636,800, which includes approximately $37,300 set aside or accrued to provide pension, retirement or similar benefits, but does not include amounts expended by us for automobiles made available to our officers, expenses (including business travel, professional and business association dues and expenses) reimbursed to officers and other fringe benefits commonly reimbursed or paid by companies in Israel. The Company does not pay directors' fees to its directors.

During fiscal 2002, all persons who served in the capacity of director and executive officer for the year ended December 31, 2002, were granted options to purchase a total of 289,600 ordinary shares at an average price of $7.18 per share, with vesting terms of 2-4 years. All options were granted pursuant to our then current share option and incentive plans (see in Item 6.E below the paragraph titled "Share Option Plans and recent changes in Israeli law").

INGEN-0100759

## C. BOARD PRACTICES

**Terms of Office**

Directors are elected by an ordinary resolution at the Annual General Meeting of our shareholders. All directors of the Company, other than "External directors under the Companies Law (see in this Item 6.C below the paragraph titled "External Directors") who serve for a period of three years after their election, serve until the next Annual General Meeting, unless their offices are vacated earlier under any relevant provision of our Articles of Association.

We have entered into employment agreements with all of our executive officers similar in form to the agreements entered into with all of our other employees. These agreements are subject to termination by either party, with or without cause, in most cases on either 30 or 60 days' notice, depending on the agreement. Under these agreements with our Israeli executive officers, we and the employee each contribute a percentage of the salary of the employee to a fund known as "Managers' Insurance." This fund provides a combination of savings plan, insurance and severance pay benefits to the employee, giving the employee a lump sum of payment upon retirement and securing severance pay, if legally entitled, upon termination of employment. Each employee who agrees to participate contributes an amount equal to 5% of his or her salary and we contribute between 13.3% and 15.8% of his or her salary. Israeli law generally requires severance pay, which may be funded by Managers' Insurance, upon the retirement or death of an employee or termination of employment without due cause. These agreements all contain provisions standard for a company in our industry regarding non competition, confidentiality of information and assignment of inventions. The enforceability of covenants not to compete is limited in Israel.

**Alternate Directors**

Our Articles of Association provide that a director may appoint, by written notice to us, any individual to serve as an alternate director so long as such individual does not already serve as a director or an alternate director. Any alternate director will have all of the rights and obligations of the director appointing him or her, except the power to appoint an alternate (unless the instrument appointing him or her provides otherwise) and the right to remuneration. The alternate director may not act at any meeting at which the director appointing him or her is present. Unless the appointing director limits the time period or scope of any such appointment, the appointment will be effective for all purposes and for an indefinite time, but will expire upon the expiration of the appointing director's term. Currently, no alternate directors have been appointed.

**External Directors**

Under the Companies Law, companies incorporated under the laws of Israel whose shares have been offered to the public in or outside of Israel are required to appoint at least two external directors. This law provides that a person may not be appointed as an external director if the person or the person's relative, partner, employer or any entity under the person's control, has, as of the date of the person's appointment to serve as external director, or had, during the two years preceding that date, any affiliation with the company or any entity controlling, controlled by or under common control with the company. The term "affiliation" includes:

- an employment relationship;
- a business or professional relationship maintained on a regular basis;
- control; and
- service as an office holder.

No person may serve as an external director if the person's position or other business activities create, or may create, a conflict of interest with the person's responsibilities as an external director or may otherwise interfere with the person's ability to serve as an out external side director.

External directors are to be elected by a majority vote at a shareholders' meeting, provided that either:

1. at least one-third of the shares of non-controlling shareholders voted at the meeting, vote in favor of election of the director; or

2. the total number of shares of non-controlling shareholders voted against the election of the director does not exceed one percent of the aggregate voting rights in the company.

-43-

INGEN-0100760

The initial term of an external director will be three years and may be extended for an additional three years. Each committee of a company's board of directors will be required to include at least one external director and the audit committee of a company's board of directors is required to include both the external directors. We have appointed Yair Shoham and Amir Friedman as external directors pursuant to the Companies Law.

An external director is entitled to compensation as provided in regulations to be adopted under the Companies Law and is otherwise prohibited from receiving any other compensation, directly or indirectly, in connection with service provided as an external director.

**Independent Directors**

Our ordinary shares are listed for quotation on the Nasdaq National Market and thus we are subject to the rules of the Nasdaq National Market applicable to quoted companies as well as to the applicable provisions of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the rules and regulations thereunder. Under the rules, we are required to appoint a minimum of three (3) Independent Directors. The independence standard under the rules excludes any person who is a current employee of the Company or who has been an employee of the Company for a certain period of time as well as the immediate family members of an executive officer of the Company. Messrs. Friedman, Shoham and Ben-Shalom and Dr. Wagner serve as Independent Directors and meet the independence standard of the above rules.

**Audit Committee**

Under the Companies Law, the board of directors of any publicly traded company must appoint an audit committee, comprised of at least three directors including all of the external directors but excluding: (a) the chairman of the board of directors; (b) any controlling shareholder or relative of a controlling shareholder; or (c) any director employed by the company or who provides services to the company on a regular basis. Under the Nasdaq rules, we are required to have at least three independent directors on the audit committee. In addition, Nasdaq requires that the members of the audit committee (a) not have any relationship to the company that may interfere with the exercise of their independence, and (b) must be financially literate.

The roles of our audit committee under the Companies Law include identifying irregularities in the management of the company's business and approving related party transactions as required by law. The responsibilities of the audit committee under the Nasdaq rules include, among other things, evaluating the independence of a company's outside auditors.

In addition to such functions as the audit committee may have under the Companies Law or under the Nasdaq rules, the primary purpose of our audit committee is to assist the board of directors in fulfilling its responsibility to oversee management's conduct of the financial reporting process, the systems of internal accounting and financial controls and the annual independent audit of the company's financial statements. The audit committee reviews with management and our outside auditors the audited financial statements included in our Annual Report on Form 20-F and our interim quarterly financial results included on Form 6-K.

The audit committee must observe the independence of our outside auditors and has the authority and responsibility to nominate for shareholder approval, evaluate and, where appropriate, replace our outside auditors.

In discharging its oversight role, our audit committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of our company and the power to retain outside counsel, auditors or other experts for this purpose.

Our audit committee currently consists of Amir Friedman, Yair Shoham and Yossi Ben Shalom.

**Financial Expert**

Under Sarbanes-Oxley, one of the Audit Committee members must have accounting or related financial management expertise. Our Board of Directors has recognized Mr. Ben Shalom, based on all of the requirements set forth in the applicable rules and regulations, as our "financial expert" and we believe that we are in compliance with this requirement.

44

INGEN-0100761

DX-091.47
**Appx10978**

### Internal Auditor

Under the Companies Law, the board of directors of a public company must appoint an internal auditor, nominated by its audit committee. The role of the internal auditor is to examine, among other matters, whether the company's actions comply with the law and orderly business procedure. Under the Companies Law, the internal auditor may be an employee of the company but not an office holder, an affiliate, or a relative of an office holder or affiliate, and he may not be the company's independent accountant or its representative. We have appointed an internal auditor in accordance with the requirements of the Companies Law.

## D. EMPLOYEES

As of May 1st, 2003, we had 311 employees, including 42 employees in administration and accounting, 112 in sales and marketing, 95 in research and development and 62 in operations. Of these 311 employees, 243 were based in Israel, 27 in the United States and 41 in other countries.

We are subject to Israeli labor laws and regulations with respect to our Israeli employees. These laws principally concern matters such as paid annual vacation, paid sick days, length of the workday and work week, minimum wages, pay for overtime, insurance for work-related accidents, severance pay and other conditions of employment.

Furthermore, by order of the Israeli Ministry of Labor and Welfare, we and our Israeli employees are subject to provision of the collective bargaining agreements between the Histadrut, the General Federation of Labor in Israel and the Coordination Bureau of Economic Organizations, including the Industrialists Associations. These provisions principally concern cost of living increases, recreation pay and other conditions of employment. We believe that the benefits and working conditions that we provide to our employees are above the required minimum. Our employees are not represented by a labor union. We have written employment contracts with virtually all of our employees and we believe that our relations with our employees are satisfactory.

## E. SHARE OWNERSHIP

As of May 1st, 2003, the aggregate number of our ordinary shares beneficially owned by each of our directors and executive officers as of such date is set forth in the following table. For the purposes hereof, beneficial ownership by a person, as of a particular date, assumes the exercise of all options and warrants held by such person that are currently exercisable or are exercisable within 60 days of such date.

| Name of director/executive officer | Ordinary Shares beneficially owned | |
|---|---|---|
| | Number | Percent |
| Dov Moran | 2,362,771 | 8.58% |
| Aryeh Mergi | 822,256 | 2.99% |
| Amir Friedman | * | * |
| Yair Shoham | * | * |
| Hans Wagner | * | * |
| Dana Gross | * | * |
| Ronit Maor | * | * |
| Yossi Ben-Shalom | * | * |

\* beneficially owned less than 1% of the Company's issued and outstanding ordinary shares as of May 1st, 2003.

INGEN-0100762

DX-091.48
Appx10979

### Share Option Plans and Recent Changes in Israeli Law

The Company previously had two incentive share option plans in place, the Incentive and Restricted Share Option Plan (the "IRSO Plan") and the Section 102 Share Option Plan (the "102 Plan" and, together with the IRSO Plan, the "Old Plans"). The respective term of each of the Old Plans expired on February 15th, 2003.

In replacement of the Old Plans and in lieu of recent revisions (the "Tax Reform") to the Israeli Income Tax Ordinance (New Version) 1961 (the "Tax Ordinance") requiring the adoption of certain adjustments concerning the issuance of share options to Israeli employees, the Company adopted, by way of a resolution of the Board of Directors on November 5th, 2002 and a resolution of the shareholders of the Company on December 17th, 2002, its new omnibus 2003 Stock Option and Restricted Stock Incentive Plan (the "New 2003 Plan"). Following is a brief review of each of the Old Plans, of the New 2003 Plan and of the Tax Reform:

#### Incentive and Restricted Share Option Plan

Under the IRSO Plan, we were authorized to grant options for up to 3,000,000 ordinary shares to our employees, directors and consultants. The exercise price per share for an incentive share option could not be less than the market value of the ordinary shares on the date the option was granted. Incentive options granted under the IRSO Plan in accordance with the terms thereof were intended to qualify as incentive stock options under Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"). Any options that were cancelled or forfeited before expiration became available for future grant under the IRSO Plan. The IRSO Plan expired on February 15th, 2003.

As of December 31, 2002, we had outstanding options for 1,108,116 ordinary shares under the IRSO Plan, at an average exercise price of $6.46 per ordinary share, and with expiration dates ranging from February, 2005 to December, 2012.

#### Section 102 Share Option Plan

Under the 102 Plan, we were authorized to grant options to purchase an aggregate of 4,000,000 ordinary shares to our Israeli employees. The exercise prices of options granted under the 102 Plan were determined by our Board of Directors at the time of the grant, and such granted options usually expire no later than ten years from the date of grant. Any options that were cancelled or forfeited before expiration became available for future grant under the 102 Plan. The 102 Plan expired on February 15th, 2003.

Prior to the revision of the Tax Ordinance, pursuant to Section 102 thereof and the rules promulgated thereunder (including the requirement that the options and/or the resulting shares be deposited with a trustee for at least two years), the tax on the benefit arising to the employee from the grant and exercise of options as well as from the allotment of ordinary shares under these options is deferred until the transfer of the options and/or ordinary shares to the employee's name or upon the sale of those options and/or ordinary shares. We will be allowed to claim as an expense for tax purposes the amounts credited to the employees as a benefit upon sale of the shares allotted under the 102 Plan at a price exceeding the exercise price, when the related capital gains tax is payable by the employee.

As of December 31, 2002, we had outstanding options for 2,705,538 ordinary shares under the 102 Plan, at an average exercise price of $6.24 per ordinary share, and with expiration dates ranging from August, 2003 to December, 2012.

INGEN-0100763

**DX-091.49**

**Appx10980**

### The New 2003 Plan

Under the New 2003 Plan, the Company has reserved five million (5,000,000) ordinary shares for the granting of awards to the employees, officers, directors, service providers and consultants of the Company and of any subsidiary of the Company. The New 2003 Plan is intended to enable the Company to issue awards under varying tax regimes, including without limitation (i) pursuant and subject to the provisions of the Tax Ordinance; (ii) incentive stock options within the meaning of Section 422 of the Code; (iii) nonqualified stock options; (iv) shares of restricted stock; and (v) other share-based awards. Apart from issuance under the relevant tax regimes in the State of Israel and the United States of America, the New 2003 Plan contemplates issuances of awards in other jurisdictions, with respect to which the Board of Directors is empowered to make the requisite adjustments in the New 2003 Plan and set forth the relevant conditions in the Company's agreement with the grantee in order to comply with the requirements of the tax regimes in any such jurisdictions.

Awards may be granted pursuant to the New 2003 Plan from time to time within a period of ten (10) years from the date the New 2003 Plan was adopted by the Board of Directors. The exercise prices of options granted under the New 2003 Plan is to be determined, subject to applicable law, by the Board of Directors at the time of the grant, and such granted options usually expire no later than ten years from the date of grant. Any of the ordinary shares reserved under the New 2003 Plan, which may remain unsold and which are not subject to outstanding options at the termination of the New 2003 Plan, shall cease to be reserved for the purpose of the New 2003 Plan. If any outstanding award under the New 2003 Plan should, for any reason, expire, be canceled or be forfeited without having been exercised in full, the ordinary shares allocable to the unexercised, canceled or terminated portion of such award shall (unless the New 2003 Plan shall have been terminated) become available for subsequent grants of awards under the New 2003 Plan.

### Revisions to the Tax Ordinance

The Tax Reform created a new tax structure for taxing stock or stock options that the Company grants to its Israeli employees, while the existing tax structure will continue to apply to the issuance of options to external service providers and to the controlling owners of the Company, who are not considered to be 'employees' of the Company for the purposes of Section 102 of the Tax Ordinance. As a general rule, a company can choose to issue options or shares through a trustee or without a trustee. If such company chooses the trustee track, it must further opt for either the 'ordinary income track' or the 'capital gains track' and this decision is then binding on the company and on all similarly situated office-holders for the subsequent two years.

We have chosen to issue shares and options through a trustee, who has been authorized by the tax authorities in accordance with and for the period set by law and, as a result, neither the issuance of shares or options to those of our eligible employees, nor the exercise by such employees of their options, will be taxable. The tax will be imposed only when the shares are sold by the trustee or transferred to the employee, whichever is earlier. We have notified the tax authorities of our opting for the 'capital gains track' in accordance with the requirements of the Tax Ordinance.

As a result of our choosing the 'capital gains track,' in the event that the trustee holds the shares until the end of the required holding period, which is at least 2 years from the end of the tax year in which the shares or options were issued to the trustee, the value of the benefit to the employee will be considered to be capital gain and he or she will be taxed at a rate of 25%. In addition, we will not be able to deduct expenses for tax purposes. As our ordinary shares are registered on a stock exchange, a part of the profit that reflects the value of the benefit to the date of issuance will be considered as ordinary income by the employee and we will be able to deduct this as a salary expense, with the balance being deemed as capital gains and taxable at 25% which we will not be able to deduct as an expense. Had we chosen the 'ordinary income (employment income) track', the employee would have been considered as having received employment income in an amount equal to the benefit (consideration at date of sale, less share option exercise price and expenses from the purchase and sale). We would then have been entitled to deduct as a salary expense, the same amount as the employee would have received in income. The required holding period by the trustee under the 'ordinary income (employment income) track' is one year from the end of the tax year in which the options or shares were issued to the employee.

47

INGEN-0100764

**The Employee Stock Purchase Plan — Global Non-U.S. (the "Global ESPP plan"); and the Employee Stock Purchase Plan — U.S. (the "U.S. ESPP plan")**

The purpose of the ESPP plans is to enable our employees to purchase M-Systems' shares through accumulated payroll deductions. The Global ESPP plan is available to all of our non-U.S. employees. The U.S. ESPP plan is available to our U.S. employees and contains certain provisions intended to qualify the U.S. ESPP plan as an "employee stock purchase plan" under Section 423 of the Code.

The terms of our ESPP plans (both Global and U.S.) provide that any of our employees (with certain restrictions in the U.S. ESPP Plan), if he or she so chooses, can elect before any "Offering Period" to have any whole percentage between 1% and 10% deducted from his salary and allocated to buy M-Systems shares. An "Offering Period" is a six-month period, with a new Offering Period beginning on May 15 and November 15 each year (unless changed by the Board of Directors). The price of the shares purchased by the employee — i.e., the number of shares that he will receive in return for the amounts deducted from his salary over the six-month Offering Period — will be determined at the end of the Offering Period and will be equal to the lower of 85% of the closing bid for M-Systems' shares on (1) the first day of the Offering Period; or (2) the last day of the Offering Period.

Under the Global ESPP plan, we may sell up to 550,000 shares to our employees. Under the U.S. ESPP plan, we may sell up to 200,000 shares to our employees.

The ESPP plans expire in 2011 unless earlier terminated by our Board of Directors.

INGEN-0100765

DX-091.51
**Appx10982**

## ITEM 7.  MAJOR SHAREHOLDERS AND INTERESTED PARTY TRANSACTIONS

### A.  MAJOR SHAREHOLDERS

The following table sets forth the number of ordinary shares owned beneficially by all shareholders known to us to own beneficially more than 5% of the outstanding ordinary shares on May 1st, 2003 .

| Name | Ordinary Shares beneficially owned | |
|---|---|---|
| | Number | Percent |
| RS Investment Management Co. LLC [1] | 2,874,000 | 10.44% |
| Dov Moran | 2,362,771 | 8.58% |
| All directors and executive officers as a group (8 persons) [2] | 3,578,740 | 13.00% |

[1] Based on information contained in the Report of Form 13-G filed by RS Investment Management Co. LLC, it is the general partner of RS Investment Management, L.P. and the majority shareholder of RS Investment Management, Inc.  G. Randall Hecht is the chief executive officer and a control person of RS Investment Management Co. LLC, RS Investment Management, L.P., and RS Investment Management, Inc.

[2] Also includes options granted to such directors and executive officers of the Company, which are exercisable within 60 days of May 1st, 2003.

As of May 1st, 2003, our ordinary shares were held by approximately 74 holders of record. Based on a review of the information provided to us by our transfer agent, 54 holders of record, holding approximately 85.56% of our outstanding ordinary shares, were residents of the United States.

### B.  RELATED PARTY TRANSACTIONS

In October, 2000, we purchased 586,080 preferred shares of Saifun for approximately $10 million. This investment was part of a transaction in which Saifun sold 2,327,323 of its preferred shares to various venture capital and strategic investors for aggregate consideration of approximately $39.7 million. Saifun is a private, venture-backed Israeli company engaged in research, development, production and marketing of flash memory products and technology. Boaz Eitan, who was at the time of this transaction a member of our Board of Directors, is the founder, chief executive officer and a director of Saifun. This transaction was approved by our Audit Committee and Board of Directors, in the absence of Dr. Eitan in both cases, in accordance with the provisions of the Companies Law governing approval of related party transactions. As of the date hereof, Mr. Eitan is no longer a member of the Company's Board of Directors.

On May 1st, 2003, we entered into a Share Purchase Agreement (the "PPM") with Dr. Hans Wagner, a member of our Board of Directors, according to which Dr. Wagner is to purchase 500,000 of our ordinary shares, at a purchase price per share of $8.21, for an aggregate investment amount of $4,105,000 (a copy of the PPM is attached to this Annual Report as Exhibit 4(b)(i)). The closing of this transaction occurred prior to the filing of this Annual Report. This transaction was approved by our Audit Committee and Board of Directors, in the absence of Dr. Wagner, in accordance with the provisions of the Companies Law governing approval of related party transactions.

INGEN-0100766

DX-091.52
Appx10983

**Insurance**. We have obtained directors and officers liability insurance for the benefit of our office holders and intend to continue and obtain such insurance and pay all premiums thereunder to the fullest extent permitted by the Companies Law. Under the Companies Law, an Israeli company may not exempt an office holder from liability for a breach of his duty of loyalty, but may exempt in advance an office holder from his liability to the company, in whole or in part, for a breach of his duty of care.

Our Articles of Association provide that, subject to the provisions of the Companies Law, we may enter into a contract for the insurance of the liability of any of our office holders for acts which he or she performed in his or her capacity as an office holder in relation to:

- A breach of his/her duty of care to us or to another person;
- a breach of his/her duty of loyalty to us, provided that the office holder acted in good faith and had reasonable cause to assume that his/her act would not prejudice our interests; or
- A financial liability imposed upon him/her in favor of another person.

## C. INTEREST OF EXPERT AND COUNSEL

– Not applicable

## ITEM 8. FINANCIAL INFORMATION

### A. CONSOLIDATED STATEMENTS AND OTHER FINANCIAL INFORMATION

Our consolidated audited financial statements are included in this annual report in "Item 18: Financial Statements."

**Legal Proceedings**

Other than the litigation set forth in Item 4.B above in the paragraph titled "Intellectual Property Rights and Current Litigation," we are not involved in any legal proceedings that we believe, individually or in the aggregate, will have a material adverse effect on the Company.

**Dividend Distribution Policy**

We have never declared or paid any cash dividends on our ordinary shares and we do not intend to pay cash dividends on our shares in the foreseeable future. We currently intend to retain any future earnings to finance operations and to expand our business. If we declare cash dividends, they could be taxable to the recipient. Because we have received benefits under the Investment Law (see item 10.E below the paragraph titled "Law for the Encouragement of Capital Investments, 1959"), payment of cash dividends during the exemption period granted under the Investment Law will subject that portion of our income derived from the 'approved enterprise' status granted to us under the Investment Law, to Israeli taxes to which the income would not otherwise be subject. We intend to reinvest the amount of the tax-exempt income derived from our "approved enterprises" status permanently and not to distribute such income as dividends.

Under the provisions of our Articles of Association, the declaration of any final cash dividends in respect of any fiscal period requires shareholder approval, which may reduce but not increase such dividend from the amount proposed by our Board of Directors; provided that any failure by our shareholders to approve a final dividend will not affect any interim dividend which has been paid.

### B. SIGNIFICANT CHANGES

– Not applicable

INGEN-0100767

**DX-091.53**
**Appx10984**

## ITEM 9. THE OFFER AND LISTING

**A. 4.** The following table lists the high and low last reported sales prices on Nasdaq for the periods indicated:

### Yearly Figures

|        | High    | Low     |
|--------|---------|---------|
| 1998:  | $8.09   | $2.75   |
| 1999:  | $34.00  | $3.63   |
| 2000:* | $44.25  | $11.94  |
| 2001:  | $16.56  | $3.92   |
| 2002:  | $12.59  | $4.95   |

### Quarterly Figures

| 2001:          | High    | Low    |
|----------------|---------|--------|
| First Quarter  | $16.56  | $5.78  |
| Second Quarter | $11.96  | $6.02  |
| Third Quarter  | $8.13   | $3.92  |
| Fourth Quarter | $11.69  | $4.13  |

| 2002:          | High    | Low    |
|----------------|---------|--------|
| First Quarter  | $12.59  | $7.15  |
| Second Quarter | $9.86   | $7.27  |
| Third Quarter  | $8.68   | $6.21  |
| Fourth Quarter | $8.68   | $4.95  |

### Monthly Figures

| 2002-2003:            |        |        |
|-----------------------|--------|--------|
| Most Recent 6 months: | High   | Low    |
| November 2002         | $8.68  | $6.15  |
| December 2002         | $8.68  | $6.89  |
| January 2003          | $8.25  | $5.82  |
| February 2003         | $6.50  | $5.63  |
| March 2003            | $6.40  | $5.20  |
| April 2003            | $8.84  | $6.00  |

\* We effected a two-for-one stock split in September 2000. Accordingly, the share price information for 2000 is adjusted to reflect such stock split. The share price information for the years 1999 and 1998 remain unadjusted and reflect the pre-split highs and lows for said years.

On May 1st, 2003, the last reported sale price of our ordinary shares was $8.34 per share. There is currently no trading market for our ordinary shares outside the United States.

INGEN-0100768

DX-091.54

Appx10985

**B. – Not applicable**

C. Our ordinary shares were quoted on the Nasdaq Small-Cap Market under the symbol "FLSHF" from our initial public offering in March 1993 through our secondary public offering in August 1996. Since August 8, 1996, our ordinary shares have been quoted on the Nasdaq National Market. On March 24, 1999, our ticker symbol was changed to "FLSH."

**D. – Not applicable**

**E. – Not applicable**

**F. – Not applicable**

# ITEM 10. ADDITIONAL INFORMATION

## A. SHARE CAPITAL

– Not applicable

## B. MEMORANDUM AND ARTICLES OF ASSOCIATION

### Objects and Purposes

The objects and purposes of our company appear in our Memorandum of Association and include taking all actions permissible under applicable laws.

### Approval of Specified Related Party Transactions

The Companies Law imposes a duty of care and a duty of loyalty on all of a company's office holders as defined below, including directors and executive officers. The duty of care requires an office holder to act with the level of care that a reasonable office holder in the same position would have acted under the same circumstances. The duty of loyalty generally requires an office holder to act in good faith and for the good of the company. An "office holder" as defined in the Companies Law is a director, a general manager, a chief executive officer, a deputy general manager, a vice general manager, other managers directly subordinate to the general manager and any person who fills one of the above positions without regard to title.

The Companies Law requires that an office holder of a company promptly disclose any personal interest that he may have and all related material information known to him, in connection with any existing or proposed transaction by the company. Once an office holder complies with these disclosure requirements, the board of directors may approve a transaction between the company and the office holder, or a third party in which an office holder has a personal interest, unless the articles of association provide otherwise. A transaction that is adverse to the company's interest cannot be approved. If the transaction is an extraordinary transaction under the Companies Law, then, in addition to any approval stipulated by the articles of association, it also requires audit committee approval before board approval and, in specified circumstances, subsequent shareholder approval. Any transaction between a company and one of its directors relating to the conditions of the director's service, including in relation to exculpation, insurance or indemnification, or in relation to the terms of the director's service in any other capacity requires audit committee approval before board approval and subsequent shareholder approval.

The Companies Law also provides that a director with an interest in an extraordinary transaction brought before the board of directors or the audit committee for its approval may not vote on the approval and may not be present for the discussion of the issue. However, this rule would not apply if a majority of the directors or a majority of the members of the audit committee also possessed an interest in the transaction.

Under our Articles of Association, our Board of Directors may exercise all powers and take all actions that are not required under law or under our Articles of Association to be exercised or taken by our shareholders, including the power to borrow money for the purposes of our company.

INGEN-0100769

DX-091.55

Appx10986

Our directors are not subject to any age limit requirement, nor are they disqualified from serving on the Board of Directors because of a failure to own certain amount of our shares.

**Rights, Preferences and Restrictions on Shares**

Our Articles of Association authorize one class of shares, which are our ordinary shares. We may declare a dividend to be paid to the holders of our ordinary shares and allocated among them in proportion to the sums paid up or credited as paid up on account of the nominal value of their respective shareholdings, without taking into account any premium paid for the shares. Our Board of Directors may declare dividends only out of retained earnings, or earnings derived over the two most recent fiscal years, whichever is higher. Our Articles of Association provide that our Board of Directors may propose a final dividend in respect of any fiscal period but that such dividend shall be payable only after approved by our shareholders. All unclaimed dividends may be invested or otherwise used by the Board of Directors for our benefit until those dividends are claimed. In the event an unclaimed dividend is claimed, only the principal amount of the dividend will be paid to the person entitled to the dividend.

If we liquidate, after satisfying liabilities to creditors and subject to the rights of holders of shares, if any, with any special rights upon winding up, our assets will be distributed to the holders of ordinary shares in proportion to their holdings.

Holders of ordinary shares have one vote for each - paid-up ordinary share held of record on all matters submitted to a vote of our shareholders. These voting rights may be affected by the grant of any special voting rights to the holders of a class of shares with preferential rights that may be authorized in the future.

Our Articles of Association provide that directors are elected by an ordinary resolution of a general meeting of our shareholders. Our ordinary shares do not have cumulative voting rights in the election of directors. Accordingly, the holders of ordinary shares representing more than 50% of the voting power in our company have the power to elect all directors.

We may, subject to the applicable provisions of the Companies Law, issue redeemable shares and subsequently redeem them. In addition, our Board of Directors may make calls for upon shareholders in respect of any sum that has not been paid up in respect of any shares held by those shareholders.

Under the Companies Law, the disclosure requirements that apply to an office holder also apply to a controlling shareholder of a public company. A controlling shareholder includes a shareholder that holds 25% or more of the voting rights in a public company if no other shareholder owns more than 50% of the voting rights in the company. Extraordinary transactions with a controlling shareholder or in which a controlling shareholder has a personal interest, and the terms of compensation of a controlling shareholder who is an office holder, require the approval of the audit committee, the board of directors and the shareholders of the company. The shareholder approval requires that: (a) the majority of shares voted at the meeting, including at least one third of the shares of disinterested shareholders voted at the meeting, vote in favor of the transaction; or (b) the total number of shares of disinterested shareholders voted against the transaction does not exceed one percent of the aggregate voting rights in the company.

The Companies Law also requires a shareholder to act in good faith towards a company in which he holds shares and towards other shareholders and to refrain from abusing his power in the company, including in connection with voting at a shareholders' meeting on:

- Any amendment to the Articles of Association;

- An increase in the company's authorized capital;

- A merger; or

- Approval of some of the acts and transactions that require shareholder approval.

A shareholder has the general duty to refrain from depriving other shareholders of their rights. Any controlling shareholder, any shareholder that knows that it possesses the power to determine the outcome of a shareholder vote and any shareholder that, under the provisions of the articles of association, has the power to appoint an office holder in the company, is under a duty to act in fairness towards the company. The Companies Law does not describe the substance of this duty.

INGEN-0100770

## Modifications of Share Rights

Under our Articles of Association, the rights attached to any class may be varied by adoption of the necessary amendment of the Company's Articles of Association, provided that the holders of shares of the affected class approve the change by a class meeting in which the holders of at least 75% of the shareholders present at the meeting, in person or by proxy, and voting on the issue approve the change. Our Articles of Association differ from the Companies Law in this respect, as under the law changes in the rights of shareholders require the consent of at least 50% of the voting power of the affected class represented at the meeting and voting on the change. Our Articles of Association require for quorum at a meeting of a particular class of shares the presence of two shareholders holding at least 25% of the voting power of that class. Our Articles of Association - may be amended by majority of the voting power of our company represented at a shareholders meeting and voting thereon, except that the provisions of our Articles of Association relating to mergers and acquisitions can only be amended by a vote of 75% of the voting power of our company represented at a meeting and voting thereon.

## Shareholders Meetings and Resolutions

We are required to hold an annual general meeting of our shareholders once every calendar year, but no later than 15 months after the date of the previous annual general meeting. All meetings other than the annual general meeting of shareholders are referred to as extraordinary general meetings. Our Board of Directors may call extraordinary general meetings whenever it sees fit, at such time and place, within or without the State of Israel, as it may be determined. In addition, the Companies Law provides that the board of directors of a public company is required to convene an extraordinary meeting upon the request of (a) any two directors of the company or one quarter of the company's board of directors or (b) one or more shareholders holding, in the aggregate, (i) five percent of the outstanding shares of the company and one percent of the voting power in the company or (ii) five percent of the voting power in the company.

The quorum required by our Articles of Association for a meeting of shareholders consists of at least two shareholders present in person or by proxy who hold or represent between them at least 25% of the voting power in our company. A meeting adjourned for lack of quorum is adjourned to the same day in the following week at the same time and place or any time and place as the chairman of the meeting decides. At such reconvened meeting, the required quorum consists of any two shareholders present in person or by proxy.

Our Articles of Association enable our Board of Directors to fix a record date to allow us to determine the shareholders entitled to notice of, or to vote at, any general meeting of our shareholders. The record date may not be more than 40 days, or any longer period permitted under the Companies Law, nor less than 4 days before the date of the meeting. Each shareholder of record as of the record date determined by the Board of Directors may vote the shares then held by that shareholder unless all calls and other sums then payable by the shareholder in respect of its shares have not been paid.

## Limitation on Ownership of Securities

The ownership and voting of our ordinary shares by non-residents of Israel are not restricted in any way by our Articles of Association or by the laws of the State of Israel, except for shareholders who are subjects of countries which are enemies of the State of Israel.

## Mergers and Acquisitions; Anti-takeover Provisions

The Companies Law includes provisions allowing corporate mergers. These provisions require that the board of directors of each company that is party to the merger approve the transaction. In addition, the shareholders of each company must approve the merger. Our Articles of Association require approval of a merger or acquisition by a vote of the 75% of our company's voting power, present and voting on the proposed merger at a shareholders' meeting. In determining whether the requisite majority has approved the merger, shares held by the other party to the merger or by any person holding at least 25% of such other party are excluded from the vote. The Companies Law does not require court approval of a merger other than in specified situations. However, upon the request of a creditor of either party to the proposed merger, a court may delay or prevent the merger if it concludes that there exists a reasonable concern that as a result of the merger, the surviving company will be unable to satisfy the obligations of any of the parties of the merger to their creditors.

A merger may not be completed unless at least 70 days have passed from the time that a Merger Proposal (as defined in the Companies Law) has been filed with the Israeli registrar of companies.

INGEN-0100771

The Companies Law also provides that the acquisition of shares in a public company on the open market (i.e., from other shareholders of the company) must be made by means of a tender offer if, as a result of the acquisition, the purchaser would become a 25% shareholder of the company. The rule does not apply if there already is another 25% shareholder of the company. Similarly, the law provides that an acquisition of shares in a public company must be made by means of a tender offer if, as a result of the acquisition, the purchaser would become a 45% shareholder of the company, unless there already is a 50% shareholder of the company.

If, following any acquisition of shares, the purchaser would hold 90% or more of the shares of the company that acquisition must be made by means of a tender offer for all of the target company's shares. An acquirer who wishes to eliminate all minority shareholders must do so by means of a tender offer and acquire 95% of all shares not held by or for the benefit of the acquirer prior to the acquisition. However, in the event that the tender offer to acquire that 95% is not successful, the acquirer may not acquire tendered shares if by doing so the acquirer would own more than 90% of the shares of the target company.

**Changes in Capital**

Our Articles of Association enable us to increase or reduce our share capital. Any such changes are subject to the provisions of the Companies Law and must be approved by a resolution passed by a majority of the voting power of our company present, in person or by proxy, at a general meeting and voting on such change in the capital. In addition, certain transactions which have the effect of reducing capital, such as the declaration and payment of dividends under certain conditions and the issuance of shares for less than their nominal value, require a resolution of the Board of Directors and court approval.

# C. MATERIAL CONTRACTS

In April 2001, we signed an agreement with Aspen Nadlan Ltd. and Narkis Marom Mivnei Ta'asiya Ltd. to purchase the building in which our headquarters' executive offices, research, development and manufacturing facilities are located. As part of the agreement, we also purchased a vacant lot adjacent to our offices. The aggregate consideration for these purchases was approximately $10.5 million that we financed ourselves. Some of the consideration has been placed in an escrow fund pending the receipt by the sellers of these properties of certain permits and third party approvals. In addition, in April 2001 we entered into a development and supply agreement with Atmel Sarl. Under this agreement, Atmel is to layout, develop, manufacture, test and supply the ASIC components for our DiskOnKey products.

Other than the agreement referred to above, in the past two years we have not entered into any material contracts other than contracts entered into in the ordinary course of our business.

# D. EXCHANGE CONTROLS

Under Israeli law, foreign currency transactions are generally permitted, except for transactions that are specifically restricted. Among these restricted transactions are foreign currency transactions by institutional investors, including investments outside of Israel by pension funds and insurers, as well as futures contracts by foreign residents for periods of more than one month.

Holders of ordinary shares are able to convert dividends and liquidation distributions into freely repatriable non-Israeli currencies at the rate of exchange prevailing at the time of repatriation, pursuant to a general permit issued by the Controller of Foreign Exchange at the Bank of Israel under the Currency Control Law, 1978, provided that Israeli income tax has been withheld by us with respect to such amounts.

Our ordinary shares may be freely held and traded pursuant to the General Permit and the Currency Control Law. The ownership or voting of ordinary shares by non-residents of Israel, except with respect to citizens of countries that are in a state of war with Israel, are not restricted in any way by our Memorandum of Association or Articles of Association or by the laws of the State of Israel.

INGEN-0100772

# E. TAXATION

The following is a summary of the current tax structure applicable to companies in Israel, with special reference to its effect on us. The following also contains a discussion of certain Israeli Government programs benefiting us. To the extent that the discussion is based on new tax legislation that has not been subject to judicial or administrative interpretation, there can be no assurance that the views expressed in the discussion will be accepted by the tax authorities in question. The discussion is not intended, and should not be construed, as legal or professional tax advice and is not exhaustive of all possible tax considerations.

## General Corporate Tax Structure

Israeli companies are subject to corporate tax at the rate of 36%. However, the effective rate of tax of a company that derives income from an 'approved enterprise' (as referred to below) may be considerably lower (see in this Item 10.E below the paragraph titled "Law for the Encouragement of Capital Investments, 1959").

## Law for the Encouragement of Industry (Taxes), 1969

We currently qualify as an "industrial company" under the Law for the Encouragement of Industry (Taxes), 1969 (the "Industry Encouragement Law"). A company qualifies as an "industrial company" if it is resident in Israel and at least 90% of its income in a given tax year, determined in NIS (other than income from certain types of loans, capital gains, interest and dividends), is derived from industrial enterprises owned by that company. An "industrial enterprise" is defined as an enterprise whose major activity in a particular tax year is industrial manufacturing activity. See Note 12 to our Consolidated Financial Statements.

Under the Industry Encouragement Law, an industrial company is entitled to deduct the purchase price of patents and certain other intangible property rights (other than goodwill) over a period of eight years, beginning with the year in which such rights were first used.

An industrial company may be eligible for special depreciation rates for machinery, equipment and buildings. These rates differ based on various factors, including the date of commencement of operation and the number of work shifts. An industrial company owning an 'approved enterprise' may choose between such special depreciation rates and the depreciation rates available to 'approved enterprises'.

Qualification as an industrial company under the Industry Encouragement Law is not conditioned upon the receipt of prior approval from any Israel government authority. No assurance can be given that we will continue to qualify as an industrial company or that we will, in the future, be able to take advantage of any tax benefits available to industrial companies.

## Law for the Encouragement of Capital Investments, 1959

The Investment Law provides that a capital investment in eligible facilities may, upon application to the Investment Center, be designated as an 'approved enterprise'. Each certificate of approval for an 'approved enterprise' relates to a specific investment program delineated both by its financial scope, including its capital resources, and by its physical characteristics, e.g., the equipment to be purchased and utilized pursuant to the program. The tax benefits derived from any such certificate of approval relate only to taxable income attributable to the specific 'approved enterprise'. If a company has more than one approval, its effective tax rate is the result of a weighted combination of the applicable rates. Income derived from activity that is not integral to the activity of the enterprise should not be divided between the different enterprises and should not enjoy tax benefits.

Most of our current production facilities have been granted the status of an 'approved enterprise' under the Investment Law, in six separate investment programs. Under the Investment Law, we have chosen the "alternative benefits" option and have waived Government grants in return for a tax exemption. These programs provide us with the tax benefits described below. Under the terms of our 'approved enterprise' programs, our income from 'approved enterprises' will be tax exempt for periods of 2-4 years (except with respect to income from our Omer facility, which will be tax-exempt for 10 years), commencing with the year in which we first earn taxable income from the relevant 'approved enterprise', and is subject to a reduced tax rate for an additional period of up to a total of ten years from when the tax exemption began. The reduced tax rate is imposed at a rate of between 10% and 25%, depending on the percentage of M-Systems' shares held by non-Israelis during that remaining period (the more shares held by non-Israelis, the lower the tax rate). The tax benefits periods described above will end upon the earlier of (a) 12 years from the year of commencement of production, or (b) 14 years from the year of approval of 'approved enterprise' status).

56

INGEN-0100773

A company that has elected the alternative package of benefits, like we have, and that subsequently pays dividend out of income derived from the 'approved enterprise' during the tax exemption period, will be subject to tax in respect of the amount distributed (including the tax thereon) at the rate that would have been applicable had it not elected the alternative package of benefits (generally 10%-25%, depending on the extent of foreign shareholders holding our ordinary shares). The dividend recipient is taxed at the reduced rate applicable to dividends from 'approved enterprises' (15%), if the dividend is distributed during the tax exemption period or within 12 years thereafter.

The Investment Law also provides that an 'approved enterprise' is entitled to accelerated tax depreciation on property and equipment included in an approved investment program.

Any future applications we make to the Investment Center will be reviewed separately, and decisions as to whether or not to approve such applications will be based, among other things, on the then prevailing criteria set forth in the Investment Law, on the specific objectives we set forth in such applications and on certain financial criteria. Accordingly, there can be no assurance that any such applications will be approved. In addition, the benefits available to an 'approved enterprise' are conditional upon our fulfilling certain conditions stipulated in the Investment Law and its regulations and the criteria set forth in the specific certificate of approval, as described below. If we were to violate those conditions, in whole or in part, we would be required to refund the amount of tax benefits, with the addition of the CPI linkage adjustment and interest. We believe that our 'approved enterprises' operate in substantial compliance with all of these conditions and criteria.

As a result of the Investment Law benefits, as well as our accumulated net operating loss carry forwards, we do not anticipate being subject to income taxation in Israel until approximately 2005.

As of December 31, 2001, we generated a total of approximately $35 million of net operating loss carryforwards in Israel. These Israeli net operating loss carryforwards have no expiration date. The tax benefits granted to an 'approved enterprise' are not available to us with respect to the income of our subsidiaries. The actual amount of the benefits associated with the 'approved enterprise' program will depend upon a number of factors, including whether these tax incentives are renewed or if the tax authorities successfully challenge the manner in which profits are recognized among our subsidiaries or within specified tax jurisdictions.

**Taxation under Inflationary Conditions**

The Income Tax (Inflationary Adjustments) Law, 1985 (the "Inflationary Adjustments Law"), was designed to neutralize the erosion of capital investments in business and to prevent tax benefits resulting from deduction of inflationary expenses. This law applies a supplementary set of inflationary adjustments to the normal taxable profits computed under regular historical cost principles.

The Inflationary Adjustments Law introduced a special tax adjustment for the preservation of equity based on changes in the Israeli CPI, whereby certain corporate assets are classified broadly into fixed (inflation-resistant) assets and non-fixed assets. Where a corporation's equity exceeds the depreciated cost of fixed assets, a tax deduction that takes into account the effect of the annual rate of inflation on such excess is allowed (up to a ceiling of 70% of taxable income for companies in any single year, with the unused portion carried forward on a linked basis, without limit). If the depreciated cost of fixed assets exceeds shareholders' equity, then such excess, multiplied by the annual inflation rate, is added to taxable income.

Under the Inflationary Adjustments Law, results for tax purposes are measured in real terms, in accordance with changes in the Israeli CPI. We are taxed under this law. The discrepancy between the change in (1) the Israeli CPI and (2) the exchange rate of Israeli currency in relation to the dollar, may in future periods cause significant differences between taxable income and the income measured in dollars as reflected by our financial statements (which are measured in dollars). In addition, subject to certain limitations, depreciation of fixed assets and losses carried forward are adjusted for inflation on the basis of changes in the Israeli CPI.

**Withholding and Capital Gains Taxes Applicable to Non-Israeli Shareholders**

The State of Israel imposes income tax on nonresidents of Israel on income accrued or derived from sources in Israel. These sources of income include passive income such as dividends, royalties and interest, as well as non-passive income from services rendered in Israel. We are required to withhold income tax at the rate of 25%, or 15% for dividends of income generated by an 'approved enterprise', on all distributions of dividends other than bonus shares (stock dividends), unless a different rate is provided in a treaty between Israel and the shareholder's country

57

INGEN-0100774

of residence. Under the income tax treaty between the United States and Israel, the maximum tax on dividends paid to a holder of ordinary shares who is a U.S. resident (as defined in the treaty) is 25%.

**Capital Gains Taxes on Sales of our Ordinary Shares**

Israeli law imposes a capital gains tax on the sale of securities and other capital assets. In general, the capital gains tax rate on the sale of publicly-traded securities of an Israeli company is 15%. Non-residents of Israel, however, are exempt from Israeli capital gains tax on the sale of our shares.

A nonresident of Israel who receives interest, dividend or royalty income derived from or accrued in Israel, from which tax was withheld at the source, is generally exempted from the duty to file tax returns in Israel with respect to such income, provided such income was not derived from a business conducted in Israel by the taxpayer and the taxpayer has no other taxable sources of income in Israel.

Israel presently has no estate or gift tax.

**United States Federal Income Tax Considerations**

The following discussion describes the material United States federal income tax consequences to a holder of our ordinary shares, referred to for purposes of this discussion as a "U.S. Holder", that is:

- A citizen or resident of the United States;

- A corporation created or organized in or under the laws of the United States or of any state thereof;

- An estate, the income of which is includible in gross income for United States federal income tax purposes regardless of its source; or
- A trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust.

This summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to each person's decision to purchase ordinary shares. This summary considers only U.S. Holders that will own ordinary shares as capital assets.

This discussion does not address all aspects of United States federal income taxation that may be relevant to any particular shareholder based on such shareholder's individual circumstances. In particular, this discussion does not address the potential application of the alternative minimum tax or United States federal income tax consequences to U.S. Holders that are subject to special treatment, including:

- Taxpayers who are broker-dealers or insurance companies;

- Taxpayers who have elected mark-to-market accounting;

- Tax-exempt organizations;

- Financial institutions or "financial services entities";

- Taxpayers who hold ordinary shares as part of a straddle, "hedge" or "conversion transaction" with other investments;
- Taxpayers who own directly, indirectly or by attribution at least 10% of our voting power; and

- Taxpayers whose functional currency is not the U.S. dollar.

In addition, this discussion does not address any aspect of state, local or non-United States tax laws.

Additionally, this discussion does not consider the tax treatment of partnerships or persons who hold ordinary shares through a partnership or other pass-through entity or the possible application of United States federal gift or estate tax.

INDIVIDUAL HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISOR WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES TO THEM OF PURCHASING, HOLDING OR DISPOSING OF OUR ORDINARY SHARES.

58

INGEN-0100775

DX-091.61
**Appx10992**

## Taxation of Ordinary Shares

### Taxation of Dividends Paid On Ordinary Shares

A U.S. Holder will be required to include in gross income as ordinary income the amount of any distribution paid on ordinary shares, including the amount of foreign taxes, if any, withheld from the amount paid, on the date the distribution is received to the extent the distribution is paid out of our current or accumulated earnings and profits as determined for United States federal income tax purposes. Distributions in excess of such earnings and profits will be applied against and will reduce the U.S. Holder's basis in the ordinary shares and, to the extent in excess of such basis, will be treated as gain from the sale or exchange of a capital asset.

Distributions of current or accumulated earnings and profits paid in foreign currency to a U.S. Holder will be includible in the income of a U.S. Holder in a U.S. dollar amount calculated by reference to the exchange rate on the day the distributions received. A U.S. Holder that receives a foreign currency distribution and converts the foreign currency into U.S. dollars subsequent to receipt will have foreign exchange gain or loss based on any appreciation or depreciation in the value of the foreign currency against the U.S. dollar, which will generally be U.S. source ordinary income or loss.

U.S. Holders will have the option of claiming the amount of any Israeli income taxes withheld at source either as a deduction from gross income or as a dollar-for-dollar credit against their United States federal income tax liability. Individuals who do not claim itemized deductions, but instead utilize the standard deduction, may not claim a deduction for the amount of the Israeli income taxes withheld, but such amount may be claimed as a credit against the individual's United States federal income tax liability. The amount of foreign income taxes that may be claimed as a credit in any year is subject to complex limitations and restrictions, which must be determined on an individual basis by each shareholder. These limitations include, among others, rules that limit foreign tax credits allowable with respect to specific classes of income to the United States federal income taxes otherwise payable with respect to each such class of income. The total amount of allowable foreign tax credits in any year cannot exceed regular U.S. tax liability for the year attributable to foreign source taxable income. A U.S. Holder will be denied a foreign tax credit with respect to Israeli income tax withheld from dividends received on the ordinary shares to the extent such U.S. Holder has not held the ordinary shares for at least 16 days of the 30-day period beginning on the date which is 15 days before the ex-dividend date or to the extent such U.S. Holder is under an obligation to make related payments with respect to substantially similar or related property. Any days during which a U.S. Holder has substantially diminished its risk of loss on the ordinary shares are not counted toward meeting the 16-day holding period required by the statute. In addition, distributions of current or accumulated earnings and profits will be foreign source passive income for United States foreign tax credit purposes and will not qualify for the dividends received deduction available to corporations.

### Taxation of the Disposition of Ordinary Shares

Generally, upon the sale, exchange or other disposition of our ordinary shares, a U.S. Holder will recognize capital gain or loss in an amount equal to the difference between such U.S. Holder's basis in the ordinary shares, which is usually the cost of such shares, and the amount realized on the disposition. If, as anticipated, the ordinary shares are publicly traded, a disposition of shares will be considered to occur on the "trade date," regardless of the holder's method of accounting. Capital gain from the sale, exchange or other disposition of ordinary shares held more than one year is long-term capital gain and is eligible for a maximum 20% rate of taxation for non-corporate holders. Gain or loss recognized by a U.S. Holder on a sale, exchange or other disposition of ordinary shares generally will be treated as United States source income or loss for United States foreign tax credit purposes. The deductibility of a capital loss recognized on the sale, exchange or other disposition of ordinary shares is subject to limitations.

### Information Reporting and Backup Withholding

Dividend payments with respect to the ordinary shares and proceeds from the sale, exchange or redemption of ordinary shares may be subject to information reporting to the Internal Revenue Service ("IRS") and possible U.S. backup withholding. Backup withholding will not apply, however, to a U.S. Holder who furnishes a correct taxpayer identification number and makes any other required certification or who is otherwise exempt from backup withholding. Generally, a U.S. Holder will provide such certification on IRS Form W-9 (Request for Taxpayer Identification Number and Certification).

INGEN-0100776

DX-091.62
Appx10993

Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's tax liability, and a U.S. Holder may obtain a refund of any excess amount withheld under the backup withholding rules by filing the appropriate claim for refund with the IRS.

### Tax Consequences of Passive Foreign Investment Company (PFIC) Status

We will be deemed a passive foreign investment company, or PFIC, if 75% or more of our gross income in a taxable year, including our pro rata share of the gross income of any company, U.S. or foreign, in which we are considered to own 25% or more of the shares by value, is passive income. Alternatively, we will be deemed to be a PFIC if at least 50% of our assets in a taxable year, averaged over the year and ordinarily determined based on fair market value and including our pro rata share of the assets of any company in which we are considered to own 25% or more of the shares by value, are held for the production of, or produce, passive income. Passive income includes, among other things, amounts derived by reason of the temporary investment of funds raised in offerings of our ordinary shares. If we were a PFIC, and a U.S. Holder did not make an election to treat us as a "qualified electing fund" (as described below):

- Excess distributions by us to a U.S. Holder would be taxed in a special way. "Excess distributions" are amounts received by a U.S. Holder with respect to our stock in any taxable year that exceed 125% of the average distributions received by such U.S. Holder from us in the shorter of either the three previous years or such U.S. Holder's holding period for ordinary shares before the present taxable year. Excess distributions must be allocated ratably to each day that a U.S Holder has held our stock. A U.S. Holder must include amounts allocated to the current taxable year in its gross income as ordinary income for that year. A U.S. Holder must pay tax on amounts allocated to each prior taxable year in which we were a PFIC at the highest rate in effect for that year on ordinary income and the tax is subject to an interest charge at the rate applicable to deficiencies for income tax.

- The entire amount of gain realized by a U.S. Holder upon the sale or other disposition of ordinary shares will also be treated as an excess distribution and will be subject to tax as described above.

- The tax basis in shares of our stock that were acquired from a decedent who was a U.S. Holder would not receive a step-up to fair market value as of the date of the decedent's death but would instead be equal to the decedent's basis, if lower than fair market value.

The special PFIC rules described above will not apply to a U.S. Holder if the U.S. Holder makes an election to treat us as a 'qualified electing fund' ("QEF") in the first taxable year in which the U.S. Holder owns ordinary shares and if we comply with certain reporting requirements. Instead, a shareholder of a qualified electing fund is required for each taxable year to include in income a pro rata share or the ordinary earnings of the qualified electing fund as ordinary income and a pro rata share or the net capital gain of the qualified electing fund as long-term capital gain, subject to a separate election to defer payment of taxes, which deferral is subject to an interest charge.

The QEF election is made on a shareholder-by-shareholder basis and can be revoked only with the consent of the Internal Revenue Service, or IRS. A shareholder makes a QEF election by attaching a completed IRS Form 8621, including the PFIC annual information statement, to a timely filed United States federal income tax return and by filing such form with the IRS Service Center in Philadelphia, Pennsylvania. Even if a QEF election is not made, a shareholder in a PFIC who is a U.S. person must file a completed IRS Form 8621 every year.

A U.S. Holder of PFIC stock which is publicly traded could, instead of making a QEF election, elect to mark the stock to market annually, recognizing as ordinary income or loss each year an amount equal to the difference as of the close of the taxable year between the fair market value of the PFIC stock and the U.S. Holder's adjusted tax basis in the PFIC stock. Losses would be allowed only to the extent or net mark-to-market gain previously included by the U.S. Holder under the election for prior taxable years. If the mark-to-market election were made, then the rules set forth above would not apply for periods covered by the election.

INGEN-0100777

We reasonably believe that we were not a PFIC for 2002. We base our belief that we were not a PFIC in 2002 on a tax valuation made by an independent "big 4" U.S. accounting firm for the fiscal year 2001 and further calculations that we have made in comparison to such tax valuation and the facts set forth in such tax valuation. However, we did not obtain any new tax valuation with respect to 2002. There can be no assurance, however, that the IRS will not determine that we are a PFIC. Furthermore, the tests for determining PFIC status are applied annually and it is difficult to make accurate predictions of future income and assets, which are relevant to this determination. Accordingly, we cannot assure you that we will not be treated as a PFIC in any of 2001, 2002 or in future years.

U.S. Holders who hold ordinary shares during a period when we are a PFIC will be subject to the foregoing rules, even if we cease to be a PFIC, subject to certain exceptions for U.S. Holders who made a QEF election. U.S. Holders are urged to consult their tax advisors about the PFIC rules, including as to the advisability of choosing to make a QEF election, a "protective" QEF election, or an election to mark the shares to market annually.

## F. DIVIDENDS AND PAYING AGENTS

– Not applicable

## G. STATEMENT BY EXPERTS

– Not applicable

## H. DOCUMENTS ON DISPLAY

All documents referenced herein concerning us are archived at our principal offices located at 7 Atir Yeda St., Kfar Saba, Israel.

## I. SUBSIDIARY INFORMATION

– Not applicable

## ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to a variety of risks, including changes in foreign currency exchange rates, changes in interest rates and weak economic conditions in foreign markets. However, we do not use derivative financial instruments in our investment portfolio to hedge foreign currency, interest rate or other types of market risks.

**Interest Rate Risk**
Our exposure to interest rate risk relates primarily to our short term deposits and investments. The majority of our cash is held in U.S. dollars and bears interest at various rates based upon the London Inter Bank Offered Rate (LIBOR). These deposits are placed with high quality U.S. and European banks. Approximately half of our cash is currently invested in bonds featuring credit ratings of A or higher. The bonds possess terms of up to six (6) years.

INGEN-0100778

DX-091.64
**Appx10995**

**Foreign Currency Exchange and Inflation Risk**

Most of our revenues generated and costs incurred outside of the United States are generally denominated in dollar currencies. Costs not effectively denominated in United States dollars are translated to United States dollars, when recorded, at the prevailing exchange rates for the purposes of our financial statements. Consequently, fluctuations in the rates of exchange between the dollar and non-dollar currencies will affect our results of operations. An increase in the value of a particular currency relative to the dollar will increase the dollar reporting value for transactions in that particular currency, and a decrease in the value of that currency relative to the dollar will decrease the dollar reporting value for those transactions. This effect on the dollar reporting value for transactions is generally only partially offset by the impact that currency fluctuations may have on costs. We do not generally engage in currency hedging transactions to offset the risks associated with variations in currency exchange rates. Consequently, significant foreign currency fluctuations and other foreign exchange risks may have a material adverse effect on our business, financial condition and results of operations. Since our revenues are generated in United States dollars and currencies other than NIS, and a substantial portion of our expenses is incurred and will continue to be incurred in NIS, we are exposed to risk by the amount that the rate of inflation in Israel exceeds the rate of devaluation of the NIS in relation to the dollar and other currencies or if the timing of the devaluation lags behind inflation in Israel.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

– Not applicable

INGEN-0100779

DX-091.65

Appx10996

PART II

## ITEM 13.  DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

– Not applicable

## ITEM 14.  MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

– Not applicable

## ITEM 15.  CONTROLS AND PROCEDURES

(a)  Evaluation of disclosure controls and procedures. To their best knowledge and belief and based on their evaluation of the Company's disclosure controls and procedures (as defined in Rules 13a-14(c) and 15d-14(c) under the Securities Exchange Act of 1934) as of a date within 90 days of the filing date of this Annual Report on Form 20-FA, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and are operating in an effective manner.

(b)  Changes in internal controls. There were no significant changes in the Company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their most recent evaluation.

## ITEM 16A.  [RESERVED]

## ITEM 16B.  [RESERVED]

## ITEM 16C.  [RESERVED]

INGEN-0100780

DX-091.66

Appx10997

## ITEM 17. FINANCIAL STATEMENTS

– Not applicable

## ITEM 18. FINANCIAL STATEMENTS

See Consolidated Financial Statements, immediately following Item 19 below.

INGEN-0100781

DX-091.67

Appx10998

## ITEM 19. EXHIBITS

| | | |
|---|---|---|
| 1.1 | * | M-Systems' Memorandum of Association, as amended |
| 1.2 | ** | M-Systems' Articles of Association, as amended |
| 4(a).1 | *** | Form of Warrant for Purchase of Ordinary Shares, dated July 23, 1999 |
| 4(a).2 | ** | Purchase Agreement made as of September 17, 2000 between Fortress U&T Ltd. and M-Systems Flash Disk Pioneers Ltd. |
| 4(a).3 | ** | Agreement, dated April 24, 2001, by and between Aspen Real Estate Ltd., Narkis Marom Industrial Buildings Ltd., and M-Systems Flash Disk Pioneers Ltd., together with an English summary of the Agreement |
| 4(a).4 | ***** | Development and Supply Agreement dated April 18, 2001 by and between Atmel Rousset, Atmel Sarl, and M-Systems Flash Disk Pioneers Ltd. |
| 4(b)(i) | **** | Share Purchase Agreement dated May 1st, 2003, by and between M-Systems Flash Disk Pioneers Ltd. and Dr. Hans Wagner |
| 8 | **** | List of M-Systems' Subsidiaries and where they are incorporated |
| 12(a).1 | ***** | Consent of Kost Forer and Gabbay |
| 12(a).2 | ***** | Consent of BDO Seidman, LLP |
| 12(a).3 | ***** | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 12(a).4 | ***** | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |

---

| | |
|---|---|
| * | Previously filed as an exhibit to our Registration Statement on Form F-1, File No. 33-55838, and incorporated by reference herein. |
| ** | Previously filed as an exhibit to our Annual Report on Form 20-F for the fiscal year ended December 31, 2000, and incorporated by reference herein. |
| *** | Previously filed as an exhibit to our Registration Statement on Form F-1, File No. 333-11450, and incorporated by reference herein. |
| **** | Previously filed as an exhibit to our original Annual Report on Form 20-F for the fiscal year ended December 31, 2002, and incorporated by reference herein. |
| ***** | Filed herewith. |

INGEN-0100782

DX-091.68

Appx10999

# M-SYSTEMS FLASH DISK PIONEERS LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED FINANCIAL STATEMENTS

### AS OF DECEMBER 31, 2002

### IN U.S. DOLLARS

## INDEX

|  | Page |
|---|---|
| Report of Independent Auditors | 2 |
| Consolidated Balance Sheets | 3 - 4 |
| Consolidated Statements of Operations | 5 |
| Statements of Changes in Shareholders' Equity | 6 |
| Consolidated Statements of Cash Flows | 7 - 8 |
| Notes to Consolidated Financial Statements | 9 – 33 |
| Report of BDO Seidman | 34 |

- - - - - - - -

)

INGEN-0100783

 ERNST & YOUNG

REPORT OF INDEPENDENT AUDITORS

to the Shareholders of

M-SYSTEMS FLASH DISK PIONEERS LTD.

We have audited the accompanying consolidated balance sheets of M-Systems Flash Disk Pioneers Ltd. ("the Company") and its subsidiaries as of December 31, 2001 and 2002, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2002. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of certain, wholly-owned subsidiaries, which statements reflect total assets of 2.5% and 2.9% out of total consolidated assets as of December 31, 2001 and 2002, respectively and total revenues of 28% and 26% out of total consolidated revenues for the years ended December 31, 2001 and 2002, respectively. Those statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to data included for these subsidiaries is based solely on the report of the other auditors.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the report of other auditors, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company and its subsidiaries as of December 31, 2001 and 2002, and the consolidated results of their operations and cash flows for each of the three years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States.

Tel-Aviv, Israel
January 23, 2003
(Except for Note 15 which date is May 1, 2003)

KOST FORER & GABBAY
A Member of Ernst & Young Global

INGEN-0100784

**DX-091.70**
**Appx11001**

CONSOLIDATED BALANCE SHEETS

**U.S. dollars in thousands**

| | December 31, | |
| | 2001 | 2002 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 75,914 | $ 29,833 |
| Short-term bank deposits | ---- | 23,364 |
| Short-term marketable securities (Note 3) | 4,137 | 10,836 |
| Trade receivables (net of allowance for doubtful accounts - $ 102 in 2001 and 2002) | 5,125 | 4,920 |
| Other accounts receivable and prepaid expenses | 1,008 | 1,962 |
| Inventories (Note 4) | 11,631 | 17,100 |
| Total current assets | 97,815 | 88,015 |
| **LONG-TERM INVESTMENTS:** | | |
| Severance pay funds | 1,338 | 1,763 |
| Long-term marketable securities (Note 3) | 17,185 | 30,061 |
| Long-term investments (Note 5) | 10,391 | 10,616 |
| Total long-term investments | 28,914 | 42,440 |
| PROPERTY AND EQUIPMENT, NET (Note 6) | 17,206 | 16,756 |
| GOODWILL (Note 7a) | 477 | 477 |
| OTHER INTANGIBLE ASSETS, NET (Note 7b) | 1,039 | 514 |
| Total assets | $ 145,451 | $ 148,202 |

The accompanying notes are an integral part of the consolidated financial statements.

3

INGEN-0100785

DX-091.71
Appx11002

CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands, except share data

|  | December 31, | |
|---|---|---|
|  | 2001 | 2002 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| CURRENT LIABILITIES: | | |
| Trade payables | $ 2,796 | $ 8,044 |
| Deferred revenues | 2,919 | 4,759 |
| Other accounts payable and accrued expenses (Note 8) | 4,836 | 4,915 |
| Total current liabilities | 10,551 | 17,718 |
| ACCRUED SEVERANCE PAY | 1,849 | 2,194 |
| COMMITMENTS AND CONTINGENT LIABILITIES (Note 9) | | |
| SHAREHOLDERS' EQUITY (Note 10): | | |
| Share capital: | | |
| Ordinary shares of NIS 0.001 par value: Authorized - 100,000,000 shares as of December 31, 2001 and 2002; Issued and outstanding - 26,860,379 shares as of December 31, 2001 and 27,485,361 shares as of December 31, 2002 | 8 | 8 |
| Additional paid-in capital | 184,648 | 185,387 |
| Accumulated deficit | (51,605) | (57,105) |
| Total shareholders' equity | 133,051 | 128,290 |
| Total liabilities and shareholders' equity | $ 145,451 | $ 148,202 |

The accompanying notes are an integral part of the consolidated financial statements.

INGEN-0100786

DX-091.72

Appx11003

## CONSOLIDATED STATEMENTS OF OPERATIONS

**U.S. dollars in thousands, except share and per share data**

| | Year ended December 31, | | |
| | 2000 | 2001 | 2002 |
| --- | --- | --- | --- |
| Revenues (Note 14) | $ 92,589 | $ 44,678 | $ 64,817 |
| Cost of revenues | 64,281 | 30,356 | 44,415 |
| Inventory write-down (Note 4) | --- | 30,217 | --- |
| Gross profit (loss) | 28,308 | (15,895) | 20,402 |
| Operating expenses: | | | |
| Research and development, net (Note 13a) | 7,364 | 13,290 | 11,974 |
| Selling and marketing | 11,535 | 12,122 | 12,547 |
| General and administrative | 2,809 | 3,913 | 4,000 |
| In-process research and development write off | 6,215 | --- | --- |
| Total operating expenses | 27,923 | 29,325 | 28,521 |
| Operating income (loss) | 385 | (45,220) | (8,119) |
| Other expenses | --- | (1,193) | --- |
| Financial income, net (Note 13b) | 5,875 | 4,628 | 2,619 |
| Income (loss) before minority interest in losses of a subsidiary | 6,260 | (41,785) | (5,500) |
| Minority interest in losses of a subsidiary | 19 | --- | --- |
| Net income (loss) | $ 6,279 | $ (41,785) | $ (5,500) |
| Basic net earnings (loss) per share (Note 11) | $ 0.25 | $ (1.56) | $ (0.20) |
| Diluted net earnings (loss) per share (Note 11) | $ 0.22 | $ (1.56) | $ (0.20) |

The accompanying notes are an integral part of the consolidated financial statements.

INGEN-0100787

**DX-091.73**
**Appx11004**

STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

U.S. dollars in thousands

| | Share capital | Additional paid-in capital | Treasury Stock | Accumulated other comprehensive income (loss) | Accumulated deficit | Total comprehensive income (loss) | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2000 | $ 4 | $ 38,307 | $ (4,738) | $ --- | $ (16,099) | | $ 17,474 |
| Issuance of shares, net | 1 | 148,225 | --- | --- | --- | | 148,226 |
| Exercise of warrants to investors | *) --- | *) --- | --- | --- | --- | | --- |
| Exercise of options | *) --- | 827 | --- | --- | --- | | 827 |
| Stock split effected as stock dividend (100%) | 3 | (3) | --- | --- | --- | | --- |
| Comprehensive income (loss): | | | | | | | |
| Unrealized losses on available for sale marketable securities | --- | --- | --- | (7) | --- | $ (7) | (7) |
| Net income | --- | --- | --- | --- | 6,279 | 6,279 | 6,279 |
| Total comprehensive income | | | | | | $ 6,272 | |
| Balance as of December 31, 2000 | 8 | 187,356 | (4,738) | (7) | (9,820) | | 172,799 |
| Exercise of options | *) --- | 562 | --- | --- | --- | | 562 |
| Reversal of accrued issuance expenses | --- | 1,315 | --- | --- | --- | | 1,315 |
| Issuance of shares related to employees stock purchase plan | *) --- | 153 | --- | --- | --- | | 153 |
| Cancellation of treasury stock | --- | (4,738) | 4,738 | --- | --- | | --- |
| Comprehensive income (loss): | | | | | | | |
| Reclassification adjustment to available for sale marketable securities | --- | --- | --- | 7 | --- | $ 7 | 7 |
| Net loss | --- | --- | --- | --- | (41,785) | (41,785) | (41,785) |
| Total comprehensive loss | | | | | | $ (41,778) | |
| Balance as of December 31, 2001 | 8 | 184,648 | --- | --- | (51,605) | | 133,051 |
| Exercise of options | *) --- | 303 | --- | --- | --- | | 303 |
| Exercise of warrants to investors | *) --- | *) --- | --- | --- | --- | | *) --- |
| Issuance of shares related to employees stock purchase plan | *) --- | 436 | --- | --- | --- | | 436 |
| Net loss | --- | --- | --- | --- | (5,500) | (5,500) | (5,500) |
| Total comprehensive loss | | | | | | $ (5,500) | |
| Balance as of December 31, 2002 | $ 8 | $ 185,387 | $ --- | $ --- | $ (57,105) | | $ 128,290 |

*) Represents an amount lower than $ 1.

The accompanying notes are an integral part of the consolidated financial statements.

6

INGEN-0100788

## CONSOLIDATED STATEMENTS OF CASH FLOWS

**U.S. dollars in thousands**

| | Year ended December 31, | | |
|---|---|---|---|
| | 2000 | 2001 | 2002 |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ 6,279 | $ (41,785) | $ (5,500) |
| Adjustments required to reconcile net income (loss) to net cash used in operating activities: | | | |
| Depreciation and amortization of other intangible assets | 895 | 2,213 | 2,234 |
| Amortization of goodwill | 19 | 65 | --- |
| Accrued interest on short-term bank deposits | (1,926) | (783) | (502) |
| Interest accrued and amortization of premium and discount on held-to-maturity marketable securities | (6) | 27 | 167 |
| Write-off of long-term investment in KeyNetica Inc. | --- | 1,012 | --- |
| Write-off of in-process research and development | 6,215 | --- | --- |
| Capital loss from sale of property and equipment | --- | 181 | --- |
| Gain on sale of available for sale and held to maturity marketable securities | --- | (106) | (70) |
| Accrued severance pay, net | 103 | 15 | (80) |
| Minority interest in losses of a subsidiary | (19) | --- | --- |
| Decrease (increase) in trade receivables | (1,533) | 2,031 | 205 |
| Decrease (increase) in other accounts receivable and prepaid expenses | (245) | 477 | (903) |
| Decrease (increase) in inventories | (24,235) | 25,907 | (5,469) |
| Increase (decrease) in trade payables | (2,662) | (380) | 5,248 |
| Increase (decrease) in deferred revenues | (1,081) | 1,755 | 1,840 |
| Increase (decrease) in other accounts payable and accrued expenses | 2,814 | (455) | 79 |
| Net cash used in operating activities | (15,382) | (9,826) | (2,751) |
| | | | |
| Cash flows from investing activities: | | | |
| Investment in available-for-sale marketable securities | (2,894) | --- | --- |
| Investment in held to maturity marketable securities | --- | (29,435) | (30,955) |
| Purchase of property and equipment | (3,192) | (14,735) | (1,292) |
| Investment in long-term lease deposits | 41 | (50) | 7 |
| Loans to employees, net | (133) | (64) | (76) |
| Proceeds from sale and maturity of available for sale and held to maturity marketable securities | --- | 11,092 | 11,283 |
| Proceeds from sales of property and equipment | 22 | 86 | 33 |
| Short-term bank deposits, net | (44,298) | 47,709 | (22,862) |
| Investment in private company | (11,012) | --- | (207) |
| Payment for the acquisition of Fortress' assets (a) | (8,456) | --- | --- |
| Purchase of the minority interest in a subsidiary | --- | (235) | --- |
| Net cash provided by (used in) investing activities | (69,922) | 14,368 | (44,069) |

The accompanying notes are an integral part of the consolidated financial statements.

INGEN-0100789

DX-091.75

Appx11006

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands**

| | Year ended December 31, | | |
|---|---|---|---|
| | 2000 | 2001 | 2002 |
| Cash flows from financing activities: | | | |
| Proceeds from issuance of shares, net | 149,606 | --- | --- |
| Proceeds from exercise of options | 827 | 562 | 303 |
| Proceeds from issuance of shares related to employees stock purchase plan | --- | 153 | 436 |
| Net cash provided by financing activities | 150,433 | 715 | 739 |
| Increase (decrease) in cash and cash equivalents | 65,129 | 5,257 | (46,081) |
| Cash and cash equivalents at the beginning of the year | 5,528 | 70,657 | 75,914 |
| Cash and cash equivalents at the end of the year | $ 70,657 | $ 75,914 | $ 29,833 |
| Non-cash activities: | | | |
| Issuance expenses payable (reversal) | $ 1,380 | $ (1,315) | $ --- |
| Realized (unrealized) losses on available for sale marketable securities | $ (7) | $ 7 | $ --- |

(a)   Payment for the acquisition of Fortress U&T Ltd. assets:

Estimated fair values of assets acquired at the date of acquisition are as follows:

| | | | |
|---|---|---|---|
| Property and equipment | $ 172 | $ --- | $ --- |
| Core technology | 1,243 | - | - |
| In-process research and development | 6,215 | - | - |
| Assembled workforce | 252 | - | - |
| Goodwill | 326 | - | - |
| Other assets - patents | 248 | - | - |
| | $ 8,456 | $ --- | $ --- |

The accompanying notes are an integral part of the consolidated financial statements.

8

INGEN-0100790

## NOTE 1:- GENERAL

M-Systems Flash Disk Pioneers Ltd. ("the Company") is a developer, manufacturer and marketer of innovative data storage products, known as flash disks. The Company's flash disks provide the functionality of a mechanical hard drive on a solid state silicon chip. The Company's products are based on its patented TrueFFS technology and include the DiskOnChip, DiskOnKey, and Fast Flash Disk (FFD) product families. DiskOnChip is primarily targeted at the High-End Mobile Devices and Embedded Devices Markets, while the FFD product line is primarily targeted at military systems and network infrastructure equipment. The DiskOnKey product family is targeted at the PC and laptop markets (see also Note 14).

As of December 31, 2002, the Company has wholly-owned subsidiaries in the United States, Netherlands, Taiwan, U.K., Japan and Israel, and an office in China.

The Company depends on Toshiba as a single source for its mobile DiskOnChip, DiskOnChip Millennium and DiskOnChip Millennium Plus products, and expects to be dependant DiskOnChip on them as a single source for future DiskOnChip products. Toshiba not only provides the flash components but also manufactures and assembles the finished product. The Company is seeking to develop, with other manufacturers, products that will be comparable to the DiskOnChip although possessing different features and capacity. This will require additional hardware and software development, and therefore it is not assured that the Company will be successful in developing such comparable products or that such other manufacturers will succeed in delivering products, which are of similar cost, quality and functionality. If Toshiba were to close down or downsize its flash business, experience manufacturing problems or delays for any reason, including difficulty in obtaining sufficient raw materials, work stoppages, excessive demand for its manufacturing capacity or other causes, the Company may be unable to fill its customers' orders for this product or unable to fulfill them in a timely fashion, which would result in lost sales and significantly lower revenues.

The Company relies on third parties to manufacture and supply components for its products, including the capacitors, printed circuit boards and the application specific integrated circuit ("ASIC") components used in the DiskOnKey and in some of the DiskOnChip products. For some components, the Company relies on a single source of supply. In particular, it has an agreement with Atmel Sarl, its single source for supply of ASIC components for the DiskOnKey products. Because the Company depends on single suppliers for certain key components, and do not have a long-term supply contract with its suppliers, it faces the risk of inadequate component supply, price increases, late deliveries and poor component quality, as any supplier may terminate their relationships with the Company or pursue other relationships with its competitors. If the Company was to lose its relationship with these suppliers, the lead time required to qualify new suppliers could be as long as six months. Also, if the Company were to lose its single suppliers or these suppliers are otherwise unable to satisfy the volume and delivery schedule requirements, it may be difficult to locate any suppliers who have the ability to develop, manufacture and deliver the specialized components the Company needs for its products in the desired lead times and quality.

As to the principal markets and customers, see Note 14.

INGEN-0100791

DX-091.77
Appx11008

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP").

**Use of estimates:**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

**Financial statements in U.S. dollars:**

A majority of the revenues of the Company and its subsidiaries is generated in U.S. dollars ("dollars"). In addition, a substantial portion of the Company and its subsidiaries' costs is incurred in dollars. Since management believes that the dollar is the primary currency in the economic environment in which the Company and each of its subsidiaries operate, the dollar is their functional and reporting currency. Accordingly, monetary accounts maintained in currencies other than the dollar are remeasured into U.S. dollars in accordance with Statement of the Financial Accounting Standard No. 52 "Foreign Currency Translation" ("SFAS No. 52"). All transaction gains and losses from the remeasurement of monetary balance sheet items are reflected in the statement of operations as financial income or expense, as appropriate.

**Principles of consolidation:**

The consolidated financial statements include the accounts of the Company and its subsidiaries ("the Group"). Intercompany balances and transactions including profits from inter-company sales not yet realized outside the group, have been eliminated upon consolidation.

**Cash equivalents:**

Cash equivalents include short-term, highly liquid investments that are readily convertible to cash with maturities of three months or less, at the date acquired.

**Short-term bank deposits:**

Short-term bank deposits are deposits with maturities of more than three months, but less than one year. The short-term bank deposits are presented at their cost, including accrued interest. The deposits are in U.S. dollars and bear annual interest at an average rate of 2.5%.

**Marketable securities:**

The Company accounts for investments in marketable securities in accordance with Statement of Financial Accounting Standard No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("SFAS No. 115").

Management determines the appropriate classification of its investments in marketable debt securities at the time of purchase and reevaluates such determinations at each balance sheet date.

Debt securities for which the Company does not have the intent or ability to hold to maturity are classified as available-for-sale, along with any investments in equity securities that have not been classified as trading securities. Securities available for sale are carried at fair value, with the unrealized gains and losses, net of income taxes, reported as a separate component of shareholders' equity, accumulated other comprehensive income (loss). Realized gains and losses on sales of investments, as determined on a specific identification basis, are included in the consolidated statement of operations.

Debt securities are classified as held-to-maturity when the Company has the positive intent and ability to hold the securities to maturity and are stated at amortized cost. As of December 31, 2001 and 2002, the Company classified all its marketable securities as held to maturity whereas in December 31, 2000 all the marketable securities were classified as available-for-sale.

The amortized cost of debt securities held to maturity is adjusted for amortization of premiums and accretion of discounts to maturity. Such amortization, interest and decline in value judged to be other than temporary are included in financial income, net. The cost of securities sold is based on the specific identification method.

10

INGEN-0100792

DX-091.78
**Appx11009**

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

**Inventories:**

Inventories are stated at the lower of cost or market value. Inventory write-downs are provided to cover risks arising from slow-moving items, excess inventories, technological obsolescence or market prices lower than cost. In 2001, the Company re-evaluated the fair value of its inventories and wrote-down $ 30,217.

Cost is determined as follows:

Raw materials, parts and supplies - using the moving average cost method.

Work in progress and finished products:

Raw materials and components - using the moving average cost method.

Labor, overhead and subcontracted work - on the basis of actual costs.

**Investment in other companies:**

The investment in other companies is stated at cost, since the Company does not have the ability to exercise significant influence over operating and financial policies of the investees.

The Company's investments in other companies are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an investment may not be recoverable, in accordance with Accounting Principle Board Opinion No. 18 "The Equity Method of Accounting for Investments in Common Stock", ("APB No. 18"). During 2001, the Company recorded a write off of its investments in KeyNetica in the amount of $1,012. During 2002, based on managements' most recent analyses, no impairment losses have been identified.

**Property and equipment:**

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is calculated by the straight-line method over the estimated useful lives of the assets, at the following annual rates:

|  | % |
| --- | --- |
| Building | 4 |
| Computers, manufacturing and peripheral equipment | 20 - 33 |
| Office furniture and equipment | 6 - 20 |
| Motor vehicles | 15 |
| Leasehold improvements | Over the term of the lease |

The Company's and its subsidiaries long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standard No. 144 "Accounting for the Impairment for Disposal of Long-Lived Assets" ("SFAS No. 144") whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. As of December 31, 2002, no impairment losses have been identified.

11

INGEN-0100793

**DX-091.79**
# Appx11010

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

**Other intangible assets:**

Intangible assets subject to amortization arose from acquisitions prior July 1, 2001, are being amortized on a straight-line basis over their useful life in accordance with APB Opinion No. 17 "Intangible Assets" ("APB No. 17") at the following periods:

| | Weighted average amortization period, in Years |
|---|---|
| Core Technology | 3 |
| Patents and know-how | 3 |
| Other | 5 |
| Total | 3 |

Intangible assets acquired in a business combination for which date is on or after July 1, 2001, should be amortized over their useful life using a method of amortization that reflects the pattern in which the economic benefits of the intangible assets are consumed or otherwise used up, in accordance with Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets", ("SFAS No. 142").

The Company's and its subsidiaries long-lived assets are reviewed for impairment in accordance with Statement of Financial Accounting Standard No. 144 "Accounting for the Impairment for Disposal of Long-Lived Assets" ("SFAS No. 144") whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

As of December 31, 2002, no impairment losses have been identified.

Goodwill represents excess of the costs over the fair value of net assets of businesses acquired. Goodwill that arose from acquisitions prior to July 1, 2001, was amortized until December 31, 2001, on a straight-line basis over 5 years. Under Statement of Financial Accounting Standard No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142") goodwill acquired in a business combination for which date is on or after July 1, 2001, shall not be amortized.

SFAS No. 142 requires goodwill to be tested for impairment on adoption and at least annually thereafter or between annual tests in certain circumstances, and written down when impaired, rather than being amortized as previous accounting standards required. Goodwill attributable to each of the reporting units is tested for impairment by comparing the fair value of each reporting unit with its carrying value. Fair value is determined using discounted cash flows, market multiples and market capitalization. Significant estimates used in the methodologies include estimates of future cash flows, future short-term and long-term growth rates, weighted average cost of capital and estimates of market multiples for the reportable unit. Based on its most recent analysis, management believes that no impairment of intangible assets exists as of December 31, 2002.

**Income taxes:**

The Company and its subsidiaries account for income taxes in accordance with Statement of Financial Accounting Standard No. 109, "Accounting for Income Taxes" ("SFAS No.109"). This statement prescribes the use of the liability method whereby deferred tax asset and liability account balances are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company and its subsidiaries provide a valuation allowance, if necessary, to reduce deferred tax assets to their estimated realizable value.

INGEN-0100794

**DX-091.80**
## Appx11011

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

**Revenue recognition:**

The Company and its subsidiaries generate most of their revenues from selling their data storage products to end customers, resellers and to Original Equipment Manufacturers ("OEM").

Revenues from product sales are recognized in accordance with Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements" ("SAB 101") when delivery has occurred, persuasive evidence of an arrangement exists, the vendor's fee is fixed or determinable, no further obligation exists, and collectibility is reasonably assured. Because of frequent sales price reductions and rapid technology obsolescence in the industry, sales are made to distributors and retailers under agreements allowing price protection and/or right of return and deferred until the retailers or distributors sell the merchandise to the end customer, or the right of return expire. Deferred revenues include amounts received from customers for which revenue has not been recognized.

Revenues from royalties are accounted for upon notification from licensees that royalties are due.

**Research and development costs:**

Research and development costs, net of grants received, are charged to the statements of operations as incurred.

**Royalty and non-royalty bearing grants:**

Royalty-bearing grants from the Government of Israel and others for funding approved research and development projects and for funding marketing activities are recognized at the time the Company and its subsidiaries are entitled to such grants, based on costs incurred, and are recorded as a deduction of research and development costs, and selling and marketing expenses, respectively (see also Note 13a).

In addition, during 2002, the Company received non-royalty-bearing grant in the amount of $ 212 for its participation in the secure mobile payments and services on chip project ("SN-PAYSOC").

The grants are not required to be repaid and are recognized at the time the Company is entitled to such grants, on the basis of the costs incurred and are recorded as a deduction of research and development expenses.

**Warranty costs:**

The Company provides a warranty in a range between 12 to 60 months at no extra charge. A provision is recorded for estimated warranty costs based on the Company's experience. Warranty expenses for the years ended December 31, 2000, 2001 and 2002 were approximately $ 200, $ 200 and $ 272, respectively.

**Advertising expenses:**

Advertising expenses are charged to the statements of operations as incurred. Advertising expenses for the years ended December 31, 2000, 2001 and 2002 were $ 335, $ 195 and $ 132, respectively.

**Concentrations of credit risk:**

Financial instruments that potentially subject the Company and its subsidiaries to concentrations of credit risk consist principally of cash and cash equivalents, short-term bank deposits, marketable securities and trade receivables.

Cash and cash equivalents and short-term bank deposits are invested mainly in U.S dollars in deposits with major banks worldwide (mainly in Israel, the United States, Cayman, England and France). Such deposits may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the investments of the Company and its subsidiaries are financially sound and, accordingly, minimal credit risk exists with respect to these investments.

INGEN-0100795

**NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

The trade receivables of the Company and its subsidiaries are derived from sales to customers located primarily in the United States, the Far East and Europe. The Company and its subsidiaries generally do not require collateral; however, in certain circumstances, the Company and its subsidiaries may require letters of credit, other collateral, additional guarantees or advanced payments. The Company and its subsidiaries perform ongoing credit evaluations of its customers and to date have not experienced material losses. An allowance for doubtful accounts is determined with respect to specific debts that are doubtful of collection.

Investments in marketable securities are conducted through investment banks in France and in the United States, and include investments in government and corporate debts. Management believes that the financial institutions that hold the Company's investments are financially sound, the portfolio is well diversified and accordingly, minimal credit risk exists with respect to these investments.

The Company and its subsidiaries have no significant off-balance-sheet concentration of credit risk such as foreign exchange contracts, option contracts or other foreign hedging arrangements.

**Accounting for stock-based compensation:**

The Company has elected to follow Accounting Principles Board Opinion No. 25 "Accounting for Stock Issued to Employees" ("APB No. 25") and FASB Interpretation No. 44 "Accounting for Certain Transactions Involving Stock Compensation" ("FIN No. 44") in accounting for its employee stock option plans. Under APB 25, when the exercise price of the Company's share options is less than the market price of the underlying shares on the date of grant, compensation expense is recognized.

Under SFAS 123, pro forma information regarding net income (loss) and net earnings (loss) per share is required, and has been determined as if the Company had accounted for its employee stock options under the fair value method of that Statement. The fair value for these options was estimated at the date of grant using a Black-Scholes Option pricing model, with the following weighted- average assumptions for each of the years ended December 31, 2000, 2001 and 2002: expected volatility of 108%, 104% and 62%, respectively; a risk-free interest rate of 6%, 2% and 1.5%, respectively; dividend yield of 0% for all years; and a weighted-average expected life of 3.25 years for all years presented.

For purposes of pro-forma disclosure, the estimated fair value of the options is amortized to expenses over the options' vesting period which is four years.

Pro forma information under SFAS 123:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2000 | 2001 | 2002 |
| Net income (loss) as reported | $ 6,279 | $ (41,785) | $ (5,500) |
| Add: stock-based compensation expenses included in reported net income (loss) | --- | --- | --- |
| Deduct: stock-based compensation expense determined under fair value method for all awards | 3,318 | 4,580 | 4,475 |
| Pro forma net income (loss) | $ 2,961 | $ (46,365) | $ (9,975) |
| Pro forma basic net earnings (loss) per share | $ 0.12 | $ (1.74) | $ (0.37) |
| Pro forma diluted net earnings (loss) per share | $ 0.11 | $ (1.74) | $ (0.37) |

14

INGEN-0100796

DX-091.82

Appx11013

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

### Severance pay:

The Company's liability for severance pay is calculated pursuant to Israeli and Taiwanese severance pay laws as applicable to the relevant employees, based on the most recent salary of the employees multiplied by the number of years of employment, as of the balance sheet date. Employees are entitled to one month's salary for each year of employment or a portion thereof. The Company's liability for all of its employees in Israel, is fully covered by monthly deposits with severance pay funds, insurance policies and by an accrual. The value of those policies is recorded as an asset in the Company's balance sheet.

The Company's liability for all of its employees in Taiwan is not covered by deposits with severance pay funds or insurance policies, but only by an accrual.

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israeli severance pay law or labor agreements. The value of the deposited funds is based on the cash surrendered value of these policies, and includes immaterial profits.

Severance expenses for the years ended December 31, 2000, 2001 and 2002, amounted to approximately $ 464, $ 501 and $ 531, respectively.

### Fair value of financial instruments:

The following methods and assumptions were used by the Company and its subsidiaries in estimating their fair value disclosures for financial instruments:

The carrying amounts of cash and cash equivalents, short-term bank deposits, trade receivables and trade payables approximate their fair value due to the short-term maturities of such instruments.

As of December 31, 2001 and 2002, the fair value of marketable securities was based on the quoted market prices.

### Basic and diluted net earnings (loss) per share:

Basic net earnings (loss) per share is computed based on the weighted average number of Ordinary shares outstanding during each year. Diluted net earnings per share is computed based on the weighted average number of Ordinary shares outstanding during each year, plus dilutive potential Ordinary shares considered outstanding during the year, in accordance with Statement Financial Accounting Standard No. 128, "Earnings Per Share" ("SFAS No. 128").

The total weighted average number of shares related to the outstanding options and warrants excluded from the calculations of diluted net earnings (loss) per share since they had an anti-dilutive effect was 1,237, 3,519,902 and 3,635,851 for 2000, 2001 and 2002, respectively.

### Impact of recently issued accounting standard:

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections," which rescinds SFAS No. 4, "Reporting Gains and Losses from Extinguishment of Debt" and an amendment of that Statement, and SFAS No. 64, "Extinguishments of Debt Made to Satisfy Sinking-Fund Requirements." SFAS No. 145 also rescinds SFAS No. 44, "Accounting for Intangible Assets for Motor Carriers." SFAS No. 145 amends SFAS No. 13, "Accounting for Leases," to eliminate an inconsistency between the required accounting for sale-leaseback transactions and the required accounting for certain lease modifications that have economic effects that are similar to sale-leaseback transactions. SFAS No. 145 also amends other existing authoritative pronouncements to make various technical corrections, clarify meanings, or describe their applicability under changed conditions. SFAS No. 145 is effective for fiscal years beginning after May 15, 2002. The Company does not expect the adoption of SFAS No. 145 to have a material impact on its results of operations or financial position.

In June 2002, the FASB issues SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," which addresses significant issue regarding the recognition, measurement, and reporting of costs associated with exit and disposal activities, including restructuring activities. SFAS No. 146 requires that costs associated with exit or disposal activities be recognized when they are incurred rather than at the date of a commitment to an exit or disposal plan. SFAS No. 146 is effective for all exit or disposal activities initiated after December 31, 2002. The Company does not expect the adoption of SFAS No. 146 to have a material impact on our results of operations or financial position.

15

INGEN-0100797

DX-091.83
Appx11014

## NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

In November 2002, the FASB issued FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57, and 107 and Rescission of FASB Interpretation No. 34" ("FIN No. 45"). FIN No. 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. FIN No. 45 does not prescribe a specific approach for subsequently measuring the guarantor's recognized liability over the term of the related guarantee. It also incorporates, without change, the guidance in FASB Interpretation No. 34, "Disclosure of Indirect Guarantees of Indebtedness of Others," which is being superseded. The disclosure provisions of FIN No. 45 are effective for financial statements of interim or annual periods that end after December 15, 2002 and the provisions for initial recognition and measurement are effective on a prospective basis for guarantees that are issued or modified after December 31, 2002, irrespective of a guarantor's year-end. The Company does not expect the adoption of FIN No. 45 to have a material impact on its results of operations or financial position.

INGEN-0100798

DX-091.84

Appx11015

## NOTE 3:- MARKETABLE SECURITIES

The following is a summary of held-to-maturity marketable securities:

| | December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | | | | 2002 | | | |
| | Amortized cost | Gross Unrealized Gains | Gross unrealized losses | Estimated fair market value | Amortized cost | Gross unrealized gains | Gross unrealized losses | Estimated fair market value |
| **Held-to-maturity:** | | | | | | | | |
| Government debts | $ --- | $ --- | $ --- | $ --- | $ 10,041 | $ 434 | $ (9) | $ 10,466 |
| Corporate debts | 21,322 | 662 | (365) | 21,619 | 30,856 | 975 | --- | 31,831 |
| | $ 21,322 | $ 662 | $ (365) | $ 21,619 | $ 40,897 | $ 1,409 | $ (9) | $ 42,297 |

Aggregate maturities of held-to-maturity securities for years subsequent to December 31, 2002 are:

| | December 31, 2002 | |
|---|---|---|
| | Amortized cost | Estimated fair market value |
| **Held-to-maturity:** | | |
| 2003 (short-term marketable securities) | $ 10,836 | $ 10,991 |
| 2004 | 1,016 | 1,071 |
| 2005 | 10,342 | 10,810 |
| 2006 | 8,325 | 8,822 |
| 2007 | 7,279 | 7,484 |
| 2008 | 3,099 | 3,119 |
| | $ 40,897 | $ 42,297 |

The net adjustment to unrealized holding gains (losses) on available-for-sale securities included as a separate component of shareholders' equity called "accumulated other comprehensive losses" amounted to $ (7), $ 7 and $ 0 in 2000, 2001 and 2002, respectively.

During 2002, the Company sold several marketable securities in consideration of $ 8,283 and several of the securities were redeemed in consideration of $ 3,000. The marketable securities were sold before their maturity, due to deterioration of their credit rating. As a result of the sale, the Company recorded gain in the amount of $ 70 in the financial income.

INGEN-0100799

**DX-091.85**
**Appx11016**

## NOTE 4:- INVENTORIES

|                    | December 31, | |
|                    | 2001     | 2002     |
|--------------------|----------|----------|
| Raw materials      | $ 1,832  | $ 3,021  |
| Work in progress   | 681      | 3,367    |
| Finished products  | 9,118    | 10,712   |
|                    | $ 11,631 | $ 17,100 |

During 2001, as a result of a sharp reduction in the prices of flash components, and the economic slowdown that caused a decline in the Company's sales resulting in prolonged inventory cycles, the Company re-evaluated the fair value of its inventories and recorded an inventory write-down in the cost of revenues at an approximate amount of $ 30,217.

## NOTE 5:- LONG-TERM INVESTMENTS

|                                               | December 31, | |
|                                               | 2001     | 2002     |
|-----------------------------------------------|----------|----------|
| Investment in Saifun Semiconductors Ltd. (1)  | $ 10,000 | $ 10,000 |
| Investment in KeyNetica Inc. (2)              | ---      | ---      |
| Investment in Phison Electronics Corp. (3)    | ---      | 207      |
| Employee loans and lease deposits             | 391      | 409      |
|                                               | $ 10,391 | $ 10,616 |

(1) In October 2000, the Company purchased 2.5% of the outstanding Preferred B shares of NIS 0.01 par value of Saifun Semiconductors Ltd. ("Saifun") in consideration of $ 10,000.

Saifun is a privately held Israeli company engaged in research, development, production and marketing of flash memory products and technology. Saifun's founder, Chief Executive Officer and director was, up until December 2002, a member of the Board of Directors of the Company.

(2) In August 2000, the Company purchased 400,000 Preferred A shares of $ 0.001 par value, representing approximately 19% of the outstanding shares, of KeyNetica Inc. ("KeyNetica"), in consideration of $ 412. In addition, the Company provided a convertible loan to KeyNetica in the amount of $ 600.

On March 31, 2001, the Company decided to impair all of its investments in Preferred A shares in KeyNetica and to write-off the convertible loan, based on several indicators which supported KeyNetica's inability to continue as a going concern. The Company recorded in the other expenses, a capital loss in the amount of $ 1,012, resulting from assessing the impairment loss based upon the difference between the carrying amount and the fair value of the investment, as evaluated by the Company.

(3) During the first quarter of 2002, the Company signed a share purchase agreement with Phison Electronics Corp. ("Phison") a Taiwanese company, to purchase 550,000 Preferred shares TWD 10 par value in consideration of $ 600.

In April 2002, the Company purchased 184,000 Preferred shares of TWD 10 par value of Phison in consideration of $ 207. The investment represents approximately 2% of the outstanding shares of Phison.

18

INGEN-0100800

## NOTE 6:- PROPERTY AND EQUIPMENT, NET

|  | December 31, | |
|---|---|---|
|  | 2001 | 2002 |
| Cost: | | |
| Land and building (1) | $ 14,475 | $ 14,633 |
| Computers, manufacturing and peripheral equipment | 5,029 | 6,042 |
| Office furniture and equipment | 1,551 | 1,639 |
| Motor vehicles | 257 | 182 |
| Leasehold improvements (1) | 433 | 433 |
|  | 21,745 | 22,929 |
| Accumulated depreciation | 4,539 | 6,173 |
| Depreciated cost | $ 17,206 | $ 16,756 |

(1) In April 2001, the Company acquired its facility and nearby land in Kfar Saba, Israel, in consideration of approximately $ 10,500. In addition, the Company reclassified during 2001 the leasehold improvements related to the facility in Kfar-Saba in the amount of $ 3,290 to the cost of the building.

a. As for charges, see Note 9.

b. Depreciation expenses for the years ended December 31, 2000, 2001 and 2002, were $ 820, $ 1,584 and $ 1,709, respectively.

INGEN-0100801

DX-091.87
Appx11018

## NOTE 7:- OTHER INTANGIBLE ASSETS, NET

a. Goodwill:

| | December 31, | |
|---|---|---|
| | 2001 | 2002 |
| Original amount | $ 561 | $ 561 |
| Accumulated amortization | 84 | 84 |
| Amortized cost | $ 477 | $ 477 |

In June 1998, the Company established a subsidiary in Japan, M-Systems Flash Disk Pioneers (Japan), Inc. ("MSJ"). The Company owned 67% of this company. In June 2001, the Company exercised its option and purchased all shares of MSJ held by minority for a total cash consideration of $ 235. The acquisition was accounted for on the basis of the purchase method of accounting and the purchase price has been allocated to goodwill.

b. Other assets:

| | December 31, | |
|---|---|---|
| | 2001 | 2002 |
| Original amount: | | |
| Core Technology | $ 1,243 | $ 1,243 |
| Patents and know-how | 248 | 248 |
| Other | 252 | 252 |
| | 1,743 | 1,743 |
| Accumulated Amortization: | | |
| Core technology | 535 | 931 |
| Patents and know-how | 104 | 185 |
| Other | 65 | 113 |
| | 704 | 1,229 |
| Amortized cost | $ 1,039 | $ 514 |

In September 2000, the Company acquired the business and assets of Fortress U&T Ltd. ("Fortress"), in exchange for $ 8,456 in cash. Fortress was a privately held Israeli company that was engaged in data security technologies.

The acquisition was treated on the basis of the purchase method of accounting in accordance with Accounting Principle Board Opinion No. 16 "Business Combinations" ("APB No. 16") and accordingly the purchase price, in the total amount of $ 8,456, has been allocated according to the estimated fair value of the assets acquired.

The Company recorded a one-time expense in September 2000, in the amount of $ 6,215, to write off in-process research and development acquired from Fortress, for which technological feasibility had not yet been established and for which no alternative future use existed.

20

INGEN-0100802

DX-091.88
Appx11019

## NOTE 7:- OTHER INTANGIBLE ASSETS, NET (Cont.)

c. Amortization expense amounted to $ 94, $ 694 and $ 525 for the years ended December 31, 2000, 2001 and 2002, respectively.

d. Estimated amortization expenses for the year ended:

|  | December 31, |
|---|---|
| 2003 | $ 424 |
| 2004 | $ 51 |
| 2005 | $ 39 |

## NOTE 8:- OTHER ACCOUNTS PAYABLE AND ACCRUED EXPENSES

|  | December 31, | |
|---|---|---|
|  | 2001 | 2002 |
| Employees and payroll accruals | $ 2,191 | $ 2,187 |
| Accrued expenses | 2,139 | 2,130 |
| Accrued royalty expenses | 166 | 166 |
| Provision for warranty | 200 | 272 |
| ESPP | 52 | 59 |
| Other | 88 | 101 |
|  | $ 4,836 | $ 4,915 |

INGEN-0100803

DX-091.89
Appx11020

## NOTE 9:- COMMITMENTS AND CONTINGENT LIABILITIES

**Royalty commitments:**

a. Under the Company's research and development agreements with the Office of the Chief Scientist ("OCS"), the Bi-national Industrial Research and Development Foundation ("BIRD-F") and Singapore-Israel Industrial Research and Development ("SIIRD"), the Company is required to pay royalties at the rate of 1.5%-5% of sales of products developed with funds provided by the OCS, BIRD-F and SIIRD, up to an amount equal to 150% of the OCS and BIRD-F and 100% of the SIIRD research and development grants (dollar-linked) related to such projects. The obligation to pay these royalties is contingent on actual sales of the products and in the absence of such sales, no payment is required. Royalties payable with respect to grants received under programs approved by the OCS after January 1, 1999, are subject to interest on the U.S. dollar-linked value of the total grants received at the annual rate of LIBOR applicable to U.S. dollar deposits. Royalties payable with respect to grants received under programs approved by the BIRD-F, are linked to the Consumer Price Index in the United States.

The Company has expensed royalties relating to repayment of grants from the OCS, BIRD-F and SIIRD of $ 312, $ 0 and $ 0 for the years ended December 31, 2000, 2001 and 2002, respectively. The royalties were recorded in the cost of revenues.

As of December 31, 2002, the Company had an outstanding contingent obligation to pay royalties of $ 281, in respect of these grants.

b. The Israeli Government, through the Fund for Encouragement of Marketing Activities, and the BIRD-F awarded the Company and its U.S. subsidiary grants for participation in expenses for overseas marketing. The Company is committed to pay royalties to the Fund for Encouragement of Marketing Activities at the rate of 3% on the increase in export sales, up to the amount of the grants received by the Company linked to the dollar and to the BIRD-F as described in paragraph a. above.

The Company has expensed royalties relating to repayment of grants from the Fund for Encouragement of Marketing Activities and the BIRD-F of $ 66, $ 5 and $ 0 for the years ended December 31, 2000, 2001 and 2002, respectively. The royalties were recorded in the cost of revenues.

As of December 31, 2002, the Company had outstanding obligations to pay royalties of $ 166 in respect of these grants.

**Lease commitments:**

The Company's facilities in Omer, its subsidiaries facilities and its vehicles are leased under several operating lease agreements, which expire on various dates, the latest of which is in 2005 .

Future minimum lease commitments under non-cancelable operating leases, are as follows:

|      | Year ended December 31, | | |
|------|------------|----------|---------|
|      | **Facilities** | **Vehicles** | **Total** |
| 2003 | $ 363 | $ 666 | $ 1,029 |
| 2004 | 369 | 375 | 744 |
| 2005 | 305 | 122 | 427 |
|      | $ 1,037 | $ 1,163 | $ 2,200 |

Facilities lease expenses for the years ended December 31, 2000, 2001 and 2002, were approximately $ 798, $ 384 and $ 456, respectively.

Vehicles lease expenses for the years ended December 31, 2000, 2001 and 2002 were approximately $ 234, $ 606 and $ 763, respectively.

22

INGEN-0100804

DX-091.90

Appx11021

## NOTE 9:- COMMITMENTS AND CONTINGENT LIABILITIES (Cont.)

**Guarantees:**

The Company issued a guarantee in the amount of $ 127 in connection with a lawsuit against one of its suppliers.

The Company has provided additional guarantees in the amount of approximately $ 30 in connection with its subsidiary's bank account.

**Lines of credit:**

As of December 31, 2002, the Company has authorized and available credit lines of $ 4,000 from banks.

In connection with the credit lines, the Company agreed not to place any liens on its assets without the respective bank's consent.

**Charges:**

The land and the building are free and clear of all encumbrances except for a mortgage taken out by the sellers of the building from Bank Leumi. The outstanding balance of that mortgage on the land and the building is covered in full by escrowed funds to be delivered to the sellers only upon the receipt of various necessary permits and third party approvals, at which point the escrowed funds are to be applied to pay off the mortgage and remove the lien.

INGEN-0100805

## NOTE 10:- SHAREHOLDERS' EQUITY

The Ordinary shares of the Company are traded on NASDAQ National Market.

### General:

The Ordinary shares entitle their holders to receive notice to participate and vote in general meetings of the Company, the right to share in distribution upon liquidation of the Company, and to receive dividends, if declared.

In July 1999, the Company issued an aggregate of 1,818,182 Ordinary shares to investors for net proceeds of $ 4,753. The Company also granted to the investors warrants, exercisable into 1,038,962 Ordinary shares, at a price of $ 2.875 per share. The warrants were exercisable until December 31, 2002. On April 1, 2000, 415,584 warrants were exercised to 383,508 shares due to a cashless exercise mechanism and on December 31, 2002, the remaining 623,378 warrants were exercised to 406,140 shares also due to a cashless exercise mechanism.

In March 2000, the Company issued 4,735,000 Ordinary shares at $ 34.125 per share in consideration of net proceeds of approximately $ 148,226 in a public offering.

In September 2000, the Company's Board of Directors has approved a two-for-one stock split effected as a 100% stock dividend from the Company's additional paid-in capital. All Ordinary shares, options, warrants and per share data have been retroactively adjusted for all periods presented.

### Stock option plans:

The Company has two share incentive and stock option plans for directors, officers, employees, consultants and contractors of the Company and its subsidiaries (the plans were adopted on February 16, 1993):

a. Incentive and restricted stock options ("the IRSO plan"):

Options to purchase 3,000,000 Ordinary shares may, from time to time, be granted to employees, directors, consultants and contractors of the Company. Options granted under the IRSO plan in accordance with the terms thereof will be qualified as incentive stock options. As of December 31, 2002, 1,324,384 options are available for future grant. Any options which are canceled or forfeited before expiration become available for future grant.

The exercise price per share for a restricted stock option is to be determined by the Board of Directors, but may not be less than the lower of 75% of the market value of the Ordinary shares on the date the option is granted, or 75% of the book value per share of the Ordinary shares at the end of the year.

The options vest over a period of four years; 50% after two years, and an additional 25% per each year thereafter.

The options granted generally expire no later than ten years from the date of grant. This plan expires in 2003.

b. Employee Stock Options Plan ("the ESOP plan") :

Under the ESOP Plan, options to purchase an aggregate of 4,000,000 Ordinary shares may, from time to time, be granted to Israeli employees of the Company. The exercise prices of options granted under this plan are to be determined by the Board of Directors at the time of the grant and shall not be less than the market value of the Ordinary shares on the date of granting such options. The options granted expire no later than ten years from the date of grant. This plan expires in 2003. As of December 31, 2002, options to purchase 644,702 Ordinary shares were available for future grant. Any options that are canceled or forfeited before expiration become available for future grant.

The options vest over a period of four years; 50% after two years, and an additional 25% per each year thereafter.

c. In November 2002, the Company approved a new option plan "2003 Stock Option and Restricted Stock Incentive Plan". Under this plan, 5,000,000 options to purchase Ordinary shares are available for future grant to employees, officers, directors, service providers and consultants of the Company and its subsidiaries.

24

INGEN-0100806

## NOTE 10:- SHARE CAPITAL (cont.)

d. A summary of the Company's employees share option activity under the IRSO and ESOP plans and related information is as follows:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2000 | | 2001 | | 2002 | |
| | Amount | Weighted average exercise price | Amount | Weighted average exercise price | Amount | Weighted average exercise price |
| | | $ | | $ | | $ |
| Options outstanding at the beginning of the year | 2,298,976 | 2.43 | 2,742,928 | 7.33 | 3,560,138 | 6.37 |
| Changes during the year: | | | | | | |
| Granted | 1,098,310 | 15.24 | 1,628,480 | 5.37 | 855,166 | 6.68 |
| Exercised | (407,908) | 2.02 | (294,370) | 1.92 | (154,250) | 1.96 |
| Forfeited or cancelled | (246,450) | 5.55 | (516,900) | 10.87 | (447,400) | 9.04 |
| Options outstanding at the end of the year | 2,742,928 | 7.33 | 3,560,138 | 6.37 | 3,813,654 | 6.30 |
| Options exercisable at the end of the year | 398,968 | 2.12 | 760,048 | 2.50 | 1,213,003 | 5.47 |
| Weighted average fair value of options granted during the year, at their grant date | | 10.52 | | 3.45 | | 2.92 |

INGEN-0100807

DX-091.93
Appx11024

## NOTE 10:- SHARE CAPITAL (cont.)

The options outstanding as of December 31, 2002, under the IRSO and ESOP plans have been separated into ranges of exercise prices as follows:

| Range of exercise prices | Options outstanding at December 31, 2002 | Weighted average exercise price | Weighted average remaining contractual life | Options exercisable at December 31, 2002 | Weighted average exercise price of exercisable options |
|---|---|---|---|---|---|
| $ | | $ | Years | | $ |
| 1.38 - 1.88 | 580,438 | 1.83 | 5.74 | 473,788 | 1.82 |
| 2.00 - 2.75 | 305,560 | 2.25 | 4.35 | 293,560 | 2.26 |
| 3.25 - 3.75 | 66,000 | 3.61 | 5.98 | 52,500 | 3.58 |
| 4.01 - 4.3 | 607,080 | 4.28 | 8.80 | --- | --- |
| 5.00 - 5.75 | 226,500 | 5.46 | 9.70 | 2,000 | 5.00 |
| 6.00 - 6.2 | 795,000 | 6.03 | 8.01 | 88,650 | 6.13 |
| 7.02 - 10.1 | 641,366 | 7.39 | 9.19 | 7,650 | 8.75 |
| 12.00 - 12.75 | 439,410 | 12.36 | 7.54 | 219,705 | 12.36 |
| 16.25 - 19.50 | 90,600 | 18.80 | 7.32 | 44,300 | 18.78 |
| 21.75 - 25.00 | 61,700 | 24.58 | 7.55 | 30,850 | 24.58 |
| | 3,813,654 | 6.29 | 7.68 | 1,213,003 | 5.47 |

All of the options were granted at exercise prices that were equal or higher to market prices at the date of grant and, therefore, no compensation cost has been charged against income in respect of the aforementioned plans in the years ended December 31, 2000, 2001 and 2002.

**Employee Stock Purchase Plan ("ESPP"):**

During 2001, the Company adopted its Global and U.S. ESPP (the "plans"). The plans provide eligible employees with the opportunity to purchase 550,000 Ordinary shares under the Global ESPP and 200,000 Ordinary shares under the U.S. ESPP. Under the plans' terms the employees may purchase the shares through periodic deduction between 1% and 10% of their salary. The number of shares to be issued in return for the amounts deducted in a six-months period ("the offering period") will be determined at the end of the offering period and will be equal to the lower of 85% of the closing bid of the Company's shares in the Stock Exchange Market on the first day or the last day of the offering period.

In November 2001, at the end of the First Offering period, the Company issued 18,313 Ordinary shares to eligible employees in consideration of $ 153.

In May 2002, at the end of the second offering period, the Company issued 28,711 Ordinary shares to eligible employees in consideration of $ 214.

In November 2002, at the end of the third offering period, the Company issued 35,881 Ordinary shares to eligible employees in consideration of $ 222. Subsequently, a new offering period commenced, which will elapse in May 2003.

As of December 31, 2002, 667,095 Ordinary shares were available for future purchase by employees. The average weighted price of the Ordinary shares purchased in 2002 was $ 6.85.

INGEN-0100808

DX-091.94
Appx11025

## NOTE 10:- SHARE CAPITAL (cont.)

**Treasury stock:**

During 1998, the Company sold a former subsidiary based in Taiwan, to certain shareholders of the subsidiary. As part of the agreement, the Company returned 6,045,500 shares of the subsidiary to those shareholders and in exchange, those shareholders transferred 1,330,000 shares of M-Systems to one of M-Systems wholly-owned subsidiary.

The Company accounted for the investment by its subsidiary in its shares as treasury stock at the cost of $ 4,738. During 2001, the Company canceled the treasury stock and recorded the cancellation against additional paid in capital.

**Dividends:**

In the event that cash dividends are declared in the future, such dividends will be paid in NIS or in foreign currency subject to any statutory limitations. The Company does not intend to pay cash dividends in the foreseeable future. The Company has decided not to declare dividends out of tax-exempt earnings.

## NOTE 11:- NET EARNINGS (LOSS) PER SHARE

The following table sets forth the computation of historical basic and diluted net earnings (loss) per share:

|  | Year ended December 31, | | |
|  | 2000 | 2001 | 2002 |
|---|---|---|---|
| Numerator: |  |  |  |
| Net income (loss) | $ 6,279 | $ (41,785) | $ (5,500) |
| Numerator for basic net earnings (loss) per share - income (loss) available to Ordinary shareholders | $ 6,279 | $ (41,785) | $ (5,500) |
| Numerator for diluted net earnings (loss) per share - net income (loss) available to Ordinary shareholders after assumed exercises | $ 6,279 | $ (41,785) | $ (5,500) |
| Denominator: |  |  |  |
| Weighted average shares | 26,698,286 | 26,715,683 | 26,953,410 |
| Treasury stock | (1,330,000) | --- | --- |
| Denominator for basic net earnings (loss) per share-weighted-average shares | 25,368,286 | 26,715,683 | 26,953,410 |
| Effect of dilutive securities: |  |  |  |
| Employee stock options | 2,020,185 | *) --- | *) --- |
| Warrants | 652,140 | *) --- | *) --- |
| Dilutive potential Ordinary shares | 2,672,325 | --- | --- |
| Denominator for diluted net earnings (loss) per share | 28,040,611 | 26,715,683 | 26,953,410 |

*) Anti-dilutive.

27

INGEN-0100809

DX-091.95
Appx11026

## NOTE 12:- INCOME TAXES

**Tax benefits under the Law for the Encouragement of Capital Investments, 1959 (the "Capital Investment Law"):**

Most of the Company's and its Israeli subsidiary production facilities have been granted an "Approved Enterprise" status under the above Law under six separate investment programs. According to the Capital Investments Law, the Company has elected the "alternative benefits" - and has waived Government grants in return for a tax exemption.

The Company is also a "foreign investors' company", as defined by the abovementioned law, and, as such, is entitled to a 10-year period of benefits and to an additional reduction in tax rates, up to 10% or 25% (based on the percentage of foreign ownership in each taxable year).

Income derived from the first investment program which commenced in 1992 and expired in 1998 was tax-exempt for a period of two years (1992 and 1993), and was subject to tax at the reduced rate of 20%, for an additional period of five years ended in 1998. The period of benefits for this program ended in 1998.

For the Company's other five investment programs, the tax benefits are as follows: Income derived from investment programs, which commenced operations prior to or during 1996 is tax exempt for the first four years of the 10-year tax benefit period, and is entitled to a reduced tax rate of 20% during the remaining benefit period. Income derived from investment programs that commenced operations subsequent to 1996, is tax exempt for the first two years of the 10-year tax benefit period, and is entitled to a reduced tax rate of 20% during the remaining benefit period. The period of benefits for all these investment programs has not yet commenced, since the Company does not yet have taxable income.

The period of tax benefits detailed above is subject to limits of the earlier of 12 years from commencement of production, or 14 years from receiving the approval. Accordingly, the period of benefits relating to all investment programs will expire in the years 2005 through 2012.

In connection with the purchase of Fortress, the Company established a research and development facility in Omer, Israel, at the site of Fortress' facilities. Income derived from the Omer facility is tax exempt for a 10-year period. The Company came to agreement with the Israeli tax authorities on the percentage of revenues which are deemed attributable to the facility in Omer.

The entitlement to the above benefits is conditional upon the Company's fulfilling the conditions stipulated by the above law, regulations published thereunder and the instruments of approval for the specific investments in "approved enterprises". In the event of failure to comply with these conditions, the benefits may be canceled and the Company may be required to refund the amount of the benefits, in whole or in part, including interest.

The tax exempt income attributable to the "Approved Enterprise" can be distributed to shareholders without imposing tax liability on the Company only upon the complete liquidation of the Company. In the event of a distribution of such tax-exempt income as a cash dividend in a manner other than in the complete liquidation of the Company, the Company will be required to pay tax at the rate of 20% on the amount distributed. In addition, these dividends will be subject to 15% withholding tax.

The Company's Board of Directors has determined that such tax-exempt income will not be distributed as dividends. Accordingly, no deferred taxes have been provided on income attributable to the Company's "Approved Enterprise".

The Capital Investments Law also grants entitlement to claim accelerated depreciation on equipment used by the "Approved Enterprise" during five tax years.

If the Company derives income from sources other than an "Approved Enterprise", such income will be taxable at the regular corporate tax rate of 36%.

INGEN-0100810

**DX-091.96**
## Appx11027

## NOTE 12:- INCOME TAXES (cont.)

### Tax benefits under the Law for the Encouragement of Industry (Taxes), 1969:

The Company and its Israeli subsidiary currently qualify as an "industrial company" under the above law and, as such, are entitled to certain tax benefits, mainly accelerated depreciation of machinery, equipment, and building the rights to claim public issuance expenses and amortization of patents and other intangible property rights as a deduction for tax purposes.

### Taxable income under the Inflationary Income Tax (Inflationary Adjustments) Law 1985:

Results of the Company and its Israeli subsidiary for tax purposes are measured and reflected in real terms in accordance with the changes in the Israeli Consumer Price Index ("CPI"). As explained in Note 2, the financial statements are presented in U.S. dollars. The difference between the change in the Israeli CPI and in the NIS/U.S. dollar exchange rate causes a difference between taxable income or loss and the income or loss before taxes reflected in the financial statements. In accordance with paragraph 9(f) of SFAS No. 109, the Company has not provided deferred income taxes on this difference between the reporting currency and the tax bases of assets and liabilities.

### Deferred income taxes:

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets are as follows:

|  | December 31, | |
|  | 2001 | 2002 |
| --- | --- | --- |
| Deferred tax assets: | | |
| Net operating loss carryforward of subsidiaries | $ 3,268 | $ 4,459 |
| Reserve and allowances | 727 | 1,041 |
| Total deferred tax asset before valuation allowance | 3,995 | 5,500 |
| Valuation allowance | (3,995) | (5,500) |
| Net deferred tax asset | $ --- | $ --- |

As of December 31, 2002, the Company's subsidiaries have provided valuation allowances of approximately $ 5,500 in respect of deferred tax assets resulting from tax loss carryforwards and other temporary differences. The net change in the valuation allowance in the year 2002, amounted to $ (1,505). Management currently believes that since the Company's subsidiaries have a history of losses it is more likely than not that the deferred tax regarding the loss carryforwards and other temporary differences will not be realized in the foreseeable future.

29

INGEN-0100811

## NOTE 12:- INCOME TAXES (cont.)

Income (loss) before minority interest consists of the following:

|  | Year ended December 31, | | |
|  | 2000 | 2001 | 2002 |
|---|---|---|---|
| Domestic | $ 6,177 | $ (36,356) | $ (1,509) |
| Foreign | 83 | (5,429) | (3,991) |
|  | $ 6,260 | $ (41,785) | $ (5,500) |

### Net operating loss carryforwards:

The Company and its Israeli subsidiary have accumulated losses for Israel income tax purposes as of December 31, 2002, in the amount of approximately $ 58,000. These losses may be carried forward (linked to the Israeli CPI) and offset against taxable income in the future for an indefinite period. The Company expects that during the period these tax losses are utilized, its income would be substantially tax exempt. Accordingly, there will be no tax benefit available from such losses and no deferred income taxes have been included in these consolidated financial statements.

As of December 31, 2002, M-Systems Inc. had U.S. federal net operating loss carryforwards of approximately $ 3,710, that can be carried forward and offset against taxable income and expire during the years 2015 to 2022. Utilization of U.S. net operating losses may be subject to substantial annual limitations due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar state law provisions. The annual limitations may result in the expiration of net operating losses before utilization.

As of December 31, 2002, M-Systems Taiwan and M-Systems Japan had a net operating loss carryforwards of approximately $ 2,700 and $ 2,070, respectively, which can be carried forward and offset against taxable income and expire during the years 2003 to 2005.

### Reconciliation of the theoretical tax expense (benefit) to the actual tax expense (benefit):

In 2000, 2001 and 2002 the main reconciling item of the statutory tax rate of the Company (36%) to the effective tax rate (0%) is carryforward tax losses and other deferred taxes for which a full valuation allowance was provided.

INGEN-0100812

DX-091.98
Appx11029

## NOTE 13:- SELECTED STATEMENTS OF OPERATIONS DATA

|  |  | Year ended December 31, | | |
|---|---|---|---|---|
|  |  | 2000 | 2001 | 2002 |
| a. | Research and development expenses, net: | | | |
|  | Total expenses | $ 7,364 | $ 13,350 | $ 12,249 |
|  | Less - grants and participations | --- | 60 | 275 |
|  |  | $ 7,364 | $ 13,290 | $ 11,974 |
| b | Financial income, net: | | | |
|  | Financial income: | | | |
|  | Interest on marketable securities, net | $ 10 | $ 729 | $ 1,391 |
|  | Interest on bank deposits | 6,145 | 4,018 | 1,164 |
|  | Gain on sale of held to maturity marketable securities | --- | 48 | 70 |
|  | Gain on sale of available for sale marketable securities | --- | 58 | --- |
|  | Foreign currency translation differences | 390 | 225 | 157 |
|  | Other | 8 | 62 | 117 |
|  |  | 6,553 | 5,140 | 2,899 |
|  | Financial expenses: | | | |
|  | Foreign currency translation differences | 480 | 389 | 174 |
|  | Bank commissions | 153 | 77 | 74 |
|  | Other | 45 | 46 | 32 |
|  |  | 678 | 512 | 280 |
|  | Financial income, net | $ 5,875 | $ 4,628 | $ 2,619 |

INGEN-0100813

DX-091.99
Appx11030

## NOTE 14:- CUSTOMERS AND GEOGRAPHIC INFORMATION

The Company manages its business on a basis of one reportable segment. See Note 1 for a description of the Company's business. Total revenues are attributed to geographic areas based on the location of customers in accordance with Statement of Financial Accounting Standard of No. 131, "Disclosures about Segments of an Enterprise and Related Information ("SFAS 131").

The following presents total revenues and long-lived assets as of and for the years ended December 31, 2000, 2001 and 2002:

|  | 2000 | | 2001 | | 2002 | |
|---|---|---|---|---|---|---|
|  | Total revenues | Long-lived assets | Total revenues | Long-lived assets | Total revenues | Long-Lived assets |
| Israel | $ 4,584 | $ 4,226 | $ 2,435 | $ 17,346 | $ 1,678 | $ 16,923 |
| United States | 42,172 | 217 | 17,130 | 157 | 17,248 | 117 |
| Europe (excluding France) | 6,732 | 20 | 5,533 | 15 | 7,648 | 4 |
| France | 11,911 | --- | 3,690 | --- | 2,957 | --- |
| Taiwan | 12,742 | 145 | 7,835 | 114 | 8,282 | 100 |
| Japan | 6,776 | 23 | 4,635 | 31 | 22,177 | 76 |
| Far East (excluding Taiwan and Japan) | 7,626 | --- | 3,420 | 20 | 4,827 | 15 |
| Other | 46 | --- | --- | --- | --- | --- |
|  | $ 92,589 | $ 4,631 | $ 44,678 | $ 17,683 | $ 64,817 | $ 17,235 |

**Accumulated Amortization**

Total revenues from external customers, divided on the basis of the Company's product lines, are as follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2000 | 2001 | 2002 |
| DiskOnChip | $ 72,950 | $ 27,440 | $ 29,366 |
| DiskOnKey | --- | 6,606 | 26,810 |
| Fast Flash Disks (FFD) | 8,002 | 5,389 | 5,926 |
| PC Cards | 9,024 | 3,402 | 1,154 |
| Other | 2,613 | 1,841 | 1,561 |
|  | $ 92,589 | $ 44,678 | $ 64,817 |

INGEN-0100814

DX-091.100

Appx11031

## NOTE 14:- CUSTOMERS AND GEOGRAPHIC INFORMATION (Cont.)

Major customers data as a percentage of total revenues:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2000 | 2001 | 2002 |
| Customer A | 15% | 4% | 1% |
| Customer B | 12% | 4% | --- |
| Customer C | --- | 3% | 15% |
| Customer D | 3% | 6% | 10% |

## NOTE 15:- SUBSEQUENT EVENTS

a. In May 2003, the Company entered into a share purchase agreement with one of its directors according to which, the director is to purchase within no later than 60 days, 500,000 ordinary shares of the Company for an aggregate amount of $4,105.

b. In April 2003, the Company established a subsidiary in Israel named Smart Caps Ltd. ("Smart Caps") for the purpose of developing and marketing smart applications for M-Systems' line of DiskOnKey products.

The State of Israel, through the Office of the Chief Scientist, has committed to investing up to approximately $ 550 in Smart Caps. This investment by the State of Israel is to at least match the Company's investment in Smart Caps. In consideration for such investments, the Company and the State of Israel are to be issued shares in Smart Caps pro rata to each of their relative investments.

- - - - - - - -

33

INGEN-0100815

DX-091.101

Appx11032



BDO Seidman, LLP
Accountants and Consultants

125 South Market Street, Suite 800
San Jose, California 95113-2205
Telephone: (408) 278-0220
Fax: (408) 278-0230

## Report of Independent Certified Public Accountants

The Board of Directors of
M-Systems, Inc.

We have audited the accompanying balance sheets of M-Systems, Inc. (a wholly owned subsidiary of M-Systems Flash Disk Pioneers Ltd.) as of December 31, 2002 and 2001 and the related statements of operations, shareholders deficiency, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of M-Systems, Inc. as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Notes 1 and 5, the Company's revenues consist of commission income from its parent company that are generated under terms and conditions prescribed by its parent company. Further, as of December 31, 2002, the Company has a net liability of $10,354,000 due to its parent company and is economically dependant upon its parent company for continuing financial support. The accompanying financial statements of M-Systems, Inc. may not necessarily be indicative of the financial position, results of operations and cash flows of the Company had it operated without its affiliation with and continuing financial support of its parent company.

/S/ BDO Seidman, LLP

San Jose, California
January 8, 2003

INGEN-0100816

## SIGNATURES

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, M-Systems hereby certifies that it meets all of the requirements for filing on Form 20-F/A, and that it has duly caused and authorized the undersigned to sign this Amendment No. 1 to its Annual Report on its behalf on the 10th day of November, 2003.

**M-SYSTEMS FLASH DISK PIONEERS LTD.**

By: /s/ Dov Moran
Dov Moran,
President and Chief Executive Officer

INGEN-0100817

**CERTIFICATIONS**

I, Dov Moran, certify that:

1. I have reviewed this annual report on Form 20-F/A of M-Systems Flash Disk Pioneers Ltd.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

   a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's Board of Directors (or persons performing the equivalent function):

   a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: November 10th, 2003          By: /s/ Dov Moran

Dov Moran, President and Chief Executive Officer

M-Systems Flash Disk Pioneers Limited

INGEN-0100818

I, Ronit Maor, certify that:

1. I have reviewed this annual report on Form 20-F/A of M-Systems Flash Disk Pioneers Ltd.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

    a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's Board of Directors (or persons performing the equivalent function):

    a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: November 10th, 2003        By: /s/ Ronit Maor

Ronit Maor, Chief Financial Officer

M-Systems Flash Disk Pioneers Limit

INGEN-0100819



News & Events

PRODUCTS
TECHNOLOGY
APPLICATIONS
PARTNERS

MOBILE DEVICES

nasdaq.com

- Quote
- News
- Income Statement
- Balance Sheet
- Chart
- Historical Splits

FREMONT, CA. and ELMSFORD, NY, July 10, 2002          Press Release

## Fuji Photo Film U.S.A., Inc. Introduces Its USB Drive Version of DiskOnKey™

*The Computer Products Division of Fujifilm Continues to Broaden its Removable Storage Product Line by Offering M-Systems' Award Winning Technology*

M-Systems (Nasdaq: FLSH), a leader in flash disk data storage products, and the Computer Products Division of Fuji Photo Film U.S.A., Inc., a leading global manufacturer of imaging and information products and services, today announced that Fujifilm will offer its USB Drive, a Fujifilm-branded version of the M-Systems' USB product.

Fujifilm's USB Drive will feature the M-Systems DiskOnKey's renowned driverless capabilities and will be available in 8, 16, 32, 64, 128 and 256MB storage capacities. The device will be offered through the business and retail sales channels of the Computer Products Division of Fujifilm, beginning in July, according to Scott McNulty, Director of Marketing, Computer Products Division, Fuji Photo Film U.S.A., Inc.

"With the growth in popularity of such devices as digital cameras, MP3 players and other products, the demand for portable, flexible, high capacity storage products is on the upswing in both the consumer and the business marketplace," said McNulty. "Fujifilm's USB product is small enough to fit into any pocket and powerful enough to store large multimedia files. This addition to Fujifilm's product portfolio further expands the choice of reliable data storage solutions that we offer to a broad range of business customers."

Fujifilm conducted focused business and consumer market research, about the viability of the portable storage market, and has introduced the USB Drive product to respond to the rise in customer demand for flexible storage solutions.

"This relationship with the Computer Products Division of Fujifilm has allowed us to tap an entirely new market not previously penetrated by any of our current partners," said Blaine Phelps, Director of Marketing of M-Systems. "We are confident that Fujifilm's customer base will realize the benefits of a small storage device that offers cross-platform capability and does not require the user to buy a multitude of readers for use between the home or office."

Fujifilm's USB product will incorporate DiskOnKey technology, and will be marketed in storage capacity configurations of: 8MB, 16MB, 32MB, 64MB, 128MB and 256MB.

M-Systems' DiskOnKey contains no moving parts, enabling it to be smaller than the size of your palm while offering an onboard CPU for driverless operation via a computer's universal serial bus (USB) port. The innovative lightweight design and ease-of-use makes the DiskOnKey ideal for the easy transfer of files among PCs and other devices. This DiskOnKey has undergone rigorous testing for reliability and durability, securing certification by Microsoft's Windows Hardware Quality Testing Lab (WHQL). It is also the only product in the category that is approved to carry the certified-USB logo set by the USB Implementers Forum.

### Availability of M-Systems' DiskOnKey

The DiskOnKey is available in 8, 16, 32, 64, 128, 256, and 512MB capacities, and is currently available through major partners in North America, Asia and Europe. Please visit DiskOnKey on the Internet at www.diskonkey.com for contact information.

### About Fujifilm

Fuji Photo Film U.S.A., Inc. is the U.S. marketing subsidiary of Fuji Photo Film Co., Ltd. of Tokyo (FUJIY), a leading global manufacturer in three business segments, including Imaging Solutions, Information Solutions and Document Solutions. Recognized for its technological innovation and high quality, Fujifilm offers a complete portfolio of imaging, information and document products, services and e-solutions to retailers, consumers, professionals and business customers.

The complete Fujifilm product portfolio in the U.S.A. includes: professional and consumer film and cameras; digital imaging products, including cameras and printers for commercial and consumer use; digital minilabs and kiosks; photographic paper and photofinishing supplies; professional motion picture film; high-capacity floppy disks, CDs and DVDs, tape cartridges and other data storage media; videotape and audiocassettes; professional and consumer optical discs; microfilm and other micrographic products; and graphic arts film, conventional and digital printing plates, analog and digital color proofing systems, drum and flatbed scanners, imagesetters and computer-to-plate systems. Fujicolor Processing, Inc., a subsidiary of Fuji Photo Film U.S.A., Inc., provides wholesale photofinishing through a network of laboratories across the country. Fujifilm e-Systems is a subsidiary of Fuji Photo Film U.S.A., Inc., that develops workflow solutions to support the company's photofinishing labs and consumer photographic businesses, including online imaging services such as Fujifilm.net.

For more information on Fujifilm products, consumers can call 800-800-FUJI or access the Fujifilm USA Web site at www.fujifilm.com. For answers to frequently asked questions and software download, consumers can access Fujifilm's technical support Web site at www.fujifilmmediasource.com.

Ingenico Inc. v. IOENGINE LLC

**DX-092**

C.A. No. 18-cv-00826-WCB

INGEN-0100823

DX-092.1

**Appx11037**

**About M-Systems**

M-Systems (Nasdaq: FLSH) is a leader and innovator of flash-based data storage products known as flash disks. M-Systems' flash disks provide the functionality of a mechanical hard drive in a silicon chip. M-Systems' products are based on its patented TrueFFS® technology and target applications in a vast array of markets, including connected devices, mobile, and telecom. M-Systems' products include the DiskOnChip®, DiskOnKey™ and Fast Flash Disk (FFD) product families. For more information, please contact M-Systems at www.m-sys.com.

**Note to Editors:** Images of the M-Systems' DiskOnKey product can be found on the Internet at http://www.diskonkey.com/photos.htm. Images of the Fujifilm USB Drive product can be found on the Fujifilm Computer Products Division's Web site, located at: www.fujifilmmediasource.com.

*-end-*

All company and product names mentioned may be trademarks or registered trademarks of their respective holders and are used for identification purposes only.

The matters discussed in this news release include forward-looking statements that are subject to risks and uncertainties that may cause actual results to vary significantly. These risks include market and competitive factors, and other risks described in the Company's most recent annual report and/or in any of its other filings with the Securities and Exchange Commission. The Company assumes no obligation to update the information in this release. Reference to the Company's website above does not constitute incorporation of any of the information thereon into this press release.

Home | About M-Systems | News & Events | Technical Support | Contact
DiskOnKey | DiskOnChip | IDE/SCSI Flash Disks

Legal Terms of Use | info@m-sys.com | webmaster@m-sys.com

INGEN-0100824

DX-092.2
Appx11038

http://www.diskonkey.com/prod_dok_spec.asp  Go  NOV **DEC** FEB

16 captures  ◀ **02** ▶

19 Nov 2002 - 22 Dec 2005  2001 **2002** 2003

▼ About this capture

Products & Solutions   Partners & Channels   Keychain Storage   Corporate   Support   Contact Us   Home

Products
Applications
SDK

# Products & Solutions

## DiskOnKey Technical Specifications



**Interface**
Compliant with Universal Serial Bus
(USB) 1.1 and USB 2.0 full-speed devices

**Power Supply**
USB bus-powered
No external power required

**Power Consumption**
Standby: 320 fA (typical), 500 fA (max)
Read/Write: 42 mA (typical), 50 mA (max)

**Performance(read/write)**
Read: 1MB/s
Write: 0.85 MB/s

**Operating Systems Supported**
Windows 98[1] Second Edition, Windows 2000, Windows ME, Windows XP, MacOS 9.0 & higher,
Linux 2.4.0

**Capacity (MB)**
8, 16, 32, 64, 128, 256 and 512

**LED Indicator**
Slowly flashing: Connected and inactive
Quickly flashing: Transmitting/receiving data

**Operating temperature**
0° C to +50° C (32° F to 122° F)

**Storage temperature**
-20° C to +60° C (-4° F to 140° F)

**Environmental conditions**
Relative humidity during operation(Non-condensation): 10% to 95%
Relative humidity during storage: 5% to 95%.

**Dimensions**
9.81x2.53x1.84 cm /3.86x0.99x0.72 inches (LxWxH)

**Weight**
22 grams (0.78 ounces)

**Vibration**
Operating: 5 G, 10 to 500 Hz, 0.5 Oct/Min sweep rate
Non-operating: 5 G, 10 to 500 Hz, 0.5 Oct/Min sweep rate

**Shock**
Operating: 10 G, 11 ms, half-sine.

**Maximum Altitude**
Operating: 6,096 m (0 to 20,000 ft.)
Non-operating: 12,192 m (0 to 40,000 ft.)

**Service**
2 years warranty

**Certifications**
. USB Interface 2.0, Full Speed
. WHQL for Windows XP, Windows 2000 and Windows ME
. CE and FCC
Also meets the following universal standards:
. EN 55022 (CE)
. AS/NZS 3548 (Australia and New Zealand standard)



Ingenico Inc. v. IOENGINE LLC
**DX-093**
C.A. No. 18-cv-00826-WCB

INGEN-0100833

DX-093.1
**Appx11039**

http://www.diskonkey.com/prod_dok_spec.asp   Go   NOV **DEC** FEB

**16 captures**     ◀ **02** ▶
19 Nov 2002 - 22 Dec 2005     2001 2002 **2003**

** Driver required for Windows 98(SE) and Windows NT.
Drivers can be downloaded here or may be included with product

© 2002 DiskOnKey. All rights reserved  |  Legal terms of use  |  Webmaster
Windows is a registered trademark of Microsoft Corp.   Mac is a registered trademark of Apple Computer Inc.
Linux is a registered trademark of Linus Torvalds.

INGEN-0100834

DX-093.2
**Appx11040**



**News & Events**

日本語 简体 繁體

PRODUCTS
TECHNOLOGY
APPLICATIONS
PARTNERS

MOBILE DEVICES

nasdaq.com
- Quote
- News
- Income Statement
- Balance Sheet
- Chart
- Historical Splits

FREMONT, Calif., July 11, 2002                    *Press Release*

## M-Systems Engineers Automatic Firmware Upgrades for Previous Generation DiskOnKey™ Devices

### *DiskOnKey Offers Increased Functionality Beyond Storage*

M-Systems (Nasdaq: FLSH), a leader in flash disk data storage products, today announced that it has engineered upgrades that will automatically update the majority of first generation DiskOnKey devices for current and future applications by visiting www.diskonkey.com. The automatic upgrade capability offers these users the KeySafe security application and solidifies that the DiskOnKey is the only product in the keychain storage category offering storage capabilities combined with the functionality to run applications from the device.

"The vision for our DiskOnKey, really a miniature PC, has always been the capability to run multiple applications," said Blaine Phelps, worldwide marketing manager for M-Systems. "By developing the DiskOnKey upgrade, we are providing existing and new applications to our past, present and future DiskOnKey users."

Powered by a 32-bit ARM7 processor, the DiskOnKey provides users with the most computing power in the keychain storage market by offering the characteristics of a hard drive with the versatility to run applications. By creating automatic upgrades to the firmware the Company has created a new computing platform with the DiskOnKey. Such as being able to run any number of applications for updating patient profile information in the medical market, instant login to Websites as a sales tool for companies, or specific read-only applications for the education market.

M-Systems' flash data storage technology enables the DiskOnKey to be smaller than the size of your palm while offering an onboard CPU for driverless operation connecting to a computer's universal serial bus (USB) port. The DiskOnKey has undergone rigorous testing for reliability and durability, securing certification by Microsoft's Windows Hardware Quality Testing Lab (WHQL), as well as being the only product in the category approved to carry the certified-USB logo set by the USB Implementers Forum. The DiskOnKey has been honored with numerous industry accolades including CNET's Editors' Choice Award, BusinessWeek's Industrial Design Award and listings in PC Magazine and Computer Shopper as one of the top 100 products of the past year, among others.

**Pricing and Availability**

Manufacturers suggested retail prices (MSRP) for the 8, 16, 32, 64, 128, 256 and 512MB DiskOnKey are $29.99, $49.99, $79.99, $99.99, $149.99, $249.99 and $499.99, respectively. The DiskOnKey is currently available through major partners including Apple, Compaq, Dell and Targus. Please visit DiskOnKey on the Internet at www.diskonkey.com for additional information.

**About M-Systems**

M-Systems (Nasdaq: FLSH) is a leader and innovator of flash-based data storage products known as flash disks. M-Systems' flash disks provide the functionality of a mechanical hard drive in a silicon chip. M-Systems' products are based on its patented TrueFFS® technology and target applications in a vast array of markets, including connected devices, mobile, and telecom. M-Systems' products include the DiskOnChip®, DiskOnKey™ and Fast Flash Disk (FFD) product families. For more information, please contact M-Systems at www.m-sys.com.

**Note to Editors:** Images of the M-Systems' family of DiskOnKey products can be found on the Internet at http://www.diskonkey.com/photos.htm.

*-end-*

All company and product names mentioned may be trademarks or registered trademarks of their respective holders and are used for identification purposes only.

The matters discussed in this news release include forward-looking statements that are subject to risks and uncertainties that may cause actual results to vary significantly. These risks include market and competitive factors, and other risks described in the Company's most recent annual report and/or in any of its other filings with the Securities and Exchange Commission. The Company assumes no obligation to update the information in this release. Reference to the Company's website above does not constitute incorporation of any of the information therein into this press release.

Home | About M-Systems | News & Events | Technical Support | Contact
DiskOnKey | DiskOnChip | IDE/SCSI Flash Disks

Legal Terms of Use | info@m-sys.com | webmaster@m-sys.com

Ingenico Inc. v. IOENGINE LLC
**DX-097**
C.A. No. 18-cv-00826-WCB


**Elazar Exhibit**
4

INGEN-0101310

DX-097.2
Appx11042



© 2002 DiskOnKey. All rights reserved | Legal terms of use | Webmaster

Ingenico Inc. v. IOENGINE LLC

**DX-099**

C.A. No. 18-cv-00826-WCB

INGEN-0101330

DX-099.1

**Appx11043**

**Exhibit**
**0004**
Sobol



Ingenico Inc. v. IOENGINE LLC

**DX-170**

C.A. No.18-cv-00826-WCB

DX-170.1

**Appx11044**











Appx11098 to Appx11112

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx11113 to Appx11114

REMOVED DUE TO CONFIDENTIAL MATERIAL



**Editorial Contact for M-Systems:**
Bryan Sherlock / Allison Smith
T&O Public Relations
bsherlock@topr.com / asmith@topr.com
Tel: 1-949-224-4035 / 4028

**Investor Contacts for M-Systems:**
Joseph A. Mansi / Adam J. Rosen
KCSA Worldwide
jmansi@kcsa.com / arosen@kcsa.com
Tel: 1-212-896-1205 / 1220

**FOR IMMEDIATE RELEASE**

### M-Systems Designs Software Developer's Kit For The DiskOnKey* Technology Computing Platform

*Company Invites Developers to Design Applications for Leading Keychain Storage Device*

**FREMONT,** Calif., Sept. 25, 2002 – M-Systems (Nasdaq: FLSH), a leader in flash-based data storage products, today announced a software developer's kit (SDK) allowing the developer community to implement applications with the DiskOnKey Technology computing platform. M-Systems' DiskOnKey is the first product in the keychain storage category offering the capability to run programs off of the device while also offering its driverless capabilities with all major operating systems.

"By creating an SDK we are demonstrating the power and flexibility of the DiskOnKey beyond just a floppy replacement and storage medium," said Blaine Phelps, worldwide marketing manager for M-Systems' DiskOnKey Division. "The company vision continues as we are opening the doors of creativity to companies that can offer compelling applications for this new computing platform."

-more-

Ingenico Inc. v. IOENGINE LLC

**DX-307**

C.A. No. 18-cv-00826-WCB

**Elazar Exhibit**

2

WDC0000387

**DX-307.1**
**Appx11115**

The DiskOnKey SDK provides an Application Program Interface (API) allowing developers to access source codes quickly and easily from the device. Currently, the SDK uses a Windows-based format allowing the developer to create software applications executed on a PC running a Windows operating system (OS). The DiskOnKey firmware already contains powerful functions such as encryption and authentication that only need to be activated by software developers. The SDK allows developers to access this firmware without the need to modify the internal DiskOnKey software. An SDK will be available for additional OS platforms like Mac and Linux in the near future.

The DiskOnKey has undergone rigorous testing for reliability and durability, securing certification by Microsoft's Windows Hardware Quality Testing Lab (WHQL), as well as being the only product in the category approved to carry the certified-USB logo set by the USB Implementers Forum. The DiskOnKey also provides the widest flexibility of use by offering access to the most operating systems including Win 98, 2000, ME, NT, XP, CE 4.0, Mac OS 8.6, 9+, 10+, and Linux 2.4.1. The entire DiskOnKey line of devices offers unsurpassed computing power employing the latest DiskOnKey technology with the assurance of award-winning quality and reliability.

**Availability of M-Systems' SDK**

M-Systems has designed a software developer's kit allowing engineers to create applications designed for the DiskOnKey. Currently, the SDK will be available to select partners and software development companies. To request the SDK, please contact M-Systems at sdk@diskonkey.com.

-more-

WDC0000388

**About M-Systems**

M-Systems (Nasdaq: FLSH) is a leader and innovator of flash-based data storage products known as flash disks. M-Systems' flash disks provide the functionality of a mechanical hard drive in a silicon chip. M-Systems' products are based on its patented TrueFFS® technology and target applications in a vast array of markets, including connected devices, mobile and telecom. M-Systems' products include the DiskOnChip®, DiskOnKey® and Fast Flash Disk (FFD™) product families. For more information, please contact M-Systems at www.m-sys.com.

**Note to Editors:** Images of the M-Systems' family of DiskOnKey products can be found on the Internet at http://www.diskonkey.com/photos.htm.

# # #

All company and product names mentioned may be trademarks or registered trademarks of their respective holders and are used for identification purposes only.

The matters discussed in this news release include forward-looking statements that are subject to risks and uncertainties that may cause actual results to vary significantly. These risks include market and competitive factors, and other risks described in the Company's most recent annual report and/or in any of its other filings with the Securities and Exchange Commission. The Company assumes no obligation to update the information in this release. Reference to the Company's website above does not constitute incorporation of any of the information thereon into this press release.

WDC0000389

Appx11118

ELECTRONIC APPENDIX MATERIAL UNABLE TO BE PRODUCED IN
PAPER PURSUANT TO FCR 30(i)

Appx11119

ELECTRONIC APPENDIX MATERIAL UNABLE TO BE PRODUCED IN
PAPER PURSUANT TO FCR 30(i)

Appx11120

ELECTRONIC APPENDIX MATERIAL UNABLE TO BE PRODUCED IN
PAPER PURSUANT TO FCR 30(i)

Appx11121 to Appx11170

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx11171

ELECTRONIC APPENDIX MATERIAL UNABLE TO BE PRODUCED IN
PAPER PURSUANT TO FCR 30(i)

Appx11174 to Appx11176

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx11177 to Appx11182

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx11197 to Appx11281

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx11282 to Appx11287

REMOVED DUE TO CONFIDENTIAL MATERIAL



US 20040039932A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2004/0039932 A1

Elazar et al. (43) Pub. Date: **Feb. 26, 2004**

(54) **APPARATUS, SYSTEM AND METHOD FOR SECURING DIGITAL DOCUMENTS IN A DIGITAL APPLIANCE**

(76) Inventors: Gidon Elazar, Tsur-Igal (IL); Dan Harkabi, Lachish (IL); Nehemiah Weingarten, Ramat Gan (IL).

Correspondence Address:
WILSON SONSINI GOODRICH & ROSATI
650 PAGE MILL ROAD
PALO ALTO, CA 943041050

(21) Appl. No.: 10/227,155

(22) Filed: Aug. 23, 2002

**Publication Classification**

(51) Int. Cl.$^7$ ........................................ H04L 9/00

(52) U.S. Cl. ................................. 713/200; 705/59

(57) **ABSTRACT**

Various embodiments include an apparatus and a method to secure protected digital document content from tampering by their user, such as unauthenticated use or use violating a policy of the digital document. The digital document file can be transferred from a network node such as a web site server to a digital appliance, such as a computer, in encrypted form. The digital document file can be resident already on a device, and or be transferred into a device that is connected to the digital appliance. The device (hereafter a DRM device) can internally store the digital document or part of the document. The DRM device may decrypt the digital document when requested to do so. The device may further format the content for usage, for example, convert text into its graphic bitmap representation. Device formatting can include sending plain text data to the digital appliance. The device may further process degradation to the resulted file, for example, reduce the resolution of the graphic representation. The digital appliance uploads the result of the processing or sections of the result of the processing for user access via the digital appliance.

402
User invokes document visualization function of the digital appliance

403
Digital appliance requests a document or part of the document from the DRM device

404
DRM device processes the document or the section of document using the decryptor, formatter and policy

405
Result is transmitted to the digital appliance

406
Digital appliance receives the processed information through the interface with the DRM device

407
Image is displayed in the user interface of the digital appliance

Ingenico Inc. v. IOENGINE LLC
DX-363
C.A. No. 18-cv-00826-WCB



Elazar Exhibit
6



FIG. 1



FIG. 2

**301**
User requests to download a digital
document from a remote content server
over the network

**302**
Digital document is downloaded from the
content server to the DRM device
through the digital appliance

**303**
License downloaded from the server to
the DRM device through the digital
appliance

**304**
License is installed in the DRM device
non volatile storage, activating the device
for using the content file according to the
policy

FIG. 3



**402**
User invokes document visualization
function of the digital appliance

**403**
Digital appliance requests a document or part
of the document from the DRM device

**404**
DRM device processes the document or the
section of document using the decryptor,
formatter and policy

**405**
Result is transmitted to the digital appliance

**406**
Digital appliance receives the processed
information through the interface with the
DRM device

**407**
Image is displayed in the user interface of the
digital appliance

FIG. 4



FIG. 5



601

Decrypting at last part of
the digital document
content

602

Applying at least one
policy

603

Formatting at least part of
the digital document
content

604

Sending at least part of the
digital document

FIG. 6

1

## APPARATUS, SYSTEM AND METHOD FOR SECURING DIGITAL DOCUMENTS IN A DIGITAL APPLIANCE

### FIELD OF THE INVENTION

[0001] This invention generally relates to digital rights management. More particularly this invention relates to methods of securing digital documents to be used in a digital appliance such as a personal computer.

### BACKGROUND OF THE INVENTION

[0002] The Internet worldwide network enables many digital appliances to interconnect and exchange information. A particular use of the Internet is to distribute digital files, specifically digital content such as digital books or music files, to the connected appliances.

[0003] The proliferation and distribution of digital music files is substantial. Various devices, programs and methods to listen to digital music are available, and an increasing number of music title exists in digital form. Unfortunately there exists a substantial amount of illegal copies of digital music files, such that the rights of the owner of the music cannot be exercised with respect to the illegal copies.

[0004] Digital books are substantially less popular and common than music. One of the reasons for the difference between the proliferation of music in digital form and books in digital form is the caution felt by book content rights owners against potential copyright infringement, a lesson learned from the experience of the music industry. Concerns about losing control over the management of rights prevents the usage of the Internet as a powerful digital content distribution infrastructure.

[0005] Digital rights management (DRM) systems are developed to challenge the above difficulties. Part of the function of a typical DRM system is to define the form of "rights-protected files"—methods that enable the use of digital files under limitations defined by the owner of the rights to the content. These systems typically involve cryptographic methods for the secure distribution of the content between a content repository or server and a digital appliance. Such methods typically require the appliance to include an implementation of cryptographic algorithms and hold cryptographic keys in order to gain access to the content. The access to the content is performed through a program that is DRM sensitive and is hereafter called—an electronic book reader.

[0006] Examples of electronic book reading software are the Adobe Acrobat, Adobe eBook Reader (http://www.adobe.com) and the Microsoft eBook Reader (http://www.microsoft.com reader). Such software implements some form of DRM that is engaged when the users attempts to open and view a digital document. One of the operations performed by such electronic book readers is the process of decrypting the document using cryptographic methods and cryptographic keys. In order to do so, the reader program must have access to the cryptographic methods and keys; therefore the cryptographic methods and keys must reside within the access of the reader program. Typically the cryptographic methods, the keys, or both reside within the reader program, on the document itself, or somewhere within the appliance storage.

[0007] A digital appliance such as a computer is typically an open platform enabling computer programmers to develop programs. In some cases, software programs are developed for the purpose of hacking and locating the cryptographic keys and algorithms of a DRM system (hereafter referred to as hacking programs), in order to circumvent the DRM and gain illegal access to the content. This process is generally called an "attack" and if it succeeds it is commonly referred to as to "crack" the DRM system. A computer program that performs this function is referred hereafter as a hacking program.

[0008] Examples for such successful attacks are well known in the art. In late 2001, a programmer was able to crack the Microsoft eBook reader and locate the cryptographic methods and keys, producing a program that inputs an encrypted eBook file and outputs an illegal electronic book that is not protected (http://www.technologyreview.com articles innovation1101.asp). A similar cracking event of the Adobe system took place earlier that year (http://www.wired.com news politics 0,1283,45298,00.html).

[0009] Other forms of attacks include using programming tools. For example, software debuggers track and trap the electronic book information after the electronic book reader has decrypted it, retrieving the "protected" information. Such information includes the book text, images and attributes such as fonts, text color, and image locations, etc., which instruct the electronic book reader on how it should reconstruct the book for presentation to the user. A hacking program that cracks the reader and releases this information from the DRM system enables the construction of illegal copies of the original electronic book.

[0010] As a countermeasure, DRM systems have used more sophisticated cryptographic schemes and code obfuscation techniques. Other methods include adding tamper resistant hardware to store the cryptographic keys. Examples of such methods are cryptographic tokens such as iToken of Rainbow Technologies Inc. (http://www.rainbow.com ikey-index.html) and using a smart card to store cryptographic keys and optionally cryptographic algorithms. Such solutions either reveal the cryptographic key to the digital appliance in the process of decrypting the information, or internally perform the cryptographic functions but reveal the end result in a raw form that can be hacked. In practice these methods were proven to slow, but not halt, an adversary. Given enough time and effort a computer program that "cracks" the DRM system may be written. It can be appreciated by those skilled in the art that such successful attacks may occur to such program readers that execute in an open environment that enables programmers to develop software programs. Similarly, cryptographic co-processors leave the content vulnerable after decryption.

[0011] Several ongoing initiatives focus on securing the personal computer itself.

[0012] As result, a major effort is being taken by the industry, led by companies such as Microsoft to protect some part of a personal computer by transforming that part into a closed system. (http://www.microsoft.com presspass-features-2002-jul02-0724palladiumwp.asp). This initiative may produce a personal computer that is less sensitive to viruses, can be identified by service providers over the network, and can be used to build a DRM system. Microsoft's Palladium defines how to make the operating system of the personal computer secure. Once the operating system is secure, the PC is considered trusted and it can be

used for purposes such as DRM. The Wave Embassy verification system secures an appliance. Unfortunately these initiatives will be realized only in future digital appliances, which must incorporate technology specific to Palladium and Wave Embassy for securing the personal computer itself. There is clearly an unmet need for a system, method and device for securing digital documents in a digital appliance.

## SUMMARY OF THE INVENTION

[0013]    The above-mentioned disadvantages and problems are addressed by the present invention, which will be understood by reading the following specification. To protect the cryptographic keys and cryptographic methods from being located within a digital appliance, according to the present invention the keys and methods are stored and executed in a dedicated DRM device that has processing capability distinct from the digital appliance, and does not provide an open environment for at least some security functions of the DRM device for programmers to develop programs. In some embodiments, another party may develop additional functions.

[0014]    According to some embodiments, a digital document file or a section of the digital document that is protected is downloaded from an Internet server to the DRM device through a digital appliance. According to other embodiments, the digital document is already resident in the DRM device. Once the document is internal to the device, several processes may take place.

[0015]    In some embodiments, if the document is in an encrypted form it is processed through a decryptor to produce a decrypted form. A decrypted digital document can be processed by a formatter internal to the DRM device to produce a formatted form of the digital document or the section of the digital document, such as, but not limited to, a bitmap image of a page of the document. Other examples of formatting include passing plain text to the digital appliance.

[0016]    The DRM device can further process policies such as allowing or disallowing a formatted form of the document to be transferred to the digital appliance, for example in order to be presented to the user. The policy may be based on rights of use, time, number of usage events and so on. Some embodiments involve end use of digital documents. Other embodiments involve end use of music data and/or video data.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0017]    The foregoing and other objects, aspects and advantages will be better understood from the following detailed description of an embodiment of the invention with reference to the drawings, wherein:

[0018]    FIG. 1 is a schematic block diagram of an embodiment of the DRM device;

[0019]    FIG. 2 is a schematic block diagram of an exemplary system;

[0020]    FIG. 3 is a flowchart of an exemplary method for delivering a digital document file using the system of FIG. 2;

[0021]    FIG. 4 is a flowchart of an exemplary method for using the digital document file of FIG. 3;

[0022]    FIG. 5 is a schematic block diagram of another exemplary system; and

[0023]    FIG. 6 is a flowchart of another exemplary method for using the digital document file of FIG. 3.

## DETAILED DESCRIPTION OF THE INVENTION

[0024]    In the following detailed description of exemplary embodiments of the invention, reference is made to the drawings that illustrate specific exemplary embodiments in which the invention may be practiced. Those skilled in the art will appreciate that other embodiments may be utilized without departing from the spirit of the present invention, therefore the following detailed description of the invention should not be taken in a limiting sense. The scope of the invention is defined only by the appended claims.

[0025]    FIG. 1 is a diagram of an exemplary embodiment of the DRM device hardware 110, which includes a central processing unit (CPU) 112, an optional system memory 113, non-volatile storage 114, and an interface 116 to connect the device 110 to a digital appliance 120. There may be only one or a plurality of central processing units 112, as there may optionally be only one or a plurality of system memory 113 or non-volatile storage 114. There may be only one or a plurality of interfaces 116; the invention is not so limited. The non-volatile storage 114 may be included in the CPU 112 or be discrete from the CPU 112; generally, components or subcomponents of the DRM device hardware 110 may be combined with other components or subcomponents of the DRM device for higher integration and perhaps lower cost.

[0026]    The CPU 112 may be a general purpose CPU or a CPU with dedicated functions. Furthermore the CPU 112 may include internal memory, and internal non-volatile storage which in the description of the present invention may serve a similar purpose of the system memory 113, and non-volatile storage 14 respectively. The CPU 112, the non-volatile storage 114, and or other components may be implemented as a tamper resistant hardware, or sections of the CPU 112, the non-volatile storage 114, and or other components may be tamper resistant; the invention is not so limited.

[0027]    The non-volatile storage 114 may be any of several types of storage including semiconductor based media such as read only memory (ROM), electronic erasable programmable read only memory (EEPROM), flash memory or battery backed up random access memory (RAM); or magnetic media storage such as hard disk drive or floppy disk, or the like.

[0028]    The interface 116 can connect the DRM device 110 with a digital appliance 120 in both physical and communication aspects. The physical aspect can be, for example directly, through one or more cables, and/or wireless. The communication aspect of the interface 116 allows data exchange between the DRM device and the digital appliance. The interface 116 may be one of several types of interfaces, for example PCI, ISA, Universal Serial Bus (USB), FireWire, IDE, SCSI, RS-232 or other serial interface, parallel interface, Compact Flash (CF) interface, Sony Memory Stick interface, Multimedia Card (MMC), secure

digital (SD), Bluetooth, Infiniband, and/or any other type of interface that may be used to connect a DRM device with a digital appliance.

[0029] The digital appliance 120 is used by an end user for some end use of one or more digital documents. A digital document is data which has an end use of being read by an end user, and at some point prior to end use is stored and/or represented in numerical form. The digital document can have various purposes, for example a corporate purpose such as a sales presentation, a legal contract, a finance spread-sheet, or the like; or an academic purpose, such as an academic book, a published paper, a student class pack reader, or the like; or a commercial purpose, for example a newspaper, a periodical journal, a comics journal, or the like; or the like various purposes that a digital document may have. The digital appliance 120 may be one of several digital appliances such as a personal computer, tablet computers, personal digital assistant (PDA) or other types of hand held devices, cell phones, programmable consumer electronics and the like. End use includes use of the DRM device by an end user to access digital document content. Some examples of tasks which can be performed in connection with access-ing the document content include viewing the content of the document or a section of the document, modifying the document, searching the document for a text string, copying parts or all of the document, selecting text within the document to perform an operation on that text, add overlay comments on top of existing content, respond to assign-ments by adding content to the document or adding content to a matching but separate document, listening to a voice version of the document, printing sections or all of the document, sharing the document with other end users, transferring all or part of the document to other end users, transferring the rights to use the document to other end users, aggregation of several documents or sections of several documents into one or more new documents and other like operations that a user may apply to a digital document. The invention is not so limited.

[0030] The non-volatile storage 114 contains instructions which may be executed by the CPU 112. The non-volatile storage 114 further may contain: an optional unique device serial number, a method of authentication such as a unique pair of public and private cryptographic keys and a signed authenticity certificate. The instructions stored in the non volatile storage 114 allow the digital appliance 120 to access a portion of the non volatile storage 114 through the inter-face 116, but prevent access to another portion of the non volatile storage 114, including a portion that stores the private cryptographic key and a portion that stores instruc-tions that execute in a closed environment without enabling user access. The non-volatile storage may also store a plurality of methods for authentication, the invention is not so limited.

[0031] FIG. 2 is a diagram of an exemplary embodiment of the system which includes a DRM device 210 with an interface 216, a digital appliance 220 with an interface 221 which matches the interface 216 of the DRM device 210, a user interface component 222 on which a processed docu-ment may be presented (for example as a visual image, synthesized audio and/or form) to the user, the network 230, a content server 240 which is a computer that can transfer digital documents over the network and a license server 250 which is a computer that may transfer authenti-

cation and/or decryption and/or policy and/or formatting information over the network. According to one embodi-ment that information is embedded in one or more files. According to one embodiment the servers are optionally interconnected. The system may include a plurality of DRM devices 210, digital appliances 220, content servers 240 and license servers 250, the invention is not so limited. It may be appreciated by those skilled in the art that the content server 240 and the license server 250 may be implemented as separate or unite hardware and/or software components.

[0032] The interface 221 connects the digital appliance 220 with a DRM device 210. The interface 221 may be any of several types that may be used to connect a device with a digital appliance. The interface 221 of the digital appliance matches the type of interface 216 of the DRM device in a form that enables information to pass between the DRM device 210 and the digital appliance 220.

[0033] The content server 240 is a computer that can be accessed through a network 230 such as the Internet net-work. The content server 240 can respond to requests to download content such as digital electronic documents. Examples of content servers can be Amazon.com or another on-line bookseller web site that enables downloading of electronic books to a personal computer, a university web site that enables downloading of electronic versions of articles to a researcher's personal computer, and a corporate web site that enables employees to download corporate documents to their personal computers. A license server 250 is a computer that can be accessed through a network 230 such as the Internet network. A license server 250 can respond to requests to download information such as authen-tication and/or decryption and/or policy and/or formatting information. This data may include: definition of policies to be used by the DRM device policies, definition of formatting to be used by the DRM device formatters, definition of decryption to be used by the DRM device decryptors, definition of authentication to be used by the DRM device authenticators, parts of the text of the electronic document or parts of the electronic document, information regarding the user, information regarding the rights of the user to one or more end uses (the user may have access to all possible end uses or less than all possible end uses) of the document or part of the document, information regarding the vendor owner-operator of the system, information regarding the specific DRM device, and other information. The informa-tion may be utilized by the DRM device or the digital appliance while the user makes use of the content or in preparation to enable the user to make use of the content or any additional information. According to one embodiment the content server 240 and the license server 250 are implemented as separate entities that interconnect through a network and do not directly interconnect. According to another embodiment the servers directly interconnect. According to another embodiment the content server 240 and the license server 250 are implemented as a single entity. The invention is not so limited.

[0034] An authenticator implemented in a DRM device participates in the process of authenticating the DRM device to a remote server over a network. An authenticator may implement one of several methods of authentication including sending a device ID number to the remote server. Another authenticator uses an encryption secret key known only to the device and the server, and bases the authentica-

tion on challenging the device in order to verify that it has possession of the secret key. In an exemplary embodiment of such an authentication process the server sends an encrypted message to the device, and the authenticator at least decrypts the message and returns it to the server. In some embodiments, the same key can be used in a variety of methods to authenticate, for example, by signing a plaintext message and/or decrypting an encrypted message. In some embodiments, the authenticator responds to challenges by performing a series of operations such as decrypt a message, process the result, encrypt the result, and return it to the server for verification. For this authentication process to occur, the secret key may be stored in the device prior to the authentication process. The stored key can be a single key stored equally on all devices or a dedicated key unique to each device. In the latter case the server should know in advance which key is stored within which device. Another method to authenticate uses a public and private key and a digital certificate. In such an embodiment, the authenticator has access to a private key and a matching public key stored in the device. The private key must be kept secret, but the public key may be made public. The server may then challenge the authenticator with a message encrypted with the device public key to ensure it has access to the matching private key. In some embodiments, the authenticator signs a message but does not necessarily encrypt the message. Optionally the server can receive from the device a digital certificate, which contains device identification information such as the device serial number or device ID and/or the public key of the device and/or additional information relating to the device, the server, the organization operating the system or any other information. The device identification information is digitally signed by a trusted authority, such as the vendor of the device, owner of the server, the organization operating the system and/or another trusted authority to form a digital certificate for that device. Some embodiments of the authenticator can authenticate the DRM device and/or a user of the DRM device.

[0035]   A decryptor in the device participates in the process of transforming encrypted documents or sections of documents into a decrypted form. A decryptor may implement one or more of several methods: symmetric algorithms such as DES, 3DES, AES, and IDEA; and/or asymmetric algorithms such as RSA, Diffie-Hellman, elliptic curve; and/or others. A decryptor may implement one or a plurality of decryption methods. A decryptor may include hashing algorithms such as DSA, MD2, MD4, MD5, HMAC and/or SHA1 and/or others to retrieve a signature and check origin and integrity of the data received. The decryption key or plurality of decryption keys for such operations may originate in one or a plurality of sources. For example, decryption key data can be stored in the non-volatile storage of the DRM device, received from the digital appliance, and/or received from a network server, such as through the digital appliance. Some embodiments receive digital document content which is at least partly decrypted. In such embodiments, obviously the decryptor may or may not process the already decrypted portion. The decryptor can at least partly decrypt—for example, fully decrypt part of a document, and/or perform one or more decryption steps, which can be the complete decryption process or a subset of the complete decryption process, for a whole or part of the document. In

some embodiments, the document can be received at least partly as plaintext—in other words, received as at least partly unencrypted.

[0036]   A policy in the device participates in the process of verifying the eligibility of end use of a document or a section of a document, allowing or disallowing operations such as decrypting, formatting, searching, and/or transmitting an output to the digital appliance. The verification may check one or several eligibility options, including the right to use the document, the right to use the document up to a certain date, the right to use the document between certain dates, the right to use the document after a certain date, the right to use the document for a certain accumulated usage time, the right to use the document for a certain number of times, the right to transfer the document, the right to modify the document, the right to add overlay information on the document, the right to save the document into the device and/or another location, the right to save the overlay information into the device and/or another location, the right to copy the document, the right to copy portions of the document, the right to copy specific sections of the document, and other rights related to an end user in connection with an end use of the document. These might be checked by the policy to produce a result that might be one or more possible actions such as allowing the output to be transmitted to the digital appliance, disallowing the output from being transmitted to the digital appliance, erasing the document or part of the document, and/or allowing or disallowing operations such as search, cut, paste, copy, edit, save, and other operations that a user may perform while in an end use of the document.

[0037]   A formatter defines a process step in formatting a document into a presentable form. A formatter may do one or more formatting operations including: selecting the section of the document to be presented; conversion of the text, graphics and images to a single or set of digital images in one of many formats such as a bitmap image (BMP) or like form or compressed image such as JPEG, TIFF, GIF, or any other like form; setting spaces between characters and letters according to the required display form; searching the text for a particular text string; generating the layout of the document; drawing the text characters in the appropriate font and font size; and other operations performed in the preparation and conversion of a document into a presentable form. Some embodiments of a formatter degrade at least part of the document. Some embodiments arrange a presentation of the digital document content by presenting visual and/or audio information, such as presenting a voice version of the document.

[0038]   FIG. 3 is a flow chart describing an exemplary sequence of operations carried out when a user downloads content from a network server. In step 301 one or more users request a digital document to be downloaded to the DRM device that is connected to the digital appliance. Typically following step 301, the server drives a phase of proving the eligibility of the user to receive the document. User eligibility to receive the content is determined by the server, following rules such as payment, free for use, user authentication, registration or other similar methods that may be used by a user to prove eligibility or to become eligible to receive the document. Once the server is ready to download the content, it sends the content through the network to the digital appliance that is attached to the network. The content may be encrypted or parts of it may be encrypted. According

to one embodiment the DRM device must be presently attached to the digital appliance at the time of transmission. According to another embodiment the DRM device does not necessarily have to be attached at the time of transmission of the document and can be made present later when the document is to be used. At step 302 the document is transmitted from the network server (depicted as content server) to the digital appliance and from the digital appliance to the DRM device. According to one embodiment the document is completely transferred to the digital appliance before being transferred to the DRM device. According to another embodiment the document is transferred in sections, where each section is transferred to the DRM device at its own pace. On step 303 the license is transferred from the network server (depicted as license server) to the digital appliance and from the digital appliance to the DRM device. The license can be one or more files. The license contains information used by the policy, authenticator, decryptor, and/or formatter in the DRM device. According to another embodiment the license server and the content sever are implemented as a single server. According to another embodiment the license is embedded in the document to form a single file transferred from a single server. It may be appreciated by those skilled in the art that there exist other methods to sequence the transfer process with the result of having the document or part of the document and the license transferred to the DRM device. Step 304 describes the installation of the license in the non-volatile storage of the DRM device. Once installed in the storage, the license may activate the usage of the document according to the rights defined in the license. According to one embodiment the activation is performed immediately following the installation process. According to another embodiment the activation is performed in a later timeframe, such as at the time of usage of the document.

[0039] FIG. 4 is a flow chart describing an exemplary sequence of operations for using a document for visualization. In step 402 the user invokes a document usage function in the digital appliance. In step 403 the digital appliance further sends requests to the DRM device. In step 404 the DRM device processes the request by performing a sequence of operations, optionally involving one or more decryptors, one or more formatters, and one or more policies on the document or part of the document, before transferring the result to the digital appliance in step 405. According to another embodiment, part or all of the operations that involve the decryptors, formatters and/or policies is performed before the request from the digital appliance is received. The order of the operations of the decryptors, formatters and policies can be altered and executed in any sequence. The invention is not so limited.

[0040] FIG. 4 is a flow chart describing an exemplary sequence of operations for using a document for visualization. In step 402 the user invokes a document usage function in the digital appliance. In step 403 the digital appliance further sends requests to the DRM device. In step 404 the DRM device processes the request by performing a sequence of operations, optionally involving one or more decryptors, one or more formatters, and one or more policies on the document or part of the document, before transferring the result to the digital appliance in step 405. According to another embodiment, part or all of the operations that involve the decryptors, formatters and/or policies is performed before the request from the digital appliance is

received. The order and existence of the operations of the decryptors, formatters and policies can be altered and can occur in any sequence. The invention is not so limited.

[0041] FIG. 5 is a diagram of another exemplary embodiment of the system which includes a DRM device 510 with an IC interface 516, a digital appliance 520 with an IC interface 521 which matches the IC interface 516 of the DRM device 510, and a user interface component 522 on which a processed document may be presented (for example as a visual image, synthesized audio or other form) to the user. One example of the DRM device 510 is an integrated circuit executing instructions. The DRM device 510 can be included in the digital appliance 520. In some embodiments the code or data can be stored inside the non-volatile storage of the DRM device IC, and/or can be in storage external to the DRM device IC. The DRM device IC can execute independently from a processor of the digital appliance.

[0042] FIG. 6 is a flow chart describing another exemplary sequence of operations for using a document for visualization. In step 601, at least part of the digital document content is decrypted. In step 602, at least one policy is applied. In step 603; at least part of the digital document content is formatted. In step 604, at least part of the digital document is sent. The order and existence of the operations can be altered and can occur in any sequence.

1. A digital rights management (DRM) device for digital content management, the DRM device adapted to be coupled to a digital appliance for end use of at least part of a digital document, the DRM device comprising:

   one or more nonvolatile storages adapted to store:

      1) one or more authenticators;

      2) one or more decryptors, wherein at least one of the decryptors is adapted to at least partly decrypt at least part of the digital document;

      3) one or more policies, wherein at least one of the policies at least partly controls access to at least part of the digital document; and

      4) one or more formatters, wherein at least one of the formatters at least partly arranges a presentation of at least part of the digital document; and

   one or more interfaces coupled to at least one of the nonvolatile storages, the one or more interfaces for receiving and sending at least part of the digital document.

   wherein at least part of the sent digital document is sent to the digital appliance for end use of the digital document.

2. The device of claim 1, wherein the DRM device is coupled to the digital appliance.

3. The device of claim 2, wherein the digital appliance is a computer.

4. The device of claim 2, wherein the digital appliance is a personal digital assistant.

5. The device of claim 2, wherein the digital appliance is a mobile phone.

6. The device of claim 1, wherein the digital document is an electronic book.

7. The device of claim 1, wherein the digital document is a corporate document

8. The device of claim 1, wherein the digital document is an academic document.

9. The device of claim 1, wherein the digital document is a commercial document.

10. The device of claim 1, wherein the DRM device, prior to a first attempted end use of the DRM device, has stored in the nonvolatile storage at least one of: at least one of the one or more authenticators, at least one of the one or more decryptors, at least one of the one or more policies, and at least one of the one or more formatters.

11. The device of claim 1, wherein the DRM device, at least partly responsive to a first attempted use of the DRM device, downloads into the nonvolatile storage at least one of: at least one of the one or more authenticators, at least one of the one or more decryptors, at least one of the one or more policies, and at least one of the one or more formatters.

12. The device of claim 1, wherein the DRM device couples to the digital appliance via a physical connection to the digital appliance.

13. The device of claim 12, wherein the physical connection includes one or more cables.

14. The device of claim 1, wherein the DRM device couples to the digital appliance by directly physically connecting to the digital appliance.

15. The device of claim 1, wherein the DRM device couples to the digital appliance by remotely connecting to the digital appliance.

16. The device of claim 1, wherein the DRM device couples to the digital appliance by wirelessly connecting to the digital appliance.

17. The device of claim 1, wherein at least part of the received digital document content is received encrypted.

18. The device of claim 1, wherein at least part of the received digital document content is received as plaintext.

19. The device of claim 1, wherein the presentation is at least partly visual data.

20. The device of claim 1, wherein the presentation is at least partly audio data.

21. A digital rights management (DRM) integrated circuit (IC) for digital content management, the DRM IC adapted to be included in a digital appliance for end use of at least part of a digital document, the DRM IC comprising:

one or more nonvolatile storages adapted to execute:

  1) one or more authenticators;

  2) one or more decryptors, wherein at least one of the decryptors is adapted to at least partly decrypt at least part of the digital document;

  3) one or more policies, wherein at least one of the policies at least partly controls access to at least part of the digital document; and

  4) one or more formatters, wherein at least one of the formatters at least partly arranges a presentation of at least part of the digital document; and

one or more interfaces coupled to at least one of the nonvolatile storages, the one or more interfaces for receiving and sending at least part of the digital document,

wherein at least part of the sent digital document is sent to a processor in the digital appliance for end use of the digital document.

22. A digital rights management (DRM) system for digital content management, the DRM system including:

one or more servers, wherein the one or more servers send at least one of: authentication data, decryption data, policy data, formatting data, and at least part of digital document content data;

a digital appliance for end use of at least part of the digital document content; and

a DRM device adapted to be coupled to the digital appliance, the DRM device comprising:

  one or more nonvolatile storages adapted to store:

    1) one or more authenticators;

    2) one or more decryptors, wherein at least one of the decryptors is adapted to at least partly decrypt at least part of the digital document content;

    3) one or more policies, wherein at least one of the policies at least partly controls access to at least part of the digital document content; and

    4) one or more formatters, wherein at least one of the formatters at least partly arranges a presentation of at least part of the digital document content; and

  one or more interfaces coupled to at least one of the nonvolatile storages, the one or more interfaces for receiving at least data from the one or more servers and sending at least part of the digital document content to at least the digital appliance,

  wherein at least part of the sent digital document content is sent to the digital appliance for end use of at least part of the digital document content.

23. A method of digital rights management (DRM) with a DRM device for at least part of the digital document content, comprising:

applying at least one policy to at least part of the digital document content in the DRM device;

formatting at least part of the digital document content in the DRM device; and

sending at least part of the digital document for end use to a digital appliance coupled to the DRM device.

24. The device of claim 23, further comprising:

decrypting at least part of the digital document content in the DRM device.

* * * * *

http://www.diskonkey.com/applications.asp    Go    MAR  DEC  FEB

33 captures
2 Mar 2001 - 2 Apr 2012                              ◄  07  ►
                                             2001  2002  2004

**Products & Solutions**  **Partners & Channels**  **Keychain Storage**  **Corporate**  **Support**  **Contact Us**  **Home**

Products
Applications
SDK

# Products & Solutions

## Applications

DiskOnKey-enabled devices are the only devices that combine storage capabilities with an ARM7 32-bit processor. This makes DiskOnKey powered devices the only devices that can run applications, making them as mobile as your data!

Applications based on the DiskOnKey platform are a great way to extend your device's functionality. Download any application to secure files, personalize your interface and more.

### MyKey

MyKey, the newest application based on the DiskOnKey platform, lets you take things personally. It offers a fun and personal alternative to using your browser, and a great way to easily customize your DiskOnKey device. The small and simple Graphic User Interface lets you designate files that you use frequently for quick and easy transfer, choose language preferences, set audio or visual indications for new data, and more.

**Download Now**

### KeySafe

KeySafe, the new security application based on the DiskOnKey platform, ensures the confidentiality of your private data. You can use this application to save all your confidential data in an off-limits, password-protected area.

**Download Now**

### DiskOnKey Upgrade

DiskOnKey Upgrade lets you upgrade your DiskOnKey device remotely with the most up-to-date firmware version. It supports a complete range of customization and enhanced functionality applications, such as KeySafe, to protect your data.

**Download Now**

© 2002 DiskOnKey. All rights reserved  |  Legal terms of use  |  Webmaster

Ingenico Inc. v. IOENGINE LLC
**DX-402**
C.A. No. 18-cv-00826-WCB

**Exhibit
0058**
Sobol

**DX-402.1**
**Appx11305**



Ingenico Inc. v. IOENGINE LLC

**DX-403**

C.A. No. 18-cv-00826-WCB

Exhibit
0060
Sobol

DX-403.1

**Appx11306**

Appx11397

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx11398 to Appx11399

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16485 to Appx16501

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16553

ELECTRONIC APPENDIX MATERIAL UNABLE TO BE PRODUCED IN
PAPER PURSUANT TO FCR 30(i)

Appx16560 to Appx16562

REMOVED DUE TO CONFIDENTIAL MATERIAL



# PC
# MAGAZINE

ww.pcmag.com

**JULY 2001**

DELIVERY      PC magaz'...
DESK          v. 20
              no. 13
JSP           Jul 2001
90--47        **DO NOT CLAIM. CHECK WITH
SIRI          RM. 108 FOR MISSING ISSUES

## EXTREMETECH
www.ExtremeTech.com

Bill Machrone
Editor-in-Chief
ExtremeTech.com

Dear PC Magazine Subscriber,

If you share my passion for technology, I've got great news for you.

**Introducing ExtremeTech, www.ExtremeTech.com**

Written and edited by a hand-picked expert staff, and backed by the unmatched resources and experience of PC Magazine's and Ziff Davis's testing labs, ExtremeTech's dedicated to bringing you more information, more technical detail, more inside scoop on how and why things work the way they do:

> Thorough, pull-no-punches reviews, analysis and benchmark tests of the latest hardware, the hottest software tools, languages and the new development environments.

> In-depth coverage, explanation and discussion of tomorrow's technologies and gear like digital imaging, wireless, state-of-the-art audio, the new storage media.

> The Resource Center, an extensive library of links to great resources including, useful technology sites, white papers, newsletters, FAQs, and books.

> Penetrating, honest investigation and real-world testing of operating systems and their applications.

And there's more to ExtremeTech than deep information. The best part might just be the debates, the questions answered and the sheer fun that comes from being part of one of the most savvy, opinionated and experienced technology communities anywhere.

I hope you'll join us today at ExtremeTech!

Bill

*BXBHFGD*****CAR-RT LOT**B095
*B8762233889 9*58N0006      LQ
B5675872-SWETS        MAY 21 02
NY PUB LIB SCI IND-BUS    BALA
BOX 2233-GRND CNTRL STA *0999
NEW YORK        NY  10163-2233

N.Y.P.L.
JUN - 2001

C.A. No. 18-826-WCB (D.Del.)
IOENGINE Trial Exhibit

PX-222

IOENGINE013926

PX-222-0001

Appx16566

CHRISTINA WOOD

# Implications

## The Myth of E-Books



We're being brainwashed to believe that books will disappear, thanks to e-book technology. Thousands of readers flocked to download Stephen King's novel *Riding the Bullet* in 2000, turning it into an unprecedented publishing event. But I prefer paper. In fact, I'm in the middle of four bound books right now. I read three magazines, a newspaper, and several catalogs every day. And frankly, I like the portrait this mess creates on my bedside table.

But for the sake of science, I recently got my hands on the latest Franklin eBookMan and downloaded both Microsoft Reader and Adobe Acrobat eBook Reader. Then I browsed Amazon.com for offerings on its e-book page. There were a collection of stories by fiction writer James Ellroy and a travel book I wanted, so I paid for and downloaded them. One advantage of the e-book is that delivery is instant. I waited only a few minutes for a link to arrive via e-mail.

But then things got dicey. Microsoft Reader crashed my computer. I moved to another PC to download it again, but I still had to activate it, which meant signing up for a Microsoft Passport account. The whole rigmarole cost me hours—about as long as reading a short novel takes.

I still wanted to read the Ellroy works, but I found the eBookMan screen too small, my PC screen fuzzy, and the whole experience annoying.

But even Ellroy—who still writes with pen and paper—is buying into the e-book bill of goods. He states in his introduction: "This cutting-edge s**t may perplex and befuddle—but the bottom line stands out clear: e-book publishing gets you more readers." But does it?

In short, what we have here is an early stab at what might someday be a cool technology. It needs a lot of work. The screens need help. How about one that's a readable size? Somewhere between a laptop's and a hand-held would be good, but the reflectivity and luminance contrast have to get closer to paper, something MIT and others are working on with digital paper. For now, I can't see anyone opting to read on a device that requires using dim lighting, getting out of the sun, and holding it at just the right angle.

Another problem is the hassle involved in hooking an e-book to the Net. I'll just say: "Wireless?" Then, of course, there is the issue of short battery life. Only a ninny would willingly endure all this when a paper book asks only that you lift and open.

I can say with no embarrassment that nothing about this technology will turn me against paper anytime soon. In fact, a study published by The Electronic Document Systems Foundation (*www.edsf.org*) predicts that the likelihood of people reading novels or even magazines digitally in the future is low.

The chance that they will read digital reference materials, professional journals, and reports, however, is good. If I were a doctor, lawyer, or student who had to cart lots of books around, I might be able to put up with the hassles even now. I'd love to have every reference book I'll ever need in my purse.

Frank Romano, professor of digital publishing at the Rochester Institute of Technology in Rochester, New York, and the man who commissioned the EDSF study, believes we'll all still be reading paper books 50 years from now, because it's not just the technology that has to change. People have to change.

"We have had 500 years to get used to paper. We grew up with it," says Romano, adding that our children's children—who have grown up reading, studying, and playing on computer screens—will adopt digital books. By then, we'll probably have sorted out the muddy intellectual-property-rights issues that surround digital publishing, and the technology (including the screens) will have been perfected.

Of course, not being a member of this future generation, I am by definition unable to understand it. But I still don't buy the prediction. As a culture, we treasure the manuscripts of our favorite authors. Books that were held in the hands of people who lived and died before we existed take on a weight that has nothing to do with the words on the page. And most homes hold at least one area that acts as a shrine to our books—a place that displays what interests us, what we dream about, and what we've studied.

And as if it's trying to agree with me, my eBookMan just ran out of battery power. But that stack of magazines and books in the corner is good to go.

**MORE ON THE WEB:** *You can contact Christina Wood at christinawood@mindspring.com. Check out more opinions at* **www.pcmag.com/opinions.**

> I can say with no embarrassment that nothing about this technology will turn me against paper anytime soon.

IOENGINE014145

PX-222-0220

Appx16785



This June, the leading companies and conferences in technology take center stage in New York City.

# TECHXNY

**Limited Engagement. One Week Only.**

**At PC EXPO**, the expo portion of TECHXNY, you'll find mobile & wireless, business solutions, leading-edge Internet security advances, ASPs, the latest in Linux, storage technologies and more. The best products, services and real-world solutions—all delivered by the best vendors and solutions providers in the IT industry.

**Conference Dates:** June 25-28, 2001
**Exposition Dates:** June 26-28, 2001
**Location:** Javits Center, New York City

**TECHXNY's** full week of conferences, education summits and special events has something for just about everyone. The IT Innovation Conference focusing on innovative security solutions... an IT infrastructure built for speed... top-notch information-sharing architecture...Best of Brainshare...SAN and Clustering Summits... and the wide, wide, wireless world.

There's the **Finance Exchange. Touched by an Angel** for entrepreneurs. **eTV World. Solutions Integrator Think Tech. PC Career Expo. Working Woman's W.E.S.T. Awards.** Compelling keynotes. And still more targeted programs and events are on their way to bring you the cutting-edge of IT today.

To learn all about what there is to see, do, hear, and learn at TECHXNY this June, log on to **www.techxny.com**. And while you're there, make sure to register right away!

**Flagship Sponsors**

    

**Sponsor of IT Innovation Conference**

 

**Platinum Sponsors**

  

**Gold Sponsors**

 

**Keynote Sponsor**



**W.E.S.T. Awards**



**REGISTER TODAY AT: www.techxny.com**   Use source code: **M3AA**

   TECHXNY   

IOENGINE014146

BILL HOWARD

# On Technology

## Online Investing: It's All About Blame



The past year was not good to my investments. I'm to blame for not paying more attention to the market. But in an era when a sugar high or a flashback to some childhood trauma is considered a plausible defense for criminals, I'd like my personal-finance software and its creators to share some of the blame for the sorry state of affairs.

Even with Intuit's Quicken and Microsoft Money approaching two decades of service (by now, you would assume they'd be close to perfect), I find so much lacking in both the disk-based products and their affiliated online services. The time I wasted getting everything sorted out and accurate is time I could have spent developing smarter investment strategies.

For keeping an accurate checkbook register, downloading and sorting credit card statements, and showing stock price histories, personal-finance software is great and has been for years. But when it comes to tracking my investments, I've found that coming up with errors for anything trickier than a stock buy-and-hold is easy. If the stock splits, a company is acquired, or you exercise a stock option, the chances increase that you'll make a mistake figuring out how to record the transaction. There aren't enough wizards to guide you through complex situations, and the ones that exist don't help enough.

I wish Quicken.com and MSN MoneyCentral maintained databases of all the common stock splits and takeovers with dates and split ratios. And if you entered something approximating the right information, the next time you went online, these sites would offer you the option to correct a miscalculated transaction. Virtually every investment I hold needs some kind of entry adjustment at the end of each year to bring it into sync with the paper statement.

Another ongoing problem lies with financial houses that burden customers with odd rules. Want to check your stock holdings at E*Trade? Log on any time and be its guest. Want to download the same info to Money or Quicken? Sorry, not during business hours (9:00 to 5:00 eastern time). Want to track your Citibank accounts and other finances at Citibank online? No charge. Want to use Quicken to get the same information? Citibank tags you with $9.95 a month for the privilege. What's going on is

pretty clear: All the financial houses want you to see their ads alongside your financial information. And if they cannot control you, they want you to pay for taking information and using it in the most convenient way. That's what I would do if I ran a bank, and that's what I dislike when I'm a customer of the bank.

To reduce the clutter of paper statements, I took Fidelity.com up on its offer of electronic statement viewing. What a horror show! You have to go get the statement online; it isn't e-mailed to you. On my home desktop, the preferred Adobe Acrobat–format statement doesn't display properly. If I try to print the less accurate HTML version, only the first page comes out. Trying and failing to view the same statements on my notebook, I'm told to check the Microsoft ActiveX Gallery for a viewer. Heck, trees are a renewable resource, so I'm going back to paper.

Then there's the lack of sophistication and customer service. E*Trade's OptionsLink refuses my log on if I enter hyphens in my Social Security number. For years I used CheckFree to automate my check writing, but the price went up, and upstart Trans-Point offered more bells and whistles for less, so I switched. Later, CheckFree bought TransPoint, so I'm back at square one. The password for the "new and improved" merged account arrived a week late. Once again, I can set recurring payments—but not record the check numbers of paper checks. How hard can that be? And I'm still waiting for electronic bill presentment (where your bill comes electronically and you pay it electronically) to be adopted by more than a handful of vendors.

To paraphrase an old French proverb, le banquier bon est un banquier stupide (the best banker is a stupid banker). That makes sense when you're trying to borrow a ton of the bank's money without much credit. The problem is that some such bankers' descendants appear to have gravitated to online and personal finance. So if you're having trouble keeping your finances in tip-top shape electronically, go ahead and ask them to share the blame.

**MORE ON THE WEB:** *If you'd like to contact Bill Howard, you can reach him at bill_howard@ziffdavis.com. For more opinions, check out* www.pcmag.com/opinion.

> The time I wasted is time I could have spent developing smarter investment strategies.

www.pcmag.com JULY 2001 PC MAGAZINE 225

IOENGINE014147

PX-222-0222

Appx16787

Appx16795 to Appx16797

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16798 to Appx16799

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16800 to Appx16801

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16802

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16803

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx16804 to Appx16805

REMOVED DUE TO CONFIDENTIAL MATERIAL

Appx18000

PHYSICAL EXHIBIT IN THE CUSTODY OF COUNSEL

# PHYSICAL EXHIBIT



C.A. No. 18-826-WCB (D.Del.)
iOENGINE Trial Exhibit

PX-434

PX-434-0001

Appx18000



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 13, 2019

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE
RECORDS OF THIS OFFICE:

COLOR DRAWINGS DATED MARCH 23, 2004 FOR
SERIAL NUMBER: *10/807,731*
FILING DATE: *March 23, 2004*
PATENT NUMBER: *7,861,006*
ISSUE DATE: *December 28, 2010*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. Tan

**M. TARVER**
**Certifying Officer**

C.A. No. 18-826-WCB (D.Del.)
IOENGINE Trial Exhibit

**PX-543**



Figure 1

22859  U.S. PTO
10/807731
032304

Appx18152



Figure 2

PX-543-0003



**Figure 3**

Engage TCAP with Access Terminal (e.g., via BT, WiFi, USB, etc.) 3 05

1 30  AT 3 27

TCAP powers up 3 10

TCAP loads/accesses operating system 3 15

TCAP provides memory space to Access Terminal (AT) 3 20

AT accesses/mounts the TCAP memory space 3 25

1 25

Is AT capable of accessing instructions in TCAP memory? 3 30

N

Fuji Film 3 42
desktoptool.exe

User engages TCAP memory to issue instruction signals (e.g., executes a TCAP application by double-clicking mounted TCAP) 3 40

Is a TCAP driver loaded? 3 35

Y

Y

AT executes instructions from TCAP memory to provide I/O for TCAP 3 45

Engage Tunneling Client Access Point (TCAP) 3 01

Execution 3 98



Display Error Message (e.g., please go online to register or login again) 4 35

Continue 4 98

Display Error Message (e.g., please go online to register or login) 4 25

Display login/ registration welcome screen 4 05

Log in My Account
Username
Password
☐ Register
☐ Forgotten a Password
☐ Forget questions
2 05a

User selection 4 10

Logging in? 4 15

Is AT online? 4 20

N

Is user registered? 4 30

User Provides Registration Information 4 40

4 40a

Provide Options (e.g., online(dimmed if not online)/USB storage) 4 53

Unique user? All Info? 4 45

Display Error Message (e.g., Information incomplete, please re-enter; User exists, please choose different name; etc.) 4 50

4 53a

Is AT online? 4 55

Synchronize on and off-line storage? 4 70

Synchronize 4 75

N

N

Provide TCAP off-line options (e.g., run program) 4 60

Provide all TCAP options (e.g., run program, order prints, print documents, etc.) 4 80

Allow user to access/ execute/store data/ programs on TCAP off-line (e.g., decrypt) 4 65

Allow user to access/ execute/store data/ programs on TCAP and at remote server (e.g., decrypt) 4 85

Figure 4



Figure 5

PX-543-0006
Appx18156



Figure 6



Figure 7



Figure 8

PX-543-0009

Appx18159



PX-543-0010

Appx18161

REMOVED DUE TO CONFIDENTIAL MATERIAL

**Query    Reports    Utilities    Help    Log Out**

APPEAL,CASREF,PATENT

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:18-cv-00826-WCB

Ingenico Inc. v. IOENGINE LLC                          Date Filed: 06/01/2018
Assigned to: Judge William C. Bryson                   Date Terminated: 12/09/2022
Related Case: 1:18-cv-00452-WCB                         Jury Demand: Defendant
Case in other court: Federal Circuit, 23-01367         Nature of Suit: 830 Patent
Cause: 35:271 Patent Infringement                      Jurisdiction: Federal Question

**Plaintiff**

**Ingenico Inc.**                    represented by   **Frederick L. Cottrell , III**
                                                      Richards, Layton & Finger, PA
                                                      One Rodney Square
                                                      Suite 600
                                                      920 N. King Street
                                                      Wilmington, DE 19801
                                                      (302) 658-6541
                                                      Email: cottrell@rlf.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Christine Dealy Haynes**
                                                      Richards, Layton & Finger
                                                      920 North King Street
                                                      Wilmington, DE 19801
                                                      302-651-7508
                                                      Email: haynes@rlf.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Joel R. Leeman**
                                                      Email: jleeman@sunsteinlaw.com
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Kerry L. Timbers**
                                                      Email: KTimbers@sunsteinlaw.com
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Kevin R. Mosier**
                                                      Email: kmosier@sunsteinlaw.com
                                                      *PRO HAC VICE*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lisa M. Tittemore**
                                                      Email: LTittemore@sunsteinlaw.com

**Appx18162**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sharona H. Sternberg**
Email: ssternberg@sunsteinlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**IOENGINE LLC**                    represented by    **Beth Ann Swadley**
Young, Conaway, Stargatt & Taylor LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
302-571-6600
*TERMINATED: 12/10/2019*
*LEAD ATTORNEY*

**Eve H. Ormerod**
Smith, Katzenstein, & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
302-652-8400
Fax: 302-652-8405
Email: eormerod@skjlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neal C. Belgam**
Smith, Katzenstein, & Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
Email: nbelgam@skjlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Derek J. Brader**
Email: derek.brader@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gregory T. Chuebon**
Email: greg.chuebon@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Judah Bellin**
Email: Judah.Bellin@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Appx18163**

**Luke M. Reilly**
Email: luke.reilly@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael A. Fisher**
Email: michael.fisher@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael H. Joshi**
Email: michael.joshi@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah M. Leibowitz**
Email: noah.leibowitz@dechert.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**IOENGINE LLC**                represented by **Beth Ann Swadley**
(See above for address)
*TERMINATED: 12/10/2019*
*LEAD ATTORNEY*

**Eve H. Ormerod**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neal C. Belgam**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory T. Chuebon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Noah M. Leibowitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ingenico Corp.**             represented by **Frederick L. Cottrell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appx18164**

**Christine Dealy Haynes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin R. Mosier**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Ingenico Group S.A.**                represented by **Christine Dealy Haynes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Frederick L. Cottrell , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin R. Mosier**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Ingenico Inc.**                represented by **Frederick L. Cottrell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Dealy Haynes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel R. Leeman**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/01/2018 | 1 | COMPLAINT FOR DECLARATORY JUDGMENT OF NONINFRINGEMENT filed against IOENGINE LLC - Magistrate Consent Notice to Pltf. ( Filing fee $ 400, receipt number 0311-2392684.) - filed by Ingenico Inc. (Attachments: # 1 Exhibits A-C, # 2 Civil Cover Sheet)(ceg) (Entered: 06/01/2018) |
| 06/01/2018 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (ceg) (Entered: 06/01/2018) |
| 06/01/2018 | 3 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) 8,539,047; 9,059,969; 9,774,703. (ceg) (Entered: 06/01/2018) |
| 06/01/2018 | 4 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Ingenico Corp. for Ingenico Inc. filed by Ingenico Inc. (ceg) (Entered: 06/01/2018) |
| 06/01/2018 |  | Summons Issued with Magistrate Consent Notice attached as to IOENGINE LLC on 6/1/2018. Requesting party or attorney should pick up issued summons at the Help Desk, |

**Appx18165**

| | | Room 4209, or call 302-573-6170 and ask the Clerk to mail the summons to them. (ceg) (Entered: 06/01/2018) |
|---|---|---|
| 06/01/2018 | 5 | SUMMONS Returned Executed by Ingenico Inc.. IOENGINE LLC served on 6/1/2018, answer due 6/22/2018. (Cottrell, Frederick) (Entered: 06/01/2018) |
| 06/06/2018 | | Case Assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 06/06/2018) |
| 06/19/2018 | 6 | Joint STIPULATION TO EXTEND TIME to Move, Answer or Otherwise respond to the Complaint to August 3, 2018 - filed by IOENGINE LLC. (Belgam, Neal) (Entered: 06/19/2018) |
| 06/20/2018 | | SO ORDERED - re 6 Joint STIPULATION TO EXTEND TIME to Move, Answer or Otherwise respond to the Complaint to August 3, 2018 filed by IOENGINE LLC, Set/Reset Answer Deadlines: IOENGINE LLC answer due 8/3/2018.. Ordered by Judge Gregory M. Sleet on 6/20/2018. (mdb) (Entered: 06/20/2018) |
| 06/28/2018 | 7 | NOTICE of Subpoena to Netsuite Inc. by Ingenico Inc. (Attachments: # 1 Exhibit 1) (Haynes, Christine) (Entered: 06/28/2018) |
| 07/18/2018 | 8 | NOTICE OF SERVICE of Subpoena on Netsuite Inc. filed by Ingenico Inc.. (Attachments: # 1 Exhibit 1)(Haynes, Christine) (Entered: 07/18/2018) |
| 08/02/2018 | 9 | Joint STIPULATION TO EXTEND TIME to Move, Answer or Otherwise Respond to the Complaint to August 17, 2018 - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/02/2018) |
| 08/02/2018 | | SO ORDERED - re 9 Joint STIPULATION TO EXTEND TIME to Move, Answer or Otherwise Respond to the Complaint to August 17, 2018 filed by IOENGINE LLC, Set/Reset Answer Deadlines: IOENGINE LLC answer due 8/17/2018.. Ordered by Judge Gregory M. Sleet on 8/2/2018. (mdb) (Entered: 08/02/2018) |
| 08/02/2018 | 10 | MOTION for Pro Hac Vice Appearance of Attorney Noah M. Leibowitz and Gregory T. Chuebon - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/02/2018) |
| 08/06/2018 | | SO ORDERED, re 10 MOTION for Pro Hac Vice Appearance of Attorney Noah M. Leibowitz and Gregory T. Chuebon filed by IOENGINE LLC. Ordered by Judge Gregory M. Sleet on 8/6/2018. (asw) (Entered: 08/06/2018) |
| 08/07/2018 | | Pro Hac Vice Attorney Noah M. Leibowitz,Gregory T. Chuebon for IOENGINE LLC added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (crb) (Entered: 08/07/2018) |
| 08/09/2018 | 11 | MOTION for Pro Hac Vice Appearance of Attorney Kerry L. Timbers, Lisa M. Tittemore, Joel R. Leeman and Sharona H. Sternberg of Sunstein Kann Murphy & Timbers LLP - filed by Ingenico Inc.. (Haynes, Christine) (Entered: 08/09/2018) |
| 08/10/2018 | | SO ORDERED, re 11 MOTION for Pro Hac Vice Appearance of Attorney Kerry L. Timbers, Lisa M. Tittemore, Joel R. Leeman and Sharona H. Sternberg of Sunstein Kann Murphy & Timbers LLP filed by Ingenico Inc. Ordered by Judge Gregory M. Sleet on 8/10/2018. (asw) (Entered: 08/10/2018) |
| 08/13/2018 | | Pro Hac Vice Attorney Joel R. Leeman for Ingenico Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (ceg) (Entered: 08/13/2018) |
| 08/17/2018 | 12 | ANSWER to 1 Complaint, with Jury Demand, and Affirmative Defenses, COUNTERCLAIM against Ingenico Inc., Ingenico Corp., Ingenico Group S.A. by |

**Appx18166**

|            |    | IOENGINE LLC.(Ormerod, Eve) Modified on 8/20/2018 (mdb). (Entered: 08/17/2018) |
|------------|----|---------------------------------------------------------------------------------|
| 08/17/2018 | 13 | Disclosure Statement pursuant to Rule 7.1: No Parents or Affiliates Listed filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/17/2018) |
| 08/20/2018 | 14 | ORDER REGARDING CASE MANAGEMENT IN CIVIL CASES. Signed by Judge Gregory M. Sleet on 8/20/2018. (asw) (Entered: 08/20/2018) |
| 08/20/2018 |    | Pro Hac Vice Attorney Lisa M. Tittemore,Kerry L. Timbers,Sharona H. Sternberg for Ingenico Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (crb) (Entered: 08/20/2018) |
| 08/21/2018 | 15 | MOTION for Pro Hac Vice Appearance of Attorney Derek J. Brader - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/21/2018) |
| 08/23/2018 |    | Summons Issued with Magistrate Consent Notice attached as to Ingenico Corp. on 8/23/2018. (sar) (Entered: 08/23/2018) |
| 08/24/2018 | 16 | Return of Service Executed by IOENGINE LLC. Ingenico Corp. served on 8/23/2018, answer due 9/13/2018. (Ormerod, Eve) (Entered: 08/24/2018) |
| 08/28/2018 |    | SO ORDERED - re 15 MOTION for Pro Hac Vice Appearance of Attorney Derek J. Brader filed by IOENGINE LLC. Ordered by Judge Gregory M. Sleet on 8/28/2018. (mdb) (Entered: 08/28/2018) |
| 08/30/2018 |    | Summons Issued with Magistrate Consent Notice attached as to Ingenico Group S.A. on 8/30/2018. (nmg) (Entered: 08/30/2018) |
| 08/30/2018 | 17 | STIPULATION TO EXTEND TIME to move, answer or otherwise respond to Defendant's counterclaims to October 9, 2018 - filed by Ingenico Corp., Ingenico Inc.. (Cottrell, Frederick) (Entered: 08/30/2018) |
| 08/31/2018 | 18 | AFFIDAVIT of Service for Summons, Answer and Counterclaim and related papers served on Ingenico Group S.A. on 8/31/2018, filed by IOENGINE LLC. (Attachments: # 1 Exhibits A and B)(Ormerod, Eve) (Entered: 08/31/2018) |
| 09/04/2018 |    | SO ORDERED - re 17 STIPULATION TO EXTEND TIME to move, answer or otherwise respond to Defendant's counterclaims to October 9, 2018 filed by Ingenico Inc., Ingenico Corp.. Ordered by Judge Gregory M. Sleet on 9/4/2018. (mdb) (Entered: 09/04/2018) |
| 09/07/2018 | 19 | NOTICE OF SERVICE of Defendant/Counterclaim Plaintiff IOENGINE, LLC's (1) Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1); (2) Initial Disclosures Pursuant to Section 3 of the Default Standard of Discovery, Including Discovery of Electronically Stored Information; and (3) Disclosures Pursuant to Section 4(a) of the Default Standard of Discovery, Including Discovery of Electronically Stored Information filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 09/07/2018) |
| 09/11/2018 |    | Pro Hac Vice Attorney Derek J. Brader for IOENGINE LLC added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. Associated Cases: 1:18-cv-00826-GMS, 1:18-cv-00452-GMS(ceg) (Entered: 09/11/2018) |
| 09/13/2018 | 20 | STIPULATION TO EXTEND TIME for Ingenico Group S.A. to move, answer or otherwise respond to Defendant's counterclaims to and including October 9, 2018 - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 09/13/2018) |

**Appx18167**

| 09/14/2018 |    | SO ORDERED - re 20 STIPULATION TO EXTEND TIME for Ingenico Group S.A. to move, answer or otherwise respond to Defendant's counterclaims to and including October 9, 2018 filed by Ingenico Inc., Ingenico Corp., Ingenico Group S.A.. Ordered by Judge Gregory M. Sleet on 9/14/2018. (mdb) (Entered: 09/14/2018) |
| 09/18/2018 | 21 | NOTICE OF SERVICE of Ingenico Inc. and Ingenico Corp.'s Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) filed by Ingenico Corp., Ingenico Inc..(Haynes, Christine) (Entered: 09/18/2018) |
| 09/19/2018 | 22 | Joint STATUS REPORT by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 09/19/2018) |
| 09/19/2018 | 23 | Joint PROPOSED ORDER Scheduling Order by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A)(Cottrell, Frederick) (Entered: 09/19/2018) |
| 09/20/2018 |    | Case reassigned to Judge Colm F. Connolly. Please include the initials of the Judge (CFC) after the case number on all documents filed. Associated Cases: 1:18-cv-00452-CFC, 1:18-cv-00826-CFC (rjb) (Entered: 09/20/2018) |
| 09/20/2018 |    | ORAL ORDER: Pursuant to the reassignment of this action, the parties shall submit a joint status report on or before October 4, 2018. Please identify in the status report the next event the parties believe the Court needs to schedule. (Status report due 10/4/2018.) Ordered by Judge Colm F. Connolly on September 20, 2018. Associated Cases: 1:18-cv-00452-CFC, 1:18-cv-00826-CFC(nmf) (Entered: 09/20/2018) |
| 09/27/2018 |    | Summons Reissued with Magistrate Consent Notice attached as to Ingenico Group S.A. (jcs) (Entered: 09/27/2018) |
| 10/01/2018 | 24 | ORDER: IT IS ORDERED that on or before October 22, 2018, each party or each party group shall email to Chief Magistrate Judge Thynge, with a copy to her Judicial Administrator, Cathleen Kennedy, information requested regarding ADR. SEE ORDER FOR DETAILS. Signed by Judge Mary Pat Thynge on 10/1/18. (cak) (Entered: 10/01/2018) |
| 10/04/2018 | 25 | Joint STATUS REPORT *Pursuant to the Court's September 20, 2018 Oral Order* by IOENGINE LLC. (Ormerod, Eve) (Entered: 10/04/2018) |
| 10/09/2018 | 26 | MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order)(Cottrell, Frederick) (Entered: 10/09/2018) |
| 10/09/2018 | 27 | OPENING BRIEF in Support re 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Answering Brief/Response due date per Local Rules is 10/23/2018. (Cottrell, Frederick) (Entered: 10/09/2018) |
| 10/09/2018 | 28 | DECLARATION re 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim *of Ward D. Hewins* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 10/09/2018) |
| 10/18/2018 | 29 | NOTICE OF SERVICE of (1) First Set of Requests for Production of Documents to Ingenico Inc., Ingenico Corp. and Ingenico Group S.A.; and (2) First Set of Interrogatories to Ingenico Inc., Ingenico Corp. and Ingenico Group S.A. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 10/18/2018) |
| 10/19/2018 | 30 | NOTICE OF SERVICE of (1) Ingenico Inc. and Ingenico Corp.'s First Amended Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) and (2) Ingenico Inc. and Ingenico Corp.'s Initial Disclosures Pursuant to Section 3 of the Delaware Default Standard for |

**Appx18168**

| | | Discovery filed by Ingenico Corp., Ingenico Inc..(Haynes, Christine) (Entered: 10/19/2018) |
|---|---|---|
| 10/23/2018 | 31 | AFFIDAVIT of Service for Alias Summons, Answer and Counterclaims and related documents served on Ingenico Group S.A., filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 10/23/2018) |
| 10/23/2018 | 32 | Joint STIPULATION to Extend the Deadline to file the Answering Brief in Opposition to the Motion to Dismiss to October 24, 2018, and the Deadline to file the Reply Brief in Further Support of the Motion to Dimiss to November 1, 2018 by IOENGINE LLC. (Ormerod, Eve) (Entered: 10/23/2018) |
| 10/24/2018 | | SO ORDERED, re 32 Stipulation filed by IOENGINE LLC. Set Briefing Schedule: re 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim. (Answering Brief due 10/24/2018., Reply Brief due 11/1/2018.). Signed by Judge Colm F. Connolly on 10/24/2018. (fms) (Entered: 10/24/2018) |
| 10/24/2018 | 33 | ANSWERING BRIEF in Opposition re 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim filed by IOENGINE LLC.Reply Brief due date per Local Rules is 10/31/2018. (Ormerod, Eve) (Entered: 10/24/2018) |
| 10/24/2018 | 34 | DECLARATION re 33 Answering Brief in Opposition, -- *Declaration of Gregory T. Chuebon, Esq.* -- by IOENGINE LLC. (Attachments: # 1 Exhibits 1-26)(Ormerod, Eve) (Attachment 1 replaced on 10/25/2018) (fms). (Entered: 10/24/2018) |
| 10/25/2018 | | CORRECTING ENTRY: The exhibits attached to D.I. 24 have been removed and replaced with color exhibits per request of filer. (fms) (Entered: 10/25/2018) |
| 11/01/2018 | 35 | REPLY BRIEF re 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 11/01/2018) |
| 11/01/2018 | 36 | DECLARATION re 35 Reply Brief *of Sharona H. Sternberg in Support of Defendants' Motion to Dismiss* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-B)(Cottrell, Frederick) (Entered: 11/01/2018) |
| 11/05/2018 | 37 | Order Setting Scheduling Conference: A Scheduling Conference is set for 11/29/2018 at 03:00 PM in Chambers before Judge Colm F. Connolly. All scheduling orders and deadlines previously entered for these cases are vacated. Signed by Judge Colm F. Connolly on 11/5/2018. Associated Cases: 1:18-cv-00452-CFC, 1:18-cv-00826-CFC(nmf) (Entered: 11/05/2018) |
| 11/08/2018 | 38 | REQUEST for Oral Argument by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. re 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim. (Cottrell, Frederick) (Entered: 11/08/2018) |
| 11/09/2018 | 39 | PROPOSED ORDER Protective Order Regarding the Disclosure and Use of Discovery Materials by IOENGINE LLC. (Ormerod, Eve) (Entered: 11/09/2018) |
| 11/13/2018 | 40 | AGREED PROTECTIVE ORDER. Signed by Judge Colm F. Connolly on 11/13/2018. (fms) (Entered: 11/13/2018) |
| 11/19/2018 | 41 | NOTICE OF SERVICE of (1) Ingenico Inc. and Ingenico Corp.'s Response to IOENGINE, LLC's First Set of Interrogatories; (2) Ingenico Group S.A.'s Response to IOENGINE, LLC's First Set of Interrogatories; (3) Ingenico Inc. and Ingenico Corp.'s Response to IOENGINE, LLC's First Set of Requests for Production of Documents; and (4) Ingenico Group S.A.'s Response to IOENGINE, LLC's First Set of Requests for |

**Appx18169**

| | | |
|---|---|---|
| | | Production of Documents filed by Ingenico Corp., Ingenico Inc..(Haynes, Christine) (Entered: 11/19/2018) |
| 11/27/2018 | 42 | Joint PROPOSED ORDER -- Proposed Scheduling Order -- by IOENGINE LLC. (Ormerod, Eve) (Entered: 11/27/2018) |
| 11/28/2018 | | ORAL ORDER that the Scheduling Conference set for 11/29/2018 at 03:00 PM is cancelled as these cases are to be reassigned to another judge. The Court apologizes for any inconvenience. Ordered by Judge Colm F. Connolly on 11/28/2018. Associated Cases: 1:18-cv-00826-CFC, 1:18-cv-00452-CFC(nmf) (Entered: 11/28/2018) |
| 11/29/2018 | | Case Reassigned to Judge William C. Bryson of the United States Court of Appeals for the Federal Circuit. Please include the initials of the Judge (WCB) after the case number on all documents filed. (nms) (Entered: 11/29/2018) |
| 11/29/2018 | 43 | ORDER Setting Hearing on Motion: Oral arguments on the motions to dismiss in these cases, Case No. 18-452, Dkt. No. 8, and Case No. 18-826, Dkt. No. 26 , will be held on Monday, December 17, 2018, at 2:00 p.m., in Courtroom 4A of the J. Caleb Boggs Federal Building and Courthouse in Wilmington, Delaware before Judge William C. Bryson. Signed by Judge William C. Bryson on 11/29/2018. (ceg) (Entered: 11/29/2018) |
| 12/14/2018 | 44 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding additional authority in support of Ingenico's Motion to Dismiss. (Attachments: # 1 Attachments)(Cottrell, Frederick) (Entered: 12/14/2018) |
| 12/14/2018 | 45 | NOTICE of Supplemental Authority by IOENGINE LLC re (44 in 1:18-cv-00826-WCB) Letter (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Belgam, Neal) (Entered: 12/14/2018) |
| 12/18/2018 | 46 | [SEALED] NOTICE of Supplemental Facts by IOENGINE LLC (Attachments: # 1 Exhibit A)(Ormerod, Eve) Modified on 12/18/2018 (nmg). (Entered: 12/18/2018) |
| 12/20/2018 | 47 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding response to IOENGINE's Notice of Supplemental Facts - re 46 Notice (Other). (Cottrell, Frederick) (Entered: 12/20/2018) |
| 12/20/2018 | 48 | NOTICE OF SERVICE of (1) Ingenico Inc. and Ingenico Corp.'s First Set of Interrogatories to IOENGINE; and (2) Ingenico Inc. and Ingenico Corp.'s First Set of Requests for Production of Documents to IOENGINE filed by Ingenico Corp., Ingenico Inc..(Haynes, Christine) (Entered: 12/20/2018) |
| 12/20/2018 | 49 | [SEALED] Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Letter in Response to Ingenico's December 20, 2018 Letter. (Ormerod, Eve) (Entered: 12/20/2018) |
| 12/21/2018 | 50 | Official Transcript of Hearing held on 12/17/2018 before Judge William C. Bryson. Court Reporter/Transcriber Dale C. Hawkins,Telephone number 573-6196. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/11/2019. Redacted Transcript Deadline set for 1/22/2019. Release of Transcript Restriction set for 3/21/2019. (dh) (Entered: 12/21/2018) |
| 12/27/2018 | 51 | REDACTED VERSION of 49 Letter *to The Honorable William C. Bryson from Eve H. Ormerod regarding Letter in Response to Ingenico's December 20, 2018 Letter.* by IOENGINE LLC. (Ormerod, Eve) (Entered: 12/27/2018) |
| 01/11/2019 | 52 | SCHEDULING ORDER: Case referred to the Magistrate Judge for the purpose of exploring ADR. Joinder of Parties due by 6/4/2019. Dispositive Motions due by |

| | | |
|---|---|---|
| | | 3/15/2020. Answering Brief due 4/15/2020. Reply Brief due 4/29/2020. Claim Construction Opening Brief due by 7/15/2019. Claim Construction Answering Brief due by 8/1/2019. Claim Construction Reply Brief due by 8/15/2019. Claim Construction Surreply Brief due by 8/25/2019. This matter is scheduled for two five-day jury trials. The trial in No. 18-452, IOENGINE, LLC v. PayPal Holdings, Inc. will be held on a date to be determined in July 2020. The trial in No. 18-826, IOENGINE, LLC v. Ingenico Inc. et al. and Ingenico Inc. v. IOENGINE, LLC, will be held on a date to be determined in August 2020. The trial will be timed, and each party will be allocated a total of 12 hours in which to present their respective cases, not counting opening statements and closing arguments. (See Order for further details). Signed by Judge William C. Bryson on 1/11/2019. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 01/11/2019) |
| 01/14/2019 | | CASE REFERRED to Chief Magistrate Judge Mary Pat Thynge for Mediation. Please see Standing Order dated January 20, 2016, regarding disclosure of confidential ADR communications. A link to the standing order is provided here for your convenience at http://www.ded.uscourts.gov/general-orders/magistrate-judges-standing-order-adr-mediation (cak) (Entered: 01/14/2019) |
| 01/18/2019 | 53 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Proposed Changes to Scheduling Order - re (52 in 1:18-cv-00826-WCB) Scheduling Order,,,,. (Attachments: # 1 Exhibit A)(Ormerod, Eve) (Entered: 01/18/2019) |
| 01/22/2019 | 54 | NOTICE OF SERVICE of (1) Responses and Objections to Ingenico Inc.'s and Ingenico Corp.'s First Set of Requests for Production; and (2) Responses and Objections to Ingenico Inc.'s and Ingenico Corp.'s First Set of Interrogatories filed by IOENGINE LLC. (Belgam, Neal) (Entered: 01/22/2019) |
| 01/25/2019 | 55 | MEMORANDUM AND ORDER re D.I. 26 MOTION to Dismiss Based upon Lack of Personal Jurisdiction, Insufficiency of Service, and Failure to State a Claim is denied without prejudice. (See Order for further details). Signed by Judge William C. Bryson on 1/25/2019. (nmg) (Entered: 01/25/2019) |
| 01/25/2019 | 56 | NOTICE OF SERVICE of Ingenico Inc. and Ingenico Corp.'s core technical documents filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 01/25/2019) |
| 01/28/2019 | 57 | Revised SCHEDULING ORDER: Joinder of Parties due by 6/4/2019. Fact Discovery completed by 10/30/2019. Opening Expert Reports due by 12/12/2019. Rebuttal Expert Reports due by 1/13/2020. Expert Discovery due by 11/1/2019. Dispositive Motions due by 3/16/2020. Answering Brief due 4/15/2020. Reply Brief due 4/29/2020. Claim Construction Opening Brief due by 7/15/2019. Claim Construction Answering Brief due by 8/1/2019. Claim Construction Reply Brief due by 8/15/2019. Claim Construction Surreply Brief due by 8/26/2019. A Markman Hearing is set for 8/29/2019 at 10:00 AM in Courtroom 2B of the J. Caleb Boggs Federal Building before Judge William C. Bryson. Proposed Pretrial Order due by 7/15/2020. A Final Pretrial Conference is set for 7/20/2020 at 10:00 AM in Courtroom 6C of the J. Caleb Boggs Federal Building before Judge William C. Bryson. A 5-day Jury Trial is set for 8/10/2020 at 09:30 AM in Courtroom 6A of the J. Caleb Boggs Federal Building before Judge William C. Bryson. (See order for further details). Signed by Judge William C. Bryson on 1/25/2019. (nmg) (Entered: 01/28/2019) |
| 01/31/2019 | 58 | STIPULATION TO EXTEND TIME to answer Counterclaim Plaintiff IOENGINE, LLC's Counterclaims to March 11, 2019 - filed by Ingenico Corp., Ingenico Inc.. (Haynes, Christine) (Entered: 01/31/2019) |

**Appx18171**

| 02/01/2019 | 59 | ORDER granting D.I. 58 STIPULATION TO EXTEND TIME to answer Counterclaim Plaintiff IOENGINE, LLC's Counterclaims to March 11, 2019. Signed by Judge William C. Bryson on 2/1/2019. (nmg) (Entered: 02/01/2019) |
|---|---|---|
| 02/07/2019 | 60 | STIPULATION and [Proposed] Order Regarding Ingenico Group S.A. by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 02/07/2019) |
| 02/08/2019 | 61 | MOTION for Pro Hac Vice Appearance of Attorney Michael H. Joshi - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 02/08/2019) |
| 02/08/2019 | 62 | STIPULATION AND ORDER. Signed by Judge William C. Bryson on 2/8/2019. (nmg) (Entered: 02/08/2019) |
| 02/08/2019 | 63 | ORDER granting D.I.50 MOTION for Pro Hac Vice Appearance of Attorney Michael H. Joshi in case 1:18-cv-00452-WCB and D.I. 61 MOTION for Pro Hac Vice Appearance of Attorney Michael H. Joshi in case 1:18-cv-00826-WCB. Signed by Judge William C. Bryson on 2/8/2019. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (nmg) (Entered: 02/08/2019) |
| 02/12/2019 | 64 | NOTICE OF SERVICE of (1) IOENGINE, LLC's First Set of Special Requests for Production of Documents Regarding Jurisdiction to Ingenico Group SA; (2) IOENGINE, LLC's First Set of Special Requests for Production of Documents Regarding Jurisdiction to Ingenico Inc. and Ingenico Corp.; (3) IOENGINE, LLC's First Set of Special Interrogatories Regarding Jurisdiction to Ingenico Group SA; and (4) IOENGINE, LLC's First Set of Special Interrogatories Regarding Jurisdiction to Ingenico Inc. and Ingenico Corp. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 02/12/2019) |
| 02/26/2019 | 65 | ORDER Setting Teleconference: Counsel for IOENGINE to initiate the call. A Telephone Conference is set for 3/11/2019 at 1:30 PM Eastern Time before Judge Mary Pat Thynge to discuss ADR. Signed by Judge Mary Pat Thynge on 2/26/19. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(cak) (Entered: 02/26/2019) |
| 03/04/2019 | 66 | NOTICE OF SERVICE of Defendant/Counterclaim Plaintiff IOENGINE, LLC's Initial Claim Charts filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 03/04/2019) |
| 03/11/2019 | 67 | ORAL ORDER Setting Teleconference: A teleconference has been scheduled for 11/6/19 at 11:30 AM Eastern Time with Judge Mary Pat Thynge to discuss the status of the case and its effect on scheduling mediation. Counsel for Paypal shall initiate the teleconference call. Ordered by Judge Mary Pat Thynge on 3/11/19. (cak) (Entered: 03/11/2019) Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(cak) (Entered: 03/11/2019) |
| 03/11/2019 | 68 | ANSWER to 12 Answer to Complaint, Counterclaim by Ingenico Corp., Ingenico Inc.. (Cottrell, Frederick) (Entered: 03/11/2019) |
| 03/26/2019 |  | Pro Hac Vice Attorney Michael H. Joshi for IOENGINE LLC, added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(ddp) (Entered: 03/26/2019) |
| 03/26/2019 | 69 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Ingenico France's March 11, 2019 Withdrawal of its Motion to Dismiss for Lack of Personal Jurisdiction and IOENGINE's Request That the Court Order Ingenico France to Answer IOENGINE's Counterclaims by April 1, 2019 and Produce Core Technical Documents by April 8, 2019. (Belgam, Neal) (Entered: 03/26/2019) |
| 03/27/2019 | 70 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding IOENGINE'S 3-26-19 letter - re 69 Letter,. (Cottrell, Frederick) (Entered: 03/27/2019) |

Appx18172

| 03/28/2019 | 71 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding response to Ingenico France's letter of March 27, 2019 - re 70 Letter. (Belgam, Neal) (Entered: 03/28/2019) |
| --- | --- | --- |
| 03/28/2019 | 72 | ORDER setting the following deadlines: Ingenico France will serve its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on or before April 9, 2019. Ingenico France will file and serve its answer to the counterclaims on or before April 16, 2019. Ingenico France will serve amended responses to IOENGINEs First Set of Requests for Production of Documents and First Set of Interrogatories on or before April 16, 2019. Ingenico France will produce core technical documents on or before May 3, 2019. Signed by Judge William C. Bryson on 3/28/2019. (nmg) (Entered: 03/28/2019) |
| 03/29/2019 | 73 | NOTICE OF SERVICE of (1) IOENGINE, LLC's Second Set of Requests for Production of Documents to Ingenico Inc., Ingenico Corp., and Ingenico Group SA and (2) IOENGINE, LLC's Second Set of Interrogatories to Ingenico Inc., Ingenico Corp., and Ingenico Group SA filed by IOENGINE LLC.(Belgam, Neal) (Entered: 03/29/2019) |
| 04/05/2019 | 74 | NOTICE OF SERVICE of Ingenico's Initial Invalidity Contentions filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 04/05/2019) |
| 04/09/2019 | 75 | NOTICE OF SERVICE of Ingenico Group S.A.'s Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) and Section 3 of the Delaware Default Standard for Discovery filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 04/09/2019) |
| 04/12/2019 | 76 | NOTICE OF SERVICE of Ingenico's First Amended Initial Invalidity Contentions filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 04/12/2019) |
| 04/16/2019 | 77 | NOTICE OF SERVICE of First Amended Response to IOENGINE, LLC's First Set of Interrogatories and Ingenico Group S.A.'s First Amended Response to IOENGINE, LLC's First Set of Requests for Production of Dcouments filed by Ingenico Group S.A..(Haynes, Christine) (Entered: 04/16/2019) |
| 04/16/2019 | 78 | ANSWER to 12 Answer to Complaint, Counterclaim by Ingenico Group S.A..(Cottrell, Frederick) (Entered: 04/16/2019) |
| 04/22/2019 | 79 | NOTICE of Subpoenas to FUJIFILM North America Corporation and FUJIFILM Holdings America Corporation by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1-2)(Haynes, Christine) (Entered: 04/22/2019) |
| 04/29/2019 | 80 | NOTICE OF SERVICE of (1) Ingenico Inc., Ingenico Corp. and Ingenico Group S.A.'s Response to Ioengine, LLC's Second Set of Requests for Production of Documents; (2) Ingenico Inc., Ingenico Corp., and Ingenico GROUP S.A.'s Response to Ioengine, LLC's Second Set of Interrogatories; and (3) Ingenico Inc. and Ingenico Corp.'s Supplemental Response to Ioengine, LLC's First Set of Interrogatories (No. 9) filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 04/29/2019) |
| 05/06/2019 | 81 | NOTICE OF SERVICE of Ingenico Group S.A.s core technical documents filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 05/06/2019) |
| 05/14/2019 | 82 | NOTICE OF SERVICE of Plaintiff and Counterclaim Defendant Ingenico Inc. and Counterclaim Defendants Ingenico Corp. and Ingenico Group S.A.'s Second Set of Interrogatories to IOENGINE filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 05/14/2019) |

**Appx18173**

| 05/31/2019 | 83 | NOTICE of Appearance by Beth Ann Swadley on behalf of IOENGINE LLC (Swadley, Beth) (Entered: 05/31/2019) |
|---|---|---|
| 05/31/2019 | 84 | Letter to The Honorable William C. Bryson, U.S. Court of Appeals for the Federal Circuit from Frederick L. Cottrell, III regarding discovery dispute. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit C-E)(Cottrell, Frederick) (Entered: 05/31/2019) |
| 05/31/2019 | 85 | [SEALED] EXHIBIT re 84 Letter, *Exhibit B to Letter to The Honorable William C. Bryson, U.S. Court of Appeals for the Federal Circuit from Frederick L. Cottrell, III regarding discovery dispute* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 05/31/2019) |
| 05/31/2019 | 86 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding IOENGINE LLC's Opening Letter in Advance of the June 5, 2019 Discovery Conference. (Attachments: # 1 Exhibits A - D)(Belgam, Neal) (Entered: 05/31/2019) |
| 06/03/2019 | 87 | STIPULATION and [Proposed] Order Permitting the Ingenico Counterclaim Defendants to File Amended Answers by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Haynes, Christine) (Entered: 06/03/2019) |
| 06/04/2019 | 88 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding discovery dispute - re 86 Letter. (Attachments: # 1 Exhibit A-C)(Cottrell, Frederick) (Entered: 06/04/2019) |
| 06/04/2019 | 89 | [SEALED] Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Response to Plaintiff's May 31, 2019 Letter - re 84 Letter,. (Belgam, Neal) (Entered: 06/04/2019) |
| 06/04/2019 | 90 | NOTICE OF SERVICE of Ingenico's Preliminary List of Claim Terms for Construction and Proposed Constructions filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 06/04/2019) |
| 06/05/2019 | 91 | STIPULATION AND ORDER. Signed by Judge William C. Bryson on 6/5/2019. (nmg) (Entered: 06/05/2019) |
| 06/06/2019 | 92 | Amended ANSWER to 12 Answer to Complaint, Counterclaim by Ingenico Group S.A.. (Cottrell, Frederick) (Entered: 06/06/2019) |
| 06/06/2019 | 93 | Amended ANSWER to 12 Answer to Complaint, Counterclaim by Ingenico Corp., Ingenico Inc..(Cottrell, Frederick) (Entered: 06/06/2019) |
| 06/07/2019 | 94 | NOTICE OF SERVICE of IOENGINE, LLC's Preliminary List of Claim Terms for Construction and Proposed Constructions filed by IOENGINE LLC.(Swadley, Beth) (Entered: 06/07/2019) |
| 06/07/2019 | 95 | REDACTED VERSION of 85 Exhibit to a Document, *Exhibit B to Letter to The Honorable William C. Bryson, U.S. Court of Appeals for the Federal Circuit from Frederick L. Cottrell, III regarding discovery dispute* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 06/07/2019) |
| 06/11/2019 | 96 | REDACTED VERSION of 89 Letter by IOENGINE LLC. (Swadley, Beth) (Entered: 06/11/2019) |
| 06/14/2019 | 97 | NOTICE OF SERVICE of Defendant/Counterclaim Plaintiff IOENGINE, LLC's Responses and Objections to Plaintiff/Counterclaim Defendant Ingenico Inc.'s and Counterclaim Defendants Ingenico Corp.'s and Ingenico Group S.A.'s Second Set of Interrogatories filed by IOENGINE LLC.(Swadley, Beth) (Entered: 06/14/2019) |

**Appx18174**

| 06/25/2019 | 98 | CLAIM Construction Chart by IOENGINE LLC. (Attachments: # 1 Exhibits A - I, # 2 Exhibits J - S, # 3 Exhibits T - AA)(Swadley, Beth) (Entered: 06/25/2019) |
| --- | --- | --- |
| 06/26/2019 | 99 | NOTICE of Subpoena to Apple, Inc. by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1 (subpoena))(Haynes, Christine) (Entered: 06/26/2019) |
| 07/10/2019 | 100 | NOTICE OF SERVICE of IOENGINE, LLC's Supplemental Responses and Objections to Ingenico, Inc.'s and Ingenico Corp.'s First Set of Interrogatories filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 07/10/2019) |
| 07/15/2019 | 101 | CLAIM CONSTRUCTION OPENING BRIEF filed by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Ormerod, Eve) (Entered: 07/15/2019) |
| 07/15/2019 | 102 | APPENDIX re 101 Claim Construction Opening Brief -- *Appendix A* -- by IOENGINE LLC. (Ormerod, Eve) (Entered: 07/15/2019) |
| 07/17/2019 | 103 | MOTION to Stay *Pending Resolution of the '047 IPR* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Certification Pursuant to Local Rule 7.1.1)(Cottrell, Frederick) (Entered: 07/17/2019) |
| 07/17/2019 | 104 | OPENING BRIEF in Support re 103 MOTION to Stay *Pending Resolution of the '047 IPR* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Answering Brief/Response due date per Local Rules is 7/31/2019. (Cottrell, Frederick) (Entered: 07/17/2019) |
| 07/17/2019 | 105 | DECLARATION re 104 Opening Brief in Support, *(Declaration of Sharona H. Sternberg)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A & E-K)(Cottrell, Frederick) (Entered: 07/17/2019) |
| 07/17/2019 | 106 | [SEALED] EXHIBIT re 105 Declaration *Exhibits B-D to the Declaration of Sharona H. Sternberg* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit B-D)(Cottrell, Frederick) (Entered: 07/17/2019) |
| 07/17/2019 | 107 | NOTICE OF SERVICE of (1) Ingenico Group S.A.'s First Supplemental Response to Ioengine, LLC's First Set of Interrogatories, and (2) Ingenico's Second Supplemental Response to Ioengine, LLC's First Set of Interrogatories filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 07/17/2019) |
| 07/22/2019 | 108 | NOTICE OF SERVICE of IOENGINE, LLC's Supplemental Responses and Objections to Ingenico, Inc.'s Ingenico Corp.'s and Ingenico Group S.A.'s Second Set of Interrogatories filed by IOENGINE LLC.(Swadley, Beth) (Entered: 07/22/2019) |
| 07/31/2019 | 109 | ANSWERING BRIEF in Opposition re 103 MOTION to Stay *Pending Resolution of the '047 IPR* filed by IOENGINE LLC.Reply Brief due date per Local Rules is 8/7/2019. (Ormerod, Eve) (Entered: 07/31/2019) |
| 07/31/2019 | 110 | DECLARATION re 109 Answering Brief in Opposition --*Declaration of Gregory T. Chuebon*-- by IOENGINE LLC. (Attachments: # 1 Exhibits A - G)(Ormerod, Eve) (Entered: 07/31/2019) |
| 08/01/2019 | 111 | [SEALED] Joint CLAIM CONSTRUCTION ANSWERING BRIEF filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 08/01/2019) |
| 08/01/2019 | 112 | [SEALED] DECLARATION re 111 Claim Construction Answering Brief *of Travis Jensen* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-O)(Haynes, Christine) (Entered: 08/01/2019) |
| 08/02/2019 | 113 | NOTICE of Change of Physical Address for Certain IOENGINE, LLC Pro Hac Vice Counsel by IOENGINE LLC (Ormerod, Eve) (Entered: 08/02/2019) |

**Appx18175**

| 08/07/2019 | 114 | REPLY BRIEF re 103 MOTION to Stay *Pending Resolution of the '047 IPR* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 08/07/2019) |
| --- | --- | --- |
| 08/07/2019 | 115 | DECLARATION re 114 Reply Brief *(Declaration of Sharona H. Sternberg)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-D)(Cottrell, Frederick) (Entered: 08/07/2019) |
| 08/08/2019 | 116 | REDACTED VERSION of 111 Claim Construction Answering Brief by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 08/08/2019) |
| 08/08/2019 | 117 | REDACTED VERSION of 112 Declaration *of Travis Jensen* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-O)(Haynes, Christine) (Entered: 08/08/2019) |
| 08/09/2019 | 118 | MOTION for Leave to File *Supplemental Answer and Counterclaims* - filed by IOENGINE LLC. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1 - Supplemental Answer and Counterclaims, # 3 Exhibit 2 - Redline of Supplemental Answer and Counterclaims)(Ormerod, Eve) (Entered: 08/09/2019) |
| 08/09/2019 | 119 | OPENING BRIEF in Support re 118 MOTION for Leave to File *Supplemental Answer and Counterclaims* filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 8/23/2019. (Swadley, Beth) (Entered: 08/09/2019) |
| 08/09/2019 | 120 | DECLARATION re 119 Opening Brief in Support -- *Declaration of Michael H. Joshi* -- by IOENGINE LLC. (Attachments: # 1 Exhibits A - D, # 2 Exhibits G - J)(Swadley, Beth) (Entered: 08/09/2019) |
| 08/09/2019 | 121 | [SEALED] EXHIBIT re 120 Declaration -- *Exhibits E and F* -- by IOENGINE LLC. (Swadley, Beth) (Entered: 08/09/2019) |
| 08/14/2019 | 122 | Letter to The Honorable William C. Bryson from Jack B. Blumenfeld and Christine D. Haynes regarding Request for Teleconference to Discuss Continuance of Markman Hearing. (Blumenfeld, Jack) (Entered: 08/14/2019) |
| 08/15/2019 | 123 | CLAIM CONSTRUCTION REPLY BRIEF filed by IOENGINE LLC. (Belgam, Neal) (Entered: 08/15/2019) |
| 08/15/2019 | 124 | DECLARATION re 123 Claim Construction Reply Brief -- *Declaration of Michael H. Joshi* -- by IOENGINE LLC. (Attachments: # 1 Exhibit A)(Belgam, Neal) (Entered: 08/15/2019) |
| 08/16/2019 | 125 | REDACTED VERSION of 121 Exhibit to a Document by IOENGINE LLC. (Swadley, Beth) (Entered: 08/16/2019) |
| 08/16/2019 | 126 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding PayPal and Ingenico's Request for Teleconference to Discuss Continuance of Markman Hearing - re (122 in 1:18-cv-00826-WCB) Letter. (Belgam, Neal) (Entered: 08/16/2019) |
| 08/19/2019 | 127 | NOTICE of Subpoena to Western Digital Corporation by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1 (Subpoena to Western Digital Corporation))(Haynes, Christine) (Entered: 08/19/2019) |
| 08/21/2019 | 128 | MEMORANDUM OPINION AND ORDER STAYING CASES. (*See Order for Additional Details). Signed by Judge William C. Bryson on 8/21/2019. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 08/21/2019) |
| 08/21/2019 | 129 | ORAL ORDER re (67 in 1:18-cv-00826-WCB, 58 in 1:18-cv-00452-WCB) Order Setting Teleconference, The Teleconference scheduled for 11/6/19 at 11:30 AM Eastern Time in |

**Appx18176**

| | | these matters is cancelled. Counsel are to advise of the completion of the IPR and also advise if the parties wish to reschedule the teleconference to discuss ADR. Ordered by Judge Mary Pat Thynge on 8/21/19. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(cak) (Entered: 08/21/2019) |
|---|---|---|
| 09/03/2019 | 130 | NOTICE of Withdrawal of Subpoena directed to Western Digital Corporation by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit A)(Haynes, Christine) (Entered: 09/03/2019) |
| 11/26/2019 | 131 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Status Update. (Belgam, Neal) (Entered: 11/26/2019) |
| 11/27/2019 | 132 | Letter to Honorable William C. Bryson from Frederick L. Cottrell, III regarding Response to IOENGINE's November 26, 2019 letter - re 131 Letter. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Cottrell, Frederick) (Entered: 11/27/2019) |
| 12/03/2019 | 133 | ORDER - that the request to file a motion to lift the stay is GRANTED. re Letter(132 in 1:18-cv-00826-WCB) Letter(131 in 1:18-cv-00826-WCB, Letter 119 in 1:18-cv-00452-WCB). Signed by Judge William C. Bryson on 12/2/19. (rwc) (Entered: 12/03/2019) |
| 12/10/2019 | 134 | NOTICE of Withdrawal of Appearance of Beth A. Swadley by IOENGINE LLC (Swadley, Beth) (Entered: 12/10/2019) |
| 12/13/2019 | 135 | MOTION to Lift Stay - filed by IOENGINE LLC. (Attachments: # 1 Proposed Order) (Ormerod, Eve) (Entered: 12/13/2019) |
| 12/13/2019 | 136 | OPENING BRIEF in Support re 135 MOTION to Lift Stay filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 12/27/2019. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Ormerod, Eve) (Entered: 12/13/2019) |
| 12/19/2019 | 137 | STIPULATION TO EXTEND TIME for PayPal Holdings, Inc. and Ingenico Inc., Ingenico Corp., and Ingenico Group SA to file answering brief in opposition to IOENGINE, LLC's Motion to Lift the Stays of Litigation and IOENGINE, LLC to file reply brief in further support of its Motion to Lift the Stays of Litigation to January 10, 2020 and January 22, 2020 - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 12/19/2019) |
| 12/19/2019 | 138 | SO ORDERED - re STIPULATION TO EXTEND TIME for PayPal Holdings, Inc. and Ingenico Inc., Ingenico Corp., and Ingenico Group SA to file answering brief in opposition to IOENGINE, LLC's Motion to Lift the Stays of Litigation and IOENGINE, LLC to file reply brief in further support of its Motion to Lift the Stays of Litigation to January 10, 2020 and January 22, 2020. Signed by Judge William C. Bryson on 12/20/2019. (amf) (Entered: 12/20/2019) |
| 01/10/2020 | 139 | Joint ANSWERING BRIEF in Opposition re 135 MOTION to Lift Stay *(by Ingenico and Paypal)* filed by Ingenico Inc..Reply Brief due date per Local Rules is 1/17/2020. (Cottrell, Frederick) (Entered: 01/10/2020) |
| 01/22/2020 | 140 | REPLY BRIEF re 135 MOTION to Lift Stay *of Litigation* filed by IOENGINE LLC. (Attachments: # 1 Exhibit 1)(Ormerod, Eve) (Entered: 01/22/2020) |
| 01/27/2020 | 141 | MEMORANDUM AND ORDER denying Motion to Vacate Stay. Signed by Judge William C. Bryson on 1/27/2020. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 01/27/2020) |
| 02/10/2020 | 142 | NOTICE of Change to Firm Name and Address by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Haynes, Christine) (Entered: 02/10/2020) |

**Appx18177**

| 10/06/2020 | 143 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Case Status Update and Seeking Order to Lift Stays - re (116 in 1:18-cv-00452-WCB, 116 in 1:18-cv-00452-WCB, 128 in 1:18-cv-00826-WCB, 128 in 1:18-cv-00826-WCB) Memorandum and Order, Order Staying Case, (141 in 1:18-cv-00826-WCB, 128 in 1:18-cv-00452-WCB) Memorandum and Order. (Ormerod, Eve) (Entered: 10/06/2020) |
| 10/09/2020 | 144 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell and Brian P. Egan regarding response to IOENGINE's request to lift the stay. (Attachments: # 1 Exhibit A-C)(Cottrell, Frederick) (Entered: 10/09/2020) |
| 10/11/2020 | 145 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Reply to Response to Request to Lift the Stay - re (144 in 1:18-cv-00826-WCB, 130 in 1:18-cv-00452-WCB) Letter. (Belgam, Neal) (Entered: 10/11/2020) |
| 10/26/2020 | 146 | MEMORANDUM AND ORDER - The request to lift a stay of proceedings ( 143 in 1:18-cv-00826-WCB, 129 in 1:18-cv-00452-WCB) is GRANTED, and the parties are directed to propose a revised scheduling order for the two cases. Signed by Judge William C. Bryson on 10/26/2020. (amf) (Entered: 10/26/2020) |
| 11/05/2020 | 147 | NOTICE of Withdrawal of Motion by IOENGINE LLC re 118 MOTION for Leave to File *Supplemental Answer and Counterclaims* (Belgam, Neal) (Entered: 11/05/2020) |
| 11/05/2020 | 148 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Proposed Revised Scheduling Order - re (132 in 1:18-cv-00452-WCB, 132 in 1:18-cv-00452-WCB, 146 in 1:18-cv-00826-WCB, 146 in 1:18-cv-00826-WCB) Memorandum and Order,, Order Lifting Stay,. (Attachments: # 1 Appendix A)(Ormerod, Eve) (Entered: 11/05/2020) |
| 11/05/2020 | 149 | Joint Letter to The Honorable William C. Bryson from Jack B. Blumenfeld regarding Proposed Case Schedule - re (134 in 1:18-cv-00452-WCB, 148 in 1:18-cv-00826-WCB) Letter,. (Blumenfeld, Jack) (Entered: 11/05/2020) |
| 11/06/2020 | 150 | NOTICE OF SERVICE of Supplemental Claim Charts filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 11/06/2020) |
| 11/10/2020 | 151 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Defendants' Joint Letter of November 5, 2020 - re (149 in 1:18-cv-00826-WCB, 135 in 1:18-cv-00452-WCB) Letter. (Belgam, Neal) (Entered: 11/10/2020) |
| 11/18/2020 | 152 | PROPOSED ORDER -- Revised Scheduling Order -- by PayPal Holdings, Inc.. (Blumenfeld, Jack) (Entered: 11/18/2020) |
| 11/24/2020 | 153 | SECOND REVISED SCHEDULING ORDER. Signed by Judge William C. Bryson on 11/24/2020. (amf) (Entered: 11/24/2020) |
| 12/07/2020 | 154 | Official Transcript of Discovery Dispute Teleconference held on 11/20/20 before Judge William C. Bryson. Court Reporter Heather M. Triozzi,Email: Heather_Triozzi@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 12/28/2020. Redacted Transcript Deadline set for 1/7/2021. Release of Transcript Restriction set for 3/8/2021. (Triozzi, Heather) (Entered: 12/07/2020) |
| 01/07/2021 | 155 | NOTICE OF SERVICE of Subpoena on Western Digital Corporation filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1 (Subpoena to Western Digital Corporation))(Haynes, Christine) (Entered: 01/07/2021) |
| 01/08/2021 | 156 | NOTICE OF SERVICE of Second Amended Initial Invalidity Contentions filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: |

**Appx18178**

| | | 01/08/2021) |
|---|---|---|
| 01/19/2021 | 157 | NOTICE OF SERVICE of Preliminary List of Claim Terms for Construction and Proposed Constructions filed by IOENGINE LLC.(Belgam, Neal) (Entered: 01/19/2021) |
| 01/29/2021 | 158 | CLAIM Construction Chart by IOENGINE LLC. (Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 159 | EXHIBIT re (158 in 1:18-cv-00826-WCB, 144 in 1:18-cv-00452-WCB) Claim Construction Chart *(Volume I)* by IOENGINE LLC. (Attachments: # 1 Exhibits A-H, # 2 Exhibits I-Z, # 3 Exhibits AA-GG)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 160 | EXHIBIT re (158 in 1:18-cv-00826-WCB, 144 in 1:18-cv-00452-WCB) Claim Construction Chart *(Volume II)* by IOENGINE LLC. (Attachments: # 1 Exhibit II, # 2 Exhibit KK, # 3 Exhibit MM, # 4 Exhibit NN, # 5 Exhibit OO, # 6 Exhibits QQ-VV, # 7 Exhibit WW)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 161 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume III)* by IOENGINE LLC. (Attachments: # 1 Exhibits XX-ZZ, # 2 Exhibits AAA-FFF)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 162 | EXHIBIT re (158 in 1:18-cv-00826-WCB, 144 in 1:18-cv-00452-WCB) Claim Construction Chart *(Volume IV)* by IOENGINE LLC, PayPal Holdings, Inc.. (Attachments: # 1 Exhibits GGG-KKK, # 2 Exhibits LLL-MMM, # 3 Exhibits OOO, QQQ, RRR)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 163 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume V)* by IOENGINE LLC. (Attachments: # 1 Exhibits TTT-ZZZ, # 2 Exhibit AAAA (Part 1 of 2))(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 164 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume VI)* by IOENGINE LLC. (Attachments: # 1 Exhibit AAAA (Part 2 of 2), # 2 Exhibit BBBB)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 165 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume VII)* by IOENGINE LLC. (Attachments: # 1 Exhibits CCCC-DDDD)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 166 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume VIII)* by IOENGINE LLC. (Attachments: # 1 Exhibits EEEE-OOOO)(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 167 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume IX)* by IOENGINE LLC. (Attachments: # 1 Exhibits PPPP-ZZZZ, # 2 Exhibits AAAAA-DDDDD (Part 1 of 2))(Ormerod, Eve) (Entered: 01/29/2021) |
| 01/29/2021 | 168 | EXHIBIT re (144 in 1:18-cv-00452-WCB, 158 in 1:18-cv-00826-WCB) Claim Construction Chart *(Volume X)* by IOENGINE LLC. (Attachments: # 1 Exhibits DDDDD (Part 2 of 2) - PPPPP)(Ormerod, Eve) (Entered: 01/29/2021) |
| 02/02/2021 | 169 | CLAIM Construction Chart by IOENGINE LLC. (Ormerod, Eve) (Entered: 02/02/2021) |
| 02/02/2021 | 170 | EXHIBIT re (155 in 1:18-cv-00452-WCB, 169 in 1:18-cv-00826-WCB) Claim Construction Chart *Corrected (Volume I)* by IOENGINE LLC. (Attachments: # 1 Exhibits A-M, # 2 Exhibits N-V)(Ormerod, Eve) (Entered: 02/02/2021) |
| 02/02/2021 | 171 | EXHIBIT re (155 in 1:18-cv-00452-WCB, 169 in 1:18-cv-00826-WCB) Claim Construction Chart *Corrected (Volume II)* by IOENGINE LLC. (Attachments: # 1 Exhibits W1-W13)(Ormerod, Eve) (Entered: 02/02/2021) |

**Appx18179**

| | | |
|---|---|---|
| 02/02/2021 | 172 | EXHIBIT re (155 in 1:18-cv-00452-WCB, 169 in 1:18-cv-00826-WCB) Claim Construction Chart *Corrected (Volume III)* by IOENGINE LLC. (Attachments: # 1 Exhibits W14-W15, # 2 Exhibits W17-W18, # 3 Exhibits W19-W20, # 4 Exhibits X1-X4)(Ormerod, Eve) (Entered: 02/02/2021) |
| 02/02/2021 | 173 | EXHIBIT re (155 in 1:18-cv-00452-WCB, 169 in 1:18-cv-00826-WCB) Claim Construction Chart *Corrected (Volume IV)* by IOENGINE LLC. (Attachments: # 1 Exhibits X5-X10, # 2 Exhibits X11-X14)(Ormerod, Eve) (Entered: 02/02/2021) |
| 02/02/2021 | 174 | EXHIBIT re (155 in 1:18-cv-00452-WCB, 169 in 1:18-cv-00826-WCB) Claim Construction Chart *Corrected (Volume V)* by IOENGINE LLC. (Attachments: # 1 Exhibits X15-X16, # 2 Exhibits Y-Z)(Ormerod, Eve) (Entered: 02/02/2021) |
| 02/02/2021 | 175 | EXHIBIT re (155 in 1:18-cv-00452-WCB, 169 in 1:18-cv-00826-WCB) Claim Construction Chart *Corrected (Volume VI)* by IOENGINE LLC. (Attachments: # 1 Exhibits AA-GG, # 2 Exhibits HH-OO)(Ormerod, Eve) (Entered: 02/02/2021) |
| 02/02/2021 | 176 | [SEALED] MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to The Hague Evidence Convention - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Letter of Request, # 3 Certification Pursuant to Local Rule 7.1.1)(Cottrell, Frederick) (Entered: 02/02/2021) |
| 02/02/2021 | 177 | [SEALED] DECLARATION re 176 MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to The Hague Evidence Convention *(Declaration of Sharona H. Sternberg)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-C)(Cottrell, Frederick) (Entered: 02/02/2021) |
| 02/02/2021 | 178 | Supplemental Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Ingenico Corp., Corporate Parent INGENICO GROUP S.A., Corporate Parent Worldline S.A. for Ingenico Inc. filed by Ingenico Inc.. (Haynes, Christine) (Entered: 02/02/2021) |
| 02/12/2021 | 179 | CLAIM CONSTRUCTION OPENING BRIEF filed by IOENGINE LLC. (Attachments: # 1 Exhibit 1)(Ormerod, Eve) (Entered: 02/12/2021) |
| 02/16/2021 | 180 | NOTICE of Withdrawal of Objection by IOENGINE LLC re 176 MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to The Hague Evidence Convention (Ormerod, Eve) (Entered: 02/16/2021) |
| 02/23/2021 | 181 | REDACTED VERSION of 176 MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to The Hague Evidence Convention by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Letter of Request for International Judicial Assistance, # 3 Certification Pursuant to Local Rule 7.1.1.)(Haynes, Christine) (Entered: 02/23/2021) |
| 02/23/2021 | 182 | REDACTED VERSION of 177 Declaration, by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-C)(Haynes, Christine) (Entered: 02/23/2021) |
| 02/24/2021 | 183 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding Motion Requesting Issuance of Letter of Request for International Assistance Pursuant to the Hague Evidence Convention - re 176 MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to The Hague Evidence Convention . (Cottrell, Frederick) (Entered: 02/24/2021) |
| 02/26/2021 | 184 | MEMORANDUM AND ORDER - Ingenico's motion seeking a letter of request for international judicial assistance 176 is DENIED without prejudice to its renewal upon a |

**Appx18180**

| | | |
|---|---|---|
| | | sufficient presentation. Signed by Judge William C. Bryson on 2/26/2021. (amf) (Entered: 02/26/2021) |
| 02/26/2021 | 185 | Joint CLAIM CONSTRUCTION ANSWERING BRIEF re 179 Claim Construction Opening Brief filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 02/26/2021) |
| 03/05/2021 | 186 | CLAIM CONSTRUCTION REPLY BRIEF re 179 Claim Construction Opening Brief, 185 Claim Construction Answering Brief filed by IOENGINE LLC. (Belgam, Neal) (Entered: 03/05/2021) |
| 03/12/2021 | 187 | [SEALED] MOTION (Renewed) Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Renewed Letter of Request, # 3 Certification Pursuant to Local Rule 7.1.1) (Cottrell, Frederick) (Entered: 03/12/2021) |
| 03/12/2021 | 188 | [SEALED] OPENING BRIEF in Support re 187 MOTION (Renewed) Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Answering Brief/Response due date per Local Rules is 3/26/2021. (Cottrell, Frederick) (Entered: 03/12/2021) |
| 03/12/2021 | 189 | [SEALED] DECLARATION re 187 MOTION (Renewed) Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention *(Declaration of Sharona H. Sternberg)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-L)(Cottrell, Frederick) (Entered: 03/12/2021) |
| 03/12/2021 | 190 | Joint CLAIM CONSTRUCTION SURREPLY BRIEF re 179 Claim Construction Opening Brief filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 03/12/2021) |
| 03/12/2021 | 191 | EXHIBIT re 190 Claim Construction Surreply Brief *(Exhibits 1-3)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 03/12/2021) |
| 03/17/2021 | 192 | ORDER granting 187 MOTION (Renewed) Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention . Signed by Judge William C. Bryson on 3/17/2021. (kmd) (Entered: 03/17/2021) |
| 03/19/2021 | 193 | [SEALED] Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding the Renewed Motion Requesting Issuance of a Letter of Request for International Judicial Assistance - re 187 MOTION (Renewed) Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention , 192 Order on Motion for Miscellaneous Relief. (Cottrell, Frederick) (Entered: 03/19/2021) |
| 03/22/2021 | 194 | REDACTED VERSION of 187 MOTION (Renewed) Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention by Ingenico Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Letter Request, # 3 7.1.1 Statement)(Haynes, Christine) (Entered: 03/22/2021) |
| 03/22/2021 | 195 | REDACTED VERSION of 188 Opening Brief in Support, by Ingenico Inc.. (Haynes, Christine) (Entered: 03/22/2021) |
| 03/22/2021 | 196 | REDACTED VERSION of 189 Declaration, by Ingenico Inc.. (Attachments: # 1 Exhibit A-L)(Haynes, Christine) (Entered: 03/22/2021) |

**Appx18181**

| 03/22/2021 | 197 | NOTICE OF SERVICE of Supplemental Responses and Objections to Ingenico's Interrogatory No. 8 and No. 10 filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 03/22/2021) |
|---|---|---|
| 03/23/2021 | 198 | [SEALED] Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding the Discovery Dispute with Ingenico, Inc., Ingenico Corp., and Ingenico Group S.A.. (Attachments: # 1 Exhibits A-M)(Ormerod, Eve) (Entered: 03/23/2021) |
| 03/25/2021 | 199 | [SEALED] Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding Response of Ingenico Inc., Ingenico Corp., and Ingenico S.A. to IOENGINE, LLC's March 23, 2021 Letter regarding Discovery Dispute. (Attachments: # 1 Exhibit 1-3)(Cottrell, Frederick) (Entered: 03/25/2021) |
| 03/26/2021 | 200 | [SEALED] Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Discovery Dispute Reply - re 199 Letter,. (Ormerod, Eve) (Entered: 03/26/2021) |
| 03/26/2021 | 201 | REDACTED VERSION of 193 Letter, by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 03/26/2021) |
| 03/30/2021 | 202 | REDACTED VERSION of 198 Letter *Regarding its Discovery Dispute with Ingenico Defendants* by IOENGINE LLC. (Attachments: # 1 Exhibits A-M)(Ormerod, Eve) (Entered: 03/30/2021) |
| 03/31/2021 | | Minute Entry for proceedings held before Judge William C. Bryson Telephone Conference held on March 31, 2021, regarding discovery disputes between the parties (Court reporter Valerie Gunning).(amf) (Entered: 03/31/2021) |
| 04/05/2021 | 203 | REDACTED VERSION of 200 Letter *to The Honorable William C. Bryson from Eve H. Ormerod regarding Discovery Dispute Reply* by IOENGINE LLC. (Ormerod, Eve) (Entered: 04/05/2021) |
| 04/13/2021 | 204 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding the transmission of the executed Hague Evidence Convention Letter of Request to the Israeli Central Authority pursuant to the Court's Order of 3-17-21. (Attachments: # 1 Exhibit A) (Cottrell, Frederick) (Entered: 04/13/2021) |
| 04/15/2021 | 205 | NOTICE OF SERVICE of Supplemental Response to Second Set of Interrogatories filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 04/15/2021) |
| 04/22/2021 | 206 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Request for Trial Dates. (Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 207 | NOTICE to Take Deposition of Scott Tubbs on May 20, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 208 | NOTICE to Take Deposition of Alain Soubirane on May 25, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 209 | NOTICE to Take Deposition of Ryan Ahern on May 21, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 210 | NOTICE to Take Deposition of Russell Kondaveti on May 18, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 211 | NOTICE to Take Deposition of Nino Maisuradze on May 25, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 212 | NOTICE to Take Deposition of Joey Tang on May 20, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |

**Appx18182**

| 04/22/2021 | 213 | NOTICE to Take Deposition of Irfan Nasir on May 18, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 214 | NOTICE to Take Deposition of Eric Brier on May 24, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 215 | NOTICE to Take Deposition of David Szczepanski on May 24, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 216 | NOTICE to Take Deposition of Christopher Rotsaert on May 21, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/22/2021 | 217 | NOTICE to Take Deposition of Christophe Cayrol on May 19, 2021 at 9:30 a.m. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 04/22/2021) |
| 04/23/2021 | 218 | NOTICE of Subpoena on PayPal Holdings, Inc. by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit A)(Haynes, Christine) (Entered: 04/23/2021) |
| 04/26/2021 | 219 | Letter to Honorable William C. Bryson from Frederick L. Cottrell, III regarding IOENGINEs April 22, 2021 Letter - re (199 in 1:18-cv-00452-WCB, 206 in 1:18-cv-00826-WCB) Letter. (Cottrell, Frederick) (Entered: 04/26/2021) |
| 04/26/2021 | 220 | [SEALED] EXHIBIT re (201 in 1:18-cv-00452-WCB, 219 in 1:18-cv-00826-WCB) Letter by IOENGINE LLC, Ingenico Corp., Ingenico Group S.A.. (Attachments: # 1 Exhibit A - B)(Cottrell, Frederick) (Entered: 04/26/2021) |
| 04/26/2021 | 221 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Reply to PayPal and Ingenico's Letter Regarding Trial Dates - re (201 in 1:18-cv-00452-WCB, 219 in 1:18-cv-00826-WCB) Letter. (Ormerod, Eve) (Entered: 04/26/2021) |
| 04/27/2021 | | ORAL ORDER: The trial in case No. 18-826 is now scheduled for the week of March 14, 2022, in Courtroom 4B of the J. Caleb Boggs Federal Building and U.S. Courthouse. The trial in case No. 18-452 is now scheduled for the week of March 21, 2022, in Courtroom 4B of the J. Caleb Boggs Federal Building and U.S. Courthouse. If that schedule creates an irreconcilable conflict for trial counsel in either case, counsel should advise the court by Monday, May 3, 2021, detailing the nature of the conflict. So Ordered by Judge William C. Bryson on 4/27/2021. (amf) (Entered: 04/28/2021) |
| 05/03/2021 | 222 | REDACTED VERSION of (220 in 1:18-cv-00826-WCB, 202 in 1:18-cv-00452-WCB) Exhibit to a Document by Ingenico Corp., Ingenico Group S.A.. (Haynes, Christine) (Entered: 05/03/2021) |
| 05/05/2021 | 223 | NOTICE of Subpoena Directed to Banc of America Merchant Services by IOENGINE LLC (Ormerod, Eve) (Entered: 05/05/2021) |
| 05/05/2021 | 224 | NOTICE of Subpoena Directed to Clover Network, Inc. by IOENGINE LLC (Ormerod, Eve) (Entered: 05/05/2021) |
| 05/05/2021 | 225 | NOTICE of Subpoena Directed to NCR Corporation by IOENGINE LLC (Ormerod, Eve) (Entered: 05/05/2021) |
| 05/05/2021 | 226 | NOTICE of Subpoena Directed to PayPal Holdings, Inc. by IOENGINE LLC (Ormerod, Eve) (Entered: 05/05/2021) |
| 05/05/2021 | 227 | [SEALED] NOTICE to Take Deposition of Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. on a Date/Time Mutually Agreed Upon by the Parties filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 05/05/2021) |
| 05/05/2021 | 228 | NOTICE OF SERVICE of 1) Second Set of Requests for Production of Documents; 2) Third Set of Interrogatories; and 3) Requests for Admission filed by Ingenico Corp., |

**Appx18183**

| | | |
|---|---|---|
| | | Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 05/05/2021) |
| 05/06/2021 | 229 | NOTICE OF SERVICE of 1) Third Set of Interrogatories to Ingenico; 2) Third Set of Requests for Production of Documents to Ingenico; and 3) First Set of Requests for Admission to Ingenico filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 05/06/2021) |
| 05/11/2021 | 230 | [SEALED] Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Discovery Dispute. (Attachments: # 1 Exhibits 1-8)(Ormerod, Eve) (Entered: 05/11/2021) |
| 05/12/2021 | 231 | REDACTED VERSION of 227 Notice to Take Deposition *of Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. on a Date/Time Mutually Agreed Upon by the Parties* by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/12/2021) |
| 05/13/2021 | 232 | [SEALED] Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding discovery dispute - re 230 Letter. (Attachments: # 1 Exhibit A-D)(Cottrell, Frederick) (Entered: 05/13/2021) |
| 05/18/2021 | 233 | REDACTED VERSION of 230 Letter *to The Honorable William C. Bryson from Eve H. Ormerod regarding Discovery Dispute.* by IOENGINE LLC. (Attachments: # 1 Exhibits 1-8)(Belgam, Neal) (Entered: 05/18/2021) |
| 05/19/2021 | 234 | [SEALED] NOTICE to Take Deposition of IOENGINE, LLC under Rule 30(b)(6) on a date and at a time to be mutually agreed upon filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Cottrell, Frederick) (Entered: 05/19/2021) |
| 05/19/2021 | 235 | NOTICE to Take Deposition of Scott McNulty on June 2, 2021 filed by Ingenico Inc.. (Cottrell, Frederick) (Entered: 05/19/2021) |
| 05/24/2021 | 236 | STIPULATION and [Proposed] Order to Modify Scheduling Order by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 05/24/2021) |
| 05/25/2021 | 237 | THIRD REVISED SCHEDULING ORDER. Signed by Judge William C. Bryson on 5/25/2021. (amf) (Entered: 05/25/2021) |
| 05/28/2021 | 238 | NOTICE of Subpoena to Testify at a Deposition in a Civil Action to Bank of America N.A. by IOENGINE LLC (Ormerod, Eve) (Entered: 05/28/2021) |
| 05/28/2021 | 239 | NOTICE of Subpoena to Testify at a Deposition in a Civil Action to Bank of America Corp. by IOENGINE LLC (Ormerod, Eve) (Entered: 05/28/2021) |
| 06/01/2021 | 240 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding Markman hearing. (Ormerod, Eve) (Entered: 06/01/2021) |
| 06/15/2021 | 241 | NOTICE OF SERVICE of 1) Responses and Objections to Ingenico's Third Set of Interrogatories; 2) Responses and Objections to Ingenico's First Set of Requests for Admission and 3) Responses and objections to Ingenico's Second Set of Requests for Production of Documents filed by IOENGINE LLC.(Belgam, Neal) (Entered: 06/15/2021) |
| 06/17/2021 | 242 | ORDER Setting Mediation Conferences: A Telephone Conference re: Mediation is set for 6/29/2021 at 12:30 PM Eastern Time before Judge Mary Pat Thynge. Counsel for IOENGINE shall initiate the call to chambers. See ORDER for details. Signed by Judge Mary Pat Thynge on 6/17/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(DAT). (Entered: 06/17/2021) |
| 06/22/2021 | 243 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Additional Citation Authorities re Markman Hearing. (Belgam, Neal) (Entered: 06/22/2021) |
| 06/24/2021 | 244 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding June 23, 2021 Markman Hearing. (Attachments: # 1 Enclosure Article)(Belgam, Neal) (Entered: |

**Appx18184**

| | | 06/24/2021) |
|---|---|---|
| 06/24/2021 | 245 | Letter to The Honorable William C. Bryson from Jack B. Blumenfeld regarding Opposition to IOENGINE's Supplemental Submission - re (244 in 1:18-cv-00826-WCB, 222 in 1:18-cv-00452-WCB) Letter. (Blumenfeld, Jack) (Entered: 06/24/2021) |
| 06/24/2021 | | Minute Entry for proceedings held before Judge William C. Bryson - Telephone Conference held on 6/24/2021. (Court Reporter Natalia at Fortz Legal Support.) (kmd) (Entered: 06/25/2021) |
| 06/25/2021 | 246 | ORDER: PayPal and Ingenico's joint request for an opportunity to respond to IOENGINE's supplemental letter (see Dkt. Nos. 222 and 223 in 452-WCB, and Dkt. Nos. 244 and 245 in 826-WCB) is GRANTED. They can respond jointly in a letter no more than one page in length, or they can file separate letters no more than one page in length each, if they so choose. Any such responsive letter or letters must be filed by 3 pm ET today, June 25, 2021. No "reply letter" will be entertained. The Court intends to issue the claim construction order in this case by the close of business today. See Order for further details. Signed by Judge William C. Bryson on 6/25/2021. (kmd) (Entered: 06/25/2021) |
| 06/25/2021 | 247 | Letter to The Honorable William C. Bryson from Jack B. Blumenfeld regarding opposition to IOENGINE's supplemental claim construction submission (D.I. 224). (Blumenfeld, Jack) (Entered: 06/25/2021) |
| 06/25/2021 | 248 | CLAIM CONSTRUCTION ORDER. Signed by Judge William C. Bryson on 6/25/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB. (kmd) (Entered: 06/25/2021) |
| 06/28/2021 | 249 | NOTICE of Subpoena Directed to Western Digital Corporation by IOENGINE LLC (Ormerod, Eve) (Entered: 06/28/2021) |
| 06/29/2021 | 250 | NOTICE OF SERVICE of Responses and Objections to Ingenico Inc.'s Notice of 30(b) (6) Deposition filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 06/29/2021) |
| 07/09/2021 | 251 | NOTICE of SUBPOENA by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit A)(Cottrell, Frederick) (Entered: 07/09/2021) |
| 07/12/2021 | 252 | MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention - filed by IOENGINE LLC. (Attachments: # 1 Certification Pursuant to Rule 7.1.1, # 2 Text of Proposed Order)(Ormerod, Eve) (Entered: 07/12/2021) |
| 07/12/2021 | 253 | [SEALED] OPENING BRIEF in Support re 252 MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 7/26/2021. (Attachments: # 1 Letter of Request, # 2 Exhibit Letter of Request Exhibits Part 1, # 3 Exhibit Letter of Request Exhibits Part 2A, # 4 Exhibit Letter of Request Exhibits Part 2B, # 5 Exhibit Letter of Request Exhibits Part 3, # 6 Certificate of Service)(Ormerod, Eve) (Entered: 07/12/2021) |
| 07/12/2021 | 254 | NOTICE of Subpoena to Eugene Klein by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1)(Cottrell, Frederick) (Entered: 07/12/2021) |
| 07/12/2021 | 255 | NOTICE of Subpoena to Jeffrey Ash by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1)(Cottrell, Frederick) (Entered: 07/12/2021) |
| 07/12/2021 | 256 | NOTICE of Subpoena to Walter Hanchuk by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1)(Cottrell, Frederick) (Entered: 07/12/2021) |

**Appx18185**

| 07/12/2021 | 257 | NOTICE OF SERVICE of Ingenico's Second Set of Requests for Admission to IOENGINE filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 07/12/2021) |
|---|---|---|
| 07/13/2021 | 258 | NOTICE OF SERVICE of Defendant/Counterclaim Plaintiff IOENGINE, LLCs Fourth Set of Interrogatories to Ingenico Inc., Ingenico Corp., and Ingenico Group S.A., and IOENGINE, LLCs Second Set of Requests for Admission to Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 07/13/2021) |
| 07/15/2021 | | CORRECTING ENTRY: Previous Order has been removed, filed in incorrect case. (smg) (Entered: 07/15/2021) |
| 07/15/2021 | 259 | ORDER granting 252 MOTION Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention. The Court shall issue and sign the Letter of Request, bearing the Courts seal, which shall be returned to IOENGINE, LLC, which shall send the Letter of Request to the proper international authorities. Signed by Judge William C. Bryson on 07/15/2021. (smg) (Entered: 07/15/2021) |
| 07/15/2021 | 260 | NOTICE of SUBPOENA by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1)(Cottrell, Frederick) (Entered: 07/15/2021) |
| 07/19/2021 | 261 | REDACTED VERSION of (253 in 1:18-cv-00826-WCB) Opening Brief in Support,, (233 in 1:18-cv-00452-WCB) Opening Brief in Support,, re Motion Requesting Issuance of a Letter of Request for International Judicial Assistance Pursuant to the Hague Evidence Convention by IOENGINE LLC. (Attachments: # 1 Letter of Request, # 2 Letter of Request Exhibits Part 1, # 3 Letter of Request Exhibits Part 2A, # 4 Letter of Request Exhibits Part 2B, # 5 Letter of Request Exhibits Part 3)(Ormerod, Eve) (Entered: 07/19/2021) |
| 07/19/2021 | 262 | NOTICE of Re-Notice of Subpoena by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit 1 - Subpoena to Eugene Klein)(Cottrell, Frederick) (Entered: 07/19/2021) |
| 07/22/2021 | 263 | Letter to The Honorable William C. Bryson from PayPal and Ingenico regarding scheduling extension. (Blumenfeld, Jack) (Entered: 07/22/2021) |
| 07/22/2021 | 264 | Letter to The Honorable William C. Bryson from Neal C. Belgam regarding Discovery Dispute Regarding Case Scheduling. (Attachments: # 1 Exhibits A-G)(Belgam, Neal) (Entered: 07/22/2021) |
| 07/23/2021 | | Minute Entry for proceedings held before Judge William C. Bryson Telephone Conference held on July 23, 2021, regarding a discovery and scheduling dispute between the parties (court reporting service provided by Lexitas).(Total Time in Court: 1 hour, 10 minutes) Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB(myr) (Entered: 07/26/2021) |
| 07/26/2021 | 265 | ORDER: The discovery period is further extended re 263 Letter, 264 Letter.The Court will adopt a schedule that is based on the proposal offered by PayPal and Ingenico. A fourth revised scheduling order will be filed separately as soon as the Clerk's Office provides me with information me as to the availability of courtrooms for each of the trials. Every Friday through the completion of fact discovery, I will require the parties to file a joint report. (See Order for further details). Signed by Judge William C. Bryson on 7/26/2021. (myr) (Entered: 07/26/2021) |
| 07/26/2021 | 266 | FOURTH REVISED SCHEDULING ORDER: Fact Discovery completed by 10/22/2021. Opening Expert Reports due by 11/19/2021. Rebuttal Expert Reports due by 1/7/2022. |

**Appx18186**

| | | Expert Discovery due by 1/28/2022. Dispositive Motions due by 1/28/2022. Answering Brief due 3/11/2022. Reply Brief due 3/18/2022. A Jury Trial is set for 7/11/2022 in Courtroom 6A before Judge William C. Bryson. See Order for further details. Signed by Judge William C. Bryson on 7/26/2021. (kmd) (Entered: 07/26/2021) |
|---|---|---|
| 07/30/2021 | 267 | Joint STATUS REPORT by IOENGINE LLC. (Ormerod, Eve) (Entered: 07/30/2021) |
| 08/02/2021 | 268 | FOURTH REVISED SCHEDULING ORDER: Fact Discovery completed by 10/22/2021. Opening Expert Reports due by 11/19/2021. Rebuttal Expert Reports due by 1/7/2022. Expert Discovery due by 1/28/2022. Dispositive Motions due by 2/18/2022. Answering Brief due 3/11/2022. Reply Brief due 3/18/2022. A Jury Trial is set for 7/11/2022 in Courtroom 6A before Judge William C. Bryson. Signed by Judge William C. Bryson on 8/2/2021. (kmd) (Entered: 08/02/2021) |
| 08/02/2021 | 269 | Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. regarding Executed Hague Evidence Convention Letter of Request. (Attachments: # 1 Exhibit Exhibit A)(Ormerod, Eve) (Entered: 08/02/2021) |
| 08/03/2021 | 270 | NOTICE of Subpoena to Rowayton Fire Department by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Attachments: # 1 Exhibit A)(Haynes, Christine) (Entered: 08/03/2021) |
| 08/05/2021 | 271 | ORDER Setting Mediation Conferences: A Video/Virtual Mediation Conference is set for 11/15/2021 at 10:00 AM before Judge Mary Pat Thynge and a Video/Virtual Mediation Conference is set for 11/16/2021 at 10:30 AM before Judge Mary Pat Thynge. See ORDER for details. Signed by Judge Mary Pat Thynge on 8/5/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(DAT). (Entered: 08/05/2021) |
| 08/06/2021 | 272 | Joint STATUS REPORT *(Weekly Discovery Status Report)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 08/06/2021) |
| 08/09/2021 | 273 | ORDER re (258 in 1:18-cv-00452-WCB, 272 in 1:18-cv-00826-WCB) Status Report. Signed by Judge William C. Bryson on 8/9/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 08/09/2021) |
| 08/11/2021 | 274 | Letter to The Honorable William C. Bryson from Neal C. Belgam, Esq. regarding Depositions of INGENICO, Inc., INGENICO Corp., and INGENICO Group S.A.S Rule 30(b)(6) Designee In France - re 273 Order. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Belgam, Neal) (Entered: 08/11/2021) |
| 08/11/2021 | 275 | NOTICE OF SERVICE of Responses and Objections to Ingenico Inc., Ingenico Corp., and Ingenico Group S.A.s Second Set of Requests for Admission filed by IOENGINE LLC.(Belgam, Neal) (Entered: 08/11/2021) |
| 08/11/2021 | 276 | NOTICE OF SERVICE of Response to Second Set of Requests for Admission and Response to Fourth Set of Interrogatories filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 08/11/2021) |
| 08/13/2021 | 277 | STATUS REPORT *(Discovery)* by PayPal Holdings, Inc.. (Blumenfeld, Jack) (Entered: 08/13/2021) |
| 08/13/2021 | 278 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding French Witness - re 274 Letter,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Cottrell, Frederick) (Entered: 08/13/2021) |
| 08/17/2021 | 279 | ORDER: This order addresses several issues raised in the parties' weekly discovery status report filed on August 13, 2021. Case No. 18-452, Dkt. No. 261 . Please see Order for |

**Appx18187**

| | | details. Signed by Judge William C. Bryson on 8/17/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(kmd) (Entered: 08/17/2021) |
|---|---|---|
| 08/17/2021 | 280 | Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. regarding Reply Regarding Depositions of Ingenico, Inc., Ingenico Corp., and Ingenico Group S.A.'s 30(b)(6) Designee in France - re 274 Letter, 278 Letter. (Attachments: # 1 Exhibit A - E)(Ormerod, Eve) (Entered: 08/17/2021) |
| 08/17/2021 | 281 | MOTION for Pro Hac Vice Appearance of Attorney Judah Bellin, Michael Fisher, and Luke Reilly - filed by IOENGINE LLC. (Attachments: # 1 Certification, # 2 Certification, # 3 Certification)(Ormerod, Eve) (Entered: 08/17/2021) |
| 08/18/2021 | 282 | ORDER granting 281 Motion to Appear Pro Hac Vice as to Judah Bellin, Michael A. Fisher, and Luke M. Reilly. Signed by Judge William C. Bryson on 08/18/2021. (smg) (Entered: 08/18/2021) |
| 08/19/2021 | 283 | ORDER, This order addresses a discovery dispute regarding the deposition of an Ingenico employee, Alain Soubirane. Please see Order for details. Signed by Judge William C. Bryson on 8/19/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 08/19/2021) |
| 08/20/2021 | | Pro Hac Vice Attorneys Luke M. Reilly, Michael A. Fisher, and Judah Bellin for IOENGINE LLC added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB(srs) (Entered: 08/20/2021) |
| 08/20/2021 | 284 | [SEALED] Joint STATUS REPORT *(Weekly Discovery Status Report)* by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/20/2021) |
| 08/24/2021 | 285 | ORDER, This order responds to issues raised in the parties' weekly discovery status report filed on August 20, 2021. Please see Order for details. Signed by Judge William C. Bryson on 8/24/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 08/24/2021) |
| 08/24/2021 | 286 | NOTICE OF SERVICE of Second Supplemental and Amended Responses and Objections to First Set of Interrogatories filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 08/24/2021) |
| 08/25/2021 | 287 | Joint MOTION to Appoint a Commissioner for Discovery in France and for Issuance of a Request for International Judicial Assistance Under Chapter II of the Hague Convention - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A - D)(Cottrell, Frederick) (Entered: 08/25/2021) |
| 08/25/2021 | 288 | ORDER granting 287 Joint MOTION to Appoint a Commissioner for Discovery in France and for Issuance of a Request for International Judicial Assistance Under Chapter II of the Hague Convention. Signed by Judge William C. Bryson on 8/25/2021. (cna, ) (Entered: 08/26/2021) |
| 08/26/2021 | 289 | REDACTED VERSION *Joint STATUS REPORT (Weekly Discovery Status Report)* by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/26/2021) |
| 08/27/2021 | 290 | STIPULATION Stipulation and [Proposed] Order Regarding Documents Relating to Subpoenas re (226 in 1:18-cv-00826-WCB) Notice (Other), (227 in 1:18-cv-00826-WCB) Notice to Take Deposition by IOENGINE LLC. (Belgam, Neal) (Entered: 08/27/2021) |
| 08/27/2021 | 291 | [SEALED] Joint STATUS REPORT *(Weekly Discovery Status Report)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1-12)(Haynes, Christine) |

**Appx18188**

| | | (Entered: 08/27/2021) |
|---|---|---|
| 08/30/2021 | 292 | ORDER, This order addresses the parties' weekly discovery status report filed on August 27, 2021. Please see Order for details. Signed by Judge William C. Bryson on 8/30/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (nmg) (Entered: 08/30/2021) |
| 08/30/2021 | 293 | STIPULATION AND ORDER regarding documents relating to subpoenas. Signed by Judge William C. Bryson on 8/30/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (nmg) (Entered: 08/30/2021) |
| 09/03/2021 | 294 | [SEALED] STATUS REPORT -- *Weekly Discovery Status Report* -- by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 09/03/2021) |
| 09/09/2021 | 295 | NOTICE OF SERVICE of Ingenico, Inc., Ingenico Corp. and Ingenico Group S.A.'s Supplemental Response to IOENGINE, LLC's First Set of Interrogatories (No. 4) filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 09/09/2021) |
| 09/10/2021 | 296 | ORDER, In case no. 18-452, plaintiff IOENGINE, LLC, filed a Motion Requesting Issuance of Letter of Request for International Assistance Pursuant to the Hague Evidence Convention. Dkt. No. 278. The motion, filed on September 3, 2021, seeks discovery from a United Kingdom company, Miura Systems, Limited. Pursuant to a court order shortening the time for response, defendant PayPal Holdings, Inc., filed a response to the motion three business days later, on September 9, 2021. Dkt. No. 284. If IOENGINE, LLC, wishes to file a reply, the reply will be due by 5 p.m. Eastern Time, on September 14, 2021. The reply will be limited to no more than 10 pages in length. Signed by Judge William C. Bryson on 9/10/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 09/10/2021) |
| 09/10/2021 | 297 | MOTION for Pro Hac Vice Appearance of Attorney Kevin R. Mosier of Sunstein LLP - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 09/10/2021) |
| 09/10/2021 | 298 | Joint STATUS REPORT *(Weekly Discovery Status Report)* by IOENGINE LLC. (Ormerod, Eve) (Entered: 09/10/2021) |
| 09/13/2021 | 299 | ORDER granting 297 Motion to Appear Pro Hac Vice as to Kevin R. Mosier. Signed by Judge William C. Bryson on 09/13/2021. (smg) (Entered: 09/13/2021) |
| 09/13/2021 | | Pro Hac Vice Attorney Kevin R. Mosier for Ingenico Corp., Ingenico Group S.A.,and Ingenico Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (srs) (Entered: 09/13/2021) |
| 09/17/2021 | 300 | [SEALED] MOTION for Leave to Serve Third-Party Subpoena on Scott Tubbs - filed by IOENGINE LLC. (Attachments: # 1 [Proposed] Order, # 2 Exhibit 1-5, # 3 Certificate of Service)(Ormerod, Eve) (Entered: 09/17/2021) |
| 09/17/2021 | 301 | Joint STATUS REPORT by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 09/17/2021) |
| 09/20/2021 | 302 | ORDER, granting D.I. 300 unopposed MOTION for Leave to Serve Third-Party Subpoena on Scott Tubbs. Signed by Judge William C. Bryson on 9/20/2021. (myr) (Entered: 09/20/2021) |
| 09/21/2021 | 303 | NOTICE of Subpoena to Scott Tubbs by IOENGINE LLC (Belgam, Neal) (Entered: 09/21/2021) |

**Appx18189**

| 09/21/2021 | 304 | [SEALED] Letter to The Honorable William C. Bryson from Brian P. Egan regarding motion to compel. (Attachments: # 1 Exhibits A-M)(Egan, Brian) (Entered: 09/21/2021) |
|---|---|---|
| 09/23/2021 | 305 | ACKNOWLEDGMENT OF RECEIPT for the taking of Evidence Request in Civil and Commercial Matters, regarding 288 Order on Joint MOTION to Appoint a Commissioner for Discovery in France and for Issuance of a Request for International Judicial Assistance Under Chapter II of the Hague Convention. Acknowledgement filed by The French Ministry of Justice. (smg) (Entered: 09/23/2021) |
| 09/23/2021 | 306 | [SEALED] Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. regarding IOENGINE'S ANSWERING DISCOVERY DISPUTE LETTER. (Attachments: # 1 Exhibit Exhibits A-O with Certificate of Service)(Ormerod, Eve) (Entered: 09/23/2021) |
| 09/24/2021 | 307 | [SEALED] Letter to The Honorable William C. Bryson from Brian P. Egan regarding reply regarding motion to compel - re (304 in 1:18-cv-00826-WCB, 299 in 1:18-cv-00452-WCB) Letter. (Egan, Brian) (Entered: 09/24/2021) |
| 09/24/2021 | 308 | NOTICE of Lodging by PayPal Holdings, Inc. re (307 in 1:18-cv-00452-WCB, 307 in 1:18-cv-00826-WCB) Letter (Egan, Brian) (Entered: 09/24/2021) |
| 09/24/2021 | 309 | STATUS REPORT -- *Weekly Discovery Status Report* -- by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 09/24/2021) |
| 09/27/2021 | 310 | REDACTED VERSION of 300 MOTION for Leave to Serve Third-Party Subpoena on Scott Tubbs by IOENGINE LLC. (Attachments: # 1 [Proposed] Order, # 2 Exhibit 1-5) (Ormerod, Eve) (Entered: 09/27/2021) |
| 09/28/2021 | 311 | REDACTED VERSION of (304 in 1:18-cv-00826-WCB, 299 in 1:18-cv-00452-WCB) Letter by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 09/28/2021) |
| 09/29/2021 | | Minute Entry for proceedings held before Judge William C. Bryson: Telephonic hearing held on 9/29/2021. Counsel for all parties appeared. Court reporter present. The Court heard arguments on various discovery disputes. (Total Time in Court: 2 hours, 45 minutes). Associated Cases: 1:18-cv-00826-WCB; 1:18-cv-00452-WCB. (myr) (Entered: 10/14/2021) |
| 09/30/2021 | 312 | REDACTED VERSION of (307 in 1:18-cv-00452-WCB, 307 in 1:18-cv-00826-WCB) Letter by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 09/30/2021) |
| 09/30/2021 | 313 | [SEALED] ORDER re D.I.(300 in 1:18-cv-00452-WCB) Letter, (304 in 1:18-cv-00826-WCB, 299 in 1:18-cv-00452-WCB) Letter. Signed by Judge William C. Bryson on 9/30/2021.This order has been emailed to local counsel. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(myr) (Entered: 09/30/2021) |
| 09/30/2021 | 314 | REDACTED VERSION of (306 in 1:18-cv-00826-WCB, 304 in 1:18-cv-00452-WCB) Letter *to The Honorable William C. Bryson from Eve Ormerod, Esq. regarding IOENGINE's Answering Discovery Dispute Letter* by IOENGINE LLC. (Attachments: # 1 Exhibit)(Ormerod, Eve) (Entered: 09/30/2021) |
| 10/01/2021 | 315 | NOTICE OF SERVICE of IOENGINE, LLC's Final Claim Charts filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 10/01/2021) |
| 10/01/2021 | 316 | Joint STATUS REPORT *(Weekly Discovery Status Report)* by IOENGINE LLC. (Ormerod, Eve) (Entered: 10/01/2021) |
| 10/04/2021 | 317 | Joint PROPOSED ORDER [Proposed] Inspection Protocol by IOENGINE LLC. (Ormerod, Eve) (Entered: 10/04/2021) |

**Appx18190**

| 10/04/2021 | 318 | INSPECTION PROTOCOL. Signed by Judge William C. Bryson on 10/4/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 10/04/2021) |
|---|---|---|
| 10/04/2021 | 319 | REDACTED VERSION of (312 in 1:18-cv-00452-WCB, 311 in 1:18-cv-00826-WCB) Redacted Document, (304 in 1:18-cv-00826-WCB, 299 in 1:18-cv-00452-WCB) Letter by PayPal Holdings, Inc.. (Attachments: # 1 Exhibits A-M, # 2 Letter to the Honorable William C. Bryson)(Egan, Brian) (Entered: 10/04/2021) |
| 10/08/2021 | 320 | Joint STATUS REPORT *(Weekly Discovery Status Report)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 10/08/2021) |
| 10/12/2021 | | ORAL ORDER re (257 in 1:18-cv-00452-WCB, 271 in 1:18-cv-00826-WCB) Order Setting Mediation Conferences: Pursuant to correspondence from counsel, it is ORDERED that 4, first sentence of the Mediation Order at D.I. 257 in C.A. No. 18-452-WCB and D.I. 271 in C.A. No. 18-826-WCB is hereby modified as follows: "On or before **Tuesday, November 2, 2021 by no later than 3:00 p.m. Eastern**, AN ORIGINAL and ONE COPY of a confidential mediation statement containing all of the information required by 6 shall be submitted **ONLY** to the Magistrate Judge." All other aspects of the Mediation Order shall remain in full force and effect. Ordered by Judge Mary Pat Thynge on 10/12/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(DAT). (Entered: 10/12/2021) |
| 10/12/2021 | 321 | REDACTED VERSION of (316 in 1:18-cv-00452-WCB, 313 in 1:18-cv-00826-WCB) SEALED Order. (nmg) (Entered: 10/12/2021) |
| 10/14/2021 | 322 | STIPULATION and [Proposed] Order Regarding Limited Extension of Fact Discovery Deadline for Deposition in Israel by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 10/14/2021) |
| 10/15/2021 | 323 | STIPULATION AND ORDER: The current deadline for the close of fact discovery is extended for the sole purpose of taking the deposition of Dan Harkabi in Israel pursuant to the Hague Convention on The Taking of Evidence Abroad. The deposition of Mr. Harkabi shall be completed by November 4, 2021 on a date that is mutually agreeable to counsel to the parties and to the witness. Pursuant to D. Del. L.R. 16.4, counsel certify that a copy of this request has been provided to their respective clients. Signed by Judge William C. Bryson on 10/15/2021. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 10/15/2021) |
| 10/15/2021 | 324 | NOTICE OF SERVICE of IOENGINE, LLC'S Third Supplemental and Amended Responses and Objections to Ingenico, Inc.'s and Ingenico Corp.'s First Set of Interrogatories filed by IOENGINE LLC.(Belgam, Neal) (Entered: 10/15/2021) |
| 10/15/2021 | 325 | STATUS REPORT -- *Weekly Discovery Status Report* -- by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 10/15/2021) |
| 10/22/2021 | 326 | Joint STATUS REPORT *(Weekly Discovery Status Report)* by IOENGINE LLC. (Ormerod, Eve) (Entered: 10/22/2021) |
| 10/22/2021 | 327 | NOTICE OF SERVICE of Ingenico's Supplemental Responses to IOENGINE's First and Third Request for Production of Documents and Ingenico's Third Supplemental Response to IOENGINE, LLC's First Set of Interrogatories filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 10/22/2021) |
| 11/01/2021 | 328 | NOTICE OF SERVICE of Ingenico's Final Initial Invalidity Contentions filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 11/01/2021) |

**Appx18191**

| 11/15/2021 | [329](#) | NOTICE OF SERVICE of Ingenico's Fourth Supplemental and Amended Response to IOENGINE, LLC's First Set of Interrogatories filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 11/15/2021) |
|---|---|---|
| 11/19/2021 | [330](#) | NOTICE OF SERVICE of Expert Report of James T. Geier filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 11/19/2021) |
| 11/22/2021 | [331](#) | NOTICE OF SERVICE of 1) Expert Report of Dr. Aviel D. Rubin, Ph.D. and 2) Expert Report of Jeffrey A. Stec, Ph.D. filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 11/22/2021) |
| 11/24/2021 | [332](#) | NOTICE OF SERVICE of IOENGINE, LLC's Fourth Supplemental and Amended Responses and Objections to Ingenico, Inc.'s and Ingenico Corp.'s First Set of Interrogatories filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 11/24/2021) |
| 12/06/2021 | [333](#) | [SEALED] MOTION for Joinder *with Paypal's Motion for Spoliation Sanctions* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # [1](#) Exhibit A-D, # [2](#) 7.1.1 Certification)(Cottrell, Frederick) (Entered: 12/06/2021) |
| 12/06/2021 | [334](#) | NOTICE of Withdrawal of Lena M. Cavallo (pro hac vice) by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Haynes, Christine) (Entered: 12/06/2021) |
| 12/13/2021 | [335](#) | REDACTED VERSION of [333](#) MOTION for Joinder *with Paypal's Motion for Spoliation Sanctions* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 12/13/2021) |
| 12/17/2021 | [336](#) | STIPULATION and [Proposed] Order Extending Deadlines for Briefing on PayPal's and Ingenico's Motion for Spoliation Sanctions re (366 in 1:18-cv-00452-WCB) MOTION for Sanctions , (333 in 1:18-cv-00826-WCB) MOTION for Joinder *with Paypal's Motion for Spoliation Sanctions* by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 12/17/2021) |
| 12/17/2021 | [337](#) | STIPULATION AND ORDER Extending Deadlines for Briefing on PayPal's and Ingenico's Motion(See Order for further details). Signed by Judge William C. Bryson on 12/17/2021. Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB(myr) (Entered: 12/17/2021) |
| 12/21/2021 | [338](#) | ANSWERING BRIEF in Opposition re [333](#) MOTION for Joinder *with Paypal's Motion for Spoliation Sanctions* filed by IOENGINE LLC.Reply Brief due date per Local Rules is 12/28/2021. (Ormerod, Eve) (Entered: 12/21/2021) |
| 12/21/2021 | [339](#) | [SEALED] DECLARATION re [338](#) Answering Brief in Opposition *Declaration of Noah M. Leibowitz* by IOENGINE LLC. (Attachments: # [1](#) Exhibit 1-3)(Ormerod, Eve) (Entered: 12/21/2021) |
| 12/21/2021 | [340](#) | [SEALED] DECLARATION re [338](#) Answering Brief in Opposition *Declaration of Scott F. McNulty* by IOENGINE LLC. (Ormerod, Eve) (Entered: 12/21/2021) |
| 12/28/2021 | [341](#) | REDACTED VERSION of [339](#) Declaration by IOENGINE LLC. (Attachments: # [1](#) Exhibit 1-3)(Ormerod, Eve) (Entered: 12/28/2021) |
| 12/28/2021 | [342](#) | REDACTED VERSION of [340](#) Declaration by IOENGINE LLC. (Ormerod, Eve) (Entered: 12/28/2021) |
| 12/30/2021 | [343](#) | [SEALED] REPLY to Response to Motion re [333](#) MOTION for Joinder *with Paypal's Motion for Spoliation Sanctions* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 12/30/2021) |
| 12/30/2021 | [344](#) | [SEALED] DECLARATION re [343](#) Reply to Response to Motion *(Declaration of Joel Leeman)* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # [1](#) |

**Appx18192**

| | | Exhibit A-D)(Cottrell, Frederick) (Entered: 12/30/2021) |
|---|---|---|
| 01/06/2022 | 345 | REQUEST for Oral Argument by IOENGINE LLC re 333 MOTION for Joinder *with Paypal's Motion for Spoliation Sanctions.* (Ormerod, Eve) (Entered: 01/06/2022) |
| 01/07/2022 | 346 | NOTICE OF SERVICE of (1) Responsive Expert Report of James T. Geier and (2) Expert Rebuttal Report of Barry Sussman filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 01/07/2022) |
| 01/10/2022 | 347 | NOTICE OF SERVICE of the Expert Reports of 1) Aviel D. Rubin, Ph.D. and 2) Jeffrey Klenk filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 01/10/2022) |
| 01/11/2022 | 348 | REDACTED VERSION of 343 Reply to Response to Motion by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 01/11/2022) |
| 01/11/2022 | 349 | REDACTED VERSION of 344 Declaration *of Joel Leeman* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit A-D)(Haynes, Christine) (Entered: 01/11/2022) |
| 01/19/2022 | 350 | NOTICE to Take Deposition of Barry Sussman on January 21, 2022 at 9:00 a.m. filed by IOENGINE LLC.(Belgam, Neal) (Entered: 01/19/2022) |
| 01/20/2022 | 351 | NOTICE to Take Deposition of James T. Geier on January 26 and 27, 2022 at 9:00 a.m. filed by IOENGINE LLC.(Belgam, Neal) (Entered: 01/20/2022) |
| 02/18/2022 | 352 | MOTION for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier - filed by IOENGINE LLC. (Attachments: # 1 Text of Proposed Order)(Ormerod, Eve) (Entered: 02/18/2022) |
| 02/18/2022 | 353 | MOTION to Preclude *the Testimony of Dr. Stec* - filed by PayPal Holdings, Inc., Ingenico Corp., Ingenico Group S.A.. (Egan, Brian) (Entered: 02/18/2022) |
| 02/18/2022 | 354 | MOTION to Preclude *the Testimony of Mr. Klenk* - filed by PayPal Holdings, Inc., Ingenico Corp., Ingenico Group S.A.. (Egan, Brian) (Entered: 02/18/2022) |
| 02/18/2022 | 355 | MOTION for Summary Judgment *of No Indirect Infringement* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order)(Cottrell, Frederick) (Entered: 02/18/2022) |
| 02/18/2022 | 356 | MOTION for Summary Judgment *that IOENGINE is Estopped from Relitigating the Validity of Claims Found Unpatentable by the PTAB* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Egan, Brian) (Entered: 02/18/2022) |
| 02/18/2022 | 357 | MOTION for Summary Judgment *of No Direct or Joint Infringement* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Egan, Brian) (Entered: 02/18/2022) |
| 02/18/2022 | 358 | MOTION for Summary Judgment *that the Asserted Claims are Invalid Under Section 101* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Egan, Brian) (Entered: 02/18/2022) |
| 02/18/2022 | 359 | [SEALED] OPENING BRIEF in Support re 358 MOTION for Summary Judgment *that the Asserted Claims are Invalid Under Section 101*, 357 MOTION for Summary Judgment *of No Direct or Joint Infringement*, 356 MOTION for Summary Judgment *that IOENGINE is Estopped from Relitigating the Validity of Claims Found Unpatentable by the PTAB*, 353 MOTION to Preclude *the Testimony of Dr. Stec*, 354 MOTION to Preclude *the Testimony of Mr. Klenk* - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Answering Brief/Response due date per Local Rules is 3/4/2022. (Egan, Brian) (Entered: 02/18/2022) |

**Appx18193**

| | | |
|---|---|---|
| 02/18/2022 | 360 | [SEALED] DECLARATION re 359 Opening Brief in Support,, *of Brian P. Egan* - by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhilbits 1-33) (Egan, Brian) (Entered: 02/18/2022) |
| 02/18/2022 | 361 | [SEALED] OPENING BRIEF in Support re 352 MOTION for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier *including Certificate of Service* filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 3/4/2022. (Attachments: # 1 Appendix 1-6) (Ormerod, Eve) (Entered: 02/18/2022) |
| 02/18/2022 | 362 | [SEALED] DECLARATION re (352 in 1:18-cv-00826-WCB, 397 in 1:18-cv-00452-WCB) MOTION for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier *including Certificate of Service* by IOENGINE LLC. (Attachments: # 1 Exhibit Vol 1 - Exhibits 1-13, # 2 Exhibit Vol 2 - Exhibits 14-18, # 3 Exhibit Vol 3 - Exhibits 19-24, # 4 Exhibit Vol 4 - Exhibits 25-36, # 5 Exhibit Vol 5 - Exhibits 37-46)(Ormerod, Eve) (Entered: 02/18/2022) |
| 02/22/2022 | 363 | [SEALED] EXHIBIT re (406 in 1:18-cv-00452-WCB, 362 in 1:18-cv-00826-WCB) Declaration, by IOENGINE LLC. (Attachments: # 1 Exhibit Sanitized Volume 4(A) - Exhibits 25-28, # 2 Exhibit Sanitized Volume 4(B) - Exhibits 29-32, # 3 Exhibit Sanitized Volume 4(C) - Exhibits 33-36)(Ormerod, Eve) (Entered: 02/22/2022) |
| 02/25/2022 | 364 | REDACTED VERSION of (405 in 1:18-cv-00452-WCB) Opening Brief in Support, (361 in 1:18-cv-00826-WCB) Opening Brief in Support, by IOENGINE LLC. (Attachments: # 1 Appendix 1-6)(Ormerod, Eve) (Entered: 02/25/2022) |
| 02/25/2022 | 365 | REDACTED VERSION of (406 in 1:18-cv-00452-WCB, 362 in 1:18-cv-00826-WCB) Declaration, by IOENGINE LLC. (Attachments: # 1 Exhibit Vol 1 - Exhibits 1-13, # 2 Exhibit Vol 2 - Exhibits 14-18, # 3 Exhibit Vol 3 - Exhibits 19-24, # 4 Exhibit Vol 4A-4C - Exhibits 25-36, # 5 Exhibit Vol 5 - Exhibits 37-46)(Ormerod, Eve) (Entered: 02/25/2022) |
| 02/25/2022 | 366 | STIPULATION TO EXTEND TIME to file redacted public versions of their Opening Brief in Support of Their Motion for Summary Judgment and Daubert Motions and the Declaration of Brian P. Egan in Support of Opening Brief in Support of Their Motions for Summary Judgment and Daubert Motions to February 28, 2022 - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 02/25/2022) |
| 02/28/2022 | 367 | STIPULATION AND ORDER Regarding Redactions, the deadline for PayPal and Ingenico to file redacted public versions of their Opening Brief in Support of Their Motions for Summary Judgment and Daubert Motions (D.I. 403 in C.A. 18-452-WCB) and the Declaration of Brian P. Egan in Support of PayPal and Ingenico's Opening Brief in Support of Their Motions for Summary Judgment and Daubert Motions (D.I. 404 in C.A. No. 18-452-WCB) is extended through and including February 28, 2022. Signed by Judge William C. Bryson on 02/28/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 02/28/2022) |
| 02/28/2022 | 368 | REDACTED VERSION of (359 in 1:18-cv-00826-WCB) Opening Brief in Support,, (403 in 1:18-cv-00452-WCB) Opening Brief in Support,, by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 02/28/2022) |
| 02/28/2022 | 369 | REDACTED VERSION of (360 in 1:18-cv-00826-WCB) Declaration, (404 in 1:18-cv-00452-WCB) Declaration by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 02/28/2022) |
| 03/08/2022 | 370 | ORDER, The court will hold an evidentiary hearing on the motion for spoliation sanctions on Wednesday, April 6, 2022. The hearing will begin at 9:30am Eastern Time and will be held in Courtroom 6A of the J. Caleb Boggs Federal Building and Courthouse in Wilmington, Delaware before Judge William C. Bryson. Signed by Judge William C. |

**Appx18194**

| | | |
|---|---|---|
| | | Bryson on 3/8/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 03/08/2022) |
| 03/08/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Telephonic hearing held on 3/8/2022. Counsel for all parties appeared. Court reporter present. The Court discussed the format and timing of the evidentiary hearing on PayPal and Ingenicos motion for spoliation sanctions (Dkt. No. 366 in case 18-452; Dkt. No. 333 in case 18-826). (Total Time in Court: 30 minutes) (Court reporter Carrie Gold). Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(nmg) (Entered: 03/08/2022) |
| 03/11/2022 | 371 | [SEALED] ANSWERING BRIEF in Opposition re 352 MOTION for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Reply Brief due date per Local Rules is 3/18/2022. (Egan, Brian) (Entered: 03/11/2022) |
| 03/11/2022 | 372 | [SEALED] ANSWERING BRIEF in Opposition re 358 MOTION for Summary Judgment *that the Asserted Claims are Invalid Under Section 101*, 355 MOTION for Summary Judgment *of No Indirect Infringement*, 357 MOTION for Summary Judgment *of No Direct or Joint Infringement*, 356 MOTION for Summary Judgment *that IOENGINE is Estopped from Relitigating the Validity of Claims Found Unpatentable by the PTAB* filed by IOENGINE LLC.Reply Brief due date per Local Rules is 3/18/2022. (Ormerod, Eve) (Entered: 03/11/2022) |
| 03/11/2022 | 373 | [SEALED] DECLARATION re (371 in 1:18-cv-00826-WCB) Answering Brief in Opposition,, (415 in 1:18-cv-00452-WCB) Answering Brief in Opposition, -- *Declaration of Brian P. Egan* -- by PayPal Holdings, Inc.. (Attachments: # 1 Exhibits A-KK)(Egan, Brian) (Entered: 03/11/2022) |
| 03/11/2022 | 374 | [SEALED] DECLARATION re (372 in 1:18-cv-00826-WCB) Answering Brief in Opposition,, (416 in 1:18-cv-00452-WCB) Answering Brief in Opposition, *Declaration of Derek J. Brader* by IOENGINE LLC. (Attachments: # 1 Exhibit Vol 1 - Ex 1-3, # 2 Exhibit Vol 2 - Ex 4-15, # 3 Exhibit Vol 3 - Ex 16-19, # 4 Exhibit Vol 4 - Ex 20-29, # 5 Exhibit Vol 5 - Ex 30-45, # 6 Exhibit Vol 6 - Ex 46-49)(Ormerod, Eve) (Entered: 03/11/2022) |
| 03/11/2022 | 375 | NOTICE of of Lodging regarding Exhibits 10-15 by IOENGINE LLC re (418 in 1:18-cv-00452-WCB, 374 in 1:18-cv-00826-WCB) Declaration, (Ormerod, Eve) (Entered: 03/11/2022) |
| 03/16/2022 | 376 | Joint STIPULATION TO EXTEND TIME for the parties to file redactions to March 11, 2022 filings from March 18, 2022 to March 22, 2022 - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 03/16/2022) |
| 03/17/2022 | 377 | STIPULATION AND ORDER to Extend Time, the deadline for public versions shall be extended from March 18, 2022, to March 22, 2022. (See Order for further details) Signed by Judge William C. Bryson on 03/17/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 03/17/2022) |
| 03/18/2022 | 378 | [SEALED] REPLY BRIEF *in further support of IOENGINE LLC's combined Motion for Partial Summary Judgment of No Invalidity and to Exclude Testimony of Barry Sussman and James Geier* filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 03/18/2022) |
| 03/18/2022 | 379 | [SEALED] DECLARATION re 378 Reply Brief *Declaration of Michael H. Joshi* by IOENGINE LLC. (Attachments: # 1 Exhibit 50-58)(Ormerod, Eve) (Entered: 03/18/2022) |
| 03/18/2022 | 380 | [SEALED] REPLY BRIEF re 358 MOTION for Summary Judgment *that the Asserted Claims are Invalid Under Section 101*, 357 MOTION for Summary Judgment *of No* |

**Appx18195**

| | | |
|---|---|---|
| | | *Direct or Joint Infringement*, 356 MOTION for Summary Judgment *that IOENGINE is Estopped from Relitigating the Validity of Claims Found Unpatentable by the PTAB*, 353 MOTION to Preclude *the Testimony of Dr. Stec*, 354 MOTION to Preclude *the Testimony of Mr. Klenk* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Egan, Brian) (Entered: 03/18/2022) |
| 03/18/2022 | 381 | [SEALED] DECLARATION re (380 in 1:18-cv-00826-WCB) Reply Brief,, (424 in 1:18-cv-00452-WCB) Reply Brief,, -- *Declaration of Brian P. Egan* -- by PayPal Holdings, Inc.. (Attachments: # 1 Exhibits 34-39)(Egan, Brian) (Entered: 03/18/2022) |
| 03/22/2022 | 382 | REDACTED VERSION of (416 in 1:18-cv-00452-WCB) Answering Brief in Opposition, (372 in 1:18-cv-00826-WCB) Answering Brief in Opposition,, by IOENGINE LLC. (Ormerod, Eve) (Entered: 03/22/2022) |
| 03/22/2022 | 383 | REDACTED VERSION of (418 in 1:18-cv-00452-WCB, 374 in 1:18-cv-00826-WCB) Declaration, by IOENGINE LLC. (Attachments: # 1 Exhibit Vol 1 - 1-3, # 2 Exhibit Vol 2 - 4-15, # 3 Exhibit Vol 3 - 16-19, # 4 Exhibit Vol 4 - Ex 20-29, # 5 Exhibit Vol 5 - 30-45, # 6 Exhibit Vol 6 - 46-49)(Ormerod, Eve) (Entered: 03/22/2022) |
| 03/22/2022 | 384 | REDACTED VERSION of (371 in 1:18-cv-00826-WCB) Answering Brief in Opposition, (415 in 1:18-cv-00452-WCB) Answering Brief in Opposition, by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 03/22/2022) |
| 03/22/2022 | 385 | REDACTED VERSION of (417 in 1:18-cv-00452-WCB, 373 in 1:18-cv-00826-WCB) Declaration, by PayPal Holdings, Inc.. (Attachments: # 1 Exhibits A-KK)(Egan, Brian) (Entered: 03/22/2022) |
| 03/25/2022 | 386 | REDACTED VERSION of (380 in 1:18-cv-00826-WCB) Reply Brief,, (424 in 1:18-cv-00452-WCB) Reply Brief,, by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 03/25/2022) |
| 03/25/2022 | 387 | REDACTED VERSION of (381 in 1:18-cv-00826-WCB, 425 in 1:18-cv-00452-WCB) Declaration by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 03/25/2022) |
| 03/25/2022 | 388 | REDACTED VERSION of (378 in 1:18-cv-00826-WCB) Reply Brief, (422 in 1:18-cv-00452-WCB) Reply Brief by IOENGINE LLC. (Ormerod, Eve) (Entered: 03/25/2022) |
| 03/25/2022 | 389 | REDACTED VERSION of (423 in 1:18-cv-00452-WCB) Declaration, (379 in 1:18-cv-00826-WCB) Declaration by IOENGINE LLC. (Attachments: # 1 Exhibit 50-58) (Ormerod, Eve) (Entered: 03/25/2022) |
| 03/28/2022 | 390 | ORAL ORDER: The evidentiary hearing on the motion for spoliation sanctions scheduled for Wednesday, April 6, 2022, at 9:30am, will now take place in Courtroom 2A of the J. Caleb Boggs Federal Building and Courthouse. PayPal and Ingenico should arrange for and cover the cost of court reporting services for the hearing. ORDERED by Judge William C. Bryson on 3/28/2022. (cna, ) (Entered: 03/28/2022) |
| 03/30/2022 | 391 | [SEALED] STATEMENT *IOENGINE's Witness List, Additional Exhibits List, and Additional Deposition Designations for the April 6 Evidentiary Hearing on PayPal's Motion for Spoliation Sanctions* by IOENGINE LLC. (Attachments: # 1 Exhibit HH-KK) (Ormerod, Eve) (Entered: 03/30/2022) |
| 03/31/2022 | 392 | NOTICE OF SERVICE of IOENGINE, LLC's Amended Responses and Objections to Ingenico, Inc., Ingenico Corp., and Ingenico Group S.A.'s Third Set of Interrogatories filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 03/31/2022) |
| 03/31/2022 | | CASE NO LONGER REFERRED to Chief Magistrate Judge Thynge for the purpose of exploring ADR. Pursuant to the Court's Standing Order No. 2022-2, dated March 14, 2022, "[u]nless otherwise directed by the Court, Magistrate Judges will no longer engage |

**Appx18196**

| | | in alternative dispute resolution of patent and securities cases." *See also* 28 U.S.C. § 652(b). Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(DAT). (Entered: 03/31/2022) |
|---|---|---|
| 04/01/2022 | 393 | STATEMENT re (435 in 1:18-cv-00452-WCB) Statement, *IOENGINE, LLC's Objections to PayPal's Witness List, Additional Exhibits List, and Additional Deposition Designations for the April 6, 2022 Evidentiary Hearing on PayPal's Motion for Spoliation Sanctions* by IOENGINE LLC. (Ormerod, Eve) (Entered: 04/01/2022) |
| 04/06/2022 | 394 | Joint STIPULATION TO EXTEND TIME to file redactions to sealed Statements to April 8, 2022 - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 04/06/2022) |
| 04/07/2022 | 395 | STIPULATION AND ORDER to Extend Time to file redactions to sealed Statements to April 8, 2022. Signed by Judge William C. Bryson on 4/7/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (nmg) (Entered: 04/07/2022) |
| 04/07/2022 | 396 | ORAL ORDER: The pretrial conference will be held via teleconference on Monday, June 13, 2022, at 11:00am Eastern Time. The call-in information will be provided to counsel via email shortly before the conference. Plaintiff IOENGINE LLC should obtain court reporting services for the conference, with the cost to be shared equally among IOENGINE, PayPal, and Ingenico. Signed by Judge William C. Bryson on 4/7/22. (mal) (Entered: 04/07/2022) |
| 04/08/2022 | 397 | REDACTED VERSION of (436 in 1:18-cv-00452-WCB, 391 in 1:18-cv-00826-WCB) Statement, by IOENGINE LLC. (Attachments: # 1 Exhibit HH-KK)(Ormerod, Eve) (Entered: 04/08/2022) |
| 04/11/2022 | 398 | FIFTH REVISED SCHEDULING ORDER: This revised scheduling order modifies paragraphs 7 through 15 of the Fourth Revised Scheduling Order, Case No. 18-452, Dkt. No. 254 and Case No. 18-826, Dkt. No. 268. Signed by Judge William C. Bryson on 4/11/2022. Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB (nmg) (Entered: 04/11/2022) |
| 04/22/2022 | 399 | STATEMENT -- *Transcript from April 6, 2022 spoliation hearing before The Honorable William C. Bryson* -- by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 04/22/2022) |
| 05/03/2022 | 400 | [UNSEALED] MEMORANDUM OPINION AND ORDER. Signed by Judge William C. Bryson on 5/3/22.This order has been emailed to local counsel. (mal) Modified on 5/6/2022 (smg). (Entered: 05/03/2022) |
| 05/04/2022 | 401 | STIPULATION and [Proposed] Order Regarding Motions in Limine by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 05/04/2022) |
| 05/05/2022 | 402 | STIPULATION AND ORDER regarding Motions in Limine. Signed by Judge William C. Bryson on 5/5/2022. Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB (nmg) (Entered: 05/05/2022) |
| 05/06/2022 | | Remark: Parties have notified chambers that no redactions are necessary. Order at D.I. 452 in Ca No. 18-452 and D.I. 400 in Ca No. 18-826 is UNSEALED. Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB(smg) (Entered: 05/06/2022) |
| 05/09/2022 | 403 | STIPULATION TO EXTEND TIME for parties to serve and file respective Motions in Limine to May 10, 2022 - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 05/09/2022) |
| 05/10/2022 | 404 | MOTION Combined Motions in Limine - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Text of Proposed Order)(Cottrell, Frederick) (Entered: 05/10/2022) |

**Appx18197**

| 05/10/2022 | 405 | [SEALED] OPENING BRIEF in Support re 404 MOTION Combined Motions in Limine filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Answering Brief/Response due date per Local Rules is 5/24/2022. (Attachments: # 1 Exhibit 1-3)(Cottrell, Frederick) (Entered: 05/10/2022) |
|---|---|---|
| 05/10/2022 | 406 | MOTION in Limine *IOENGINE's Combined Motions in Limine 1-9* - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/10/2022) |
| 05/10/2022 | 407 | [SEALED] OPENING BRIEF in Support re 406 MOTION in Limine *IOENGINE's Combined Motions in Limine 1-9* filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 5/24/2022. (Ormerod, Eve) (Entered: 05/10/2022) |
| 05/10/2022 | 408 | [SEALED] DECLARATION re 407 Opening Brief in Support *Declaration of Derek J. Brader* by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Ormerod, Eve) (Entered: 05/10/2022) |
| 05/10/2022 | 409 | STIPULATION AND ORDER, on STIPULATION TO EXTEND TIME for parties to serve and file respective Motions in Limine to May 10, 2022. Signed by Judge William C. Bryson on 05/10/2022. Associated Cases: DI 403 in 1:18-cv-00826-WCB, DI 455 in 1:18-cv-00452-WCB(smg) (Entered: 05/10/2022) |
| 05/13/2022 | 410 | Joint STIPULATION and [Proposed] Order regarding Reply Briefs for Motions in Limine by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/13/2022) |
| 05/13/2022 | 411 | STIPULATION AND ORDER Regarding Reply Briefs for Motions In Limine. Parties may file their respective Reply Briefs in Further Support of their Motions In Limine with the Court by 10:00 p.m. ET on May 19, 2022. Signed by Judge William C. Bryson on 05/13/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 05/13/2022) |
| 05/16/2022 | 412 | [SEALED] ANSWERING BRIEF in Opposition re 406 MOTION in Limine *IOENGINE's Combined Motions in Limine 1-9* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Reply Brief due date per Local Rules is 5/23/2022. (Attachments: # 1 Exhibit 1-9, # 2 Exhibit 10-11)(Cottrell, Frederick) (Entered: 05/16/2022) |
| 05/16/2022 | 413 | [SEALED] ANSWERING BRIEF in Opposition re 404 MOTION Combined Motions in Limine filed by IOENGINE LLC.Reply Brief due date per Local Rules is 5/23/2022. (Ormerod, Eve) (Entered: 05/16/2022) |
| 05/16/2022 | 414 | [SEALED] DECLARATION re 413 Answering Brief in Opposition *Declaration of Gregory T. Chuebon* by IOENGINE LLC. (Attachments: # 1 Exhibit 1-9)(Ormerod, Eve) (Entered: 05/16/2022) |
| 05/17/2022 | 415 | REDACTED VERSION of 407 Opening Brief in Support by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/17/2022) |
| 05/17/2022 | 416 | REDACTED VERSION of 408 Declaration by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Ormerod, Eve) (Entered: 05/17/2022) |
| 05/17/2022 | 417 | REDACTED VERSION of 405 Opening Brief in Support, *of its Combined Motions in Limine* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1-3)(Haynes, Christine) (Entered: 05/17/2022) |
| 05/19/2022 | 418 | [SEALED] REPLY BRIEF re 406 MOTION in Limine *IOENGINE's Combined Motions in Limine 1-9* filed by IOENGINE LLC. (Belgam, Neal) (Entered: 05/19/2022) |
| 05/19/2022 | 419 | DECLARATION re 418 Reply Brief *Declaration of Gregory T. Chuebon* by IOENGINE LLC. (Attachments: # 1 Exhibit A-B)(Belgam, Neal) (Entered: 05/19/2022) |

Appx18198

| 05/19/2022 | 420 | [SEALED] REPLY BRIEF re 404 MOTION Combined Motions in Limine filed by Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1)(Cottrell, Frederick) (Entered: 05/19/2022) |
|---|---|---|
| 05/20/2022 | 421 | OPENING BRIEF in Support *IOENGINE, LLC's Brief Regarding the Seventh Amendment Right to Trial by Jury on 35 U.S.C. § 101 Determinations* filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 6/3/2022. (Belgam, Neal) (Entered: 05/20/2022) |
| 05/20/2022 | 422 | DECLARATION *Declaration of Michael H. Joshi* by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6) (Belgam, Neal) (Entered: 05/20/2022) |
| 05/20/2022 | 423 | Supplemental OPENING BRIEF in Support re 358 MOTION for Summary Judgment *that the Asserted Claims are Invalid Under Section 101* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Answering Brief/Response due date per Local Rules is 6/3/2022. (Egan, Brian) (Entered: 05/20/2022) |
| 05/23/2022 | 424 | REDACTED VERSION of 413 Answering Brief in Opposition by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/23/2022) |
| 05/23/2022 | 425 | REDACTED VERSION of 414 Declaration by IOENGINE LLC. (Attachments: # 1 Exhibit 1-9)(Ormerod, Eve) (Entered: 05/23/2022) |
| 05/23/2022 | 426 | REDACTED VERSION of 412 Answering Brief in Opposition, by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1-9, # 2 Exhibit 10-11) (Haynes, Christine) (Entered: 05/23/2022) |
| 05/26/2022 | 427 | REDACTED VERSION of 420 Reply Brief *re Combined Motions in Limine* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1)(Haynes, Christine) (Entered: 05/26/2022) |
| 05/26/2022 | 428 | REDACTED VERSION of 418 Reply Brief by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/26/2022) |
| 05/27/2022 | 429 | Proposed Pretrial Order by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2D, # 3 Exhibit 3P, # 4 Exhibit 3D, # 5 Exhibit 4P, # 6 Exhibit 4D, # 7 Exhibit 5P, # 8 Exhibit 5D, # 9 Exhibit 6P, # 10 Exhibit 6D)(Ormerod, Eve) (Entered: 05/27/2022) |
| 05/27/2022 | 430 | [SEALED] EXHIBIT re 429 Proposed Pretrial Order, *Exhibits 2P, 7, 8P, 8D* by IOENGINE LLC. (Ormerod, Eve) (Entered: 05/27/2022) |
| 05/31/2022 | 431 | NOTICE of Subpoena to Western Digital Corporation by IOENGINE LLC (Attachments: # 1 Exhibit 1)(Ormerod, Eve) (Entered: 05/31/2022) |
| 06/02/2022 | 433 | STATEMENT -- *PayPal and Ingenico's Supplemental Brief Regarding the Privity and Real-Party-In-Interest Analysis* -- by PayPal Holdings, Inc.. (Egan, Brian) (Entered: 06/02/2022) |
| 06/03/2022 | | CORRECTING ENTRY: D.I. 432 Deleted per counsel's request, to be refiled. (srs) (Entered: 06/03/2022) |
| 06/03/2022 | 434 | [SEALED] SUR-REPLY BRIEF re 352 MOTION for Partial Summary Judgment of No Invalidity and to Exclude the Testimony of Barry Sussman and James T. Geier *IOENGINE, LLC's Supplemental Brief Regarding Real Party in Interest and Privity for Purposes of IPR Estoppel* filed by IOENGINE LLC. (Attachments: # 1 Certificate of Service)(Belgam, Neal) (Entered: 06/03/2022) |

| 06/03/2022 | 435 | NOTICE OF SERVICE of IOENGINE, LLC's First Set of Requests for Admission of Authenticity to Ingenico Inc., Ingenico Corp. And Ingenico Group S.A. filed by IOENGINE LLC.(Belgam, Neal) (Entered: 06/03/2022) |
|---|---|---|
| 06/03/2022 | 436 | Amended EXHIBIT re 429 Proposed Pretrial Order, by IOENGINE LLC. (Attachments: # 1 Exhibit 6D)(Belgam, Neal) (Entered: 06/03/2022) |
| 06/03/2022 | 437 | REDACTED VERSION of 430 Exhibit to a Document by IOENGINE LLC. (Belgam, Neal) (Entered: 06/03/2022) |
| 06/07/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Telephonic hearing held on 6/7/2022. Counsel for all parties appeared. Court reporter present. The Court heard argument on the parties' outstanding motions for summary judgment and Daubert motions. (Total Time in Court: 3 hours, 20 minutes) (Court reporter Brian Gaffigan).Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 06/07/2022) |
| 06/10/2022 | 438 | Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. regarding IOENGINE's agenda items for pretrial conference. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/10/2022 | 439 | REDACTED VERSION of (434 in 1:18-cv-00826-WCB) Sur-Reply Brief, (496 in 1:18-cv-00452-WCB) Sur-Reply Brief, by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/10/2022 | 440 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding agenda items for pretrial conference. (Cottrell, Frederick) (Entered: 06/10/2022) |
| 06/10/2022 | 441 | Proposed Voir Dire by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/10/2022 | 442 | VERDICT SHEET by IOENGINE LLC *Ingenico's Proposed Verdict Form*. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/10/2022 | 443 | VERDICT SHEET by IOENGINE LLC *IOENGINE's Proposed Verdict Form*. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/10/2022 | 444 | Proposed Jury Instructions by IOENGINE LLC *Proposed Preliminary Jury Instructions*. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/10/2022 | 445 | Proposed Jury Instructions by IOENGINE LLC *Proposed Final Jury Instructions*. (Ormerod, Eve) (Entered: 06/10/2022) |
| 06/13/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Telephonic Pretrial Conference held on 6/13/2022. Counsel for all parties appeared. Court reporter present. Total Time in Court: 2 hours and 21 minutes. Court Reporter Brian Gaffigan (302-376-1322). Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (srs) (Entered: 06/13/2022) |
| 06/13/2022 | 446 | MOTION in Limine *IOENGINE, LLC's Motion in Limine to Preclude Reliance on the Western Digital Business Record Certification* - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/13/2022) |
| 06/13/2022 | 447 | [SEALED] OPENING BRIEF in Support re 446 MOTION in Limine *IOENGINE, LLC's Motion in Limine to Preclude Reliance on the Western Digital Business Record Certification* filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 6/27/2022. (Ormerod, Eve) (Entered: 06/13/2022) |
| 06/13/2022 | 448 | [SEALED] DECLARATION re (447 in 1:18-cv-00826-WCB) Opening Brief in Support, (507 in 1:18-cv-00452-WCB) Opening Brief in Support, *Declaration of Derek J. Brader* |

**Appx18200**

| | | |
|---|---|---|
| | | by IOENGINE LLC. (Attachments: # 1 Exhibit 1-5)(Ormerod, Eve) (Entered: 06/13/2022) |
| 06/15/2022 | 449 | MEMORANDUM OPINION AND ORDER. Signed by Judge William C. Bryson on 6/15/2022. This order has been emailed to local counsel. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (nmg) Unsealed on 6/27/2022 per Judge Bryson (nmg). (Entered: 06/15/2022) |
| 06/15/2022 | 450 | [SEALED] MEMORANDUM OPINION AND ORDER. Signed by Judge William C. Bryson on 6/15/2022. This order has been emailed to local counsel. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB (nmg) (Entered: 06/15/2022) |
| 06/16/2022 | 451 | [SEALED] RESPONSE to Motion re 446 MOTION in Limine *IOENGINE, LLC's Motion in Limine to Preclude Reliance on the Western Digital Business Record Certification* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1-6)(Haynes, Christine) (Entered: 06/16/2022) |
| 06/16/2022 | 452 | NOTICE of Lodging by Ingenico Corp., Ingenico Group S.A., Ingenico Inc. (Haynes, Christine) (Entered: 06/16/2022) |
| 06/17/2022 | 453 | Official Transcript of Telephonic Oral Argument held on 06/07/2022 before Judge William C. Bryson. Court Reporter/Transcriber Brian P. Gaffigan. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 7/8/2022. Redacted Transcript Deadline set for 7/18/2022. Release of Transcript Restriction set for 9/15/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 06/17/2022) |
| 06/17/2022 | 454 | Official Transcript of Telephonic Pretrial Conference held on 06/13/2022 before Judge William C. Bryson. Court Reporter/Transcriber Brian P. Gaffigan. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 7/8/2022. Redacted Transcript Deadline set for 7/18/2022. Release of Transcript Restriction set for 9/15/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 06/17/2022) |
| 06/17/2022 | 455 | MOTION Regarding Applicability of AIA to Patents-in-Suit - filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1-6, # 2 Exhibit 9-10) (Cottrell, Frederick) (Entered: 06/17/2022) |
| 06/17/2022 | 456 | [SEALED] EXHIBIT re 455 MOTION Regarding Applicability of AIA to Patents-in-Suit *(Exhs. 7-8)* by Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/17/2022) |
| 06/17/2022 | 457 | [SEALED] REPLY BRIEF re 446 MOTION in Limine *IOENGINE, LLC's Motion in Limine to Preclude Reliance on the Western Digital Business Record Certification* filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/17/2022) |
| 06/21/2022 | 458 | [SEALED] Letter to The Honorable William C. Bryson from Neal C. Belgam, Esq. regarding Letter Responding to Court's June 17, 2022 Email on Daubert Ruling. (Belgam, Neal) (Entered: 06/21/2022) |
| 06/21/2022 | 459 | Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. regarding Redactions Deadline for Memorandum Opinions and Orders. (Ormerod, Eve) (Entered: 06/21/2022) |

**Appx18201**

| | | |
|---|---|---|
| 06/21/2022 | 460 | REDACTED VERSION of (447 in 1:18-cv-00826-WCB) Opening Brief in Support, (507 in 1:18-cv-00452-WCB) Opening Brief in Support, by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/21/2022) |
| 06/21/2022 | 461 | REDACTED VERSION of (448 in 1:18-cv-00826-WCB, 508 in 1:18-cv-00452-WCB) Declaration by IOENGINE LLC. (Attachments: # 1 Exhibit 1-5)(Ormerod, Eve) (Entered: 06/21/2022) |
| 06/22/2022 | 462 | ORAL ORDER: The deadline for the parties to submit proposed redactions to the June 15, 2022, orders of the court (Dkt Nos. 511, 513 in 18-452; Dkt. Nos. 449, 450 in 18-826) is extended to Friday, June 24, 2022. Ordered by Judge William C. Bryson on 06/22/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 06/22/2022) |
| 06/22/2022 | 463 | MEMORANDUM OPINION AND ORDER granting in part and denying in part (506) Motion in Limine in case 1:18-cv-00452-WCB; granting in part and denying in part (446) Motion in Limine in case 1:18-cv-00826-WCB. Signed by Judge William C. Bryson on 06/22/2022. Associated Cases: 1:18-cv-00452-WCB, 1:18-cv-00826-WCB(smg) (Entered: 06/22/2022) |
| 06/22/2022 | 464 | [SEALED] Letter to The Honorable William C. Bryson from Brian P. Egan regarding Response to IOENGINE's Letter Regarding the Court's June 17, 2022 Email on Daubert Ruling - re (519 in 1:18-cv-00452-WCB, 458 in 1:18-cv-00826-WCB) Letter. (Egan, Brian) (Entered: 06/22/2022) |
| 06/23/2022 | 465 | Letter to The Honorable William C. Bryson from Frederick L. Cottrell, III regarding upcoming trial. (Cottrell, Frederick) (Entered: 06/23/2022) |
| 06/23/2022 | 466 | Letter to The Honorable William C. Bryson from Neal C. Belgam, Esq. regarding Responsive Letter regarding upcoming trials - re (465 in 1:18-cv-00826-WCB, 526 in 1:18-cv-00452-WCB) Letter. (Ormerod, Eve) (Entered: 06/23/2022) |
| 06/23/2022 | 467 | ORDER, The Ingenico trial (18-cv-1826), to begin on July 11, 2022, will be limited to issues of liability, including willfulness. The PayPal trial (18-cv-452), set to begin on July 25, 2022, is canceled. IOENGINE should serve its addendum opinions on PayPal and Ingenico by June 30, 2022, at 5:00pm Eastern Time. If IOENGINE's addendum opinions are challenged in a Daubert motion and subsequently excluded, IOENGINE will not be granted another opportunity to supplement its damages opinions. (See Order for further details) Signed by Judge William C. Bryson on 06/23/2022. Associated Cases: 1:18-cv-00826-WCB, 1:18-cv-00452-WCB(smg) (Entered: 06/23/2022) |
| 06/23/2022 | 468 | MOTION IOENGINE, LLC's Supplemental Brief Regarding Use of Deposition Testimony of PayPal Holdings, Inc. Witnesses - filed by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Ormerod, Eve) (Entered: 06/23/2022) |
| 06/24/2022 | 469 | REDACTED VERSION of (457 in 1:18-cv-00826-WCB) Reply Brief, (518 in 1:18-cv-00452-WCB) Reply Brief by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/24/2022) |
| 06/24/2022 | 470 | STATEMENT *Ingenico's Submission of Facts Relevant to 35 U.S.C. 101* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 1-5, # 2 Exhibit 7) (Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/24/2022 | 471 | [SEALED] EXHIBIT re 470 Statement *Exhibit 6* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # 1 Exhibit 6)(Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/24/2022 | 472 | EXHIBIT re 470 Statement *Volume 2 - Exhibits 8-13* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/24/2022) |

**Appx18202**

| 06/24/2022 | [473](#) | EXHIBIT re [470](#) Statement *Volume 3 - Exhibits 14-18* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/24/2022 | [474](#) | EXHIBIT re [470](#) Statement *Volume 4 - Exhibits 19-20* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/24/2022 | [475](#) | EXHIBIT re [470](#) Statement *Volume 5 - Exhibits 21-27* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/24/2022 | [476](#) | EXHIBIT re [470](#) Statement *Volume 6 - Exhibits 28-33* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/24/2022 | [477](#) | EXHIBIT re [470](#) Statement *Volume 7 - Exhibits 34-37* by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Cottrell, Frederick) (Entered: 06/24/2022) |
| 06/27/2022 | [478](#) | REDACTED VERSION of (450 in 1:18-cv-00826-WCB, 513 in 1:18-cv-00452-WCB) Memorandum and Order. (nmg) (Entered: 06/27/2022) |
| 06/28/2022 | [479](#) | ORDER, There are a few outstanding issues that should be resolved, to the extent possible, in advance of the trial on liability. Accordingly, the parties are directed to file a joint status report by Friday, July 1, 2022, at 5:00pm Eastern Time, that addresses the items listed. (See Order for further details). Signed by Judge William C. Bryson on 06/28/2022. (smg) (Entered: 06/28/2022) |
| 06/28/2022 | [480](#) | Official Transcript of Telephone Conference held on June 22, 2022 before Judge The Honorable William C. Bryson. Court Reporter/Transcriber Brian P. Gaffigan,Email: gaffigan@verizon.net. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 7/19/2022. Redacted Transcript Deadline set for 7/29/2022. Release of Transcript Restriction set for 9/26/2022. (srs) (Entered: 06/28/2022) |
| 06/28/2022 | [481](#) | REDACTED VERSION of (519 in 1:18-cv-00452-WCB, 458 in 1:18-cv-00826-WCB) Letter *Responding To Courts June 17, 2022 Email On Daubert Ruling* by IOENGINE LLC. (Ormerod, Eve) (Entered: 06/28/2022) |
| 06/30/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Telephonic hearing held on 6/22/2022. Counsel for all parties appeared. Court reporter present. The Court discussed IOENGINEs proposals for supplementing its expert opinions and the potential impact of that supplementation on the trial schedules in these cases. (Total Time in Court: 1 hour, 15 minutes) (Court reporter Brian Gaffigan). (apk) (Entered: 06/30/2022) |
| 06/30/2022 | [482](#) | RESPONSE to Motion re [468](#) MOTION IOENGINE, LLC's Supplemental Brief Regarding Use of Deposition Testimony of PayPal Holdings, Inc. Witnesses *(Ingenico's Supplemental Brief for Excluding Use at Trial of Deposition Testimony of PayPal Witnesses)* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Attachments: # [1](#) Exhibit 1-2)(Cottrell, Frederick) (Entered: 06/30/2022) |
| 06/30/2022 | [483](#) | REDACTED VERSION of (525 in 1:18-cv-00452-WCB, 464 in 1:18-cv-00826-WCB) Letter, by PayPal Holdings, Inc., Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Egan, Brian) (Entered: 06/30/2022) |
| 07/01/2022 | [484](#) | NOTICE OF SERVICE of 1) the Supplemental Expert Report of Dr. Aviel D. Rubin, Ph.D.; 2) the Supplemental Expert Report of Jeffrey A. Stec, Ph.D.; 3) the Expert Reports of Wayne Hoeberlein from Imation and IMC cases; and 4) Documents cited by Wayne Hoeberlein Reports from Imation and IMC cases filed by IOENGINE LLC.(Ormerod, Eve) (Entered: 07/01/2022) |

**Appx18203**

| 07/01/2022 | 485 | [SEALED] RESPONSE to Motion re 455 MOTION Regarding Applicability of AIA to Patents-in-Suit filed by IOENGINE LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Ormerod, Eve) (Entered: 07/01/2022) |
|---|---|---|
| 07/01/2022 | 486 | [SEALED] Joint STATUS REPORT *Regarding Outstanding Pretrial Issues* by IOENGINE LLC. (Ormerod, Eve) (Entered: 07/01/2022) |
| 07/05/2022 | 487 | OMNIBUS PRETRIAL ORDER, On June 13, 2022, the court held a telephonic pretrial conference with the parties in this case. This order addresses several issues that were raised during the conference as well as other issues relating to the conduct of the trial on liability. Ingenicos motion in limine barring the admission of the depositions of PayPal witnesses in the PayPal action on hearsay grounds is therefore GRANTED. (PLEASE SEE ORDER FOR FURTHER DETAILS). Signed by Judge William C. Bryson on 7/5/2022. (apk) (Entered: 07/05/2022) |
| 07/05/2022 | 488 | NOTICE OF SERVICE of Ingenico Inc., Ingenico Corp. and Ingenico Group S.A.'s Response to IOENGINE, LLC's Requests for Admission of Authenticity filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..(Haynes, Christine) (Entered: 07/05/2022) |
| 07/07/2022 | 489 | Letter to The Honorable William C. Bryson from Eve H. Ormerod regarding potential use at trial of DX207. (Ormerod, Eve) (Entered: 07/07/2022) |
| 07/07/2022 | 490 | ORDER on Admissibility of Trial Exhibits. Signed by Judge William C. Bryson on 07/07/2022. (smg) (Entered: 07/07/2022) |
| 07/07/2022 | 491 | PRELIMINARY Jury Instructions. (smg) (Entered: 07/07/2022) |
| 07/08/2022 | 492 | ORAL ORDER: The parties have notified the court of a dispute regarding PX547, one of IOENGINE's proposed trial exhibits. PX547 will be treated as admissible so long as the word "application" is redacted from the exhibit. Assuming there is no further elaboration on that exhibit suggesting that it indicates that the MediKey device performed any particular function, see Dkt. No. 400 at 17, the introduction of PX547 will not have the effect of opening the door to evidence regarding the disappearance of the MediKey prototype. In light of IOENGINE's representation that the document will be authenticated by Mr. McNulty, PX547 will be deemed admissible over an authentication objection as long as Mr. McNulty is able to authenticate it satisfactorily. Any concerns on Ingenico's part regarding the exhibit's authenticity can be raised on cross-examination. Signed by Judge William C. Bryson on 07/08/2022. (dds) (Entered: 07/08/2022) |
| 07/08/2022 | 493 | VOIR DIRE Questionnaire. (smg) (Entered: 07/08/2022) |
| 07/08/2022 | 494 | REDACTED VERSION of 485 Response to Motion, by IOENGINE LLC. (Attachments: # 1 Exhibit Exhibits 1-11)(Ormerod, Eve) (Entered: 07/08/2022) |
| 07/08/2022 | 495 | REDACTED VERSION of 486 Status Report by IOENGINE LLC. (Ormerod, Eve) (Entered: 07/08/2022) |
| 07/11/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Jury Trial held on 7/11/2022. (Total Time in Court: 7 hours) (Court Reporter Brian Gaffigan) (DAY 1). (dds) (Entered: 07/14/2022) |
| 07/12/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Jury Trial held on 7/12/2022. (Total Time in Court: 7 hours, 45 minutes) (Court Reporter Brian Gaffigan) (DAY 2). (dds) (Entered: 07/14/2022) |
| 07/13/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Jury Trial held on 7/13/2022. (Total Time in Court: 6 hours, 15 minutes) (Court Reporter Brian Gaffigan) |

**Appx18204**

| | | (DAY 3). (dds) (Entered: 07/14/2022) |
|---|---|---|
| 07/14/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Jury Trial held on 7/14/2022. (Total Time in Court: 6 hours, 35 minutes) (Court Reporter Brian Gaffigan) (DAY 4). (dds) (Entered: 07/14/2022) |
| 07/15/2022 | 496 | VERDICT FORM. (dds) (Entered: 07/15/2022) |
| 07/15/2022 | 497 | COURT'S FINAL JURY INSTRUCTIONS. (dds) (Entered: 07/15/2022) |
| 07/15/2022 | 498 | STATEMENT *to Proffer the Deposition Testimony of Eval Sobol as Trial Evidence* by IOENGINE LLC. (Attachments: # 1 Exhibit A)(Ormerod, Eve) (Entered: 07/15/2022) |
| 07/15/2022 | 499 | [SEALED] JURY VERDICT. (smg) (Entered: 07/18/2022) |
| 07/15/2022 | 500 | [REDACTED] JURY VERDICT. (smg) (Entered: 07/18/2022) |
| 07/15/2022 | 501 | [SEALED] Jury Notes. (smg) (Entered: 07/18/2022) |
| 07/15/2022 | 502 | JOINT Exhibit and Witness List (local version).(smg) (Entered: 07/18/2022) |
| 07/15/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Jury Trial completed on 7/15/2022. (Total Time in Court: 3 hours, 45 minutes) (Court Reporter Brian Gaffigan) (DAY 5). (dds) (Entered: 07/18/2022) |
| 07/20/2022 | 503 | Joint Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. and Christine D. Haynes, Esq. regarding Post-Trial Submissions. (Attachments: # 1 Exhibit A - Proposed Form of Judgment)(Ormerod, Eve) (Entered: 07/20/2022) |
| 07/21/2022 | 504 | ORDER, Because the jurys verdict disposes of all justiciable claims, and the issue of inequitable conduct relates only to Ingenicos affirmative defense of unenforceability, the issue of inequitable conduct should not be briefed in the parties post-trial submissions. If adjudication of that issue becomes necessary in light of my rulings on the post-trial motions or a ruling from the Federal Circuit, I will set a schedule for proceeding on the issue of inequitable conduct at that time.In the parties letter, IOENGINE indicated that it did not have an opportunity to review the proposed form of judgment offered by Ingenico. Id. at 2. The parties are directed to meet and confer on the proposed form of judgment. The court will await the results of the parties meet and confer before entering judgment on the verdict. Signed by Judge William C. Bryson on 7/21/2022. (apk) (Entered: 07/21/2022) |
| 07/22/2022 | 505 | Letter to The Honorable William C. Bryson from Eve H. Ormerod, Esq. regarding Enclosed Final Form of Judgment. (Attachments: # 1 Exhibit [FINAL] proposed form of judgment)(Ormerod, Eve) (Entered: 07/22/2022) |
| 07/25/2022 | 506 | JUDGMENT. Signed by Judge William C. Bryson on 7/25/2022. (apk) (Entered: 07/25/2022) |
| 07/28/2022 | 507 | [SEALED] Official Transcript of Jury Trial - Volume A held on 07.11.2022 before Judge William C. Bryson. Court Reporter/Transcriber Brian Gaffigan,Email: gaffigan.b@outlook.com. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 8/18/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/26/2022. (Rolfe, Michele) Modified on 8/26/2022 (srs). (Entered: 07/28/2022) |
| 07/28/2022 | 508 | [SEALED] Official Transcript of Jury Trial - Volume B held on 07.12.2022 before Judge William Bryson. Court Reporter/Transcriber Brian Gaffigan,Email: gaffigan.b@outlook.com. Transcript may be viewed at the court public terminal or |

**Appx18205**

| | | |
|---|---|---|
| | | order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 8/18/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/26/2022. (Rolfe, Michele) Modified on 8/26/2022 (srs). (Entered: 07/28/2022) |
| 07/28/2022 | 509 | [SEALED] Official Transcript of Jury Trial - Volume C held on 07.13.2022 before Judge W. Bryson. Court Reporter/Transcriber Brian Gaffigan,Email: gaffigan.b@outlook.com. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 8/18/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/26/2022. (Rolfe, Michele) Modified on 8/26/2022 (srs). (Entered: 07/28/2022) |
| 07/28/2022 | 510 | [SEALED] Official Transcript of Jury Trial - Volume D held on 07.14.2022 before Judge W. Bryson. Court Reporter/Transcriber Brian Gaffigan,Email: gaffigan.b@outlook.com. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 8/18/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/26/2022. (Rolfe, Michele) Modified on 8/26/2022 (srs). (Entered: 07/28/2022) |
| 07/28/2022 | 511 | [SEALED] Official Transcript of Jury Trial - Volume E held on 07.15.2022 before Judge W. Bryson. Court Reporter/Transcriber Brian Gaffigan,Email: gaffigan.b@outlook.com. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 8/18/2022. Redacted Transcript Deadline set for 8/29/2022. Release of Transcript Restriction set for 10/26/2022. (Rolfe, Michele) Modified on 8/26/2022 (srs). (Entered: 07/28/2022) |
| 07/29/2022 | | Remark: D.I. 512 previously deleted per counsels request. (apk) (Entered: 07/29/2022) |
| 08/17/2022 | 512 | MOTION for Judgment as a Matter of Law *or in the Alternative for a New Trial* - filed by IOENGINE LLC. (Attachments: # 1 Text of Proposed Order)(Belgam, Neal) (Entered: 08/17/2022) |
| 08/17/2022 | 513 | [SEALED] OPENING BRIEF in Support re 512 MOTION for Judgment as a Matter of Law *or in the Alternative for a New Trial* filed by IOENGINE LLC.Answering Brief/Response due date per Local Rules is 8/31/2022. (Attachments: # 1 Exhibit with Certificate of Service)(Belgam, Neal) (Entered: 08/17/2022) |
| 08/18/2022 | 514 | Joint STIPULATION TO EXTEND TIME (various deadlines - see Stipulation for details) to (various deadlines - see Stipulation for details) - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 08/18/2022) |
| 08/18/2022 | 515 | STIPULATION AND ORDER to Extend Time to Submit Proposed Redactions to the Trial Transcripts to the Court. Redaction Request due 8/25/2022. Redacted Transcript Deadline set for 9/7/2022. Signed by Judge William C. Bryson on 8/18/2022. (srs) Modified on 8/18/2022 (srs). (Entered: 08/18/2022) |
| 08/24/2022 | 516 | REDACTED VERSION of 513 Opening Brief in Support, *MOTION for Judgment as a Matter of Law or in the Alternative for a New Trial* by IOENGINE LLC. (Attachments: # 1 Exhibit)(Ormerod, Eve) (Entered: 08/24/2022) |
| 08/25/2022 | 517 | [SEALED] Joint MOTION to Redact 509 Transcript,, 508 Transcript,, 511 Transcript,, 510 Transcript,, 507 Transcript,, *and to Seal the Unredacted Transcripts.* - filed by IOENGINE LLC. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Exhibit |

**Appx18206**

| | | Exhibit A w/Certificate of Service, # 3 Exhibit Exhibit B w/Certificate of Service) (Ormerod, Eve) (Entered: 08/25/2022) |
|---|---|---|
| 08/26/2022 | 518 | ORDER granting 517 Motion to Redact. The trial transcript excerpts proposed for redaction in Exhibit A to the Motion shall be redacted. The unredacted transcripts in Exhibit B shall be sealed. (See Order for Further Details) Signed by Judge William C. Bryson on 8/26/2022. (srs) (Entered: 08/26/2022) |
| 09/01/2022 | 519 | REDACTED VERSION of 517 Joint MOTION to Redact 509 Transcript,, 508 Transcript,, 511 Transcript,, 510 Transcript,, 507 Transcript,, *and to Seal the Unredacted Transcripts.* by IOENGINE LLC. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B [redacted in its entirety])(Ormerod, Eve) (Entered: 09/01/2022) |
| 09/14/2022 | 520 | [SEALED] ANSWERING BRIEF in Opposition re 512 MOTION for Judgment as a Matter of Law *or in the Alternative for a New Trial* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Reply Brief due date per Local Rules is 9/21/2022. (Haynes, Christine) (Entered: 09/14/2022) |
| 09/16/2022 | 521 | STIPULATION TO EXTEND TIME for submission of IOENGINE, LLCs Reply Brief in Further Support of its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, from October 5, 2022 to October 7, 2022 - filed by IOENGINE LLC. (Ormerod, Eve) (Entered: 09/16/2022) |
| 09/16/2022 | 522 | STIPULATION AND ORDER. Signed by Judge William C. Bryson on 9/16/2022. (apk) (Entered: 09/16/2022) |
| 09/16/2022 | 523 | [SEALED] Amended ANSWERING BRIEF in Opposition re 512 MOTION for Judgment as a Matter of Law *or in the Alternative for a New Trial* filed by Ingenico Corp., Ingenico Group S.A., Ingenico Inc..Reply Brief due date per Local Rules is 9/23/2022. (Cottrell, Frederick) (Entered: 09/16/2022) |
| 09/21/2022 | 524 | REDACTED VERSION of 523 Answering Brief in Opposition, by Ingenico Corp., Ingenico Group S.A., Ingenico Inc.. (Haynes, Christine) (Entered: 09/21/2022) |
| 10/04/2022 | 525 | Supplemental Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Banks and Acquirers International Holding S.A.S. for Ingenico Inc. filed by Ingenico Inc.. (Cottrell, Frederick) (Entered: 10/04/2022) |
| 10/07/2022 | 526 | [SEALED] REPLY BRIEF re 512 MOTION for Judgment as a Matter of Law *or in the Alternative for a New Trial* filed by IOENGINE LLC. (Attachments: # 1 Exhibit 1 with Certificate of Service)(Belgam, Neal) (Entered: 10/07/2022) |
| 10/14/2022 | 527 | REQUEST for Oral Argument by IOENGINE LLC. (Belgam, Neal) (Entered: 10/14/2022) |
| 10/14/2022 | 528 | REDACTED VERSION of 526 Reply Brief *in Support of IOENGINE's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial* by IOENGINE LLC. (Attachments: # 1 Exhibit 1 with Certificate of Service)(Belgam, Neal) (Entered: 10/14/2022) |
| 11/29/2022 | 529 | ORAL ORDER: The court will hold a telephonic oral argument on IOENGINE's 512 Motion for Judgment as a Matter of Law on December 5, 2022, at 9:30am Eastern Time. The dial-in information will be distributed to counsel via email. IOENGINE should arrange for court reporting services for the argument. Signed by Judge William C. Bryson on 11/29/2022. (dds) (Entered: 11/29/2022) |
| 11/30/2022 | 530 | ORAL ORDER: The telephonic argument on IOENGINE's 512 Motion for Judgment as a Matter of Law has been rescheduled to December 6, 2022, at 9:30am Eastern Time. The |

**Appx18207**

| | | dial-in information has been distributed to counsel via email. Signed by Judge William C. Bryson on 11/30/2022. (dds) (Entered: 11/30/2022) |
|---|---|---|
| 12/06/2022 | | Minute Entry for proceedings held before Judge William C. Bryson: Telephonic oral argument held on 12/6/2022. Counsel for both parties appeared. Court reporter present. The Court heard argument on IOENGINE's motion for judgment as a matter of law. (Total Time in Court: 1 hour, 20 minutes) (Court Reporter Deanna Warner). (dds) (Entered: 12/06/2022) |
| 12/09/2022 | 531 | [SEALED] MEMORANDUM OPINION AND ORDER denying 512 Motion for Judgment as a Matter of Law. Signed by Judge William C. Bryson on 12/9/2022.This order has been emailed to local counsel. (apk) (Entered: 12/09/2022) |
| 12/14/2022 | 532 | ORAL ORDER: The Clerk's Office is directed to unseal the Memorandum Opinion and Order at Dkt. No. 531 in its entirety. Signed by Judge William C. Bryson on 12/14/2022. (dds) (Entered: 12/14/2022) |
| 01/05/2023 | 533 | NOTICE OF APPEAL to the Federal Circuit of 449 Memorandum and Order, 531 Order on Motion for Judgment as a Matter of Law, 506 Judgment . Appeal filed by IOENGINE LLC. (Belgam, Neal) (Entered: 01/05/2023) |
| 01/05/2023 | | APPEAL - Credit Card Payment of $505.00 received re 533 Notice of Appeal (Federal Circuit) filed by IOENGINE LLC. ( Filing fee $505, receipt number ADEDC-4037614.) (Belgam, Neal) (Entered: 01/05/2023) |
| 01/06/2023 | | Notification regarding 533 Notice of Appeal (Federal Circuit) sent to Reporter Hawkins (mpb) (Entered: 01/06/2023) |
| 01/06/2023 | | Notification regarding 533 Notice of Appeal (Federal Circuit) sent to Reporter Triozzi (mpb) (Entered: 01/06/2023) |
| 01/06/2023 | | Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 533 Notice of Appeal. (mpb) (Entered: 01/06/2023) |
| 01/10/2023 | 534 | NOTICE of Docketing Record on Appeal from USCA for the Federal Circuit re 533 Notice of Appeal (Federal Circuit) filed by IOENGINE LLC. USCA Case Number 2023-1367 (mpb) (Entered: 01/11/2023) |
| 03/17/2023 | 535 | NOTICE of Withdrawal of Appearance of Delaware Counsel, Eve Ormerod by IOENGINE LLC (Ormerod, Eve) (Entered: 03/17/2023) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">06/26/2023 16:34:59</td></tr>
<tr><td>**PACER Login:**</td><td>SarahRattlsarah</td><td>**Client Code:**</td><td>399618-162632</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>1:18-cv-00826-WCB Start date: 1/1/1975 End date: 6/26/2023</td></tr>
<tr><td>**Billable Pages:**</td><td>30</td><td>**Cost:**</td><td>3.00</td></tr>
</table>

Appx18208